EVAN C. NELSON (SBN 172957)
LAW OFFICE OF EVAN C. NELSON
1990 N. CALIFORNIA BLVD., 8TH FLOOR
WALNUT CREEK, CA 94596
Telephone: (925) 323-1991
Email: evancnelson.law@gmail.com

*Attorneys for Plaintiff Peter Colombo*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PETER COLOMBO, | Case No. 5:24-cv-00909-NC |
| Plaintiff, | **DECLARATION OF EVAN C. NELSON AND EXHIBITS IN SUPPORT OF PLAINTIFF PETER COLOMBO'S OPPOSITION TO DEFENDANTS MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE, RULE 12(b)(6)** |
| v. | |
| PALO ALTO UNIFIED SCHOOL DISTRICT, et al., | |
| Defendants. | DATE:         SEPTEMBER 25, 2024 |
| | TIME:         11:00 AM |
| | LOCATION:  COURTROOM 4, 4th FLOOR |
| | 280 SOUTH 1ST STREET |
| | SAN JOSE, CA 95113 |
| | **HON. NATHANAEL M. COUSINS** |

I, EVAN C. NELSON declare as follows:

1.       I am an attorney licensed to practice law before all courts in the State of California.  I am a principal attorney with the Law Office of EVAN C. NELSON, attorney of record for Plaintiff, Peter Colombo ("Plaintiff" or "Colombo").  The following facts are based on my personal knowledge and review of and familiarity with this file, except as to those matters stated on information and belief.  If called as a witness, I could and would testify competently thereto.

2.      Attached as **Exhibit A** is a copy of an original of the Declaration of Peter Colombo prepared and submitted in support of Plaintiff's Motion for Partial Summary Judgment, which was previously filed.

3.      Attached as **Exhibit B** is a true and correct copy of a News Report obtained from the online website for the Paly Voice, which is offered simply to show that the criminal charges brought against Peter Colombo were dismissed for lack of substantiating evidence to support the allegation of a rape.

4.      Attached as **Exhibit C** is a true copy of a printout obtained from Defendant Palo Alto Unified School District's official website affirming that they retain archived records for prior students dating back into the early 1900s. If necessary, Plaintiff could request judicial notice and/or request for an admission from Defendants that document is what it purports to be.

5.      Attached as **Exhibit D** is a true copy of a redacted portion of California Commission on Teacher Credentialing's ("CTC") investigation report summarizing the investigating detective's report with regard to Defendants' admission that they should have been able to produce a copy of NT's grade report for 6th grade, but they had inexplicably either lost or deleted it. If necessary, Plaintiff could produce this portion of the detective's report, which is substantially similar to the CTC investigator's recitation. In an attempt to use only the minimal amount of material from the underlying criminal matter, I deemed it better to use a redacted portion of the CTC investigator's report.

6.      Attached as **Exhibit E** is a true copy of a portion of the PAUSD Employee File for Peter Colombo obtained directly from PAUSD via a request for our client's employment file.

7.      Attached as **Exhibit F** is a true copy an email obtained through a CPRA request to the Santa Clara County District Attorneys' Office that purports to be between Zoe Morgan, a junior staff writer for Palo Alto Weekly Online, and Deputy District Attorney Kelly Meeker requesting to confirm that Don Austin had located a copy of the lost or deleted student file, including NT's grade report for 6th grade, and provided it to the District Attorneys' Office, as he had apparently told Ms. Morgan he had. NT's grade report for 6th grade is the only missing document of interest to any of the parties involved in this matter. Numerous and repeated requests have been made for this potentially completely exonerating grade report, but the document has never been produced, presented or discussed other than by its inexplicable absence in any investigation or court proceeding relating to this matter.

8.      Attached as **Exhibit G** is a true copy of my extensive notes taken during the January 25,

2024 interview of my client by PAUSD's independent investigator, Nicole Miller, a female former sheriff. Defendants had demanded our client appear for a 3-hour interview, but the investigator only used 20 minutes stating that there was nothing of substance to evaluate and the evidence was not even close to establishing a factual finding of an actual assault or rape, as had been claimed. Because Defendant refused to allow a recording of the zoom interview, I was careful to take extensive notes of what I deemed to be material statements made during the course of the interview. I have reviewed these notes several times, including immediately after the interview concluded, and to the best of my recollection these notes reflect accurately the interview statements. Since Defendants have refused to provide a proper investigation report and are also obstructing attempts to obtain Ms. Miller's deposition, these notes are the best evidence available concerning the investigator's statements and factual findings, as expressed during the interview.

9.      Attached as **Exhibit H** is a true copy of a printout from CTC's official website showing the renewal of Peter Colombo's credential without limitation, following CTC's investigation of the unsubstantiated rape claim.

10.     Attached as **Exhibit I** is a true copy of a letter from Lisa Hickey to Peter Colombo dated 11.1.23 acknowledging completion of CTC's investigation in Colombo's favor, and which resulted in his credential being renewed without limitation.

11.     Attached as **Exhibit J** is a true copy of a letter from Lisa Hickey to Peter Colombo dated May 24, 2023 following dismissal of the criminal charges with prejudice in Colombo's favor, but notifying him PAUSD was still placing him on paid admin leave "pending an investigation." No information was provided regarding the scope, authority, due process protections, or time limitations of the investigation.

12.     Attached as **Exhibit K** is a true copy of Defendants' letter dated May 28, 2024, which finally closed the investigation that had been kept open more than a year after opening the investigation against Colombo and more than four months after the PAUSD investigator found there was no substance to the rape claim, similar to the conclusions previously reached by the District Attorney and then by CTC.

13.     Attached as **Exhibit L** is a true copy of my letter response to Defendants' one sentence summary of a year-long investigation, which provides the law showing Colombo is entitled to receive a complete report regarding all evidence reviewed by the investigator, factual findings discerned from that evidence, conclusions including analysis of law and regulations, and other information.

14.   Attached as **Exhibit M** is a true copy of California Code of Regulations, Title 2, section 11017.1, which clarifies that it is a violation of the Fair Employment and Housing Act ("FEHA") to discriminate against any person who has been arrested, without conviction, by considering such an arrest for any employment decision or adverse employment action.

15.   Attached as **Exhibit N** is a true copy of a portion of the Equal Employment Opportunity Commission ("EEOC") 2012 Guidance on Use of Criminal Records that similarly states it is a violation of Title VII under federal law, to not presume that an arrestee who was not convicted is innocent and/or to discriminate against a person by using the information of an arrest for any purpose other than to investigate into whether proven conduct leading to the arrest warrants employment action.

16.   Attached as **Exhibit O** are true copies of official letter head and signatures for Lisa Hickey and Amanda Bark, and a news article quoting Don Austin, which show that these Defendants were acting under color of state law as public school administrators at Palo Alto Unified School District ("PAUSD") at times relevant to the claims in this action. If required, judicial notice and/or requests for admissions could be readily requested as these matters should not be contested.

17.   Attached as **Exhibit P** is a true copy of PAUSD Board Agendas showing closed sessions for dates matching each significant date in the persecution of Colombo, including when the email with the false rape claim was received, when he was arrested, when he was released from ankle monitoring at the preliminary hearing, when the criminal charges were dismissed, and when he was placed on admin leave "pending an investigation." For each of those closed sessions, item number 8 is checked (the checked box online shows as a blank on printouts) for "Employee Discipline/Dismissal/Release/Leaves pursuant to Government Code §§54957(b)(1)."

18.   Attached as **Exhibit Q** is a true copy of the "Believe Women" resolution co-sponsored by Michele Dauber and by Shay Franco-Clausen, the spouse of the Palo Alto Police Detective who was assigned to investigate the case for the police.

19.   Attached as **Exhibit R** is a true copy of a News Report demonstrating that Ken Dauber, Michele Dauber's husband, was President of the PAUSD Board during a substantial period of time when actions were being taken with regard to Colombo and the false rape report.

20.   Attached as **Exhibit S** is the "Unfit to Teach" article that was published to vilify Colombo

4

in the media for discretions, including alcohol abuse from a decade and a half ago, which had no relevance to the false rape claim levied against him. Of particular note are Michele Dauber's comments to that article, which appear clearly designed to impugn Colombo, treat him as guilty, ignore the presumption of innocence and disregard his due process, all in keeping with the misandrist notions inherent in the "Believe Women" policies she and the investigating detective's spouse co-sponsored.

21.     Attached as **Exhibit T** is a true copy of numerous tweets attributed to Michele Dauber and her former twitter account, which paint a particularly hateful and misandrist form of discrimination.

22.     Overarching the mistreatment of Colombo is a widespread misandrist policy, "Believe Women", sponsored by former PAUSD Board President Ken Dauber's spouse Michele Dauber, that as implemented by PAUSD and other Santa Clara County government officials, compels treatment of a man accused of rape as guilty thereby depriving him of due process guarantees implicit in the presumption of innocence – even when there is no credible evidence to substantiate the accusation as determined by Defendants' own independent investigator, a female former sheriff. (See Exhibit G; Exhibit Q, "Believe Women" co-sponsored by Michele Dauber; Exhibit R, Report of Ken Dauber, Michele Dauber's husband resigning as President of the PAUSD School Board several months after the "process" against Colombo had already been set into motion; Exhibit S, "Unfit to Teach?" Article with comments from Michele Dauber showing clear gender based discrimination against men; Exhibit T, Michele Dauber sexist "tweets" exhibiting hateful, misandrist discrimination.)

23.     Attached as **Exhibit U** is a true copy of a spreadsheet and two CalSTRS retirement calculator projection printouts. The spreadsheet lists what should be Colombo's salary for this coming school year (assuming he is properly given service credit while Defendants continue to hold him on admin leave) his salary for the following year without any increase and then for each subsequent year through his anticipated retirement at age 70 presuming a 3.5% average annual increase. His stipends for summer school and coaching are calculated in the same manner. Employee paid benefits are calculated at only 20% of the salary rates. The two pension calculators represent (a) his pension if he is able to work without further harassment until age 70, as he had planned and (b) his pension if he is no longer able to work due to Defendants' creation of a hostile work environment and begins taking his pension upon retirement at age 70. The difference between full pension and the much lower pension represents his monthly pension losses

DECLARATION AND EXHIBITS ISO PLTF.'S OPPOSITION
TO DEFT.'S RULE 12(b)(6) MOTION

1   multiplied by 12 for an annual amount and duplicated for each year of life expectancy after retirement. The

2   totals are then calculated and added together to estimate Colombo's reasonably certain economic losses,

3   unless Defendants cease their harassment and figure out a way to correct the record regarding Colombo's

4   innocence, which must still be presumed, and return him to his career as a PE teacher at Greene Middle

5   School and a baseball coach at Paly.

6       24.     According to the mathematical calculations expressed in the spreadsheet using the Excel

7   "sum" function calculator, Colombo's economic losses for the constructive termination of his career,

8   calculated to his statistical work life expectancy of 69.75 years, totals $5,201,739 in future losses,

9   comprised of $2,632,280 in salaries (assuming 3.5% average annual increases), $224,307 in lost stipends

10  for coaching and summer school, $526,456 in employer paid benefits, and $1,818,336 in lost pensions (the

11  difference between his pension for retirement now versus his pension if he retires at age 69.75 for 13 years

12  of additional life expectancy after retirement).

13      25.     Attached as **Exhibit V** is a true copy of the "Man Behind the Mitt" article published in 2017

14  that was downloaded from the internet.

15      26.     Colombo received approximately more than 20 letters of support following the false rape

16  claim being brought against him. Attached as **Exhibit W** are the letters from Cynthis Pappas, Aimee

17  Becker and Jill Naylor, the three female PE teachers who were in charge of the girls locker room at Jordan

18  (now Greene) Middle School in 2001-2002, each of whom doubts and refutes the false claim that was

19  levied against Colombo.

20      27.     Attached as **Exhibit X** is a true copy of the Collective Bargaining Agreement Between Palo

21  Alto Unified School District ("PAUSD") and Palo Alto Educators Association ("PAEA") as updated

22  January 29, 2023.

23      28.     Attached as **Exhibit Y** is a true copy of the pertinent portion of California Educators' Guide

24  to School Law, Chapter XIV, School Employees, published by the Orange County Department of

25  Education.

26      29.     Attached as **Exhibit Z** is a true copy of  PAUSD's Bylaws of the Board, 9220 BB

27  "Governing Board Elections" as downloaded from PAUSD Board Docs.

28      30.     Attached as **Exhibit AA** is a true copy of the Legislative Analyst Office's Explanation of

DECLARATION AND EXHIBITS ISO PLTF.'S OPPOSITION                                    Case No.: 5:24-cv-00909-NC
TO DEFT.'S RULE 12(b)(6) MOTION

Local Control Funding Formula and Basic Aid Districts.

31.    Attached as **Exhibit BB** is a true copy of an article from the Palo Alto Pulse discussing that PAUSD is a Basic Aid District receiving almost 90% of its revenue from local funding sources.

32.    Attached as **Exhibit CC** is a true copy of PAUSD's Bylaws of the Board, 9260 BB "Legal Protection" as downloaded from PASUD Board Docs.

33.    Attached as **Exhibit DD** is a true redacted copy of the accuser, NT's, 7th grade report card from Foothill Middle School where she attended school during the 2002-2003 school year. Plaintiff is informed and believes that the family moved to Walnut Creek after NT's 6th grade school year to be closer to Terrapins Swim Team so that NT's older sister, OT, a very promising backstroke swimmer who rose as high as 16th ranked in the United States, could train at the same place where Natalie Coughlin, the premier female backstroke swimmer at the time, had also trained.

34.    Attached as **Exhibit EE** is a true redacted copy of competitive swimming records for the accuser, NT, obtained from swimcloud.com, a swimming times and records management website for competitive swimmers, coaches and recruiters that maintains archived swimming records dating back into the early 2000s.

35.    Attached as **Exhibit FF** is a true copy of the letter sent to counsel for Defendants requesting that they withdraw their motion, which is based in substantial part on outdated law.

36.    Attached as **Exhibit GG** (and Exhibit B thereto at pp. GG-013 through GG-017) is a true copy of the Memorandum of Understanding (MOU) between Palo Alto Unified School District ("PAUSD") and Palo Alto Police Department ("PAPD") concerning Title IX investigations relating to investigations of sexual misconduct reports. This document was obtained from the Palo Alto Unified School District "BoardDocs" online repository.

37.    Attached as **Exhibit HH** is a true copy of Resolution Agreement, Palo Alto Unified School District, OCR Case Nos. 09-13-5901 and 09-14-1217. This document was obtained from the Palo Alto Unified School District "BoardDocs" online repository.

38.    Attached as **Exhibit II** is a true copy of an email notice forwarded to me by Plaintiff Peter Colombo showing that he provided written notification to Defendants of his intention to return to his PE teaching assignment at Greene Middle School from which he has been temporarily placed on leave.

39.    Attached as **Exhibit JJ** is a true copy of the May 23, 2024 letter sent by Defendant Lisa Hickey to Plaintiff Peter Colombo notifying him that Defendants were placing him on paid leave pending an internal investigation.

40.    Attached as **Exhibit KK** is a true copy of an email from Defendants' counsel intentionally obstructing the deposition of Nicole Miller, the independent investigator, by claiming that they were considering representing her during her deposition.

41.    Attached as **Exhibit LL** is a true copy of a Palo Alto Unified School District ("PAUSD") Agenda Item Detail dated December 15, 2020 providing an update on the U.S. Department of Education, Office of Civil Rights' ("OCR") closing of its monitoring phase of PAUSD to fulfill the terms of a three-year Resolution Agreement. Item 3 acknowledges that "[t]he District revised its Memorandum of Understanding (MOU) with the Palo Alto Police Department (PAPD) to clarify language regarding Title IX." The subject Resolution Agreement was previously attached as Exhibit HH and the Revised MOU was previously attached as Exhibit GG. This document was obtained from the Palo Alto Unified School District "BoardDocs" online repository.

42.    Attached as **Exhibit MM** is a true and correct copy of the Declaration of Defendant Trent Bahadursingh that was previously submitted by Defendants in this action.

43.    Attached as **Exhibit NN** is an original of a Declaration of Mark Allendorf describing tactics used by Defendants to extort his early retirement, as an older, white male teacher at Greene Middle School.

44.    Attached hereto as **Exhibit OO** is a true and correct copy of the grievance form submitted in response to Defendants' retaliatory, improper transfer of Plaintiff into an undefined non-teaching position without following the procedures mandated by the Collective Bargaining Agreement, Education Code and Board Policies.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on August 16, 2024 at Walnut Creek, California.



_____
EVAN C. NELSON

8

EVAN C. NELSON (SBN 172957)
LAW OFFICE OF EVAN C. NELSON
1990 N. CALIFORNIA BLVD., 8TH FLOOR
WALNUT CREEK, CA 94596
Telephone: (925) 323-1991
Email: evancnelson.law@gmail.com

*Attorneys for Plaintiff Peter Colombo*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PETER COLOMBO,<br><br>      Plaintiff,<br><br>v.<br><br>PALO ALTO UNIFIED SCHOOL DISTRICT, et al.,<br><br>      Defendants. | Case No. 5:24-cv-00909-NC<br><br>**DECLARATION OF EVAN C. NELSON AND EXHIBITS IN SUPPORT OF PLAINTIFF PETER COLOMBO'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>DATE:      SEPTEMBER 25, 2024<br>TIME:      11:00 AM<br>LOCATION: COURTROOM 4, 4th FLOOR<br>               280 SOUTH 1ST STREET<br>               SAN JOSE, CA 95113<br><br>**HON. NATHANAEL M. COUSINS** |

I, EVAN C. NELSON declare as follows:

      1.      I am an attorney licensed to practice law before all courts in the State of California. I am a principal attorney with the Law Office of EVAN C. NELSON, attorney of record for Plaintiff, Peter Colombo ("Plaintiff" or "Colombo"). The following facts are based on my personal knowledge and review of and familiarity with this file, except as to those matters stated on information and belief. If called as a witness, I could and would testify competently thereto.

2.      Attached as **Exhibit A** is a copy of an original of the Declaration of Peter Colombo prepared and submitted in support of Plaintiff's Motion for Partial Summary Judgment, which was previously filed.

3.      Attached as **Exhibit B** is a true and correct copy of a News Report obtained from the online website for the Paly Voice, which is offered simply to show that the criminal charges brought against Peter Colombo were dismissed for lack of substantiating evidence to support the allegation of a rape.

4.      Attached as **Exhibit C** is a true copy of a printout obtained from Defendant Palo Alto Unified School District's official website affirming that they retain archived records for prior students dating back into the early 1900s. If necessary, Plaintiff could request judicial notice and/or request for an admission from Defendants that document is what it purports to be.

5.      Attached as **Exhibit D** is a true copy of a redacted portion of California Commission on Teacher Credentialing's ("CTC") investigation report summarizing the investigating detective's report with regard to Defendants' admission that they should have been able to produce a copy of NT's grade report for 6th grade, but they had inexplicably either lost or deleted it. If necessary, Plaintiff could produce this portion of the detective's report, which is substantially similar to the CTC investigator's recitation. In an attempt to use only the minimal amount of material from the underlying criminal matter, I deemed it better to use a redacted portion of the CTC investigator's report.

6.      Attached as **Exhibit E** is a true copy of a portion of the PAUSD Employee File for Peter Colombo obtained directly from PAUSD via a request for our client's employment file.

7.      Attached as **Exhibit F** is a true copy an email obtained through a CPRA request to the Santa Clara County District Attorneys' Office that purports to be between Zoe Morgan, a junior staff writer for Palo Alto Weekly Online, and Deputy District Attorney Kelly Meeker requesting to confirm that Don Austin had located a copy of the lost or deleted student file, including NT's grade report for 6th grade, and provided it to the District Attorneys' Office, as he had apparently told Ms. Morgan he had. NT's grade report for 6th grade is the only missing document of interest to any of the parties involved in this matter. Numerous and repeated requests have been made for this potentially completely exonerating grade report, but the document has never been produced, presented or discussed other than by its inexplicable absence in any investigation or court proceeding relating to this matter.

8.      Attached as **Exhibit G** is a true copy of my extensive notes taken during the January 25,

2024 interview of my client by PAUSD's independent investigator, Nicole Miller, a female former sheriff. Defendants had demanded our client appear for a 3-hour interview, but the investigator only used 20 minutes stating that there was nothing of substance to evaluate and the evidence was not even close to establishing a factual finding of an actual assault or rape, as had been claimed. Because Defendant refused to allow a recording of the zoom interview, I was careful to take extensive notes of what I deemed to be material statements made during the course of the interview. I have reviewed these notes several times, including immediately after the interview concluded, and to the best of my recollection these notes reflect accurately the interview statements. Since Defendants have refused to provide a proper investigation report and are also obstructing attempts to obtain Ms. Miller's deposition, these notes are the best evidence available concerning the investigator's statements and factual findings, as expressed during the interview.

9.      Attached as **Exhibit H** is a true copy of a printout from CTC's official website showing the renewal of Peter Colombo's credential without limitation, following CTC's investigation of the unsubstantiated rape claim.

10.     Attached as **Exhibit I** is a true copy of a letter from Lisa Hickey to Peter Colombo dated 11.1.23 acknowledging completion of CTC's investigation in Colombo's favor, and which resulted in his credential being renewed without limitation.

11.     Attached as **Exhibit J** is a true copy of a letter from Lisa Hickey to Peter Colombo dated May 24, 2023 following dismissal of the criminal charges with prejudice in Colombo's favor, but notifying him PAUSD was still placing him on paid admin leave "pending an investigation." No information was provided regarding the scope, authority, due process protections, or time limitations of the investigation.

12.     Attached as **Exhibit K** is a true copy of Defendants' letter dated May 28, 2024, which finally closed the investigation that had been kept open more than a year after opening the investigation against Colombo and more than four months after the PAUSD investigator found there was no substance to the rape claim, similar to the conclusions previously reached by the District Attorney and then by CTC.

13.     Attached as **Exhibit L** is a true copy of my letter response to Defendants' one sentence summary of a year-long investigation, which provides the law showing Colombo is entitled to receive a complete report regarding all evidence reviewed by the investigator, factual findings discerned from that evidence, conclusions including analysis of law and regulations, and other information.

14. Attached as **Exhibit M** is a true copy of California Code of Regulations, Title 2, section 11017.1, which clarifies that it is a violation of the Fair Employment and Housing Act ("FEHA") to discriminate against any person who has been arrested, without conviction, by considering such an arrest for any employment decision or adverse employment action.

15. Attached as **Exhibit N** is a true copy of a portion of the Equal Employment Opportunity Commission ("EEOC") 2012 Guidance on Use of Criminal Records that similarly states it is a violation of Title VII under federal law, to not presume that an arrestee who was not convicted is innocent and/or to discriminate against a person by using the information of an arrest for any purpose other than to investigate into whether proven conduct leading to the arrest warrants employment action.

16. Attached as **Exhibit O** are true copies of official letter head and signatures for Lisa Hickey and Amanda Bark, and a news article quoting Don Austin, which show that these Defendants were acting under color of state law as public school administrators at Palo Alto Unified School District ("PAUSD") at times relevant to the claims in this action. If required, judicial notice and/or requests for admissions could be readily requested as these matters should not be contested.

17. Attached as **Exhibit P** is a true copy of PAUSD Board Agendas showing closed sessions for dates matching each significant date in the persecution of Colombo, including when the email with the false rape claim was received, when he was arrested, when he was released from ankle monitoring at the preliminary hearing, when the criminal charges were dismissed, and when he was placed on admin leave "pending an investigation." For each of those closed sessions, item number 8 is checked (the checked box online shows as a blank on printouts) for "Employee Discipline/Dismissal/Release/Leaves pursuant to Government Code §§54957(b)(1)."

18. Attached as **Exhibit Q** is a true copy of the "Believe Women" resolution co-sponsored by Michele Dauber and by Shay Franco-Clausen, the spouse of the Palo Alto Police Detective who was assigned to investigate the case for the police.

19. Attached as **Exhibit R** is a true copy of a News Report demonstrating that Ken Dauber, Michele Dauber's husband, was President of the PAUSD Board during a substantial period of time when actions were being taken with regard to Colombo and the false rape report.

20. Attached as **Exhibit S** is the "Unfit to Teach" article that was published to vilify Colombo

1  in the media for discretions, including alcohol abuse from a decade and a half ago, which had no relevance

2  to the false rape claim levied against him. Of particular note are Michele Dauber's comments to that article,

3  which appear clearly designed to impugn Colombo, treat him as guilty, ignore the presumption of

4  innocence and disregard his due process, all in keeping with the misandrist notions inherent in the "Believe

5  Women" policies she and the investigating detective's spouse co-sponsored.

6      21.    Attached as **Exhibit T** is a true copy of numerous tweets attributed to Michele Dauber and

7  her former twitter account, which paint a particularly hateful and misandrist form of discrimination.

8      22.    Overarching the mistreatment of Colombo is a widespread misandrist policy, "Believe

9  Women", sponsored by former PAUSD Board President Ken Dauber's spouse Michele Dauber, that as

10  implemented by PAUSD and other Santa Clara County government officials, compels treatment of a man

11  accused of rape as guilty thereby depriving him of due process guarantees implicit in the presumption of

12  innocence – even when there is no credible evidence to substantiate the accusation as determined by

13  Defendants' own independent investigator, a female former sheriff. (See Exhibit G; Exhibit Q, "Believe

14  Women" co-sponsored by Michele Dauber; Exhibit R, Report of Ken Dauber, Michele Dauber's husband

15  resigning as President of the PAUSD School Board several months after the "process" against Colombo

16  had already been set into motion; Exhibit S, "Unfit to Teach?" Article with comments from Michele Dauber

17  showing clear gender based discrimination against men; Exhibit T, Michele Dauber sexist "tweets"

18  exhibiting hateful, misandrist discrimination.)

19      23.    Attached as **Exhibit U** is a true copy of a spreadsheet and two CalSTRS retirement

20  calculator projection printouts. The spreadsheet lists what should be Colombo's salary for this coming

21  school year (assuming he is properly given service credit while Defendants continue to hold him on admin

22  leave) his salary for the following year without any increase and then for each subsequent year through his

23  anticipated retirement at age 70 presuming a 3.5% average annual increase. His stipends for summer school

24  and coaching are calculated in the same manner. Employee paid benefits are calculated at only 20% of the

25  salary rates. The two pension calculators represent (a) his pension if he is able to work without further

26  harassment until age 70, as he had planned and (b) his pension if he is no longer able to work due to

27  Defendants' creation of a hostile work environment and begins taking his pension upon retirement at age

28  70. The difference between full pension and the much lower pension represents his monthly pension losses

multiplied by 12 for an annual amount and duplicated for each year of life expectancy after retirement. The totals are then calculated and added together to estimate Colombo's reasonably certain economic losses, unless Defendants cease their harassment and figure out a way to correct the record regarding Colombo's innocence, which must still be presumed, and return him to his career as a PE teacher at Greene Middle School and a baseball coach at Paly.

24.    According to the mathematical calculations expressed in the spreadsheet using the Excel "sum" function calculator, Colombo's economic losses for the constructive termination of his career, calculated to his statistical work life expectancy of 69.75 years, totals $5,201,739 in future losses, comprised of $2,632,280 in salaries (assuming 3.5% average annual increases), $224,307 in lost stipends for coaching and summer school, $526,456 in employer paid benefits, and $1,818,336 in lost pensions (the difference between his pension for retirement now versus his pension if he retires at age 69.75 for 13 years of additional life expectancy after retirement).

25.    Attached as **Exhibit V** is a true copy of the "Man Behind the Mitt" article published in 2017 that was downloaded from the internet.

26.    Colombo received approximately more than 20 letters of support following the false rape claim being brought against him. Attached as **Exhibit W** are the letters from Cynthis Pappas, Aimee Becker and Jill Naylor, the three female PE teachers who were in charge of the girls locker room at Jordan (now Greene) Middle School in 2001-2002, each of whom doubts and refutes the false claim that was levied against Colombo.

27.    Attached as **Exhibit X** is a true copy of the Collective Bargaining Agreement Between Palo Alto Unified School District ("PAUSD") and Palo Alto Educators Association ("PAEA") as updated January 29, 2023.

28.    Attached as **Exhibit Y** is a true copy of the pertinent portion of California Educators' Guide to School Law, Chapter XIV, School Employees, published by the Orange County Department of Education.

29.    Attached as **Exhibit Z** is a true copy of  PAUSD's Bylaws of the Board, 9220 BB "Governing Board Elections" as downloaded from PAUSD Board Docs.

30.    Attached as **Exhibit AA** is a true copy of the Legislative Analyst Office's Explanation of

Local Control Funding Formula and Basic Aid Districts.

31.     Attached as **Exhibit BB** is a true copy of an article from the Palo Alto Pulse discussing that PAUSD is a Basic Aid District receiving almost 90% of its revenue from local funding sources.

32.     Attached as **Exhibit CC** is a true copy of PAUSD's Bylaws of the Board, 9260 BB "Legal Protection" as downloaded from PASUD Board Docs.

33.     Attached as **Exhibit DD** is a true redacted copy of the accuser, NT's, 7th grade report card from Foothill Middle School where she attended school during the 2002-2003 school year. Plaintiff is informed and believes that the family moved to Walnut Creek after NT's 6th grade school year to be closer to Terrapins Swim Team so that NT's older sister, OT, a very promising backstroke swimmer who rose as high as 16th ranked in the United States, could train at the same place where Natalie Coughlin, the premier female backstroke swimmer at the time, had also trained.

34.     Attached as **Exhibit EE** is a true redacted copy of competitive swimming records for the accuser, NT, obtained from swimcloud.com, a swimming times and records management website for competitive swimmers, coaches and recruiters that maintains archived swimming records dating back into the early 2000s.

35.     Attached as **Exhibit FF** is a true copy of the letter sent to counsel for Defendants requesting that they withdraw their motion, which is based in substantial part on outdated law.

36.     Attached as **Exhibit GG** (and Exhibit B thereto at pp. GG-013 through GG-017) is a true copy of the Memorandum of Understanding (MOU) between Palo Alto Unified School District ("PAUSD") and Palo Alto Police Department ("PAPD") concerning Title IX investigations relating to investigations of sexual misconduct reports. This document was obtained from the Palo Alto Unified School District "BoardDocs" online repository.

37.     Attached as **Exhibit HH** is a true copy of Resolution Agreement, Palo Alto Unified School District, OCR Case Nos. 09-13-5901 and 09-14-1217. This document was obtained from the Palo Alto Unified School District "BoardDocs" online repository.

38.     Attached as **Exhibit II** is a true copy of an email notice forwarded to me by Plaintiff Peter Colombo showing that he provided written notification to Defendants of his intention to return to his PE teaching assignment at Greene Middle School from which he has been temporarily placed on leave.

39.     Attached as **Exhibit JJ** is a true copy of the May 23, 2024 letter sent by Defendant Lisa Hickey to Plaintiff Peter Colombo notifying him that Defendants were placing him on paid leave pending an internal investigation.

40.     Attached as **Exhibit KK** is a true copy of an email from Defendants' counsel intentionally obstructing the deposition of Nicole Miller, the independent investigator, by claiming that they were considering representing her during her deposition.

41.     Attached as **Exhibit LL** is a true copy of a Palo Alto Unified School District ("PAUSD") Agenda Item Detail dated December 15, 2020 providing an update on the U.S. Department of Education, Office of Civil Rights' ("OCR") closing of its monitoring phase of PAUSD to fulfill the terms of a three-year Resolution Agreement. Item 3 acknowledges that "[t]he District revised its Memorandum of Understanding (MOU) with the Palo Alto Police Department (PAPD) to clarify language regarding Title IX." The subject Resolution Agreement was previously attached as Exhibit HH and the Revised MOU was previously attached as Exhibit GG. This document was obtained from the Palo Alto Unified School District "BoardDocs" online repository.

42.     Attached as **Exhibit MM** is a true and correct copy of the Declaration of Defendant Trent Bahadursingh that was previously submitted by Defendants in this action.

43.     Attached as **Exhibit NN** is an original of a Declaration of Mark Allendorf describing tactics used by Defendants to extort his early retirement, as an older, white male teacher at Greene Middle School.

44.     Attached hereto as **Exhibit OO** is a true and correct copy of the grievance form submitted in response to Defendants' retaliatory, improper transfer of Plaintiff into an undefined non-teaching position without following the procedures mandated by the Collective Bargaining Agreement, Education Code and Board Policies.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on August 16, 2024 at Walnut Creek, California.



_____
EVAN C. NELSON

# EXHIBIT A

1  EVAN C. NELSON (SBN 172957)
   LAW OFFICE OF EVAN C. NELSON
2  1990 N. CALIFORNIA BLVD., 8TH FLOOR
   WALNUT CREEK, CA 94596
3  Telephone: (925) 323-1991
   Email: evancnelson.law@gmail.com
4
   *Attorneys for Plaintiff Peter Colombo*
5

6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11

   PETER COLOMBO,                    Case No. 5:24-cv-00909-NC
12
           Plaintiff,                **DECLARATION OF PETER COLOMBO**
13
14 v.

15 PALO ALTO UNIFIED SCHOOL DISTRICT,
   et al.,
16
           Defendants.               JUDGE:   HON. NATHANAEL M. COUSINS
17

18

19 I, PETER COLOMBO declare as follows:

20     1.    I am the Plaintiff in this action and the following facts are based on my own personal

21 knowledge.  If called as a witness, I could and would testify competently thereto.

22     2.    I am a credentialed, fully tenured teacher in good standing with 27 years of teaching and

23 coaching history, almost entirely within the Palo Alto Unified School District.

24     3.    I do want to address up front the fact that the rape allegation against me is false. I never

25 approached any of my students where I taught and coached in a sexual manner. And I never did, nor would

26 I ever, force myself on someone in the brutal manner described by my accuser. When I learned about the

27 things that Bill Giordano had been doing at Jordan Middle School for decades, I was disgusted and I still

28 find his conduct despicable. I also cannot imagine how anyone could carry out an attack like NT described.

                                    1

4.      The false accusation against me has been devastating. For almost two and a half years now I have been treated as though I were guilty of this heinous crime, even though I have now been cleared by three investigations. I was so grateful when Nicole Miller, a former sheriff and the investigator Palo Alto Unified School District hired to interview me, candidly stated that she didn't see how anyone could find that an assault had actually occurred based on the complete lack of credible supporting evidence. But my gratitude was short-lived because Palo Alto Unified has concealed Ms. Miller's findings. I have reviewed the notes that my attorney prepared from the interview by Ms. Miller, and they do reflect what I recall from the interview. As a former sheriff, she seemed shocked that I had been arrested and prosecuted, because she didn't think it was even a close call, stating that obviously she could not make a finding that an assault or rape had taken place, because the evidence just simply didn't add up.

5.      Returning to discussion of my career, during my entire 27 years of teaching, I was only "written up" three times for things that I was involved in at school[1]: (a) in 2007, for making some male students run liners for being disrespectful and a parent didn't approve of the way I yelled at him like a drill sergeant while he was running; (b) in 2020, during COVID, a parent reported seeing a couple basketball players in the gym with their masks down; and, (c) in 2021, I was reported for using improper slang language with some boys at middle school and for elbow bumping a boy for running a great 400m.

6.      Attached as **Exhibit A-1** are true copies of all of the write-ups contained in my personnel file, which I had my attorneys request from Palo Alto Unified School District.

7.      I have always tried my best to be a good example, a mentor, a good teacher and coach to the thousands of kids I have taught and coached over the years. I understand that I am not perfect and that some of the things I did were not appreciated by those who observed them. But I have always tried to remain humble and to change when I recognize the need for change or when it is brought to my attention that change is needed.

8.      Attached as **Exhibit A-2** is a true copy of teacher evaluations obtained from my employment file. My evaluations were always good and were, at times, stellar. Overall, I am very proud

---

[1] The prior alcohol abuse that was broadcast by the Palo Alto Weekly Online was outside school and never impacted my work with students as a teacher or with athletes as a coach. That was hurtful, but I have been completely sober for 14 years, going on 15 years, and I am vigilant in maintaining my sobriety.

DECLARATION OF PETER COLOMBO
Case No.: 5:24-cv-00909-NC

of my accomplishments in my teaching career. I was a valued PE teacher and still should be.

9.      Attached as **Exhibit A-3** is a true copy of forms obtained from my employment file that show I have consistently taught summer school during the decade before the false accusation was raised against me. My wife has a career and works most summers, so it makes sense for me to also work during the summer and that was my intention to continue teaching summer school until my retirement.

10.     Attached as **Exhibit A-4** is a true copy of documents from obtained from my employment file showing a few of my coaching assignments. I coached two sports consistently from 1998 until 2022. Most recently, I was coaching basketball and baseball and had intended to continue coaching past my retirement. I was also an athletic director at the middle school for 6 years.

11.     After all that has happened, it is clear to me that the one thing that I enjoyed doing more than anything else in life was coaching baseball. In the article "Man Behind the Mitt" I meant what I stated, I would have kept teaching and coaching at least until age 70, because I loved teaching, coaching, mentoring, and instructing middle schoolers and high schoolers to help prepare them to be successful in all that they do. Even after retiring from teaching, I would have continued coaching baseball until I was no longer able to do so, maybe at 85 or 90, God willing.

12.     I do not recall being NT's 6th grade PE teacher at Jordan (now Greene) Middle School. During the 2001-2002 school year I was teaching 6th grade PE at a different location, Terman (now Fletcher) Middle School, which accounted for thirty percent (30%) of my time. Attached as **Exhibit A-5** is a true copy of documents from my employment file showing that I worked 30% at Terman (now Fletcher) and 70% at Jordan (now Greene). I also recall teaching 7th grade PE at Jordan in 2001-2002, but do not recall teaching 6th grade PE at Jordan (now Greene) in 2001-2002.

13.     I wish that Palo Alto Unified had produced NT's grade report for 6th grade, because it would have at least provided credible, objective evidence regarding whether I was even NT's PE teacher. I was informed that the statement that "only staff could remove a student [file]" was being used to suggest that somehow I had taken NT's file. Staff didn't have access to student files and I never had access to student files or grade reports, other than to enter grades at the end of a term and that access was then terminated within a short period of time after grades were entered. To my understanding and experience, the only people with access to student grade reports and other student records would be those in the administration

1    administration offices (Don Austin, Lisa Hickey, Amanda Bark, etc.) and those persons specifically

2    assigned to the records department. I have no reason to want that file lost. In fact, I would like very much

3    to know whether I was even her PE teacher. Either way, it would not change the fact that I absolutely did

4    not do what I have been accused of doing, but I would like to know whether I was even her PE teacher.

5        14.    As the direct result of my arrest, which did not result in any conviction or even a factual

6    finding that the alleged sexual assault took place after a criminal investigation and prosecution, and two

7    additional administrative investigations, the following adverse employment actions have been taken

8    against me: (i) I was not returned to my PE teaching assignment at Greene Middle School, (ii) I was not

9    returned to coach baseball at Paly, (iii) I have not been paid for summer school and coaching stipends that

10   I consistently earned, (iv) I was not paid for three months' salary during the period of August to October

11   2023, (v) I was not given salary increases and bonuses every active teacher has received, (vi) I was not

12   being proactively offered mental wellness care.

13       15.    I have greatly appreciated the kind support I have received from hundreds of former

14   students, athletes and their parents, as I have been undergoing this ordeal. I do not pretend to understand

15   what forces have combined to place my life into such upheaval over a fabricated story, and it is unclear to

16   me what ultimate purpose is being served. What I do know, unequivocally, is that I absolutely did not do

17   what I have been accused of doing and I have never done anything that could be truthfully and accurately

18   described as anything suggesting I am guilty. I know this to be true. My God knows it is true.

19

20       I declare under penalty of perjury under the laws of the United States that the foregoing is true and

21   correct and that this declaration was executed on June 4, 2024, at Redwood City, California.

22

23

24   PETER COLOMBO

25

26

27

28

4

# EXHIBIT A-1



**PALO ALTO UNIFIED SCHOOL DISTRICT**

**GREENE MIDDLE SCHOOL** • 750 N. California Avenue • Palo Alto, CA 94303
(650) 494-8120     FAX: (650) 858-1310
Mr. Sebastian A. Benavidez III, Principal

September 3, 2021

To: Pete Colombo
From: Sebastian Benavidez
RE: Letter of Warning

Dear Pete,

This formal written letter of warning addresses the multiple parent concerns I received this week regarding inappropriate comments made to students and directly relates to CSTP 6.6, Maintaining professional responsibilities to maintain motivation and commitment to all students.

On Friday, September 3rd, I met with you, Lisa Hickey, Director of Certificated Human Resources, and Dave DeGeronimo (PE colleague you requested to attend the meeting) in my office to discuss a total of four parent complaints received since the beginning of the 2021-2022 school year. These complaints included using inappropriate language with students including calling a student a "pimp" and joking with them using the term "Deez nuts." In addition, one student felt you were not supportive when he was having difficulty with his PE locker and one student complained about contact you made with them that made them feel uncomfortable.

During the meeting, it was clear that you have been very concerned about the complaints and have taken responsibility and reflected. While the use of the term "pimp" was meant as a positive slang term, it is not an appropriate word used to address a student and will understandably be taken out of context by parents. In speaking with you on multiple occasions, you appear to be a physical communicator. While the physical contact with a student appears to be innocent, it can make students feel uncomfortable.

We discussed the range of students you work with as a teacher and coach, from 6th grade to high school upperclassmen and how essential it is for you to code-switch depending on your audience.

As a teacher of the District, you are required to use effective interpersonal and communication skills and establish good rapport and healthy relationships with students. As described above, you engaged in instances of inappropriate verbal conduct toward students, which contradicted your duties as a teacher. District Board Policy ("BP") 4119.21, which requires you to behave professionally, <u>exercise good judgment when interacting with students</u> and other members of the school community, <u>engage in conduct that enhances the integrity of the District</u>, advances the goals of the District's educational programs, and contributes to a positive school climate.

You are expected to reflect upon your conduct and take immediate steps to remediate these deficiencies. Effectively immediately, you are directed to do the following:

- Use appropriate language with your students at all times.
- Do not email directly parents who have a concern or complaint.

- Avoid physical contact with students at all times.

Failure to comply with these directives will result in disciplinary action.

A copy of this warning letter will be placed in your personnel file. You have the right to respond to this letter within 10 days.

Sincerely,

Sebastian Benavidez
Principal

cc: Personnel File



Palo Alto Senior High School
50 Embarcadero Rd. Palo Alto, CA  94301
(650) 329-3701 Fax: (650) 329-3753

Brent Kline
Principal

Warning To: Pete Colombo
From: Assistant Principal, Tom Keating
Date: November 18, 2020
Re: Letter of Warning

On Saturday, November 14, 2020, I was informed by a concerned citizen that an unauthorized Basketball scrimmage under your supervision took place in the Palo Alto High School gym. This behavior directly violates protocols set forth by the PAUSD to protect student-athletes' health and safety during the COVID pandemic.

Your conduct negatively impacts students' and employees' safety by not honoring the District mandated COVID protocols.

In addition, you are to be suspended from your coaching duties for two weeks.

We set up a time to meet over Zoom, but if you have any questions concerning the above or need further clarification, I suggest that you call me to arrange an appointment.

This document will be placed in your personnel file. You may prepare a response that will be attached to this memo within ten days.

Sincerely yours,

Tom Keating
Assistant Principal
tkeating@pausd.org
650-329-3718

Cc: Personnel File

EXHIBIT A-1_003

October 30, 2007

On Friday, October 19, 2007, at 12:20 p.m., Mr. Peter Colombo, a Jordan physical education teacher, observed three boys, two seventh graders and a sixth grader, throwing water bottles over the lockers in the locker room. Mr. Colombo spoke with the boys and gave them the option of receiving an action referral [to an administrator] or completing "liners" before they went to lunch. Doing "liners" involves running in a set pattern in the gym, in this case, for a period of ten minutes.

According to one student, during the course of this exercise, "He [Mr. Colombo] asked another teacher to take out the waste basket because we were all going to throw up." He also said, "We were going to run our asses off." According to the student, he said, "There was once a general who took his troops across the desert and all of them didn't shit for three days." However, Mr. Colombo states that he said, "If General Patton, Old Blood and Guts, led his troops for three straight days during the Battle of Bastogne, you guys can do these liners."

Mr. Colombo's use of such language was inappropriate and unprofessional. As a result, I met with Mr. Colombo and the Physical Education Instructional Supervisor, Mrs. Cindy Pappas, on October 29, 2007 [I was not made aware of the incident until a week later.]. At that meeting, Mr. Colombo took full responsibility for his actions and agreed to meet with the counselor and the students to make certain that they were comfortable returning to physical education class and with Mr. Colombo.

Submitted by,

*Suzanne Barbarasch*

Suzanne Barbarasch
Principal, Jordan Middle School

EXHIBIT A-1_004

# EXHIBIT A-2



PALO ALTO UNIFIED SCHOOL DISTRICT
CERTIFICATED HUMAN RESOURCES
**SUMMARY FORM (PERMANENT STAFF)**
**EVALUATION OF PERFORMANCE – TEACHERS**

Name: _Pete Colombo_     Evaluation Date: _5/15/15_
Supervisor: _Gregory Barnes_     Site: _Jordan_
Evaluation Plan: ☒ Plan 2A   ☐ Plan 2B   ☐ Plan 2C   ☐ Plan 3   ☐ Plan 4

| | Supervisor's Rating of Performance Related To: | Meets All Elements of the Standards | Does Not Meet All Elements of the Standards (Indicate Elements Not Met) |
|---|---|---|---|
| 1. | Engaging and Supporting All Students in Learning | ✓ | |
| 2. | Creating and Maintaining Effective Environments for Student Learning | ✓ | |
| 3. | Understanding and Organizing Subject Matter for Student Learning | ✓ | |
| 4. | Planning Instruction and Designing Learning Experiences for All Students | ✓ | |
| 5. | Assessing Students for Learning | ✓ | |
| 6. | Developing as a Professional Educator | ✓ | |

**Overall Evaluation:** The overall evaluation must reflect the evidence regarding relevant performance in all areas of performance standards and progress on the professional development plan.

☒ **Meets Elements of the Standards - Satisfactory**
☐ **Does Not Meet All Elements of the Standards -Support/Improvement Plan Implemented**
☐ **Does Not Meet Standards - Unsatisfactory**

Addendum ☐ has  ☒ has not been attached with additional comments (by either or both parties).

Provisions have been established for appealing an evaluation the Supervisee feels unfair. Contact the Certificated Human Resources Department for information regarding this appeal process.

Plan For Next Evaluation Cycle: ☒ Plan 2A   ☐ Plan 2B   ☐ Plan 2C   ☐ Plan 3   ☐ Plan 4

| Supervisee's Signature and Date _5/18/15_ My signature does not necessarily indicate agreement | Supervisor's Signature and Date _A. Barnes_ | Instructional Supervisor Signature and Date |
|---|---|---|

**Note:** Signature of teacher does not imply agreement with evaluation. Teacher has the right to attach written comments within ten (10) days.

| | Supervisee Responses: | YES | NO |
|---|---|---|---|
| 1. | Supervisor has scheduled and met with me at least two times during the year to discuss my long-range professional development plan and annual objectives and to review progress and performance. | ✓ | |
| 2. | Supervisor has supported my efforts to attain the teaching standards. | ✓ | |
| 3. | I have shared with my supervisor information gathered from students. | ✓ | |
| 4. | I have shared with my supervisor information gathered from parents. | ✓ | |
| 5. | My supervisor has given me the opportunity to provide input on his/her performance. | ✓ | |

Supervisee's Initials

Cert Pers / CEHR Eval Forms / Summary Form Perm Staff....Rev 9/11

EXHIBIT A-2_001

## OBSERVATION & PERFORMANCE REVIEW                    Pete Colombo

8ʰ Grade PE Class
Jordan Middle School; 2014-2015
Date May 15th, 2015

### For the second observation & performance review, the focus standards included, but were not limited to:

1. ENGAGING AND SUPPORTING ASS STUDENTS IN LEARNING
2. CREATING AND MAINTAINING EFFECTIVE ENVIRONMENTS FOR STUDENT LEARNING
3. UNDERSTANDING AND ORGANIZING SUBJECT MATTER FOR STUDENT LEARNING
4. PLANNING INSTRUCTION AND DESIGNING LEARNING EXPERIENCES FOR ALL STUDENTS
5. ASSESSING STUDENTS FOR LEARNING
6. DEVELOPING AS A PROFESSIONAL EDUCATOR

### Summary of Class Observations:

The warm up activity covered all areas of the body including dedicated exercises to the upper and lower body such as warm up stretches, "squeeze em", karaoke, wizard of oz, and butt kickers. Students are asked to do a warm up job to the blue bars and back. Colombo uses words of encouragement and prompts others to give him an effort. Colombo has a tough love approach with the students that many of them respond to.

The exercise room is used for both genders to accomplish "600". Girls start on the bikes as the boys row. After each male student achieves 600, students switch and it's the girls turn to row. Colombo constantly checks in with students during the exercise. He encourages and give praise when and where appropriate.

The class moves into the gym for the main part of the lesson. Badminton is the primary focus for the days lesson. Students are divided up into Six games of 4-6 players per game. The games are set up on a rotation. Each games lasts roughly 5 minutes before students are paired with another group. Colombo monitors each game closely, pointing out technique and offering advice and strategy for each game. Music is playing

**General Observations:**
Pete is a valuable member of the Jordan PE department. He has a strong rapport with students and takes his role as a mentor seriously. Pete is often reflective of his behavior and works hard to maintain a professional and courteous work environment.

### TEACHER COMMENTS:

Teacher/Evaluate                          Administrator/ Supervisor



PALO ALTO UNIFIED SCHOOL DISTRICT
CERTIFICATED HUMAN RESOURCES
**SUMMARY FORM (PERMANENT STAFF)**
**EVALUATION OF PERFORMANCE – TEACHERS**



PAUSD
APR 24 2014
HUMAN RESOURCES

---

**Name:** PETE Colombo          **Evaluation Date:** Oct 29, 2013

**Supervisor:** Elinor Slack          **Site:** Jordan Middle School

**Evaluation Plan:** ☒ Plan 2.2  ☐ Plan 2.2 Peer  ☐ Plan 2.4 (after 10 yrs)  ☐ Plan 2.4 Peer (after 10 yrs)  ☐ Plan 3  ☐ Plan 4

| | Supervisor's Rating of Performance Related To: | Meets All Elements of the Standards | Does Not Meet All Elements of the Standards (Indicate Elements Not Met) |
|---|---|---|---|
| 1. | Engaging and Supporting All Students in Learning | ✓ | |
| 2. | Creating and Maintaining Effective Environments for Student Learning | ✓ | |
| 3. | Understanding and Organizing Subject Matter for Student Learning | ✓ | |
| 4. | Planning Instruction and Designing Learning Experiences for All Students | ✓ | |
| 5. | Assessing Students for Learning | ✓ | |
| 6. | Developing as a Professional Educator | ✓ | |

---

**Overall Evaluation:** The overall evaluation must reflect the evidence regarding relevant performance in all areas of performance standards and progress on the professional development plan.

☑ **Meets Elements of the Standards - Satisfactory**

☐ **Does Not Meet All Elements of the Standards -Support/Improvement Plan Implemented**

☐ **Does Not Meet Standards - Unsatisfactory**

**Addendum** ☑ has  ☐ has not been attached with additional comments (by either or both parties).

Provisions have been established for appealing an evaluation the Supervisee feels unfair.  Contact the Certificated Human Resources Department for information regarding this appeal process.

Plan for Next Evaluation Cycle: ☒ Plan 2.2  ☐ Plan 2.2 Peer  ☐ Plan 2.4 (after 10 yrs)  ☐ Plan 2.4 Peer (after 10 yrs)  ☐ Plan 3  ☐ Plan 4

| Supervisee's Signature and Date 4/23/14 | Supervisor's Signature and Date Elinor Slack 4/23/14 | Instructional Supervisor Signature and Date |
|---|---|---|
| My signature does not necessarily indicate agreement | | |

**Note:**  Signature of teacher does not imply agreement with evaluation.  Teacher has the right to attach written comments within ten (10) days.

| | Supervisee Responses: | YES | NO |
|---|---|---|---|
| 1. | Supervisor has scheduled and met with me at least two times during the year to discuss my long-range professional development plan and annual objectives and to review progress and performance. | X | |
| 2. | Supervisor has supported my efforts to attain the teaching standards. | X | |
| 3. | I have shared with my supervisor information gathered from students. | X | |
| 4. | I have shared with my supervisor information gathered from parents. | X | |
| 5. | My supervisor has given me the opportunity to provide input on his/her performance. | X | |

Supervisee's Initials

EXHIBIT A-2_003

# OBSERVATION AND PERFORMANCE REVIEW

| | Limited Progress Evident | Progress Evident | Meets Standards | Evidence |
|---|---|---|---|---|
| 1.5 Promoting critical thinking through inquiry, problem solving and reflection. | | | M | Evidence: It is a natural response to reflect and adjust after a physical activity like serving a volleyball. Students learn to change what they are doing if the serve goes awry. Basic survival in many sports is problem solving in a real life activity. In order to complete a mile in a given amount of time, students have to learn how to pace themselves. |
| 1.6 Monitoring student learning and adjusting instructions while teaching. | | | M | Evidence: this is one of Peter's goals this year. To monitor student performance and make modifications for his class and for students specifically. For example, he spoke to a girl who was struggling with her serving and the next time she served, she got the ball over the net. He encourages his students to play as a team and not just hit the ball over the net. |
| **2. CREATING AND MAINTAINING EFFECTIVE ENVIRONMENTS FOR STUDENTS LEARNING** | | | **Meets Standards** | |
| 2.1 Promoting social development and responsibility within a caring community where each student is treated fairly and respectfully. | | | M | Evidence: Peter is genuinely concerned about his students. He strives to listen to them and encourages all of them to interact with each other with respect. |
| 2.2 Creating physical/virtual learning environments that promote student learning, reflect diversity, and encourage constructive/productive interactions among students. | | | M | Evidence: Peter maintains a safe environment as much as possible. He pointed out to the students to run with their heads up to see what was in front of them. One student didn't and ran into someone. He checked with them to be sure they were OK. But many in this age group do not listen to instructions. He is clear about what he is doing and explains why. |
| 2.3 Establishing and maintaining learning environments that are physically, intellectually, and emotionally safe. | | | M | Evidence: Peter tries to make all of his students comfortable in his classes. The range of physical abilities is huge. He tries really hard to get students to step up and feel good about what they do. |
| 2.4 Creating a rigorous learning environment with high expectations and appropriate support for all students. | | | M | Evidence: the whole department has high expectations. They evaluate their physical fitness data and adjust their program to try to improve in areas that the data says they are a bit short in. Cardio fitness is extremely important to the department, so all teachers emphasize it in their classes. |

## OBSERVATION AND PERFORMANCE REVIEW

| | Limited Progress Evident | Progress Evident | Meets Standards | Evidence |
|---|---|---|---|---|
| 2.5 Developing, communicating, and maintaining high standards for individual and group behavior. | | | M | Evidence:  Peter constantly communicates his expectations to his students with coaching hints like when they were doing the delayed steal as a warm up he went over things to make their form better.  I found it interesting that they had such a real life application in a warm up activity. |
| 2.6 Employing classroom routines, procedures, norms, and supports for positive behavior to ensure a climate in which all students can learn. | | | M | Evidence: Peter recognizes that classroom structure is important to young people. One of Peters goals this year is to improve his classroom management in order to ensure a healthy experience for his students in PE.  He is trying to use lots of positive reinforcement during class.  and in observing him, he does this a lot.  Just be careful that it isn't used so much that students think it's insincere. |
| 2.7 Using instructional time to optimize learning. | | | M | Evidence:  PE struggles with not having enough minutes for their content area.  In an effort to ensure student safely participating in activities they have stretching and warm ups, kids have to change into their PE clothes and out of them, a cardio piece and then an activity lesson often with rules and skills techniques.  Time is a rare commodity. |
| **3. UNDERSTANDING AND ORGANIZING SUBJECT MATTER FOR STUDENT LEARNING** | | | | Evidence |
| 3.1 Demonstrating knowledge of subject matter, academic content standards, and curriculum frameworks. | | | M | Evidence: Peter knows his subject matter, and strives to make it accessible to all of his students.  He works closely with his colleagues to ensure that all students have access to the content.  He also attends workshops or professional development to increase his knowledge base of his content area. |
| 3.2 Applying knowledge of student development and proficiencies to ensure student understanding of subject matter. | | | M | Evidence: Peter tries to pair his understanding and love of PE with where the various students are in his classes.  He tries to impress them that maintaining a healthy lifestyle is really important.  Enjoying PE is a hope but a challenge with respect to all students. |
| 3.3 Organizing curriculum to facilitate student understanding of subject matter. | | | M | Evidence:  Pete works with his department to plan their units, their rotations for facilities and equipment. |

## OBSERVATION AND PERFORMANCE REVIEW

| | Limited Progress Evident | Progress Evident | Meets Standards | Evidence |
|---|---|---|---|---|
| 3.4 Utilizing instructional strategies that are appropriate to the subject matter. | | | M | Evidence: His instruction with regards to volleyball was appropriate as evidenced by his students using bumping techniques, various serving techniques and setting the ball to each other. |
| 3.5 Using and adapting resources, technologies, and standard-aligned instructional materials/adopted materials to make subject matter accessible to all students. | | | M | Evidence: The PE department uses iPads to take roll on the courts. They keep adding to their program to keep the interest up for their students and increase the activities that may perhaps become life time activities. Golf is a good example. |
| 3.6 Addressing the needs of English learners and students with special needs to provide equitable access to content. | | | M | Evidence: PE is very physical and requires lots of actual demonstrations. So language doesn't play a hindering role for students. Many of the activities use basic physical skills, i.e. running, jumping, throwing though some of these need some refreshing for the students. |
| **4. PLANNING INSTRUCTION AND DESIGNING LEARNING EXPERIENCES FOR ALL STUDENTS** | Limited Progress Evident | Progress Evident | Meets Standards | Evidence |
| 4.1 Using background knowledge of students' academic readiness, language proficiency, cultural background, and individual development to plan instruction. | | | M | Evidence: PE might be one of the only places that language and culture do not keep students from participating because the sports cross the cultures and the demos are so visual. |
| 4.2 Establishing and articulating goals for student learning. | | | M | Evidence: Pete sets the goal for the class just before or during their warm ups. They need to accomplish at least one thing whether it is something related to fitness or cardio, or whether it is related to skills or strategies of a game. |
| 4.3 Developing and sequencing long-term and short-term instructional plans to support student learning. | | | M | Evidence: PE has lots of short and long term goals. They are very performance based. One often needs to learn skills, like in the class I watched today Pete taught some students how to bat the wiffle ball. In another class, he showed students how to best pitch to their team mates in order to allow their team the best chance of getting good hits. |
| 4.4 Planning instruction that incorporates appropriate strategies to meet the learning needs of all students. | | | M | Evidence: Pete knows what he wants his students to do when he enters the class. He has warm up, cardio fitness and sport targets to hit each day. |

## OBSERVATION AND PERFORMANCE REVIEW

| | Limited Progress Evident | Progress Evident | Meets Standards | Evidence |
|---|---|---|---|---|
| 4.5 Adapting instructional plans and curricular materials to meet the assessed learning needs of all students. | | | M | Evidence: Pete gets his assessments of his students from timing, measuring and watching them play or perform. He then knows, student by student what they need to work on or learn to be more successful the next time. |
| **5. ASSESSING STUDENTS FOR LEARNING** | | | | |
| 5.1 Applying knowledge of purposes, characteristics, and users of different types of assessments. | | | M | Evidence: Pete knows his performance tests whether they be sport related or fitness related. He knows good sequencing in order for his students to build to a peak at test time. |
| 5.2 Collecting and analyzing assessment data from a variety of sources to inform instruction. | | | M | Evidence: Pete gives each of his students 2 points each day for dressing and warm ups, then he has 2 points each day for their cardio involvement. He also had fitness grades, mile times, class sport participation points, points for how their teams perform in tournaments. And so on. He has lots of measures to use in grading his students and adjusts his warm ups or cardio or lesson of the day on how the students are doing. |
| 5.3 Reviewing data, both individually and with colleagues, to monitor student learning. | | | M | Evidence: Pete interacts and collaborates with his colleagues about rotating stations so that classes make good use of the cardio room and he team teaches on class with another PE teacher in order to have enough students to have tournaments etc. |
| 5.4 Using assessment data to establish learning goals and to plan, differentiate, and modify instruction. | | | M | Evidence: As I mentioned above, Pete sets the goals for the classes and then watches and in some cases measures whether they achieve the goal and then adjusts the next few lessons to ensure that the goal is accessible to all students. They play a role in whether they achieve it or not in many cases. |
| 5.5 Involving all students in self-assessments, goal-setting, and monitoring progress. | | | M | Evidence: Peter even taught a lesson in how to gage lap speeds in their mile runs so they don't burn themselves out but that they can achieve a pretty high goal if they break it up a bit. |
| 5.6 Using available technologies to assist in assessment, analysis, and communication of student learning. | | | M | Evidence: Pete uses Infinte Campus, iPad, stop watches whatever is needed to assess his students in the tasks the has set for them. |

# OBSERVATION AND PERFORMANCE REVIEW

| | Limited Progress Evident | Progress Evident | Meets Standards | |
|---|---|---|---|---|
| 5.7 Using assessment information to share timely and comprehensive feedback with students and their families. | | | | Evidence: The results of the students performances, their participation, their cardio development( mile times) as all recorded on Infinte Campus and the student and their family can access it. |
| **6. DEVELOPING AS A PROFESSIONAL EDUCATOR** | | | M | |
| 6.1 Reflecting on teaching practice in support of student learning. | | | | Evidence: Pete reflects on all things. This is not an area that Pete is lax in at all !! He very much supports the student, the whole student especially in attitude and self worth. Pete is committed to his students and their well being both now and in the future. this is one of Peter's goals for the year. |
| 6.2 Establishing professional goals and engaging in continuous and purposeful professional growth and development. | | | | Evidence: Peter does participate in purposeful professional growth and development. For example he recertified in First Aid, CPR and AED this spring. He also attends department professional growth when ever they introduce a new activity like golf. |
| 6.3 Collaborating with colleagues and the broader professional community to support teacher and student learning. | | | | Evidence: Peter meets with his department members once a month and with the members of all the Middle Schools three times a year to collaborate and share what they are doing and what is working and what isn't working and how can they better use facilities and equipment. |
| 6.4 Working with families to support student learning. | | | | Evidence: This is also one of Peter's goal areas this year. He wants to be in closer touch with the families of his students, especially the ones that are struggling. So he makes contact with the parents through Infinite campus, email and phone calls. Occasionally, he will meet with the family in person. |
| 6.5 Engaging local communities in support of the instructional program. | | | | |

## OBSERVATION AND PERFORMANCE REVIEW

| | | | |
|---|---|---|---|
| 6.6 Managing professional responsibilities to maintain motivation and commitment to all students. | | | Evidence: Peter supports his colleagues and his Instructional Supervisor. He attends all the staff meeting and cluster meetings. He keeps himself in good physical shape to model the importance of good physical fitness. He helps coach the High School boys baseball team. He really does commit to the lives and well being of all of his students. |
| 6.7 Demonstrating professional responsibility, integrity, and ethical conduct. | | | Evidence: Peter works hard to try and be the guy with high integrity and ethical conduct. He wants students to do that for themselves as well. He has a great deal to share with students and feels professionally responsible to do that. |

Observation of Peter Colombo
By Elinor J. Slack
April 15, 2014
PE  Grade 8

Students dressed and returned to their numbers while Peter took roll.  Pete began
the class with "Lot's to accomplish today".

Warm Ups.
Right to left 10, front to back 10,  hamstring stretch.  He says,"Guess where I was at 5
AM this morning? "  as he moves around the students that are stretching. " I was at
the gym , getting better, stronger, to be a good role model".
Pushup position and then do windmill or side planks.
Santana Row

"Girls, go around the gym you have one minute on the clock.  He held the boys
behind and then sent the boys to catch up with the girls and they had to be back
when the clock said 1:30.

Then he had them line up and the had them by groups of 1,2,3,or 4 do:  high knees,
lunges on each step, walking Frankensteins ("get a good stretch—way t go Smutz"),
Base steal slide to sprint, 4 flat out sprints, side slides to Peter and then take off.

"Everybody do a perimeter and 1/2" Meet over by the fence to get our 4 teams.  You
can make your own team  5 girls and 4 boys or 4 girls and 5 boys.
The kids took off on the jog and Peter explained what designated a 1 or a 2 on the
cardio part of the exercise by pointing out the effort levels of the kids on the
perimeter run.

When everyone got in, the kids arranged themselves in the aforementioned team
arrangement.  He had them line up under the evacuation numbers 1,2,3,4.  Team 2
organized first then Team 4 and so on.  Peter sent teams 1 and 2 over to Field one
and then teams 3 and 4 went to Field 2.

The teams are playing softball with a wiffle ball and bat.  There are 3 strikes and
students run the bases.  Students can be put out by either not making to the base by
the time the other team gets the ball back into the pitcher or by throwing them out
like in regular baseball.  I watched on student who probably would have been out
because his fielder was throwing the ball to him and he had his back turned to the
runner coming in, get shoved in the back so he missed the ball and because he
wasn't expecting the shove went flying on his face.  His neck took a pretty good
shake.  On field # 1, a pitcher got hit with a line drive.  Pete had someone else come
in and pitch while she let things calm down.  She was OK and was soon batting.

Peter was coaching students on how to bat on the other field and missed this
incident.  Pete also went over rules on double plays with a girl who had made a

second out because she ran to the next base on a fly ball the was caught and she didn't wait to leave the bag until after the ball was caught so when they threw the ball to the base she left she was out.

Peter called a guy that hit the ball really well and was trying to make it in to home, back to third because the ball reached the pitcher before he reached home.

On the other field one boy was hit in the foot by his own team's batter and Pete called him out and explained interference.

Then Pete went to one of the fields and rearranged the fielders and who was playing 2nd base.

And so it went for the rest of the period.  Pete went back and forth between the two field helping students in both games.  Peter also likes to sing, "Joy to the world and lyrics created by him".  Then he called safe and out in both games.

He sent teams 1 and 2 in and the 3 and 4.  Everyone seems to have had a good time.

Observation of
Peter Colombo
By Elinor Slack
Oct. 23, 2013
PE

It was quite cold this morning and you decided to keep the class indoors.  You had the students go into to gym and get on their numbers.  You took role.  This was an 8th grade class.
Warm Ups were done in their number formation:
Side to side     front to back, up and down   Quad stretches,  1-2-3 up and downs with heels down.  You moved about the class correcting students that weren't doing the stretches properly.  You called " enough, get into push up position and do hip touches".

Hips off the ground….

You had the students turn and face the opposite wall and come up to the green line .  then you had them sprint to the end of the gym.  Then high knee  skips and 49er  karaoke.  1-2-3  clap clap clap.  You moved a kid who had moved out of his line.
Shuffles across the gym—"Keep moving and keep your heart rate up"
High knee skips      Base stealing position—delayed steal  2 shuffle steps and then sprint.
You encourage students during every phase of this cardio workout.  They did several sprints  one involved sprinting dropping down and doing a push up and then sprinting again.
Delayed steal again---shuffle shuffle sprint
Listen to directions we have 2 more things to do.

Every boy spread out along the line at one end of the gym and the girls spread out at the opposite end of the gym.  Suicides trying to complete the circuit in 30 seconds.  You instructed the boys to run to the first free throw line and touch it and then return to the start, then go to the half court line and touch it and return to the start and then go to the second free thrown line and return to the start and then go to the end of the court and touch it and return to the start.  Then you had the girls do it.  Students weren't to sit or lie down.  You had the boys do it again and then the girls again.  In this exercise you told them to get their heads up, the reason became clear when one girl was holding her head and staggering back to the line.  She had run into someone or the wall.  You checked on her.  She stepped outside for a bit and then returned.

You had them sit if they wanted and praised them for their hard work.
You pointed out that they had already gone over bumping, serving and setting.  You reminded them to serve from the blue or green line.  The green lines were the court boundaries but the stands come pretty close to the back green line.  You can't hit the roof on a serve.  In play, if you hit the roof on your side and it comes down on your

side you can play it but if it hits the roof and comes down on the other team's side it isn't live any more.

You asked if anything was confusing from yesterday?  You reminded them that no one can touch the net.  You must call out the serve before you serve every time. They are playing a 6 points in a row rule and then you must give the ball over to the other side.  You asked about rotations?  If they had any questions to just come and ask you.

You had a tournament set up.  On  court one team 4 serving to team 2.  On court 2 Team 1  with team 3 serving.

The students set up quickly.

Call out the score with the serving team's score first and the receiving team's scocre second.

They are playing rally scoring.  The teacher walks about  to watch play.  He encourages students as they play and praises them for trying especially when they are not successful.

While students are playing, the teacher comments to me about students and how he calls one tweety bird and one Delaware because they moved recently from there. He points out his athletes and points out that one of his girls is a boxer.

The period goes on and the teacher calls out 10 minutes and 5 minutes etc. The students with the blue ball finished 37-35  Team 1  and the game with the red ball finished in a 35-35 tie which they would play off until someone had won by 2 points tomorrow.  The teacher excused the students to go change

There were 9 kids on a team with three rows on the court, the teacher said this allowed students to play all the time not have one third of the students sitting out of the game at all times.



PALO ALTO UNIFIED SCHOOL DISTRICT
CERTIFICATED HUMAN RESOURCES
**SUMMARY FORM (PERMANENT STAFF)**
**EVALUATION OF PERFORMANCE – TEACHERS**

*PAUSD JUN 11 2013 HUMAN RESOURCES*

Name: Pete Colombo

Evaluation Date: _____

Supervisor: Elinor J. Slack    Site: Jordan Middle School

Evaluation Plan:  ☑ Plan 2A    ☐ Plan 2B    ☐ Plan 2C    ☐ Plan 3    ☐ Plan 4

| | Supervisor's Rating of Performance Related To: | Meets All Elements of the Standards | Does Not Meet All Elements of the Standards (Indicate Elements Not Met) |
|---|---|---|---|
| 1. | Engaging and Supporting All Students in Learning | ✓ | |
| 2. | Creating and Maintaining Effective Environments for Student Learning | ✓ | |
| 3. | Understanding and Organizing Subject Matter for Student Learning | ✓ | |
| 4. | Planning Instruction and Designing Learning Experiences for All Students | ✓ | |
| 5. | Assessing Students for Learning | ✓ | |
| 6. | Developing as a Professional Educator | ✓ | |

**Overall Evaluation:** The overall evaluation must reflect the evidence regarding relevant performance in all areas of performance standards and progress on the professional development plan.

☑ **Meets Elements of the Standards - Satisfactory**

☐ **Does Not Meet All Elements of the Standards -Support/Improvement Plan Implemented**

☐ **Does Not Meet Standards - Unsatisfactory**

Addendum  ☑ has  ☐ has not been attached with additional comments (by either or both parties).

Provisions have been established for appealing an evaluation the Supervisee feels unfair. Contact the Certificated Human Resources Department for information regarding this appeal process.

Plan For Next Evaluation Cycle:  ☑ Plan 2A    ☐ Plan 2B    ☐ Plan 2C    ☐ Plan 3    ☐ Plan 4

| Supervisee's Signature and Date | Supervisor's Signature and Date | Instructional Supervisor Signature and Date |
|---|---|---|
| *[signature]* 5/1/13 | Elinor Slack 5/1/13 | |
| My signature does not necessarily indicate agreement | | |

**Note:** Signature of teacher does not imply agreement with evaluation. Teacher has the right to attach written comments within ten (10) days.

| | Supervisee Responses: | YES | NO |
|---|---|---|---|
| 1. | Supervisor has scheduled and met with me at least two times during the year to discuss my long-range professional development plan and annual objectives and to review progress and performance. | ☒ | |
| 2. | Supervisor has supported my efforts to attain the teaching standards. | ☒ | |
| 3. | I have shared with my supervisor information gathered from students. | ☒ | |
| 4. | I have shared with my supervisor information gathered from parents. | ☒ | |
| 5. | My supervisor has given me the opportunity to provide input on his/her performance. | ☒ | |

Supervisee's Initials _____

**EXHIBIT A-2  014**



# PROFESSIONAL DEVELOPMENT PLAN

| Name: | Click here to enter name. *Pete Colombo* | | Year: | Click here to enter year. 2010 |
|---|---|---|---|---|
| Supervisor: | Click here to enter supervisor. *Steve Slack* | | Site: | Click here to enter site. *Jordan Middle* |

This plan may cover 1 to 4 years of professional activity. It should include 1 to 5 professional growth goals that are consistent with school, district, and department goals and identify the CSTPs related to the goals.  This plan should be updated annually and be kept on file by both the teacher and the supervisor.

## CALIFORNIA STANDARDS FOR THE TEACHING PROFESSION (CSTP)

1. Engaging and Supporting All Students in Learning
2. Creating and Maintaining Effective Environments for Student Learning
3. Understanding and Organizing Subject Matter for Student Learning
4. Planning Instruction and Designing Learning Experiences
5. Assessing Students for Learning
6. Developing as a Professional Educator

Click here to enter your professional development goals.

1. ENGAGING AND SUPPORTING ALL STUDENTS IN LEARNING
(1.1) USING Knowledge of STUDENTS to ENGAGE them in LEARNING
    A. ASK Questions About STUDENTS / Their LIKES AND interest.
    B. Keep improving on listening to STUDENTS.
    C. Keep improving with " Checking for UNDERSTANDING"
       AND MODELING.

(1.3) Connect Subject Matter to Meaningful, Real Life contexts.

6. Developing AS A Professional EDUCATOR
6.1 Reflection to Support Student learning
    A. ATTEND Reach Conf.
    B. FINISH PROF Growth Units VARNI Classes

6.4 WORK WITH FAMILIES to Support Student learning.

### What support might you need to reach your goals?

Click here to enter support needs.

1. Input FROM Colleagues / ASK Questions      A. Email
2. S I P DAYS                                 B. Phone
3. Department Meetings = Sharing Ideas / Best practices   C. Conference

We have discussed this professional development plan and will work together toward its implementation.

_____ 11/13/2012        _Elwin Slack_ 11/13/2012
Teacher's Signature & Date      Supervisor's Signature & Date      Instructional Sup Signature & Date

## CALIFORNIA STANDARDS FOR THE TEACHING PROFESSION (CSTP)

### 1. ENGAGING AND SUPPORTING ALL STUDENTS LEARNING

1.1   Using knowledge of students to engage them in learning.

1.2   Connecting learning to students' prior knowledge, backgrounds, life experiences, and interests.

1.3   Connecting subject matter to meaningful, real-life contexts.

1.4   Using a variety of instructional strategies, resources, and technologies to meet students' diverse needs.

1.5   Promoting critical thinking through inquiry, problem solving and reflection.

1.6   Monitoring student learning and adjusting instructions while teaching.

### 2. CREATING AND MAINTAINING EFFECTIVE ENVIRONMENTS FOR STUDENTS LEARNING

2.1   Promoting social development and responsibility within a caring community where each student is treated fairly and respectfully.

2.2   Creating physical/virtual learning environments that promote student learning, reflect diversity, and encourage constructive/productive interactions among students.

2.3   Establishing and maintaining learning environments that are physically, intellectually, and emotionally safe.

2.4   Creating a rigorous learning environment with high expectations and appropriate support for all students.

2.5   Developing, communicating, and maintaining high standards for individual and group behavior.

2.6   Employing classroom routines, procedures, norms, and supports for positive behavior to ensure a climate in which all students can learn.

2.7   Using instructional time to optimize learning.

### 3. UNDERSTANDING AND ORGANIZING SUBJECT MATTER FOR STUDENT LEARNING

3.1   Demonstrating knowledge of subject matter, academic content standards, and curriculum frameworks.

3.2   Applying knowledge of student development and proficiencies to ensure student understanding of subject matter.

3.3   Organizing curriculum to facilitate student understanding of subject matter.

3.4   Utilizing instructional strategies that are appropriate to the subject matter.

3.5   Using and adapting resources, technologies, and standard-aligned instructional materials/adopted materials to make subject matter accessible to all students.

3.6   Addressing the needs of English learners and students with special needs to provide equitable access to content.

### 4. PLANNING INSTRUCTION AND DESIGNING LEARNING EXPERIENCES FOR ALL STUDENTS

4.1   Using background knowledge of students' academic readiness, language proficiency, cultural background, and individual development to plan instruction.

4.2   Establishing and articulating goals for student learning.

4.3   Developing and sequencing long-term and short-term instructional plans to support student learning.

4.4   Planning instruction that incorporates appropriate strategies to meet the learning needs of all students.

4.5   Adapting instructional plans and curricular materials to meet the assessed learning needs of all students.

### 5. ASSESSING STUDENTS FOR LEARNING

5.1   Applying knowledge of purposes, characteristics, and users of different types of assessments.

5.2   Collecting and analyzing assessment data from a variety of sources to inform instruction.

5.3   Reviewing data, both individually and with colleagues, to monitor student learning.

5.4   Using assessment data to establish learning goals and to plan, differentiate, and modify instruction.

5.5   Involving all students in self-assessments, goal-setting, and monitoring progress.

5.6   Using available technologies to assist in assessment, analysis, and communication of student learning.

5.7   Using assessment information to share timely and comprehensive feedback with students and their families.

### 6. DEVELOPING AS A PROFESSIONAL EDUCATOR

6.1   Reflecting on teaching practice in support of student learning.

6.2   Establishing professional goals and engaging in continuous and purposeful professional growth and development.

6.3   Collaborating with colleagues and the broader professional community to support teacher and student learning.

6.4   Working with families to support student learning.

6.5   Engaging local communities in support of the instructional program.

6.6   Managing professional responsibilities to maintain motivation and commitment to all students.

6.7   Demonstrating professional responsibility, integrity, and ethical conduct.

Summary of Pete Colombo
By Elinor Slack
April 2013
PE

Pete is passionate about his teaching.  He cares about his students.  He works hard to get to know his students.  He wants the best for them.  He wants them to improve in whatever they try.   He gives animated instruction.  He provides very visual instruction so the students can see what they are supposed to do.  He works hard to break the skill down and show students how to do it.  Then he involves the students in the task as soon as they are ready.  If one of the students shows that they can really do the task, Pete has them demonstrates the skill.

Pete tries hard to identify with some students who struggle with school and the system.  He is honest and straight forward with them.  He supports them within his department.

Pete's own professional goals reflects his desire to attend to the human needs of his students.  He wants to support student learning and to work with families to support student learning.  He is working on reaching out to families through email, phone calls or conferences to improve student performance and well being.

He wants to improve his ways of checking for understanding and modeling what he wants them to do.  He continues to work on improving how to listen to students.

Physical education is Pete's medium but he is concerned with the whole student.  What makes them tick, what and why they are doing what they are doing, these are often what motivates him.

When watching and listening to Pete teach you will hear frequent encouragement and positive support for all levels of students.  He tries really hard to help students that struggle in PE to find themselves and push themselves a bit further than they might without the support.  He spots students that have natural ability and try to get them to go even further.

Pete is a people person.  It is his strength and can be a draw back.  It can lead him to disappointment or temporary frustration with some of his students.  He cares so

much that they might be letting themselves down. Or that they might be taking a really bad road, he reacts strongly.

One of the goals of the PE department is to monitor the locker rooms more closely, this is a good idea. Especially 5th or 6th period when we have sixth graders and eighth graders in the locker room at the same time.

Things to Work On-

1. Work on tempering that concern that you have. It is a valuable piece but work with it in moderation.
2. If you become aware of a source of information that could help you be even better, seek it out and make yourself more knowledgeable.
3. Continue to work on monitoring the locker room to maintain a safe environment for all students.

Observation of Peter Colombo
By Elinor Slack
April 18, 2013
PE Per. 5   10:30 AM

Peter began the class by taking roll, a few kids were tardy.  This class is quite something with its personnel makeup.  He took roll and dismissed them to go in and get changed.  Question?  If students aren't going to change, why do they need to go into the locker room.

Students return from the locker room and Peter has them do warm ups and  jogs around the courts.  Then he had the class jog to the cardio room for a cardio warm-up.  The boys started with rowing and the girls started on the spin cycles.  The boys had to row 800 yards and the girls just had to ride.  He kept calling on students to put both of their hands on the handlebars of the bikes and spoke to students about keeping aware of their backs on the rowing.  The teacher was also checking students for complete PE outfits as they worked out.

Then the girls and boys switched.  He had the boys sprint on the bikes ( I don't remember if he did that with the girls)   Peter complimented Jasmine on her rowing that she could be a really good rower.  She smiled at his comment.  He told everyone there were two minutes left in the session and then he did one minute.  And then the students finished.

He had them all go out to the track where he grouped the guys, instructed them to give him one lap all out.  He started them and called the girls over and told them to do the 400 as fast as they could.

As students finished their lap, Pete called out their times and complimented the gentlemen on their work.  He then instructed the class to go over to their numbers.  He called out their names once they were on their numbers and recorded their 400 times.  As he was taking them he checked their previous 400 time and gave them the improvement in the time if there was one.  And in many cases there was tremendous improvement.

He called the class together and told them that they were going to transition to long jump. He had the students sit in the bleachers called for quiet using 5-4-3... no talking.

Jamal sit the right way up the stands.

Long jump is a running approach, and a one foot take off and landing on two feet especially being aware of where the heels land. He pointed out that they must take off from behind the forward edge of the white board. He had a student run a short distance and take off showing what a fault/foul jump looked like. Then he had the students line up about 6-8 feet down the run way and try jogging to the board and taking off on one foot and not fouling. The teacher emphasized to land on two feet in the pit. As students attempted the jumps, the teacher corrected their jump and in many cases complimented them on their jumps. Examples were Jamal, and Edward. Then he had the line back up and run a further distance. He repeated that again until the students were running about 50 feet before take off.

The coach repeatedly compliments the students on their effort. The bell rang and few students still wanted to achieve the class record and there were some pretty good jumps. By marking the farthest jump students were trying pretty had to set the new record. The teacher excused the class but stayed with the students that still wanted to jump.

# OBSERVATION AND PERFORMANCE REVIEW

Pete Colombo

Apr-13

| 1. ENGAGING AND SUPPORTING ALL STUDENTS LEARNING | Limited Progress Evident | Progress Evident | Meets Standards | Evidence |
|---|---|---|---|---|
| 1.1 Using knowledge of students to engage them in learning. | | | M | Evidence:  One of Pete's goals is to listen to his students and get to know and understand them more.  He feels that if he knows them better, he can get them to engage in his subject area better. |
| 1.2 Connecting learning to students' prior knowledge, backgrounds, life experiences, and interests. | | | M | Evidence:  He is checking with students about how they have done, keeping them informed as to what they have done in the past. |
| 1.3 Connecting subject matter to meaningful, real-life contexts. | | | M | Evidence:  Pete feels his subject area is real life.  Right down to the students' future survival and healthy living. |
| 1.4 Using a variety of instructional strategies, resources, and technologies to meet students' diverse needs. | | | M | Evidence:  Pete is working on improving his checking for understanding during his lesson and to model his lesson so students who may not speak English proficiently can keep up with everyone else by watching what he or a student is doing to show how to do a skill. |
| 1.5 Promoting critical thinking through inquiry, problem solving and reflection. | | | | |
| 1.6 Monitoring student learning and adjusting instructions while teaching. | | | M | Evidence:  He gave some individual coaching to each student as they did their long jump and then gave a comment about the group in general as to what they could do to improve their jumps. |

| 2. CREATING AND MAINTAINING EFFECTIVE ENVIRONMENTS FOR STUDENTS LEARNING | Limited Progress Evident | Progress Evident | Meets Standards | Evidence |
|---|---|---|---|---|
| 2.1 Promoting social development and responsibility within a caring community where each student is treated fairly and respectfully. | | | | |
| 2.2 Creating physical/virtual learning environments that promote student learning, reflect diversity, and encourage constructive/productive interactions among students. | | | M | Evidence; Pete is very sensitive to how students interact with each other. |

EXHIBIT A-2_021

# OBSERVATION AND PERFORMANCE REVIEW

| | Limited Progress Evident | Progress Evident | Meets Standards | Evidence |
|---|---|---|---|---|
| 2.3 Establishing and maintaining learning environments that are physically, intellectually, and emotionally safe. | | | M | Evidence: the rules for safety are explained and enforced. |
| 2.4 Creating a rigorous learning environment with high expectations and appropriate support for all students. | | | | |
| 2.5 Developing, communicating, and maintaining high standards for individual and group behavior. | | | | |
| 2.6 Employing classroom routines, procedures, norms, and supports for positive behavior to ensure a climate in which all students can learn. | | | | |
| 2.7 Using instructional time to optimize learning. | | | M | Evidence: Pete's classes transition to so many stations with exercise, agility drills, cardio practice and his specific sport instruction, he has to make good use of the instructional time. |
| **3. UNDERSTANDING AND ORGANIZING SUBJECT MATTER FOR STUDENT LEARNING** | | | | Evidence |
| 3.1 Demonstrating knowledge of subject matter, academic content standards, and curriculum frameworks. | | | | |
| 3.2 Applying knowledge of student development and proficiencies to ensure student understanding of subject matter. | | | | |
| 3.3 Organizing curriculum to facilitate student understanding of subject matter. | | | M | Evidence: Pete breaks the task down to get it across to his students. Like beginning the long jump with a short jog of 6-8 feet and then slowly having them back it up to about 60 feet. |
| 3.4 Utilizing instructional strategies that are appropriate to the subject matter. | | | | |
| 3.5 Using and adapting resources, technologies, and standard-aligned instructional materials/adopted materials to make subject matter accessible to all students. | | | | |
| **4. PLANNING INSTRUCTION AND DESIGNING LEARNING EXPERIENCES FOR ALL STUDENTS** | | | | Evidence |
| 3.6 Addressing the needs of English learners and students with special needs to provide equitable access to content. | | | M | Evidence: One of Pete's goals is to make as much use of modeling as possible. This really helps in conjunction with a verbal explanation so English Language Learners can learn the skill and the language at the same time. |

# OBSERVATION AND PERFORMANCE REVIEW

| | Limited Progress Evident | Progress Evident | Meets Standards | Evidence |
|---|---|---|---|---|
| 4.1 Using background knowledge of students' academic readiness, language proficiency, cultural background, and individual development to plan instruction. | | | | |
| 4.2 Establishing and articulating goals for student learning. | | | | |
| 4.3 Developing and sequencing long-term and short-term instructional plans to support student learning. | | | | |
| 4.4 Planning instruction that incorporates appropriate strategies to meet the learning needs of all students. | | | M | Evidence: Lessons are planned in short sections. Instruction is preceded by safety instructions. Students practice, the coach moves about and makes individual corrections. |
| 4.5 Adapting instructional plans and curricular materials to meet the assessed learning needs of all students. | | | | |
| **5. ASSESSING STUDENTS FOR LEARNING** | | | | |
| 5.1 Applying knowledge of purposes, characteristics, and users of different types of assessments. | | | | |
| 5.2 Collecting and analyzing assessment data from a variety of sources to inform instruction. | | | | |
| 5.3 Reviewing data, both individually and with colleagues, to monitor student learning. | | | | |
| 5.4 Using assessment data to establish learning goals and to plan, differentiate, and modify instruction. | | | | |
| 5.5 Involving all students in self-assessments, goal-setting, and monitoring progress. | | | | |
| 5.6 Using available technologies to assist in assessment, analysis, and communication of student learning. | | | M | Evidence: The PE department uses the computer quite a bit. An iPad to take roll, the lockers are all kept on computer, grades, etc. |
| 5.7 Using assessment information to share timely and comprehensive feedback with students and their families. | | | | |
| **6. DEVELOPING AS A PROFESSIONAL EDUCATOR** | | | | |
| 6.1 Reflecting on teaching practice in support of student learning. | | | M | Evidence: Pete is attending the Reach Conference to help support student learning. |
| 6.2 Establishing professional goals and engaging in continuous and purposeful professional growth and development. | | | M | Evidence: To assist him with computer skills to better support his assessment and data collecting or just being able to check on students in other classes, he is attending the professional growth opportunities held by Dominican College. |

## OBSERVATION AND PERFORMANCE REVIEW

| | | |
|---|---|---|
| 6.3 Collaborating with colleagues and the broader professional community to support teacher and student learning. | M | Evidence: Pete works in a department that has to collaborate just to best use the facilities with all of the students and teachers. They also set department goals to reach, this year there is a focus to improve the flexibility responses of our students on the physical fitness tests. |
| 6.4 Working with families to support student learning. | M | Evidence: Another of Pete's goals is to work with families to support student learning and he has identified email, phone calls and conferences to help accomplish this goal. |
| 6.5 Engaging local communities in support of the instructional program. | | |
| 6.6 Managing professional responsibilities to maintain motivation and commitment to all students. | | |
| 6.7 Demonstrating professional responsibility, integrity, and ethical conduct. | | |



PALO ALTO UNIFIED SCHOOL DISTRICT
CERTIFICATED HUMAN RESOURCES
**SUMMARY FORM (PERMANENT STAFF)**
**EVALUATION OF PERFORMANCE – TEACHERS**



PAUSD
JUN 11 2013
HUMAN RESOURCES

Name: _Pete Colombo_     Evaluation Date: _____

Supervisor: _Elinor J. Slack_     Site: _Jordan Middle School_

Evaluation Plan:  ☑ Plan 2A     ☐ Plan 2B     ☐ Plan 2C     ☐ Plan 3     ☐ Plan 4

| | Supervisor's Rating of Performance Related To: | Meets All Elements of the Standards | Does Not Meet All Elements of the Standards (Indicate Elements Not Met) |
|---|---|---|---|
| 1. | Engaging and Supporting All Students in Learning | ✓ | |
| 2. | Creating and Maintaining Effective Environments for Student Learning | ✓ | |
| 3. | Understanding and Organizing Subject Matter for Student Learning | ✓ | |
| 4. | Planning Instruction and Designing Learning Experiences for All Students | ✓ | |
| 5. | Assessing Students for Learning | ✓ | |
| 6. | Developing as a Professional Educator | ✓ | |

**Overall Evaluation:** The overall evaluation must reflect the evidence regarding relevant performance in all areas of performance standards and progress on the professional development plan.

☑ Meets Elements of the Standards - Satisfactory

☐ Does Not Meet All Elements of the Standards -Support/Improvement Plan Implemented

☐ Does Not Meet Standards - Unsatisfactory

Addendum  ☑ has     ☐ has not been attached with additional comments (by either or both parties).

Provisions have been established for appealing an evaluation the Supervisee feels unfair. Contact the Certificated Human Resources Department for information regarding this appeal process.

Plan For Next Evaluation Cycle:  ☑ Plan 2A     ☐ Plan 2B     ☐ Plan 2C     ☐ Plan 3     ☐ Plan 4

| Supervisee's Signature and Date | Supervisor's Signature and Date | Instructional Supervisor Signature and Date |
|---|---|---|
| _[signature]_ 5/1/13 <br> My signature does not necessarily indicate agreement | _Elinor Slack_ 5/1/13 | |

**Note:** Signature of teacher does not imply agreement with evaluation. Teacher has the right to attach written comments within ten (10) days.

| | Supervisee Responses: | YES | NO |
|---|---|---|---|
| 1. | Supervisor has scheduled and met with me at least two times during the year to discuss my long-range professional development plan and annual objectives and to review progress and performance. | ✗ | |
| 2. | Supervisor has supported my efforts to attain the teaching standards. | ✗ | |
| 3. | I have shared with my supervisor information gathered from students. | ✗ | |
| 4. | I have shared with my supervisor information gathered from parents. | ✗ | |
| 5. | My supervisor has given me the opportunity to provide input on his/her performance. | ✗ | |

Supervisee's Initials _____

EXHIBIT A-2  025

Cert Pers / CEHR Eval Forms / Summary Form Perm Staff.....Rev 9/11



# PROFESSIONAL DEVELOPMENT PLAN

| Name: | Pete Colombo | | Year: | 2019 |
|---|---|---|---|---|
| Supervisor: | Ellen Blach | | Site: | Gordon M.S. |

This plan may cover 1 to 4 years of professional activity. It should include 1 to 5 professional growth goals that are consistent with school, district, and department goals and identify the CSTPs related to the goals. This plan should be updated annually and be kept on file by both the teacher and the supervisor.

## CALIFORNIA STANDARDS FOR THE TEACHING PROFESSION (CSTP)

1. Engaging and Supporting All Students in Learning
2. Creating and Maintaining Effective Environments for Student Learning
3. Understanding and Organizing Subject Matter for Student Learning
4. Planning Instruction and Designing Learning Experiences
5. Assessing Students for Learning
6. Developing as a Professional Educator

*Click here to enter your professional development goals.*

1. ENGAGING AND SUPPORTING ALL STUDENTS IN LEARNING
   (1.1) USING Knowledge of STUDENTS to ENGAGE them in learning
      A. ASK questions about STUDENTS/Their Likes and interest.
      B. Keep improving on listening to students.
      C. Keep improving with " Checking for Understanding AND modeling.
   (1.3) Connect Subject Matter to Meaningful, Real Life contexts.

6. Developing AS A PROFESSIONAL EDUCATOR
   6.1 Reflection to Support Student learning
      A. ATTEND Reach Conf.
      B. finish PROF Growth Units VARNI classes
   6.4 WORK with families to Support Student learning
      A. Email
      B. Phone
      C. Conference

### What support might you need to reach your goals?

*Click here to enter support needs.*

1. Input from colleagues/Ask questions
2. SIP DAYS
3. Department meetings = Sharing IDEAS/Best practices

### We have discussed this professional development plan and will work together toward its implementation.

| | | |
|---|---|---|
| ___ 11/13/2012 | Ellen Blach 11/13/2012 | |
| Teacher's Signature & Date | Supervisor's Signature & Date | Instructional Sup Signature & Date |



PALO ALTO UNIFIED SCHOOL DISTRICT
CERTIFICATED HUMAN RESOURCES
**SUMMARY FORM (PERMANENT STAFF)**
**EVALUATION OF PERFORMANCE – TEACHERS**

---

Name: *Pete Colombo*                   Evaluation Date: _____

Supervisor: *Elinor J. Slack*          Site: *Jordan Middle School*

Evaluation Plan:  ☑ Plan 2A   ☐ Plan 2B   ☐ Plan 2C   ☐ Plan 3   ☐ Plan 4

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | Supervisor's Rating of Performance Related To: | Meets All Elements of the Standards | Does Not Meet All Elements of the Standards (Indicate Elements Not Met) |
|---|---|---|---|
| 1. | Engaging and Supporting All Students in Learning | ✓ | |
| 2. | Creating and Maintaining Effective Environments for Student Learning | ✓ | |
| 3. | Understanding and Organizing Subject Matter for Student Learning | ✓ | |
| 4. | Planning Instruction and Designing Learning Experiences for All Students | ✓ | |
| 5. | Assessing Students for Learning | ✓ | |
| 6. | Developing as a Professional Educator | ✓ | |

**Overall Evaluation:**  The overall evaluation must reflect the evidence regarding relevant performance in all areas of performance standards and progress on the professional development plan.

☑ Meets Elements of the Standards - Satisfactory

☐ Does Not Meet All Elements of the Standards -Support/Improvement Plan Implemented

☐ Does Not Meet Standards - Unsatisfactory

Addendum  ☑ has   ☐ has not been attached with additional comments (by either or both parties).

Provisions have been established for appealing an evaluation the Supervisee feels unfair.  Contact the Certificated Human Resources Department for information regarding this appeal process.

Plan For Next Evaluation Cycle:  ☑ Plan 2A   ☐ Plan 2B   ☐ Plan 2C   ☐ Plan 3   ☐ Plan 4

| Supervisee's Signature and Date<br>5/1/13<br><sub>My signature does not necessarily indicate agreement</sub> | Supervisor's Signature and Date  *Elinor Slack* 5/1/13 | Instructional Supervisor Signature and Date |
|---|---|---|

**Note:**  Signature of teacher does not imply agreement with evaluation.  Teacher has the right to attach written comments within ten (10) days.

| | Supervisee Responses: | YES | NO |
|---|---|---|---|
| 1. | Supervisor has scheduled and met with me at least two times during the year to discuss my long-range professional development plan and annual objectives and to review progress and performance. | ✕ | |
| 2. | Supervisor has supported my efforts to attain the teaching standards. | ✕ | |
| 3. | I have shared with my supervisor information gathered from students. | ✕ | |
| 4. | I have shared with my supervisor information gathered from parents. | ✕ | |
| 5. | My supervisor has given me the opportunity to provide input on his/her performance. | ✕ | |

Supervisee's Initials

EXHIBIT A-2_027

Cert Pers / CEHR Eval Forms / Summary Form Perm Staff....Rev 9/11



# PROFESSIONAL DEVELOPMENT PLAN

| Name: | Pete Colombo | | Year: | 2010 |
|---|---|---|---|---|
| Supervisor: | Elmie Slack | | Site: | Jordan M.DD. |

This plan may cover 1 to 4 years of professional activity. It should include 1 to 5 professional growth goals that are consistent with school, district, and department goals and identify the CSTPs related to the goals. This plan should be updated annually and be kept on file by both the teacher and the supervisor.

## CALIFORNIA STANDARDS FOR THE TEACHING PROFESSION (CSTP)

1. Engaging and Supporting All Students in Learning
2. Creating and Maintaining Effective Environments for Student Learning
3. Understanding and Organizing Subject Matter for Student Learning
4. Planning Instruction and Designing Learning Experiences
5. Assessing Students for Learning
6. Developing as a Professional Educator

Click here to enter your professional development goals.

1. ENGAGING AND SUPPORTING ALL STUDENTS IN LEARNING
(1.1) USING Knowledge of Students to Engage them in Learning
   A. ASK questions about Students / their Likes and interests.
   B. Keep improving on listening to students.
   C. Keep improving with "Checking for Understanding" and modeling.

(1.3) Connect Subject Matter to meaningful, Real Life contexts.

6. Developing AS A Professional Educator
6.1 Reflection to Support Student Learning
   A. ATTEND Reach Conf.
   B. finish Prof Growth Units VARNI classes

6.4 Work with Families to Support Student Learning
   A. Email
   B. Phone
   C. Conference

### What support might you need to reach your goals?

Click here to enter support needs.

1. Input from colleagues / ASK questions
2. SIP DAYS
3. Department Meetings = Sharing Ideas / Best Practices

We have discussed this professional development plan and will work together toward its implementation.

| 11/13/2012 | Elmie Slack 11/3/2012 | |
|---|---|---|
| Teacher's Signature & Date | Supervisor's Signature & Date | Instructional Sup Signature & Date |



PALO ALTO UNIFIED SCHOOL DISTRICT
CERTIFICATED HUMAN RESOURCES
**SUMMARY FORM (PERMANENT STAFF)**
**2010-2011 EVALUATION OF PERFORMANCE – TEACHERS**



PAUSD
JUN 06 2011
Human Resources

Name: _Peter Colombo_

Site: _Jordan Middle School_

Evaluator: _Elinor Slack_

Evaluation Date: **May 1, 2011**

Evaluation Plan: ☒ 2A  ☐ 2B  ☐ 2C  ☐ 3  ☐ 4

| | Supervisor's Rating of Performance Related To: | | Meets All Standards | Progress Evident Towards Standards | Does Not Meet Standards |
|---|---|---|---|---|---|
| 1. | Management and Monitoring of Student Learning | 1. | ☒ | ☐ | ☐ |
| 2. | Commitment to Students and Learning | 2. | ☒ | ☐ | ☐ |
| 3. | Knowledge of Content and How to Teach | 3. | ☒ | ☐ | ☐ |
| 4. | Reflection on and Refinement of Practice | 4. | ☒ | ☐ | ☐ |
| 5. | Participation in Learning Communities | 5. | ☒ | ☐ | ☐ |

**Overall Evaluation** The overall evaluation must reflect the evidence regarding relevant performance in all areas of performance standards and progress on the professional development plan.

☒ **Meets Standards - Satisfactory**

☐ **Does Not Meet Standards -Support/Improvement Plan Implemented**

☐ **Does Not Meet Standards - Unsatisfactory**

Addendum ☒ has ☐ has not been attached with additional comments (by either or both parties).

Provisions have been established for appealing an evaluation the Supervisee feels unfair. Contact the Certificated Human Resources Department for information regarding this appeal process.

Plan Selection For Next Evaluation Cycle: ☒ 2A  ☐ 2B  ☐ 2C  ☐ 3  ☐ 4

| Supervisee's Signature and Date | Evaluator's Signature and Date | Principal's Signature and Date |
|---|---|---|
| _[signature]_ 5/18/2011 | _Elinor Slack_ 5/4/11 | _[signature]_ 5/31/11 |
| My signature does not necessarily indicate agreement | if other than building principal | |

**Note:** Signature of teacher does not imply agreement with evaluation. Teacher has the right to attach written comments within ten (10) days.

| | Supervisee Responses: | YES | NO |
|---|---|---|---|
| 1. | Supervisor has scheduled and met with me at least three times during the year to discuss my long-range professional development plan and annual objectives and to review progress and performance. | ☒ | ☐ |
| 2. | Supervisor has supported my efforts to attain the teaching standards. | ☒ | ☐ |
| 3. | I have shared with my supervisor information gathered from students. | ☒ | ☐ |
| 4. | I have shared with my supervisor information gathered from parents. | ☒ | ☐ |
| 5. | My supervisor has given me the opportunity to provide input on his/her performance. | ☒ | ☐ |

Supervisee's Initials _[initials]_

Evaluation of Peter Colombo
Observation 4/26/11
By Elinor Slack

1. Management and Monitoring of Student Learning
   Peter has excellent control of his class. He had them warm up before he took them over to the long jump pit where he explained the approach, the rules of the take off, how the jump is measured as the nearest part of the body to the front part of the board. The warm up consisted of stretches, half of a perimeter and then you went into the workout room where you had boys on rowers for 7 minutes and girls on spin cycles and then you had them switch. You wanted the rowers to row 1000 meters. They were to raise their hands when they finished and you congratulated nearly every one of them individually. Following that you set two and half minutes for a time to complete one lap of the field and then went to the long jump pit.
   He did a couple of demo jumps and then had the class line up about 50 feet from the take off board and had students run up and jump, then they were to go sit down on the bleachers. Then he shortened up the run in order to get the students another jump. He had some students who weren't quite into the long jump and he had them go back and put in better efforts. He complimented a number of students on their efforts. He pointed out that they would get better at the long jump as they practiced. Peter spotted that a couple of students would do well to go out for track.

2. Commitment to Students & Learning
   Peter has a wide variety of athletic talent in his class. This diversity can lead to some frustration. There were three girls that were always the last to do anything. Rather than call them out negatively you would say, " Girls, I need a better effort". This put the message into a more positive frame and made it an I message. You also had them repeat their jumps upon which they would give a better performance.
   You have one young man in the class who has a severe leg challenge but still participates in all of the activities and you mentioned that this student had a lot of heart. And he amazed you almost daily.
   You are really positive with these students, encouraging when you can, asking them to try again to improve when they try to do less than they are capable. Your directions are clear and repeated.

3. Knowledge of content & How to Teach
   You work much like the rest of your department. You have a definite plan of moving from activity to activity. The period is very full, students are moving nearly all of the time.
   You were clear in the rules of the long jump and I believe all of the students understood them. I think you realized that you started them from too far back for their first jump and corrected that on their second and then corrected again. Note to yourself, have them start short and then move back.

In your track unit, you are going over every field activity and running event so that each student has a chance to experience them and then they will find that they are better at some of the events over others.

4. Reflection on and Refinement of Practice

I don't know what personal reflection you might do but I know you work with your department in revamping and upgrading the whole PE program. For example, you were in the 6th grade folk dance classes, you went to the golf workshop on a staff development day, you upgrade your lifeguard and swimming certification yearly or every two years.

I know you are part of the department meetings that look at topics like trying to get everyone to be on the same page for attendance, mile performances, fitness test performances and the new literacy focus.

I know that Cindy set some goals for you to achieve this year and I believe you are well on your way to accomplishing that. Continue the good work, it only makes you a better teacher.

5. Participation in Learning Communities

Pete is a very definite part of the PE department. He works well with the others and they all have a concern for the well being of our students. He is mindful of proper warm ups, good cardio vascular stamina and skills presentation.

He also attended the folkdance classes with his 6th grade and participated in the dancing.

He takes some of our Saturday school sessions and works with students there.

He substitutes when we need a teacher to fill in for another teacher when we have an open period.

He attends all of the staff, extended team and cluster meetings.

Areas to Work On:
1. Continue to focus on honing your teaching skills in PE.
2. Supervise the PE locker rooms before and after class to help maintain a safe environment for all of our students.



PALO ALTO UNIFIED SCHOOL DISTRICT
CERTIFICATED HUMAN RESOURCES
SUMMARY FORM (PERMANENT STAFF)
2009-2010 EVALUATION OF PERFORMANCE - TEACHERS

PAUSD
MAY 2 8 2010
Human Resources

| Name: | Colombo, Peter M. | Jordan | Evaluation Date: | **May 1, 2010** |
| Site: | Permanent | 1.00 | | |
| | Pappas, C. | | Evaluation Plan: | ☒ 2A ☐ 2B ☐ 2C ☐ 3 ☐ 4 |

STATUS OF EMPLOYEE:

| | Supervisor's Rating of Performance Related To: | | Meets All Standards | Progress Evident Towards Standards | Does Not Meet Standards |
|---|---|---|---|---|---|
| 1. | Management and Monitoring of Student Learning | 1. | | | X |
| 2. | Commitment to Students and Learning | 2. | | X | |
| 3. | Knowledge of Content and How to Teach | 3. | | X | |
| 4. | Reflection on and Refinement of Practice | 4. | | X | |
| 5. | Participation in Learning Communities | 5. | | | X |

**Overall Evaluation**    The overall evaluation must reflect the evidence regarding relevant performance in all areas of performance standards and progress on the professional development plan.

☐ Meets Standards - Satisfactory

☒ Does Not Meet Standards - Support/Improvement Plan Implemented    (To be implemented 2010-2011)

☐ Does Not Meet Standards - Unsatisfactory

Addendum ☐ has ☐ has not been attached with additional comments (by either or both parties).

Provisions have been established for appealing an evaluation the Supervisee feels unfair. Contact the Certificated Human Resources Department for information regarding this appeal process.

Plan Selection For Next Evaluation Cycle: ☐ 2A ☐ 2B ☐ 2C ☐ 3 ☐ 4

| Supervisee's Signature and Date | Supervisor's Signature and Date | Principal's Signature and Date |
|---|---|---|
| *[signature]* 5/28/10 | *Cynthia Pappas* 5/21/10 | *[signature]* 5/28/10 |
| My signature does not necessarily indicate agreement | If other than building principal | |

**Note:**    Signature of teacher does not imply agreement with evaluation. Teacher has the right to attach written comments within ten (10) days.

| | Supervisee Responses: | YES | NO |
|---|---|---|---|
| 1. | Supervisor has scheduled and met with me at least three times during the year to discuss my long-range professional development plan and annual objectives and to review progress and performance. | X | |
| 2. | Supervisor has supported my efforts to attain the teaching standards. | X | |
| 3. | I have shared with my supervisor information gathered from students. | X | |
| 4. | I have shared with my supervisor information gathered from parents. | X | |
| 5. | My supervisor has given me the opportunity to provide input on his/her performance. | X | |

Supervisee's Initials *[initials]*

Attach to this form the following:

Plan 2A, 3, or 4
1. Supervisor's Comments: Please identify and describe outstanding performance, needed improvements, and progress relative to professional development plan.
2. Description of Area(s) for Growth.

Plan 2B
1. Collaborative assessment and signed responses from 2 professional partners.

Plan 2C
1. In 2nd year of cycle: Reflective Review
2. In 4th year of cycle: Supervisor's Comments

The following are the PAUSD Teaching Performance Standards, which are the basis for this evaluation.

1. **MANAGEMENT AND MONITORING OF STUDENT LEARNING**
   - The teacher is able to orchestrate learning in a group setting.
   - The teacher motivates and engages students' minds and hearts in learning.
   - The teacher regularly assesses and provides feedback on student progress to students and parents and uses assessment information effectively in making instructional decisions.
   - The teacher plans instruction mindful of short- and long-term student learning objectives.

2. **COMMITMENT TO STUDENTS AND LEARNING**
   - The teacher makes knowledge accessible to all students based on recognition of individual differences, employing effective practice with diverse groups of students.
   - The teacher addresses in a balanced program all areas of student development, including cognitive, social, personal, and ethical development.

3. **KNOWLEDGE OF CONTENT AND HOW TO TEACH**
   - The teacher is in command of his/her subject(s), understanding the relevant factual information, central organizing concepts, and links to other disciplines.
   - The teacher uses appropriate instructional strategies to convey a subject to students and enhances instruction by providing opportunities to develop various learning styles, creating varied instructional settings, and using effectively a range of materials and available resources.
   - The teacher uses both directed and discovery teaching to integrate the subject into the students' thinking, offering students knowledge of concepts and principles as well as problem-solving opportunities.

4. **REFLECTION ON AND REFINEMENT OF PRACTICE**
   - The teacher participates in professional growth activities to expand his/her repertoire and uses new knowledge and skill to improve his/her teaching.
   - The teacher uses reasoned judgment to make instructional decisions based on theory and experience, asking for assistance when appropriate.

5. **PARTICIPATION IN LEARNING COMMUNITIES**
   - The teacher participates in collaborative efforts to improve the school.
   - The teacher demonstrates the interpersonal skill needed to work on a team with colleagues, parents, and community members.

Final Distribution:
   One copy: Human Resources Office
   One copy: Supervisor
   One copy: Supervisee

Pete Colombo
May, 2010
Formal Observation date: May 12, 2010
6th period, 8th grade

## Tenure Standard 1: Management and monitoring of student learning.

### a) The Teacher is able to orchestrate learning in a group setting.

Pete Colombo understands the importance of a well-organized class and has set behavior expectations and routines.
Evidence: Students are on numbers and prepared to participate. They understand and follow clearly given instructions during the warm-up. For example, when Pete states, "Number to number sprints," the students know exactly what to do. Years ago Pete came up with our department saying of S.O.D., which means structure, organization and discipline. He frontloaded his lesson by giving clear directions. Example: "Today we will be doing a short warm-up outside, moving into the workout room and rowing a 1000 meters, running a timed 400 around the track and if there is time left we will be doing some sprints.

**Improvements Needed:**
-Directions need to be more consistent.
Example 1: Pete said referring to sprinting, "Last one, then we'll jog to the workout room." But he had the class do 2 more sprints, then said, "Follow me" and walked to the workout room with the class. Students need consistent instruction in order to meet teacher expectations. If the expectations are inconsistent, then the students become confused.
Example 2: After telling the class they would be doing sprints after the timed 400, Pete said they could go to their numbers and he would collect times. He then walked past his numbers and had them go to the gym, where another class was scheduled. He then directed the class to go over to the brunch area in the shade stating it is "hot." It was there that he collected times, closed his lesson with a discussion about aerobic and anaerobic conditioning. Pete let the class rest for the remainder of the period; about five minutes.

### b. The teacher motivates and engages the students' minds and hearts in learning.

Pete Colombo engages his students during his class. He is upbeat and fun. During the lessons I have observed, this one in particular, the students were challenged. Like any good coach, Pete is constantly giving positive feedback during the various tasks being completed.
Examples:
"Excellent Job, nice!"
"I like it Anderson!"
"Very nice!"

"Let's go!"

**Improvements Needed:**
None.

***c. The teacher regularly assesses and provides feedback on student progress to students and parents and uses assessment information effectively in making instructional decisions.***
During the lessons I have observed, Pete makes his lesson expectations for learning clear to his students, however the directions changed and were inconsistent. If a student is getting a D or an F in his class, Pete will send home a "Report to Parents" as a warning.

**Improvements Needed:**
-When Pete took his leave of absence, we were unable to find his grades.  With the direction of the PE department, the subs had to make their own grade sheets and start from scratch.  Running records were found but the daily grade sheets were blank.
-Try this…."Use a variety of methods to evaluate student progress. (Exhibitions, daily work and observations.) Provide opportunities for students to evaluate and monitor their own learning and to receive feedback from peers."-Teaching Performance Standards, PAUSD.

***d. The teacher plans instruction mindful of short and long-term student learning objectives.***
Pete stated the objective of his lesson before the class began and "delivers instruction that is aligned with (District) objectives and goals." He always makes accommodations for individual differences.

**Improvements Needed:**
-Learn to set long-range instructional goals that align with District and State standards.
-Learn the District and State standards for the grade level taught.

## 2. Commitment to Students and Learning
***a) The teacher makes knowledge accessible to all students based on recognition of individual differences, working effectively with diverse groups of students.***
Pete Colombo is respectful toward his students.  He treats them fairly and takes time during the regular school day to help them with various issues like lost locks and uniforms.  He also "attends to the needs of individuals" throughout his class.  He is very encouraging to all students and really wants to see them all succeed at whatever the present task may be.
Example:  During rowing in the workout room Pete reminds individual students about the importance of posture and proper form.  He checked for understanding

EXHIBIT A-2_035

when he asked, "The mirrors are for what?" and a few students responded, "posture."

**Improvements needed:**
In tenure standard 2A, the PAUSD states, "being attentive to revealing messages in classroom responses." During the lesson I observed, Pete asked the question, "Don't you feel better after you've had PE?" Referring to the effects exercise has on the brain. A student responds, "I feel like I want to kill everyone." The class gasped and Pete walked away, shrugging it off, noting the student "says that stuff everyday." It was not until I intervened and suggested Pete discipline the student that he responded. Pete took my advice and escorted the student up to the main office, wrote him a referral and spoke with a counselor.

*b. The teacher addresses in a balanced program all areas of student development, including cognitive, social, personal and ethical development.*
Pete provides students many opportunities to develop socially through teamwork. He chats with his students personally during transitions or warm-up in order to get to know them better. He teaches ethical development through fair play and the understanding/respect for individual differences.
Example: During this lesson, Pete asked a student, "Who is going to win tonight?" referring to the basketball playoffs. Clearly this has been an ongoing discussion with this student and they have basketball as a common interest. This is an example of how Pete to connects with his students.

Pete also models "courteous behavior and good citizenship" and communicates his expectations in these areas of development.

**Improvements Needed:**
-"Understand the ways in which physical and emotional development influence learning and behavior and adjust teaching accordingly."
-Learn to understand what is "normal 8th grade behavior" and what is "behavior that may indicate a special need." PAUSD tenure standards manual.

## Tenure Standard 3: Knowledge of Content and How to Teach
*a) The teacher is in command of her/his subjects, understanding the relevant factual information, central organizing concepts and links to other disciplines.*
Pete is proficient with teaching 8th grade PE. He has a general idea about the content and is not afraid to ask for advice or ideas around a particular unit.
Example: Pete's strengths are basketball and baseball, therefore he knows how to chunk a lesson to help his students' progress in these areas.

**Improvements needed:**
-Attend conferences to expand content knowledge.

-Learn District/State PE standards.
-Integrate with other subject matters.  (ex: Science)

**b. The teacher uses appropriate instructional strategies to convey a subject to students and enhances instruction by providing opportunities to develop various learning styles, creating varied instructional settings, and effectively using a range of materials and available resources.**
During the lesson I formally observed, Pete was teaching Aerobic v. Anaerobic. He used varied examples and allowed the students to participate in varied activities to learn the differences.  He started with a light warm-up outside on the courts. He then moved the students to the workout room for rowing and discussed that prolonged exercise like rowing for 5 minutes is aerobic.  When they moved back outside to the track, he mentioned again that the timed 400 was an example of aerobic work.  He also asked the students for examples of anaerobic exercise.

During this lesson Pete allowed for a balance of "competition and individual performance."

Pete, like most PE teachers, uses mainly the visual (modeling), oral (speaking) and kinesthetic modes of instruction.

**Improvements Needed:**
-Check the teaching schedule before class to be sure the rooms/areas are available. Example: During this lesson, Pete wanted to move into the gym to collect times and close his lesson, however the gym was previously scheduled for a sixth grade class.

**c. The teacher uses both directed and discovery teaching to integrate the subject into the students' thinking, offering students knowledge of concepts and principles as well as problem-solving opportunities.**

Pete uses both direct instruction and discovery learning when teaching his 8th grade classes.  He allows for both direct (modeling proper form) and discovery learning (students try.)  He truly believes in teaching PE as teaching lifelong wellness and often gives connections to real life situations.

**Improvements Needed:**
None.

## 4) Reflection and Refinement of Practice
**a) The teacher participates in professional growth activities to expand his/her repertoire and uses new knowledge and skill to improve her/his teaching.**
Pete participates in collegial discussions and peer observations.

**Improvements Needed:**
-Attend workshops or conferences

*b) The teacher uses reasoned judgement to make instructional decisions based on theory and experience, asking for assistance when appropriate.*
Pete recognizes his strengths and areas for growth. He is not afraid to ask for help when needed and if an idea doesn't work, he makes the necessary adjustment for his next class.

**Improvements Needed:**
None.

## 5) Participation in Learning Communities

*a) The teacher participates in collaborative efforts to improve the school.*
Pete always attends staff and department meetings. He participated in our staff development day where we discussed English Language Learners and the PE department's strategies to effectively communicate/teach our content.
Example: Pete helped brainstorm content related academic language that relates directly to the PE Department.

**Improvements Needed:**
-Involvement in school related improvement.
-"Demonstrate thoughtful consideration by the state frameworks and District standards." PAUSD tenure standards.

*b) The teacher demonstrates the interpersonal skills needed to work on a team with colleagues and community members.*
Pete is generally considerate of the needs and feelings of others.
He is also willing to communicate with counselors regarding students' misbehavior.

**Improvements Needed:**
-In tenure standard 5b it is stated, "the teacher communicates effectively with parents, colleagues and community members." Pete needs to improve his communication skills.
-Complete feedback forms for special education students.



PALO ALTO UNIFIED SCHOOL DISTRICT

## Reflective Review Form
*(For Use at the End of the Second Year of the Four-Year Evaluation Plan To Promote Collegial Dialogue Between Teacher and Evaluator)*

**Name:** Peter Colombo

**Evaluation Date:** 4/30/2020

**Site:** Greene

**Subject/Grade:** P.E. 8th grade

PAUSD
AUG 26 2020
HUMAN...

| TEACHING PERFORMANCE STANDARDS |
|---|

**1. ENGAGING AND SUPPORTING ALL STUDENTS LEARNING**
1.1  *Using knowledge of students to engage them in learning.*
1.2  *Connecting learning to students' prior knowledge, backgrounds, life experiences, and interests.*
1.3  *Connecting subject matter to meaningful, real-life contexts.*
1.4  *Using a variety of instructional strategies, resources, and technologies to meet students' diverse needs.*
1.5  *Promoting critical thinking through inquiry, problem solving and reflection.*
1.6  *Monitoring student learning and adjusting instructions while teaching.*

*Reflections*
1.1. I make a concerted effort to talk to my students on a daily basis about life and their interest etc./ which helps me reach them mentally when getting them to work hard. Kids will work hard for you if they know you care and are interested in them as people as well as students. I ask lots of questions.

1.3 I always use life examples, experiences to empasize the imprtance of being healthy mind BODY and soul.

**2. CREATING AND MAINTAINING EFFECTIVE ENVIRONMENTS FOR STUDENTS LEARNING**
2.1  *Promoting social development and responsibility within a caring community where each student is treated fairly and respectfully.*
2.2  *Creating physical/virtual learning environments that promote student learning, reflect diversity, and encourage constructive/productive interactions.*
2.3  *Establishing and maintaining learning environments that are physically, intellectually, and emotionally safe.*
2.4  *Creating a rigorous learning environment with high expectations and appropriate support for all students.*
2.5  *Developing, communicating, and maintaining high standards for individual and group behavior.*
2.6  *Employing classroom routines, procedures, norms, and supports for positive behavior to ensure a climate in which all students can learn.*
2.7  *Using instructional time to optimize learning.*

*Reflections*
2.4 I have continued to grow in this area using new ideas for teaching and exercise after collaborating with my colleagues to keep the expectations for my P.E. classes at a high level and I continue to grow in the area of supporting my students with clear communication and visual evaluation on what needs to be taught again etc...so all students feel supported no matter what levels they are at physical or talent wise.

**3.  UNDERSTANDING AND ORGANIZING SUBJECT MATTER FOR STUDENT LEARNING**
3.1  *Demonstrating knowledge of subject matter, academic content standards, and curriculum frameworks.*
3.2  *Applying knowledge of student development and proficiencies to ensure student understanding of subject matter.*
3.3  *Organizing curriculum to facilitate student understanding of subject matter.*
3.4  *Utilizing instructional strategies that are appropriate to the subject matter.*
3.5  *Using and adapting resources, technologies, and standard-aligned instructional/adopted materials to make subject matter accessible to all students.*
3.6  *Addressing the needs of English learners and students with special needs to provide equitable access to content into the students' thinking, offering students knowledge of concepts and principles as well as problem-solving opportunities.*

*Reflections*
3.5 With covid 19 I have had to really get involved with technology and being able to deliver content within distant learning so the P.E. material is available to all my students. I have managed to do this by being open to suggestions and just really following advice of the district tech people who have done a great job of instruction.

**4.  PLANNING INSTRUCTION AND DESIGNING LEARNING EXPERIENCES FOR ALL STUDENTS**
4.1  *Using background knowledge of students' academic readiness, language proficiency, cultural background, and individual development to plan instr.*
4.2  *Establishing and articulating goals for student learning.*
4.3  *Developing and sequencing long-term and short-term instructional plans to support student learning.*
4.4  *Planning instruction that incorporates appropriate strategies to meet the learning needs of all students.*
4.5  *Adapting instructional plans and curricular materials to meet the assessed learning needs of all students.*

*Reflections*

4.2 I have had to learn to be very aticulate and precise in giving instructions/expectations during this period of distance learning using schoology. My goals for the kids have been on point and easy to understand, I can see this from participation results over first two weeks of ROLE, around 94 percent.  This was made possible from following directions and asking questions, being vulnerable so my kids can learn!

## 5. ASSESSING STUDENTS FOR LEARNING

5.1  Applying knowledge of purposes, characteristics, and users of different types of assessments.
5.2  Collecting and analyzing assessment data from a variety of sources to inform instruction.
5.3  Reviewing data, both individually and with colleagues, to monitor student learning.
5.4  Using assessment data to establish learning goals and to plan, differentiate, and modify instruction.
5.5  Involving all students in self-assessments, goal-setting, and monitoring progress.
5.6  Using available technologies to assist in assessment, analysis, and communication of student learning.
5.7  Using assessment information to share timely and comprehensive feedback with students and their families.

*Reflections*

5.6 Again, with covid I have learned to use schoology to asses and analyze my students work in distant learning so I can provide feedback and communication on what they have learned etc...completely different than in person assesment and communication.  messages, email, discussions online, chats etc...

5.7 All my online assessment has been on time and clear during this distant learning and also during regular learning through constant updating of infinite campus and schoology.

## 6. DEVELOPING AS A PROFESSIONAL EDUCATOR

6.1  Reflecting on teaching practice in support of student learning.
6.2  Establishing professional goals and engaging in continuous and purposeful professional growth and development.
6.3  Collaborating with colleagues and the broader professional community t support teacher and student learning.
6.4  Working with families to support student learning.
6.5  Engaging local communities in support of the instructional program.
6.6  Managing professional responsibilities to maintain motivation and commitment to all students.
6.7  Demonstrating professional responsibility, integrity, and ethical conduct.

*Reflections*

6.3 During covid as well as during regular learning I'm constantly collaborating with my p.e. colleagues as well as with other subject teachers on how to better teach my students and how to reach them in even better way mentally and intellectually, socially also.  Always open to learning new tricks of the trade which is critical to growing as a instructor.
6.7 Everyday I show and suit up and always willing to help students and staff.


**ACCOMPLISHMENTS, ACHIEVEMENTS, COMMITTEES, and/or FUTURE GOALS**

1. Head J.V. Basketball Coach at Paly this year and we finsished 23-2, 12-0 in league undefeated. I recieved 100 percent good evalutions from parents as well as A.D. at Paly which I'm proud of, tells me I'm doing good as a coach and a MENTOR TO MY PLAYERS which is most important.


2. Started my 15th year this year as a Varsity Baseball Coach, Head and Asst. roles, at Paly which I'm very proud of as a P.E. teacher/coach.


3. Started my 23rd overall year in the Palo Alto District and I have a goal of contiuing as a teacher/coach till at least 65 years old, I love my job!  At least 12 more years to go and I'm excited to continue the journey.


4. I also taught a 6th grade core this year to help out other 6th grade teachers and I take pride in always saying yes and meeting challenges head on! It was for sure different and I had to make an adjustment with my 8th grade filter, meaning what u can say to an 8th grader is way, way different than what you can say toa 6th grader. I had to grow in that area for sure and enjoyed the kids, I forgot how cute and innocent 6th graders can be. I have been dealing only with 8th graders last 10 years so was great to have a little variety!

| Supervisee's Signature and Date | Supervisor's Signature and Date | |
|---|---|---|
| | *[signature]* Valerie Royaltey-Quandt | |



PALO ALTO UNIFIED SCHOOL DISTRICT
CERTIFICATED HUMAN RESOURCES
**SUMMARY FORM (PERMANENT STAFF)**
**2004-2005 EVALUATION OF PERFORMANCE – TEACHERS**



| Name | Colombo, Peter M., | Jordan | Evaluation Date: | **May 1, 2005** |
|---|---|---|---|---|
| Site: | Perm | 1.0000 | Evaluation Plan: | ☐ 2A  ☐ 2B  ☐ 3  ☐ 4 |
| | Pappas, C. | | STATUS OF EMPLOYEE: | |

| | Supervisor's Rating of Performance Related To: | | Meets Standards | Progress Evident Towards Standards | Does Not Meet Standards |
|---|---|---|---|---|---|
| 1. | Management and Monitoring of Student Learning | 1. | X | | |
| 2. | Commitment to Students and Learning | 2. | X | | |
| 3. | Knowledge of Content and How to Teach | 3. | X | | |
| 4. | Reflection on and Refinement of Practice | 4. | | X | |
| 5. | Participation in Learning Communities | 5. | X | | |

**Overall Evaluation**    The overall evaluation must reflect the evidence regarding relevant performance in all areas of performance standards and progress on the professional development plan.

☒ **Meets Standards - Satisfactory**

☐ **Does Not Meet Standards -Support/Improvement Plan Implemented**

☐ **Does Not Meet Standards - Unsatisfactory**

Addendum ☑ has ☐ has not been attached with additional comments (by either or both parties).

Provisions have been established for appealing an evaluation the Supervisee feels unfair. Contact the Certificated Human Resources Department for information regarding this appeal process.

**Evaluation Plan for 2005 -2006**    ☐ 2A    ☐ 2B    ☐ 3    ☐ 4

| Supervisee's Signature and Date | Supervisor's Signature and Date | Principal's Signature and Date |
|---|---|---|
| 5/1/05  My signature does not necessarily indicate agreement | Cynthia Pappas  If other than building principal | |

**Note:**    Signature of teacher does not imply agreement with evaluation. Teacher has the right to attach written comments within ten (10) days.

| | Supervisee Responses: | YES | NO |
|---|---|---|---|
| 1. | Supervisor has scheduled and met with me at least three times during the year to discuss my long-range professional development plan and annual objectives and to review progress and performance. | √ | |
| 2. | Supervisor has supported my efforts to attain the teaching standards. | √ | |
| 3. | I have shared with my supervisor information gathered from students. | √ | |
| 4. | I have shared with my supervisor information gathered from parents. | √ | |
| 5. | My supervisor has given me the opportunity to provide input on his/her performance. | √ | |

Supervisee's Initials ____

EXHIBIT A-2_041

---

**Attach to this form the following:**

Plan 2A, 3, or 4

1. Supervisor's Comments: Please identify and describe outstanding performance, needed improvements, and progress relative to professional development plan.
2. Description of Area(s) for Growth.

Plan 2B

1. Collaborative assessment and signed responses from 2 professional partners.

---

The following are the PAUSD Teaching Performance Standards, which are the basis for this evaluation.

1. **MANAGEMENT AND MONITORING OF STUDENT LEARNING**
   - The teacher is able to orchestrate learning in a group setting.
   - The teacher motivates and engages students' minds and hearts in learning.
   - The teacher regularly assesses and provides feedback on student progress to students and parents and uses assessment information effectively in making instructional decisions.
   - The teacher plans instruction mindful of short- and long-term student learning objectives.

2. **COMMITMENT TO STUDENTS AND LEARNING**
   - The teacher makes knowledge accessible to all students based on recognition of individual differences, employing effective practice with diverse groups of students.
   - The teacher addresses in a balanced program all areas of student development, including cognitive, social, personal, and ethical development.

3. **KNOWLEDGE OF CONTENT AND HOW TO TEACH**
   - The teacher is in command of his/her subject(s), understanding the relevant factual information, central organizing concepts, and links to other disciplines.
   - The teacher uses appropriate instructional strategies to convey a subject to students and enhances instruction by providing opportunities to develop various learning styles, creating varied instructional settings, and using effectively a range of materials and available resources.
   - The teacher uses both directed and discovery teaching to integrate the subject into the students' thinking, offering students knowledge of concepts and principles as well as problem-solving opportunities.

4. **REFLECTION ON AND REFINEMENT OF PRACTICE**
   - The teacher participates in professional growth activities to expand his/her repertoire and uses new knowledge and skill to improve his/her teaching.
   - The teacher uses reasoned judgment to make instructional decisions based on theory and experience, asking for assistance when appropriate.

5. **PARTICIPATION IN LEARNING COMMUNITIES**
   - The teacher participates in collaborative efforts to improve the school.
   - The teacher demonstrates the interpersonal skill needed to work on a team with colleagues, parents, and community members.

Final Distribution:
One copy: Human Resources Office
One copy: Supervisor
One copy: Supervisee

Pete Colombo
April 28, 2005

1)  Management and Monitoring of Student Learning:

S.O.D.-Structure, Organization and Discipline.  This is your mantra.  It encompasses all your classes.  Your students are trained at the beginning of the semester and know exactly what to expect each day.  You motivate your students by providing feedback on their performances.  You say, " Great Job!  Good Effort!" when you see a student really trying to do their best.

    You do a fabulous job of orchestrating learning in a group setting. You use a variety of motivational techniques to engage students, like the "1-2-3 clap."  The students love it and respond accordingly.

    Your assessment is done daily in each class.  A student can check their grades with you at anytime as you keep accurate records in your grade book.  You return parent phone calls and emails in a timely manner and answer their questions respectfully. An example of using assessment information effectively to make instructional decisions is when your sixth graders ran a timed run and, as a group, did not do very well. You noticed they were out of shape and needed guidance. You decided to focus on fitness for the remainder of the unit.

    An example of your long and short-term objective was during your wiffle ball unit.  You first wanted your students to be able to throw the ball with correct form then with accuracy.  Finally, you taught them to throw from shortstop to first base with correct form and accuracy. Finally you included game strategy.

2)  Commitment to Students and Learning.

    As we discussed, you teach mainly in a large group setting.  There are times when you feel it is necessary to break the students into smaller groups based on skill level. This way they get the individual attention you feel they need.  You offer alternative exercises for mainstreamed students and request another student/peer to shadow the student with special needs.

    I believe your program offers a balance with regards to student development. You promote positive personal development by constantly asking students to "make good choices."  You teach respect for each other and themselves.  You believe in "praising publicly and criticizing privately." You often conduct "locker room chats" on the boys' side to talk about ethics and treating each other's things with respect.

    As we reviewed, you do have some room for growth under Standard 2.  Asking your students more questions helps to engage them in the lesson and promotes cognitive growth. Clear and consistent communication allows your students to understand their behavior boundaries.  If one day it is acceptable to goof around or not participate and the next day it is not, the students receive mixed messages.  Clear and consistent communication will promote "buy-in" for your program.

3) Knowledge of Content and How to Teach

   Pete, you use a variety of instructional strategies in your classes. You spoke (auditory), you showed (visual) and you let them try (kinesthetic). You use your sense of humor and positive personality to engage the kids. All eyes are on you! You balance individual skill building, competition and teamwork within your classes. As a result of the use of a variety of strategies, students have multiple opportunities to understand and apply skills.

4) Reflection and Refinement of Practice

   I know you discuss your units with your colleagues before they begin. You ask for clarification of unit expectations and outcomes. You are interested in making sure all students are getting an equal opportunity and equal access within the Physical Education Department. You are willing to ask for help with a unit or a difficult student situation.

   Where I would like to see improvement under Standard #4 is for you to be willing to hear the advice you have asked for. I would also like you to reflect on the unit you just taught and ask yourself (or others) how you could make it more effective. Ask for creative ideas for discipline. Our department is full of experience and welcomes the opportunity to offer advice.

5) Participation in Learning Communities

   You participate in collaborative efforts to improve the PE department and the school. You helped write the PE department goals for 04-05. You collaborate on units and team-teach with your sixth grade classes. You are an active member of you cluster group. You cover classes school-wide when needed and regularly attend staff meetings. You are a valuable member of the Jordan Search and Rescue Team.

   You continue to show yearly growth with your communication with colleagues and students. As you mentioned, next year you would like to coach at Jordan more. You mentioned missing the connection with the kids after school. You will continue to coach Varsity Baseball at PALY which allows you a solid connection to the educational community as a whole.

EXHIBIT A-2_044





PALO ALTO UNIFIED SCHOOL DISTRICT
CERTIFICATED HUMAN RESOURCES
**SUMMARY FORM (PERMANENT STAFF)**
**2002-2003 EVALUATION OF PERFORMANCE – TEACHERS**

PAUSD

FEB 2 0 2003

HUMAN RESOURCES

| | |
|---|---|
| **Name:** Colombo, Peter M.    Jordan | **Evaluation Date:** __May 1, 2003__ |
| Permanent    1 | **Evaluation Plan:** ☐ 2A ☐ 2B ☐ 3 ☐ 4 |
| **Site:** Pappas, C. | **STATUS OF EMPLOYEE:** |

| | Supervisor's Rating of Performance Related To: | | Meets Standards | Progress Evident Towards Standards | Does Not Meet Standards |
|---|---|---|---|---|---|
| 1. | Management and Monitoring of Student Learning | 1. | X | | |
| 2. | Commitment to Students and Learning | 2. | X | | |
| 3. | Knowledge of Content and How to Teach | 3. | X | | |
| 4. | Reflection on and Refinement of Practice | 4. | X | | |
| 5. | Participation in Learning Communities | 5. | X | | |

**Overall Evaluation**    The overall evaluation must reflect the evidence regarding relevant performance in all areas of performance standards and progress on the professional development plan.

☒ **Meets Standards - Satisfactory**

☐ **Does Not Meet Standards -Support/Improvement Plan Implemented**

☐ **Does Not Meet Standards - Unsatisfactory**

**Addendum** ☐ **has** ☐ **has not been attached with additional comments (by either or both parties).**

Provisions have been established for appealing an evaluation the Supervisee feels unfair. Contact the Certificated Human Resources Department for information regarding this appeal process.

**Evaluation Plan for 2003 -2004**    ☐ 2A    ☐ 2B    ☐ 3    ☐ 4

| Supervisee's Signature and Date | Supervisor's Signature and Date | Principal's Signature and Date |
|---|---|---|
| *[signature]* | *Cynthia Pappas* | *Lyoanne Solomon* |
| My signature does not necessarily indicate agreement | If other than building principal    2/13/03 | 2/19/03 |

| | Supervisee Responses: | YES | NO |
|---|---|---|---|
| 1. | Supervisor has scheduled and met with me at least three times during the year to discuss my long-range professional development plan and annual objectives and to review progress and performance. | ✓++ | |
| 2. | Supervisor has supported my efforts to attain the teaching standards. | ✓++ | |
| 3. | I have shared with my supervisor information gathered from students. | ✓++ | |
| 4. | I have shared with my supervisor information gathered from parents. | | X * |
| 5. | My supervisor has given me the opportunity to provide input on his/her performance. | ✓++ | |

**\* \*\*** MRS. PAPPAS HAS been Very, Very helpful M PROFESSIONAL. (Very Good I.S.)

X * PARENT infos just went out - not in yet.

Supervisee's Initials *[initials]*

**Attach to this form the following:**

Plan 2A, 3, or 4
1.  Supervisor's Comments: Please identify and describe outstanding performance, needed improvements, and progress relative to professional development plan.
2.  Description of Area(s) for Growth.

Plan 2B
1.  Collaborative assessment and signed responses from 2 professional partners.

The following are the PAUSD Teaching Performance Standards, which are the basis for this evaluation.

1.  **MANAGEMENT AND MONITORING OF STUDENT LEARNING**
    - The teacher is able to orchestrate learning in a group setting.
    - The teacher motivates and engages students' minds and hearts in learning.
    - The teacher regularly assesses and provides feedback on student progress to students and parents and uses assessment information effectively in making instructional decisions.
    - The teacher plans instruction mindful of short- and long-term student learning objectives.

2.  **COMMITMENT TO STUDENTS AND LEARNING**
    - The teacher makes knowledge accessible to all students based on recognition of individual differences, employing effective practice with diverse groups of students.
    - The teacher addresses in a balanced program all areas of student development, including cognitive, social, personal, and ethical development.

3.  **KNOWLEDGE OF CONTENT AND HOW TO TEACH**
    - The teacher is in command of his/her subject(s), understanding the relevant factual information, central organizing concepts, and links to other disciplines.
    - The teacher uses appropriate instructional strategies to convey a subject to students and enhances instruction by providing opportunities to develop various learning styles, creating varied instructional settings, and using effectively a range of materials and available resources.
    - The teacher uses both directed and discovery teaching to integrate the subject into the students' thinking, offering students knowledge of concepts and principles as well as problem-solving opportunities.

4.  **REFLECTION ON AND REFINEMENT OF PRACTICE**
    - The teacher participates in professional growth activities to expand his/her repertoire and uses new knowledge and skill to improve his/her teaching.
    - The teacher uses reasoned judgment to make instructional decisions based on theory and experience, asking for assistance when appropriate.

5.  **PARTICIPATION IN LEARNING COMMUNITIES**
    - The teacher participates in collaborative efforts to improve the school.
    - The teacher demonstrates the interpersonal skill needed to work on a team with colleagues, parents, and community members.

Final Distribution:
    One copy: Human Resources Office
    One copy: Supervisor
    One copy: Supervisee

EXHIBIT A-2_046

Pete Colombo
Formal Observation
1/30/03
Basketball
6th Grade

Pete, thanks for letting me observe your class. This period, you had sixth graders and some mainstreamed special-needs kids. I enjoyed watching your patient demeanor with the special kids and your funny antics with the entire class. The kids were really enjoying themselves!

You began with the warm-up jog and as they finished you said, "good job!" with a "let's go, hustle!" while clapping. The students knew just what you expected of them. They sat on their numbers and waited in sit-up position. You counted the abdominal crunches and they counted back. You assisted a student, "Gently, chin to the sky" and motivated them by saying, "Louder! Come on!" They responded by counting louder and smiling from ear to ear. You moved through the class well and gave feedback as they immediately got into push-up position. You corrected their form and gave an example of proper position. This class really understands your expectations and responds accordingly.

As you began the stretching phase of the period, you roamed about your teaching area, checking for understanding. "What are we stretching?" you asked. The students responded appropriately, "Hamstrings." You used humor throughout the period, but I was especially amused when you said, " Right toe towards your nose, but don't _____" And the kids responded "Pick your nose!" When the students were to jump side to side over their numbers you were interested in know who was going skiing this weekend and a few responded. This shows genuine interest in their lives outside of school.

You praise your students often and well. "Good job, Kristen!" "I'm proud of you guys!" "Perfect jumping-jacks!" These were only a few of the wonderful ways you let your students know how well they are doing in class.

As you moved the class into the tennis courts, you had them line-up in their team lines. You stated, "Now you may all be seated. 5,4,3,2,1 ok, be seated." You then shared with your class the expectations and lesson plans for the basketball unit. You stated, "Everyday, after we stretch and run we will work on fundamentals." You then began your lesson.

You let your class know that today was the first day of the unit and they were expected to, "Look, listen and learn!" You did a review to check for prior knowledge, "How many seconds can you stand in the key? What is this white thing called?" The students answered appropriately and correctly. Then you let the class know they were going to work on footwork. You modeled the two-foot jump-stop drill and they followed. You showed the wrong way to do the drill and asked them what foul would be called it they did it wrong. They answered in unison, "traveling."

Pete, you are great about demonstrating a skill and showing what is the correct way to do it and the incorrect way. Your knowledge of content related to physical education is high. You participate in collaborative efforts to improve the physical education department and the school. You are a part of the Sense of Community Task Force, which focuses on building collegiality among our staff to improve the working and learning environment for our staff members and students. You also work well with your Athletic Director teammate and the City of Palo Alto to run the Athletics Program at Jordan Middle School.

Keep up the great work!
Let's schedule a post-conference.



PALO ALTO UNIFIED SCHOOL DISTRICT
CERTIFICATED HUMAN RESOURCES
**SUMMARY FORM**
**2000-2001 EVALUATION OF PERFORMANCE – TEACHERS**

PAUSD
MAR 0 5 2001
HUMAN RESOURCES

---

Name: _____

Site: ___

Columbo, Peter
Jordan
Prob2 (1.0)
Garcia, Lupe

Evaluation Date: _____

Evaluation Plan: ☐ 1   ☐ 2A   ☐ 2B   ☐ 3   ☐ 4

**STATUS OF EMPLOYEE:**

☐ Temporary                    ☐ 1st Year Probationary
☐ Special Contract             ☐ 2nd Year Probationary
☐ Intern                       ☐ Permanent

---

|   | Supervisor's Rating of Performance Related To: |   | Meets Standards | Progress Evident Towards Standards | Does Not Meet Standards |
|---|---|---|---|---|---|
| 1. | Management and Monitoring of Student Learning | 1. | X | | |
| 2. | Commitment to Students and Learning | 2. | X | | |
| 3. | Knowledge of Content and How to Teach | 3. | X | | |
| 4. | Reflection on and Refinement of Practice | 4. | X | | |
| 5. | Participation in Learning Communities | 5. | X | | |

---

**Overall Evaluation**    The overall evaluation must reflect the evidence regarding relevant performance in all areas of performance standards and progress on the professional development plan.

☒ **Meets Standards - Satisfactory**

☐ **Does Not Meet Standards - Support/Improvement Plan Implemented**

☐ **Does Not Meet Standards - Unsatisfactory**

Addendum ☐ has ☒ has not been attached with additional comments (by either or both parties).

Provisions have been established for appealing an evaluation the Supervisee feels unfair. Contact the Certificated Human Resources Department for information regarding this appeal process.

**Evaluation Plan for 2001-2002**    ☐ 2A    ☐ 2B    ☐ 3    ☐ 4

| Supervisee's Signature and Date | Supervisor's Signature and Date | Principal's Signature and Date |
|---|---|---|
| *Peta Pol* 3/1/01 | | *Garcia* 3/01 |
| My signature does not necessarily indicate agreement | If other than building principal | |

---

|   | Supervisee Responses: | YES | NO |
|---|---|---|---|
| 1. | Supervisor has scheduled and met with me at least three times during the year to discuss my long-range professional development plan and annual objectives and to review progress and performance. | ✓ | |
| 2. | Supervisor has supported my efforts to develop and implement my professional development plan. | ✓ very much | |
| 3. | I have shared with my supervisor information gathered from students. | ✓ | |
| 4. | I have shared with my supervisor information gathered from parents. | ✓ | |
| 5. | My supervisor has given me the opportunity to provide input on his/her performance. | ✓ | |

Supervisee's Initials _____

**EXHIBIT A-2_049**

# RECOMMENDATION REGARDING PERMANENT STATUS – PROBATIONARY 2 TEACHERS

Please submit this form to Certificated Human Resources by **March 1**

**Please check to indicate which standards this teacher has successfully met:**

## I. MANAGEMENT AND MONITORING OF STUDENT LEARNING

☒ a. The teacher is able to orchestrate learning in a group setting.

☒ b. The teacher motivates and engages students' minds and hearts in learning.

☒ c. The teacher regularly assesses and provides feedback on student progress to students and parents and uses assessment information effectively in making instructional decisions.

☒ d. The teacher plans instruction mindful of short- and long-term student learning objectives.

## II. COMMITMENT TO STUDENTS AND LEARNING

☒ a. The teacher makes knowledge accessible to all students based on recognition of individual differences, employing effective practice with diverse groups of students.

☒ b. The teacher addresses in a balanced program all areas of student development, including cognitive, social, personal, and ethical development.

## III. KNOWLEDGE OF CONTENT AND HOW TO TEACH

☒ a. The teacher is in command of her/his subject(s), understanding the relevant factual information, central organizing concepts, and links to other disciplines.

☒ b. The teacher uses appropriate instructional strategies to convey a subject to students and enhances instruction by providing opportunities to develop various learning styles, creating varied instructional settings, and using effectively a range of materials and available resources.

☒ c. The teacher uses both directed and discovery teaching to integrate the subject into the students' thinking, offering students knowledge of concepts and principles as well as problem-solving opportunities.

## IV. REFLECTION ON AND REFINEMENT OF PRACTICE

☒ a. The teacher participates in professional growth activities to expand her/his repertoire and uses new knowledge and skill to improve her/his teaching.

☒ b. The teacher uses reasoned judgement to make instructional decisions based on theory and experience, asking for assistance when appropriate.

## V. PARTICIPATION IN LEARNING COMMUNITIES

☒ a. The teacher participates in collaborative efforts to improve the school.

☒ b. The teacher demonstrates the interpersonal skill needed to work on a team with colleagues, parents, and community members.

**Do you recommend that this teacher be granted permanent status in the PAUSD?** ___Yes___

(Remember to attach the teacher's summary evaluation to this form.)

_Garcia_     3/01

—————————————————————————
Supervisor's signature and date

Note:   In order to be granted permanent status in the PAUSD, a teacher must be rated "meets standards" in *all* areas of assessment by March 1 of the Probationary 2 year.

Columbo, Peter
Jordan
Prob2 (1.0)
Garcia, Lupe

Pete Colombo

## Summary Evaluation

Pete, it is evident you recognize that that effective instruction and a clear management system are mutually supportive. You maintain a well-organized class in which students understand expectations and routine procedures. You manage time, equipment, and materials efficiently and maintain a physical environment that is organized for students. You create an environment in which students are engaged in learning. On a recent class observation it was obvious that you provide a safe, supportive environment; make classroom experiences meaningful; create opportunities that allow students at different levels of skills to experience success; and provide students timely and informative feedback on their efforts. Students find a level of confidence and trust that allows them to "try" different challenges in your class. It is also clear that you make expectations for learning clear to students. You report student progress to parents and students on a regular basis and in a manner that both acknowledges effort and supports improvement. You also provide opportunities for students to evaluate and monitor their own learning and to receive feedback from peers. Pete, you also articulate learning objectives for a lesson, set long-range instructional goals that meet District curricular standards and plan and deliver instruction that is aligned with these objectives and goals. You design tasks and activities that accommodate individual differences while leading to the achievement of a common objective.

It is clear that you make knowledge accessible to all students based on recognition of individual differences, working effectively with diverse groups of students. You strive to learn about the personalities and social background of your students through observing the students with peers, talking privately with the student or parents, talking with the counselors or other support staff, and being attentive to revealing responses in class. Pete, you show respect for all students by treating and speaking of them courteously, acknowledging that they have opinions and values that may be different than those of the teacher, listening to individual concerns, and giving all of them the opportunity to speak and be heard by others. You encourage all students and provide the opportunities for all to improve their performance. You recognize that the intellectual development of students is interdependent with the development of self-concept, motivation, character, and aspirations. You provide opportunities for growth in these aspects. You model courteous behavior and good citizenship, and communicate high expectations for students in these areas. You notice subtle changes in behavior that may indicate a special need and make appropriate contact with either school or community support staff in order to provide the support necessary.

It is clear that you continue to expand your proficiency in the delivery of the subject matter as well as expand content knowledge, formally and informally, through personal study, professional reading and attendance at conferences. Some of these professional activities include:

- Summer Conference at Cal-Poly San Luis Obispo with specific workshops and instruction on badminton, basketball, golf, Teaching Methods & Practices Related to Physical Education, and others.

It is evident that you adapt state and District curriculum expectations to meet student needs. You also use appropriate state frameworks and District standards to plan instruction. In addition you use appropriate instructional strategies to convey specific

subject matter to students and enhance instruction by providing opportunities to develop various learning styles. You continue to grow in your ability to use both directed and discovery teaching to integrate the subject into the students' thinking, offering students concepts and principles as well as problem-solving opportunities.

It is evident that you continue to grow in your ability to use reasoned judgment to make instructional decisions based on theory and experience, asking for assistance whenever appropriate. It is clear that you reflect on and analyze your teaching and dealings with others to plan for future adjustments to instruction, as well as how you communicate with them. You recognize your teaching strengths as well as areas for growth. You engage others in discussions about improvement of teaching and responding thoughtfully to suggestions for improvement.

Pete, it is evident that you are an active contributor to school and department committees related to school improvement. You readily volunteer to do "your part" for Jordan and the kids. It is clear that you have grown tremendously over the last year and now demonstrate the interpersonal skills needed to work on a team with colleagues and community members. You show an interest in and are considerate of the needs and feelings of others. You communicate effectively with parents, colleagues, and community members, respecting the opinions of others, even when disagreeing. This year, for example, when issues arise either in your class or involving after school sports, you do not hesitate to deal with it positively, contact those involved in the issue and then address it in an appropriate manner. You also seek out staff members providing special services to students and work cooperatively with such staff members to provide an appropriate program for special needs students. One such example is Chris B. Even though he might not now be in your class, you continue to work with him, his teacher and his mother in an effort to make school a positive place for him. You are always willing and eager to work with others in the interest of individual students or the whole school. Pete, keep up the effort!



RECEIVED
NOV 1 4 2000

**PALO ALTO UNIFIED SCHOOL DISTRICT**
**CERTIFICATED HUMAN RESOURCES**
# ASSESSMENT – PROBATIONARY 2 TEACHERS
# 2000-2001

☒ 1ˢᵗ assessment due 11/1/00     ☐ 2ⁿᵈ assessment due 12/21/00     ☐ 3ʳᵈ assessment due 2/15/01

Columbo, Peter
Jordan
Prob2 (1.0)
Garcia, Lupe

**Please check the standards covered by this assessment report:**

☒ I.   Management and Monitoring of Student Learning
☒ II.  Commitment to Students and Learning
☐ III. Knowledge of Content and How to Teach
☐ IV.  Reflection on and Refinement of Practice
☐ V.   Participation in Learning Communities

☐ Supervisor's statement below
☒ Supervisor's statement attached

**Overall assessment of progress toward these standards:**

**Standard #** _I_
☒ Meets standards     ☐ Progress evident     ☐ Progress not evident

**Standard #** _II_
☒ Meets standards     ☐ Progress evident     ☐ Progress not evident

_____  11/9/00            _____  11/10/00
Supervisor's signature and date          Teacher's signature and date

Note:  In order to be granted permanent status in the PAUSD, a teacher must be rated "meets standards" in *all* areas of assessment by March 1 of the Probationary 2 year.

EXHIBIT A-2_053

**Pete Colombo**                                                                              **November, 2000**

Pete, your current teaching assignment is full-time physical education teacher at Jordan Middle School. You teach grades 6, 7 and 8, depending on the period and the activity. It is clear that you have settled in as part of the PE team at Jordan. You seem at ease and readily contribute with the other staff members to provide the most appropriate program for the benefit of all students. As probationary 2 teacher, you have selected the following order of addressing the Palo Alto Teaching Standards:

- Assessment 1:     Standards I & II
- Assessment 2:     Standards III & IV
- Assessment 3:     Standard V

**Management and Monitoring of Student Learning:**

It is evident you recognize that that effective instruction and a clear management system are mutually supportive. You maintain a well-organized class in which students understand expectations and routine procedures. You manage time, equipment, and materials efficiently and maintain a physical environment that is organized for students. You create an environment in which students are engaged in learning. On a recent class observation it was obvious that you provide a safe, supportive environment; make classroom experiences meaningful; create opportunities that allow students at different levels of skills to experience success; and provide students timely and informative feedback on their efforts. Students find a level of confidence and trust that allows them to "try" different challenges in your class.

It is evident that you make expectations for learning clear to students. You report student progress to parents and students on a regular basis and in a manner that both acknowledges effort and supports improvement. You also provide opportunities for students to evaluate and monitor their own learning and to receive feedback from peers. On a recent observation, I noted during a class assigned "run" that some students were lagging behind the group, even though they were trying—as they stopped and then would run, stopped and then would run. As the first runners came in, you noticed the ones lagging, and sent back a couple of the more able students to help and exhort those not as capable. This was done in a manner that both acknowledged the individual effort of the less able, as well as the support of the ones helping. It was commendable! All students responded very positively to this approach, which had much to do with your ability to inspire "fair play and individual effort" by everyone. Pete, you also articulate learning objectives for a lesson, set long-range instructional goals that meet District curricular standards and plan and deliver instruction that is aligned with these objectives and goals. You design tasks and activities that accommodate individual differences while leading to the achievement of a common objective.

**Commitment to Students and learning:**

It is clear that you make knowledge accessible to all students based on recognition of individual differences, working effectively with diverse groups of students. You strive to learn about the personalities and social background of your students through observing the students with peers, talking privately with the student or parents, talking with the counselors or other support staff, and being attentive to revealing responses in class. On a recent observation I noted your ongoing encouragement of a couple of specific individuals (Chris and Dora). You later mentioned to me that the reason for this was that both had particular needs: Dora had just lost her older brother and Chris has been having difficulties in his classroom. You feel that if a student succeeds in your class, the positive aspect will carry back to the other classes. In this way you tend to the needs of individuals within the context of the class and make time to help students within the regular workday. Pete, you show respect for all students by treating and speaking of them courteously, acknowledging that they have opinions and values may be different than those of the teacher, listening to individual concerns, and giving all of them the opportunity to speak and be heard by others. You encourage all students and provide the opportunities for all to improve their performance.

It is evident that you recognize that the intellectual development of students is interdependent with the development of self-concept, motivation, character, and aspirations. You provide opportunities for growth in these aspects, as noted above. You model courteous behavior and good citizenship, and communicate high expectations for students in these areas. You notice subtle changes in behavior (also noted above) that may indicate a special need and make appropriate contact with either school or community support staff in order to provide the support necessary.

Pete, your effort and enthusiasm for teaching is obvious. I encourage you to continue to be reflective and thoughtful about what you do for yourself and others. Take your time and respond appropriately to the various situations we all encounter in our workday, whether it be with colleagues, students or community.



PALO ALTO UNIFIED SCHOOL DISTRICT
CERTIFICATED HUMAN RESOURCES

JAN 1 8 2001

# ASSESSMENT – PROBATIONARY 2 TEACHERS
## 2000-2001

☐ 1st assessment due 11/1/00        ☒ 2nd assessment due 12/21/00        ☐ 3rd assessment due 2/15/01

Columbo,  Peter
Jordan
Prob2  (1.0)
Garcia,  Lupe

**Please check the standards covered by this assessment report:**

☐   I.   Management and Monitoring of Student Learning
☐   II.   Commitment to Students and Learning
☒   III.   Knowledge of Content and How to Teach
☒   IV.   Reflection on and Refinement of Practice
☐   V.   Participation in Learning Communities

☐   Supervisor's statement below
☒   Supervisor's statement attached

**Overall assessment of progress toward these standards:**

**Standard #** _III_
☒ Meets standards          ☐ Progress evident          ☐ Progress not evident

**Standard #** _IV_
☒ Meets standards          ☐ Progress evident          ☐ Progress not evident

_____  1/01
Supervisor's signature and date

_____  1/17/01
Teacher's signature and date

Note:   In order to be granted permanent status in the PAUSD, a teacher must be rated "meets standards" in *all*
areas of assessment by March 1 of the Probationary 2 year.

(Cert. Pers\CEHR Eval. Forms\Assessment-Prob 2 Teachers (Prob 2) Rev 9-00)

EXHIBIT A-2_056

**Pete Colombo**                                                                                  **January 2001**

Pete, your current teaching assignment is full-time physical education teacher at Jordan Middle School. You teach grades 6, 7 and 8, depending on the period and the activity. You are also co-athletic director with Bill Giordano and manage the after school athletic program. It is clear that you have settled in as part of the PE team at Jordan. You seem at ease and readily contribute with the other staff members to provide the most appropriate program for the benefit of all students.

**Knowledge of Content and How to Teach**

Pete, it is evident that you continue to expand your proficiency in the delivery of the subject matter as well as expand content knowledge, formally and informally, through personal study, professional reading and attendance at conferences. Some of these professional activities include:

- Summer Conference at Cal-Poly San Luis Obispo with specific workshops and instruction on badminton, basketball, golf, Teaching Methods & Practices Related to PE, and others.

It is evident that you adapt state and District curriculum expectations to meet student needs. You also use appropriate state frameworks and District standards to plan instruction. In addition you use appropriate instructional strategies to convey specific subject matter to students and enhance instruction by providing opportunities to develop various learning styles. For example, on several observations I've noted the way you personalize your teaching to students. Your connection to students invites them to be active participants in the activities. You also create links to other subjects or sports, or level of activities, such as high school as opposed to middle school—all for the purpose of creating relevance and interest in the subject matter and or activity. Through observation of and conversation with the student, talking to parents and consultation with resource personnel you identify strengths that can be used to build effective learning approaches. Students engage in a balance of competition, individual performance, and collaboration and teamwork. Your work with Chris B is an example of your interest in individual student's development. Chris is a special day student with particular issues with attention and behavior. Your involvement with him, his teacher, and professional support personnel pays dividends when he is in your class.

It is obvious that you continue to grow in your ability to use both directed and discovery teaching to integrate the subject into the students' thinking, offering students concepts and principles as well as problem-solving opportunities. Your personal growth is also manifested in your dealings with others related to your professional responsibilities. You provide a better balance of direct instruction and opportunities to experiment, emphasizing direct experience whenever possible.

**Reflection On and Refinement of Practice**

Pete, it is clear that you continue to participate in professional growth activities to expand your repertoire and use the new knowledge and skills to improve your teaching (examples previously cited).

It is evident that you continue to grow in your ability to use reasoned judgment to make instructional decisions based on theory and experience, asking for assistance whenever appropriate. It is clear that you reflect on and analyze your teaching and dealings with others to plan for future adjustments to instruction, as well as how you communicate with them. You recognize your teaching strengths as well as areas for growth. You engage others in discussions about improvement of teaching and responding thoughtfully to suggestions for improvement.

Pete, your effort and enthusiasm for teaching are obvious. I encourage you to continue to be reflective and thoughtful about what you do for yourself and others. Take your time and respond appropriately to the various situations we all encounter in our workday, whether with colleagues, students or community. You have shown tremendous growth in this area. Keep it up!



PAUSD

MAR 0 5 2001

**PALO ALTO UNIFIED SCHOOL DISTRICT**
**CERTIFICATED HUMAN RESOURCES**
HUMAN RESOURCES

# ASSESSMENT – PROBATIONARY 2 TEACHERS
## 2000-2001

☐ 1st assessment due 11/1/00        ☐ 2nd assessment due 12/21/00        ☒ 3rd assessment due 2/15/01

Columbo, Peter
Jordan
Prob2  (1.0)
Garcia, Lupe

**Please check the standards covered by this assessment report:**

☐    I.    Management and Monitoring of Student Learning
☐    II.    Commitment to Students and Learning
☐    III.    Knowledge of Content and How to Teach
☐    IV.    Reflection on and Refinement of Practice
☒    V.    Participation in Learning Communities

☒  Supervisor's statement below
☐  Supervisor's statement attached

**Overall assessment of progress toward these standards:**

**Standard #** _V_
☒ Meets standards        ☐ Progress evident        ☐ Progress not evident

**Standard #** ____
☐ Meets standards        ☐ Progress evident        ☐ Progress not evident

_____3/01_____                                    _____3/1/01_____
Supervisor's signature and date                      Teacher's signature and date

Note:    In order to be granted permanent status in the PAUSD, a teacher must be rated "meets standards" in *all*
         areas of assessment by March 1 of the Probationary 2 year.

(Cert. Pers\CEHR Eval Forms\Assessment-P2 (Prob2 Teacher) (Rev 9-00) Rev 9-00)

EXHIBIT A 2_059

**Pete Colombo**                                                    **March   2001**

Pete, your current teaching assignment is full-time physical education teacher at Jordan Middle School.  You teach grades 6, 7 and 8, depending on the period and the activity.  You are also co-athletic director with Bill Giordano and manage the after school athletic program.  You seem at ease and readily contribute to provide the most appropriate program for the benefit of all students.

**Participation in Learning Communities**

   Pete, it is evident that you are an active contributor to school and department committees related to school improvement.  You readily volunteer to do "your part" for Jordan and the kids. You also demonstrate thoughtful consideration of learning goals and objectives established by state frameworks and District standards.  Specifically, on the February 20, 2001 Staff Development Day you and the PE Department analyzed the state frameworks to make sure we were addressing all areas mentioned therein.

   It is clear that you have grown tremendously over the last year and now demonstrate the interpersonal skills needed to work on a team with colleagues and community members.  You show an interest in and are considerate of the needs and feelings of others.  You communicate effectively with parents, colleagues, and community members, respecting the opinions of others, even when disagreeing.  This year, for example, when issues arise either in your class or involving after school sports, you do not hesitate to deal with it positively, contact those involved in the issue and then address it in an appropriate manner.  You also seek out staff members providing special services to students and work cooperatively with such staff members to provide an appropriate program for special needs students.  One such example is Chris B.  Even though he might not now be in your class, you continue to work with him, his teacher and his mother in an effort to make school a positive place for him.  You are always willing and eager to work with others in the interest of individual students or the whole school.  Pete, keep up the effort!



PALO ALTO UNIFIED SCHOOL DISTRICT
**CERTIFICATED HUMAN RESOURCES**
**FIRST ASSESSMENT**
**PROBATIONARY 1 AND TEMPORARY TEACHERS OVER 40%**
**DUE DATE:  NOVEMBER 1**

Colombo, Peter
T    100    T2
Jordan/        Schneiderman

**Comment on the teacher's progress toward the following standards:**

**I.    MANAGEMENT AND MONITORING OF STUDENT LEARNING**

   a.    The teacher is able to orchestrate learning in a group setting.

   b.    The teacher motivates and engages student's minds and hearts in learning.

   c.    The teacher regularly assesses and provides feedback on student progress to students and parents and uses assessment information effectively in making instructional decisions.

   d.    The teacher plans instruction mindful of short- and long-term student learning objectives.

☑ Supervisor's statement below

☐ Supervisor's statement attached

**Overall assessment of progress toward these standards:**

☑ Meets standards          ☐ Progress evident          ☐ Progress not evident

_W. Schneiderman_  1/16/99
**Supervisor's signature and date**

_Peter Colombo_  11/16/99
**Teacher's signature and date**

**NOTE:**    In order to be granted permanent status in the PAUSD, a teacher must be rated "meets standards" in **all** areas of assessment by March 1 of the Probationary 2 year.

Pete Columbo                    Physical Education                    11/1/99

**I.     Management and Monitoring of Student Learning**
  a.  The teacher is able to orchestrate learning in a group setting.
  b.  The teacher motivates and engages students' minds and hearts in learning
  c.  The teacher regularly assesses and provides feedback on student progress to students
      and parents and uses assessment information effectively in making instructional
      decisions.
  d.  The teacher plans instruction mindful of short- and long-term student learning
      objectives.

Pete,

   This is your second year as a physical education teacher at Jordan.  You have done a
good job in adjusting to this role.  As I observe your class, the one thing that I see most often is
the effort you make to encourage children to perform at their best.  I often hear you praising all
the children on their good effort.  In addition, I see you go out of your way to make sure all
children are included in this praise.  For instance during a recent class, you
began your class by running them through a series of calisthenics and stretching exercises.  As
the children performed these activities with you, you continually praised them for good effort and
encouraged them to do their exercises well.  After the children finished the exercises, you had the
children run a 440 yard oval.   As the children came back from the run, one girl was having
trouble and you gave her encouragement and found another child to run along with her so that she
would finish.  I noted that she was breathing hard, but happy to have finished like everyone else.

   I like the fact that when you are working with children in learning a skill, you always
provide reasons for their effort.  During a lesson, you had the children run a basketball drill where
students had to run a short distance stop and pivot.  The drill went well and you corrected
children in regard to how they turned.  As you were doing this, you reminded them of why they
were doing this drill.  You asked them what happens after you finish the pivot.  Some of the
children responded and you reiterated that it is to either go for the hole, pass or shoot.

   I have seen you to always having the best interest of the children at heart.  This year you
asked me if you could create some new procedures that all the PE teachers would adhere to
regarding the supervision of the locker room.  Through your efforts, we have had fewer issues
around lost clothes and missing locks and other items. Thanks for that effort!

   You currently meet the Teacher Standard 1a, b, c, and d.  Thanks for your efforts in
managing the After School Sports Program.

Areas for Growth:

  1)  Continue to work with your PE and new teacher mentor.
  2)  Continue to observe other teachers for ideas and techniques.

Bill Schneiderman

98-99 ✓



PALO ALTO UNIFIED SCHOOL DISTRICT
CERTIFICATED HUMAN RESOURCES
**SUMMARY FORM**
**1998-99 EVALUATION OF PERFORMANCE – TEACHERS**

DATE RECEIVED
APR 0 9 1999
CERTIFICATED
HUMAN RESOURCES

Colombo, Peter
T   100%
Jordan/Paly
Brummett/Davis      TS1

Evaluation Date: _____

Evaluation Plan: ☐ 1  ☐ 2A  ☐ 2B  ☐ 3  ☐ 4

STATUS OF EMPLOYEE:
☑ Temporary          ☐ 1st Year Probationary
☐ Special Contract   ☐ 2nd Year Probationary
☐ Intern             ☐ Permanent

| | Supervisor's Rating of Performance Related To: | | Meets Standards | Progress Evident Towards Standards | Does Not Meet Standards |
|---|---|---|---|---|---|
| 1. | Management and Monitoring of Student Learning | 1. | ✓ | | |
| 2. | Commitment to Students and Learning | 2. | ✓ | | |
| 3. | Knowledge of Content and How to Teach | 3. | ✓ | | |
| 4. | Reflection on and Refinement of Practice | 4. | ✓ | | |
| 5. | Participation in Learning Communities | 5. | | ✓ | |

**Overall Evaluation**   The overall evaluation must reflect the evidence regarding relevant performance in all areas of performance standards and progress on the professional development plan.

☑ **Meets Standards - Satisfactory**
☐ **Does Not Meet Standards - Support/Improvement Plan Implemented**
☐ **Does Not Meet Standards - Unsatisfactory**
Addendum ☐ has ☐ has not been attached with additional comments (by either or both parties).

Provisions have been established for appealing an evaluation the Supervisee feels unfair. Contact the Certificated Human Resources Department for information regarding this appeal process.

**Evaluation Plan for 1999-2000**   ☐ 2A   ☐ 2B   ☐ 3   ☐ 4

| Supervisee's Signature and Date | Supervisor's Signature and Date | Principal's Signature and Date |
|---|---|---|
| *Peter Colombo* 4/6/99 | *signature* 4/6/99 | |
| My signature does not necessarily indicate agreement | If other than building principal | |

| | Supervisee Responses: | YES | NO |
|---|---|---|---|
| 1. | Supervisor has scheduled and met with me at least three times during the year to discuss my long-range professional development plan and annual objectives and to review progress and performance. | X | |
| 2. | Supervisor has supported my efforts to develop and implement my professional development plan. | X | |
| 3. | I have shared with my supervisor information gathered from students. | X | |
| 4. | I have shared with my supervisor information gathered from parents. | X | |
| 5. | My supervisor has given me the opportunity to provide input on his/her performance. | X | |

Supervisee's Initials _____

CEHR 10/98



PALO ALTO UNIFIED SCHOOL DISTRICT
**CERTIFICATED HUMAN RESOURCES**

## THIRD ASSESSMENT
## PROBATIONARY 1 AND TEMPORARY TEACHERS OVER 40%
### DUE DATE: APRIL 1

Colombo, Peter
T   100%
Jordan/Paly
Brummett/Davis          TS1

DATE RECEIVED

APR 0 9 1999

CERTIFICATED
HUMAN RESOURCES

---

**Comment on the teacher's progress toward the following standards:**

**IV. REFLECTION ON AND REFINEMENT OF PRACTICE**

    a. The teacher participates in professional growth activities to expand his/her repertoire and uses new knowledge and skill to improve his/her teaching.

    b. The teacher uses reasoned judgment to make instructional decisions based on theory and experience, asking for assistance when appropriate.

**V. PARTICIPATING IN LEARNING COMMUNITIES**

    a. The teacher participates in collaborative efforts to improve the school.

    b. The teacher demonstrates the interpersonal skill needed to work on a team with colleagues, parents, and community members.

❏ Supervisor's statement below

☑ Supervisor's statement attached

**Overall assessment of progress toward these standards:**

    ❏ Meets standards    ☑ Progress evident    ❏ Progress not evident

**Assessment of teacher's progress toward standards previously assessed:**

    **I.**    **MANAGEMENT AND MONITORING OF STUDENT LEARNING**
    ☑ Meets standards    ❏ Progress evident    ❏ Progress not evident

    **II.**    **COMMITMENT TO STUDENTS AND LEARNING**
    ☑ Meets standards    ❏ Progress evident    ❏ Progress not evident

    **III.**    **KNOWLEDGE OF CONTENT AND HOW TO TEACH**
    ☑ Meets standards    ❏ Progress evident    ❏ Progress not evident

_____ 4/6/99      _____ 4/6/99
Supervisor's signature and date        Teacher's signature and date

**NOTE:**  In order to be granted permanent status in the PAUSD, a teacher must be rated "meets standards" in **all** areas of assessment by March 1 of the Probationary 2 year.



PALO ALTO UNIFIED SCHOOL DISTRICT
**CERTIFICATED HUMAN RESOURCES**

**SUMMARY ASSESSMENT**
**PROBATIONARY 1 AND TEMPORARY TEACHERS OVER 40%**
**DUE DATE: APRIL 1**

Colombo, Peter
T   100%
Jordan/Paly
Brummett/Davis        TS1

DATE RECEIVED
APR 0 9 1999
CERTIFICATED
HUMAN RESOURCES

**Please check to indicate which standards this teacher has successfully met:**

**I.  MANAGEMENT AND MONITORING OF STUDENT LEARNING**
☑ a.  The teacher is able to orchestrate learning in a group setting.
☑ b.  The teacher motivates and engages students' minds and hearts in learning.
☑ c.  The teacher regularly assesses and provides feedback on student progress to students and parents and uses assessment information effectively in making instructional decisions.
✓ d.  The teacher plans instruction mindful of short- and long-term student learning objectives.

**II.  COMMITMENT TO STUDENTS AND LEARNING**
☑ a.  The teacher makes knowledge accessible to all students based on recognition of individual differences, employing effective practice with diverse groups of students.
☑ b.  The teacher addresses in a balanced program all areas of student development, including cognitive, social, personal, and ethical development.

**III. KNOWLEDGE OF CONTENT AND HOW TO TEACH**
☑ a.  The teacher is in command of his/her subject(s), understanding the relevant factual information, central organizing concepts, and links to other disciplines.
☑ b.  The teacher uses appropriate instructional strategies to convey a subject to students and enhances instruction by providing opportunities to develop various learning styles, creating varied instructional settings, and using effectively a range of materials and available resources.
☑ c.  The teacher uses both directed and discovery teaching to integrate the subject into the students' thinking, offering students knowledge of concepts and principles as well as problem-solving opportunities.

**IV. REFLECTION ON AND REFINEMENT OF PRACTICE**
☑ a.  The teacher participates in professional growth activities to expand his/her repertoire and uses new knowledge and skill to improve his/her teaching.
☑ b.  The teacher uses reasoned judgment to make instructional decisions based on theory and experience, asking for assistance when appropriate.

**V.  PARTICIPATION IN LEARNING COMMUNITIES**
☐ a.  The teacher participates in collaborative efforts to improve the school.
☐ b.  The teacher demonstrates the interpersonal skill needed to work on a team with colleagues, parents, and community members.

Is this teacher making progress toward meeting the standards not marked above?
(Remember to attach a <u>brief</u> summary evaluation).

_____  4/6/99          _____  4/6/99
Supervisor's signature and date            Teacher's signature and date

**NOTE:**   In order to be granted permanent status in the PAUSD, a teacher must be rated "meets standards" in **all** areas of assessment by March 1 of the Probationary 2 year.

Peter Columbo          Physical Education          April 1, 1999

IV.    REFLECTION ON AND REFINEMENT OF PRACTICE

V.    PARTICIPATION IN LEARNING COMMUNITIES

Peter,

You have done a good job this year as a physical education teacher at Jordan.  You demonstrated an ability to motivate children in your classes and have worked hard to understand the teaching of physical education.  You have worked with both your mentors and the other physical education teachers to develop a viable program for your students.

In looking at the objectives IV and V, you readily accept ideas and suggestions and incorporate them into your teaching.  You have made an effort to increase your knowledge by taking classes through National University to add physical education to your credential.  At the same time, you have attended the College of Notre Dame on the way towards a Master's Degree in Public Administration.   While this keeps you busy, it has not detracted from your efforts to teach physical education.

This year, you have also taken on the difficult job of Athletic Director.  You have helped our school immensely in taking over a program that requires lots of time in organization and scheduling for a program that serves so many children.  In doing so, you have had to tackle some difficult situations working with parents and students to run a fair and balanced program.  Through it all you,  have kept your integrity and we appreciate your efforts.

Pete, you seem to have boundless energy and even with all your current duties you manage to coach a baseball team at the high school.  All these experiences add to your ability and effectiveness of working with students.

As you look to next year,  you need to see how you can take an active role in other parts of the school program.   This will require a way for you to be involved in some of the efforts to improve the school.   Your ideas and efforts to help the school move forward towards meeting it stated goals will be appreciated.

You currently meet objective IV and show progress evident for objective V.

Areas for Growth
1 ) Continue to work with your mentors and department colleagues.
2 ) Next year, look for ways to  that you can involve yourself with other staff on projects or committees that help the school.

Keep up the good work!

Bill Schneiderman



PALO ALTO UNIFIED SCHOOL DISTRICT
**CERTIFICATED HUMAN RESOURCES**

## FIRST ASSESSMENT
## PROBATIONARY 1 AND TEMPORARY TEACHERS OVER 40%
### DUE DATE: NOVEMBER 1

Colombo, Peter
T   100%
Jordan/Paly
Brummett/Davis        TS1

DATE RECEIVED

DEC 0 7 1998

CERTIFICATED
HUMAN RESOURCES

**Comment on the teacher's progress toward the following standards:**

### I.   MANAGEMENT AND MONITORING OF STUDENT LEARNING

a.  The teacher is able to orchestrate learning in a group setting.

b.  The teacher motivates and engages student's minds and hearts in learning.

c.  The teacher regularly assesses and provides feedback on student progress to students and parents and uses assessment information effectively in making instructional decisions.

d.  The teacher plans instruction mindful of short- and long-term student learning objectives.

❑ Supervisor's statement below

❑ Supervisor's statement attached

**Overall assessment of progress toward these standards:**

❑ Meets standards          ☑ Progress evident          ❑ Progress not evident

_____          _____
Supervisor's signature and date          Teacher's signature and date

**NOTE:**   In order to be granted permanent status in the PAUSD, a teacher must be rated "meets standards" in **all** areas of assessment by March 1 of the Probationary 2 year.

**Peter Columbo**                     **Physical Education**

**1.    MANAGEMENT AND MONITORING OF STUDENT LEARNING**

     **a.**  The teacher is able to orchestrate learning in a group setting.
     **b.**  The teacher motivates and engages students' minds and hearts in learning.
     **c.**  The teacher regularly assesses and provides feedback on student progress to students and parents and uses assessment information effectively in making instructional decisions.
     **d.**  The teacher plans instruction mindful of short- and long-term student learning objectives.

Pete,

     You are a young teacher that shows enthusiasm and love of teaching. You have some natural instincts that become very apparent in your classroom. You create really good routines and expectations that are known to your children and demonstrated in their ability to follow your instruction. Even when running students through exercises, you often praise them for doing the stretches well and saying things like "good effort" and "great attitude." When certain children were struggling with the correct position for the exercises, you would help the individual in the placement of hands and position. They really follow all your exercises in exact rhythm.

     You use a variety of techniques in your instruction and you do not move on to a new activity until you are sure that all the children can show understanding of what to do. You seem not let anything to chance and remind students of all the things they must remember to do. During a recent class you broke the class into four separate groups on the different ends of the two volleyball courts. You then ran a competition between the groups with the object to see how long they could keep the ball up in the air. The students on the first round barely could make six. You reminded them to communicate and call the balls as well as to track the ball. During the second round the students did much better keeping the ball up for sometimes thirty times. You logically develop your lessons. Students move through a series of activities that build upon previous learning.

     This year, you have also taken on the job of Athletic Director. You are doing a good job in coordinating our after school sports program.

You currently show progress to teacher standard 1a,b,c, and d.

Areas of growth:

     1) Continue to work with your mentor.
     2) Observe Cindi Durchslag in her methods of working with children.

Bill Schneiderman



PALO ALTO UNIFIED SCHOOL DISTRICT
**CERTIFICATED HUMAN RESOURCES**


DATE RECEIVED
MAR 8 1999
CERTIFICATED
HUMAN RESOURCES

## SECOND ASSESSMENT
## PROBATIONARY 1 AND TEMPORARY TEACHERS OVER 40%
### DUE DATE: FEBRUARY 15

Colombo, Peter
T   100%
Jordan/Paly
Brummett/Davis        TS1

**Comment on the teacher's progress toward the following standards:**

**II. COMMITMENT TO STUDENTS AND LEARNING**

   a.  The teacher makes knowledge accessible to all students based on recognition of individual differences, employing effective practice with diverse groups of students.

   b.  The teacher addresses in a balanced program all areas of student development, including cognitive, social, personal, and ethical development.

**III. KNOWLEDGE OF CONTENT AND HOW TO TEACH**

   a.  The teacher is in command of his/her subject(s), understanding the relevant factual information, central organizing concepts, and links to other disciplines.

   b.  The teacher uses appropriate instructional strategies to convey a subject to students and enhances instruction by providing opportunities to develop various learning styles, creating varied instructional settings, and using effectively a range of materials and available resources.

   c.  The teacher uses both directed and discovery teaching to integrate the subject into the students' thinking, offering students knowledge of concepts and principles as well as problem-solving opportunities.

❑ Supervisor's statement below

❑ Supervisor's statement attached

**Overall assessment of progress toward these standards:**

☑ Meets standards        ❑ Progress evident        ❑ Progress not evident

**Assessment of teacher's progress toward standards previously assessed:**

   I.    **MANAGEMENT AND MONITORING OF STUDENT LEARNING**

☑ Meets standards        ❑ Progress evident        ❑ Progress not evident

_____  3/5/99        _____  3/5/99
Supervisor's signature and date              Teacher's signature and date

**NOTE:**   In order to be granted permanent status in the PAUSD, a teacher must be rated "meets standards" in **all** areas of assessment by March 1 of the Probationary 2 year.

EXHIBIT A-2_069
CEHR\Evaluation Forms\Second Assessment 10/97

**Pete Columbo**              **Physical Education**              **2/15/99**

**II.     COMMITMENT TO STUDENT LEARNING**

**III.    KNOWLEDGE OF CONTENT AND HOW TO TEACH**

Pete,

In observing your classes, you have both organized your classes well and set good routines.  You give all children an opportunity to perform to the best of their ability.  For instance in a class where you asking students to run long distances,  you modified the activity in such a way that all the children were able to either run, walk fast or run when they could for the portion they were able.   You allow children to move through things as mundane as exercises with their own self direction related to the extent that they can participate.   Through these types of activities, you talk to the class informing them about what muscle group they are working or at time allowing them to give you their idea about what they think they are the groups they are involving.

Just as academic teachers have to check for understanding when teaching new concepts,  you do a god job of both checking to see that all students understand what you are teaching and all are given opportunities to demonstrate knowledge and ability before moving to new activities. You spend much time reviewing previous concepts before teaching new thing.  You logically develop your lessons to build on previously learned information.

I have watched you co-teach with your colleagues where you broke your groups into similarly skilled or boy/ girl divisions where students could stay involved without having to compete unfairly.

You do a good job of demonstrating new skills and make sure that all the students understand how to accomplish what is asked.  You develop good activities to strengthen these skills and all the children willingly participate.

You have done a good job this year walking into a new area of instruction and picking up the skills necessary to teach it.  You currently

EXHIBIT A-2_070

meet the teacher standards II and III.

Areas for growth:

1) Continue to work with Cindy Durchslag and the mentors.

Bill Schneiderman

99-00



PALO ALTO UNIFIED SCHOOL DISTRICT
**CERTIFICATED HUMAN RESOURCES**

**SECOND ASSESSMENT**
**PROBATIONARY 1 AND TEMPORARY TEACHERS OVER 40%**
**DUE DATE:  FEBRUARY 15**

Colombo, Peter
T    100    T2
Jordan/          Schneiderman

**Comment on the teacher's progress toward the following standards:**

**II.  COMMITMENT TO STUDENTS AND LEARNING**

    a.  The teacher makes knowledge accessible to all students based on recognition of individual differences, employing effective practice with diverse groups of students.

    b.  The teacher addresses in a balanced program all areas of student development, including cognitive, social, personal, and ethical development.

**III. KNOWLEDGE OF CONTENT AND HOW TO TEACH**

    a.  The teacher is in command of his/her subject(s), understanding the relevant factual information, central organizing concepts, and links to other disciplines.

    b.  The teacher uses appropriate instructional strategies to convey a subject to students and enhances instruction by providing opportunities to develop various learning styles, creating varied instructional settings, and using effectively a range of materials and available resources.

    c.  The teacher uses both directed and discovery teaching to integrate the subject into the students' thinking, offering students knowledge of concepts and principles as well as problem-solving opportunities.

❑ Supervisor's statement below

☑ Supervisor's statement attached

**Overall assessment of progress toward these standards:**

    ☑ Meets standards    ❑ Progress evident    ❑ Progress not evident

**Assessment of teacher's progress toward standards previously assessed:**

    I.    **MANAGEMENT AND MONITORING OF STUDENT LEARNING**

    ❑ Meets standards    ❑ Progress evident    ❑ Progress not evident

_____  2/15/00    _____  2/15/00
Supervisor's signature and date    Teacher's signature and date

**NOTE:**  In order to be granted permanent status in the PAUSD, a teacher must be rated "meets standards" in **all** areas of assessment by March 1 of the Probationary 2 year.

EXHIBIT A-2 072

CEHR\Evaluation Forms\Second Assessment 10/97

**Pete Columbo**                    **Physical Education**                                2/8/00

**II.      COMMITMENT TO STUDENTS AND LEARNING**

**III.     KNOWLEDGE OF CONTENT AND HOW TO TEACH**

Pete,

    In observing your classes, I have observed that you are committed to students and learning.   You really excel at noticing differences in children and making sure that all children have a chance to succeed. You do this through encouragement and praise that you give regularly to children while performing some type of activity, You also encourage children to assist and motivate children who have difficulty with any particular activity.  During a recent class, I noted as children were completing an intermediate distance run that you asked the students to cheer the students who were the most behind and help them complete their run.  When finished even though last, they were praised for putting forth "good effort."

    On more than one occasion, I have seen you use a variety of techniques to have children understand what is being asked of them.  You use verbal and visual cues.  I have seen you use different children to model behaviors and demonstrate skills.   In one recent class, you were describing what you felt was a person appropriately attired and took a student out to show how one should be dressed for PE.  On other occasions, I have seen you demonstrate a specific skill for basketball follow that up with having a few students model the skill and then have all the students practice the skill while you walked amongst them correcting position.  Along with the practice, you often ask your students to explain why a particular skill is also important in the playing of the game.  You give many children an opportunity to respond to see that there is more than one simple response for most questions.

    Your consistent referencing and asking children to tell you why a skill is important or how it might best be used in game points to your own knowledge of the game and skills that you are teaching. Even in the presentation of your daily exercises, you choose to interject information about muscle physiology.  This typically gives children not only an exercise to warm-up muscles, but also an understanding of which muscle an exercise effects to which you usually tie to the upcoming activity.

    I realize that in teaching a subject like physical education, the opportunity for children to be inventive is not so easily done; however, you and your colleagues have managed to interject some discovery types of activities as evidenced by the dance unit.  The children had to work in small groups to invent a new dance using some type of provided music.

    Your efforts this year in your classes show that you are currently meeting the Teacher Standards II and III.  Keep up the good work!

Bill Schneiderman

# EXHIBIT A-3

**PALO ALTO UNIFIED SCHOOL DISTRICT**
HUMAN RESOURCE CENTER
25 CHURCHILL AVENUE
PALO ALTO, CALIFORNIA 94306
(650) 329-3785    FAX (650) 323-5162

_____ Permanent

_____ Summer School

_____ Payroll

## 2021 Summer Session Assignment

**DATE:**    March 12, 2021

**TO:** PETER COLOMBO

**FROM:**   PAUSD Summer School Office

You have been selected to fill the summer session certificated assignment shown below.

It is understood that this agreement is contingent upon sufficient enrollment in the class or classes to which you have been assigned, sufficient funding to support the program and ability to hold in person session. The district will provide notification that your services are not required at least one week prior to the start of the summer school session.  If notification is given less than a week before, the employee will be paid the daily rate of three days.

Please advise us of your acceptance of this agreement by signing below.  **Keep a copy for your records please.**

Teachers are expected to attend  faculty meetings/preparatory workshops called for their particular assignment level. Such hours will be paid via time card submission.

District policy does not provide leave benefits for summer session teaching.

**Assignment:** Teacher - Middle School - 6-8  at Greene Middle School

**Dates:**       MS Session - June 14- July 9, 2021      19  days
**Hours/Day:**  4.50
**Salary:**    $5,776.00

**Account:**    ████████████████

**SSN:**

_____
Signature

**Distribution:**  **White** Summer School Office, **Yellow**  Payroll   -   **Pink** keep for your records

EXHIBIT A-3_001



**PALO ALTO UNIFIED SCHOOL DISTRICT**
**HUMAN RESOURCE CENTER**
25 CHURCHILL AVENUE
PALO ALTO, CALIFORNIA 94306
(650) 329-3785       FAX  (650) 323-5162

Reviewed:  Greene
_____  Summer School
_____  Payroll

## 2019 Summer Session Assignment

**DATE:**    December 18, 2018

**TO:**    PETER
COLOMBO

**FROM:**    PAUSD Summer School Office

You have been selected to fill the summer session certificated assignment shown below.

It is understood that this agreement is contingent upon sufficient enrollment in the class or classes to which you have been assigned, and sufficient funding to support the program.

Please advise us of your acceptance of this agreement by signing below.  **Keep the pink copy for your records and return the white and yellow copies to Certificated HR within two weeks of the date of this contract.**

Teachers will be expected to attend such faculty meetings or preparatory workshops as may be called for their particular assignment level.  District policy does not provide leave benefits for summer session teaching.

**Assignment:**  Teacher - STREAM - 6-8 at JLS Middle School

**Dates:**        MS Session - June 6- July 3, 2019        20  days

**Hours/Day:**  4.00

**Salary:**       $5,220.00

**Account:**    ██████████

**SSN:**         ████████

12/20/18

_____
Signature

**Distribution**:  **White** Summer School Office,  **Yellow**  Payroll  -  **Pink** keep for your records

EXHIBIT A-3_002



**PALO ALTO UNIFIED SCHOOL DISTRICT**
HUMAN RESOURCE CENTER
25 CHURCHILL AVENUE
PALO ALTO, CALIFORNIA 94306
(650) 329-3785    FAX (650) 323-5162

Reviewed: Jordan
_____ Permanent
_____ Summer School
_____ Credentials
_____ Payroll

## 2016 Summer Session Assignment

**DATE:**    May 13, 2016

**TO:**    PETER COLOMBO

**FROM:**    PAUSD Summer School Office

You have been selected to fill the summer session certificated assignment shown below.

It is understood that this agreement is contingent upon sufficient enrollment in the class or classes to which you have been assigned, and sufficient funding to support the program.

**Please advise us of your acceptance of this agreement by signing below.  Keep the pink copy for your records and return the white and yellow copies to Certificated HR within two weeks of the date of this contract.**

Teachers will be expected to attend such faculty meetings or preparatory workshops as may be called for their particular assignment level.  District policy does not provide leave benefits for summer session teaching.

**Assignment:** Teacher - STREAM - 6-8 at Terman Middle School

**Dates:**    June 13 - June 30, 2016    14 days
**Hours/Day:**    4.00
**Salary:**    $3,234.00

**Account:**    ██████████

**SSN:**    ██████████

_____
Signature

**Distribution:  White** Summer School Office, **Yellow**  Payroll  -  **Pink** keep for your records

EXHIBIT A-3_003



**PALO ALTO UNIFIED SCHOOL DISTRICT**
HUMAN RESOURCE CENTER
25 CHURCHILL AVENUE
PALO ALTO, CALIFORNIA 94306
(650) 329-3785    FAX (650) 323-5162



## 2013 Summer Session Assignment

**DATE:**    July 1, 2013

**TO:**    PETER COLOMBO

**FROM:**    PAUSD Certificated Human Resources

You have been selected to fill the summer session certificated assignment shown below.

It is understood that this agreement is contingent upon sufficient enrollment in the class or classes to which you have been assigned, and sufficient funding to support the program.

**Please print and sign this contract. Return the signed document to Certificated Human Resources by inter-district mail or as a PDF document to smacgregor@pausd.org. Signed contracts must be on file with Certificated HR no later than *July 2, 2013*.**

**NOTE: If you are an out-of-district teacher, you will be expected to complete PAUSD employment paperwork prior to the start of your summer school assignment.**

Teachers will be expected to attend such faculty meetings or preparatory workshops as may be called for their particular assignment level.  District policy does not provide leave benefits for summer session teaching.

**Assignment:**  Teacher - Middle School Fun Field Games

**Dates:**       06/10 to 07/03      18 days
**Hours/Day:**   2.0
**Salary:**      $1,908.00

**Account:**     ██████████████

**SSN:**         ███████████

_____
Signature



**PALO ALTO UNIFIED SCHOOL DISTRICT**
HUMAN RESOURCE CENTER
25 CHURCHILL AVENUE
PALO ALTO, CALIFORNIA 94306
(650) 329-3785     FAX  (650) 323-5162

Reviewed: Jordan
800428

| | |
|---|---|
| _____ | Summer School |
| ✓ | Credentials |
| ✓ | Payroll |

## 2012 Summer Session Assignment

**DATE:**    May 11, 2012

**TO:**    PETER COLOMBO

**FROM:**    PAUSD Summer School Office

You have been selected to fill the summer session certificated assignment shown below.

It is understood that this agreement is contingent upon sufficient enrollment in the class or classes to which you have been assigned, and sufficient funding to support the program.

**Please advise us of your acceptance of this agreement by signing , *keep the pink copy for your records and return the white, yellow  & goldenrod copies to the Summer School office  by June 1, 2012.***

**NOTE:  If you are an out-of-district teacher, you must have contacted Sarah MacGregor in Human Resources at 329-3741 to verify your eligibility to teach.**

Teachers will be expected to attend such faculty meetings or preparatory workshops as may be called for their particular assignment level.  District policy does not provide leave benefits for summer session teaching.

**Assignment:**  Teacher - Middle School Fun Field Games

**Dates:**    6/18 to 7/13      19 days

**Hours/Day:**  4.0

**Salary:**    $3,917.61

**Account:**    ███████████

**SSN:**    ███████████

_____
Signature

**Distribution**:  **White, Yellow  & Goldenrod** Summer School Office   -   **Pink** keep for your records   EXHIBIT A-3_005



Reviewed: Jordan
800428

| | |
|---|---|
| ✓ | **Summer School** |
| ✓ | **Credentials** |
| ✓ | **Payroll** |

**PALO ALTO UNIFIED SCHOOL DISTRICT**
HUMAN RESOURCE CENTER
25 CHURCHILL AVENUE
PALO ALTO, CALIFORNIA 94306
(650) 329-3785      FAX  (650) 323-5162

## 2011 Summer Session Assignment

**DATE:**     June 9, 2011

**TO:**        PETER COLOMBO

**FROM:**    PAUSD Summer School Office

You have been selected to fill the summer session certificated assignment shown below.

It is understood that this agreement is contingent upon sufficient enrollment in the class or classes to which you have been assigned, and sufficient funding to support the program.

**Please advise us of your acceptance of this agreement by signing , *keep the pink copy for your records and return the white, yellow  & goldenrod copies to the Summer School office  by June 10, 2011.***

**NOTE:  If you are an out-of-district teacher, you must have contacted Sarah MacGregor in Human Resources at 329-3741 to verify your eligibility to teach.**

Teachers will be expected to attend such faculty meetings or preparatory workshops as may be called for their particular assignment level.  District policy does not provide leave benefits for summer session teaching.

**Assignment:**  Teacher - Middle School Fun Field Games

**Dates:**        6/20 to 7/15        19 days

**Salary:**        $3,917.61

**Account:**     ████████████

**SSN:**          ████████████

_____
Signature

**Distribution:  White, Yellow  & Goldenrod** Summer School Office   -   **Pink** keep for your records   EXHIBIT A-3_006



**PALO ALTO UNIFIED SCHOOL DISTRICT**
**HUMAN RESOURCE CENTER**
25 CHURCHILL AVENUE
PALO ALTO, CALIFORNIA 94306
(650) 329-3785    FAX (650) 323-5162

| Reviewed: Jordan Permanent | |
|---|---|
| ✓ | Summer School |
| ✓ | Credentials |
| ✓ | Payroll |

## 2009 Summer Session Assignment

**DATE:**    May 21, 2009

**TO:**    PETER COLOMBO

**FROM:**    PAUSD Summer School Office

You have been selected to fill the summer session certificated assignment shown below.

It is understood that this agreement is contingent upon sufficient enrollment in the class or classes to which you have been assigned, and sufficient funding to support the program.

**Please advise us of your acceptance of this agreement by signing , keep the pink copy for your records and return the white, yellow & goldenrod copies to the Summer School office by June 1, 2009.**

**NOTE: If you are an out-of-district teacher, you must have contacted Siena Van Heusen in Human Resources at 329-3741 to verify your eligibility to teach.**

Teachers will be expected to attend such faculty meetings or preparatory workshops as may be called for their particular assignment level. District policy does not provide leave benefits for summer session teaching.

**Assignment:**  Teacher - Middle School Fun Field Game

**Dates:**    6/22 to 7/17    19 days

**Salary:**    $3,917.61

**Account:**    ███████

**SSN:**    ██████

_Signature_

**Distribution: White, Yellow & Goldenrod** Summer School Office  -  **Pink** keep for your records

EXHIBIT A-3_007



**PALO ALTO UNIFIED SCHOOL DISTRICT**
HUMAN RESOURCE CENTER
25 CHURCHILL AVENUE
PALO ALTO, CALIFORNIA 94306
(650) 329-3785    FAX (650) 323-5162

Reviewed: Jordan

☐ Permanent
✓ Summer School
☐ Credentials
☐ Payroll

## 2008 Summer Session Assignment

**DATE:**   April 14, 2008

**TO:**    PETER COLOMBO

**FROM:**   PAUSD Summer School Office

You have been selected to fill the summer session certificated assignment shown below.

It is understood that this agreement is contingent upon sufficient enrollment in the class or classes to which you have been assigned, and sufficient funding to support the program.

**Please advise us of your acceptance of this agreement by signing , *keep the pink copy for your records and return the white, yellow & goldenrod copies to the Summer School office by June 1, 2008.***

**NOTE:  If you are an out-of-district teacher, you must have contacted Siena Van Heusen in Human Resources at 329-3741 to verify your eligibility to teach.**

Teachers will be expected to attend such faculty meetings or preparatory workshops as may be called for their particular assignment level.  District policy does not provide leave benefits for summer session teaching.

**Assignment:** Teacher - Middle School Fun Field Game

**Dates:**   6/23 to 7/18    19 days

**Salary:**   $3,822.04

**Account:**   █████████

**SSN:**    █████████

Signature

**Distribution:  White, Yellow  & Goldenrod** Summer School Office  -  **Pink** keep for your records    EXHIBIT A-3_008



**PALO ALTO UNIFIED SCHOOL DISTRICT**
**HUMAN RESOURCE CENTER**
25 CHURCHILL AVENUE
PALO ALTO, CALIFORNIA 94306
(650) 329-3785     FAX  (650) 329-3901

|  | Permanent |
|---|---|
| ✓ | Summer School |
| ✓ | Credentials |
| ✓ | Payroll |

## 2006 Summer Session Assignment

**DATE:**   May 2, 2006

**TO:**   PETER COLOMBO

**FROM:**   PAUSD Summer School Office

You have been selected to fill the summer session certificated assignment shown below.

It is understood that this agreement is contingent upon sufficient enrollment in the class or classes to which you have been assigned, and sufficient funding to support the program.

**Please advise us of your acceptance of this agreement by signing , *keep the pink copy for your records and return the white & yellow copies to the Summer School office  by June 1, 2004.***

**NOTE:  If you are an out-of-district teacher, you must have contacted Siena Van Heusen in Human Resources at 329-3741 to verify your eligibility to teach.**

Teachers will be expected to attend such faculty meetings or preparatory workshops as may be called for their particular assignment level.  District policy does not provide leave benefits for summer session teaching.

**Assignment:**  Teacher - Middle School Tennis

**Dates:**        6/26 to 7/21        19 days

**Salary:**       $3,551.10

**Account:**     ███████████

**SSN:**         ███████

_Peter Colombo_
Signature

**Distribution:  White & Yellow** Summer School Office   -   **Pink** keep for your records

EXHIBIT A-3_009

**Palo Alto** ...**fied School District**
Certificated Human Resources
25 Churchill Avenue
Palo Alto, CA  94306

### 2002 Summer Session Assignment

**DATE:**    4/1/2002

**TO:**    Peter Colombo

**FROM:**    Sue Herhold
Certificated Human Resources

You have been selected as a summer session teacher for the level and subject shown below.

It is understood that this agreement is contingent upon sufficient enrollment in the class or classes to which you have been assigned, and sufficient funding to support the program.

**Please advise us of your acceptance of this agreement by signing all copies, keep one copy for your records and return all other copies to Cathy Nazario of Human Resources Payroll by May 1, 2002.**

**NOTE:  If you are an out-of-district teacher, please contact Sue Herhold in Human Resources at 329-3741 to verify your eligibility to teach.**

Teachers will be expected to attend such faculty meetings or preparatory workshops as may be called for their particular assignment level.  District policy does not provide leave benefits for summer session teaching.

ASSIGNMENT:   Jordan, 100%, Learning Strategies (2, 2 hr sessions)

DATE:   June 24 - July 19
        ( 19 days)

SALARY:  $3,306.00

ACCOUNT:  ███████████

_____
Signature

_____
Social Security #

EXHIBIT A-3_010

# EXHIBIT A-4

PALO ALTO UNIFIED SCHOOL DISTRICT

CLASSIFIED HUMAN RESOURCES

# COACHING EMPLOYMENT INTENT

**NOTE:** If you are not currently an employee of the PAUSD, you must complete employment papers and show evidence of completed First Aid/CPR courses. Non-credentialed coaches must be fingerprinted in the Human Resources Office. No one may begin work until these pre-employment requirements are met.

## TO BE COMPLETED BY SCHOOL

Request for employment of: _Peter Colombo_
_____ **Name** _____ **Phone**

_____
**Address**          **City**          **Zip**          **Social Security #**

**CHECK ONE:**    ☒ **Credentialed Coach**    ☐ **Non-credentialed Coach**

Account Number: ▮▮▮▮▮▮

Requested first day of assignment: _10/25/04_    Sport: _J.V. Girls Basketball_

Last day of assignment: _2/18/05_    Category/step:* _C-2_

Total weeks or months: _4 months_    School: _PALY_

Total payment for assignment: _2,199.00_    To be paid in _3_ installments

_Earl D Hansen_
**Athletic Director**    _10-20-04_
                         **Date**

I agree to the conditions of coaching pay as noted above and further understand the agreement may be canceled by the Athletic Director at any time he/she deems it necessary.

_____    _10/20/04_
**Coach/Coaching Assistant**    **Date**

✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱ ✱

## TO BE COMPLETED BY HUMAN RESOURCES OFFICE

Fingerprinting date: _____    TB clearance date: _3/21/07_
                    **(Non-credentialed only)**

First Aid date: _1/22/07_    CPR date: _1/22/05_

First day of assignment: _10/25/04_

Approved Human Resources _____    _1/13/05_
                        **Signature**          **Date**

*See Coaching Salary Schedule for Categories.*

PALO ALTO UNIFIED SCHOOL DISTRICT

CLASSIFIED HUMAN RESOURCES

# COACHING EMPLOYMENT INTENT

**NOTE:** If you are not currently an employee of the PAUSD, you must complete employment papers and show evidence of completed First Aid/CPR courses. Non-credentialed coaches must be fingerprinted in the Human Resources Office. No one may begin work until these pre-employment requirements are met.

## TO BE COMPLETED BY SCHOOL

Request for employment of: _Peter Colombo_

**Name** _____  **Phone** ██████

**Address** ██████  **City** ██████  **Zip** _____  **Social Security #** ██████

CHECK ONE:  ☒ **Credentialed Coach**    ☐ **Non-credentialed Coach**

Account Number: ██████

Requested first day of assignment: _1/26/04_

Last day of assignment: ~~6/1/04~~ _5/14/04_

Total weeks or months: _3 months_

Total payment for assignment: _3201.00_

Sport: _VARSITY BASEBALL_

Category/step:* _B-12_

School: _PALY_

To be paid in _2_ installments

_Earl D Hansen_
**Athletic Director**

_5-5-04_
**Date**

I agree to the conditions of coaching pay as noted above and further understand the agreement may be canceled by the Athletic Director at any time he/she deems it necessary.

_____
**Coach/Coaching Assistant**

_5/5/04_
**Date**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## TO BE COMPLETED BY HUMAN RESOURCES OFFICE

Fingerprinting date: _____
**(Non-credentialed only)**

First Aid date: _1/22/07_

First day of assignment: _1/26/04_

Approved Human Resources _____
**Signature**

TB clearance date: _8/21/07_

CPR date: _1/22/05_

_9/4/04_
**Date**

*See Coaching Salary Schedule for Categories.

RECEIVED
BY (AG)  DATE _5/5/04_ 8 am

CLHR\Coaching Empl Intent 3/97

EXHIBIT A-4 002

PALO ALTO UNIFIED SCHOOL DISTRICT

CLASSIFIED HUMAN RESOURCES

# COACHING EMPLOYMENT INTENT

**NOTE:** If you are not currently an employee of the PAUSD, you must complete employment papers and show evidence of completed First Aid/CPR courses. Non-credentialed coaches must be fingerprinted in the Human Resources Office. No one may begin work until these pre-employment requirements are met.

## TO BE COMPLETED BY SCHOOL

Request for employment of: _Peter Colombo_

Name                                Phone

Address            City            Zip            Social Security #

**CHECK ONE:**  ☒ **Credentialed Coach**   ☐ **Non-credentialed Coach**

Account Number: ▪▪▪▪▪▪

Requested first day of assignment: _10-27-03_     Sport: _F/S BASKETBALL_

Last day of assignment: _2-20-04_     Category/step:* _C-1_

Total weeks or months: _3 months_     School: _Palo Alto_

Total payment for assignment: _2199.00_     To be paid in _3_ installments

_Earl D Hansen_
Athletic Director        _12-1-03_   Date

I agree to the conditions of coaching pay as noted above and further understand the agreement may be canceled by the Athletic Director at any time he/she deems it necessary.

_____        _12-1-03_
Coach/Coaching Assistant        Date

★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★

## TO BE COMPLETED BY HUMAN RESOURCES OFFICE

Fingerprinting date: _____        TB clearance date: _8/21/07_
(Non-credentialed only)

First Aid date: _1/22/06_        CPR date: _1/22/04_

First day of assignment: _____

Approved Human Resources _____        _1/6/04_
Signature        Date

*See Coaching Salary Schedule for Categories.*



RECEIVED
BY _GB_  DATE _12/3/03_

EXHIBIT A-4.003

CLHR\Coaching Empl Intent 9/97

*l'04*

## PALO ALTO UNIFIED SCHOOL DISTRICT
### CLASSIFIED HUMAN RESOURCES
## COACHING EMPLOYMENT INTENT

**NOTE:** If you are not currently an employee of the PAUSD, you must complete employment papers and show evidence of completed First Aid/CPR courses. Non-credentialed coaches must be fingerprinted in the Human Resources Office. No one may begin work until these pre-employment requirements are met.

### TO BE COMPLETED BY SCHOOL

Request for employment of: _Peter Colombo_
Name _____  Phone ▮▮▮▮

Address ▮▮▮▮   City _____   Zip _____   Social Security # ▮▮▮▮

**CHECK ONE:** ☒ Credentialed Coach   ☐ Non-credentialed Coach

Account Number ▮▮▮▮

Requested first day of assignment: _9-2-03_   Sport: _Weight Room Sup_

Last day of assignment: _11-14-03_   Category/step:* _C-1_

Total weeks or months: _3 months_   School: _Palo Alto_

Total payment for assignment: _2199.00_   To be paid in _3_ installments

_Earl D Hansen_
**Athletic Director**        _9-2-03_
                             **Date**

I agree to the conditions of coaching pay as noted above and further understand the agreement may be canceled by the Athletic Director at any time he/she deems it necessary.

_____   _9/5/03_
**Coach/Coaching Assistant**    **Date**

☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆

### TO BE COMPLETED BY HUMAN RESOURCES OFFICE  _8/21/2007_

Fingerprinting date: _____   TB clearance date: _5.18.2003_
(Non-credentialed only)

First Aid date: _1.22.2006_   CPR date: _1.22.2004_

First day of assignment: _9.2.03_

Approved Human Resources _____   _10/30/03_
                          Signature                    Date

*See Coaching Salary Schedule for Categories.*

_9/2/03_

*file*

**PALO ALTO UNIFIED SCHOOL DISTRICT**

**HUMAN RESOURCES**

# COACHING EMPLOYMENT INTENT

**NOTE:** If you are not currently an employee of the PAUSD, you must complete employment papers and show evidence of completed First Aid/CPR courses. Non-credentialed coaches must be fingerprinted in the Human Resources Office. No one may begin work until these pre-employment requirements are met.

## TO BE COMPLETED BY SCHOOL

Request for employment of: _Peter Colombo_
                              Name                                          **Phone**

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
**Address**              **City**          **Zip**          **Social Security #**

**CHECK ONE:**  ☒ **Credentialed Coach**      ☐ **Non-credentialed Coach**

Account Number: ▇▇▇▇▇▇▇▇▇                        VARSITY

Requested first day of assignment: _1-27-03_        Sport: _BASEBALL_

Last day of assignment: _5-15-03_                  Category/step:* _B-11_

Total weeks or months: _3 months_                  School: _PALY_

Total payment for assignment: ~~$358.00~~ _3200_  To be paid in _3_ installments

_Signature_                                        _1-28-03_
**Athletic Director**                                      **Date**

I agree to the conditions of coaching pay as noted above and further understand the agreement may be canceled by the Athletic Director at any time he/she deems it necessary.

_Signature_                                        _1/28/03_
**Coach/Coaching Assistant**                               **Date**

★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★

## TO BE COMPLETED BY HUMAN RESOURCES OFFICE

Fingerprinting date: _____              TB clearance date: _5/18/2003_
                    **(Non-credentialed only)**

First Aid date: _1/22/2006_                        CPR date: _1/22/2004_

First day of assignment: _1/27/2003_

Approved Human Resources _Signature_
                          **Signature**                                    **Date**

*See Coaching Salary Schedule for Categories.*

**Assignment Notification** Effective Date 8/12/2002    Palo Alto Unified School District

**Colombo, Peter M.**

Alternate Name:

| | |
|---|---|
| Employee# | |
| SSN | ████ |
| Status | Permanent |
| Employee Type | Certificated |

Spouse/Partner

Emergency Contact

| | | | | |
|---|---|---|---|---|
| Hire Date | 9- 1-1998 | TB Due Date | 5-18-2003 | |
| Termination Date | | Prof Gr Units | 80.167 | |

| | |
|---|---|
| BirthDate | ████ |
| Sex | Male |
| Ethnicity | White (Not Hispanic |

**Benefits**   STRS    Medicare:        CaliforniaCare S

---

**MS Tchr -- P.E.**                    **Permanent**        Start   8-22-02 End   6-13-03 Days/yr 186                FTE .7

| | | | | | | |
|---|---|---|---|---|---|---|
| Dept | 51 Jordan | | Eval: Durchslag, C. | | Mos/Yr 10 | FTE 0.70000 |
| Group | 30-CE Middle Classrm Teacher | | Level P.E. | Track | | FTE/Yr 0.70000 |

| Range | Step | Sal Table Rate | Annual Base Rate | Budget Account | ProRate |
|---|---|---|---|---|---|
| 75 | 6 | 63117.00 | $63,117.00 | ████ | 0.70000 |

**ExtraPay**            Degrees

Longevity

Differential

ProfGr

**Annual Salary**     **$44,181.90** Base     **$44,181.90** Total       $4,418.19 Monthly Total

---

**MS Tchr -- P.E.**                    **Permanent**        Start   8-22-02 End   6-13-03 Days/yr 186                FTE .3

| | | | | | | |
|---|---|---|---|---|---|---|
| Dept | 52 Terman | | Eval: Durchslag, C. | | Mos/Yr 10 | FTE 0.30000 |
| Group | 30-CE Middle Classrm Teacher | | Level P.E. | Track | | FTE/Yr 0.30000 |

| Range | Step | Sal Table Rate | Annual Base Rate | Budget Account | ProRate |
|---|---|---|---|---|---|
| 75 | 6 | 63117.00 | $63,117.00 | ████ | 0.30000 |

**ExtraPay**            Degrees

Longevity

Differential

ProfGr

**Annual Salary**     **$18,935.10** Base     **$18,935.10** Total       $1,893.51 Monthly Total

---

| | FTE | Base Salary | Extra Pay | Total Salary |
|---|---|---|---|---|
| **Employee Total** | **1.00000** | **$63,117.00** | **$0.00** | **$63,117.00** |

---

**Employee:  Please complete this section:**          **Please confirm work phone  494-8120**

I have reviewed the information on this form and:

☐ agree that it is correct.    ☐ have made corrections as noted.    ☐ need to discuss with Personnel.

Please cross out the following items you DO NOT wish to have printed in the Personnel Directory:
ADDRESS    PHONE

Signature                              Date          EXHIBIT A-4_006

Printed: 7/25/2002

PALO ALTO UNIFIED SCHOOL DISTR    T

## HUMAN RESOURCES

# COACHING EMPLOYMENT INTENT

**NOTE:** If you are not currently an employee of the PAUSD, you must complete employment papers and show evidence of completed First Aid/CPR courses. Non-credentialed coaches must be fingerprinted in the Human Resources Office. No one may begin work until these pre-employment requirements are met.

## TO BE COMPLETED BY SCHOOL

Request for employment of: _Peter Colombo_
<br>**Name**

█████████████████████    / **Phone**

**Address**          **City**          **Zip**          **Social Security #**

**CHECK ONE:**   ☒ **Credentialed Coach**     ☐ **Non-credentialed Coach**

Account Number: ████████████████

Requested first day of assignment: _1/28/01_          Sport: _V. BASEBALL_

Last day of assignment: _6/1/02_          Category/step:* _B-10  75%_

Total weeks or months: _16 weeks_          School: _PALO ALTO_

Total payment for assignment: ~~████~~ _2256.00_          To be paid in _3_ installments

_Earl D Hanson_          _2-5-02_
**Athletic Director**          **Date**

I agree to the conditions of coaching pay as noted above and further understand the agreement may be canceled by the Athletic Director at any time he/she deems it necessary.

_R.Colombo_          _2/5/02_
**Coach/Coaching Assistant**          **Date** _3 @ 752. m.  37.6 wks_
_0 20/wk_

★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★

## TO BE COMPLETED BY HUMAN RESOURCES OFFICE

Fingerprinting date:_____          TB clearance date:_____
**(Non-credentialed only)**

First Aid date:_____          CPR date:_____

First day of assignment:_____

Approved Human Resources_____
**Signature**          **Date**

*See Coaching Salary Schedule for Categories.*

PALO ALTO UNIFIED SCHOOL DISTRICT

HUMAN RESOURCES

# COACHING EMPLOYMENT INTENT

**NOTE:** If you are not currently an employee of the PAUSD, you must complete employment papers and show evidence of completed First Aid/CPR courses. Non-credentialed coaches must be fingerprinted in the Human Resources Office. No one may begin work until these pre-employment requirements are met.

## TO BE COMPLETED BY SCHOOL

Request for employment of: _Peter Colombo_

▮▮▮▮▮▮▮

| | | |
|---|---|---|
| Address | City | Zip |

Phone

Social Security #

**CHECK ONE:** ☒ Credentialed Coach          ☐ Non-credentialed Coach

Account Number: ▮▮▮▮▮▮▮

Requested first day of assignment: _1-22-01_

Sport: _V. Baseball_

Last day of assignment: _5-10-01_

Category/step:* _B-5_

Total weeks or months: _3 months_

School: _Palo Alto_

Total payment for assignment: _2772.00_

To be paid in _3_ installments

_Earl D Hansen_
**Athletic Director**

_1-26-01_
**Date**

I agree to the conditions of coaching pay as noted above and further understand the agreement may be canceled by the Athletic Director at any time he/she deems it necessary.

_____
**Coach/Coaching Assistant**

_1/26/01_
**Date**

★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★

## TO BE COMPLETED BY HUMAN RESOURCES OFFICE

Fingerprinting date:_____
**(Non-credentialed only)**

TB clearance date:_____

First Aid date:_____

CPR date:_____

First day of assignment:_____

Approved Human Resources_____
**Signature**

_____
**Date**

*See Coaching Salary Schedule for Categories.*



PALO ALTO UNIFIED SCHOOL DISTRICT

CLASSIFIED HUMAN RESOURCES

# COACHING EMPLOYMENT INTENT

**NOTE:** If you are not currently an employee of the PAUSD, you must complete employment papers and show evidence of completed First Aid/CPR courses. Non-credentialed coaches must be fingerprinted in the Human Resources Office. No one may begin work until these pre-employment requirements are met.

## TO BE COMPLETED BY SCHOOL

Request for employment of: *Peter Colombo*
Name

Address ████████  City  Zip  Phone ████
Social Security # ████

CHECK ONE: ☒ **Credentialed Coach**    ☐ **Non-credentialed Coach**

Account Number: ████████

Requested first day of assignment: *1/14/99*    Sport: *BASEBALL*

Last day of assignment: *5/14/99*    Category/step:* *C-6*

Total weeks or months: *3*    School: *PALO ALTO High*

Total payment for assignment: *$1,300.00*    To be paid in *3* installments

*Earl D Hansen*
Athletic Director    *2/5/99*
Date

I agree to the conditions of coaching pay as noted above and further understand the agreement may be canceled by the Athletic Director at any time he/she deems it necessary.

*Peter Colombo*
Coach/Coaching Assistant    *2/5/99*
Date

✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶ ✶

## TO BE COMPLETED BY HUMAN RESOURCES OFFICE

Fingerprinting date:_____    TB clearance date:_____
(Non-credentialed only)

First Aid date:_____    CPR date:_____

First day of assignment:_____

Approved Human Resources_____
Signature    Date

*See Coaching Salary Schedule for Categories.*

PALO ALTO UNIFIED SCHOOL DISTRICT

CLASSIFIED HUMAN RESOURCES

JAN 19 REC'D

# COACHING EMPLOYMENT INTENT

**NOTE:** If you are not currently an employee of the PAUSD, you must complete employment papers and show evidence of completed First Aid/CPR courses. Non-credentialed coaches must be fingerprinted in the Human Resources Office. No one may begin work until these pre-employment requirements are met.

## TO BE COMPLETED BY SCHOOL

Request for employment of: *Peter Colombo*
Name _____ **Phone**

Address _____ City _____ Zip _____ Social Security #

CHECK ONE:    ☒ **Credentialed Coach**        ☐ **Non-credentialed Coach**

Account Number: ▯▯▯▯▯

Requested first day of assignment: _1-24-00_        Sport: *BAsebAll*

Last day of assignment: _5-11-00_        Category/step:* *B-6*

Total weeks or months: _3 months_        School: *PALO ALTO*

Total payment for assignment: _2309.00_        To be paid in _3_ installments

_Earl D Hansen_        _1-18-00_
**Athletic Director**        **Date**

I agree to the conditions of coaching pay as noted above and further understand the agreement may be canceled by the Athletic Director at any time he/she deems it necessary.

_____        _1/18/99_
**Coach/Coaching Assistant**        **Date**

✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳

## TO BE COMPLETED BY HUMAN RESOURCES OFFICE

Fingerprinting date: _____        TB clearance date: _____
**(Non-credentialed only)**

First Aid date: _11/01_        CPR date: _11/99_

First day of assignment: _____

Approved Human Resources _____
Signature _____        Date

*See Coaching Salary Schedule for Categories.*

# EXHIBIT A-5

**Assignment Notification**  Effective Date  9/24/2001          Palo Alto Unified School District

**Colombo, Peter M.**

Employee# 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

SSN 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

| | | | |
|---|---|---|---|
| Alternate Name: | | | Status Permanent |
| 392 Ridge Rd. | | | Employee Type Certificated |
| San Carlos | CA 94070 | (650) 573-8032 | |

Spouse

Emergency Contact

| | | | |
|---|---|---|---|
| | | | BirthDate 6- 6-1967 |
| Hire Date 9- 1-1998 | TB Due Date 5-18-2003 | | Sex Male |
| Termination Date | Prof Gr Units 80.167 | | Ethnicity White (Not Hispanic origin) |

**Benefits** STRS   Medicare:   CaliforniaCare 1   Delta   Vision Life

**MS Tchr -- P.E.**          Permanent          Start 8-23-01 End 6-14-02 Days/yr 186          FTE .7

| | | | | | | |
|---|---|---|---|---|---|---|
| Dept | 51 Jordan | | Eval: Durchslag, C. | Mos/Yr | 10 | FTE 0.70000 |
| Group | 30-CE Middle Classrm Teacher | | Level P.E. | Track | | FTE/Yr 0.70000 |

| Range | Step | Sal Table Rate | Annual Base Rate | Budget Account | ProRate |
|---|---|---|---|---|---|
| 75 | 5 | 55822.00 | $55,822.00 | 01-51-017100-11100 | 0.70000 |

**ExtraPay**          Degrees

Longevity

Differential

ProfGr

**Annual Salary**   **$39,075.40** Base   **$39,075.40** Total   $3,907.54 Monthly Total

**MS Tchr -- P.E.**          Permanent          Start 8-23-01 End 6-14-02 Days/yr 186          FTE .3

| | | | | | | |
|---|---|---|---|---|---|---|
| Dept | 52 Terman Middle School | | Eval: Durchslag, C. | Mos/Yr | 10 | FTE 0.30000 |
| Group | 30-CE Middle Classrm Teacher | | Level P.E. | Track | | FTE/Yr 0.30000 |

| Range | Step | Sal Table Rate | Annual Base Rate | Budget Account | ProRate |
|---|---|---|---|---|---|
| 75 | 5 | 55822.00 | $55,822.00 | 01-52-017100-11100 | 0.30000 |

**ExtraPay**          Degrees

Longevity

Differential

ProfGr

**Annual Salary**   **$16,746.60** Base   **$16,746.60** Total   $1,674.66 Monthly Total

| | FTE | Base Salary | Extra Pay | Total Salary |
|---|---|---|---|---|
| **Employee Total** | 1.00000 | $55,822.00 | $0.00 | $55,822.00 |

**Employee: Please complete this section:**

I have reviewed the information on this form and:

☐ agree that it is correct.   ☐ have made corrections as noted.   ☐ need to discuss with Personnel.

Please cross out the following items you DO NOT wish to have printed in the Personnel Directory:
ADDRESS   PHONE

Signature _____          Date _____

Printed: 9/24/2001

EXHIBIT A-5_001

**Assignment Notification** ᵉffective Date  8/22/2002          Palo Alto Unified School District

**Colombo, Peter M.**                                          Employee# 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

Alternate Name:                                                SSN 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

| 392 Ridge Rd. | | | | Status Permanent |
| San Carlos | | CA 94070 | (650) 365-9361 | Employee Type Certificated |

Spouse/Partner

Emergency Contact

|  | | | BirthDate  6- 6-1967 |
| Hire Date  9- 1-1998 | TB Due Date  5-18-2003 | | Sex  Male |
| Termination Date | Prof Gr Units  80.167 | | Ethnicity  White (Not Hispanic |

| **Benefits** | STRS | Medicare: | CaliforniaCare S |
|---|---|---|---|

---

**MS Tchr -- P.E.**                        **Permanent**      Start  8-22-02  End  6-13-03  Days/yr 186          FTE .7

| Dept | 51 Jordan | | Eval: Durchslag, C. | | Mos/Yr | 10 | FTE 0.70000 |
| Group | 30-CE Middle Classrm Teacher | | Level P.E. | Track | | | FTE/Yr 0.70000 |

| Range | Step | Sal Table Rate | Annual Base Rate | Budget Account | ProRate |
|---|---|---|---|---|---|
| 75 | 6 | 63117.00 | $63,117.00 | 01-51-017100-11100 | 0.70000 |

**ExtraPay**          Degrees

Longevity

Differential

ProfGr

**Annual Salary**      **$44,181.90** Base    **$44,181.90** Total    $4,418.19 Monthly Total

---

**MS Tchr -- P.E.**                        **Permanent**      Start  8-22-02  End  6-13-03  Days/yr 186          FTE .3

| Dept | 52 Terman | | Eval: Durchslag, C. | | Mos/Yr | 10 | FTE 0.30000 |
| Group | 30-CE Middle Classrm Teacher | | Level P.E. | Track | | | FTE/Yr 0.30000 |

| Range | Step | Sal Table Rate | Annual Base Rate | Budget Account | ProRate |
|---|---|---|---|---|---|
| 75 | 6 | 63117.00 | $63,117.00 | 01-52-017100-11100 | 0.30000 |

**ExtraPay**          Degrees

Longevity

Differential

ProfGr

**Annual Salary**      **$18,935.10** Base    **$18,935.10** Total    $1,893.51 Monthly Total

| | FTE | Base Salary | Extra Pay | Total Salary |
|---|---|---|---|---|
| **Employee Total** | 1.00000 | $63,117.00 | $0.00 | $63,117.00 |

---

| |
|---|
| |

**Employee:  Please complete this section:**          **Please confirm work phone  494-8120**

I have reviewed the information on this form and:

☐ agree that it is correct.     ☐ have made corrections as noted.     ☐ need to discuss with Personnel.

Please cross out the following items you DO NOT wish to have printed in the Personnel Directory:
ADDRESS    PHONE

Signature _____                          Date _____

Printed: 7/25/2002                                         EXHIBIT A-5_002

PALO ALTO UNIFIED SCHOOL DISTRICT

## NOTICE OF CERTIFICATED PERSONNEL ACTION

Name: _Colombo_ , _Peter_ _____     Date: _7/7/3_
     Last        First       Middle

Social Security Number: _____

---

### TYPE OF ACTION

☑ Change of Assignment        ☑ Change of Account Structure
☐ Change of Salary/Placement    ☐ Change of FTE
☐ Return from Leave of Absence    ☐ Other_____
☐ Change of Employment Status

---

| Present Status | Proposed Status |
|---|---|
| Status: _PERM_ | Status: _Permanent_ |
| Site: _JORDAN 70%_ _TERMAN 30%_ | Site: _JORDAN_ |
| Assignment: _PE_ | Assignment: _100% PE_ |
| FTE: _1.0_ | FTE: _1.0_ |
| Salary/Placement: _____ | Salary/Placement: _____ |
| Account Structure: _____ | Account Structure: _01-017100-51-11000_ |
| Last Day Present Status: _June 03_ | First Day New Status: _Aug 03_ |

### INSTRUCTIONS

1. The form will be prepared by Human Resources for all personnel actions.

2. Human Resources will forward copies as follows:
   - ☑ Benefits
   - ☑ Credentials
   - ☑ Database
   - ☑ HR File (original)
   - ☑ Payroll
   - ☑ Substitute Services

_7/8/03_

Reason for Action or Remarks_____
_____
_____
_____
_____
_____
_____
_____
_____

---

APPROVED BY: _____
    Assistant Superintendent-Human Resources

CEHR\Forms\Notice of Certific Pers Action 5-22-03

EXHIBIT A-5_003

# EXHIBIT B



# DA dropping charges, but district plans to investigate Colombo

Shreyas Shashi and Joseph Kessler

May 15, 2023

According to PAUSD Superintendent Don Austin, longtime middle school teacher Peter Colombo will be investigated by the Palo Alto Unified School District, despite the Santa Clara County district attorney's office announcing plans to drop felony sexual assault charges against him.

In a Paly Voice sponsored press conference on April 28, Austin said the district attorney's office has signaled its interest in dropping charges against Colombo but cannot officially do so until June 20 when Colombo will attend his next court hearing.

"The allegations are no joking matter," Austin said. "The allegations are the most serious allegations you can have."

Austin later said, "The day the allegations came forward, Mr. Colombo was removed from his teaching position on paid administrative leave, for the protection of students and for the protection of the individual with the allegations against them."

The husband of former Greene Middle School student Jane Doe accused Colombo of



sexually assaulting his wife during the 2001-2002 school year while Colombo was a physical education teacher and Doe was a student.

Colombo was arrested in June 2022, at which time the district placed him on unpaid leave. In April 2023, Colombo pleaded not guilty to the crime.

Before he was placed on administrative leave, Colombo served as the head coach for the Palo Alto High School boys' junior varsity basketball team and an assistant coach for the Paly varsity baseball team, in addition to teaching physical education at Greene Middle School.

According to Palo Alto Online, the district attorney's office stated it would be dismissing all charges against Colombo as a result of insufficient evidence.

In addition to the allegation of sexual assault, a Palo Alto Online article mentions Colombo drew complaints in 2021 from parents who were concerned about inappropriate comments he allegedly made toward students.

Austin said the scope of the district investigation has not been determined yet. He also declined to speculate on scenarios in which the district might bring Colombo back to work.

"We have different standards than the legal system when it comes to what we need to look at," Austin said.

Austin said he did not know if Colombo would be on paid or unpaid leave while the district completes its investigation.

"Our attorneys are going to guide us," Austin said.

allegations     Don Austin     investigation     Palo Alto Unified School District     peter colombo

superintendent     Teacher

Leave a Comment

News Tips        Archives

© 2024 • FLEX Pro WordPress Theme by SNO • Log in

# EXHIBIT C

# Student Records



The Palo Alto Unified School District (PAUSD) has established a Custodian of Records at each school site and at the District Office, to receive requests for records, and to ensure a copy of those records is provided to authorized individuals making the request. **Students currently attending a PAUSD school should request records from the school the student attends.**

The PAUSD Registration Services office is responsible for the permanent archiving of student records of PAUSD students. Records are maintained for students who attended PAUSD schools from the early 1900s to present.

## Changing Student Name and/or Gender

Submit requests, along with any required additional documents, to the Registration Services office (contact information listed above):

- If the name / gender change has been changed legally, download <u>Legal Change of Name / Gender</u> form.
- If the name/gender change has not been legally changed, <u>download Requested Change of Name / Gender form.</u>

## Special Education Student Records

Submit a <u>Special Education Records Request form</u> by fax or postal mail, to the attention of the Director of Special Education:

- Fax: (650) 833-4265
- Mail: Special Education Department
  Palo Alto Unified School District
  25 Churchill Avenue
  Palo Alto, CA 94306

Call (650) 833-4257 for questions regarding Special Education records.

## Enrollment Verification

Enrollment Verifications can not be provided over the phone. Submit a <u>Records Request form</u> to Registration Services: email RegistrationServices@pausd.org, or fax (650) 321-4525.

## Transcripts, Report Cards, Progress Reports

- **Current students**: Send <u>Records Requests Form</u> to the school itself, if school is in session; send to <u>RegistrationServices@pausd.org</u> during summer school closures. There is no charge for records up to a maximum of five (5) copies.
- **Former students**: two (2) documents without charge; additional copies $10 each. Cash or check only. Checks made payable to PAUSD. Contact PAUSD Registration Services if other arrangements are needed.
  - If the student is over eighteen (18) years old, the student must be the requestor; if not, a written release from the student must be included with this form, granting permission for the requestor to receive the records.
- Requests have a five (5) day turnaround.
- Include Requestor's Government Issued Photo ID.

 English

# Requests related to Legal Actions

Please direct subpoenas for student records to:

- Mail: Palo Alto Unified School District
  Attention: Legal Department
  25 Churchill Avenue
  Palo Alto, CA 94306
- Phone: (650) 329-3785

English

# EXHIBIT D

## CONFIDENTIAL INVESTIGATIVE REPORT

### COLOMBO, Peter
### 2-400095614

## 1. INTRODUCTION:

Peter Colombo (Respondent) held the following credential(s):
- Clear Multiple Subject Teaching Credential originally issued on July 30, 1997, and valid until September 1, 2022.
- Long Term Single Subject Teaching Permit issued on July 29, 1998, and valid until August 1, 1999.
- 30-Day Substitute Teaching Permit originally issued on August 8, 1995, and valid until September 1, 1997.

Respondent is applying for the following teaching credential(s):
- Multiple Subject Teaching Credential

A letter of inquiry was sent to Respondent on June 13, 2023.

This probable cause report contains information that Respondent may be subject to discipline as a result of the following:
- A report from Palo Alto Police Department dated February 2, 2022, alleged that during 2001-2002 Respondent raped a then 11-year-old student. Respondent was charged with rape of a child who was under 14 years of age and seven or more years younger than the person. On May 2, 2023, the Santa Clara Superior Court dismissed Respondent's case.

At the October 19-21, 2005 meeting, the Committee of Credentials (Committee) found probable cause to recommend the suspension of Respondent's teaching credentials for a period of sixty (60) days regarding his alcohol related offenses. At the February 7-8, 2007 meeting, the Commission on Teacher Credentialing (Commission) adopted a Consent Determination and Order (Order) that became effective March 17, 2007, that placed Respondent on probation for six years with the Commission. Effective April 26, 2013, Respondent successfully complied with the terms and conditions of probation contained in the Order. The stay order had been made permanent and Respondent's credentials were restored.

## 2. SUMMARY OF APPLICABLE LAW:

- The investigation commenced pursuant to Education Code section 44242.5 (b)(1).
- The Committee of Credentials (Committee) does not have jurisdiction to hold a meeting pursuant to Education Code section 44244.

1

*Instructor C's Statement*

On March 23, 2022, YF spoke with one of the longest standing Instructors at JGMS. C had been an instructor for over thirty years. C held a position as PE teacher for most of her career. In 2001-2002, C was a PE teacher. She described that most of the things that teachers did in 2001-2002 hadn't changed. C confirmed that the girl's locker room at the time did have a mural on the north wall. The mural contained a ghost like image of a student that had passed away. The image had clouds and was similar to the description by NT.

C was aware of the allegation against Respondent. She was upset that this type of serious allegation had been alleged against him. When asked, C said she had never had a concern for Respondent with the students. C believed that Respondent was well-liked and loved the students. During her 21 years working with Respondent, she had never witnessed anything that alarmed her or seemed inappropriate. C was only concerned "about his mouth." Respondent was verbal and would yell, he would say things that could have been taken out of

11

context. Respondent had been spoken to about using words like "honey" but used the language innocently.

C described the details of a typical swim unit. She advised YF that typically the 6ᵗʰ graders had their class at the end of the school day. The teachers typically allow students that were in the pool to get out of class sooner than the other classes because the students had to change into their clothes from their bathing suits. When asked, YF said that students normally helped pull the pool cover across the pool, and students would get selected, or students volunteered to help. C said some students would try to run across the pool covered after the covers were on.

C said she was normally in the females' locker room after PE and the sports activities ended. The assault was "not likely," to have happened because she was often in the locker room at the time the assault was described to have happened. C was confident that Respondent would not have done the things he had been accused of.

*Additional Information*

- When YF asked K for NT's school record, so she could compare grades and attendance at JGMS, K said NT's profile had been removed or was lost. K was not sure why or how there was no record of NT. When asked, K said that only staff could have removed a student. Based on the school's lack of documentation, YF was not able to collect NT's grades.

12

# EXHIBIT E

**Assignment Notification**    Effective Date   9/24/2001      Palo Alto Unified School District

**Colombo, Peter M.**

     Employee# 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

     Alternate Name:          SSN 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

| 392 Ridge Rd. | | | Status Permanent |
|---|---|---|---|
| San Carlos | CA 94070 | (650) 573-8032 | Employee Type Certificated |

     Spouse

Emergency Contact

| Hire Date   9- 1-1998 | TB Due Date   5-18-2003 | BirthDate   6- 6-1967 |
|---|---|---|
| Termination Date | Prof Gr Units   80.167 | Sex   Male |
| | | Ethnicity   White (Not Hispanic origin) |

**Benefits**   STRS    Medicare:      CaliforniaCare 1      Delta    Vision Life

**MS Tchr -- P.E.**      Permanent      Start   8-23-01   End   6-14-02   Days/yr 186      FTE .7

| | | | Eval: Durchslag, C. | Mos/Yr | 10 | FTE 0.70000 |
|---|---|---|---|---|---|---|
| Dept | 51 | Jordan | | | | FTE/Yr 0.70000 |
| Group | 30-CE | Middle Classrm Teacher | Level P.E. | Track | | |

| Range | Step | Sal Table Rate | Annual Base Rate | Budget Account | ProRate |
|---|---|---|---|---|---|
| 75 | 5 | 55822.00 | $55,822.00 | 01-51-017100-11100 | 0.70000 |

**ExtraPay**      Degrees

     Longevity

     Differential

     ProfGr

**Annual Salary**    **$39,075.40** Base      **$39,075.40** Total      $3,907.54 Monthly Total

**MS Tchr -- P.E.**      Permanent      Start   8-23-01   End   6-14-02   Days/yr 186      FTE .3

| | | | Eval: Durchslag, C. | Mos/Yr | 10 | FTE 0.30000 |
|---|---|---|---|---|---|---|
| Dept | 52 | Terman Middle School | | | | FTE/Yr 0.30000 |
| Group | 30-CE | Middle Classrm Teacher | Level P.E. | Track | | |

| Range | Step | Sal Table Rate | Annual Base Rate | Budget Account | ProRate |
|---|---|---|---|---|---|
| 75 | 5 | 55822.00 | $55,822.00 | 01-52-017100-11100 | 0.30000 |

**ExtraPay**      Degrees

     Longevity

     Differential

     ProfGr

**Annual Salary**    **$16,746.60** Base      **$16,746.60** Total      $1,674.66 Monthly Total

| | FTE | Base Salary | Extra Pay | Total Salary |
|---|---|---|---|---|
| **Employee Total** | 1.00000 | **$55,822.00** | **$0.00** | **$55,822.00** |

**Employee: Please complete this section:**

I have reviewed the information on this form and:

☐ agree that it is correct.    ☐ have made corrections as noted.    ☐ need to discuss with Personnel.

Please cross out the following items you DO NOT wish to have printed in the Personnel Directory:
     ADDRESS    PHONE

Signature                        Date

Printed: 9/24/2001

**Assignment Notification**     Effective Date   8/22/2002                    Palo Alto Unified School District

**Colombo, Peter M.**                                                        Employee# 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

Alternate Name:                                                              SSN 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

392 Ridge Rd.                                                                Status Permanent
San Carlos          CA 94070          (650) 365-9361                         Employee Type Certificated

Spouse/Partner
Emergency Contact                                                            BirthDate   6- 6-1967
      Hire Date  9- 1-1998      TB Due Date   5-18-2003                             Sex   Male
      Termination Date          Prof Gr Units  80.167                         Ethnicity   White (Not Hispanic

| Benefits | STRS | Medicare: | CaliforniaCare S |
|---|---|---|---|

**MS Tchr -- P.E.**                        Permanent          Start  8-22-02  End   6-13-03  Days/yr 186          FTE .7

| Dept | 51 Jordan | | Eval: Durchslag, C. | Mos/Yr | 10 | FTE 0.70000 |
| Group | 30-CE Middle Classrm Teacher | | Level P.E.      Track | | | FTE/Yr 0.70000 |

| Range | Step | Sal Table Rate | Annual Base Rate | Budget Account | ProRate |
|---|---|---|---|---|---|
| 75 | 6 | 63117.00 | $63,117.00 | 01-51-017100-11100 | 0.70000 |

ExtraPay            Degrees
                    Longevity
                    Differential
                    ProfGr

**Annual Salary**      **$44,181.90** Base      **$44,181.90** Total      $4,418.19 Monthly Total

**MS Tchr -- P.E.**                        Permanent          Start  8-22-02  End   6-13-03  Days/yr 186          FTE .3

| Dept | 52 Terman | | Eval: Durchslag, C. | Mos/Yr | 10 | FTE 0.30000 |
| Group | 30-CE Middle Classrm Teacher | | Level P.E.      Track | | | FTE/Yr 0.30000 |

| Range | Step | Sal Table Rate | Annual Base Rate | Budget Account | ProRate |
|---|---|---|---|---|---|
| 75 | 6 | 63117.00 | $63,117.00 | 01-52-017100-11100 | 0.30000 |

ExtraPay            Degrees
                    Longevity
                    Differential
                    ProfGr

**Annual Salary**      **$18,935.10** Base      **$18,935.10** Total      $1,893.51 Monthly Total

|  | FTE | Base Salary | Extra Pay | Total Salary |
|---|---|---|---|---|
| **Employee Total** | **1.00000** | **$63,117.00** | **$0.00** | **$63,117.00** |

---

**Employee:  Please complete this section:**          **Please confirm work phone  494-8120**

I have reviewed the information on this form and:

☐ agree that it is correct.    ☐ have made corrections as noted.    ☐ need to discuss with Personnel.

Please cross out the following items you DO NOT wish to have printed in the Personnel Directory:
                                        ADDRESS    PHONE

Signature                                            Date

Printed: 7/25/2002

PALO ALTO UNIFIED SCHOOL DISTRICT

## NOTICE OF CERTIFICATED PERSONNEL ACTION

Name: _Colombo , Peter_                                      Date: _7/7/3_
       Last        First        Middle

Social Security Number: _____

---

### TYPE OF ACTION

☑ Change of Assignment                    ☑ Change of Account Structure
☐ Change of Salary/Placement              ☐ Change of FTE
☐ Return from Leave of Absence            ☐ Other_____
☐ Change of Employment Status

---

| **Present Status** | **Proposed Status** |
|---|---|
| Status: _PERM_ | Status: _Permanent_ |
| Site: _JORDAN 70%_ _TERMAN 30%_ | Site: _JORDAN_ |
| Assignment: _PE_ | Assignment: _100% PE_ |
| FTE: _1.0_ | FTE: _1.0_ |
| Salary/Placement:_____ | Salary/Placement:_____ |
| Account Structure:_____ | Account Structure: _01-017100-51-11000_ |
| Last Day Present Status: _June 03_ | First Day New Status: _Aug 03_ |

### INSTRUCTIONS

1. The form will be prepared by Human Resources for all personnel actions.

2. Human Resources will forward copies as follows:
   ☑ Benefits
   ☑ Credentials
   ☑ Database
   ☑ HR File (original)
   ☑ Payroll
   ☑ Substitute Services

   _7/8/03_

Reason for Action or Remarks_____
_____
_____
_____
_____
_____
_____
_____
_____

---

APPROVED BY: _____
              Assistant Superintendent-Human Resources

CEHR\Forms\Notice of Certific Pers Action 5-22-03

# EXHIBIT F

**From:** Zoe Morgan <zmorgan@embarcaderomediagroup.com>
**To:** "Meeker, Kelly" <kmeeker@dao.sccgov.org>
**Subject:** Re: [EXTERNAL] Re: People v. Columbo (B2201250) - Inquiry
**Date:** Tue, 17 Jan 2023 13:44:25 -0800
**Importance:** Normal

---

Hi Kelly,

I'm working on finalizing our article about Mr. Colombo's case and had a few follow up questions that I would appreciate your help answering:

- The police report in the case states that when an officer asked the school district for the victim's student record, she was advised that "the Victim's profile had been removed or was lost" and that "only staff could have removed a student." In speaking with Superintendent Don Austin, he told me that although an administrator initially couldn't find the student record, when another employee went to look for it, the record was located and turned over to law enforcement. Is this accurate? Do you now have a copy of the victim's student record? If so, when did you/police receive it? The Palo Alto Police Department referred me over to you for more information, since the case is currently moving through the court system.
- What was the outcome of the Jan. 5 preliminary examination? It looks like the case was continued to March 21, but I wanted to confirm that with you. Was there any other notable developments at the Jan. 5 hearing?

Best,
Zoe

Zoe Morgan (she/her)
Staff Writer, Palo Alto Weekly/Mountain View Voice
450 Cambridge Ave.
Palo Alto, CA 94306
650.326.8210    650.223.6519 (direct)


On Mon, Dec 19, 2022 at 9:12 AM Zoe Morgan <zmorgan@embarcaderomediagroup.com> wrote:

Thanks for the reply! Is there a time today or tomorrow that we could nail down for a call? Both days are very open for me, so let me know what works for you.

Here are some options:

- 11 a.m. on Monday, Dec. 19
- 2 p.m. on Monday, Dec. 19
- 9 a.m. on Tuesday, Dec. 20
- 12:30 p.m. on Tuesday, Dec. 20


Best,
Zoe
Zoe Morgan (she/her)
Staff Writer, Palo Alto Weekly/Mountain View Voice

# EXHIBIT G

Notes of Investigation Interview of Pete Colombo
Via Zoom on 1/25/2024 from 11:00 – 11:25 (after PAUSD required a 3-hour appointment from 11-2)
(PAUSD demanded via Zoom w/o recording despite request for in person and/or recorded proceeding)

Nelson - I'm here with Pete, I'm trying to get him into the. You see me try to get him into the screen here

Investigator Miller - I see two kind of heads but I don't know who is who.

Colombo - oh I'm the bald Guy.

Investigator - Okay, so the bald guy is Pete. Hi to you.

Colombo - Hi how are you?

Investigator - I want to take a moment to do the introductions, and first and foremost, I do want to let you know that this meeting, I don't plan to be longer than 20 min. The reason for that is that the district assigned me to investigate a report that took that was allegations from the 2001-2002 school year. That is basically the scope of my investigation. I first want to answer any questions you and your attorney might have. I'm an independent investigator assigned by the district to investigate a report of an alleged incident alleged sexual assault of a sixth grader that allegedly took place at a Jordan Middle School, now it's named Green Middle School, where you were a teacher in a locker room during, well, this alleged incident occurred in the locker room during the 2001 2002 school year. And the assault charge was, the criminal charge was filed on June 16, 2022, according to court documents that I reviewed. Now I want to let you know and your attorney know that I was unable to interview the student involved, a former student involved. And so that, combined with the lack of details in, in the court documents itself, leave me to only really be able to ask you a couple questions that I don't think will take too long to answer.

Investigator - The districts complaint policies and several applicable laws prohibit retaliation against any person for making a complaint or participating in the investigation of the complaint, retaliation grants for a separate complaint, potential discipline against the offending party.

Investigator - Do you Pete or, do you, Mr. Nelson, have any questions for me before I start to ask questions?

Nelson - I don't, I had two questions and you already answered them and the first was we never really got the scope of the investigation. Pete got a formal letter, I think like in April but that didn't set forth the scope of the investigation and there's never been any authority for the investigation provided to us. There's been a lot of back and forth and, and through the back and forth, finally about a week or so ago, Mr. Willis did say what you said today, which is a scope of the investigation, is this single allegation from the 2001-2002 time frame. You have provided something they haven't provided, which is confirming it is the same one that was involved in the criminal case, so I don't have any questions from that standpoint.

Nelson - Again, it was the, you know, the Contra Costa Community College PERB decision that says we're entitled to know that basic information but I think that you've confirmed that's all you have as well.

Investigator - Of course

Nelson - All right. Um I think I think that's. I think that's it Okay.

1

Investigator - Well, if you have any questions along the way, this isn't your only opportunity. So, my understanding is that district administrators had, they were notified of an accusation against, against you in late January 2022, after receiving an email from a husband who alleged his wife, now in her thirties, was sexually assaulted by you when she was eleven years old um again there's not a formal complaint. It was just a report to the District um. And then my understanding is that you were initially placed on leave and that you're still on leave. Have you been on leave this entire time.

I can answer that yes. Initially, even though it's supposed to be offered as paid admin leave if you post a bond, that option wasn't really explained or offered in a way for him to take advantage of it, so it was actually unpaid leave until it went to the preliminary hearing and the judge ordered the ankle monitoring be removed and made clear the case should not be prosecuted, then the DA dropped the charges and back pay was paid for that time. Then he was placed on admin leave with pay, except for a three-month period where the school district didn't pay even though the statute requires he be on paid admin leave and they have never paid him for summers school or coaching, which he consistently did, but that's that is neither here nor there for this investigation. That's something that we will deal with in a separate proceeding. But I guess the short answer to your question about admin leave is yes.

Investigator - I'm curious and. You don't have to answer this, just my curiosity, when the judge threw this out, did you have to give any testimony.

Colombo - I just sat there the whole time.

Investigator - got it. Okay. so that you didn't, you didn't give any statements.

Colombo – I wasn't asked for one, no, just listen, just sat there and left after the preliminary hearing. At CTC, they allowed for me to make a statement and they then renewed my credential.

Investigator - Okay, all right that is just curious to me. I just didn't see anything in the, in the court documents. My question is, I'm just going to call her [NT] Jane Doe, right, and so I don't expect you to have A recollection of students that were in your class back in 2001, 2002, but where did you teach in 2001.

Colombo – in 2001 and 2002, I was 70% at Jordan Middle School, and I was 30% at another school, Terman, because it just reopened, and I taught three sections of 6th grade at Terman. I also taught 7th grade at Jordan [OT, NT's older sister, said she had Mr. Colombo for 7th grade PE that year].

Investigator - Can you spell Terman

Colombo - T-E-R-M-A-N. And now it's called Fletcher, now Terman is now Fletcher, and Jordan is now Green.

Investigator - Did you teach any sixth graders at Jordan Middle School or are they all at Terman

Colombo - I remember only at Terman. I remember teaching seventh grade at Jordan. A lot of 6th grade at Terman, I don't remember 6th grade that year at Jordan. I could have, I just remember 6th grade at Terman and 7th grade at Jordan. I think they had 6th grade PE at Terman that year because it was just reopening, but records could show better.

Nelson - Interestingly that that is one thing we've been asking for from the school for the grade report and for the class list. The school records. His prior attorneys that defended him in the criminal action, and then me, when I came on board for this part of it, we, we've been asking for those records and, and have never received them, so, either they lost them or they don't have them for whatever reason. We would hope that the record would actually show whether he even taught her in a class or was at Terman when she alleges the assault took place during her class or right after her class, but we don't have the records, period. I'm curious if you were provided those school records.

Colombo - so when the detective, and if I may interrupt, just telling you the way it was because I have the information or this will help. The detective, when she interviewed the lawyer for Palo Alto Unified, who's no longer with the district, she asked her, can I have this student school records? The lawyer told the detective those records cannot be found. They disappeared, and the lawyer, and then the detective said, how can that happen. And the lawyer did not have an answer for her.

Investigator - Well, thank you for that, that information. Okay, so let's talk about what you can recall back during the 2001 to 2002 school year. Do you have any independent recollection from that year of telling a female student to go change in the locker room after she had done a cover like a pool um what do they called like the pool covers.

Colombo - There used to be a pool cover, but no, it would have never been one kid doing the pool cover, it would have been six kids because they're little 6th or 7th graders and that's on record. It would have been six kids. Doing the pool covers and as soon as they were done, suit them up, suit them out. Go to. Girls go that way, boys go that way That's it.

Investigator - The boys and girls have separate locker rooms

Colombo - oh absolutely 50 feet apart with separate doors.

Investigator - Have you ever been in the girls locker room with female students?

Colombo - No, in the, absolutely not.

Nelson - Let her finish

Colombo - Oh okay All right.

Investigator - So you've never been in the female locker room let's say in your whole career when students were there. Obviously your students are not there, I don't care if you're in the girls locker room, right, but have you ever been in the female locker room while students were present.

Colombo – Not . . .

Investigator - Is there a supervising female teacher in the locker room at that time?

Colombo - It was Mrs Pappas. And Mrs. Becker and they're still teacher there there today and um. Yes, I have the letters they provided me about this false charge. That's Mrs. Becker and Mrs. Papp is P-A-P-P-A-S

Investigator - good thank you I was going ask you those questions.

Nelson - okay and when we're done He, he did get. I want to say 20 letters of support, those two women were two of the letters for him. There was a third female P-E teacher from the time period who also wrote a letter for him those, to me it seemed, like those three people would have been critical for somebody early on to talk to to try to find out what was going on and what was not going on. But we will get you those letters and, and the information for those three women.

Investigator - And to be entirely forthcoming with you, I didn't see the need to interview any of these people because I don't have a student statement and even the what I read in the court files, she never identifies you in the first place as seeing you or hearing you. So I-I don't i mean I-I base my findings on a preponderance of evidence standard and I don't even see with her testimony that this comes close to meeting that standard. Um, you know, I have to admit there is no evidence to show that you did this or for me to make that kind of finding right, because it's just not, there's not enough evidence at all here, so um.

Colombo - Miss Miller, may ask you a question, sheriff, you are a sheriff in your prior life, correct? I appreciate your candor, let's just put it that way, because I didn't get that from day one and I appreciate you.

Investigator - I also have to base my findings on fact, right, I-I mean whether I believe you or not whether believe her or not doesn't make a difference is does the preponderance of the evidence sustain finding or does it not. And here the standard isn't met, does that make sense so it's, it's just basic you know I, I'm not, I'm not trying to give you my support.

Colombo - No no I understand I just appreciate. I haven't got much candor before like this, and I just appreciate it.

Investigator -  There is something you already answered, but again you are not ever in the, you've never been in the female locker room? In the girls locker room while females are present?

Colombo - No.

Nelson - OK, can we say it another way, that's a double negative?

Colombo - Absolutely not.

Investigator - Have you ever been accused of any type of sexual assault or sexual harassment complaints by female students in the past.

Colombo - No, absolutely not.

Investigator - And you mentioned that you had letters from Pappas, from Becker?

Colombo - yes, for what I mean, as a result of this this whole thing that's going down.

Investigator - Why would they give you a letter as a result of this whole thing going.

Colombo - Cause the CTC was going through the process of renewing my credential and Jill Naylor, Cindy Pappus, Amy Becker, who are all PE teachers at the time they all jumped on board and said we will write you whatever you need because you need to be back here working with these kids. This false accusation was not okay. And they know me best, and they run the girls locker room for 25 years.

Investigator - Do you still have those letters?

Colombo - Absolutely.

Investigator - Would you share those with me, if like, via email if your attorney wants to send those to me just so that I can include them in my file.

Nelson - Yes, yes, absolutely.

Investigator - Thank you.

Nelson - There are three of them right huh there there's actually like 20 but we'll get those three. Those are the three most pertinent, I think. It. We also have his stellar performance reviews, if you want all those, but haha they may not be as pertinent.

Investigator - So you were present during when she [NT], were you present when she was giving testimony? Did you hear what you mean during the prelim. They're sitting right there, you're right there, so you heard her when she said, I remember rinsing off and going to change out of my swim suit.

Colombo - I don't remember that I don't recall that, it was back in March. She [NT] claimed she was in front of her locker felt somebody grab her from behind and push her on the bench in front of the locker.

Investigator - And I-I mean to say because you've never been in a locker along with female student this couldn't have happened based on what you're telling me right but I have to ask you, did you sexually assault or rape a female student?

Colombo - Absolutely not.

Investigator - Okay, I don't have anything else to ask you, and I think we are about at the 20, minute mark.

Nelson - We can only speculate, you know, what may have been part of the reasoning at least for her husband coming forward, or other family members coming forward and, and starting the process. We do know that it wasn't Pete. We're not discounting, as you said, you know, it's hard to not believe somebody who comes forward with this kind of an allegation that something may have very well happened to her. We just know it wasn't Pete. [This was before we conducted extensive investigation into the background and family dynamic, found grade reports and other information giving a clearer picture of what likely transpired].

Investigator - I'm sorry, Mr. Nelson, I can't hear you

Nelson - Okay, I will walk back around here. Sorry. Um, if you look at the details that were reported – they don't make sense.

Investigator - So I look at her testimony, too, and I think, oh my gosh, usually I, you know, I do sexual investigations for school districts. In the. Last 20 years. Right. And a hundred percent of the time there's like some type of connection like grooming about, you know, going out. and going off campus, like getting involved in the personal life, like all these different kind of precursors. As to um to what leads to sexual assault. And so I didn't see any of that in her testimony, and they're like, I can't sit here and say, hey, did you invite her out to people so did you take her off campus did you do this you do that because none of that's there you know what I mean Usually that's kind of like. You know that's the precursor I guess if you want to look for these types of situations **so it doesn't add up to me either**.

**Investigator - Okay well thank you again. I took all your statements down and I will, um, include those in my notes and I will prepare to write my final investigative report and submit that to the District's Legal Counsel, as you know.** My finished work product and that's it, I know you both know, I don't make any recommendations or conclusions, **I just put the facts down on paper and, and make findings. I will say that, as you know, I already explained to you, is that, obviously, there's no way the facts support a finding that there was any type of sexual assault, sexual impropriety but um I'm sure you already knew that** so without further ado, I, um, will end the meeting for Everybody.

# EXHIBIT H

**Note:** If you have any questions, please view the CTC Online – Written Instructions for Application and Payment page.

| | | |
|---|---|---|
| Last Name: | COLOMBO | |
| First Name: | PETER | |
| Middle Name: | MICHAEL | |

Last Known County of Employment:

Adverse and Commission Actions Indicator:

Deceased Flag:

Note: Please verify County of Employment is current

Note: Information on Adverse and Commission Actions is available for this educator if a flag is displayed. If the Deceased flag is displayed, the licensee is deceased.

| Document Number | Term | Issue Date | Status | Special Grad |
|---|---|---|---|---|
| ❯ 230276311 | Clear | 10/20/2023 | Valid | |

## Authorization/Subjects

| Authorization Code | Authorization Description | Subject Code | S |
|---|---|---|---|
| ❯ ELA1 | The following instructional services may be provided to English learners: (1) instruction for English language development in grades twelve and below, including preschool, and in classes organized primarily for adults. If the prerequisite credential or permit is a designated subjects adult education teaching credential, a child development instructional permit, or a child development supervision permit, English language development instruction is limited to the programs authorized by that credential or permit; (2) specially designed content instruction delivered in English in the subjects, programs and at the grade levels authorized by the prerequisite credential or permit. This English learner authorization also covers classes authorized by other valid, non-emergency credentials or permits held, as specified in Education Code Section 44253.3. | NONE | |
| R2B | This credential authorizes the holder to teach single-subject-matter (departmentalized) courses within the field of the supplementary authorization listed in grades nine and below. | PE | P |

| R2M | This credential authorizes the holder to teach all subjects in a self-contained class and, as a self-contained classroom teacher, to team teach or to regroup students across classrooms, in grades twelve and below, including preschool, and in classes organized primarily for adults.  In addition, this credential authorizes the holder to teach core classes consisting of two or more subjects to the same group of students in grades five through eight, and to teach any of the core subjects he or she is teaching to a single group of students in the same grade level as the core for less than fifty percent of his or her work day. | GSX | ( |

## Renewal Requirements

Please disregard any # signs you may see below and refer to the "Additional Description" column to the right for specific renewal requirements.

| Renewal Code | Renewal Description |
|---|---|
| ❯ R20 | To renew this credential, the holder needs to submit only an application and fee to the Commission no earlier than 12... before the expiration date.  The renewal period is five years. |

## Employment Restrictions

| County | Organization Type | Organization |
|---|---|---|
| | | |

# EXHIBIT I

**PALO ALTO UNIFIED SCHOOL DISTRICT**

25 Churchill Avenue • Palo Alto, CA 94306
Telephone:  (650) 329-3958 • FAX:  (650) 323-5162

PALO ALTO
UNIFIED SCHOOL DISTRICT

HUMAN RESOURCES

November 1, 2023

Peter Colombo
642 Bair Island Rd. #1001
Redwood Shores, CA 94063

Re:    **NOTICE OF PLACEMENT ON PAID ADMINISTRATIVE LEAVE**

Method of Delivery: Regular US Mail and email to *ptrcolombo@yahoo.com*

Dear Mr. Colombo:

On October 26, 2023, the Palo Alto Unified School District ("District") was informed that the California Commission on Teaching Credentialing "CTC" reinstated your credential with an effective date of 10/20/23. Based on the receipt of this information, please be advised that you have been returned to <u>paid administrative leave</u>, commencing 10/23/23, per the terms of the May 24, 2023 "Notice of Placement of Paid Administrative Leave" correspondence.

As previously noted, during this leave, you will continue to receive your usual salary, and health & welfare benefits, if applicable. While on leave, you are to: 1) remain available to return to work at my direction; and 2) remain available by telephone during regular business hours (required to provide the District with a current telephone number where you can be reached during business hours).

In the event that you will be unavailable during regular business hours on a normal workday, you shall notify the District, in advance, and report your unavailability as either sick leave or personal necessity leave, as applicable. You are not authorized to accept any other paid employment during your regular business hours while you are on leave.

Furthermore, as previously directed, you shall not return to any District property, including Greene Middle School, unless authorized to do so in advance by me. You are further directed not to contact any staff during regular school hours or students via email, text, phone, or in person.

A copy of this letter will be placed in your personnel file.  You may submit a written response, which will be attached and placed in your file. Please contact me if you have any questions regarding this correspondence.

Sincerely,

*Lisa Hickey*

Lisa Hickey
Director of Certificated Human Resources
Palo Alto Unified School District

cc: Personnel File

42911160.1

# EXHIBIT J

**PALO ALTO UNIFIED SCHOOL DISTRICT**

25 Churchill Avenue • Palo Alto, CA 94306
Telephone:  (650) 329-3958 • FAX:  (650) 323-5162

**PALO ALTO**
UNIFIED SCHOOL DISTRICT

**HUMAN RESOURCES**

May 24, 2023

Peter Colombo
642 Bair Island Rd. #1001
Redwood Shores, CA 94063

Re:    <u>NOTICE OF PLACEMENT ON PAID ADMINISTRATIVE LEAVE</u>

Method of Delivery: Regular US Mail and email to *ptrcolombo@yahoo.com*

Dear Mr. Colombo:

The Palo Alto Unified School District ("District") has been informed that the California Commission on Teaching Credentialing "CTC" has reinstated your credential on May 2, 2023 when the charges leading to the mandatory leave of absence offenses were dropped.

You are hereby notified that you are placed on a paid administrative leave pending an internal investigation.

During this leave, you will continue to receive your usual salary, and health and welfare benefits, if applicable. While on leave, you are to remain available to return to work at my direction. You are to remain available by telephone during regular business hours, and you are required to keep the district notified of a telephone number where you can be reached during business hours. In the event that you will be unavailable during regular business hours on a normal work day, you shall notify the District in advance and report your unavailability as either sick leave or personal necessity leave as applicable. You are not authorized to accept any other paid employment during your regular business hours while you are on leave.

You are hereby directed not to return to any District property, including Greene Middle School, unless authorized to do so in advance by me. You are further directed not to contact any staff or students via email, text, phone, or in person.

A copy of this letter will be placed in your personnel file.  You may submit a written response, which will be attached and placed in your file.

Please contact me if you would like to respond to your placement on paid administrative leave, or if you have any questions regarding this correspondence.

Sincerely,

*Lisa Hickey*

Lisa Hickey
Director of Certificated Human Resources
Palo Alto Unified School District

cc: Personnel File

# EXHIBIT K



**PALO ALTO UNIFIED SCHOOL DISTRICT**
25 CHURCHILL AVENUE • PALO ALTO, CALIFORNIA 94306

HUMAN RESOURCES                                                (650) 329-3736

May 28, 2024

SENT VIA FIRST CLASS MAIL

Peter Colombo
ptrcolombo@yahoo.com

Re:    **Notice of Investigation Findings**

Dear Mr. Colombo,

The correspondence will serve as notice that the Palo Alto Unified School District ("District") has completed the personnel investigation regarding potential misconduct by you in your capacity as an employee of the District.

Specifically, the District received information from an anonymous source regarding report of an alleged sexual assault of a student by you, occurring on District property during the 2001-2002 school year.

The Investigator determined that the allegation was not substantiated due to a lack of evidence, including but not limited to, the absence of a direct statement from the alleged victim to support the claim.

Sincerely,

*Herb Espiritu*

Herb Espiritu
Director of Certificated Human Resources

cc:    Evan Nelson, Esq. (via email at evancnelson.law@gmail.com)

# EXHIBIT L



THE LAW OFFICE OF
# EVAN C. NELSON

1990 North California Blvd., Floor 8
WALNUT CREEK, CA 94596
(925) 323-1991

May 29, 2024

<u>**VIA EMAIL ONLY**</u>

Jabari A. Willis, Esq.
ATKINSON, ANDELSON, LOYA, RUUD & ROMO
12800 Center Court Drive South, Suite 300
Cerritos, CA 90703-9364
*JWillis@aalrr.com*

RE:     *Response to May 28, 2024 Letter Re Investigation Result*
        Our Client:  Peter Colombo

Dear Mr. Willis:

This letter is in response to the letter I received yesterday from Mr. Espiritu regarding Notice of Investigation Findings. You took umbrage with my having responded directly to Mr. Espiritu's communication, which included you on my "reply to all" response to what I understood to be communication that you had expressly authorized. Your objection to my response is odd under the circumstances, considering that it is very likely that you ghost wrote all or part of the letter and had your client send it to my client, which would also technically offend rules against attorneys speaking with persons known to be represented by counsel (parties can speak to each other, but an attorney cannot tell their client what to say in those communications or it violates the rule of attorneys not speaking to parties represented by counsel). Nonetheless, I will respond directly to you and will have my client email this letter to your client to ensure this response is included in all proper files.

**Inadequate Written Report of Findings and Conclusions – 1312.3 AR**

We find the one line, "The Investigator determined that the allegation was not substantiated due to a lack of evidence, including but not limited to, the absence of a direct statement from the alleged victim to support the claim" to be grossly inadequate for an investigation into such a serious matter that spanned in excess of a full calendar year. It certainly does not accurately represent Ms. Miller's findings as she expressed them during the investigation interview of my client, which you can see in the attached comprehensive notes that I took during the interview because you refused to allow us to record it. (Exhibit A.) Under the

EXHIBIT L-001

applicable board policies, including 1312.3 AR[1] and federal law, we are entitled to a written report that includes all of the following:

> a. The findings of fact based on the evidence gathered
> b. As to each allegation, the District's conclusion(s) of law
> c. Rationale for such conclusion(s).

Specifically, your one sentence "report" fails to list the evidence gathered and specific findings of fact based on that evidence. It does not list each allegation and provide the District's conclusions of law. It further fails to provide rationale for such conclusions of law.

Particularly troubling is that your conclusion appears to directly contradict the investigator's expressed findings in favor of a bland report that suggests the District is still pressing a narrative that some level of merit exists to the false rape charge levied by N--T********* against Peter Colombo for something alleged to have occurred in 2001, but which the investigator found did not come close to meeting a preponderance of the evidence threshold for maintaining such a claim.

We are specifically curious why analysis of the student's grade report from 6th grade for school year 2001-2002 was not provided. It is our understanding that PAUSD retains grade reports going back into the 1900s, that PAUSD's prior in house counsel reported the grade report deleted from the system, but that Don Austin reported Nia's grade report "lost" but then found again. We also understand that the grade report would show NT did not even have Mr. Colombo as her 6th grade PE teacher, that she did not have PE for the class period right before lunch and that her grades did not fall immediately following any alleged rape in 2001. Specific analysis of this evidence and these facts in conjunction with numerous other factors deserve attention in the report, including how could a grown man have raped a 6th grade girl from behind, in the girl's locker room, with students and teachers all over the campus, with female PE teachers in the office at the front of the girl's locker room, forcing her down on the narrow hardwood bench with his weight on top of her 6th grade body but causing no bruising, no broken ribs, no bleeding, and leaving her fine to attend her other classes and go to competitive swim practice that day without any complaint or anyone noticing anything wrong. Is there any evidence that Nia's grades dropped in 2001-2002 immediately after the time of the alleged rape as she claimed that she had PE right before lunch, and/or that Colombo taught NT's 6th grade PE class or was even on Jordan Middle School campus during the class period, since he taught at Terman Middle School 30% of his time during the 2001-2002 school year. In addition, the following questions should be resolved, (i) was swimming even part of the PE curriculum for 6th grade fall semester at Jordan, (ii) could one student pull the pool cover into place, (iii) was the cover pulled over the

---

[1] I am also attaching, as Exhibit B, the relevant board policies showing that this investigation is governed by 1312.3 BP (and 1312.3 AR) through 5145.7 BP (and 5145.7 AR) despite your attempts to ignore the definitions and other express language contained therein, including that there is no distinction between a "report" or a "complaint" and that the definition of both includes an email from a third party, even an anonymous third party – NT's husband's email constituted a "complaint" and a "report" bringing these board policies into application.

pool before lunch or only at end of the day, and (iv) why did NT's story change in 2022 and become drastically different from her original story told to her mother many years previous.

**Request for N\*\* T\*\*\*\*\*\*\*\*'s (birthdate \*\*/\*\*\*\*\*\*) Grade Report for 6th Grade, 2001-2002**

We are again requesting that PAUSD provide a copy of N\*\* T\*\*\*\*\*\*\*\*'s (birthdate \*\*/\*\*/\*\*\*\*) grade report for 6th grade at Greene Middle School (now Terman Middle School) for the school year 2001-2002. Since this is a critical piece of exonerating evidence it should not have been excluded from any investigation relating to this false rape claim.

**No Explanation for PAUSD Delay in Providing Report**

The report does not include any authority or justification for the substantial delays, in violation of board policies, for the investigation that was supposed to be completed within 90 days and the report, which was supposed to be provided within 60 days of completion of the investigation. The investigation began in May of 2023 and should have completed no later than by August of 2023. The investigation completed with the interview of Peter Colombo on January 25, 2024 (certainly no other later reviewed evidence is discussed in the report) and the written report should have been provided no later than by March 26, 2024.

Please explain the reason for the delays and authority for exceeding applicable deadlines.

**Reminder of Some of the Harms Caused by PAUSD Mishandling of the False Rape Claim**

Mr. Colombo was falsely arrested and placed in prison and was at fear of substantial risk of serious injury or death due to the treatment of accused child molesters (even those falsely accused) in prison. He had to endure a week of solitary confinement, living in a small box for 23.5 hours each day with a half hour outside where he was in fear of being beaten and possibly killed. This precise torture has resulted in more than one suicide. He was then placed on house arrest for more than a year until the judge finally scratched his head at what was being done to him, ordered the anklet removed, took him off house arrest and the dismissal of all charges followed shortly thereafter.

PAUSD then determined to pile on. Instead of providing the exonerating evidence readily available to it, PAUSD continued creating a false narrative about Mr. Colombo. When he was released from the criminal charges, Superintendent Austin stated in the press that PAUSD would intentionally prolong Mr. Colombo's ordeal, even though they had no evidence to support the false charge and while they were continuing to deliberately conceal exonerating evidence. The "big" investigation was a farce and a pretext.

**Peter Colombo's Life Has Been Placed at Risk Due to PAUSD's False Narrative**

PAUSD caused substantial risk of personal assault and physical harm to Mr. Colombo by inciting the public through intimation that he had committed the heinous crime, even though PAUSD knows he did not. PAUSD created this false implication when they (i) concealed the exonerating grade report and other exonerating facts while (ii) creating a false light narrative

May 29, 2024
*Response to Investigation Report*
Page 4 of 4

against Peter Colombo (a) in the "Unfit to Teach" article both through statements and release of private information irrelevant to the false rape charge (and not providing the exonerating grade report) and (b) by deliberately proclaiming that PAUSD would be conducting a "big" investigation even though the DA dismissed the criminal charges based on the false report.

Mr. Austin acknowledged this risk to Mr. Colombo's person when he announced the investigation and stated that Mr. Colombo would be placed on administrative leave for his own safety due to the serious allegations. [He stated it might be paid or unpaid leave, even though the law requires the leave to be paid, again giving the intended impression that Mr. Colombo committed the rape of which he was falsely accused.]

**In light of this state-created danger for Mr. Colombo, it would be unconscionable, if not criminal, to attempt to assign him to a school site without completely dispelling the false light created to the public by PAUSD, and as again intimated through the recent "Investigation Report". It is extremely unlikely, if not impossible, for PAUSD to reverse the damage, restore Mr. Colombo's reputation and career, and place him back on campus without substantial risk of physical harm and with assurance that he will be treated with respect and admiration by all the students and their parents.**

Sincerely,

Evan C. Nelson

Attachments – Exhibit A and Exhibit B

# EXHIBIT L(A)

EXHIBIT L-005

Notes of Investigation Interview of Pete Colombo
Via Zoom on 1/25/2024 from 11:00 – 11:25 (after PAUSD required a 3-hour appointment from 11-2)
(PAUSD demanded via Zoom w/o recording despite request for in person and/or recorded proceeding)

Nelson - I'm here with Pete, I'm trying to get him into the. You see me try to get him into the screen here

Investigator Miller - I see two kind of heads but I don't know who is who.

Colombo - oh I'm the bald Guy.

Investigator - Okay, so the bald guy is Pete. Hi to you.

Colombo - Hi how are you?

Investigator - I want to take a moment to do the introductions, and first and foremost, I do want to let you know that this meeting, I don't plan to be longer than 20 min. The reason for that is that the district assigned me to investigate a report that took that was allegations from the 2001-2002 school year. That is basically the scope of my investigation. I first want to answer any questions you and your attorney might have. I'm an independent investigator assigned by the district to investigate a report of an alleged incident alleged sexual assault of a sixth grader that allegedly took place at a Jordan Middle School, now it's named Green Middle School, where you were a teacher in a locker room during, well, this alleged incident occurred in the locker room during the 2001 2002 school year. And the assault charge was, the criminal charge was filed on June 16, 2022, according to court documents that I reviewed. Now I want to let you know and your attorney know that I was unable to interview the student involved, a former student involved. And so that, combined with the lack of details in, in the court documents itself, leave me to only really be able to ask you a couple questions that I don't think will take too long to answer.

Investigator - The districts complaint policies and several applicable laws prohibit retaliation against any person for making a complaint or participating in the investigation of the complaint, retaliation grants for a separate complaint, potential discipline against the offending party.

Investigator - Do you Pete or, do you, Mr. Nelson, have any questions for me before I start to ask questions?

Nelson - I don't, I had two questions and you already answered them and the first was we never really got the scope of the investigation. Pete got a formal letter, I think like in April but that didn't set forth the scope of the investigation and there's never been any authority for the investigation provided to us. There's been a lot of back and forth and, and through the back and forth, finally about a week or so ago, Mr. Willis did say what you said today, which is a scope of the investigation, is this single allegation from the 2001-2002 time frame. You have provided something they haven't provided, which is confirming it is the same one that was involved in the criminal case, so I don't have any questions from that standpoint.

Nelson - Again, it was the, you know, the Contra Costa Community College PERB decision that says we're entitled to know that basic information but I think that you've confirmed that's all you have as well.

Investigator - Of course

Nelson - All right. Um I think I think that's. I think that's it Okay.

1

EXHIBIT L-006

Investigator - Well, if you have any questions along the way, this isn't your only opportunity. So, my understanding is that district administrators had, they were notified of an accusation against, against you in late January 2022, after receiving an email from a husband who alleged his wife, now in her thirties, was sexually assaulted by you when she was eleven years old um again there's not a formal complaint. It was just a report to the District um. And then my understanding is that you were initially placed on leave and that you're still on leave. Have you been on leave this entire time.

I can answer that yes. Initially, even though it's supposed to be offered as paid admin leave if you post a bond, that option wasn't really explained or offered in a way for him to take advantage of it, so it was actually unpaid leave until it went to the preliminary hearing and the judge ordered the ankle monitoring be removed and made clear the case should not be prosecuted, then the DA dropped the charges and back pay was paid for that time. Then he was placed on admin leave with pay, except for a three-month period where the school district didn't pay even though the statute requires he be on paid admin leave and they have never paid him for summers school or coaching, which he consistently did, but that's that is neither here nor there for this investigation. That's something that we will deal with in a separate proceeding. But I guess the short answer to your question about admin leave is yes.

Investigator - I'm curious and. You don't have to answer this, just my curiosity, when the judge threw this out, did you have to give any testimony.

Colombo - I just sat there the whole time.

Investigator - got it. Okay. so that you didn't, you didn't give any statements.

Colombo – I wasn't asked for one, no, just listen, just sat there and left after the preliminary hearing. At CTC, they allowed for me to make a statement and they then renewed my credential.

Investigator - Okay, all right that is just curious to me. I just didn't see anything in the, in the court documents. My question is, I'm just going to call her [NT] Jane Doe, right, and so I don't expect you to have A recollection of students that were in your class back in 2001, 2002, but where did you teach in 2001.

Colombo – in 2001 and 2002, I was 70% at Jordan Middle School, and I was 30% at another school, Terman, because it just reopened, and I taught three sections of 6th grade at Terman. I also taught 7th grade at Jordan [OT, NT's older sister, said she had Mr. Colombo for 7th grade PE that year].

Investigator - Can you spell Terman

Colombo - T-E-R-M-A-N. And now it's called Fletcher, now Terman is now Fletcher, and Jordan is now Green.

Investigator - Did you teach any sixth graders at Jordan Middle School or are they all at Terman

Colombo - I remember only at Terman. I remember teaching seventh grade at Jordan. A lot of 6th grade at Terman, I don't remember 6th grade that year at Jordan. I could have, I just remember 6th grade at Terman and 7th grade at Jordan. I think they had 6th grade PE at Terman that year because it was just reopening, but records could show better.

EXHIBIT L-007

Nelson - Interestingly that that is one thing we've been asking for from the school for the grade report and for the class list. The school records. His prior attorneys that defended him in the criminal action, and then me, when I came on board for this part of it, we, we've been asking for those records and, and have never received them, so, either they lost them or they don't have them for whatever reason. We would hope that the record would actually show whether he even taught her in a class or was at Terman when she alleges the assault took place during her class or right after her class, but we don't have the records, period. I'm curious if you were provided those school records.

Colombo - so when the detective, and if I may interrupt, just telling you the way it was because I have the information or this will help. The detective, when she interviewed the lawyer for Palo Alto Unified, who's no longer with the district, she asked her, can I have this student school records? The lawyer told the detective those records cannot be found. They disappeared, and the lawyer, and then the detective said, how can that happen. And the lawyer did not have an answer for her.

Investigator - Well, thank you for that, that information. Okay, so let's talk about what you can recall back during the 2001 to 2002 school year. Do you have any independent recollection from that year of telling a female student to go change in the locker room after she had done a cover like a pool um what do they called like the pool covers.

Colombo - There used to be a pool cover, but no, it would have never been one kid doing the pool cover, it would have been six kids because they're little 6th or 7th graders and that's on record. It would have been six kids. Doing the pool covers and as soon as they were done, suit them up, suit them out. Go to. Girls go that way, boys go that way That's it.

Investigator - The boys and girls have separate locker rooms

Colombo - oh absolutely 50 feet apart with separate doors.

Investigator - Have you ever been in the girls locker room with female students?

Colombo - No, in the, absolutely not.

Nelson - Let her finish

Colombo - Oh okay All right.

Investigator - So you've never been in the female locker room let's say in your whole career when students were there. Obviously your students are not there, I don't care if you're in the girls locker room, right, but have you ever been in the female locker room while students were present.

Colombo – Not . . .

Investigator - Is there a supervising female teacher in the locker room at that time?

Colombo - It was Mrs Pappas. And Mrs. Becker and they're still teacher there there today and um. Yes, I have the letters they provided me about this false charge. That's Mrs. Becker and Mrs. Papp is P-A-P-P-A-S

EXHIBIT L-008

Investigator - good thank you I was going ask you those questions.

Nelson - okay and when we're done He, he did get. I want to say 20 letters of support, those two women were two of the letters for him. There was a third female P-E teacher from the time period who also wrote a letter for him those, to me it seemed, like those three people would have been critical for somebody early on to talk to to try to find out what was going on and what was not going on. But we will get you those letters and, and the information for those three women.

**Investigator - And to be entirely forthcoming with you, I didn't see the need to interview any of these people because I don't have a student statement and even the what I read in the court files, she never identifies you in the first place as seeing you or hearing you. So I-I don't i mean I-I base my findings on a preponderance of evidence standard and I don't even see with her testimony that this comes close to meeting that standard. Um, you know, I have to admit there is no evidence to show that you did this or for me to make that kind of finding right, because it's just not, there's not enough evidence at all here, so um.**

Colombo - Miss Miller, may ask you a question, sheriff, you are a sheriff in your prior life, correct? I appreciate your candor, let's just put it that way, because I didn't get that from day one and I appreciate you.

Investigator - I also have to base my findings on fact, right, I-I mean whether I believe you or not whether believe her or not doesn't make a difference is does the preponderance of the evidence sustain finding or does it not. And here the standard isn't met, does that make sense so it's, it's just basic you know I, I'm not, I'm not trying to give you my support.

Colombo - No no I understand I just appreciate. I haven't got much candor before like this, and I just appreciate it.

Investigator - There is something you already answered, but again you are not ever in the, you've never been in the female locker room? In the girls locker room while females are present?

Colombo - No.

Nelson - OK, can we say it another way, that's a double negative?

Colombo - Absolutely not.

Investigator - Have you ever been accused of any type of sexual assault or sexual harassment complaints by female students in the past.

Colombo - No, absolutely not.

Investigator - And you mentioned that you had letters from Pappas, from Becker?

Colombo - yes, for what I mean, as a result of this this whole thing that's going down.

Investigator - Why would they give you a letter as a result of this whole thing going.

4

EXHIBIT L-009

Colombo - Cause the CTC was going through the process of renewing my credential and Jill Naylor, Cindy Pappus, Amy Becker, who are all PE teachers at the time they all jumped on board and said we will write you whatever you need because you need to be back here working with these kids. This false accusation was not okay. And they know me best, and they run the girls locker room for 25 years.

Investigator - Do you still have those letters?

Colombo - Absolutely.

Investigator - Would you share those with me, if like, via email if your attorney wants to send those to me just so that I can include them in my file.

Nelson - Yes, yes, absolutely.

Investigator - Thank you.

Nelson - There are three of them right huh there there's actually like 20 but we'll get those three. Those are the three most pertinent, I think. It. We also have his stellar performance reviews, if you want all those, but haha they may not be as pertinent.

Investigator - So you were present during when she [NT], were you present when she was giving testimony? Did you hear what you mean during the prelim. They're sitting right there, you're right there, so you heard her when she said, I remember rinsing off and going to change out of my swim suit.

Colombo - I don't remember that I don't recall that, it was back in March. She [NT] claimed she was in front of her locker felt somebody grab her from behind and push her on the bench in front of the locker.

Investigator - And I-I mean to say because you've never been in a locker along with female student this couldn't have happened based on what you're telling me right but I have to ask you, did you sexually assault or rape a female student?

Colombo - Absolutely not.

Investigator - Okay, I don't have anything else to ask you, and I think we are about at the 20, minute mark.

Nelson - We can only speculate, you know, what may have been part of the reasoning at least for her husband coming forward, or other family members coming forward and, and starting the process. We do know that it wasn't Pete. We're not discounting, as you said, you know, it's hard to not believe somebody who comes forward with this kind of an allegation that something may have very well happened to her. We just know it wasn't Pete. [This was before we conducted extensive investigation into the background and family dynamic, found grade reports and other information giving a clearer picture of what likely transpired].

Investigator - I'm sorry, Mr. Nelson, I can't hear you

Nelson - Okay, I will walk back around here. Sorry. Um, if you look at the details that were reported – they don't make sense.

EXHIBIT L-010

Investigator - So I look at her testimony, too, and I think, oh my gosh, usually I, you know, I do sexual investigations for school districts. In the. Last 20 years. Right. And a hundred percent of the time there's like some type of connection like grooming about, you know, going out. and going off campus, like getting involved in the personal life, like all these different kind of precursors. As to um to what leads to sexual assault. And so I didn't see any of that in her testimony, and they're like, I can't sit here and say, hey, did you invite her out to people so did you take her off campus did you do this you do that because none of that's there you know what I mean Usually that's kind of like. You know that's the precursor I guess if you want to look for these types of situations **so it doesn't add up to me either**.


**Investigator - Okay well thank you again. I took all your statements down and I will, um, include those in my notes and I will prepare to write my final investigative report and submit that to the District's Legal Counsel, as you know. My finished work product and that's it, I know you both know, I don't make any recommendations or conclusions, I just put the facts down on paper and, and make findings. I will say that, as you know, I already explained to you, is that, obviously, there's no way the facts support a finding that there was any type of sexual assault, sexual impropriety but um I'm sure you already knew that so without further ado, I, um, will end the meeting for Everybody.**

6

EXHIBIT L-011

# EXHIBIT L(B)

EXHIBIT L-012

 Gmail

Evan Nelson <evancnelson.law@gmail.com>

---

## Re: [EXTERNAL] Peter Colombo - Prelawsuit Demand [AALRR-CERRITOS.006247.00142.FID3839071]

1 message

---

**Evan Nelson** <evancnelson.law@gmail.com>                                        Wed, Jan 17, 2024 at 7:44 AM
To: "Jabari A. Willis" <JWillis@aalrr.com>

Jabari,

You are grasping at straws while ignoring the definition of "complaint" in the board policies that govern here. As you are well aware, "report" and "complaint" are synonymous under Palo Alto Board policy 1312.3 AR, which states "A 'report' or 'complaint' is defined as any oral or written communication to a school district employee or administrator which alleges behavior or misconduct that may constitute unlawful discrimination. A report or complaint may include an oral report, an email, a text message or other message conveyed to a school district employee or administrator. The report or complaint does not have to be on a particular form or use specific words to identify the law which may have been violated." This applicable administrative rule also describes that such a report or complaint can originate from any person, including parent, student or third party; so, regardless of who made the report (even if it originated from an alleged anonymous or confidential source) and regardless of whether you are trying to call it a report or a complaint, the Board Policies cited in my previous communications still govern and your client's purported "investigation" is without jurisdictional authority as it has exceeded all time restrictions without consent or even a request for consent.

In addition, 4119.12 AR states:

 "A report of sexual harassment shall be submitted directly to or forwarded to the district's Title IX Coordinator:

> Title IX Coordinator
> Palo Alto Unified School District
> 25 Churchill Avenue
> Palo Alto, CA  94306
> titleixcoordinator@pausd.org
> (650) 833-4248

Upon receiving such a report, the Title IX Coordinator shall inform the complainant of the process for filing a formal complaint.

**Even if the alleged victim chooses not to file a formal complaint, the Title IX Coordinator shall file a formal complaint in situations in which a safety threat exists.** In addition, the Title IX Coordinator may file a formal complaint in other situations as permitted under the Title IX regulations. In such cases, the alleged victim is not a party to the case, but will receive notices as required by the Title IX regulations at specific points in the complaint process."

Again, you need to provide the authority and clear basis for the "investigation" because it appears to only be a threat of an unfounded investigation being used as an abuse of process in a manner that will support an unfair practice charge.

 Best regards,

 Evan C. Nelson
 Law Office of Evan C. Nelson
 1990 North California Blvd., 8th Floor
 Walnut Creek, CA 94596
 (925) 323-1991

On Tue, Jan 16, 2024 at 3:41 PM Jabari A. Willis <JWillis@aalrr.com> wrote:

EXHIBIT L-013



| Book | PAUSD Policies & Regulations |
|---|---|
| Section | 5000 - Students |
| Title | Sexual Harassment |
| Code | 5145.7 BP |
| Status | Active |
| Adopted | February 11, 2014 |
| Last Revised | September 12, 2017 |
| Prior Revised Dates | December 8, 2015 |

[中文版](#)

[En Español](#)

The Governing Board is committed to maintaining a safe school environment that is free from harassment and discrimination. The Board prohibits sexual harassment against students in the educational setting by an employee, student or third party. Under federal and state law, the term sexual harassment includes sexual violence. The Board also prohibits retaliatory behavior or action against any person who reports, testifies about, files a complaint, or otherwise participates in a District complaint, investigation or grievance process.

*(cf. 0410 - Nondiscrimination in District Programs and Activities)*
*(cf. 1312.3 - Uniform Complaint Procedures)*
*(cf. 4119.11/4219.11/4319.11 - Sexual Harassment)*
*(cf. 5131 - Conduct)*
*(cf. 5131.2 - Bullying)*
*(cf. 5137 - Positive School Climate)*
*(cf. 5145.3 - Nondiscrimination/Harassment)*
*(cf. 5157 - Gender Identity and Access)*
*(cf. 6142.1 - Sexual Health and HIV/AIDS Prevention Instruction)*

**Scope and Definitions Related to Sexual Harassment Complaints**

Prohibited sexual harassment includes, but is not limited to, unwelcome sexual advances, unwanted requests for sexual favors, or other unwanted verbal, visual, or physical conduct of a sexual nature made against another person of the same or opposite sex in the educational setting, when made on the basis of sex and under any of the following conditions: *(Education Code 212.5; 5 CCR 4916)*

1. Submission to the conduct is explicitly or implicitly made a term or condition of a student's academic status or progress.
2. Submission to or rejection of the conduct by a student is used as the basis for academic decisions affecting the student.
3. The conduct has the purpose or effect of having a negative impact on the student's academic

EXHIBIT L-014

performance or of creating an intimidating, hostile, or offensive educational environment; or under Title IX a hostile environment has been created if the unwelcome conduct of a sexual nature is sufficiently serious that it denies or limits the student's ability to participate in or benefit from the educational program.

4. Submission to or rejection of the conduct by the student is used as the basis for any decision affecting the student regarding benefits and services, honors, programs, or activities available at or through any district program or activity.

    *(cf. 5131 - Conduct)*
    *(cf. 5131.2 - Bullying)*
    *(cf. 5137 - Positive School Climate)*
    *(cf. 5145.3 - Nondiscrimination/Harassment)*
    *(cf. 6142.1 - Sexual Health and HIV/AIDS Prevention Instruction)*

The district will review and address any report or complaint of sexual harassment involving a student, employee or third party against another student, employee or third party. Specifically:

a. Any sexual harassment or sexual violence report or complaint involving a student complainant or a student respondent shall be addressed under BP 5145.7 and the Uniform Complaint Procedures, and it will ***not*** be addressed under BP/AR 1312.1, 4119.11/4219.11/4319.11, or AR 4031. Any other report or complaint of unlawful discrimination involving a student complainant or a student respondent shall be addressed through BP/AR 5145.3 and the Uniform Complaint Procedures.

b. Any sexual harassment or sexual violence report or complaint, between employees or between employees and third parties, but ***not*** involving student complainants or student respondents, shall be addressed through BP/AR 4119.11/4219.11/4319.11 and AR 4031.

c. Any sexual harassment or sexual violence report or complaint between third parties which took place in the educational setting shall be referred to the District Compliance Officer to determine how to appropriately address the complaint.

d. Though an incident of sexual harassment may occur off campus or unrelated to school activity, if the effects of the incident may result in harassment, intimidation, or bullying at school or at a school activity, which is sufficiently serious to interfere with or limit the targeted student's ability to participate in or benefit from the education program, the District Compliance Officer or Principal/designee shall, under these Uniform Complaint Procedures, promptly investigate, determine what occurred, eliminate any harassment, intimidation, or bullying that occurs at school or at a school activity, prevent its recurrence, and address its effects.

A "report" or "complaint" is defined as any oral or written communication to a school district employee or administrator which alleges behavior or misconduct that may constitute sexual harassment or sexual violence. A report or complaint may include an oral report, an email, a text message or other message conveyed to a school district employee or administrator. The report or complaint does not have to be on a particular form or use specific words to identify the law which may have been violated.

An "educational setting" includes participation in educational programs and activities of the school or district, including all the academic, educational, extracurricular, athletic, and other programs and activities of the school, whether those programs or activities take place in a school's facilities, on a school bus, or at a class or training program sponsored by the school at another location.

A "third party" includes someone who is connected to the school or the district for educational, business or extra-curricular purposes. For example, a third party may include a vendor, volunteer, coach, or other person who is on school or district grounds during the hours of operation or who is present in the educational setting.

**Examples**

Examples of types of conduct which are prohibited in the District and which may constitute sexual harassment include, but are not limited to:

1. Unwelcome leering, sexual flirtations, or propositions
2. Unwelcome sexual slurs, epithets, threats, verbal abuse, derogatory comments, or sexually

EXHIBIT L-015

degrading descriptions

3. Unwelcome or demeaning conduct or comments of a sexual nature directed at or about an individual related to actual or perceived gender, gender identity and gender expression, sex, sexual behavior, sexual orientation, or other related personal characteristics
4. Graphic verbal comments about an individual's body or overly personal conversation
5. Sexual jokes, derogatory posters, notes, stories, cartoons, drawings, pictures, obscene gestures, or computer-generated images of a sexual nature
6. Spreading sexual rumors
7. Teasing or sexual remarks about students enrolled in a predominantly single-sex class
8. Massaging, grabbing, fondling, stroking, or brushing the body
9. Touching an individual's body or clothes in a sexual way
10. Impeding or blocking movements or any physical interference with school activities when directed at an individual on the basis of sex
11. Displaying sexually suggestive objects
12. Sexual violence, including, but not limited to, sexual assault or sexual battery as defined in Education Code 48900(n), or sexual coercion
13. Dating violence, stalking, and relationship abuse
14. An employee engaging in, soliciting, or encouraging a sexual relationship or sexual activity with a student(s) based on written, verbal, and/or physical contact or fraternization with a student(s). In some circumstances, an employee's physical contact with a student may also take on sexual connotations and rise to the level of sexual harassment. For example, an employee's behavior, such as repeatedly hugging and putting their arms around a student under inappropriate circumstances, could rise to the level of unwelcome touching of a sexual nature. (*cf. 4119.21/4219.11/4319.21-Professional Standards*)
15. Sexual relationships between employees and students. (*cf. 4119/21/4219.11/4319.21-Professional Standards*)
16. Sexual relationships between employees and former students if the employee pursued an intimate or sexual relationship with the former student while the student was enrolled in the District and while the employee was employed with the District. (*cf. 4119.21/4219.21/4319.21 – Professional Standards*)
17. Sexual relationships between employees and students or former students may also violate Title IX. (*cf. OCR 2001 Guidance on Sexual Harassment*)

**Instruction/Information**

The Superintendent or designee shall ensure that all District students receive age-appropriate instruction and information on sexual harassment. Such instruction and information shall include:

1. What acts and behavior constitute sexual harassment and sexual violence, including the fact that sexual harassment and sexual violence could occur between people of the same sex
2. A clear message that students do not have to endure sexual harassment or sexual violence
3. Encouragement for a student to immediately contact a teacher, the Principal/designee or any other available employee if the student has been subjected to sexual harassment by a student, employee, or a third party in the educational setting
4. Explanation that, when a report of sexual harassment is made to a Principal/designee, that administrator shall inform the student and/or parent/guardian of the right to file a written complaint through the District's Uniform Complaint Procedures, BP/AR 1312.3, and also explain how to access those procedures
5. Encouragement for student bystanders to report observed instances of sexual harassment, even where the target of the harassment has not complained
6. Information about the District's procedure for investigating sexual harassment complaints under BP 5145.7 and the Uniform Complaint Procedures 1312.3 and the person(s) to whom a report of sexual harassment should be made
7. Information about the rights of students and parents/guardians to file a criminal complaint or an OCR complaint, as applicable

**Complaint Process/Grievance Procedure**

***Uniform Complaint Procedures***. All reports and complaints alleging sexual harassment or sexual violence shall be addressed immediately in accordance with this policy and the Uniform Complaint Procedures - BP/AR 1312.3.

EXHIBIT L-016

**District Compliance Officer** The following individual is designated to handle complaints under the Uniform Complaint Procedures regarding sexual harassment prohibited by BP 5145.7 and to answer inquiries regarding the District's sexual harassment policies. This individual is also the District's Title IX Coordinator:

District Compliance Officer
25 Churchill Avenue, Palo Alto, CA 94306
650-833-4262
complianceofficer@pausd.org

**Student Reports**. Any student who believes they have been subjected to sexual harassment or who has witnessed sexual harassment may report the conduct to any school employee.

**School Employee Observation and Reports**. Within one school day of receiving a sexual harassment report or complaint from a student, parent/guardian or other person, the school employee shall report it to the site Principal/designee.

Any school employee who observes an incident of sexual harassment involving a student shall immediately intervene when safe to do so and shall, within one school day, report the conduct to the Principal/designee, whether or not the target of the harassment makes a report or files a complaint. *(Education Code 234.1)*

**Reports about Principal/designee**. Where a sexual harassment report or complaint involves the Principal/designee to whom the report would ordinarily be communicated, the employee who receives the report or who observes the incident shall instead report to the District Compliance Officer within one school day.

**Principal Actions after Receiving a Report**. The Principal/designee shall, within one school day of receiving the report from a student, an employee or a third party, forward the complaint itself or a transcription of the oral report to the District Compliance Officer.

The Principal/designee shall also inform the student and/or student's parent/guardian of the right to file a written complaint through the Uniform Complaint Procedures, BP/AR 1312.3. The Principal/designee shall provide a free copy or a link to the Uniform Complaint Procedures. The Principal/designee shall document when and how they informed the student and/or the parent/guardian.

**Reports about Adult Sexual Relationships with Students.** In all allegations of an employee or third party adult engaging in a sexual relationship with a student or a former student, the District Compliance Officer shall assess whether a referral is necessary to either law enforcement or other appropriate agency.

**Notification of Factual Findings from other Entities**. If the District is on notice of a factual finding that a District employee engaged in behavior with a student, (including a student from a different school or district), which may constitute sexual harassment or sexual violence as defined in this policy, the District Compliance Officer shall investigate the circumstances surrounding the factual finding.

If the District is on notice of a factual finding that a student engaged in behavior with another student, (including a student from a different school or district), which may constitute sexual harassment or sexual violence as defined in this policy, the District Compliance Officer shall investigate the circumstances surrounding the factual finding.

If the District Compliance Officer is able to determine that the factual finding rises to the level of harassment in violation of this policy, the District shall promptly eliminate the harassment in the educational setting, prevent its recurrence in the educational setting, and address its effects in the educational setting.

For the purposes of this section, a "factual finding" includes a finding of fact made by another public or private school, a law enforcement agency, a child protection agency, a court, the Commission on Teaching Credentials or any other finding of fact provided to the District which indicates that an employee or

EXHIBIT L-017

student engaged in behavior which may constitute a violation of this policy and poses a risk to the safety of the District's students.

***Other Complaint Options***. A student may also file a sex discrimination complaint with the Office for Civil Rights (OCR) of the United States Department of Education. Instructions for filing a complaint can be found at https://www2.ed.gov/about/offices/list/ocr/docs/howto.html.

## Enforcement of District Policy

The Superintendent or designee shall take appropriate actions to reinforce the District's sexual harassment policy. As needed, these actions may include any of the following:
1. Removing vulgar or offending graffiti
   *(cf. 5131.5 - Vandalism and Graffiti)*
2. Providing training to students, staff, and parents/guardians about how to recognize harassment and how to respond
   *(cf. 4131 - Staff Development)*
   *(cf. 4231 - Staff Development)*
   *(cf. 4331 - Staff Development)*
3. Disseminating and/or summarizing the District's policy and regulation regarding sexual harassment
4. Consistent with the laws regarding the confidentiality of student and personnel records, communicating the school's response to parents/guardians and the community
   *(cf. 4119.23/4219.23/4319.23 - Unauthorized Release of Confidential/Privileged Information)*
   *(cf. 5125 - Student Records)*
5. Taking appropriate disciplinary action as set forth below or in Section I of AR 1312.3
6. Taking appropriate remedial actions including, but not limited to, those listed in Section H of AR 1312

## Disciplinary Action

If it is determined that an employee has violated this policy by engaging in sexual harassment, sexual violence, a sexual relationship with a student, or retaliation, the District shall take action to address the violation and any substantiated risk, including appropriate disciplinary action. Disciplinary action may include action to dismiss the employee, in accordance with law, board policy, and applicable collective bargaining agreements. (*cf. AR 4218 –Dismissal/Suspension/Disciplinary Action; Education Code sections 44932 et seq.*)

Any student who engages in sexual harassment or sexual violence in the educational setting, in violation of this policy, shall be subject to disciplinary action. For students in grades 4-12, disciplinary action may include suspension and/or expulsion, provided that, in imposing such discipline, the entire circumstances of the incident(s) shall be taken into account. Suspensions and recommendations for expulsion shall follow applicable law. *(Education Code sections 48900 et seq.)*

Students who knowingly file false complaints of sexual harassment or sexual violence or give knowingly false statements in an investigation shall be subject to discipline by measures up to and including suspension and expulsion, as shall any student who is found to have retaliated against another student in violation of this policy.

*(cf. 5144.1 - Suspension and Expulsion/Due Process)*

*(cf. 5144.2 - Suspension and Expulsion/Due Process (Students with Disabilities))*

When disciplinary action is recommended after the uniform complaint process is complete, the District Compliance Officer shall promptly determine the appropriate sanction and forward the matter to the Principal/designee and/or appropriate District administrator who will promptly implement any disciplinary process.

## Confidentiality

All complaints and allegations of sexual harassment or sexual violence shall be kept confidential except as necessary to carry out the investigation or take other subsequent necessary action. (5 CCR 4964)

EXHIBIT L-018

*(cf. 4119.23/4219.23/4319.23 - Unauthorized Release of Confidential/Privileged Information)[15]*
*(cf. 5125 - Student Records) [16]*

However, when a complainant notifies the District of the harassment but requests confidentiality, the Principal/designee or the District Compliance Officer shall inform the complainant that the request may limit the District's ability to investigate the harassment or take other necessary action. When honoring a request for confidentiality, the District will nevertheless take all reasonable steps to investigate and respond to the complaint consistent with the request.

When a complainant notifies the District of the harassment but requests that the District not pursue an investigation, the District will determine whether or not it can honor such a request while still providing a safe and nondiscriminatory environment for all students.

**Record-Keeping**

The District Compliance Officer, in consultation with the Superintendent or designee, shall maintain a record of all reported cases of sexual harassment and sexual violence to enable the District to monitor, address, and prevent repetitive harassing behavior in the educational setting.

**Notifications**

A copy of the District's sexual harassment policy and regulation shall:
1. Be included in the notifications that are sent to parents/guardians at the beginning of each school year *(Education Code 48980; 5 CCR 4917)*
   *(cf. 5145.6 - Parental Notifications)*
2. Be displayed on the District website, in a prominent location in the main administrative building and in other areas where notices of District rules, regulations, procedures, and standards of conduct are posted *(Education Code 231.5)*
3. Be provided as part of any orientation program conducted for new students at the beginning of each quarter, semester, or summer session *(Education Code 231.5)*
4. Appear in any school or District publication that sets forth the school's or District's comprehensive rules, regulations, procedures, and standards of conduct *(Education Code 231.5)*
5. Be included in the student handbook
6. Be provided to employees and employee organizations

Legal Reference:

EDUCATION CODE
*200-262.4 Prohibition of discrimination on the basis of sex*
*48900 Grounds for suspension or expulsion*
*48900.2 Additional grounds for suspension or expulsion; sexual harassment*
*48904 Liability of parent/guardian for willful student misconduct*
*48980 Notice at beginning of term*

CIVIL CODE
*51.9 Liability for sexual harassment; business, service and professional relationships*
*1714.1 Liability of parents/guardians for willful misconduct of minor*

GOVERNMENT CODE
*12950.1 Sexual harassment training*

CODE OF REGULATIONS, TITLE 5
4600-4687 Uniform complaint procedures
4900-4965 Nondiscrimination in elementary and secondary education programs

UNITED STATES CODE, TITLE 20

1221 Application of laws

1232g Family Educational Rights and Privacy Act

EXHIBIT L-019

1681-1688 Title IX, discrimination

UNITED STATES CODE, TITLE 42
1983 Civil action for deprivation of rights
2000d-2000d-7 Title VI, Civil Rights Act of 1964
2000e-2000e-17 Title VII, Civil Rights Act of 1964 as amended

CODE OF FEDERAL REGULATIONS, TITLE 34

99.1-99.67 Family Educational Rights and Privacy

106.1-106.71 Nondiscrimination on the basis of sex in education programs

COURT DECISIONS
Donovan v. Poway Unified School District, (2008) 167 Cal.App.4th 567
Flores v. Morgan Hill Unified School District, (2003, 9th Cir.) 324 F.3d 1130
Reese v. Jefferson School District, (2001, 9th Cir.) 208 F.3d 736
Davis v. Monroe County Board of Education, (1999) 526 U.S. 629
Gebser v. Lago Vista Independent School District, (1998) 524 U.S. 274
Oona by Kate S. v. McCaffrey, (1998, 9th Cir.) 143 F.3d 473
Doe v. Petaluma City School District, (1995, 9th Cir.) 54 F.3d 1447


Management Resources:

CSBA PUBLICATIONS

Safe Schools: Strategies for Governing Boards to Ensure Student Success, 2011

Providing a Safe, Nondiscriminatory School Environment for Transgender and Gender-Nonconforming Students, Policy Brief, February 2014


OFFICE FOR CIVIL RIGHTS PUBLICATIONS

Dear Colleague Letter Title IX Coordinators, April 2015

Questions and Answers on Title IX and Sexual Violence, April 2014

Dear Colleague Letter Sexual Violence, April 4, 2011 Sexual Harassment: It's Not Academic, September 2008 Revised Sexual Harassment Guidance, January 2001

WEB SITES
CSBA: http://www.csba.org
California Department of Education: http://www.cde.ca.gov
U.S. Department of Education, Office for Civil Rights: http://www.ed.gov/about/offices/list/ocr

BP5145-7性骚扰Chinese.pdf (222 KB)     BP5145-7AcosoSexual.pdf (398 KB)

EXHIBIT L-020



| Book | PAUSD Policies & Regulations |
|---|---|
| Section | 5000 - Students |
| Title | Title IX Sexual Harassment Complaint Procedures |
| Code | 5145.71 AR |
| Status | Active |
| Adopted | October 27, 2020 |

This administrative regulation shall be used in conjunction with current District policies and practice. In terms of the timeline, the process under this regulation shall commence at the same time as the processes under the District's existing policies including Sexual Harassment, Nondiscrimination, and UCP.

The complaint procedures described in this administrative regulation shall be used to address any complaint governed by Title IX of the Education Amendments of 1972 alleging that a student was subjected to one or more of the following forms of sexual harassment: (34 CFR 106.30)

1. A district employee conditioning the provision of a district aid, benefit, or service of the district on the student's participation in unwelcome sexual conduct
2. Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a student equal access to the district's education program or activity
3. Sexual assault, dating violence, domestic violence, or stalking on the basis of sex, defined as follows:
   - Forcible Sexual Assault includes any sexual act directed against a student, forcibly, against the student's will, or without consent, including rape, sodomy, sexual assault with an object, and fondling.  (See 20 USC 1092(f)(6)(A)(v).)
   - Non-forcible Sexual Assault includes offenses that do not involve force where the student is incapable of giving consent, including statutory rape and incest. (See 20 USC 1092(f)(6)(A)(v).)
   - Dating Violence includes violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the student, where the existence of such a relationship shall be determined based on a consideration of the following factors: the length of the relationship, the type of relationship and/or the frequency of interaction between the persons involved in the relationship.  (See 34 USC 12291(a)(10).)
   - Domestic Violence includes felony or misdemeanor crimes of violence committed by a current or former spouse or intimate partner of the student. (See 34 USC 12291(a)(8).)
   - Stalking which includes engaging in a course of conduct directed at a student that would cause a reasonable person to fear for their safety or the safety of others or suffer substantial emotional distress. (See 34 USC 12291(a)(30).)

All other sexual harassment complaints shall be investigated and responded to pursuant to AR 1312.3 - Uniform Complaint Procedures.

*(cf. 1312.3 - Uniform Complaint Procedures)*

A report of sexual harassment shall be submitted directly to or forwarded to the district's Title IX Coordinator using the contact information listed below:

EXHIBIT L-021

Title IX Coordinator
Palo Alto Unified School District
25 Churchill Avenue
Palo Alto, CA  94306
titleixcoordinator@pausd.org
(650) 833-4248

Upon receiving such a report, the Title IX Coordinator shall inform the complainant of the process for filing a formal complaint.

Even if the alleged victim chooses not to file a formal complaint, the Title IX Coordinator shall file a formal complaint in situations in which a safety threat exists. In addition, the Title IX Coordinator may file a formal complaint in other situations as permitted under the Title IX regulations. In such cases, the alleged victim is not a party to the case, but will receive notices as required by the Title IX regulations at specific points in the complaint process.

A formal complaint, with the complainant's physical or digital signature, may be filed with the Title IX Coordinator in person, by mail, by email, or by any other method authorized by the district. (34 CFR 106.30)

The Superintendent or designee shall ensure that the Title IX Coordinator, investigator, decision-maker, or a facilitator of an informal resolution process does not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent, and that such persons receive training in accordance with 34 CFR 106.45. (34 CFR 106.45)

**Supportive Measures**

Upon receipt of a report of Title IX sexual harassment, even if a formal complaint is not filed, the Title IX Coordinator shall promptly contact the complainant to discuss the availability of supportive measures which are nondisciplinary, nonpunitive, and do not unreasonably burden the other party. Such measures may include, but are not limited to, counseling, course-related adjustments, modifications of class schedules, mutual restrictions on contact, increased security, and monitoring of certain areas of the campus. The Title IX Coordinator shall consider the complainant's wishes with respect to supportive measures. (34 CFR 106.30, 106.44)

**Emergency Removal from School**

On an emergency basis, the district may remove a student from the district's education program or activity, provided that the district conducts an individualized safety and risk analysis, determines that removal is justified due to an immediate threat to the physical health or safety of any student or other individual arising from the allegations, and provides the student with notice and an opportunity to challenge the decision immediately following the removal. This authority to remove a student does not modify a student's rights under the Individuals with Disabilities Education Act or Section 504 of the Rehabilitation Act of 1973. (34 CFR 106.44)

If a district employee is the respondent, the employee may be placed on administrative leave during the pendency of the formal complaint process. (34 CFR 106.44)

**Dismissal of Complaint**

The Title IX Coordinator shall dismiss a formal complaint if the alleged conduct would not constitute sexual harassment as defined in 34 CFR 106.30 even if proved. The Title IX Coordinator shall also dismiss any complaint that did not occur in the district's education program or activity or did not occur against a person in the United States, and may dismiss a formal complaint if the complainant notifies the district in writing that the complainant would like to withdraw the complaint or any allegations in the complaint, the respondent is no longer enrolled or employed by the district, or sufficient circumstances prevent the district from gathering evidence sufficient to reach a determination with regard to the complaint. (34 CFR 106.45)

Upon dismissal, the Title IX Coordinator shall promptly, and simultaneously to the parties, send written notice of the dismissal and the reasons for the dismissal. (34 CFR 106.45)

EXHIBIT L-022

If a complaint is dismissed on the grounds that the alleged conduct does not constitute sexual harassment as defined in 34 CFR 106.30, the conduct may still be addressed pursuant to BP/AR 1312.3 - Uniform Complaint Procedures as applicable.

**Informal Resolution Process**

When a formal complaint of sexual harassment is filed, the district may offer an informal resolution process, such as mediation, at any time prior to reaching a determination regarding responsibility. The district shall not require a party to participate in the informal resolution process or to waive the right to an investigation and adjudication of a formal complaint. (34 CFR 106.45)

The district may facilitate an informal resolution process provided that the district: (34 CFR 106.45)
1. Provides the parties with written notice disclosing the allegations, the requirements of the informal resolution process, the right to withdraw from the informal process and resume the formal complaint process, and any consequences resulting from participating in the informal resolution process, including that records will be maintained or could be shared.
2. Obtains the parties' voluntary, written consent to the informal resolution process
3. Does not offer or facilitate an informal resolution process to resolve allegations that an employee sexually harassed a student

**Formal Complaint Process**

If a formal complaint is filed, the Title IX Coordinator shall provide the known parties with written notice of the following: (34 CFR 106.45)
1. The district's formal Title IX complaint process, including any informal resolution process
2. The allegations potentially constituting sexual harassment with sufficient details known at the time, including the identity of parties involved in the incident if known, the conduct allegedly constituting sexual harassment, and the date and location of the alleged incident if known. Such notice shall be provided with sufficient time for the parties to prepare a response before any initial interview.

If, during the course of the investigation, the district investigates allegations about the complainant or respondent that are not included in the initial notice, the Title IX Coordinator shall provide notice of the additional allegations to the parties.
3. A statement that the respondent is presumed not responsible for the alleged conduct and that a determination regarding responsibility is made at the conclusion of the complaint process
4. The opportunity for the parties to have an advisor of their choice who may be, but is not required to be, an attorney, and the ability to inspect and review evidence
5. The prohibition against knowingly making false statements or knowingly submitting false information during the complaint process

The above notice shall also include the name of the investigator, facilitator of an informal process, and decision-maker and shall provide either party with no less than three calendar days to raise concerns of conflict of interest or bias regarding any of these persons.

During the investigation process, the district shall: (34 CFR 106.45)
1. Provide an equal opportunity for the parties to present witnesses, including fact and expert witnesses, and other inculpatory and exculpatory evidence
2. Not restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence
3. Provide the parties with the same opportunities to have others present during any grievance proceeding, including the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice, who may be, but is not required to be, an attorney
4. Not limit the choice or presence of an advisor for either the complainant or respondent in any meeting or grievance proceeding, although the district may establish restrictions regarding the extent to which the advisor may participate in the proceedings as long as the restrictions apply equally to both parties
5. Provide, to a party whose participation is invited or expected, written notice of the date, time, location, participants, and purpose of all investigative interviews or other meetings, with sufficient time for the party to prepare to participate
6. Send in an electronic format or hard copy to both parties and their advisors, if any, any evidence that is obtained as part of the investigation that is directly related to the allegations raised in the complaint, including the evidence upon which the district does not intend to rely in reaching a

EXHIBIT L-023

determination regarding responsibility and inculpatory or exculpatory evidence obtained by a party or other source, so that each party can meaningfully respond to the evidence and have at least 10 days to submit a written response for the investigator to consider prior to the completion of the investigative report

7. Objectively evaluate all relevant evidence, including both inculpatory and exculpatory evidence, and determine credibility in a manner that is not based on a person's status as a complainant, respondent, or witness

8. Create an investigative report that fairly summarizes relevant evidence and, at least 10 days prior to the determination of responsibility, send to the parties and their advisors, if any, the investigative report in an electronic format or a hard copy, for their review and written response

9. After sending the investigative report to the parties for review and before a decision-maker reaches a determination regarding responsibility, the decision-maker must afford each party the opportunity to submit written, relevant questions that the party wants asked of any party or witness, provide each party with the answers, and allow for additional, limited follow-up questions from each party

Questions and evidence about the complainant's sexual predisposition or prior sexual behavior are not relevant, unless such questions and evidence are offered to prove that someone other than the respondent committed the conduct alleged by the complainant or if the questions and evidence concern specific incidents of the complainant's prior sexual behavior with respect to the respondent and are offered to prove consent.

The district shall maintain confidentiality and/or privacy rights of all parties to the complaint in accordance with applicable state and federal laws, except as may be permitted or required by law or to carry out the purposes of this formal Title IX complaint process.

If the complaint is against an employee, rights conferred under an applicable collective bargaining agreement shall be applied to the extent they do not conflict with the Title IX requirements.

## Written Decision

The Superintendent shall designate an employee as the decision-maker to determine responsibility for the alleged conduct, who shall not be the Title IX Coordinator or a person involved in the investigation of the matter. (34 CFR 106.45)

The decision-maker shall issue, and simultaneously provide to both parties, a written decision as to whether the respondent is responsible for the alleged conduct. (34 CFR 106.45)

The written decision shall be issued within 45 calendar days of the receipt of the complaint.

The timeline may be temporarily extended for good cause with written notice to the complainant and respondent of the extension and the reasons for the action. (34 CFR 106.45)

In making this determination, the district shall use the "preponderance of the evidence" standard for all formal complaints of sexual harassment. The same standard of evidence shall be used for formal complaints against students as for complaints against employees. (34 CFR 106.45)

The written decision shall include the following: (34 CFR 106.45)

1. Identification of the allegations potentially constituting sexual harassment as defined in 34 CFR 106.30

2. A description of the procedural steps taken from receipt of the formal complaint through the written decision, including any notifications to the parties, interviews with parties and witnesses, site visits, methods used to gather other evidence, and hearings held if the district includes hearings as part of the grievance process

3. Findings of fact supporting the determination

4. Conclusions regarding the application of the district's code of conduct to the facts

5. A statement of, and rationale for, the result as to each allegation, including a decision regarding responsibility, any disciplinary sanctions the district imposes on the respondent, and whether remedies designed to restore or preserve equal access to the district's educational program or activity will be provided by the district to the complainant

6. The district's procedures and permissible bases for the complainant and respondent to appeal

## Appeals

EXHIBIT L-024

Either party may appeal the district's decision or dismissal of a formal complaint or any allegation in the complaint, if the party believes that a procedural irregularity affected the outcome, new evidence is available that could affect the outcome, or a conflict of interest or bias by the Title IX Coordinator, investigator(s), or decision- maker(s) affected the outcome. If an appeal is filed, the district shall: (34 CFR 106.45)

1. Notify the other party in writing when an appeal is filed and implement appeal procedures equally for both parties
2. Ensure that the decision-maker(s) for the appeal is trained in accordance with 34 CFR 106.45 and is not the same decision-maker(s) who reached the determination regarding responsibility or dismissal, the investigator(s), or the Title IX Coordinator
3. Give both parties a reasonable, equal opportunity to submit a written statement in support of, or challenging, the outcome
4. Issue a written decision describing the result of the appeal and the rationale for the result
5. Provide the written decision simultaneously to both parties

An appeal must be filed in writing within 5 school days of receiving the determination, stating the grounds for the appeal and including any relevant documentation in support of the appeal. Appeals submitted after this deadline are not timely and shall not be considered. Either party has the right to file a complaint with the U.S. Department of Education's Office for Civil Rights.

A written decision shall be provided to the parties within 7 school days from the receipt of the appeal.

**Remedies**

When a determination of responsibility for sexual harassment has been made against the respondent, the district shall provide remedies to the complainant. Such remedies may include the same individualized services described above in the section "Supportive Measures," but need not be nondisciplinary or nonpunitive and need not avoid burdening the respondent. (34 CFR 106.45)

**Corrective/Disciplinary Actions**

The district shall not impose any disciplinary sanctions or other actions against a respondent, other than supportive measures as described above in the section "Supportive Measures," until the complaint procedure has been completed and a determination of responsibility has been made. (34 CFR 106.44)

For students in grades 4-12, discipline for sexual harassment may include suspension and/or expulsion. After the completion of the complaint procedure, if it is determined that a student at any grade level has committed sexual assault or sexual battery at school or at a school activity off school grounds, the principal or Superintendent shall immediately suspend the student and shall recommend expulsion. (Education Code 48900.2, 48915)

*(cf. 5144 - Discipline)*

*(cf. 5144.1 - Suspension and Expulsion/Due Process)*

Other actions that may be taken with a student who is determined to be responsible for sexual harassment include, but are not limited to:
1. Transfer from a class or school as permitted by law
2. Parent/guardian conference
3. Education of the student regarding the impact of the conduct on others
4. Positive behavior support
5. Referral of the student to a student success team

   *(cf. 6164.5 - Student Success Teams)*

6. Denial of participation in extracurricular or cocurricular activities or other privileges as permitted by law

   *(cf. 6145 - Extracurricular and Cocurricular Activities)*

EXHIBIT L-025

When an employee is found to have committed sexual harassment or retaliation, the district shall take appropriate disciplinary action, up to and including dismissal, in accordance with applicable law and collective bargaining agreement.

*(cf. 4117.7/4317.7 - Employment Status Report)*

*(cf. 4118 - Dismissal/Suspension/Disciplinary Action)*

*(cf. 4119.11/4219.11/4319.11 - Sexual Harassment)*

*(cf. 4218 - Dismissal/Suspension/Disciplinary Action)*

## Record-Keeping

The Superintendent or designee shall maintain for a period of seven years a record of all reported cases and Title IX investigations of sexual harassment, any determinations of responsibility, any audio or audiovisual recording and transcript if applicable, any disciplinary sanctions imposed, any remedies provided to the complainant, any appeal or informal resolution and the results therefrom, and responses made pursuant to 34 CFR 106.44. (34 CFR 106.45)

The Superintendent or designee shall also maintain for a period of seven years all materials used to train the Title IX Coordinator, investigator(s), decision-maker(s), and any person who facilitates an informal resolution process. The district shall make such training materials publicly available on its web site, or if the district does not maintain a web site, available upon request by members of the public. (34 CFR 106.45)

*(cf. 3580 - District Records)*

Legal Reference:

EDUCATION CODE
200-262.4 Prohibition of discrimination on the basis of sex
48900 Grounds for suspension or expulsion
48900.2 Additional grounds for suspension or expulsion; sexual harassment
48985 Notices, report, statements and records in primary language

CIVIL CODE
51.9 Liability for sexual harassment; business, service and professional relationships
1714.1 Liability of parents/guardians for willful misconduct of minor

GOVERNMENT CODE
12950.1 Sexual harassment training

CODE OF REGULATIONS, TITLE 5
4600-4670 Uniform complaint procedures
4900-4965 Nondiscrimination in elementary and secondary education programs

UNITED STATES CODE, TITLE 20
1092 Definition of sexual assault 1221 Application of laws
1232g Family Educational Rights and Privacy Act
1681-1688 Title IX of the Education Amendments of 1972

UNITED STATES CODE, TITLE 34
12291 Definition of dating violence, domestic violence, and stalking

UNITED STATES CODE, TITLE 42
1983 Civil action for deprivation of rights
2000d-2000d-7 Title VI, Civil Rights Act of 1964
2000e-2000e-17 Title VII, Civil Rights Act of 1964 as amended

CODE OF FEDERAL REGULATIONS, TITLE 34

EXHIBIT L-026

99.1-99.67 Family Educational Rights and Privacy
106.1-106.82 Nondiscrimination on the basis of sex in education programs

COURT DECISIONS
Donovan v. Poway Unified School District, (2008) 167 Cal.App.4th 567
Flores v. Morgan Hill Unified School District, (2003, 9th Cir.) 324 F.3d 1130
Reese v. Jefferson School District, (2000, 9th Cir.) 208 F.3d 736
Davis v. Monroe County Board of Education, (1999) 526 U.S. 629
Gebser v. Lago Vista Independent School District, (1998) 524 U.S. 274
Oona by Kate S. v. McCaffrey, (1998, 9th Cir.) 143 F.3d 473
Doe v. Petaluma City School District, (1995, 9th Cir.) 54 F.3d 1447

Management Resources:

CSBA PUBLICATIONS
Providing a Safe, Nondiscriminatory School Environment for Transgender and Gender-Nonconforming
Students, Policy Brief, February 2014
Safe Schools: Strategies for Governing Boards to Ensure Student Success, 2011

U.S. DEPARTMENT OF EDUCATION, OFFICE FOR CIVIL RIGHTS PUBLICATIONS
Q&A on Campus Sexual Misconduct, September 2017
Examples of Policies and Emerging Practices for Supporting Transgender Students, May 2016
Dear Colleague Letter: Title IX Coordinators, April 2015
Sexual Harassment: It's Not Academic, September 2008
Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or
Third Parties, January 2001

WEB SITES
CSBA: http://www.csba.org
California Department of Education: http://www.cde.ca.gov
U.S. Department of Education, Office for Civil Rights: http://www.ed.gov/about/offices/list/ocr 7/20

EXHIBIT L-027



| | |
|---|---|
| Book | PAUSD Policies & Regulations |
| Section | 1000 - Community Relations |
| Title | Uniform Complaint Procedures |
| Code | 1312.3 BP |
| Status | Active |
| Adopted | September 27, 2011 |
| Last Revised | December 14, 2021 |
| Prior Revised Dates | October 9, 2012, June 21, 2016, September 12, 2017, June 19, 2018 |

En Español
中文版

The Board of Education recognizes that the district has the primary responsibility to ensure compliance with applicable state and federal laws and regulations governing educational programs.

The district's Uniform Complaint Procedures (UCP) shall be used to investigate and resolve the following complaints:

**Complaints Subject to UCP**

The district's uniform complaint procedures (UCP) shall be used to investigate and resolve complaints regarding the following programs and activities:

1. Accommodations for pregnant and parenting students (Education Code 46015)

2. Adult education programs (Education Code 8500-8538, 52334.7, 52500-52617)

3. After School Education and Safety programs (Education Code 8482-8484.65)

4. Agricultural career technical education (Education Code 52460-52462)

5. Career technical and technical education and career technical and technical training programs (Education Code 52300-52462)

6. Child care and development programs (Education Code 8200-8498)

7. Compensatory education (Education Code 54400)

8. Consolidated categorical aid programs (Education Code 33315; 34 CFR 299.10-299.12)

EXHIBIT L-028

9. Course periods without educational content, when students in grades 9-12 are assigned to such courses more than once in any semester or in a course the student has previously satisfactorily completed, unless specified conditions are met (Education Code 51228.1-51228.3)

10. Discrimination, harassment (including but not limited to sexual harassment, sexual violence or harassment based on a protected characteristic), intimidation, or bullying in district programs and activities, including in those programs or activities funded directly by or that receive or benefit from any state financial assistance, based on the person's actual or perceived characteristics of race or ethnicity, color, ancestry, nationality, national origin, immigration status, ethnic group identification, age, religion, marital status, pregnancy, parental status, physical or mental disability, medical condition, sex, sexual orientation, gender, gender identity, gender expression, or genetic information, or any other characteristic identified in Education Code 200 or 220, Government Code 11135, or Penal Code 422.55, or based on the person's association with a person or group with one or more of these actual or perceived characteristics (5 CCR 4610)

11. Educational and graduation requirements for students in foster care, homeless students, students from military families, students formerly in a juvenile court school, migrant students, and immigrant students participating in a newcomer program (Education Code 48645.7, 48853, 48853.5, 49069.5, 51225.1, 51225.2)

12. Every Student Succeeds Act (Education Code 52059; 20 USC 6301 et seq.)

13. Local control and accountability plan (Education Code 52075)

14. Migrant education (Education Code 54440-54445)

15. Physical education instructional minutes (Education Code 51210, 51222, 51223)

16. Student fees (Education Code 49010-49013)

17. Reasonable accommodations to a lactating student (Education Code 222)

18. Regional occupational centers and programs (Education Code 52300-52334.7)

19. School plans for student achievement as required for the consolidated application for specified federal and/or state categorical funding (Education Code 64001)

20. School safety plans (Education Code 32280-32289)

21. School site councils as required for the consolidated application for specified federal and/or state categorical funding (Education Code 65000)

22. State preschool programs (Education Code 8235-8239.1)

23. State preschool health and safety issues in license-exempt programs (Education Code 8235.5)

24. Any complaint alleging retaliation against a complainant or other participant in the complaint process or anyone who has acted to uncover or report a violation subject to this policy

25. Any other state or federal education program the Superintendent of Public Instruction or designee deems appropriate.

**Scope and Definitions Related to Unlawful Discrimination Complaints**

The district will review and address any report or complaint of unlawful discrimination involving a student, employee or third party against another student, employee or third party. Specifically:

a. Any sexual harassment or sexual violence report or complaint involving a student complainant or a student respondent shall be addressed through BP 5145.7 and the Uniform Complaint Procedures. Any other report or complaint of unlawful discrimination involving a student complainant or a student respondent shall be addressed through BP/AR 5145.3 and the Uniform Complaint Procedures.

EXHIBIT L-029

b. Any unlawful discrimination report or complaint, including sexual harassment or sexual violence complaints, between employees or between employees and third parties, but **not** involving student complainants or student respondents, shall be addressed through BP/AR 4119.11/4219.11/4319.11 and AR 4031.

c. Any unlawful discrimination report or complaint, including sexual harassment or sexual violence complaints, between third parties which took place in the educational setting shall be referred to the District Compliance Officer to determine how to appropriately address the complaint.

A "report" or "complaint" is defined as any oral or written communication to a school district employee or administrator which alleges behavior or misconduct that may constitute unlawful discrimination. A report or complaint may include an oral report, an email, a text message or other message conveyed to a school district employee or administrator. The report or complaint does not have to be on a particular form or use specific words to identify the law which may have been violated.

A "third party" is defined as someone who is connected to the school or the district for educational, business or extra-curricular purposes. For example, a third party may include a vendor; volunteer; coach; or other person who is on school or district grounds during the hours of operation or who is present in the educational setting.

"Educational setting" includes all educational programs and activities of the school or district, including all the academic, educational, extracurricular, athletic, and other programs and activities of the school, whether those programs or activities take place in a school's facilities, on a school bus, or at a class or training program sponsored by the school at another location.

*(cf. 5145.7 - Sexual Harassment)*
*(cf.4119.11/4219.11/4319.11 - Sexual Harassment)*
*(cf. 0410 - Nondiscrimination in District Programs and Activities)*
*(cf. 4030 - Nondiscrimination in Employment)*
*(cf. 5145.3 - Nondiscrimination/Harassment)*

3. Any complaint alleging district noncompliance with the requirement to provide reasonable accommodation to a lactating student on school campus to express breast milk, breastfeed an infant child, or address other breastfeeding-related needs of the student (Education Code 222)

*(cf. 5146 - Married/Pregnant/Parenting Students)*

4. Any complaint alleging district noncompliance with the prohibition against requiring students to pay fees, deposits, or other charges for participation in educational activities (5 CCR 4610)
*(cf. 3260 - Fees and Charges)*
*(cf. 3320 - Claims and Actions Against the District)*

5. Any complaint alleging district noncompliance with legal requirements related to the implementation of the local control and accountability plan (Education Code 52075)
*(cf. 0460 - Local Control and Accountability Plan)*

6. Any complaint, by or on behalf of any student who is a foster youth, alleging district noncompliance with any legal requirement applicable to the student regarding placement decisions, the responsibilities of the district's educational liaison to the student, the award of credit for coursework satisfactorily completed in another school or district, school transfer, or the grant of an exemption from Board-imposed graduation requirements (Education Code 48853, 48853.5, 49069.5, 51225.1, 51225.2)
*(cf. 6173.1 - Education for Foster Youth)*

7. Any complaint, by or on behalf of a homeless student as defined in 42 USC 11434a, alleging district noncompliance with any requirement applicable to the student regarding the award of credit for coursework satisfactorily completed in another school or district or the grant of an exemption from Board-imposed graduation requirements (Education Code 51225.1, 51225.2)
*(cf. 6173 - Education for Homeless Children)*

EXHIBIT L-030

8. Any complaint alleging district noncompliance with the requirements of Education Code 51228.1 and 51228.2 that prohibit the assignment of a student to a course without educational content for more than one week in any semester or to a course the student has previously satisfactorily completed, without meeting specified conditions (Education Code 51228.3)
*(cf. 6152 - Class Assignment)*

9. Any complaint alleging district noncompliance with the physical education instructional minutes requirement for students in elementary school (Education Code 51210, 51223)
*(cf. 6142.7 - Physical Education and Activity)*

10. Any complaint alleging retaliation against a complainant or other participant in the complaint process or anyone who has acted to uncover or report a violation subject to this policy

11. Any other complaint as specified in a district policy

**Retaliation and Confidentiality**

The Board prohibits any retaliatory behavior or action against any person who reports, testifies about, files a complaint, or otherwise participates in a district complaint, investigation, or grievance process under the UCP. Participation in the complaint process shall not in any way affect the status, grades, or work assignments of the complainant. An individual who believes they have been subjected to retaliation defined herein may also file a complaint under the UCP. The district shall protect all complainants from retaliation. In investigating complaints, the confidentiality of the parties involved shall be protected as required by law. For any complaint alleging retaliation or unlawful discrimination (such as discriminatory harassment, intimidation, or bullying), the Superintendent or designee shall keep the identity of the complainant, and/or the subject of the complaint if different from the complainant, confidential when appropriate and as long as the integrity of the complaint process is maintained, such as when the district has a duty to share parties' identifying information as necessary to gather a response in the complaint, in order to take subsequent corrective action if misconduct is found to have occurred, and/or to conduct ongoing monitoring. When a complainant requests confidentiality, the Principal/designee or the district Compliance Officer shall notify the complainant that the request may limit the district's ability to investigate the harassment or take the necessary action. An intentional breach of a complainant's confidentiality by a student or employee may be considered a violation of this policy or a retaliatory act.

When an allegation that is not subject to UCP is included in a UCP complaint, the district shall refer the non-UCP allegation to the appropriate staff or agency and shall investigate and, if appropriate, resolve the UCP-related allegation(s) through the district's UCP.

The Superintendent or designee shall provide training to district staff to ensure awareness and knowledge of current law and requirements related to UCP, including the steps and timelines specified in this policy and the accompanying administrative regulation.

The Superintendent or designee shall maintain records of all UCP complaints, the investigations of those complaints, and the resolution of the complaints in confidential complaint files for a minimum of two years. All such records shall be maintained and/or destroyed in accordance with applicable state law and district policy.

*(cf. 5125 - Student Records)*
*(cf. 3580 - District Records)*

**Non-UCP Complaints**

The following complaints shall not be subject to the district's UCP but shall be investigated and resolved by the specified agency or through an alternative process:

1. Any complaint alleging child abuse or neglect shall be referred to the County Department of Social Services Protective Services Division or the appropriate law enforcement agency. (5 CCR 4611) However, the District may still be obligated to address and investigate any complaint alleging child abuse or neglect of a student by an employee or third party which took place in the educational setting.

EXHIBIT L-031

2. Any complaint alleging health and safety violations by a child development program shall, for licensed facilities, be referred to Department of Social Services and shall, for licensing-exempt facilities, be referred to the appropriate Child Development regional administrator. (5 CCR 4611)

3. Any complaint alleging employment discrimination or harassment shall be investigated and resolved by the district in accordance with the procedures specified in AR 4030 - Nondiscrimination in Employment, including the right to file the complaint with the California Department of Fair Employment and Housing.

4. Any complaint alleging a violation of a state or federal law or regulation related to special education, a settlement agreement related to the provision of a free appropriate public education, or a due process hearing order shall be submitted to the California Department of Education (CDE) in accordance with AR 6159.1 - Procedural Safeguards and Complaints for Special Education. (5 CCR 3200-3205)

5. Any complaint alleging noncompliance of the district's food service program with laws regarding meal counting and claiming, reimbursable meals, eligibility of children or adults, or use of cafeteria funds and allowable expenses shall be filed with or referred to CDE in accordance with BP 3555 - Nutrition Program Compliance. (5 CCR 15580-15584)

6. Any allegation of discrimination based on race, color, national origin, sex, age, or disability in the district's food service program shall be filed with or referred to the U.S. Department of Agriculture in accordance with BP 3555 - Nutrition Program Compliance. (5 CCR 15582)

7. Any complaint alleging fraud shall be referred to the California Department of Education.

In addition, the district's Williams Uniform Complaint Procedures, AR 1312.4, shall be used to investigate and resolve any complaint related to sufficiency of textbooks or instructional materials, emergency or urgent facilities conditions that pose a threat to the health or safety of students or staff, or teacher vacancies and misassignments. (Education Code 35186)

*(cf. 1312.4 - Williams Uniform Complaint Procedures)*

The district's Williams uniform complaint procedures, AR 1312.4, shall be used to investigate and resolve any complaint related to the following:

1. Sufficiency of textbooks or instructional materials

2. Emergency or urgent facilities conditions that pose a threat to the health or safety of students or staff

3. Teacher vacancies and misassignments

4. Deficiency in the district's provision of instruction and/or services to any student who, by the completion of grade 12, has not passed one or both parts of the high school exit examination *(cf. 1312.4 - Williams Uniform Complaint Procedures)*
Legal Reference:

EDUCATION CODE
200-262.4 Prohibition of discrimination
8200-8498 Child care and development programs
8500-8538 Adult basic education
18100-18203 School libraries
32289 School safety plan, uniform complaint procedure
35186 Williams uniform complaint procedure
37254 Intensive instruction and services for students who have not passed exit exam
41500-41513 Categorical education block grants
48985 Notices in language other than English
49010-49013 Student fees
49060-49079 Student records
49490-49590 Child nutrition programs
52160-52178 Bilingual education programs
52300-52490 Career-technical education

EXHIBIT L-032

52500-52616.24 Adult schools
52800-52870 School-based coordinated programs
54000-54028 Economic impact aid programs
54100-54145 Miller-Unruh Basic Reading Act
54400-54425 Compensatory education programs
54440-54445 Migrant education
54460-54529 Compensatory education programs
56000-56867 Special education programs
59000-59300 Special schools and centers
64000-64001 Consolidated application process

GOVERNMENT CODE
11135 Nondiscrimination in programs or activities funded by state
12900-12996 Fair Employment and Housing Act

CODE OF REGULATIONS, TITLE 5
3080 Application of section
4600-4687 Uniform complaint procedures
4900-4965 Nondiscrimination in elementary and secondary education programs

PENAL CODE
*422.6 Interference with constitutional right or privilege*

UNITED STATES CODE, TITLE 20

1681-1688 Title IX of the Education Amendments of 1972
6301-6577 Title I basic programs
6601-6777 Title II preparing and recruiting high quality teachers and principals
6801-6871 Title III language instruction for limited English proficient and immigrant students
7101-7184 Safe and Drug-Free Schools and Communities Act
7201-7283g Title V promoting informed parental choice and innovative programs
7301-7372 Title V rural and low-income school programs

Management Resources:

WEB SITES
CSBA: http://www.csba.org
California Department of Education: http://www.cde.ca.gov
U.S. Department of Education, Office for Civil Rights: http://www.ed.gov/about/offices/list/ocr/index.html

BP1312-3统一投诉程序Chinese.pdf (193 KB)

BP1312-3ProcedimientosUniformesDeQuejas.pdf (304 KB)

EXHIBIT L-033



| | |
|---|---|
| Book | PAUSD Policies & Regulations |
| Section | 1000 - Community Relations |
| Title | Uniform Complaint Procedures |
| Code | 1312.3 AR |
| Status | Active |
| Adopted | October 10, 2011 |
| Last Revised | May 24, 2022 |
| Prior Revised Dates | August 21, 2018; September 12, 2017; February 11, 2014; August 29, 2012 |

中文版
En Español

Except as the Board of Education may otherwise specifically provide in other Board policies, these Uniform Complaint Procedures shall be used to investigate and resolve complaints alleging (1) unlawful discrimination, including discriminatory harassment, (such as sexual harassment, sexual violence or harassment based on a protected characteristic), intimidation, bullying, and retaliation, and (2) violations of other state and federal laws and regulations. The steps for each type of complaint are explained below.

**District Compliance Officer**

The following individual shall be responsible for receiving and coordinating the District's response to complaints, investigating or delegating the investigation of complaints, and ensuring district compliance with the law:

> **Robert Andrade**
> **Coordinator of Compliance and Legal Affairs**
> **25 Churchill Avenue, Palo Alto, CA 94306**
> **(650) 833-4248**
> **randrade@pausd.org**

The Superintendent or designee shall ensure that the District Compliance Officer and those designated to investigate or otherwise resolve complaints have received training and are knowledgeable about the laws and programs for which they are responsible. This should include knowledge and training about the applicable laws governing the program, including federal and state anti-discrimination laws, the district's grievance procedures, the appropriate steps for investigating and documenting investigations, the applicable legal standards for reaching decisions on such complaints, and appropriate corrective measures. Designated employees may have access to legal counsel as determined by the Superintendent or designee. (*cf. 9124 - Attorney*)

**Avoiding Conflict**

EXHIBIT L-034

The District Compliance Officer, a designee, or an outside consultant shall not be designated to investigate a uniform complaint if that person (1) is named as being involved with the underlying facts of the complaint or (2) has a conflict of interest that would prohibit that person from fairly and impartially investigating the complaint.

For the purposes of an investigation under the Uniform Complaint Procedures, a conflict of interest includes a personal, professional, or financial interest that has the potential to compromise or bias the professional judgment or objectivity of the holder of the interest. The investigator assigned to investigate shall disclose to the Superintendent or designee any potential conflicts of interest, including a relationship or familiarity with the complainant, respondent, and/or individuals who are likely to be witnesses, as well as any interest the investigator might have in the outcome of the matter. Because the Board of Education is obligated to provide and/or hire an investigator for uniform complaints, the act of paying the investigator's salary or fee is not considered to be an impermissible financial conflict of interest.

If the Superintendent or designee determines that an assigned investigator has a conflict of interest, the complaint and investigation shall be delegated to an impartial, trained, and available administrator or outside investigator.

Any complaint filed against or implicating the District Compliance Officer or other assigned investigator may instead be filed with the Superintendent or designee.

**Notifications**

The Superintendent or designee shall annually provide written/online notification of the district's Uniform Complaint Procedures to students, employees, parents/guardians, the district advisory committee, school advisory committees, appropriate private school officials or representatives, and other interested parties. (*5 CCR 4622*)

The district's Uniform Complaint Procedures under Board Policy and Administrative Regulation 1312.3 shall be posted in all district schools and offices, including staff lounges and student government meeting rooms. If 15 percent or more of students enrolled in a particular district school speak a single primary language other than English the district's policy, regulation, forms, and notices concerning uniform complaint procedures shall be translated into that language. (*Education Code 234.1, 48985*) Additionally, when otherwise necessary to provide access to information for limited English proficient students and parents/guardians, as required by federal law, the district's policy, regulation, forms, and notices concerning uniform complaint procedures shall be translated into the student's or parent/guardian's primary language.

The Superintendent or designee shall annually provide written notification of the district's UCP, including information regarding unlawful student fees, local control and accountability plan (LCAP) requirements, and requirements related to the educational rights of foster youth, homeless students, and former juvenile court school students to students, employees, parents/guardians, the district advisory committee, school advisory committees, appropriate private school officials or representatives, and other interested parties. (*Education Code 262.3, 48853, 48853.5, 49013, 49069.5, 51225.1, 51225.2, 52075; 5 CCR 4622*)

*(cf. 0460 - School Plans/Site Councils)*
*cf. 0460 - Local Control and Accountability Plan)*
*(cf. 1220 - Citizen Advisory Committees)*
*(cf. 3260 - Fees and Charges)*
*(cf. 4112.9/4212.9/4312.9 - Employee Notifications)*
*(cf. 5145.6 - Parental Notifications)*
*(cf. 6173 - Education of Homeless Children)*
*(cf. 6173.1 - Education for Foster Youth)*
*(cf. 6173.3 - Education for Juvenile Court School Students)*

The annual notification, complete contact information of the compliance officer(s), and information related to Title IX as required pursuant to Education Code 221.61 shall be posted on the district web site and may be provided through district-supported social media, if available. *(cf. 1113 - District and School Web Sites) (cf. 1114 - District-Sponsored Social Media)*

EXHIBIT L-035

The notice shall:

1. Identify the person(s), position(s), or unit(s) responsible for receiving complaints
2. Explain any civil law remedies that may be available to a victim of discrimination under state or federal discrimination laws, if applicable
3. Describe the appeal process, including, if applicable, a complainant's right to take a complaint directly to the California Department of Education (CDE) or to pursue remedies before civil courts or other public agencies. A respondent to an unlawful discrimination complaint may also file an appeal with the CDE in the same manner as the complainant.
4. Include statements that:
   a. The district has the primary responsibility to ensure compliance with applicable state and federal laws and regulations governing educational programs.
   b. The complaint review shall be completed within 60 calendar days of the district's receipt of the complaint. This time period may be extended by written agreement of the complainant and respondent.
   c. A complaint alleging retaliation or unlawful discrimination, including discriminatory harassment, intimidation, or bullying should be filed not later than six months from the date it occurred or six months from the date the complainant first obtained knowledge of the facts unless the time for filing is extended in writing by the Superintendent or designee for up to 90 calendar days following the expiration of the six month time period, for good cause upon written request by the complainant setting forth the reasons for the extension. (e.g., *5 CCR §4630*.)
   d. A complainant has a right to appeal the district's decision to the CDE by filing a written appeal within 15 calendar days of receiving the district's decision. A respondent to an unlawful discrimination complaint also shall have the right to file an appeal with the CDE in the same manner as the complainant.
   e. The appeal to the CDE shall include a copy of the complaint filed with the district and a copy of the district's decision.
   f. Copies of the district's Uniform Complaint Procedures are available free of charge.
   g. While it is the District's intent to notify a parent/guardian about a Title IX report involving their student, the District must consider any student request not to notify a parent/guardian based on the law.
      (*cf. 5145.6 - Parental Notifications*)
   h. A student enrolled in a public school shall not be required to pay a fee for his/her participation in an educational activity that constitutes an integral fundamental part of the district's educational program, including curricular and extracurricular activities.
   i. The Board is required to adopt and annually update the LCAP in a manner that includes meaningful engagement of parents/guardians, students, and other stakeholders in the development and/or review of the LCAP.
   j. A foster youth shall receive information about educational rights related to his/her educational placement, enrollment in and checkout from school, as well as the responsibilities of the district liaison for foster youth to ensure and facilitate these requirements and to assist the student in ensuring proper transfer of his/her credits, records, and grades when he/she transfers between schools or between the district and another district.
   k. A foster youth, homeless student, or former juvenile court school student who transfers into a district high school or between district high schools as applicable shall be notified of the district's responsibility to: (1) Accept any coursework or part of the coursework that the student has satisfactorily completed in another public school, juvenile court school, or a nonpublic, nonsectarian school or agency, and to issue full or partial credit for the coursework completed (2) Not require the student to retake any course or a portion of a course which he/she has satisfactorily completed in another public school, juvenile court school, or a nonpublic, nonsectarian school or agency (3) If the student has completed his/her second year of high school before the transfer, provide the student information about district-adopted coursework and Board-imposed graduation requirements from which he/she may be exempted pursuant to Education Code 51225.1

**Complaint Procedures/Grievance Procedures**

**I. Complaints Alleging Unlawful Discrimination, Including Discriminatory Harassment, Intimidation and/or Bullying**

EXHIBIT L-036

All complaints alleging unlawful discrimination, including conduct prohibited by the District's Nondiscrimination/Harassment Policy – BP 5145.3, and Sexual Harassment Policy– BP 5145.7, as well as other discriminatory intimidation, harassment, or bullying shall be addressed in accordance with the following procedure and shall be investigated and resolved within 60 calendar days of the district's receipt of the complaint. *(5 CCR 4631)* Such complaints shall be investigated using this procedure regardless of whether the alleged harassment occurred on or off campus.

Recordkeeping: The District Compliance Officer shall maintain a log of complaints received, providing each with a code number and a date stamp. The District Compliance Officer shall also maintain a record of actions taken by the District in response to each complaint. The record shall include documentation of the steps taken during an investigation, including interview summaries and all information required for compliance with 5 CCR 4631 and 4633.

**A. Reports and Complaints:**

A "report" or "complaint" is defined as any oral or written communication to a school district employee or administrator which alleges behavior or misconduct that may constitute unlawful discrimination. A report or complaint may include an oral report, an email, a text message or other message conveyed to a school district employee or administrator. The report or complaint does not have to be on a particular form or use specific words to identify the law which may have been violated.

Any student, parent/guardian, third party, or other individual or organization who believes that an individual or group has been subjected to unlawful discrimination, including discriminatory harassment, intimidation and/or bullying, or who has witnessed such conduct, whether the conduct initially occurred on or off campus, is encouraged to report the conduct to any school district employee or administrator, and/or file a written uniform complaint under these procedures.

The following requirements apply to school district employees or administrators:

**i. Reporting Up**

a. A school district employee who receives a report or complaint of discrimination, including discriminatory harassment, intimidation and/or bullying, shall, within one school day of receiving the report, notify the Principal/designee. In addition, any school district employee who observes any incident of unlawful discrimination, including discriminatory harassment, intimidation and/or bullying involving a student shall, within one school day, report this observation to the Principal/designee, whether or not the victim makes a report.

b. The Principal/designee shall, within one school day of receiving a report or complaint of unlawful discrimination, including discriminatory harassment, intimidation and/or bullying, notify the District Compliance Officer of the report or complaint.

c. When a report or complaint of unlawful discrimination, including discriminatory harassment, intimidation and/or bullying is made against the Principal/designee to whom the report would ordinarily be communicated, the school district employee who receives the report or who observes the incident shall instead report to the District Compliance Officer within one school day.

**ii. Information, Options and Documentation Provided to Reporting Individuals and Complainants**

a. Either the Principal/designee or the District Compliance Officer shall, within one school day of receiving a report or complaint, inform the reporting individual or complainant of the resolution options under these procedures and the differences between these options (such as appeal rights and different types of written outcome.) The options include (1) the right to proceed under the Uniform Complaint Procedures; (2) the option to pursue resolution through an informal resolution process as described below in subsection D; or (3) the right to request that the District not take steps to investigate or pursue the complaint, with the understanding that the District may still have a duty to address the matter after a District-initiated investigation described in subsection E, below, depending on the seriousness of the allegations and the risk of future harm to students or others. If a District-initiated investigation proceeds, the Principal/designee or the District Compliance Officer shall inform the reporting individual or

EXHIBIT L-037

complainant in writing of the District's decision to proceed. After the District has investigated the matter and determined the outcome, the Principal/designee or the District Compliance Officer shall provide a written notice of outcome to the parties who would have been the complainant and respondent. The notice of outcome shall state that the party who would have been the complainant may pursue a Uniform Complaint at a later date, but the District reserves the right to enforce the six to nine month time line constraints for filing a Uniform Complaint as set forth in 5 CCR §4630(b). If a District-initiated investigation does not proceed, the reporting individual or complainant shall be informed of the right to proceed under the Uniform Complaint Procedures at a later time by making a request in writing to the District Compliance Officer.

b. If an individual who wants to proceed and submit the allegations in writing, but is unable to do so due to conditions such as a disability or illiteracy, district staff shall assist the individual in the writing the information related to the allegations. (See, e.g., 5 CCR 4600) The district may offer a Uniform Complaint Form for the complainant to place the uniform complaint in writing.

c. The Principal/designee or District Compliance Officer shall also inform the reporting individual or complainant that the identity of all parties of a complaint shall be kept confidential except when the District has a duty to share the parties' identifying information as necessary to gather a response to the complaint, in order to take subsequent corrective action if misconduct is found to have occurred, and/or to conduct ongoing monitoring.

d. If the reporting individual or complainant insists on not being identified or does not give names of the alleged perpetrators, the individual shall be informed by the Principal/designee or the District Compliance Officer that the request may limit the District's ability to investigate or take other necessary action.

e. This discussion and any decisions based on the discussion shall be reduced to writing and submitted to the reporting individual or complainant. The Principal/designee shall forward a copy of the document to the District Compliance Officer. A copy of the document shall be maintained in a confidential complaint file with the Principal/designee and with the District Compliance Officer.

**B. Interim Measures:**

After a report or complaint is received, the responsible administrator (Principal/designee and/or the District Compliance Officer) shall determine whether interim measures are necessary during and pending the result of an investigation. If interim measures are determined to be necessary, the responsible administrator shall implement measures to stop, prevent or address the effects of the alleged discrimination, including discriminatory intimidation or retaliation, harassment, or bullying during and pending any informal resolution and/or investigation. The interim measures may include actions such as no-contact directives, increased supervision, placing students in separate classes, or transferring a student to a class taught by a different teacher. To the extent possible, interim measures will be implemented in a manner that minimizes the burden on the individual who was the target of the alleged discrimination.

**C. Off-Campus Incidents or Incidents Unrelated to School Activity:**

Though an incident of unlawful discrimination, including discriminatory harassment, intimidation, or bullying may occur off campus or unrelated to school activity, if the effects of the incident result or may result in harassment, intimidation, or bullying at school or at a school activity, which is sufficiently serious to interfere with or limit student(s)' ability to participate in or benefit from the education program, the District Compliance Officer or Principal/designee shall, under these Uniform Complaint Procedures, promptly investigate, determine what occurred, eliminate any harassment, intimidation, or bullying that occurs at school or at a school activity, prevent its recurrence, and address its effects.

**D. Optional Informal Resolution Process at the Site Level:**

Except in complaints alleging sexual violence, when a complaint alleging unlawful discrimination, including discriminatory harassment, intimidation and/or bullying against an individual is submitted under these procedures, the site Principal/designee may, after gathering evidence related to the complaint, engage in informal efforts to resolve the complaint after obtaining the signed, written consent of the complainant, the complainant's parent/guardian, the respondent, and the respondent's parent/guardian. The Principal/designee shall notify the District Compliance Officer that the complainant and respondent

EXHIBIT L-038

have consented to an informal resolution process and submit a copy of the signed consent documents to the District Compliance Officer. The District Compliance Officer shall develop a template for the Principal/designee to use to facilitate written consent by the parties.

Before the parties consent to engage in an informal resolution process, the Principal/designee shall inform the complainant, the respondent and their respective parents/guardians of the following: (1) The complainant or the complainant's parent/guardian will not be asked or required to meet directly with the respondent as part of the informal resolution process; (2) The informal resolution process shall be completed within 10 calendar days of the district's receipt of the complaint; (3) The differences between the informal resolution process and the process set forth under subsections D-H below shall be explained; (4) The right of either party to terminate an informal resolution process at any time and request that the District Compliance Officer proceed with the investigation of the uniform complaint under subsections F-H within the timelines set forth in this AR 1312.3; and (5) the informal resolution process, if successful, will result in a signed, written agreement between the parties which includes a waiver of any appeal rights set forth in AR 1312.3 and acknowledgement that the complainant cannot pursue another Uniform Complaint regarding the same allegations discussed and resolved between the parties.

At the conclusion of 10 calendar days, the informal resolution process shall cease, and the Principal/designee shall create a written report to memorialize the information gathered during the informal process, the procedures used during the informal process, whether an agreement was reached by the parties, and the terms of any agreement. A copy of this report shall be sent to the District Compliance Officer.

If an agreement is reached between the parties, the parties, with the assistance of the Principal, shall reduce the agreement to writing, and the parties shall sign the document only if they agree with the terms of the agreement. The District Compliance Officer shall create an agreement template which the parties shall use to memorialize their agreement. The agreement shall include, among other things, a waiver of appeal rights set forth in AR 1312.3 and a statement that the complainant is precluded from filing another complaint regarding the same allegation(s). The complainant, respondent, their respective parents/guardians and the District Compliance Officer shall receive a copy of the signed agreement. The Principal's written report and the signed agreement shall be maintained in a confidential complaint file with the Principal/designee and with the District Compliance Officer.

If the informal resolution process did not result in an agreement within the 10 calendar days or if the informal process is stopped by either party, the District Compliance Officer shall immediately proceed with the investigation under subsections F-H below. The investigation process shall be concluded within 60 calendar days of the district's receipt of the complaint.

**E. District-Initiated Procedures to Address a Report**

If the Principal/designee and/or the District Compliance Officer has determined to pursue a District-Initiated investigation, the investigation will follow procedures in subsection F, below, except the investigation does not need to be initiated within 10 calendar days of receipt of the report, refusal of the complainant to participate does not dismiss the report or complaint, and the District does not need to re-describe the UCP to the reporting individual or complainant.. In any matter involving discrimination, including discriminatory harassment, intimidation and/or bullying, the expectation is to complete the process within 60 calendar days of the date the district received the initial report. The individuals who would have been the complainant and respondent shall receive a written notice of outcome within the 60 calendar days, unless there is good cause to extend the time, which will be explained to the parties in writing.

**F. Investigation**

**i. Initiation of Investigation**

The District Compliance Officer shall initiate an impartial investigation of an allegation of unlawful discrimination, including discriminatory harassment, intimidation and/or bullying, within five school days of receiving a complaint under this procedure. The time may be extended if informal resolution is undertaken pursuant to subsection D, above. However, in all cases the investigation shall begin within 10

EXHIBIT L-039

calendar days of the district's receipt of the initial complaint unless the District Compliance Officer has confirmed that the complaint has been resolved informally to the satisfaction of complainant, respondent and their respective parents/guardians, under subsection D, above.

When a student is reported to be engaging in unlawful discrimination, including discriminatory harassment, intimidation, and/or bullying, against an individual off campus, the District Compliance Officer shall investigate and document the activity and shall identify specific facts or circumstances that explain the impact or potential impact on school activity, school attendance, or the complainant's educational performance.

If the District Compliance Officer receives an anonymous complaint or media report about alleged unlawful discrimination including discriminatory harassment, intimidation and/or bullying, the District Compliance Officer shall determine whether it is appropriate to pursue an investigation considering the specificity and reliability of the information, the seriousness of the alleged incident, and whether any individuals can be identified who were subjected to the alleged harassment.

A complainant's refusal to provide the district's investigator with documents or other evidence related to the allegations in the complaint, failure or refusal to cooperate in the investigation, or engagement in any other obstruction of the investigation may result in the dismissal of the complaint because of a lack of evidence to support the allegation. (5 CCR 4631)

In accordance with law, the district shall provide the investigator with access to records and/or other information related to the allegations in the complaint. (5 CCR 4631)

The District Compliance Officer shall keep the complaint and allegation(s) confidential, except as necessary to carry out the investigation or take other necessary action. (5 CCR 4964)

## ii. Initial Interview with the Subject of the Complaint:

At the beginning of an investigation, the District Compliance Officer shall describe the uniform complaint procedures to the complainant and the complainant's parent or guardian, and discuss what actions and remedies are being sought in response to the complaint. The complainant shall have an opportunity to describe the incident, identify witnesses who may have relevant information and provide other evidence or information leading to evidence of the alleged conduct.

## iii. Additional Interviews and Gathering of Evidence:

The District Compliance Officer shall interview individuals who have information relevant to the investigation, including, but not limited to, the complainant and, where appropriate, the complainant's parents/guardians, the respondent, anyone who witnessed the reported conduct, and anyone mentioned as having relevant information.

When interviewing the respondent, the District Compliance Officer shall describe the Uniform Complaint Procedures to the respondent and the respondent's parent/guardian, if applicable. The respondent shall have the opportunity to respond to the allegations, identify witnesses who may have relevant information, and provide other evidence or information leading to evidence related to the allegations.

The District Compliance Officer will also locate and review any available records, notes, documents, electronic information or statements related to the complaint and may take other steps such as visiting the location where the conduct is alleged to have taken place.

Information about a complainant's past or current sexual relationship with individuals other than respondent shall be excluded from the investigation process.

When necessary to carry out his/her investigation or to protect student safety, and consistent with federal and state privacy laws, the District Compliance Officer also may discuss the complaint with the Superintendent or designee, the parent/guardian of the respondent if the respondent is a student, a teacher or staff member whose knowledge of the students involved may help in determining the facts, law enforcement and/or child protective services, and district legal counsel or the district's risk manager.

EXHIBIT L-040

Interviews of the complainant, the respondent, and all relevant witnesses are conducted privately, separately, and are confidential. At no time will the complainant and respondent be interviewed together.

Interviews, evidence and other information gathered will be documented and maintained in confidential complaint files. Confidential complaint files shall be maintained for a minimum of two years or as otherwise required by district policy and shall be destroyed in accordance with state law and district policy.
*(cf. 5125 – Student Records)*
*(cf. 3580 – District Records)*

### iv. Factors in Reaching a Determination:

The District Compliance Officer shall apply a "preponderance of the evidence" standard in determining the veracity of the factual allegations in a complaint. The standard is met if the allegation is more likely or not to have occurred.

In reaching a decision about the complaint, the District Compliance Officer may take into account:

a. Statements made by the complainant, the respondent, and other persons with knowledge relevant to the allegations
b. The details, consistency and/or corroboration of each person's account
c. Evidence of how the complainant and respondent reacted to and felt about the incident, if it was found to have occurred
d. Evidence of any past instances of unlawful discrimination, including discriminatory harassment, intimidation and/or bullying or other misconduct by the respondent
e. Evidence that the complainant or respondent filed a complaint or cross-complaint alleging unlawful discrimination, including discriminatory harassment, intimidation and/or bullying which was found to be a knowingly false complaint or cross-complaint or to have included knowingly false statements made by the complainant or respondent.

To judge the severity of the unlawful discrimination, including discriminatory harassment, intimidation and/or bullying, the District Compliance Officer may take into consideration:

a. How the misconduct affected the complainant and/or the complainant's access to education and education programs and activities
b. The type, frequency, and duration of the misconduct
c. The age of complainant and respondent and the nature of the relationship between them
d. The number of persons engaged in the alleged conduct
e. The size of the school, location of the incidents, and context in which they occurred
f. Other incidents of discrimination, harassment, intimidation or bullying at the school

### G. Written Report of Findings and Decision:

Within 60 calendar days of the district's receipt of the complaint, the District Compliance Officer shall conclude the investigation and prepare a written report of findings and decision, as described below. This timeline may be extended by written agreement of the complainant and the respondent.

The district's decision shall be in writing and sent to the complainant and respondent. *(5 CCR 4631)* The decision shall maintain any applicable confidentiality rights of the parties and be issued in consideration of any legal limitations based on such confidentiality.

The district's decision shall be written in English and, when required by Education Code 48985, in the complainant's primary language. Additionally, when otherwise necessary to provide access to information for limited English proficient students and parents/guardians, as required by federal law, the decision shall be translated into the student's or parent/guardian's primary language.

For all complaints, the decision shall include: *(5 CCR 4631)*

a. The findings of fact based on the evidence gathered
b. As to each allegation, the District's conclusion(s) of law
c. Rationale for such conclusion(s)

EXHIBIT L-041

d. Corrective actions, if warranted, which may include consequences imposed on the individual found to have engaged in the discriminatory conduct that relate directly to the complainant, as required by law, such as requiring that the individual found to have engaged in the discrimination stay away from the complainant, prohibiting the individual from attending school for a period of time, or transferring the individual to other classes or another school.

In consultation with district legal counsel, information about the relevant part of a decision may be communicated to a victim who is not the complainant and to other parties who may be involved in implementing the decision or are affected by the complaint, as long as the privacy of the parties is protected. In a complaint alleging unlawful discrimination (such as discriminatory harassment, intimidation, and bullying), notice of the district's decision to the alleged victim shall include information about any sanction to be imposed upon the respondent that relates directly to the alleged victim.

Individual remedies, if warranted, which were offered or provided to the complainant, such as counseling, academic remedies, or other measures taken to eliminate any hostile environment, prevent retaliation and prevent the discrimination from recurring. The remedies offered and provided to the complainant shall not be revealed to the respondent unless required by law or district policy.

Systemic measures the school has taken or will take to eliminate a hostile environment and prevent recurrence, including counseling and academic support services for other affected students, training for faculty and staff, revisions to the school's policies, and campus climate surveys.

e. Notice that the complainant and/or the complainant's parent/guardian should immediately report any reoccurrence of the conduct or retaliation to the District Compliance Officer or Principal/designee. Notice that the respondent and/or the respondent's parent/guardian should also immediately report any retaliation to the District Compliance Officer or Principal/designee.

f. Notice of the complainant's and respondent's right to appeal the district's decision within 15 calendar days to the CDE and procedures to be followed for initiating such an appeal.

Any decision concerning a complaint of discrimination, including discriminatory harassment, intimidation, and/or bullying shall include a notice that the complainant must wait until 60 calendar days have elapsed from the filing of an appeal with the CDE before pursuing state law civil law remedies. *(Education Code 262.3)*

## H. Remedial Action

Remedial action will be designed to end the discriminatory conduct, to prevent its recurrence, and to address its effects on the complainant. Examples of remedial actions, as appropriate, include, but are not limited to, the following:

1. Interventions for the respondent who engaged in the discrimination, such as parent or supervisor notification, discipline (discussed below), counseling, or training.
2. Interventions for the subject of the complaint such as counseling, academic support, and information on how to report further incidents of discrimination.
3. Separating the subject of the complaint and the respondent who engaged in the discrimination, provided the separation does not penalize the subject of the complaint.
4. Follow-up inquiries with the subject of the complaint and witnesses to ensure that the discriminatory conduct has stopped and that they have not experienced any retaliation. Follow-up inquiries with the respondent who engaged in the discrimination to ensure that the respondent understands what behavior is expected and/or appropriate after the investigation.
5. Training or other interventions for the larger school community to ensure that students, staff, and parents understand the types of behavior that constitute discrimination, that the District does not tolerate it, and how to report it.

In addition, the District Compliance Officer shall ensure that the individual who was the target of discrimination and/or the individual's parent/guardian are informed of the procedures for reporting any subsequent problems. The District Compliance Officer shall make follow-up inquiries to see if there have been any new incidents or retaliation and shall keep a record of this information.

## I. Disciplinary Action

EXHIBIT L-042

Students who are found to have engaged in discriminatory conduct may be subject to discipline up to and including expulsion. Disciplinary action may include oral warnings, written warnings, mandatory training, counseling, suspension, transfer, or expulsion for students. Such disciplinary action shall be in accordance with Board Policy, Administrative Regulation and state law. Suspension and recommendations for expulsion shall follow applicable law.

Staff members who are found to have engaged in discriminatory conduct toward students shall be subject to discipline up to and including dismissal. Disciplinary action may include oral warnings, written warnings, mandatory training, counseling, suspension, transfer, demotion, or termination of employees. Such disciplinary action shall be determined by site and District Administration in accordance with applicable policies, laws, and/or collective bargaining agreements.
*(cf. AR 4218 – Dismissal/Suspension/Disciplinary Action; Education Code 44932 et seq.)*

In identifying appropriate disciplinary action, repeated incidents and/or multiple victims will result in more severe penalties.

Individuals who knowingly file false complaints of discrimination, including discriminatory harassment, intimidation, and/or bullying or give false statements in an investigation shall be subject to discipline up to and including suspension, expulsion, and or dismissal, as shall any individual who is found to have retaliated against another in violation of this policy.

## II. Complaints Alleging Noncompliance with Other Federal or State Laws

A complaint alleging district violation or noncompliance with federal or state laws or regulations governing specific educational programs, such as adult education programs, consolidated categorical aid programs, migrant education, career technical and technical education and training programs, child care and development programs, child nutrition programs, and special education programs may be filed by any individual, public agency, or organization. *(5 CCR 4630)*

Any complaint alleging noncompliance with the law regarding the prohibition against requiring students to pay student fees, deposits, and charges or any requirement related to the LCAP may also be filed under this procedure or may be filed anonymously if the complaint provides evidence, or information leading to evidence, to support an allegation of noncompliance. A complaint about a violation of the prohibition against the charging of unlawful student fees may be filed with the principal of the school or with the Superintendent or designee. However, any such complaint shall be filed no later than one year from the date the alleged violation occurred. (*Education Code 49013, 52075; 5 CCR 4630)*

If a complaint alleging noncompliance with federal or state laws or regulations governing specific educational programs or the laws regarding student fees, deposits, and other charges, physical education instructional minutes for students in elementary schools, or any requirement related to the LCAP is found to have merit, the district shall provide a remedy to all affected students and parents/guardians, subject to procedures established by regulation of the State Board of Education. *(Education Code 49013, 51223, 52075.)*

For complaints alleging noncompliance with the laws regarding student fees, the district shall attempt in good faith, by engaging in reasonable efforts, to identify and fully reimburse all affected students and parents/guardians who paid the unlawful student fees within one year prior to the filing of the complaint. *Education Code 49013 and 5 CCR 4600.*

## Appeals to the California Department of Education

Any complainant who is dissatisfied with the district's investigation report/decision about a complaint regarding any specified federal or state educational program subject to UCP may file an appeal in writing with CDE within 30 calendar days of receiving the district's investigation report. (5 CCR 4632)

In any complaint alleging unlawful discrimination including discriminatory harassment, (such as sexual harassment, sexual assault, or harassment based on a protected characteristic such as gender), intimidation or bullying, the respondent also shall have the right to file an appeal with the CDE in the same manner as the complainant if the respondent is dissatisfied with the district's investigation report/decision.

EXHIBIT L-043

The appeal shall be sent to CDE with a copy of the locally filed complaint and a copy of the district's investigation report/decision for that complaint. The complainant shall specify and explain the basis for the appeal, including at least one of the following: (5 CCR 4632)

1. The district failed to follow its complaint procedures.
2. Relative to the allegations of the complaint, the district's investigation report lacks material findings of fact necessary to reach a conclusion of law.
3. The material findings of fact in the district's investigation report are not supported by substantial evidence.
4. The legal conclusion in the district's investigation report is inconsistent with the law.
5. In a case in which the district found noncompliance, the corrective actions fail to provide a proper remedy.

Upon notification by CDE that the district's investigation report has been appealed, the Superintendent or designee shall forward the following documents to CDE within 10 days of the date of notification: (5 CCR 4633)

1. A copy of the original complaint
2. A copy of the district's investigation report
3. A copy of the investigation file including, but not limited to, all notes, interviews and documents submitted by the parties or gathered by the investigator
4. A report of any action taken to resolve the complaint
5. A copy of the district's UCP (BP 1312.3 and AR 1312.3)
6. Other relevant information requested by CDE

The district's failure to provide a timely and complete response may result in the CDE ruling on the appeal without considering information from the district.

Any confidential information or pupil information in the investigative file shall remain confidential and shall not be disclosed by the CDE, to the extent permitted by law. (5 CCR 4633)

If notified by CDE that the district's investigation report failed to address allegation(s) raised by the complaint, the district shall, within 20 days of the notification, provide CDE and the appellant with an amended investigation report that addresses the allegation(s) that were not addressed in the original investigation report. The amended report shall also inform the appellant of the right to separately appeal the amended report with respect to the allegation(s) that were not addressed in the original report. (5 CCR 4632)

**Civil Law Remedies**

A complainant may pursue available civil law remedies outside of the district's complaint procedures. Complainants may seek assistance from mediation centers or public/private interest attorneys. Civil law remedies that may be imposed by a court include, but are not limited to, injunctions and restraining orders.

For complaints alleging discrimination, including discriminatory harassment, intimidation, bullying, or sexual harassment based on state law, a complainant shall wait until 60 calendar days have elapsed from the filing of an appeal with the CDE before pursuing civil law remedies, provided the district has appropriately and in a timely manner apprised the complainant of the right to file a complaint in accordance with 5 CCR 4622. The moratorium does not apply to injunctive relief and to discrimination complaints based on federal law.

Complaints alleging discrimination based on race, color, national origin, sex/gender, disability or age may also be filed with the U.S. Department of Education, Office for Civil Rights. Instructions for filing a complaint can be found at https://www2.ed.gov/about/offices/list/ocr/docs/howto.html. Such complaints must generally be filed within 180 calendar days of the alleged discrimination.

AR1312-3统一投诉程序Chinese.pdf (198 KB)

EXHIBIT L-044

AR1312-3ProcedimientosUniformesDeQuejas.pdf (314 KB)

EXHIBIT L-045

# EXHIBIT M

# Cal. Code Regs. tit. 2 § 11017.1

Section 11017.1 - Consideration of Criminal History in Employment Decisions

**(a)** Prohibition of Consideration of Criminal History Prior to a Conditional Offer of Employment. Except in the circumstances addressed in subsection (a)(4) below, employers and other covered entities ("employers" for purposes of this section) are prohibited from inquiring into, considering, distributing, or disseminating information related to the criminal history of an applicant until after the employer has made a conditional offer of employment to the applicant.

**(1)** Prohibited consideration under this subsection includes, but is not limited to, inquiring about criminal history through an employment application, background check, or internet searches.

**(2)** Employers are prohibited from including statements in job advertisements, postings, applications, or other materials that no persons with criminal history will be considered for hire, such as "No Felons" or "Must Have Clean Record."

**(3)** Employers who violate the prohibition on inquiring into criminal history prior to making a conditional offer of employment may not, after extending a conditional offer of employment, use an applicant's failure to disclose criminal history prior to the conditional offer as a factor in subsequent employment decisions, including denial of the position conditionally offered.

**(4)** The prohibition against inquiring about or using any criminal history before a conditional offer of employment has been made does not apply in the following circumstances (though use of such criminal history, either during the application process or during employment, is still subject to the requirements in subsections (b) and (d)-(g)):

**(A)** If the position is one for which an employer is otherwise required by law to conduct a conviction history background check where the employer is a state or local agency;

**(B)** If the position is with a criminal justice agency, as defined in Section 13101 of the Penal Code;

**(C)** If the position is as a Farm Labor Contractor, as described in Section 1685 of the Labor Code; or

**(D)** If the position is one that an employer or an employer's agent is required by any state, federal, or local law to conduct criminal background checks for employment purposes or to restrict employment based on criminal history. Federal law, for purposes of this provision, includes rules or regulations promulgated by a self-regulatory organization as defined in Section 3(a)(26) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(26).

**(5)** For the exemptions set forth in subsection (a)(4)(A) and (a)(4)(D) to apply, the employer or the employer's agent must be required by law to conduct the criminal



1

background check. A state, federal, or local law requiring another entity, such as an occupational licensing board, to conduct a criminal background check will not exempt an employer from the prohibitions set forth in this subsection and other requirements of this section.

**(6)** If an applicant raises their criminal history voluntarily prior to receiving a conditional offer, the employer must not consider any information the employer is prohibited from considering under subsection (b). In addition, an employer is prohibited from considering any other conviction history information until after making a conditional offer of employment, unless subsection (a)(4) applies.

**(b)** Prohibition of Consideration of Certain Types of Criminal History. Employers are prohibited from inquiring into, considering, distributing, or disseminating information regarding the following types of criminal history prior to making a conditional offer, after a conditional offer has been made, and in any other subsequent employment decisions such as decisions regarding promotion, training, discipline, lay-off, and termination:

**(1)** An arrest or detention that did not result in conviction (Labor Code section 432.7 (see limited exceptions in subdivisions (a)(1) for an arrest for which the employee or applicant is out on bail or on their own recognizance pending trial and (f)(1) for specified positions at health facilities); Government Code section 12952);

**(2)** Referral to or participation in a pretrial or post-trial diversion program (Labor Code section 432.7 and Government Code section 12952);

   **(A)** While employers are prohibited from considering referral to or participation in a pretrial or post-trial diversion program, it is permissible to consider these programs as evidence of rehabilitation or mitigating circumstances after a conditional offer has been made if offered by the applicant as evidence of rehabilitation or mitigating circumstances.

   **(B)** While employers are prohibited from considering referral to or participation in a pretrial or post-trial diversion program, until a pretrial or post-trial diversion program is completed and the underlying pending charges or conviction dismissed, sealed, or eradicated, employers may still consider the conviction or pending charges themselves after a conditional offer is made.

**(3)** A conviction that has been judicially dismissed or ordered sealed, expunged or statutorily eradicated pursuant to law (e.g., juvenile offense records sealed pursuant to Welfare and Institutions Code section 389 and Penal Code sections 851.7 or 1203.45) or any conviction for which the person has received a full pardon or has been issued a certificate of rehabilitation (Id.);

**(4)** An arrest, detention, processing, diversion, supervision, adjudication, or court disposition that occurred while a person was subject to the process and jurisdiction of juvenile court law (Labor Code section 432.7); and

**(5)** A non-felony conviction for possession of marijuana that is two or more years old (Labor Code section 432.8).



**(6)** In addition to the limitations provided in subsections (b)(1)-(5), employers that obtain investigative consumer reports such as background checks are also subject to the requirements of the Fair Credit Reporting Act (15 U.S.C. § 1681 et seq.) and the California Investigative Consumer Reporting Agencies Act (Civil Code section 1786 et seq.).

**(7)** Employers may also be subject to local laws or city ordinances that provide additional limitations.

**(c)** Requirements if an Employer Intends to Deny an Applicant the Employment Conditionally Offered Because of the Applicant's Conviction History.

**(1)** Initial Individualized Assessment. If an employer intends to deny an applicant the employment position they were conditionally offered based solely or in part on the applicant's conviction history, the employer must first conduct an individualized assessment -- a reasoned, evidence-based determination of whether the applicant's conviction history has a direct and adverse relationship with the specific duties of the job that justify denying the applicant the position.

**(A)** The standard for determining what constitutes a direct and adverse relationship that justifies denying the applicant the position is the same standard described in subsection (f)(4).

**(i)** An applicant's possession of a benefit, privilege, or right required for the performance of a job by a licensing, regulatory, or government agency or board is probative of the applicant's conviction history not being directly and adversely related to the specific duties of that job.

**(B)** The individualized assessment must include, at a minimum, consideration of the following factors:

**(i)** The nature and gravity of the offense or conduct. Consideration of this factor may include but is not limited to:

**(I)** The specific personal conduct of the applicant that resulted in the conviction;

**(II)** Whether the harm was to property or people;

**(III)** The degree of the harm (e.g., amount of loss in theft);

**(IV)** The permanence of the harm;

**(V)** The context in which the offense occurred;

**(VI)** Whether a disability, including but not limited to a past drug addiction or mental impairment, contributed to the offense or conduct, and if so, whether the likelihood of harm arising from similar conduct could be sufficiently mitigated or eliminated by a reasonable accommodation, or whether the disability has been mitigated or eliminated by treatment or otherwise;

**(VII)** Whether trauma, domestic or dating violence, sexual assault, stalking, human trafficking, duress, or other similar factors contributed to the offense or conduct;



and/or

**(VIII)** The age of the applicant when the conduct occurred.

**(ii)** The time that has passed since the offense or conduct and/or completion of the sentence. Consideration of this factor may include but is not limited to:

**(I)** The amount of time that has passed since the conduct underlying the conviction, which may significantly predate the conviction itself; and/or

**(II)** When the conviction led to incarceration, the amount of time that has passed since the applicant's release from incarceration.

**(iii)** The nature of the job held or sought. Consideration of this factor may include but is not limited to:

**(I)** The specific duties of the job;

**(II)** Whether the context in which the conviction occurred is likely to arise in the workplace; and/or

**(III)** Whether the type or degree of harm that resulted from the conviction is likely to occur in the workplace.

**(C)** To the extent that any evidence of rehabilitation or mitigating circumstances, as described in subsections (c)(2)(D)(i)-(ii), is voluntarily provided by the applicant, or by another party at the applicant's request, before or during the initial individualized assessment, that evidence must be considered as part of the initial individualized assessment. In doing so, an employer may consider, but is not limited to considering, the factors set forth in subsection (c)(1)(B) and subsection (c)(3) as they relate to the evidence of rehabilitation or mitigating circumstances.

**(2)** Notice of Preliminary Decision and Opportunity for Applicant Response. If, after conducting an initial individualized assessment, the employer makes a preliminary decision that the applicant's conviction history disqualifies the applicant from the employment conditionally offered, the employer shall notify the applicant of the preliminary decision in writing. The written notice to the applicant may, but is not required to, justify or explain the employer's reasoning for making the decision. However, the notice to the applicant must include all of the following:

**(A)** Notice of the disqualifying conviction or convictions that are the basis for the preliminary decision to rescind the offer.

**(B)** A copy of the conviction history report utilized or relied on by the employer, if any (such reports include, but are not limited to: consumer reports, credit reports, public records, results of internet searches, news articles, or any other writing containing information related to the conviction history that was utilized or relied upon by the employer).

**(C)** Notice of the applicant's right to respond to the notice before the preliminary decision rescinding the offer of employment becomes final.



4

**(D)** An explanation informing the applicant that, if the applicant chooses to respond, the response may include submission of either or both of the following types of evidence: evidence challenging the accuracy of the conviction history report that is the basis for the preliminary decision to rescind the offer, or evidence of rehabilitation or mitigating circumstances.

**(i)** Evidence of rehabilitation or mitigating circumstances may include, but is not limited to, the items listed in paragraphs (I)-(X) below. Any such evidence of rehabilitation or mitigating circumstances is optional and may only be voluntarily provided by the applicant or by another party at the applicant's request.

**(I)** The length and consistency of employment history before and after the offense or conduct;

**(II)** The facts or circumstances surrounding the offense or conduct;

**(III)** The applicant's current or former participation in self-improvement efforts, including but not limited to school, job training, counseling, community service, and/or a rehabilitation program, including in-custody programs;

**(IV)** Whether trauma, domestic or dating violence, sexual assault, stalking, human trafficking, duress, or other similar factors contributed to the offense or conduct;

**(V)** The age of the applicant when the conduct occurred;

**(VI)** Whether a disability, including but not limited to a past drug addiction or mental impairment, contributed to the offense or conduct, and, if so, whether the likelihood of harm arising from similar conduct could be sufficiently mitigated or eliminated by a reasonable accommodation, or whether the disability has been mitigated or eliminated by treatment or otherwise;

**(VII)** The likelihood that similar conduct will recur;

**(VIII)** Whether the applicant is bonded under a federal, state, or local bonding program;

**(IX)** The fact that the applicant is seeking employment; and/or

**(X)** Successful completion, or compliance with the terms and conditions, of probation or parole.

**(ii)** Documentary evidence may include, but is not limited to, the items listed in paragraphs (I)-(V) below. Any such documentary evidence is optional and may only be voluntarily provided by the applicant or by another party at the applicant's request.

**(I)** Certificates or other documentation of participation in, enrollment in, or completion of an educational, vocational, training, counseling, community service, or rehabilitation program, including in-custody programs;

**(II)** Letters from current or former teachers, counselors, supervisors, co-workers, parole or probation officers, or others who know the applicant;



**(III)** Police reports, protective orders, and/or documentation from healthcare providers, counselors, case managers, or victim advocates who can attest to the applicant's status as a survivor of domestic or dating violence, sexual assault, stalking, or comparable offenses;

**(IV)** Documentation confirming the existence of a disability; and/or

**(V)** Any other document demonstrating rehabilitation or mitigating circumstances.

**(iii)** An employer is prohibited from the following actions:
**(I)** Refusing to accept additional evidence voluntarily provided by an applicant, or by another party at the applicant's request, at any stage of the hiring process (including prior to making a preliminary decision to rescind the applicant's job offer);

**(II)** Requiring an applicant to submit any of the additional evidence described in this subsection at any time in the hiring process;

**(III)** Requiring an applicant to provide a specific type of documentary evidence (e.g., a police report as evidence of domestic or dating violence), or disqualifying an applicant from the employment conditionally offered for failing to provide any specific type of documents or other evidence;

**(IV)** Requiring an applicant to disclose their status as a survivor of domestic or dating violence, sexual assault, stalking, or comparable statuses; and/or

**(V)** Requiring an applicant to produce medical records and/or disclose the existence of a disability or diagnosis.

**(E)** Notice of the deadline for the applicant to respond, if the applicant chooses to do so.
**(i)** The deadline for providing a response must be at least five business days from the date of receipt of the notice. An employer may offer an applicant more than five business days to respond to the notice regarding its preliminary decision.

**(ii)** If notice is transmitted through a format that does not provide a confirmation of receipt, such as a written notice mailed by an employer without tracking delivery enabled, the notice shall be deemed received five calendar days after the mailing is deposited for delivery for California addresses, ten calendar days after the mailing for addresses outside of California, and twenty calendar days after mailing for addresses outside of the United States.

**(iii)** If notice is transmitted through email, the notice shall be deemed received two business days after it is sent.

**(F)** If the applicant timely notifies the employer in writing that the applicant disputes the accuracy of the conviction history being relied upon and that the applicant is taking specific steps to obtain evidence supporting the applicant's assertion, then the applicant



shall be permitted no fewer than five additional business days to respond to the notice before the employer's decision to rescind the employment offer becomes final.

**(3)** Reassessment. The employer shall consider any information submitted by the applicant before making a final decision regarding whether or not to rescind the conditional offer of employment. When considering evidence of rehabilitation or mitigating circumstances provided by the applicant, or by another party at the applicant's request, the employer may consider, but is not limited to, the following factors, in addition to the factors set forth in subsection (c)(1)(B), as applicable:

**(A)** When the conviction led to incarceration, the applicant's conduct during incarceration, including participation in work and educational or rehabilitative programming and other prosocial conduct;

**(B)** The applicant's employment history since the conviction or completion of sentence;

**(C)** The applicant's community service and engagement since the conviction or completion of sentence, including but not limited to volunteer work for a community organization, engagement with a religious group or organization, participation in a support or recovery group, and other types of civic participation; and/or

**(D)** The applicant's other rehabilitative efforts since the completion of sentence or conviction or mitigating factors not captured in the above subfactors.

**(4)** Final Decision. If the employer makes a final decision to rescind the conditional offer and deny an application based solely or in part on the applicant's conviction history, the employer shall notify the applicant in writing. The employer may, but is not required to, use the sample final notice form available on the Department's website. However, any notice to the applicant must includes the following:

**(A)** The final denial or disqualification decision reached. The employer may also include, but is not required to include, the justification or an explanation of the employer's reasoning for reaching the decision that it did;

**(B)** Any procedure the employer has for the applicant to challenge the decision or request reconsideration; and

**(C)** The right to contest the decision by filing a complaint with the Civil Rights Department.

**(d)** Labor contractors, union hiring halls, and client employers.

**(1)** A labor contractor, union hiring hall, and client employer are governed in the same way by section 11017.1 of these regulations as are other employers.

**(2)** A labor contractor or union hiring hall may not decline to admit a worker to a pool or availability list, discontinue a worker's inclusion in a pool or availability list, or decline to refer a worker to a position with a client employer, because of the worker's criminal history unless the labor contractor or union hiring hall has complied with the procedures and requirements outlined in section 11017.1 of these regulations. To the extent labor



contractors or union hiring halls place applicants into a pool of workers from which individuals may be assigned to a variety of positions, the labor contractors or union hiring halls must still comply with the requirements of section 11017.1, including the individualized assessment of whether any conviction history being considered has a direct and adverse relationship with the specific duties of the jobs for which the applicant may be assigned from the pool or hall.

**(3)** If a labor contractor or union hiring hall re-conducts inquiries into criminal history to maintain the eligibility of workers admitted to a pool or availability list, then it must comply with the procedures and requirements outlined in section 11017.1 of these regulations. When re-conducting an inquiry, labor contractors or union hiring halls cannot satisfy the requirements of subsection (c) if they disqualify a worker from retention in a pool based on conviction history that was already considered and deemed not disqualifying for entry into the pool in the first place unless the decision is based on new material developments such as changes to job duties, legal requirements, or experience or data regarding the particular convictions involved.

**(4)** A client employer may inquire into or consider the conviction history of a worker supplied by a labor contractor or union hiring hall only after extending a conditional offer of employment to the worker and when following the procedures described in subsections (a) - (c), unless the specific position is exempted pursuant to subsection (a)(4). A client employer violates this section by instructing labor contractors or union hiring halls to refer only workers without conviction records, unless exempted by subsection (a)(4).

**(e)** Disparate Treatment. The Act also prohibits employers from treating applicants or employees differently in the course of considering criminal conviction history, or any evidence of rehabilitation or mitigating circumstances, if the disparate treatment is substantially motivated by a basis protected by the Act.

**(f)** Adverse Impact. In addition to the types of criminal history addressed in subsection (b) that employers are explicitly prohibited from inquiring about or considering unless an exception applies, consideration of other forms of criminal convictions, not enumerated above, may have an adverse impact on applicants or employees on a basis protected by the Act, including, but not limited to, gender, race, and national origin.

**(1)** An applicant or employee bears the burden of demonstrating that the policy of considering criminal convictions has an adverse impact on a basis protected by the Act.

**(2)** Consistent with sections 11017 and 11010 of these regulations and the *Uniform Guidelines on Employee Selection Procedures* ( 29 C.F.R. part 1607 (1978)) incorporated by reference in sections 11017(a) and (e), adverse impact includes a substantial disparity in the rate of selection in hiring, promotion, or other employment decisions which works to the disadvantage of groups of individuals on the basis of any characteristics protected by the Act.

**(3)** An adverse impact may be established through the use of statistics or by offering any other evidence that establishes an adverse impact. State- or national-level statistics on conviction records that show a substantial disparity based on any characteristic protected



by the Act are presumptively sufficient to establish an adverse impact. This presumption may be rebutted by a showing that there is a reason to expect a markedly different result after accounting for any particularized circumstances such as the geographic area encompassed by the applicant or employee pool, the particular types of convictions being considered, or the particular job at issue.

**(4)** Establishing "Job-Related and Consistent with Business Necessity."

**(A)** If the policy or practice of considering criminal convictions creates an adverse impact on applicants or employees on a basis protected by the Act, the burden shifts to the employer to establish that the policy is nonetheless justifiable because it is job-related and consistent with business necessity. The policy or practice needs to bear a demonstrable relationship to successful performance on the job and in the workplace and measure the person's fitness for the specific position(s), not merely to evaluate the person in the abstract. In order to establish job-relatedness and business necessity, any employer must demonstrate that the policy or practice is appropriately tailored, taking into account at least the following factors:

**(i)** The nature and gravity of the offense or conduct;

**(ii)** The time that has passed since the offense or conduct and/or completion of the sentence; and

**(iii)** The nature of the job held or sought.

**(B)** Demonstrating that a policy or practice of considering conviction history in employment decisions is appropriately tailored to the job for which it is used as an evaluation factor requires that an employer demonstrate the applicant's or employee's conviction history has a direct and adverse relationship with the specific duties of the job that justify denying the applicant or employee the position.

**(C)** Bright-line conviction disqualification or consideration policies or practices that include conviction-related information that is seven or more years old are subject to a rebuttable presumption that they are not sufficiently tailored to meet the job-related and consistent with business necessity affirmative defense (except if justified by subsection (g) below).

**(D)** An individualized assessment must involve notice to the adversely impacted applicant or employee (before any adverse action is taken) that they have been screened out or otherwise denied an employment opportunity because of a criminal conviction; if more than one conviction appeared on the background report, which conviction(s) were found disqualifying; a reasonable opportunity for the individuals to demonstrate that the exclusion should not be applied due to their particular circumstances; and consideration by the employer as to whether the additional information provided by the individuals or otherwise obtained by the employer warrants an exception to the exclusion and shows that the policy as applied to the applicant or employee is not job -related and consistent with business necessity.



**(E)** Before an employer may take an adverse action such as discharging, laying off, or declining to promote an adversely impacted individual based on conviction history obtained by a source other than the applicant or employee (e.g. through a credit report or internally generated research), the employer must give the impacted individual notice of the disqualifying conviction and a reasonable opportunity to present evidence that the information is factually inaccurate. If the applicant or employee establishes that the record is factually inaccurate, then that information cannot be considered in the employment decision.

**(5)** Less Discriminatory Alternatives. If an employer demonstrates that its policy or practice of considering conviction history is job-related and consistent with business necessity, adversely impacted employees or applicants may still prevail under the Act if they can demonstrate that there is a less discriminatory policy or practice that serves the employer's goals as effectively as the challenged policy or practice, such as a more narrowly targeted list of convictions or another form of inquiry that evaluates job qualification or risk as accurately without significantly increasing the cost or burden on the employer.

**(g)** Compliance with Federal or State Laws, Regulations, or Licensing Requirements Requiring Consideration of Criminal History. In some instances, employers are subject to federal or state laws or regulations that prohibit individuals with certain criminal records from holding particular positions or occupations or mandate a screening process employers are required or permitted to utilize before employing individuals in such positions or occupations (e.g., 21 U.S.C. § 830(e)(1)(G); Labor Code sections 432.7). Examples include, but are not limited to, government agencies employing individuals as peace officers, employers employing individuals at health facilities where they will have regular access to patients, and employers employing individuals at health facilities or pharmacies where they will have access to medication or controlled substances. Some federal and state laws and regulations make criminal history a determining factor in eligibility for occupational licenses (e.g., 49 U.S.C. § 31310). Compliance with federal or state laws or regulations that mandate particular criminal history screening processes or requiring that an employee or applicant possess or obtain any required occupational licenses constitute rebuttable defenses to an adverse impact claim under the Act.

**(h)** Claims under the Fair Chance Act, codified at Government Code section 12952, are subject to the procedures set forth in Article 1 of Chapter 7 of the Act, including Government Code section 12965, and the Department's procedural regulations. An individual may file a complaint for investigation by the Department or may obtain an immediate right-to-sue notice.

**(i)** Employers Seeking the Work Opportunity Tax Credit. An employer who wishes to claim the Work Opportunity Tax Credit ("WOTC") provided for under federal law is not exempt from this section or Section 12952 of the Act.

**(1)** An employer may require an applicant to complete IRS form 8850 ("Pre-Screening Notice and Certification Request for the Work Opportunity Credit"), as revised March 2016, or its equivalent, before a conditional offer is made, so long as the information gathered is used solely for the purpose of applying for the WOTC. In particular, no



applicant may be asked the basis of their qualification for the WOTC other than in the form of questions that do not encourage or force an applicant to identify themselves as a person who has been convicted of a felony or released from prison following a felony conviction rather than as a person who qualifies for the WOTC under one of the several bases listed in Question 2 on form 8850. Information regarding an applicant's criminal history obtained from the applicant's form 8850 may only be considered as otherwise provided by law.

**(2)** An employer may require an applicant to complete U.S. Department of Labor Employment and Training Administration form 9061 ("Individual Characteristics Form (ICF) Work Opportunity Tax Credit"), as revised November 2016, or its equivalent, only after a conditional offer has been made. Information regarding an applicant's criminal history obtained from the applicant's form 9061 may only be considered as otherwise provided by law.

**(3)** An employer must maintain any forms, documents, or information used to complete the forms described in this subsection in confidential files separate from the applicant's general personnel file and shall not use or disseminate these forms, documents, or information for any purpose other than applying for the WOTC.

**(j)** Definitions. For purposes of section 11017.1 of these regulations only:
**(1)** "Applicant" includes, in addition to the individuals within the scope of the general definition in section 11008(a) of these regulations, individuals who have been conditionally offered employment, even if they have commenced employment when the employer undertakes a post-conditional offer review and consideration of criminal history; existing employees who have applied or indicated a specific desire to be considered for a different position with their current employer; and an existing employee who is subjected to a review and consideration of criminal history because of a change in ownership, management, policy, or practice. An employer cannot evade the requirements of Government Code section 12952 or this regulation by having an individual lose their status as an "applicant" by working before undertaking a post-conditional offer review of the individual's criminal history.

**(2)** "Employer" includes a labor contractor and a client employer; any direct and joint employer; any entity that evaluates the applicant's conviction history on behalf of an employer, or acts as an agent of an employer, directly or indirectly; any staffing agency; and any entity that selects, obtains, or is provided workers from a pool or availability list.

**(3)** "Client employer" means a business entity, regardless of its form, that selects workers from a pool or availability list, or obtains or is provided workers to perform labor within its usual course of business from a labor contractor.

**(4)** "Labor contractor" means an individual or entity, either with or without a contract, which supplies a client employer with, or maintains a pool or availability list of, workers to perform labor within the client employer's usual course of business. This definition is not intended to include Farm Labor Contractors.



**(5)** "Hiring hall" means an agency or office operated by a union, by an employer and union, or by a state or local employment service, to provide and place employees for specific jobs.

**(6)** "Pool or availability list" means applicants or employees admitted into entry in the hiring hall or other hiring pool utilized by one or more employers and/or provided by a labor contractor for use by prospective employers.

*Cal. Code Regs. Tit. 2, § 11017.1*

1. New section filed 3-27-2017; operative 7-1-2017 (Register 2017, No. 13).

2. Amendment of section and NOTE filed 7-6-2020; operative 10-1-2020 (Register 2020, No. 28).

3. Editorial correction implementing inadvertently omitted replacement of subsection (a) (Register 2023, No. 9).

4. Change without regulatory effect amending subsection (d)(3)(C) filed 3-20-2023 pursuant to section 100, title 1, California Code of Regulations (Register 2023, No. 12).

5. Amendment of section and NOTE filed 7-24-2023; operative 10-1-2023 (Register 2023, No. 30).

*Note: Authority cited: Section 12935(a), Government Code. Reference: Sections 12920, 12921, 12940, 12946 and 12952, Government Code.*

1. New section filed 3-27-2017; operative 7/1/2017 (Register 2017, No. 13).

2. Amendment of section and Note filed 7-6-2020; operative 10/1/2020 (Register 2020, No. 28).

3. Editorial correction implementing inadvertently omitted replacement of subsection (a) (Register 2023, No. 9).

4. Change without regulatory effect amending subsection (d)(3)(C) filed 3-20-2023 pursuant to section 100, title 1, California Code of Regulations (Register 2023, No. 12).

5. Amendment of section and NOTE filed 7-24-2023; operative 10/1/2023 (Register 2023, No. 30).



# EXHIBIT N



# U.S. Equal Employment Opportunity Commission

# Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions under Title VII of the Civil Rights Act

This guidance document was issued upon approval by vote of the U.S. Equal Employment Opportunity Commission.

| | |
|---|---|
| **OLC Control Number:** | EEOC-CVG-2012-1 |
| **Concise Display Name:** | Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions under Title VII of the Civil Rights Act |
| **Issue Date:** | 04-25-2012 |
| **General Topics:** | Race, Color, Sex, National Origin |
| **Summary:** | This document addresses Title VII's application to the |

use of arrest or conviction records in employment decisions.

**Citation:**      Title VII, 29 CFR Part 1601, 29 CFR Part 1606, 29 CFR Part 1607

**Document Applicant:**      Employers, Employees, Applicants, Attorneys and Practitioners, EEOC Staff

**Previous Revision:**      Yes. This document combined and replaced 3 guidance documents from the 1980's.

The contents of this document do not have the force and effect of law and are not meant to bind the public in any way. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies.

| *EEOC Enforcement Guidance* | **Number**<br>915.002<br><br>**Date**<br>4/25/2012 |
|---|---|

1. **SUBJECT**: Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et seq*.

2. **PURPOSE**: The purpose of this Enforcement Guidance is to consolidate and update the U.S. Equal Employment Opportunity Commission's guidance documents regarding the use of arrest or conviction records in employment decisions under Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. § 2000e *et seq.*

3. **EFFECTIVE DATE**: Upon receipt

4. **EXPIRATION DATE**: This Notice will remain in effect until rescinded or superseded.

5. **ORIGINATOR**: Office of Legal Counsel.

# Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964

## Table of Contents

I.  **Summary**

II.  **Introduction**

III.  **Background**

    A.  **Criminal History Records**

    B.  **Employers' Use of Criminal History**

**See Also**

**What You Should Know About the EEOC and Arrest and Conviction**

Exhibit N-003

**Information**

  C. **The EEOC's Interest in Employers' Use of Criminal Records in Employment Screening**

IV. **Disparate Treatment Discrimination and Criminal Records**

V. **Disparate Impact Discrimination and Criminal Records**

  A. **Determining Disparate Impact of Policies or Practices that Screen Individuals Based on Records of Criminal Conduct**

    1. **Identifying the Practice or Policy**

    2. **Determining Disparate Impact**

  B. **Job Related for the Position in Question and Consistent with Business Necessity**

    1. **Generally**

    2. **Arrests**

    3. **Convictions**

    4. **Determining Whether a Criminal Conduct Exclusion Is Job Related and Consistent with Business Necessity**

    5. **Validation**

    6. **Detailed Discussion of the *Green* Factors and Criminal Conduct Screens**

      a. **The Nature and Gravity of the Offense or Conduct**

      b. **The Time that Has Passed Since the Offense, Conduct and/or Completion of the Sentence**

      c. **The Nature of the Job Held or Sought**

**Records (https://www.eeoc.gov/node/130147)**

**Questions and Answers About the EEOC's Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII (https://www.eeoc.gov/node/130197)**

Exhibit N-004

7. **Examples of Criminal Conduct Exclusions that Do Not Consider the _Green_ Factors**

8. **Targeted Exclusions that Are Guided by the _Green_ Factors**

9. **Individualized Assessment**

  C. **Less Discriminatory Alternatives**

VI. **Positions Subject to Federal Prohibitions or Restrictions on Individuals with Records of Certain Criminal Conduct**

  A. **Hiring in Certain Industries**

  B. **Obtaining Occupational Licenses**

  C. **Waiving or Appealing Federally Imposed Occupational Restrictions**

  D. **Security Clearances**

  E. **Working for the Federal Government**

VII. **Positions Subject to State and Local Prohibitions or Restrictions on Individuals with Records of Certain Criminal Conduct**

VIII. **Employer Best Practices**

# I. Summary

- An employer's use of an individual's criminal history in making employment decisions may, in some instances, violate the prohibition against employment discrimination under Title VII of the Civil Rights Act of 1964, as amended.

- The Guidance builds on longstanding court decisions and existing guidance documents that the U.S. Equal Employment Opportunity Commission (Commission or EEOC) issued over twenty years ago.

- The Guidance focuses on employment discrimination based on race and national origin. The Introduction provides information about criminal

records, employer practices, and Title VII.

- The Guidance discusses the differences between arrest and conviction records.

  - The fact of an arrest does not establish that criminal conduct has occurred, and an exclusion based on an arrest, in itself, is not job related and consistent with business necessity. However, an employer may make an employment decision based on the conduct underlying an arrest if the conduct makes the individual unfit for the position in question.

  - In contrast, a conviction record will usually serve as sufficient evidence that a person engaged in particular conduct. In certain circumstances, however, there may be reasons for an employer not to rely on the conviction record alone when making an employment decision.

- The Guidance discusses disparate treatment and disparate impact analysis under Title VII.

  - A violation may occur when an employer treats criminal history information differently for different applicants or employees, based on their race or national origin (disparate treatment liability).

  - An employer's neutral policy (e.g., excluding applicants from employment based on certain criminal conduct) may disproportionately impact some individuals protected under Title VII, and may violate the law if not job related and consistent with business necessity (disparate impact liability).

    - National data supports a finding that criminal record exclusions have a disparate impact based on race and national origin. The national data provides a basis for the Commission to investigate Title VII disparate impact charges challenging criminal record exclusions.

    - Two circumstances in which the Commission believes employers will consistently meet the "job related and consistent with business necessity" defense are as follows:

Exhibit N-006

- The employer validates the criminal conduct exclusion for the position in question in light of the Uniform Guidelines on Employee Selection Procedures (if there is data or analysis about criminal conduct as related to subsequent work performance or behaviors); or

- The employer develops a targeted screen considering at least the nature of the crime, the time elapsed, and the nature of the job (the three factors identified by the court in *Green v. Missouri Pacific Railroad*, 549 F.2d 1158 (8th Cir. 1977)). The employer's policy then provides an opportunity for an individualized assessment for those people identified by the screen, to determine if the policy as applied is job related and consistent with business necessity. (Although Title VII does not require individualized assessment in all circumstances, the use of a screen that does not include individualized assessment is more likely to violate Title VII.).

- Compliance with other federal laws and/or regulations that conflict with Title VII is a defense to a charge of discrimination under Title VII.

- State and local laws or regulations are preempted by Title VII if they "purport[] to require or permit the doing of any act which would be an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-7.

- The Guidance concludes with best practices for employers.

## II. Introduction

The EEOC enforces Title VII of the Civil Rights Act of 1964 (Title VII) which prohibits employment discrimination based on race, color, religion, sex, or national origin.[1] This Enforcement Guidance is issued as part of the Commission's efforts to eliminate unlawful discrimination in employment screening, for hiring or retention, by entities covered by Title VII, including private employers as well as federal, state, and local governments.[2]

In the last twenty years, there has been a significant increase in the number of

Americans who have had contact[3] with the criminal justice system[4] and,
concomitantly, a major increase in the number of people with criminal records
in the working-age population.[5] In 1991, only 1.8% of the adult population had
served time in prison.[6] After ten years, in 2001, the percentage rose to 2.7% (1 in
37 adults).[7] By the end of 2007, 3.2% of all adults in the United States (1 in every
31) were under some form of correctional control involving probation, parole,
prison, or jail.[8] The Department of Justice's Bureau of Justice Statistics
(DOJ/BJS) has concluded that, if incarceration rates do not decrease,
approximately 6.6% of all persons born in the United States in 2001 will serve
time in state or federal prison during their lifetimes.[9]

Arrest and incarceration rates are particularly high for African American and
Hispanic men.[10] African Americans and Hispanics[11] are arrested at a rate that is
2 to 3 times their proportion of the general population.[12] Assuming that current
incarceration rates remain unchanged, about 1 in 17 White men are expected to
serve time in prison during their lifetime;[13] by contrast, this rate climbs to 1 in 6
for Hispanic men; and to 1 in 3 for African American men.[14]

The Commission, which has enforced Title VII since it became effective in 1965,
has well-established guidance applying Title VII principles to employers' use of
criminal records to screen for employment.[15] This Enforcement Guidance
builds on longstanding court decisions and policy documents that were issued
over twenty years ago. In light of employers' increased access to criminal
history information, case law analyzing Title VII requirements for criminal
record exclusions, and other developments,[16] the Commission has decided to
update and consolidate in this document all of its prior policy statements about
Title VII and the use of criminal records in employment decisions. Thus, this
Enforcement Guidance will supersede the Commission's previous policy
statements on this issue.

The Commission intends this document for use by employers considering the
use of criminal records in their selection and retention processes; by
individuals who suspect that they have been denied jobs or promotions, or
have been discharged because of their criminal records; and by EEOC staff who
are investigating discrimination charges involving the use of criminal records in
employment decisions.

Exhibit N-008

# III. Background

The contextual framework for the Title VII analysis in this Enforcement Guidance includes how criminal record information is collected and recorded, why employers use criminal records, and the EEOC's interest in such criminal record screening.

## A. Criminal History Records

Criminal history information can be obtained from a wide variety of sources including, but not limited to, the following:

- Court Records. Courthouses maintain records relating to criminal charges and convictions, including arraignments, trials, pleas, and other dispositions.[17] Searching county courthouse records typically provides the most complete criminal history.[18] Many county courthouse records must be retrieved on-site,[19] but some courthouses offer their records online.[20] Information about federal crimes such as interstate drug trafficking, financial fraud, bank robbery, and crimes against the government may be found online in federal court records by searching the federal courts' Public Access to Court Electronic Records or Case Management/Electronic Case Files.[21]

- Law Enforcement and Corrections Agency Records. Law enforcement agencies such as state police agencies and corrections agencies may allow the public to access their records, including records of complaints, investigations, arrests, indictments, and periods of incarceration, probation, and parole.[22] Each agency may differ with respect to how and where the records may be searched, and whether they are indexed.[23]

- Registries or Watch Lists. Some government entities maintain publicly available lists of individuals who have been convicted of, or are suspected of having committed, a certain type of crime. Examples of such lists include state and federal sex offender registries and lists of individuals with outstanding warrants.[24]

- State Criminal Record Repositories. Most states maintain their own centralized repositories of criminal records, which include records that

are submitted by most or all of their criminal justice agencies, including their county courthouses.[25] States differ with respect to the types of records included in the repository,[26] the completeness of the records,[27] the frequency with which they are updated,[28] and whether they permit the public to search the records by name, by fingerprint, or both.[29] Some states permit employers (or third-parties acting on their behalf) to access these records, often for a fee.[30] Others limit access to certain types of records,[31] and still others deny access altogether.[32]

- The Interstate Identification Index (III). The Federal Bureau of Investigation (FBI) maintains the most comprehensive collection of criminal records in the nation, called the "Interstate Identification Index" (III). The III database compiles records from each of the state repositories, as well as records from federal and international criminal justice agencies.[33]

  The FBI's III database may be accessed for employment purposes by:

  - the federal government;[34]

  - employers in certain industries that are regulated by the federal government, such as "the banking, nursing home, securities, nuclear energy, and private security guard industries; as well as required security screenings by federal agencies of airport workers, HAZMAT truck drivers and other transportation workers";[35] and

  - employers in certain industries "that the state has sought to regulate, such as persons employed as civil servants, day care, school, or nursing home workers, taxi drivers, private security guards, or members of regulated professions."[36]

Recent studies have found that a significant number of state and federal criminal record databases include incomplete criminal records.

- A 2011 study by the DOJ/BJS reported that, as of 2010, many state criminal history record repositories still had not recorded the final dispositions for a significant number of arrests.[37]

- A 2006 study by the DOJ/BJS found that only 50% of arrest records in the

Exhibit N-010

FBI's III database were associated with a final disposition.[38]

Additionally, reports have documented that criminal records may be inaccurate.

- One report found that even if public access to criminal records has been restricted by a court order to seal and/or expunge such records, this does not guarantee that private companies also will purge the information from their systems or that the event will be erased from media archives.[39]

- Another report found that criminal background checks may produce inaccurate results because criminal records may lack "unique" information or because of "misspellings, clerical errors or intentionally inaccurate identification information provided by search subjects who wish to avoid discovery of their prior criminal activities."[40]

Employers performing background checks to screen applicants or employees may attempt to search these governmental sources themselves or conduct a simple Internet search, but they often rely on third-party background screening businesses.[41] Businesses that sell criminal history information to employers are "consumer reporting agencies" (CRAs)[42] if they provide the information in "consumer reports"[43] under the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq*. (FCRA). Under FCRA, a CRA generally may not report records of arrests that did not result in entry of a judgment of conviction, where the arrests occurred more than seven years ago.[44] However, they may report convictions indefinitely.[45]

CRAs often maintain their own proprietary databases that compile information from various sources, such as those described above, depending on the extent to which the business has purchased or otherwise obtained access to data.[46] Such databases vary with respect to the geographic area covered, the type of information included (e.g., information about arrests, convictions, prison terms, or specialized information for a subset of employers such as information about workplace theft or shoplifting cases for retail employers[47]), the sources of information used (e.g., county databases, law enforcement agency records, sex offender registries), and the frequency with which they are updated. They also may be missing certain types of disposition information, such as updated convictions, sealing or expungement orders, or orders for entry into a diversion

program.[48]

## B. Employers' Use of Criminal History Information

In one survey, a total of 92% of responding employers stated that they subjected all or some of their job candidates to criminal background checks.[49] Employers have reported that their use of criminal history information is related to ongoing efforts to combat theft and fraud,[50] as well as heightened concerns about workplace violence[51] and potential liability for negligent hiring.[52] Employers also cite federal laws as well as state and local laws[53] as reasons for using criminal background checks.

## C. The EEOC's Interest in Employers' Use of Criminal Records in Employment Screening

The EEOC enforces Title VII, which prohibits employment discrimination based on race, color, religion, sex, or national origin. Having a criminal record is not listed as a protected basis in Title VII. Therefore, whether a covered employer's reliance on a criminal record to deny employment violates Title VII depends on whether it is part of a claim of employment discrimination based on race, color, religion, sex, or national origin. Title VII liability for employment discrimination is determined using two analytic frameworks: "disparate treatment" and "disparate impact." Disparate treatment is discussed in Section IV and disparate impact is discussed in Section V.

# IV. Disparate Treatment Discrimination and Criminal Records

A covered employer is liable for violating Title VII when the plaintiff demonstrates that it treated him differently because of his race, national origin, or another protected basis.[54] For example, there is Title VII disparate treatment liability where the evidence shows that a covered employer rejected an African American applicant based on his criminal record but hired a similarly situated White applicant with a comparable criminal record.[55]

**Example 1: Disparate Treatment Based on Race.** John, who is White, and

Robert, who is African American, are both recent graduates of State University. They have similar educational backgrounds, skills, and work experience. They each pled guilty to charges of possessing and distributing marijuana as high school students, and neither of them had any subsequent contact with the criminal justice system.

After college, they both apply for employment with Office Jobs, Inc., which, after short intake interviews, obtains their consent to conduct a background check. Based on the outcome of the background check, which reveals their drug convictions, an Office Jobs, Inc., representative decides not to refer Robert for a follow-up interview. The representative remarked to a co-worker that Office Jobs, Inc., cannot afford to refer "these drug dealer types" to client companies. However, the same representative refers John for an interview, asserting that John's youth at the time of the conviction and his subsequent lack of contact with the criminal justice system make the conviction unimportant. Office Jobs, Inc., has treated John and Robert differently based on race, in violation of Title VII.

Title VII prohibits "not only decisions driven by racial [or ethnic] animosity, but also decisions infected by stereotyped thinking . . . ."[56] Thus, an employer's decision to reject a job applicant based on racial or ethnic stereotypes about criminality - rather than qualifications and suitability for the position - is unlawful disparate treatment that violates Title VII.[57]

**Example 2: Disparate Treatment Based on National Origin.** Tad, who is White, and Nelson, who is Latino, are both recent high school graduates with grade point averages above 4.0 and college plans. While Nelson has successfully worked full-time for a landscaping company during the summers, Tad only held occasional lawn-mowing and camp-counselor jobs. In an interview for a research job with Meaningful and Paid Internships, Inc. (MPII), Tad discloses that he pled guilty to a felony at age 16 for accessing his school's computer system over the course of several months without authorization and changing his classmates' grades. Nelson, in an interview with MPII, emphasizes his successful prior work experience, from which he has good references, but also discloses that, at age 16, he pled guilty to breaking and entering into his high school as part of a class prank that caused little damage to school property. Neither Tad nor Nelson had subsequent contact with the criminal

justice system.

The hiring manager at MPII invites Tad for a second interview, despite his record of criminal conduct. However, the same hiring manager sends Nelson a rejection notice, saying to a colleague that Nelson is only qualified to do manual labor and, moreover, that he has a criminal record. In light of the evidence showing that Nelson's and Tad's educational backgrounds are similar, that Nelson's work experience is more extensive, and that Tad's criminal conduct is more indicative of untrustworthiness, MPII has failed to state a legitimate, nondiscriminatory reason for rejecting Nelson. If Nelson filed a Title VII charge alleging disparate treatment based on national origin and the EEOC's investigation confirmed these facts, the EEOC would find reasonable cause to believe that discrimination occurred.

There are several kinds of evidence that may be used to establish that race, national origin, or other protected characteristics motivated an employer's use of criminal records in a selection decision, including, but not limited to:

- Biased statements. Comments by the employer or decisionmaker that are derogatory with respect to the charging party's protected group, or that express group-related stereotypes about criminality, might be evidence that such biases affected the evaluation of the applicant's or employee's criminal record.

- Inconsistencies in the hiring process. Evidence that the employer requested criminal history information more often for individuals with certain racial or ethnic backgrounds, or gave Whites but not racial minorities the opportunity to explain their criminal history, would support a showing of disparate treatment.

- Similarly situated comparators (individuals who are similar to the charging party in relevant respects, except for membership in the protected group). Comparators may include people in similar positions, former employees, and people chosen for a position over the charging party. The fact that a charging party was treated differently than individuals who are not in the charging party's protected group by, for example, being subjected to more or different criminal background

checks or to different standards for evaluating criminal history, would be evidence of disparate treatment.

- Employment testing. Matched-pair testing may reveal that candidates are being treated differently because of a protected status.[58]

- Statistical evidence. Statistical analysis derived from an examination of the employer's applicant data, workforce data, and/or third party criminal background history data may help to determine if the employer counts criminal history information more heavily against members of a protected group.

# V. Disparate Impact Discrimination and Criminal Records

A covered employer is liable for violating Title VII when the plaintiff demonstrates that the employer's neutral policy or practice has the effect of disproportionately screening out a Title VII-protected group and the employer fails to demonstrate that the policy or practice is job related for the position in question and consistent with business necessity.[59]

In its 1971 *Griggs v. Duke Power Company* decision, the Supreme Court first recognized that Title VII permits disparate impact claims.[60] The *Griggs* Court explained that "[Title VII] proscribes . . . practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude [African Americans] cannot be shown to be related to job performance, the practice is prohibited."[61] In 1991, Congress amended Title VII to codify this analysis of discrimination and its burdens of proof.[62] Title VII, as amended, states:

> An unlawful employment practice based on disparate impact is established . . . if a complaining party demonstrates that an employer uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity. . . .[63]

With respect to criminal records, there is Title VII disparate impact liability where the evidence shows that a covered employer's criminal record screening policy or practice disproportionately screens out a Title VII-protected group and the employer does not demonstrate that the policy or practice is job related for the positions in question and consistent with business necessity.

## A. Determining Disparate Impact of Policies or Practices that Screen Individuals Based on Records of Criminal Conduct

### 1. Identifying the Policy or Practice

The first step in disparate impact analysis is to identify the particular policy or practice that causes the unlawful disparate impact. For criminal conduct exclusions, relevant information includes the text of the policy or practice, associated documentation, and information about how the policy or practice was actually implemented. More specifically, such information also includes which offenses or classes of offenses were reported to the employer (e.g., all felonies, all drug offenses); whether convictions (including sealed and/or expunged convictions), arrests, charges, or other criminal incidents were reported; how far back in time the reports reached (e.g., the last five, ten, or twenty years); and the jobs for which the criminal background screening was conducted.[64]  Training or guidance documents used by the employer also are relevant, because they may specify which types of criminal history information to gather for particular jobs, how to gather the data, and how to evaluate the information after it is obtained.

### 2. Determining Disparate Impact

Nationally, African Americans and Hispanics are arrested in numbers disproportionate to their representation in the general population. In 2010, 28% of all arrests were of African Americans,[65] even though African Americans only comprised approximately 14% of the general population.[66] In 2008, Hispanics were arrested for federal drug charges at a rate of approximately three times their proportion of the general population.[67] Moreover, African Americans and Hispanics were more likely than Whites to be arrested, convicted, or sentenced for drug offenses even though their rate of drug use is

similar to the rate of drug use for Whites.[68]

African Americans and Hispanics also are incarcerated at rates disproportionate
to their numbers in the general population. Based on national incarceration
data, the U.S. Department of Justice estimated in 2001 that 1 out of every 17
White men (5.9% of the White men in the U.S.) is expected to go to prison at
some point during his lifetime, assuming that current incarceration rates
remain unchanged.[69] This rate climbs to 1 in 6 (or 17.2%) for Hispanic men.[70]
For African American men, the rate of expected incarceration rises to 1 in 3 (or
32.2%).[71] Based on a state-by-state examination of incarceration rates in 2005,
African Americans were incarcerated at a rate 5.6 times higher than Whites,[72]
and 7 states had a Black-to-White ratio of incarceration that was 10 to1.[73] In
2010, Black men had an imprisonment rate that was nearly 7 times higher than
White men and almost 3 times higher than Hispanic men.[74]

National data, such as that cited above, supports a finding that criminal record
exclusions have a disparate impact based on race and national origin. The
national data provides a basis for the Commission to further investigate such
Title VII disparate impact charges. During an EEOC investigation, the employer
also has an opportunity to show, with relevant evidence, that its employment
policy or practice does not cause a disparate impact on the protected group(s).
For example, an employer may present regional or local data showing that
African American and/or Hispanic men are not arrested or convicted at
disproportionately higher rates in the employer's particular geographic area.
An employer also may use its own applicant data to demonstrate that its policy
or practice did not cause a disparate impact. The Commission will assess
relevant evidence when making a determination of disparate impact, including
applicant flow information maintained pursuant to the Uniform Guidelines on
Employee Selection Procedures,[75] workforce data, criminal history background
check data, demographic availability statistics, incarceration/conviction data,
and/or relevant labor market statistics.[76]

An employer's evidence of a racially balanced workforce will not be enough to
disprove disparate impact. In *Connecticut v. Teal*, the Supreme Court held that a
"bottom line" racial balance in the workforce does not preclude employees
from establishing a prima facie case of disparate impact; nor does it provide
employers with a defense.[77] The issue is whether the policy or practice

Exhibit N-017

deprives a disproportionate number of Title VII-protected individuals of employment opportunities.[78]

Finally, in determining disparate impact, the Commission will assess the probative value of an employer's applicant data. As the Supreme Court stated in *Dothard v. Rawlinson*, an employer's "application process might itself not adequately reflect the actual potential applicant pool since otherwise qualified people might be discouraged from applying" because of an alleged discriminatory policy or practice.[79] Therefore, the Commission will closely consider whether an employer has a reputation in the community for excluding individuals with criminal records. Relevant evidence may come from ex-offender employment programs, individual testimony, employer statements, evidence of employer recruitment practices, or publicly posted notices, among other sources.[80] The Commission will determine the persuasiveness of such evidence on a case-by-case basis.

## B. Job Related For the Position in Question and Consistent with Business Necessity

### 1. Generally

After the plaintiff in litigation establishes disparate impact, Title VII shifts the burdens of production and persuasion to the employer to "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity."[81] In the legislative history of the 1991 Civil Rights Act, Congress referred to *Griggs* and its progeny such as *Albemarle Paper Company v. Moody*[82] and *Dothard*[83] to explain how this standard should be construed.[84] The *Griggs* Court stated that the employer's burden was to show that the policy or practice is one that "bear[s] a demonstrable relationship to successful performance of the jobs for which it was used" and "measures the person for the job and not the person in the abstract."[85] In both *Albemarle*[86] and *Dothard*,[87] the Court emphasized the factual nature of the business necessity inquiry. The Court further stated in *Dothard* that the terms of the exclusionary policy must "be shown to be necessary to safe and efficient job performance."[88]

In a case involving a criminal record exclusion, the Eighth Circuit in its 1975

*Green v. Missouri Pacific Railroad* decision, held that it was discriminatory under Title VII for an employer to "follow[] the policy of disqualifying for employment any applicant with a conviction for any crime other than a minor traffic offense."[89] The Eighth Circuit identified three factors (the *Green* factors") that were relevant to assessing whether an exclusion is job related for the position in question and consistent with business necessity:

- The nature and gravity of the offense or conduct;[90]

- The time that has passed since the offense or conduct and/or completion of the sentence; [91] and

- The nature of the job held or sought.[92]

In 2007, the Third Circuit in *El v. Southeastern Pennsylvania Transportation Authority*[93] developed the statutory analysis in greater depth. Douglas El challenged SEPTA's policy of excluding everyone ever convicted of a violent crime from the job of paratransit driver.[94] El, a 55 year-old African American paratransit driver-trainee, was terminated from employment when SEPTA learned of his conviction for second-degree murder 40 years earlier; the conviction involved a gang fight when he was 15 years old and was his only disqualifying offense under SEPTA's policy.[95] The Third Circuit expressed "reservations" about a policy such as SEPTA's (exclusion for all violent crimes, no matter how long ago they were committed) "in the abstract."[96]

Applying Supreme Court precedent, the *El* court observed that some level of risk is inevitable in all hiring, and that, "[i]n a broad sense, hiring policies . . . ultimately concern the management of risk."[97] Recognizing that assessing such risk is at the heart of criminal record exclusions, the Third Circuit concluded that Title VII requires employers to justify criminal record exclusions by demonstrating that they "accurately distinguish between applicants [who] pose an unacceptable level of risk and those [who] do not."[98]

The Third Circuit affirmed summary judgment for SEPTA, but stated that the outcome of the case might have been different if Mr. El had, "for example, hired an expert who testified that there is a time at which a former criminal is no longer any more likely to recidivate than the average person, . . . [so] there would be a factual question for the jury to resolve."[99] The Third Circuit

reasoned, however, that the recidivism evidence presented by SEPTA's experts, in conjunction with the nature of the position at issue - paratransit driver-trainee with unsupervised access to vulnerable adults - required the employer to exercise the utmost care.[100]

In the subsections below, the Commission discusses considerations that are relevant to assessing whether criminal record exclusion policies or practices are job related and consistent with business necessity. First, we emphasize that arrests and convictions are treated differently.

## 2. Arrests

The fact of an arrest does not establish that criminal conduct has occurred.[101] Arrests are not proof of criminal conduct. Many arrests do not result in criminal charges, or the charges are dismissed.[102] Even if an individual is charged and subsequently prosecuted, he is presumed innocent unless proven guilty.[103]

An arrest, however, may in some circumstances trigger an inquiry into whether the conduct underlying the arrest justifies an adverse employment action. Title VII calls for a fact-based analysis to determine if an exclusionary policy or practice is job related and consistent with business necessity. Therefore, an exclusion based on an arrest, in itself, is not job related and consistent with business necessity.

Another reason for employers not to rely on arrest records is that they may not report the final disposition of the arrest (e.g., not prosecuted, convicted, or acquitted). As documented in Section III.A., *supra*, the DOJ/BJS reported that many arrest records in the FBI's III database and state criminal record repositories are not associated with final dispositions.[104] Arrest records also may include inaccuracies or may continue to be reported even if expunged or sealed.[105]

**Example 3: Arrest Record Is Not Grounds for Exclusion.** Mervin and Karen, a middle-aged African American couple, are driving to church in a predominantly white town. An officer stops them and interrogates them about their destination. When Mervin becomes annoyed and comments that his offense is simply "driving while Black," the officer arrests him for disorderly conduct. The prosecutor decides not to file charges against Mervin, but the arrest remains in

# EXHIBIT O

**PALO ALTO UNIFIED SCHOOL DISTRICT**

25 Churchill Avenue • Palo Alto, CA 94306
Telephone:  (650) 329-3958 • FAX:  (650) 323-5162

**PALO ALTO**
UNIFIED SCHOOL DISTRICT

HUMAN RESOURCES

November 1, 2023

Peter Colombo
642 Bair Island Rd. #1001
Redwood Shores, CA 94063

Re:     <u>NOTICE OF PLACEMENT ON PAID ADMINISTRATIVE LEAVE</u>

Method of Delivery: Regular US Mail and email to *ptrcolombo@yahoo.com*

Dear Mr. Colombo:

On October 26, 2023, the Palo Alto Unified School District ("District") was informed that the California Commission on Teaching Credentialing "CTC" reinstated your credential with an effective date of 10/20/23. Based on the receipt of this information, please be advised that you have been returned to <u>paid administrative leave</u>, commencing 10/23/23, per the terms of the May 24, 2023 "Notice of Placement of Paid Administrative Leave" correspondence.

As previously noted, during this leave, you will continue to receive your usual salary, and health & welfare benefits, if applicable. While on leave, you are to: 1) remain available to return to work at my direction; and 2) remain available by telephone during regular business hours (required to provide the District with a current telephone number where you can be reached during business hours).

In the event that you will be unavailable during regular business hours on a normal workday, you shall notify the District, in advance, and report your unavailability as either sick leave or personal necessity leave, as applicable. You are not authorized to accept any other paid employment during your regular business hours while you are on leave.

Furthermore, as previously directed, you shall not return to any District property, including Greene Middle School, unless authorized to do so in advance by me. You are further directed not to contact any staff during regular school hours or students via email, text, phone, or in person.

A copy of this letter will be placed in your personnel file.  You may submit a written response, which will be attached and placed in your file. Please contact me if you have any questions regarding this correspondence.

Sincerely,

Lisa Hickey
Director of Certificated Human Resources
Palo Alto Unified School District

cc: Personnel File

42911160.1

**PALO ALTO**
UNIFIED SCHOOL DISTRICT    **Legal Department** • 25 Churchill Avenue • Palo Alto • CA • 94306 • (650) 833-4217

**August 31, 2023**
*VIA LET'S TALK AT*
*EVANCNELSON.LAW@GMAIL.COM*

Evan Nelson, Esq.
EVANCNELSON.LAW@GMAIL.COM
1990 N. California Blvd., Floor 8
WALNUT CREEK, CA 9459

**Re:    Additional Response to August 17, 2023 Revised PRA Request**

Dear Mr. Nelson,

This correspondence will serve as the Palo Alto Unified School District's ("District") additional response to your Public Records Act ("PRA") request dated and received by the District on August 7, 2023.  The District provided an initial response on August 17, 2023 and pursuant to Government Code section 7922.535(b), the District extended the timeframe to evaluate the request.  The District responds as follows:

Request # 1

*Peter Colombo and his employment, including but not limited to his entire employment file;*

Response to Request #1

Some documentation responsive to this request is exempt pursuant to California Government Code sections 7923.600 and 7927.705 [see, Evid. Code § 952], including investigations conducted by a local police agency, records compiled for law enforcement purposes, and confidential attorney/client communications.

Aside from these exempt records, the District has attached all records responsive to your request. The District has redacted information such as Social Security numbers, home addresses, birth dates, and telephone numbers pursuant to Government Code sections 7922.200 and 7928.300.

The PRA does not require the District to *create* records; the District's obligation under the CPRA is limited to producing existing records.  *Haynie v. Superior Court,* (2001) 26 Cal.4th 1061, 1075.

Request #2

*Investigations of Peter Colombo, whether conducted by the District Attorney, Palo Alto Unified School District ("PAUSD"), Commission on Teacher Credentialing ("CTC") and/or others;*

Response to Request #2

Any documentation responsive to the request is exempt from disclosure pursuant to Government Code section 7923.600.

Sincerely,

Amanda Bark
Manager of Policy & Compliance

Enclosure(s)

# The Stanford Daily

https://stanforddaily.com/2019/01/31/allegations-of-mishandled-sexual-assault-intensify-case-at-gunn-high-school/

## Allegations of mishandled sexual assault intensify case at Gunn High School



*MELISSA WEYANT / The Stanford Daily*

By [Sean Lee](#)
January 31, 2019

A female student at Gunn High School is seeking legal action to stop the Palo Alto Unified School District (PAUSD) from reducing the punishment on her assailant.

According to a petition filed in Santa Clara County Superior Court, PAUSD's original punishment included banning the attacker from participating in Gunn High School's robotics team, in which the survivor herself is a member. This measure, among others, was meant to keep the two from having any contact.

However, PAUSD — which has been under U.S. Department of Education scrutiny since 2017, when it was accused of failing to comprehensively and promptly respond to sexual harassment reports — informed the survivor's family earlier this month that the attacker would be able to return to the robotics team under the condition that he was accompanied by an escort, and later proposed the attacker and survivor participate in the

robotics team on alternating days.

"The district is essentially asking [the girl] to make an impossible choice — to choose either her safety or her access to education," the survivor's legal team wrote in the petition.

Pending the outcome of the court proceedings, a judge on Friday granted a stay in the case requiring the male student to remain barred from the robotics team.

The survivor's petition also includes details of the alleged assault. The female student briefly dated the male student before he forced her to perform a sexual act in January 2018. In June, the survivor filed a complaint under Title IX after the male student allegedly sent text messages about the assault to her and joked about the assault with others.

While the school did not look into the case because the act in question was said to have taken place off campus, a school investigation did find the male student responsible for sexual harassment. An investigator for the school wrote that even if the sexual act between the male and female students was consensual, the male student's actions would have still been considered sexual harassment.

It is unclear whether the alleged sexual assault was reported to police at any point in time.

"As a school district, our obligation is … to protect the health, safety and well-being of all students," Palo Alto Unified Superintendent Don Austin told the Mercury News. "We have tried really hard to balance the rights and needs of the students involved."

Citing confidentiality laws, Austin declined to comment on details of the district's handling of the case.

*Contact Sean Lee at seanklee 'at' stanford.edu.*

Sean Lee '22 is the desk editor for the University News beat. He is interested in studying Political Science, History, International Relations, the humanities and the intersections between the humanities and STEM. An avid boba connoisseur and adventure seeker, he proudly hails from Arcadia, Los Angeles, California. Contact him at seanklee 'at' stanford.edu.

# EXHIBIT P



**Agenda Item Details**

| | |
|---|---|
| Meeting | Jun 04, 2024 - Regular Board Meeting |
| Category | 1. Call to Order |
| Subject | C. Recess to Closed Session (Aspen Room, 5:45 p.m.) |
| Type | Action |

Anyone wishing to address the Board regarding Closed Session items may do so prior to the beginning of Closed Session. Items listed below may be discussed in Closed Session pursuant to Board Bylaw 9321 . Items marked     are scheduled for discussion at this meeting. All proceedings are reported to the public in open session where action is taken or staff is given direction.

1. ☐ Public Employee Performance Evaluation pursuant to Government Code    54957
2. ☐ Public Employee Employment pursuant to Government Code    54957(b)(1)
3.    Conference with Legal Counsel - Existing Litigation pursuant to Government Code    54956.9(d)(1)
   Case No. 5:24-cv-909
4. ☐ Conference with Legal Counsel - Anticipated Litigation pursuant to Government Code    54956.9(d)(2)
5. ☐ Liability Claims pursuant to Government Code    54956.95
6.    Conference with Labor Negotiators pursuant to Government Code    54957.6
   Agency Designated Representatives: Deputy Superintendent, Chief Business Officer, Superintendent of Schools
   Employee Organizations: California School Employees Association (CSEA)
7.    Conference with Real Property Negotiator pursuant to Government Code    54956.8
   Property: Cubberley Community Center, 4000 Middlefield Rd, Palo Alto, CA 94303
   Agency Negotiator: Don Austin, Trent Bahadursingh, Carolyn Chow
   Negotiating Parties: City of Palo Alto
   Under Negotiation: Real Property
8.    Employee Discipline/Dismissal/Release/Leaves pursuant to Government Code    54957(b)(1)
9. ☐ Student Discipline or Other Confidential Student Matters



**Agenda Item Details**

| | |
|---|---|
| Meeting | May 21, 2024 - Regular Board Meeting |
| Category | 1. Call to Order |
| Subject | C. Recess to Closed Session (Aspen Room, 5:30 p.m.) |
| Type | Action |

Anyone wishing to address the Board regarding Closed Session items may do so prior to the beginning of Closed Session. Items listed below may be discussed in Closed Session pursuant to Board Bylaw 9321. Items √     ] marked are scheduled for discussion at this meeting. All proceedings are reported to the public in open session where action is taken or staff is given direction.

1. Public Employee Performance Evaluation pursuant to Government Code    54957
   Superintendent of Schools
☐ 2. Public Employee Employment pursuant to Government Code    54957(b)(1)
3. Conference with Legal Counsel - Existing Litigation pursuant to Government Code
   54956.9(d)(1)
   Case No. 5:24-cv-909
☐ 4. Conference with Legal Counsel - Anticipated Litigation pursuant to Government Code
   54956.9(d)(2)
☐ 5. Liability Claims pursuant to Government Code    54956.95
6. Conference with Labor Negotiators pursuant to Government Code    54957.6
   Agency Designated Representatives: Deputy Superintendent, Chief Business Officer,
   Superintendent of Schools
   Employee Organizations: Palo Alto Educators Association (PAEA) and California School
   Employees Association (CSEA)
   Non-Represented Employee Group: Palo Alto Management Association (PAMA) and Contracted
   Positions
☐ 7. Conference with Real Property Negotiator pursuant to Government Code    54956.8
☐ 8. Employee Discipline/Dismissal/Release/Leaves pursuant to Government Code    54957(b)(1)
☐ 9. Student Discipline or Other Confidential Student Matters



**Agenda Item Details**

| | |
|---|---|
| Meeting | Apr 23, 2024 - Regular Board Meeting |
| Category | 1. Call to Order |
| Subject | C. Recess to Closed Session (Aspen Room, 5:30 p.m.) |
| Type | Action |

Anyone wishing to address the Board regarding Closed Session items may do so prior to the beginning of Closed Session. Items listed below may be discussed in Closed Session pursuant to Board Bylaw 9321. Items √     ] marked are scheduled for discussion at this meeting. All proceedings are reported to the public in open session where action is taken or staff is given direction.

☐  1.  Public Employee Performance Evaluation pursuant to Government Code     54957
☐  2.  Public Employee Employment pursuant to Government Code     54957(b)(1)
      3.  Conference with Legal Counsel - Existing Litigation pursuant to Government Code
            54956.9(d)(1)
            Student v. Palo Alto Unified School District, OAH Case No. 2023060486
            Colombo v. Palo Alto Unified School District, Austin, et. al., Case No. 5:24-cv-909
      4.  Conference with Legal Counsel - Anticipated Litigation pursuant to Government Code
            54956.9(d)(2)
            One (1) case
☐  5.  Liability Claims pursuant to Government Code     54956.95
      6.  Conference with Labor Negotiators pursuant to Government Code     54957.6
            Agency Designated Representatives: Deputy Superintendent, Chief Business Officer,
            Superintendent of Schools
            Employee Organizations: Palo Alto Educators Association (PAEA) and California School
            Employees Association (CSEA)
            Non-Represented Employee Group: Palo Alto Management Association (PAMA) and Contracted
            Positions
☐  7.  Conference with Real Property Negotiator pursuant to Government Code     54956.8
☐  8.  Employee Discipline/Dismissal/Release/Leaves pursuant to Government Code     54957(b)(1)
☐  9.  Student Discipline or Other Confidential Student Matters



**Agenda Item Details**

| | |
|---|---|
| Meeting | Jun 06, 2023 - Regular Board Meeting |
| Category | 1. Call to Order |
| Subject | C. Recess to Closed Session (Aspen Room, 4:30 p.m.) |
| Type | Action |

Anyone wishing to address the Board regarding Closed Session items may do so prior to the beginning of Closed Session. Items listed below may be discussed in Closed Session pursuant to Board Bylaw 9321. Items [√] marked are scheduled for discussion at this meeting. All proceedings are reported to the public in open session where action is taken or staff is given direction.

1. Public Employee Performance Evaluation pursuant to Government Code §54957
   Superintendent of Schools
   Deputy Superintendent, Chief of Staff
   Chief Business Officer
   Assistant Superintendent of Educational Services, Elementary
   Assistant Superintendent of Educational Services, Secondary
   Assistant Superintendent of Equity and Student Affairs
☐ 2. Public Employee Employment pursuant to Government Code §54957(b)(1)
☐ 3. Conference with Legal Counsel - Existing Litigation pursuant to Government Code §54956.9(d)(1)
4. Conference with Legal Counsel - Anticipated Litigation pursuant to Government Code §54956.9(d)(2)
   PAUSD-LD-22-23.01 anticipated claim on behalf of student (student name withheld to protect confidentiality of pupil records)
☐ 5. Liability Claims pursuant to Government Code §54956.95
☐ 6. Conference with Labor Negotiators pursuant to Government Code §54957.6
☐ 7. Conference with Real Property Negotiator pursuant to Government Code §54956.8
8. Employee Discipline/Dismissal/Release pursuant to Government Code §54957(b)(1)
9. Student Discipline or Other Confidential Student Matters



**Agenda Item Details**

| | |
|---|---|
| Meeting | May 23, 2023 - Regular Board Meeting |
| Category | 1. Call to Order |
| Subject | C. Recess to Closed Session (Aspen Room, 5:30 p.m.) |
| Type | Action |

Anyone wishing to address the Board regarding Closed Session items may do so prior to the beginning of Closed Session. Items listed below may be discussed in Closed Session pursuant to Board Bylaw 9321. Items [√] marked are scheduled for discussion at this meeting. All proceedings are reported to the public in open session where action is taken or staff is given direction.

☐ 1. Public Employee Performance Evaluation pursuant to Government Code §54957
☐ 2. Public Employee Employment pursuant to Government Code §54957(b)(1)
   3. Conference with Legal Counsel - Existing Litigation pursuant to Government Code §54956.9(d)(1)
      Student vs. PAUSD (PAUSD-SE-22-23.04)
   4. Conference with Legal Counsel - Anticipated Litigation pursuant to Government Code §54956.9(d)(2)
      PAUSD-LD-22-23.01 anticipated claim on behalf of student (student name withheld to protect confidentiality of pupil records)
☐ 5. Liability Claims pursuant to Government Code §54956.95
   6. Conference with Labor Negotiators pursuant to Government Code §54957.6
      Agency Designated Representatives: Deputy Superintendent, Chief Business Officer, Superintendent of Schools
      Employee Organizations: Palo Alto Educators Association (PAEA) and California School Employees Association (CSEA)
      Non-Represented Employee Group: Palo Alto Management Association (PAMA)
☐ 7. Conference with Real Property Negotiator pursuant to Government Code §54956.8
   8. Employee Discipline/Dismissal/Release pursuant to Government Code §54957(b)(1)
   9. Student Discipline or Other Confidential Student Matters



**Agenda Item Details**

| | |
|---|---|
| Meeting | Mar 28, 2023 - Regular Board Meeting |
| Category | 1. Call to Order |
| Subject | C. Recess to Closed Session (Aspen Rm, 5:45 pm) |
| Type | Action |

Anyone wishing to address the Board regarding Closed Session items may do so prior to the beginning of Closed Session. Items listed below may be discussed in Closed Session pursuant to Board Bylaw 9321. Items [√] marked are scheduled for discussion at this meeting. All proceedings are reported to the public in open session where action is taken or staff is given direction.

☐ 1. Public Employee Performance Evaluation pursuant to Government Code §54957
    2. Public Employee Employment pursuant to Government Code §54957(b)(1)
       Assistant Superintendent
    3. Conference with Legal Counsel - Existing Litigation pursuant to Government Code
       §54956.9(d)(1)
       Edith Cohen, Xin Li, Yiyi Zeng, and Marek Alboszta v. PAUSD
    4. Conference with Legal Counsel - Anticipated Litigation pursuant to Government Code
       §54956.9(d)(2)
       PAUSD-SE-22-23.03, anticipated claim on behalf of Special Education student (student name
       withheld to protect confidentiality of pupil records)
☐ 5. Liability Claims pursuant to Government Code §54956.95
☐ 6. Conference with Labor Negotiators pursuant to Government Code §54957.6
       Agency Designated Representatives: Deputy Superintendent, Chief Business Officer,
       Superintendent of Schools
       Employee Organizations: Palo Alto Educators Association (PAEA) and California School
       Employees Association (CSEA)
☐ 7. Conference with Real Property Negotiator pursuant to Government Code §54956.8
    8. Employee Discipline/Dismissal/Release pursuant to Government Code §54957(b)(1)
☐ 9. Student Discipline or Other Confidential Student Matters



**Agenda Item Details**

| | |
|---|---|
| Meeting | Jun 21, 2022 - Regular Board Meeting |
| Category | 1. Call to Order |
| Subject | C. Recess to Closed Session (Aspen Room) |
| Type | Action |

Anyone wishing to address the Board regarding Closed Session items may do so prior to the beginning of Closed Session. Items listed below may be discussed in Closed Session pursuant to Board Bylaw 9321. Items [√] marked are scheduled for discussion at this meeting. All proceedings are reported to the public in open session where action is taken or staff is given direction.

☐  1.  Public Employee Performance Evaluation pursuant to Government Code §54957
☐  2.  Public Employee Employment pursuant to Government Code §54957(b)(1)
   3.  Conference with Legal Counsel – Existing Litigation pursuant to Government Code
       §54956.9(d)(1)
       One (1) case: Chakmakchi v. PAUSD (PAUSD-GC-2021-22.05)
☐  4.  Conference with Legal Counsel – Anticipated Litigation pursuant to Government Code
       §54956.9(d)(2)
☐  5.  Liability Claims pursuant to Government Code §54956.95
☐  6.  Conference with Labor Negotiators pursuant to Government Code §54957.6
       Agency Designated Representatives: Deputy Superintendent, Chief Business Officer, Superintendent of
       Schools
       Employee Organizations: Palo Alto Educators Association (PAEA) and California School Employees
       Association (CSEA)
☐  7.  Conference with Real Property Negotiator pursuant to Government Code §54956.8
   8.  Employee Discipline/Dismissal/Release pursuant to Government Code §54957(b)(1)
☐  9.  Student Discipline or Other Confidential Student Matters



PALO ALTO
UNIFIED SCHOOL DISTRICT

**Agenda Item Details**

| | |
|---|---|
| Meeting | Feb 08, 2022 - Regular Board Meeting |
| Category | 1. Call to Order |
| Subject | C. Recess to Closed Session (Aspen Room) |
| Type | Action |

Anyone wishing to address the Board regarding Closed Session items may do so prior to the beginning of Closed Session. Items listed below may be discussed in Closed Session pursuant to Board Bylaw 9321. Items [√] marked are scheduled for discussion at this meeting. All proceedings are reported to the public in open session where action is taken or staff is given direction.

☐ 1. Public Employee Performance Evaluation pursuant to Government Code §54957
☐ 2. Public Employee Employment pursuant to Government Code §54957(b)(1)
☐ 3. Conference with Legal Counsel – Existing Litigation pursuant to Government Code §54956.9(d)(1)
   4. Conference with Legal Counsel – Anticipated Litigation pursuant to Government Code §54956.9(d)(2)
   PAUSD-SE-21-22.06, anticipated claim on behalf of Special Education student (student name withheld to protect confidentiality of pupil records)
☐ 5. Liability Claims pursuant to Government Code §54956.95
   6. Conference with Labor Negotiators pursuant to Government Code §54957.6
   Agency Designated Representatives: Deputy Superintendent, Chief Business Officer, Superintendent of Schools
   Employee Organizations: Palo Alto Educators Association (PAEA) and California School Employees Association (CSEA)
   Unrepresented Employees: Contracted Positions
☐ 7. Conference with Real Property Negotiator pursuant to Government Code §54956.8
☐ 8. Employee Discipline/Dismissal/Release pursuant to Government Code §54957(b)(1)
☐ 9. Student Discipline or Other Confidential Student Matters

# EXHIBIT Q

## SANTA CLARA COUNTY DEMOCRATIC CENTRAL COMMITTEE
**7 PM-9PM, via Zoom Online Conference (details in box below)**

*(Our meeting is open to the public, but we reserve the right to remove guests who disrupt the meeting. Video and audio recording not permitted without prior approval)*

### AGENDA FOR Thursday, June 4, 2020

**1. CALL TO ORDER**

**2. ROLL CALL**

**3. IDENTIFICATION OF VISITORS**

**4. ADOPTION OF AGENDA**

**5. APPROVAL OF MINUTES**

    a. Thursday, May 7, 2020

**6. OLD BUSINESS**

**7. NEW BUSINESS**

    a. Spotlight on disparate impact of COVID-19 on communities of color: SJ Councilmember Maya Esparza

    b. Resolution to Believe Women

    c. Resolution Opposing DeVos Final Rule on Campus and K-12 Sexual Assault and Harassment

    d. Request to endorse ABA 5 (Repeal of Proposition 209)

    e. Resolution in Support of Placing the Fair Elections Initiative on the November Ballot

    f. First reading: proposed change re fast track endorsement of previously-endorsed incumbent Democrats

**8. REPORTS**

    a. Executive Board/Chair: Bill James

    b. Vice Chair: Jean Cohen

    c. Treasurer: Angelica Ramos

    d. Secretary: Helen Chapman

    e. Executive Director: James Kim

    f. Issues: Michael Vargas

    g. Community Services and Voter Registration: Judy Pipkin

    h. Finance: James Kim

    i. Endorsements: Clarence Madrilejos

    j. Communications: John Comiskey

    k. Gender Equity and the Status of Women: Shay Franco-Clausen

    l. Campaign Services: Titus Lin

    m. Clubs: Alex Wara

    n. Regional Director Report(s)

    o. DNC: Otto Lee

    p. DTV Report: Steve Chessin

    q. Pro-Choice Coalition: Claudia Shope

**9. ANNOUNCEMENTS/REMINDERS**

    June 13, 2020, 10am-12pm, via Zoom Campaign Training for candidates, professionals, and youth (rsvp@sccdp.org)

**10. EXECUTIVE BOARD MEETING**

    June 17, 2020, 6-7:30pm, via Zoom (contact chair@sccdp.org for link)

**11. ADJOURNMENT**

Join Zoom Meeting:

https://us02web.zoom.us/j/87869028946?pwd=d0ptanVxbUV3aVVWYUxlcFgyaFBDUT09

Join by Phone: (669) 900 6833
Meeting ID: 878 6902 8946
Password: 924240

## Resolution to Believe Women

**Whereas** survivors and allies are tired of seeing powerful individuals, especially men, commit abuse freely without consequences; and injustices and violence against the less powerful, especially women, have galvanized a popular uprising in recent years, from the Ya Basta movement against the sexual abuse and exploitation of immigrant women workers in the janitorial industry; to the first Women's March in 2017; to the consciousness-raising of the #MeToo movement, where millions of women shared their stories as survivors of harassment and assault; to the national horror of a partisan Senate voting to confirm Brett Kavanaugh as a Supreme Court Justice even though three women had accused him of sexual assault; and

**Whereas** per our platform the Santa Clara County Democratic Party *strongly opposes all gender-based discrimination, including misogyny, sexual harassment, and sexual violence,* and *believes that any person who perpetrates sexual harassment or sexual assault of any kind is unfit for elected and appointed office, and that public officials and entities have a duty to investigate accusations of sexual harassment or assault and take appropriate corrective or punitive action*; and

**Whereas** the Democratic presumptive nominee for President, former Vice President Joe Biden, has been accused of sexual assault by his former employee Tara Reade, and has been accused of unwanted and inappropriate touching by seven other women; and Anita Hill, Senators Ed Markey and Jeff Merkley, the editorial board of the New York Times, the Enough is Enough Voter Project, and many Democrats, as well as Biden himself, have called for an investigation; therefore

**Be it resolved** that the Santa Clara County Democratic Party calls on the Democratic National Committee to commission an investigation into the allegation that presumptive nominee Joe Biden committed sexual assault against Tara Reade, and any other allegations or evidence of inappropriate behavior, to be conducted by impartial investigators independent of any campaign or partisan entity; and, if any allegation of sexual assault or harassment by Joe Biden is found to be substantiated by such an investigation, calls for him to voluntarily withdraw his candidacy and calls for the Democratic National Convention to choose a different nominee; and

**Be it further resolved** that our call for an investigation shall be communicated to the public and to the media; and that a copy of this resolution shall be sent to all other Democratic Central Committees in California, all Caucuses of the California Democratic Party, and to the CDP Executive Board, to urgently ask them to pass similar resolutions; as well as to all DNC delegates from California; and to DNC Chair Tom Perez.

Submitted by:
Rebeca Armendariz; Michele Dauber; Shay Franco-Clausen; Rohin Ghosh; Ellie Greene; Michelle Hua; Jennie Hutchinson; Alex Lee; Sally Lieber; Sergio Lopez; Monica Mallon; Jessica Matthew; Johannes Muenzel; Olivia Navarro; Ruben Navarro; Angelica Ramos-Allen; Emily Ramos; Kristin Rivers, Ph.D.; Cari Templeton

# EXHIBIT R



(?return)



**The Campanile** • December 23, 2022 • https://thecampanile.org/23773/news/board-president-ken-dauber-resigns-after-eight-years-of-service/

# Board President Ken Dauber resigns after eight years of service

**Julian Hong**

The resignation of the Board president and a controversy surrounding open forum speaking time highlighted the Nov. 15 Board of Education meeting.

First elected in 2014, President Ken Dauber officially resigned after eight years of service. Dauber has been an advocate for student mental health support and helped oversee the implementation of the Wellness Centers at Paly and Gunn and the curtailing of zero-period classes.

Many attendees at the meeting said Dauber's legacy is one of success and action.



"One of the main things you taught me was how to get things done," Vice President Jennifer DiBrienza said.

Over 45 minutes, Dauber's accomplishments were celebrated by over 15 different community members.

During the meeting, the Board also voted 3-2 to reduce open forum speaking time to two minutes. Open forum is time allocated to the general public to comment on matters to the Board. Through Zoom or in-person, the speakers used to have three minutes to address the Board.

DiBrienza, Board member Jesse Ladomirak and both student representatives opposed the resolution.

"I can understand where the Board is coming from," Paly Board Representative Johannah Seah said. "But I think what makes it difficult is that it does deter students from coming to speak. It's already the case that many do not come to meetings."

Ladomirak said she thinks more public participation at Board meetings is better for the Board.

"I believe our past practice, which started at three minutes and decreased from there when a large number of community members wanted to speak to a specific item, struck the right balance. I saw no compelling reason to change it," she said.

Despite voting against the change, Ladomirak said the new policy shouldn't impact the number of people who can comment at meetings, and many speakers currently don't use their full three minutes.

Ladomirak said, "Those who do have a lot to say will need to do so more efficiently, and, of course, are always encouraged to email their thoughts in writing to board@pausd.org.

# EXHIBIT S



### NEWS

# Unfit to teach? Teacher accused of rape had a checkered history in schools

*Palo Alto Unified continued to employ Peter Colombo for over two decades*



by **Zoe Morgan**
February 17, 2023   Updated January 24, 2024

*Editor's note: This article contains descriptions of sexual violence and self harm that may be disturbing to some readers.*

In January of last year, the Palo Alto Unified School District received an anonymous email from the husband of a former student, alleging that two decades earlier physical education teacher Peter Colombo had raped the then-sixth grader.

The allegation, which led to a police investigation and his arrest last June, was only the latest charge of criminal conduct by Colombo stretching back nearly 30 years. That list doesn't include additional noncriminal complaints about his behavior that parents submitted to the school district.

District administrators knew of Colombo's criminal history more than a decade ago and yet kept him in the district's employ, according to documents obtained by the Palo Alto Weekly.

How could this have happened? That's the question the Weekly set out to answer by filing Public Records Act requests, interviewing school district administrators, scrutinizing online personnel data and posing numerous questions to the state's teacher credentialing commission. We also reached out to the student and her husband, as well as Colombo and his attorney, though none

EXHIBIT S_001

responded.

The picture that has emerged is one of numerous second chances given to a teacher and athletic coach who was well-known and, by some, well-regarded. Despite red flags and a checkered history, Colombo worked with Palo Alto students for nearly a quarter century. Colombo himself acknowledged in 2021 the grace administrators had extended to him a decade earlier, saying that they found him "likable" and appreciated the success he'd had with students in athletics.

Current Superintendent Don Austin said in an interview that no one who had decision-making power over Colombo's employment at the time of his criminal convictions and credential suspension is still employed by the district, and he couldn't speak for them. However, Austin said that if the same series of events happened today, he would not let the teacher keep their job.

"Selecting and retaining the people that work with your children is the most important job that we do in the school district," Austin said. "There's a point to where there's enough of a pattern of behavior where some people should not have that right of working with students."

When Palo Alto Unified received the rape allegation, district officials placed Colombo on administrative leave and reported the message to police, who conducted an investigation. Colombo was ultimately arrested in June and was charged with aggravated sexual assault of a child. He is currently out on bail awaiting a preliminary hearing scheduled for next month. If convicted, he faces 15 years to life in prison.

## Legal troubles pre-date Colombo's work in Palo Alto schools

Colombo's professional troubles began before he was hired by Palo Alto Unified in 1998. He failed to disclose three prior criminal convictions on a 1995 substitute teaching credential application, an omission that triggered the California Commission on Teacher Credentialing to issue a "public reproval" in 1997, which serves as a public warning of misconduct.

Those convictions included a 1988 misdemeanor trespassing charge after he went unannounced to the home of a woman he had met through his girlfriend and began honking the horn of his vehicle, according to the teacher credentialing commission's summary of his criminal cases. When police arrived, he was found hiding in the bushes, the summary states.

EXHIBIT S_002

Later that year, he was arrested for ripping a telephone off its cord outside a bar and grill and throwing it at a parked car during an argument with the person inside the vehicle. He pleaded no contest and was convicted of misdemeanor vandalism and misdemeanor disorderly conduct under the influence of alcohol or drugs, the summary of his criminal cases states.

In 1990, he was convicted after pleading no contest to misdemeanor charges of DUI and hit and run. The charges stemmed from a traffic accident after which he failed a field sobriety test, had a blood alcohol level of 0.236% and told police officers that he had a drinking problem, the summary states. The legal limit is 0.08%.



| YEAR | ASSIGNMENT. | GRADE OR SUBJECT | MOS. | CLASS | STEP | BASE SALARY | M.A. | TENURE | DR. | TOTAL SALARY. |
|------|-------------|------------------|------|-------|------|-------------|------|--------|-----|---------------|
| 98–99 | Jordan .8 | Physical Ed. | 10 | 60 | 2 | 39,059 | | Temp | | 39,059 |
| | Paly .2 | Physical Ed. | | | | | | | | |

The Palo Alto Unified School District hired Peter Colombo in 1998 as a P.E. teacher at Jordan Middle School, now called Greene, and Palo Alto High School. Source: Palo Alto Unified School District records.

The state Commission on Teacher Credentialing issued the public warning in June 1997. The following year, Palo Alto Unified hired Colombo as a P.E. teacher at Jordan Middle School, now called Greene, and Palo Alto High School, district records show.

It's unclear what the district would have known before hiring Colombo in the 1990s.

The California Commission on Teacher Credentialing in 1998 provided an "all points bulletin" to superintendents that listed adverse actions the commission took against educators, a representative from the commission told the Weekly. Although the commission now offers an online tool to look up a teacher's credential status, that wasn't launched until 2001, after Colombo was hired in Palo Alto.

For employees being hired today, not all criminal convictions are automatically disqualifying,

EXHIBIT S_003

Austin said, including DUI convictions. Relevant factors in determining whether to employ someone with a DUI conviction include looking at any proactive measures the applicant has taken to address the issue, their explanation of what occurred and the district's level of confidence that the issue is in the past, Austin said.

When it comes to someone withholding information on a job application about past convictions and credential-related disciplinary actions, Austin said that would stop the district from hiring the person.

"Yes, lying on your application would be a disqualification if you withheld information about discipline of any sort," Austin said.

If the district knows that an applicant has been publicly reproved by the teacher credentialing commission for failing to disclose criminal convictions, Austin said, the district would not hire them.

EXHIBIT S_004

Courtesy Palo Alto Police Department.

# PETER COLOMBO'S HISTORY IN PALO ALTO SCHOOLS

Peter Colombo spent nearly a quarter century teaching and coaching Palo Alto students, before being arrested last year for allegedly raping a former student. Records obtained by the Palo Alto Weekly show that Colombo had a disciplinary and criminal history dating back to before he was hired by Palo Alto Unified in 1998 and that district officials knew about that history more than a decade ago.



While it isn't known whether the district was aware of Colombo's criminal history when it hired him in 1998, it turned out that he had not put his alcohol problems in his past. In December 2003, he was pulled over for traffic violations and exhibited signs of intoxication. His blood alcohol content measured at 0.19% and 0.17%, according to the summary of his criminal cases. The following month, he pleaded guilty and was convicted of misdemeanor DUI, court records show.

Despite the conviction, Colombo continued working and coaching. **http**, he led the Palo Alto High School baseball team to the Central Coast Section Division I championship game.

EXHIBIT S_005

In October 2005, the Commission on Teacher Credentialing wrote Colombo to notify him that the Committee of Credentials had found probable cause to recommend the suspension of his teaching credential for 60 days. The basis for the suspension recommendation is not publicly known; an attachment explaining the basis of the decision wasn't included among the documents that the commission released to the Weekly, and a commission representative stated that it was exempt from public disclosure.

Colombo appealed the 2005 suspension recommendation, requesting an administrative hearing, the commission confirmed.

After the administrative hearing, Colombo and the commission agreed on a **http** in February 2007, the commission representative told the Weekly. That agreement placed him on a four-year probationary period, citing his multiple convictions, including the 2004 DUI.

The conditions of probation included that Colombo couldn't drink alcohol and would be subject to random alcohol tests. He also had to attend Alcoholics Anonymous, or a similar group if he got pre-approval from the Commission, at least once a week for the first two years of probation. Colombo was also required to follow all federal, state and local laws and submit a detailed written account of any arrests and citations, except minor traffic offenses, within 72 hours. The agreement took effect on March 17, 2007.



Peter Colombo and the California Commission on Teacher Credentialing agreed on a Consent Determination and Order in February 2007. That agreement placed him on a four-year probationary period. Source: California Commission on Teacher Credentialing records.

Jordan Middle School's principal at the time and Assistant Superintendent for Human Resources

EXHIBIT S_006

Scott Bowers each signed forms acknowledging that Colombo had given them a copy of the agreement.

An administrator from the Redwood City Elementary School District also signed a form acknowledging he had received the agreement. Colombo had worked as a day-to-day substitute teacher in the district during the 2006-2007 school year, a Redwood City School District spokesperson told the Weekly.

On March 9, 2010, the Commission on Teacher Credentialing sent Colombo a letter notifying him that it had received credible evidence he had used alcohol during his probation. According to the terms of the 2007 agreement, if he used alcohol during probation, the Commission would immediately suspend his credential until it reviewed and took "final action" on the issue.

As a result, Palo Alto Unified placed Colombo on leave, his Palo Alto employment record shows. Bowers wrote the Commission on Teacher Credentialing a letter on April 6, 2010, urging it to reinstate Colombo's credential.

"I would like the Commission to know that I believe that Mr. Colombo has made considerable effort and progress in dealing with his alcohol issues," the letter states. "On a continued positive note, these issues have not impacted his work as a teacher in our District."

The letter also notes that Colombo remained a tenured teacher in the district and was entitled to a full-time job when the suspension was lifted.

EXHIBIT S_007

Palo Alto school district administrator Scott Bowers wrote the Commission on Teacher Credentialing a letter on April 6, 2010, urging it to reinstate Peter Colombo's credential. Source: Palo Alto Unified School District records.

The Commission and Colombo subsequently agreed to modify the 2007 Consent Determination and Order so that his credential would be suspended from March 9, 2010, through April 28, 2010, and his probation would be extended by two more years, for a total of six years. He was also required to attend Alcoholics Anonymous or a similar group at least once a week for the rest of the probation period.

On April 29, 2010, Colombo's employment record shows that he returned to his position at Jordan.

In April 2013, the Commission sent Colombo a letter notifying him that he had successfully complied with the probation requirements, and his credential was restored.

When asked why the district retained Colombo as a teacher and coach after this string of criminal and disciplinary problems, Austin said he did not know.

"There's literally not a person that would have been involved in that decision that still works in our school district," Austin said.

Bowers declined to answer questions for this article.

## Multiple complaints as the 2021-2022 school year starts

School district records show that Colombo found himself in trouble again in the fall of 2021. Within the first month of the 2021-2022 school year, Greene Middle School parents lodged four complaints against Colombo for rudeness and inappropriate comments and behavior.

A parent emailed Greene Middle School officials in September 2021, objecting to Peter Colombo using "pimp" to refer to male students. Source: Palo Alto Unified School District records.

One parent reported that Colombo used the term "pimp" to refer to students and said that it didn't appear to have been a one-time incident, emails released by the district show.

"I am really appalled by the standards you have for yourself with these kids," the parent wrote. "You are supposed to be a role model when you are with them and instead you are introducing them to highly offensive language and you are glorifying misogyny and human trafficking."

Colombo responded, telling the parent it wouldn't happen again.

"I understand your feelings and my only recourse is to assure you this will not happen again," Colombo wrote.

The parent then followed up with Greene Middle School Principal Sebastian Benavidez and said that Colombo had once again called the child, and others, a pimp.

"I demand that he is reprimanded and fired. He has no remorse, is not contrite, and lied to us," the parent wrote in an email to Benavidez and an assistant principal.

Colombo explained his behavior to Benavidez, writing in an email that he intended "pimp" as a compliment, that it was a way of saying that the student was "hecka cool" and that he had used the term for years. At the same time, Colombo said that he needed to change with the times and that he had no excuses.

Benavidez, who had taken over as principal two months before, replied that he appreciated

Colombo's reflection.

"Just so you know, I'm not about consequences, I'm about learning and development, especially my own. I'm learning and growing every day and here to support you in doing the same," said Benavidez, who had previously worked in the Fresno Unified School District from 2004 to 2021.

Peter Colombo emailed Greene Middle School Principal Sebastian Benavidez in September 2021 after parents complained about his behavior. Source: Palo Alto Unified School District records.

In a follow-up email to Benavidez, Colombo wrote that his "ego is out of control and I need to look at that." He said that he had almost lost his job in 2010 because of drug and alcohol abuse, and that this was the first time in 11 years that he'd had ego-driven behavior problems.

"In all honesty I should have been fired back in 2010 but they gave me one more chance because

EXHIBIT S_010

they said I was likeable and had done lots of good things coaching too," Colombo wrote.

Benavidez replied, "You're a great person Pete. Your struggles have given you a deep understanding many others will never know. I'm proud of you for recovering from a challenging addiction and for being courageous enough to share your experience with me."

Greene Middle School Principal Sebastian Benavidez emailed Peter Colombo in September 2021, responding to a message from Colombo that described his history of addiction. Source: Palo Alto Unified School District records.

Another parent complaint alleged that a physical education teacher was rude to their son on two different occasions. In one case, the child allegedly went to the P.E. teachers' office to report that his lock was missing from his locker. Three teachers were in the middle of a conversation, so the student said that he waited for a break in the conversation.

One of the teachers turned to him and said "What do you want? Just go!," the parent's email stated. Although the report didn't name the teacher, it described him as bald and not very tall. Benavidez apparently knew this referenced Colombo because he forwarded the email to him.

Green Middle School received multiple complaints at the start of the 2021-2022 school year about Peter Colombo's behavior with students. Source: Palo Alto Unified School District records.

Another complaint that the district released, sent on Sept. 2, 2021, alleged that Colombo had made inappropriate comments to multiple students, including talking about his dating life before he was married and his divorce. What the writer described as the "most disturbing" incident was largely redacted but involved the phrase "dez nutts."

"For him to talk about his genitalia, to (redacted) any child in a joking manner or not, is utterly irresponsible and outrageous," the complaint states.

The email went on to say that Colombo told students "that he knows who files reports against him so don't try it."

On Sept. 3, Benavidez emailed Colombo a more formal message that began "Dear Mr. Colombo" and informed Colombo that Benavidez wanted to meet with him the following day to discuss multiple complaints that were received over the past week. Lisa Hickey, the district's director of human resources for certificated employees, which encompasses teachers, was included on the message, and Benavidez said that she would be present for the meeting.

Following the meeting, Benavidez sent Colombo a formal warning letter, directing him to correct his behavior moving forward, which included always using appropriate language with students, not directly emailing parents who have concerns or complaints, and avoiding physical contact with students at all times.

{pdf 1003}

While warning Colombo that his behavior must change, Benavidez also wrote that during their meeting it was clear Colombo had "taken responsibility and reflected" on the complaints.

Benavidez also said, "In speaking with you on multiple occasions, you appear to be a physical communicator." The letter referenced a fourth complaint about Colombo that Benavidez had received: A student "complained about contact you made with them that made them feel uncomfortable."

Benavidez told the Weekly that "the alleged contact happened during the daily routine of guiding students through an exercise/activity. Mr. Colombo redirected the student in (the) right direction by putting his open hand on the middle of their back."

In response to the Weekly's questions about Benavidez's initially forgiving email exchanges with Colombo, followed by the warning letter, Benavidez stressed the broader context of his messages, including that he was responding to Colombo sharing information about his struggles with addiction. He also said that disciplinary action typically isn't finalized until after a meeting with the staff member, which was when the warning letter was issued.

"Therefore, I did not switch course because my course of action had not yet been decided," Benavidez wrote in an email.

## How the rape allegation surfaced

Less than five months after issuing the warning letter to Colombo, the district received the rape allegation that http.

In an email to the school district, included in the police department's investigative report, the student's now-husband alleged that his wife had been raped by Colombo roughly 20 years ago,

EXHIBIT S_013

during the 2001-2002 school year, when she was 11 years old. After the assault, Colombo called her "saucy" and tormented her about the rape, the email said.

The Palo Alto Unified School District forwarded police an email in January 2022 from the husband of one of Peter Colombo's former students, alleging that the teacher had raped the then-sixth grader roughly 20 years before. Source: Palo Alto Police Department investigative report.

He told the district that he was sending the email not because he wanted to pursue legal recourse but because he has to live with the reality of his wife's rape every day. He added that, most importantly, there could be other victims.

"I pray we are truly the only ones who have suffered from Pete's actions and that he has not victimized any other children since then, though I know the odds are quite high that he has," the husband wrote.

After receiving the email, the district's then-General Counsel Komey Vishakan, whose employment with the district was terminated last summer, contacted the police department, forwarding a copy of the message. The district also placed Colombo on paid administrative leave.

Before the police had identified who the former student was or interviewed Colombo, he contacted them to report what he described as "cyberbullying." Colombo said that he and his wife were sent an anonymous email, which police confirmed was similar to the one the district received.

EXHIBIT S_014

Colombo told police that it could have been a case of mistaken identity because another teacher had been arrested for inappropriate behavior with a student. The police report states that Colombo brought up someone named Bill, but the last name is redacted from the report.

Bill Giordano was a fellow teacher and coach at Jordan Middle School who was http in 2006 for child molestation that occurred from 1991 to 1994. Giordano began teaching in the district in 1978 and was teaching at Jordan from 1991 until his arrest in 2005.

Colombo also suggested the allegation could have been made by "a disgruntled former girlfriend or some other mentally unhealthy person," according to the police report. He also said that he was dealing with alcohol addiction at the time and "may have been an alcoholic, and a womanizer," but that he wasn't a "child abuser."

Once Colombo's accuser was identified in 2022, she was at first hesitant to talk to police but ultimately agreed to be interviewed, according to the police report. She attributed her willingness to talk to "the fact that she had recently become a mother and wanted to reconcile her past trauma for both her and her family," the police report states.

She confirmed to police that although her attacker had raped her from behind, she knew it had been Colombo.

She recounted that the assault occurred after class during the swim unit in the 2001-2002 school year. Colombo asked her to stay behind to help with the pool cover and by the time she returned to the locker room to get changed, it was almost or entirely empty, she told police.

Colombo then came up behind her, pushed her down on a bench and raped her, she said. The former student explained that when she recalls the assault, she has flashbacks to a mural above her locker that she was looking at during the rape. The mural honored a Jordan student who had died and depicted a child's face among the clouds.

When the student got home that day, she told her mother that she wanted "to get Mr. Colombo fired" and that he was "too nice to me," an account that her mother confirmed to investigators, according to the police report.

Tables and benches outside the gymnasium at Greene Middle School (formerly Jordan Middle School). Embarcadero Media file photo by Veronica Weber.

Prior to the assault, the student told police, she got good grades and was on a competitive swim team. Afterward, she said that she experienced major depression, began drinking and doing drugs. Her sister also told police that she used to be "bubbly and happy" but then began to self-harm and developed bulimia.

The student also tried to avoid Colombo and P.E. class, including in one case purposefully kicking a basketball post so hard that she bled, she said.

"She stated that everything changed after this incident and was the cause of self-medication and drug and alcohol use at a very young age," the police report states.

Her mother told police that her daughter required psychiatric help. The family decided to move to try to improve things.

EXHIBIT S_016

According to the police report, the investigating officer spoke to family members and friends in 2022 who confirmed that they had been told about the assault over the years. The older sister told police that when she was 14 years old, her younger sister told her that she had been raped by Colombo. The older sister also sent police a copy of a 2010 online chat with her now-husband, in which she wrote that Colombo had raped her sister in sixth grade.

Their father told police that his younger daughter had told him that she was raped by Colombo the year after the assault occurred. Their mother told police that she had learned about the assault from a family friend when her younger daughter was roughly 16 years old.

> 'Selecting and retaining the people that work with your children is the most important job that we do in the school district. There's a point to where there's enough of a pattern of behavior where some people should not have that right of working with students.'
>
> Don Austin, superintendent, Palo Alto Unified School District

One of the student's friends told police that almost 16 years ago, the student told her that she'd been sexually assaulted by her P.E. teacher. When another teacher was arrested for sexual misconduct — identified in the report as Bill, with the last name redacted — the friend contacted the student, who was positive that had not been the person who had raped her, according to the police report.

The student and her older sister both told police that before the assault, Colombo behaved in ways that in retrospect were inappropriate. The older sister told police that Colombo always asked about her younger sister and made comments about her. She said that this attention was unique to her younger sister.

The younger sister also recalled that when Colombo once overheard that she had forgotten her lunch, he offered to take her to his house and make her food. When she refused, he offered to buy her pizza. She said that she was so uncomfortable that she responded "I don't like food" and quickly walked away.

She also remembered that Colombo would walk through the girls locker room and yell, "Girls, a guy is coming through, close your eyes!" She said this stuck out to her as weird behavior because he was an adult man in a girls' locker room telling students to close their eyes.

The police report includes one interview in defense of Colombo. A fellow physical education teacher told police that she would often be in the locker room at the time of day that the assault was described to have happened, so she believed it was unlikely to have occurred. She also said that in 21 years of working with Colombo, she had "never witnessed anything that alarmed her or seemed inappropriate," and was only concerned "about his mouth," noting that he would yell and use words like "honey" in a way that she said was innocent.

In an interview with police, Colombo reviewed a copy of the school yearbook and denied remembering either of the sisters.

After conducting interviews with nearly a dozen people connected to the case and reviewing documentation including a school yearbook, photos of the student before and after the alleged rape, and a 2004 poem the student had written, police ultimately **http**.

Peter Colombo has been charged with aggravated sexual assault of a child. If convicted, he faces 15 years to life in prison. Source: Santa Clara County Superior Court records.

After initially being held without bail, a judge granted Colombo's lawyers' request for bail in June, over prosecutors' objections. Colombo posted the $250,000 bond. His next scheduled court date is a preliminary hearing in March.

Austin told the Weekly that Colombo remains on unpaid administrative leave while the current court case proceeds.

EXHIBIT S_018

Reflecting on Colombo's past disciplinary and criminal problems, Austin said that a teacher with that record today wouldn't be allowed to keep their job. As for why the district has not fired Colombo, Austin said that the decision on how to handle Colombo's misconduct had been made by administrators many years ago.

"Those transgressions cannot be reevaluated again more than a decade later," Austin said in an email. "The new, and unrelated, allegations are a different story. We expect the current allegation from long ago to be presented, heard, and judged in the court of law. Until that happens, unpaid leave is our only option."

When asked if the school district conducted its own investigation after receiving the rape allegation, Austin said that the district offered its formal complaint process to the person who had submitted the allegation, but that it was declined. Because the complaint had been anonymous, Austin said in an email that "there was very little the district could investigate at that time." Instead, he said that the Palo Alto Police Department conducted the investigation.

"Due to the serious and sensitive nature of an allegation from long ago, we followed the request of the Palo Alto Police Department to stand down and allow them to conduct an unobstructed investigation," Austin said in an email.

A police department spokesperson declined to comment on the specifics of Colombo's case but confirmed that in general, "a criminal investigation takes precedence over an administrative (internal) investigation, so that the criminal investigator can have the first opportunity to gather evidence and perform interviews."

Typically, investigators will let other entities know when the criminal investigation has reached a point where an administrative inquiry wouldn't impact law enforcement's ability to gather evidence and perform interviews, the police spokesperson said.

In general, initial criminal investigations by police are completed by the time the District Attorney's Office charges the arrestee, at which point another organization's administrative inquiry wouldn't interfere with the police's ability to gather evidence or perform interviews, the police spokesperson said.

As for whether the student who said that Colombo raped her was the only one to make such

allegations, Austin said that the district issued a June 2022 press release announcing Colombo's arrest and encouraging those with information to contact police. No one else alleging misconduct has come forward to the district, Austin said, though he added that he wouldn't know if someone contacted law enforcement.

Santa Clara County Deputy District Attorney Kelly Meeker declined to comment on whether any other victims have been identified, beyond saying that only one victim is listed in the criminal complaint.

Colombo's attorney did not return multiple requests for comment.

*Graphics of documents by Douglas Young.*

*Graphics of documents by Douglas Young.*

*Graphics of documents by Douglas Young.*

*Graphics of documents by Douglas Young.*

## michele-dauber

February 17, 2023 at 8:13 am

Once again, PAUSD has failed to appropriately address sexual harassment. The allegations at Greene in 2021-22 should have been investigated as Title IX complaints because they involved allegations of a hostile environment. The Board needs a new policy such that any time a teacher is alleged to have said or done anything even remotely sexual in nature (calling a student a "pimp" for example) it should be reported to the Board. Apparently, instead of sending the allegations to Title IX, Benavidez decided to attribute them to this alleged predator being a "physical communicator." Don Austin should take a look at what happened during the time that he was in charge, and account for that, because Scott Bowers is evidently not the only person who screwed this up.

## v-2

February 17, 2023 at 8:31 am

Scott Bowers!!! he gets to walk away, WOW

## hal

February 17, 2023 at 8:43 am

"Accused" So no one else has come forward ? Court dates keep getting extended? DA has nothing is what this article reads like. Since there is no real news, dig some up. Sad to see a persons life and family get slowly destroyed by just one false accusation. No wonder there is a teacher shortage.

## retired-pausd-teacher

February 17, 2023 at 8:55 am

Remember, a vital precept to our justice system is "Innocent Until Proven Guilty". Mr. Colombo was charged on 6/14/22 and has since then sat at home awaiting his day in court. He has been clean for 11 years and is allowed to continue his role as a highly respected AA counselor. Unfortunately, Ms. Morgan goes to great lengths to document complaints against Mr. Colombo but put very little effort into finding the myriad of compliments and thank you cards he has received over the years. In addition, his personnel file is a lot cleaner than many other PAUSD staff members when it comes to complaints.

If a vigorous high five or male chest bump is tantamount to sexual abuse, then there is a long list of PAUSD administrators, teachers, staff, and coaches that are all suspect too. On any given day benevolent high fives, fist bumps, nudges, hugs, and hands on shoulders are administered by the aforementioned. Terms of endearment like "honey" and "sweetheart" are used frequently. Yes, pimp is not an appropriate term, but it is used by students as a compliment, and Mr. Colombo mistakenly fed on that and learned his lesson. As far as offers of food to students, it happens daily on campus. In 27 years, I've seen teachers, administrators, and staff offer food to hungry kids, and often students come begging for it. Heck, not long ago, before the PAUSD website was covered with construction images, there was an image of Don Austin seated on a couch with an elementary school child. Should he be investigated too?

Of course, the press is always looking for tantalizing tidbits to attract readers so digging up the Colombo case that has gone nowhere in nearly 8 months with no other accusers coming forward must have seemed a good idea. But the press is not a courtroom, nor is this forum. The accuser, her family, and Mr. Colombo all deserve justice. Let the facts speak before you jump to conclusions.

## jennifer-2

February 17, 2023 at 8:56 am

The rape of a sixth grader over two decades ago and all his other criminal activity, this man should've been sent to prison a long time ago. How he kept his job is beyond me. I hope he's sentenced to prison for the rest of his life. Hopefully there aren't other victims. Referring to a student as a "pimp" isn't a "compliment" but it's not as bad as everything else he's done. He's disgusting, and so is enabling him all these years. Enough is enough.

## a-person

Kudos to the PA Weekly and Zoe Morgan for this investigative journalism.

## a-person

February 17, 2023 at 10:47 am

I'm a child of PAUSD and a parent of PAUSD. Bill Giordano tried to groom me in junior high. He regularly asked me to chat after class, designed personal jokes with me, included me on special field trips to pick bands for school events. He successfully groomed many other girls, leaving them with PTSD that was only temporarily relieved by his arrest and conviction. Hawaiian shirts with white pants can bring up challenging memories for me…I can't imagine how these shirts fall for the girls who didn't get away. That said, Giordano wasn't violent, he was stealth. Colombo raping an 11-year-old girl and blaming it on Giordano is another level of sociopath.

## pausd-parent-5

February 17, 2023 at 11:28 am

We learned a few months ago that the in house attorney for the district was fired suddenly and without cause. Is this investigation the reason? Was the school district trying to avoid responsibility and an investigation?

## michele-dauber

February 17, 2023 at 12:08 pm

I have been sober 34 years and have never seen this jerk in a meeting, and he better hope I never do. Furthermore, even if he doesn't drink, that has nothing to do with whether he is abusive. Sobriety is not a cure for sexual harassment or abuse and people should stop equating them. AA treats alcoholism, not rape.

## ben-z-2

February 17, 2023 at 12:27 pm

This is just another example of higher-ups protect sexual abusers until the flood gates open up.

It shouldn't matter what position a person has, whether it be a school administrator, a police officer, a district attorney, or even a judge. These people have an OBLIGATION to protect children in the community.

Sadly, I can attest that this doesn't always happen. Some administrators just prefer to throw other people's children under the bus rather than hold their colleagues and subordinates accountable.

## jerry-2

February 17, 2023 at 12:42 pm

It's good that Colombo is now clean but that doesn't negate the fact that he allegedly raped a schoolgirl. If guilty, that might be considered at his sentencing.

Unfortunately there's no public evidence (yet) that he's guilty. But the fact that the DA brought charges against him suggest they have some strong evidence. Many comments on this story here have already convicted him or exonerated him.

The real failing here is that PAUSD did not aggressively investigate each of these complaints when they arose. Even if Colombo is innocent, he should have been fired by PAUSD long ago for inappropriate and unprofessional behavior. He himself admitted this.

I think this story is well written and detailed but the graphics are a bit on the 1970's creepy side.

### pausd-volunteer

February 17, 2023 at 12:59 pm

@Michelle Dauber
There are multiple places to attend AA meetings and because "the jerk" you refer doesn't attend your meeting doesn't mean he's not, in fact, he attends meetings daily in his home city.
You also sound like you're making a threat which is violent behavior and to someone that hasn't been convicted of molestation or rape.
So much anger, you may need to consider anger management meetings.

### lynne-henderson

February 17, 2023 at 1:09 pm

I fail to see why the lack of other reports of rape make the charge a "false accusation". The CA statute of limitations for child sexual abuse cases was lengthened to allow adult survivors who were unable to "tell" as children to come forward, but many still do not report assaults for many reasons. (Or maybe there is a "one free rape" understanding in this culture–you need multiple victims to prove he really did it?)
As for "he's just kidding around"/"everybody does it"–no, "everybody *doesn't.* Offering food to hungry students at school is one thing, inviting a single student home for pizza is quite another.

### jordanmom

February 17, 2023 at 2:48 pm

@RetiredPAUSDTeacher: Well said: "The press is not a courtroom, nor is this forum. Let the facts speak before you jump to conclusions."

## jennifer-2

February 17, 2023 at 3:22 pm

You're "innocent until proven guilty" in a court of law. In the court of public opinion (which this is) you're only "innocent" if you didn't do it. I've read more than enough "facts" to form an opinion. As a child and parent of PAUSD, this makes me sick. Unless you're a sworn juror, you're entitled to an opinion. That's what commenting here is all about.

## michele-dauber

February 17, 2023 at 3:40 pm

I was really disturbed by the number of people claiming to be Palo Altans defending this guy. Then I remembered how many of you supported Mike Airo, Mr. G, and even Brock Turner. There is a segment of this community that believes rape myths and blames victims. Mostly affluent, mostly older, mostly lawyers, mostly Stanford affiliated. Mostly wrong. Mostly jerks.

## jordan-student

February 17, 2023 at 4:14 pm

I went to Jordan Middle School 2006-2009. It was an open secret that he messed with a sixth grade girl at that time, and that he has a criminal record. It confused everyone on how he managed to still have employment at Jordan, but he was liked well enough by the guys who took PE seriously. He also kept saying how he used to teach math and he had debates with students on history, such as WWII. He always rubbed me the wrong way, even after he returned from an administrative leave for a year.

The only shocking thing is that it took PAUSD this long to actually get an investigation on him and for charges to be pressed. The amount of people defending him is very disappointing.

## north-pa-mom

February 17, 2023 at 4:15 pm

My kids had Mr. G, and they had Mr. C. Not impressed by their demeanor with the kids, and after my two boys went through Jordan, and I had a daughter, it's pretty sad that I had to tell her to look out for pervy PE coaches since PAUSD was doing nothing to discipline and fire them. And like Michelle Dauber, I am astounded by the parents who defend these guys and victim shame. The bro network sticks together and defends their own. I was amazed by how little time Mr. G spent in prison. Clearly, Mr. C needed help that he was not getting, but keeping him on the payroll and allowing further interactions with children is beyond the pale.

## bystander

February 17, 2023 at 4:41 pm

I am not defending either of these two former teachers so please do not take this as such.

However, if a mistake has been made and somebody, anybody, gets accused of sexual assault, even if later found innocent, their life is ruined. Particularly in the age of internet, there is always an old article or an opinion somewhere that can be found by a future employer or similar. I think it is time that we remember that innocent until proven guilty is the way the law works and a court of law decides that, not as mentioned above, the court of public opinion. It is bad when someone who is later acquitted has their life destroyed in this way.

## jordanmom

February 17, 2023 at 5:01 pm

@Jennifer, in my "opinion", the article is written in a way that implies the accused is guilty.

## spectator-at-large

February 17, 2023 at 5:10 pm

It's not only PE teachers who are molesting students. I had a history/English teacher at my junior high school back in late 50's or early 60's who was doing it with a student (everyone knew about it) and he later went on to marry her after she finished high school so it validated our suspicions or outright knowledge. He had been carrying on with her for all those years and was married to boot.

It's great that girls are feeling freer to report abuses but all too frequently it doesn't result in the outcome it should.

After Mr. G's sentencing, students in Paly's student publication the Voice were still talking about how much they liked Mr. G. Some felt sorry for him for having
to do jail time.

I too am shocked at how many people are jumping in to defend this Colombo creep. The perp is just as capable of committing another rape whether he is
sober or intoxicated. One commenter even said that he thinks the fact that Colombo says he isn't drinking any longer should be considered at his trial.

Like Ms Dauber, I am supremely disappointed at how many other creeps live in
my fair city.

## jordan-student

February 17, 2023 at 5:13 pm

@bystander: Colombo ruined his life when he got his first DUI. He's been known among everyone at Jordan to be a troubling person. Just because he's good at his job absolutely does not mean he gets to keep his job. I guess the past administration decided landing Paly's baseball team into championships was more important than firing someone shady.

EXHIBIT S_025

@JordanMom: the article does not imply anything. It merely states that Colombo has a rap sheet the length of a CVS receipt prior to being hired by PAUSD, and he's continued being a rambunctious individual with too many people excusing his behavior. Ask anyone who's attended Jordan in the 2000's and they'll confirm everything written in this article.

# jennifer-2

February 17, 2023 at 5:25 pm

I'm also appalled by the number of Palo Altan's defending him, probably parents. All I care about is the kids. If defendants were really "innocent until proven guilty" would they be allowed to be jailed, sometimes without bail? You're innocent until proven guilty in a court of law, where the prosecution has the burden of proof. This isn't a court of law.

# nayeli

February 17, 2023 at 6:14 pm

Yikes! If true, this is a shocking failure of the PAUSD. The district certainly didn't do its due diligence during the hiring process. If this was my child, I'd seek a maximum penalty AND THEN sue the district for as much in damages as can be levied. There is no money that can compensate that child.

Of course, if it's found to not be true, then this man will still be guilty in the eyes of others. Either way, this is a reason why fewer men (and women) have opted to pursue a career in education. It's already a difficult profession even before you weigh the dangers of being accused of a crime. Yes, this man could be guilty of what he's been accused. However, even a completely innocent person is damaged forever by such an accusation.

Personally, I'd prefer to withhold an opinion of guilt until the legal system has done its best at fair and impartial jurisprudence.

# myfeelz

February 17, 2023 at 7:09 pm

@Michele Dauber have you ever seen the documentary called "13th Step -a film by Monica Richardson"? It can be seen in full for free at youtube here > https://www.youtube.com/watch?v=-iUd6qZRSi8 < No shortage of newcomers in AA who are often referred to as babies, newbies, pigeons, etc. All diminutive descriptors for people who are newly sober and extremely vulnerable. Low hanging fruit. I'm not surprised this guy is an AA cheerleader.

PS there are no "AA Counselors". If you mean "SPONSOR", Retired PAUSD Teacher, those are exactly some of the worst offenders who commit the 13th step on the regular.

# roger-dodger

February 17, 2023 at 7:58 pm

One would hope that somewhere along the line in her 34 years of sobriety, Ms. Dauber would have come across the 11th Tradition of AA, which strongly encourages maintaining anonymity "at the level of press, radio, and film." One of the main ideas there was to keep egos in check. Not that they're in play here at all, really. (There's also a notion floating around AA that people are capable of change, that people can forgive and be forgiven, and that people can be redeemed from the depths of unspeakable suffering. Not that these are in play here either. Nothing to see here, move along.)

The man has been tried and found guilty by the "court of public opinion" here on the PA Town Square. Surely the gallows should be raised in front of city hall? Hardly a fair trial, but it is what it is. A sad spectacle in an allegedly progressive, thoughtful community….

## michele-dauber

February 17, 2023 at 8:08 pm

It's Columbo who brought sobriety into public controversy not me. He's the one who had had "all these years of supposed recovery," and an apparently acquaintance here claimed he was an "AA Counselor" which is by the way not a thing. It's Columbo who decided to bring recovery into this in a way that brought sobriety into public controversy and a negative light; I can only imagine young women who have been assaulted or abused reading this bulls— and thinking "If that's sobriety I want nothing to do with it." So thanks but no thanks save your lectures for the other bleeding Deacons on your soapbox. The ladies know exactly what I am saying.

## north-pa-mom

February 17, 2023 at 8:21 pm

If you're a woman, and a mother, having observed Mr. C's behavior, you would never want your daughter to be in a situation alone with him. His behavior was inappropriate on so many occasions, and he was always given a pass. He should've been fired.

## anonymous

February 17, 2023 at 8:25 pm

Very complicated situation and account, but:

– I think my kids both had this teacher – thought was….semi-ok……

– I had one interaction (as an adult parent) with Giardano that appeared normal

– mention of not all criminal offenses are disqualifying for employment:

This brings to mind California's charming efforts to prioritize criminal offenders over victims.

In some cities landlords cannot check/use criminal history of tenant applicants (I am horrified, I believe landlords' attempts to have safe dwellings are now at risk, unaware female tenants are at risk)

AND employers under the Fair Chance Act are required to help applicants; a quick search shows SB-731 "was signed into law by California Governor Gavin Newsom (in) 2022. The new law will automatically seal felony records for non-sex offender-related, non-violent offenses that meet (certain criteria)…(for convictions after January 1, 2005) The new

EXHIBIT S_027

law will expunge these records from public view and make them difficult for most employers to access during background checks."

I believe female employees – naive to the clear risky workplace they may be in – are now especially placed at risk. These things are complicated and schools MUST be especially careful to have a safe environment for students, teachers, staff.

New law(s) for elaborate rules, hiring procedures place burdens on police, school administrators/hiring officials (our politicians trying to help ex-felons with their employment and apartment searches) that will lead to omissions and mistakes.

I could care less about the ex-offenders: I DO care about the general public who are naive to the risk a nearby co-worker may pose, for example (under CA's misguided priorities).

I hope to leave California as I oppose prioritizing criminals, felons, ex-offenders over children, women, vulnerable persons, whether at school, CA places of employment, or in rental housing. Ex-offenders may well re-offend.

## myfeelz

February 17, 2023 at 8:26 pm

Roger, I believe it was in the Retired PAUSD opinion that outed the accused as an "AA Counselor". Which, if you read your big book, you will find there are no AA Counselors. It would be interesting to know how Retired PAUSD came to use that particular term for him. Any old drunk can be an AA member. But you have to be really special if you're going to call yourself an "AA Counselor"? Unless he has a license as a drug and alcohol counselor, he's misstating his position. And if he DOES have a license, AA would be filing a cease and desist order because, among the traditions, Tradition 6 states: "An AA Group ought never endorse, finance, or lend the AA name to any related facility, or outside enterprise, lest problems of money, property and prestige divert us from our primary purpose." You can insert "An AA member" where it says "An AA group."

## jennifer-2

February 17, 2023 at 8:37 pm

Sadly, it's women (probably mom's) who are defending him. Why? I don't know anything about AA, but sober or not, what does that have to do with abusing young girls? He says himself he should've been fired in 2010. If you don't know a horse, look at its track record.

This article points out his criminal activity. If that makes him look guilty, whose fault is that?

As a woman and a mom, I DO know what Michele Dauber is saying. She's an advocate, and a darn good one.

## myfeelz

February 17, 2023 at 8:44 pm

Jennifer, many people hide behind the mantle of AA membership to smooth the rough edges of a sketchy past. But it

EXHIBIT S_028

being an "anonymous" program, and they are promoting themselves toward a higher reputation than they actually have by citing AA membership, AA's traditions say essentially 'don't use us as a human shield'. The funniest thing I ever saw was a Norm MacDonald stand-up bit about alcoholics. And now when I watch it, I put the accused's face on it and it seems even funnier. >https://www.youtube.com/watch?v=TCxfIoD1MXg&lt;

## retired-pausd-teacher

February 17, 2023 at 8:55 pm

So now we are parsing sponsor over counselor. I own the wrong nomenclature. Sorry folks. That is all some weak people have: pin the "undereducated" on buzzwords because there is no substance to the "educated" argument. Great. Enjoy it and then wonder why your children can't stand to live. At the end of the day, why do this to a man unless you have all the facts. Hyperbole is great. Facts are better, but none of that counts when you are a crusader, right Michelle?

## morgan

February 17, 2023 at 10:11 pm

Why is Benavidez still the principal at Greene? How can he be so naive? His first email sounds more like he wants to be Columbo's buddy.

And, as always, Austin sits on his ass and says, "there's nothing we can do".

There have been far too many teachers at PAUSD that have given similar creepy vibes that have either been caught and/or fired or still lurk on campus. Almost always, the female students can tell you exactly who they are. Publicly called out have been Airo, Giordano, Farrell and I know I'm missing at least one. There are also those still on campus like Shelton at Paly and Rappaport who was "allowed to resign" for unwanted comments and behavior. Teachers and students all knew when Jackson Hall was raping students and within the past few years there were at least two students accused of multiple rapes that never became public.

It's a top-down problem. Austin makes everything about him, so he tries to brush aside bad news instead of accepting responsibility. Sites are essentially encouraged to bury negative incidents. If they do, they are rewarded with promotions, just look at Kathie Laurence and the former Terman principal Pier Angeli La Place.

## myfeelz

February 17, 2023 at 10:59 pm

@Retired, he can file a slander suit if any lies have been published. But he admits so much himself, and convictions are public record, so nobody is shying away from the real matter at hand. There are enough AA "stars" out there and you can pore over the sites that have Speaker tapes that can be had for free. I'm sure he's out there. That's why I love the Richie K. story in Norm MacDonald's standup bit about AA. People tell stories in AA that will curl your hair. Despite the 2nd A in the name of the group, people do talk outside of meetings about what they hear there, to others who are NOT members of the club. Meanwhile, there are 30 years of criminal records that CAN'T be obtained by the average citizen, to

EXHIBIT S_029

determine if those citizens want their kids to be taught by a career criminal.

## rebecca-eisenberg

February 18, 2023 at 1:57 am

I hate rape and I love Title 9. I have been a consistent vocal critic of the school district every single time — *countless* times — that the district fails to address sexual assault and rape culture. I do not trust Don Austin to do one thing right to protect young women and girls. And as to the Paly Principal, I'm still steaming from how he blamed victims for outing their harassers and assailants on instagram. It's not the talking about assault that is the problem, Principal Kline. It is the actual assault that is the problem.

That said, I question this article's research. I do not understand why the other PE teacher, who later was convicted for multiple assaults during that exact time period, was not considered for this rape as well. Given that most rape is done by repeat offenders (I think I learned that from Michele Dauber, amongst others), Giordano is the obvious #1 suspect. Did they interview him?

This is particularly troubling because in the email I read (PAO should publish the entire emails), the victim states that she was unsure who raped her–very different from what this article reports. In that email, the victim's husband describes the rapist as her PE teacher and swim coach–both of which point to Giordano, not Colombo.

Yes, Colombo used inappropriate language. But the complaints were from parents of boys, who were not victims of sexism. Both my daughter and my son had Colombo for PE at Greene fka Jordan, and yes, the language sometimes was bad, but they always felt safe. Bad language does not correlate with rape, but a history of sexual assault, like Giordano's, does.

As to Colombo's criminal record, none of it involved violence, only drunkenness, and no crimes were committed at or near school. If we fired all recovered alcoholics, we would have far fewer teachers (and doctors, lawyers, etc). Recovered alcoholics can be exceptional at their jobs, even teaching.

Did PAO talk to Giordano? Did PAUSD? Did PAPD? He's out of jail by now, sadly.

## pausd-volunteer

February 18, 2023 at 8:16 am

Thank you @ Rebecca Eisenberg for your thoughtful comments.
I'm not suggesting that Giordano is the suspect, however the victim never saw who the rapist was, but pointed her accusations to Mr Colombo.
It appears that the law professor @ Dauber is on a witch hunt and has tried and convicted Mr Colombo, without a trial. I am all for justice, but let's wait for the real judicial system to work this out.
Yes, Mr Colombo had a past, who doesn't? Everyone commenting, is a saint?
He is not PC, (I didn't read anywhere that his language was sexual) he aligns with the kids and their language to be "cool" and to relate, not to abuse and violate, that might be his downfall. But let's be honest, do you think your kids

EXHIBIT S_030

haven't used or heard this language elsewhere? As a parent this is where discussion, as to what is acceptable in your family. Sure it's ok to report, but it's important that your student is educated and understands these things happen outside their bubble and how they'll deal with words that are offensive to them.

Mr Colombo is passionate about his teaching/coaching. As the article states he redirected a male student, by putting his hand mid back. This is not sexual, Why is this a problem? Palo Alto parents get real, your kids are soft, if they aren't exposed to some of this type of banter and language they will have a difficult transition into the real world. It's definitely worth a conversation with your child, but let's face it, Palo Alto is not the real world. Your children are sheltered need some real life.

And yes, I have adult children that went through Jordan and Paly and were instructed by Mr Colombo.

# myfeelz

February 18, 2023 at 11:22 am

"What an order! I can't go through with it." Do not be discouraged. No one among us has been able to maintain anything like perfect adherence to these principles. We are not saints." Some people stop right there because that sentence gives them a pass to allow them not to change anything except remove the alcohol. A drunken multiple offender, minus alcohol, is still a multiple offender. One thing is certain. In many cases where offenders blame their bad behavior on alcohol –(BOOZE MADE ME DO IT!) — judges are lenient in sentencing and will give the offender a pass if they will go to mandatory AA meetings. If an offender is already claiming to be an AA Counselor, the judge might be inclined to see him as nothing but an opportunistic parasite. This particular person being referenced in the article has a 30 year history of "bad behavior", and if sobriety churns out people who are like that, I'm in agreement with Ms. Dauber. He sets a bad example. If AA's traditions say that their "public relations policy is based on attraction rather than promotion", any recovery advocacy on his part can be taken with a grain of salt. Unless this disclaimer is added: "Do as I say, not as I do".

# spectator-at-large

February 18, 2023 at 12:41 pm

It is unfortunate that Mr. Columbo's involvement with AA was introduced into this article. The door that was opened has afforded anopportunity for people with no real knowledge of how AA works (other than a video referenced on this forum and a comedian's disgraceful strand up routine about alcoholism). The very unfortunate result of all of this side chatter about alcoholics and criticism of AA is that suffering alcoholics out there that may have been thinking of trying to get some help will decide that AA is not for them without even trying it out. By extension, that individual may die some day from this disease and cause untold havoc in their own lives as well as in the lives of those who love them. Alcoholism is a terminal disease that can be put in permanent remission by removing the substance from one's life. Unfortunately, most people require a spiritual program and some kind of support in order to achieve long-term sobriety. Reading so many negative things about twelve step recovery programs in this forum may severely reduce the chances of recovery for many people. If there is only one person who misses a chance to get sober because of all the misinformation that has been offered in this forum it would be heartbreaking.

Please consider that this article in a not a forum on AA. It is about Mr. Columbo and his behavior. Thanks to those that

stick to the subject.

## michele-dauber

February 18, 2023 at 1:01 pm

@PA volunteer, I for one do not have a "past" of being accused of raping a child, or of being inappropriate with children. No, not everyone has "a past" of that nature. And I wholeheartedly agree with Spectator that his drinking or lack thereof is irrelevant to the current accusations. And I am quite certain that the victim knew exactly who assaulted her by the time Columbo was charged. The idea that this was mistaken identity is anti-survivor, and reminds me of Susan Collins who famously said that Christine Ford was probably raped by someone other than Kavanaugh and she just didn't remember. I hope this survivor receives justice.

## jerry-2

February 18, 2023 at 3:16 pm

"One commenter even said that he thinks the fact that Colombo says he isn't drinking any longer should be considered at his trial."

@Spectator If you're referring to my comment, that's not what I said at all. I said it *might* be considered at his sentencing. That's a statement of fact, not my intent. It's standard practice during sentencing to consider the defendant's current circumstances.

I'm not defending this guy at all. I'm just trying to stick the facts presented in the article. I would hope that any potential juror would keep that mindset. As @Bystander said, if someone is wrongly convicted, it will follow them forever and destroy their life.

We all know how the Court of Public Opinion works because we're all part of it right now. But that doesn't make it a good thing or even an acceptable thing. In my opinion, it's the internet equivalent of mob lynching.

## michele-dauber

February 18, 2023 at 5:25 pm

A white man in a union possibly losing his job or being held criminally accountable after receiving appropriate due process not lynching. Nor is discussion of it. That is offensive and insulting to black people who have actually been lynched to make that comparison.

## jennifer-2

February 18, 2023 at 5:26 pm

You don't see the "innocent until proven guilty" "court of public opinion" outrage when someone is facing burglary, etc.

EXHIBIT S_032

charges. Why the defense of an alleged child rapist? If someone is wrongfully accused of any crime it could ruin them, and that's why certain news organizations withhold names, including this one. You'll notice names are mentioned in this article for a reason. If you're more concerned about him than the young girl, I hope and pray you don't have any daughters. It's human nature to have an opinion, and I find it "acceptable."

## david-10

February 18, 2023 at 9:59 pm

Rather than debate and rebut and defend and judge, I'll just say Colombo is many things and has flaws but HE IS MOST DEFINITELY not a rapist. It is really that simple and you will see soon that the DA messed up. Hope we don't have two victims here. To the alleged victim, you need to be 100% certain and you are admittedly NOT!

## rebecca-eisenberg

February 19, 2023 at 12:24 am

Jennifer: I don't think you were asking me, but FYI: I do become outraged when someone is unfairly accused of burglary, etc. See, e.g., https://rle.medium.com/admitting-lack-of-evidence-papd-blames-purse-theft-on-black-males-in-their-early-20s-cbc3732a8db4

## neighbor-5

February 19, 2023 at 3:45 am

"Yes, pimp is not an appropriate term, but it is used by students as a compliment, and Mr. Colombo mistakenly fed on that and learned his lesson."

Is this appropriate in school? I don't understand why people are defending inappropriate behavior. Let boys be boys is not acceptable. Coaches and teachers that boys are okay with and love that young women feel uncomfortable around MUST BE INVESTIGATED if a concrete allegation (rape, inappropriate touch, bad language) is made.

Why isn't the District following through in investigations and reporting them? Why does the principle still have his job at Jordan?

## neighbor-5

February 19, 2023 at 3:51 am

Thank you Zoe Morgan for writing this piece. Without these kinds of articles, we would have no idea what goes on in the district and be able warn our children about it. I already talk thoroughly about body safety but will make sure I have conversations about all their teachers and coaches periodically.

This is a great reminder to parents. This happens in school and in activities. Let's not forget the School of Rock guitar

teacher that molested a child several years ago right in midtown. I am sure there are many more examples. Be vigilant with your kids!

## silver-linings

February 19, 2023 at 8:27 pm

Much of the back and forth above has to do with people's different experiences of this person. Too many seem to assume that if their child had no issues, therefore the victim couldn't have.

This is a non sequitur.

Sexual predators, gaslighters of all stripes and even emotional abusers who don't use physical force, get away with it by insinuating themselves into a group and are prepared to come across as congenial compared to the victim. When the victim complains about what they were subjected to, the perpetrator inflicts yet more harm by blaming the victim or invalidating them; the perpetrator gets away with it because they are "liked" (as Colombo made a point of talking up in his letter).

I cannot speak to the facts of the case but I believe the victim, especially since she has no incentive to come forward, and there was so much corroboration from the time.

"Current Superintendent…said in an interview that no one who had decision-making power over Colombo's employment at the time of his criminal convictions and credential suspension is still employed by the district, and he couldn't speak for them. However, Austin said that if the same series of events happened today, he would not let the teacher keep their job."

This is such a cop out. He's basically saying, those people left the district (almost certainly to other nearby districts), so therefore I/PAUSD bears no responsibility and can't do anything. What a crock. This is why our district is condemned to keep repeating its mistakes. Instead of reacting to a wrong by figuring out how to make it right, how to take responsibility, how to do the right thing for kids who have been harmed, our district culture is to sweep under the rug, cover up, push people out, avoid even dealing with the harmed kids or families. Then believe with all their shrunken shriveled hearts that if the situation came up again, THEN they'd do the right thing. Lather, rinse, repeat.

## morgan

February 19, 2023 at 8:36 pm

Silver Linings hit the nail on the head, "This is such a cop out. He's basically saying, those people left the district (almost certainly to other nearby districts), so therefore I/PAUSD bears no responsibility and can't do anything. What a crock. This is why our district is condemned to keep repeating its mistakes. Instead of reacting to a wrong by figuring out how to make it right, how to take responsibility, how to do the right thing for kids who have been harmed, our district culture is to sweep under the rug, cover up, push people out, avoid even dealing with the harmed kids or families. Then believe with all their shrunken shriveled hearts that if the situation came up again, THEN they'd do the right thing. Lather, rinse, repeat."

EXHIBIT S_034

Austin is too cowardly to take responsibility or make changes for the future that will benefit the students.

It's amazing that the board can't see through his act, or maybe they don't care about students either.

## staying-home

February 20, 2023 at 9:37 am

there is a sense of betrayal here. you want to trust teachers/coaches and believe they represent the best of us.

Teachers/coaches use inappropriate language all the time. It's usually the adult trying to connect with the student by using the same words they youths use among themselves. I can forgive foul language. Drug use is so common these days, a run in with the law can sometimes be seen as an outlier instead of a pattern of behavior. The desire to trust and believe is strong. Sexual assault, though is not in the same category as foul language and drug use. It is unacceptable in any context and requires zero tolerance. Victims need to be believed, investigations need to be made, and if found guilty, columbo needs to be punished.

## hal

February 20, 2023 at 8:51 pm

A couple interesting sources of reference:

https://www.reddit.com/r/micheledauber/

https://www.youtube.com/watch?v=JHjU6FLl0CY

## myfeelz

February 20, 2023 at 11:33 pm

Spectator at large, I guess you only noticed the Norm MacDonald video (may he rest in peace) delivering irony by the plate-ful at that show. If you scroll through the comments many sober old-timers said it was hilarious if it's taken in the right context and if you have a sense of humor. The other link I provided was https://www.youtube.com/watch?v=-iUd6qZRSi8, a documentary that recounts numerous 13th stepper horror stories, when "newbies" or "pigeons" or "babies" a.k.a. newcomers are often 13 stepped before even knowing what it is. This usually happens when a young vulnerable person goes to a group and is latched on by a "Counselor" — no such thing, but there ARE sponsors. Nothing in the AA literature says you have to have a sponsor. Also, AA is not the only solution for sobriety. Many people can't get past "How It Works" that starts off every meeting, saying "Remember that we deal with alcohol—cunning, baffling, powerful! Without help it is too much for us. But there is One who has all power—that One is God. May you find Him now" — quite preachy, and not everyone can get behind that. The only thing I know about AA is take what you need, and leave the rest as you walk out the door. I hope that Mr. Columbo finds strength in his "program". Every change, whether wanted or not, leads to a new opportunity.

**v-3**

February 21, 2023 at 10:29 am

@Jordan Student – well said!!! It's sad, but the district likes to hide issues. It's not only students getting hurt, but staff as well. I think former administrators should be prosecuted for allowing things like this to happen. It's all about who knows who and who helped who.

**rc**

February 21, 2023 at 3:35 pm

This story is appalling in so many ways. I wish the people involved could be held accountable in some way, even if they are long gone from the district. While Scott Bowers was so graciously defending Pete Columbo, he was also responsible, (along with the the Terman principal at that time) of bringing down an entire staff by removing the beloved secretary there and lying about it to parents and staff. Yet, he was fine trying to get Pete Columbo reinstated…and it worked! I can only hope this comes back to haunt those involved. Stop defending this teacher and the others who enabled him and his behavior.

# myfeelz

February 21, 2023 at 4:26 pm

@RC it's ironic there are 3 headlines pointing to this article on the front page of this website, but comments like yours get censored for naming names. It's like they WANT everybody here to call out the system that brought a suspicious character into a position of authority with access to children, yet they don't want anybody to really say how this could ever happen.

## concerned-student

February 26, 2023 at 9:14 am

I believe the user Retired PAUSD Teacher is Mr. Colombo, his lawyer, or close friend. The user states direct knowledge of the gender of the student who was touched in 2021. While the article clearly states "they're back."

Retired PAUSD states on Feb 18, 2023 at 8:16 am: "As the article states he redirected a male student, by putting his hand mid back. This is not sexual, Why is this a problem?"

## concerned-student

February 26, 2023 at 10:02 am

Adults on this thread, please act and step up to protect students from sexual predators.

Palo Alto has turned a blind eye to toxic male teacher behavior for too long.

EXHIBIT S_036

The analogy used earlier in this thread of Mr. Colombo having a rap sheet as long as a CVS receipt is all too true. Colombo's reputation is well known and it's unfortunate it extends beyond his sexualized comments and inappropriate touching into sexual assault.

It only takes one rape to make a rapist. I hope this is the only case and there are not other victims. We are finally starting to see justice for victim's of the early 2000s — too many cases but, justice for cases like Weinstein are increasing public attention.

## myfeelz

February 26, 2023 at 8:51 pm

Thank you Concerned Student. Weinstein is a perfect example of a person who could influence people's future and the victims had no voice because they were faced with too much to lose by telling the truth. The alleged victim in this case took 20 years to gather the strength to do it. I can't think of a single reason to allege something if it never happened, 20 years after the fact. The victim will still likely be grilled over this process even after so long. There's no purpose to it except to try to make your generation safer than the victim's generation was. It's an act of generosity and hope for future generations.

Everybody should see the movie "Bombshell", which is about how the FOX network's style of sexual harassment became a way of life, until one reporter just couldn't remain silent anymore.

## palo-alto-res

February 26, 2023 at 9:37 pm

How convenient for Superintendent Don Austin to say anyone related to hiring or keeping PE teacher Colombo is no longer at the PAUSD district. Ultimately doesn't the buck stop with Don Austin? PAUSD was getting complaints nonstop about PAUSD PE teacher Columbo in 2021-2022. Multiple emails to the principal Benavidez (that Don Austin hired) and so really you have the Principal Benavidez and Superintendent Don Austin working at PAUSD and fully aware of the complains.

Ironic Don Austin passes the buck. Is he ever responsible for anything other than "being a leader" in education (which he constantly touts and pats himself on the back with)?

Also why did the district not notify PAUSD parents and try to keep news like this under cover?

Student suicides at PAUSD? PAUSD parents not notified.
Teacher investigated? PAUSD parents not notified.
Teacher death during pandemic? PAUSD parents not notified.
Teacher arrested for grooming investigation or rape allgegations? PAUSD parents not notified.

Don Austin likes to do things by omission. Everything is top secret, especially things that should come to light.

Instead of sending out an email to parents to ask if there are any other reportable instances regarding PE Teacher Pete

EXHIBIT S_037

Colombo, it's all a secret. Hidden away.

## morgan

February 28, 2023 at 3:46 pm

@Palo Alto Res – You are exactly right. Most people don't see it. Those that stay up on what comes out of PAUSD are well aware. I think it was one of the reasons Shana Segal ran for school board. She doesn't trust him.

He always comes off publicly as though he cares about students and respects parents. Ask anyone who has brought an opposing opinion to him and you realize he only cares about his public perception. He will lie straight to your face. It's amazing he's lasted this long.

He will only bring up the positives, never accept blame for any of the negatives.

## myfeelz

March 4, 2023 at 11:36 am

An incidental finding on zee interweebz reveals this:
https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/09141217-b.pdf It's an agreement between the Office Of Civil Rights under HHS and PAUSD from 2017. Among the orders given to PAUSD is below:

"Tracking Reports and Complaints of Sexual Harassment
1. The District will develop an online system where students and parents can make anonymous reports of sexual harassment and sexual violence. To the extent possible based on anonymous reports, complaints will be processed consistent with Section A.2.e and A.2.f."

And this: "OCR will monitor this resolution agreement for a minimum of three years."

Sounds like any one of the affected students, faculty, parent, friend of a friend, etc can re-open the complaint by filing a new complaint referencing "OCR Case Nos. 09-13-5901 and 09-14-1217" We don't know all of the facts, as usual. This is about more than what the DA can charge the accused with. It's a violation of all people affected by PAUSD, and their civil rights under Title IX, and PAUSD's failure to keep up with their mandated responsibilities per OCR. Just because the case expired doesn't mean PAUSD could get back to "business as usual".

---

© 2024 Palo Alto Online.

# EXHIBIT T

 todoke

# Tenured Stanford professor and avid Amber Heard defender Michele Dauber on men

Wokeism



# EXHIBIT U

| YEAR | SALARIES | SUMMER SCHOOL | BASKETBALL | BASEBALL |
|---|---|---|---|---|
| 2024-2025 | $168,715 | $5,644 | $4,893 | $3,840 |
| 2025-2026 | $168,715 | $5,644 | $4,893 | $3,840 |
| 2026-2027 | $174,620 | $5,841 | $5,064 | $3,974 |
| 2027-2028 | $180,731 | $6,045 | $5,242 | $4,114 |
| 2028-2029 | $187,057 | $6,257 | $5,425 | $4,258 |
| 2029-2030 | $193,604 | $6,476 | $5,615 | $4,407 |
| 2030-2031 | $200,380 | $6,703 | $5,811 | $4,561 |
| 2031-2032 | $207,393 | $6,937 | $6,015 | $4,720 |
| 2032-2033 | $214,652 | $7,180 | $6,225 | $4,886 |
| 2033-2034 | $222,165 | $7,432 | $6,443 | $5,057 |
| 2034-2035 | $229,941 | $7,692 | $6,669 | $5,234 |
| 2035-2036 | $237,989 | $7,961 | $6,902 | $5,417 |
| 2036-2037 | $246,318 | $8,240 | $7,144 | $5,606 |
| **TOTALS** | **$2,632,280** | **$88,052** | **$76,341** | **$59,914** |
| **BENEFITS 20%** | **$526,456** | | | |

| YEAR | CALSTRS | | |
|---|---|---|---|
| 2037 | $139,872 | | |
| 2038 | $139,872 | | |
| 2039 | $139,872 | | |
| 2040 | $139,872 | | |
| 2041 | $139,872 | **ECONOMIC LOSS** | **$5,201,379** |
| 2042 | $139,872 | **ATTORNEYS' FEES** | **$410,000** |
| 2043 | $139,872 | **TOTAL ECON** | **$5,611,379** |
| 2044 | $139,872 | | |
| 2045 | $139,872 | | |
| 2046 | $139,872 | | |
| 2047 | $139,872 | | |
| 2048 | $139,872 | | |
| 2049 | $139,872 | | |

| | |
|---|---|
| **TOTAL PENSION** | **$1,818,336** |
| **TOTAL SALARY** | **$2,632,280** |
| **TOTAL BENEFITS** | **$526,456** |
| **TOTAL STIPENDS** | **$224,307** |
| **ECONOMIC LOSS** | **$5,201,379** |

# Retirement Benefits Calculator



**The information you provided:**

| | |
|---|---|
| You plan to retire: | 6/7/2037 |
| Your age at retirement will be: | 70 years, 0 months |
| Your years of service credit will be (includes service credit, unused sick leave): | 40.196 |
| Your years of other service credit will be: | 0.000 |
| Your age factor based on your date of birth will be: | 0.024 |

| | |
|---|---|
| **Your average monthly salary (final compensation):** | **$20,526.50** |

## Retirement Calculation

The Member–Only Benefit shown below is calculated by multiplying your final compensation by your years of service credit and the age factor at the time of your retirement.

| Service Credit | X | Age Factor | X | Final Compensation | = | Member–Only Benefit | $19,802.00 |
|---|---|---|---|---|---|---|---|
| **40.196** | | **0.024** | | **$20,526.50** | | | |

| | |
|---|---|
| **Your Estimated Member–Only Benefit:** | **$19,802.00** |

## Disclaimer

**This report is only an estimate and should not be your only source of information for retirement planning.** You may elect an option that provides a monthly benefit to a beneficiary who outlives you. CalSTRS encourages you to obtain additional information regarding your benefits by attending a benefits planning session.

Learn more about CalSTRS benefits planning sessions.

Return to Calculator

# Retirement Benefits Calculator



**The information you provided:**

| | |
|---|---:|
| You plan to retire: | 6/7/2037 |
| Your age at retirement will be: | 70 years, 0 months |
| Your years of service credit will be (includes service credit, unused sick leave): | 27.196 |
| Your years of other service credit will be: | 0.000 |
| Your age factor based on your date of birth will be: | 0.024 |

| | |
|---|---:|
| **Your average monthly salary (final compensation):** | **$12,481.00** |

**Retirement Calculation**

The Member–Only Benefit shown below is calculated by multiplying your final compensation by your years of service credit and the age factor at the time of your retirement.

| Service Credit | X | Age Factor | X | Final Compensation | = | Member–Only Benefit | $8,146.40 |
|---|---|---|---|---|---|---|---|
| **27.196** | | **0.024** | | **$12,481.00** | | | |

| | |
|---|---:|
| **Your Estimated Member–Only Benefit:** | **$8,146.40** |

**Disclaimer**

**This report is only an estimate and should not be your only source of information for retirement planning.** You may elect an option that provides a monthly benefit to a beneficiary who outlives you. CalSTRS encourages you to obtain additional information regarding your benefits by attending a benefits planning session.

Learn more about CalSTRS benefits planning sessions.

Return to Calculator

# EXHIBIT V



(?return)

**The Campanile** • April 26, 2017 • https://thecampanile.org/13540/sports/themanbehindthemitt/

# Pete Colombo: the man behind the mitt

**Edan Sneh**



Those who know him have very few bad things to say about him, probably because current Palo Alto High School varsity baseball assistant coach Pete Colombo is an enormous asset to the team for his skills both on and off the diamond.

Colombo resumed coaching Paly baseball in 2011 after a brief hiatus; however, his roots in the Palo Alto Unified School District (PAUSD) and coaching expertise extend long beforehand. Colombo has been a coach since 1993, starting off at Junipero Serra High School as the head coach of a JV squad. His tenure at Paly started in 1998 and he was the head coach from 2000 to 2005. Colombo ended up leading the 2004 Paly baseball team to a Central Coast Section (CCS) open division title appearance, defeating powerhouses Saint Francis High School and Bellarmine College Preparatory school for an unprecedented, second place finish.

While Colombo has the most experience coaching baseball, his expertise is not limited to the sport.

"I have been the head freshman football coach, and I have been the head JV girl basketball coach," Colombo said. "Now, not only am I an assistant coach at Paly, but I am the eighth grade basketball coach at Jordan Middle School, where I teach."

Colombo is unique when it comes to his coaching style and his attitude towards students. He exudes a dangerously infectious sense of charisma and enthusiasm.

"[Colombo] is unlike other coaches because he is always having fun and always goofing around, but he still gets on you if you're slacking," said junior George Welch.

Colombo's love for coaching comes from his love for working with kids. Because he was so passionate, for a few years at Paly as a head coach, Colombo even worked without pay.

Colombo is unique when it comes to his coaching style and his attitude towards students. He exudes a dangerously infectious sense of charisma and enthusiasm.

"I didn't care," Colombo said. "You're not doing it for the money, you're doing it because you love kids. You want to teach the kids to compete and play the game the right way, be fundamentally sound, especially on defense."

Colombo explained that his hate for paperwork and his gratitude for the District sticking by him through some difficult times made working without pay feel like a way of giving back.

Of all the positive remarks that can be said about Colombo, his passion and energy for coaching most certainly shine the brightest. Colombo's energy was so prevalent that when asked about what his players thought about him, he immediately shouted to one of his players, asking them what they thought about him:

"Passionate, crazy and energetic," the player said.

Not only does Colombo's passion and energy come from his enthusiasm for the students at Paly, but also for PAUSD. Colombo is especially grateful to Paly varsity baseball head coach Pete Fukuhara, who allows Colombo to be part of the program and gives him freedom while coaching the kids.

"[The students] are smart, they're respectful and they will work hard for you if they buy into your system," Colombo said. "I am the luckiest man in the world. I will teach and coach until I am 70, easy."

Colombo's honesty separates him from many coaches because he is able to get players working in the right direction.

"I'll rip a kid, but later I will come back and touch base in a positive manner to let them know I care about them," Colombo said. When kids see humility and that you will make fun of yourself a little bit, they buy into that and will play hard for you. This should not apply to just coaches, but to any teacher who wants their kids to work hard."

Of all the positive remarks that can be said about Colombo, his passion and energy for coaching most certainly shine the brightest.

Likewise, Colombo's honesty also motivates the players to put in extra effort.

"Colombo is honest with you, because he knows that if he makes stuff up about your playing then you are not going to get any better," said junior Ole Erickson.

To Colombo, it does not matter what sport he is teaching, as long as the kids are learning fundamentals, and he is running a tight ship.

In fact, in 2010, during his time in PAUSD, Colombo coached football for his first time — a game in which he had no prior experience. Focusing hard on teamwork and learning the basics of the game, with the help of a few coordinators, the team ended up with a winning record of 8-2 in the season.

Colombo's uniqueness as a coach comes from his goal of teaching players a bigger lesson than the game.

"[Colombo] tries to make us better people rather than make us better ball players," said junior Niko Lillios.

Colombo's experiences over his 20 plus years of coaching have taught him many things about life.

"We are all going to make mistakes in life, its how we get up," Colombo said, referencing the popular Japanese saying: "Fall seven times, stand up eight."

"There are so many important life lessons that can be taught through sports," Colombo said. "Working together as a team, putting the team before yourself and working together to achieve a common goal."

He explained that sometimes his wife's problems with coworkers at work are similar to lessons that he teaches.

"My wife, who works in high tech, shares with me the problems going on at work, and I will use those life lessons during team time with the kids," Colombo said.

He prepares his players for the real world, not just the sports world.

"If you're stuck with something, look for a solution and keep moving forward," Colombo said. "In the real world now, everything is working on teams."

# EXHIBIT W

June 16, 2023

Dear CTC Credential Committee,

I am writing to you on behalf of Peter Colombo with the Palo Alto Unified School District. I taught with Pete for twenty-three years prior to him being accused of sexual assault. During the years I taught with him, he was always a dedicated and passionate teacher and coach. Pete did have some issues, which are well-documented on your end. He has grown as a teacher, coach and a man since then. Aren't we all a work in progress?

I believe Pete should have his credential reinstated and should have the right to work in the state of California. He was accused, was placed on paid-leave, had to hire lawyers, was indicted, had to spend a week in jail, attended numerous court hearings, then the case was dropped.

The judicial process has run its course and Pete followed all the mandates given. Therefore, I believe any teacher in this type of scenario should have their right to work in their chosen field reinstated.

Thanks for your consideration,

Cynthia Pappas
Teacher
Palo Alto Unified School District

June 21, 2023
Aimee Becker
1759 Virginia Ave
Redwood City, CA, 94061
650-464-8156
a_m_becker@me.com
re: Pete Colombo letter of support

Dear Commission on Teacher Credentialing-

I am writing on behalf of my colleague Peter Colombo in reference to his character and personal qualities. I have known Pete since 1999 and taught Physical Education with him over the years. I have seen a man who has given his all to teaching and coaching to help better the students in his classes and the players on the teams he coaches.

When reflecting on Pete's character; integrity, selflessness, sincerity and honesty come to mind. Pete has the utmost probity in his work. He takes is job seriously but has fun with it also which puts the students at ease. I can say wholeheartedly that Pete is in the teaching profession for the good of the students. He does his best to provide meaningful lessons so all students improve and thrive in his class.

Pete has a tremendous knack for connecting with the people he teaches/coaches thus motivating people to achieve success. Sometimes he will give the students a nickname (which the kids love), ask them about a game they played in over the weekend or praise a best running time to make the student feel "seen". Pete encourages students to do more and better than they ever thought possible. Motivating kids takes a tremendous amount of consistent effort thus showing Pete's selflessness to pursue excellence in his students.

Pete is also an exceptional coach as he encourages players to reach their full potential. He is sincere in his intentions to help others. Pete has made an impact on several lives over the years as indicated by players writing to tell him about their success due directly to the support in his coaching. Sometimes these letters come years after the kids have graduated and are reflecting on their journey to adulthood. In a very busy society, it is significant for young adults to reflect and reach out to someone who has made a profound impact on their lives.

Above all Pete is honest. He will "own" a mistake and work to repair any issue that may be present because of a misstep. His honesty is tied to his integrity in that he does his best to always do the right thing in any given situation.

I was absolutely SHCOKED to hear about the false allegations brought up against Pete last year. These allegations do not reflect any actions or hint of any action that would be in line with Pete's character. I have never witnessed any questionable interaction with Pete and a student that would be cause for concern. It is my hope that this issue will not have an effect on Pete's employment as a teacher or coach.

Pete is profound in all of his actions.  He gives endlessly, seeking nothing in return.  Pete Colombo has a huge personality and an even bigger heart.

It is with all sincerity that I submit this character letter of reference for Pete Colombo. Please don't hesitate to contact me via e-mail or call if I can be of any assistance.

Thank you for your time,

Aimee Becker

Jill Naylor
2098 Louise Lane
Los Altos, CA 94024
408-398-6660

June 20, 2023

To Whom it May Concern at CTC, Committee of Credentials:

As a teacher and colleague of Pete Colombo, I am writing to express the importance of renewing Pete Colombo's teaching credential.

I have had the privilege and honor of working with Pete throughout the last twenty years of my career. Pete and I began working together at Jordan, now Greene, Middle School in the early 2000's as PE teachers in the same department. After a few years, I left Jordan to work at the high school and continued my relationship with him while he was coaching many of the student athletes in high school and I was a PE teacher and then Athletic Director at Gunn High School. Fortunately, for me, our career paths came full circle when I returned to Greene Middle School and we worked together in the same department again for the last eight to nine years.

Working with Pete, and watching his interaction with students, has always been one of my greatest enjoyments as a teacher. It is said that we can all learn from one another and that is especially true when it comes to observing Pete's mentorship with students. He has a knack for inspiring and lifting up the spirits of his students with his natural leadership and guidance. He motivates each of them, drives them to do better, and brings out the best in each student in a kind and gentle manner. He is supportive and understanding when they are struggling to grasp a concept and never gives up on each individual student. Pete has truly gifted his students the will to work and try harder at whatever they do in life. Year after year, I have watched past students return to visit Pete and thank him for the impression he placed upon them. He leaves a positive imprint in the hearts and minds of his students. His charismatic leadership is rare and priceless and should be in every school district for ALL students to encounter.

As a teacher, I have always offered to my students, a "safe space" for them to come discuss with me anything and everything that may be bothering them, such as: suicidal thoughts, teen issues, frustrations with teachers, students, etc. Over the years I have heard many issues from our students as they feel comfortable confiding in me and NOT ONCE has any student come to me with a "Mr. Colombo" issue.

Since I was working with Pete around the time of these false accusations, I can assure you, not once was Pete interested in entering the girl's locker room or working one on one with a female student in a private setting. Pete was very cognizant of his surroundings and showing respect for all of the female students. He would always ask us, the female teachers, for assistance when dealing with female students. For example, our PE uniforms were stored in a back room off of the girls' locker room and he would always request us to get the female students their

uniforms. He would never have one on one conversations with female students unless it was out in the open where his colleagues were in sight, and he would make sure if there was a sensitive topic or issue with one of his female students, that he would request one of the female teachers get involved to help guide the student with a female perspective. Pete was extremely respectful when it came to these types of circumstances and beyond.

Not only are the allegations that faced Pete over the last year, false, our court system, through all of its due diligence, and investigation, have realized there is no evidence to convict this innocent man.  Now that our system has realized it and renewed my faith in "innocent until proven guilty", I am hoping our Committee of Credentials can also see how this was wrong and allow Pete, an innocent man/teacher, to regain his integrity and some of his normalcy back by giving him what is rightfully his...his credential. He worked hard for that credential, applied it with pride and proved over the course of twenty+ years that he deserves to continue to hold his credential and teach.

As a teacher, and a mother of two grown children, one boy and one girl, I would, without hesitation, allow both my children to be taught under the guidance and expertise of Pete Colombo. He has worked with my daughter in a coaching setting, without my attendance, and she absolutely loved working with him. My son has mentioned many times how he wished he had had Pete as his teacher and coach because "mom he teaches way more than how to throw a ball. Mr. Colombo makes me want to attend his class every day". Hearing things like this from my child, and many other students, only ensures in me that he is beyond deserving of the renewal of his teaching credential

Please do not hesitate to contact me should the committee have any questions.


With high regard and respect,

Jill Naylor
PE Teacher/Past Athletic Director
PAUSD

# EXHIBIT X



# Collective Bargaining Agreement

*Between*

## PAUSD

### Palo Alto Unified School District

25 Churchill Avenue
Palo Alto, California 94306

———— *and* ————

## PAEA

### Palo Alto Educators Association

616 Ramona Street, Suite 25
Palo Alto, California 94301

# Negotiations 2021-24

***Adopted January 17, 2023***

***Updated January 29, 2023***



**PALO ALTO**
UNIFIED SCHOOL DISTRICT

This contract between the Palo Alto Educators Association and the Board of Education of the Palo Alto Unified School District has been developed by the negotiating teams for these two parties.  It has been ratified on this day, January 17, 2023, by the Palo Alto Educators Association and the Board of Education of the Palo Alto Unified School District.

| 2022-2023 School Year | 2021-2022 School Year |
|---|---|
| *Negotiation Team Members*<br><br>- Theresa Baldwin, *PAEA President*<br>- Demetrio Gonzalez-Hoy, *CTA Representative*<br>- Daniel Nguyen<br>- Jeff Patrick<br>- Megan Shelby<br>- Krista Velasquez<br>- Kelly Zalatimo<br>- Trent Bahadursingh, *Deputy Superintendent*<br>- Greg Dannis, *PAUSD Legal Counsel*<br>- Carolyn Chow<br>- Lisa Hickey<br>- Melissa Howell<br>- Anne Le<br>- Iris Wong<br>- Charen Yu<br><br>*Palo Alto Unified School District Board of Education*<br><br>- Jennifer  DiBrienza, *President*<br>- Todd Collins<br>- Shounak Dharap<br>- Jesse Ladomirak<br>- Shana Segal | *Negotiation Team Members*<br><br>- Theresa Baldwin, *PAEA President*<br>- Demetrio Gonzalez-Hoy, *CTA Representative*<br>- Daniel Nguyen<br>- Mimi Park<br>- Josh Spira<br>- Kelly Zalatimo<br>- Trent Bahadursingh, *Deputy Superintendent*<br>- Greg Dannis, *PAUSD Legal Counsel*<br>- Amanda Boyce<br>- Carolyn Chow<br>- Lisa Hickey<br>- Anne Le<br><br>*Palo Alto Unified School District Board of Education*<br><br>- Ken Dauber, *President*<br>- Todd Collins<br>- Shounak Dharap<br>- Jennifer  DiBrienza<br>- Jesse Ladomirak |

# Table of Contents

*Page*

ARTICLE I          Recognition ........................................................................ 4
ARTICLE II         Term .................................................................................. 4
ARTICLE III        Association Rights ............................................................ 5
ARTICLE IV         District Rights .................................................................. 9
ARTICLE V          Grievance ........................................................................ 10
ARTICLE VI         Compensation and Benefits ............................................ 14
ARTICLE VII        Hours ............................................................................... 21
ARTICLE VIII       Transfers ......................................................................... 24
ARTICLE IX         Class Size ........................................................................ 26
ARTICLE X          Evaluations ..................................................................... 28
ARTICLE XI         Leave Provisions ............................................................ 40
ARTICLE XII        Concerted Activities ...................................................... 51
ARTICLE XIII       Working Conditions ....................................................... 52
ARTICLE XIV        Non-Discrimination ....................................................... 56
ARTICLE XV         Academic Freedom ......................................................... 56
ARTICLE XVI        Savings Provisions ......................................................... 57
ARTICLE XVII       Support of Agreement .................................................... 57
ARTICLE XVIII      Effect of Agreement ....................................................... 57
ARTICLE XIX        Completion of Meet and Negotiate ................................ 57
ARTICLE XX         Hourly Adult Education Teachers .................................. 58
APPENDIX A         Teachers' Salary Schedule 2021-23 ............................... 61
APPENDIX B         Plan for Salary Advancement ........................................ 63
APPENDIX C         California Professional Growth Plan for Credential Renewal ....... 66
APPENDIX D         Pre-Retirement Employment and Post-Retirement Programs ........ 68
APPENDIX E         Peer Assistance and Review Program ............................ 71
APPENDIX F         Employee Concerns Regarding District Policies and Procedures ... 76
APPENDIX G         Controversial Issues ...................................................... 77
APPENDIX H         Certificated Special Salaries and Stipends 2021-23 ....................... 78
APPENDIX I         Board Policy on Staff Evaluation ................................... 79
APPENDIX J         PAUSD Academy Working Conditions ......................... 80
Memorandum of Understandings ...................................................................... 81

# ARTICLE I
## Recognition

The District confirms its recognition of the Palo Alto Educators Association/California Teachers Association/National Education Association (hereinafter referred to as Association) as the exclusive representative for that unit of employees originally recognized by the District per its Resolution dated May 4, 1976.

The representation unit consists of all certificated employees with the following exceptions:

a. All management and supervisory personnel as defined by the Educational Employment Relations Act (including those who serve part-time in such positions and part-time in non-management/supervisory positions).
b. Principals
c. Assistant Principals
d. Hourly Special Hire employees
e. Child Development Center teachers
f. Psychologists
g. Deans
h. Substitute Teachers

If the District creates a new position and the parties cannot agree whether the position should be included in the bargaining unit, the dispute will be submitted to the Public Employment Relations Board for determination.

# ARTICLE II
## Term

This Agreement shall remain in full force and effect from the date it is adopted by the District and the Association through June 30, 2024.

1. The Association shall submit its proposals to modify, amend or terminate specific sections of this Agreement for the successor Agreement no later than May 15th of the last year of the agreement.

2. The District shall respond and submit its proposals to modify, amend or terminate specific sections of this Agreement no later than May 15th of the last year of the agreement.

3. The parties agree to reopen negotiations on Article VI (Compensation & Benefits) and two other articles of each party's choice for of the second (2022-2023) and third (2023-2024) years of the agreement. PAEA and the District have a signed agreement for Article VI, Compensation and Benefits for the 2021-2022 school year which was board approved on May 25, 2021, and continue to bargain over the remaining articles opened by either party for the 2021-2022 school year.

   a. The parties agree to change the Article VI.C.4.b, Article VI.C.4.b.1, Article VI.C.4.b.2, and Article VI.C.4.b.3 to reflect the increase in the District's health and welfare contribution multiplier for eligible employees.

4. Upon receipt from the parties hereto of a timely request to modify, amend or terminate specific sections of the Agreement, the other party shall have ten (10) days to respond. Such requests to negotiate shall affect only those sections identified. Exceptions to this shall be in order to adjust any technical flaws or inconsistencies.

# ARTICLE III
# Association Rights

**A.  Use of Facilities**

All Association business, discussions, and activities shall be conducted by unit members or Association officials outside established work hours as defined in Article VII herein, and shall be conducted in places other than District property except when an authorized Association representative obtains advance permission from the Superintendent or designee regarding the specific time, place, and type of activity to be conducted.  Permission shall be granted if the Superintendent or designee can verify that such activities and use of facilities will not interfere with the school programs and/or duties of employees, and will not directly or indirectly interfere with the right of employees to refrain from listening to or speaking with an Association representative.

**B.  Association Communications**

The Association shall be entitled to the use of and access to employee mailboxes for communications to unit members regarding matters which involve the Association.  The Association shall also be entitled to post notices of Association concern on bulletin boards designated for exclusive use by the Association, at least one of which shall be provided in each school building, in areas frequented by employees.

All postings for bulletin boards or items for school mailboxes shall contain the date of posting or distribution and the identification of the Association.  A copy of such postings or distributions shall be provided to the Superintendent or designee at the time of posting or distribution.

The Association shall make every effort not to post or to distribute information, which is derogatory or defamatory of the District or its personnel.  When the District deems material to be derogatory or defamatory, the site administrator shall notify the Association representative who shall remove the material for referral to the Superintendent and the Association President or their designees.  After the two officials have had a reasonable opportunity to discuss the challenged material, the material may be posted again at the Association's discretion.

**C.  Association Meetings**

1.  The District and site administration will not schedule meetings and trainings outside regular school hours on Thursdays with the exception of one (1) Thursday of per month. The District may schedule high school Back-to-School Nights on any Thursday. The Association President will give the District a list of the Association Thursdays per month prior to the commencement of the school year.

**D.  Association Information**

The District shall provide the Association with names and building assignments of the bargaining unit members, without cost to the Association, no later than September 30 of each school year.  The names and assignments of all bargaining unit members employed after September 30 of each school year shall be supplied to the Association within ten (10) days of the first date of their paid service.

**E.  Association Released Time**

1.  The Association shall exclusively receive time off from duties for the processing of grievances past Level I of the grievance procedure, Article V herein, for Association members who are designated as Association representatives, subject to the following conditions:

    a.  Twenty-four (24) hours prior to release from duties for grievance processing, a designated representative shall inform the immediate supervisor in order that an adequate substitute may be obtained, if such is necessary; and

b. That such time off shall be limited solely to representing a Grievant in a conference with management person beyond Level I, and in no way shall this limitation include use of such time for matters such as gathering information, interviewing witnesses, or preparing a presentation.

2. In addition, released time for Association business will be provided according to the following conditions:

a. The Association may designate representatives who shall be entitled to a total of ten (10) days or its equivalent of released time per school year for conducting business pertinent to the Association.  The Association is entitled to an additional 5 days for this purpose, for which it will pay to the District substitute costs.

b. The Association may designate six (6) members to their bargaining team who shall be entitled to a reasonable amount of time for the purpose of negotiating with the Board and/or its designated representatives.

c. The District shall grant paid leave, exclusive of all other paid or unpaid leave, to the President of the Association for for up to one hundred percent (100%) of release time but no less than eighty percent (80%) of release time during the school year. The amount of release time shall be at the discretion of the Association President. The Association will inform the District of the decision to be either 100% or 80% by April 1st.  The duty to defend under Government Code Section 810, et seq., will apply during that portion of the assignment when the President is working under the direction of the District.

d. According to the provisions and benefits of Education Code Section 22711 and 44987, and subject to the following conditions:

(1) When the Association President elects to be on 100% of release time, the Association will reimburse the District, on an agreed upon schedule, fifty percent (50%) of the costs of the President's salary, retirement, benefits, and salary related costs.

(2) When the Association President elects to be on 80% of release time, the Association will reimburse the District for forty percent (40%) of the costs of the President's salary, retirement, benefits, and salary related costs. The Association President shall work 20% and will work with the District to try to find a position that is mutually agreed upon by the District and the President. Failure to provide this reimbursement in a timely fashion will be grounds for the immediate termination of the leave.

(3) The Association President may elect to return to their original teaching position at the end of their term as President. If the original teaching position no longer exists, the President and the District will make all efforts to find an equitable position for the President.

(4) If the parties are unable to reach agreement on a new provision in a successor agreement, the leave accorded the President in subsection "c" above and the Association reimbursement to the District according to section E.2.d. l above shall constitute the status quo ante for purposes of negotiations under the EERA.

## F. Association Members Dues Deduction

1. Employee Rights
   The District and PAEA/CTA/NEA recognize the right of employees to form, join, and participate in lawful activities of employee organizations and the equal, alternative right of employees to refuse to form, join, and participate in employee organizations. Neither party shall exert pressure upon nor discriminate against an employee in the exercise of these alternative rights. Accordingly, membership in the Association shall not be compulsory.

2. Payroll Deductions - Association Dues and Other Voluntary Programs

The District shall deduct from the pay of Association members and pay to the Association the normal and regular monthly Association membership dues as voluntarily authorized in writing by the employee on the dues authorization form developed by the Association, subject to the following conditions:

   a. Such deduction shall be made only upon written submission by the Association to the designated representative of the District the names of unit members who have completed the Association developed dues authorization form. Said form shall be duly completed and executed by the employee and an authorized representative of the Association.

   b. Existing administrative procedures regarding other legally authorized voluntary deductions shall be maintained. The Certificated Human Resources Office shall supply each unit member with information regarding all insurance programs and a list of items that have been approved for payment deductions. For those receiving ten warrants, double deductions shall be taken in May and June for dependent health, dental, and voluntary life insurance premiums. Such authorization may be invoked or revoked in writing by the unit member at any time.

   c. The District shall not be obligated to put into effect any new, changed or discontinued deduction authorization until the pay period commencing fifteen (15) days or longer after such submission. Authorizations to deduct Association membership dues shall continue in effect according to the provisions of the dues authorization form developed by the Association.

   d. The parties agree that membership - adding new members, maintaining current members. or dropping members who complete the process with the Association to do so - is entirely a function of the Association. and no pa.it of this Agreement may interfere with the Association membership process.

3. District's Obligation

The District's obligations under this Article are 1) to notify any unit member who has failed to comply with the provisions of this section that, as a condition of employment in the District, such unit member must either become an Association member, pay a service fee, or establish an exempt status and make payment pursuant to the provisions of this Agreement; and 2) is to deduct from pay appropriate membership dues amounts pursuant to Sections 2 herein. Under no circumstances shall the District be required to dismiss or otherwise discipline any Association member for failure to fulfill their obligations to pay the membership dues established herein.

Hold Harmless and Indemnity Provision

   a. The Association, as defined by this Agreement, shall hold the District harmless and shall fully and promptly reimburse the District for reasonable legal fees and costs incurred in responding to or defending against any claims, disputes, or challenges, which are actually brought against the District or any of its agents by other than the Association in connection with the administration or enforcement of any section of this agreement pertaining to the deduction of membership dues. Such reimbursement shall include costs and attorneys' fees incurred by the District.

   b. Upon notice that the District is going to seek indemnification or to be held harmless under this provision, the Association shall have the right to meet with the District regarding the reasonableness and merit of any claim, demand, suit, or action for which the District seeks indemnification, and shall attempt to agree whether any such action listed above in "(a)" shall be compromised, resisted, defended, tried or appealed.

   c. In determining whether or not such action shall be compromised, resisted, defended, tried or appealed, the District will defer to the Association's interest if the District does not have a distinct and separate legal interest in the matter in dispute.

7

    d.  The District shall not be entitled to be reimbursed for any fees, costs, charges, or penalties for which the Association was not properly notified and provided the opportunity to discuss as set forth herein; nor will the District be entitled to any such reimbursements when the District's efforts in defending against such action would be duplicative, or when the District is defending a separate and distinct legal interest or when the District is defending an activity which is arguably subject to criminal liability on the part of any District administrator.

## G. Consulting Procedures

The Association may consult with the District consistent with Board Policy 4143. Consulting Procedures are not subject to the grievance process contained in Article V of this contract.

# ARTICLE IV
## District Rights

**A. Definitions**

Except as expressly limited by this collective bargaining Agreement, and as thereafter amended or modified, it is understood and agreed by the Association that the District retains all of its powers to direct, manage and control the affairs of the District to the full extent of the law.  Included in, but not limited to, those duties and powers are the exclusive right to:  Determine its organization; direct the work of its employees; determine the times and hours of operation; determine the kinds and levels of services to be provided and the methods and means of providing them; establish its educational policies, goals and objectives; ensure the rights and educational opportunities of students; maintain the efficiency of District operations; determine the curriculum; build, move or modify facilities; establish budget procedures and determine budgetary allocation; determine the methods of raising revenue; and contract out work.  In addition, the Board retains the right to hire, classify, assign, evaluate, promote, terminate and discipline employees.

**B. Emergencies**

1. The District retains its right to amend, modify or rescind policies and practices referred to in this Agreement in cases of emergency.  Emergency is defined as an Act of God, natural disaster or other calamity affecting the schools.  The determination of whether or not an emergency exists is solely within the discretion of the Board and is expressly excluded from the provisions of Article V, Grievance.

2. The District shall publicly announce any such amendment, modification or rescission of policies and practices together with the specific facts, which constitute the existence of the emergency.  Any such amendment, modification or rescission shall last only during the term of the emergency.

# ARTICLE V
# Grievance

**A. Definitions**

1. A "grievance" is a confidential claim based upon an event or condition relating to the interpretation, meaning, or application of any of the provisions of the Agreement. Actions to challenge or change the policies of the District as set forth in the rules and regulations or administrative regulations and procedures must be undertaken under separate legal processes.

2. A "Grievant" is a person, persons or Association making a claim of improper or illegal interpretation of any of the provisions of this Agreement who is adversely affected by such application or interpretation. When the Association files on behalf of a specifically named Grievant, such Grievant shall be available at each level of this procedure to respond to inquiries by the employer. In addition, the Association may combine two or more grievances for purposes of processing and hearing, provided the individual grievances involve the same issues of fact and same provision of the Collective Agreement, and provided all Grievants involved are present at each level of this procedure and are available to respond to inquiries by the employer.

3. A "day" is any day, except those days during winter or spring vacation, in which the central administrative office of the Palo Alto Unified School District is open for business. Time limits for appeal provided in each level shall begin the day following the day that receipt of a written decision by the parties in interest was due.

4. The "immediate supervisor" is the lowest level supervisor who has been designated to adjust grievances, having immediate jurisdiction over the Grievant. Jurisdictional disputes shall be resolved by the Assistant Superintendent - Human Resources/Administration.

**B. Informal Level**

1. Before filing a formal written grievance, the Grievant shall attempt to resolve the grievance by an informal conference with his/her immediate supervisor who shall, within ten (10) days, attempt to resolve the grievance and report back to the Grievant. The immediate supervisor shall discuss with the Grievant those persons he/she plans to involve while attempting to resolve the grievance.

2. The informal level of the grievance shall begin within twenty (20) days after the alleged violation of the contract. The twenty-day limitation shall not apply to alleged violations of the contract which occur while staff members are on sabbatical or straight leave granted by the Board provided that the grievance is filed within twenty (20) days after returning from sabbatical or straight leave.

**C. Formal Level**

**1. Level I**

a. If the grievance is not resolved to the satisfaction of the Grievant(s) at the informal level, the grievance shall be presented to the immediate supervisor and building principal, if they are not one and the same, within ten (10) days after the informal conference.

b. This statement shall be a clear, concise statement of the grievance, the circumstances involved, the decision rendered at the informal conference, and the specific remedy sought.

c. The supervisor shall communicate the decision to the Grievant in writing within ten (10) days after receiving the grievance. If the supervisor does not respond within the time limits, the Grievant may appeal to the next level.

d. Within the above limits, either party may request and be granted a personal conference.

**2. Level II**

a. In the event the Grievant is not satisfied with the decision at Level I, the Grievant may appeal the decision in writing to the Administrator of Human Resources within ten (10) days.

b. The statement shall include a copy of the original grievance, the decision rendered, and a clear, concise statement of the reasons for the appeal.

c.  Representative(s) of the Association may attend and state their views in any meeting with the Administrator and the aggrieved person, relating to the grievance filed. A grievance may be adjusted without the intervention of the Association, as long as the adjustment is made prior to the arbitration, and the adjustment is not inconsistent with the terms of this Agreement; and provided further, the District shall not agree to a resolution of a grievance until the Association has received a copy of the proposed resolution and has been given the opportunity to file a response.

d.  The Administrator shall communicate the decision within ten (10) days after receiving the appeal. Either the Grievant or the Administrator may request and be granted a personal conference within the above time limit. If the Administrator does not respond within the time limits, the Grievant may appeal to the next level.

**3.  Level III**

a.  If the Grievant is not satisfied with the decision at Level II, the Grievant may within ten (10) days appeal the decision in writing to the Superintendent.

b.  This statement shall include a copy of the original grievance and appeal, the decisions rendered, and a clear, concise statement of the reasons for the appeal.

c.  The Superintendent shall communicate the decision to the Grievant within ten (10) days. If the Superintendent does not respond within the time limits provided, the Grievant may appeal to the next level.

d.  Either the Grievant or the Superintendent may request and be granted a conference at a mutually agreed upon time.

**4.  Level IV - Mediation**

a.  If the grievance is not resolved to the satisfaction of the Grievant at Level III, the Grievant may appeal, within ten (10) days of the delivery of the Level III decision, the grievance to Level IV.

b.  In such case, the Association and the District will mutually agree upon the identification of a mediator. Upon appointment of the mediator, mediation shall be scheduled according to the availability of the mediator and the parties.

c.  The mediation process shall be completed within twenty (20) days following the Grievant's appeal to Level IV, unless the parties mutually agree to extend the twenty- (20) day time requirement.

d.  If an agreement is reached, the agreement shall be written and shall be signed by all the parties to the mediation. All settlement agreements shall be non-precedential and shall constitute only a settlement of the particular grievance.

**5.  Level V - Arbitration**

a.  If the Grievant is not satisfied with the disposition of the grievance at Level IV, the Grievant may, within ten (10) days of the last meeting with the mediator, or within ten (10) days of the expiration of the timeline in Level IV above, submit a request to the Association Grievance Chairperson, requesting that the Association submit the grievance to arbitration. If the Association Grievance Committee approves the request, the Association shall submit the grievance to arbitration by giving written notice to the Superintendent's Office within fifteen (15) days after the date the request is made of the Association by the Grievant.

b.  Within ten (10) days after such written notices of submission to arbitration, the Superintendent's Office and the Association shall request jointly the State Conciliation Services to supply a panel of five (5) names of persons experienced in hearing grievances in public schools. Each party shall alternately strike a name until only one name remains. The remaining panel member shall be the arbitrator. The order of the striking shall be determined by lot.

c. The fees and expenses of the arbitrator and the hearing shall be borne equally by the District and the Grievant. All other expenses shall be borne by the party incurring them.

d. Once the arbitrator has been selected, hearings shall commence at the convenience of the arbitrator. The arbitrator shall hear evidence and render a decision on the issue or issues submitted to him. If the parties cannot agree upon a submission agreement, the arbitrator shall determine the issues by referring to the written grievance and the answers thereto at each step.

e. The arbitrator shall have no power to award punitive damages, make class action awards, except where the class is properly identified at Level I of the procedure, or make money damage awards effective any date earlier than up to one year prior to the date the grievance was filed, except as provided by law.

f. The arbitrator shall have no power to add to, subtract from, or modify the terms of this Agreement or the written policies, rules, regulations, and procedures of the District.

g. Issues arising out of the exercise by the Board and administration of its responsibilities under Article IV (District Rights) of this Agreement, including the facts underlying its exercise of such discretion, shall not be subject to this arbitration procedure.

h. After a hearing and after both parties have had an opportunity to make written arguments, the arbitrator shall submit in writing to all parties his findings and recommendations and shall set forth the arbitrator's reasoning and conclusions on the issues submitted.

i. The arbitrator's decision is final and binding except that the arbitrator's award must be supported by the preponderance of the evidence and in conformance with law. Such awards are specifically reviewable by the Superior Court pursuant to the processes and procedures set forth under the California Code of Civil Procedure.

## D. Miscellaneous

1. No reprisals of any kind shall be taken by the District or the Association against any participant in the grievance procedures.

2. A unit member may be self-represented or have a representative of the unit member's own choice at all formal levels of the grievance procedure below Level V.

3. When a Grievant is required to appear before an agent of the employer, or the employer, the meeting shall be at a mutually agreed upon time and the Grievant shall be given the reasons for the required appearance.

4. All grievances shall be treated as confidential matters and as such only persons who are necessary to the processing of the grievance or to the adjustment of the grievance or necessarily involved in the investigation of the grievance shall have access to information concerning the grievance.

5. Nothing contained herein shall deprive any unit member of any legal right that he presently has.

6. Any expenses incurred shall be borne by the parties incurring them, except as provided for in Level V.

7. Any employee who is requested to appear in such conferences or hearings as a witness during working hours shall be accorded release time, but not the cost of a substitute. Witnesses shall be informed that their testimony shall be kept confidential unless they choose to make it public.

8. All documents, communications and records dealing with the processing of a grievance shall be filed in a separate grievance file and shall not be kept in the personnel file of any of the participants.

9. Neither the employer nor the Association shall be permitted to assert any grounds or evidence before the arbitrator that was not previously disclosed to the other party. The arbitrator shall consider only those issues that have been carried through prior steps as required by the provisions of the procedure.

The Superintendent, or his designee, and the Association agree to make available to both parties all pertinent information, not privileged under law or employer policies, in their possession or control and which is relevant to the issues raised by the grievance.

10. If the Association and the Superintendent, or the Superintendent's designee, agree in writing, the grievance may be brought directly to any higher level of the grievance procedure.  Time limits may be shortened or extended.

11. A grievance may be withdrawn at any level without establishing precedent.

12. A decision rendered at any level shall be considered final unless an appeal is registered within the limit specified.  If a decision is not given to the aggrieved party within the time limit, an appeal may be taken to the next level.

13. Nothing in these grievance procedures is meant to deny to either the Association or to the District the right to complain directly to the other, at whatever level seems appropriate, about the handling of issues that appear elsewhere in this contract other than in the articles on Association Rights or District Rights.  Such discussions shall not be matters of formal grievance procedures unless both parties agree that formal grievance procedures should be entered into as a possible way of avoiding a contest over unfair labor practices with the Public Employment Relations Board.

# ARTICLE VI
# Compensation & Benefits

**A. 2021-2022 Teachers' Salary**

    1. **Salary Schedule Increase:** The 2021-2022 Teachers' Salary Schedule shall reflect a three percent (3%) increase over the 2020-2021 Employees' Salary Schedule, effective July 1, 2021. Appendix H (Certificated Special Salaries and Stipends, including Hourly, Adult Education) shall be increased by three percent (3%) effective July 1, 2021.

    2. **One-Time Payment:** Employees shall receive a one-time, off the schedule payment equal to two percent (2%) of their earned salary as reflected on the 2021- 2022 salary schedule after the raise in section B (1) has been applied. This payment will be issued to unit members who are in active status as of May 1, 2022.

**B. 2022-2023 Teachers' Salary**

    1. **Salary Schedule Increase:** The 2022-2023 Teachers' Salary Schedule shall reflect an seven percent (7%) increase over the 2021-2022 Employees' Salary Schedule, effective July 1, 2022 for unit members employed by the district as of the date of ratification of the tentative agreement by both parties.

    2. Appendix H (Certificated Special Salaries and Stipends, including Hourly) shall be increased by seven percent (7%) effective prospectively from the date of ratification of this agreement by both parties. Adult Education) hourly rates shall be increased by seven percent (7%) effective for hours worked from July 1, 2022 for unit members employed by the district as of the date of ratification of the tentative agreement by both parties.

**C. Benefits**

    1. **Retirement and Workers' Compensation**

    The District shall pay the increased employer costs of all STRS, PERS and workers' compensation benefits during the duration of this contract.

    2. **Unemployment Insurance**

    The District shall pay the cost of this item, if mandated by law during the duration of this contract.

    3. **Life Insurance**

    For the duration of the contract, the District shall provide life insurance coverage for active employees at the same level [*Note:* the new plan benefits are based on age- up to age 65, $100,000, age 65-69- $65,000, age 70 and older, $50,000] and shall pay the premiums for each active employee who qualifies for full benefit coverage. The District shall pay the pro-rated premiums for active employees who work more than fifty percent (50%) but less than one hundred percent (100%), as specified in Section B.4.f.2 of this article.

    4. **Medical, Dental, and Vision Insurance**

    a. The District and PAEA are committed to providing unit members with cost effective health insurance coverage with plan choices and family coverage. Therefore, they each hereby instruct their appointed representatives to the Joint Benefits Committee to explore all options, including but not limited to:

        (1) Changing carriers

        (2) Changing coverage levels

        (3) Changing rate structures

(4) Changing eligibility requirements

To achieve our joint goal, the Committee shall make every reasonable effort, depending upon obtaining information from the benefits consultants, to issue its recommendations to the parties no later than September 10th of each school year. Within two weeks of receiving a recommendation from the Joint Committee, the District and PAEA shall make every reasonable attempt to meet to negotiate this Article. The district will suspend the JBC committee during Fall, 2021 (The 2022 plan year).

*(Note: PAUSD and PAEA have a MOU that addresses benefits for the 2023 calendar year that supercedes section C, 4b and 5.)*

b.  Effective January 1, 2021, and through December 31, 2021 only, the District shall contribute towards health and welfare benefits an amount not to exceed the product of $15,141 multiplied by the number of eligible employees (pro-rated to a full time equivalent assignment) for medical, dental, vision, and life insurance. Unit members who are eligible for fully paid health benefits shall participate in one of the medical programs, plus the dental, vision, and life. Full-time unit members qualified for Section B.4.e of this article may opt out of insurance.

Effective January 1, 2022, and through December 31, 2022 only, the District shall contribute towards health and welfare benefits an amount that provides unit members with the same dependent contributions from January 1, 2021 through December 31, 2021.

1)  The District shall contribute up to the maximum amount listed per month toward the cost of the selected medical plan for each full-time unit member

| Active Employee Plan | District Monthly Contribution (12 per year) | Employee Monthly Contribution (12 per year) | Total Monthly Premium Rate for 2023 |
|---|---|---|---|
| **Kaiser** | | | |
| Employee | $   781.32 | $0 | $   781.32 |
| Employee + 1 | $1,406.63 | $ 156.00 | $1,562.63 |
| Employee + | $1,990.14 | $ 221.00 | $2,211.14 |
| **Sutter Health** | | | |
| Employee | $   899.20 | $0 | $   899.20 |
| Employee + 1 | $1,618.90 | $ 180.00 | $1,798.90 |
| Employee + | $2,291.10 | $ 255.00 | $2,546.10 |
| **Delta Dental** | | | |
| PPO Plan | $   107.46 | $0 | $   107.46 |
| Premier Plan | $   128.55 | $0 | $   128.55 |
| **VSP** | | | |
| Vision Plan | $   17.56 | $0 | $   17.56 |
| **VOYA Life Ins** | | | |
| Life Insurance up to | $   14.00 | $0 | $   14.00 |
| Life Insurance age 65 | $   9.10 | $0 | $   9.10 |
| Life Insurance age 70 | $   7.00 | $0 | $   7.00 |
| Dependent Cost | $   .24 | $0 | $   .24 |

15

2) Absent any written subsequent agreement to the contrary, the District's obligation on and after January 1, 2021, to contribute towards health benefits shall not exceed the product of $15,141 multiplied by the number of eligible employees (pro-rated to a full time equivalent assignment) divided by twelve (12) equal monthly payments. The dollar amount specified in this section sets no precedent regarding the District's obligation to provide benefits at any particular plan level in future years. However, the District's obligation to pay premium costs at the January 1 to December 31, 2021 level shall continue until a subsequent agreement regarding health and welfare benefits is reached or until the automatically applied $280,000 below is expended, whichever comes first.

3) Beginning January 1, 2021, the District will automatically contribute $280,000 to defray any increased cost of benefits for the 2021 benefit year above the District's contribution of the product of $15,141 multiplied by the number of eligible employees in the bargaining unit as outlined in this section.

4) Agreed upon principles and procedures for calculating and allocating increased benefits costs are set forth in section B.5 of this article.

5) For eligible employees whose first date of paid service is on or after January 1, 2010, the District shall provide dental insurance coverage under a PPO dental plan. Eligible employees whose first date of paid service is before January 1, 2010, the District shall provide eligible employees with a choice of dental plans--the current incentive dental plan or the PPO dental plan under which employees hired on or after January 1, 2010 are covered. Employees who have the option of selecting dental coverage and who select the PPO dental plan shall not be eligible to return to the current incentive plan. Eligible employees whose first date of paid service is before January 1, 2010, and who resign or are laid off and are subsequently rehired within thirty-nine months shall be provided only the PPO dental plan.

6) The District will provide coverage to domestic partners of unit members, provided the definition of domestic partnership meets all the criteria of Section 297 of the California Family Code, and provided further that the unit member presents the District with proof that a valid declaration of domestic partnership has been filed pursuant to the above Family Code section or with any local agency registering domestic partnerships. At any time during this agreement, the carriers and the benefits specifications may be changed through negotiations if the parties mutually agree.

c. Joint Benefits Committee

1) The District will form a Joint Employee-Employer Benefits Committee, comprised of four (4) appointees each of the Association, the District, and CSEA and one (1) appointee from PAMA.

2) The purpose of the Committee will be to consider and make recommendations to the negotiating teams regarding matters related to medical, dental, and vision benefits, including the following:

   a) To explore alternative indemnity carriers and/or modification of current indemnity benefit specifications;

   b) To recommend employment of the necessary professional advice regarding medical, dental and vision programs; and

   c) To review and make recommendations on any cost savings or cost containment measures, including brokerage/sales fees, pre- and post- admissions review, contracting with local hospitals, and utilization review.

3) The respective parties will make their appointments annually by April 15 of each year. The first meeting will be scheduled by the District Human Resources Office;

16

thereafter meetings will be scheduled by consensus of the Committee. Released time will be provided for the committee members.

d. No person shall be covered under more than one plan contributed to by the District. An employee with a spouse or partner who is also employed by the District would be covered in the following manner:

    1) No dependents: (a) each may be covered under employee only coverage or (b) one employee-plus-one coverage policy.

    2) One or more dependents: (a) one employee-plus-family coverage policy.

    3) Employee contributions: Married or registered partners, both benefit eligible and employed by the District may be eligible for an additional District contribution toward the employee contribution for health benefits in the Kaiser or Sutter Health Plus HMO employee-plus-one and the Kaiser or Sutter Health Plus HMO employee-plus-family medical coverage policies. Adding the FTE of the couple and multiplying the portion over 1.0 FTE by the District's monthly contribution for the Kaiser or Sutter Health Plus HMO employee-only policy shall determine the amount of the additional District contribution toward the employee contribution. If this product equals or exceeds the employee monthly contribution for the chosen Kaiser or Sutter Health Plus HMO policy ($160 for the Kaiser employee-plus-one policy or $220 for Kaiser employee-plus-family policy or $150 for Sutter Health Plus HMO employee-plus-one policy or $205 for Sutter Health Plus HMO employee-plus-family policy) then the couple will not be required to pay the employee contribution. If this product does not equal or exceed the employee contribution for the chosen HMO policy then the couple will pay the difference as a monthly payroll deduction. Married or registered partners, where both are benefit eligible part-time employees, may combine their FTE to qualify for the full-time District contribution toward an employee-plus-one or employee-plus-family policy without having the District's contribution prorated.

e. Employees eligible for full-time medical coverage who provide proof of comparable medical coverage through a non-District spouse or legal partner may choose to decline District medical coverage and receive $2500 in ten (10) equal payments for a full-year of non-coverage. Employees who have declined medical benefits and received the non-coverage payment may reenroll in a medical plan during open enrollment or if a qualifying event occurs. It is within the sole discretion of the District to continue this provision for each successive year of this agreement.

f. Employees eligible for full-time dental coverage may choose to decline District dental benefits and receive $300 in ten (10) equal payments for a full year of non-coverage. Employees who have declined dental benefits and received a non-coverage payment may reenroll in the Delta Dental PPO plan during open enrollment or if a qualifying event occurs. It is within the sole discretion of the District to continue this provision for each successive year of this agreement.

g. Part-Time Employees

    1) Employees must work one-half (.5) of a full time equivalent (FTE) position or more to be eligible for health, dental, vision and life insurance coverage.

    2) For employees regularly assigned at least .5 FTE but less than 1.0 FTE, the District's contribution for health insurance benefits (medical, dental, vision and life) shall be prorated based upon a full time assignment. If the employee elects to participate in the District's health plans, the part time employee shall pay the

17

balance of the premium cost through monthly payroll deductions in advance of the month of coverage.

3) Summer school employment shall not be considered for purposes of eligibility for health and welfare benefits.

5. **Principles and Procedures for Calculating and Allocating Increased Benefits Costs**

As part of 2019-2020 negotiations the District, Association and representatives of other District employees clarified principles and procedures for how increased benefit costs are calculated and allocated among the parties in order to implement section 4.b of this Article. These principles and procedures are reflected in the parties' Memorandum of Understanding dated October 15, 2019, which included agreement to add language to this Article "to provide a clear and succinct explanation of how the cost of health and welfare premiums are allocated among the parties in the future." This language is set forth below in this section.

a. Beginning with the 2020-2021 District Adopted Budget, there shall be a separate budget category ("fund") for District health and welfare benefit programs with appropriate breakdown and detail of revenues and expenditures, including a monthly accounting of employee and District contributions toward benefit costs. This fund shall be updated per established budget updates and interim reports.

b. The parties will continue to utilize the Joint Benefits Committee and time lines set forth in this Article to study and make recommendations for the parties to consider in negotiations regarding increased health and welfare benefit costs.

c. The data to be considered by the parties in the foregoing processes shall continue to be a so-called "Calculator" or its functional equivalent and shall include:

1) The total number of full time equivalent (FTE) employees participating in health and welfare programs as of June 30 each year (defined as medical, dental, vision and life insurance).

2) A breakdown of FTEs participating in each health and welfare program, including FTEs at each "tier of coverage," and the corresponding cost of District and employee contributions for such coverage (per FTE rate and aggregate).

3) The number of FTEs "opting out" of District medical coverage with the corresponding individual District contribution rate and aggregate cost.

4) A breakdown of the total cost of benefits, comparing the sum of all District and employee contributions and the amount (if any) by which contributions have exceeded this total cost (the so-called "rollover").

5) The foregoing total cost of benefits calculation shall not include estimated employee vacancies or corresponding estimated costs.

6) If there is an increase in the total cost of benefits after applying the "rollover" (if any), per past practice, the parties will meet and negotiate as necessary to allocate the increased premium costs among employees based on "tiers of coverage" and may also agree through negotiations to increase the District's dollar contribution per eligible FTE.

a) The allocation of increased costs to employees is an additional expense that impacts employee total compensation.

b) Any increase in the District's dollar contribution per FTE shall be considered as part of an overall increase in total compensation.

**D. Salary Advancement**

1. **Step Advancement**

   Unit members (including those members with part-time assignments) who work at least seventy-five percent (75%) of the days required for their assignment shall have that year count as a year of experience for salary purposes and shall move one step on the certificated employee salary schedule. Unit members (including those with part-time assignments) whose assignments do not span the length of a full school year shall not be eligible to move one step on the salary schedule. The District shall use both days worked and personally accumulated sick leave used during the year to calculate the number of days of service for a given school year.

2. **Column Advancement**

   "Plan for Salary Advancement" is incorporated into this Agreement by reference as Appendix B and shall be subject to the grievance procedure, except for the section "Salary Advancement Categories."

E. **Salary Payments**

The procedures in effect January 17, 1978, as outlined in Section 6 of Policy VI-E, "Compensation and Related Benefits" of the Board Policy and Procedure Manual, shall be maintained for the duration of the contract. The mileage reimbursement for approved travel will be the Internal Revenue Service rate.

F. **Pre-Retirement and Post-Retirement Employment Programs**

1. The "Pre-Retirement Employment and Post-Retirement Programs" are incorporated into this Agreement by reference as Appendix D.

2. Subject to Education Code Section 22119.2, the District will make the following activities creditable for STRS Defined Supplement Benefit:

   a. All regular teaching beyond 1.0 FTE;

   b. Stipends listed in Appendix H;

   c. Summer school;

   d. Academy teaching;

   e. Lead teacher;

   f. Hourly rate teaching;

   g. Substituting during the school day;

   h. Curriculum writing;

   i. BTSA coach; and

   j. PAR consulting teacher.

3. In addition, the Superintendent or designee and the Association President may agree during the term of this Agreement to add to the list provided the work qualifies under Education Code Section 22119.2.

4. This supplemental benefit may be taken at retirement as an additional annuity or as a lump sum payment, for purposes of paying medical benefits or any other individual use.

G. **Peer Assistance and Review Program**

The "Peer Assistance and Review Program" is incorporated into this Agreement by reference as Appendix E, and is subject to the grievance procedure, except for the first three paragraphs of "Program Description."

H. **Summer School Pay**

The pay for summer school shall be increased by a percentage equal to the percentage increase in Appendix A, for each year of this Agreement.

I. **Certificated Special Salaries**

Certificated special salaries are incorporated into this agreement by reference as Appendix H.

J. **Early Notice of Retirement Bonus**

A permanent unit member who submits written notice of retirement to the District by February 15th of the year of retirement shall receive a bonus of $1000 for providing the District with the early notification. The bonus shall be pro-rated based upon a full-time assignment.

**K. Professional Learning Stipend (PL Stipend)**

The District is committed to fostering a culture of on-going professional learning in PAUSD in order to create an environment in which every staff member is actively engaged in professional learning that enhances their ability to improve the experience and education of our students. Unit members and administrators will jointly identify and provide quality professional learning opportunities focused on student learning.

1. The District shall form a committee with teacher representation to assist in identifying eligible professional learning activities and in evaluating the effectiveness of the activities. The Professional Learning Committee will consist of three (3) unit members appointed by the Association and three (3) members appointed by the District. The committee shall be responsible for:

   a. Assisting in the identification of eligible professional learning activities

   b. Assisting in the communication with unit members of those activities that qualify for the PL Stipend.

   c. Providing feedback on the effectiveness of professional learning activities offered by the school sites and District during staff development days

2. Unit members will earn the PL Stipend by engaging in 18 hours of eligible professional learning activities outside the professional workday and beyond those activities provided during designated staff development days.

3. The PL Stipend will be paid at the rate published in Appendix H.

4. Unit members who plan and complete 18 hours of eligible professional learning activities in a given year may earn the PL Stipend annually.

5. Unit members changing grade levels, by their choice, and unit members returning from leave of absence shall be encouraged to participate in this PL program prior to the start of the school year.

6. Unit members shall have their proposed professional learning activities pre-approved by their site principal using district-supplied forms. If a proposed activity is denied by the principal, the unit member may appeal the decision to the Associate Superintendent or designee.

7. In extenuating circumstances, the Superintendent or Superintendent's designee may grant a unit member an extension beyond the two-year time frame to complete the 18 hours of professional learning.

8. Unit members approved by their sites for professional learning hours beyond the 18 hours needed for the PL Stipend will be paid at the hourly professional learning rate in Appendix H.

9. Professional learning hours used for the PL Stipend may not be used for units to move columns on the salary schedule.

10. The District has the sole discretion to discontinue the PL Stipend program (stipend and expectation of 18 hours of professional learning every two years) for any school year beyond 2015-16.

# ARTICLE VII
# Hours

## A. Working Hours

1. All unit members shall be available to students and other staff members before opening and after the closing of school each day.

2. Included in the above are other instructional day duties as assigned, which include, but are not limited to, program development, parent conferences, committee assignments, site and District meetings, special help to student(s), and student supervision. Unit members are encouraged to pursue individual programs of professional growth and development and to participate in parent-school meetings.

3. General education teachers assigned to two or more sites, in the same day, shall not be assigned any extra pupil supervision. General education teachers assigned to two or more sites, in the same week, may be assigned extra pupil supervision in an amount not to exceed that for unit members assigned to one site in the week. Special Education teachers assigned to two or more sites shall not be assigned any extra pupil supervision.

4. At all times possible, site and District administration shall provide staff with three (3) days' advance notice of meetings not calendared at the beginning of the year.

5. Mandated staff development programs shall be scheduled on shortened teaching days, as part of regular department meetings or when released time is provided for those unit members involved.

6. Grades K-6 teachers (including K-6 SDC teachers) shall be given up to four days of released time per year for the purpose of conducting bi-annual parent conferences or a stipend equal to four days at the daily rate specified in Appendix H, for conducting parent conferences outside the school day. With prior approval from the site administrator, a fifth day of conferences may be approved. Elementary (K-5) Resource Specialist, and Elementary ELL, Reading Specialists, and Speech/Language teachers shall be given up to four days of released time per year, or a stipend equal to a maximum of four days at the daily rate specified in Appendix H, for the purpose of attending and participating in bi-annual parent conferences beyond the federal and state mandated meetings (e.g. IEP meetings).

7. A. Meeting time for Elementary Teachers

    3. Elementary teachers will not be required to attend more than an average of four (4) hours per month calculated over a period of two months for such meetings outside the regular day.

    OR

    4. Elementary sites may jointly determine to schedule staff meetings, leadership team meetings, staff development and staff collaboration activities on restructured days, which may occur on any regular day, including Wednesdays.

    5. The principal and the teaching staff/leadership team at each elementary school site will jointly determine an annual schedule of mandatory staff meetings with specified start and end times. This schedule may include, but not be limited to, site, grade level, cluster, department, and faculty meetings.

    B. Meeting Time for Secondary Teachers

    1. Faculty and department meetings will be scheduled on restructured days, which may occur on any regular school day.

    2. The principal and the leadership team at each secondary site will jointly determine an annual schedule of mandatory staff meetings within the restructured days.

C. Part-time teachers shall be required to attend site meetings proportionate to their regular percentage FTE assignment.

8. Mandatory meetings of staff will be run in an efficient manner. The PAEA site representative, after discussion with the principal, may ask for the Superintendent or designee's assistance in the event that the meeting practice at the site is inefficient.

9. Salary advancement credit will be earned for service on a school site council or as a designated school or grade level representative on a district committee mutually identified as being eligible for salary advancement credit by the Superintendent/designee and President of the Association. One unit for salary advancement is earned for each 15 hours of actual attendance at school site council or identified committee meetings. If actual attendance is less than 15 hours, the unit member will receive a prorated amount of hours or a prorated amount of the stipend provided in Appendix H. Unit members on column BA+90 will earn the stipend specified in Appendix H in lieu of salary advancement credit provided site council/district committee attendance is a minimum of 15 hours of attendance. On occasion, the Association will provide the stipend. (See Appendix B for details)

10. The District, will, consistent with law, notify the Association of any proposed changes to the school day which might have negotiable impact on unit members hours.

## B. Minimum Days

At the beginning of the school year, the District shall furnish each employee a calendar of specific minimum days, identifying those for staff. In addition, the Superintendent, or his designee, shall approve all additional minimum days or any departure from the established hours prior to a change in any such schedule at a particular school within the District.

Elementary and Secondary teachers shall be dismissed at the end of the student instructional day on the Friday before Labor Day Weekend no matter which week their school holds its Back to School Night.

6. Minimum Day Schedule
   a) Secondary: Follow school site schedules for minimum days
   b) Elementary: Students are released at the same time as Wednesday early dismissal

## C. Working Days

1. The work year shall be 187 days which shall be configured as follows:
   a. 180 - Student attendance days
   b. 3 - Staff development days
   c. 1 - District workday for site and District meetings
   d. 3 - Teacher directed workdays for preparation, collaboration, and school year completion.

2. If the District requires a unit member to work additional days, said unit member shall be compensated at a daily rate in accord with the unit member's placement on the salary schedule.

3. The work year for unit members appointed by the District to be District Teachers on Special Assignment (DTOSA) shall be 200 days. This work year does not apply to a unit member appointed by a site to be Site Teacher on Special Assignment (STOSA).

4. The work year for secondary school counselors shall be the teacher work-year plus four (4) additional days. The four (4) additional workdays may occur before first teacher workday and/or after the last teacher workday of the school year. The school principal shall determine the specific workdays, in consultation with the counselor. If the District or school principal requires a unit member to work additional days, said unit member shall be compensated at a daily rate in accord with his/her placement on the salary schedule. Three workdays are contingent upon the District's continued ability to receive funding according to Education Code Section 44579.

5. In developing the work calendar for the succeeding school years, the parties will use the following process:

22

a. By November 1, the negotiating teams for PAEA, CSEA, and the District will publicly meet and negotiate over the work calendar.

b. The tentative agreement will be forwarded to the Board of Education for consideration in a session open to the public.

c. If the Board does not adopt the tentative agreement, the joint parties will meet and negotiate again, or at the election of PAEA, will meet and negotiate separately on mandatory subjects related to the school calendar.

**D. Reduced Workload Program**

Requirements unit members must meet to participate in the Reduced Workload Program (Willie Brown Act), are referenced in Appendix D-1 "Pre-Retirement Employment and Post-Retirement Programs."

# ARTICLE VIII
## Transfers

**A. Definitions**

A transfer is a movement of a unit member to a different level (elementary, middle, high, or alternative program) or site. Transfers are seen as a means to facilitate and support professional growth or to meet specific individual, site, or district needs. A unit member, his/her principal or supervisor, or the Superintendent or his/her designee may initiate a transfer. The District shall attempt to make transfers on a mutually satisfactory basis among unit members. Teachers shall be assigned to teach within the authorizations of their teaching credentials and, to the extent possible, within their major or minor fields of study.

**B. Information on Teacher Needs**

Early in February of each year, information shall be requested from unit members regarding their plans for the ensuing school year. Results of this survey provide preliminary information on personnel needs for the fall semester.

**C. Vacancies**

A current list of vacancies shall be posted on the PAUSD staff web site with known information about the grade level/subject and school site of the vacancies. Unit members are encouraged to check the PAUSD staff website regularly for the most up-to-date vacancy information.

**D. Transfers Initiated by Unit Member**

1. The Human Resources Department shall coordinate the transfer process for the District.

2. The deadline for self-initiated transfer requests for the following school year is March 1st.

3. Unit members interested in transferring to a different position shall submit a transfer request, using the District form, to the Assistant Superintendent--Human Resources. Transfer request forms are available on the PAUSD Intranet in the general forms folder of the Human Resources section. Unit members are encouraged to discuss their interest in a transfer with their supervisor.

4. The Assistant Superintendent--Human Resources or his/her designee shall acknowledge receipt of transfer requests within five days of receipt; and, unless special arrangements are made, shall communicate the transfer requests to the principal/supervisor of those sites/departments that the unit member indicated on the transfer request form and to the unit member's current principal/department administrator. Unit members are encouraged to contact site/department administrators with vacancies matching their interests.

5. Transfer requests from unit members who meet the position qualifications shall be considered in the following order:

    a. Displaced teachers due to collapsed classes and loss of bubble classes.

    b. Permanent unit members and unit members returning from leave of absence or teacher-on-special-assignment (TOSA) positions.

    c. Probationary/Temporary unit members

6. When a vacancy exists, the site principal or other responsible administrator shall interview, in person or via phone, all qualified unit members with transfer requests matching vacancies in his/her building/department. The site principal or other responsible administrator shall communicate in writing the final action taken to fill the vacancy with each unit member who interviewed for a transfer.

7. A unit member who initiates a request for transfer need not accept a position/assignment offered, but may remain in his/her present role.

8. In the event a unique vacancy occurs after March 1st, then the deadline is extended to 5 school days after the vacancy is posted.

9. Vacancies that occur after the school year ends shall be posted on the PAUSD staff website. However, these late vacancies shall be filled in the most expedient manner, with no timeline for posting or filling the vacancy.

10. In the event a unit member's grade-level assignment changes after March 1st, the deadline for a self-initiated transfer request for that unit member shall be extended to 5 school days after the assignment change is communicated in writing to the unit member.

**E. Transfers Initiated by Principals, Supervisors, or District Administration**

1. The central administration or a site principal or supervisor may initiate teacher transfers in order to meet the staffing needs of the District or site.

2. Staffing needs of the District or site that may be considered when initiating transfers include, but are not limited to:

   a. Special qualifications;

   b. Minority representation;

   c. Male-female balance;

   d. Varied length of service at the site or in the department;

   e. Level of experience and expertise; and

   f. Staff collaboration and teamwork.

3. Before an administrative transfer is initiated, each person affected by the proposed transfer shall participate in a conference with the principal and the administrator of Human Resources. The parties will discuss the issues giving rise to the transfer, explore possible options to resolve the issue other than a transfer, and seek mutual agreement on a resolution. If an administrative transfer is initiated, the District will provide a written response as to the reasons for the transfer.

4. Administrative transfers will not be made for disciplinary purposes.

5. In considering administrative transfers, every effort shall be made to place a unit member who meets the Teaching Standards defined in Article X in an appropriate assignment, as perceived by the unit member and his/her supervisor.

6. When considering involuntary staff transfers, if an employee has signed a formal agreement with the District to retire at the end of the next school year, the District administration shall make a good faith effort to keep the employee at the same school site during the last year of employment.

**F. Transfers Resulting from School Closure or District Reorganization**

A committee consisting of four (4) representatives each from the Association and the District shall meet to review transfer procedures if or when school closure or District reorganization occurs.

**G. Newly Created Certificated Positions**

Newly created certificated positions within the bargaining unit shall be advertised in accordance with District procedures and shall include the job description and necessary qualifications.

# ARTICLE IX
## Class Size

*The following provisions will become effective July 1, 2016:*

**A. Class Size Staffing Ratios**

The class size staffing ratios within each school shall be based on the following:

Grade K………………………..One teacher per average of 19 students*

Grades 1……………………...One teacher per average of 22 students*

Grades 2-3 ............................. One teacher per average of 23 students*

Grades 4-5 ............................. One teacher per average of 24 students*

Grades 6 (Core) ..................... One teacher per average of 24 students*

Grades 7-8 (Math/English) ..... One teacher per average of 24 students*

Grades 9 (Math/English) ........ One teacher per average of 24 students*

Grades 10 (English)................ One teacher per average of 26 students*

Grades 6-12............................ One teacher per average of 28.5 students

* Class size reductions supported by State or local funding

**B. Class Size Reduction**

1. Class Size Reduction Based on State and Local Funding

   The class size reduction ratios listed in Section A are contingent on continued State and local funding. If the State or local funding ceases or is reduced below the 2002 funding levels, the Board may reinstate, in Section A, the appropriate ratios list in Section B.2 that existed before the implementation of State and Local class size reductions.

2. Ratios prior to Class Size Reduction per Section A

   K ............................................ One teacher per 27 students

   Grades 1-5.............................. One teacher per 27.5 students

   Grades 6-12............................ One teacher per 28.5 students

**C. Remediation Measures**

1. If the daily enrollment in a K-5 class exceeds the class size ratio listed in Section A, the remediation measures of Section C.3 will apply. This remediation will be paid quarterly and will be calculated on the fifteenth day of each quarter. Remediation funds, per student over the appropriate class size ratio, shall be determined by dividing the first cell of the salary schedule by the class size ratio for K-1 in Section A. Except for this provision, any enforcement of the K-3 standards or any penalties or other remedies will be only through the appropriate State rules and regulations.

2. If the class size staffing ratios for grades 6 through 12 within a school exceeds the above listed averages on the fifteenth day of the school year and/or the beginning of the second semester, the remediation measures described in Section C.3 below will apply.

3. When remediation measures apply, the first consideration for the use of the remediation funds shall be to reduce the impact of the larger class size. The principal and staff members involved shall explore and mutually discuss the following methods for remediation, and thereafter the principal shall select from the following options:

   a. Aide assistance

   b. Additional aide time or additional classroom support FTE

   c. Transfer of pupils.

   d. Hiring of additional teacher(s).

e.  If after discussion, none of the above options are feasible, the principal and staff members involved will present a remediation plan for equivalent funds in lieu of personnel to the Superintendent or designee for approval.

In the case of remediation in grades 6 through 12, the principal will present the remediation plan to the staff by the twenty-first day of the semester or school year, whichever is appropriate. In the case of remediation in grades K- 5, the plan will be presented within 10 school days of the date on which the criteria for remediation are met.

4. The District shall provide the Association with the class size school average statistics as of the eleventh day of the school year, or thereafter on request. The Association's building site representative may participate in the remediation discussion.

# ARTICLE X
# Evaluations

**A. Introduction**

1. The District and the Association mutually agree on the importance of an evaluation system that:

   a. Acknowledges excellence in teaching, encourages risk-taking and collegiality for professional growth, and supports those needing assistance;

   b. Is based on standards of excellence that are well known and that are applied with clarity, consistency, and fairness for all teachers;

   c. Allows administrators, teachers, parents, and students to work together efficiently and effectively to continuously improve education in our schools.

2. This article shall be implemented in accord with the guidelines of the Board Policy 4115. (This policy is included as Appendix I as an attachment to the contract for information purposes but is not subject to the grievance procedure.)

3. In elementary and secondary school, the principal has ultimate responsibility for evaluating staff members. In the secondary schools, the principal may share this responsibility with other site administrators. Department Instructional Leaders at the secondary schools may contribute toward the evaluation of department staff members.

4. By September 30 of each school year, staff members on the formal assessment schedule shall be notified by the Certificated Human Resources office of the name(s) of the person(s) responsible for their evaluation.

5. The responsibilities and duties enumerated in this section are listed to indicate activities that help accomplish the goals of evaluation. It is not necessarily an all-inclusive list. Staff and supervisors are encouraged to design and implement other activities that help fulfill the goals of evaluation.

**B. Definitions**

1. Professional Development Plan

   A document developed by the teacher in consultation with the supervisor describing a teacher's professional growth interests and needs that:

   a. Covers one to four years of professional activity

   b. Includes 1-5 long-term professional growth goals that are consistent with school, district, and department goals and priorities

   c. Identifies the California Standards for the Teaching Profession (CSTP) and the California Standards for the School Counseling Profession (CSSCP) related to each professional growth objective; hereafter referred to as the "Standards"

   d. Identifies specific annual objective(s) to be the focus in the present year and describes activities to be undertaken

   e. Is updated each year and may be revised at any time, and

   f. Is kept on file by the teacher and supervisor/evaluator

2. Formal Observation

   A classroom observation by the supervisor/evaluator that:

   a. Is announced at least 2 days in advance

   b. Is preceded by a conference between supervisor and teacher

   c. Is at least 30 minutes in length, and

   d. Is followed by a conference and written report of the supervisor's comments no later than five school days after the observation

3. Informal Observation

   A classroom observation by a supervisor/evaluator that:

    a. Does not meet one or more of the criteria listed above for a formal observation. Informal observations include drop-ins, visits, or pass-throughs. These are usually short visits, but have no time restrictions

    b. For informal observations of more than 10 minutes, the supervisor/evaluator shall provide brief, informal, and meaningful feedback within 3 days to help the teacher reflect on their practice.

## C. Evaluation Plans

1. Teachers will be evaluated by one of the following plans:

    a. Plan 1: Staff members who do not have permanent status in the District will be evaluated under Plan 1.

    b. Plan 2: Two and Four Year Cycles

      (i) Plans 2.2 and 2.2 Peer (two-year cycle): Permanent staff members who are judged by their supervisor(s) to meet all the Standards and who have been in the District fewer than ten years shall be evaluated under Plan 2.2 unless the teacher selects Plan 2.2 Peer

      ii) Plans 2.4 and 2.4 Peer (four-year cycle): Permanent staff members who have been in the District ten years or more and who are judged by their supervisor(s) to meet all the Standards shall be evaluated under Plan 2.4 unless the teacher selects Plan 2.4 Peer

    c. Plans 3 and 4: Permanent staff members who are judged by their supervisor not to meet one or more of the Standards shall be evaluated by Plan 3 or Plan 4. These plans are described in Sections H, I, and J of this Article.

2. Required procedures for each plan are listed here. Under no circumstances will any of the evaluation procedures described here prohibit the District from initiating termination procedures at any time for reasons other than unsatisfactory performance, pursuant to the Education Code.

    a. Plan 1 Required Procedures for Evaluation of Staff Members Not Having Permanent Status

      (1) Plan 1 Procedures Required of Staff Members:

        (a) To follow the chronology outlined in Section G (Chronology) for relevant plan.

        (b) To meet with his/her supervisor to discuss progress toward meeting the PAUSD Teaching Performance Standards and/or toward achieving the annual objectives in the professional development plan.

      (2) Plan 1 Procedures Required of Supervisors/Evaluators:

        (a) To follow the chronology outlined in Section G (Chronology) for relevant plan.

        (b) To observe the work of the staff member for a sufficient period of time to make an appropriate assessment.

        (c) To make informal classroom observations, announced or unannounced and of any duration, as needed.

        (d) To be sure that no more than two supervisors observe a teacher at the same time.

        (e) To assist the staff member in identifying desired improvements and to develop a program to effect those improvements. If a desired or needed improvement for a staff member is identified, the supervisor shall indicate in subsequent written records whether or not the staff member has effected or partially effected improvement.

        (f) To determine whether a staff member's performance meets the Standards. If it does not, the supervisor shall communicate this to the staff member in writing. The judgment of teacher performance reported on the Summary Evaluation will determine the evaluation status of the staff member at the start of the next school year.

    b. Plan 2 (2.2, 2.2 Peer, 2.4, and 2.4 Peer) Required Procedures for Evaluation of Permanent Staff Members Meeting the Standards

    A permanent teacher determined by his/her supervisor to be meeting all of the Standards shall be evaluated by Plan 2. A teacher with fewer than ten years in the District may select either

Plan 2.2 involving evaluation by his/her supervisor in a two-year cycle, or Plan 2.2 Peer involving self-assessment and peer collaboration, also in a two-year cycle. A teacher who has been in the District for ten years or more and is determined by his/her supervisor to be meeting all of the Standards may select either Plan 2.4 involving evaluation by his/her supervisor in a four-year cycle, or Plan 2.4 Peer involving self-assessment and peer collaboration, also in a four-year cycle. A teacher may change plans at the end of a complete cycle by informing his/her supervisor. Requests to change plans other than at the end of the cycle because of unusual circumstances must be approved by the teacher's supervisor and the Assistant Superintendent, Human Resources.

(1) Plan 2.2 and 2.4 Procedures Required of Staff Members:

    (a) To follow the chronology outlined in Section G (Chronology) for Plan 2.2 or 2.4.

    (b) To meet and work with his/her supervisor/evaluator to:

        i. Develop a multi-year professional development plan that includes annual objectives;

        ii. Assess progress toward achievement of annual objectives;

        iii. Assess the staff member's performance on the Standards; and

        iv. Assess the learning and working environment.

    (c) Additional Procedures Required of a staff member on Plan 2.4: To have a professional dialogue and reflective review with supervisor/evaluator at the end of the second year of the four-year evaluation cycle to summarize achievements/efforts and to support continuous growth and achievement.

(2) Plan 2.2 and 2.4 Procedures Required of the Supervisor:

    (a) To follow the chronology outlined in Section G (Chronology) for Plan 2.2 or 2.4.

    (b) To assist staff members in preparing a multi-year professional development plan that includes annual objectives, to provide support for staff member's continuous progress toward achievement of the annual objectives in the plan, and to assess achievement of those objectives.

    (c) To provide staff members with information about goals and priorities at other levels within the system, and to ensure that individual staff members' professional development plans support those goals and priorities.

    (d) To observe the work of the staff member for a sufficient period of time to make an appropriate assessment. In the formal evaluation year this will include at least two formal observations, and in the informal evaluation year at least one formal observation.

    (e) To assess whether a staff member's performance meets the Standards. If the performance does not meet the Standards, the supervisor/evaluator shall communicate this to the staff member in writing, and procedures outlined in Evaluation Plan 3 shall be followed.

    (f) Additional Procedures Required of the Supervisor/Evaluators for staff on Plan 2.4: To have a professional dialogue and reflective review with each staff member at the end of the second year of the four-year evaluation cycle to summarize achievements/efforts and to support continuous growth and achievement.

(3) Plan 2.2 Peer and 2.4 Peer Procedures Required of Staff Member:

    (a) To follow the chronology outlined in Section G (Chronology) for Plan 2.2 Peer or 2.4 Peer.

    (b) To create and participate in a professional partnership group, to inform his/her supervisor/evaluator of the names of the partnership group members by September 30, and to meet at least quarterly to discuss teaching concerns and interests.

    (c) To write and annually update a multi-year professional development plan that includes annual objectives and to discuss this plan with his/her professional partnership group and supervisor/evaluator.

(d) To encourage partners to observe his/her class on an informal basis and to visit partners' classes.

(e) In the informal evaluation year(s), to discuss with partners and supervisor his/her progress and performance with regard to the professional development plan and the Standards.

(f) Additional Procedures Required of a staff member on Plan 2.4 Peer:  To have a professional dialogue and reflective review with supervisor/evaluator at the end of the second year of the four-year evaluation cycle to summarize achievements/efforts and to support continuous growth and achievement.

(g) At end of the formal evaluation year (the second year of a two-year cycle or the fourth year of a four-year cycle), to collaborate with supervisor in writing a summary evaluation based on the professional development plan and performance in relation to the Standards, submit this report to at least one partner for response by May 1, and submit the report and response(s) to the Certificated Human Resources Office by May 15.

(h) A staff member who fails to fulfill the requirements of Plan 2.2 Peer or 2.4 Peer shall move to Plan 2.2 or 2.4.

(4) Plan 2.2 Peer and 2.4 Peer Procedures Required of Supervisor:

(a)  To follow the chronology outlined in Section G (Chronology) for Plan 2.2 Peer or 2.4 Peer.

(b) To discuss the professional development plans with participant and sign the plan to indicate acceptance.

(c) To observe informally on a regular basis, collect data on teacher performance in all areas covered by teaching standards, and discuss data promptly and honestly.

(d) To support teacher's professional development goals by providing resources, feedback, and recognition, or by arranging for this support to be provided by others.

(e) Additional Procedures Required of the Supervisor/Evaluators for staff on Plan 2.4 Peer: To have a professional dialogue and reflective review with each staff member at the end of the second year of the four-year evaluation cycle to summarize achievements/efforts and to support continuous growth and achievement.

(f) To collaborate with the teacher on writing the summary evaluation in the formal evaluation year (second year of a two-year cycle or the fourth year of a four-year cycle).

(g) To assess whether a staff member's performance meets the Standards.  If the performance does not meet the Standards, the supervisor/evaluator shall communicate this to the staff member in writing, and procedures outlined in Evaluation Plan 3 shall be followed.

**D. Procedures to Resolve Disagreement over the Professional Development Plan or Observation Schedule for Teachers on Evaluation Plans 1, 2.2, 2.2 Peer, 2.4, or 2.4 Peer**

The following procedures shall be followed in the event of a disagreement between the staff member and the supervisor/evaluator regarding the professional development plan or classroom observations.

1. The staff member and the supervisor/evaluator shall make good faith effort to resolve the disagreement themselves.

2. If the disagreement persists, the parties may together invite a third party to assist in resolving the disagreement.

3. If the third party is not successful in helping the staff member and supervisor/evaluator to resolve the disagreement, the staff member, supervisor/evaluator, and the third party shall each have the opportunity to state his/her position on the matter(s) in dispute and to have a written statement attached to the observation report or professional development plan.  If necessary, a Human Resources administrator shall make the final decision on the matter(s) in dispute.

**E. Responsibilities of the Superintendent and His/Her Staff**

1. To ensure fairness in the evaluation process by:
   a. Consulting with supervisors/evaluators to ensure that judgments are based upon appropriate data;
   b. Helping supervisors/evaluators identify and assist staff members who do not meet the Standards, or assisting those staff members directly;
   c. Developing forms for the recording of observations and for the summary evaluation consistent with the contract and with the agreement of the Association; and
   d. Reviewing completed summary evaluations.
2. To provide for training of staff members who must evaluate the work of others.
3. To make decisions regarding the initiation of termination of a staff member, pursuant to the Education Code.

**F. Responsibilities of the School District**

1. To provide the resources necessary for carrying out this process, including, but not limited to, the following:
   a. Time for supervisors/evaluators and staff members to confer in order to develop the professional development plan;
   b. Training on the process of developing professional development plans and assessing staff member performance; and
   c. A list of immediate supervisors/evaluators for each member of the bargaining unit, to be provided to the Association no later than September 30. The District shall notify the Association of any changes in the September 30 list.
2. To identify priorities for supervisors/evaluators in such a way that they have time to provide needed support for staff members.
3. To establish goals for the District and to review progress toward the accomplishment of those goals.
4. To specify the District goals and any specific objectives of a management team member or of any other supervisor if those objectives affect the staff member(s).
5. To provide resources determined by the District to assist staff members in pursuing their professional development plans.
6. To defend and indemnify, to the extent required by law, staff in the performance of their duties as an agent of the administration in the evaluation of a unit member.

**G. Chronology**

1. Evaluation tables are listed for Plans 1, 2.2, 2.2 Peer, 2.4, and 2.4 Peer describing the procedures for both formal evaluation years, in which summary evaluations are required, and informal years, in which no written summary evaluation is required.
2. All temporary and probationary staff members will follow the chronology given for Plan 1, which involves formal evaluation every year.
3. All permanent staff members with fewer than ten years experience in the District unless requesting Plan 2.2 Peer (two-year cycle), shall follow Plan 2.2, having a formal evaluation (written summary evaluation) every other year except when:
   a. The staff member has been placed under Evaluation Plan 3: Does Not Meet Standards — Support/Improvement Plan Implemented;
   b. The staff member has been placed under Evaluation Plan 4: Does Not Meet Standards — Administrative Review.
4. All permanent staff members with ten years or more experience in the District, unless requesting Plan 2.4 Peer (four-year cycle), shall follow Plan 2.4, having a formal evaluation (written summary evaluation) every four years and a professional dialogue with reflective review with the

supervisor/evaluator in the second year of the cycle, except when circumstances exist as detailed in G.3.a. and 3.b. listed above.

5.  The target dates listed in the tables do not necessarily preclude those activities from also occurring during other times of the year.

6.  This chronology by itself does not give a complete picture of the evaluation process. It must be looked at in conjunction with the responsibilities listed on the previous pages. Further, the establishment of the following target dates is not meant to ignore the importance of ongoing informal meetings between the supervisor and the staff member. Such meetings are an important part of the evaluation process.

7.  The target dates listed in these tables are dates by when the procedures are expected to be accomplished, although exceptions may be made. If procedures are not accomplished within two weeks after the target dates listed, some final judgments about the staff member's performance that year may be impossible or inappropriate.

8.  During the informal evaluation year, staff members will be expected to review and revise their professional development plans, and may use a variety of methods for assessing progress on their professional development plans, including self-evaluation. Informal meetings with supervisors are encouraged.

## Plan 1 — Chronology

This plan applies to all temporary and probationary staff members and their supervisors. Formal evaluation occurs every year.

A staff member who is employed more than 40% and who is temporary for a third consecutive year will follow the chronology for a temporary staff member who is equal to or less than 40%.

| Plan 1 Target Dates | Probationary 2 Staff | Supervisor |
|---|---|---|
| 11/1 | Meet to discuss progress on Standards | 1st Interim Assessment |
| 12/21 | Meet to discuss progress on Standards | 2nd Interim Assessment |
| 2/15 | Meet to discuss progress on Standards | 3rd Interim Assessment<br>Provide opportunity for staff assessment of administrative performance |
| 3/1 |  | Complete "Summary Evaluation" and Tenure Decision |

| Plan 1 Target Dates | Probationary 1 & Temporary Staff | Supervisor |
|---|---|---|
| 11/1 | Meet to discuss progress on Standards | 1st Interim Assessment |
| 2/15 | Meet to discuss progress on Standards | 2nd Interim Assessment<br>Provide opportunity for staff assessment of administrative performance |
| 4/1 | Meet to discuss progress on Standards | 3rd Interim Assessment |
| 4/1 |  | Complete "Summary Evaluation" and Rehire Decision |

| Plan 1 Target Dates | Temporary 40% or Less Staff | Supervisor |
|---|---|---|
| 12/21 | Meet to discuss progress on Standards | 1st Interim Assessment |
| 2/15 |  | Provide opportunity for staff assessment of administrative performance |

| | | |
|---|---|---|
| 4/1 | | Complete "Summary Evaluation" and Rehire Decision |

## Plan 2.2 — Chronology

This plan applies to all permanent staff members who have been in the District for fewer than ten years and who meet the Standards. It has a two-year cycle, alternating formal and informal evaluation years.

| Plan 2.2 Target dates | Staff Member | Supervisor |
|---|---|---|
| **Informal Year (1)** | | |
| 10/15 | Meet to write, discuss, and plan implementation of professional development plan | |
| 2/14 | | Provide opportunity for staff assessment of administrative performance |
| 4/30 | Discuss and assess progress on professional development plan | |
| 5/1 | Plan tentative revisions in professional development plan for following year | |
| **Formal Year (2)** | | |
| 10/15 | Meet to write, discuss, and plan implementation of professional development plan | |
| 2/14 | | Provide opportunity for staff assessment of administrative performance |
| 4/30 | Discuss and assess progress on professional development plan | |
| 5/1 | Plan tentative revisions in professional development plan for following year | Complete "Summary Form for Evaluation of Performance" |

## Plan 2.2 Peer — Chronology

This plan applies to all permanent staff members who have been in the District for fewer than ten years and who meet the Standards. It has a two-year cycle, alternating formal and informal evaluation years.

| Plan 2.2 Peer Target dates | Staff Member | Peer(s) | Supervisor |
|---|---|---|---|
| **Informal Year (1)** | | | |
| 9/30 | Identify professional partnership group | | |
| 10/15 | Meet to write, discuss, and plan implementation of professional development plan | | |
| 2/14 | | | Provide opportunity for staff assessment of administrative performance |
| 5/1 | Plan tentative revisions in professional development plan for following year | | |

| Formal Year (2) | | | |
|---|---|---|---|
| 9/30 | If needed, modify professional partnership group | | |
| 10/15 | Meet to write, discuss, and plan implementation of professional development plan | | |
| 2/14 | | | Provide opportunity for staff assessment of administrative performance |
| 4/30 | Discuss and assess progress on professional development plan | | |
| 5/1 | Plan tentative revisions in professional development plan for following year | | Complete "Summary Form for Evaluation of Performance" |

## Plan 2.4 — Chronology

This plan is available to any permanent staff member who has been in the District for ten or more years and who meets the Standards. It has a four-year cycle with a two-year reflective review and professional dialogue.

| Plan 2.4 Target Dates | Staff Member | Supervisor |
|---|---|---|
| **Informal Year (1)** | | |
| 10/15 | Meet to write, discuss, and plan implementation of professional development plan | |
| 2/14 | | Provide opportunity for staff assessment of administrative performance |
| 5/1 | Plan tentative revisions in professional development plan for following year | |
| **Reflective Year (2)** | | |
| 10/15 | Meet to write, discuss, and plan implementation of professional development plan | |
| 2/14 | | Provide opportunity for staff assessment of administrative performance |
| 4/30 | Discuss and assess progress on professional development plan | |
| 5/1 | Complete Reflective Review  Plan tentative revisions in professional development plan for following year | Receive completed Reflective Review and send to HR |
| **Informal Year (3)** | | |
| 10/15 | Meet to write, discuss, and plan implementation of professional development plan | |
| 2/14 | | Provide opportunity for staff assessment of administrative performance |
| 5/1 | Plan tentative revisions in professional development plan for following year | |
| **Formal Year (4)** | | |
| 10/15 | Meet to write, discuss, and plan implementation of professional development plan | |
| 2/14 | | Provide opportunity for staff assessment of administrative performance |
| 4/30 | Discuss and assess progress on professional development plan | |
| 5/1 | Plan tentative revisions in professional development plan for following year | Complete "Summary Form for Evaluation of Performance" |

**Plan 2.4 Peer — Chronology**

This plan is available to any permanent staff member who has been in the District for ten or more years and who meets the Standards. It has a four-year cycle with a two-year reflective review and professional dialogue.

| Plan 2.4 Peer Target Dates | Staff Member | Peer(s) | Supervisor |
|---|---|---|---|
| **Informal Year (1)** | | | |
| **9/30** | Identify professional partnership group | | |
| **10/15** | Meet to write, discuss, and plan implementation of professional development plan | | |
| **2/14** | | | Provide opportunity for staff assessment of administrative performance |
| **5/1** | Plan tentative revisions in professional development plan for following year | | |
| **Reflective Year (2)** | | | |
| **9/30** | If needed, modify professional partnership group | | |
| **10/15** | Meet to write, discuss, and plan implementation of professional development plan | | |
| **2/14** | | | Provide opportunity for staff assessment of administrative performance |
| **4/30** | Discuss and assess progress on professional development plan | | |
| **5/1** | Complete Reflective Review. Plan tentative revisions in professional development plan for following year | | Receive completed Reflective Review and send to HR |
| **Informal Year (3)** | | | |
| **9/30** | If needed, modify professional partnership group | | |
| **10/15** | Meet to write, discuss, and plan implementation of professional development plan | | |
| **2/14** | | | Provide opportunity for staff assessment of administrative performance |
| **5/1** | Plan tentative revisions in professional development plan for following year | | |
| **Formal Year (4)** | | | |
| **9/30** | If needed, modify professional partnership group | | |
| **10/15** | Meet to write, discuss, and plan implementation of professional development plan | | |
| **2/14** | | | Provide opportunity for staff assessment of administrative performance |
| **4/30** | Discuss and assess progress on professional development plan | | |
| **5/1** | Plan tentative revisions in professional development plan for following year | | Complete "Summary Form for Evaluation of Performance" |

**H.  Evaluation Plan 3:  Does Not Meet Standards:  Support/ Improvement Plan Implemented**

1. Placement on Plan 3 is the result of a staff member's failing to meet one or more of the Standards as identified by the site principal and administrative supervisor working in consultation with the Superintendent's staff.  While placement on Evaluation Plan 3 may occur during the spring reviews, a staff member shall be placed on this plan whenever it is deemed necessary by the site principal/administrator.

2. Prior to a teacher's being formally assigned to Plan 3, the following procedures will be followed:

   a. If the site principal/administrator determines that a teacher's performance does not meet all the Standards, s/he and the teacher will develop a plan to address concerns over an informal support period of 4 to 8 weeks. The principal/administrator shall notify a PAEA representative chosen by the teacher and a Human Resources administrator of the discussion.

   b. At the end of the agreed-upon informal support period, if the teacher's performance does not meet standards, the principal/administrator shall notify the teacher in writing that s/he is being placed on Evaluation Plan 3.

   c. If a teacher has previously been given the opportunity to address performance concerns through this type of informal support period, it is the prerogative of the principal/administrator to assign the teacher directly to Plan 3 should the same or other concerns surface at a later date.

3. While the principal/administrator may request any assistance or resources that she/he deems appropriate, the responsibility for monitoring and supervising staff placed on Evaluation Plan 3 is the responsibility of the principal/administrator as identified at the beginning of the school year.

## I. Procedures for Evaluation Plan 3

1. All general procedures for the staff member and the supervisor listed in in Section G (Chronology) for Plans 1, 2.2, 2.2 Peer, 2.4, and 2.4 Peer are required here. In the case of conflict between those general procedures and these specific procedures, these specific procedures apply.

2. A staff member placed on Evaluation Plan 3 shall be notified of this by both the principal/administrator and a Human Resources administrator.

3. When the staff member has been placed on Plan 3, the teacher, the principal, the administrative supervisor(s), a Human Resources administrator, and at the staff member's request, a PAEA representative of the staff member's choice will develop a support/improvement plan, which shall specify:

   a. Time span of the plan, not to exceed 18 weeks

   b. Performance concerns, including the Standards to be addressed

   c. Support to be provided to the staff member, including referral to the Peer Assistance and Review Program

   d. Process and schedule for gathering parent/student input, if deemed by the supervisor to be a necessary part of the plan

   e. Information about classroom observations to be made, which may be announced or unannounced

   f. Description of what will be considered satisfactory progress toward meeting Standards, to be used in consideration of an extension of the support period (see "5(b)" following) and

   g. Dates of written progress reports and summary evaluation

4. At least every 6 weeks the supervisor shall complete a written report on the staff member's progress and discuss it with the staff member. Each report will clearly identify which standards remain to be met.

5. At the end of the period specified in the support/improvement plan the principal/administrator will write a summary evaluation of the staff member's performance.

   a. If the principal/administrator, in consultation with the supervisor/evaluator, determines that the staff member meets all Standards, s/he will be placed on Evaluation Plan 2.2 and will receive a summary evaluation in the following school year. Thereafter, the staff member may select to be evaluated under any Plan appropriate to the staff member's experience in the District.

   b. If the principal/administrator, in consultation with the supervisor/evaluator, determines that a staff member has made satisfactory progress but still does not meet all standards, an extension

of Plan 3 may be granted for up to 18 weeks. A definition of what will be considered satisfactory progress will be included in the original support/improvement plan.

   c. If the principal/administrator, in consultation with the supervisor, determines that a staff member has not made satisfactory progress toward meeting all standards, the staff member will be placed on Evaluation Plan 4.

6. The support/improvement plan and summary evaluation required under Plan 3 will be placed in the staff member's personnel file.

## J. Evaluation Plan 4: Does Not Meet Standards: Administrative Review

1. A staff member not meeting one or more of the Standards and not making satisfactory improvement during a period of support in Plan 3 shall be evaluated under Plan 4. Evaluations of staff members under Plan 4 are structured to accumulate a file that demonstrates the quality of the staff member's performance and the efforts expended in assisting the staff member to improve performance. Evaluation Plan 4 requires careful monitoring and analysis of the staff member's performance. The District may begin termination procedures for unsatisfactory performance pursuant to the Education Code at any time while the teacher is being evaluated under Plan 4.

2. The Superintendent's staff, in consultation with site principals and other administrative personnel, shall identify individuals to be placed under Evaluation Plan 4. The staff member shall be notified of this decision at a meeting with the principal/administrator and a member of the Superintendent's staff, in order to delineate clearly concerns associated with the staff member's performance.

   a. Procedures for Evaluation Plan 4

      (1) School and District administrators shall revise the staff member's support/improvement plan (created in Plan 3) to include more frequent observations and conferences and more direct intervention in the classroom. The maximum duration of this support/improvement plan will be 9 weeks.

      (2) At least every 2 weeks the principal/administrator shall complete a written report on the staff member's progress and discuss this report with the teacher.

      (3) The principal/administrator shall write a summary evaluation by a date specified in the support/improvement plan, but no later than 9 weeks after the time the staff member is placed on Plan 4. This evaluation will be reviewed by the Superintendent's staff.

         (a) If the principal/administrator and Superintendent's staff determine that the staff member meets all standards at the end of the support period, the staff member will be evaluated by Plan 2.2 for the remainder of that school year and the following year, receiving a summary evaluation by May 1 in each of those years. Thereafter, the staff member may select to be evaluated under any Plan appropriate to the staff member's experience in the District. (b) If the principal/administrator and Superintendent's staff determine that the staff member does not meet all standards at the end of the support period, the District will initiate termination procedures for unsatisfactory performance, if termination procedures have not already been initiated.

      (4) The revised support/improvement plan, progress reports, and summary evaluation required under Plan 4 will be placed in the staff member's personnel file.

**K. Student Input**

*(This section will be temporarily replaced by a two-year pilot program specified in a separate MOU for the 2023-24 and 2024-25 school years.)*

1. Student Input

    a. The District and the Association agree that the purpose of student input is to provide meaningful feedback to assist teachers and supervisors in their reflection on and improvement of teaching practices. A staff member's administrative supervisor(s) is/are the sole evaluator(s) of that staff member's performance. The District is responsible for providing information to students regarding the purpose of student input and their opportunity to provide it. The District may use department, school, and district aggregate data as benchmarks to identify growth in instructional practices. Classroom teachers are required to collect unidentifiable input from students in Grades 6-12. The procedure used for student input must provide for student anonymity.

    b. The staff member may devise, subject to approval by his/her supervisor/evaluator, forms and procedures for the collection of student input, or s/he may use forms and procedures provided by the District.

    c. Student input shall be collected by the classroom teacher prior to the end of the first semester and for semester courses again prior to the end of the school year. The teacher shall share input received with his/her supervisor.

    d. Student input shall not form the basis for a less than "meets Standards" evaluation unless corroborated by the evaluation process described in this Article.

# ARTICLE XI
## Leave Provisions

Statutory or regulatory leave provisions not specified in this Article are not subject to the grievance/arbitration mechanism, Article V.

**A. Definitions**

Members of the immediate family, as used in this section, mean the mother, father, grandmother, grandchild, or grandfather of the employee or of the spouse of the employee, and the spouse, registered domestic partner, son, son-in-law, daughter, daughter-in-law, brother, brother-in-law, sister, sister-in-law, step-parent, step-child, or current foster child of the employee; or any relative living in the immediate household of the employee. The immediate family shall also include any person who is a permanent member of the household who has been designated and identified as such on the annual employee emergency form. If a member of the immediate family falls outside this list, the unit member may apply for leave from the Human Resources administrator who may grant leave with pay provided the unit member satisfies the appropriate relationship to the bereaved unit member.

**B. Personal Illness and Injury Leave**

1. Full-time employees shall be entitled to ten (10) days leave with full-time pay for each school year for purposes of personal illness or injury. Employees who work less than full-time shall be entitled to that portion of the ten (10) days leave as the number of hours per week of scheduled duty relates to the number of hours for a full-time employee in a comparable position.

2. During each school year, when a unit member has exhausted all available sick leave, including accumulated sick leave, and continues to be absent from duty on account of illness or accident for an additional 5 school months, the amount deducted from the salary for any of the additional five months in which the absence occurs shall be the amount actually paid a substitute employee employed to fill the position during the leave, or, if no substitute is employed, the amount that would have been paid to a substitute.

   The accumulated sick leave and the five-month period shall run consecutively. A unit member may not be provided more than one five-month period per illness or accident. However, if a school year terminates before the five-month period is exhausted, the employee may take the balance of the five-month period in a subsequent school year.

3. If an employee does not utilize the ten (10) days of leave as authorized in the paragraphs above in any school year, the amount not utilized shall be accumulated from year to year.

4. Upon request by District management, an employee shall be required to present a medical doctor's certificate verifying the personal illness or injury and/or a medical authorization to return to work. All personnel are required to report the reason for absence to qualify for pay during that absence, and to report their absences to the Attendance Reporting/ Substitute System (AESOP). This reporting to the Attendance Reporting/Substitute System is sufficient for absences of six (6) days or fewer. For absences in excess of six (6) days, verification may be made by a principal, supervisor, or medical doctor. If requested by the District management, an employee shall not return to work until he submits a medical doctor's authorization to return to work.

5. An employee must contact the Attendance Reporting/Substitute System as soon as the need to be absent is known. Failure to provide adequate notice may be grounds for denial of leave with pay. Chronic failure to provide adequate notice may be grounds for other disciplinary action.

6. An employee who is absent for one-half (1/2) day or less shall have deducted one-half (1/2) day from the accumulated leave; and if the absence exceeds more than one-half (1/2 day), a full day shall be deducted from accumulated leave.

7. Upon request, a unit member shall be informed of the individual's accumulated leave.

**C. Personal Necessity Leave**

1. Leave that is credited under Section B of this Article may be used, at the employee's election, for purposes of personal necessity, provided that use of such personal necessity leave does not exceed seven (7) days in any school year.

2. For the purpose of this provision, personal necessity shall be limited to:

    a. Death or serious illness of a member of the employee's family (for this section only, unit members may utilize three (3) additional personal necessity days in addition to the seven (7) days provided in section C. l above).

    b. An unforeseen accident involving the employee's person or property, or the person or property of the employee's family

    c. Attending school activities of the unit member's child under Labor Code Section 230.8

    d. Other activities that cannot reasonably be deferred to other than regular work hours, which are neither matters of personal convenience, recreational activities, or concerted activities. Important family events whose timing is not within the control of the staff member, such as weddings, graduations, or family reunions, will not be considered matters of convenience or recreation

3. No prior permission is required for use of seven (7) days in any school year. However, the leave under "B.2.d" above cannot be used on the day immediately proceeding or following a holiday or vacation without prior approval from the principal or central department supervisor. If the immediate supervisor denies the request, the employee has the right to appeal to the Human Resources administrator. Employees utilizing personal necessity leave must identify which category above applies ("a," "b," "c," or "d") and shall make every effort to comply with the District procedures regarding advance notice to enable the District to secure a substitute.

**D. Bereavement Leave**

1. During a fiscal year, a unit member shall be allowed up to five (5) days of paid leave of absence per bereavement, without deductions from accumulated sick leave, in case of death in the immediate family.

    a. A unit member may use the personal necessity days specified in C.1 of this Article to augment the bereavement leave beyond the five (5) bereavement days specified above.

    b. A unit member may request to use additional personal necessity days from the unit member's accumulated sick leave if extenuating circumstances apply to his/her situation. The unit member shall submit a request in writing to the Human Resources administrator for consideration and prior approval for the use of any additional personal necessity days.

    c. The provisions of this leave are not cumulative, and must be used for the attendance at funeral services and related bereavement activities.

**E. Critical Family Illness Leave**

1. During a fiscal year, a unit member shall be allowed up to three (3) days of paid leave of absence for critical illness or serious injury to an immediate family member, without deductions from accumulated sick leave. For the purpose of this leave, the use of critical illness or serious injury leave requires the hospitalization or hospice care of the immediate family member.

    a. A unit member may use the personal necessity days specified in C.1 of this Article to augment the critical family illness leave beyond the three (3) critical leave days specified above.

    b. A unit member may request to use additional personal necessity days from the unit member's accumulated sick leave if extenuating circumstances apply to his/her situation. The unit member shall submit a request in writing to the Human Resources administrator for consideration and prior approval for the use of any additional personal necessity days.

    c.   The provisions of this leave are not cumulative, and must be used for the attendance at funeral services and related bereavement activities.

**F.  Pregnancy Disability Leave**

Employees are entitled to use sick leave as set forth in Section B of this Article for disabilities caused or contributed to by pregnancy, miscarriage, childbirth, and recovery therefrom.  Such leave shall not be used for childcare, child rearing, or preparation for childbearing, but shall be limited to those disabilities as set forth above.  The length of such disability leave, including the date on which the leave shall commence and the date on which the duties are to be resumed shall be determined by the employee and the employee's physician; however, the District management may require a verification of the extent of disability from the employee's physician.

**G.   Child Bonding Leave**

1.  Employees are entitled to child bonding leave as set forth below. Employees may elect to utilize up to twelve (12) weeks of child bonding leave occasioned by the birth of the employee's child, or the placement of a child with the employee in connection with the employee's adoption or foster care of the child as provided by CFRA.

2.  Pursuant to Education Code section 44977. 5 in order to qualify for child bonding leave, employees must have completed one (1) year (twelve month of employment) for the District but are not required to have at least 1,250 hours of service during the previous one (1) year (twelve month) period.

3.  For mothers, the twelve (12) week child bonding leave shall commence at the conclusion of any pregnancy disability leave.

    a.   The twelve (12) weeks of leave may extend into the following school year provided that the leave days fall within the twelve (12) month period of time following the child's birth.

    b.   Maternity/paternity leave may be taken in a minimum of two (2) week increments.

For non-birthing parents, the twelve (12) week child bonding leave shall commence on the first day of such leave.

4.  Pursuant to Education Code section 44977.5, if an employee exhausts his/her accumulated sick leave prior to expiration of the twelve (12) week child bonding leave, s/he shall be entitled to differential pay as defined in section B.2 or 50% of the employee's regular pay whichever is more.

5.  The District must be provided with at leavt thirty (30) days prior notice of intent to take child bonding leave, except in the case of emergency.

6.  Upon request, a parent of a newly-born or newly-adopted child may be granted a leave of absence without pay at the conclusion of leave under Education Code section 44977.5 provided the District is able to hire a replacement on a temporary basis. This leave may commence as authorized by the Board at any time during the first year following the child's birth. This leave shall not exceed one (1) year.

7.  Upon exhaustion of all Child Bonding Leave and accumulated sick leave, (Section B(1)) for child bonding leave purposes, employees remain eligible to use differential pay according to section B (2) for illness or injury.

**H.  Parental Leave (Leave Without Pay)**

1.  Parental leave without pay and with medical insurance benefits may be granted to an employee for preparation for childbearing, child adoption, or for child-rearing, under the District rules and regulations for Family Medical Leave Act and California Family Rights Act under section N of this article.

2.  After Maternity/Paternity Leave or Family and Medical Leave are exhausted, an employee may request straight leave for continued parental leave. This leave will be without pay or other benefits, except that medical insurance benefits will be extended for a total of five (5) months or until June 30, whichever is the lesser period. The duration of such leave shall be no more than twelve (12) consecutive months and shall automatically terminate on June 30 in the school year closest to the end of the twelve-month period. An extension of straight leave without pay or other benefits may be granted, not to exceed an additional twelve months.

3.  The employee shall request such leave as soon as practicable, but under no circumstances less than thirty (30) work days prior to the date on which the leave is to begin. Such request shall be in writing and shall include a statement as to the dates the employee wishes to begin and end the leave without pay.

4.  Upon consultation with the employee, the determination as to the date on which the leave shall begin and the duration of such leave shall be made at the discretion of the Superintendent or designee, when considering the scheduling and replacement problems of the District. See Section O.2 of this article for information regarding returning from parental leave to a reduced assignment.

5.  The employee is not entitled to the use of any accrued sick leave or other paid leave while such employee is on a parental leave, whether or not the illness or disability is related to a pregnancy, miscarriage, childbirth, or recovery therefrom.

6.  There shall not be a diminution of employment status for parental leave, except that no employee shall be entitled to compensation, increment, nor shall the time taken on parental leave count toward credit for probationary teachers in earning tenure status.

7.  If an employee is on parental leave and in the event of miscarriage or death of a child subsequent to childbirth, the employee may request an immediate assignment to a unit position. If there is a vacancy for which an employee is qualified, or if a vacancy develops, the District will assign the employee to a position as soon as practicable.

## I. Industrial Accident Leave

1.  Employees will be entitled to industrial accident leave according to the provisions in the Education Code for personal injury that has qualified for Workers Compensation.

2.  Such leave shall not exceed sixty (60) days during which the schools of the District are required to be in session or when the employee would otherwise have been performing work for the District in any one fiscal year for the same industrial accident.

3.  Allowable leave shall not be accumulative from year to year. When an industrial accident or illness occurs at a time when the full sixty (60) days will overlap into the next fiscal year, the employee shall be entitled to only that amount remaining at the end of the fiscal year in which the injury or illness occurred, for the same illness or injury.

4.  The District has the right to have the employee examined by a physician designated by the District to assist in determining the length of time during which the employee will be temporarily unable to perform assigned duties and the degree to which a disability is attributable to the injury involved.

5.  The District shall deduct from the employee's salary warrant the amount of such disability indemnity actually paid from the Workers' Compensation Fund to and retained by the employee.

## J. Judicial Leave

1.  Employees shall be provided leave for regularly called jury duty, and to appear as a witness in Court, other than as a litigant, for reasons not brought about through the convenience or misconduct of the employee.

2.  The employee, while serving jury duty, will receive pay in the amount of the difference between the employee's regular earnings and any amount received for jury service. The employee may retain any fee paid as a travel allowance.

3.  If the employee does not wish jury duty pay to be deducted from the paycheck, he/she must submit a check for the amount of the jury duty pay with the monthly absence report covering the time he/she was on judicial leave.

## K. Other Leaves Without Pay

1.  A leave of absence without compensation may be granted to any teacher for a period of not less than one semester, nor more than one year, for the purpose of: (1) teaching programs in other states, territories, or countries, or military teaching programs; (2) Peace Corps, Teacher Corps, or Job Corps, as a full-time participant; (3) cultural travel; (4) work programs related to the teacher's professional responsibilities; (5) rest; (6) public office; (7) continued parental leave as described in E2 of this Article, (8) care for a member of the immediate family who is ill; (9) long-term illness of the employee; (10) disability; or (11) other reasons acceptable to the Board. Upon application, the District may grant an extension.

2.  Applications for leaves of absence without pay for reasons 1 through 6 above shall be submitted in writing to the Certificated Human Resources Office no later than March 31 of the year preceding the proposed leave. Approval of requests received after this date may be contingent upon finding a suitable replacement for the staff member requesting leave. Applications for leaves for reasons 7 through 11 should be made as soon as possible after the need for the leave becomes known.

3.  Salary credit (step advancement) shall be granted for teaching experience outside the District while an individual is on leave, if he teaches seventy-five percent (75%) of the days of the Palo Alto Unified School District calendar on a half-time or more basis.

## L. Sabbatical Leaves

1.  Sabbatical leave may be granted to certificated employees after seven years of continuous service for the purpose of permitting study or travel, which will benefit the schools and pupils of the District. Certificated employees may apply for a full-year or a semester or quarter-year sabbatical leave. No more than two (2) percent of the certificated staff may be on sabbatical leave. Quarter-year sabbaticals are limited to three staff members within the two (2) percent.

2.  Certificated personnel shall be granted sabbatical leaves only in accordance with the following provisions:

    a.  Objectives of Sabbatical Leaves

        Sabbatical leaves are approved under State law "for the purpose of permitting study or travel by said employees, which will benefit the schools and pupils of the District."

    b.  Extent and Distribution of Leaves

        (1) The number of certificated employees granted a sabbatical leave during any academic year shall not exceed two (2) percent of the total number of certificated employees.

        (2) Sabbatical leave applications will be considered according to criteria in the following order of priority:

            (a) Specific purpose of the sabbatical

            (b) Former sabbatical leaves granted an individual

            (c) Individual's seniority in the District

            (d) Total length of individual's professional services

            (e) Individual's professional contributions

        (3) Leaves granted during the contract period will be honored during the following academic year.

44

c.  Selection Procedures

Applications for sabbatical leave shall be evaluated by a panel of nine certificated staff members, five of whom shall be recommended by the teachers' bargaining unit.  The Human Resources administrator shall act as an advisory non-voting member of the panel.  Should the panel need help in determining the value of a project and its equivalence to course units, it may choose to call in a special panel of educators conversant with the subject area involved.  The panel's confidential recommendations shall be submitted to the Superintendent no later than February 10.  Final recommendation for sabbatical leaves shall be at the discretion of the Superintendent, with Board action taken not later than the first Board meeting in March.  The Board of Education retains the right to either grant or deny any and all sabbatical leaves.   Denials of committee recommendations shall be explained in writing to the members of the panel.

d.  Sabbatical Leave Requirements

Service:  Sabbatical leaves must be preceded by at least seven consecutive years of service, all of which shall have been served as a regular certificated employee in the Palo Alto Unified School District.  Qualifying service shall be as defined in the Education Code.

e.  Sabbatical Leave Applications

(1) Plans for sabbatical leave should be made with the full knowledge of the principal of the school in which the applicant is serving.

(2) Applications that appear to meet the objectives of Board policy and are consistent with administrative procedures must be submitted to the Certificated Human Resources Office by January 10 of the year preceding the proposed sabbatical leave.

(3) Appropriate application forms for sabbatical leaves may be secured through the Certificated Human Resources Office.

f.  Compensation While on a Sabbatical Leave

(1) The employee on sabbatical leave shall receive compensation as follows:

(a) One Year Sabbatical —The difference between the salary the employee would have received and the salary at AB +45, step 6.

(b) One-half Year Sabbatical — Three-fourths of the employee's annual salary.  (Full salary for semester not on leave and one-half salary for semester on leave.)

(c) Quarter-year Sabbatical — Seven-eighths of the employee's annual salary.  (Full salary for semester and quarter not on leave and one-half salary for quarter on leave.)

(2) The District shall continue to pay life, health, dental, and vision insurance premiums as set forth in Article VI of this agreement.

(3) At the employee's option, the employee may purchase service credit equivalent to the sabbatical leave period pursuant to the State Teachers Retirement System rules and regulations.

(4) Sabbatical leave time shall count as regular service for salary purposes.  As a condition of being granted sabbatical leave, the unit member shall agree in writing to render a period of service to the District following the return from leave which is equal to twice the period of leave.

g.  Effect of Sabbatical Leave on Salary Increments and Retirement

(1) A teacher who acquires twelve semester units per semester's leave shall be credited with one complete semester of teaching service for salary increment purposes.  Sabbatical leave credit for salary increments will be tentatively granted on approval of the sabbatical leave program submitted with the application.  Completion of the program must be verified by April 15 for those returning from first semester leave and November 15 for those returning

from second semester and full-year leave.  Failure to verify completion by this date will result in the loss of any salary granted on the basis of the approved preplan.

(2) The teacher's normal percentage rate of deduction for retirement purposes shall be applied to the actual salary received by the teacher.  Time on sabbatical leave is credited as service in the proportion that the compensation received bears to the full compensation earnable on a full-time basis.  Within a two-year period, an individual may receive full-time credit by paying to the system additional contributions based on the compensation that is the difference between compensation earned and the compensation earnable during the period of sabbatical leave.

h.  Types of Sabbatical Leaves

(1) Sabbatical leaves for study:

(a) A teacher shall complete at least twelve semester units of work per semester's leave. These courses shall be exclusive of correspondence courses.  A special project or research problem may be substituted for the unit requirements (see subsection "L.2.h.4 of this Article).

Transcripts or other evidence of completion shall be submitted to the Certificated Human Resources Office by April 15 for those returning from first semester leave and November 15 for those returning from second semester or full-year leaves.

(b) Staff members requesting a quarter-year sabbatical leave must take a minimum of six semester units during the quarter.  The April 15th and November 15th dates also apply for quarter-year sabbaticals.

(2) Sabbatical leaves for travel:

Personnel on sabbatical leave for travel shall remain on travel status at least $4^1/_2$ months for each semester of leave.  Personnel on a quarter-year sabbatical leave for travel must remain on travel status for at least six weeks.  The application for leave shall include, in general terms, an itinerary of the proposed travel, together with a statement specifying the contributions which such travel will make to the applicant's service to the pupils and schools.  Upon completion of the leave, a detailed itinerary and a written report of not less than 2,500 words shall be submitted to the Certificated Human Resources Office setting forth the teacher's reactions to the trip and a statement of the benefits received from it. These reports are due April 15 for those returning from first semester leave and November 15 for those returning from second semester and full-year leave.  (A description of the trip will not satisfy the requirement.)  The report shall be referred to the Sabbatical Leave Panel for appraisal.

(3) Sabbatical leaves for combined travel and study:

(a) Personnel on sabbatical leave for travel and study shall be on continuous travel status for at least $4^1/_2$ months and shall complete a minimum of twelve semester units of work during the sabbatical year.  In addition, all other provisions in 8a and 8b apply.

(b) Personnel granted a quarter-year sabbatical leave shall complete three (3) semester units of work and travel a minimum of three weeks.

(4) Sabbatical leaves for individual projects:

In preplanning individual projects, the applicant shall include a detailed plan, specifying:

• The way in which the project will benefit the pupils and schools in the District;

• A detailed statement of the time to be allocated to the project;

• The name and position of the supervisor or consultant; and

- A statement that the work to be done on the project will be equivalent in time spent, and in quality of work, to twenty-four semester units for a one-year sabbatical, twelve semester units for a half-year sabbatical or six semester units for a quarter-year sabbatical.

Evidence of completion of the project shall include

- A logbook or daily journal describing time spent and activities undertaken,
- Slides, photographs, or charts to show stages of development,
- Verification of completed work by advisor or consultant,
- Tangible evidence of the completed project, and
- A written report of not less than 5 pages or a 30-minute presentation to interested colleagues. This report/ presentation will include the staff member's summary of the project, a discussion of how work on the project contributed to his/her professional growth, and specific plans for how s/he will disseminate the results of the project to benefit students and other staff members in the district.

**M. Catastrophic Leave Bank**

The Association and the District agree to establish a Catastrophic Leave Bank, effective July 1, 1998.

**1.  Eligibility**

a. Unit members who have exhausted all applicable paid leaves provided for in the collective agreement, excluding differential pay, may apply for Catastrophic Leave under this Article.

b. To qualify for Catastrophic Leave, the unit member must have suffered an illness or injury that is expected to incapacitate him/her for an extended period of time, or that incapacitates a member of the bargaining unit member's immediate family, and that incapacity requires the bargaining unit member to take time off from work for an extended period of time to care for that family member, and taking extended time off from work creates a financial hardship for the bargaining unit member because all of her or his sick leave and other paid time off has been exhausted. "Immediate family members" shall be defined in Section A of the Article.

c. A unit member's use of Catastrophic Leave shall not exceed a cumulative maximum of seventy-five (75) days per unit member. Catastrophic Leave shall be taken in full day increments. The use of differential pay will follow, when appropriate, the use of the allocated Catastrophic Leave days.

d. Participation in the Catastrophic Leave Bank is voluntary. Unit members who wish to participate will donate at least one (1) sick day upon joining. Further donations may be required when the committee calls for them. New hires will have sixty (60) calendar days from the date of hire to elect to participate, or when Human Resources sends out the open enrollment information and timeline. Only those who donate may receive contributions from the Bank. If a unit member decides to discontinue participation in the Bank, the unit member may rejoin during an open enrollment period during the month of October.

e. Unit members who do not join the Bank when they first become eligible must wait until the next open enrollment period (during the month of October or November) to join.

**2.  Catastrophic Leave Bank Committee**

a. A Catastrophic Leave Bank Committee shall be established that includes three (3) unit members appointed by the Association and two (2) members appointed by the District. The Committee shall be responsible for administering the Catastrophic Leave Bank in accordance with this Agreement and applicable state law. The Committee's duties are:

(1) Receiving leave requests

(2) Verifying the validity of requests

      (3) Approving or denying requests

      (4) Communicating the Committee's decisions to affected unit members and the District

      (5) Soliciting donations of sick leave from eligible unit members as needed

      (6) Reviewing special circumstances of a member that prohibit him or her from donating additional days in order to continue as a member of the Bank and

      (7) Accepting donations of days of sick leave for the Bank from unit members who wish to donate in the name of a colleague. This constitutes immediate membership in the Bank. The donated days will not increase the maximum number of days the individual may receive.

  b. The Committee shall designate one of its members as Chairperson.

  c. The Committee will establish appropriate record-keeping procedures, including the total number of accumulated days in the Bank and the names of participating members.

  d. The Committee shall keep all records confidential and shall not disclose the nature of any illness except as is necessary to process the request for leave and appeals of denials.

  e. Catastrophic Leave requests shall only be approved by a majority vote of the Committee.

**3. Application Procedure**

  a. A unit member who wishes to use Catastrophic Leave shall submit a request on the appropriate form to the Catastrophic Leave Bank Committee, stating the facts that support his/her need for Catastrophic Leave. Each request for a withdrawal from the Bank or extension of a withdrawal must be accompanied by medical verification of the need for the leave.

  b. The Committee shall review the unit member's application and make its decision within a reasonable period of time.

  c. When the Committee determines that the unit member is eligible for Catastrophic Leave, it shall designate the number of days of eligibility. No days may be granted retroactively. The Committee may approve eligibility in renewable increments not to exceed thirty (30) days. If donated days of sick leave are available from the Leave Bank, they may be used by the unit member. If sufficient days are not available, the Committee may solicit donations of days from eligible unit members in accordance with this Agreement on the appropriate form approved by the Association and the District.

  d. If the Committee denies a request for withdrawal from the Bank, or an extension of withdrawal, because of insufficient days to fund the request, the Committee shall notify the unit member, in writing, of the reason for the denial.

  e. If the Committee reasonably believes that the unit member may be eligible for disability allowance or disability retirement under STRS or Social Security, the Committee may request that the unit member apply for those benefits. If the unit member refuses to submit a complete application, including medical information provided by the unit member's physician, within twenty (20) calendar days, he/she shall no longer be eligible to withdraw days from the Catastrophic Leave Bank for the pending application.

  f. The unit member shall comply with any requests for additional information from STRS or Social Security within fifteen (15) calendar days, or his/her eligibility to participate in the Catastrophic Leave Bank shall cease. If denied benefits by STRS or Social Security, the unit member must appeal, or his/her eligibility to participate in the Catastrophic Leave Bank shall cease.

**4. Donations to Catastrophic Leave Bank**

  a. Participating unit members may donate a maximum of three (3) days of accrued, full-time sick leave to the Catastrophic Leave Bank each school year in full day increments only, upon a solicitation by the Catastrophic Leave Bank Committee. Donations are irrevocable, and shall

not be returned to unit members upon their cancellation of membership in the Bank. All contributions to the Bank are voluntary.

   b. Members of the Catastrophic Leave Bank Committee may solicit an additional day or days, depending upon need, when the bank of days drops to or below fifty (50) days. The solicitation shall be made by the Catastrophic Leave Bank Committee. A unit member's membership in the Bank may be canceled if they fail to make a donation when donations are solicited. Eligibility, if available, may only be reestablished in accordance with Section 1e.

**5. Miscellaneous Provisions**

   a. Unused days remaining in the Catastrophic Leave Bank shall carry over from year to year.

   b. Unit members using days granted to them from the Catastrophic Leave Bank shall not accrue any other leave provided by this Agreement or by law.

   c. Leave from the Bank may not be used for illness or disability that qualifies a unit member for workers' compensation benefits.

   d. The Catastrophic Leave Bank donations are subject to appeal to the Committee only and are not subject to review or appeal under any other procedure. Specifically, the Catastrophic Leave Bank Committee's exercise of the rights and discretion described in this Article shall not be subject to the grievance/arbitration procedure. Except for allegations that the District failed to cooperate as required by this Section, no grievance may be filed against the District alleging a violation of Section (M).

   e. If the Catastrophic Leave Bank has insufficient days to fund a withdrawal request, the Committee is under no obligation to provide days and the District is under no obligation to pay the unit member any funds whatsoever.

   f. If the Catastrophic Leave Bank is terminated for any reason, the days remaining in the Catastrophic Leave Bank shall be returned to the then-current members of the Bank proportionately. In no event shall any unit member receive more sick leave days than she/he donated to the Catastrophic Leave Bank.

**N.  FMLA and CFRA**

Unit members are eligible for leave under the Federal Family and Medical Leave Act (FMLA) and the California Family Rights Act (CFRA). The parties will prepare a memorandum covering the various rights and obligations, including those areas where discretion may be exercised by the District and/or employees. This will be posted on the HR website.

**O.  Reduced Employment**

1. Prior to March 1, a unit member may request in writing reduced employment for the subsequent school year. In the event the District agrees to reduce the unit member's employment, such reduction shall be granted for not less than one (1) year nor more than five (5) years provided further that the parties mutually agree to the amount the employment shall be reduced and the date on which the unit member may elect in writing to return to the unit member's prior employment percentage. If the reduced assignment results in two teachers instructing the same students, i.e. sharing one assignment, the provisions of Article VII, Section D must be met.

2. When a unit member returns from parental leave that ends during the school year, the District will make an effort to honor a request for reduced employment status upon return, provided that:

   a. The request for reduced employment was made before the parental leave began,

   b. A replacement teacher satisfactory to the District is available for the parental leave and agrees to continue during the reduced employment period.

3. A unit member may renew his/her reduced employment status by completing the appropriate form in the Certificated Human Resources Office. The March 1 deadline date also applies to the renewal.

4. In the event the unit member does not elect in writing by March 1 to return to the prior employment percentage, the unit member's employment percentage shall be permanently reduced. However, the unit member and the District may mutually agree to reduce or extend within the above period of reduced employment.

**P. Miscellaneous**

**1. Eligibility for Leave**

A unit member becomes eligible for an unpaid leave of absence, with the exception of parental leave, after he/she has permanent status as defined in Education Code Section 44929.21b. He/she may apply for that leave any time after establishing permanent status.

**2. Benefits**

While on approved leave, a unit member shall be considered to be a member of the department or school from which he/she is on leave. Upon return, the unit member shall be given equal consideration with other members of that department or school for continued assignment in that school or department. He/she, spouse and named dependents, shall be permitted to remain in District fringe benefit programs when on unpaid leave provided that: (1) the unit member pays to the District the premium costs incurred by the District for benefits elected by the unit member going on unpaid leave; and (2) the insurance companies agree to extend that coverage.

**3. Notice of Intent to Return from Leave**

The unit member shall give written notice to the District of the unit member's intention to return to duties by March 1 of the year in which the leave expires; otherwise, it will be assumed that the unit member does not intend to return.

# ARTICLE XII
# Concerted Activities

**A.  Definitions**

It is agreed and understood that except as specified in the fourth paragraph of this article, there will be no strike, work stoppage, slow-down, picketing, or refusal or failure to perform fully and faithfully job functions and responsibilities, or other interference with the operations of the District by the Association or by its officers, agents, or members during the term of this Agreement, including compliance with the request of other labor organizations to engage in such activity.

**B.  Duty to Comply**

The Association recognizes the duty and obligation of its representatives to comply with the provisions of this Agreement and to make every effort toward inducing all employees to do so.  In the event of a strike, work stoppage, slow-down, or other interference with the operations of the District by employees who are represented by the Association, the Association agrees in good faith to take all necessary steps to cause those employees to cease such action.

**C.  Discipline**

It is agreed and understood that any employee violating this Article may be subject to discipline.

**D.  Rights**

It is understood that this Agreement shall not negate the right of members of the bargaining unit or the Association and its officers or agents from engaging in informational picketing or other such concerted activities, exclusive of a strike or other work stoppage.

# ARTICLE XIII
# Working Conditions

**A. Elementary Preparation/Planning**

1. The District will provide an elementary traveling team in the form of additional specialized instruction to provide preparation and planning time for teachers in elementary grades 1 through 5.

2. Traveling teachers shall be members of the staff at each site served.

3. Full-time K through Grade 5 teachers at the elementary level shall have preparation/planning time during the student attendance day as follows:

   a. Kindergarten teachers:  30 minutes per week.

   b. Teachers teaching a primary day —90 minutes per week.

   c. Teachers teaching an intermediate day —190 minutes per week.

4. Sites are encouraged to schedule blocks of common grade level planning time.

5. In addition to the time listed above, primary teachers shall have the minute differential between the primary instructional day and the intermediate instructional day (currently 100 minutes) to use for instructional preparation, individual and joint planning, and scheduled parent and staff conferences.  The teacher has the professional discretion to use the time within these purposes. Seventy-five to eighty (75-80) minutes of the 100-minute differential shall be provided in a minimum of 20-minute blocks during the week. If the primary teachers at a site are interested in a modification to the 20-minute blocks they may submit an alternate proposal to the site principal and site Association representative.   A proposal may be adopted by a 2/3 vote of the affected teachers. A representative selected by the Association and a representative selected by the site administration shall oversee the voting process. The District must approve any schedule of differential time blocks that affects the District bus transportation schedule.

**B. Secondary Preparation/Planning/Conferencing**

Full time classroom teachers at the middle and high school levels shall have two sevenths (2/7) of the instructional periods for the purpose of instructional preparation, individual and joint planning, parent and staff conferencing, and student support.  The classroom teacher has the professional discretion to use the time within these purposes. At the middle school level, teachers shall use one common preparation period per week for a "team" meeting.  Middle school elective subject "team" members, who are unable to attend the team meetings, shall participate by contributing their views/information on meeting topics on a weekly basis. The scheduling of preparation periods shall be done at the site level to meet the needs of the program, staff, and students.

**C. Same-Day Multiple-Site Secondary Classroom Teachers**

Classroom teachers whose assignments require them to travel to different secondary school sites during the same teaching day (multiple-site teachers) and who are not members of the district-wide traveling music and P.E. teams shall be entitled to the following rights.

1. The site administrators in collaboration with the teacher shall determine which school will be the primary site of assignment for the purposes of attendance at required meetings when the meeting times conflict.  It is the expectation that the teacher will be required to attend the number of meetings normally required of teachers assigned solely to the primary site served by the multiple site teacher.

2. Multiple-Site teachers shall be given a reasonable travel time between schools, except in extraordinary circumstances.  In extraordinary circumstances, the site administrators at each site and the affected teacher shall work together to define the expectations of each site and develop a plan with the teacher to mitigate the circumstances.  A full time teacher who is required to travel between sites during his/her workday shall be paid a full-time traveling teacher stipend pursuant to Appendix H.

**D. Job Sharing**

1. Definition:  Job-sharing shall refer to two (2) permanent staff members or one (1) permanent staff member and a retired former PAUSD permanent staff member, when no other current permanent staff member is available, sharing one (1) assignment in order to accommodate staff members. Temporary staff members who are in a job-share assignment for the 2005-06 school year and who were in a job-share assignment in the previous year shall be eligible to continue to serve in a job-share assignment in 2006-07 and to continue thereafter notwithstanding the requirement that both members of a job-share have permanent status.

2. Any assignment openings may be available to unit members who have indicated in writing to the Certificated Human Resources Office their desire to job-share. Permanent staff members may submit job-share requests denied at the school site level to the Human Resources administrator for review.

3. Job-sharing assignments shall be filled only by permanent staff members, except as provided in D-1 above, who have jointly requested to work together and who have the approval of their supervisor(s).  No job-sharing may be administratively mandated for any reason.

4. Responsibilities of an assignment by two (2) job-sharers may be divided and/or allocated according to a plan designed by the job-sharers, with the concurrence of their immediate supervisor.  This shall include, but not be limited to, attendance at regular staff meetings, District meetings, parent conferencing, etc.  Each job-sharer shall attend the three professional development days that are part of the teacher work year.  Job-sharers shall be paid their per diem rate when attending a full professional development day.

5. Job-sharing unit members shall be placed appropriately on the teachers' salary schedule, receive one step increment for each year of service, and be given appropriate added increments for advanced degrees or longevity.

6. A job-sharer who has full-time permanent status and who wishes to return to a full-time assignment in the subsequent year, must so inform the Certificated Human Resources Office in February when staff plans are solicited.  He/she shall return to a full-time status, provided there is an appropriate vacancy for which the unit member is qualified by specific training or experience.

7. If a permanent staff member wishes to job-share but is unable to find a permanent staff member as a partner, the staff member may request reduced employment pursuant to Article XI, Section K.

**E. Elementary Specialized Academic Instruction (SAI, formerly Special Day Class) Preparation/Planning**

The District will provide some form of preparation/planning time for SAI teachers, comparable to that received by regular classroom teachers for each grade level.

Due to the complexity of SAI teaching assignments, comparability shall be determined based upon deliberations at each site among the teacher, site administrator, and Assistant Superintendent, HR.

F. **Student Support Teams** (e.g. Instructional Support Team, Student Study Team, Inclusion Support Team, Intervention Strategy Team, etc.)

1. Sites will establish student support teams to implement inclusive best practices to support student success and learning in alignment with the district vision.

2. To support the development of these practices, each elementary/secondary site shall be allocated funds annually to support meetings, attendance at trainings, observing other school models, and the planning, implementation and evaluation of site level practices.
   a. Elementary sites will be allocated $1,500
   b. Middle school sites will be allocated $2,500
   c. High school sites will be allocated $3,500

3. The placement of students needing identified support in classes shall be thoughtful, with due consideration of the instructional/emotional/behavioral needs of the students, and adhere to IEP specifics.

**G. Co-Teaching**

1. Definition: Co-teaching is defined as an instructional delivery approach in which general and special education educators share responsibility for planning, delivery and evaluation of instructional techniques for a group of students; general and special education educators work in a coactive and coordinated fashion, which involves the joint teaching of academically and behaviorally heterogeneous groups of students in integrated settings.

2. Assignment to co-teaching sections/classes will be based on expertise and site/student needs as directed by site administrator.

3. For secondary level co-teaching sections, partners may be assigned up to four (4) co-teaching sections with no more than three (3) co-teaching preps each semester.

4. The District will provide two (2) days of professional learning each year for co-teaching teams (all levels).

5. To the extent possible, secondary school administrators shall give primary consideration in the development of the master schedule to providing co-teaching partners with a common preparation period.

6. Responsibilities of the co-teaching assignment may be divided and/or allocated according to a plan designed by the co-teaching partners with the approval of the site administrator.

**H. Student Medical Procedures**

Unit members will not be required to be primary providers of necessary pupil medical procedures. However, unit members will be expected to provide backup service for the health of the student in emergency circumstances. The District and the Association will establish an ongoing list, which defines "medical procedures" which are covered by this provision. Unit members may agree to receive an annual stipend for being the on-site primary provider of necessary pupil medical procedures. The Primary Medical Provider Stipend is listed in Appendix H.

**I. Status After Change in Assignment**

For teachers who are assigned to a new discipline at the secondary level, or for elementary teachers who are assigned a new grade level, the District will provide additional training and support as necessary.

**J. Safety Conditions**

1. The following procedure will be utilized to provide a written response to matters, which negatively impact the safe and orderly learning environment. This procedure will require the site principal to provide a written response within five (5) workdays of the date the unit member's written concern was first received. In addition, if the unit member believes that the written response was inadequate, or that the action taken was insufficient to remedy the unsafe condition, then the unit member may receive a written response from the Superintendent or designee within ten (10) workdays of the receipt of such a request from the unit member. Forms for such submissions will be made available at each school site.

2. Within 24 hours of verifying the information, the Superintendent or designee shall inform the teachers and administrators at a site that a potentially violent student is assigned to their site. Within three days of this notification, a site administrator will schedule a meeting involving all personnel who have regular contact with the student to develop an appropriate support plan or to modify an existing plan. If the student changes teachers or grade levels at a site, all personnel who have regular contact with the student will have the opportunity to review and modify the plan.

3. Beginning with the 1998-99 school year, the District will develop procedures for implementing this provision and will train unit members about teacher rights and responsibilities in dealing with students identified under this section.

**K.    Full Day Kindergarten**

    1.  The Kindergarten school year will begin with a shorter instructional day – ending at the start of the primary lunch period.  The full-day Kindergarten day shall begin in mid-October and be the full primary day, with a maximum of 1550 instructional minutes per week.

    2.  The site and District shall provide 14 hours per week of instructional aide support for each kindergarten class.

# ARTICLE XIV
# Non-Discrimination

**A.** The District and the Association agree to provide a learning and work environment free from discrimination and harassment based upon race, national origin, sex, sexual orientation, religion, age, physical or mental disability, or marital status.

**B. Procedure**

1. Notwithstanding other Board policies and procedures, if a unit member believes that an incident of illegal discrimination or harassment has occurred, the unit member should first notify the immediate supervisor of the incident. If the immediate supervisor is believed to be involved in the alleged incident, the unit member should report the matter to a person having authority over the person(s) engaged in the alleged illegal activity. The supervisor shall investigate and take appropriate action, including reporting the matter to the Human Resources administrator.

2. At the time of observation or awareness of an incident of discrimination, the unit member should inform the person(s) responsible for the discrimination that the act(s) were inappropriate and/or unwelcome, and that the behavior should stop.

3. If the above procedures do not satisfactorily remedy the illegal conduct, the unit member should report the matter to the Human Resources administrator, or designee, who shall conduct an investigation into the allegations. At the end of the investigation, a written report outlining findings and conclusions shall be provided the original complainant(s) and the Association President, to the extent allowed by law. These findings and conclusions shall conclude the District's investigation; however, the Superintendent, upon the complaint's(s') request, shall meet informally with the complainant(s) and/or Association to review the elements of the report.

4. Upon request of the complainant(s), the District shall provide a facilitator, with skills in interest-based problem solving and substantive knowledge of discrimination law, who shall meet with the involved parties. The facilitation, and any information obtained by the facilitator during this process, shall remain confidential.

5. If any of the above provisions conflict with rules, regulations, or requirements of the State or Federal government, those provisions shall be superseded by the appropriate rule, regulation, or requirement.

# ARTICLE XV
# Academic Freedom

**A.** Unit members shall be accorded the right to academic freedom, provided such right is balanced with the students' right of academic freedom. To this end, the Board's policy on "Controversial Issues" will be maintained during the duration of this Agreement.

**B.** Before the Board undertakes any modification of this policy, which impacts upon teacher academic freedom, the District will provide the Association with notice and opportunity to negotiate any impact. (See Board Policy, which is attached for information only, as "Appendix G.")

# ARTICLE XVI
# Savings Provisions

If any provisions of the Agreement are held to be contrary to law by a court of competent jurisdiction, such provisions shall not be deemed valid and subsisting except to the extent permitted by law, but all other provisions shall continue in full force and effect.

# ARTICLE XVII
# Support of Agreement

**A.** The District and Association agree that it is to their mutual benefit to encourage the resolution of differences through the meet and negotiation process.

**B.** The Board of Education agrees that it shall not change any policies referred to directly by this Agreement as being effective parts of the Agreement during its term, except that it may request the Association for a meet and confer session with them about a possible change of policy.

**C.** The Association agrees that future negotiations regarding successor contracts shall be open to the public. On agreement of both parties, negotiation sessions may be closed to the public in order to facilitate interest-based discussions.

# ARTICLE XVIII
# Effect of Agreement

It is understood and agreed that the specific provisions contained in this Agreement shall prevail over District practices and procedures and over State laws to the extent permitted by State law; and that in the absence of specific provisions in this Agreement, such practices and procedures are discretionary.

# ARTICLE XIX
# Completion of Meet & Negotiate

The terms and conditions set forth in this Agreement represent the full and complete understanding and commitment between the parties. These terms and conditions may be altered or modified only through a written amendment approved and signed in the same manner as the master Collective Agreement. During the term of this Agreement, the Association and the District agree that neither party shall be obligated to meet and negotiate with respect to any subject or matter whether or not referred to or covered in this Agreement.

57

# ARTICLE XX

# Hourly Adult Education Teachers

Articles I, II, IV, V, XII, XIII, XIV, XV and XVI of this contract between the Palo Alto Unified School District and the Palo Alto Educators Association are also applicable to hourly Adult Education teachers. Articles III, VI, VII, VIII, IX, X and XI do not apply to hourly Adult Education teachers. The following are unique to hourly Adult Education teachers:

**A. Association Rights**

    **1. Right to Join**

        The District and the Association recognize the right of the employees to form, join and participate in lawful activities of employee organizations, and the equal right of employees to refuse to join or participate in employee organization activities.

    **2. Use of Facilities**

        All Association business, discussions, and activities by unit members or Association officials shall be conducted outside established work hours and shall be conducted in places other than District property except when an authorized Association representative obtains advance permission from the Superintendent or designee regarding the specific time, place, and type of activity to be conducted. Permission shall be granted if the Superintendent or designee can verify that such activities and use of facilities will not interfere with the school programs and/or duties of employees, and will not directly or indirectly interfere with the right of employees to refrain from listening or speaking with a Association representative.

    **3. Association Communications**

        a. The Association shall be entitled to the use of and access to employee mailboxes for communications to unit members regarding matters, which involve the Association. The Association shall also be entitled to post notices of Association concern on designated bulletin boards designated for exclusive use by the Association, at least one of which shall be provided in each school building, in areas frequented by employees.

        b. All postings for bulletin boards or items for school mailboxes shall contain the date of posting or distribution and the identification of the Association. A copy of such postings or distributions shall be provided to the Superintendent or designee at the time of posting or distribution.

        c. The Association shall make every effort not to post or to distribute information, which is derogatory or defamatory of the District or its personnel. When the District deems material to be derogatory or defamatory, the site administrator shall notify the Association representative who shall remove the material for referral to the Superintendent and the Association President or their designees. After the two officials have had a reasonable opportunity to discuss the challenged material, the matter may be posted again at the Association's discretion.

    **4. Association Information**

        The District shall provide the Association with a staffing list of the bargaining unit members, without cost to the Association, no later than September 30 of each school year. The names of all bargaining unit members employed after October 15 of each school year shall be supplied to the Association within ten (10) days of the first date of their paid service.

    **5. Meetings**

        In an attempt to minimize calendar conflicts, the District's Adult Education Department shall give the Association reasonable advance notice of scheduled staff meetings.

6. **Payroll Deductions**

The District shall deduct in two equal parts from the October pay and the November pay of Association members and pay to the Association the normal and regular annual membership dues as voluntarily authorized in writing by the employee on the District form, subject to the following conditions:

   a. Such deduction shall be made only upon submission of the District form to the designated representative of the District.  Said form shall be duly completed and executed by the employee and an authorized representative of the Association.

   b. The District shall not be obligated to put into effect any new, changed or discontinued deduction until the pay period commencing fifteen (15) days or longer after such submission.

## B. Compensation and Benefits

### 1. Compensation

See Appendix H for Adult School Hourly rates.

Placement on Step 2 shall be after completing service of 700 hours.

Placement on Step 3 shall be after completing service of 1400 hours.

Placement on Step 4 shall be after completing service of 2100 hours.

The schedule shall be increased by an amount equal to the same percentage as the COLA increase from the State for Adult Education for respective year, rounded to the nearest one-tenth of one percent.

### 2. Benefits

Subject to approval of the various insurance carriers, unit members may elect to participate in the District's health and/or dental programs at the unit member's expense.

## C. Working Conditions

### 1. Working Days

The Director of Adult Education shall determine the work year calendar after consultation with the staff.

### 2. Discontinued Classes

Adult Education teachers who have been employed by the District in Adult Education for two consecutive years, whose classes are temporarily discontinued by the District, shall have the right of first re-hire in the event that the discontinued class is offered at the beginning of the following year.

## D. Leave Provisions

### 1. Sick Leave

   a. Hourly Adult Education teachers shall accrue sick leave on the basis of one hour of sick leave for every eighteen (18) hours taught.  The District shall compensate teachers at their hourly rate for sick leave as it is used.  Unused sick leave shall accrue from year to year.

   b. After a unit member accrues three (3) hours of sick leave, he/she shall be entitled to use this leave (up to a maximum of six (6) hours per year) for death or serious illness of a member of the immediate family or an accident involving his/her person or property or the person or property of a member of the immediate family.

   c. Whenever possible an employee must contact the Adult Education office as soon as the need to be absent is known.  In the event the Adult Education office is closed, the employee may contact the District's Certificated Human Resources Office.  Failure to provide adequate notice shall be grounds for denial of leave with pay.

   d. Upon request, a unit member shall be informed of the individual's accumulated leave.

### 2. Leaves of Absence Without Pay

A leave of absence without compensation may be granted to any unit member for any period not to exceed one year.  A unit member who is granted such leave by the District shall have the right

to return at the expiration of such leave provided such return does not displace any other unit member.

3. **Industrial Accidents**

    a. Any unit member who is injured as a result of an industrial accident shall submit to the office of the District's Risk Manager a completed District Accident Report form as soon as possible.

    b. Unit members injured as a result of an industrial accident are covered by the Workers' Compensation Laws of the State of California and may be entitled to receive benefits pursuant to such laws.

4. **Judicial Leave**

Unit members who have hourly daytime classes in the Adult Education Program shall be provided leave for regularly called jury duty, and to appear as a witness in Court, other than as a litigant, for reasons not brought about through the convenience or misconduct of the unit member. Unit members while serving jury duty shall receive pay in the amount of the difference between the unit member's regular earnings and any amount received for jury service. The unit member may retain any fee paid as a travel allowance. If the unit member does not wish jury duty pay to be deducted from the paycheck, a check for the amount of the jury duty pay shall be submitted to the Certificated Human Resources Office with the monthly absence report.

# APPENDIX A

# Palo Alto Unified School District
## TEACHERS' 2021-2022  SALARY SCHEDULE
*Effective 7-1-21    Approved 5-25-22*

| Step | 0 | 15 | 30 | 45 | 60 | 75 | 90 |
|------|------|------|------|------|------|------|------|
| 1 | 71,484 | 71,484 | 71,484 | 73,101 | 76,491 | 79,731 | 82,727 |
| 2 | 71,484 | 71,484 | 74,578 | 78,327 | 81,975 | 85,355 | 88,410 |
| 3 | 71,484 | 74,701 | 79,102 | 83,124 | 87,015 | 90,515 | 93,691 |
| 4 | 73,351 | 78,520 | 83,200 | 87,524 | 91,666 | 95,293 | 98,607 |
| 5 | 76,491 | 82,036 | 87,072 | 91,590 | 95,990 | 99,759 | 103,210 |
| 6 | 79,352 | 85,295 | 90,639 | 95,414 | 100,073 | 103,956 | 107,472 |
| 7 | 82,095 | 88,354 | 95,096 | 99,502 | 103,914 | 108,322 | 112,728 |
| 8 | 84,704 | 91,209 | 98,392 | 102,795 | 107,198 | 111,612 | 116,024 |
| 9 | 87,207 | 94,009 | 101,685 | 106,090 | 110,503 | 114,909 | 119,312 |
| 10 | 87,207 | 94,009 | 104,975 | 109,386 | 113,794 | 118,198 | 122,611 |
| 11 | 87,207 | 94,009 | 104,975 | 109,386 | 117,196 | 121,695 | 125,899 |
| 12 | 87,207 | 94,009 | 104,975 | 109,386 | 117,196 | 121,695 | 125,899 |
| 13 | 87,207 | 94,009 | 108,245 | 112,656 | 120,466 | 124,965 | 129,169 |
| 14 | 87,207 | 94,009 | 108,245 | 112,656 | 120,466 | 124,965 | 129,169 |
| 15 | 87,207 | 94,009 | 108,245 | 112,656 | 120,466 | 124,965 | 129,169 |
| 16 | 87,207 | 94,009 | 111,515 | 115,926 | 123,736 | 128,235 | 132,439 |
| 17 | 87,207 | 94,009 | 111,515 | 115,926 | 123,736 | 128,235 | 132,439 |
| 18 | 87,207 | 94,009 | 111,515 | 115,926 | 123,736 | 128,235 | 132,439 |
| 19 | 87,207 | 94,009 | 111,515 | 115,926 | 123,736 | 128,235 | 132,439 |
| 20 | 87,207 | 94,009 | 114,785 | 119,196 | 127,006 | 131,505 | 135,709 |
| 21 | 87,207 | 94,009 | 114,785 | 119,196 | 127,006 | 131,505 | 135,709 |
| 22 | 87,207 | 94,009 | 114,785 | 119,196 | 127,006 | 131,505 | 135,709 |
| 23 | 87,207 | 94,009 | 114,785 | 119,196 | 127,006 | 131,505 | 135,709 |
| 24 | 87,207 | 94,009 | 114,785 | 119,196 | 127,006 | 131,505 | 135,709 |
| 25 | 87,207 | 94,009 | 114,785 | 119,196 | 131,271 | 135,770 | 139,974 |
| 26 | 87,207 | 94,009 | 114,785 | 119,196 | 131,271 | 135,770 | 139,974 |
| 27 | 87,207 | 94,009 | 114,785 | 119,196 | 131,271 | 135,770 | 139,974 |
| 28 | 87,207 | 94,009 | 114,785 | 119,196 | 131,271 | 135,770 | 139,974 |
| 29 | 87,207 | 94,009 | 114,785 | 119,196 | 131,271 | 135,770 | 139,974 |
| 30 | 87,207 | 94,009 | 114,785 | 119,196 | 131,271 | 135,770 | 144,239 |

**PLACEMENT ON SCHEDULE:**

1. Column placement is determined by number of semester units completed after receipt of bachelor's degree.  Maximum of 90 units will be granted at time of hire.  Only one column advancement may be made each year unless all of the units are earned while on authorized leave.

2. Step placement is determined by credited years of experience.  A maximum credit of 11 years of experience within the last 15 years will be granted at time of hire.

3. Exceptions to this schedule are made by the Board of Education upon the recommendation of the Superintendent.

Masters Degree = Add $2,740
2nd Masters Degree = Add $2,740
Doctoral Degree = Add $2,740
NBPTS/CCC Certification = Add $3,556
Athletic Director = Add $9,031

# Palo Alto Unified School District
## TEACHERS' 2022-2023 SALARY SCHEDULE
*Effective 7-1-22    Approved 1-17-23*

| Step | 0 | 15 | 30 | 45 | 60 | 75 | 90 |
|---|---|---|---|---|---|---|---|
| 1 | 76,488 | 76,488 | 76,488 | 78,218 | 81,845 | 85,312 | 88,518 |
| 2 | 76,488 | 76,488 | 79,798 | 83,810 | 87,713 | 91,330 | 94,599 |
| 3 | 76,488 | 79,930 | 84,639 | 88,943 | 93,106 | 96,851 | 100,249 |
| 4 | 78,486 | 84,016 | 89,024 | 93,651 | 98,083 | 101,964 | 105,509 |
| 5 | 81,845 | 87,779 | 93,167 | 98,001 | 102,709 | 106,742 | 110,435 |
| 6 | 84,907 | 91,266 | 96,984 | 102,093 | 107,078 | 111,233 | 114,995 |
| 7 | 87,842 | 94,539 | 101,753 | 106,467 | 111,188 | 115,905 | 120,619 |
| 8 | 90,633 | 97,594 | 105,279 | 109,991 | 114,702 | 119,425 | 124,146 |
| 9 | 93,311 | 100,590 | 108,803 | 113,516 | 118,238 | 122,953 | 127,664 |
| 10 | 93,311 | 100,590 | 112,323 | 117,043 | 121,760 | 126,472 | 131,194 |
| 11 | 93,311 | 100,590 | 112,323 | 117,043 | 125,400 | 130,214 | 134,712 |
| 12 | 93,311 | 100,590 | 112,323 | 117,043 | 125,400 | 130,214 | 134,712 |
| 13 | 93,311 | 100,590 | 115,822 | 120,542 | 128,899 | 133,713 | 138,211 |
| 14 | 93,311 | 100,590 | 115,822 | 120,542 | 128,899 | 133,713 | 138,211 |
| 15 | 93,311 | 100,590 | 115,822 | 120,542 | 128,899 | 133,713 | 138,211 |
| 16 | 93,311 | 100,590 | 119,321 | 124,041 | 132,398 | 137,211 | 141,710 |
| 17 | 93,311 | 100,590 | 119,321 | 124,041 | 132,398 | 137,211 | 141,710 |
| 18 | 93,311 | 100,590 | 119,321 | 124,041 | 132,398 | 137,211 | 141,710 |
| 19 | 93,311 | 100,590 | 119,321 | 124,041 | 132,398 | 137,211 | 141,710 |
| 20 | 93,311 | 100,590 | 122,820 | 127,540 | 135,896 | 140,710 | 145,209 |
| 21 | 93,311 | 100,590 | 122,820 | 127,540 | 135,896 | 140,710 | 145,209 |
| 22 | 93,311 | 100,590 | 122,820 | 127,540 | 135,896 | 140,710 | 145,209 |
| 23 | 93,311 | 100,590 | 122,820 | 127,540 | 135,896 | 140,710 | 145,209 |
| 24 | 93,311 | 100,590 | 122,820 | 127,540 | 135,896 | 140,710 | 145,209 |
| 25 | 93,311 | 100,590 | 122,820 | 127,540 | 140,460 | 145,274 | 149,772 |
| 26 | 93,311 | 100,590 | 122,820 | 127,540 | 140,460 | 145,274 | 149,772 |
| 27 | 93,311 | 100,590 | 122,820 | 127,540 | 140,460 | 145,274 | 149,772 |
| 28 | 93,311 | 100,590 | 122,820 | 127,540 | 140,460 | 145,274 | 149,772 |
| 29 | 93,311 | 100,590 | 122,820 | 127,540 | 140,460 | 145,274 | 149,772 |
| 30 | 93,311 | 100,590 | 122,820 | 127,540 | 140,460 | 145,274 | 154,336 |

**PLACEMENT ON SCHEDULE:**

1. Column placement is determined by number of semester units completed after receipt of bachelor's degree. Maximum of 90 units will be granted at time of hire. Only one column advancement may be made each year unless all of the units are earned while on authorized leave.

2. Step placement is determined by credited years of experience. A maximum credit of 11 years of experience within the last 15 years will be granted at time of hire.

3. Exceptions to this schedule are made by the Board of Education upon the recommendation of the Superintendent.

4. Teachers' contract is a total of 187 work days. Counselors have a total of 191 work days and Teachers on Special Assignments have a total of 200 work days. Any work days above the 187 day contract are compensated by a per diem rate which is in addition to their base salary.

Masters Degree = Add $2,932
2nd Masters Degree = Add $2,932
Doctoral Degree = Add $2,932
NBPTS/CCC Certification = Add $3,805
Athletic Director = Add $9,663

# APPENDIX B
# Plan for Salary Advancement

The Palo Alto Unified School District encourages all staff members to engage in continuous professional improvement.  Professional development activities in the form of college and university work, District sponsored workshops or study groups, individual professional development activities, and service on school site councils or identified district committees are recognized, and credit is given for advancement on the salary schedule.

The procedures are as follows:

1.  All work must be pre-planned prior to commencement of the activity in order to receive salary advancement credit.

    a.  Any pre-planned activity that will result in column advancement credit must be submitted using the District professional development information program (MyLearningPlan.com).

    b.  All pre-planned activities will be electronically transmitted to the school principal/department supervisor for approval and then to the Certificated Human Resources Office for final approval.

    c.  The only exception to the pre-planning requirement as set forth above is for crediting upper division or graduate level courses that also meet the requirements of "A-1" and "A-2" below. Within ninety (90) calendar days from the date of completion of such a course, the certificated staff member must submit to the application for salary advancement credit through the District professional development information program (MyLearningPlan.com) and provide official verification of course completion.

2.  These deadlines must be met in order to move on the salary schedule for the following year:

    a.  All professional activities to be undertaken during the summer that will result in column advancement on the salary schedule the following year must be pre-planned by May 1.  Units must be pre-planned by the deadline date, even when specific course information is not available at that time.  Course information should be added to the pre-plan in the District professional development information program (MyLearningPlan.com)as soon as it is known.

    b.  Pre-planned activities that result in salary column advancement in the current year must be unofficially verified by the first teacher contract day.  Unofficial verification of college coursework may be in the form of a grade report or instructor letter. By November 15 final official verification of pre-planned activities that have resulted in salary column advancement must be submitted to the Certificated Human Resources Office.  Failure to provide final official verification of pre-planned activities that resulted in salary column advancement by November 15th will result a payroll reversal to the previous salary column level for the current school year.

    Failure to meet the May or November deadlines, even if the activities have been completed, will result in the salary advancement not taking effect until the following school year.

3.  All activities proposed for salary advancement must be related to one or more of the following:

    a.  District goals and priorities;

    b.  School goals;

    c.  Department goals;

    d.  The staff member's professional development plan;

    e.  District performance standards for the staff member's role group.

4. All activities proposed for salary advancement must be undertaken at the staff member's own expense and during time when a salary is not being paid by the District or released time is not being provided by the District.

## PROFESSIONAL ADVANCEMENT CATEGORIES

**A. College (including community college) and university course work which satisfies one or more of the following:**

1. Courses that develop skill and/or knowledge related to published district, school, or department goals or to district performance standards for certificated staff.

2. Courses intended to help a staff member to develop competence in a new teaching area or to earn a new credential.

All college course work must be verified by submitting official transcripts or electronic transcripts received by Certificated Human Resource Office directly from the institution.

**B. District sponsored in-service training sessions and workshops:**

One semester unit will be allowed for each 15 hours of attendance in programs that have been approved by the Certificated Human Resources Office.

All participation in District sponsored workshops and study groups must be verified by roll sheets showing hours attended, submitted by the person designated to lead or facilitate the activity.

**C. Individual Professional Development Activity:**

**1. Independent Study:** A program of independent study of a specified aspect of education, culminating in a written report or other tangible product may be undertaken for up to 3 units per year. Each unit of credit requires 30 hours of work. Examples of independent study include: preparing an article for publication in a professional journal; researching and preparing a presentation for a professional conference; independent reading and reflection on a particular education topic; an action research project; and systematic, focused programs of observation and analysis of teaching or other educational functions.

All independent study must be verified by submitting the end product of the study, a written description of the staff member's activities that led to the product, and a one-page evaluation of the study's contribution to the staff member's professional development.

**2. Private Lessons:** Private lessons may be undertaken for a maximum of four units per year or up to 12 units in a staff member's career to develop skill or knowledge that is directly applicable to the staff member's work. Each unit of credit requires fifteen hours of actual instruction time.

Private lessons must be verified by a log of dates and times and a one-page summary of the relevance and value of the lessons to the staff member's work.

**3. Work Experience:** During the summer or while on leave, credit may be earned for employment or work experience that results in increased skill or knowledge related to the District performance standards for the staff member's role group. This work experience must be significantly different from the staff member's work in the District. One unit of credit requires 40 hours of work time. The maximum credit to be allowed for this type of activity is six units in one calendar year or 12 units throughout the teacher's career in the PAUSD.

**4.** Online professional development courses and Massive Open Online Courses (MOOCs)**:** A maximum of 4 units per year may be earned for completion of pre-approved courses of this type, provided that the activity:

a. Has a direct relationship to the staff member's current role or a role that the staff member is preparing to take on; and

b. Comprises at least 15 hours of direct participation in online sessions per unit

Completion of online programs/courses shall be verified with a certificate of completion. The Certificated Human Resource Office shall identify the number of course hours from the online course instructor, developer, and/or materials.

5. **Workshops, Conferences, or Other Programs that are Sponsored or Offered by an Organization Other than a College, University or the District:** A maximum of 4 units per year (15 hours per unit) may be earned for attendance at pre-approved programs of this type, provided that the activity:

   a. Has a direct relationship to the staff member's current role or a role that the staff member is preparing to take on; and

   b. Comprises at least 15 hours of direct participation in instructional programs,or professional development sessions.

   Attendance at this type of program must be verified by a certificate of completion or letter from sponsoring organization with time, dates, and titles of sessions attended, length of individual sessions, and a one-two paragraph summary of the activity describing its value for the staff member.

6. **National Board for Professional Teaching Standards (NBPTS):** Teachers who complete both the portfolio and the exams will receive four (4) units of credit in the year following completion. Verification will include a copy of the letter indicating that the portfolio has been received by the NBPTS and verification of completion of the exams.

Upon completion of an individual activity, Verification of Completion forms and any additional verification materials described above must be submitted for evaluation to the Certificated Human Resources administrator responsible for this program. These forms may be obtained in the Certificated Human Resources Office and are to be submitted to that office.

D. **Service on a School Site Council or Identified District Committee:**

A maximum of 3 units per year (15 hours actual committee or subcommittee meeting time per unit) may be earned for service on a school site council or as a designated school or grade level representative on a district committee mutually identified for this purpose by the Superintendent and the President of the Association by September 30. Service on such committees must be verified by signed attendance sheets submitted by the person designated to lead the committee.

**NO CREDIT WILL BE GRANTED FOR ANY OF THE FOLLOWING:**

- Adult Education courses unless prior approval is given.
- Any activity for which a salary is paid by the District or released time provided, or that occurs during normal working hours for which the staff member is paid.
- Any activity other than an upper division or graduate course at a college or university, for which a completed pre-planning form has not been received and approved prior to the beginning date of the activity.

# APPENDIX C

# California Standards for the Teaching Profession & California Standards for the School Counseling Profession Clarification Addendum

In 2011, the Palo Alto Unified School District (District), with support from the Palo Alto Educators Association (PAEA), adopted the California Standards for the Teaching Profession (CSTP) and the California Standards for the School Counseling Profession (CSSCP) as its benchmark "Standards" for teacher and counselor recruitment, development, and performance. In the interest of establishing and communicating clear and consistent expectations, Appendix C provides more detail to District's expectations around these identified Standards.

**1. CSTP Standard 3: Understanding and Organizing Subject Matter for Student Learning**

In order to provide readily available and inclusive access to learning expectations, instructional materials and assignments, secondary teachers are required to use the District's adopted Learning Management System (Schoology) to electronically-post their course syllabus, instructional materials, and assignment handouts.  Secondary teachers are required to post graded homework assignments, assessment (e.g. lab, project, essay) due dates and test/quiz dates on the Schoology Calendar (with the exception of pop quizzes).

3.5  Using and adapting resources, technologies, and standard-aligned instructional materials/adopted materials to make subject matter accessible to all students.

**2. CSTP Standard 5: Assessing Students for Learning**

In order to provide timely feedback on student learning, secondary teachers are required to use the District adopted Student Information System or Learning Management System (Infinite Campus or Schoology) to electronically post assessment, test, and quiz results and updated grades at least once every three weeks.

5.6  Using available technologies to assist in assessment, analysis, and communication of student learning.

5.7  Using assessment information to share timely and comprehensive feedback with students and their families.

**3. CSTP Standard 6: Developing as a Professional Educator**

In order to establish a culture where teachers continuously develop as professional educators, all unit members are expected to engage in 18 hours of professional learning every two years.

6.1  Reflecting on teaching practice in support of student learning.

6.2  Establishing professional goals and engaging in continuous and purposeful professional growth and development.

6.3  Collaborating with colleagues and the broader professional community to support teacher and student learning.

To support meaningful professional learning activities that are aligned with district goals, the District shall pay a Professional Learning Stipend (PL Stipend) to compensate teachers for engaging in 18 hours of eligible professional learning activities.  Specifics for the PL Stipend are in Article VI, Section J.

**4. CSTP Standard 6: Developing as a Professional Educator**

The District and PAEA have collaborated to provide guidance on expectations around professional responsibility, integrity, and ethical conduct.

6.7  Demonstrating professional responsibility, integrity, and ethical conduct.

**Commitment to Students**

a.  The professional educator deals considerately and justly with each student, and seeks to resolve problems, including discipline, according to the law, education code, and school policy.

b.  The professional educator does not intentionally expose students to disparagement or embarrassment.

c.  The professional educator makes a constructive effort to protect students from conditions detrimental to learning, health, and safety.

d.  The professional educator endeavors to present facts without distortion, bias, or personal prejudice.

**Commitment to Profession**

a.  The professional educator assumes responsibility and accountability for his or her performance and continually strives to demonstrate competence.

b.  The professional educator shall not in any application for a professional position deliberately make a false statement to competency and qualifications

c.  The professional educator shall not misrepresent his/her professional qualifications

d.  The professional educator shall not make false or malicious statements about a colleague.

e.  The professional educator complies with written local school policies, education code and applicable laws and regulations.

# APPENDIX  D
## Pre-Retirement Employment & Post-Retirement Programs

**1.  Reduced Workload Program (Willie Brown Program)**

A.  A unit member may reduce employment from full- to part-time, and receive service credit the unit member would have received if employed on a full-time basis, provided the unit member meets all the requirements of this subsection and Education Code 22713 and the following District criteria.

(1) The option of part-time employment must be exercised at the unit member's request and, once granted, can be revoked only with the mutual consent of the District and the unit member.  The employment level can be increased or decreased within the limitation of part-time employment no less than 50%.

(2) The unit member must submit a request to participate in this program to the Personnel Office no later than March 1 of the school year preceding the desired year of participation.

(3) The unit member must have reached the age of fifty-five (55) prior to the school year in which the reduction in workload starts.

(4) The unit member must have been employed full-time in a position requiring certification for at least ten (10) years, of which the immediately preceding five (5) years were full-time employment. For the purposes of this section, approved leaves of absences shall not constitute a break in service.

(5) A unit member's participation in the reduced workload program may not exceed 10 years.

(6) The District and the unit member shall agree to make the appropriate contributions to the State Teachers' Retirement System (STRS) equal to the amount required as if serving as a full-time unit member.

(7) The final determination the form of part-time employment and the qualifications necessary to meet the District's instructional needs rests within the sole discretion of the District.

B.  The minimum part-time employment shall be the equivalent of one-half (1/2) of the number of days of service required by the unit member's contract of employment during his/her final year of service in a full-time position.  Except for the reduction of salary corresponding to the reduced workload, the District will provide the part-time unit member with the same fringe benefits provided a regular full-time unit member.

C.  If the Governing Board agrees, the reduced service may be on a part-time daily schedule or full-time for at least one-half (1/2) year.  Regardless of the work schedule, the unit member and District contributions must be paid monthly to STRS.

D.  Unit members who terminate before the end of the school year will receive retirement credit based on the salary actually paid in the proportion that it relates to the annual salary that would have been paid had the employment continued.  Retirement contributions for services not actually performed will be returned to the unit member and the District. The amount of sick leave earned while on reduced workload will vary directly to the percent of full-time employment.  For example, fifty percent (50%) employment would yield ten (10) days of half-time sick leave or five (5) days of full-time sick leave.

**2.  Post-Retirement Employment Programs**

A.  Retired teachers employed pursuant to this program shall be placed in distinct classes of temporary teachers within the bargaining unit.  A teacher shall be classified as a "Retired Temporary Teacher" if hired pursuant to these sections.  The service of a Retired Temporary Teacher shall not be included in computing the service required as a prerequisite to attainment of or eligibility for classification as a permanent employee of a school district.

B  Retired Temporary Teachers and Retired Temporary Remedial Teachers shall be compensated according to the salary schedule set forth in Appendix A.

C.  Retired Temporary Teachers and Retired Temporary Remedial Teachers shall receive health and welfare benefits contribution specified in Section 3 of this Appendix.

D.  Retired Temporary Teachers shall not be subject to the evaluation requirements of Article 10.

E.  Post-Retirement Programs Effective July 1, 2000.

    (1) The District may employ in a full-time teaching position a teacher who retired from the District under the State Teachers Retirement System and who meets either of the following:

        (a) The teacher retired with an effective date on or before January 1, 2000, and will provide direct classroom instruction to students in kindergarten through eighth grade, and/or will provide services to beginning teachers specified in Education Code Section 24216.5 (a)(2); or

        (b) The teacher retired with an effective date on or before July 1, 2000, and will provide direct remedial instruction to students in grades 2 through 8 as defined in Education Code Sections 37252 and 37252.5.

F.  Post-Retirement Employment, Effective January 1, 2001, to June 30, 2009

    (1) Individuals who return to employment with the District after being retired for a period of twelve (12) months will earn full salary and without a reduction in retirement allowance, and without requirement of a contribution to STRS for salary earned.

    (2) The retiree must work in a position requiring a certificate, and must otherwise qualify under the provisions of Education Code Section 24214.

    (3) This K-12 employment may be either full-time or part-time. The District retains the final discretion as to the type of work, the percentage of part-time work, the qualifications for the work, and the availability of work.

    (4). At the option of the retiree, the compensation shall be in the form of regular salary, or, to the extent legally permissible, the employee may earn credits in lieu of salary for health and welfare benefits or MediCare Part B.

## 3.  Retiree Health and Welfare Benefits

A.  For unit members whose first date of paid contracted service is prior to June 1, 2009 and retiring after June 30, 2002, the District will contribute the same amount to health and welfare benefits as though the unit member were an active member with the same percentage of paid benefits as held immediately prior to retirement, for a period of five years, age 65, or is eligible for Medicare, whichever occurs first; provided:

    (1) The retiree has twenty years of full-time service or the equivalent of twenty years of full-time service in the District, and

    (2) The retiree has reached age fifty-five.

B.  Unit members in the Early Retiree Benefits Program described in Appendix D, Section 3A shall make monthly contributions in the same amount as an active employee in the same benefit plan with the same percentage of paid benefits.

C.  Individuals drawing STRS benefits while employed by the District under any of these post-retirement employment programs at 50% or more will receive the same contribution to District health and welfare benefits as other unit members, until age sixty-five (65) or eligible for Medicare, whichever occurs first.

D   Individuals drawing STRS benefits while employed by the District in a post-retirement program less than 50% full-time may elect to earn salary combined with health and welfare benefits in lieu of a commensurate salary, until age sixty-five (65) or eligible for Medicare, whichever occurs first.

E.  If a retiree wishes to participate in health and welfare benefits, the retiree may purchase the benefits through direct payment to the District, provided the retiree is otherwise qualified for the benefits under the carrier's provisions.

F   Retirees eligible for paid full-time medical coverage for a period of five years or until attaining age sixty-five (65), whichever occurs first, may choose to decline the District medical coverage and receive $6000 for each year of eligibility the retiree declines (except as prohibited by law). Early retirees may not return to district medical coverage once the coverage has been declined. It is within the sole discretion of the District to continue to offer this provision to new early retirees for each successive year of this agreement.

# APPENDIX E
# Peer Assistance & Review Program

**1. Purpose**

1.1   The Peer Assistance and Review Program (Program) allows exemplary teachers to assist certain permanent and beginning teachers in the areas of subject matter knowledge, teaching strategies, and teaching methods.

1.2   The extent of the Program's assistance and review depends on whether the participating teacher is a beginning teacher, a volunteer permanent teacher, or a permanent teacher who has been referred to the program.  The Program's assistance shall be provided through Consulting Teachers as described in detail in Sections 3 and 4.2 of this section.  This assistance shall not involve participation in nor conducting of the evaluation of certificated unit members as set forth in Article X of the Agreement and Education Code 44660, et seq., except for making available to the evaluator the report of a unit member's participation in the Program.

1.3   The Program resources shall be utilized in the following priority: first, for Referred Participating Teachers on Evaluation Plan 3; second, for beginning teachers; and thereafter other priorities determined by the Joint Panel.

**2. Definitions for Purposes of This Document**

2.1   "Classroom Teacher" or "Teacher"
Any classroom teacher in the certificated bargaining unit.

2.2   "Participating Teacher"
A unit member who is a classroom teacher who either volunteers or is required by this Agreement to participate in the Program.

2.3   "Referred Participating Teacher with an Unsatisfactory Evaluation"
A unit member with permanent status who has been placed on Evaluation Plan 3 (Article X, Section H and I) because his/her supervisor has determined that s/he does not meet one or more of the PAUSD teaching standards in the areas of subject matter knowledge, teaching strategies, or teaching methods and instruction (Cluster 1, Management and Monitoring of Student Learning; Cluster 2, Commitment to Students and Learning; or Cluster 3, Knowledge of Content and How to Teach).

2.4   "Beginning Teacher"
Any unit member having probationary or temporary status, or any District teaching intern participating in a program established according to Education Code Sections 44305, et seq. and 44325, et seq.  This Program is to be closely coordinated with other District programs for training and assistance to beginning teachers.

2.5   "Voluntary Participating Teacher"
Any permanent teacher other than a Referred Participating Teacher or a teacher on Evaluation Plan 4 (Article X, Section J).

2.6   "Consulting Teacher"
An exemplary teacher meeting the requirements of subsection 4.2.1 who is selected by the Joint Panel to provide Program assistance to a Participating Teacher.

2.7   "Evaluator"
An administrator or instructional supervisor appointed by the District to evaluate a certificated teacher.

**3. Program Outline**

3.1   For Referred Participating Teachers on Plan 3 (RPT)

3.1.1 Any permanent teacher who has been placed on Evaluation Plan 3 because of not meeting standards in Clusters 1, 2, or 3 of the PAUSD Teaching Standards must participate in the program.

3.1.2 The Consulting Teacher's assistance and review shall focus on the specific areas identified in the support/improvement plan developed by the RPT's Evaluator(s) when the RPT was placed on Plan 3.

3.1.2.1   These areas for improvement shall be aligned with student learning, clearly stated, and consistent with Education Code Section 44662. These recommendations shall be considered as the performance goals required by Education Code Sections 44664(a) and 44500(b)(2).

3.1.2.2   The Principal and the Consulting Teacher assigned shall meet and discuss the recommended areas of improvement outlined by the Principal and the types of assistance that should be provided by the Consulting Teacher.

3.1.2.3   The Consulting Teacher and the Evaluator(s) are expected to establish a cooperative relationship and shall coordinate and align the assistance provided to the RPT.

3.1.2.4   The Consulting Teacher and the RPT shall meet to discuss the plan for assistance. After that meeting, the Consulting Teacher will provide the assistance set forth in Section 4.2.6, which shall also involve conducting multiple classroom observations of the RPT.

3.1.3 At the end of the time period specified in the support/improvement plan, the Consulting Teacher shall complete a written report describing the teacher's participation in the Program. This report shall consist solely of: (1) a description of the assistance provided by the Consulting Teacher; and (2) a description of the RPT's participation in the Program. This report shall be submitted to the Joint Panel, with copies also submitted to the RPT and the Evaluator(s).

3.1.4 The Consulting Teacher's report (described in 3.1.3) shall be made available as part of the RPT's annual evaluation. Either the Evaluator or the RPT may choose to have the report included in the annual evaluation.

3.1.5 After receiving the report, the Joint Panel shall determine whether the RPT will benefit from continued participation in the Program.

3.1.6 The RPT will continue participating in the Program until the Joint Panel determines that s/he will no longer benefit from participation, the RPT receives a satisfactory evaluation, or the RPT is placed on Evaluation Plan 4, whichever occurs first. The RPT's Evaluator will determine whether s/he has been able to demonstrate satisfactory improvement.

3.1.7 The names of RPT's who, after sustained assistance, are not able to demonstrate satisfactory improvement will be forwarded by the Joint Panel to the Governing Board.

3.2   For Beginning Teachers

3.2.1 A Consulting Teacher may be assigned to one or more beginning teachers to provide assistance. Priority will be given to teachers in their first two years in the district who are not eligible for the Beginning Teacher Support and Assessment Program.

3.2.2 In the first year the Consulting Teacher shall concentrate the assistance on any area of the District's Teaching Standards. In the second year, the Consulting Teacher will focus the assistance on any areas identified as needing improvement and/or assistance.

3.2.3 The Consulting Teacher and the Evaluator(s) shall have a cooperative relationship and shall coordinate the assistance provided to the beginning teachers.

3.2.4 Because beginning teachers' participation in the Program is not legally mandated, neither the Consulting Teacher nor the Joint Panel will make written reports regarding individual beginning teachers, nor forward to the Board the names of individual beginning teachers who participated in the Program.

3.3  For Voluntary Participating Teachers (VPT)

3.3.1 Teachers eligible to be Voluntary Participating Teachers (VPT) may submit to the Joint Panel a proposal to work with a Consulting Teacher or to participate in any activity approved by the Joint Panel that utilizes the concept of peer assistance and support.

3.3.2 Because permanent teachers with satisfactory performance are not mandated by law to participate in the Program, neither the Consulting Teacher nor the Joint Panel will forward to the Board the names of individual VPTs or report on the outcome of their participation. At the request of a VPT who is on Evaluation Plan 2B, however, the Consulting Teacher may write the required partner response to the teacher's summary evaluation (Article X, Section C.2.c.3.f).

## 4. Governance and Program Structure

4.1  Joint Panel

4.1.1 The Peer Assistance and Review Program will be administered by a Joint Panel consisting of seven members, four selected by the certificated classroom teachers, and three appointed by the District. Qualifications for the teacher representatives shall be the same as those for Consulting Teacher as set forth in Section 4.2.1, and they shall be selected by the Association. A Panel member's term shall be two years, except the first terms shall be for the teacher members two two-year terms and two three-year terms, and for the District members one two-year term and two three-year terms. The Panel shall establish a procedure for selecting the Chair. The term of the Chair shall be one year, and the position shall alternate between the Association and the District. The Chair shall be a full voting member of the panel.

4.1.2 The Joint Panel will make through consensus all decisions in the areas of appointments, reports and recommendations to the Governing Board, and Program plan and budget. Failing consensus, decisions will be made by a majority vote. Five of the seven members will constitute a quorum for purposes of meeting and conducting business.

4.1.3 The Joint Panel's primary responsibilities are to establish the annual Program and budget, and to select and oversee the Consulting Teachers. In addition the Panel is responsible for:

- Submitting to the Governing Board recommendations regarding RPTs, including forwarding the names of any individuals who, after sustained assistance, are unable to demonstrate satisfactory improvement;
- Making an annual report to the Governing Board and the Association regarding the impact of the Program, its overall effectiveness, and recommendations for improvements in the Program;
- Assigning the Consulting Teachers;
- Reviewing Consulting Teachers' reports on RPTs;
- Evaluating the effectiveness of the Consulting Teachers in their role;
- Coordinating with the District to provide training for Consulting Teachers, for panel members, and where appropriate, for any participating teachers;
- Forwarding to the Human Resources Office at the end of the year all the records regarding the Program, which shall be filed separately from the individual personnel records, except as set forth in Section 3.1.4 above; and

- Establishing internal operating procedures and regulations necessary to carry out the requirements of the Education Code and this section of the Agreement.

4.1.4 The Joint Panel shall use the following procedure for establishing the annual Program plan and budget:

(a) By April 1 of each fiscal year the Joint Panel will establish a Program and budget for the succeeding year, which will include:

- The estimated state revenues for the Program;
- The estimated expenditures, involving:
  - Projected number of Participating Teachers,
  - Projected number of Consulting Teachers (full and part-time) needed to serve the projected need,
  - Released time for the panel and Consulting Teachers,
  - Pay for Consulting Teachers that is consistent with the pay parameters established by the negotiating parties, and
  - Projected costs for training, administrative overhead, and if necessary, legal and consulting assistance.

(b) By April 15, the Program plan/budget will be submitted to the Association President and the Superintendent for approval. If the plan/budget is not approved by both parties, it may be modified by mutual agreement. By May 1, if the parties cannot reach agreement to either approve the plan/budget or to amend it, then the plan/budget will be implemented as submitted by the panel.

(c) In 1999-2000, the Program plan/budget will be focused on planning and training for implementation in 2000-2001. It will be developed by a subcommittee of the negotiating teams and will be submitted to the Association President and the Superintendent by January 31, 2000.

4.2  Consulting Teachers

4.2.1 Minimum qualifications for Consulting Teacher:

- A fully credentialed Classroom Teacher with permanent status and at least five years of teaching experience within the preceding 7 years;
- Demonstrated exemplary teaching ability, consistent with the PAUSD Teaching Performance Standards
- Demonstrated ability to work cooperatively and effectively with other teachers and administrators.

4.2.2 Consulting Teacher positions may be full or part time. The Human Resources office shall post Consulting Teacher positions. Each applicant shall be required to submit a completed application, which shall include at least three references from individuals who have direct knowledge of the applicant's abilities for the position, including at least one reference from a District principal or Instructional Supervisor. The Panel's procedures for selecting Consulting Teachers shall include provision for interviews and classroom observations of candidates. The Joint Panel will make the selection, which will be forwarded to the Superintendent. All applications and references will be treated with confidentiality and will not be disclosed except as required by law.

4.2.3 The Joint Panel will assign Consulting Teachers. Within the first six weeks of the assignment, either the Consulting Teacher or the Participating Teacher may petition the

Panel for an assignment change, stating the reasons. The Participating Teacher shall be allowed one assignment change per year.

4.2.4 A Consulting Teacher's term will be two years, and s/he may reapply for one additional term. If a Consulting Teacher's assignment involves being released from the classroom, upon completion of the assignment, unless the Consulting Teacher requests otherwise, the District will make every effort to return the teacher to the school (and department, where relevant) in which the teacher taught before assuming the Consulting Teacher position. In the first year of the Program only, the Joint Panel may create both 2-year and 3-year terms in order to stagger the entry of Consulting Teachers into the Program.

4.2.5 Consulting Teachers will be required to attend training programs designed to prepare them for their role. This training will take place on a combination of released time and non-work time, with appropriate compensation.

4.2.6 Consulting Teachers shall provide assistance to RPTs in the areas of subject matter knowledge, teaching strategies, and teaching methods (Clusters 1, 2, and 3 of the PAUSD Teaching Standards. For RPTs this assistance may include any of the following activities:

(a) Providing consultative assistance to improve in the specific areas identified by the Evaluator(s) or the PAUSD Teaching Performance Standards;

(b) Meeting and consulting with the Evaluator(s) or designee regarding the nature of the assistance being provided;

(c) Observing the RPT during periods of classroom instruction;

(d) Demonstrating teaching for the RPT or arranging opportunities for the RPT to observe other teachers;

(e) Facilitating the RPT's access to specific training in specified teaching techniques or in designated subject matter;

(f) Other activities appropriate to the RPT's needs and interests.

4.2.7 Support provided by Consulting Teachers to beginning teachers or VPTs may include providing consultative assistance to improve in areas identified by the participating teacher, as well as the activities listed in c, d, e, and f above.

## 5. Other Provisions

5.1 Unit members who function as Joint Panel members or Consulting Teachers under this document shall not be considered either management or supervisory employees as defined by Government Code Section 3540.1(g) and (m).

5.2 Unit members who perform functions as Consulting Teachers or Joint Panel members under this document shall have the same protection from liability and access to appropriate defense as other public school employees pursuant to Division 3.6 (commencing with Section 810) of Title 1 of the California Government Code.

5.3 Records

5.3.1 All documents and information relating to the participation in this Program will be regarded as a personnel matter and subject to the personnel record exemption of the California Public Records Act (Government Code Section 6250, et seq.). The annual evaluation of the Program's impact, excluding any information on identifiable individuals, shall be subject to disclosure under the Public Records Act.

5.3.2 All parts of the selection process for Consulting Teachers will be treated as confidential and will not be disclosed except as required by law.

5.3.3 All the documents for the Program will be filed by the Human Resources office separately from the individual personnel records, except as set forth in 3.1.4 above.

# APPENDIX F

## Employee Concerns Regarding District Policies & Procedures
## (from Board Policy Manual, Chapter VI —
## Certificated Human Resources)

This provision is attached to the Collective Bargaining Agreement for information purposes only, and is not subject to review or enforcement through the grievance/arbitration mechanism.

Employees are encouraged to solve difficulties and problems within the school or department by referring their concerns about the implementation of District policies and procedures to their immediate supervisor.

If the concern is not resolved through this process, the employee may present his/her concern to the member of the Superintendent's Staff responsible for that part of the District's operation. The Staff member shall communicate his/her decision to the employee within twenty (20) working days of receipt of the concern.

Final appeal of the Superintendent's decision may be made to the Board of Education. The decision of the Board of Education shall be final.

# APPENDIX G
## Controversial Issues
## (from Board Policy Manual, Chapter III — Instruction)

This provision is attached to the Collective Bargaining Agreement for information purposes only, and is not subject to review or enforcement through the grievance/arbitration mechanism.

The examination and discussion in classrooms of important controversial issues has educational value and may be pursued when appropriate to the course of study. Events of such significance may occur so as to make discussion acceptable in other courses. Teachers shall:

1.  Conduct discussions in a spirit of honest inquiry;
2.  Guide discussions to provide opportunity for students to hear and consider differing views of the issue; and
3.  See that such discussions do not unduly preempt time from the regular course of study.

Forums at which timely issues are debated or closely spaced talks by speakers who can ably present opposing views are encouraged. Organized groups or individuals wishing to provide students with information or to make presentations to classes concerning controversial issues shall make application to the Superintendent of Schools, who shall determine the relevance of such presentations to the welfare of the students and to their education.

The Board shall support staff members when they have acted in the spirit of this policy, which obligates teachers to approach controversial issues in the spirit of inquiry rather than advocacy.

Administrative Procedure: Controversial issues shall be freely discussed in the classrooms of the District in accordance with the prudent judgment of teachers and in conformity with the provision of professional codes of ethics. In the discussion of controversial issues, teachers should consistently relate them to the democratic process and emphasize that differences of opinion and protest are to be exercised in the context of majority of decision and willingness to abide by that decision. Respect for minority opinion should be encouraged. Responsible citizenship within a framework of free and informed expression should be the instructional goal of all teachers who deal with controversy in the classroom. In handling discussions of controversial issues, the school personnel should consider that the students have the following rights:

1.  To study any controversial issue which has political, economic or social significance and upon which they should begin to form opinions.
2.  To have free access to all relevant information including the materials that circulate freely within the community. The exception to this procedural matter results from Education Code Section 8506. This section provides that any audiovisual or written materials, excluding state adopted texts, that include information on human reproduction processes or functions may not be used without providing parents with the opportunity to review and without parental permission.
3.  To study under competent instruction in an atmosphere free of bias and prejudice or external pressures.
4.  To form and express their own opinions in the classroom on controversial issues without jeopardizing their relations with the teacher or the school, when the issues discussed are relevant to the instructional program.

# APPENDIX H

**Hourly:**

Home Teaching – No transportation allowance ................................................................................ $65
Hourly Teaching ............................................................................................................................. $65
Professional Development Hourly Rate .......................................................................................... $65
Academy Hourly Teaching ............................................................................................................. $65
Proctoring ....................................................................................................................................... $35
Curriculum Writing ........................................................................................................................ $50
Parking Supervision ....................................................................................................................... $38
Club Supervision ............................................................................................................................ $21
Summer School Hourly Teaching Rate........................................................................................... $77

*Unit members who work 50% or more and who work on an hourly basis to provide substitute teaching services for their colleagues may choose to receive released time in lieu of hourly compensation. A secondary unit member will be granted one day of released time for every 5 periods (275 minutes) worked, and an elementary unit member one day for every 5 hours worked in this way. This released time may be utilized in units of no less than the unit member's workday.*

**Hourly, Adult Education:**

Step I ......................................................................................................................................... $44.34
Step II ........................................................................................................................................ $46.73
Step III ....................................................................................................................................... $49.59
Step IV ....................................................................................................................................... $52.60

**Stipends:**

Lead Teachers (Literacy, Math, Science and Technology).................................................... $2,095/year
Professional Learning Stipend (18 hours of PL every two years, may be earned annually)................. $1,409 /year
Site Council Stipend (only when at Range 90) ..................................................................... $839/year
Primary Medical Stipend ...................................................................................................... $2,070/year
Same-Day Multiple-Site Secondary Classroom Teacher Stipend ........................................ $2,198/year
Parent Conference Stipend (K-6) (6 conference hours equals one day) .................................$387/day
New Teacher Orientation (6 hours equals one day)...............................................................$387/day
High School Yearbook Teacher Stipend ............................................................................... $5,024/year
Teacher Recommendation Writing (after 10th Student) ............................................... $55/each after 10
Athletic Director (High School) ............................................................................................ $9,655/year

Overnight Stipend…………………………………………………………….…………...$345/day

(required duty overnight supervising students on a District-sponsored school activity.)

**Marching Band Camp Director:**

5 Days at Summer School Rate .............................................................................................. $306/day

**High School Credentialed Coaching Salary Schedule**

| Category | Initial | 3rd Year* * (10%) | 6th Year* * (15%) | 11th Year* (20%) |
|----------|---------|-------------------|-------------------|------------------|
| A | $5,387 | $5,924 | $6,196 | $6,464 |
| B | $4,580 | $5,038 | $5,266 | $5,496 |
| C | $3,776 | $4,153 | $4,342 | $4,531 |
| D | $2,963 | $3,259 | $3,408 | $3,556 |

*\* Beginning of 3rd, 6th and 11th year and thereafter.*

**Extended Season:** An increment will be paid to the Coach(es) who are directly responsible for those athletes involved in either a league, regional, sectional, or state playoff. The increment will be $279 per week for ten (10) or more participants on a team and $140 per week for fewer than ten (10) participants. Designation of extended season coach(es) is subject to prior approval of the district.

# APPENDIX I
## Evaluation / Supervision
## (Certificated Personnel BP 4115)

The Board of Education believes that regular and comprehensive evaluations can help instructional staff improve their teaching skills and raise students' levels of achievement. Evaluations also serve to hold staff accountable for their performance. The Superintendent or designee shall evaluate the performance of certificated staff members in accordance with law, negotiated employee contracts and Board-adopted evaluation standards.

*(cf. 4141/4241 - Collective Bargaining Agreement)*

Objective standards from the National Board for Professional Teaching Standards and/or the California Standards for the Teaching Profession shall be reviewed and may be incorporated in district evaluation standards with the agreement of the exclusive representative of the certificated staff.

*(cf. 4119.21/4219.21/4319.21 - Professional Standards)*
*(cf. 4140/4240 - Bargaining Units)*
*(cf. 4315.1 - Staff Evaluating Teachers)*

Evaluation procedures may include observation of teacher performance in the classroom.

The Superintendent or designee shall ensure that evaluation ratings have uniform meaning throughout the district.

Evaluations shall be used to recognize the exemplary skills and accomplishments of staff and to identify areas needing improvement. When areas needing improvement are identified, the Board expects employees to accept responsibility for improving their performance. The Superintendent or designee shall assist employees in improving their performance and may require participation in appropriate programs. Staff members are encouraged to take initiative to request assistance as necessary to promote effective teaching.

*(cf. 4131 - Staff Development)*
*(cf. 4139 - Peer Assistance and Review*

# APPENDIX  J
## Academy Working Conditions

The terms of this appendix will not constitute the status quo for purposes of negotiating under the Educational Employment Relations Act, Government Code Section 3540, et seq.

**A.  Academy Working Conditions**

1.  **Program hours and compensation**.  The PAUSD Academy will serve students identified as academically at risk in Grades 1-5.  The classes will be limited to 6-10 students, each working with one teacher. Teachers will be paid the Academy Teaching Rate specified in Appendix H for each hour of instruction.  For planning and parent conferencing, the teacher will receive one additional hour of pay for every 3 hours of instruction.  Teachers-in-charge will receive one additional hour of pay for every 3 hours of being in charge.

2.  **Selection of teachers**.  All unit members will have an opportunity to apply for Academy positions. Selection will be made by the site principal and Director for Elementary Education.  Qualified unit members will receive preference in hiring over non-unit member applicants.  Qualifications will be determined by the level of students and the curriculum to be taught.  No priority will be given to teachers holding a particular type of contract (permanent, probationary, temporary, etc.) over those holding other types.

3.  **Schedule of classes**.  Academy classes will meet outside of the normal work-day hours.  Academy teachers will be excused from other meetings that conflict with Academy instruction.

4.  **Absences and substitutes**.  Teachers will not accrue sick leave related to Academy work and will not be allowed to use sick leave, personal necessity, or other types of leave to cover an absence from Academy classes.  If a teacher is unable to teach a scheduled Academy class for any reason, s/he will not receive payment for that class.  A contract teacher who works on an hourly basis to provide substitute teaching for an Academy teacher will receive the Academy Teaching Rate.

5.  **Observation of Academy classes**.  An Academy teacher will be observed in Academy classes by the site principal and/or district TOSA.  Work in the Academy classes will not be addressed in the teacher's interim assessments or summary evaluation.

6.  **Safety conditions**. Contract provisions regarding safety conditions (Article XIII, section F) apply to Academy work.  At each site there will be a principal or teacher-in-charge.  During instructional time in the academy program, no teacher should be on site without another adult present.

**B.  Contracted Programs**

Should the District desire to contract out Academy programs to commercial concerns on a pilot basis, in order to evaluate the effectiveness of such programs for low achieving students, the District will provide the Association with notice and opportunity to negotiate.

**MEMORANDUM OF UNDERSTANDING BETWEEN**
**PALO ALTO UNIFIED SCHOOL DISTRICT (PAUSD)**
**AND PALO ALTO EDUCATORS ASSOCIATION (PAEA)**
**EVALUATION REVIEW /REVISION COMMITTEE**

1. PAEA and the District agree that the current evaluation process of certificated staff is in need of review and potential revision. The parties are committed to working together to explore and design a new evaluation process that is beneficial to both unit members and administrators and as such have identified the following interests:

| PALO ALTO UNIFIED SCHOOL DISTRICT | PALO ALTO EDUCATORS ASSOCIATION |
|---|---|
| • Consistency of practice<br>• Focus on growth, reflection, and meaningful and timely feedback<br>• Make system more user friendly; less complicated process<br>• Strong, standards based feedback and accountability<br>• Legally compliant | • Authentic, meaningful, practical, timely feedback<br>• Relevant to our professional goals<br>• Performed by qualified, trained evaluator with content area knowledge<br>• Based on agreed upon professional standards<br>• Not punitive, competitive or ranking<br>• Not connected to test scores<br>• Teachers have opportunity to respond to evaluations |

1. The parties agree that a committee will be established consisting of up to six (6)_administrators and six (6) teachers. One member of each team would be a member of the Negotiations team; one from each team should be from the high school; one from each team from the middle school; and one from each the team following: from elementary. The evaluation committee's responsibilities will include, but are not limited to the following:

        • gathering data
        • exploring current teacher evaluation models
        • drafting procedures
        • writing a mission statement
        • creating a prototype
        • designing a piloting of the recommended procedures

2. Recommended timeline:
Committee established by April 1, 2019
Committee begins work by May 15, 2019
Pilot of procedures: 2020-2021 school year

3. Representatives of the District and the Association shall review and approve the pilot program for the new procedures. Following completion of the pilot program, the procedures shall be submitted to the parties' negotiations teams for review and approval, after which the new procedures shall be subject to ratification by both parties for implementation beginning with the 2021-2022 school year.

Dated 5/19/19

For the Association:

Dated: 3/19/19

For the District:

## Memorandum of Understanding (MOU) Between
## Palo Alto Unified School District and
## Palo Alto Education Association
## April 15, 2022

The Palo Alto Unified School District and the Palo Alto Educators Association CTA, "the parties" herein, have reached the following understandings, related to special education.

1. SAI Teachers are entitled to 2 release days per year to perform student related non-instructional duties and other student-related non-instructional duties. These release days will follow the same guidelines as Personal Necessity Leave listed in Article XI, Section C and the unit member shall be on site. An SAI teacher may be permitted to use these days (6 hours each) on non-work days to perform such duties and shall receive the teacher hourly rate in Appendix H for the extra day(s).

2. All educators who are required to attend IEP, SST, IST, 504 meetings outside of school hours (i.e., after the latest student dismissal time), shall be compensated at the Appendix H Hourly Teaching rate (prorated) for meeting time that exceeds (6) hours per semester.

3. Assignment to co-teaching sections/classes will be based on expertise and site/student needs in collaboration with the unit members and site administrator. This collaboration will occur at least 14 days before the unit members' first work day in August. Responsibilities of the co-teaching assignment will be divided and/or allocated according to a plan designed by the co-teaching partners with the approval of the site administrator. A site administrator will make the final decision in the event co-teaching partners are unable to agree to a plan that is divided and/or allocated with the approval of the site administrator.

4. Aggressive Behavior and Violent Outbursts in Class:
   a. If a student exhibits behavior that is unsafe to staff or other students or is escalating towards the potential of violent behavior, any staff member can request assistance from the site Safety Care team to attend to the situation. Members of the site Safety Care team or site administrator will work with the student until the student de-escalates.
   b. For any aggressive behavior or violent outbursts by a student toward staff, the administrator will convene an IEP meeting within 48 business hours. If the student does not have an IEP, a meeting will be set up with the administrator, teacher and parents as soon as possible, but no later than 3 school days after the incident unless an exceptional circumstance applies.

5. This MOU shall be effective for the 2022-2023 school year only and shall expire automatically on June 30, 2023. Both parties will study fiscal and other impacts of this MOU during the 2022-2023 school year.

6. The automatic expiration of this MOU on June 30, 2023 does not preclude either party from making proposals on the subject matter of this MOU as part of prescribed reopener negotiations for the 2023-2024 school year. In the absence of any subsequent agreement over this subject matter, the provisions of Article XIII (Working Conditions) as stated in the 2021-2024 negotiated agreement shall automatically apply.


_____     4/15/2022          _____     4/15/22
Trent Bahadursingh          Date                Teri Baldwin                Date
Deputy Superintendent                           PAEA President


- 83 -

**Memorandum of Understanding (MOU) Between**
**Palo Alto Unified School District and**
**Palo Alto Education Association**
**December 5, 2022**

The Palo Alto Unified School District and the Palo Alto Educators Association CTA, "the parties" herein, have reached the following understandings, related to special education for the 2023-2024 school year.

1. SAI Teachers are entitled to two (2) release days per year to perform student related non-instructional duties. These release days will follow the same guidelines as Personal Necessity Leave listed in Article XI, Section C and the unit member shall be on site. An SAI teacher may be permitted to use the two (2) days (6 hours each), plus an additional day (6 hours) outside of work hours to perform such duties and shall receive the teacher hourly rate in Appendix H for the extra day(s). SAI teachers may use a combination of release days and extra compensation during the school year as long as they do not exceed two (2) release days and/or a total of eighteen (18) hours of compensation on a timecard, for a maximum of three (3) total days.

2. All educators who are required to attend IEP, SST, IST, 504, or Staffing meetings and/or any other legal meetings outside of school hours (i.e., before school, lunch, or after the latest student dismissal time excluding early dismissal days), shall be compensated at the Appendix H Hourly Teaching rate (prorated) for meeting time that exceeds five (5) hours per semester. Any time needed (with prior approval from your supervisor) for legal paperwork shall be compensated at the Appendix H Hourly Teaching Rate.

3. Assignment to co-teaching sections/classes will be based on expertise and site/student needs in collaboration with the unit members and site administrator. This collaboration will occur at least 14 days before the unit members' first work day in August. Responsibilities of the co-teaching assignment will be divided and/or allocated according to a plan designed by the co-teaching partners with the approval of the site administrator. A site administrator will make the final decision in the event co-teaching partners are unable to agree to a plan that is divided and/or allocated with the approval of the site administrator.

4. Aggressive Behavior and Violent Outbursts in Class:
   a.  If a student exhibits behavior that is unsafe to staff or other students or is escalating towards the potential of violent behavior, any staff member can request assistance from the site Safety Care team to attend to the situation. Members of the site Safety Care team or site administrator will work with the student until the student de-escalates.
   b.  For any aggressive behavior or violent outbursts by a student toward staff, the administrator will convene an IEP meeting within 48 business hours. If the student does not have an IEP, a meeting will be set up with the

administrator, teacher and parents as soon as possible, but no later than 3 school days after the incident unless an exceptional circumstance applies.

5. This MOU shall be effective for the 2023- 2024 school year only and shall expire automatically on June 30, 2024. Both parties will study fiscal and other impacts of this MOU during the 2022-2023 school year.

6. The automatic expiration of this MOU on June 30, 2024 does not preclude either party from making proposals on the subject matter of this MOU as part of prescribed reopener negotiations for the 2024-2025 school year. In the absence of any subsequent agreement over this subject matter, the provisions of Article XIII (Working Conditions) as stated in the 2021-2024 negotiated agreement, shall automatically apply.

| | |
|---|---|
| _____ 12/5/22 | _____ 12/5/22 |
| Trent Bahadursingh        Date | Teri Baldwin        Date |
| Deputy Superintendent | PAEA President |

# PALO ALTO UNIFIED SCHOOL DISTRICT
## Memorandum of Understanding

The Palo Alto Unified School District (District) and the Palo Alto Educators Association CTA (PAEA) "the parties" herein, have reached the following understandings, related to health benefits for the 2023 & 2024 calendar year.

For the 2023 & 2024 calendar year only, the increased cost of the medical health benefits premiums will be shared between the district and the employees, through contributions via automatic payroll deductions as necessary for health insurance premiums as follows instead of the language listed in the current CBA in Article VI, Compensation & Benefits, Section C, numbers 4b and 5:

1. The District shall assume and pay for the full cost of health (medical) insurance benefits provided in the Agreement for the full-time employee only, prorated for part-time employees who work at least half-time.
2. The District shall assume and pay for ninety percent (90%) of the full cost of health
3. (medical) insurance benefits provided in the Agreement for the employee's dependents (i.e., one dependent or family coverage). The employee shall contribute the remaining ten percent (10%).
4. The district has an interest in including increases of district contributions for all health (medical, dental, vision, and life) benefits as a part of total compensation; however, they will not be included in this MOU which addresses the 2023 & 2024 calendar year benefits.
5. PAEA has an interest in considering the increase of employee contributions for medical benefits when calculating total compensation.
6. The language listed in the current CBA in Article VI, Compensation & Benefits, Section C, numbers 4d, 4e, 4f, and 4g still apply as written.

This MOU shall be effective for the 2023 & 2024 calendar year only and shall expire automatically on December 31, 202M. Both parties will be meeting for ongoing negotiations during the 2022- 2023 school year. Article VI, Compensation and Benefits, is open.

If the parties have not ratified a negotiated agreement regarding health and welfare benefits by August 31, 202M, District and employee contributions for the cost of health (medical) benefits effective January 1, 2025 shall be determined by the CBA language which was board adopted on May 25, 2021, in Article VI, Compensation & Benefits, Section C, numbers 4b and 5. If that occurs, the $15,141 employee district contribution amount and the June 30, 2022 FTE numbers will be utilized for the Calculator process to establish the District and employee copay portions for 2023. This will be the basis for establishing new calculator rates for 2025.

Trent Bahadursingh                12/5/22
Deputy Superintendent            Date

Theresa M Baldwin               12/5/22
Teri Baldwin                        Date
PAEA President

# Memorandum of Understanding (MOU) Between
# Palo Alto Unified School District and
# Palo Alto Education Association
# December 5, 2022

## STUDENT INPUT

The Palo Alto Unified School District and the Palo Alto Educators Association CTA, "the parties" herein, have reached the following understandings, related to student input.

**K.  Student Input**
1.  Student Input
    a.  The District and the Association agree that the purpose of student input is to provide meaningful feedback to assist teachers and supervisors in their reflection on and improvement of teaching practices. A staff member's administrative supervisor(s) is/are the sole evaluator(s) of that staff member's performance. The District is responsible for providing information to students regarding the purpose of student input and their opportunity to provide it. The District may use department, school, and district aggregate data as benchmarks to identify growth in instructional practice. Classroom teachers are required to collect unidentifiable input from students in Grades 6-12. The procedure used for student input must provide for student anonymity.

    b.  The staff member may devise, subject to approval by their supervisor/evaluator, forms and procedures for the collection of student input, or they may use forms and procedures provided by the District. The student input collected will include no more than 8 multiple-choice or scaled questions jointly developed by the District with input from PAEA. The same questions will be used consistently in all student input forms and procedures.
    c.  Student input shall be collected by the classroom teacher prior to the end of the first semester and for semester courses again prior to the end of the school year. The classroom teacher will provide the results of the District questions to their supervisor upon request. Aggregate data may be shared by the school departments. Student input received in response to any additional questions developed by the teacher may be shared with their supervisor.
    d.  Student input shall not form the basis for a less than "meets Standards" evaluation unless corroborated by the evaluation process described in this Article

2.   This MOU shall be effective for the 2023-2024 and 2024-2025 school years only and shall expire automatically on June 30, 2025. Both parties will study the efficacy of the data collected from this MOU during the 2024-2025 school year.

3.  The automatic expiration of this MOU on June 30, 2025 does not preclude either party from making proposals on the subject matter of this MOU as part of prescribed reopener negotiations for the 2025-2026 school year. In the absence of any subsequent agreement over this subject matter, the provisions of Article X (Evaluations), K. Student Input as stated in the 2021-2024 negotiated agreement, shall automatically apply.



Trent Bahadursingh                    Date
Deputy Superintendent

Teri Baldwin                          Date
PAEA President

12/5/22

12/5/22

# PALO ALTO UNIFIED SCHOOL DISTRICT
## Memorandum of Understanding

The Palo Alto Unified School District (District) and the Palo Alto Educators Association CTA (PAEA) "the parties" herein, have reached the following understandings, related to Appendix H- temporary increase to the hourly teaching rate from December 5, 2022 to June 1, 2023.

The parties agree that the District will temporarily increase the hourly teaching rate when serving as a substitute teacher during your contractual prep time for another unit member from $60 (current contractual rate) an hour to $100 an hour from December 5, 2022 to June 1, 2023 to address increased absences.

The parties agree that if a teacher chooses to serve as a substitute teacher and opt for compensation time over financial compensation, a unit member will be granted one day of released time for every 275 minutes worked.

The parties agree that this side letter will expire on June 1, 2023 (unless extended by mutual agreement).


_____  12/5/22          _____  12/5/22
Trent Bahadursingh         Date             Teri Baldwin               Date
Deputy Superintendent                       PAEA President

- 89 -

# EXHIBIT Y

# CHAPTER XIV

# SCHOOL EMPLOYEES

# NATURE OF EMPLOYMENT

The Education Code contains detailed provisions relating to the employment of persons by school districts. Generally, positions are designated as certificated and classified. No person has a right to obtain employment with the public schools. An employment is considered a public trust requiring an oath of office to be taken by every public officer and employee.

The oath is set forth in the California Constitution.[1] A portion of the oath was declared unconstitutional by the California Supreme Court.[2] In Bessard v. California Community Colleges, the federal district court held that a religious exemption must be granted to persons who have religious objections to taking an oath. The Court of Appeal found that under the Religious Freedom Restoration Act, there must be a compelling governmental interest not to grant the exemption.[3] The court found that requiring the oath despite religious objections was a substantial burden upon the religious freedom of religious objectors and enjoined the defendants from requiring the religious objectors to take the oath as a precondition of employment.[4] Following the decision in Bessard, the United States Supreme Court declared the Religious Freedom Restoration Act unconstitutional leaving the viability of the Bessard decision in question.

The relationship between a school district and its employees is contractual in nature.[5] The statutory provisions which grant teachers tenure and classified employees permanent status are generally considered restrictions on the power of the school district to dismiss employees.[6]

The governing boards of school districts have the authority to hire employees, both certificated and classified.[7] In the absence of statutory limitations, the governing board may employ certificated and classified employees for a term extending beyond that of the board itself and, if the contract is made in good faith, it binds the succeeding board.[8] Except for the tenure laws and other statutory provisions granting permanence to classified employees, school district contracts with employees are subject to the same rules of law that ordinarily apply to contracts of employment.[9]

---

[1] Article XX, Section 3.
[2] See, Vogel v. County of Los Angeles, 68 Cal.2d 18 (1967). The portion of the oath which states that the oathtaker is not or has never been a member of an organization that advocates the overthrow of the state or federal government was the portion that was declared unconstitutional.
[3] 42 U.S.C. Section 2000(bb-1(b)).
[4] Bessard v. California Community Colleges, 867 F.Supp. 1454 (E.D.Cal. 1994).
[5] Richardson v. Board of Education, 6 Cal.2d 583 (1936); Fry v. Board of Education, 17 Cal.2d 753 (1941); Holbrook v. Board of Education, 37 Cal.2d 316 (1951).
[6] Taylor v. Board of Education, 31 Cal.App.2d 734 (1939).
[7] Education Code sections 44831, 45103.
[8] King City Union High School District v. Waibel, 2 Cal.App.2d 65 (1934).
[9] Taylor v. Board of Education, 31 Cal.App.2d 734 (1939); Frates v. Burnett, 9 Cal.App.3d 63 (1970); Goddard v. South Bay Union High School District, 79 Cal.App.3d 98 (1978).

(Revised May 2016)

Certain people may not be employed or retained in employment by school districts. These people include those convicted of sex and narcotic offenses and those found to be sexual psychopaths.[10]

## DUE PROCESS AND PUBLIC EMPLOYMENT

Public employment is also governed by constitutional considerations. The Fourteenth Amendment to the United States Constitution states that no person may be deprived of life, liberty or property without due process of law.

A public employee has a "property interest" or "liberty interest" in their employment if the employee has a legitimate claim of entitlement to continued employment.[11] The employee must have more than a unilateral expectation, abstract need or desire for continued employment.[12] The United States Supreme Court, in Board of Regents v. Roth, stated:

> "Property interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and support claims of entitlement to those benefits."[13]

Therefore, the courts will look to state law (e.g., Education Code), state regulations, and local policies to determine if the employee has a legitimate claim of entitlement to continued employment (i.e., property interest). If it is determined that the employee has a legitimate property interest in continued employment, then certain procedural due process protections apply. In Cleveland Board of Education v. Loudermill,[14] the United States Supreme Court established the standard for procedural due process which must be followed before disciplining a public employee who has a legitimate "property interest" entitlement to continued employment under state law or local policy. The court held that, at a minimum, prediscipline safeguards must include:

1.      Oral or written notice of the charges.

2.      An explanation of the employer's evidence.

3.      An opportunity to present his or her side of the story.[15]

In California, state law provides for permanency or tenure for certificated and classified employees after a certain period of time.[16]   Once the probationary time period has been

---

[10] Education Code sections 44836, 44837, 45123.
[11] Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701 (1972).
[12] Id. at 577.
[13] Id. at 577.
[14] 105 S.Ct. 1487, 470 U.S. 532 (1985).
[15] Id. at 546.
[16] Education Code sections 44929.21(generally, a two-year probation period leading to tenure), 45113 (a maximum one year probationary period leading to permanency).

(Revised May 2016)

completed, employees have an entitlement to continued employment and may only be dismissed by statutorily prescribed procedures.[17]   As a result, the state courts have developed a body of procedural due process case law interpreting state constitutional and statutory provisions which are more detailed and prescriptive than federal due process requirements that must be complied with by California educators.

In <u>Skelly v. State Personnel Board</u>,[18] the California Supreme Court held that California's statutory schemes for civil service employment, which confer permanent status upon certain individuals, constitute a property interest and establish a legitimate claim of entitlement to continued employment.[19]   In <u>Skelly</u>, the court held that in California an employee is not constitutionally entitled to a full trial type evidentiary hearing prior to the initial taking of punitive action but held that, at a minimum, certain procedural due process rights were required before disciplinary action can be taken.  These preremoval safeguards include:

1.    Notice of the proposed action to be taken.

2.    The reasons for the proposed action.

3.    A copy of the charges and materials upon which it is based.

4.    The right to respond either orally or in writing to the authority initially imposing discipline.[20]

In <u>Bostean v. Los Angeles Unified School District</u>,[21] the Court of Appeal held that, under the due process clause of the Fourteenth Amendment, Bostean was entitled to a hearing prior to being placed on involuntary sick leave.  The court held that to determine whether a hearing is required, it must balance three factors:

1.    The private interest that will be affected by the school district's action.

2.    The risk of an erroneous deprivation of the employee's interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards.

3.    The school district's interest in immediate removal.[22]

Due to the length of time Bostean was on involuntary sick leave and due to the significant interruption in his receipt of salary, the court held that a hearing prior to placement on

---

[17] Education Code sections 44932, 45113.
[18] 15 Cal.3d 194, 124 Cal.Rptr. 14 (1975).
[19] Id. at 206-208.
[20] Id. at 215; see, also, Coleman v. Department of Personnel Administration, 52 Cal.3d 1102, 278 Cal.Rptr. 346 (1991); Levine v. City of Alameda, 525 F.3d 903 (9th Cir. 2000) (employee's due process rights violated when he was laid off without a pretermination hearing regarding a layoff).
[21] 73 Cal.Rptr.2d 523, 63 Cal.App.4th 95 (1998).
[22] Id. at 534.

(Revised May 2016)

# EXHIBIT Z



| Book | PAUSD Policies & Regulations |
|------|------------------------------|
| Section | 9000 - Bylaws of the Board |
| Title | Governing Board Elections |
| Code | 9220 BB |
| Status | Active |
| Adopted | January 12, 2010 |

Any person is eligible to be a Board of Education member, without further qualifications, if he/she is 18 years of age or older, a citizen of the state, a resident of the school district, a registered voter, and not legally disqualified from holding civil office. *(Education Code 35107)*

A district employee elected to the Board shall resign his/her position before being sworn in or shall have his/her employment automatically terminated upon being sworn into office. *(Education Code 35107)*
*(cf. 9224 - Oath of Affirmation)*
*(cf. 9270 - Conflict of Interest)*

Whenever possible, the Board shall consolidate Board elections with the local municipal or statewide primary or general election. Board election procedures shall be conducted in accordance with state and federal law.
*(cf. 9110 - Terms of Office)*

**Campaign Conduct**

In order to help protect the public's trust in the electoral process as well as the public's confidence in the Board and district, the Board encourages all candidates to sign and adhere to the principles in the Code of Fair Campaign Practices pursuant to Elections Code 20440.
*(cf. 0410 - Nondiscrimination in District Programs and Activities)*
*(cf. 9005 - Governance Standards)*

**Statement of Qualifications**

In order to help defray the costs of campaigning for the Board, the district shall pay half the cost of printing, handling, translating, and mailing candidate statements included in the voter's pamphlet filed pursuant to Elections Code 13307.

On the 125th day prior to the day fixed for the general district election, the Board secretary or his/her designee shall deliver a notice, bearing the secretary's signature and district seal, to the county elections official describing both of the following: *(Elections Code 10509)*

1. The elective offices of the district to be filled at the general election and which offices, if any, are for the balance of an unexpired term
2. Whether the district or the candidate is to pay for the publication of a statement of qualifications pursuant to Elections Code 13307
   *(cf. 9223 - Filling Vacancies)*

Candidate statements shall be limited to no more than 400 words. *(Elections Code 13307)*

**Tie Votes in Board Member Elections**

Whenever a tie makes it impossible to determine which of two or more candidates has been elected to the Board, the Board shall immediately notify the candidates who received the tie votes of the time and place where the candidates or their representatives should appear before the Board. The Board at that time shall determine the winner by lot. *(Education Code 5016)*

Legal Reference:

EDUCATION CODE
*1006 Qualifications for holding office, county board of education*
*5000-5033 Elections*
*5220-5231 Elections*
*5300-5304 General provisions (conduct of elections)*
*5320-5329 Order and call of elections*
*5340-5345 Consolidation of elections*
*5360-5363 Election notice*
*5380 Compensation (of election officer)*
*5390 Qualifications of voters*
*5420-5426 Cost of elections*
*5440-5442 Miscellaneous provisions*
*7054 Use of district property*
*35107 Eligibility; school district employees*
*35177 Campaign expenditures or contributions*
*35239 Compensation of governing board member of districts with less than 70 ADA*

ELECTIONS CODE
*1302 Local elections, school district election*
*2201 Grounds for cancellation*
*4000-4004 Elections conducted wholly by mail*
*10400-10418 Consolidation of elections*
*10509 Notice of election by secretary*
*10600-10604 School district elections*
*13307 Candidate's statement*
*13309 Candidate's statement, indigency*
*20440 Code of Fair Campaign Practices*

GOVERNMENT CODE
*1021 Conviction of crime*
*1097 Illegal participation in public contract*
*12940 Nondiscrimination, Fair Employment and Housing Act*
*81000-91014 Political Reform Act*

PENAL CODE
*68 Bribes*
*74 Acceptance of gratuity*
*424 Embezzlement and falsification of accounts by public officers*
*661 Removal for neglect or violation of official duty*

CALIFORNIA CONSTITUTION
Article 2, Section 2 Voters, qualifications
Article 7, Section 7 Conflicting offices
Article 7, Section 8 Disqualification from office

COURT DECISIONS
Randall v. Sorrell, (2006) 126 S.Ct. 2479

ATTORNEY GENERAL OPINIONS
85 Ops.Cal.Atty.Gen. 49 (2002)
83 Ops.Cal.Atty.Gen. 181 (2000)
81 Ops.Cal.Atty.Gen. 98 (1998)
69 Ops.Cal.Atty.Gen. 290 (1986)

Management Resources:

WEB SITES
California Secretary of State's Office: http://www.ss.ca.gov
Fair Political Practices Commission: http://www.fppc.ca.gov
Institute for Local Self Government: http://www.islg.org

# EXHIBIT AA



# The Local Control Funding Formula for School Districts and Charter Schools

GABRIEL PETEK | LEGISLATIVE ANALYST | JANUARY 2023

## SUMMARY

In 2013-14, the state created the Local Control Funding Formula (LCFF)—a major change to the school finance system. The LCFF was intended to simplify school funding and distribute funding based on student demographics. School districts and charter schools receive most of their LCFF apportionment through a per-student formula—based on average daily attendance (ADA)—that provides a base amount of funding by different grade spans. Almost one-fifth of LCFF funding for school districts and charter schools is provided through two separate calculations based on the proportion of their student population that is an English learner, from a low-income family, or a foster youth. The formula also includes a few add-ons that remain from the previous funding system. (The state also retained a few other categorical programs, such as special education and child nutrition.) The 2022-23 budget package provides $75.5 billion in LCFF funding, which represents about 80 percent of state funding for public schools. In this brief, we provide some historical background on LCFF's implementation, describe how the formula works for school districts and charter schools, describe how the formula was phased in, and explain requirements for districts to adopt plans that describe how LCFF funding will be spent.

## INTRODUCTION

Proposition 98 requires the state to annually set aside a minimum amount of General Fund and local property tax revenue for public schools and community colleges. Whereas Proposition 98 establishes a minimum funding level, the Legislature decides how to allocate this funding among school and community college programs. About 80 percent of Proposition 98 funding to public schools is allocated through the LCFF, which was established in 2013. In this brief, we discuss the LCFF for school districts and charter schools. For brevity, we refer to both as school districts throughout this brief unless otherwise noted. (We do not discuss the LCFF for county offices of education.)

***LCFF Replaced System of Revenue Limits and Numerous Categorical Programs.*** Prior to LCFF, the state distributed about two-thirds of school funding through revenue limits—general purpose grants that could be used for any educational purpose. Revenue limits were allocated to districts based on a per-student rate (using student ADA), with the specific rate varying significantly by district. This variation was largely based on historical local levels of

funding prior to the state becoming more involved in financing K-12 education in the early 1970s. (The state took several steps to equalize rates in subsequent decades, but some variation in per-student rates remained.) In addition to revenue limits, the state had more than 50 categorical programs. The level of categorical funding also varied significantly by district, as each categorical program had its own allocation formula and spending restrictions.

***LCFF Was Intended to Address Flaws of Previous System.*** In the years leading up to LCFF, policy makers and researchers had concerns with the state's K-12 funding system. Most notably, there was a broad-based consensus that the system was:

- ***Overly Complex.*** The system consisted of a myriad of programs, each with different allocation formulas and different spending requirements, which made tracking difficult for school districts.

- ***Antiquated.*** The allocation formulas for numerous programs were based on historical factors that no longer had relevance—which led to variation in funding across districts with no rationale.

AN LAO REPORT

- *Inequitable.* Although some funding was targeted to support specific student groups, such as low-income students and English learners, the state's school finance system as a whole was not well-aligned to student need.
- *Inefficient.* Due to the multiple funding streams, districts often took a compliance-oriented approach that did not attempt to coordinate activities across various programs.
- *Highly Centralized.* State restrictions limited districts' ability to design educational programs based on local needs and priorities.

During the Great Recession, the state reduced funding for the majority of categorical programs and temporarily exempted districts from most categorical program spending requirements. As the state was coming out of the recession and categorical restrictions were scheduled to return, the Governor, Legislature, and stakeholders began to discuss options for reforming the existing system. In 2013, as part of the 2013-14 budget package, the state replaced its general purpose grants and most categorical programs with the LCFF. The new funding formula is much simpler than the previous funding system, treats districts similarly, and provides dedicated funding to certain student populations with greater needs. The new system also gives districts more control over how to spend state funding, while also creating a local planning process that is intended to increase transparency and stakeholder engagement.

## COMPONENTS OF FORMULA

As Figure 1 shows, school districts receive virtually all of their LCFF apportionment (about 98 percent) through a per-student formula, with the remainder provided through several "add-ons." Schools pay for most of their general operating expenses (including employee salaries and benefits, supplies, and student services) using these funds. In this section, we describe how the formula works in more detail.

### Main Components

*LCFF Is Based on ADA.* The state allocates LCFF funding to school districts and charter schools based on their ADA—the average number of students in class each day throughout the school year. For funding purposes, the state credits school districts with their ADA in the current year, prior year, or the average of three prior years, whichever is higher. (The option to fund based on the average of three prior years was established in 2022-23.) Charter schools, by contrast, are funded according to their ADA in the current year only.

Figure 1

## Overview of the Local Control Funding Formula

(In Billions)

| Components | Description | 2022-23 Funding (LAO Estimates) |
|---|---|---|
| Base grant | Provides a uniform level of funding per student in different grade spans. Includes two grade span adjustments—one for smaller class sizes in grades K-3 and one to acknowledge costs of providing career technical education in high schools. Beginning in 2022-23, also includes additional funding for students in transitional kindergarten. | $60.8 |
| Supplemental grant | Provides an additional 20 percent of the adjusted base grant rate for each student that is an English learner, low income, or foster youth. | 7.5 |
| Concentration grant | Each English learner, low-income student, and foster youth above 55 percent of enrollment generates an additional 65 percent of the adjusted base rate. | 5.5 |
| | **Total, Main Components** | **$73.8** |
| Add-ons | Includes Targeted Instructional Improvement Block Grant, Home-to-School Transportation, Economic Recovery Target, Education Protection Account, and Minimum State Aid. | $1.7 |
| | **Total** | **$75.5** |

***Base Grant Varies by Grade Span.*** As **Figure 2** shows, school districts receive the bulk of their LCFF funding based on their ADA in four grade spans. (This includes two grade span adjustments that will be discussed in the next paragraph.) The base funding rates are higher for students in higher grade spans—reflecting generally higher costs of education at higher grade levels. Districts may use their base funding for any educational purpose. As described in the box on the next page, the base grant calculations differ for attendance associated with certain small schools.

***Grade Span Adjustments for Early Elementary and High School Grades.*** The LCFF base rates include two specific grade span adjustments that increase the base rates, with the goal of maintaining some aspects of the previous finance system. The K-3 adjustment increases the base rate for grades K-3 by 10.4 percent. To receive this adjustment, districts must maintain average K-3 class sizes of 24 students or fewer for each of their school sites—unless the district has a collective bargaining agreement for a higher class size. This adjustment reflects a state commitment to have relatively smaller classes in grades K-3. Prior to the LCFF, the K-3 Class Size Reduction program provided funding to districts for this purpose. Absent a related collective bargaining provision, a district could lose its entire K-3 adjustment if at least one school site in the district has an average class size that is greater than 24. (Charter schools receive the K-3 adjustment but are exempt from the class size requirement.) The adjustment for grades 9-12 increases the base rate by 2.6 percent and was intended to account for the additional cost of providing career technical education to high school students—though this funding is not explicitly restricted for this purpose.

***New Funding for Transitional Kindergarten Staffing Beginning in 2022-23.*** As part of the 2021-22 budget, the state enacted an increase in funding for transitional kindergarten attendance, set to begin in 2022-23. (Transitional kindergarten is considered the first year of a two-year kindergarten program and is therefore funded using the K-3 base rates.) In addition to the funding generated through the base grant and K-3 grade span adjustment, school districts will receive $2,813 per transitional kindergarten ADA. To receive this funding in 2022-23, districts must maintain an average of 1 adult for every 12 students in transitional kindergarten classrooms at each school site. Beginning in 2023-24, districts must maintain an average of 1 adult for every 10 students in their transitional kindergarten classrooms at each school site. Unlike the K-3 adjustment, districts cannot collectively bargain for higher transitional kindergarten staffing ratios. (Charter schools can receive this adjustment, but unlike the K-3 adjustment, must meet the transitional kindergarten staffing requirements to receive the funding.)

***Supplemental Grant Funding Based on Proportion of English Learners/Low-Income (EL/LI) Students and Foster Youth.*** The LCFF provides additional funds to districts based on the proportion of their students who are EL/LI (based on eligibility to receive free or reduced-price



Figure 2

## LCFF Adjusted Base Rates by Grade Span
2022-23

Grade Span Adjustment[a]
Base Rate

$10,119   $9,304   $9,580   $11,391

K-3   4-6   7-8   9-12

[a] Reflects a 10.4 percent adjustment to the K-3 base rate and a 2.6 percent adjustment to the 9-12 base rate.
LCFF = Local Control Funding Formula.

LAO

AN LAO REPORT

school meals under a federal nutrition program) or foster youth. This proportion is commonly called the unduplicated pupil percentage. The additional funding is intended to recognize that, on average, these student groups typically require additional support to meet grade level standards. For each EL/LI student, a district receives a supplemental grant equal to 20 percent of the base grant (including the K-3 and 9-12 grade span adjustments). A student who is both EL and LI generates the same funding rate as a student who belongs to only one of these groups. (Because all foster youth also meet the state's LI definition, we do not refer to them as a separate subgroup for the remainder of the brief.). For the purposes of calculating LCFF allotments, the state uses a three-year rolling average of the district's EL/LI percentage.

*Concentration Grant Funding for Districts With Relatively High Shares of EL/LI Students.* Districts serving a student population of more than 55 percent EL/LI also receive a concentration grant equal to 65 percent of the adjusted base grant for each EL/LI student above the 55 percent threshold. (A charter school's concentration grant funding is calculated based on the proportion of EL/LI students in the district in which it resides, if it is lower.) Figure 3 illustrates how the concentration grant is calculated. The state adopted concentration grants in response to numerous studies that showed EL/LI students face greater educational challenges when they are enrolled in higher-poverty schools. When LCFF was first enacted, the concentration grant amount was equal to 50 percent of the adjusted base grant. The 2021-22 budget plan increased the concentration grant rate to 65 percent of the adjusted base grant.

## Base Grant Differs for Some School Districts With Necessary Small Schools

*What Is a Necessary Small School?* The Necessary Small Schools (NSS) program provides an alternative base grant funding methodology for districts with average daily attendance (ADA) of 2,500 or fewer that operate very small schools (less than 96 ADA for an elementary school or less than 286 ADA for a high school). To be classified as an NSS, schools also must demonstrate that (1) students who attend the small school would otherwise be required to travel relatively long distances from their home to attend school, or (2) geographic or other conditions (such as annual snowfall) make busing students an unusual hardship.

*How Is Funding Determined for Necessary Small Schools?* The NSS allocation uses funding bands based on the combination of a school's ADA and its staffing levels, whichever provides the lesser amount. The number of full-time teachers is used for elementary schools that serve students in grades K-8, while the number of full-time equivalent certificated employees is used for high schools. The funding bands for elementary schools are shown in the figure below. Districts receive NSS funding for their eligible schools in place of Local Control Funding Formula (LCFF) base grants, but they still receive LCFF base grant funding for all other schools in their district. Supplemental and concentration funding for NSS is calculated in the same way for all other ADA. As with the base grant, the NSS amounts are annually adjusted by the LCFF statutory cost-of-living adjustment.

### Funding Bands for Necessary Small Elementary Schools
2022-23 Rates

| Number of Certificated Teachers | Average Daily Attendance | Funding Amount |
|---|---|---|
| 1 | 1-24 | $247,965 |
| 2 | 25-48 | 490,709 |
| 3 | 49-72 | 733,666 |
| 4 | 73-96 | 976,409 |

LEGISLATIVE ANALYST'S OFFICE

AN LAO REPORT

Figure 3

## Illustration of How Main LCFF Components Are Calculated

For a School District With 10,000 K-3 ADA and an EL/LI Share of 75 percent

| Grant Type | Associated ADA[a] | Rate[b] | Funding | Funding Per Total District ADA |
|---|---|---|---|---|
| Base grant | 10,000 | $10,119 | $101,190,000 | $10,119 |
| Supplemental grant | 7,500 | 2,024 | 15,180,000 | 1,518 |
| Concentration grant | 2,000 | 6,577 | 13,154,000 | 1,315 |
| | | **Totals** | **$129,524,000** | **$12,952** |

[a] Total ADA for base grant. For supplemental grant, consists of total ADA multiplied by EL/LI share. For concentration grant, consists of total ADA multiplied by 20 percent (the 75 percent EL/LI share minus 55 percent).

[b] Base grants reflect adjusted K-3 base rate, supplemental grants reflect 20 percent of adjusted K-3 base rate, and concentration grants reflect 65 percent of adjusted K-3 base rate.

LCFF = Local Control Funding Formula; ADA = average daily attendance; and EL/LI = English learner/low income.

*Districts Must Ensure "Proportionality" When Spending Supplemental and Concentration Grant Funds.* A district must use their supplemental and concentration grant funding to proportionally increase or improve services for their EL/LI students, relative to the base amount of funding they receive. Statute also allows districts to use supplemental and concentration funding on a districtwide or schoolwide basis. The State Board of Education (SBE) is required to develop regulations implementing these provisions. The existing regulations allow districts to reflect their increase or improvement in services in quantitative or qualitative ways. Districts must report the total amount of supplemental and concentration funding they expect to receive, as well as describe how they plan to use their supplemental and concentration funding for the benefit of EL/LI students. They also must report how the proportional increase in supplemental and concentration grant meets a proportional increase in services for EL/LI students. If districts choose to use supplemental funding for a schoolwide or districtwide purpose, they must explain how this approach will benefit EL/LI students. Districts demonstrate adherence with these requirements through their Local Control and Accountability Plans (LCAPs), which we discuss in greater detail later in this brief.

*Two Recent Changes Related to Supplemental and Concentration Grant Funding.* Since the enactment of LCFF, the state made two notable changes related to how supplemental and concentration grant funding must be spent.

- *Restrictions on Unspent Supplemental and Concentration Grants.* Trailer legislation included in the 2021-22 budget package introduced a new requirement that districts track their unspent supplemental and concentration grant funding and use the funding to increase or improve services for EL/LI students in future years. Prior to this change, districts could use unspent supplemental and concentration grant funding in subsequent years for any educational purpose.

- *Use of Concentration Grant Funding for Staffing at High Needs Schools.* When the state increased the concentration grant rate to 65 percent of the base grant, it also specified that the associated increase in funding must be used by school districts to increase the number of staff that provide direct services to students in schools where more than 55 percent of students are EL/LI.

*Effect of Supplemental and Concentration Grants on Per-Student Funding.* Supplemental and concentration grant funding provides higher levels of total LCFF funding per ADA for districts with higher proportions of EL/LI students. Figure 4 on the next page shows how variation in a districts' EL/LI share affects their total per-pupil funding. A district with an EL/LI share of 25 percent will receive an additional $506 per ADA from the supplemental grant (a 5 percent increase from the base rate). Comparatively, a district with an EL/LI share of 75 percent will receive $1,518 per

ADA from the supplemental grant and $1,315 from the concentration grant—for a total of $2,833 in additional funding (a 28 percent increase from the base rate). This results in a district with an EL/LI share of 75 percent receiving 22 percent more funding per student than a district with an EL/LI share of 25 percent.

***Statute Requires a Cost-of-Living Adjustment (COLA) for LCFF.*** The COLA rate is based on a price index published by the federal government. This index reflects changes in the cost of goods and services purchased by state and local governments across the country. State law provides an automatic COLA for LCFF unless the constitutionally required Proposition 98 funding level is insufficient to cover the associated costs. In these cases, the law reduces the COLA rate to fit within the available funding. The state applies the COLA to LCFF by increasing the grade span base rates, necessary small schools rates, and the transitional kindergarten staffing adjustment. These rate increases also result in proportional increases to the grade span adjustments and supplemental and concentration grants, since the value of these components are funded as a percentage of the base grant.

## Add-Ons to the Formula

In addition to the main components of the LCFF, the state also included several add-ons to the formula. In this section, we describe three major add-ons. A certain subset of school districts with relatively high local property tax revenue also benefit from other LCFF add-ons. We discuss local property tax revenue and the associated add-ons in the nearby box.

***Two Categorical Programs Remain as LCFF Add-Ons.*** With the implementation of LCFF, funds from two pre-existing categorical programs—the



Figure 4

**Supplemental and Concentration Grants Increase Effective Funding Per Student**

2022-23 K-3 Funding Rates Per Student Based on District's EL/LI Share

| | |
|---|---|
| 0% EL/LI Share | **$10,119 Total Funding** $0 S/C Funding |
| 25% EL/LI Share | **$10,625** $506 |
| 50% EL/LI Share | **$11,131** $1,012 |
| 75% EL/LI Share | **$12,952** $2,833 |
| 100% EL/LI Share | **$15,103** $4,984 |

**Base Funding**          **S/C Funding**

EL/LI = English learners/low income and S/C = supplemental and concentration.

LAO

Targeted Instructional Improvement Block Grant (TIIG) and Home-to-School (HTS) Transportation program—were treated as add-ons. Districts that received funding from these programs in 2012-13 continue to receive that same amount of funding in addition to what the LCFF provides each year. Districts can use their TIIG funding for any educational purpose. Regarding the HTS add-on, districts must spend at least as much on school transportation as they spent from state funds in 2012-13. As long as districts meet this requirement, they can spend the HTS add-on for any purpose. In 2021-22, the TIIG and HTS add-ons totaled $1.3 billion statewide.

***2022-23 Budget Included Changes to School Transportation Funding.*** The 2022-23 budget package included two major changes to how the state funds school transportation. Beginning in 2023-24, the existing HTS add-on will receive the same COLA as the rest of LCFF. The budget also established a new funding stream, beginning in 2022-23, for school districts and county offices of education (COEs) to be reimbursed for 60 percent of eligible transportation expenditures

## How Local Property Tax Revenue Affects Total LCFF Funding

***LCFF Is Funded Through a Combination of State General Fund and Local Property Tax Revenue.*** The Local Control Funding Formula (LCFF) and add-ons are used to determine a district's total LCFF target. To meet each district's target, the state first credits each district with its share of local property tax revenue. For the vast majority of school districts, local property tax revenue is insufficient to cover their total LCFF target. The state provides funding to cover the remaining amount.

***School Districts With Local Property Tax Revenue Above Their LCFF Target Are Known as Basic Aid Districts.*** The term is derived from the section of the State Constitution guaranteeing all school districts at least $120 per student from the state. The property tax revenue in excess of their LCFF allotments is known as excess property tax revenue. Basic aid school districts can use their excess property tax revenue on their local education priorities. In 2021-22, the state had 118 basic aid school districts (about 13 percent of all districts), with a statewide total of $1.2 billion in excess property tax revenues.

***For Basic Aid Districts, Changes in Funding Are Driven by Property Taxes.*** For most districts, changes in LCFF funding are driven by changes in their average daily attendance (ADA); the per-ADA base rates; and the share of their students that are English learners, low income, or foster youth. For basic aid school districts, changes in their LCFF allotments typically have no effect on funding. Rather, changes in funding are driven by changes in local property tax revenue. A district's status as a basic aid district can change over time. For example, a basic aid district with local property tax revenue slightly above their LCFF target might no longer be basic aid if the state made large increases to the LCFF rates, resulting in the LCFF target exceeding local property tax revenue. Similarly, a school district can become basic aid over time if its local property tax revenue grows at faster rates than its LCFF target.

***Basic Aid Districts Also Uniquely Benefit From Two Other Provisions.*** In addition to receiving excess property tax revenue above their LCFF targets, basic aid districts also receive additional funding due to two other provisions, discussed below.

***Minimum State Aid.*** The legislation creating LCFF includes a provision that specifies no district is to receive less state aid from LCFF than it received in 2012-13 from the pre-existing programs that were replaced by LCFF. For most school districts, the state General Fund they receive for their LCFF targets is sufficient to meet this provision. Since basic aid districts do not receive state aid towards their LCFF target, the state must provide additional General Fund to meet this requirement. (Other school districts with relatively high property tax revenue also receive additional funding due to this provision.) In 2021-22, the state provided $192 million in addition to the LCFF target to meet this provision.

***Education Protection Account.*** Proposition 30 (2012) temporarily increased tax revenues and required the revenue to be deposited into the Education Protection Account (EPA). (Proposition 55 [2016] extended some portion of these tax increases to 2030.) The state allocates EPA funding to schools and community colleges as part of their primary funding formulas—LCFF in the case of school districts. The state must also must provide at least $200 per student from the EPA to all school districts, charter schools, and county offices of education and at least $100 per full-time equivalent student to community college districts. For most school districts, EPA allocations count toward their LCFF targets and do not affect their individual funding levels. For basic aid school districts (and a few other districts with relatively high property tax revenue), the state must provide additional funding to meet this requirement. In 2021-22, the state provided $64 million in EPA funding in excess of the LCFF targets.

they reported in the previous year. (Charter schools are not eligible to receive this funding.) A district's HTS add-on would count towards meeting the 60 percent threshold. To qualify for this funding, districts and COEs must adopt local plans describing the transportation services they will provide for their students. These plans must prioritize transportation for students in grade 6 or below and LI students. For 2022-23, the cost of the new transportation increases is estimated to be $637 million.

***LCFF Also Provides Economic Recovery Target to Some Districts.*** Some districts were expected to receive less total LCFF funding than they would have received if the state had maintained its previous funding system and adjusted it for inflation. The state provided some of these districts with an Economic Recovery Target in addition to their base, supplemental, and concentration grants. This funding was phased in over seven years (from 2013-14 through 2019-20), and is now a permanent, fixed add-on. Funding from the Economic Recovery Target can be used for any educational purpose. More than 120 districts (13 percent of districts statewide) receive funding through the Economic Recovery Target, for total costs of $61 million.

# LCFF IMPLEMENTATION AND FUNDING

***LCFF Was Phased In Over Multiple Years.*** When first enacted in 2013-14, LCFF was estimated to cost $18 billion more than the previous funding system. In order to accommodate this increase, LCFF was to be implemented over a multiyear period using a transition formula that increased LCFF rates as more funding became available. The administration projected the state would fully fund LCFF by 2020-21. As Figure 5 shows, LCFF was fully implemented by 2018-19— two years ahead of schedule. This

was largely due to greater-than-anticipated revenue increases during the period. In several instances, the state also has provided increases to the main LCFF components beyond COLA. Specifically, the state provided increases to LCFF beyond COLA of $570 million in 2018-19, $520 million in 2021-22, and $4.2 billion in 2022-23.

***LCFF Now Represents About 80 Percent of School Funding.*** As Figure 6 shows, out of the $95.5 billion Proposition 98 funding provided to K-12 education in 2022-23, $75.5 billion went towards funding the LCFF for school districts and charter schools (about 80 percent). Outside of the LCFF, roughly half of the remaining funding is provided through two large categorical programs for special education ($6.1 billion) and providing before/after and summer school programs ($4 billion). Of the total LCFF funding, the state allocates 81 percent through base grants, 17 percent through supplemental and concentration grants combined, and 2 percent through the add-ons.



Figure 5

## LCFF Was Phased In Over Six Years

(In Billions)

[a] The 2018-19 budget package increased LCFF by an additional 1 percent beyond full implementation.

LCFF = Local Control Funding Formula.

***Most Students Attend Districts Receiving Concentration Grant Funding.*** In 2021-22, 62 percent of the state's 5.9 million students enrolled in public schools were classified as EL/LI students. As **Figure 7** shows, about 64 percent of statewide enrollment is in districts with an EL/LI share of at least 55 percent. Figure 7 also shows that 79 percent of the state's EL/LI students attend districts that receive concentration grant funding.

# LOCAL CONTROL AND ACCOUNTABILITY PLANS

In conjunction with creating the LCFF, the state established a new system of transparency and accountability centered around eight state priority areas. To provide transparency regarding how LCFF funding is spent, the state requires districts to adopt LCAPs. Districts must develop and adopt their LCAPs with specific requirements for stakeholder engagement. In their LCAPs, districts must set goals in the eight state priority areas and specify actions they will take to meet these goals. In this section, we discuss the specific requirements in more detail. (In this brief, we do not discuss the state's system of accountability, which was developed in conjunction with LCAPs and is also based around the eight state priority areas.)

***LCAPs Based on Eight State Priority Areas and Associated Performance Measures.*** The legislation enacting LCFF establishes a framework for LCAPs based around goals in eight state priority areas. Statute also directs



Figure 6

## LCFF Represents Majority of Proposition 98 Funding for K-12 Education

2022-23 (In Billions)

a Reflects LCFF funding for school districts and charter schools.
LCFF = Local Control Funding Formula.



Figure 7

## Majority of Students Attend Concentration Grant Districts

2021-22 Statewide Share of Enrollment by District EL/LI Percentage

EL/LI = English learners/low income.

AN LAO REPORT

SBE to address several implementation details, such as developing an LCAP template that all districts must use. As shown in Figure 8, some priority areas focus on academic success (such as student achievement and course access), while others address issues outside of academics (such as parental involvement and school climate). SBE also has established 13 performance measures in the state priority areas intended to monitor districts' performance. As Figure 8 shows, seven of the performance measures are metrics that districts report to the state and are measured consistently statewide. The remaining six measures are local indicators for which districts report locally developed metrics or qualitative information describing their progress in the priority area. In addition to these required state and local measures, districts may include other performance measures in their LCAPs.

***Statute Requires Districts to Set Goals in State Priority Areas.*** For each of the state and local measures, statute requires districts to establish performance targets for all students and student subgroups and schools. (Statute identifies 13 student subgroups—eight racial and ethnic groups as well as English Learners, low-income students, foster youth, students with disabilities, and homeless students.) Statute requires that districts establish these targets for the coming school year as well as the next two years.

***Districts Must Specify Actions They Will Take to Achieve Goals.*** A district's LCAP must specify the actions the district plans to take to achieve its goals. The specified actions must be aligned with the school district's adopted budget. For example, a school district could specify that it intends to provide tutors to all EL students reading below grade level to improve its EL reclassification rate. To ensure the LCAP and adopted budget are

aligned, the school district would be required to include sufficient funding for EL tutors in its adopted budget plan.

***LCAPs Must Include Information on Services for EL/LI Students.*** As mentioned earlier in the brief, districts must include information demonstrating that they are increasing or improving services for EL/LI students in proportion to their supplemental and concentration funding. As part of these requirements, districts must provide justification for spending their supplemental and concentration funding for districtwide or schoolwide purposes.

***Districts Must Solicit Input From Various Stakeholders in Developing Plan.*** Figure 9 outlines the process a district must follow in adopting its LCAP. One of the main procedural requirements is that a district consult with its school employees, local bargaining units, parents,

---

Figure 8

## State Priority Areas and Associated Performance Measures

| | State Measure | Local Measure |
|---|:---:|:---:|
| **Basic Conditions of Learning** | | |
| Access to instructional materials, appropriately assigned teachers, and facility conditions | | X |
| **Implementation of State Standards** | | |
| Implementation of academic standards | | X |
| **Parent Engagement** | | |
| Parent and family engagement | | X |
| **Student Achievement** | | |
| English Language Arts assessment | X | |
| Mathematics assessment | X | |
| English learner progress | X | |
| College and career readiness | X | |
| **Student Engagement** | | |
| High school graduation rate | X | |
| Chronic absenteeism | X | |
| **School Climate** | | |
| Suspension rate | X | |
| Local climate survey | | X |
| **Course Access** | | |
| Access to a broad course of study | | X |
| **Other Student Outcomes** | | |
| —[a] | | X |

[a] The state has not adopted specific indicators that districts must use for this priority area. Districts may choose to include specific measures as part of their local planning process.

and students. As part of this consultation process, districts must present their proposed plans to a parent advisory committee and, in some cases, a separate EL parent advisory committee. (EL parent advisory committees are required if ELs comprise at least 15 percent of the district's enrollment and the district has at least 50 EL students.) The advisory committees can review and comment on the proposed plan. Districts must respond in writing to the comments of the advisory committees. Consulting with students may include conducting student surveys, holding student forums, or working with student advisory committees. Districts also are required to notify members of the public that they may submit written comments regarding the specific actions and expenditures proposed in the LCAP.

***LCAPs Must Include an LCFF Budget Overview for Parents and Guardians.*** Beginning in 2019-20, districts must include in their LCAPs a short summary for parents and guardians. This summary must include projected total revenue for the upcoming fiscal year (including LCFF and other state, local, and federal funding), projected expenditures, and budgeted expenditures for planned actions and services. The summary must also break out LCFF funding by component type and provide estimates of current-year expenditures to increase or improve services for EL/LI students. In addition, the overview must contain a brief description of the activities or programs supported by general fund expenditures that are not included in the LCAP.

***Districts Must Adopt LCAPs Every Three Years and Update Them Annually.*** LCAPs are three-year plans that school districts must update annually. Through a vote of their local governing board, districts must adopt (or update) their LCAP by July 1 every year, in conjunction with their annual budget adoption. Districts also are required to hold at least two public hearings to discuss and adopt (or update) their LCAPs. The district must first hold at least one hearing to solicit recommendations and comments from the public regarding expenditures proposed in the plan. It then must adopt (or officially update) the LCAP at a subsequent hearing.



Figure 9

## School District LCAP Adoption Process

LCAP = Local Control and Accountability Plan.

**COEs Must Review and Approve a School District's LCAP.** Each district must submit its LCAP to its COE for review. The COE must approve a district's LCAP if it determines that (1) the LCAP adheres to the required template, (2) the district's budgeted expenditures are sufficient to implement the strategies outlined in the LCAP, and (3) the LCAP adheres to the expenditure requirements for supplemental and concentration funding. As part of its review, the COE can then seek clarification from the district about the contents of its LCAP. If a COE seeks such clarification, a district must respond in writing. Based on a district's response, the COE can submit recommendations for amendments to the LCAP back to the district. The district must consider any COE recommendations at a public hearing, but the district is not required to make changes to its plan. The annual deadline for approval or rejection of a district's LCAP by a COE is October 8. Charter schools are not required to have their LCAPs reviewed and approved by a COE.

## CONCLUSION

The state created the LCFF with many goals in mind: to simplify school finance, give more discretion to school districts, distribute funding more equitably based on student needs, and avoid a compliance-oriented approach to operating programs. As the state approaches ten years since the LCFF was enacted, the Legislature may want to consider whether the LCFF has met these intended goals. Some effects, such as the simplification of the school finance system and greater local control, are easier to assess. Others, such as the effects on student outcomes, are more challenging to determine. Some preliminary studies (using pre-pandemic data) suggest that the LCFF has resulted in improvements on standardized tests and graduation rates for EL/LI students, most notably in districts with high concentrations of EL/LI students. The Legislature may also want to consider whether changes to the formula could help in further meeting the intended goals. For example, the Legislature could evaluate whether the levels of funding for the main components of the formula (base, supplemental, and concentration grants) are distributed in a way that aligns with best practices for serving EL/LI students.

## LAO PUBLICATIONS

This report was prepared by Michael Alferes, and reviewed by Edgar Cabral and Anthony Simbol. The Legislative Analyst's Office (LAO) is a nonpartisan office that provides fiscal and policy information and advice to the Legislature.

To request publications call (916) 445-4656. This report and others, as well as an e-mail subscription service, are available on the LAO's website at www.lao.ca.gov. The LAO is located at 925 L Street, Suite 1000, Sacramento, California 95814.

# EXHIBIT BB

About Us　Our Contributors　Suggest a Story　Comment Policy　Subscribe

## PALO ALTO Pulse

Arts　Palo Alto 101　Profiles　Cool Businesses　Schools and Youth　Community Connections

Innovation　Editorials

A fresh look at all things Palo Alto

Palo Alto 101 • Schools and Youth

# How Does School Funding Work in Palo Alto?

October 16, 2014 • by Victoria Thorp • 7 min read



*Palo Alto High School*

State funding, local taxes, school bonds…how does it all add up to fund Palo Alto schools? Palo Alto is unique in so many ways, including how our public schools are funded. Read on to find out where the money comes from and where it goes in Palo Alto schools.

**How much does Palo Alto spend per student per year?**

Palo Alto Unified School District (PAUSD) has an annual budget of about $270 million, and per pupil spending of about $16,000. Across California, the average per pupil spending is about $10,000, which places the Golden State near the bottom in terms of state rankings for per pupil spending. Despite having a strong tax base, PAUSD remains just slightly above the national average for per-student funding and behind many other high-performing districts, which spend about $20,000 per student.

**Where does the money come from?**

Almost 90% of the revenue for Palo Alto Unified School District (PAUSD) is generated through local sources, including property taxes and the parcel tax because it is a 'basic aid' district. Palo Alto is one of the most locally funded districts in the state.



**What does 'basic aid' mean for Palo Alto?**

Palo Alto funds our schools largely through local revenue because PAUSD is one of only about 10% of districts across the state that are what's called "basic aid." This means that Palo Alto brings in more money from our local property taxes than we would get from Sacramento. Other local basic aid districts include Mill Valley, Woodside and Los Altos.

As a basic aid district, Palo Alto's revenue is not tied to the number of students in our schools. As a result, if PAUSD adds students but our property taxes do not grow, the amount available per pupil declines. Of course the opposite is true too- if property taxes increase and enrollment is flat or declining, there is more funding to spend per student.

PAUSD has added an additional 2,000 students in the past 10 years, and due to our basic aid structure, these new children do <u>not automatically</u> mean an increase in funding.

**Why does the parcel tax matter?**

The parcel tax in Palo Alto for the current year $758 per assessed property, regardless of property value. Seniors can apply for an exemption from the parcel tax.

The Palo Alto parcel tax generates 7% of PAUSD's operating budget, which is almost the same as state funding. Revenues from the parcel tax are essential for PAUSD because they are not dynamic to the economy (unlike property taxes) and form a locally controlled stream of reliable funding dedicated only to educating the children of Palo Alto.

The current parcel tax was last renewed in 2015. As a sign of the community's commitment to public education, the last parcel tax renewal in 2015 was approved by almost 80% of Palo Alto voters.

**What is Partners in Education (PiE)?**

Partners in Education (PiE) is the only nonprofit organization dedicated to raising funds to support all of PAUSD schools and students. PiE relies on a team of over 200 parent volunteers to raise funds at each school site, which are then distributed back to Palo Alto schools on a per pupil basis to ensure equitable distribution of resources across the district.

Since PiE was founded in 2005, the organization has donated over $30 million to PAUSD schools. In 2017, PiE donated a total of $5.8 million dollars to PAUSD.

PiE asks Palo Alto families to give $1,000 per child enrolled in PAUSD, which is lower than many surrounding communities such as Woodside, where parents are asked to give $4,800 per child.

School principals control how PiE funds are spent, using guidance from district leadership and in response to their specific student needs. PiE funds can only be used to pay for salaries, not for materials or supplies. In 2013-14 school year, PiE funded salaries for 250 full and part time instructors, teachers and counselors in PAUSD schools.

In PAUSD elementary schools, PiE funds classroom aides, along with art, science and music programs. In middle schools, PiE pays for elective teachers, counselors and classroom specialists, and in high school, PiE supports college counseling, STEM-based electives and other school-based programs to engage students and support their academic growth.

**What's the deal with Cubberley?**

As seen in the chart above, lease revenue generates 6% of PAUSD's operating budget. Of this, $7 million has been coming from the fee the City of Palo Alto pays PAUSD to lease Cubberley for recreation facilities and space for numerous city programs and nonprofits. With the new Cubberly agreement that was framed in November 2014, PAUSD will lose almost $2 million a year in these fees. There is no immediate new income stream to replace this revenue loss. The City of Palo Alto is currently working with Palo Alto Unified on a new vision and plan for how to use the Cubberley building complex.

**Why aren't bond funds included in the chart?**

Bond funding is a separate income stream for facilities only. In 2008, 77% of voters passed the Strong Schools Bond, a $378 million bond to upgrade and build facilities for Palo Alto's aging schools and growing student population. The Strong Schools Bond has funded many major facility projects at our Palo Alto schools, including the new buildings at Gunn and Paly high schools. Measure Z, which would raise new funding for school facilities in Palo Alto, is on the November 2018 ballot.

Bond measures require a simple majority (55%) to pass and are repaid through property taxes. Bond funds are not included in the revenue chart because they cannot be used for operational costs, except for purchasing technology.

If PAUSD were to open additional schools, a new bond could be necessary to pay for the construction and rebuilding costs.

**Where does the money go?**

Like most organizations, PAUSD's biggest expense is its people. The majority of the district's budget is spent on salaries and benefits for teachers, administrators and support staff.



PAUSD has won the Meritorious Budget Award from the Association of School Business Officials International (ASBO) and has a conservative approach to spending its revenue.

Palo Alto maintains large reserve, part of which is required by the basic aid reserve policy. Much of the revenue that Palo Alto Unified brings in each year is allocated by law and contract to specific expenses and only a tiny portion of the $220 million budet is currently 'unrestricted,' which means it has flexibility to address the changing needs of PAUSD students. This is why the almost $6 million raised by PiE is so valuable for Palo Alto school principals.

**What's the bottom line?**

**Palo Alto's excellent public schools rely almost entirely on local funds**. Funding from the state is minimal for Palo Alto and federal funding is even lower. While Palo Alto's property taxes revenues have been on the rise in recent years, so are expenses for PAUSD, particularly salaries and benefits. Governor Brown is also shifting responsibilities for unfunded pensions to local districts and Palo Alto will be required to foot a lion's share of this bill.

We are extremely fortunate in Palo Alto to have a strong property tax base, supportive families and a community that values public schools. However local funding, including the parcel tax, PiE and bond funds are more important then ever for ensuring a strong future for Palo Alto public schools.

**Resources:**

*Palo Alto Unified audit report, June 2017*, Chavand & Associates, LLP.

*For more information on how money works, check out the Palo Alto Pulse overview of city finances: Where does the money come from and where does it go in Palo Alto?*

Sign up here to follow Palo Alto Pulse and stay tuned about all things Palo Alto

**Share this post!**

Share 0      Post      Share        Email    Print

**Like this:**

Loading...

**Related**

Editorial: 10 Reasons why Palo Alto should vote "Yes" on Measure A
April 8, 2015
In "Editorials"

Pulse Asks: Why Does the Cubberley Lease Matter for PAUSD and Palo Alto?
November 12, 2014
In "Palo Alto 101"

Palo Alto Election 2016: Who's Running and Why it Matters
September 14, 2016
In "Election 2016"

#basic aid   #budget   #Cubberley   #enrollment   #how does school funding work in Palo Alto?   #Palo Alto   #parcel tax   #PAUSD   #pensions   #PiE   #revenue   #school funding   #Strong Schools Bond

## About the author

### Victoria Thorp

Victoria is the founder and editor of Palo Alto Pulse and has lived in Palo Alto since 2007. Victoria's diverse professional background includes working as the editor of GreatSchools.org , as a senior writer for KIPP and Teach for America, and as a radio producer for City Visions on KALW (91.7FM San Francisco). She is a graduate of Leadership Palo Alto and a member of the Palo Alto Partners in Education Advisory Board.

She has a BA in English from Tufts University and Masters in Education and Secondary Teaching Credential in English from UCLA.

View all posts

## You may also like


Meet the Turkish soccer star
behind Palo Alto's Tuts Cafe
May 10, 2018


What happens to donated clothes
will surprise you- this local
company offers a...
June 5, 2015


5 unique Palo Alto summer
camps that offer something for
everyone
June 14, 2016


Beam store gives a glimpse into a
robotic future
March 2, 2015

## 2 Comments


**Peter T**

October 17, 2014 at 3:11 pm

A fascinating and most informative article…


**M. Grooms**

May 27, 2015 at 8:56 am

This is the clearest article I've found detailing how PA schools are funded. Thanks! I've used it
several times to answer or clarify questions from others.

## Love Palo Alto Pulse?

### Subscribe - It's Free!

Be the first to get the latest stories delivered
right into your inbox - hot off the press!

Enter your first name

Enter your email address

Subscribe

## Follow Palo Alto Pulse

---

## Find Us on Facebook





---

## Follow Us on Twitter

My Tweets

---

## More Stories By



View all posts

---

## Organizations We Love








## Featured Video



Ravenswood Middle Scho...

Watch how Access Books Bay Area transformed the library at Ravenswood Middle School in east Menlo Park with a team of volunteers in just one day!

## Cool Stuff Happening in Palo Alto

## View by Category

Arts

Book reviews

Community Connections

Election 2014

Election 2016

Cool Businesses

Editorials

Innovation

Palo Alto 101

Palo Alto Now and Then

Profiles

Schools and Youth

Uncategorized

## Recent Stories



Greeting card company Pyarful is 'naan stoppable'

January 17, 2019



Access Books Bay Area brings library joy to children in need

December 10, 2018



Salt & Straw offers a new twist on ice cream

November 25, 2018



Aroma Health Co teaches the power of essential oils for health

November 16, 2018



PAUSD alum Shounak Dharap offers a fresh perspective for School Board

October 23, 2018

## Love Palo Alto Pulse?

### Subscribe - It's Free!

Be the first to get the latest stories delivered right into your inbox - hot off the press!

Enter your first name

Enter your email address

Subscribe

## Don't Miss a Beat. Follow Us

Featured Videos

The 3 Percent Confere

See how Kat Gordon's 3% Conference is changing the conversation about women leadership in advertising

About Us

Our Contributors

Suggest a Story

Copyright © 2015 PaloAltoPulse.com. All Rights Reserved. Design by Aisha.

Comment Policy    Sign Up for Pulse!    Contact Us

# EXHIBIT CC



| | |
|---|---|
| Book | PAUSD Policies & Regulations |
| Section | 9000 - Bylaws of the Board |
| Title | Legal Protection |
| Code | 9260 BB |
| Status | Active |
| Adopted | January 12, 2010 |

**Liability Insurance**

The Board of Education shall provide insurance necessary to protect Board members and employees while acting within the scope of their office or employment in accordance with Education Code 35208.
*(cf. 3530 - Risk Management/Insurance)*

**Protection Against Liability**

No Board member shall be liable for harm caused by his/her act or omission when acting within the scope of district responsibilities. The act or omission must be in conformity with federal, state and local laws and made in furtherance of an effort to control, discipline, expel or suspend a student, or maintain order or control in the classroom or school. (20 USC 6736)

The protection against liability shall not apply when: (20 USC 6736)

1. The Board member acted with willful or criminal misconduct, gross negligence, recklessness, or a conscious, flagrant indifference to the harmed person's right to safety.
2. The Board member caused harm by operating a motor vehicle.
3. The Board member was not properly licensed, if required, by the State for such activities.
4. The Board member was found by a court to have violated a federal or state civil rights law.
5. The Board member was under the influence of alcohol or any drug at the time of the misconduct.
6. The misconduct constituted a crime of violence pursuant to 18 USC 16 or an act of terrorism for which the Board member has been convicted in a court.
7. The misconduct involved a sexual offense for which the Board member has been convicted in a court.

Legal Reference:

EDUCATION CODE
*17029.5 Contract funding; board liability*
*35208 Liability insurance*
*35214 Liability insurance (self-insurance or a combination of self-insurance and insurance through an insurance company)*

GOVERNMENT CODE
*815.3 Intentional torts*
*820-823 Tort Claims Act*
*825.6 Indemnification of public entity*
*1090-1098 Conflicts of interest, prohibitions applicable to specified officers*
*54950-54963 The Ralph M. Brown Act*
*87100-89503 Conflicts of interest*

UNITED STATES CODE, TITLE 18
16 Crime of violence defined

UNITED STATES CODE, TITLE 20
6731-6738 Teacher Protection Act

COURT DECISIONS
Caldwell v. Montoya (Paramount Unified School District) 10 Cal 4th 972 (1995)

# EXHIBIT DD

FOOTHILL MIDDLE SCHOOL
Report Card -- Fourth Quarter 2002-03
Jun 13, 2003

T        , N                                                    Page:  1

                                            Grade: 7
Walnut Creek  CA94598                       002168278

Current Quarter: 2.429
Cumulative GPA: 3.071

| Course | Per | 1st Qtr | 2nd Qtr | 3rd Qtr | 4th Qtr |
|---|---|---|---|---|---|
| Computers | 1 | B | B | | |
| Teacher Aide | 1 | | | A | C |
| Science 7 | 2 | A | B | B | C |
| English 7 | 3 | B | B | A | B |
| Social Studies 7 | 4 | B | B | B | C |
| Drama | 5 | A | B | | |
| DramaI Stage Craft | 5 | | | B | B |
| Spanish IA | 6 | A | B | B | C |
| Math 7 | 7 | A | B | B | B |

| Course | Teacher | Attmpt Credit |
|---|---|---|
| Computers | C Hoshaw | 5.000 |
| Teacher Aide | | 10.000 |
| Science 7 | G Corpuz | 10.000 |
| English 7 | E Wegenka | 10.000 |
| Social Studies 7 | E Wegenka | 10.000 |
| Drama | E Spanos | 5.000 |
| DramaI Stage Craft | E Spanos | 5.000 |
| Spanish IA | C Sparks | 10.000 |
| Math 7 | T Campora | 10.000 |

| Course | Comments |
|---|---|
| Science 7 | Work incomplete or missing |

STATE LAW REQUIRES THAT MMR #2 AND HEPATITIS B SERIES BE STARTED BEFORE
7TH GRADE. AUGUST ORIENTATION 25TH/26TH. 1ST DAY OF SCHOOL: SEPT. 3RD



MT. DIABLO UNIFIED SCHOOL DISTRICT
JAMES W. DENT EDUCATION CENTER
1936 Carlotta Drive
Concord, California 94519-1358
(925) 682-8000

OFFICE OF
STUDENT SERVICES
DIRECTOR

## DECLARATION OF CUSTODIAN OF RECORDS

I, Fred Maunahan, declare as follows:

1.  I am a duly authorized Custodian of Records, Student Services, for the Mt. Diablo Unified School District and have authority to certify records.

2.  The district's business address and phone number are:
    1936 Carlotta Drive
    Concord, CA 94519-1397
    925-682-8000 ext. 4049

3.  The copies enclosed are true copies of records.

4.  The records requested are records for N    T           D.O.B. 03/02/1990.

5.  The records being produced are copies of school records.

6.  The copies of records enclosed with this declaration were prepared by personnel of the above-referenced business department in the ordinary course of business.

7.  The original records were prepared by copying documents from digital scanned documents.

8.  I certify that the above mentioned student attended school with Mt. Diablo Unified School District.

MT. DIABLO UNIFIED SCHOOL DISTRICT
STUDENT RECORDS
1936 CARLOTTA DRIVE
CONCORD, CA 94519-1397
5/16/2024

Fred Maunahan
Student Records Technician
Custodian of Records, Student Services
Mt. Diablo Unified School District

# EXHIBIT EE



# Performance points ⓘ

Season  2000-2001 ⇕

## USA

| POINT SYSTEM | AGE GROUP | SCORE |
|---|---|---|
| FINA | Open | 343.75 |

| Event | Meet | Base Time | Time | Points |
|---|---|---|---|---|
| 400 L Free | 2001 PC LAMV LCM B/A+ 2 | 4:03.13 | 5:45.88 | 347 |
| 100 L Free | 2001 PC DACA LCM BA+ LONG CRS | 53.44 | 1:16.33 | 343 |
| 200 L Back | 2001 PC DACA LCM LONG A+ | 2:06.95 | 3:01.89 | 340 |
| 200 Y Free | 2000 PC SUNN SCY AGE GRP | 1:43.28 | 2:28.66 | 335 |

## DeAnza Cupertino Aquatics

| POINT SYSTEM | AGE GROUP | SCORE |
|---|---|---|
| NAG | 9 - 10 | 501.50 |

| Event | Meet | Base Time | Time | Points |
|---|---|---|---|---|
| 100 Y Free | 2001 PC SOLO SCY Z1N CBA | 54.89 | 1:08.66 | 511 |
| 200 Y Free | 2000 PC SUNN SCY AGE GRP | 1:58.20 | 2:28.66 | 503 |
| 500 Y Free | 2000 PC SUNN SCY AGE GRP | 5:13.45 | 6:38.10 | 488 |
| 200 Y IM | 2001 PC SOLO SCY Z1N CBA | 2:11.99 | 2:51.77 | 454 |

## DeAnza Cupertino Aquatics

| POINT SYSTEM | AGE GROUP | SCORE |
|---|---|---|
| **NAG** | **11 - 12** | **413.95** |

| Event | Meet | Base Time | Time | Points |
|---|---|---|---|---|
| 400 L Free | 2001 PC LAMV LCM B/A+ 2 | 4:18.41 | 5:45.88 | 417 |
| 100 L Free | 2001 PC DACA LCM BA+ LONG CRS | 56.87 | 1:16.33 | 414 |
| 200 L Back | 2001 PC DACA LCM LONG A+ | 2:15.17 | 3:01.89 | 410 |
| 50 L Free | 2001 PC DACA LCM BA+ LONG CRS | 26.21 | 35.55 | 401 |

## DeAnza Cupertino Aquatics

| POINT SYSTEM | AGE GROUP | SCORE |
|---|---|---|
| **FINA** | **Open** | 343.75 |

| Event | Meet | Base Time | Time | Points |
|---|---|---|---|---|
| 400 L Free | 2001 PC LAMV LCM B/A+ 2 | 4:03.13 | 5:45.88 | 347 |
| 100 L Free | 2001 PC DACA LCM BA+ LONG CRS | 53.44 | 1:16.33 | 343 |
| 200 L Back | 2001 PC DACA LCM LONG A+ | 2:06.95 | 3:01.89 | 340 |
| 200 Y Free | 2000 PC SUNN SCY AGE GRP | 1:43.28 | 2:28.66 | 335 |



# Performance points ⓘ



## USA

| POINT SYSTEM | AGE GROUP | SCORE |
|---|---|---|
| **FINA** | **Open** | **441.65** |

| Event | Meet | Base Time | Time | Points |
|---|---|---|---|---|
| 400 L Free | 2002 PC OAPB LCM Age Group Championships | 4:03.13 | 5:17.68 | 448 |
| 200 L Free | 2002 PC OAPB LCM Age Group Championships | 1:55.73 | 2:31.37 | 447 |
| 100 L Free | 2002 PC OAPB LCM Age Group Championships | 53.44 | 1:11.26 | 422 |
| 50 L Free | 2002 PC OAPB LCM Age Group Championships | 24.21 | 32.67 | 407 |

## Terrapins Swim Team

| POINT SYSTEM | AGE GROUP | SCORE |
|---|---|---|
| **FINA** | **Open** | **441.65** |

| Event | Meet | Base Time | Time | Points |
|---|---|---|---|---|
| 400 L Free | 2002 PC OAPB LCM Age Group Championships | 4:03.13 | 5:17.68 | 448 |
| 200 L Free | 2002 PC OAPB LCM Age Group Championships | 1:55.73 | 2:31.37 | 447 |
| 100 L Free | 2002 PC OAPB LCM Age Group Championships | 53.44 | 1:11.26 | 422 |
| 50 L Free | 2002 PC OAPB LCM Age Group Championships | 24.21 | 32.67 | 407 |

Terrapins Swim Team

| POINT SYSTEM | AGE GROUP | SCORE |
|---|---|---|
| **NAG** | **11 - 12** | **528.40** |

| Event | Meet | Base Time | Time | Points |
|---|---|---|---|---|
| 400 L Free | 2002 PC OAPB LCM Age Group Championships | 4:18.41 | 5:17.68 | 538 |
| 200 L Free | 2002 PC OAPB LCM Age Group Championships | 2:02.21 | 2:31.37 | 526 |
| 50 L Free | 2002 PC OAPB LCM Age Group Championships | 26.21 | 32.67 | 516 |
| 100 L Free | 2002 PC OAPB LCM Age Group Championships | 56.87 | 1:11.26 | 508 |

## DeAnza Cupertino Aquatics

| POINT SYSTEM | AGE GROUP | SCORE |
|---|---|---|
| **FINA** | **Open** | **380.20** |

| Event | Meet | Base Time | Time | Points |
|---|---|---|---|---|
| 200 Y Free | 2001 PC PSL SCY A | 1:43.28 | 2:21.72 | 387 |
| 500 Y Free | 2001 PC DCD SCY B/A+ | 4:34.39 | 6:17.43 | 384 |
| 200 Y IM | 2001 PC PSL SCY A | 1:55.54 | 2:42.30 | 361 |
| 100 Y Free | 2001 PC DCD SCY B/A+ | 47.61 | 1:07.38 | 353 |

## DeAnza Cupertino Aquatics

| POINT SYSTEM | AGE GROUP | SCORE |
|---|---|---|
| **NAG** | **11 - 12** | **442.30** |

| Event | Meet | Base Time | Time | Points |
|---|---|---|---|---|
| 500 Y Free | 2001 PC DCD SCY B/A+ | 4:49.32 | 6:17.43 | 450 |
| 200 Y Free | 2001 PC PSL SCY A | 1:47.71 | 2:21.72 | 439 |

EXHIBIT EE_005

| 200 Y IM | 2001 PC PSL SCY A | | 2:03.23 | 2:42.30 | 438 |
| 50 Y Free | 2001 PC DCD SCY B/A+ | | 23.15 | 30.92 | 420 |



# Performance points ⓘ

Season 2002-2003 ⬍

## USA

| POINT SYSTEM | AGE GROUP | SCORE |
|---|---|---|
| FINA | Open | 440.65 |

| Event | Meet | Base Time | Time | Points |
|---|---|---|---|---|
| 100 L Free | 2003 PC TIGR Tiger Aquatics B/A+ | 53.44 | 1:09.99 | 445 |
| 500 Y Free | PC SOVA SCY Age Championship | 4:34.39 | 5:59.88 | 443 |
| 200 Y Free | PC SOVA SCY Age Championship | 1:43.28 | 2:16.68 | 431 |
| 50 L Free | 2003 PC TIGR Tiger Aquatics B/A+ | 24.21 | 32.43 | 416 |

## Terrapins Swim Team

| POINT SYSTEM | AGE GROUP | SCORE |
|---|---|---|
| FINA | Open | 440.65 |

| Event | Meet | Base Time | Time | Points |
|---|---|---|---|---|
| 100 L Free | 2003 PC TIGR Tiger Aquatics B/A+ | 53.44 | 1:09.99 | 445 |
| 500 Y Free | PC SOVA SCY Age Championship | 4:34.39 | 5:59.88 | 443 |
| 200 Y Free | PC SOVA SCY Age Championship | 1:43.28 | 2:16.68 | 431 |
| 50 L Free | 2003 PC TIGR Tiger Aquatics B/A+ | 24.21 | 32.43 | 416 |

Terrapins Swim Team

| POINT SYSTEM | AGE GROUP | SCORE |
|---|---|---|
| **NAG** | **11 - 12** | **500.90** |

| Event | Meet | Base Time | Time | Points |
|---|---|---|---|---|
| 500 Y Free | PC SOVA SCY Age Championship | 4:49.32 | 5:59.88 | 520 |
| 200 Y Free | PC SOVA SCY Age Championship | 1:47.71 | 2:16.68 | 489 |
| 200 Y IM | 2002 PC Short Course Closed Fall Champ | 2:03.23 | 2:36.66 | 487 |
| 50 Y Free | PC SOVA SCY Age Championship | 23.15 | 29.47 | 485 |

## Terrapins Swim Team

| POINT SYSTEM | AGE GROUP | SCORE |
|---|---|---|
| **NAG** | **13 - 14** | **457.15** |

| Event | Meet | Base Time | Time | Points |
|---|---|---|---|---|
| 50 L Free | 2003 PC TIGR Tiger Aquatics B/A+ | 25.23 | 32.43 | 471 |
| 100 L Free | 2003 PC TIGR Tiger Aquatics B/A+ | 54.03 | 1:09.99 | 460 |
| 200 L Free | 2023 PC Zone 2 Long Course Meet | 1:58.23 | 2:37.29 | 425 |
| 200 L Back | 2003 PC TIGR Tiger Aquatics B/A+ | 2:09.16 | 2:52.48 | 420 |



# Performance points ⓘ

Season  2003-2004 ▲▼


## Terrapins Swim Team

| POINT SYSTEM | AGE GROUP | SCORE |
|---|---|---|
| FINA | Open | 374.55 |

| Event | Meet | Base Time | Time | Points |
|---|---|---|---|---|
| 200 Y Free | 2004 PC OAPB SCY JR+ | 1:42.65 | 2:21.15 | 385 |
| 50 Y Free | 2004 PC OAPB SCY JR+ | 21.69 | 30.05 | 376 |
| 200 Y Back | 2004 PC OAPB SCY JR+ | 1:49.52 | 2:34.81 | 354 |
| 200 Y IM | 2004 PC OAPB SCY JR+ | 1:53.91 | 2:43.08 | 341 |

## Terrapins Swim Team

| POINT SYSTEM | AGE GROUP | SCORE |
|---|---|---|
| NAG | 13 - 14 | 388.65 |

| Event | Meet | Base Time | Time | Points |
|---|---|---|---|---|
| 200 Y Free | 2004 PC OAPB SCY JR+ | 1:44.10 | 2:21.15 | 401 |
| 50 Y Free | 2004 PC OAPB SCY JR+ | 21.89 | 30.05 | 387 |
| 200 Y Back | 2004 PC OAPB SCY JR+ | 1:51.07 | 2:34.81 | 369 |
| 200 Y IM | 2004 PC OAPB SCY JR+ | 1:56.20 | 2:43.08 | 362 |

## USA

| POINT SYSTEM | AGE GROUP | SCORE |
| --- | --- | --- |
| **FINA** | **Open** | **374.55** |

| Event | Meet | Base Time | Time | Points |
| --- | --- | --- | --- | --- |
| 200 Y Free | 2004 PC OAPB SCY JR+ | 1:42.65 | 2:21.15 | 385 |
| 50 Y Free | 2004 PC OAPB SCY JR+ | 21.69 | 30.05 | 376 |
| 200 Y Back | 2004 PC OAPB SCY JR+ | 1:49.52 | 2:34.81 | 354 |
| 200 Y IM | 2004 PC OAPB SCY JR+ | 1:53.91 | 2:43.08 | 341 |

# EXHIBIT FF



THE LAW OFFICE OF
# EVAN C. NELSON

1990 North California Blvd., Floor 8
WALNUT CREEK, CA 94596
(925) 323-1991

June 14, 2024

<u>**VIA EMAIL ONLY**</u>

Eugene Elliott, Esq.
Ethan Lowry, Esq.
Benjamin I. Oreper
Bertrand Fox Elliot Osman & Wenzel
The Waterfront Building
2749 Hyde Street
San Francisco, CA 94109
eelliott@bfesf.com; elowry@bfesf.com; boreper@bfesf.com;
lroberts@bfesf.com; sguerrero@bfesf.com

RE:    *Colombo v. PAUSD, et al.* Northern District of California Case No. 24-CV-00909-NC
        Competing Cross Motions
        Our Client:  Peter Colombo

Dear Counsel,

Suffice it to say at the outset of this communication that we disagree with your characterizations contained in your email of last night.

<u>**Withdrawal of Defendants' Motion to Dismiss that Violates Rule 11**</u>

As a preliminary matter, we should be discussing withdrawal of your motion to dismiss and answering of the complaint in short order. Rule 11 sanctions should be of concern to you, as your motion appears to intentionally omit current law and otherwise makes no attempt to address the current three factor test for an "arm of the state" analysis in the Ninth Circuit. As the proponent of the sovereign immunity defense, it is your burden to plead and prove entitlement to the defense and your motion to dismiss, which relies heavily on sovereign immunity, fails to properly address the "arm of the state" factors that would give rise to the defense in this case. Accordingly, your motion should be immediately withdrawn, even if failure to cite clear authority from the *en banc* decision in *Kohn* was an oversight, which is difficult to imagine in light of the army of attorneys at your client's disposal and the fact that the decision is cited in the Ninth Circuit Model Jury Instructions relating to sovereign immunity for actions brought pursuant to 42 U.S.C. § 1983.

To avoid the resulting immediate default situation that withdrawal of your motion to dismiss would create, Plaintiff will stipulate to provide you a proposed amended complaint with the previously agreed upon changes to avoid your needing to answer claims and paragraphs that will be deleted. However, Defendant would need to agree to immediate withdrawal of the offending motion to dismiss and to file an answer to the amended complaint within 10 days without further preliminary motions or delays.

**Plaintiff's Competing Cross Motion for Summary Judgment**

*Meet and Confer Supporting both of the two, competing cross motions*

We most certainly did meet and confer about the substance of our motion for summary judgment. In fact, you claim in your motion to dismiss that we met and conferred over these very issues and you argue that Plaintiff cannot even allege the claims that are established with evidence in his motion for summary judgment, which evidence will be referenced and/or included as part of our opposition to your motion to dismiss (pending potential withdrawal of your motion), since these two motions are competing cross motions.

*Defendants' Control of Ms. Miller and Access to Her Findings*

Your lengthy email fails to provide what testimony you anticipate Ms. Miller will offer that will assist you in opposing our motion for summary judgment. It is our expectation that as an independent investigator, she is likely to testify truthfully and consistent with what is reflected in the notes taken during the investigation interview of our client on January 25, 2024. Your client has had complete access to Ms. Miller and her findings since January 25, 2024 and you have had access to her findings (and a report or declaration of her findings) through your client from the moment that you were retained in February of 2024.

Fundamentally, the only reason that no report exists from Ms. Miller is because your client either instructed her to not complete a report or has otherwise concealed her report. Ms. Miller was ready on January 25, 2024 to complete her investigation and to draft a report of her findings. The only reason we do not have her findings in any writing other than extensive notes taken during the interview (not an unofficial transcript as you call it in your email), is because your client also chose to eschew the board policies and related due process entitling our client to a final report of the investigation, inclusive of Ms. Miller's findings, all evidence provided to and reviewed by her, conclusions based thereon, etc. (See Exhibit L to Plaintiff's Motion for Summary Judgment.) And the only reason we don't have an audio or video recording or an official transcript of the January 25, 2024 interview, which would include the investigator's statement of findings during that interview, is because your client refused to allow such. (Although it is questionable whether your client had authority to refuse Mr. Colombo's requests in this regard, he did not feel that he could fight for his rights, since it appeared your client was, and still is, looking to manufacture "cause" to try and terminate him from his tenured teaching position.) What we do have are extensive notes from the interview (Exhibit G to Plaintiff's Motion for Summary Judgment), that we provided to you in advance of the second of two

June 14, 2024
*Colombo v. PAUSD, et al.*
Letter Re Competing Cross Motions

Page 3 of 3

mediation sessions that were specifically requested by your client as an apparent ruse to increase delays and the expense of litigation in this matter.

You and your client then interfered with our attempt to obtain Ms. Miller's deposition early. Ms. Miller agreed to accept our subpoena by email and was working with us on deposition dates until you and/or your client told her to no longer communicate with us for deposition scheduling purposes. We notified you ten days in advance of the June 3, 2024 scheduled deposition date and expressly asked for you to inform us as soon as possible if you had a problem with the date. You waited until a few days before the scheduled June 3, 2024 deposition date to claim you had a conflict, and provided alternative dates without clearing them first with the witness (whom you had instructed to no longer communicate with us) and asserted that you might decide to represent the witness. Not to put too fine of a point on it, but you actually suggested that you were considering representing the independent investigator. You then asked to appear by telephone and stated you anticipated assertion of attorney client and attorney work product privileges - intimating that you would telephone in and suspend the deposition or obstruct it after we traveled to appear in person, again actions that would result in increasing costs and delays. In short, your and your client's gamesmanship is what has prevented completion of Ms. Miller's deposition, just as it is responsible for not having her findings available in a proper report or in a recorded proceeding. And there is nothing that has precluded you and/or your client from obtaining a report or even a declaration from her at any time between January 25, 2024 and present.

*Ancillary Matters Re Ms. Miller's Deposition*

Are you seriously claiming that the interview of our client on January 25, 2024 was initiated and taken in anticipation of litigation, not as part of the open ended investigation that your client began with Ms. Hickey's letter in May of 2023?

Your client should be able to provide you the 2017 audit of their Title IX procedures, the OCR probationary oversight that ensued, the modified MOU with the Palo Alto Police Department, etc. They are also accessible through publicly available sources.

I will check with my client about which of the offered dates will work for Ms. Miller's deposition. In the interim, we suggest you obtain Ms. Miller's report of her findings and/or a declaration for use in attempting to oppose the summary judgment motion, so that we can determine whether her deposition warrants a continuation of the summary judgment motion. We presume she will truthfully confirm her findings as stated during the January 25, 2024 interview, which will only serve to supplement the evidence already submitted.

Sincerely,

Evan C. Nelson

# EXHIBIT GG

**CITY OF PALO ALTO CONTRACT NO. _____**

**AGREEMENT BETWEEN THE CITY OF PALO ALTO AND THE PALO ALTO UNIFIED SCHOOL DISTRICT**

**FOR PROFESSIONAL SERVICES**

This Agreement is entered into on this_____day of April 2018 ("Agreement") by and between the CITY OF PALO ALTO, a California chartered municipal corporation ("CITY"), and the Palo Alto Unified School District, a unified school district, located at 25 Churchill Avenue, Palo Alto, CA 94306-1099 ("PAUSD").

**RECITALS**

The following recitals are a substantive portion of this Agreement:

A.      PAUSD intends to provide increased safety at its public schools by utilizing two Palo Alto Police Department School Resource Officers for its Project ("Safety Enhancement Project") and desires to engage the City to provide two such officers in connection with the Project ("Services").

B.      CITY and PALO ALTO POLICE DEPARTMENT ("PAPD") represent that its School Resource Officers have the necessary professional expertise, qualifications, and capability, and all required licenses and/or certifications to provide the Services.

C.      PAUSD in reliance on these representations desires to engage CITY to provide the Services as more fully described in Exhibits "A" and "B", attached to and made a part of this Agreement.

NOW, THEREFORE, in consideration of the recitals, covenants, terms, and conditions, in this Agreement, the parties agree:

**AGREEMENT**

**SECTION 1. SCOPE OF SERVICES.** CITY shall perform the Services described in Exhibits "A" and "B" in accordance with the terms and conditions contained in this Agreement. The performance of all Services shall be to the reasonable satisfaction of both parties.

**SECTION 2. TERM.** The term of this Agreement shall be from the date of its full execution through June 30, 2020, with the option to extend for up to 1 year until June 30, 2021, unless terminated earlier pursuant to Section 15 of this Agreement.

**SECTION 3. SCHEDULE OF PERFORMANCE.** Time is of the essence in the performance of Services under this Agreement. Any Services for which times for performance are not specified in this Agreement shall be commenced and completed by CITY in a reasonably prompt and timely manner based upon the circumstances and direction communicated to the CITY.

**SECTION 4. NOT TO EXCEED COMPENSATION.** The compensation to be paid to CITY for performance of the Services described in Exhibit "A", including both payment for professional services and reimbursable expenses, shall not exceed the cost of half of two officers, equivalent to one FTE as follows:

July 1, 2018 – June 30, 2019 (FY 19) – 50% of two officers / amount shall not exceed $200,000

July 1, 2019 – June 30, 2020 (FY 20) – 50% of two officers / amount shall not exceed $250,000

July 1, 2020 – June 30, 2021 (FY 21) – 50% of two officers /amount shall not exceed $275,000

CITY shall not receive any compensation for Additional Services performed without the prior written authorization of PAUSD. Additional Services shall mean any work that is determined by CITY to be necessary for the proper completion of the Project, but which is not included within the Scope of Services described in Exhibits"A" and "B".

**SECTION 5. INVOICES.** In order to request payment, CITY shall submit by invoices to the PAUSD describing the services performed and the applicable charges (including an identification of personnel who performed the services, hourly rates, and reimbursable expenses) by June 1 of the relevant year. If applicable, the invoice shall also describe the percentage of completion of each task. The information in CITY'S payment requests shall be subject to verification by PAUSD. CITY shall send all invoices to the PAUSD address specified in Section 16 below. PAUSD will process and pay invoices within thirty (30) days of receipt.

**SECTION 6. QUALIFICATIONS/STANDARD OF CARE.** All of the Services shall be performed by CITY or under CITY's supervision. CITY represents that it possesses the professional and technical personnel necessary to perform the Services required by this Agreement and that the personnel have sufficient skill and experience to perform the Services assigned to them. CITY represents that it, its employees and sub consultants, if permitted, have and shall maintain during the term of this Agreement all licenses, permits, qualifications, insurance and approvals of whatever nature that are legally required to perform the Services.

All of the services to be furnished by CITY under this agreement shall meet the professional standard and quality that prevail among professionals in the same discipline and of similar knowledge and skill engaged in related work throughout California under the same or similar circumstances.

CITY shall retain control over supervision, wages, and other terms and conditions of employment of the officers providing the Services under this Agreement. The parties acknowledge that such officers are held to the requirements of the law and CITY policies and procedures. PAUSD agrees that it shall not have authority to direct the officers' law enforcement activity. PAUSD shall assist CITY with evaluation of the officers, however, the CITY shall have the responsibility to evaluate, manage, and supervise the officers. PAUSD will immediately notify CITY of any concerns regarding such activity.

006247.00028
17708061.1

EXHIBIT GG_003

**SECTION 7. COMPLIANCE WITH LAWS.** CITY shall keep itself informed of and in compliance with all federal, state and local laws, ordinances, regulations, and orders that may affect in any manner the Project or the performance of the Services or those engaged to perform Services under this Agreement. CITY shall procure all permits and licenses, pay all charges and fees, and give all notices required by law in the performance of the Services.

**SECTION 8. INDEPENDENT CONTRACTOR.** It is understood and agreed that in performing the Services under this Agreement CITY, and any person employed by or contracted with CITY to furnish labor and/or materials under this Agreement, shall act as and be an independent contractor and not an agent or employee of the PAUSD.

**SECTION 9. ASSIGNMENT.** The parties agree that the expertise and experience of CITY are material considerations for this Agreement. CITY shall not assign or transfer any interest in this Agreement nor the performance of any of CITY's obligations hereunder without the prior written consent of the city manager. Consent to one assignment will not be deemed consent to any subsequent assignment. Any assignment made without the approval of the city manager will be void.

**SECTION 10. SUBCONTRACTING.**

**No Subcontractor:** CITY shall not subcontract any portion of the work to be performed under this Agreement without the prior written authorization of the city manager or designee.

**SECTION 11. PROJECT MANAGEMENT.** CITY will assign the Police Department Investigative Services Division Commander as the Project Manager to have managerial responsibility for the performance, progress, and execution of the Services and as the project liaison to represent CITY. If circumstances cause the substitution of the project manager, project coordinator, or any other key personnel for any reason, the appointment of a substitute project director and the assignment of any key new or replacement personnel will be subject to the prior written approval of the PAUSD's project manager. CITY shall review any request made by PAUSD to remove CITY personnel who PAUSD finds do not perform the Services in an acceptable manner, are uncooperative, or present a threat to the adequate or timely completion of the Project or a threat to the safety of persons or property. The day-to-day supervision of the services will be handled by the Investigative Services Division Supervisor as assigned by the Project Manager.

The PAUSD's Project Manager is Karen Hendricks, Deputy Superintendent, Palo Alto Unified School District, Palo Alto, CA 94306. PAUSD's project manager will be CITY's point of contact with respect to performance, progress and execution of the Services. PAUSD may designate an alternate project manager from time to time.

**SECTION 12. INDEMNITY.**

12.1.    The CITY shall protect, indemnify, defend, and hold harmless the PAUSD, its employees, agents, and Board members from and against any demands, claims, liability, or expense on account of suits, verdicts, judgments, costs or claims of any nature or kind arising out of, or in any way connected with, the CITY'S performance or nonperformance under this Agreement, including the CITY'S operations on, use, management, alteration or control of

3

EXHIBIT GG_004

the PAUSD's property under this Agreement except for any claims or liability, or portions thereof, arising from the concurrent or sole negligence or intentional malfeasance of the PAUSD, its directors, officers, employees or agents.

12.2.   PAUSD shall protect, indemnify, defend, and hold harmless the CITY, its employees, agents, and elected officials from and against any demands, claims, liability, or expense on account of suits, verdicts, judgments, costs or claims of any nature or kind arising out of, or in any way connected with, the PAUSD's performance or nonperformance under this Agreement, including the PAUSD's operations on, use, management, alteration or control of the PAUSD's property under this Agreement except for any claims or liability, or portions thereof, arising from the concurrent or sole negligence or intentional malfeasance of the CITY, its directors, officers, employees or agents.

**SECTION 13. WAIVERS.** The waiver by either party of any breach or violation of any covenant, term, condition or provision of this Agreement, or of the provisions of any ordinance or law, will not be deemed to be a waiver of any other term, covenant, condition, provisions, ordinance or law, or of any subsequent breach or violation of the same or of any other term, covenant, condition, provision, ordinance or law.

**SECTION 14. INSURANCE.**

14.1.   PAUSD, at its sole cost and expense, shall obtain and maintain, in full force and effect during the term of this Agreement, the insurance coverage described in Exhibit "C". PAUSD and its contractors, if any, shall obtain a policy endorsement naming CITY as an additional insured under any general liability policy or policies.

14.2.   All insurance coverage required hereunder shall be provided through carriers with AM Best's Key Rating Guide ratings of A-: VII or higher which are licensed or authorized to transact insurance business in the State of California. All contractors of CITY retained to perform Services under this Agreement will obtain and maintain, in full force and effect during the term of this Agreement, identical insurance coverage, naming CITY as an additional insured under such policies as required above.

14.3.   Certificates evidencing such insurance shall be filed with CITY concurrently with the execution of this Agreement. The certificates will be subject to the approval of CITY's Risk Manager and will contain an endorsement stating that the insurance is primary coverage and will not be canceled, or materially reduced in coverage or limits, by the insurer except after filing with the Purchasing Manager thirty (30) days' prior written notice of the cancellation or modification. If the insurer cancels or modifies the insurance and provides less than thirty (30) days' notice to PAUSD, PAUSD shall provide the Purchasing Manager written notice of the cancellation or modification within two (2) business days of the PAUSD's receipt of such notice. PAUSD shall be responsible for ensuring that current certificates evidencing the insurance are provided to CITY's Purchasing Manager during the entire term of this Agreement.

14.4.   The procuring of such required policy or policies of insurance will not be construed to limit PAUSD's liability hereunder nor to fulfill the indemnification provisions of this Agreement. Notwithstanding the policy or policies of insurance, PAUSD will be obligated for the full and total amount of any damage, injury, or loss caused by or directly arising as

4

a result of the Services performed under this Agreement, including such damage, injury, or loss arising after the Agreement is terminated or the term has expired.

14.5.    The CITY, at its sole cost and expense, shall obtain and maintain, in full force and effect during the term of this Agreement, the insurance coverage described in Exhibit "C". The CITY and its contractors, if any, shall obtain a policy endorsement naming PAUSD as an additional insured under any general liability policy or policies. The CITY may self-insure to meet the requirement specified in this Section 14.

14.6.    Certificates evidencing such insurance shall be filed with PAUSD concurrently with the execution of this Agreement. The certificates will be subject to the approval of PAUSD's Risk Manager and will contain an endorsement stating that the insurance is primary coverage and will not be canceled, or materially reduced in coverage or limits, by the insurer except after filing with the Purchasing Manager thirty (30) days' prior written notice of the cancellation or modification. If the insurer cancels or modifies the insurance and provides less than thirty (30) days' notice to CITY, CITY shall provide the Purchasing Manager written notice of the cancellation or modification within two (2) business days of the CITY's receipt of such notice. CITY shall be responsible for ensuring that current certificates evidencing the insurance are provided to PAUSD's Purchasing Manager during the entire term of this Agreement.

## SECTION 15. TERMINATION OF SUSPENSION OF AGREEMENT OR SERVICES.

15.1.    Either party may suspend the performance of the Services, in whole or in part, or terminate this Agreement, with or without cause, by giving thirty (30) days prior written notice thereof to the other party. Upon receipt of such notice, CITY will immediately discontinue its performance of the Services.

15.2.    Upon such suspension or termination by either party, CITY will be paid for the Services rendered or materials delivered to PAUSD in accordance with the scope of services on or before the effective date (i.e., 30 days after giving notice) of suspension or termination. The following Sections will survive any expiration or termination of this Agreement: 12, 15.2, 16 and 21.

15.3.    No payment, partial payment, acceptance, or partial acceptance by CITY will operate as a waiver on the part of CITY of any of its rights under this Agreement.

006247.00028
17708061.1

EXHIBIT GG_006

**SECTION 16. NOTICES.**

All notices hereunder will be given in writing and mailed, postage prepaid, by certified mail, addressed as follows;

To CITY:
ATTN: Office of the City Clerk City of Palo Alto
Post Office Box 10250
Palo Alto, CA 94303
With a copy to the City of Palo Alto Purchasing Manager

To PAUSD:
ATTN: Karen Hendricks, Deputy Superintendent
25 Churchill Avenue
Palo Alto, CA 94306-1099

**SECTION 17. CONFLICT OF INTEREST.**

17.1.   In accepting this Agreement, PAUSD covenants that it presently has no interest, and will not acquire any interest, direct or indirect, financial or otherwise, which would conflict in any manner or degree with the performance of the Services.

17.2.   Both parties certify that they will comply with all laws applicable to governmental agencies and related conflicts of interest.

17.3.   If the Project Manager determines that PAUSD is a "Consultant" as that term is defined by the Regulations of the Fair Political Practices Commission, PAUSD shall be required and agrees to file the appropriate financial disclosure documents required by the Palo Alto Municipal Code and the Political Reform Act.

**SECTION 18. NONDISCRIMINATION.** As set forth in Palo Alto Municipal Code section 2.30.510, PAUSD certifies that in the performance of this Agreement, it shall not discriminate in the employment of any person because of the race, skin color, gender, age, religion, disability, national origin, ancestry, sexual orientation, housing status, marital status, familial status, weight or height of such person. PAUSD acknowledges that it has read and understands the provisions of Section 2.30.510 of the Palo Alto Municipal Code relating to Nondiscrimination Requirements and the penalties for violation thereof, and agrees to meet all requirements of Section 2.30.510 pertaining to nondiscrimination in employment.

**SECTION 19. ENVIRONMENTALLY PREFERRED PURCHASING AND ZERO WASTE.** PAUSD shall comply with the City's Environmentally Preferred Purchasing policies, which are available at the City's Purchasing Department, incorporated by reference and may be amended from lime to time. PAUSD shall comply with waste reduction, reuse, recycling and disposal requirements of the City's Zero Waste Program. Zero Waste best practices include first minimizing and reducing waste; second, reusing waste and third, recycling or composting waste.

6

EXHIBIT GG_007

In particular, PAUSD shall comply with the following zero waste requirements:

- All printed materials provided by PAUSD to City generated from a personal computer and printer including but not limited to, proposals, quotes, invoices, reports, and public education materials, shall be double-sided and printed on a minimum of 30% or greater post-consumer content paper, unless otherwise approved by the City's Project Manager. Any submitted materials printed by a professional printing company shall be a minimum of 30% or greater post-consumer material and printed with vegetable-based inks.

- Goods purchased by PAUSD on behalf of the City shall be purchased in accordance with the City's Environmental Purchasing Policy including but not limited to Extended Producer Responsibility requirements for products and packaging. A copy of this policy is on file at the Purchasing Office.

- Reusable/returnable pallets shall be taken back by the PAUSD, at no additional cost to the City, for reuse or recycling. PAUSD shall provide documentation from the facility accepting the pallets to verify that pallets are not being disposed.

**SECTION 20. NON-APPROPRIATION.** This Agreement is subject to the fiscal provisions of the Charter of the City of Palo Alto and the Palo Alto Municipal Code. It is further subject to the fiscal provisions of the PAUSD's appropriations process. This Agreement will terminate without any penalty (a) at the end of any fiscal year in the event that funds are not appropriated for the following fiscal year, or (b) at any time within a fiscal year in the event that funds arc only appropriated for a portion of the fiscal year and funds for this Agreement are no longer available. This section shall take precedence in the event of a conflict with any other covenant, term, condition, or provision of this Agreement.

**SECTION 21. MISCELLANEOUS PROVISIONS.**

21.1.   This Agreement will be governed by the laws of the State of California.

21.2.   In the event that an action is brought, the parties agree that trial of such action will be vested exclusively in the state courts of California in the County of Santa Clara, State of California.

21.3.   The prevailing party in any action brought to enforce the provisions of this Agreement may recover its reasonable costs and attorneys' fees expended in connection with that action. The prevailing party shall be entitled to recover an amount equal to the fair market value of legal services provided by attorneys employed by it as well as any attorneys' fees paid to third parties.

21.4.   This document represents the entire and integrated agreement between the parties and supersedes all prior negotiations, representations, and contracts, either written or oral. This document may be amended only by a written instrument, which is signed by the parties.

21.5.   The covenants, terms, conditions and provisions of this Agreement will apply to, and will bind, the heirs, successors, executors, administrators, assignees, and consultants of the

006247.00028
17708061.1

EXHIBIT GG_008

parties.

21.6.    If a court of competent jurisdiction finds or rules that any provision of this Agreement or any amendment thereto is void or unenforceable, the unaffected provisions of this Agreement and any amendments thereto will remain in full force and effect.

21.7.    All exhibits referred to in this Agreement and any addenda, appendices, attachments, and schedules to this Agreement which, from time to time, may be referred to in any duly executed amendment hereto are by such reference incorporated in this Agreement and will be deemed to be a part of this Agreement.

21.8.    If, pursuant to this contract with PAUSD, City shares with PAUSD personal information as defined in California Civil Code section 1798.81.5(d) about a California resident ("Personal Information"), PAUSD shall maintain reasonable and appropriate security procedures to protect that Personal Information, and shall inform City immediately upon learning that there has been a breach in the security of the system or in the security of the Personal Information. PAUSD shall not use Personal Information for direct marketing purposes without City's express written consent. Similarly, the CITY shall maintain reasonable and appropriate security procedures to protect personal information pertaining to PAUSD students.

21.9.    The individuals executing this Agreement represent and warrant that they have the legal capacity and authority to do so on behalf of their respective legal entities.

21.10.   This Agreement may be signed in multiple counterparts, which shall, when executed by all the parties, constitute a single binding agreement.

8

EXHIBIT GG_009

**IN WITNESS WHEREOF,** the parties hereto have by their duly authorized representatives executed this Agreement on the date first above written.

**Signatures of the Parties**

**For PALO ALTO UNIFIED SCHOOL DISTRICT:**

_____

Chief Business Officer                                    Date
_____

_____

                                                         Date
_____

**For CITY OF PALO ALTO:**

_____

Purchasing Manager                                       Date

_____

Police Department Representative                         Date

_____

**Attachments:**

EXHIBIT "A":          SCOPE OF SERVICES - GENERAL

EXHIBIT "B":          SCOPE OF SERVICES - SEXUAL MISCONDUCT AND RELATED MATTERS

EXHIBIT "C":          INSURANCE REQUIREMENTS

9

**EXHIBIT "A"**

**SCOPE OF SERVICES – GENERAL**

The PAPD/PAUSD School Resource Officer shall perform the following services:

A.     **Parent Project.** The School Resource Officer (SRO) shall facilitate management of the Parent Project. The SRO shall recruit and register parents for the English and Spanish Parent Project classes; update / maintain Parent Project official website; Facilitate Two 12-week English classes; and Facilitate One-Two 12-week Spanish classes.

B.     **Emergency Preparedness.** The School Resource Officer (SRO) shall provide training to PAUSD ~~public and certain private~~ schools; Meet with District Office Risk Manager and school administrators who serve as regular members of the Emergency Preparedness and Safety Team; schedule and provide Emergency Preparedness training to District staff; schedule, prepare, and evaluate Drills; and respond to school to provide Site- Security Walkthroughs and recommendations to the District Emergency and Safety Team.

C.     **Calls for Service.** On-duty patrol officers will be the primary responders for any emergency or exigent call for service generated by PAUSD. The School Resource Officer (SRO) at the direction of the Investigative Services Division Supervisor may respond to calls for service and complete reports / make arrests /citations per incident; provide criminal legal advice to school administrators in their official capacities; and speak to truant or offending students. If the School Resource Officer (SRO) is unable to respond to a call for service, PAPD will make an effort to ensure that the responder has been instructed/trained with regard to all provisions contained in this agreement and its exhibits, including but not limited to all protocols contained therein.

D.     **C.O.R.E-Type Requests.** The School Resource Officer (SRO) shall teach classes as requested; appear on multidisciplinary panels; attend career fairs; and attend Exit Interviews (held at JLS Middle School). Events occurring outside of school hours may be mutually agreed upon to be considered part of the base duties of the SRO, however, hours and schedules will be adjusted at the direction of the Investigative Services Division Supervisor. The CITY retains the right to make necessary staffing adjustments as necessary.

E.     **Truancy Issues.** The School Resource Officer (SRO) shall assist the PAUSD resolve truancy issues, including by attending Student Attendance Review Board (SARB) meetings, and Truancy Mediation Meetings with District Attorney; other duties may include providing information on criminal consequences of truancy; issue criminal citations in certain cases; meeting with parents of habitual truants; and completing home visits / welfare checks of truant students.

006247.00028
17708061.1

F.   **Comply With Legal Reporting Requirements.** The School Resource Officer (SRO) shall comply with legal reporting requirements, including completing the Monthly Report on the Detention of Minors form for the California Board of State and Community Corrections, and completing the Annual Survey of Law Enforcement Facilities.

G.   **School "Office Hours".** The School Resource Officer (SRO) will be available during school hours. The SRO shall be proactive in policing on school campuses; work with school Campus Security Officers; work with school administrators regarding school happenings; interact with kids of all campuses during brunch, lunch, free play, etc.; attend after-suspension, school intake hearings; and assist with First Aid.

H.   **Juvenile Training to New Officers.** The School Resource Officer (SRO) shall provide training regarding juvenile issues to new officers.

REMOVED I, J, K AND L

11

006247.00028
17708061.1

EXHIBIT GG_012

EXHIBIT "B"

SCOPE OF SERVICES – SEXUAL MISCONDUCT AND

RELATED MATTERS

**Cooperation regarding Sexual Misconduct and Related Matters.** The following sets forth the guidelines for cooperation between the PAUSD and the PAPD, collectively referred to herein as the "Parties," related to sexual misconduct investigations. These guidelines operate in addition to the foregoing Services outlined in this Agreement between the CITY and the PAUSD.

1.     **Background:**

PAUSD is committed to a working and learning environment free from sexual harassment and sexual violence, including sexual assault, sexual battery, and sexual coercion (collectively, "sexual misconduct"). Sexual misconduct is not tolerated. It corrupts the integrity of the educational process and work environment, and it violates the core mission and values of the PAUSD.

Sexual misconduct in the educational or work setting may constitute sex discrimination prohibited by federal and state anti-discrimination laws, including Title IX of the Education Amendments of 1972 ("Title IX"), Title VII of the Civil Rights Act, California's Fair Employment and Housing Act, and the California Education Code. In addition, some forms of sexual misconduct violate the criminal laws of the State of California.

2.     **Purpose:**

Because sexual misconduct may constitute a violation of state and federal law, the criminal laws of California, and PAUSD Board policies and administrative regulations, it is important for the PAUSD to clarify its working relationship with the PAPD to ensure an effective, prompt, coordinated, and fair response to sexual misconduct.

The Parties will work together collaboratively and effectively when sexual misconduct is reported. The Parties recognize that they each have different obligations under state and federal law, and it is important to respect those differences.

The purpose of this MOU is to coordinate PAUSD and PAPD processes in response to reported sexual misconduct and increase collaboration between the agencies when such matters arise. In addition, this MOU is written to build an understanding between the agencies regarding their respective responsibilities and promote compliance with the numerous state and federal laws that provide specific requirements for the PAUSD related to sexual misconduct, including the statutory requirements of the California Education Code, Title IX, as well as the California Penal Code and applicable state laws related to health and confidentiality/privacy.

3.     **Term:**

Representatives of the signing agencies will review and update this MOU when necessary based upon changes in applicable law, policies and/or regulations.

12

**4.    Agreement:**

i.    An investigation conducted by the PAPD is a separate investigation from PAUSD's Title IX investigation. Investigations may proceed on parallel paths, and involve different professional and legal obligations under federal and state law. PAUSD will not directly or indirectly discourage (or, alternatively, require) individuals from making a criminal complaint. Similarly, the PAPD will not directly or indirectly discourage (or, alternatively, require) individuals from pursuing a Title IX investigation or seeking District disciplinary action.

ii.    To the extent practicable, investigations shall be conducted in a manner that minimizes duplicative interviews and maximizes efficiency of the Parties' resources.

iii.    The Parties will each identify a point of contact for the other with respect to this MOU:

| **PAUSD** | **PAPD** |
|---|---|
| Megan Farrell | Persons/Crimes Supervisor |
| District Compliance Officer/Title IX Coordinator | (650) 392-2140 |
| (650) 833-4248 | |

iv.    Unless otherwise agreed to, any information sharing between the Parties described in this MOU will flow between these points of contact. The Parties agree to share a contact list with their point of contact for implementation of this MOU, and to notify the Parties of any changes to their points of contact as soon as practicable.

v.    The Parties will comply with applicable law and guidance regarding anonymous and confidential reporting of sexual misconduct, including when, how, and what information can or must be disclosed to local law enforcement officials or designated District officials. The Parties agree that if an alleged victim requests confidentiality regarding a reportable incident, the Parties will take all reasonable steps to comply with the request or inform the reporting individual when the Parties cannot ensure confidentiality.

**5.    Responsibilities of PAPD:**

i.    PAPD will share information with PAUSD related to instances of sexual violence, such as sexual assault or sexual battery, that occurs within    the

13

006247.00028
17708061.1

EXHIBIT GG_014

PAPD's jurisdiction, in accordance with California law and as appropriate given the particular circumstances.

ii.    The PAPD will respond to calls for service by PAUSD related to the investigation of sexual misconduct.

iii.    The PAPD's investigation will not take the place of a District Title IX investigation.

iv.    During the normal course and scope of their work, the PAPD will follow the check-in procedures outlined in District Board Policy/Administrative Regulation ("BP/AR") 5145.11 when arriving on school premises to question and/or apprehend students. In situations involving exigent or unique circumstances, the PAPD will follow the check-in procedures when practical or reasonable based on the circumstances. Pursuant to applicable state law, prior to conducting a student interview, the PAPD officer will provide the principal or designee his/her identity, his/her official capacity, and the legal authority under which the interview is to be conducted. The PAPD will advise minors of their right to have a representative, which includes a District representative, appear at the interview with them. Upon the student's request for a District representative, the PAPD officer will include PAUSD representative in the interview. The student's parent/guardian shall be notified by the school site principal or designee as soon as practicable when the student is questioned, and immediately when the student is taken into the custody of law enforcement, except in cases of suspected child abuse, pursuant to BP/AR 5145.11.

v.    Upon receiving information that a criminal restraining order has been violated, the PAPD will confirm the existence and the terms of the restraining order and take any appropriate action to address the violation. The PAPD will also inform PAUSD's Point of Contact (identified above) as allowable by law of the reported violation so that PAUSD may take any appropriate action.

vi.    In an effort to increase interagency awareness of responsibilities of the respective agencies and to coordinate interagency processes, the PAPD agrees to participate with PAUSD in interagency training of District staff. Such training shall discuss each agencies legal mandates, procedures and investigatory processes as they relate to sexual misconduct.

6.    **Responsibilities of PAUSD:**

i.    In an effort to increase interagency awareness of responsibilities of the respective agencies and to coordinate interagency processes, PAUSD agrees to provide training to the PAPD/District School Resource Officer ("SRO") and other designated PAPD officers on PAUSD's Title   IX

obligations, policies, strategies and best practices for responding to reports of sexual misconduct in a trauma-informed manner.

ii.    PAUSD will notify all reporting parties of the right to file a civil or criminal complaint. The decision to file a civil or criminal complaint rests solely with the complainant, unless a California mandated reporting is required based upon the victim's classification (e.g., minor, dependent adult, etc.).

iii.   PAUSD will annually provide the PAPD with copies of the following policies:

   1)    Sexual Harassment policies (which include sexual violence);

   2)    Uniform Complaint Procedures; and

   3)    BP/AR 5145.11.

iv.    Prior to contacting a respondent regarding a complaint that PAUSD has been informed is under investigation by the PAPD, PAUSD and/or PAUSD's Title IX Coordinator will first contact the PAPD. The PAPD is also aware that PAUSD must complete its Title IX investigation promptly within a reasonable timeframe (e.g. 60 calendar days or less), and it agrees to coordinate with PAUSD to meet that obligation.

v.     PAUSD will provide training to staff regarding the appropriate procedures to follow when the PAPD enters school premises to question and/or apprehend students, as outlined in BP/AR 5145.11. In addition to obtaining the PAPD officer's identity, his/her official capacity, and the legal authority under which the interview is to be conducted pursuant to applicable state law, the site staff will also immediately inform PAUSD's Point of Contact (identified above) in writing of the PAPD's presence on site and any information gathered from the PAPD officer.

vi.    PAUSD acknowledges its duty to comply with protective orders and is committed to implementing such orders while ensuring the rights of all students to access education. PAUSD will work with the protected student and the students' parent/guardian to create a plan for implementation of the protective order and provide information about reporting violations of the protective order.

vii.   PAUSD, by and through PAUSD's Point of Contact (identified above), will ensure that information related to the protective orders is effectively communicated between school site staff and PAPD officers. PAUSD will provide its staff and the PAPD with copies of its policy or protocols on implementation of protective orders.

viii.  Upon receiving information that a protective order has been issued, PAUSD will follow the following procedures:

1)    Notify PAUSD**'s Point of Contact (identified above)** and provide a copy of the protective order;

2)    Notify the parties subject to the protective order;

3)    Work with the protected and restrained student and the student's parent/guardian to create a plan for implementation of the protective order, regardless of whether the restrained individual is a student at the same school;

4)    If the restrained individual is not a student at the same school, PAUSD will focus on how to restrict that individual's access to the school according to the protective order and how to support the students travels to and from school;

5)    If the restrained individual is a student at the same school, PAUSD will work to make changes to the students' schedule(s), participation, or environment in order to comply with the protective order.

6)    If the protective order raises concerns that would warrant a sufficient risk to other students and/or staff, PAUSD will notify the PAPD, administrators, and/or PAUSD community to the extent allowed by applicable state and federal law;

7)    Upon receiving information that a protective order has been violated in a way that implicates a safety risk, PAUSD will promptly notify the PAPD of the reported violation, as well as the parties subject to the protective order.

006247.00028
17708061.1

EXHIBIT GG_017

# EXHIBIT HH

EXHIBIT_HH-001

**Resolution Agreement**
Palo Alto Unified School District
OCR Case Nos. 09-13-5901 and 09-14-1217

In order to resolve the issues raised in the above-referenced investigations by the U.S. Department of Education, Office for Civil Rights (OCR), under Title IX of the Education Amendments of 1972 (Title IX), the Palo Alto Unified School District (District) agrees to take the actions outlined in this Resolution Agreement (Agreement). The District's execution and performance of the terms of this Agreement do not constitute any admission of liability or any admission of a violation of federal or state law.

A.     Sexual Harassment Policies, Complaint Procedures, Notice of Nondiscrimination, and MOU with Police Department

1.  The District will revise Board Policy (BP) 5145.3, "Nondiscrimination and Harassment", to include information about how complainants can file a complaint with the Office for Civil Rights and to ensure that it and any and all notices of nondiscrimination include the title, address, email, and phone number of the Title IX Coordinator.

2.  The District will revise Board Policy (BP) 5145.7 concerning sexual harassment of students so that it is compliant with Title IX and its requirements, and amend it to include at least the following:

    a.  information about how complainants can file a complaint with the Office for Civil Rights

    b.  that the District strongly encourages any student who feels that they have been sexually harassed on school grounds or at a school-related activity by a student, employee, or a third party, to immediately contact a teacher, the principal or any other available school employee;

    c.  to include the definition of inappropriate relationships between employees and students in relation to the definition of sexual harassment, such as situations where an employee has crossed professional boundaries to cultivate an inappropriate relationship with a student. The policy will also include statements regarding employee responsibilities not to engage in sexual or inappropriate relationships with students, that sexual relationships with students may violate Title IX, that sexual relationships with former students may also violate Title IX, and that in all instances involving sexual relationships between employees and students, the District shall assess whether a referral is necessary to either to law enforcement or other appropriate agency;

    d.  in order to ensure that the District conducts a prompt and equitable investigation as required by Title IX, a statement that all complaints regarding alleged sexual harassment and sexual violence by students, employees and third parties will be processed under BP/AR 5145.7 and BP/AR 1312.3 rather than District BP/AR

EXHIBIT_HH-002

1312.1, 4119.11, 4219.11, and 4319.11.  This statement is not intended to prevent the District from proceeding with a separate personnel investigation or from referring for a law enforcement investigation;

e.   that when a report of sexual harassment is made to a principal or other site administrator, they will inform the student and/or parent/guardian of the right to file a formal complaint through the District's Uniform Complaint Procedures (UCP), Administrative Regulation 1312.3, and provide a copy of or link to the UCP and if an informal process is retained that such process is voluntary, shall also comply with Title IX requirements, can be ended at any time by either party in order to proceed through the formal process, and will be concluded in 10 days;

f.   that when an oral or written complaint of sexual harassment is initially submitted to a principal, they will, within two school days, forward the complaint itself or a transcription of the oral complaint to the District Compliance Officer ("Title IX Coordinator"); unless the complaint does not involve sexual violence and the complainant chooses to proceed through the informal investigation process at the local school site after being provided with information about the difference between the informal and formal processes and that such informal process may be ended at any time and the formal process started, the Title IX Coordinator will immediately contact the complainant and investigate and resolve the complaint under the UCP; and

g.   if the District is on notice of a factual finding that a District employee engaged in behavior with a student, (including a student from a different district), which constitutes sexual harassment, sexual violence or the cultivation of an inappropriate relationship as defined in the District's revised policies pursuant to A. and G.1, the District shall investigate under the revised policies in Section A and take action to address the sexual harassment, sexual violence, or inappropriate behavior and any substantiated risk, including disciplinary action, up to and including dismissal of the employee, as applicable.

3.  The District will revise the UCP, which already requires written notice of outcome to the complainant, to ensure compliance with Title IX and its requirements and amend it to include at least the following:

a.   written notice of the outcome will be provided to both parties, the complainant and the respondent/accused.  Such notices shall maintain any applicable confidentiality rights of the parties and be issued in consideration of any legal limitations based on such confidentiality;

b.   the district will address any complaint of sexual harassment;

c.   that the complainant and respondent have equal appeal rights with respect to the determination under the UCP procedures;

    d. a definition of conflict of interest, a statement that conflicts of interest, including with respect to outside entities contracted to conduct investigations, are prohibited and a process for identifying and addressing such conflicts; and

    e. a complainant's past sexual relationships with individuals other than respondent are excluded.

4. The District will post and provide notice of the revised BP 5145.7 and BP/AR 1312.3 in accordance with the Notification section of each respective policy/procedure, including providing a copy of the revised policy and procedure to school site administrators, employees and District and school climate committees.

5. In order to ensure that the District conducts a prompt and equitable investigation as required by Title IX, a statement that all complaints regarding alleged sexual harassment and sexual violence by students, employees, or third parties will not be processed under BP/AR 1312.1 and BP/AR 4119.11, 4219.11, and 4319.11, but rather, revised BP 5145.7 and UCP (AR 1312.3). The District will revise and re-issue the 2012-2013 Discrimination Policy and Complaint Procedure Guidance Memorandum to Staff to include definitions of sexual harassment and sexual violence.

6. The District will revise its Memorandum of Understanding (MOU) with the Palo Alto Police Department to clarify the roles and responsibilities of police department and district staff with respect to compliance with Title IX and a safe, nondiscriminatory school environment, including the responsibility of the District's separate obligation to promptly and equitably resolve complaints of sexual harassment even while a criminal investigation is ongoing. The MOU will also address training on Title IX requirements and the District's grievance process that will be provided to school resource officers involved in investigating and resolving such complaints.

7. To the extent not addressed by the above listed provisions, the District will develop and implement policies, procedures, and practices in compliance with Title IX requirements.

B.   <u>Tracking Reports and Complaints of Sexual Harassment</u>

1. The District will develop an online system where students and parents can make anonymous reports of sexual harassment and sexual violence. To the extent possible based on anonymous reports, complaints will be processed consistent with Section A.2.e and A.2.f.

2. The District will continue to develop a confidential system for tracking all complaints and allegations of sexual harassment and sexual violence in the District, including, but not limited to, matters that are resolved informally at the school site level and through the UCP. The system will include the following information: (a) the date the matter was first reported and to whom it was first reported (i.e., school principal, Title IX Coordinator, etc.); (b) if first reported to the school site, the date the Title IX

Coordinator was notified of the complaint or report; (c) who filed the complaint (parent, student, or third party); (d) the school where the student was enrolled; (e) the nature of the allegation; (e) if resolved at the school-site, information about the resolution, including remedies and sanctions and whether notice of the outcome was provided to both parties; (f) the date any formal investigation under the UCP was completed; (g) under the UCP, the date notice of the outcome of the complaint was provided to the complainant and respondent; (h) the consequences or sanctions imposed on any individual found to have engaged in sexual harassment; and (i) all interim and remedial actions taken to assist and support the complainant.

3. All schools shall develop a confidential system for tracking all reports and complaints of sexual harassment or sexual violence, including, but not limited to, matters that are resolved at the site level (i.e., those that are not resolved through the UCP process). The system will include the following information: (a) who made the report or complaint; (b) who received the report or complaint; (c) whether the complainant was informed of the right to file a criminal complaint, when the data support such action; (d) whether the complainant was informed of the right to file a UCP complaint and provided with the UCP procedures; (e) the nature of the report or complaint; (f) how the allegations were resolved, including any consequences imposed on the alleged harasser and any actions taken to assist and support the complainant(s), (g) how and when notice of the outcome was provided to the individual who made the report or complaint and the respondent, and (h) the date that information about the resolution was provided to the Title IX Coordinator.

4. At the end of each school year, the Title IX Coordinator will report to the Superintendent and Board of Education a summary of the information shown by the tracking systems, including the number of reports or complaints regarding sexual harassment and sexual violence, including, but not limited to, complaints filed and resolved under the UCP and the number of complaints resolved through an informal process at the schools in the District, any patterns or concerns raised by the information gathered, any steps the District and/or Schools have taken to address the concerns, and recommendations for future actions.

C.    <u>Staff Guidance and Training</u>

1. The District will provide annual mandatory Title IX training for employees, including administrators, classified staff, and teaching staff throughout the District. This training may be provided through online modules. At Palo Alto and Gunn, this training shall include an in person component for the duration of this Resolution Agreement. The Title IX training shall clarify employee responsibilities when they receive a report or complaint of sexual harassment or sexual violence, including their responsibilities when a complainant requests informal resolution at the site level. The training shall also address employee responsibility for forwarding all oral or written sexual harassment or sexual violence complaints to the Title IX Coordinator.

2. At each training session, the District will distribute a guidance memorandum or bulletin. The training and guidance memorandum will address at least the items below:

    a. the District's policy prohibiting discrimination and sexual harassment of a student by other students, third parties, or by District employees based on sex, including the policy revisions described above;

    b. OCR's January 2001 "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" and other OCR guidance documents (which OCR shall provide the District before August 15 of each school year), which explains a school's responsibility to respond promptly and effectively to sexual violence against students in accordance with Title IX;

    c. all of the types of conduct that could constitute sexual harassment and sexual violence;

    d. appropriate student and staff boundaries and power imbalance;

    e. that staff members who are responsible employees and that those responsible employees must report to the Title IX Coordinator and the principal if he or she learns of possible sexual harassment of a student by a peer or by an employee;

    f. an explanation that the UCP is the District's procedure for resolving all sexual harassment and sexual violence complaints, a summary of the procedure, where individuals can locate the full procedure, and the name and contact information of the Title IX Coordinator who is responsible for responding to complaints of sex discrimination, including sexual harassment;

    g. that the Title IX Coordinator must be notified when informal resolution is requested;

    h. that the informal resolution process must be completed within 10 days of receipt of the complaint and is voluntary;

    i. that the principal/designee will notify the student and their parent/guardian and any respondent of the right to terminate informal resolution at any time;

    j. that neither the student or their parent/guardian may be asked or required to work out the complaint directly with the respondent;

    k. that the student or parent filing the complaint must be advised that they may file a formal complaint under the UCP at any time during or after the informal process;

    l. that optional mediation may be arranged only when the student, their parent, and the respondent student agree to resolve the complaint informally with the help of a counselor, teacher, administrator, or trained mediator, and that this does not apply to complaints of sexual violence;

    m. that the principal/designee will document whether informal resolution has been successful in resolving the complaint to the satisfaction of all the parties and to ensure compliance with Title IX, and will notify the Title IX Coordinator in writing; and

    n. an explanation, as required under the revised UCP, of the equitable application of the UCP, and that in all cases the complainant and respondent will be provided with a written notice of outcome of the informal or formal investigation which will include, among other things, any remedies and sanctions, consistent with confidentiality considerations.

3. The District will develop guidance and provide training for administrators and teaching and classified staff regarding the responsibility of the District and school to develop and implement a prompt, equitable and appropriate response to sexual harassment complaints when students with disabilities are involved, including, when necessary, holding manifestation determination hearings.  This shall include:

    a. the application of BP 5145.7 to such students;

    b. the District's obligations to such students under both Title IX and the IDEA/ Section 504;

    c. the appropriate steps that should be taken when sexual harassment of or by a student with a disability is reported, including which staff members should respond to such reports;

    d. when remedies such as discipline, schedule changes, or stay away orders might constitute a change in a student's placement; and

    e. the appropriate steps to apprise the student's Individual Education Program team or Section 504 team of necessary information regarding sexual harassment and/or remedial actions.

4. The District will develop guidance and provide training for administrators and all staff to clarify the District's obligation with respect to the enforcement of protective orders and restraining orders between students, whether or not those orders result from reports of sexual harassment or sexual violence.  The guidance and training on enforcement of such orders will include, but not be limited to, when notification of such an order may trigger the District's responsibilities under BP 5145.7 and/or AR 1312.3.

5. The District will provide annual training for its designated Title IX Coordinator.  The training will include, but not be limited to, the topics described in sections C.1-4 above.

D.    <u>School Climate Assessment</u>

1. The District will conduct a school climate assessment at each school in the District, including a student and parent survey, during the 2016-2017 school year to assess the extent to which students are subjected to or witness sexual harassment by any party, whether such sexual harassment is reported to school staff and if not, why, and the effectiveness of school sexual harassment response and prevention efforts. At Palo Alto and Gunn High Schools, this survey shall include questions regarding maintenance of appropriate boundaries between staff and students. The District may modify an existing survey, such as the California Healthy Kids Survey or other climate assessment conducted by the school site, provided that the survey asks specific questions sufficient to assess the areas described in this section. The survey will be administered using the District's established method of parental notification and consent.

2. The District will provide a copy of and discuss the results of the school climate survey described with the District's Safe and Welcoming Schools Committee and consider whether additional steps should be taken to strengthen the District's school climate programs and activities in response to the survey results.

E.    Sexual Harassment Investigations

1. The District will conduct an investigation into:

   a. reports the District received during the 2013-2014 school year that the former Principal at Palo Alto High School (PAHS) sexually harassed students and address all the information obtained during the investigation to determine whether remedial actions or services are needed;

      i.   whether staff in the District or at the school-site should be provided training for failing to report the behavior.

   b. reports the District received in 2007 and 2013 regarding a former teacher at PAHS who had been subject to investigations regarding alleged crossing of professional boundaries for the purpose of cultivating an inappropriate relationship with former student(s) in order to determine whether there are any other affected current or former students and whether they require remedial actions or services;

   c. as it pertains to investigations in E.1.a. and b. above, determine whether staff in the District or at the school-site should be provided training for enabling or failing to report behavior if such findings are made;

   d. reports the District received of an off-campus sexual assault during the 2012-13 school year and the March 2014 off campus incident related to PAHS; and

   e. The investigations described in E.1 a-d will be conducted by an Independent Investigator approved by OCR in collaboration with the District's Title IX Coordinator under the District's UCP.

2. For the investigation described in E.1.a., the investigation will involve:

   a. review of the information gathered during the District's investigation under its personnel policies;

   b. identification of the current and former students who were subjected to sexually harassing conduct during the period that the former Principal was at PAHS and/or at the middle school that he was assigned to after resignation from PAHS and notify their parents/guardians;

   c. conducting and documenting interviews with students, staff and other relevant witnesses;

   d. for each identified student and for the parent who filed a formal complaint about conduct that she observed during an onsite visit, reach a written determination regarding whether sexual harassment occurred; and

   e. if applicable, determine and document what remedial actions will be taken and services provided, for the student(s) and if any additional actions need to be taken at the school-site to address any ongoing problems. This includes actions and services provided for former students and any actions to address any failure to report by responsible employees.

3. With respect to all of the investigations, consistent with the revisions to the UCP discussed in A.3.a the District will provide a written notice of outcome to complainant(s) (with any remedies and sanctions) and the respondent(s) (with any sanctions) after OCR review and approval. Such notices shall maintain any applicable confidentiality rights of the parties and be issued in consideration of any legal limitations based on such confidentiality.

4. The District will review the behavioral incident reports the District received at both Gunn and Palo Alto High School for the 2012-13, 2013-14, 2014-15, and 2015-16 school years to determine whether the incidents were handled appropriately under Title IX and whether any remedies are needed for the complainants, whether the steps taken for the respondents have been sufficient to address prevention of further sexual harassment, and, to the extent not already issued, provide a notice of written outcome to the complainants and respondents, if the incident involves a Title IX issue.

5. In exercising due diligence in locating respective parties in the above referenced investigations and providing notice of the investigations in Section E, the District shall send written correspondence to the last known address, unless additional current telephone or email contact information is in the District's possession.  If additional telephone or email contact information is in the District's possession, it shall attempt to notify parties through those means as well.

Page 9 of 12: 09-13-5901 and 09-14-1217

6.   For review and approval, the District will provide OCR with the investigative reports and all underlying documents and interviews conducted to produce the reports related to the two alleged incidents of sexual harassment reported to OCR during the spring semester of the 2015-16 school year at Ohlone and PAHS, along with a proposed corrective action plan and written notices of outcome, consistent with the UCP. For review and approval, the District will provide OCR with a proposed corrective action plan to address the concerns raised about policies, procedures, and staff training in the investigative report issued related to the allegations of an inappropriate relationship at Gunn in December of 2015.

F.    <u>Individual Student (Case No. 09-14-1217)</u>

1.   The District will provide the Complainant and Student at issue in Case No. 09-14-1217 with a letter describing the actions the District will take pursuant to this Agreement and the current resources available to victims of sexual harassment, stalking and dating violence based on gender or sex at the Student's school.

2.   The District will invite the Complainant and Student to share their perspectives on how the District can strengthen its commitment to providing a prompt and equitable response to reports of sexual harassment, stalking and dating violence based on gender or sex with an individual of their choice with appropriate expertise and authority, such as the District Superintendent or Title IX Coordinator. The District will incorporate the feedback of the Complainant and Student, wherever relevant, in the development of the staff training and guidance and school climate assessment described in this Agreement.

3.   Within seven days of the signing this Agreement, the District will request documentation from the Complainant regarding private counseling expenses incurred to date as a result of the sexual harassment and dating violence based on gender or sex the Student endured and, within 45 days, reimburse the Complainant for such documented expenses if requested.

4.   The District will provide an opportunity at a time and location convenient for the Student to retake any courses or exams given during the period of time during which the complaint was being investigated by the District and her grades dropped.

G.    <u>Reporting Requirements</u>

The following reporting requirements are in effect:

1.   By June 30, 2017, the District will provide OCR with a draft of the revised policies, notice, and UCP described in Section A for review and approval. The District will provide OCR with a copy of the adopted policies and notice within 30 days of OCR approval. The District will also provide information regarding the method of dissemination of the adopted policies and documentation of the same.

2.   By June 30, 2017, the District will provide OCR with a draft of the notice and staff memorandum described in Sections A.4 and 5 for review and approval. The District

EXHIBIT_HH-010

will provide OCR with a copy of the final notice and verification that it was distributed within 15 days after the OCR approval.

3.  By August 14, 2017, the District will provide OCR with a draft of the revised MOU described in A.6 for review and approval.  After receiving approval, the District will immediately engage and take the necessary steps with the PAPD to obtain its approval and signature on the revised agreement.  Within thirty days of receiving approval and signature, the District will distribute the MOU to administrative staff at all schools and provide training to administrators regarding the same.

4.  By June 30, 2017, the District will provide OCR with verification that it has designed the tracking system and implemented the provisions under Sections B.1-3.  After approval by OCR, the District will immediately begin implementing the systems. By June 30, 2018, and by the same date for each year thereafter, the District will provide OCR with printouts of the data from the tracking systems and a copy of the report presented to the Board by the Title IX Coordinator pursuant to Section B.4.

5.  By July 30, 2017, and by July 30th for each year thereafter, the District will provide OCR with the case files for all oral and written complaints filed with the Title IX Coordinator for review.  Within 30 days after OCR's review of the case files, if OCR determines that there are any issues raised with respect to whether the complaint was promptly and equitably resolved, a meeting with the District will be scheduled to discuss a corrective action plan.

6.  By December 30, 2017, and by December 30th for each year thereafter, the District will provide OCR with verification that the training described in Sections C.1-4 has been completed. The verification will include the date(s) of the training, the names of the trainer(s), the agenda and materials from the training, and a list of the participants.

7.  By March 15, 2017, the District will provide OCR with a draft of the student and parent survey described in Section D.1 for review and approval.  By August 1 of each school year, District will provide OCR with a copy of the survey results, and a description of the steps it will take to address any concerns raised by the survey results within 60 days of the survey administration.[1]

8.  By March 30, 2017, the District will provide OCR with a copy of the qualifications of the proposed independent investigator for OCR review and approval, as described in Section E.1-2.  In addition, by December 30, 2017 the District will provide OCR with all documents gathered during the investigations described in Section E, its proposed determinations and its proposed remedial actions, if applicable, for review and approval. With respect to the investigations in Section E.1-2, the District will not issue any notice of its decision (E.3) to students or parents/guardians prior to receiving OCR approval.  Within 30 days of OCR approval, the District will provide verification to OCR that it has issued the notices of outcome to the relevant parties.

---

[1] This date may be extended if the survey report is generated by a third party, such as the California Healthy Kids Survey. Should such a situation arise, the District will work in good faith with OCR to communicate with the third party and establish the date the survey report will be provided.

9. By December 30, 2017, the District will provide OCR with copies of the written notices of outcome to be provided after its review of the Behavioral Incident Reports at Gunn and PAHS described in E.4. The District will not issue any notice of outcome to students or parents/guardians prior to receiving OCR approval. Within 30 days of OCR approval, the District will provide verification to OCR that it has issued the notices of outcome to the relevant parties.

10. By June 30, 2017, the District will provide OCR with the investigative reports and all underlying documents and interviews for review and approval with respect to the investigations of the incidents described in <u>E.6</u> and the proposed corrective action plan related to the allegations at Gunn. Within 30 days of receiving OCR's review and approval of the investigative reports, the District will provide OCR with a proposed corrective action plan, including but not limited to proposed written notices of outcome for the complainants and respondents, any remedies for the complainant, any actions necessary to address harm to the school community, and any actions necessary to prevent further recurrence of sexual harassment. Within 15 days of receiving OCR's approval of the corrective action plans and written notices, the District will implement the plans and issue the notices.

11. By March 30, 2017, the District will provide OCR with a draft of the letter and invitation to the Complainant and Student to participate in the District's school climate efforts, as described in Section F for review and approval. Within 7 days of receiving OCR's approval, the District will issue the invitation to the last known address and email address of the Complainant and provide OCR with documentation of the same. By June 30, 2017, the District will provide OCR with documentation of any counseling reimbursements provided to the Complainant, any courses or exams that Student was allowed to retake, if applicable, and any other appropriate remedies.

H.    <u>Monitoring</u>

1. OCR will monitor this resolution agreement for a minimum of three years.

2. The District understands that OCR will not close the monitoring of this Agreement until OCR determines that the District has fulfilled its terms and is in compliance with the Title IX and its implementing regulations, including 34 C.F.R. §106.31, 34 C.F.R § 106.8(a)-(b), 34 C.F.R. § 106.9, which were at issue in this case.

3. The District further understands that during the monitoring of this agreement, if necessary, OCR may visit the District to interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether the District has fulfilled the terms of this agreement and is in compliance with Title IX and its implementing regulations, which were at issue in this case. By signing this Agreement, the District agrees to provide data and other information in a timely manner in accordance with the reporting requirements of this Agreement.

4. The District understands and acknowledges that OCR may initiate administrative enforcement or judicial proceedings, including to enforce the specific terms and obligations of this Agreement. Before initiating administrative enforcement (34 C.F.R. §§

Page 12 of 12: 09-13-5901 and 09-14-1217

100.9, 100.10), or judicial proceedings, including to enforce this Agreement, OCR shall give the District written notice of the alleged breach and 60 calendar days to cure the alleged breach.


_____/s/_____          ____03/07/2017_____
Dr. Glenn "Max" McGee, Superintendent                    Date


_____/s/_____          _____03/07/2017_____
Ms. Terry Godfrey, Board President                        Date


Board Vote Date:  February  _28__, 2017

　　　　Ayes:  5


　　　　Nays:  0

# EXHIBIT II

 Gmail

Evan Nelson <evancnelson.law@gmail.com>

## Fw: Pete Colombo. "Making Intentions for 2024/2025 School Year Clear"
1 message

**peter colombo** <ptrcolombo@yahoo.com>                    Fri, Jun 21, 2024 at 9:18 PM
To: Evan Nelson <evancnelson.law@gmail.com>

fyi

----- Forwarded Message -----
**From:** peter colombo <ptrcolombo@yahoo.com>
**To:** Herb Espiritu <hespiritu@pausd.org>; Teri Baldwin <teribaldwin@paeacta.org>; Teri Baldwin <paeapresident@paeacta.org>; vluke@cta.org <vluke@cta.org>; tbahadursingh@pausd.org <tbahadursingh@pausd.org>
**Cc:** Don Austin <daustin@pausd.org>; board@pausd.org <board@pausd.org>
**Sent:** Friday, June 21, 2024 at 09:08:30 PM PDT
**Subject:** Pete Colombo. "Making Intentions for 2024/2025 School Year Clear"

Good Evening,

  It has been brought to my attention today that there might be some confusion on my intentions for the 2024/2025 school year. This email is to make things clear. Please do not make any assumptions and contact me if you need any clarification.

  Pursuant to Education Code Section 44842, I, **Peter Colombo hereby provide notice** that **I absolutely INTEND TO RETURN** to my current assignment as PE teacher at Greene Middle School, from which I have been on temporary leave ("paid administrative leave" means a temporary leave from an assignment) and pursuant to Education Code Section 44955(c) as the most senior male credentialed PE teacher at Greene, if any reassignments must be made, I request to assert my "bumping" rights and that a more junior (less senior) male PE teacher(s) can be reassigned.

  **\*\*If you have a Notice of Intention to Return Form that you would like for me to use, please forward it to me via reply to this email.**

  Herb if you could place this email in my file that would be great.

Thank you and I hope everyone has a great weekend!

Pete Colombo

# EXHIBIT JJ

**PALO ALTO UNIFIED SCHOOL DISTRICT**

25 Churchill Avenue • Palo Alto, CA 94306
Telephone:  (650) 329-3958 • FAX:  (650) 323-5162

PALO ALTO
UNIFIED SCHOOL DISTRICT

**HUMAN RESOURCES**

May 24, 2023

Peter Colombo
642 Bair Island Rd. #1001
Redwood Shores, CA 94063

Re:     <u>NOTICE OF PLACEMENT ON PAID ADMINISTRATIVE LEAVE</u>

Method of Delivery: Regular US Mail and email to *ptrcolombo@yahoo.com*

Dear Mr. Colombo:

The Palo Alto Unified School District ("District") has been informed that the California Commission on Teaching Credentialing "CTC" has reinstated your credential on May 2, 2023 when the charges leading to the mandatory leave of absence offenses were dropped.

You are hereby notified that you are placed on a paid administrative leave pending an internal investigation.

During this leave, you will continue to receive your usual salary, and health and welfare benefits, if applicable. While on leave, you are to remain available to return to work at my direction. You are to remain available by telephone during regular business hours, and you are required to keep the district notified of a telephone number where you can be reached during business hours. In the event that you will be unavailable during regular business hours on a normal work day, you shall notify the District in advance and report your unavailability as either sick leave or personal necessity leave as applicable. You are not authorized to accept any other paid employment during your regular business hours while you are on leave.

You are hereby directed not to return to any District property, including Greene Middle School, unless authorized to do so in advance by me. You are further directed not to contact any staff or students via email, text, phone, or in person.

A copy of this letter will be placed in your personnel file.  You may submit a written response, which will be attached and placed in your file.

Please contact me if you would like to respond to your placement on paid administrative leave, or if you have any questions regarding this correspondence.

Sincerely,

Lisa Hickey
Director of Certificated Human Resources
Palo Alto Unified School District

cc: Personnel File

# EXHIBIT KK

 Gmail

Evan Nelson <evancnelson.law@gmail.com>

---

## RE: Colombo v. Palo Alto USD
1 message

---

**Benjamin I. Oreper** <boreper@bfesf.com>                                    Wed, May 29, 2024 at 3:12 PM
To: Evan Nelson <evancnelson.law@gmail.com>
Cc: Alison Crane <acrane@bledsoelaw.com>, Ethan Lowry <elowry@bfesf.com>, Eugene Elliot <eelliot@bfesf.com>, "L.
Roberts" <lroberts@bfesf.com>, Nicole Miller <nmiller@nmillerinv.com>, Sergio Guerrero <sguerrero@bfesf.com>,
"Whitney T. Smith" <wtsmith@bledsoelaw.com>, "calendar@bledsoelaw.com" <calendar@bledsoelaw.com>

---

Counsel,

We are currently in the process of determining whether we would be representing Ms. Miller at her
deposition and the extent to which we would be waiving or asserting the attorney client privilege. We will
be contacting her to coordinate alternative dates for the deposition.

With regard to zoom – I have participated in many depositions conducted entirely over zoom, where the
court reporter, witness, and counsel for each party all appeared remotely with no issues. Are you able to
clarify the challenges you see in conducting the depo remotely in this manner?

Thanks,



**Benjamin I. Oreper**

Bertrand Fox Elliot Osman + Wenzel

The Waterfront Building

2749 Hyde Street

San Francisco, CA 94109

Cell: 415-933-0034

Office: 415-353-0999 x113

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally
privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or
disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If
you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** Evan Nelson <evancnelson.law@gmail.com>
**Sent:** Wednesday, May 29, 2024 2:41 PM
**To:** Benjamin I. Oreper <boreper@bfesf.com>
**Cc:** Alison Crane <acrane@bledsoelaw.com>; Ethan Lowry <elowry@bfesf.com>; Eugene Elliot <eelliot@bfesf.com>; L. Roberts <lroberts@bfesf.com>; Nicole Miller <nmiller@nmillerinv.com>; Sergio Guerrero <sguerrero@bfesf.com>; Whitney T. Smith <wtsmith@bledsoelaw.com>; calendar@bledsoelaw.com
**Subject:** Re: Colombo v. Palo Alto USD

If the court reporter is not in person, then zoom will be a challenge. Do you have any ideas or solutions? Also, have you confirmed with your witness her availability on the alternative dates you propose?

Best regards,

Evan C. Nelson

Law Office of Evan C. Nelson

1990 North California Blvd., 8th Floor

Walnut Creek, CA 94596

(925) 323-1991

On Wed, May 29, 2024 at 2:31 PM Benjamin I. Oreper <boreper@bfesf.com> wrote:

Counsel,

We are unavailable for the deposition on June 3.

Would June 5, 7, 10, or 11 work for you?

I am also confirming whether the deposition will take place remotely via zoom.

Thanks,



## Benjamin I. Oreper

Bertrand Fox Elliot Osman + Wenzel

The Waterfront Building

2749 Hyde Street

San Francisco, CA 94109

Cell: 415-933-0034

Office: 415-353-0999 x113

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** Evan Nelson <evancnelson.law@gmail.com>
**Sent:** Wednesday, May 29, 2024 2:13 PM
**To:** Benjamin I. Oreper <boreper@bfesf.com>; Ethan Lowry <elowry@bfesf.com>; Eugene Elliot <eelliot@bfesf.com>; L. Roberts <lroberts@bfesf.com>; Sergio Guerrero <sguerrero@bfesf.com>
**Cc:** Alison Crane <acrane@bledsoelaw.com>; Nicole Miller <nmiller@nmillerinv.com>; Whitney T. Smith <wtsmith@bledsoelaw.com>; calendar@bledsoelaw.com
**Subject:** Re: Colombo v. Palo Alto USD

Confirming that Ms. Miller's deposition is on calendar for June 3, 2024 beginning at 10 am. If there is no preference of location for the witness, we will select a location tomorrow and communicate it to all counsels. Unless there is objection, the court reporter will be remote.

Best regards,

Evan C. Nelson

Law Office of Evan C. Nelson

1990 North California Blvd., 8th Floor

Walnut Creek, CA 94596

(925) 323-1991

On Sun, May 26, 2024 at 7:23 AM Evan Nelson <evancnelson.law@gmail.com> wrote:

Counsels and Ms. Miller,

I think we should leave Ms. Miller's deposition on the calendar. The subpoena set June 3, 2024 as the date for her deposition and I think we should keep that date. If either Ms. Miller or counsel is unavailable then let's get the earliest date of mutual availability set. I will then secure a location near the witness (Nicole - if you have a preference or suggestion, please provide it) and line up a court reporter. If anyone wants to appear remotely, please let me know and we will ensure that a telephone connection or zoom link is available.

Best regards,

Evan C. Nelson

Law Office of Evan C. Nelson

1990 North California Blvd., 8th Floor

Walnut Creek, CA 94596

(925) 323-1991

---------- Forwarded message ---------
From: **L. Roberts** <lroberts@bfesf.com>
Date: Fri, May 24, 2024 at 5:47 PM
Subject: Colombo v. Palo Alto USD
To: Lisa Midel <lmidel@jamsadr.com>

Cc: Benjamin I. Oreper <boreper@bfesf.com>, Ethan Lowry <elowry@bfesf.com>, Eugene Elliot <eelliot@bfesf.com>, Sergio Guerrero <sguerrero@bfesf.com>, Evan Nelson <evancnelson.law@gmail.com>, acrane@bledsoelaw.com <acrane@bledsoelaw.com>, wtsmith@bledsoelaw.com <wtsmith@bledsoelaw.com>, calendar@bledsoelaw.com <calendar@bledsoelaw.com>

Good evening,

Attached please find the District Defendants' Brief for the Mediation in this matter scheduled for May 29, 2024.  Please contact our office if you have any difficulties with the attachment, or if we may be of any additional assistance.



**L Roberts** (she/her/hers)

**Senior Legal Assistant**

Bertrand Fox Elliot Osman + Wenzel

The Waterfront Building

2749 Hyde Street

San Francisco, CA 94109

P: 415-353-0999 x201

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# EXHIBIT LL



## Agenda Item Details

| | |
|---|---|
| Meeting | Dec 15, 2020 - Regular Board Meeting |
| Category | 9. Information Items |
| Subject | D. Title IX Update. This item is for information only. No action is required. |
| Type | Information |

**To:** Dr. Donald B. Austin, Superintendent of Schools

**From:** Ms. Komey Vishakan, General Counsel

### RECOMMENDATION
This item is for information only. No action is required.

### BACKGROUND

**OFFICE FOR CIVIL RIGHTS (OCR)**
On November 10, 2020, PAUSD received notification from OCR that it had determined that the District has fulfilled the terms of the three-year Resolution Agreement, resulting in the closing of the monitoring phase. This determination was based upon the following efforts that were undertaken by the District:

1) Revised policies and procedures: In consultation with OCR, the District revised and/or developed its policies regarding sexual harassment and the procedure for complaints of alleged sexual harassment. Following OCR's approval of the revised policies and procedures, the District obtained Board approval and implemented the revised policies and procedures.

2) Notices to staff: The District drafted a notice regarding the revised policies and procedures and a staff memorandum regarding the same. Following OCR's approval, the District distributed the notice and staff memorandum.

3) Memorandum of Understanding with police department: The District revised its Memorandum of Understanding (MOU) with the Palo Alto Police Department (PAPD) to clarify language regarding Title IX.

4) Online system for complaints and tracking of complaints: The District developed an online system where students and parents could anonymously report allegations of sexual harassment and sexual violence and developed a confidential system for tracking all complaints and allegations of sexual harassment and sexual violence in the District. District schools also developed a confidential system for tracking and reporting complaints, including when the information about the resolution was provided to the District Title IX Coordinator. OCR reviewed and approved the online systems. In addition, at the end of each school year, the Title IX Coordinator reported a summary of the information gathered through the tracking systems, including any recommendations for future actions, to the Board of Education

5) Staff guidance and training, including training of Title IX Coordinator: The District provided annual mandatory Title IX training for its employees, including administrators, classified staff, and teaching staff pursuant to the Agreement.

6) School climate assessment: The District developed a school climate assessment and OCR reviewed and approved the District's surveys and plans for the assessment. The District provided its climate assessment report to OCR for each school year while this Agreement was in effect.

7) Sexual harassment investigations: The District completed investigations of alleged sexual harassment incidents identified by OCR, and provided OCR with its investigative reports, underlying documents, and outcomes. OCR reviewed and approved the District's investigations, corrective action plans, and notifications regarding the identified incidents.

8) Student remedies in case under investigation: The District drafted a letter and invitation to the Complainant and Student. Following OCR's review and approval, the District contacted the Complainant and Student to implement the Agreement.

**UNIFORM COMPLAINT PROCEDURES (UCP) COMPLAINTS**
A copy of the 2020-21 UCP log is included with this update. For the 2020-21 school year, 18 complaints have been received. 13 have been resolved while the other five are currently being investigated.

**TITLE IX TRAINING EFFORTS 2020-21**
Student Training
In an effort to anticipate and address issues that might arise from an online learning environment, the Office of General Counsel and the Title IX Office developed a series of training sessions for students. The first was presented to high school students by Jody Shipper of Grand River Solutions and focused on online harassment and bullying issues. One of the topics covered in this training was sending and receiving inappropriate photos and messages through social media and text messaging. The session was streamed to the entire student body at each site--during Advisory at Gunn HS on August 26 and during period 4 at Palo Alto HS on September 3. Efforts are also currently underway to roll out a similar training for the middle schools. In addition, an upstander training session is being developed in time for the second semester.

Staff Training
As part of an effort to provide Title IX training to 100% of employees, staff were required to complete the training developed by the Title IX Office and delivered through the Keenan online training portal by September 30. In addition, Eve Fichtner, counsel with the firm AALRR, provided a 90-minute training session for site and District administrators on September 3. This training concentrated on the newly added responsibilities of the Title IX Coordinator, investigators, and decision-makers. The Title IX Office holds monthly meetings for principals and site administrators designated as Title IX "point persons" who are responsible for handling Title IX complaints.

**TITLE IX BOARD STUDY SESSION**
The Board facilitated a listening session on December 8, 2020, in order to hear from students regarding how to make current Title IX processes more accessible to students. Five PAUSD high school students participated as panel members and provided student insight into creating a safer environment for learning. Staff have been working with student representatives in the last several months and will continue collaborating with students to implement suggested improvements.

[20201215UCPLog.pdf (36 KB)]

# EXHIBIT MM

Eugene B. Elliot, State Bar No. 111475
Ethan M. Lowry, State Bar No. 278831
Benjamin I. Oreper, State Bar No. 329480
BERTRAND, FOX, ELLIOT, OSMAN & WENZEL
2749 Hyde Street
San Francisco, California 94109
Telephone: (415) 353-0999
Facsimile:  (415) 353-0990
Email:      eelliot@bfesf.com
            elowry@bfesf.com
            boreper@bfesf.com


Attorneys for Defendants
PALO ALTO UNIFIED SCHOOL DISTRICT, DON AUSTIN,
AMANDA BARK, and LISA HICKEY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER COLOMBO, | Case No. 5:24-cv-00909-NC |
|      Plaintiff, | **DECLARATION OF TRENT BAHADURSINGH IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| PALO ALTO UNIFIED SCHOOL DISTRICT, et al., | Date:    July 10, 2024<br>Time:   11:00 a.m.<br>Dept.:  Courtroom 5, 4th Floor |
|      Defendants. | **Hon. Nathanael M. Cousins** |

I, Trent Bahadursingh, declare as follows:

1.    I have personal knowledge of the facts and circumstances set forth herein and could, if called, competently testify thereto.

2.    I am the Deputy Superintendent, Chief of Staff at the Palo Alto Unified School District (the "District") and have served in this capacity since February 1, 2021. As Deputy Superintendent, Chief of Staff, my duties include oversight of the following departments:  Human Resources (including the role as the lead negotiator with the District's labor unions), Legal Services (including Title IX and California Public Records Act), Safety, Registration Services and Enrollment. I also am involved with communications and collaborating with our Public Information Officer.  At the time the District received the emailed allegation against Plaintiff, the District's general counsel was Komey Vishakan, who reported directly to the Board of Education and the Superintendent.  The District's legal department was not within my oversight.

3.    On January 28, 2022, the District received an email from the husband of a former female District student alleging that Peter Colombo, a coach and teacher within the District, had raped the student in the locker room of Greene Middle School during the 2001-2002 school year. Ms. Vishakan received the email communication and handled all communication with the individual who provided the information. Attached hereto as **Exhibit A** is a true and correct copy of the email produced pursuant to the District's initial disclosures at PAUSD000561.

4.    In accordance with the California Child Abuse and Neglect Reporting Act ("CANRA," California Penal Code §11166(a)), Ms. Vishakan promptly reported the allegation to local law enforcement.

5.    On January 31, 2022, the District notified Colombo that he was being placed on paid administrative leave effective that date, with the notification letter stating that the leave is "not intended to be disciplinary" and "is intended to avoid any undue disruption at Greene Middle School."  Attached hereto as **Exhibit B** is a true and correct copy of the notification letter, produced pursuant to the District's initial disclosures at PAUSD000598.

6.    On June 15, 2022, following an independent investigation by the Palo Alto Police Department and the Santa Clara County District Attorney's Office, Colombo was arrested, charged with

1

1    felony aggravated sexual assault of a child, and booked into the Santa Clara County Main Jail.

2        7.      The following day, on June 16, 2022, the District notified Colombo that due to his arrest

3    and the charges against him, the District was legally compelled by Sections 45304(b), 44940, and 44010

4    of the California Education Code to place him on an compulsory leave of absence, to continue until ten

5    days after the date of entry of judgment in the criminal proceeding.  Attached hereto as **Exhibit C** is a true

6    and correct copy of the notification letter, produced pursuant to the District's initial disclosures at

7    PAUSD000563-568.

8        8.      In accordance with California Education Code Section 44940(d)(1), the District also

9    reported Colombo's arrest and charging to the California Commission on Teacher Credentialing ("CTC")

10   the same day.  Attached hereto as **Exhibit D** is a true and correct copy of the notification letter, produced

11   by the District in this matter at PAUSD000016.  Independent of any further action by the District, the

12   CTC (an independent state agency) suspended Colombo's teaching credential pursuant to Education Code

13   Section 44940(d)(2).

14       9.      On April 4, 2022, during the pendency of the law enforcement investigation of Colombo

15   and prior to charges being brought, Ms. Vishakan responded via email to an inquiry from investigating

16   PAPD Detective Yolanda Franco-Clausen, stating that no records related to the alleged student victim had

17   been located in the District's digital databases with the exception of a "yearbook which shows the student

18   attended Jordan Middle."   Attached hereto as Exhibit E is a true and correct copy of these emails,

19   produced pursuant to the District's initial disclosures at PAUSD000972.

20       10.     After being apprised of Ms. Vishakan's communication, I performed a search of the

21   District's physical repository of student records pending digitization which are located in a District

22   warehouse. I was able to locate the District's copy of the student victim's file. The file did not contain the

23   student's "grade report for 6th grade," nor did it contain any information from which a conclusion could be

24   drawn that Colombo was or was not the student's PE teacher, or whether Colombo was at a different

25   school during the class period the student alleged the rape occurred. This file was subsequently provided

26   to law enforcement.

27       11.     Approximately a month after a preliminary hearing on March 21, 2023, the Santa Clara

28   District Attorney's office dismissed the criminal case against Colombo.

DECLARATION OF BAHADURSINGH IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MSJ
Case No.: 5:24-cv-00909-NC

12.    On May 24, 2023, the District notified Colombo that it had been informed that the CTC had reinstated Colombo's teaching credential effective May 2, 2023, given that the charges leading to his mandatory leave of absence offences were dropped, and that he was being returned to paid administrative leave accordingly pending an internal investigation.  Attached hereto as **Exhibit F** is a true and correct copy of this notification.  The 2022-2023 school year ended on June 1, 2023.

13.    However, the District subsequently received notification from the CTC that Colombo's credential had expired, and that the CTC had not approved its renewal.  Accordingly, on August 4, 2023, the District notified Colombo of the notification from the CTC, that as a result, he did not at that time possess a valid teaching credential; that although Colombo had informed the District of his submission of a renewal application on May 16, 2023, the status of his renewal application was listed as "Notice of Delay List;" that the District could not lawfully issue a pay warrant to a certificated employee without a valid credential in accordance with Ed. Code §45034; and that he was being returned to unpaid leave effective August 7, 2023, pending the renewal of his credential.  Attached hereto as **Exhibit G** is a true and correct copy of this notification letter.  The District was not involved in any way in Colombo's application being placed on the "Notice of Delay List."

14.    Subsequently, on October 26, 2023, the District was informed that the CTC reinstated Colombo's credential effective October 20, 2023.  On November 1, 2023, the District notified Colombo that he was being returned to paid administrative leave accordingly commencing October 23, 2023. Attached hereto as **Exhibit H** is a true and correct copy of the notification letter.

15.    The 2023-2024 school year began on August 9, 2024.  Once the District returned from its summer recess, the District initiated an independent personnel investigation into the allegations of rape against Colombo.  The District did not initiate its independent investigation prior to this date in order not to interfere with the criminal investigation and Colombo's pending criminal proceeding.    This investigation was not initiated pursuant to any of the District's internal complaint procedures, board policies, or administrative regulations.  Rather, the District was compelled to initiate the investigation due to the gravity of the allegations against Colombo, regardless of the outcome of his criminal proceedings, and further given the District's potential exposure to civil liability for failing to perform an independent investigation of the allegations.  The scope of the investigation was expressly limited to the rape

1   allegation against Colombo, which was communicated to him prior to his interview.  Attached hereto as

2   **Exhibit I** is a true and correct copy of the communication to Plaintiff's counsel.

3         16.    The investigation was overseen by the District's outside legal counsel. who retained the

4   services of an independent third-party investigator, Nicole Miller of Miller & Associates.  Throughout the

5   investigation, Ms. Miller never communicated directly with any District personnel, with the exception of:

6   (1) an email from me to provide law enforcement contact information; and (2) personnel interviewed

7   pursuant to the investigation.  Attached hereto as **Exhibit J** is a true and correct copy of that email,

8   produced pursuant to the District's initial disclosures at PAUSD000924.

9         17.    As stated above, the investigation was not initiated until after the conclusion of the

10   criminal proceedings against Colombo in order not to interfere with any concurrent, independent

11   investigation by law enforcement or with Colombo's criminal proceeding.  This is consistent with the

12   District's conduct throughout the pendency of Colombo's criminal proceeding, wherein the District at all

13   times made efforts to avoid taking actions that would in any way interfere with or compromise any

14   proceedings or investigations by law enforcement.  This is evidenced by communications between myself

15   and PAPD Detective Franco-Clausen, in which I sought direction from PAPD and the District Attorney's

16   office regarding whether the District's disclosure of documents relating to Colombo (inclusive of the

17   email sent by the alleged victim's husband containing the initial allegation against Colombo) would

18   compromise any law enforcement investigation.  In response, the District was asked not to release the

19   email containing the allegation until completion of law enforcement's investigation, which the District

20   did.  Attached hereto as **Exhibit K** is a true and correct copy of these email communications, produced

21   pursuant to the District's initial disclosures at PAUSD000970.

22         18.    The District's investigation of Plaintiff concluded in Spring 2024.  Once complete,

23   Colombo was notified of the completion of the investigation; that the investigation was exclusively

24   regarding potential misconduct based on information received by the District from an anonymous source

25   regarding an alleged sexual assault of a student by Plaintiff on District property during the 2001-2002

26   school year; and that the investigator "determined that the allegation was not substantiated due to a lack of

27   evidence, including but not limited to, the absence of a direct statement from the alleged victim to support

28   the claim."  Attached hereto as **Exhibit L** is a true and correct copy of this notification.

DECLARATION OF BAHADURSINGH IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MSJ
Case No.: 5:24-cv-00909-NC

19.     On or about May 29, 2024, Plaintiff's counsel sent a letter to the District's general counsel in which he stated that "it would be unconscionable, if not criminal, to attempt to assign [Plaintiff] to a school site without completely dispelling the false light created to the public by PAUSD, and as again intimated through the recent "Investigation Report," which the District understood to constitute Plaintiff's refusal to accept an assignment from the District.  Attached hereto as **Exhibit M** is a true and correct copy of this communication.

20.     Subsequently, on May 30, 2024, Plaintiff's counsel sent another letter to the District's general counsel in which he stated that "Colombo will now need to work until age 72," and that Colombo "will be ready to report back to his PE teaching assignment at Greene Middle School beginning with District Day on August 12, 2024 and to resume his baseball coaching role at Paly."  However, the letter stated Colombo's return would be contingent on the District's meeting several demands by Plaintiff, including that the District make a "public announcement" inclusive of specified factual contentions proffered by counsel; that the District provide Plaintiff with a "security detail" to "accompany" him on campus; and that Plaintiff be provided with "a much heightened level of mental health support."  As above, the District understood this communication to constitute Plaintiff's refusal to accept an assignment from the District absent the District meeting Plaintiff's demands.  Attached hereto as **Exhibit N** is a true and correct copy of this communication.

21.     Attached hereto as **Exhibit O** is a true and correct copy of an email sent by Plaintiff on September 1, 2021, to Principal Sebastian A. Benavidez, Principal of Greene Middle School, in which Plaintiff states "I have been in this district as a teacher/coach 24 years and this for sure is my 'MOMENT TO GROW.'  Only way I can look at it without going crazy. I'm 54 years old so just 7 more years, I know I can do it."  This document was previously produced in discovery by the District at PAUSD000379.

22.     With the exception of the time period from August 4, 2023, to October 23, 2023, during which time Plaintiff was without a valid teaching credential and the District could not issue a pay warrant to him in accordance with Education Code Section 45034, Plaintiff has received, and is continuing to receive, his full salary and health and welfare benefits.  This is inclusive of the District's full reimbursement of Plaintiff's salary and benefits which could not be paid during the pendency of his criminal proceeding when he was on mandatory unpaid leave.

23. Plaintiff has no legal claim of entitlement to be returned to his particular prior assignment. The District has the right to assign the Plaintiff to an assignment based on what is in the "best interest" of the District.

24. Plaintiff has no legal claim of entitlement to summer school and coaching stipends he alleges he would have, and did not, earn during the time period that he has been on leave from the District, as these assignments are discretionary.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on the 18th day of June 2024, at Palo Alto, California.

By: _____/s/ Trent Bahadursingh_____
TRENT BAHADURSINGH

**ATTORNEY ATTESTATION**

I hereby attest that I have been authorized by Trent Bahadursingh to show their signature on this Declaration as /s/.

Dated: June 18, 2024

By: _____/s/ Benjamin Oreper_____
Benjamin I. Oreper

# EXHIBIT NN

1    EVAN C. NELSON (SBN 172957)
     LAW OFFICE OF EVAN C. NELSON
2    1990 N. California Blvd., 8th Floor
     Walnut Creek, CA  94546
3    Telephone: (925) 323-1991
     Email: evancnelson.law@gmail.com
4
     *Attorneys for Plaintiff Peter Colombo*
5

6

7

8                        UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

                              SAN JOSE DIVISION
10

11   **PETER COLOMBO,**                      Case No. 5:24-cv-00909-NC

12                              Plaintiff,
                                             **DECLARATION OF MARK**
13        v.                                 **ALLENDORF**

14   **PALO ALTO UNIFIED SCHOOL DISTRICT,**
     **DON AUSTIN, Individually and as**
15   **Superintendent for PAUSD, LISA HICKEY,**
     **Individually and as Director of Certificated**
16   **Human Resources for PAUSD, AMANDA**
     **BARK, Individually and as Manager, Policy**
17   **and Legal Compliance for PAUSD, and**
     **TRENT BAHADURSINGH, individually and**
18   **as Chief of Staff for PAUSD,**

19                              Defendants.

20

21

22

23

24

25

26

27

28

1

## DECLARATION OF MARK ALLENDORF

2
3
4

I, Mark Allendorf, hereby declare based on my own personal knowledge, except where noted to be based on information and belief. If called as a witness, I can and will testify as follows:

5
6
7
8

1.      I retired in 2022 from my teaching position at Palo Alto Unified School District (PAUSD) due, in significant part, to discriminatory policies and/or practices being brought to bear against me and other older, white male teachers.

9
10
11
12
13
14
15
16
17
18

2.      My experience leads me to an understanding that the specific discrimination against me was directly approved by, supported and carried out by Palo Alto Unified School District's Administration, including Don Austin (Superintendent), Trent Bahadursingh (I am informed and believe he was Chief of Staff and Assistant Superintendent of Human Resources during the relevant timeframe), Lisa Hickey (Director of Human Resources), Amanda Bark (Manager Policy and Legal Compliance), Principal Sebastian Benavidez and others with the specific intention of forcing me out of the District, as an older white male teacher, in order both to accelerate the District's Equity Plan by forcing white male teachers out providing positions to be filled by "diverse" teachers and to replace older, more experienced but more expensive teachers with younger, less expensive teachers.

19
20
21

3.      Principal Sebastian Benavidez replaced Principal Valerie Royaltey-Quandt for the 2021-2022 school year and PAUSD Administration immediately began targeting me as an older, white male teacher.

22
23
24
25

4.      I had taught 8th Grade History for 30 years and exclusively taught 8th grade history from the 2000-2001 school year through the 2020-2021 school year. My first job was in Menlo Park (1989-1992). I then became a financial planner for IDS (now Ameriprise) from 1992 to 1994. For the next 27 years, I taught in PAUSD (1994-1995 to 2021-2022).

26
27
28

5.      I earned a Master's Degree in Teaching the United States Constitution, which is directly applicable to 8th Grade History. I earned both a James Madison Fellowship and a Thesis

1

1    Award in relation to my Master's Degree.

2        6.    Throughout my 30-year teaching career leading up to the 2021-2022 school year, my
3    evaluations were stellar and I received no negative marks on my employment history as a teacher.

4        7.    After the deadline for making teaching assignments for the 2021-2022 school year,
5    and less than one month before the school year was to begin, PAUSD Administration notified me
6    via an email that one of my 8th Grade History classes was going to be taken away and given to a
7    less senior teacher, and I was being assigned a 7th Grade History class. I requested, and was
8    denied, specific types of particularized support after being coerced into a different teaching
9    position than what I had competently filled for three decades with an extremely high level of
10   proficiency and seniority within the District, including Principal Sebastian Benavidez specifically
11   informing me, falsely, that the District does not pay or reimburse teachers to prepare for a new
12   course they have been scheduled to teach.
13

14       8.    At the time, I certainly believed that the District's conduct was unlawful and felt
15   strongly, even knew, that they should not be allowed to do what they were doing, but I did not
16   receive support from the CTA and had been previously told by the EEOC relating to a previous
17   complaint that I couldn't assert a claim because I was a white male, and had also been previously
18   told by PAUSD Administration that I could not file a sexual harassment report against a female
19   teacher because I was a male teacher and department head (the district called us "pseudo-
20   administrators") over the offending female temporary employee.

21       9.    However, I have recently become informed that PAUSD Administration violated
22   FEHA and Title VII through their targeting of older, white male teachers to accelerate their
23   Equity Plan and reduce their teacher salary budget, and in doing so did not follow Board Policy,
24   the Education Code, and the Collective Bargaining Agreement (CBA) as they failed to obtain a
25   board resolution and issue a seniority-based layoff notice (assuming there was a need to reduce or
26   eliminate 8th Grade History teaching positions at Greene Middle School) and/or by delaying until
27   after March 1, 2021 to notify me of the contrived 7th Grade history assignment to prevent my
28   ability to initiate an employee-initiated transfer to regain my 8th Grade History class position, and

Declaration of Mark Allendorf                                              24-cv-00909-NC

also did not follow the CBA-mandated employer-initiated transfer procedures.

10.  Principal Benavidez, supported by members of the PAUSD Administration mentioned above, then began harassing me by arrogantly stating that he was going to be my evaluator, followed by making unsubstantiated complaints about my choice of curriculum and other unwarranted criticisms. Principal Benavidez only observed my class one time, which came after his false allegations, and was only present in the room for about 10 minutes. He then left behind some barely legible notes. That was the extent of his observation-based "evaluation". Then he sent me a notice, a week after evaluations were due in May of 2022, that I needed to complete my "reflective review" in lieu of my final evaluation. When he was informed that his request was illegal, his reply was "I am fully aware of that, I was just giving you a chance to complete the process." Principal Benavidez had insufficient personal experience, knowledge or understanding from which to base an evaluation or review of my teaching.

11.  During the school year, I was unfairly reprimanded for missing meetings that were either physically impossible to attend or would have intruded significantly upon my preparation time for teaching a new course. My meeting obligations given my convoluted "two team two PLC" schedule were never clarified or put in writing, even though such clearly could have readily been properly placed into writing in advance of the school year. In addition, I was being asked to accommodate all of the other "team" and "PLC" members and their scheduling needs even though I had the toughest schedule to accommodate. Teachers in each of these entities changed the published meeting times to fit their schedules, making it even harder for me. PAUSD Administration was aware of all of this because they had to approve the schedule changes. After accepting most or all of the other member's requests for schedule changes, Administration rejected all of my meeting time suggestions. When I asked Sebastian Benavidez to intervene on my behalf or make some suggestions of his own, he did not do so.

12.  The discriminatory harassment by the District caused me to suffer severe emotional distress and forced me to take a two-week medical leave to seek mental health support. Upon my return from medical leave, not a single administrator bothered to check on my well-being. In fact,

3

1  my classroom was left in a shambles and I had to spend an hour my first morning back hurriedly

2  putting my room back in order before students arrived.

3       13.    Before the beginning of the school year, Vice Principal Brooke Tassa ordered that all

4  teachers send desk arrangement diagrams two weeks in advance of the first day of school, so that

5  the custodians would have time to put the rooms back in order and dispense with the barriers that

6  were in place during the pandemic. I complied within the timeframe, but to my dismay, my room

7  had not been arranged as I specified, and the "Covid Partitions" were strewn all over the room.

8  On day one, when I should have been preparing to welcome new students, I was cleaning up a

9  mess instead. Looking back on it now, I am certain that both acts were intentional, and just

10 another form of harassment endorsed by District leadership.

11      14.    Principal Benavidez ultimately wrote a scathing but blatantly improper and

12 unsupported "evaluation" that retaliated against me for taking a two-week medical leave, repeated

13 unsubstantiated criticisms (where I had no previous unfavorable reviews from supervisors,

14 administration, other teachers, parents, or students) and even raised a false Title IX report that had

15 never been investigated and was, in fact, withdrawn and dismissed, but he referenced it as

16 evidence of "numerous complaints against me".

17

18      15.    I decided to retire rather than continue to suffer intentional, discriminatory

19 harassment and abuse from the District. Lisa Hickey and Principal Benavidez told me that if I

20 continued to be on what they considered to be "best behavior" (including conceding to forced

21 retirement), they would consider removing Principal Benavidez' manipulative and unsupported

22 "evaluation" from my employment file.

23      16.    After I was forced to retire (I chose to retire, but would have considered more years

24 or even a part time position if I wasn't working in a hostile environment), a younger non-white

25 male teacher was hired to fill the open teaching position. I did not take an "early retirement" buy-

26 out deal presented to me the previous year, which was followed by the harassment described

27 above. I have been informed that Superintendent Don Austin bragged during a board meeting

28 about the teachers he "encouraged" to retire, showing a list to those present at the meeting.

4

17.    I want to be clear that I am uncomfortable in the role of a white male victim, but I also feel strongly that PAUSD needs to bring their practices into compliance with non-discrimination laws as they apply to all genders and races.

18.    I am confident that the record will show, and plenty of staff, including former administrators, counselors, and other teachers are willing to testify to the fact that I had a great rapport and success with students of color. I believe it to be true that Sebastian Benavidez was looking for a white male to put into his trophy case, and both Don Austin and Lisa Hickey were aware of, and supportive of, his blatantly discriminatory efforts.

19.    I want it to be known that I am not a racist and strongly support proper Equity programs. I am proud of my record of very high success teaching 8th Grade History to all students, students of all colors, races, genders, lifestyles, creeds and with particularly exceptional effect with students from traditionally disadvantaged circumstances. I currently volunteer as a tutor at the Siena Youth Center in Redwood City, California. (https://stfrancisrwc.org/services-programs/siena-youth-center). Most of the students are of Latin American origin. The center is in a formerly "distressed" part of Redwood City and includes services and housing for recently arrived immigrants from all over the globe. The staff there will attest to my dedication to these students.

20.    I believe there are several other older white male teachers who were targeted, whose names likely appeared on Don Austin's list that he presented to the PAUSD Board, and who are no longer employed at PAUSD. This unlawful, discriminatory conduct is depriving students of instruction by some of the best teachers the District used to employ, and it needs to stop.

I so testify based on my own personal knowledge under penalty of perjury under the laws of the United States of America and the State of California, dated this 6th Day of August, 2024.

MARK ALLENDORF

5

Declaration of Mark Allendorf                                                      24-cv-00909-NC

# EXHIBIT OO



## PALO ALTO EDUCATORS ASSOCIATION
## GRIEVANCE FORM – LEVEL I

Name of Grievant:_____ School Site:_____

Date Filed with Administrator:_____ Filed Against:_____

Supply the information requested below.  Use additional pages or attachments if necessary.

Term(s) of Contract at Issue:  Page Number _____    Article Number _____  Section Number _____

1. Statement of alleged grievance – A concise, factual statement of the problem – general and specific grounds for the grievance:

2. List specific remedies proposed to resolve alleged grievance:

3. Statement of reasons why specific actions in No. 1 above violate the Contract:

4. Level I Conference – Statement of steps initiated by grievant to resolve the violation by informal means:

5. Persons involved – Names, dates, places, and event:

6. Informal Level Decision:

_____                    _____
Signature of Grievant                                                                              Date

**ATTACHMENT TO PETER COLOMBO GRIEVANCE (08/05/2024)**

This is a good faith attempt to define the grievance as concisely as possible. However, due to the very unique circumstances of the current situation, including a 2-year+ background explaining what has led up to the specific violation(s) of the Collective Bargaining Agreement ("CBA") that occurred on July 31, 2024, a more complete explanation and description of the grievance requires a detailed statement that could not fit into the one line provided for each section on the standard grievance form.

**1. Statement of alleged grievance – A concise, factual statement of the problem – general and specific grounds for the grievance:**

On July 31, 2024, the District (through its Board, its Superintendent Don Austin, its Chief of Staff Trent Bahadursingh, its Director of HR-Certificated Herb Espiritu and others – the "District Actors") continued to discriminate against and violate Peter Colombo's ("Colombo") rights, a certificated and tenured teacher in good standing with high seniority, by providing intentionally dilatory notice of the District's refusal to return him to his teaching position from which he had been on involuntary admin leave pending three separate investigations, each and all of which found no evidence to substantiate the false claim against Colombo that gave rise to the investigations, including the District's own egregiously delayed investigation that unreasonably and unlawfully extended Colombo's forced leave by more than a year.

The District Actors have repeatedly failed to comply with applicable non-discrimination laws, the CBA, Board Policies and the Education Code by intentionally refusing to expeditiously and promptly complete its own investigation and properly account for Colombo's teaching position during his involuntary admin leave, to ensure that he could be returned to an appropriate teaching position (based on his experience as a middle school PE teacher for more than 26 years) upon completion of all investigations. Instead, the District Actors intentionally delayed more than a year before finally, on July 31, 2024, informing Colombo that he would not be returned to his teaching position, or to any teaching position, and would instead be forced to transfer to a sham "TOSA" position that is completely undefined.

Notice of the improper "District-initiated transfer" that was first provided to Colombo on July 31, 2024 violates the CBA contract in at least three distinct sections, including: (1) Article XIV's non-discrimination provisions by creating another adverse employment action against him as an older, white male teacher against whom widespread District polices are being employed to harass and intimidate him into a forced early retirement; (2) Article VIII, Section D through the District Actors' intentional delay beyond the March 1, 2024 deadline for an employee-initiated transfer request that precluded Colombo's ability to utilize Section D to apply for a transfer back to his position and assignment or to another appropriate teaching assignment within the District to avoid the forced sham TOSA assignment [And also beyond the March 15, 2024 deadline for providing notice to any employee impacted by a staffing reduction based on decreased enrollment]; and (3) Article VIII, Section E through the District Actors' intentional delays and complete failure to comply with the requirements for a District-initiated transfer.

After receiving the delayed notice provided by the District on July 31, 2024, research conducted on behalf of Colombo shows that during Colombo's forced admin leave period(s), the District Actors failed to follow the law, including provisions contained in Board Policy 4117.3 and Education Code §44955 for adjustment of teaching positions based on decreasing enrollment, and to then conduct layoffs based on seniority. The District Actors were required to maintain a position for Colombo based on his tenured status and seniority. Instead, the District Actors were intent to discriminate against and harass Mr. Colombo due to his arrest based on an unsubstantiated false claim. The District failed to secure his position until his return from the involuntary admin leave(s) to avoid this precise unlawful, adverse employment action.

Proper action by the District Actors required a board resolution to reduce male PE teacher positions at Greene Middle School (and/or male middle school PE teacher positions within the District) when enrollment at Greene Middle School declined during Colombo's forced admin leave period. The law required that a resolution be approved by the Board of Education with a subsequent layoff notification to the <u>least</u> senior male middle school PE teachers to maintain the proper position to staff ratio and to account for anyone on leave with more seniority, such as Colombo.[1] As the most senior male PE teacher at Greene and as the second most senior male middle School PE teacher in the District, Colombo should not have been impacted by the reduction in enrollment and should have been immediately placed in a PE teaching position at the conclusion of the District's investigation.

The District Actors should have hired a temporary teacher to cover Colombo's teaching position pending his return from his admin leave. But recent research following the District's July 31, 2024 notification revealed that the District Actors failed to follow the law (there is no evidence of a board resolution reducing PE teaching positions and no evidence of corresponding layoff notices based on seniority being sent to the least senior teacher(s)). Instead, the District simply "collapsed" one male, middle school PE teaching position in an *ad hoc* manner and unlawfully eliminated Colombo's teaching position. By their actions, the District Actors created an unlawful overstaffing situation (created intentionally or recklessly and to harass Colombo) so that they could claim they were unable to return Colombo to his teaching position or to any proper PE teaching position within the District, simultaneously forcing Colombo into a completely nebulous, undefined, secret and sham TOSA position while allowing the least senior male middle school PE teacher in the District to avoid the impact of the legally required layoff and retain a permanent teaching position that rightfully belongs to Colombo.

Rather than admitting their intentional/reckless creation of an overstaffing situation, and trying to lawfully correct it, the District Actors delayed completion of the District's investigation as they scurried to find a solution to their overstaffing situation and to not make obvious their further discrimination, harassment and/or retaliation against Colombo. When the investigator concluded her interview of Colombo on January 25, 2024 and stated that there was no evidence to support a finding that any sexual assault had occurred or that Colombo had engaged in any misconduct, the District intentionally and deliberately delayed completing the investigation because they had failed

---

[1] The District Actors know how to properly eliminate or reduce positions per Education Code. For example, the District submitted Resolutions No. 2021-22.07 and No. 2023-24.13 for board approval to eliminate or reduce positions and notice employees of those actions. However, since 2021 there is no evidence of such board resolution or notice applicable to Colombo's position, PE teacher positions or any District-wide teacher positions whatsoever.

to secure a position for Colombo, which they were lawfully required to do. Instead, the District Actors delayed until May 28, 2024 to send a letter with a one-sentence "summary" of the investigation finding that there was nothing to substantiate the claim against Colombo. These actions were designed to target Colombo in violation of the CBA non-discrimination provisions contained in Article XIV.[2] The District Actors then waited two more months, until July 31, 2024, to notify Colombo that they would be transferring him to a sham, undefined TOSA position without following the mandatory requirements for a District-initiated transfer. These actions were designed to harass, retaliate and/or discriminate and prevent Colombo from being able to return to his rightful PE teaching position due to the District Actors' derelict actions and failure to maintain proper staffing resolution and to follow seniority-based layoff procedures in violation of CBA Article XIV, and to also preclude Colombo's ability to seek an employee-initiated transfer (March 1, 2024 deadline), which conduct violates CBA Article VIII, Section D. The District Actors' further failure to follow the requirements for a District-initiated transfer violates CBA Article VIII, Section E.

Through filing this grievance, there is no waiver of legal rights under other laws (including but not limited to the Constitution, FEHA, Title VII and Title IX), which necessitated that the District retain and restore a specific teaching assignment, from which a forced admin leave occurred, in order to avoid further adverse employment action(s) based on an arrest (and related serial investigations) that never produced evidentiary substantiation of any wrongdoing. The specific situation at issue here – involving 2+ years of involuntary admin leave without any lawful cause for disciplinary action against an older white male, tenured teacher with high seniority and 25+ years of experience teaching middle school PE – is not addressed directly by the CBA[3] other than through its general call for compliance with existing laws, including the Education Code and non-discrimination laws (see e.g., CBA, Article XIV), and through CBA Article VIII, Section A's requirement that "[t]he District **shall** attempt to make transfers on a mutually satisfactory basis among unit members. Teachers **shall** be assigned to teach within the authorizations of their teaching credentials and, to the extent possible, within their major or minor fields of study."

Since the CBA cannot be negotiated, written, nor interpreted to violate other laws, the District should have carefully retained the assignment position for Colombo's return pending completion of all involuntary admin leave(s). Based on the July 31, 2024 notice of transfer, it has now become clear that the District did not properly retain the assignment from which Colombo was on temporary and involuntary admin leave and is now attempting to violate the express requirements for a Transfer as set forth in Sections D and E of Article VIII to cover for their discrimination, harassment and retaliation through intentional or reckless failure to retain a proper teaching position for Colombo. Had the District properly complied with other laws, Colombo would have been returned to his assignment and a transfer would not be needed. As it stands, the transfer is unlawful, constituting an adverse employment action based on an arrest without any finding of misconduct

---

[2] District Administrator Amanda Bark's husband, a teacher at Greene Middle School, has also reportedly been making threats of verbal abuse and physical violence against Colombo due to Colombo's exercise of his First Amendment rights to seek redress in the courts. The District Actors' appear to have been further incentivized to not restore Colombo's rightful teaching position in order to appease Ms. Bark's husband and to actively support the violation of Colombo's First Amendment rights.

[3] The CBA only addresses voluntary leaves (See Article XI, Leave Provisions) and does not specifically reference or address requirements for a return from involuntary admin leave to avoid an unlawful adverse employment action.

and appears to be part of an overarching discriminatory District policy aimed at forcing older white male teachers to retire early, in direct violation of Article XIV.

**2. List specific remedies proposed to resolve alleged grievance:**

Place Colombo in his teaching position at Greene Middle School (the position still exists because it has not been properly "reduced" through Board resolution and a layoff notice) and correct the overstaffing situation through the Education Code and Board Policy mandated board resolution process to reduce PE teaching positions followed by seniority-based layoff notification as outlined in Education Code §44955. [And appropriately address, investigate and take requisite action relating to Ms. Bark's husband's misconduct; obtain and appropriately publish Nicole Miller's (the investigator hired to conduct the District's dilatory investigation) findings exonerating Colombo, including her finding that there is no evidence to substantiate the claim that a sexual assault even occurred or that Colombo acted inappropriately in any manner; and, take all other measures necessary to ensure Colombo suffers no further adverse employment actions or other discriminatory impacts due to the false claim and arrest with no finding of misconduct.]

Eliminate discriminatory policies designed to threaten, harass and/or intimidate older white male teachers, including through contrived reassignment to new positions without proper support to ensure success (designed instead to ensure failure through manipulated adverse evaluations within the forced and improperly supported new position) and using threats of sexual harassment charges without following Title IX protocols required by law and the OCR Audit Resolution Agreement.

Follow the OCR Audit Resolution Agreement, including properly putting in place and complying with the OCR-required MOU with Palo Alto Police Department to ensure expeditious District investigations and resolution of all claims relating to sexual harassment, sexual assault, etc.

Complete training and generate mandatory protocols to ensure that Board Policy 4117.3 and Education Code §44955 are strictly followed for adjustment of teaching positions based on decreasing enrollment, and to then conduct requisite layoffs based on seniority.

Create procedures to ensure that teachers placed on involuntary admin leave have their assignments/positions protected to prevent adverse employment actions based on an arrest or investigation(s) where no finding of misconduct results.

Follow the law, the CBA, Board Policies and the Education Code. This might require substantial revamping of District policies to conform to the law, generation of strict protocols to ensure compliance, and substantial training of administrators and staff appears to be requisite.

Provide all details relevant to the proposed sham TOSA position immediately and in writing, including all expectations, job duties, requirements, experience and qualifications, administrative support and training to ensure success, any proposed evaluation processes that ensure fair treatment, details of compliance with Title VIII, Section E, justification for the transfer, explanation of why Colombo's teaching position was not properly preserved resulting in an overstaffing situation and why Board Policies and the Education Code were disregarded.

**3. Statement of reasons why specific actions in No. 1 above violate the Contract:**

As stated above: (1) the action is aimed at continued discrimination, harassment and/or retaliation against Colombo in violation of the non-discrimination provisions in CBA, Article XIV; (2) Article VIII, Section D was violated through the District Actors' intentional delay beyond the March 1, 2024 deadline for an employee-initiated transfer request that precluded Colombo's ability to utilize Section D to apply for a transfer back to his position and assignment or to another appropriate teaching assignment within the District to avoid the forced sham TOSA assignment [Also beyond the March 15, 2024 deadline for providing notice to any employee impacted by a staffing reduction based on decreased enrollment, which intentionally violates Colombo's Notice and Hearing Rights elucidated in 4117.3 BP]; and (3) Article VIII, Section E was violated through the District Actors' intentional delays and complete failure to even attempt to comply with the requirements for a District-initiated transfer into the secret, sham TOSA assignment.

**4. Level I Conference – Statement of steps initiated by grievant to resolve the violation by informal means:**

This is not applicable here as the grievance was not initiated at a site or supervisorial level. The grievance initiated at and/or above Level II Admin/HR due to the District Actors' intentional violations and ongoing unlawful discrimination against Colombo. Please immediately delineate any effective informal processes you claim are available to Colombo under these circumstances. It certainly appears fairly clear that any attempt at informal resolution would be futile due to (i) the pattern of discrimination, harassment and retaliation; (ii) the intentionally or recklessly created overstaffing situation through failure to properly account for Colombo's teaching position, failure to follow Board Policy and Education Code requirements for the Board of Education to pass a proper resolution to reduce teaching positions with corresponding seniority-based layoff; (iii) delays and other misconduct described above. If there is an established informal resolution protocol that applies under these circumstances, please describe it and inform where such protocols can be found.

**5. Persons involved – Names, dates, places, and event:**

On July 31, 2024, Herb Espiritu first provided notice of Colombo's surprise transfer to a nebulous, secret and sham "TOSA" position instead of assignment to his PE teaching position at Greene Middle School, or to any proper teaching position, which led to research that discovered the unlawful reasons for such adverse employment action. Trent Bahadursingh, Don Austin, Amanda Bark, Lisa Hickey and others have also been involved in the concerted actions that created this July 31, 2024 event, which violates the CBA as well as various other laws and regulations.

**6. Informal Level Decision:**

There has been no informal level decision as there is no applicable informal level grievance process established for the CBA violations that arose under the unique circumstances of this case. If you contend that a Level 1 Conference is required, please consider this a request for such a conference and provide all details appurtenant to such a conference and where such are detailed.