1  EVAN C. NELSON (SBN 172957)
   JONATHAN MCDOUGALL, ESQ. (SBN 212359)
2  LAW OFFICE OF JONATHAN MCDOUGALL
3  1640 Laurel Street
   San Carlos, CA  94070
4  Telephone: (650) 594-4200
   Email:  jonathan@mcdlaw.net; evancnelson.law@gmail.com
5
6  Attorneys for Plaintiff Peter Colombo

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11  PETER COLOMBO,                        Case No. 5:24-cv-00909-NC

12                        Plaintiff,      **DECLARATION OF EVAN C. NELSON AND**
                                          **EXHIBITS IN SUPPORT OF PLAINTIFF PETER**
13           v.                           **COLOMBO'S MOTION FOR PARTIAL**
                                          **SUMMARY JUDGMENT**
    PALO ALTO UNIFIED SCHOOL DISTRICT,
14  DON AUSTIN, Individually and as       **PART 1 OF 2 [EXHIBITS BETWEEN 2 AND 105]**
    Superintendent for PAUSD, LISA HICKEY,
15  Individually and as Director of Certificated
    Human Resources for PAUSD, and TRENT
16  BAHADURSINGH, individually and as Deputy
    Superintendent and Chief of Staff for PAUSD,   **FED. R. CIV. P. 56, L-R 56**
17
                          Defendants.
18

19                                        DATE:        December 17, 2025
                                          TIME:        10:00 a.m.
20                                        LOCATION:  COURTROOM 5, 4th FLOOR

21                                        **HON. NATHANAEL M. COUSINS**

22

23

24

25

26

27

28

30  DECLARATION FO EVAN C. NELSON SUPPORTING PLTF.'S MOTION FOR PARTIAL SUMMARY JUDGMENT
    Colombo v. Palo Alto Unified School District, et al. Case No.: 5:24-cv-00909-NC
31

I, EVAN C. NELSON declare as follows:

1.    I am an attorney licensed to practice law before all courts in the State of California and in the United States District Court for the Northern District of California .  I am an attorney working in association with the Law Office of Jonathan McDougall, current attorney of record for Plaintiff, Peter Colombo ("Plaintiff" or "Colombo").  The following facts are based on my personal knowledge and review of and familiarity with this file, having been involved since early- to mid-2023 with Plaintiff attempting to assist him in his efforts to regain his career after the criminal charges against him were dropped in April or May of 2023.  If called as a witness, I could and would testify competently thereto.

2.    Attached hereto as **Exhibit 2** is a true and correct copy of the Palo Alto Unified School District's ("PAUSD", "District", or "Defendant District") Resolution Agreement with the Department of Education's Office of Civil Rights ("OCR"). This signed copy of the Resolution Agreement is included with the August 22, 2017 Board Agenda Item Details regarding approval of the Resolution Agreement, which was obtained from PAUSD's BoardDocs site for its public records relating to board meetings.

3.    Attached hereto as **Exhibit 3** is a true and correct copy of the Memorandum of Understanding between PAUSD and Palo Alto Police Department ("PAPD") approved by OCR and adopted by the Palo Alto City Council on August 13, 2018. It is included with a copy of the August 21, 2018 Board Agenda Item Details regarding recommended approval of the Resolution Agreement, which was obtained from PAUSD's BoardDocs site for its public records relating to board meetings.

4.    Attached hereto as **Exhibit 6** is a true and correct copy of PAUSD Board Policy 5125 BP and Administrative Regulation 5125 AR relating to student records retention. This policy and associated regulation were obtained from PAUSD's BoardDocs site for its public records relating to its adopted board policies and administrative regulations.

5.    Attached hereto as **Exhibit 8** is a true and correct copy of PAUSD Board Policy 5145.7 BP relating to sexual harassment/sexual assault claims. This policy was originally obtained from PAUSD's BoardDocs site for its public records relating to its adopted board policies and administrative regulations and was subsequently produced in identical form by Defendants in response to written discovery.

6.    Attached hereto as **Exhibit 11** is a true and correct copy of notes produced by Defendants and represented to be contemporaneous notes taken by Hickey from January and February of 2022.

7.      Attached hereto as **Exhibit 14** is a true and correct copy of PAUSD Administrative Regulation 5145.71 AR relating to sexual harassment/sexual assault claims. This regulation was originally obtained from PAUSD's BoardDocs site for its public records relating to its adopted board policies and administrative regulations and was subsequently produced in identical form by Defendants in response to written discovery.

8.      Attached hereto as **Exhibit 15** is a true and correct copy of the September 20, 2017 Cozen O'Connor report relating to the OCR audits of PAUSD. This is included because it is referenced in the Expert Witness Report of Saundra K. Schuster.

9.      Attached hereto as **Exhibit 21** is a true and correct copy of communications produced by Defendants concerning the underlying Title IX related claim from January 28, 2022 that including PAUSD's Title IX Coordinator as of January 2022, Kelly Gallagher, as a recipient or sender.

10.      Attached hereto as **Exhibit 23** is a true and correct copy of the January 31, 2022 letter sent to Plaintiff by Bahadursingh placing Plaintiff on paid, involuntary administrative leave pending investigation of the January 28, 2022 Title IX related claim.

11.      Attached hereto as **Exhibit 25** is a true and correct copy of emails between Kena Cador, Plaintiff's union lawyer, and Hickey, Bahadursingh and PAUSD's then-General Counsel Vishakan seeking status updates on the investigation of the January 28, 2022 Title IX related claim. The initial email was sent to Hickey and Bahadursingh following up on the January 31, 2022 meeting where they placed Plaintiff on administrative leave. Neither Hickey nor Bahadursingh responded but appear to have forwarded the request for information to Vishakan, who then responded to Ms. Cador on their behalf. Plaintiff has repeatedly requested all emails forwarding the request to Vishakan and/or otherwise discussing Plaintiff's requests for information regarding the "investigation" and defense counsel has represented that no such emails are available for production.

12.      Attached hereto as **Exhibit 29** is a true and correct copy of email correspondence between Vishakan and the PAPD detective regarding the detective's February 11, 2022 request for information.

13.      Attached hereto as **Exhibit 30** is a true and correct copy of a supplemental declaration of Cindi Durchslag Ahern providing details on the 2001-2002 class schedules at Jordan Middle School (now Greene Middle School) and Terman Middle School (now Fletcher Middle school).

14.    Attached hereto as **Exhibit 32** is a true and correct copy of PAUSD's website posting relating to student records retention policies.

15.    Attached hereto as **Exhibit 34** is a true and correct copy of email correspondence between Zoe Morgan, a news reporter, and Kelly Meeker, the Assistant District Attorney initially handling the criminal prosecution of the January 28, 2022 Title IX related sexual assault claim. The notation from the police report that is referenced is found in two exhibits that have been labeled "confidential" as part of Exhibit 37 (the police investigation report produced by the California Commission on Teacher Credentialing ("CTC")) and Exhibit 113 (the police investigation report produced by PAPD in response subpoena in this action). It appears that the "notation" being discussed related to information provided to the police detective on or before February 25, 2022. Neither Defendants nor PAPD produced any emails for the five weeks between the detective's request for information showing

16.    Attached hereto as **Exhibit 36** is a true and correct copy of the Declaration of Ruth Jang Na previously filed in this action as part of ECF #66-1.

17.    Attached hereto as **Exhibit 40** is a true and correct copy of a transcript of the Open Forum session of the August 19, 2025 PAUSD Board Meeting.

18.    Attached hereto as **Exhibit 43** is a true and correct copy internal PAUSD email correspondence for the period of June 24, 2022 through August 2, 2022 relating to Plaintiff's 2001-2002 work assignment that include assignment to work at Terman Middle School.

19.    Attached hereto as **Exhibit 44** is a true and correct copy of email correspondence relating to Plaintiff's 2001-2002 work assignment at Terman Middle School, which correspondence was initiated by Plaintiff on June 9, 2022 and discussed by Hickey and Bark on June 9, 2022 and June 10, 2022.

20.    Attached hereto as **Exhibit 45** is a true and correct copy of Plaintiff's 2001-2002 work assignment printout showing he worked at Terman Middle School .3 full-time equivalent or 30% and also showing that Cindi Durchslag Ahern was his evaluator for the 2001-2002 school year. This was originally field as part of ECF #66-1 in this action and another copy was subsequently produced by Defendants (Page 001) as what Hickey provided to Plaintiff as the response to his inquiry.

21.    Attached hereto as **Exhibit 48** is a true and correct copy of the Declaration of Jill Naylor that was previously filed in this action as part of ECF #66-1.

DECLARATION OF EVAN C. NELSON SUPPORTING PLTF.'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Colombo v. Palo Alto Unified School District, et al. Case No.: 5:24-cv-00909-NC

22.     Attached hereto as **Exhibit 49** is a true and correct copy of true and correct copy of the Declaration of Cindi Durchslag Ahern that was previously filed in this action as part of ECF #66-1.

23.     Attached hereto as **Exhibit 50** is a true and correct copy of true and correct copy of the Declaration of Aimee Becker that was previously filed in this action as part of ECF #66-1.

24.     Attached hereto as **Exhibit 60** is a true and correct copy of the first page of a document produced by Defendants in this action purporting to be a June 27, 2022 email transmission of Jane Doe's student record to the detective working the case. In response to Plaintiff's subpoena in this action, PAPD did not produce either the email or the elementary school student record (not the relevant 6th grade student record) that was attached to the email in Defendants' production.

25.     Attached hereto as **Exhibit 65** is a true and correct copy of internal PAUSD correspondence between Austin, Bahadursingh and Hickey on June 19, 2022, Father's Day, while Plaintiff was in solitary confinement.

26.     Attached hereto as **Exhibit 75** is a true and correct copy of the "Unfit to Teach" article originally published by Palo Alto Online on February 17, 2023 as renewed (complete with comments) on January 24, 2024. Defendants apparently issued a subpoena to Embarcadero Media relating to this article but no  results from that subpoena have been shared with Plaintiff despite requests made to Defendants and directly to the subpoena service.

27.     Attached hereto as **Exhibit 78** is a true and correct copy of a May 15, 2023 article published in The Paly Voice titled "DA dropping charges, but district plans to investigate Colombo". The article followed an April 28, 2023 Paly Voice-sponsored press conference.

28.     Attached hereto as **Exhibit 88** is a true and correct copy of Hickey's May 24, 2023 letter to Plaintiff placing him back on involuntary administrative leave following dismissal of the criminal charges.

29.     Attached hereto as **Exhibit 90** is a true and correct copy of Hickey's June 26, 2023 letter to CTC reporting a statement of charges or intention to dismiss/suspend would be forthcoming but was not yet available because the investigation was not complete. It did not contain any investigation file or other materials as part of the submission, at least not anything that has been produced to Plaintiff. CTC did not produce this letter in response to CPRA requests or as part of its investigation file materials.

DECLARATION OF EVAN C. NELSON SUPPORTING PLTF.'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Colombo v. Palo Alto Unified School District, et al. Case No.: 5:24-cv-00909-NC

30.     Attached hereto as **Exhibit 103** is a true and correct copy of "Investigating Employee and Student-Related Complaints published in 2009 by Ronald Wenkart while he was General Counsel for Orange County Department of Education. Mr. Wenkart is currently a partner at the law firm of Atkinson, Andelson, Loya, Ruud & Romo ("AALRR"), the law firm that hired Miller to perform the "investigation" of Plaintiff. Ironically, Mr. Wenkart walked past the conference room just before the deposition of Miller began, as the deposition took place at AALRR's Irvine office per Miller's request.

31.     Attached hereto as **Exhibit 104** is a true and correct copy of website pages from the official website for Nicole Miller & Associates. The deposition subpoena for Miller requested copies of the website pages, but Miller refused to produce them. These copies were used during her deposition where she authenticated all of the pages other than the last page.

32.     Attached hereto as **Exhibit 105** is a true and correct copy of the "Packet" for the Palo Alto City Council's Special Meeting held on August 13, 2018 where they adopted the OCR-approved MOU with PAUSD. The adopted MOU was included in the "packet" and was obtained through download off the Palo Alto City Council's public records portal accessed at https://www.paloalto.gov/Departments/City-Clerk/City-Meeting-Groups/Meeting-Agendas-and-Minutes.

33.     Attached hereto as **Exhibit 107** is a true and correct copy of notes from Miller's January 25, 2024 interview of Plaintiff as part of her "investigation". Other than use of the initials "NT" to reference Jane Doe, Miller did not see anything in the notes that did not appear to be an accurate representation of the interview. In fact, she thought it was so accurate that she assumed it was based on a recording, but the interview was not recorded because Defendants prohibited such. The notes are not from a recording or even a verbatim transcription, though Plaintiff would have preferred his request for a recording or official reporting of the proceeding had been allowed per his advance request. A disability-approved note-taking assistance app with substantial after-interview editing was utilized. Fortunately, the interview was quite short and review and editing was conducted immediately after conclusion of the interview so that the notes could be made into comprehensible, complete sentences based on personal recall.

34.     Attached hereto as **Exhibit 108** is a true and correct copy of Trent Bahadursingh's Declaration submitted in opposition to Plaintiff's prior Motion for Partial Summary Judgment. The Declaration was filed in this matter as part of ECF #28-1.

DECLARATION OF EVAN C. NELSON SUPPORTING PLTF.'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Colombo v. Palo Alto Unified School District, et al. Case No.: 5:24-cv-00909-NC

35.     Attached hereto as **Exhibit 109** is a true and correct copy of the May 28, 2024 letter from Mr. Espiritu closing PAUSD's two and a half year "investigation" process that began January 31, 2022. There is no "cc" to Plaintiff's employment file for this letter.

36.     Attached hereto as **Exhibit 123** is a true and correct copy of the face page and pertinent portions of the transcript for the Preliminary Hearing on March 21, 2023 following which the criminal charges against Plaintiff were dropped.

37.     Attached hereto as **Exhibit 124** is a true and correct copy of the face page and pertinent portions of the transcript for the Deposition of Nicole Miller taken in this action on September 16, 2025.

38.     Attached hereto as **Exhibit 125** is a true and correct copy of communications between Hickey and Plaintiff dated April 26, 2022 and June 10-11, 2022, which were produced by Defendants.

39.     Attached hereto as **Exhibit 126** is a true and correct copy of the face page and pertinent portion of the transcript for the Deposition of Komathy Vishakan taken in this matter on June 5, 2025.

40.     Attached hereto as **Exhibit 127** is a true and correct copy of the face page and pertinent portion of the transcript for the Deposition of Lisa Hickey taken in this matter on June 16, 2025.

41.     Attached hereto as **Exhibit 128** is a true and correct copy of the face page and pertinent portion of the transcript for the Deposition of Cindi Durchslag Ahern taken in this matter on June 16, 2025.

42.     Attached hereto as **Exhibit 129** is a true and correct copy of the face page and pertinent portion of the transcript for the Deposition of Trent Bahadursingh taken in this matter on August 25, 2025.

43.     Attached hereto as **Exhibit 130** is a true and correct copy of the face page and pertinent portion of the transcript for the Deposition of Don Austin taken in this matter on August 26, 2025.

44.     Attached hereto as **Exhibit 132** is a true and correct copy of the face page and pertinent portion of the transcript for the Deposition of Peter Colombo taken in this matter on July 14, 2025.

45.     Attached hereto as **Exhibit 133** is a true and correct copy of an article published on September 10, 2019 titled "Dems Censure One of Their Own for Flouting Rules of Decorum."

46.     Attached hereto as **Exhibit 134** is a true and correct copy of an article published by Palo Alto Online on September 24, 2019 titled "City Council has questions about mishandled 911 call."

47.     Attached hereto as **Exhibit 135** is a true and correct copy of an article published by Claire Best on November 25, 2022.

48.    Attached hereto as **Exhibit 136** is a true and correct copy of a "community member's" tweets that have been published online and were previously submitted as part of ECF #66-1.

49.    Attached hereto as **Exhibit 137** is a true and correct copy of an article published by False Allegations Watch on December 5, 2022.

50.    Attached hereto as **Exhibit 138** is a true and correct copy of another article published by Claire Best on August 5, 2023.

51.    Attached hereto as **Exhibit 139** is a true and correct copy of a couple pages of email communications produced by Santa Clara County on behalf of the Santa Clara County District Attorneys' Office in response to a CPRA request.

52.    Attached hereto as **Exhibit 140** is a true and correct copy of a publication from March 15, 2023 relating to another set of false rape claims that were dismissed by the Santa Clara County District Attorneys' Office.

53.    Attached hereto as **Exhibit 141** is a true and correct copy of another publication relating to the false rape claims from a Stanford employee that was published on March 16, 2023.

54.    Attached hereto as **Exhibit 158** is a true and correct copy of the Expert Witness Report by Jessica Chaudhary, MD prepared and disclosed in this action.

55.    Attached hereto as **Exhibit 163** is a true and correct copy of the Expert Witness Report by Saundra K, Schuster prepared and disclosed in this action.

56.    Attached hereto as **Exhibit 168** is a true and correct copy of the Expert Witness Report by Detective Mark Alifano (ret.) prepared and disclosed in this action.

57.    Attached hereto as **Exhibit 173** is a true and correct copy of the Expert Witness Report by Ken Whittemore prepared and disclosed in this action.

58.    Attached hereto as **Exhibit 194** is a true and correct copy of Espiritu's notes dated May 5, 2025 relating to meeting with Plaintiff, at Plaintiff's specific urging, in an attempt to create an appropriate "return to work" transition plan.

59.    Attached hereto as **Exhibit 195** is a true and correct copy of email communications between Plaintiff and Espiritu relating to Plaintiff's request for reasonable accommodations for his known disability of Alcohol Use Disorder (AUD) when he discovered that Defendants had a vacancy for his PE teaching

position at Greene (the posting does not mention "Greene" and is vague even about what grades are being taught) and following his unsatisfactory attempts to engage in a meaningful discourse relating to a "return to work" transition.

60.     Attached hereto as **Exhibit 197** is a true and correct copy of an October 9, 2025 publication by Anthro, a Palo Alto High School student publication.

61.     Attached hereto as **Exhibit 242** is a true and correct copy of February 5, 2021 publication by the Association of California School Administrators ("ACSA") relating to standards and practices for California K-12 school Human Resources Administrators.

62.     Attached hereto as **Exhibit 243** is a true and correct copy of PAUSD Board Policy 4000 BP obtained from the official BoardDocs public records database containing The District's board policies and administrative regulations.

63.     Attached hereto as **Exhibit 244** is a true and correct copy of an October 1, 2025 article published by The Campanile, the Gunn High School School student newspaper.

64.     Attached hereto as **Exhibit 245** is a true and correct copy of detailed discovery requests to Defendants seeking to discover any facts and evidence they had to support the forty-one (41) defenses listed as "Affirmative Defenses" in their Answer to the third Amended Complaint.

65.     Attached hereto as **Exhibit 246** is a true and correct copy of The District's "responses" to the detailed discovery, which fails to set forth any facts or evidence to support any or all the forty-one (41) defenses listed as "Affirmative Defenses" in their Answer.

66.     Attached hereto as **Exhibit 247** is a true and correct copy of Austin's "responses" to the detailed discovery, which fails to set forth any facts or evidence to support any or all the forty-one (41) defenses listed as "Affirmative Defenses" in their Answer.

67.     Attached hereto as **Exhibit 248** is a true and correct copy of Bahadursingh's "responses" to the detailed discovery, which fails to set forth any facts or evidence to support any or all the forty-one (41) defenses listed as "Affirmative Defenses" in their Answer.

68.     Attached hereto as **Exhibit 249** is a true and correct copy of Hickey's "responses" to the detailed discovery, which fails to set forth any facts or evidence to support any or all the forty-one (41) defenses listed as "Affirmative Defenses" in their Answer.

DECLARATION OF EVAN C. NELSON SUPPORTING PLTF.'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Colombo v. Palo Alto Unified School District, et al. Case No.: 5:24-cv-00909-NC

69.     Attached hereto as **Exhibit 250** is a true and correct copy of The District's and Hickey's purported amended responses to Plaintiff's detailed discovery. These "responses" were served on August 23, 2025 (not on August 22, 2025 as noted in the Proof of Service), less than one week before close of fact discovery in this action.

70.     Attached hereto as **Exhibit 251** is a true and correct copy of Austin's and Bahadursingh's purported amended responses to Plaintiff's detailed discovery. These "responses" were served on August 29, 2025, the day that fact discovery closed in this action.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on November 3, 2024 at Walnut Creek, California.

_____

DECLARATION OF EVAN C. NELSON SUPPORTING PLTF.'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Colombo v. Palo Alto Unified School District, et al. Case No.: 5:24-cv-00909-NC

**EXHIBIT 2**

**Agenda Item Details**

| | |
|---|---|
| Meeting | Aug 22, 2017 - Regular Board Meeting |
| Category | 5. Action / Discussion / Information Items |
| Subject | A. Approval of BP/AR 1312.3 Uniform Complaint Procedures, BP/AR 5145.3 Nondiscrimination/Harassment, and BP 5145.7 Sexual Harassment: It is recommended the Board approve these three BP's and two AR's. These items were discussed at the June 22 and June 28, 2017, special Board meetings. ACTION |
| Type | Action |

To: Board of Education

From: Dr. Glenn "Max" McGee, Superintendent


**RECOMMENDATION**

It is recommended the Board approve the following Board Policies (BP) and Administrative Regulations (AR):
- BP 1312.3 Uniform Complaint Procedures
- AR 1312.3 Uniform Complaint Procedures
- BP 5145.3 Nondiscrimination Harassment
- AR 5145.3 Nondiscrimination Harassment
- BP 5145.7 Sexual Harassment

These items were discussed at the June 22 and June 28, 2017, special Board meetings.


**BACKGROUND**

Section A of the attached Resolution Agreement regarding Office for Civil Rights (OCR) case numbers 09-13-5901 and 09-14-1217 has several requirements regarding the above policies and administrative regulations. In these documents there had been internal inconsistencies and confusing language, and they had not been aligned with all Title IX requirements.

After reviewing these policies and administrative regulations with the Board last June, our attorneys and staff have conducted iterative discussions with OCR staff to assure that they approved of the alignment of our language with state and federal statute and with our own policies. As a result, all of the documents being considered for approval by the Board tonight have been approved by OCR, who also asked that we approve the BPs and ARs by the dates listed below:
- BP 5145.3 - OCR approved on 8/2/17; Board adoption due on or before 9/1/17
- BP 5145.7 - OCR approved on 8/2/17; Board adoption due on or before 9/1/17
- AR 5145.3 – OCR approved on 8/14/17; Board adoption due on or before 9/13/17
- BP 1312.3 – OCR approved on 8/15/17; Board adoption due on or before 9/14/17
- AR 1312.3 - OCR approved on 8/15/17; Board adoption due on or before 9/14/17

Because these items were discussed in June, we are presenting them for a vote this evening.

EXHIBIT 2 - 001

20170822BP1312.3UniformComplaintProceduresOCRApprovedDraft.pdf (426 KB)

20170822AR1312.3UniformComplaintProceduresOCRApprovedDraft.pdf (386 KB)

20170822BP5145.3NondiscriminationHarassmentOCRApprovedDraft.pdf (311 KB)

20170822AR5145.3NondiscriminationHarassmentOCRApprovedDraft.pdf (235 KB)

20170822BP5145.7SexualHarassmentOCRApprovedDraft.pdf (441 KB)

PalyandGunnOCRResolutionAgreementFinalSigned.pdf (3,693 KB)

EXHIBIT 2 - 002

EXHIBIT 2 - 003

EXHIBIT 2 - 004

EXHIBIT 2 - 005

EXHIBIT 2 - 006

EXHIBIT 2 - 007

EXHIBIT 2 - 008

EXHIBIT 2 - 009

EXHIBIT 2 - 010

EXHIBIT 2 - 011

EXHIBIT 2 - 012

EXHIBIT 2 - 013

EXHIBIT 2 - 014

**EXHIBIT 3**

**Agenda Item Details**

| | |
|---|---|
| Meeting | Aug 21, 2018 - Regular Board Meeting |
| Category | 5. Action / Discussion / Information Items |
| Subject | A. Agreement with Palo Alto Police Department (PAPD): It is recommended the Board approve the Memorandum of Understanding (MOU) with the PAPD. DISCUSSION/ACTION |
| Type | Action, Discussion |

**To:** Dr. Donald. B. Austin, Superintendent

**From:** Ms. Komey Vishakan, Manager of Policy and Legal Compliance

**RECOMMENDATION**
It is recommended the Board approve the MOU with the PAPD.

**BACKGROUND**
As required by the Resolution Agreement (RA) between the Office for Civil Rights (OCR) and Palo Alto Unified School District (PAUSD), the District revised the MOU with the PAPD.

Staff worked collaboratively with PAPD to clarify the roles and responsibilities of police department and district staff with respect to compliance with Title IX and a safe, nondiscriminatory school environment.

PAPD and PAUSD have produced an agreement that is relevant and comprehensive while meeting all of the specific requirements of the RA.

The MOU was passed by the Palo Alto City Council meeting on Monday, August 13, 2018.

20180821PaloAltoPoliceDeptMOU.pdf (1,147 KB)

EXHIBIT 3 -001

## CITY OF PALO ALTO CONTRACT NO.

## AGREEMENT BETWEEN THE CITY OF PALO ALTO AND THE PALO ALTO UNIFIED SCHOOL DISTRICT

### FOR PROFESSIONAL SERVICES

This Agreement is entered into on this                day of April 2018 ("Agreement") by and between the CITY OF PALO ALTO, a California chartered municipal corporation ("CITY"), and the Palo Alto Unified School District, a unified school district, located at 25 Churchill Avenue, Palo Alto, CA 94306-1099 ("PAUSD").

### RECITALS

The following recitals are a substantive portion of this Agreement:

A.     PAUSD intends to provide increased safety at its public schools by utilizing two Palo Alto Police Department School Resource Officers for its Project ("Safety Enhancement Project") and desires to engage the City to provide two such officers in connection with the Project ("Services").

B.     CITY and PALO ALTO POLICE DEPARTMENT ("PAPD") represent that its School Resource Officers have the necessary professional expertise, qualifications, and capability, and all required licenses and/or certifications to provide the Services.

C.     PAUSD in reliance on these representations desires to engage CITY to provide the Services as more fully described in Exhibit "A", attached to and made a part of this Agreement.

NOW, THEREFORE, in consideration of the recitals, covenants, terms, and conditions, in this Agreement, the parties agree:

### AGREEMENT

CITY shall perform the Services described in Exhibit "A" in accordance with the terms and conditions contained in this Agreement. The performance of all Services shall be to the reasonable satisfaction of both parties.

The term of this Agreement shall be from the date of its full execution through June 30, 2019, with the option to extend for up to 1 year until June 30, 2020, unless terminated earlier pursuant to Section 15 of this Agreement.

. Time is of the essence in the performance of Services under this Agreement. Any Services for which times for performance are not specified in this Agreement shall be commenced and completed by CITY in a reasonably prompt and timely manner based upon the circumstances and direction communicated to the CITY.

006247.00028
17708061 1

**EXHIBIT 3 -002**

. The compensation to be paid to CITY for performance of the Services described in Exhibit "A", including both payment for professional services and reimbursable expenses, shall not exceed the cost of half of two officers, equivalent to one FTE as follows:

July 1, 2018 – June 30, 2019 (FY 19) – 50% of two officers / amount shall not exceed $200,000

July 1, 2019 – June 30, 2020 (FY 20) – 50% of two officers / amount shall not exceed $250,000

CITY shall not receive any compensation for Additional Services performed without the prior written authorization of PAUSD. Additional Services shall mean any work that is determined by CITY to be necessary for the proper completion of the Project, but which is not included within the Scope of Services described in Exhibit "A".

. In order to request payment, CITY shall submit by June 1, 2018, invoices to the PAUSD describing the services performed and the applicable charges (including an identification of personnel who performed the services, hourly rates, and reimbursable expenses). If applicable, the invoice shall also describe the percentage of completion of each task. The information in CITY'S payment requests shall be subject to verification by PAUSD. CITY shall send all invoices to the PAUSD address specified in Section 16 below. PAUSD will process and pay invoices within thirty (30) days of receipt.

. All of the Services shall be performed by CITY or under CITY's supervision. CITY represents that it possesses the professional and technical personnel necessary to perform the Services required by this Agreement and that the personnel have sufficient skill and experience to perform the Services assigned to them. CITY represents that it, its employees and sub consultants, if permitted, have and shall maintain during the term of this Agreement all licenses, permits, qualifications, insurance and approvals of whatever nature that are legally required to perform the Services.

All of the services to be furnished by CITY under this agreement shall meet the professional standard and quality that prevail among professionals in the same discipline and of similar knowledge and skill engaged in related work throughout California under the same or similar circumstances.

CITY shall retain control over supervision, wages, and other terms and conditions of employment of the officers providing the Services under this Agreement. The parties acknowledge that such officers are held to the requirements of the law and CITY policies and procedures. PAUSD agrees that it shall not have authority to direct the officers' law enforcement activity. PAUSD shall assist CITY with evaluation of the officers, however, the CITY shall have the responsibility to evaluate, manage, and supervise the officers. PAUSD will immediately notify CITY of any concerns regarding such activity.

. CITY shall keep itself informed of and in compliance with all federal, state and local laws, ordinances, regulations, and orders that may affect in any manner the Project or the performance of the Services or those engaged to perform Services under this Agreement. CITY shall procure all permits and licenses, pay all charges and fees, and

2

give all notices required by law in the performance of the Services.

. It is understood and agreed that in performing the Services under this Agreement CITY, and any person employed by or contracted with CITY to furnish labor and/or materials under this Agreement, shall act as and be an independent contractor and not an agent or employee of the PAUSD.

. The parties agree that the expertise and experience of CITY are material considerations for this Agreement. CITY shall not assign or transfer any interest in this Agreement nor the performance of any of CITY's obligations hereunder without the prior written consent of the city manager. Consent to one assignment will not be deemed consent to any subsequent assignment. Any assignment made without the approval of the city manager will be void.

.

**No Subcontractor:** CITY shall not subcontract any portion of the work to be performed under this Agreement without the prior written authorization of the city manager or designee.

. CITY will assign the Police Department Investigative Services Division Commander as the Project Manager to have managerial responsibility for the performance, progress, and execution of the Services and as the project liaison to represent CITY. If circumstances cause the substitution of the project manager, project coordinator, or any other key personnel for any reason, the appointment of a substitute project director and the assignment of any key new or replacement personnel will be subject to the prior written approval of the PAUSD's project manager. CITY shall review any request made by PAUSD to remove CITY personnel who PAUSD finds do not perform the Services in an acceptable manner, are uncooperative, or present a threat to the adequate or timely completion of the Project or a threat to the safety of persons or property. The day-to-day supervision of the services will be handled by the Investigative Services Division Supervisor as assigned by the Project Manager.

The PAUSD's project manager is Yolanda Conaway, Assistant Superintendent of Strategic Initiatives and Operations, Palo Alto Unified School District, Palo Alto, CA 94306. PAUSD's project manager will be CITY's point of contact with respect to performance, progress and execution of the Services. PAUSD may designate an alternate project manager from time to time.

.

12.1.    The CITY shall protect, indemnify, defend, and hold harmless the PAUSD, its employees, agents, and Board members from and against any demands, claims, liability, or expense on account of suits, verdicts, judgments, costs or claims of any nature or kind arising out of, or in any way connected with, the CITY'S performance or nonperformance under this Agreement, including the CITY'S operations on, use, management, alteration or control of the PAUSD's property under this Agreement except for any claims or liability, or portions thereof, arising from the concurrent or sole negligence or intentional malfeasance of the PAUSD, its directors, officers, employees or agents.

12.2.    PAUSD shall protect, indemnify, defend, and hold harmless the CITY, its employees, agents, and elected officials from and against any demands, claims, liability, or expense on

EXHIBIT 3 -004

account of suits, verdicts, judgments, costs or claims of any nature or kind arising out of, or in any way connected with, the PAUSD's performance or nonperformance under this Agreement, including the PAUSD's operations on, use, management, alteration or control of the PAUSD's property under this Agreement except for any claims or liability, or portions thereof, arising from the concurrent or sole negligence or intentional malfeasance of the CITY, its directors, officers, employees or agents.

. The waiver by either party of any breach or violation of any covenant, term, condition or provision of this Agreement, or of the provisions of any ordinance or law, will not be deemed to be a waiver of any other term, covenant, condition, provisions, ordinance or law, or of any subsequent breach or violation of the same or of any other term, covenant, condition, provision, ordinance or law.

14.1.   PAUSD, at its sole cost and expense, shall obtain and maintain, in full force and effect during the term of this Agreement, the insurance coverage described in Exhibit "B". PAUSD and its contractors, if any, shall obtain a policy endorsement naming CITY as an additional insured under any general liability policy or policies.

14.2.   All insurance coverage required hereunder shall be provided through carriers with AM atings of A-:VII or higher which are licensed or authorized to transact insurance business in the State of California. All contractors of CITY retained to perform Services under this Agreement will obtain and maintain, in full force and effect during the term of this Agreement, identical insurance coverage, naming CITY as an additional insured under such policies as required above.

14.3.   Certificates evidencing such insurance shall be filed with CITY concurrently with the execution of this Agreement. The certificates will be subject to the approval of CITY's Risk Manager and will contain an endorsement stating that the insurance is primary coverage and will not be canceled, or materially reduced in coverage or limits, by the insurer except after filing with the Purchasing Manager thirty (30) days' prior written notice of the cancellation or modification. If the insurer cancels or modifies the insurance and provides less than thirty (30) days' notice to PAUSD, PAUSD shall provide the Purchasing Manager written notice of the cancellation or modification within two (2) business days of the PAUSD's receipt of such notice. PAUSD shall be responsible for ensuring that current certificates evidencing the insurance are provided to CITY's Purchasing Manager during the entire term of this Agreement.

14.4.   The procuring of such required policy or policies of insurance will not be construed to limit PAUSD's liability hereunder nor to fulfill the indemnification provisions of this Agreement. Notwithstanding the policy or policies of insurance, PAUSD will be obligated for the full and total amount of any damage, injury, or loss caused by or directly arising as a result of the Services performed under this Agreement, including such damage, injury, or loss arising after the Agreement is terminated or the term has expired.

4

14.5.    The CITY, at its sole cost and expense, shall obtain and maintain, in full force and effect during the term of this Agreement, the insurance coverage described in Exhibit "B". The CITY and its contractors, if any, shall obtain a policy endorsement naming PAUSD as an additional insured under any general liability policy or policies. The CITY may self-insure to meet the requirement specified in this Section 14.

14.6.    Certificates evidencing such insurance shall be filed with PAUSD concurrently with the execution of this Agreement. The certificates will be subject to the approval of PAUSD's Risk Manager and will contain an endorsement stating that the insurance is primary coverage and will not be canceled, or materially reduced in coverage or limits, by the insurer except after filing with the Purchasing Manager thirty (30) days' prior written notice of the cancellation or modification. If the insurer cancels or modifies the insurance and provides less than thirty (30) days' notice to CITY, CITY shall provide the Purchasing Manager written notice of the cancellation or modification within two (2) business days of the CITY's receipt of such notice. CITY shall be responsible for ensuring that current certificates evidencing the insurance are provided to PAUSD's Purchasing Manager during the entire term of this Agreement.

15.1.    Either party may suspend the performance of the Services, in whole or in part, or terminate this Agreement, with or without cause, by giving thirty (30) days prior written notice thereof to the other party. Upon receipt of such notice, CITY will immediately discontinue its performance of the Services.

15.2.    Upon such suspension or termination by either party, CITY will be paid for the Services rendered or materials delivered to PAUSD in accordance with the scope of services on or before the effective date (i.e., 30 days after giving notice) of suspension or termination. The following Sections will survive any expiration or termination of this Agreement: 12, 15.2, 16 and 21.

15.3.    No payment, partial payment, acceptance, or partial acceptance by CITY will operate as a waiver on the part of CITY of any of its rights under this Agreement.

All notices hereunder will be given in writing and mailed, postage prepaid, by certified mail, addressed as follows;

To CITY:
ATTN: Office of the City Clerk City of Palo Alto
Post Office Box 10250
Palo Alto, CA 94303
With a copy to the City of Palo Alto Purchasing Manager

To PAUSD:
ATTN:

006247.00028
17708061 1

EXHIBIT 3 -006

25 Churchill Avenue
Palo Alto, CA 94306-1099

.

17.1.    In accepting this Agreement, PAUSD covenants that it presently has no interest, and will not acquire any interest, direct or indirect, financial or otherwise, which would conflict in any manner or degree with the performance of the Services.

17.2.    Both parties certify that they will comply with all laws applicable to governmental agencies and related conflicts of interest.

17.3.    If the Project Manager determines that PAUSD is a "Consultant" as that term is defined by the Regulations of the Fair Political Practices Commission, PAUSD shall be required and agrees to file the appropriate financial disclosure documents required by the Palo Alto Municipal Code and the Political Reform Act.

                                        . As set forth in Palo Alto Municipal Code section 2.30.510, PAUSD certifies that in the performance of this Agreement, it shall not discriminate in the employment of any person because of the race, skin color, gender, age, religion, disability, national origin, ancestry, sexual orientation, housing status, marital status, familial status, weight or height of such person. PAUSD acknowledges that it has read and understands the provisions of Section 2.30.510 of the Palo Alto Municipal Code relating to Nondiscrimination Requirements and the penalties for violation thereof, and agrees to meet all requirements of Section 2.30.510 pertaining to nondiscrimination in employment.

**WASTE.** PAUSD shall comply with the City's Environmentally Preferred Purchasing policies, which are available at the City's Purchasing Department, incorporated by reference and may be amended from lime to lime. PAUSD shall comply with waste reduction, reuse, recycling and disposal requirements of the City's Zero Waste Program. Zero Waste best practices include first minimizing and reducing waste; second, reusing waste and third, recycling or composting waste. In particular, PAUSD shall comply with the following zero waste requirements:

- All printed materials provided by PAUSD to City generated from a personal computer and printer including but not limited to, proposals, quotes, invoices, reports, and public education materials, shall be double-sided and printed on a minimum of 30% or greater post-consumer content paper, unless otherwise approved by the City's Project Manager. Any submitted materials printed by a professional printing company shall be a minimum of 30% or greater post-consumer material and printed with vegetable-based inks.

  Goods purchased by PAUSD on behalf of the City shall be purchased in accordance with the City's Environmental Purchasing Policy including but not limited to Extended Producer Responsibility requirements for products and packaging. A copy of this policy is on file at the Purchasing Office.

6

Reusable/returnable pallets shall be taken back by the PAUSD, at no additional cost to the City, for reuse or recycling. PAUSD shall provide documentation from the facility accepting the pallets to verify that pallets are not being disposed.

his Agreement is subject to the fiscal provisions of the Charter of the City of Palo Alto and the Palo Alto Municipal Code. It is further subject to the fiscal provisions of the PAUSD's appropriations process. This Agreement will terminate without any penalty (a) at the end of any fiscal year in the event that funds are not appropriated for the following fiscal year, or (b) at any time within a fiscal year in the event that funds are only appropriated for a portion of the fiscal year and funds for this Agreement are no longer available. This section shall take precedence in the event of a conflict with any other covenant, term, condition, or provision of this Agreement.

.

21.1.   This Agreement will be governed by the laws of the State of California.

21.2.   In the event that an action is brought, the parties agree that trial of such action will be vested exclusively in the state courts of California in the County of Santa Clara, State of California.

21.3.   The prevailing party in any action brought to enforce the provisions of this Agreement may recover its reasonable costs and attorneys' fees expended in connection with that action. The prevailing party shall be entitled to recover an amount equal to the fair market value of legal services provided by attorneys employed by it as well as any attorneys' fees paid to third parties.

21.4.   This document represents the entire and integrated agreement between the parties and supersedes all prior negotiations, representations, and contracts, either written or oral. This document may be amended only by a written instrument, which is signed by the parties.

21.5.   The covenants, terms, conditions and provisions of this Agreement will apply to, and will bind, the heirs, successors, executors, administrators, assignees, and consultants of the parties.

21.6.   If a court of competent jurisdiction finds or rules that any provision of this Agreement or any amendment thereto is void or unenforceable, the unaffected provisions of this Agreement and any amendments thereto will remain in full force and effect.

21.7.   All exhibits referred to in this Agreement and any addenda, appendices, attachments, and schedules to this Agreement which, from time to time, may be referred to in any duly executed amendment hereto are by such reference incorporated in this Agreement and will be deemed to be a part of this Agreement.

21.8.   If, pursuant to this contract with PAUSD, City shares with PAUSD personal information as defined in California Civil Code section 1798.81.5(d) about a California resident ("Personal Information"), PAUSD shall maintain reasonable and appropriate security procedures to protect that Personal Information, and shall inform City immediately upon

7

learning that there has been a breach in the security of the system or in the security of the Personal Information. PAUSD shall not use Personal Information for direct marketing purposes without City's express written consent. Similarly, the CITY shall maintain reasonable and appropriate security procedures to protect personal information pertaining to PAUSD students.

21.9.    The individuals executing this Agreement represent and warrant that they have the legal capacity and authority to do so on behalf of their respective legal entities.

21.10.   This Agreement may be signed in multiple counterparts, which shall, when executed by all the parties, constitute a single binding agreement.

**IN WITNESS WHEREOF,** the parties hereto have by their duly authorized representatives executed this Agreement on the date first above written.


**For PALO ALTO UNIFIED SCHOOL DISTRICT:**


                                                                    Date



                                                                    Date




**For CITY OF PALO ALTO:**



Purchasing Manager                                                  Date



Police Department Representative                                     Date


8

**Attachments:**

EXHIBIT "A":      SCOPE OF WORK

EXHIBIT "B":      INSURANCE REQUIREMENTS

006247 00028
17708061 1

EXHIBIT 3 -010

**EXHIBIT "A"**

**SCOPE OF SERVICES**

The PAPD/PAUSD School Resource Officer shall perform the following services:

A.              The School Resource Officer (SRO) shall facilitate management of the Parent Project. The SRO shall recruit and register parents for the English and Spanish Parent Project classes; update / maintain Parent Project official website; Facilitate Two 12-week English classes; and Facilitate One-Two 12-week Spanish classes.

B              he School Resource Officer (SRO) shall provide training to public and certain private schools; Meet with District Office Risk Manager and school administrators who serve as regular members of the Emergency Preparedness and Safety Team; schedule and provide Emergency Preparedness training to District staff; schedule, prepare, and evaluate Drills; and respond to school to provide Site- Security Walkthroughs and recommendations to the District Emergency and Safety Team.

C.    **Calls for Service.** On-duty patrol officers will be the primary responders for any emergency or exigent call for service generated by PAUSD. The School Resource Officer (SRO) at the direction of the Investigative Services Division Supervisor may respond to calls for service and complete reports / make arrests /citations per incident; provide criminal legal advice to school administrators in their official capacities; and speak to truant or offending students. If the School Resource Officer (SRO) is unable to respond to a call for service, PAPD will make an effort to ensure that the responder has been instructed/trained with regard to all provisions contained in this agreement and its exhibits, including but not limited to all protocols contained therein.

D              he School Resource Officer (SRO) shall teach classes as requested; appear on multidisciplinary panels; attend career fairs; and attend Exit Interviews (held at JLS Middle School). Events occurring outside of school hours may be mutually agreed upon to be considered part of the base duties of the SRO, however, hours and schedules will be adjusted at the direction of the Investigative Services Division Supervisor. The CITY retains the right to make necessary staffing adjustments as necessary.

E.    **Truancy Issues.** The School Resource Officer (SRO) shall assist the PAUSD resolve truancy issues, including by attending Student Attendance Review Board (SARB) meetings, and Truancy Mediation Meetings with District Attorney; other duties may include providing information on criminal consequences of truancy; issue criminal citations in certain cases; meeting with parents of habitual truants; and completing home visits / welfare checks of truant students.

F                                    The School Resource Officer (SRO) shall comply with legal reporting requirements, including completing the Monthly Report on the Detention of Minors form for the California Board of State and Community Corrections, and completing the Annual Survey of Law Enforcement Facilities.

G.    **School "Office Hours".** The School Resource Officer (SRO) will be available during school hours. The SRO shall be proactive in policing on school campuses; work with school Campus Security Officers; work with school administrators regarding school happenings; interact with kids of all campuses during brunch, lunch, free play, etc.; attend after-suspension, school intake hearings; and assist with First Aid.

H.                                    The School Resource Officer (SRO) shall provide training regarding juvenile issues to new officers.

I.                                    . The School Resource Officer (SRO) when feasible may transport a student for a psychiatric evaluation when the student, as a result of a mental disorder, meets the criteria of Welfare and Institutions Code section 5150 and is determined to a danger to self or others or is gravely disabled. PAPD shall provide all necessary training to its officers, including SROs, regarding assessing, determining the need, reporting, and transporting a student for an involuntary psychiatric hold, including but not limited to the specific persons and agencies to contact prior to, during, and/or upon completion of transport of the student to the applicable medical facility.

J                                    s required by PAPD policy, the School Resource Officer (SRO) or the responding officer shall use mechanical restraints on a student being transported to a medical facility, but the SRO or the responding officer will make an effort, when possible, to do so out of view of other students. When possible, school officials or administrators will provide a location out of view of other students where the officer may apply the mechanical restraints.

K.                                    The School Resource Officer (SRO) or the responding officer shall notify the school principal or designee before the officer conducts a search of a student's person, possession, locker, or other shared property. The only exception to this requirement is if there is a real and immediate physical threat to the officer, student, staff or public safety. When feasible, all searches and pat downs that take place at school should happen outside the view of other youth (unless emergency situations make it impossible), to maintain the student's privacy and to decrease public embarrassment, humiliation, and any other future stigmatization and discrimination against the student(s) involved. When possible, the school officials or administrators will provide a location out of view of other students where the officer may conduct the search.

L.                                    ports to Child Protective Services and the information contained therein are confidential and shall not be revealed except as provided by law (to make the report to Child Protective Services or to notify the designated school administrator.)

11

M.                                                              The following sets forth the guidelines for cooperation between the PAUSD and the PAPD, collectively referred to herein as the "Parties," related to sexual misconduct investigations. These guidelines operate in addition to the foregoing Services outlined in this Agreement between the CITY and the PAUSD.

### 1. Background:

PAUSD is committed to a working and learning environment free from sexual harassment and sexual violence, including sexual assault, sexual battery, and sexual coercion (collectively, "sexual misconduct"). Sexual misconduct is not tolerated. It corrupts the integrity of the educational process and work environment, and it violates the core mission and values of the PAUSD.

Sexual misconduct in the educational or work setting may constitute sex discrimination prohibited by federal and state anti-discrimination laws, including Title IX of the Education Amendments of 1972 ("Title IX"), Title VII of the Civil Rights Act, California's Fair Employment and Housing Act, and the California Education Code. In addition, some forms of sexual misconduct violate the criminal laws of the State of California.

### 2. Purpose:

Because sexual misconduct may constitute a violation of state and federal law, the criminal laws of California, and PAUSD Board policies and administrative regulations, it is important for the PAUSD to clarify its working relationship with the PAPD to ensure an effective, prompt, coordinated, and fair response to sexual misconduct.

The Parties will work together collaboratively and effectively when sexual misconduct is reported. The Parties recognize that they each have different obligations under state and federal law, and it is important to respect those differences.   .

The purpose of this MOU is to coordinate PAUSD and PAPD processes in response to reported sexual misconduct and increase collaboration between the agencies when such matters arise. In addition, this MOU is written to build an understanding between the agencies regarding their respective responsibilities and promote compliance with the numerous state and federal laws that provide specific requirements for the PAUSD related to sexual misconduct, including the statutory requirements of the California Education Code, Title IX, as well as the California Penal Code and applicable state laws related to health and confidentiality/privacy.

### 3. Term:

Representatives of the signing agencies will review and update this MOU when necessary based upon changes in applicable law, policies and/or regulations.

### 4. Agreement:

   i.  An investigation conducted by the PAPD is a separate investigation from PAUSD's Title IX investigation. Investigations may proceed on parallel paths, and involve different professional and legal obligations under federal

12

EXHIBIT 3 -013

and state law. PAUSD will not directly or indirectly discourage (or, alternatively, require) individuals from making a criminal complaint. Similarly, the PAPD will not directly or indirectly discourage (or, alternatively, require) individuals from pursuing a Title IX investigation or seeking District disciplinary action.

ii. To the extent practicable, investigations shall be conducted in a manner that minimizes duplicative interviews and maximizes efficiency of the Parties' resources.

iii. The Parties will each identify a point of contact for the other with respect to this MOU:

**PAUSD**

Megan Farrell

District Compliance Officer/Title IX Coordinator

(650) 833-4248

Persons/Crimes Supervisor

(650) 392-2140

iv. Unless otherwise agreed to, any information sharing between the Parties described in this MOU will flow between these points of contact. The Parties agree to share a contact list with their point of contact for implementation of this MOU, and to notify the Parties of any changes to their points of contact as soon as practicable.

v. The Parties will comply with applicable law and guidance regarding anonymous and confidential reporting of sexual misconduct, including when, how, and what information can or must be disclosed to local law enforcement officials or designated District officials. The Parties agree that if an alleged victim requests confidentiality regarding a reportable incident, the Parties will take all reasonable steps to comply with the request or inform the reporting individual when the Parties cannot ensure confidentiality.

5. **Responsibilities of PAPD:**

i. PAPD will share information with PAUSD related to instances of sexual violence, such as sexual assault or sexual battery, that occurs within    the

13

PAPD's jurisdiction, in accordance with California law and as appropriate given the particular circumstances.

ii.     The PAPD will respond to calls for service by PAUSD related to the investigation of sexual misconduct.

iii.    The PAPD's investigation will not take the place of a District Title IX investigation.

iv.     During the normal course and scope of their work, the PAPD will follow the check-in procedures outlined in District Board Policy/Administrative Regulation ("BP/AR") 5145.11 when arriving on school premises to question and/or apprehend students. In situations involving exigent or unique circumstances, the PAPD will follow the check-in procedures when practical or reasonable based on the circumstances. Pursuant to applicable state law, prior to conducting a student interview, the PAPD officer will provide the principal or designee his/her identity, his/her official capacity, and the legal authority under which the interview is to be conducted. The PAPD will advise minors of their right to have a representative, which includes a District representative, appear at the interview with them. Upon the student's request for a District representative, the PAPD officer will include PAUSD representative in the interview. The student's parent/guardian shall be notified by the school site principal or designee as soon as practicable when the student is questioned, and immediately when the student is taken into the custody of law enforcement, except in cases of suspected child abuse, pursuant to BP/AR 5145.11.

v.      Upon receiving information that a criminal restraining order has been violated, the PAPD will confirm the existence and the terms of the restraining order and take any appropriate action to address the violation. The PAPD will also inform PAUSD's Point of Contact (identified above) as allowable by law of the reported violation so that PAUSD may take any appropriate action.

vi.     In an effort to increase interagency awareness of responsibilities of the respective agencies and to coordinate interagency processes, the PAPD agrees to participate with PAUSD in interagency training of District staff. Such training shall discuss each agencies legal mandates, procedures and investigatory processes as they relate to sexual misconduct.

6       **Responsibilities of PAUSD:**

i.      In an effort to increase interagency awareness of responsibilities of the respective agencies and to coordinate interagency processes, PAUSD agrees to provide training to the PAPD/District School Resource Officer ("SRO") and other designated PAPD officers on PAUSD's Title   IX

14

obligations, policies, strategies and best practices for responding to reports of sexual misconduct in a trauma-informed manner.

ii.     PAUSD will notify all reporting parties of the right to file a civil or criminal complaint. The decision to file a civil or criminal complaint rests solely with the complainant, unless a California mandated reporting is required based upon the victim's classification (e.g., minor, dependent adult, etc.).

iii.    PAUSD will annually provide the PAPD with copies of the following policies:

1)      Sexual Harassment policies (which include sexual violence);

2)      Uniform Complaint Procedures; and

3)      BP/AR 5145.11.

iv.     Prior to contacting a respondent regarding a complaint that PAUSD has been informed is under investigation by the PAPD, PAUSD and/or PAUSD's Title IX Coordinator will first contact the PAPD. The PAPD is also aware that PAUSD must complete its Title IX investigation promptly within a reasonable timeframe (e.g. 60 calendar days or less), and it agrees to coordinate with PAUSD to meet that obligation.

v.      PAUSD will provide training to staff regarding the appropriate procedures to follow when the PAPD enters school premises to question and/or apprehend students, as outlined in BP/AR 5145.11. In addition to obtaining the PAPD officer's identity, his/her official capacity, and the legal authority under which the interview is to be conducted pursuant to applicable state law, the site staff will also immediately inform PAUSD's Point of Contact (identified above) in writing of the PAPD's presence on site and any information gathered from the PAPD officer.

vi.     PAUSD acknowledges its duty to comply with protective orders and is committed to implementing such orders while ensuring the rights of all students to access education. PAUSD will work with the protected student and the students' parent/guardian to create a plan for implementation of the protective order and provide information about reporting violations of the protective order.

vii.    PAUSD, by and through PAUSD's Point of Contact (identified above), will ensure that information related to the protective orders is effectively communicated between school site staff and PAPD officers. PAUSD will provide its staff and the PAPD with copies of its policy or protocols on implementation of protective orders.

viii.   Upon receiving information that a protective order has been issued, PAUSD will follow the following procedures:

15

EXHIBIT 3 -016

1) Notify PAUSD**'s Point of Contact (identified above)** and provide a copy of the protective order;

2) Notify the parties subject to the protective order;

3) Work with the protected and restrained student and the student's parent/guardian to create a plan for implementation of the protective order, regardless of whether the restrained individual is a student at the same school;

4) If the restrained individual is not a student at the same school, PAUSD will focus on how to restrict that individual's access to the school according to the protective order and how to support the students travels to and from school;

5) If the restrained individual is a student at the same school, PAUSD will work to make changes to the students' schedule(s), participation, or environment in order to comply with the protective order.

6) If the protective order raises concerns that would warrant a sufficient risk to other students and/or staff, PAUSD will notify the PAPD, administrators, and/or PAUSD community to the extent allowed by applicable state and federal law;

7) Upon receiving information that a protective order has been violated in a way that implicates a safety risk, PAUSD will promptly notify the PAPD of the reported violation, as well as the parties subject to the protective order.

16

### EXHIBIT "B"

### INSURANCE REQUIREMENTS

Palo Alto Unified School District (PAUSD), AT THEIR SOLE EXPENSE. SHALL FOR 11 IE TERM OF THE CONTRACT OBTAIN AND MAINTAIN INSURANCE IN THE AMOUNTS FOR THE COVERAGE SPECIFIED BELOW, **AFFORDED BY COMPANIES WITH AM BEST'S KEY RATING OF A-:VII, OR HIGHER, LICENSED OR AUTHORIZED TO TRANSACT INSURANCE BUSINESS IN THE STATE OF CALIFORNIA.**

AWARD IS CONTINGENT ON COMPLIANCE WITH CITY'S INSURANCE REQUIREMENTS. AS SPECIFIED,

BELOW:

17

**EXHIBIT 6**

| | |
|---|---|
| Book | PAUSD Policies & Regulations |
| Section | 5000 - Students |
| Title | Student Records |
| Code | 5125 BP |
| Status | Active |
| Adopted | January 12, 2010 |
| Last Revised | November 19, 2019 |
| Prior Revised Dates | June 19, 2018; August 23, 2016 |



(cf. 3580 - District Records)
(cf. 4040 - Employee Use of Technology)
(cf. 5125.1 - Release of Directory Information)
(cf. 5125.3 - Challenging Student Records)

All appropriate personnel shall receive training regarding district policies and procedures for gathering and handling sensitive student information.

(cf. 4131 - Staff Development)
(cf. 4231 - Staff Development)
(cf. 4331 - Staff Development)

The district shall not collect or solicit social security numbers or the last four digits of social security numbers of students or their parents/guardians, unless otherwise required to do so by state or federal law. (Education Code 49076.7)

No information or documents regarding the citizenship or immigration status of students or their family members shall be collected, except as required by state or federal law or as required to administer a state or federally supported educational program. The Superintendent or designee shall not disclose student records to a person, agency, or organization for immigration enforcement purposes without

EXHIBIT 6 - 001

parental consent, a court order, or a judicial subpoena. If a district employee receives such a request, he/she shall immediately report the request to the Superintendent. The Superintendent shall report the request to the Board in a timely manner that ensures the confidentiality and privacy of any potentially identifying information. (Education Code 234.7)

(cf. 5145.13 - Response to Immigration Enforcement)

The Superintendent or designee shall not compile a list, registry, or database based on students' national origin, ethnicity, or religious belief, practice, or affiliation, nor shall he/she disclose student information to federal government authorities for the purpose of compiling such a list, registry, or database for purposes of immigration enforcement. Such information may only be compiled or exchanged with other local, state, or federal agencies if the information is aggregated and is not personally identifiable. (Government Code 8310.3) Nothing in this section prevents the collection, retention, or disclosure of personal information or documents as required by Federal law, or to comply with a court order, or as necessary to comply with Federal programs of assistance. (Government Code 8310.3 (g)."

## Student Records from Social Media

The Superintendent or designee may gather and maintain information from the social media of any district student, provided that the district first notifies students and parents/guardians about the proposed program, offers an opportunity for public comment at a regularly scheduled Board meeting, and gathers only information that directly pertains to school safety or student safety. (Education Code 49073.6)

(cf. 0450 - Comprehensive Safety Plan)
(cf. 5131.2 - Bullying)
(cf. 5145.6 - Parental Notifications)
(cf. 9322 - Agenda/Meeting Materials)
(cf. 9323 - Meeting Conduct)

## Contract for Digital Storage, Management, and Retrieval of Student Records

The Superintendent or designee may enter into a contract with a third party for the digital storage, management, and retrieval of student records and/or to authorize a third party provider of digital software to access, store, and use student records, provided that the contract meets the requirements of Education Code 49073.1 and other applicable state and federal laws.

## Legal Reference:

EDUCATION CODE
*17604 Contracts*
*48201 Student records for transfer students who have been suspended/expelled*
*48853.5 Foster youth; placement, immunizations*
*48902 Notification of law enforcement of specified violations*
*48904-48904.3 Withholding grades, diplomas, or transcripts*
*48918 Rules governing expulsion procedures*
*48980 Parental notifications*
*48985 Notices in parent/guardian's primary language*
*49060-49079 Student records*
*49091.14 Parental review of curriculum*
*51747 Independent study*
*56041.5 Rights of students with disabilities*
*56050 Surrogate parents*
*56055 Foster parents*
*69432.9 Cal Grant program; notification of grade point average*

BUSINESS AND PROFESSIONS CODE
*22580-22582 Digital privacy*
*22584-22585 Student Online Personal Information Protection Act*

EXHIBIT 6 - 002

CODE OF CIVIL PROCEDURE
*1985.3 Subpoena duces tecum*

FAMILY CODE
*3025 Access to records by noncustodial parents*
*6552 Caregiver's authorization affidavit*

GOVERNMENT CODE
*6252-6260 Inspection of public records*

HEALTH AND SAFETY CODE
*120440 Immunizations; disclosure of information*

PENAL CODE
*245 Assault with deadly weapon*

WELFARE AND INSTITUTIONS CODE
*681 Truancy petitions*
*701 Juvenile court law*
*16010 Health and education records of a minor*

CODE OF REGULATIONS, TITLE 5
430-438 Individual student records
16020-16027 Destruction of records of school districts

UNITED STATES CODE, TITLE 20
1232g Family Educational Rights and Privacy Act
1232h Protection of Pupil Rights Amendment

UNITED STATES CODE, TITLE 26
152 Definition of dependent child

UNITED STATES CODE, TITLE 42
11434a McKinney-Vento Homeless Assistance Act; definitions

CODE OF FEDERAL REGULATIONS, TITLE 16
Part 312 Children's Online Privacy Protection Rule

CODE OF FEDERAL REGULATIONS, TITLE 34
99.1-99.67 Family Educational Rights and Privacy
300.501 Opportunity to examine records for parents of student with disability

Management Resources:

WEB SITES
U.S. Department of Education, Family Policy Compliance Office,
http://www.ed.gov/policy/gen/guid/fpco/index.html

EXHIBIT 6 - 003

| | |
|---|---|
| Book | PAUSD Policies & Regulations |
| Section | 5000 - Students |
| Title | Student Records |
| Code | 5125 AR |
| Status | Active |
| Adopted | October 17, 2011 |
| Last Revised | November 19, 2019 |
| Prior Revised Dates | June 19, 2018; August 23, 2016 |

**Definitions**

████████████████████████████████████████████

Attendance includes, but is not limited to, attendance in person or by paper correspondence, videoconference, satellite, Internet, or other electronic information and telecommunication technologies for students who are not physically present in the classroom, and the period during which a person is working under a work-study program. (34 CFR 99.3)

Student records are any items of information (in handwriting, print, tape, film, computer, or other medium) gathered within or outside the district that are directly related to an identifiable student and maintained by the district, required to be maintained by an employee in the performance of his/her duties, or maintained by a party acting for the district. Any information maintained for the purpose of second-party review is considered a student record. Student records include the student's health record. (Education Code 49061, 49062; 5 CCR 430; 34 CFR 99.3)

**Student records do not include: (Education Code 49061, 49062; 5 CCR 430; 34 CFR 99.3)**

    1. Directory information
(cf. 5125.1 - Release of Directory Information)

    2. Informal notes compiled by a school officer or employee which remain in the sole possession of the maker, are used only as a personal memory aid, and are not accessible or revealed to any other person except a substitute employee

    3. Records of the law enforcement unit of the district, subject to 34 CFR 99.8
(cf. 3515 - Campus Security)
(cf. 3515.3 - District Police/Security Department)

    4. Records created or received by the district after an individual is no longer a student and that are not directly related to the individual's attendance as a student

EXHIBIT 6 - 004

5. Grades on peer-graded papers before they are collected and recorded by a teacher

Mandatory permanent student records are those records which are maintained in perpetuity and which schools have been directed to compile by state law, regulation, or administrative directive. (5 CCR 430) Mandatory interim student records are those records which the schools are directed to compile and maintain for specified periods of time and are then destroyed in accordance with state law, regulation, or administrative directive. (5 CCR 430)

Permitted student records are those records having clear importance only to the current educational process of the student. (5 CCR 430)

Disclosure means to permit access to, or the release, transfer, or other communication of, personally identifiable information contained in student records to any party, except the party that provided or created the record, by any means including oral, written, or electronic. (34 CFR 99.3)

Access means a personal inspection and review of a record or an accurate copy of a record, or receipt of an accurate copy of a record or an oral description or communication of a record, and a request to release a copy of any record. (Education Code 49061)

Personally identifiable information includes, but is not limited to: (34 CFR 99.3)

1. The student's name

2. The name of the student's parent/guardian or other family members

3. The address of the student or student's family

4. A personal identifier, such as the student's social security number, student number, or biometric record(e.g., fingerprints, retina and iris patterns, voiceprints, DNA sequence, facial characteristics, and handwriting)

5. Other indirect identifiers, such as the student's date of birth, place of birth, and mother's maiden name

6. Other information that, alone or in combination, is linked or linkable to a specific student that would allow a reasonable person in the school community, who does not have personal knowledge of the relevant circumstances, to identify the student with reasonable certainty

7. Information requested by a person who the district reasonably believes knows the identity of the student to whom the student record relates

Adult student is a person who is or was enrolled in school and who is at least 18 years of age. (5 CCR 430)

Parent/guardian means a natural parent, an adopted parent, legal guardian, surrogate parent, or foster parent. (Education Code 49061, 56050, 56055)

Mandatory permanent student records are those records which are maintained in perpetuity and which schools have been directed to compile by state law, regulation, or administrative directive. (5 CCR 430)

Mandatory interim student records are those records which the schools are directed to compile and maintain for specified periods of time and are then destroyed in accordance with state law, regulation, or administrative directive. (5 CCR 430)

Permitted student records are those records having clear importance only to the current educational process of the student. (5 CCR 430)

EXHIBIT 6 - 005

Disclosure means to permit access to, or the release, transfer, or other communication of, personally identifiable information contained in student records to any party, except the party that provided or created the record, by any means including oral, written, or electronic. (34 CFR 99.3)

Access means a personal inspection and review of a record or an accurate copy of a record, or receipt of an accurate copy of a record or an oral description or communication of a record, and a request to release a copy of any record. *(Education Code 49061)*

Personally identifiable information includes, but is not limited to: (34 CFR 99.3)

1. The student's name
2. The name of the student's parent/guardian or other family members
3. The address of the student or student's family
4. A personal identifier, such as the student's social security number, student number, or biometric record (e.g., fingerprints, retina and iris patterns, voiceprints, DNA sequence, facial characteristics, and handwriting)
5. Other indirect identifiers, such as the student's date of birth, place of birth, and mother's maiden name
6. Other information that, alone or in combination, is linked or linkable to a specific student that would allow a reasonable person in the school community, who does not have personal knowledge of the relevant circumstances, to identify the student with reasonable certainty
7. Information requested by a person who the district reasonably believes knows the identity of the student to whom the student record relates

Adult student is a person who is or was enrolled in school and who is at least 18 years of age. (5 CCR 430)

Parent/guardian means a natural parent, an adopted parent, legal guardian, surrogate parent, or foster parent. (Education Code 49061, 56050, 56055)

Legitimate educational interest is an interest held by any school official, employee, contractor, or consultant whose duties, responsibilities, or contractual obligations to the district, whether routine or as a result of special circumstances, require him/her to have access to student records.

School officials and employees are officials or employees whose duties and responsibilities to the district, whether routine or as a result of special circumstances, require that they have access to student records.

Contractor or consultant is anyone with a formal written agreement or contract with the district regarding the provision of services or functions outsourced to him/her by the district. Contractor or consultant shall not include a volunteer or other party. (Education Code 49076)

Custodian of records is the employee responsible for the security of student records maintained by the district and for devising procedures for assuring that access to such records is limited to authorized persons. (5 CCR 433)

County placing agency means the county social service department or county probation department. (Education Code 49061)

**Persons Granted Absolute Access**

In accordance with law, absolute access to any student records shall be granted to:

1. Parents/guardians of students younger than age 18 years, including the parent who is not the student's custodial parent (Education Code 49069; Family Code 3025)

2. An adult student, or a student under the age of 18 years who attends a postsecondary institution, in which case the student alone shall exercise rights related to his/her student records and grant consent for the release of records (34 CFR 99.3, 99.5)

EXHIBIT 6 - 006

3. Parents/guardians of an adult student with disabilities who is age 18 years or older and has been declared incompetent under state law (Education Code 56041.5)
(cf. 6159 - Individualized Education Program)

**Access for Limited Purpose/Legitimate Educational Interest**

The following persons or agencies shall have access to those particular records that are relevant to their legitimate educational interest or other legally authorized purpose:

1. Parents/guardians of a student age 18 or older who is a dependent child as defined under 26 USC 152 (Education Code 49076; 34 CFR 99.31)

2. Students who are age 16 or older or who have completed the 10th grade (Education Code 49076; 34 CFR 99.31)

3. School officials and employees, consistent with the definition provided in the section "Definitions" above (Education Code 49076; 34 CFR 99.31)

4. Members of a school attendance review board (SARB) who are authorized representatives of the district and any volunteer aide age 18 or older who has been investigated, selected, and trained by the SARB to provide follow-up services to a referred student (Education Code 49076)
(cf. 5113.1 - Chronic Absence and Truancy)
(cf. 5113.12 - District School Attendance Review Board)

5. Officials and employees of other public schools, school systems, or postsecondary institutions where the student intends or is directed to enroll, including local, county, or state correctional facilities where educational programs leading to high school graduation are provided, or where the student is already enrolled, as long as the disclosure is for purposes related to the student's enrollment or transfer (Education Code 49076; 34 CFR 99.31)

Unless the annual parent/guardian notification issued pursuant to Education Code 48980 includes a statement that the district may disclose students' personally identifiable information to officials of another school, school system, or postsecondary institution where the student seeks or intends to enroll, the Superintendent or designee shall, when such a disclosure is made, make a reasonable attempt to notify the parent/guardian or adult student at his/her last known address, provide a copy of the record that is disclosed, and give the parent/guardian or adult student an opportunity for a hearing to challenge the record. (34 CFR 99.34)

6. The Student Aid Commission, to provide the grade point average (GPA) of all district students in grade 12 and, when requested, verification of high school graduation or its equivalent of all students who graduated in the prior academic year, for use in the Cal Grant postsecondary financial aid program. However, such information shall not be submitted when students opt out or are permitted by the rules of the Student Aid Commission to provide test scores in lieu of the GPA. (Education Code 69432.9, 69432.92)

No later than October 15 each year, the Superintendent or designee shall notify each student in grade 12, and his/her parents/guardians if the student is under age 18 years, that the student's GPA will be forwarded to the Student Aid Commission unless he/she opts out within a period of time specified in the notice, which shall not be less than 30 days. (Education Code 69432.9)

Students' social security numbers shall not be included in the submitted information unless the Student Aid Commission deems it necessary to complete the financial aid application and the Superintendent or designee obtains permission from the student's parent/guardian, or from the adult student, to submit the social security number. (Education Code 69432.9)

7. Federal, state, and local officials, as needed for an audit, evaluation, or compliance activity related to a state or federally funded education program and in accordance with a written agreement developed pursuant to 34 CFR 99.35 (Education Code 49076; 34 CFR 99.3, 99.31, 99.35)

EXHIBIT 6 - 007

8. Any county placing agency acting as an authorized representative of a state or local educational agency which is required to audit or evaluate a state or federally supported education program pursuant to item #7 above (Education Code 49076)

9. Any person, agency, or organization authorized in compliance with a court order or lawfully issued subpoena (Education Code 49077; 5 CCR 435; 34 CFR 99.31)
Unless otherwise instructed by the court, the Superintendent or designee shall, prior to disclosing a record pursuant to a court order or subpoena, give the parent/guardian or adult student at least three days' notice of the name of the requesting agency and the specific record requested, if lawfully possible within the requirements of the judicial order. (Education Code 49077; 5 CCR 435; 34 CFR 99.31)

10. Any district attorney who is participating in or conducting a truancy mediation program or participating in the presentation of evidence in a truancy petition (Education Code 49076)

11. A district attorney's office for consideration against a parent/guardian for failure to comply with compulsory education laws (Education Code 49076)

12. Any probation officer, district attorney, or counsel of record for a minor student for the purposes of conducting a criminal investigation or an investigation in regards to declaring the minor student a ward of the court or involving a violation of a condition of probation, subject to evidentiary rules specified in Welfare and Institutions Code 701 (Education Code 49076)

When disclosing records for these purposes, the Superintendent or designee shall obtain written certification from the recipient of the records that the information will not be disclosed to another party without prior written consent of the student's parent/guardian or the holder of the student's educational rights, unless specifically authorized by state or federal law. (Education Code 49076)

13. Any judge or probation officer for the purpose of conducting a truancy mediation program for a student or for the purpose of presenting evidence in a truancy petition pursuant to Welfare and Institutions Code 681 (Education Code 49076)

In such cases, the judge or probation officer shall certify in writing to the Superintendent or designee that the information will be used only for truancy purposes. Upon releasing student information to a judge or probation officer, the Superintendent or designee shall inform, or provide written notification to, the student's parent/guardian within 24 hours. (Education Code 49076)

14. A foster family agency with jurisdiction over a currently enrolled or former student; short-term residential treatment program staff responsible for the education or case management of a student; or a caregiver who has direct responsibility for the care of a student, including a certified or licensed foster parent, an approved relative or nonrelated extended family member, or a resource family, as defined (Education Code 49076)

Such individuals shall have access to the student's current or most recent records of grades, transcripts, attendance, discipline, online communication on platforms established by schools for students and parents/guardians, and any individualized education program or Section 504 plan developed and maintained by the district (Education Code 49069.3)
(cf. 6164.6 - Identification and Education Under Section 504) (cf. 6173.1 - Education for Foster Youth)

15. A student age 14 years or older who is both a homeless student and an unaccompanied minor as defined in 42 USC 11434a (Education Code 49076)
(cf. 6173 - Education for Homeless Children)

16. An individual who completes items #1-4 of the caregiver's authorization affidavit pursuant to Family Code 6552 and signs the affidavit for the purpose of enrolling a minor in school (Education Code 49076)

EXHIBIT 6 - 008

17. A caseworker or other representative of a state or local child welfare agency or tribal organization that has legal responsibility for the care and protection of a student, provided that the information is directly related to providing assistance to address the student's educational needs (Education Code 49076; 20 USC 1232(g))

18. Appropriate law enforcement authorities, in circumstances where Education Code 48902 requires that the district provide special education and disciplinary records of a student with disabilities who is suspended or expelled for committing an act violating Penal Code 245 (Education Code 48902, 49076)

When disclosing such records, the Superintendent or designee shall obtain written certification by the recipient of the records as described in item #12 above. (Education Code 49076)



In such cases, the Superintendent or designee shall provide information about the identity and location of the student as it relates to the transfer of that student's records to another public school district or California private school. (Education Code 49076.5)

When disclosing records for the above purposes, the Superintendent or designee shall obtain the necessary documentation to verify that the person, agency, or organization is a person, agency, or organization that is permitted to receive such records.

Any person, agency, or organization granted access is prohibited from releasing information to another person, agency, or organization without written permission from the parent/guardian or adult student unless specifically allowed by state law or the federal Family Educational Rights and Privacy Act. (Education Code 49076)

In addition, the parent/guardian or adult student may provide written consent for access to be granted to persons, agencies, or organizations not afforded access rights by law. The written consent shall specify the records to be released and the party or parties to whom they may be released. (Education Code 49075)

Only a parent/guardian having legal custody of the student may consent to the release of records to others. Either parent/guardian may grant consent if both parents/guardians notify the district, in writing, that such an agreement has been made. (Education Code 49061)
(cf. 5021 - Noncustodial Parents)

**Discretionary Access**

At his/her discretion, the Superintendent or designee may release information from a student's records to the following:

1. Appropriate persons, including parents/guardians of a student, in an emergency if the health and safety of the student or other persons are at stake (Education Code 49076; 34 CFR 99.31, 99.32, 99.36)

When releasing information to any such appropriate person, the Superintendent or designee shall record information about the threat to the health or safety of the student or any other person that formed the basis for the disclosure and the person(s) to whom the disclosure was made. (Education Code 49076; 34 CFR 99.32)

Unless it would further endanger the health or safety of the student or other persons, the Superintendent or designee shall inform the parent/guardian or adult student within one week of the disclosure that the disclosure was made, of the articulable and significant threat to the health

EXHIBIT 6 - 009

or safety of the student or other individuals that formed the basis for the disclosure, and of the parties to whom the disclosure was made.

2. Accrediting associations (Education Code 49076; 34 CFR 99.31)

3. Under the conditions specified in Education Code 49076 and 34 CFR 99.31, organizations conducting administering predictive tests, administering student aid programs, or improving instruction, provided that: (Education Code 49076; 34 CFR 99.31)

    a. The study is conducted in a manner that does not permit personal identification of parents/guardians and students by individuals other than representatives of the organization who have legitimate interests in the information.

    b. The information is destroyed when no longer needed for the purposes for which the study is conducted.

    c. The district enters into a written agreement with the organization that complies with 34 CFR 99.31.

4. Officials and employees of private schools or school systems where the student is enrolled or intends to enroll, subject to the rights of parents/guardians as provided in Education Code 49068 and in compliance with 34 CFR 99.34 (Education Code 49076; 34 CFR 99.31, 99.34)

5. Local health departments operating countywide or regional immunization information and reminder systems and the California Department of Public Health, unless the parent/guardian has requested that no disclosures of this type be made (Health and Safety Code 120440)
(cf. 3600 - Consultants)

6. Agencies or organizations in connection with the student's application for or receipt of financial aid, provided that information permitting the personal identification of a student or his/her parents/guardians for these purposes is disclosed only as may be necessary to determine the eligibility of the student for financial aid, determine the amount of financial aid, determine the conditions which will be imposed regarding the financial aid, or enforce the terms or conditions of the financial aid (Education Code 49076; 34 CFR 99.31, 99.36)

7. County elections officials for the purpose of identifying students eligible to register to vote or offering such students an opportunity to register, subject to the provisions of 34 CFR 99.37 and under the condition that any information provided on this basis shall not be used for any other purpose or transferred to any other person or agency (Education Code 49076; 34 CFR 99.31, 99.37)
(cf. 1400 - Relations Between Other Governmental Agencies and the Schools)

When disclosing records for the above purposes, the Superintendent or designee shall obtain the necessary documentation to verify that the person, agency, or organization is a person, agency, or organization that is permitted to receive such records.

## De-identification of Records

When authorized by law for any program audit, educational research, or other purposes, the Superintendent or designee may release information from a student record without prior consent of the parent/guardian or adult student after the removal of all personally identifiable information. Prior to releasing such information, the Superintendent or designee shall make a reasonable determination that the student's identity is not personally identifiable, whether through single or multiple releases and taking into account other reasonably available information. (Education Code 49074, 49076; 34 CFR 99.31)

## Process for Providing Access to Records

Student records shall be maintained in a central file at the school attended by the student or, when

EXHIBIT 6 - 010

records are maintained at different locations, a notation shall be placed in the central file indicating where other records may be found. Parents/guardians shall be notified of the location of student records if not centrally located. (Education Code 49069; 5 CCR 433)

The custodian of records shall be responsible for the security of student records and shall ensure that access is limited to authorized persons. (5 CCR 433)

The custodian of records shall develop reasonable methods, including physical, technological, and administrative controls, to ensure that school officials and employees obtain access to only those student records in which they have legitimate educational interests. (34 CFR 99.31)



When required by law, the parent/guardian shall provide written, signed, and dated consent before the district discloses the student record. Such consent may be given through electronic means in those cases where it can be authenticated. The district's consent form shall specify the records that may be disclosed, state the purpose of the disclosure, and identify the party or class of parties to whom the disclosure may be made. Upon request by the parent/guardian, the district shall provide him/her a copy of the records disclosed. (34 CFR 99.30)

If the parent/guardian refuses to provide written consent for the release of student information, the Superintendent or designee shall not release the information, unless it is otherwise subject to release based on a court order or a lawful subpoena.

Within five business days following the date of request, a parent/guardian or other authorized person shall be granted access to inspect, review, and obtain copies of student records during regular school hours. (Education Code 49069)

Qualified certificated personnel shall be available to interpret records when requested. (Education Code 49069)

The custodian of records or the Superintendent or designee shall prevent the alteration, damage, or loss of records during inspection. (5 CCR 435)

**Access Log**



The log shall include requests for access to records by:

1. Parents/guardians or adult students

2. Students who are 16 years of age or older or who have completed the 10th grade

3. Parties obtaining district-approved directory information

4. Parties who provide written parental consent, in which case the consent notice shall be filed with

EXHIBIT 6 - 011

the record pursuant to Education Code 49075

    5. School officials and employees who have a legitimate educational interest
    6. Law enforcement personnel seeking to enforce immigration laws

The log shall be accessible only to the parent/guardian, adult student, dependent adult student, student who is age 16 years or older or who has completed the 10th grade, custodian of records, and certain state or federal officials. (Education Code 49064; 5 CCR 432)

**Duplication of Student Records**

To provide copies of any student record, the district shall charge a reasonable fee not to exceed the actual cost of providing the copies. No charge shall be made for providing up to two transcripts or up to two verifications of various records for any former student. No charge shall be made to locate or retrieve any student record. (Education Code 49065)

(cf. 3260 - Fees and Charges)

**Changes to Student Records**

Only a parent/guardian having legal custody of a student or an adult student may challenge the content of a record or offer a written response to a record. (Education Code 49061)

(cf. 5125.3 - Challenging Student Records)

No additions except routine updating shall be made to a student's record after high school graduation or permanent departure without prior consent of the parent/guardian or adult student. (5 CCR 437)

A student's legal name or gender as entered on the mandatory student record required pursuant to 5 CCR 432 shall only be changed with proper documentation. However, at the written request of a student or, if appropriate, his/her parents/guardians, the district shall use the student's preferred name and pronouns consistent with his/her gender identity on all other district-related documents.

(cf. 5145.3 - Nondiscrimination/Harassment)

**Retention and Destruction of Student Records**

All anecdotal information and assessment reports maintained as student records shall be dated and signed by the individual who originated the data. (5 CCR 431)

████████████████████████████████████

    1. Legal name of student

    2. Date and place of birth and method of verifying birth date (cf. 5111 - Admission)

    3. Sex of student

    4. Name and address of parent/guardian of minor student

    a. Address of minor student if different from the above

    b. Annual verification of parent/guardian's name and address and student's residence
    (cf. 5111.1 - District Residency)

████████████████████████████████████████

████████████████████████████████████████

EXHIBIT 6 - 012

(cf. 5121 - Grades/Evaluation of Student Achievement)

7. Verification of or exemption from required immunizations
(cf. 5141.31 - Immunizations)

8. Date of high school graduation or equivalent

Mandatory interim student records, unless forwarded to another district, shall be maintained subject to destruction during the third school year after the school year in which they originated, following a determination that their usefulness has ceased or the student has left the district. These records include: (Education Code 48918, 51747; 5 CCR 432, 437, 16027)

1. Expulsion orders and the causes therefor
(cf. 5144.1 - Suspension and Expulsion/Due Process)
(cf. 5144.2 - Suspension and Expulsion/Due Process (Students with Disabilities))

2. A log identifying persons or agencies who request or receive information from the student record

3. Health information, including verification or waiver of the health screening for school entry (cf. 5141.32 - Health Screening for School Entry)

4. Information on participation in special education programs, including required tests, case studies, authorizations, and evidence of eligibility for admission or discharge
(cf. 6159 - Individualized Education Program)
(cf. 6164.4 - Identification and Evaluation of Individuals for Special Education)

5. Language training records
(cf. 6174 - Education for English Learners)

6. Progress slips/notices required by Education Code 49066 and 49067

7. Parental restrictions/stipulations regarding access to directory information

8. Parent/guardian or adult student rejoinders to challenged records and to disciplinary action

9. Parent/guardian authorization or denial of student participation in specific programs

10. Results of standardized tests administered within the past three years
(cf. 6162.51 - State Academic Achievement Tests)

11. Written findings resulting from an evaluation conducted after a specified number of missed assignments to determine whether it is in a student's best interest to remain in independent study
(cf. 6158 - Independent Study)

Permitted student records may be destroyed six months after the student completes or withdraws from the educational program, including: (5 CCR 432, 437)

1. Objective counselor and/or teacher ratings

2. Standardized test results older than three years

3. Routine disciplinary data (cf. 5144 - Discipline)

4. Verified reports of relevant behavioral patterns

5. All disciplinary notices

6. Supplementary attendance records

EXHIBIT 6 - 013

**Transfer of Student Records**

When a student transfers into this district from any other school district or a private school, the Superintendent or designee shall inform the student's parent/guardian of his/her rights regarding student records, including the right to review, challenge, and receive a copy of student records. (Education Code 49068; 5 CCR 438)

When a student transfers into this district from another district, the Superintendent or designee shall request that the student's previous district provide any records, either maintained by that district in the ordinary course of business or received from a law enforcement agency, regarding acts committed by the transferring student that resulted in his/her suspension or expulsion. (Education Code 48201)

(cf. 4158/4258/4358 - Employee Security)
(cf. 5119 - Students Expelled From Other Districts)

If the transfer is out of state or to a private school, the mandatory interim record may be forwarded. Permitted student records may be forwarded to any other district or private school. (Education Code 48918, 49068; 5 CCR 438)

Upon receiving a request from a county placing agency to transfer a student in foster care out of a district school, the Superintendent or designee shall transfer the student's records to the next educational placement within two business days. (Education Code 49069.5)

All student records shall be updated before they are transferred. (5 CCR 438)
Student records shall not be withheld from the requesting district because of any charges or fees owed by the student or parent/guardian. (5 CCR 438)

If the district is withholding grades, diploma, or transcripts from the student because of his/her damage or loss of school property, this information shall be sent to the requesting district along with the student's records.
(cf. 5125.2 - Withholding Grades, Diploma or Transcripts)

**Notification of Parents/Guardians**

Upon any student's initial enrollment, and at the beginning of each school year thereafter, the Superintendent or designee shall notify parents/guardians and eligible students, in writing, of their rights related to student records. If 15 percent or more of the students enrolled in the district speak a single primary language other than English, then the district shall provide these notices in that language. Otherwise, the district shall provide these notices in the student's home language insofar as practicable. The district shall effectively notify parents/guardians or eligible students with disabilities. (Education Code 49063, 48985; 34 CFR 99.7)

(cf. 5145.6 - Parental Notifications)

The notice shall include: (Education Code 49063; 34 CFR 99.7, 99.34)

1. The types of student records kept by the district and the information contained therein

2. The title(s) of the official(s) responsible for maintaining each type of record

3. The location of the log identifying those who request information from the records

4. District criteria for defining school officials and employees and for determining legitimate educational interest

5. District policies for reviewing and expunging student records

EXHIBIT 6 - 014

6. The right to inspect and review student records and the procedures for doing so

7. The right to challenge and the procedures for challenging the content of a student record that the parent/guardian or student believes to be inaccurate, misleading, or otherwise in violation of the student's privacy rights

8. The cost, if any, charged for duplicating copies of records

9. The categories of information defined as directory information pursuant to Education Code 49073

10. The right to consent to disclosures of personally identifiable information contained in the student's records except when disclosure without consent is authorized by law

11. Availability of the curriculum prospectus developed pursuant to Education Code 49091.14 containing the titles, descriptions, and instructional aims of every course offered by the school (cf. 5020 - Parent Rights and Responsibilities)

12. Any other rights and requirements set forth in Education Code 49060-49078, and the right of parents/guardians to file a complaint with the U.S. Department of Education concerning an alleged failure by the district to comply with 20 USC 1232g

13. A statement that the district forwards education records to other agencies or institutions that request the records and in which the student seeks or intends to enroll or is already enrolled as long as the disclosure is for purposes related to the student's enrollment

In addition, the annual parental notification shall include a statement that a student's citizenship status, immigration status, place of birth, or any other information indicating national origin will not be released without parental consent or a court order.

Student Records from Social Media

For the purpose of gathering and maintaining records of students' social media activity, the Superintendent or designee shall: (Education Code 49073.6)

1. Gather or maintain only information that pertains directly to school safety or student safety

2. Provide a student with access to any information that the district obtained from his/her social media activity and an opportunity to correct or delete such information

3. Destroy information gathered from social media and maintained in student records within one year after a student turns 18 years of age or within one year after the student is no longer enrolled in the district, whichever occurs first

4. Notify each parent/guardian that the student's information is being gathered from social media and that any information maintained in the student's records shall be destroyed as provided in item #3 above. The notification shall also include, but is not limited to, an explanation of the process by which a student or his/her parent/guardian may access the student's records for examination of the information gathered or maintained and the process by which removal of the information may be requested or corrections to the information may be made. The notification may be provided as part of the annual parental notification required pursuant to Education Code 48980.

5. If the district contracts with a third party to gather information on a student from social media, ensure that the contract:

a. Prohibits the third party from using the information for purposes other than those specified in the contract or from selling or sharing the information with any person or entity other than the district, the student, or his/her parent/guardian

EXHIBIT 6 - 015

b. Requires the third party to destroy the information immediately upon satisfying the terms of the contract, or when the district notifies the third party that the student has turned 18 years of age or is no longer enrolled in the district, whichever occurs first

EXHIBIT 6 - 016

**EXHIBIT 8**

| | |
|---|---|
| Book | PAUSD Policies & Regulations |
| Section | 5000 - Students |
| Title | Sexual Harassment |
| Code | 5145.7 BP |
| Status | Active |
| Adopted | February 11, 2014 |
| Last Revised | September 12, 2017 |
| Prior Revised Dates | December 8, 2015 |

[中口版](#)

[En Español](#)

The Governing Board is committed to maintaining a safe school environment that is free from harassment and discrimination. The Board prohibits sexual harassment against students in the educational setting by an employee, student or third party. Under federal and state law, the term sexual harassment includes sexual violence. The Board also prohibits retaliatory behavior or action against any person who reports, testifies about, files a complaint, or otherwise participates in a District complaint, investigation or grievance process.

*(cf. 0410 - Nondiscrimination in District Programs and Activities)*
*(cf. 1312.3 - Uniform Complaint Procedures)*
*(cf. 4119.11/4219.11/4319.11 - Sexual Harassment)*
*(cf. 5131 - Conduct)*
*(cf. 5131.2 - Bullying)*
*(cf. 5137 - Positive School Climate)*
*(cf. 5145.3 - Nondiscrimination/Harassment)*
*(cf. 5157 - Gender Identity and Access)*
*(cf. 6142.1 - Sexual Health and HIV/AIDS Prevention Instruction)*

**Scope and Definitions Related to Sexual Harassment Complaints**

Prohibited sexual harassment includes, but is not limited to, unwelcome sexual advances, unwanted requests for sexual favors, or other unwanted verbal, visual, or physical conduct of a sexual nature made against another person of the same or opposite sex in the educational setting, when made on the basis of sex and under any of the following conditions: *[(Education Code 212.5;](#) 5 CCR 4916)*

1. Submission to the conduct is explicitly or implicitly made a term or condition of a student's academic status or progress.
2. Submission to or rejection of the conduct by a student is used as the basis for academic decisions affecting the student.

EXHIBIT 8 - 001

3. The conduct has the purpose or effect of having a negative impact on the student's academic performance or of creating an intimidating, hostile, or offensive educational environment; or under Title IX a hostile environment has been created if the unwelcome conduct of a sexual nature is sufficiently serious that it denies or limits the student's ability to participate in or benefit from the educational program.

4. Submission to or rejection of the conduct by the student is used as the basis for any decision affecting the student regarding benefits and services, honors, programs, or activities available at or through any district program or activity.

*(cf. 5131 - Conduct)*
*(cf. 5131.2 - Bullying)*
*(cf. 5137 - Positive School Climate)*
*(cf. 5145.3 - Nondiscrimination/Harassment)*
*(cf. 6142.1 - Sexual Health and HIV/AIDS Prevention Instruction)*

The district will review and address any report or complaint of sexual harassment involving a student, employee or third party against another student, employee or third party. Specifically:

a. Any sexual harassment or sexual violence report or complaint involving a student complainant or a student respondent shall be addressed under BP 5145.7 and the Uniform Complaint Procedures, and it will **not** be addressed under BP/AR 1312.1, 4119.11/4219.11/4319.11, or AR 4031. Any other report or complaint of unlawful discrimination involving a student complainant or a student respondent shall be addressed through BP/AR 5145.3 and the Uniform Complaint Procedures.

b. Any sexual harassment or sexual violence report or complaint, between employees or between employees and third parties, but **not** involving student complainants or student respondents, shall be addressed through BP/AR 4119.11/4219.11/4319.11 and AR 4031.

c. Any sexual harassment or sexual violence report or complaint between third parties which took place in the educational setting shall be referred to the District Compliance Officer to determine how to appropriately address the complaint.

d. Though an incident of sexual harassment may occur off campus or unrelated to school activity, if the effects of the incident may result in harassment, intimidation, or bullying at school or at a school activity, which is sufficiently serious to interfere with or limit the targeted student's ability to participate in or benefit from the education program, the District Compliance Officer or Principal/designee shall, under these Uniform Complaint Procedures, promptly investigate, determine what occurred, eliminate any harassment, intimidation, or bullying that occurs at school or at a school activity, prevent its recurrence, and address its effects.

A "report" or "complaint" is defined as any oral or written communication to a school district employee or administrator which alleges behavior or misconduct that may constitute sexual harassment or sexual violence. A report or complaint may include an oral report, an email, a text message or other message conveyed to a school district employee or administrator. The report or complaint does not have to be on a particular form or use specific words to identify the law which may have been violated.

An "educational setting" includes participation in educational programs and activities of the school or district, including all the academic, educational, extracurricular, athletic, and other programs and activities of the school, whether those programs or activities take place in a school's facilities, on a school bus, or at a class or training program sponsored by the school at another location.

A "third party" includes someone who is connected to the school or the district for educational, business or extra-curricular purposes. For example, a third party may include a vendor, volunteer, coach, or other person who is on school or district grounds during the hours of operation or who is present in the educational setting.

**Examples**

Examples of types of conduct which are prohibited in the District and which may constitute sexual harassment include, but are not limited to:

EXHIBIT 8 - 002

1. Unwelcome leering, sexual flirtations, or propositions
2. Unwelcome sexual slurs, epithets, threats, verbal abuse, derogatory comments, or sexually degrading descriptions
3. Unwelcome or demeaning conduct or comments of a sexual nature directed at or about an individual related to actual or perceived gender, gender identity and gender expression, sex, sexual behavior, sexual orientation, or other related personal characteristics
4. Graphic verbal comments about an individual's body or overly personal conversation
5. Sexual jokes, derogatory posters, notes, stories, cartoons, drawings, pictures, obscene gestures, or computer-generated images of a sexual nature
6. Spreading sexual rumors
7. Teasing or sexual remarks about students enrolled in a predominantly single-sex class
8. Massaging, grabbing, fondling, stroking, or brushing the body
9. Touching an individual's body or clothes in a sexual way
10. Impeding or blocking movements or any physical interference with school activities when directed at an individual on the basis of sex
11. Displaying sexually suggestive objects
12. Sexual violence, including, but not limited to, sexual assault or sexual battery as defined in Education Code 48900(n), or sexual coercion
13. Dating violence, stalking, and relationship abuse
14. An employee engaging in, soliciting, or encouraging a sexual relationship or sexual activity with a student(s) based on written, verbal, and/or physical contact or fraternization with a student(s). In some circumstances, an employee's physical contact with a student may also take on sexual connotations and rise to the level of sexual harassment. For example, an employee's behavior, such as repeatedly hugging and putting their arms around a student under inappropriate circumstances, could rise to the level of unwelcome touching of a sexual nature. (*cf. 4119.21/4219.11/4319.21-Professional Standards*)
15. Sexual relationships between employees and students. (*cf. 4119/21/4219.11/4319.21-Professional Standards*)
16. Sexual relationships between employees and former students if the employee pursued an intimate or sexual relationship with the former student while the student was enrolled in the District and while the employee was employed with the District. (*cf. 4119.21/4219.21/4319.21 – Professional Standards*)
17. Sexual relationships between employees and students or former students may also violate Title IX. (*cf. OCR 2001 Guidance on Sexual Harassment*)

**Instruction/Information**

The Superintendent or designee shall ensure that all District students receive age-appropriate instruction and information on sexual harassment. Such instruction and information shall include:

1. What acts and behavior constitute sexual harassment and sexual violence, including the fact that sexual harassment and sexual violence could occur between people of the same sex
2. A clear message that students do not have to endure sexual harassment or sexual violence
3. Encouragement for a student to immediately contact a teacher, the Principal/designee or any other available employee if the student has been subjected to sexual harassment by a student, employee, or a third party in the educational setting
4. Explanation that, when a report of sexual harassment is made to a Principal/designee, that administrator shall inform the student and/or parent/guardian of the right to file a written complaint through the District's Uniform Complaint Procedures, BP/AR 1312.3, and also explain how to access those procedures
5. Encouragement for student bystanders to report observed instances of sexual harassment, even where the target of the harassment has not complained
6. Information about the District's procedure for investigating sexual harassment complaints under BP 5145.7 and the Uniform Complaint Procedures 1312.3 and the person(s) to whom a report of sexual harassment should be made
7. Information about the rights of students and parents/guardians to file a criminal complaint or an OCR complaint, as applicable

**Complaint Process/Grievance Procedure**

EXHIBIT 8 - 003

***Uniform Complaint Procedures***. All reports and complaints alleging sexual harassment or sexual violence shall be addressed immediately in accordance with this policy and the Uniform Complaint Procedures - BP/AR 1312.3.

***District Compliance Officer*** The following individual is designated to handle complaints under the Uniform Complaint Procedures regarding sexual harassment prohibited by BP 5145.7 and to answer inquiries regarding the District's sexual harassment policies. This individual is also the District's Title IX Coordinator:

District Compliance Officer
25 Churchill Avenue, Palo Alto, CA 94306
650-833-4262
complianceofficer@pausd.org

***Student Reports***. Any student who believes they have been subjected to sexual harassment or who has witnessed sexual harassment may report the conduct to any school employee.

***School Employee Observation and Reports***. Within one school day of receiving a sexual harassment report or complaint from a student, parent/guardian or other person, the school employee shall report it to the site Principal/designee.

Any school employee who observes an incident of sexual harassment involving a student shall immediately intervene when safe to do so and shall, within one school day, report the conduct to the Principal/designee, whether or not the target of the harassment makes a report or files a complaint. *(Education Code 234.1)*

***Reports about Principal/designee***. Where a sexual harassment report or complaint involves the Principal/designee to whom the report would ordinarily be communicated, the employee who receives the report or who observes the incident shall instead report to the District Compliance Officer within one school day.

***Principal Actions after Receiving a Report***. The Principal/designee shall, within one school day of receiving the report from a student, an employee or a third party, forward the complaint itself or a transcription of the oral report to the District Compliance Officer.

The Principal/designee shall also inform the student and/or student's parent/guardian of the right to file a written complaint through the Uniform Complaint Procedures, BP/AR 1312.3. The Principal/designee shall provide a free copy or a link to the Uniform Complaint Procedures. The Principal/designee shall document when and how they informed the student and/or the parent/guardian.

***Reports about Adult Sexual Relationships with Students.*** In all allegations of an employee or third party adult engaging in a sexual relationship with a student or a former student, the District Compliance Officer shall assess whether a referral is necessary to either law enforcement or other appropriate agency.

***Notification of Factual Findings from other Entities***. If the District is on notice of a factual finding that a District employee engaged in behavior with a student, (including a student from a different school or district), which may constitute sexual harassment or sexual violence as defined in this policy, the District Compliance Officer shall investigate the circumstances surrounding the factual finding.

If the District is on notice of a factual finding that a student engaged in behavior with another student, (including a student from a different school or district), which may constitute sexual harassment or sexual violence as defined in this policy, the District Compliance Officer shall investigate the circumstances surrounding the factual finding.

If the District Compliance Officer is able to determine that the factual finding rises to the level of harassment in violation of this policy, the District shall promptly eliminate the harassment in the educational setting, prevent its recurrence in the educational setting, and address its effects in the educational setting.

EXHIBIT 8 - 004

For the purposes of this section, a "factual finding" includes a finding of fact made by another public or private school, a law enforcement agency, a child protection agency, a court, the Commission on Teaching Credentials or any other finding of fact provided to the District which indicates that an employee or student engaged in behavior which may constitute a violation of this policy and poses a risk to the safety of the District's students.

***Other Complaint Options***. A student may also file a sex discrimination complaint with the Office for Civil Rights (OCR) of the United States Department of Education. Instructions for filing a complaint can be found at https://www2.ed.gov/about/offices/list/ocr/docs/howto.html.

## Enforcement of District Policy

The Superintendent or designee shall take appropriate actions to reinforce the District's sexual harassment policy. As needed, these actions may include any of the following:
1. Removing vulgar or offending graffiti
   *(cf. 5131.5 - Vandalism and Graffiti)*
2. Providing training to students, staff, and parents/guardians about how to recognize harassment and how to respond
   *(cf. 4131 - Staff Development)*
   *(cf. 4231 - Staff Development)*
   *(cf. 4331 - Staff Development)*
3. Disseminating and/or summarizing the District's policy and regulation regarding sexual harassment
4. Consistent with the laws regarding the confidentiality of student and personnel records, communicating the school's response to parents/guardians and the community
   *(cf. 4119.23/4219.23/4319.23 - Unauthorized Release of Confidential/Privileged Information)*
   *(cf. 5125 - Student Records)*
5. Taking appropriate disciplinary action as set forth below or in Section I of AR 1312.3
6. Taking appropriate remedial actions including, but not limited to, those listed in Section H of AR 1312

## Disciplinary Action

If it is determined that an employee has violated this policy by engaging in sexual harassment, sexual violence, a sexual relationship with a student, or retaliation, the District shall take action to address the violation and any substantiated risk, including appropriate disciplinary action. Disciplinary action may include action to dismiss the employee, in accordance with law, board policy, and applicable collective bargaining agreements. (*cf. AR 4218 –Dismissal/Suspension/Disciplinary Action; Education Code sections 44932 et seq.*)

Any student who engages in sexual harassment or sexual violence in the educational setting, in violation of this policy, shall be subject to disciplinary action. For students in grades 4-12, disciplinary action may include suspension and/or expulsion, provided that, in imposing such discipline, the entire circumstances of the incident(s) shall be taken into account. Suspensions and recommendations for expulsion shall follow applicable law. *(Education Code sections 48900 et seq.)*

Students who knowingly file false complaints of sexual harassment or sexual violence or give knowingly false statements in an investigation shall be subject to discipline by measures up to and including suspension and expulsion, as shall any student who is found to have retaliated against another student in violation of this policy.

*(cf. 5144.1 - Suspension and Expulsion/Due Process)*

*(cf. 5144.2 - Suspension and Expulsion/Due Process (Students with Disabilities))*

When disciplinary action is recommended after the uniform complaint process is complete, the District Compliance Officer shall promptly determine the appropriate sanction and forward the matter to the Principal/designee and/or appropriate District administrator who will promptly implement any disciplinary process.

## Confidentiality

EXHIBIT 8 - 005

All complaints and allegations of sexual harassment or sexual violence shall be kept confidential except as necessary to carry out the investigation or take other subsequent necessary action. (5 CCR 4964)

*(cf. 4119.23/4219.23/4319.23 - Unauthorized Release of Confidential/Privileged Information)15]*
*(cf. 5125 - Student Records) [16]*

However, when a complainant notifies the District of the harassment but requests confidentiality, the Principal/designee or the District Compliance Officer shall inform the complainant that the request may limit the District's ability to investigate the harassment or take other necessary action. When honoring a request for confidentiality, the District will nevertheless take all reasonable steps to investigate and respond to the complaint consistent with the request.

When a complainant notifies the District of the harassment but requests that the District not pursue an investigation, the District will determine whether or not it can honor such a request while still providing a safe and nondiscriminatory environment for all students.

**Record-Keeping**

The District Compliance Officer, in consultation with the Superintendent or designee, shall maintain a record of all reported cases of sexual harassment and sexual violence to enable the District to monitor, address, and prevent repetitive harassing behavior in the educational setting.

**Notifications**

A copy of the District's sexual harassment policy and regulation shall:
1. Be included in the notifications that are sent to parents/guardians at the beginning of each school year *(Education Code 48980; 5 CCR 4917)*
   *(cf. 5145.6 - Parental Notifications)*
2. Be displayed on the District website, in a prominent location in the main administrative building and in other areas where notices of District rules, regulations, procedures, and standards of conduct are posted *(Education Code 231.5)*
3. Be provided as part of any orientation program conducted for new students at the beginning of each quarter, semester, or summer session *(Education Code 231.5)*
4. Appear in any school or District publication that sets forth the school's or District's comprehensive rules, regulations, procedures, and standards of conduct *(Education Code 231.5)*
5. Be included in the student handbook
6. Be provided to employees and employee organizations

Legal Reference:

EDUCATION CODE
*200-262.4 Prohibition of discrimination on the basis of sex*
*48900 Grounds for suspension or expulsion*
*48900.2 Additional grounds for suspension or expulsion; sexual harassment*
*48904 Liability of parent/guardian for willful student misconduct*
*48980 Notice at beginning of term*

CIVIL CODE
*51.9 Liability for sexual harassment; business, service and professional relationships*
*1714.1 Liability of parents/guardians for willful misconduct of minor*

GOVERNMENT CODE
*12950.1 Sexual harassment training*

CODE OF REGULATIONS, TITLE 5
4600-4687 Uniform complaint procedures
4900-4965 Nondiscrimination in elementary and secondary education programs

UNITED STATES CODE, TITLE 20

EXHIBIT 8 - 006

1221 Application of laws

1232g Family Educational Rights and Privacy Act

1681-1688 Title IX, discrimination

UNITED STATES CODE, TITLE 42
1983 Civil action for deprivation of rights
2000d-2000d-7 Title VI, Civil Rights Act of 1964
2000e-2000e-17 Title VII, Civil Rights Act of 1964 as amended

CODE OF FEDERAL REGULATIONS, TITLE 34

99.1-99.67 Family Educational Rights and Privacy

106.1-106.71 Nondiscrimination on the basis of sex in education programs

COURT DECISIONS
Donovan v. Poway Unified School District, (2008) 167 Cal.App.4th 567
Flores v. Morgan Hill Unified School District, (2003, 9th Cir.) 324 F.3d 1130
Reese v. Jefferson School District, (2001, 9th Cir.) 208 F.3d 736
Davis v. Monroe County Board of Education, (1999) 526 U.S. 629
Gebser v. Lago Vista Independent School District, (1998) 524 U.S. 274
Oona by Kate S. v. McCaffrey, (1998, 9th Cir.) 143 F.3d 473
Doe v. Petaluma City School District, (1995, 9th Cir.) 54 F.3d 1447


Management Resources:

CSBA PUBLICATIONS

Safe Schools: Strategies for Governing Boards to Ensure Student Success, 2011

Providing a Safe, Nondiscriminatory School Environment for Transgender and Gender-Nonconforming Students, Policy Brief, February 2014


OFFICE FOR CIVIL RIGHTS PUBLICATIONS

Dear Colleague Letter Title IX Coordinators, April 2015

Questions and Answers on Title IX and Sexual Violence, April 2014

Dear Colleague Letter Sexual Violence, April 4, 2011 Sexual Harassment: It's Not Academic, September 2008 Revised Sexual Harassment Guidance, January 2001

WEB SITES
CSBA: http://www.csba.org
California Department of Education: http://www.cde.ca.gov
U.S. Department of Education, Office for Civil Rights: http://www.ed.gov/about/offices/list/ocr

BP5145-7性骚扰Chinese.pdf (222 KB)     BP5145-7AcosoSexual.pdf (398 KB)

EXHIBIT 8 - 007

**Agenda Item Details**

| | |
|---|---|
| Meeting | Sep 12, 2017 - Regular Board Meeting |
| Category | 5. Action / Discussion / Information Items |
| Subject | A. Approval of BP/AR 1312.3 Uniform Complaint Procedures, BP/AR 5145.3 Nondiscrimination/Harassment, and BP 5145.7 Sexual Harassment: It is recommended the Board approve these three BP's and two AR's. These items were discussed at the June 22, June 28, and Aug. 22, 2017, special and regular Board meetings. ACTION |
| Type | Action |

To: Board of Education

From: Dr. Glenn "Max" McGee, Superintendent


**RECOMMENDATION**

It is recommended the Board approve the following Board Policies (BP) and Administrative Regulations (AR):

- BP 1312.3 Uniform Complaint Procedures
- AR 1312.3 Uniform Complaint Procedures
- BP 5145.3 Nondiscrimination Harassment
- AR 5145.3 Nondiscrimination Harassment
- BP 5145.7 Sexual Harassment

These items were discussed at the June 22, June 28, and Aug. 22, 2017, special and regular Board meetings.

**BACKGROUND**

Section A of the Resolution Agreement regarding Office for Civil Rights (OCR) case numbers 09-13-5901 and 09-14-1217 has several requirements regarding the above policies and administrative regulations. In these documents there had been internal inconsistencies and confusing language, and they had not been aligned with all Title IX requirements.

After reviewing these policies and administrative regulations with the Board last June, our attorneys and staff have conducted iterative discussions with OCR staff to assure that they approved of the alignment of our language with state and federal statute and with our own policies. These policies have been discussed both at BPRC and at a regular Board meeting and community members have provided additional input.  As a result, some minor revisions were made following the August 22nd Board meeting.  Our attorney discussed these with OCR and the language in the policies and administrative regulations has now been cleared by both OCR and counsel.  We are seeking Board approval for these documents tonight.

EXHIBIT 8 - 008

20170822BP1312.3UniformComplaintProceduresOCRApprovedDraft.pdf (426 KB)

20170912AR1312.3UniformComplaintProceduresOCRApprovedDraft.pdf (336 KB)

20170822BP5145.3NondiscriminationHarassmentOCRApprovedDraft.pdf (311 KB)

20170822AR5145.3NondiscriminationHarassmentOCRApprovedDraft.pdf (235 KB)

20170912BP5145.7SexualHarassmentOCRApprovedDraft.pdf (441 KB)

EXHIBIT 8 - 009

# Palo Alto
## Unified School District

# Sexual Harassment [1]

Board Policy
5145.7
**Adopted:**
Tuesday, February 11, 2014
Tuesday, December 8, 2015
**Revised:**
    , 2017

The Governing Board is committed to maintaining a safe school environment that is free from harassment and discrimination. The Board prohibits sexual harassment ~~of~~against students in the educational setting by an employee, student or third party ~~at school or at school-sponsored or school-related activities~~. Under federal and state law, the term sexual harassment includes sexual violence. The Board also prohibits~~-~~ retaliatory behavior or action against any person who ~~files a complaint,~~ reports, testifies about, files a complaint, or otherwise ~~-~~participates in a District complaint, investigation or grievance process~~es~~.

*(cf. 0410 - Nondiscrimination in District Programs and Activities)*[2]
*(cf. 1312.3 - Uniform Complaint Procedures)*[3]
*(cf. 4119.11/4219.11/4319.11 - Sexual Harassment)*[4]
*(cf. 5131 - Conduct)*[5]
*(cf. 5131.2 - Bullying)*
*(cf. 5137 - Positive School Climate)*[6]
*(cf. 5145.3 - Nondiscrimination/Harassment)*[7]
*(cf. 5157 - Gender Identity and Access)*
*(cf. 6142.1 - Sexual Health and HIV/AIDS Prevention Instruction)*[8]

## Scope and Definitions Related to Sexual Harassment Complaints

Prohibited sexual harassment includes, but is not limited to, unwelcome sexual advances, unwanted requests for sexual favors, or other unwanted verbal, visual, or physical conduct of a sexual nature made against another person of the same or opposite sex in the educational setting, when made on the basis of sex and under any of the following conditions: *(Education Code [9]212.5; [9] 5 CCR 4916)*

1. Submission to the conduct is explicitly or implicitly made a term or condition of a student's academic status or progress.
2. Submission to or rejection of the conduct by a student is used as the basis for academic decisions affecting the student.
3. The conduct has the purpose or effect of having a negative impact on the student's academic performance or of creating an intimidating, hostile, or offensive educational environment; or under Title IX a hostile environment has been created if the

006247.00028
16926061.100624
7.00028
Page 1 of 10
EXHIBIT 8-010
1/3/17, 9:52 AM

unwelcome conduct of a sexual nature is sufficiently serious that it denies or limits the student's ability to participate in or benefit from the educational program.

4. Submission to or rejection of the conduct by the student is used as the basis for any decision affecting the student regarding benefits and services, honors, programs, or activities available at or through any district program or activity.

*(cf. 5131 - Conduct)* [5]

*(cf. 5131.2 - Bullying)*

*(cf. 5137 - Positive School Climate)* [6]

*(cf. 5145.3 - Nondiscrimination/Harassment)* [7]

*(cf. 6142.1 - Sexual Health and HIV/AIDS Prevention Instruction)* [8]

The district will review and address any report or complaint of sexual harassment made by a student, employee or third party against another student, employee or third party. Specifically:

a.  Any sexual harassment or sexual violence report or complaint involving a student complainant or a student respondent shall be addressed under BP 5145.7 and the Uniform Complaint Procedures, and it will **not** be addressed under BP/AR 1312.1, 4119.11/4219.11/4319.11, or AR 4031.  Any other report or complaint of unlawful discrimination involving a student complainant or a student respondent shall be addressed through BP/AR 5145.3 and the Uniform Complaint Procedures.

b.  Any sexual harassment or sexual violence report or complaint, between employees or between~~involving~~ employees and third parties, but **not** involving student complainants or student respondents, shall be addressed through BP/AR 4119.11/4219.11/4319.11 and AR 4031.

c.  Any sexual harassment or sexual violence report or complaint between third parties which took place in the educational setting shall be referred to the District Compliance Officer to determine how to appropriately address the complaint.

d.  Though an incident of sexual harassment may occur off campus or unrelated to school activity, if the effects of the incident may result in harassment, intimidation, or bullying at school or at a school activity, which is sufficiently serious to interfere with or limit the targeted student's ability to participate in or benefit from the education program, the District Compliance Officer or Principal/designee shall, under these Uniform Complaint Procedures, promptly investigate, determine what occurred, eliminate any harassment, intimidation, or bullying that occurs at school or at a school activity, prevent its recurrence, and address its effects.

A "report" or "complaint" is defined as any oral or written communication to a school district employee or administrator which alleges behavior or misconduct that may constitute sexual harassment or sexual violence.  A report or complaint may include an oral report, an email, a text message or other message conveyed to a school district employee or administrator. The report or complaint does not have to be on a particular form or use specific words to identify the law which may have been violated.

An "educational setting" includes participation in educational programs and activities of the school or district, including all the academic, educational, extracurricular, athletic, and other programs and activities of the school, whether those programs or activities take place in a school's facilities, on a school bus, or at a class or training program sponsored by the school at another location.

EXHIBIT 8 - 011

1/3/17, 9:52 AM

A "third party" includes someone who is connected to the school or the district for educational, business or extra-curricular purposes.  For example, a third party may include a vendor, volunteer, coach, or other person who is on school or district grounds during the hours of operation or who is present in the educational setting.

## Examples

Examples of types of conduct which are prohibited in the District and which may constitute sexual harassment include, but are not limited to:

1. Unwelcome leering, sexual flirtations, or propositions
2. Unwelcome sexual slurs, epithets, threats, verbal abuse, derogatory comments, or sexually degrading descriptions
3. Unwelcome or demeaning conduct or comments of a sexual nature directed at or about an individual related to actual or perceived gender, gender identity and gender expression, sex, sexual behavior, sexual orientation, or other related personal characteristics
4. Graphic verbal comments about an individual's body or overly personal conversation
5. Sexual jokes, derogatory posters, notes, stories, cartoons, drawings, pictures, obscene gestures, or computer-generated images of a sexual nature
6. Spreading sexual rumors
7. Teasing or sexual remarks about students enrolled in a predominantly single-sex class
8. Massaging, grabbing, fondling, stroking, or brushing the body
9. Touching an individual's body or clothes in a sexual way
10. Impeding or blocking movements or any physical interference with school activities when directed at an individual on the basis of sex
11. Displaying sexually suggestive objects
12. Sexual violence, including, but not limited to, sSexual assault or, sexual battery as defined in Education Code 48900(n), or sexual coercion
13. Dating violence, stalking, and relationship abuse
14. An employee engaging in, inappropriate socialization or fraternization with a student or soliciting, or encouraging a, sexual relationship or sexual activity with a student(s) based on written, verbal, and/or physical or sexual relationshipcontact or fraternization with a student(s).  In some circumstances, an employee's physical nonsexual  contactduct with a student may also take on sexual connotations and rise to the level of sexual harassment and/or inappropriate conduct.  For example, an employee's behavior, such as repeatedly hugging and puttingtheir arms around a student under inappropriate circumstances, could rise to the level of unwelcome touching of a sexual nature. (cf. 4119.21/4219.11/4319.21-Professional Standards)
15. Sexual relationships between employees and students.  (cf. 4119/21/4219.11/4319.21- Professional Standards)
16. Sexual relationships between employees and former students, if (a) the employee pursued an inappropriate, intimate or sexual relationship with the former student while the student was enrolled in the District and while the employee was employed with the District; (b) if the employee's pursuing behavior took place in an educational setting; and (c) if the employee's behavior adversely  affects the current educational environment.  (cf. 4119.21/4219.21/4319.21– Professional Standards)
17. Sexual relationships between employees and students or former students may also violate Title IX.  (cf. OCR 2001 Guidance on Sexual Harassment)

**Instruction/Information**

EXHIBIT 8 - 012

1/3/17, 9:52 AM

The Superintendent or designee shall ensure that all District students receive age-appropriate instruction and information on sexual harassment. Such instruction and  information shall include:

1. What acts and behavior constitute sexual harassment and sexual violence, including the fact that sexual harassment and sexual violence could occur between people of the same sex and could involve  sexual violence
2. A clear message that students do not have to endure sexual harassment or sexual violence
3. Encouragement for a student to immediately contact a teacher, the Principal/designee or any other available employee if the student has been subjected to sexual harassment by a student, employee, or a third party in the educational setting
4. Explanation that, when a report of sexual harassment is made to a Principal/designee, that administrator shall inform the student and/or parent/guardian of the right to file a written complaint through the District's Uniform Complaint Procedures, BP/AR 1312.3, and also explain how to access those procedures
5. Encouragement for student bystanders to report observed instances of sexual harassment, even where the target victim of the harassment has not complained
6. Information about the District's procedure for investigating sexual harassment complaints under BP 5145.7 and the Uniform Complaint Procedures 1312.3 and the person(s) to whom a report of sexual harassment should be made
7. Information about the rights of students and parents/guardians to file a criminal complaint or an OCR complaint, as applicable

## Complaint Process/Grievance Procedure

**_Uniform Complaint Procedures_**.  All reports and complaints alleging sexual harassment or sexual violence shall be addressed immediately in accordance with this policy and the Uniform Complaint Procedures - BP/AR 1312.3.

**_District Compliance Officer_**  The following individual is designated to handle complaints under the Uniform Complaint Procedures regarding sexual harassment prohibited by BP 5145.7 and to answer inquiries regarding the District's sexual harassment policies.  This individual is also the District's Title IX Coordinator:

District Compliance Officer
25 Churchill Avenue, Palo Alto, CA 94306
650-833-4252
complianceofficer@pausd.org

**_Student Reports_**.  Any student who believes they have been subjected to sexual harassment or who has witnessed sexual harassment may report the conduct to any school employee.

**_School Employee Observation and Reports_**.  Within one school day of receiving a sexual harassment report or complaint from a student, parent/guardian or other person, the school employee shall report it to the site Principal/designee.

Any school employee who observes an incident of sexual harassment involving a student shall

EXHIBIT 8 - 013

immediately intervene when safe to do so and shall, within one school day, report the conduct to the Principal/designee, whether or not the target of the harassment makes a report or files a complaint. (Education Code 234.1)

***Reports about Principal/designee***.  Where a sexual harassment report or complaint involves the Principal/designee to whom the report would ordinarily be communicated, the employee who receives the report or who observes the incident shall instead report to the District Compliance Officer within one school day.

***Principal Actions after Receiving a Report***.  The Principal/designee shall, within one school day of receiving the report from a student, an employee or a third party, forward the complaint itself or a transcription of the oral report to the District Compliance Officer.

The Principal/designee shall also inform the student and/or student's parent/guardian of the right to file a written complaint through the Uniform Complaint Procedures, BP/AR 1312.3.  The Principal/designee shall provide a free copy or a link to the Uniform Complaint Procedures.  The Principal/designee shall document when and how they informed the student and/or the parent/guardian.

***Reports about Adult Sexual Relationships with Students.***  In all allegations of an employee or third party adult engaging in a sexual relationship with a student or a former student, the District Compliance Officer shall assess whether a referral is necessary to either law enforcement or other appropriate agency.

***Notification of Factual Findings from other Entities***.  If the District is on notice of a factual finding that a District employee engaged in behavior with a student, (including a student from a different school or district), which may constitute sexual harassment, or sexual violence as defined in this policy, or the cultivation of an inappropriate relationship as defineas defined in the Examples d subsection of thisin this policy or is otherwise a violation based on the policies governing Professional Standards, the District Compliance Officer shall investigate the circumstances surrounding the factual finding.

If the District is on notice of a factual finding that a student engaged in behavior with another student, (including a student from a different school or district), which may constitute sexual harassment or sexual violence as defined in this policy, the District Compliance Officer shall investigate the circumstances surrounding the factual finding.

If the District Compliance Officer is able to determine that the factual finding rises to the level of harassment in violation of this policy, the District shall promptly eliminate the harassment in the educational setting, prevent its recurrence in the educational setting, and address its effects in the educational setting.

For the purposes of this section, a "factual finding" includes a finding of fact made by another public or private school, a law enforcement agency, a child protection agency, a court, the Commission on Teaching Credentials or any other finding of fact provided to the District which indicates that an employee or student engaged in behavior which may constitute a violation of this policy and poses a risk to the safety of the District's students.

***Other Complaint Options***.  A student may also file a sex discrimination complaint with the Office for Civil Rights (OCR) of the United States Department of Education.  Instructions for filing a complaint can be found at https://www2.ed.gov/about/offices/list/ocr/docs/howto.html.  Any student who believes he/she has been subjected to sexual harassment or who has witnessed sexual harassment may report the conduct orally to any school employee and/or file a formal written complaint. Within one school day of receiving such a report, the school

EXHIBIT 8 - 014

employee shall report it to the site Principal/designee.

All reports and complaints alleging conduct prohibited by this policy shall be handled in accordance with the District's Uniform Complaint Procedures AR 1312.3.

The Superintendent or designee shall ensure that any complaints regarding sexual harassment of students are immediately investigated in accordance with the Uniform Complaint Procedures AR 1312.3. When the Superintendent or designee has determined that harassment has occurred, he/she shall take prompt, appropriate action to end the harassment and to address its effects on the victim.

Where a report is made of sexual harassment involving the Principal/designee to whom the report would ordinarily be communicated, the employee who receives the report or who observes the incident shall instead report to the District Compliance Officer within one school day.

Any school employee who observes an incident of sexual harassment shall immediately intervene when safe to do so and shall, within one school day, report the conduct to the Principal/designee, whether or not the victim makes a report or files a complaint. *(Education* [10] *Code 234.1)* [10]

Though an incident of alleged harassment, intimidation, and/or bullying as defined within this policy may occur off campus, if the effects of the off-campus incident result in harassment, intimidation, or bullying at school that is sufficiently serious to interfere with or limit the targeted student's ability to participate in or benefit from the education program, the school must respond promptly and effectively to eliminate the harassment that occurs at school, prevent its recurrence, and address its effects. Such response may include discipline  of the alleged harasser in accordance with applicable law and as provided in Board Policy  (BP) and Administrative Regulation (AR) 5144. Other possible responses include, but are  not limited to, those listed in AR 1312.3 Section G  Remedial Action.

The following position is the District's Compliance Officer designated to handle complaints under the Uniform Complaint Procedures regarding sexual harassment prohibited by BP 5145.7 and/or any behavior prohibited by District's Nondiscrimination/Harassment Policy, BP 5145.3, and to answer inquiries regarding the District's nondiscrimination and harassment policies:
Associate Superintendent – Educational Services
25 Churchill Avenue, Palo Alto, CA  94306
650-329-3700

## Enforcement of District Policy

The Superintendent or designee shall take appropriate actions to reinforce the District's sexual harassment policy.  As needed, these actions may include any of the following:

1. Removing vulgar or offending graffiti
   *(cf. 5131.5 - Vandalism and Graffiti)* [11]
2. Providing training to students, staff, and parents/guardians about how to recognize harassment and how to respond.  Training for staff may include child abuse reporting and annual Title IX training

*(cf. 4131 - Staff Development)* [12]
*(cf. 4231 - Staff Development)* [13]
*(cf. 4331 - Staff Development)* [14]

3. Disseminating and/or summarizing the District's policy and regulation regarding sexual harassment
4. Consistent with the laws regarding the confidentiality of student and personnel records, communicating the school's response to parents/guardians and the community
   *(cf. 4119.23/4219.23/4319.23 - Unauthorized Release of Confidential/Privileged Information)* [15]
   *(cf. 5125 - Student Records)* [16]

5. Taking appropriate disciplinary action as set forth below or in Section ~~III~~ of AR 1312.3
5.
6. Taking appropriate remedial actions including, but not limited to, those listed in Section ~~HG~~ of AR 1312.3
6.

~~In addition, disciplinary measures may be taken against any person who is found to have made a complaint of sexual harassment which he/she knew was not true.~~

~~*(cf. 4118 - Suspension/Disciplinary Action)* [17]~~
~~*(cf. 4218 - Dismissal/Suspension/Disciplinary Action)* [18]~~
~~*(cf. 5144.1 - Suspension and Expulsion/Due Process)* [19]~~
~~*(cf. 5144.2 - Suspension and Expulsion/Due Process (Students with Disabilities))* [19]~~

## ~~Notifications~~

~~A copy of the District's sexual harassment policy and regulation shall:~~

1. ~~Be included in the notifications that are sent to parents/guardians at the beginning of each school year *(Education Code 48980* [20]*; 5 CCR 4917)*~~
   ~~*(cf. 5145.6 - Parental Notifications)* [21]~~
2. ~~Be displayed in a prominent location in the main administrative building or other area where notices of District rules, regulations, procedures, and standards of conduct are posted, including school web sites *(Education Code 231.5)* [22]~~
3. ~~Be provided as part of any orientation program conducted for new students at the beginning of each quarter, semester, or summer session *(Education Code 231.5)* [22]~~
4. ~~Appear in any school or District publication that sets forth the school's or District's comprehensive rules, regulations, procedures, and standards of conduct *(Education Code 231.5)* [22]~~
5. ~~Be included in the student handbook~~
6. ~~Be provided to employees and employee organizations~~

## Disciplinary Action

If it is determined that an employee has violated this policy by engaging in sexual harassment, sexual violence, a sexual relationship~~, an inappropriate relationship~~ with a student, or retaliation~~, as defined herein,~~ the District shall take action to address the violation and any substantiated risk, including appropriate disciplinary action. Disciplinary action may include action to dismiss the employee, in accordance with law, board policy, and applicable collective bargaining agreements.  (*cf. AR 4218 - Dismissal/Suspension/Disciplinary Action*) (*Education Code sections 44932 et seq.*)

EXHIBIT 8  016

Any student who engages in sexual harassment or sexual violence in the educational setting, at school or at a school sponsored or school-related activity is in violation of this policy, and shall be subject to disciplinary action. For students in grades 4-12, disciplinary action may include suspension and/or expulsion, provided that, in imposing such discipline, the entire circumstances of the incident(s) shall be taken into account. Suspensions and recommendations for expulsion shall follow applicable law. (Education Code sections 48900 et seq.)

Students who knowingly file false complaints of sexual harassment or sexual violence or give knowingly false statements in an investigation shall be subject to discipline by measures up to and including suspension and expulsion, as shall any student who is found to have retaliated against another student in violation of this policy.
*(cf. 5144.1 - Suspension and Expulsion/Due Process)*[19]
*(cf. 5144.2 - Suspension and Expulsion/Due Process (Students with Disabilities))*[23]

When disciplinary action is recommended after the uniform complaint process is complete, the District Compliance Officer shall promptly determine the appropriate sanction and forward the matter to the Principal/designee and/or appropriate District administrator who will promptly implement any disciplinary process.

## Confidentiality and Record-Keeping

All complaints and allegations of sexual harassment or sexual violence shall be kept confidentialconfidential except as necessary to carry out the investigation or take other subsequent necessary action. (5 CCR 4964)
*(cf. 4119.23/4219.23/4319.23 - Unauthorized Release of Confidential/Privileged Information)* [15]
*(cf. 5125 - Student Records)* [16]

However, when a complainant notifies the District of the harassment but requests confidentiality, the Principal/designee or the District Compliance Officer shall inform the complainant that the request may limit the District's ability to investigate the harassment or take other necessary action. When honoring a request for confidentiality, the District will nevertheless take all reasonable steps to investigate and respond to the complaint consistent with the request.

When a complainant notifies the District of the harassment but requests that the District not pursue an investigation, the District will determine whether or not it can honor such a request while still providing a safe and nondiscriminatory environment for all students.

## Record-Keeping

The District Compliance Officer, in consultation with the Superintendent or designee,Superintendent or designee shall maintain a record of all reported cases of sexual harassment and sexual violence to enable the District to monitor, address, and prevent repetitive harassing behavior in the educational settingschools.

## Notifications

A copy of the District's sexual harassment policy and regulation shall:

7.1.     Be included in the notifications that are sent to parents/guardians at the beginning of each school year *(Education Code 48980 [20]; 5 CCR 4917) (cf. 5145.6 - Parental Notifications)* [21]

8.2.     Be displayed on the District website, in a prominent location in the main administrative building or and in other areas where notices of District rules, regulations, procedures, and standards of conduct are posted, including school web sites *(Education Code 231.5)* [22]

9.3.     Be provided as part of any orientation program conducted for new students at the beginning of each quarter, semester, or summer session *(Education Code 231.5)* [22]

10.4.   Appear in any school or District publication that sets forth the school's or District's comprehensive rules, regulations, procedures, and standards of conduct *(Education Code 231.5)* [22]

11.5.   Be included in the student handbook

12.6.   Be provided to employees and employee organizations

**Legal Reference:**

EDUCATION CODE
*200-262.4 Prohibition of discrimination on the basis of sex* [24]
*48900 Grounds for suspension or expulsion* [25]
*48900.2 Additional grounds for suspension or expulsion; sexual harassment* [26]
*48904 Liability of parent/guardian for willful student misconduct* [27]
*48980 Notice at beginning of term* [20]

CIVIL CODE
*51.9 Liability for sexual harassment; business, service and professional relationships* [28]
*1714.1 Liability of parents/guardians for willful misconduct of minor* [29]

GOVERNMENT CODE
*12950.1 Sexual harassment training* [30]

CODE OF REGULATIONS, TITLE 5
4600-4687 Uniform complaint procedures
4900-4965 Nondiscrimination in elementary and secondary education programs

UNITED STATES CODE, TITLE 20
1221 Application of laws
1232g Family Educational Rights and Privacy Act
1681-1688 Title IX, discrimination

UNITED STATES CODE, TITLE 42
1983 Civil action for deprivation of rights
2000d-2000d-7 Title VI, Civil Rights Act of 1964
2000e-2000e-17 Title VII, Civil Rights Act of 1964 as amended

CODE OF FEDERAL REGULATIONS, TITLE 34
99.1-99.67 Family Educational Rights and Privacy

**EXHIBIT 8 - 018**

1/3/17, 9:52 AM

COURT DECISIONS
Donovan v. Poway Unified School District, (2008) 167 Cal.App.4th 567
Flores v. Morgan Hill Unified School District, (2003, 9th Cir.) 324 F.3d 1130
Reese v. Jefferson School District, (2001, 9th Cir.) 208 F.3d 736
Davis v. Monroe County Board of Education, (1999) 526 U.S. 629
Gebser v. Lago Vista Independent School District, (1998) 524 U.S. 274
Oona by Kate S. v. McCaffrey, (1998, 9th Cir.) 143 F.3d 473
Doe v. Petaluma City School District, (1995, 9th Cir.) 54 F.3d 1447

**Management Resources:**

CSBA PUBLICATIONS
Safe Schools: Strategies for Governing Boards to Ensure Student Success, 2011
Providing a Safe, Nondiscriminatory School Environment for Transgender and Gender-Nonconforming Students, All Students, Policy Brief, April  2010February 2014

OFFICE FOR CIVIL RIGHTS PUBLICATIONS
Dear Colleague Letter Title IX Coordinators, April 2015
Questions and Answers on Title IX and Sexual Violence, April 2014
Dear Colleague Letter  Sexual Violence, April 4, 2011
Sexual Harassment: It's Not Academic, September 2008
Revised Sexual Harassment Guidance, January 2001

WEB SITES
CSBA: http://www.csba.org[31]

California Department of Education: http://www.cde.ca.gov[32]
U.S. Department of Education, Office for Civil Rights: http://www.ed.gov/about/offices/list/ocr[33]

EXHIBIT 8 - 019

# EXHIBIT 11

# Phone call with PC- Sunday, 1/30/22, 1:05 PM

• Wife received message Friday morning on Linked in. Said it was a burner account and anonymous and said you can't contact me. It's was from the husband. My wife has been in therapy. Article link with Campanile with him coaching Paly baseball. Wife didn't tell him until this morning.

• Talked to a Detective with Redwood City Police who is his buddy. He said there no victim, Burner account, so many holes. Detective stated that he should call his employer.

• ████████████████████████████████There was no swim team but there was a swim unit and he taught 6th grade at the time. There were always plenty of people around.

• He said he is in a program where truth is everything. His wife knows it's not true.

• I didn't have to say anything. Getting angry. It's sick. Nothing to worry about because it is not true. He said he was grasping at straws. After my divorce so perhaps a disgruntled ex, or a student I was mean to.

• When Giordano, 1994, arrested in 2005. Ginanni and I were his colleagues.

• I told him to consider contacting the union. I alluded to the district might have an obligation to investigate. He asked, "Would I have to stay home?"

• Stated that if he gets one more message he is going to call the police.

**To learn more and get OneNote, visit www.onenote.com.**

EXHIBIT 11 - 001

PAUSD003065

# PC Notes 1.31.22

- ███████████████████████████

- Brought a copy of the e-mail that was sent to his wife on Linked in

- Said he knows the pool was rented by Palo Alto Swim Club but he was never involved.

- Told me that is life is working for him. He goes to a meeting in the morning, teaches his classes, and then coaches.

- ████████████████████████████████████████ He asked me what would be investigated?

- ████████████████████████████████████████ I asked him to view it from the district perspective. What happens if we know this information and we ignored it and didn't even look into it.

- He said, "I get it. The district would be done."

- He shared how hard it was for his wife to share the e-mail she got. She got it Friday just before a meeting and had to sit on it all weekend until she finally told him Sunday morning.

- He said he hopes he isn't out for a month.

- Called him on the phone at 9:08 AM and told him that Trent Bahadursingh and I would be coming out at 11:45 AM and would meet him in Sebastian's office. I asked him if he wanted a union rep with him. He said, "I hate all this. No, I'll have Dave or Jill or someone else sit with me." I clarified by saying, "I just want to be clear that you want a colleague to sit in there with you but not a PAEA rep." He answered, "Yes, because I have nothing to hide."

- Called me back at 9:24 AM stating he was on his way to the Palo Alto police because he is not going to stand for this. I asked him who was covering his class. He relied "DeGeronimo."

- Went out to Greene Middle School at 11:45 AM and Trent and I met with him in Sebastian's Office. Sebastian was not at Greene that day and Pete did not bring a colleague with him to the meeting. I asked if anyone else was coming to the meeting and he said no. We provided him the leave letter and information about Care Solace and EAP. He turned in his computer and keys.

EXHIBIT 11 - 002

PAUSD003066

# PC Notes 2.1.22

• Called me at 3:45 PM to say he spent an hour with sexual assault detective Yolanda Clausen with PAPD.

• They stated that they were going to send a warrant to LinkedIn to try and find out who sent the e-mail.

• Thinks it could be one of two things- a person who has a grudge against me or an extortion plot.

• Explained that PA Police would not do anything further.

• ████████████████████████████████████████████.

EXHIBIT 11 - 003

PAUSD003067

# PC Notes 2.4.22

- Called me on my cell phone on 2/3/22 at 9:34 AM. I did not answer as I was sitting in the DWK Ed Law meeting in Sunnyvale. He did not leave a voicemail or text me.

- He also called Sharon Ofek that day and she was in a meeting so she didn't talk to him.

- Called him on 2/4/22 at 9:01 AM. Left him a voicemail saying I saw a missed call. He called me back at 9:18 AM but I was just stepping into a Zoom meeting. I told him I would call him back. He said, "If I was just teaching PE, this wouldn't be a problem, but parents on the team have been calling me and I don't know what to say."

- Called him back at 10 AM. He explained that with his history, the longer he is out, people start asking "Is he drinking again?" It damages his reputation. He also said this has been really hard on his wife.

- 

- Encouraged him to take advantage of Care Solace or EAP. He said his wife was helping him with this. I mentioned that he spoke about the structure in his life that involved going to meetings, teaching, and coaching and that structure is no longer in place.

- He said he hasn't heard back from PA Police and that he doesn't want to call them because they said no news is good news.

EXHIBIT 11 - 004

PAUSD003068

**EXHIBIT 14**

| | |
|---|---|
| Book | PAUSD Policies & Regulations |
| Section | 5000 - Students |
| Title | Title IX Sexual Harassment Complaint Procedures |
| Code | 5145.71 AR |
| Status | Active |
| Adopted | October 27, 2020 |

This administrative regulation shall be used in conjunction with current District policies and practice. In terms of the timeline, the process under this regulation shall commence at the same time as the processes under the District's existing policies including Sexual Harassment, Nondiscrimination, and UCP.

The complaint procedures described in this administrative regulation shall be used to address any complaint governed by Title IX of the Education Amendments of 1972 alleging that a student was subjected to one or more of the following forms of sexual harassment: (34 CFR 106.30)
1. A district employee conditioning the provision of a district aid, benefit, or service of the district on the student's participation in unwelcome sexual conduct
2. Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a student equal access to the district's education program or activity
3. Sexual assault, dating violence, domestic violence, or stalking on the basis of sex, defined as follows:
   ○ Forcible Sexual Assault includes any sexual act directed against a student, forcibly, against the student's will, or without consent, including rape, sodomy, sexual assault with an object, and fondling.  (See 20 USC 1092(f)(6)(A)(v).)
   ○ Non-forcible Sexual Assault includes offenses that do not involve force where the student is incapable of giving consent, including statutory rape and incest. (See 20 USC 1092(f)(6)(A)(v).)
   ○ Dating Violence includes violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the student, where the existence of such a relationship shall be determined based on a consideration of the following factors: the length of the relationship, the type of relationship and/or the frequency of interaction between the persons involved in the relationship.  (See 34 USC 12291(a)(10).)
   ○ Domestic Violence includes felony or misdemeanor crimes of violence committed by a current or former spouse or intimate partner of the student. (See 34 USC 12291(a)(8).)
   ○ Stalking which includes engaging in a course of conduct directed at a student that would cause a reasonable person to fear for their safety or the safety of others or suffer substantial emotional distress. (See 34 USC 12291(a)(30).)

All other sexual harassment complaints shall be investigated and responded to pursuant to AR 1312.3 - Uniform Complaint Procedures.

*(cf. 1312.3 - Uniform Complaint Procedures)*

A report of sexual harassment shall be submitted directly to or forwarded to the district's Title IX Coordinator using the contact information listed below:

EXHIBIT 14 - 001

Title IX Coordinator
Palo Alto Unified School District
25 Churchill Avenue
Palo Alto, CA  94306
titleixcoordinator@pausd.org
(650) 833-4248

Upon receiving such a report, the Title IX Coordinator shall inform the complainant of the process for filing a formal complaint.

Even if the alleged victim chooses not to file a formal complaint, the Title IX Coordinator shall file a formal complaint in situations in which a safety threat exists. In addition, the Title IX Coordinator may file a formal complaint in other situations as permitted under the Title IX regulations. In such cases, the alleged victim is not a party to the case, but will receive notices as required by the Title IX regulations at specific points in the complaint process.

A formal complaint, with the complainant's physical or digital signature, may be filed with the Title IX Coordinator in person, by mail, by email, or by any other method authorized by the district. (34 CFR 106.30)

The Superintendent or designee shall ensure that the Title IX Coordinator, investigator, decision-maker, or a facilitator of an informal resolution process does not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent, and that such persons receive training in accordance with 34 CFR 106.45. (34 CFR 106.45)

**Supportive Measures**

Upon receipt of a report of Title IX sexual harassment, even if a formal complaint is not filed, the Title IX Coordinator shall promptly contact the complainant to discuss the availability of supportive measures which are nondisciplinary, nonpunitive, and do not unreasonably burden the other party. Such measures may include, but are not limited to, counseling, course-related adjustments, modifications of class schedules, mutual restrictions on contact, increased security, and monitoring of certain areas of the campus. The Title IX Coordinator shall consider the complainant's wishes with respect to supportive measures. (34 CFR 106.30, 106.44)

**Emergency Removal from School**

On an emergency basis, the district may remove a student from the district's education program or activity, provided that the district conducts an individualized safety and risk analysis, determines that removal is justified due to an immediate threat to the physical health or safety of any student or other individual arising from the allegations, and provides the student with notice and an opportunity to challenge the decision immediately following the removal. This authority to remove a student does not modify a student's rights under the Individuals with Disabilities Education Act or Section 504 of the Rehabilitation Act of 1973. (34 CFR 106.44)

If a district employee is the respondent, the employee may be placed on administrative leave during the pendency of the formal complaint process. (34 CFR 106.44)

**Dismissal of Complaint**

The Title IX Coordinator shall dismiss a formal complaint if the alleged conduct would not constitute sexual harassment as defined in 34 CFR 106.30 even if proved. The Title IX Coordinator shall also dismiss any complaint that did not occur in the district's education program or activity or did not occur against a person in the United States, and may dismiss a formal complaint if the complainant notifies the district in writing that the complainant would like to withdraw the complaint or any allegations in the complaint, the respondent is no longer enrolled or employed by the district, or sufficient circumstances prevent the district from gathering evidence sufficient to reach a determination with regard to the complaint. (34 CFR 106.45)

EXHIBIT 14 - 002

Upon dismissal, the Title IX Coordinator shall promptly, and simultaneously to the parties, send written notice of the dismissal and the reasons for the dismissal. (34 CFR 106.45)

If a complaint is dismissed on the grounds that the alleged conduct does not constitute sexual harassment as defined in 34 CFR 106.30, the conduct may still be addressed pursuant to BP/AR 1312.3 - Uniform Complaint Procedures as applicable.

**Informal Resolution Process**

When a formal complaint of sexual harassment is filed, the district may offer an informal resolution process, such as mediation, at any time prior to reaching a determination regarding responsibility. The district shall not require a party to participate in the informal resolution process or to waive the right to an investigation and adjudication of a formal complaint. (34 CFR 106.45)

The district may facilitate an informal resolution process provided that the district: (34 CFR 106.45)
1. Provides the parties with written notice disclosing the allegations, the requirements of the informal resolution process, the right to withdraw from the informal process and resume the formal complaint process, and any consequences resulting from participating in the informal resolution process, including that records will be maintained or could be shared.
2. Obtains the parties' voluntary, written consent to the informal resolution process
3. Does not offer or facilitate an informal resolution process to resolve allegations that an employee sexually harassed a student

**Formal Complaint Process**

If a formal complaint is filed, the Title IX Coordinator shall provide the known parties with written notice of the following: (34 CFR 106.45)
1. The district's formal Title IX complaint process, including any informal resolution process
2. The allegations potentially constituting sexual harassment with sufficient details known at the time, including the identity of parties involved in the incident if known, the conduct allegedly constituting sexual harassment, and the date and location of the alleged incident if known. Such notice shall be provided with sufficient time for the parties to prepare a response before any initial interview.

If, during the course of the investigation, the district investigates allegations about the complainant or respondent that are not included in the initial notice, the Title IX Coordinator shall provide notice of the additional allegations to the parties.
3. A statement that the respondent is presumed not responsible for the alleged conduct and that a determination regarding responsibility is made at the conclusion of the complaint process
4. The opportunity for the parties to have an advisor of their choice who may be, but is not required to be, an attorney, and the ability to inspect and review evidence
5. The prohibition against knowingly making false statements or knowingly submitting false information during the complaint process

The above notice shall also include the name of the investigator, facilitator of an informal process, and decision-maker and shall provide either party with no less than three calendar days to raise concerns of conflict of interest or bias regarding any of these persons.

During the investigation process, the district shall: (34 CFR 106.45)
1. Provide an equal opportunity for the parties to present witnesses, including fact and expert witnesses, and other inculpatory and exculpatory evidence
2. Not restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence
3. Provide the parties with the same opportunities to have others present during any grievance proceeding, including the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice, who may be, but is not required to be, an attorney
4. Not limit the choice or presence of an advisor for either the complainant or respondent in any meeting or grievance proceeding, although the district may establish restrictions regarding the extent to which the advisor may participate in the proceedings as long as the restrictions apply equally to both parties
5. Provide, to a party whose participation is invited or expected, written notice of the date, time, location, participants, and purpose of all investigative interviews or other meetings, with sufficient time for the party to prepare to participate

EXHIBIT 14 - 003

6. Send in an electronic format or hard copy to both parties and their advisors, if any, any evidence that is obtained as part of the investigation that is directly related to the allegations raised in the complaint, including the evidence upon which the district does not intend to rely in reaching a determination regarding responsibility and inculpatory or exculpatory evidence obtained by a party or other source, so that each party can meaningfully respond to the evidence and have at least 10 days to submit a written response for the investigator to consider prior to the completion of the investigative report

7. Objectively evaluate all relevant evidence, including both inculpatory and exculpatory evidence, and determine credibility in a manner that is not based on a person's status as a complainant, respondent, or witness

8. Create an investigative report that fairly summarizes relevant evidence and, at least 10 days prior to the determination of responsibility, send to the parties and their advisors, if any, the investigative report in an electronic format or a hard copy, for their review and written response

9. After sending the investigative report to the parties for review and before a decision-maker reaches a determination regarding responsibility, the decision-maker must afford each party the opportunity to submit written, relevant questions that the party wants asked of any party or witness, provide each party with the answers, and allow for additional, limited follow-up questions from each party

Questions and evidence about the complainant's sexual predisposition or prior sexual behavior are not relevant, unless such questions and evidence are offered to prove that someone other than the respondent committed the conduct alleged by the complainant or if the questions and evidence concern specific incidents of the complainant's prior sexual behavior with respect to the respondent and are offered to prove consent.

The district shall maintain confidentiality and/or privacy rights of all parties to the complaint in accordance with applicable state and federal laws, except as may be permitted or required by law or to carry out the purposes of this formal Title IX complaint process.

If the complaint is against an employee, rights conferred under an applicable collective bargaining agreement shall be applied to the extent they do not conflict with the Title IX requirements.

**Written Decision**

The Superintendent shall designate an employee as the decision-maker to determine responsibility for the alleged conduct, who shall not be the Title IX Coordinator or a person involved in the investigation of the matter. (34 CFR 106.45)

The decision-maker shall issue, and simultaneously provide to both parties, a written decision as to whether the respondent is responsible for the alleged conduct. (34 CFR 106.45)

The written decision shall be issued within 45 calendar days of the receipt of the complaint.

The timeline may be temporarily extended for good cause with written notice to the complainant and respondent of the extension and the reasons for the action. (34 CFR 106.45)

In making this determination, the district shall use the "preponderance of the evidence" standard for all formal complaints of sexual harassment. The same standard of evidence shall be used for formal complaints against students as for complaints against employees. (34 CFR 106.45)

The written decision shall include the following: (34 CFR 106.45)

1. Identification of the allegations potentially constituting sexual harassment as defined in 34 CFR 106.30

2. A description of the procedural steps taken from receipt of the formal complaint through the written decision, including any notifications to the parties, interviews with parties and witnesses, site visits, methods used to gather other evidence, and hearings held if the district includes hearings as part of the grievance process

3. Findings of fact supporting the determination

4. Conclusions regarding the application of the district's code of conduct to the facts

5. A statement of, and rationale for, the result as to each allegation, including a decision regarding responsibility, any disciplinary sanctions the district imposes on the respondent, and whether

EXHIBIT 14 - 004

remedies designed to restore or preserve equal access to the district's educational program or activity will be provided by the district to the complainant

6. The district's procedures and permissible bases for the complainant and respondent to appeal

**Appeals**

Either party may appeal the district's decision or dismissal of a formal complaint or any allegation in the complaint, if the party believes that a procedural irregularity affected the outcome, new evidence is available that could affect the outcome, or a conflict of interest or bias by the Title IX Coordinator, investigator(s), or decision- maker(s) affected the outcome. If an appeal is filed, the district shall: (34 CFR 106.45)

1. Notify the other party in writing when an appeal is filed and implement appeal procedures equally for both parties
2. Ensure that the decision-maker(s) for the appeal is trained in accordance with 34 CFR 106.45 and is not the same decision-maker(s) who reached the determination regarding responsibility or dismissal, the investigator(s), or the Title IX Coordinator
3. Give both parties a reasonable, equal opportunity to submit a written statement in support of, or challenging, the outcome
4. Issue a written decision describing the result of the appeal and the rationale for the result
5. Provide the written decision simultaneously to both parties

An appeal must be filed in writing within 5 school days of receiving the determination, stating the grounds for the appeal and including any relevant documentation in support of the appeal. Appeals submitted after this deadline are not timely and shall not be considered. Either party has the right to file a complaint with the U.S. Department of Education's Office for Civil Rights.

A written decision shall be provided to the parties within 7 school days from the receipt of the appeal.

**Remedies**

When a determination of responsibility for sexual harassment has been made against the respondent, the district shall provide remedies to the complainant. Such remedies may include the same individualized services described above in the section "Supportive Measures," but need not be nondisciplinary or nonpunitive and need not avoid burdening the respondent. (34 CFR 106.45)

**Corrective/Disciplinary Actions**

The district shall not impose any disciplinary sanctions or other actions against a respondent, other than supportive measures as described above in the section "Supportive Measures," until the complaint procedure has been completed and a determination of responsibility has been made. (34 CFR 106.44)

For students in grades 4-12, discipline for sexual harassment may include suspension and/or expulsion. After the completion of the complaint procedure, if it is determined that a student at any grade level has committed sexual assault or sexual battery at school or at a school activity off school grounds, the principal or Superintendent shall immediately suspend the student and shall recommend expulsion. (Education Code 48900.2, 48915)

*(cf. 5144 - Discipline)*

*(cf. 5144.1 - Suspension and Expulsion/Due Process)*

Other actions that may be taken with a student who is determined to be responsible for sexual harassment include, but are not limited to:

1. Transfer from a class or school as permitted by law
2. Parent/guardian conference
3. Education of the student regarding the impact of the conduct on others
4. Positive behavior support
5. Referral of the student to a student success team

   *(cf. 6164.5 - Student Success Teams)*

6. Denial of participation in extracurricular or cocurricular activities or other privileges as permitted

EXHIBIT 14 - 005

by law

*(cf. 6145 - Extracurricular and Cocurricular Activities)*

When an employee is found to have committed sexual harassment or retaliation, the district shall take appropriate disciplinary action, up to and including dismissal, in accordance with applicable law and collective bargaining agreement.

*(cf. 4117.7/4317.7 - Employment Status Report)*

*(cf. 4118 - Dismissal/Suspension/Disciplinary Action)*

*(cf. 4119.11/4219.11/4319.11 - Sexual Harassment)*

*(cf. 4218 - Dismissal/Suspension/Disciplinary Action)*

**Record-Keeping**

The Superintendent or designee shall maintain for a period of seven years a record of all reported cases and Title IX investigations of sexual harassment, any determinations of responsibility, any audio or audiovisual recording and transcript if applicable, any disciplinary sanctions imposed, any remedies provided to the complainant, any appeal or informal resolution and the results therefrom, and responses made pursuant to 34 CFR 106.44. (34 CFR 106.45)

The Superintendent or designee shall also maintain for a period of seven years all materials used to train the Title IX Coordinator, investigator(s), decision-maker(s), and any person who facilitates an informal resolution process. The district shall make such training materials publicly available on its web site, or if the district does not maintain a web site, available upon request by members of the public. (34 CFR 106.45)

*(cf. 3580 - District Records)*

Legal Reference:

EDUCATION CODE
200-262.4 Prohibition of discrimination on the basis of sex
48900 Grounds for suspension or expulsion
48900.2 Additional grounds for suspension or expulsion; sexual harassment
48985 Notices, report, statements and records in primary language

CIVIL CODE
51.9 Liability for sexual harassment; business, service and professional relationships
1714.1 Liability of parents/guardians for willful misconduct of minor

GOVERNMENT CODE
12950.1 Sexual harassment training

CODE OF REGULATIONS, TITLE 5
4600-4670 Uniform complaint procedures
4900-4965 Nondiscrimination in elementary and secondary education programs

UNITED STATES CODE, TITLE 20
1092 Definition of sexual assault 1221 Application of laws
1232g Family Educational Rights and Privacy Act
1681-1688 Title IX of the Education Amendments of 1972

UNITED STATES CODE, TITLE 34
12291 Definition of dating violence, domestic violence, and stalking

UNITED STATES CODE, TITLE 42
1983 Civil action for deprivation of rights

EXHIBIT 14 - 006

2000d-2000d-7 Title VI, Civil Rights Act of 1964
2000e-2000e-17 Title VII, Civil Rights Act of 1964 as amended

CODE OF FEDERAL REGULATIONS, TITLE 34
99.1-99.67 Family Educational Rights and Privacy
106.1-106.82 Nondiscrimination on the basis of sex in education programs

COURT DECISIONS
Donovan v. Poway Unified School District, (2008) 167 Cal.App.4th 567
Flores v. Morgan Hill Unified School District, (2003, 9th Cir.) 324 F.3d 1130
Reese v. Jefferson School District, (2000, 9th Cir.) 208 F.3d 736
Davis v. Monroe County Board of Education, (1999) 526 U.S. 629
Gebser v. Lago Vista Independent School District, (1998) 524 U.S. 274
Oona by Kate S. v. McCaffrey, (1998, 9th Cir.) 143 F.3d 473
Doe v. Petaluma City School District, (1995, 9th Cir.) 54 F.3d 1447

Management Resources:

CSBA PUBLICATIONS
Providing a Safe, Nondiscriminatory School Environment for Transgender and Gender-Nonconforming Students, Policy Brief, February 2014
Safe Schools: Strategies for Governing Boards to Ensure Student Success, 2011

U.S. DEPARTMENT OF EDUCATION, OFFICE FOR CIVIL RIGHTS PUBLICATIONS
Q&A on Campus Sexual Misconduct, September 2017
Examples of Policies and Emerging Practices for Supporting Transgender Students, May 2016
Dear Colleague Letter: Title IX Coordinators, April 2015
Sexual Harassment: It's Not Academic, September 2008
Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, January 2001

WEB SITES
CSBA: http://www.csba.org
California Department of Education: http://www.cde.ca.gov
U.S. Department of Education, Office for Civil Rights: http://www.ed.gov/about/offices/list/ocr 7/20

EXHIBIT 14 - 007

# EXHIBIT 15

# External Report re: District Response to Title IX Report

## Palo Alto Unified School District

Gina Maisto Smith, Esq.
Leslie Gomez, Esq.



September 20, 2017

EXHIBIT 15 - 001

*Draft September 20, 2017*

## I.    Executive Summary

In May 2017, the Palo Alto Unified School District (the District) engaged Cozen O'Connor to conduct an external review of the District's response to a Title IX report at the Palo Alto High School from the 2016-2017 academic year to determine how the matter was handled, and whether it was handled in accordance with applicable federal laws, state laws and Board policies.

The Title IX report in question concerned a fall 2016 report by a Palo Alto High School (PAHS or the School) student (the Complainant). In the fall semester of the 2016-2017 academic year, the Complainant reported a Title IX-related incident to members of the PAHS Administration. PAHS administrators immediately reported the incident to the Palo Alto Police Department and later that evening, to Santa Clara County Child Protective Services. The School also notified the Complainant's family, conducted an initial investigation into the incident, imposed interim and ongoing remedial and supportive measures for the Complainant, and within several days of the report, imposed protective measures and disciplinary action against the Respondent, another PAHS student.

The School did not, however, provide the Complainant with information about procedural options under the Uniform Complaint Procedures (UCP), complete the investigation into the incident, or provide the Complainant or Respondent with written notice of the outcome of the investigation, all of which are required under both Title IX of the Education Amendments of 1972 (Title IX) and the UCP. Several weeks later, when the Complainant subsequently reported concerns about harassment by other students, the School took immediate steps to address the Complainant's concerns, but did not identify the reported conduct as potential harassment or retaliation under Title IX, did not coordinate all available information, and again did not provide the Complainant with information about procedural options under the UCP. The Complainant transferred from the District for the second semester. Despite concerns that the withdrawal may have been tied to the impact of the reported Title IX incident, the School again did not provide the Complainant with information about procedural options under the UCP.

The Complainant's parent/guardian subsequently filed a UCP with the District at the end of March 2017. In early April 2017, the School engaged an external investigator to address the issues raised in the UCP. The UCP investigation was concluded in August 2017, and the findings were communicated to the parties in writing by the District's Title IX Coordinator. Relevant documents regarding the School's response to this report were also shared with the U.S. Department of Education's Office for Civil Rights (OCR).

In sum, we find that the District's response to the 2016 Title IX report did not comport with key aspects of Title IX, state law, Board policy and the District's administrative regulations. While School administrators took timely action to respond to the Complainant's report, they did not provide the Complainant with the full range of procedural options available under Title IX, state law, Board policy and administrative regulations. The initial steps, which included a limited investigation, the provision of support and remedial measures, and the imposition of a disciplinary sanction against the Respondent were insufficient to meet the District's obligations under Title IX, state law and Board policy. Moreover, this incident reflected systemic concerns about the application of Title IX and Board policy given our observations about the role of the

2

EXHIBIT 15 - 002

*Draft September 20, 2017*

Title IX Coordinator, the level of supervisory authority exercised, the coordination of information and personnel, and the failure to follow written policies in practice.

## II.    Scope of Engagement

Cozen O'Connor was engaged by the Palo Alto Unified School District for two matters.[1]  First, on May 11, 2017, in connection with implementation of the voluntary Resolution Agreement with the U.S. Department of Education's Office for Civil Rights (OCR Cases Nos. 09-13-5901 and 09-14-1217), Cozen O'Connor was engaged to conduct an independent and external investigation as set forth in Section E of the Resolution Agreement, which provides that the District engage "an Independent Investigator approved by OCR in collaboration with the District's Title IX Coordinator under the District's UCP."[2]

Second, on May 31, 2017, Cozen O'Connor's initial engagement was expanded to include an external review of the District's response to a Title IX report at the Palo Alto High School during the 2016-2017 academic year to determine how the matter was handled, and whether it was handled in accordance with applicable federal laws, state laws and Board policies.  Our engagement did not include a determination as to whether the Respondent's reported conduct in the underlying incident violated Title IX, state law or Board policy.[3]

This report addresses the second engagement: whether the District's response to a fall 2016 Title IX report comported with applicable federal laws, state laws and Board policies.  For the reasons outlined below, we find that the District's response did not comport with applicable federal laws, state laws and Board policies.

Cozen O'Connor was engaged to conduct a thorough, fair and impartial investigation. As part of the investigation, we interviewed current and former administrators at the School and District. In addition, we reviewed all available School and District documents related to this incident.  In summary, those documents included handwritten notes, letters, timelines and other materials compiled by School or District administrators; text messages and email correspondence; records of phone calls and text messages; court orders; student education records; the external investigator's report; the UCP Complaint Reporting Form; mandatory child abuse reporting

---

[1] In addition, John DiPaolo, Esq., is currently serving at the District's Interim Title IX Coordinator.

[2] Section E requires the District to investigate "reports the District received during the 2013-2014 school year that the former principal at Palo Alto High School (PAHS) sexually harassed students," "reports the District received in 2007 and 2013 regarding a former teacher at PAHS who had been subject to investigations regarding alleged crossing of professional boundaries for the purpose of cultivating an inappropriate relationship with former student(s)," and "reports the District received of an off-campus sexual assault during the 2012-13 school year and the March 2014 off campus incident related to PAHS."  Section E also provides that "[t]he District will review the behavioral incident reports the District received at both Gunn and Palo Alto High School for the 2012-2013, 2013-2104, 2014-2015, and 2015-2016 school years." Finally, Section E requires the District to provide relevant documentation "related to the two alleged incidents of sexual harassment reported to OCR during the spring semester of the 2015-2016 school year at Ohlone and PAHS."

[3] While the issues overlap, this engagement is separate and distinct from the UCP investigation in response to the March 2017 complaint by the Complainant's parent/guardian.  The underlying circumstances of the initial report have been investigated by both the Palo Alto Police Department and an external investigator engaged by the District in April 2017 in response to the Complainant's UCP.  The findings of both investigations have been communicated to the Complainant and the Respondent.  Accordingly, this review is limited to the District's response to the report, and we make no finding as to the underlying incident.

3

EXHIBIT 15 - 003

*Draft September 20, 2017*

form; Wellness Services records; interview notes; a witness' written statement; administration team meeting minutes; Board minutes; and information provided by members of the community.

We sought to speak with the Complainant, who declined to participate in the investigation. There is sufficient information in the record, however, to identify the gravamen of the Complainant's concerns about the District's response to the Title IX report. We also reviewed concerns raised by the Respondent based on issues identified in correspondence and through interviews. As noted above, we were not engaged to determine the facts of the underlying incident.

At the conclusion of our investigation, on September 13, 2017, Cozen O'Connor presented a detailed, annotated working chronology of the District's response to the Board to enable the Board to consider and evaluate personnel issues related the facts gathered in this matter.[4] The facts gathered in that chronology provide the foundation for the findings and observations in this report. Because the working chronology includes personally identifiable information about the Complainant, Respondent, and other students, the release of that information is precluded by the Family Educational Rights and Privacy Act (FERPA).[5] Accordingly, those details are not included in this report. As appropriate, and where it can be done without disclosing personally identifiable information, this report does include references to key events during the chronology to place the findings and observations in context.

## III.    Legal and Regulatory Framework

The District's response to sexual and gender-based harassment and violence is governed by federal law and guidance, state law and Board policies. An effective response to sexual and gender-based harassment and violence requires a nuanced understanding, integration and coordination of this complex framework. This section provides a high level overview of the key provisions of each law in place at the time of the report under review. The Appendix provides a more in depth discussion of the District's obligations under these laws.

At their core, an integrated synthesis of federal law, state law and Board policies includes the following key elements for compliance:

- A written notice of non-discrimination;

- Centralized oversight of the District's response to sexual and gender-based harassment and violence;

- Written policies and procedures that govern the District's response to sexual and gender-based harassment and violence;

- Clear protocols for the reporting of sexual and gender-based harassment and violence, both internally within the School and District, and externally to law enforcement or child protective services;

---

[4] Cozen O'Connor makes no personnel recommendations in this matter; personnel decisions are within the province of the District.
[5] 20 U.S.C. §§ 1232g et. seq.

4

EXHIBIT 15 - 004

*Draft September 20, 2017*

- Provision of information to a complainant and respondent about resources and procedural options for the investigation and resolution of complaints sexual and gender-based harassment and violence;

- Prompt and equitable grievance procedures for the investigation and resolution of complaints involving sexual and gender-based harassment and violence;

- Written notice of outcome to the parties of the resolution of complaints involving sexual and gender-based harassment and violence;

- Documentation of all complaints of sexual and gender-based harassment and violence and their manner of resolution;

- Steps to eliminate, prevent and address the effects of sexual and gender-based harassment and violence, including the imposition of interim measures, sanctions and ongoing remedies; and,

- Education and training for students and employees.

Notwithstanding these common elements, there are jurisdictional differences between Title IX, the Education Code and Board policy, which require close and careful reconciliation as to the District's obligation to respond to and investigate reports about off campus conduct.

### A.    Federal Law and Guidance:  Title IX of the Education Amendments Act of 1972

Title IX is a federal civil rights law that provides no "person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[6] Title IX prohibits discrimination on the basis of sex in all of an institution's programs and activities, including an institution's education programs and activities and in employment.[7] Title IX also applies to a broad spectrum of conduct, including all forms of sex discrimination, sexual and gender-based harassment, sexual misconduct, and sexual violence.[8] Title IX's protections apply to conduct that occurs on campus, in the context of any institution-related education program or activity, or where there are any continuing effects on campus or in an off-campus education program or activity that create or contribute to a hostile environment.

Title IX's implementing regulations require that educational institutions publish a non-discrimination statement;[9] appoint a Title IX Coordinator;[10] and adopt grievance procedures that are prompt and equitable.[11]  For grievance procedures to be prompt and equitable, an institution must provide notice to students and employees of the grievance procedures, including where

---

[6] 20 U.S.C. § 1681(a).
[7] *See generally* 20 U.S.C. § 1681 *et seq.*; 34 C.F.R. Part 106.
[8] U.S. Department of Education, Office for Civil Rights Dear Colleague Letter, April 4, 2011 (2011 DCL) at 1.
[9] 34 C.F.R. § 106.9.
[10] 34 C.F.R. § 106.8(a).
[11] 34 C.F.R. § 106.8(b).

5

EXHIBIT 15 - 005

*Draft September 20, 2017*

complaints may be filed, and that the grievance procedures apply to complaints filed by any individual alleging sexual or gender-based harassment or violence carried out by students, employees, or third parties.[12]  The procedures must include: provisions for adequate, reliable, and impartial investigation of complaints, including the opportunity for both the complainant and respondent to present witnesses and evidence; designated and reasonably prompt time frames for the major stages of the complaint process; written notice to the complainant and respondent of the outcome of the complaint; and assurance that the institution will take steps to prevent recurrence of any sexual violence and remedy discriminatory effects on the complainant and others, if appropriate.[13]

Once an institution has notice of an allegation of sexual or gender-based harassment or violence allegation, it must promptly take steps to ensure equal access to its education programs and activities and protect the complainant as necessary, including taking interim measures while the investigation is pending.[14]  The institution's Title IX obligations exist regardless of whether the individual who was harassed makes a complaint or asks the institution to take action although the institution may consider a complainant's request for anonymity, or not to pursue an investigation, when determining an appropriate institutional response.[15]

Further, when an educational institution knows or reasonably should know about sexual harassment that creates a hostile educational or working environment, the institution must take immediate and appropriate steps to investigate or otherwise determine what occurred; if an investigation reveals the existence of a hostile educational or employment environment, the institution must then take prompt and effective steps reasonably calculated to eliminate the hostile educational and employment environment, prevent its recurrence and address its effects.[16]  An institution violates Title IX if it has "notice" of a sexually hostile educational or employment environment and fails to take immediate and corrective action.  In addition, an institution's delay, inappropriate response or inaction in response to a report of sexual or gender-based harassment or violence may subject the complainant to a hostile environment and require the institution to remedy the effects of the hostile environment that could reasonably have been prevented had the institution responded promptly and appropriately.[17]

A criminal investigation and a Title IX investigation are two distinct processes, each with its own set of procedural protections and legal standards.[18]  The purpose of a criminal investigation is to determine whether an individual violated a law, and if so, the individual may be imprisoned or subject to other criminal penalties.[19]  In contrast, Title IX investigations have different procedural protections and legal standards.[20]  Under Title IX, institutions are required to respond to all complaints of Title IX-related conduct.[21]  The Title IX obligation to resolve all complaints

---

[12] Title IX Q & A at 12-13.
[13] *Id.*
[14] Title IX Q & A at 32-33.
[15] 1997 Guidance.
[16] *Id.* at 4; 1997 Guidance; Questions and Answers on Title IX and Sexual Violence, Office for Civil Rights, April 29, 2014 (Title IX Q & A) at 2-3.
[17] Title IX Q & A at 4.
[18] *Id.* at 27.
[19] *Id.*
[20] *Id.*
[21] *Id.*

6

EXHIBIT 15 - 006

*Draft September 20, 2017*

promptly and equitably and to provide a safe and nondiscriminatory environment for all students is not discretionary.[22]

B.     **State Law**

1.     **California Education Code**

The California Education Code contains multiple provisions that direct the District's response to sexual and gender-based harassment and violence.  The Education Code provides:

- a definition of sexual harassment;[23]
- a prohibition against sexual harassment and a requirement for notification of remedies through the publication and distribution of a written sexual harassment policy under the "Sex Equity in Education Act" (SEEA);[24]
- authority for the California State Department of Education to assess compliance with the "Safe Place to Learn Act" (SPLA),[25] which requires a written policy that prohibits discrimination, harassment, intimidation, and bullying based on designated protected classes in all acts related to school activity or attendance occurring within a school in that district, a process for receiving and investigating complaints of the same, documentation of complaints and their resolutions, and a prohibition against retaliation;
- preconditions to the receipt of state financial assistance, which require compliance with the Education Code and the submission of compliance reports to the State Department of Education;[26] and,
- the governing board of each school district has "primary responsibility" for ensuring that school district programs and activities are free from discrimination.[27]

With respect to the discipline of students, the Education Code specifies that a pupil may not be suspended from school or recommended for expulsion unless the principal of the school or the superintendent of the district determines that the pupil has committed an enumerated act, including sexual harassment, sexual assault and sexual battery.[28]  Moreover, a pupil cannot be suspended or expelled for any of the above acts *unless* the act is related to a school activity or school attendance.[29]  The Education Code clarifies that suspension, whether out-of-school or in-school, shall be imposed only when other means of correction fail, except that a pupil may be suspended upon a first offense if the principal or district superintendent determine that the pupil

---

[22] *Id.*
[23] Cal. Ed. Code § 212.5.
[24] Cal Ed. Code §§ 221.5-231.5
[25] Cal. Ed. Code §§ 234-234.5.
[26] Cal Ed. Code §§ 250-253.
[27] Cal Ed. Code §§ 260-262.4.
[28] Cal. Ed. Code §§ 48900 (a) through (r)
[29] Cal Ed. Code § 48900 (s).

7

EXHIBIT 15 - 007

*Draft September 20, 2017*

violated one of the first five provisions[30] in § 48900 or if the pupil's presence causes a danger.[31] Suspension or expulsion also require notice to law enforcement for certain acts.[32]

Finally, the Education Code requires school districts to inform teachers of pupils who have engaged in or are reasonably suspected to have engaged in designated acts.[33]

### 2.     California Code of Regulations: The Uniform Complaint Procedure – *Cal. Code Regs., tit. 5, §§ 4600-4671*

California's Uniform Complaint Procedure (UCP)[34] specifies when and how an individual, public agency, or organization alleging a violation of federal or state education law can file a complaint to the California Department of Education (CDE).  Under the UCP, the CDE processes appeals of local educational agency's (LEA) decisions on UCP complaints.  In certain specified situations, the CDE may intervene directly and investigate the allegations in the complaint.[35]

### 3.     Mandatory Child Abuse Reporting Laws – *Cal. Penal Code § 11164 et seq.*

The "Child Abuse and Neglect Reporting Act" (CANRA) requires certain professionals, identified in the statute as "mandated reporters," to report known or suspected instances of child abuse or neglect to law enforcement.[36]

Under CANRA as it applies to the K-12 school setting, teachers, instructional or teacher's aides or assistants, classified school employees, certified pupil personnel employees, administrators, social workers, counselors, school police or security officers, psychiatrists, psychologists, licensed nurses, family therapists, drug and alcohol counselors, coaches, assistant coaches, and athletic administrators.[37]

CANRA requires mandated reporters to make a report whenever, in their professional capacity or within the scope of their employment, they have knowledge of, or observe a child (defined as a person under 18) whom the mandated reporter knows or reasonably suspects has been the victim of child abuse or neglect.  "Reasonable suspicion" occurs when it is objectively reasonable for a person, based upon facts that could cause a reasonable person in a similar position, to suspect child abuse or neglect.

---

[30] See Cal. Ed. Code §§ 48900 (a) through (e), addressing generally:  a) physical injury, b) possession of a firearm, knife or explosive, c) possession, sale or use of a controlled substance, alcohol or other intoxicant, d) negotiation or sale of a controlled substance, alcohol or other intoxicant with delivery of the actual or a look-alike substance, or e) robbery or extortion.

[31] Cal Ed. Code § 48900.5.

[32] Cal Ed. Code § 48902.

[33] Cal Ed. Code § 49079.

[34] The UCP is codified at Cal. Code of Regs., tit. 5, §§ 4600-4671.

[35] See the California Department of Education's "Uniform Complaint Procedure brochure" available at http://www.cde.ca.gov/re/cp/uc/ (last accessed Sep. 11, 2017).

[36] Cal. Penal Code § 11165.9.

[37] Cal. Penal Code § 11165.7.

EXHIBIT 15 - 008

*Draft September 20, 2017*

### 4. California Penal Code[38]

The California Penal Code contains definitions of criminal conduct, which intersect with the Education Code and other state laws.

### 5. Welfare and Institutions Code: Inspection of Juvenile Court Records – *Cal. Welfare & Inst. Code § 827*

Under the California Welfare and Institutions Code, juvenile case files may only be inspected by designated individuals.[39] Notwithstanding the general proscription against releasing juvenile court files, records indicating that a minor enrolled in a public school has been found to have committed any felony or any misdemeanor involving curfew, gambling, alcohol, drugs, tobacco products, carrying weapons, a specified sex offense,[40] assault or battery, larceny, vandalism, or graffiti, must be released in writing from the court to the district superintendent within seven days. The superintendent must then relay the information to the school principal who will disseminate the information to teachers or administrators who directly supervise or report on the behavior of the minor in question.[41]

## C. PAUSD Board Policies (BP) and Administrative Regulations (AR)

The District maintains numerous Board Policies (BP) that serve to implement the requirements of state law. Board Policies are accompanied by corresponding Administrative Regulations, which detail the necessary steps for compliance with Board Policies. In some instances, the language in the Board Policy and the Administrative Regulation is the same.

### 1. Nondiscrimination in District Programs and Activities – *BP 0410*

PAUSD Board Policy 0410 prohibits discrimination based on designated protected classes, including gender, sex, sexual orientation, gender identity or expression. Under BP 0410, the Superintendent[42] or their designee must annually review district programs and activities to ensure the removal of any barrier that may unlawfully prevent an individual or group in any protected category from accessing district programs, activities, or facilities; take prompt, reasonable

---

[38] Under California law, a person who commits any of the below-referenced acts, except for Sexual Battery, against someone who is 14 or younger and at a time when the perpetrator is more than seven years older than the victim also commits the crime of "Aggravated Sexual Assault of a Child." Cal. Penal Code § 269. Because the facts in this matter do not raise a potential violation of this law, it is not discussed here. Similarly, a person over 18 who engages in sexual intercourse, Sodomy, Oral Copulation, or sexual penetration with a child who is 10 or younger commits the crime of "Sexual Intercourse/Sodomy/Oral Copulation/Sexual Penetration with a Child." Cal. Penal Code § 288.7. Because the facts do not raise a potential violation of this law, it is not discussed here.

[39] Cal. Welfare & Inst. Code § 827.

[40] Cal. Welfare & Inst. Code § 827 references Cal. Penal Code § 290, which lists the sex offenses requiring registration and encompasses, generally, rape, sodomy, lewd or lascivious acts, oral copulation, forcible penetration, and related acts.

[41] Cal. Welfare & Inst. Code § 827(b)(2). Additional details about the confidentiality of the information and the consequences for breaching that confidentiality are detailed at § 827(b)(2)(A) through (C).

[42] When used in the PAUSD BP/AR context, "Superintendent" refers to the PAUSD Superintendent as opposed to the State Superintendent of Public Instruction.

9

EXHIBIT 15 - 009

actions to remove any identified barrier; report their findings and recommendations to the PAUSD Board after each review; and must notify designated community members about the PAUSD nondiscrimination policies and related complaint procedures.[43]

## 2.    Complaints Concerning District Employees – *BP/AR 1312.1*

PAUSD Board Policy 1312.1 specifies that the PAUSD Board "accepts responsibility for providing a means by which the public can hold employees accountable for their actions."

Administrative Regulation 1312.1 states that PAUSD must notify designated community members of its complaint procedures, including the opportunity to appeal to the California Department of Education.  AR 1312.1 requires that any written and signed complaint be processed in accordance with the policy if it alleges a violation of federal or state laws or regulations or unlawful discrimination on the basis of actual or perceived sex, sexual orientation, gender identity, gender expression, or other enumerated classes.  The investigation and written report must be completed within 60 calendar days, although alternative means of resolution are allowed and encouraged.

## 3.    Uniform Complaint Procedures (UCP) – *BP/AR 1312.3*

PAUSD Board Policy 1312.3 recognizes that PAUSD "has the primary responsibility to ensure compliance with applicable state and federal laws and regulations governing educational programs."  The Board Policy and Administrative Regulations specify that the UCP will be used to investigate and resolve complaints for enumerated forms of misconduct, including any complaint alleging the occurrence of unlawful discrimination (including discriminatory harassment, intimidating, bullying or retaliation) against any person in district programs or activities based on actual or perceived characteristics of sex, sexual orientation, gender, gender identity, gender expression, or other enumerated protected characteristics.

Board Policy 1312.3 requires the following:

- The Superintendent or designee must provide training to district staff to ensure awareness and knowledge of current law and related requirements, including the steps and timelines specified in BP/AR 1312.3
- The Superintendent or designee must maintain records of all UCP complaints and investigations and must destroy those records "in accordance with applicable state law and district policy."

Administrative Regulation 1312.3 identifies the compliance officer who "shall receive and investigate complaints" as "Associate Superintendent – Educational Services."  The Administrative Regulation states that the Superintendent or designee will ensure that the compliance officer and other designated investigators "receive training and are knowledgeable about the laws and programs for which they are responsible."

---

[43] This requirement is consistent with 34 CFR §§ 104.8 and 106.9.

EXHIBIT 15 - 010

*Draft September 20, 2017*

Under AR 1312.3, complaints alleging unlawful discrimination, including discriminatory harassment, intimidation and/or bullying shall be investigated using the UCP regardless of whether the alleged harassment occurred on or off campus. Further, the UCP states that when the conduct is reported to have occurred against an individual off campus, the District Compliance Officer (Title IX Coordinator) shall investigate and document the activity and shall identify specific facts and circumstances that explain the impact or potential impact on school activity, school attendance, or the subject of the complainant's educational performance.

AR 1312.3 details the following procedural steps in resolving a UCP:

- Any student, parent/guardian, third party, or other person or organization who believes that they or another student or group has been subjected to unlawful discrimination on or off campus may 1) report the conduct orally to any school employee or administrator, and/or 2) file a written complaint under these procedures;
- A staff member who receives an oral report alleging discrimination, harassment, intimidation, or bullying, must notify the principal or site designee within one day of receiving the report;
- The principal/designee who receives such a report must inform the person who made the initial oral report of the resolution options available under the UCP, including the right to file a written complaint;
- Within two days of receiving a written complaint, the receiving administrator must send it to the District Compliance Officer;
- After a report or complaint is made, the principal, designee or Compliance Officer shall determine whether interim measures are necessary to stop, prevent, or address the effects of discrimination, including intimidation, harassment or bullying;
- After a report or complaint is made, the principal, designee or Compliance Officer may engage in informal efforts to resolve the complaint;
- If the matter is *not* going to be resolved informally, the Compliance Officer will initiate an impartial investigation within five school days of receiving a formal complaint;
- The Compliance Officer must describe the complaint procedure to the Complainant and their parent/guardian, discuss what actions are being sought in response to the complaint, provide the Complainant with an opportunity to describe the incident, identify witnesses, and provide other evidence and information, and keep the information about the complaint confidential except as necessary to carry out the investigation or take other subsequent necessary action;
- The Compliance Officer must interview individuals who have relevant information including the Respondent, witnesses, and anyone mentioned as having relevant information;
- The Compliance Officer must review any records, notes, or statements related to the complaint;
- The Compliance Officer will document their information gathering and will maintain that documentation for at least two years; and
- Within 60 calendar days of receiving the complaint, the Compliance Officer will conclude the investigation and will prepare a written report of their findings that contains

11

EXHIBIT 15 - 011

*Draft September 20, 2017*

findings of fact, determination whether unlawful discrimination has occurred, the rationale, any corrective actions, the prohibition against retaliation and appeal rights.

In addition to outlining the procedural steps in the UCP, AR 1312.3 addresses 1) remedial actions that may result from a report or complaint[44] and 2) disciplinary actions that may result from a finding that the Respondent engaged in discriminatory conduct.[45]

### 4.      Conduct – *BP 5131*

PAUSD Board Policy 5131 states that PAUSD "believes that all students have the right to be educated in a positive learning environment free from disruptions" and that "students should be expected to exhibit appropriate conduct that does not infringe upon the rights of others or interfere with the school program" while on school grounds, going to or from school, while at school activities, while using school transportation, or off-campus during non-school hours if such conduct poses a threat or danger to the safety of students, staff or district property or substantially disrupts school.

Board Policy 5131 requires the Superintendent or designee to ensure that each school 1) develops standards of conduct and discipline consistent with board policies and administrative regulations and 2) notifies students and parents/guardians about the district and school rules related to conduct.

Board Policy 5131 defines enumerated forms of prohibited student conduct, including discrimination, harassment and/or intimidation of students or staff, sexual harassment, or any other verbal, written or physical conduct that causes or threatens to cause violence, bodily harm or substantial disruption. Under BP 5131, a student who violates school rules or regulations may be subject to discipline in the forms of suspension, expulsion, transfer to alternative programs, referral to a student success team or counseling services, denial of participation in extracurricular or co-curricular activities or other privileges, or other measures as appropriate.

### 5.      Bullying Prevention – *BP/AR 5131.2*

BP/AR 5131.2 prohibits bullying, defined consistent with California law as "any severe or pervasive physical or verbal act or conduct, including communications made in writing or by means of electronic act, and including one or more acts committed by a pupil or group of pupils that constitutes sex harassment, hate violence or creates an intimidating or hostile educational environment directed at one or more pupils[46]:

---

[44] Remedial actions include interventions for the Respondent such as parental notification, counseling, training, or discipline, and interventions for the Complainant such as counseling and academic support. Remedial actions also include separating the Complainant and Respondent (as long as such separation does not penalize the Complainant), following up to ensure that the discriminatory conduct has stopped, training, and other interventions for the larger school community to ensure that all community members understand the types of behavior that constitute discrimination.

[45] Disciplinary actions include warnings, mandatory training, counseling, suspension, transfer, and expulsion. Suspension and recommendations for expulsion must follow applicable law.

[46] Defined consistent with Cal. Ed. Code 48900(r), discussed above.

12

EXHIBIT 15 - 012

*Draft September 20, 2017*

BP 5132.2 specifically addresses "cyberbullying," defined as the transmission of harassing communications, direct threats, or other harmful texts, sounds or images or breaking into another person's electronic account and assuming that person's identity to cause harm to that person's reputation.[47] BP 5132.2 also prohibits "sexting" with a minor (i.e. sending a message to a minor where the message contains matter that is sexual in nature with the intent of seducing the minor). [48] BP 5132.2 specifies that complaints alleging bullying based on a protected characteristic (see list in BP 0410) will be addressed under BP/AR 1312.3 (UCP).

Under BP 5132.2, students who are found to be engaged in bullying (which includes sexual harassment) on school premises or off-campus in a manner that causes or is likely to cause a substantial disruption of a school activity or school attendance will be subject to discipline, which may include suspension or expulsion.

## 6.    Child Abuse Prevention and Reporting – *BP/AR 5141.4*

Board Policy 5141.4 sets forth the Board's commitment to "supporting the safety and well-being of district students and desires to facilitate the prevention of and response to child abuse and neglect." The operative definitions, procedures and obligations regarding child abuse and neglect are set forth in Administrative Regulation 5141.4.

AR 5141.4 requires mandated reporters to report child abuse or neglect. As noted above, California law defines "mandated reporter" broadly and inclusively; in the context of a school setting, the term captures, *inter alia,* teachers, instructional aides, teacher's assistants, classified employees, athletic coaches, directors and administrators. Child abuse and neglect includes, when committed by anyone against a person under the age of 18, sexual abuse, including sexual assault or sexual exploitation, physical injury or death inflicted by other than accidental means, neglect, willful harming or injuring of a child, and unlawful corporal punishment.[49] Sexual assault includes rape, statutory rape, rape in concert, incest, sodomy, lewd or lascivious acts upon a child, oral copulation, sexual penetration and child molestation.

A mandated reporter must report when, in their professional capacity or in the scope of their employment, they have knowledge of or observe a child who they know or reasonably suspect has been the victim of child abuse or neglect. Reasonable suspicion is an objective reasonable person standard; the obligation does not require certainty. A mandated reporter must immediately or as soon as practicable make an initial report to the appropriate agency or to law enforcement including any police department (except the school district's police department), the sheriff's department, the county probation department or the county welfare department. Employees reporting child abuse or neglect are encouraged, but not required, to notify their principal of the report. The principal, if notified, shall inform the district's superintendent.

---

[47] BP 5131.2 also prohibits conduct in violation of Cal. Penal Code §§ 653.2, which makes it a crime for a person to distribute personal identity information electronically with the intent to cause harassment by a third party or to threaten a person's safety by posting personal information online (e.g. placing a person's picture or address online so that he receives harassing messages).

[48] BP 5131.2's prohibition against "sexting" with a minor refers to Cal. Penal Code § 288.2 which is discussed below.

[49] Any mandated reporter who knows or reasonably suspects that a child is suffering serious emotional damage may make a report.

13

EXHIBIT 15 - 013

*Draft September 20, 2017*

### 7.    Discipline – *BP/AR 5144*

Board Policy 5144 states the Board's commitment to "providing a safe, supportive, and positive school environment which is conductive to student learning and to preparing students for responsible citizenship by fostering self-discipline and personal responsibility." The operative definitions, procedures and obligations regarding discipline are found in Administrative Regulation 5144.

AR 5144 allows each school to establish "site-level" rules that are consistent with district policies and administrative regulations. AR 5144 contains a list of suggested "disciplinary strategies" for use in resolving alleged violations of school rules. The Administrative Regulation contains the following statement:

> *To the extent possible, staff shall use disciplinary strategies that keep students in school and participating in the instructional program. Except when a student's presence causes a danger to himself/herself or others or he/she commits a single act of a grave nature or an offense for which suspension or expulsion is required by law, suspension or expulsion shall be used only when other means of correction have failed to bring about proper conduct.*

### 8.    Suspension and Expulsion Due Process – *BP/AR 5144.1 and 5144.2*

Board Policy 5144.1 states "the grounds for suspension and expulsion and the procedures for considering, recommending, and/or implementing suspension and expulsion shall be only those specified in law and the accompanying administrative regulation." Consistent with BP/AR 5144, BP 5144.1 limits the availability of suspension and expulsion to specified circumstances or instances in which other interventions have failed. The definitions, procedures and obligations regarding suspension and expulsion are found in Administrative Regulation 5144.1 (related to all students) and Administrative Regulation 5144.2 (related to students with disabilities).

AR 5144.1 also provides that the Superintendent, principal or designee shall immediately suspend any student found at school or at a school activity to be: committing or attempting to commit a sexual assault as defined in Penal Code 261, 266c, 286, 288, 288a or 289, or committing a sexual battery as defined in Penal Code 243.4. In addition, the Superintendent, principal or designee may impose a suspension upon a first offense if they determine the student's presence causes a danger to persons.

Under AR 5144.1, acts for which a student—including a student with disabilities—may be suspended or expelled are limited to the enumerated categories of behavior.[50] AR 5144.2 outlines procedures that apply for students with disabilities pursuant to the Individuals with Disabilities Education Act (IDEA). Under AR 5144.2, students with disabilities are provided with additional protections in the suspension and expulsion processes, including a "manifestation

---

[50] These categories are the same as those discussed above in section B.1(c), discussing Cal. Ed. Code §§ 48900 et seq.

EXHIBIT 15 - 014

determination" for a suspension lasting more than 10 consecutive school days.  A manifestation hearing examines the relationship between the student's disability and the behavior subject to the disciplinary action.

**9.    Questioning and Apprehension by Law Enforcement – *BP/AR 5145.11***

Board Policy 5145.11 states that "law enforcement officers may interview and question students on school premises and may remove them when appropriate."  BP 5145.11 permits law enforcement officers to interview students on campus, but states that the principal or designee must request the officer's identity, their official capacity, and the legal authority under which the interview is to be conducted.  The principal or designee must maintain a record of all documentation relative to law enforcement interviews of students.  Except in cases of alleged child abuse or neglect, the principal or designee must attempt to notify the student's parent/guardian as soon as possible if the student is interviewed by law enforcement or removed from school into the custody of law enforcement.

**10.    Nondiscrimination / Harassment – *BP/AR 5145.3***

Board Policy 5145.3 prohibits "at any district or school activity … unlawful discrimination, including harassment, intimidation and/or bullying of any student, based on actual or perceived characteristics of race or ethnicity, color, nationality, national origin, ethnic group identification, age, religion, physical or mental disability, sex, sexual orientation, gender, gender identity, gender expression, or any other [protected] characteristic or based on association with a person or group with one or more of these actual or perceived characteristics."

For incidents of alleged harassment, intimidation, and/or bullying that occur off campus, if the effects of the conduct result in harassment, intimidation or bullying at school that is sufficiently serious to interfere with or limit the targeted student's ability to participate in or benefit from the education program, the school must respond promptly and effectively to eliminate the harassment that occurs at school, prevent its recurrence, and address its effects.  Such response may include discipline of the alleged harasser in accordance with applicable law and as provided in BP/AR 5144.

AR 5145.3 requires the Superintendent or designee to publicize the district's nondiscrimination policy and related complaint procedures and provide students, employees, volunteers and parents/guardians with age-appropriate training and information about the district's nondiscrimination policy.

**11.    Sexual Harassment – *BP 5145.7***

Board Policy 5145.7 contains the same definition of sexual harassment that appears at Cal. Ed. Code § 212.5.  BP 5145.7 lists examples of conduct that may constitute sexual harassment, including but not limited to unwelcome leering, unwelcome sexual slurs, sexual jokes, derogatory posters, spreading sexual rumors, unwanted grabbing or fondling, displaying sexually suggestive objects, sexual assault or sexual battery, dating violence, stalking, and relationship abuse.

EXHIBIT 15 - 015

*Draft September 20, 2017*

BP 5145.7 requires the Superintendent or designee to ensure that all District students receive age-appropriate instruction and information on sexual harassment, including:

- What acts constitute sexual harassment,
- A clear message that students do not have to endure sexual harassment,
- Encouragement for bystanders to report instances of sexual harassment,
- Information about the district's procedure for investigating complaints (the UCP), and
- Information about the rights of students and parents/guardians to file a criminal complaint, as applicable.

BP 5145.7 requires the Superintendent or designee to maintain records of all reported cases of sexual harassment to enable the District to monitor, address, and prevent repetitive harassing behavior in its schools.

BP 5145.7, Sexual Harassment, provides that any student who engages in sexual harassment or sexual violence at school or at a school sponsored or school-related activity shall be subject to disciplinary action, which may include suspension and/or expulsion.

Like BP 5145.3, BP 5145.7 provides that for incidents of alleged harassment, intimidation, and/or bullying that occur off campus, if the effects of the conduct result in harassment, intimidation or bullying at school that is sufficiently serious to interfere with or limit the targeted student's ability to participate in or benefit from the education program, the school must respond promptly and effectively to eliminate the harassment that occurs at school, prevent its recurrence, and address its effects. Such response may include discipline of the alleged harasser in accordance with applicable law and as provided in BP/AR 5144.

## IV.    Findings and Observations

During the 2016-2017 academic year, and at all relevant time periods in this review, the District's Title IX response was overseen by the District's Assistant Superintendent for School Support Services, who also served as the District's Title IX Coordinator.[51] The Title IX Coordinator reported to the Superintendent, and worked closely with the administrative teams at the schools within the District, including the Principal and Assistant Principals at PAHS.

### A.    Ongoing Monitoring by OCR

During the course of the District's response to this matter, the U.S. Department of Education's Office for Civil Rights (OCR) was engaged in an active investigation of the District's compliance with Title IX. As part of that investigation, the District was required to produce documents, including policies and investigation records. District employees were also interviewed by OCR, and as part of the resolution of the complaint, District employees worked with OCR to negotiate a Resolution Agreement.

---

[51] As of June 9, 2017, the Assistant Superintendent for School Support Services is no longer employed by the District.

16

EXHIBIT 15 - 016

*Draft September 20, 2017*

On March 8, 2017, OCR resolved the Title IX investigation of PAUSD. As noted above, the resolution included a Resolution Agreement requiring the District to take certain actions and enter into a monitoring period by OCR. As part of its monitoring responsibilities, OCR reviewed the documents related to Title IX report that is the subject of this investigation and on August 14, 2017, OCR made the following observations:

- After receiving notice of the Complainant's concerns about the incident with the Respondent, "the District conducted its own prompt investigation and immediately alerted local law enforcement;"

- The District completed its investigation within seven days and imposed disciplinary consequences under the Education Code for the Respondent;

- The District did not communicate the findings of the investigation to the Complainant or the Respondent;

- The District did not inform the Complainant or their parent/guardian of the available grievance procedures under the UCP, but rather "in consultation with counsel but not with the parent/guardian, the District determined that a formal investigation was not necessary;"

- The District took several interim and remedial measures, including moving the Complainant out of shared classes with the Respondent, offering counseling services to the Complainant, changing the Respondent's schedule, limiting the Respondent's access to certain campus activities, prohibiting the Respondent from communicating with the Complainant, and taking steps to enforce a civil temporary restraining order issued against the Respondent;

- In response to a subsequent concern raised by the Complainant, the District interviewed relevant students, instructed the students to refrain from certain actions, and followed up with the Complainant to assess whether the conduct had stopped;

- The District did not, however, inform the Complainant or their parent/guardian of the available grievance procedures under the UCP related to this subsequent concern;

- Upon learning that the Complainant was moving to a different district, the District spoke with the Complainant's parent/guardian, but again, did not inform the Complainant or their parent/guardian of the available grievance procedures under the UCP related to circumstances underlying the withdrawal; and,

- Upon receipt of additional information about the Respondent, the District did not conduct a timely assessment of the impact of that information on its Title IX obligation to prevent further harassment and ensure a nondiscriminatory environment.[52]

**B.      Cozen O'Connor's Observations**

---

[52] OCR stated that upon receipt of additional information, it may revise or amend the issues identified and information provided.

17

EXHIBIT 15 - 017

*Draft September 20, 2017*

Cozen O'Connor's conclusions, in large part, align with the conclusions reached by OCR. Because our lens is broader than Title IX compliance, however, our conclusions are broader in scope.

### 1.    Systemic Observations

While this engagement was limited to a close look at the District's response to a specific report, we are able to offer systemic observations about the coordination and integration of Title IX, state law and Board policy compliance functions at the District level.  Under AR 5145.3, Nondiscrimination/Harassment, the District's Compliance Officer (Title IX Coordinator) is designated as the employee responsible for coordinating the district's efforts to comply with federal and state civil rights laws, including Title IX.  Further, under AR 1312.3, the District's UCP, the "compliance officer shall receive and investigate complaints and shall ensure district compliance."  In addition, under the UCP, "[t]he Superintendent or designee shall ensure that the compliance officer and any other employees designated to investigate complaints or otherwise resolve complaints receive training and are knowledgeable about the laws and programs for which they are responsible."[53]  As noted above, at the time of this incident, the District had a designated Title IX Coordinator whose responsibility included oversight of all Title IX compliance responsibilities.  In light of these provisions, and the facts gathered in our review, we find that the Superintendent and the Title IX Coordinator failed to exercise sufficient oversight of the District's compliance responsibilities under Title IX, state law and Board policy.  This lack of oversight is particularly concerning given the context at the time, which involved an ongoing OCR investigation where the District, and in particular, PAHS, were subject to a several year inquiry into how they responded to Title IX complaints.

In addition, Title IX, the Education Code (SPLA) and BP/AR 1312.3 (the UCP) all require that the District maintain appropriate documentation to demonstrate compliance with federal law, state law and Board policy.[54]  The SPLA provides that local education agencies must maintain documentation of complaints and their resolutions for a specified period of time.  Under the UCP, the Superintendent or designee must maintain records of all UCP complaints and investigations.  In addition, BP 5145.11 requires that the principal or designee maintain a record of all documentation relative to law enforcement interviews of students.  We find significant concerns in the nature and manner of the District and School's documentation, which impeded the ability to achieve – and evaluate – compliance.

Based on our review of this matter, and the nature and the manner of the District's response to this report, we observe:

- The Title IX Coordinator did not exercise sufficient supervision and centralized oversight over the District's Title IX responsibilities as it relates to the investigation and resolution of Title IX-related reports;

---

[53] AR 1312.3.
[54] Title VI's implementing regulations, 34 C.F.R. § 100.6(b) and (c), require that a recipient of Federal financial assistance make available to OCR information that may be pertinent to reach a compliance determination.  This requirement is incorporated by reference in the Title IX implementing regulations at 34 C.F.R. § 106.71.

18

EXHIBIT 15 - 018

*Draft September 20, 2017*

- The District did not coordinate and integrate the application of federal law and guidance, state law and Board policies in its response to reported Title IX conduct;

- With the exception of Board policies and Administrative Regulations, the District did not maintain written or formally developed protocols at the site level for a consistent institutional response to each Title IX report, identification of appropriate steps and application of law, guidance and policy;

- The District maintained insufficient documentation and centralized record keeping, required under both Title IX and Board policy. The lack of sufficient documentation and centralized record keeping impacted the Title IX Coordinator's ability to effectively track and monitor patterns, climate and culture; and,

- School administrators maintained inconsistent formal documentation of Title IX reports and actions taken at the site level:

  o While information was shared at administrative team meetings, there were no efforts to maintain centralized records or consistent documentation that would inform future steps or allow the institution to track patterns or identify potential retaliation or harassment;

  o Some administrators maintained personal notes, timelines and other records, which in some instances, were not contemporaneous or maintained as official School records;

  o The personal notes, timelines and other records were not shared contemporaneously with the Title IX Coordinator;

  o The Wellness Center maintained detailed and contemporaneous notes;

  o Based on training and practice, a common practice was to communicate by telephone or text message to avoid creating documentation that could potentially be publicly released.

We note that since the inception of this investigation, the District has taken steps to begin to remedy these deficiencies. In June 2017, the District appointed an interim Title IX Coordinator, who is exercising supervision and authority over all Title IX reports that are shared with the Title IX Coordinator. The Title IX Coordinator is maintaining documentation of all reports; and, the Title IX Coordinator is offering the UCP to students and their parents/guardians for any reported sexual or gender-based harassment or violence. The District has also provided significant training for District and School employees over the course of the summer, and is working to revise policies and procedures consistent with the requirements of the OCR Resolution Agreement.

**2.    Observations Related to the Specific Response to this Title IX Report**

19

EXHIBIT 15 - 019

### a. Internal Reporting

With respect to the District's response to the report that is the subject of this review, we find that staff and administrators promptly reported the incident within the supervisory structure at the School and District. This internal reporting was consistent with Title IX, which requires that responsible employees share all reports of sexual and gender-based harassment and violence with the Title IX Coordinator, and with the requirements of the UCP, BP/AR 1312.3, which requires that the receiving administrator forward the report to the principal/designee and the Title IX Coordinator (the District Compliance Officer).

Staff and administrators at the School promptly reported the incident within the supervisory structure as follows:

- An instructional staff member and counselor in the Wellness Center took immediate and responsive action to elevate the Complainant's report within the School by bringing the report to the attention of the School Resource Officer and Assistant Principal 1;

- Assistant Principal 1 immediately informed the Principal of the report of a "possible sexual assault that occurred on campus;"

- The Principal and two Assistant Principals (1 and 2) informed the Title IX Coordinator of the report on the same day they received the report;

- The Principal promptly informed the Superintendent of the report (with 24 hours of receipt);

- The Superintendent identified the potential need to pursue a UCP and took steps to ensure that the Title IX Coordinator had been informed;

- The Superintendent also informed the Board, within days of the incident, that a student disciplinary issue at the Palo Alto High School was being investigated and may result in a sexual harassment complaint through the UCP;

### b. External Reporting

We find that staff and administrators at the School promptly reported the incident externally. This external reporting was consistent with state law requirements under CANRA and BP/AR 5141.4:

- The School Resource Officer notified the Palo Alto Police Department, who responded and interviewed the Complainant on the same afternoon the report was shared with the counselor and Assistant Principal 1;

20

EXHIBIT 15 - 020

*Draft September 20, 2017*

- A school employee made a mandatory report of suspected child abuse to Santa Clara Child Protective Services on the same evening the report was shared with the Palo Alto Police Report.

### c. Centralized Oversight and Determination of Appropriate Response

We find that the Title IX Coordinator did not exercise oversight or supervision of the District's response to this report, but instead deferred to the administrators on site to investigate and evaluate the appropriate institutional response. As outlined above, once on notice, the District had an independent obligation to investigate or otherwise determine what occurred in light of its Title IX obligation to resolve all complaints promptly and equitably and to provide a safe and nondiscriminatory environment for all students. This obligation exists whether or not the complainant makes a complaint or asks the institution to take action. [55] While the Title IX Coordinator did seek legal advice from outside counsel as to the appropriateness of offering the Complainant the UCP, this advice appears to contradict Title IX, Education Code and UCP requirements. Under Title IX, the District was required to investigate or otherwise determine what occurred, to provide the Complainant with information about the District's grievance procedures and available Title IX rights, and to evaluate the appropriate institutional response to eliminate, prevent and address the effects of any sexual and gender-based harassment. Similarly, under the UCP, BP/AR 1312.3, at the beginning of an investigation, the District's Compliance Officer is required to describe the complaint procedure to the Complainant and their parent/guardian, discuss what actions are being sought in response to the complaint, and review records, notes or statements related to the complaint.

Specifically, we find the following:

- While the Title IX Coordinator engaged in conversations and discussion with School and District personnel, the Title IX Coordinator did not create a file, properly evaluate the institution's Title IX responsibilities in light of the report, or conduct a Title IX investigation to determine whether a hostile environment had been created for the Complainant;

- The Title IX Coordinator did not communicate directly with the Complainant, the Respondent or their parents to provide procedural options or resources, including the availability of the UCP, or to discuss Title IX's prohibition against retaliation;

- The Title IX Coordinator did not seek to identify pattern information, evaluate the appropriateness of interim measures, evaluate whether a UCP investigation should be initiated even absent a request by the Complainant, or evaluate whether sufficient information had been gathered to inform steps to eliminate, prevent or address a potential hostile environment.

---

[55] See also AR 5145.3, which provides that even if the student chooses not to file a formal complaint, the principal or compliance officer shall implement immediate measures necessary to stop the discrimination and to ensure all students have access to the educational program and a safe educational environment.

21

EXHIBIT 15 - 021

*Draft September 20, 2017*

We also find that the Principal/designee did not inform the Complainant and their parent/guardian of the resolution options under the UCP, including the right to file a written complaint, as required by AR 1312.3 (the UCP) and AR 5145.3 (Nondiscrimination/Harassment).[56]

### d. Investigation

Along with the failure to offer or pursue the UCP in this matter, we find that the District failed to conduct an investigation as required by Title IX, the Education Code and the UCP. Under Title IX, the District was required to conduct an adequate, reliable and impartial investigation to determine whether sexual harassment and/or a hostile environment have occurred.[57] Similarly, the UCP states that "[t]he District Compliance Officer shall initiate an impartial investigation."[58] Under the UCP, the Title IX Coordinator (the District's Compliance Officer) is required to provide the Complainant with an opportunity to describe the incident, identify witnesses, and provide other evidence and information; interview individuals who have relevant information including the Respondent, witnesses, and anyone mentioned as having relevant information; review any records, notes, or statements related to the complaint; and prepare a written report of the findings. Here, none of those steps occurred. While there was an initial investigation at the site level, this does not constitute a formal investigation under the UCP.

We find the following:

- Assistant Principal 1 took appropriate initial steps to triage and identify the nature of the concern raised by the Complainant, but did not conduct a thorough, informed or reliable investigation as required by Title IX, state law and Board policy:

    o School administrators did not use trauma-informed or effective investigation practices;

    o School administrators participated in law enforcement interviews, but did not maintain formal documentation as required by Board policy;

    o School administrators did not conduct a thorough interview of either the Complainant or Respondent that would allow the School to evaluate issues of consent, the potential impact of a power differential between the parties based on age, grade or status, or the welcomeness of the conduct;

---

[56] AR 5145.3 provides that the principal or compliance officer must inform the student or parent/guardian of the right to file a formal complaint under the UCP.

[57] The determination as to whether a hostile environment existed is a much broader analysis than whether the underlying conduct occurred.

[58] AR 1312.3. See also BP/AR 5145.3, both of which state, "Upon receiving a complaint of unlawful discrimination, including discriminatory harassment, intimidation, retaliation or bullying of a protected class, the Compliance Officer shall immediately investigate the complaint in accordance with the district's uniform complaint procedures specified in AR 1312.3 – Uniform Complaint Procedures." Similarly, under BP 5145.7, "[t]he Superintendent or designee shall ensure that any complaints regarding sexual harassment of students are immediately investigated in accordance with the Uniform Complaint Procedures AR 1312.3"

22

EXHIBIT 15 - 022

*Draft September 20, 2017*

- o Assistant Principal 1 conducted a follow up interview of the Complainant by telephone with the Complainant's parent/guardian present (who had already demonstrated in the presence of this Assistant Principal, conduct that could potentially influence the nature and amount of information presented by the Complainant);

- o The interviews of the Complainant and the Respondent were not contemporaneously documented or recorded;

- o Assistant Principal 1 required that the parties prepare written statements, but did not ultimately obtain written statements from either the Complainant or the Respondent;[59]

- o The School did not interview all relevant witnesses (including the first witness to whom the Complainant disclosed);

- o The School relied upon written summaries from witnesses (a student and staff members), rather than conducting interviews;

- o The School did not gather available documentary evidence (text messages);

- o The School did not create an investigation report or maintain detailed records of the investigation in a central place;[60]

- o There is no indication that the School evaluated or assessed the complaint for the potential of pattern conduct by the Respondent;

- o The School did not conclude the initial investigation or reach a determination, by a preponderance of the evidence, as to whether the underlying conduct violated Title IX, the Education Code or Board policy;

  - ▪ The School did not synthesize or critically analyze the available information to evaluate the totality of the circumstances, welcomeness, the severity of the reported conduct, or whether the conduct created a hostile environment or otherwise interfered with the Complainant's education;

---

[59] While not a violation of Title IX, state law or Board policy, we do not view the requirement that students write their own statements in this context to be an effective or informed investigative practice.

[60] The Title IX Coordinator prepared a draft of an after-the-fact memo to file in late March 2017, purporting to classify the site level inquiry as a "District Initiated UCP" handled at the site level. This does not comport with UCP requirements and in fact, the District initiated a UCP based on the oral complaint by the Complainant's parent/guardian received six days after this draft memo.

EXHIBIT 15 - 023

*Draft September 20, 2017*

- ▪ Instead, the School relied upon a determination by law enforcement as to the nature of the incident, which involves a different analysis (different elements and different standard of proof);[61]

In sum, the District failed to fulfill its obligation under Title IX, the Education Code, and Board policy to conduct an investigation into conduct as reported by the Complainant. Although the District later initiated a UCP investigation, the nearly five month delay in initiating the complaint does not constitute a prompt response to the report raised by the Complainant in the fall of 2016.

### e.  Written Notice of Outcome

Contrary to the requirements of Title IX, the Education Code and the UCP, the District did not provide the Complainant or Respondent with written notice of the outcome.  Title IX requires written notice to the complainant and respondent of the outcome of the complaint,[62] as do the Education Code and UCP.[63]

### f.  Interim Measures

Consistent with the requirements of Title IX, the Education Code and the UCP, we find that the School provided reasonably available and appropriate interim measures designed to facilitate the Complainant's access to educational opportunities.  The School provided remedial measures for the Complainant, including counseling, scheduling accommodations, and took action to enforce the provisions of a temporary restraining order issued against the Respondent. The School also provided interim protective measures for the Respondent, including provisions prohibiting the Respondent from communicating with the Complainant, ensuring that they had no classes together or in the same building, and limiting the Respondent's participation in certain campus activities.  In addition, the School provided interim support measures for the Respondent.

### g.  Sanctions

The School imposed disciplinary action against the Respondent for related conduct with the Complainant, although not for the specific conduct at issue in the reported incident.

### h.  Subsequent Report of Harassment

With respect to a subsequent report by the Complainant of harassing conduct by other students, approximately three weeks after the underlying incident, we find that the District took insufficient action to investigate the concerns raised by the Complainant, to initiate or offer the UCP, or to consider the potential impacts on the reported conduct on the Complainant's educational environment, as follows:

---

[61] As noted above, law enforcement investigations are separate and distinct from Title IX investigations.  The District's obligation to respond to all Title IX complaints, even where there is a concurrent law enforcement investigation, is not discretionary.

[62] Title IX Q & A at 12-13.

[63] Under Cal. Code of Regs., tit. 5 § 4632, the LEA should issue a decision, which should be in writing and sent to the complainant within 60 days from receipt of the complaint.  Similarly, under AR 1312.3, "[t]he district's decision shall be in writing and sent to the complainant."

24

EXHIBIT 15 - 024

*Draft September 20, 2017*

- Assistant Principal 3, to whom the information was reported, took timely action to address the concern, spoke with the students whose behavior was at issue, and admonished them to stop the conduct;

- However, Assistant Principal 3, who was aware of the prior report involving the Complainant and Respondent, did not make a connection between the current concerns and the prior incident, elevate the information at an administrative team meeting or share the information with Assistant Principal 1, who had overseen the response to the initial report;

- Assistant Principal 3 did not evaluate whether the conduct could potentially constitute harassment, retaliation, or the continuation of a hostile environment under Title IX;

- Assistant Principal 3 did not connect the Complainant to the Title IX Coordinator or offer the option to pursue a UCP complaint;

- Assistant Principal 3 did follow up with the Complainant within a week, but there is no documentation or indication that the information was shared with the administrative team or with those working directly with the Complainant.

We note that Title IX, the Education Code and the UCP require that the District protect complainants from retaliation, that complainants be advised of the prohibition against retaliation, and that a complainant and their parent/guardian be given notice to immediately report retaliation to the District's Compliance Officer, principal or designee. There is no evidence that occurred here.

### i.  The Complainant's Withdrawal from School

With respect to School's actions at the end of the semester, when the School was informed that the Complainant was contemplating withdrawing from the District, we also find that the District took insufficient action to investigate the concerns raised by the Complainant, to initiate or offer the UCP, or to consider the potential impacts on the reported conduct on the Complainant's educational environment, as follows:

- Assistant Principal 1 and Assistant Principal 3 were informed that the Complainant was considering leaving the District because of the impact of the incident and subsequent rumors;

- Assistant Principal 1 communicated the circumstances of the Complainant's potential departure from the School to the Title IX Coordinator and inquired of the Title IX Coordinator whether the School should offer the UCP;

- Assistant Principal 3, who was copied on this communication, did not use this opportunity to share information about the Complainant's earlier concerns about harassing conduct, which may have provided a fuller context in which to evaluate the

25

EXHIBIT 15 - 025

District's responsibilities under Title IX, state law and Board policy as they relate to harassment, retaliation or the existence of a hostile environment;

- The Title IX Coordinator advised Assistant Principal 1 to gather additional information from the Complainant's parent/guardian, which Assistant Principal 1 did;

- Based on the additional information gathered and legal advice reportedly received from outside counsel, the Title Coordinator advised Assistant Principal 1 that the School did not need to offer the UCP;

- The statements by the Complainant's parent/guardian constituted notice of a potential hostile environment and should have triggered an investigation into whether harassment or other environmental concerns had created a hostile environment for the Complainant;

### j.   Evaluation of Risk

Finally, in response to additional information the District received about the Respondent in February 2017, we find the following:

- The District did not take steps to assess or understand the import of the information that was provided to the School by an external authority;

- The District did not properly investigate to determine whether the additional information provided by the external authorities involved on or off-campus conduct by the Respondent; whether the conduct was connected to a PAHS student; whether the conduct may have had continuing effects at PAHS; whether as a result of the conduct, the Respondent may have represented a danger to persons; or whether the additional information presented a potential pattern of conduct that may warrant further action or triggered obligations under BP 5144.1, Suspension and Expulsion/Due Process.

  Moreover, the District had no protocol for the tracking and monitoring of information received from external authorities, or compliance with directives from external authorities.

## V.   Conclusion

As part of Cozen O'Connor's broader engagement with the District, Cozen O'Connor is conducting an external investigation as set forth in Section E of OCR's Resolution Agreement. At the conclusion of that review, and in connection with this engagement, Cozen O'Connor will make recommendations for effective implementation of the regulatory requirements based on the information gathered in the review.

**Appendix: Legal and Regulatory Framework**

26

EXHIBIT 15 - 026

*Draft September 20, 2017*

## I.    Legal and Regulatory Framework

The District's response to sexual and gender-based harassment and violence is governed by federal law and guidance, state law and Board policies.  An effective response to sexual and gender-based harassment and violence requires a nuanced understanding, integration and coordination of this complex framework.

### A.    Federal Law and Guidance:  Title IX of the Education Amendments of 1972

Title IX is a federal civil rights law that provides no "person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[64] Title IX applies to all educational institutions that receive federal financial assistance, either directly or indirectly, including public and private elementary and secondary schools, school districts, colleges, and universities.[65]

Title IX is accompanied by implementing regulations that have the force and effect of law.[66]  In addition to the implementing regulations, the U.S. Department of Education's Office for Civil Rights (OCR) has issued guidance documents that provide policy guidance to assist educational institutions in meeting their Title IX obligations.  Early guidance documents include the 1997 Sexual Harassment Guidance (1997 Guidance) and the 2001 Revised Sexual Harassment Guidance (2001 Guidance).[67]  In more recent years, OCR has designated the April 4, 2011 Dear Colleague Letter (2011 DCL) and the April 29, 2014 Questions and Answers on Title IX and Sexual Violence (Title IX Q&A) as significant guidance documents.[68]  These guidance documents provide information and examples to inform educational institutions about how OCR evaluates compliance with legal obligations under Title IX.[69]  While these significant guidance documents do not purport to create or add legally binding requirements to applicable law, recent enforcement efforts by OCR have held institutions accountable for the tenets set forth in these guidance documents.

### 1.    Scope

---

[64] 20 U.S.C. § 1681(a).

[65] 20 U.S.C. § 1681(a); 34 C.F.R. § 106.11.

[66] These implementing regulations are codified at 34 C.F.R. § 106.

[67] The 2001 Guidance replaced the *1997 Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*.  62 Fed. Reg. 12,034 (Mar. 13, 1997).  The 1997 guidance was "the product of extensive consultation with interested parties, including students, teachers, school administrators, and researchers" and the document was made available for public comment.  The 2001 Guidance was also published in the Federal Register, at 62 Fed. Reg. 66,092 (Nov. 2, 2000), and was available for public comment.  The 2001 Guidance is available at http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf .

[68] Recent announcements by the U.S. Secretary of Education suggest that that the 2011 and 2014 guidance documents will soon be replaced with interim guidance that will be subject to notice and comment.  At the time of the incidents in this report, however, these guidance documents were in force.

[69] *See* 2011 DCL at n. 1.

27

EXHIBIT 15 - 027

*Draft September 20, 2017*

Title IX prohibits discrimination on the basis of sex in all of an institution's programs and activities, including both education and employment programs and activities.[70]  Title IX also applies to a broad spectrum of conduct, including all forms of sex discrimination, sexual and gender-based harassment, sexual misconduct, and sexual violence.[71]  Title IX's protections apply to conduct that occurs on campus, in the context of any institution-related education program or activity, or where there are any continuing effects on campus or in an off-campus education program or activity that create or contribute to a hostile environment.  Finally, Title IX applies equally to students, employees and third parties.[72]

### 2.    Non-Discrimination Statement

Title IX requires that institutions publish a non-discrimination statement.[73]  The statement must notify students, parents and others that the institution does not discriminate on the basis of sex in its education programs and activities, and that it is required by Title IX not to discriminate in such a manner.  Educational institutions must also implement specific and continuing steps to inform students and others about the protections against discrimination on the basis of sex.  The notice must make clear that the requirement of non-discrimination in educational programs covers employment and admission, and it must indicate that questions about Title IX may be referred to the institution's Title IX Coordinator or OCR.  Institutions must include in the notice of non-discrimination the name, office address, telephone number and email address of the designated Title IX Coordinator.[74]

### 3.    Title IX Coordinator[75]

Under Title IX, institutions are required to appoint a Title IX Coordinator to oversee the institution's Title IX compliance efforts, including the centralized review, investigation, and resolution of reports of sexual and gender-based harassment and violence under the institution's complaint processes, and to identify and address any patterns or systemic problems that arise during the review of such complaints.  The Title IX Coordinator should be available to meet with

---

[70] *See generally* 20 U.S.C. § 1681 *et seq*.; 34 C.F.R. Part 106.

[71] U.S. Department of Education, Office for Civil Rights Dear Colleague Letter, April 4, 2011 (2011 DCL) at 1.

[72] *See* 34 C.F.R. § 106.8(b) (requiring schools to adopt and publish grievance procedures for students and employees); 34 C.F.R. § 106.51 (prohibiting discrimination on the basis of sex in employment in education programs or activities); *see also* 2011 DCL at n. 11 ("Title IX also protects employees of a recipient from sexual harassment.").  The nature of the third party's relationship to the educational institution, including whether the third party is a complainant or respondent, may dictate the manner in which the institution's policies and procedures are applicable.  For example, an educational institution may have limited ability to discipline a third party, but in contrast, may be deemed to be on notice of discriminatory conduct by a student or employee based on the report of a third party.  As a result, an educational institution's legal and policy obligations may not apply to a third party complainant or respondent in the same manner in which they apply to a student or employee.

[73] 34 C.F.R. § 106.9.

[74] Office for Civil Rights, U.S. Dept. of Education, *Notice of Non-Discrimination*, http://www2.ed.gov/about/offices/list/ocr/docs/nondisc.html.

[75] For further description of the responsibilities of the Title IX Coordinator, see Office for Civil Rights, Dear Colleague Letter on Title IX Coordinators, April 24, 2015, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201504-title-ix-coordinators.pdf.

EXHIBIT 15 - 028

students, employees and third parties as needed.[76]  The Title IX Coordinator's role and responsibilities should be clearly defined, and the Title IX Coordinator's contact information should be easily accessible by students and staff.[77]

Institutions must take steps to ensure that employees designated to serve as Title IX Coordinators have adequate training on what constitutes sexual harassment, including sexual violence, and that they understand how the institution's Title IX procedures operate.[78]  Where an institution chooses to designate more than one Title IX Coordinator, it should ensure that one individual has ultimate oversight responsibility, and the others should have titles that clearly show that they are in a deputy or supporting role to the senior coordinator.  Finally, the Title IX Coordinator(s) should not have other job responsibilities that would potentially create a conflict of interest.[79]

## 4.    Prompt and Equitable Grievance Procedures

Title IX requires that an institution's grievance procedures be prompt and equitable.[80]  To meet this requirement, an institution must provide notice to students and employees of the grievance procedures, including where complaints may be filed, and that the grievance procedures apply to complaints filed by any individual alleging sexual or gender-based harassment or violence carried out by students, employees or third parties.[81]  The procedures must include: provisions for adequate, reliable, and impartial investigation of complaints, including the opportunity for both the complainant and respondent to present witnesses and evidence; designated and reasonably prompt time frames for the major stages of the complaint process; written notice to the complainant and respondent of the outcome of the complaint; and assurance that the institution will take steps to prevent recurrence of any sexual violence and remedy discriminatory effects on the complainant and others, if appropriate.[82]  Grievance procedures should also include: a statement of the institution's jurisdiction over Title IX complaints; adequate definitions of sexual and gender-based harassment and violence and an explanation as to when such conduct creates a hostile environment; reporting policies and protocols, including provisions for requesting confidentiality when making a report; identification of the employee or employees responsible for evaluating requests for confidentiality; notice that Title IX prohibits retaliation; notice of an individual's right to file a criminal complaint and a Title IX complaint simultaneously; notice of available interim measures that may be taken to protect the student in the educational setting; the evidentiary standard that must be used (preponderance of the evidence) in resolving a complaint; notice of potential remedies for the complainant; notice of potential sanctions against respondents; and sources of counseling, advocacy, and support.[83]

---

[76] 2011 DCL at 7.
[77] 34 C.F.R. § 106.8(a); 2011 DCL at 6.
[78] 2011 DCL at 7.
[79] *Id.*
[80] 34 C.F.R. § 106.8(b).
[81] Title IX Q & A at 12-13.
[82] *Id.*
[83] *Id.*

EXHIBIT 15 - 029

*Draft September 20, 2017*

### 5.    Obligation to Eliminate, Prevent and Address Hostile Environment

Under Title IX, when an educational institution knows or reasonably should know about sexual harassment that creates a hostile educational or working environment, the institution must take immediate and appropriate steps to investigate or otherwise determine what occurred.[84]   If an investigation reveals the existence of a hostile educational or employment environment, the institution must then take prompt and effective steps reasonably calculated to eliminate the hostile educational or employment environment, prevent its recurrence and address its effects.[85] An institution violates Title IX if it has "notice" of a sexually hostile educational or employment environment and fails to take immediate and corrective action.  In addition, an institution's delay, inappropriate response or inaction in response to a report of sexual or gender-based harassment or violence may subject the complainant to a hostile environment and require the institution to remedy the effects of the hostile environment that could reasonably have been prevented had the institution responded promptly and appropriately.[86]

### 6.    Notice

An institution is deemed to have notice if a responsible employee knew or, in the exercise of reasonable care, should have known, about the harassment.  A responsible employee includes any employee who:  (1) has the authority to take action to redress the harassment; (2) has the duty to report to appropriate school officials sexual harassment or any other misconduct by students or employees; or (3) a student could reasonably believe has the authority or responsibility to take action.[87]  To facilitate the institution's compliance with Title IX, responsible employees are required to share with the Title IX Coordinator all relevant details about the reported incident, including identifying information about the complainant, respondent, other witnesses, and relevant facts, including the date, time, and location.[88]  Notice may come from a direct report or complaint by a student, employee or third party victim, or a responsible employee may observe or witness prohibited conduct.  Notice may also come from indirect sources: a parent, friend or third party witness; social networking sites; the media; an open, pervasive or widespread pattern; or other facts and circumstances that should cause an institution, in the exercise of reasonable care, to initiate an investigation that would lead to the discovery of additional incidents.[89]  The institution's Title IX obligations exist regardless of whether the individual who was harassed makes a complaint or asks the institution to take action although the institution may consider a complainant's request for anonymity, or not to pursue an investigation, when determining an appropriate institutional response.[90]

---

[84] *Id.* at 4; 1997 Guidance; Questions and Answers on Title IX and Sexual Violence, Office for Civil Rights, April 29, 2014 (Title IX Q & A) at 2-3.
[85] *Id.*
[86] Title IX Q & A at 4.
[87] Title IX Q &A at 15-16.
[88] Title IX Q & A at 16.
[89] Title IX Q & A at 2.
[90] 1997 Guidance.

EXHIBIT 15 - 030

*Draft September 20, 2017*

### 7.    Interim Measures

Once an institution has notice of an allegation of sexual or gender-based harassment or violence allegation, it must promptly take steps to ensure equal access to its education programs and activities and protect the complainant as necessary, including taking interim measures while the investigation is pending.[91] The institution should notify the complainant of reasonably available measures and any available resources, such as victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance.[92] The institution should also inform the complainant of their Title IX rights and the right to report a crime to campus or local law enforcement.[93]

The institution should consider a range of factors when determining the appropriate interim measures: the facts and circumstances of each case; the specific need expressed by the complainant; the age of the students involved; the severity or pervasiveness of the alleged harassment; any continuing effects on the complainant; any intersections between the complainant and respondent (e.g., shared residence hall, dining hall, class, transportation, or job location); and whether other judicial measures have been taken to protect the complainant (e.g., civil protection orders).[94] In addition, OCR has advised that when taking interim measures, an institution should minimize the burden on the complainant and carefully consider the facts of the case when determining who to remove from a shared class or residence hall.[95]

### 8.    Investigation

OCR uses the term "investigation" to refer to the process an institution uses to resolve sexual violence complaints, including the fact-finding investigation and any hearing and decision-making process the institution uses to determine whether the conduct occurred by a preponderance of the evidence and, if so, the appropriate sanctions and remedies to eliminate the sexual harassment or hostile environment, prevent its recurrence and address its effects.[96] While an investigation may include a hearing to determine whether the conduct occurred, Title IX does not require a hearing.[97]

According to the 2011 Dear Colleague Letter, Title IX requires adequate, reliable and impartial investigations that are conducted by investigators with sufficient experience or training.[98] OCR expanded on this guidance in the 2014 Title IX Q&A, outlining significant training requirements for investigators and noting that "provisions for adequate, reliable, impartial and prompt investigation of complaints require: the opportunity for both parties to present witnesses and evidence; interim measures to be implemented before the final outcome of the investigation; periodic updates on the status of the investigation to be presented to the parties; and the

---

[91] Title IX Q & A at 32-33.
[92] Title IX Q & A at 32-33.
[93] *Id.*
[94] *Id.*
[95] *Id.*
[96] Title IX Q & A at 24-25.
[97] Title IX Q & A at 25.
[98] 2011 DCL at 9-12.

31

EXHIBIT 15 - 031

application of the preponderance of the evidence standard."[99]  OCR has also noted that "a balanced and fair process that provides the same opportunities to both parties will lead to sound and supportable decisions."[100]  Notably, OCR has not provided specific standards of care for investigations beyond broadly capturing concepts such as adequate, reliable, impartial and thorough, and institutions are free to designate investigators of their choosing, whether they be employees of the institution or external resources.

A criminal investigation and a Title IX investigation are two distinct processes, each with its own set of procedural protections and legal standards.[101]  The purpose of a criminal investigation is to determine whether an individual violated a law, and if so, the individual may be imprisoned or subject to other criminal penalties.[102]  In contrast, Title IX investigations have different procedural protections and legal standards.[103]  Under Title IX, institutions are required to respond to all complaints of Title IX-related conduct.[104]  The Title IX obligation to resolve all complaints promptly and equitably and to provide a safe and nondiscriminatory environment for all students is not discretionary.[105]

In all cases, the institution should notify the complainant of the right to file a criminal complaint and should not dissuade a complainant from doing so at any stage of the institution's Title IX investigation.[106]  While Title IX does not require an institution to report alleged incidents of sexual violence to law enforcement, an institution may have reporting obligations under state, local or other federal laws.[107]  Where there are concurrent investigations, an institution should coordinate investigations and establish appropriate fact-finding roles for each investigator.[108]  An institution should also consider whether information can be shared among the investigators so that complainants are not unnecessarily required to give multiple statements about a traumatic event.[109]  However, an institution should not wait for the conclusion of a criminal investigation or criminal proceeding to begin its own Title IX investigation.[110]  Although an institution may need to delay temporarily the fact-finding portion of a Title IX investigation while law enforcement is gathering evidence, the institution must still must take interim measures to protect the complainant and the community.[111]

### 9.    Alternative Resolution

In response to a request for confidentiality, an institution may offer an alternative form of resolution.[112]  Often referred to as voluntary, informal or remedies-based resolution, an

---

[99] Title IX Q & A at 3, 12-14.
[100] *Id.* at 24-26.
[101] *Id.* at 27.
[102] *Id.*
[103] *Id.*
[104] *Id.*
[105] *Id.*
[106] Title IX Q & A at 27.
[107] *Id.*
[108] *Id.* at 24-26.
[109] *Id.*
[110] *Id.* at 28.
[111] *Id.*.
[112] 2011 DCL at 8.

EXHIBIT 15 - 032

*Draft September 20, 2017*

alternative form of resolution can effectively eliminate a hostile environment without taking disciplinary action against a respondent.  The inclusion of a remedies-based form of resolution may aid complainants or third parties who are seeking anonymity or confidentiality, or for whom pursuing formal disciplinary action may be a barrier to reporting or moving forward.  It may also provide an institution with additional mechanisms to tailor a response that recognizes the unique facts and circumstances of a particular incident, particularly in cases where there is not a broader threat to individual or campus safety, or address conduct that might not rise to the level of a hostile environment.

Participation in an alternative form of resolution must be voluntary, and a complainant must be able to request to end voluntary resolution and initiate an investigation at any time. [113]  While an institution may offer mediation in appropriate cases, mediation should not be used in cases involving sexual assault.[114]  In addition, an institution should not compel a complainant to engage in mediation, to directly confront the respondent, or to participate in any particular form of alternative resolution. [115] The institution should maintain records of all reports and conduct referred for alternative resolution, and ensure that the resolution is completed within an appropriate time frame following the initial report.

An institution may take immediate and corrective action through the imposition of individual and community remedies designed to maximize the complainant's access to the educational, extracurricular and employment activities and to eliminate a hostile environment, prevent its recurrence and address its effects.  Potential remedies include: providing increased monitoring, supervision, or security; providing training and educational materials for students and employees; changing and publicizing institutional policies on sexual and gender-based harassment and violence; conducting climate surveys regarding sexual violence; imposing short- or long-term protective measures for a complainant; and other measures that can be tailored to the facts and circumstances.[116]

## C.    State Law

### 1.    California Education Code

#### a)    Definition of Sexual Harassment – *Cal Ed. Code § 212.5*

Cal. Ed. Code § 212.5 provides the following definition of sexual harassment[117]:

> *"Sexual harassment" means unwelcome sexual advances, requests for sexual favors, and other verbal, visual, or physical conduct of a sexual*

---

[113] 2011 DCL at 8.

[114] 2011 DCL at 8.

[115] 2011 DCL at 8.

[116] Title IX Q & A at 20.

[117] See also Cal. Code of Regs, tit. 5, § 4916, which contains slightly different language, and specifies that it applies between people of the same or "opposite sexes."  The Regulation also specifies under (c) that conduct creates a hostile environment if it is "sufficiently severe, persistent, pervasive or objectively offensive" so as to "limit the individual's ability to participate in or benefit from an education program or activity."  The Regulation also specifies that the "educational environment" includes, but is not limited to, the campus or school grounds, properties owned by the district, and off-campus during an activity sponsored by the district or conducted by organizations sponsored by or under the jurisdiction of the district.

33

EXHIBIT 15 - 033

*nature, made by someone from or in the work or educational setting, under any of the following conditions:*

*(a) Submission to the conduct is explicitly or implicitly made a term or a condition of an individual's employment, academic status, or progress.*

*(b) Submission to, or rejection of, the conduct by the individual is used as the basis of employment or academic decisions affecting the individual.*

*(c) The conduct has the purpose or effect of having a negative impact upon the individual's work or academic performance, or of creating an intimidating, hostile, or offensive work or educational environment.*

*(d) Submission to, or rejection of, the conduct by the individual is used as the basis for any decision affecting the individual regarding benefits and services, honors, programs, or activities available at or through the educational institution.*

### b)     Educational Equity Provisions

#### (1)     Sex Equity in Education Act – *Cal. Ed. Code §§ 221.5-231.5*

The "Sex Equity in Education Act,"[118] (SEEA) enacted in 1982, defines its purpose as follows:

> It is the policy of the State of California … that all persons, regardless of their sex, should enjoy freedom from discrimination of any kind in the educational institutions of the state.  The purpose of this section is to provide notification of the prohibition against sexual harassment as a form of sexual discrimination and to provide notification of available remedies.[119]

The SEEA contains the following specific requirements,[120] each of which were in place at the time of the incident in question:

- Each school must have a written policy on sexual harassment;
- The school's policy must include information on "where to obtain the specific rules and procedures for reporting charges of sexual harassment and for pursuing available remedies;"
- The school must display a copy of its policy in a "prominent location;"

---

[118] Cal Ed. Code §§ 221.5-231.5.
[119] Cal. Ed. Code § 231.5; Cal. Code of Regs, tit. 5, § 4917.
[120] Cal. Ed. Code § 231.5(b)-(g).

EXHIBIT 15 - 034

*Draft September 20, 2017*

- The school must provide a copy of its policy as part of any orientation program for new students;
- The school must provide a copy of its policy to each faculty member, all administrators, and all support staff at the beginning of the school year and to all new employees; and
- The school must include a copy of its policy in any publication that sets forth the "comprehensive rules, regulations, procedures, and standards of conduct for the institution."

The 2016 amendments to the SEEA imposed additional requirements on schools. Although those requirements were not in place at the time of the matter in question, we summarize them here to reflect recent developments: on or before July 1, 2017, schools must prominently display on their website the name and contact information of the Title IX coordinator, the rights of pupils and the public under Title IX, the responsibilities of the school under Title IX, web links to federal agency information about those rights and responsibilities, a description of how to file a complaint under Title IX including an explanation of the statute of limitations, the applicable investigative process, and links and explanatory information about the United States Department of Education's Office for Civil Rights.[121]

### (2)    Safe Place to Learn Act – *Cal Ed. Code §§ 234-234.5*

In 2007, California enacted the "Safe Place to Learn Act,"[122] (SPLA) to combat bias and harassment in schools. In 2011, SPLA was expanded to address "intimidation and bullying" in addition to "discrimination, harassment, [and] violence."[123] The current version of SPLA is identical in all relevant aspects to the version that was in place at the time of the incident in question. The SPLA gives the California State Department of Education the power to assess whether local educational agencies have done all of the following:[124]

- Adopted a policy that prohibits discrimination, harassment, intimidation and bullying based on actual or perceived characteristics including disability, gender, gender identity, gender expression, nationality, race or ethnicity, religion or sexual orientation, and included in that policy a statement that it applies to all acts related to school activity or attendance occurring within a school in that district;[125]
- Adopted a process for receiving and investigating complaints of discrimination, harassment, intimidation and bullying based on the enumerated characteristics, where such process includes:

---

[121] Cal. Ed. Code §§ 221.61 and 221.8
[122] Cal. Ed. Code §§ 234-234.5.
[123] Cal. Ed. Code § 234(a), amended by Stats.2011, c. 723 (A.B.9), § 1, operative July 1, 2012.
[124] Cal. Ed. Code § 234.1 (a)-(h); See also, generally, Cal. Code of Regs., tit. 5, §§ 4960-4965.
[125] See also Cal. Code of Regs, tit. 5, § 4900, which prohibits discrimination and harassment on the basis of sex, sexual orientation, gender, ethnic group identification, race, ancestry, national origin, religion, color, or mental or physical disability in any program or activity conducted by an "educational institution" or other "local agency" (i.e. district) funded by the state. Cal. Code of Regs, tit. 5, § 4914 adds "parental, family, or marital status" and "pregnancy" as additional protected characteristics. See also Cal. Code of Regs, tit. 5, § 4950.

35

EXHIBIT 15 - 035

- o A requirement that, if school personnel witness an act of discrimination, harassment, intimidation, or bullying, they must take immediate steps to intervene when safe to do so;
- o A timeline to investigate and resolve complaints;
- o An appeal process afforded to the complainant; and
- o Language translation of all forms developed pursuant to the above process.
- Publicized to pupils, parents, employees, agents of the governing board, and members of the general public anti-discrimination, anti-harassment, anti-intimidation, and anti-bullying policies that include information about the manner in which to file a complaint;
- Provided to certified school site employees who serve students in grades 7-12 information about school and community resources for LGBTQ (lesbian, gay, bisexual, transgender and queer) pupils or related to support for students who may face bullying on the basis of their actual or perceived religious affiliation;
- Posted the policy in all school offices, including staff lounges and pupil government meeting rooms;
- Maintained documentation of complaints and their resolutions for a minimum of one review cycle;
- Ensured that complainants are protected from retaliation and that the identity of a complainant alleging discrimination, harassment, intimidation, or bullying remains confidential, as appropriate; and
- Identified a responsible local educational agency officer for ensuring compliance.

### (3) Preconditions to the Receipt of State Financial Assistance – *Cal Ed. Code §§ 250-253*

Under Sections 250-253 of the California Education Code, educational institutions must fulfill two requirements before receiving state financial assistance or state student financial aid. Schools must:  1) provide assurance to the agency administering state funds that each program or activity conducted by the school will be conducted in compliance with the Education Code; and 2) submit timely, complete and accurate compliance reports to the State Department of Education "as that entity may require," with acknowledgement that the State Department of Education may make those reports available to the public.[126]  Additionally, Section 253 instructs the Superintendent of Public Instruction[127] to review twenty school districts per year for compliance with sex discrimination laws and regulations contained in the California Education Code, if sufficient funding has been appropriated for that purpose.[128]

### (4) Enforcement Provisions – *Cal Ed. Code §§ 260-262.4*

Sections 260-262.4 of the California Education Code place "primary responsibility" for ensuring that school district programs and activities are free from discrimination with the governing board

---

[126] Cal. Ed. Code §§ 250-253.
[127] The State Superintendent of Public Instruction is a state official elected by the people on a nonpartisan ballot for a four-year term.
[128] Cal Ed. Code § 253.

EXHIBIT 15 - 036

*Draft September 20, 2017*

of each school district.[129]  Section 262.3 allows a party to file a written complaint of prohibited discrimination to appeal a governing board's decision to the State Department of Education. Section 262.3(b) requires schools to notify complainants that "civil law remedies, including, but not limited to, injunctions, restraining orders, or other remedies or orders may be available." Sections 262.3(c) and (d), read together and in light of relevant case law,[130] provide that a complainant may seek injunctive relief immediately and need not exhaust the administrative complaint process, but a complainant must wait until at least sixty days after filing an appeal under the Uniform Complaint Procedures[131] to the State Department of Education to seek monetary relief for alleged violations of the California Education Code's prohibitions against discrimination.

c)     **Pupil Rights and Responsibilities – *Cal. Ed. Code §§ 48900 et seq.***

Sections 48900 et seq. of the California Education Code specify that a pupil may not be suspended from school or recommended for expulsion unless the principal of the school or the superintendent of the district determines that the pupil has committed one of the below acts:[132]

- Caused, attempted to cause, or threatened to cause physical injury to another person, or willfully used force of violence upon another person, except in self-defense;
- Possessed, sold, or furnished a firearm, knife, explosive or "other dangerous object" without prior written permission of a school employee and the principal or their designee;
- Unlawfully possessed, used, sold, furnished, or was under the influence of a controlled substance, alcoholic beverage or intoxicant of any kind;
- Unlawfully offered, arranged or negotiated to sell a controlled substance, alcoholic beverage or intoxicant of any kind *and* actually completed the sale or delivery by providing the other person with the substance or a look-alike;
- Committed or attempted to commit robbery or extortion;
- Caused or attempted to cause damage to school[133] or private property;
- Stole or attempted to steal school or private property;
- Possessed or used tobacco products, except where the pupil has a prescription;
- Committed an obscene act or engaged in habitual profanity or vulgarity;

---

[129] Similarly, Cal. Code of Regs., tit. 5, § 4960 states that school districts have primary responsibility to ensure nondiscrimination.  The Regulation specifies that boards have the responsibility to investigate complaints of unlawful discrimination in their programs and activities, and to publicize their nondiscrimination policies to students, parents, employees, board members and agents, and the general public.  Cal. Code of Regs., tit. 5, § 4961 requires each district to identify a single person as the responsible local agency officer for ensuring district compliance and to publicize that person's name, office address and office telephone number.

[130] Donovan v. Poway Unified School District, 167 Cal.App.4th 567, 594-596 (rules of statutory construction support interpreting 263.3 (c) and (d) to permit immediate injunctive relief but a 60-day "cooling-off" period before the availability of monetary relief).

[131] The Uniform Complaint Procedures (UCP) are discussed below in this report.  The UCP is codified at Cal. Code of Regs., tit. 5, §§ 4600 through 4671.

[132] Cal. Ed. Code § 48900 (a) through (r).

[133] Throughout this section, "school property" includes school databases and electronic files.  Cal Ed. Code § 48900 (u).

EXHIBIT 15 - 037

*Draft September 20, 2017*

- Unlawfully possessed, offered, arranged, nor negotiated to sell drug paraphernalia as defined in the Health and Safety Code;[134]
- Disrupted school activities or otherwise willfully defied valid school authorities (except that K-3 students cannot be suspended and K-2 students cannot be expelled under this provision);
- Knowingly received stolen school or private property;
- Possessed an imitation firearm;
- Committed or attempted to commit a sexual assault,[135] or committed a sexual battery;[136]
- Harassed, threatened or intimidated a pupil who is a complaining witness or witness in a school disciplinary proceeding for purposes of preventing that pupil from being a witness or retaliating against that person for being a witness;
- Unlawfully offered, arranged or negotiated to sell, or sold the prescription drug Soma;
- Engaged in or attempted to engage in hazing, where "hazing" is defined as "a method of initiation or preinitiation into a pupil organization or body, whether or not the organization or body is recognized by an educational institution, that is likely to cause serious bodily injury or personal degradation or disgrace resulting in physical or mental harm to a former, current, or prospective pupil," and where "hazing" does not include athletic or school-sanctioned events;
- Engaged in an act of bullying, where "bullying" is defined as "any severe or pervasive[137] physical or verbal act or conduct, including written and electronic communications or acts,[138] directed at one or more pupils that has or can be reasonably predicted to:
  - Place a reasonable pupil in fear of harm to that pupil's person or property;
  - Cause a reasonable pupil to experience a substantially detrimental effect on their physical or mental health;
  - Cause a reasonable pupil to experience substantial interference with their academic performance; or
  - Cause a reasonable pupil to experience substantial interference with their ability to participate in or benefit from the services, activities or privileges provided by a school.
- Committed sexual harassment[139] that a reasonable person of the same gender of the victim would find sufficiently severe or pervasive to have a negative impact on the

---

[134] Cal. Health & Safety Code § 11014.5.

[135] As defined by Cal. Penal Code §§ 261, 266c, 286, 288, 288a, or 289.  See discussion and definition below in this report.

[136] As defined by Cal. Penal Code §§ 243.4.  See discussion and definition below in this report.

[137] Under this section, an act is not "pervasive" solely because it has been transmitted on the Internet or is currently posted on the Internet.  Cal. Ed. Code § 48900(r)(2)(B).

[138] "Electronic acts" are defined as including 1) texts, sounds, and images (with "videos" being added in 2017), or 2) posts on social media or elsewhere that creates an impersonation of another actual pupil or creates an impersonation of another and uses that impersonation to engage in bullying.  See Cal. Ed. Code §§ 48900(r)(1)-(2).  In 2017, the statute also prohibits engaging in "cyber sexual bullying," defined as disseminating or soliciting/inciting the dissemination nude, semi-nude or sexually explicit photos or videos of a minor where the minor is identifiable and where the transmission can be reasonably predicted to have one or more of the effects of "bullying" as defined above.  Cal. Ed. Code §§ 48900(r)(2)(A)(iii).

[139] Cal. Ed. Code § 48900.2.  "Sexual harassment" is given the definition found in Cal. Ed. Code § 212.5 (discussed above in this report).

EXHIBIT 15 - 038

individual's academic performance or to create an intimidating, hostile, or offensive educational environment (except that this provision does not apply to K-3 pupils);

- Committed "hate violence,"[140] defined as willfully injuring, intimidating, interfering with, oppressing or threatening a person based in whole or in part on their actual or perceived disability, gender, nationality, race or ethnicity, religion, sexual orientation or association with a person or group with one or more of these actual or perceived characteristics; or

- Engaged in harassment, threats or intimidation directed at school personnel or pupils that is sufficiently severe or pervasive to have the actual and reasonably expected effect of materially disrupting classwork, creating substantial disorder and invading the rights of either school personnel or pupils by creating an intimidating or hostile educational environment.[141]

Section 48900(s) specifies that a pupil cannot be suspended or expelled for any of the above acts *unless* the act is related to a school activity or school attendance. "Related to a school activity or school attendance" includes, but is not limited to, acts that occur:

- While on school grounds;
- While going to or from school;
- During the lunch period whether on or off campus;
- During or while going to or coming from a school-sponsored activity.

Section 48900.5 clarifies that suspension, whether out-of-school or in-school,[142] shall be imposed only when other means of correction fail, except that a pupil may be suspended upon a first offense if the principal or district superintendent determine that the pupil violated one of the first five provisions[143] in § 48900 or if the pupil's presence causes a danger. Section 48900.5 contains a non-exhaustive list of other means of correction[144] and states that the school may keep documentation of attempted means of correction in a student's file.

Section 48902 provides conditions that must be fulfilled in all cases of suspension or expulsion:

- Prior notice to law enforcement of any act that may violate Cal. Penal Code § 245 (related to assault with a deadly weapon);
- Within one school day after suspension or expulsion, notice to law enforcement of any act that may violate Cal. Ed. Code §§ 48900 (c) or (d) (related to controlled substances);

---

[140] Cal. Ed. Code § 48900.3, citing Cal. Ed. Code § 233 which cites Cal. Penal Code §§ 422.55 (protected characteristics), and 422.6 (definition of "hate violence").
[141] Cal. Ed. Code § 48900.4
[142] See Cal. Ed. Code § 48911.1 for a discussion of "supervised" or in-school suspension.
[143] See Cal. Ed. Code § 48900 (a) through (e), addressing generally: a) physical injury, b) possession of a firearm, knife or explosive, c) possession, sale or use of a controlled substance, alcohol or other intoxicant, d) negotiation or sale of a controlled substance, alcohol or other intoxicant with delivery of the actual or a look-alike substance, or e) robbery or extortion.
[144] E.g. parent-teacher conference, referrals to school or external counselors or social workers, psychosocial or psychoeducational assessments, anger management, restorative justice, behavior support, after-school programs.

EXHIBIT 15 - 039

- Notice (without a specified timeframe) to law enforcement of any act that may involve the possession or sale of narcotics or controlled substances or the possession of a firearm or ammunition within a "school zone."[145]

Section 48902(d) gives principals or their designee immunity for making good faith reports to law enforcement under this section.

Section 48902(e) states that, in cases of reports to law enforcement where the pupil has "exceptional needs,"[146] the principal or their designee must also send to law enforcement copies of the pupil's special education and disciplinary record, to the extent permitted by the Family Educational Rights and Privacy Act (FERPA) at 20 U.S.C. §§ 1232g et seq.

Effective 2017, section 48929 permits districts to transfer a pupil who has been convicted of a "violent felony"[147] or specific misdemeanor[148] to another school when the victim of the subject crime and the convicted pupil attend the same school and if the following conditions are met:

- The school board has a policy that:
  - Requires pupil and parent notification and the right to request a meeting with a school principal or designee;
  - Requires the school to attempt to resolve the conflict without a transfer;
  - Provides for the periodic review of transfer decisions and specifies the procedure for review; and
  - Provides a mechanism for the school board to consider and approve or disapprove the school principal's or designee's recommendations about transfers.
- The school board has provided annual notice of the policy to all parents/guardians.

### d)    Privacy of Pupil Records – *Cal Ed. Code § 49079*

Section 49079 requires school districts to inform teachers of pupils who have engaged in or are reasonably suspected have engaged in the acts described in Cal. Ed. Code §§ 48900,[149] 48900.2 (sexual harassment), 48900.3 (hate violence), 48900.4 (harassment, threats, or intimidation that

---

[145] "School Zone" is defined in the "Gun Free School Zone Act" at Cal. Penal Code §§ 626.9 or 626.10.

[146] See Cal. Ed. Code § 56026 (defines "exceptional needs" to mean pupils with disabilities under 20 U.S.C. § 1401). Generally, this includes pupils who have intellectual disabilities, physical, sensory, or speech impairments, serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, specific learning disabilities, or other health impairments that necessitate special education and related services.

[147] See Cal. Penal Code 667.5. Lists "violent felonies" which include, generally, murder, manslaughter, rape, sodomy, oral copulation, lewd or lascivious acts, any crime punishable by death or life imprisonment, a felony involving the infliction of great bodily injury on someone who is not a co-conspirator, robbery, arson, and the like.

[148] See Cal. Penal Code § 29805. Specific misdemeanors include, generally, threatening a public or school official, witness intimidation, possession of a deadly weapon with intent to use it, and possession of a weapon in school.

[149] Includes the list of acts in Section B.4.(c) of this Appendix, except for the provision related to the use of tobacco products. In summary, that list includes: physical injury; possession of a firearm, knife or explosive; possession, sale or use of a controlled substance, alcohol or other intoxicant; sale of a controlled substance, alcohol or other intoxicant or a look-alike; robbery or extortion; damage to or theft of school or private property; obscene acts; possession or sale of drug paraphernalia; disruption of school activities; receiving stolen school or private property; possession of an imitation firearm; attempted or completed sexual assault or sexual battery; harassment, threats, or intimidation of a witness or complainant; sale of controlled substance Soma; hazing; bullying.

EXHIBIT 15 - 040

*Draft September 20, 2017*

create a hostile educational environment), and 48900.7 (terroristic threats against school property or officials).

Section 49079(b) states that a district official who provides this information to a teacher is not civilly or criminally liable for provide such information unless it is proven that the information was false and that the district or the official knew or should have known it was false or if the information was provided with a reckless disregard for its truth or falsity.
Section 49079(c) states that a district officer or employee who fails to provide this information is guilty of a misdemeanor, punishable by up to six months' imprisonment and/or a fine of up to one thousand dollars.

Section 49079(d) obligates the district to provide the above-referenced information about pupils related to the previous three school years.

Section 49079(e) states that teachers must keep the information in confidence and not further disseminate it.

### 4. California Code of Regulations: The Uniform Complaint Procedure – *Cal. Code Regs., tit. 5, §§ 4600-4671*

California's Uniform Complaint Procedures (UCP)[150] specifies when and how an individual, public agency or organization alleging a violation of federal or state education law can file a complaint to the California Department of Education (CDE). Under the UCP, the CDE processes appeals of local educational agency's (LEA) decisions on UCP complaints. In certain specified situations, the CDE may intervene directly and investigate the allegations in the complaint.[151]

The UCP's purpose is to "establish a uniform system of complaint processing for specified programs or activities that receive state or federal funding."[152] The UCP applies to many different types of complaints, but for purposes of this matter, the UCP applies to complaints alleging unlawful discrimination, harassment, intimidation or bullying against any person based on actual or perceived characteristics including disability, gender, gender identity, gender expression, nationality, race or ethnicity, religion or sexual orientation, in any program or activity conducted by a LEA that receives state financial assistance.

The UCP does *not* apply to the following types of complaints, all of which are to be referred to appropriate agencies for resolution:[153]

- Allegations of child abuse;
- Health and safety complaints regarding a Child Development Program;
- Employment discrimination complaints;

---

[150] The UCP is codified at Cal. Code of Regs., tit. 5, §§ 4600-4671.
[151] See the California Department of Education's "Uniform Complaint Procedure brochure" available at http://www.cde.ca.gov/re/cp/uc/ (last accessed Sep. 11, 2017).
[152] Cal. Code of Regs., tit. 5, § 4610.
[153] Cal. Code of Regs., tit. 5 § 4611.

41

EXHIBIT 15 - 041

*Draft September 20, 2017*

- Allegations of fraud.

Under the UCP, LEAs have certain enumerated responsibilities, including:[154]

- Ensure compliance with applicable federal and state laws and regulations;
- Adopt local UCP complaint policies and procedures consistent with the UCP;
- Designate a staff member to be responsible for receiving, investigating and resolving complaints and make sure the staff member is knowledgeable about the laws/programs he or she is assigned;
- Give the filing party an opportunity to present information and/or evidence relevant to the complaint;
- Protect complainants from retaliation;
- Resolve the complaint and complete a written report within 60 days of receipt of the complaint unless extended by written agreement of the complainant;[155]
- Issue a decision in writing, which should be in writing and sent to the complainant within 60 days of receipt of the complaint;[156] and
- Advise the complainant of the right to appeal the LEA's decision to the CDE within 15 calendar days of receiving the decision.

To file a complaint under the UCP, a complainant at the LEA-level:

- Must file a complaint within six months from the date of the alleged unlawful discrimination, harassment, intimidation, or bullying;[157]
- Must file a written complaint by following the steps described in the LEA's local UCP complaint procedures;[158] and
- Should participate in the investigation and provide the LEA investigator with information and other evidence related to the allegations in the complaint.[159]

To appeal to the CDE, a complainant:

---

[154] Cal. Code of Regs. tit. 5 §§ 4620-4622, 4640.

[155] Cal. Code of Regs, tit. 5 § 4631 states that the LEA "should issue a decision based on the evidence." It contains a list of things that the decision "should" include, including: 1) the findings of fact based on the evidence gathered, 2) conclusions of law, 3) the disposition of the complaint, 4) the rationale, 5) corrective actions, if any, 6) notice of the complainant's right to appeal, and 7) procedures for initiating an appeal to the CDE.

[156] Cal. Code of Regs., tit. 5 § 4632.

[157] Cal. Code of Regs., tit. 5, § 4630. Board Policy/Administrative Regulation 1312.3 does not incorporate a six month time limit.

[158] *Id.*

[159] Cal. Code of Regs, tit. 5 § 4631. This subsection notes that, "refusal by the complainant to provide the investigator with documents or other evidence related to the allegations in the complaint, or to otherwise fail or refuse to cooperate, may result in the dismissal of the complaint because of a lack of evidence to support the allegations."

EXHIBIT 15 - 042

*Draft September 20, 2017*

- Must file a written appeal to the CDE within 15 calendar days of receiving the LEA's decision if they believe the LEA's decision is incorrect;[160] and
- Must specify the basis for the appeal and whether the LEA's facts are incorrect and/or the law is misapplied. The appeal packet must contain a copy of the original complaint to the LEA and a copy of the LEA's decision.[161]

Sections 4632-4633 describe the CDE's process for resolving appeals of LEA decisions under the UCP.

Sections 4640-4650 describe the circumstances under which the CDE may investigate a complaint directly—i.e. without the matter first being filed through the LEA. In the ordinary course, if the CDE receives a UCP complaint that has not first been adjudicated at the LEA level, the CDE will send the complaint to the LEA and request that they investigate and adjudicate the complaint.[162] However, the CDE may directly intervene in a complaint under the following circumstances:[163]

- The complaint includes an allegation that an LEA failed to comply with the UCP;
- The complaint relates to an agency that is not covered by the UCP;
- The Complainant requests anonymity because they would be in danger of retaliation and would suffer immediate and irreparable harm if they filed a complaint with the LEA;
- The Complainant alleges that the LEA failed or refused to implement the final decision that resulted from the LEA's investigation or a mediation agreement;
- The Complainant alleges, and the CDE verifies that through no fault of the Complainant, no action has been taken by the LEA within 60 calendar days of the complaint;
- The Complainant alleges and the CDE verifies that the Complainant would suffer immediate and irreparable harm as a result of an application of district-wide policy that is in conflict with state or federal law covered by this chapter and that the filing of a complaint with the LEA would be futile; or
- The complaint relates to special education and other specified conditions have been fulfilled.[164]

Sections 4660-4665 describe the CDE's process for resolving complaints when the CDE intervenes directly.

Section 4670 specifies that, if an LEA is found in violation of the provisions of this chapter, the CDE may direct the LEA to take corrective action. If the LEA fails to do so, the CDE may use "any means authorized by law" to effect compliance, including but not limited to withholding state and federal funds, placing the LEA's eligibility for future state or federal support on probationary status or initiating court proceedings to compel compliance.

---

[160] Cal. Code of Regs., tit. 5 § 4632.
[161] *Id.*
[162] Cal. Code of Regs., tit. 5 § 4640.
[163] Cal. Code of Regs., tit. 5 § 4650.
[164] Cal. Code of Regs., tit. 5 § 4650(7).

43

EXHIBIT 15 - 043

5.      **Mandatory Child Abuse Reporting Laws –** *Cal. Penal Code § 11164 et seq.*

The "Child Abuse and Neglect Reporting Act" (CANRA) requires certain professionals, identified in the statute as "mandated reporters," to report known or suspected instances of child abuse or neglect to law enforcement.[165]

Under CANRA as it applies to the K-12 school setting, teachers, instructional or teacher's aides or assistants, classified school employees, certified pupil personnel employees, administrators, social workers, counselors, school police or security officers, psychiatrists, psychologists, licensed nurses, family therapists, drug and alcohol counselors, coaches, assistant coaches and athletic administrators.[166]

CANRA requires mandated reporters to make a report whenever, in their professional capacity or within the scope of their employment, they have knowledge of, or observe a child (defined as a person under 18) whom the mandated reporter knows or reasonably suspects has been the victim of child abuse or neglect. "Reasonable suspicion" occurs when it is objectively reasonable for a person, based upon facts that could cause a reasonable person in a similar position, to suspect child abuse or neglect. Mandated reporters must make two reports: first, the mandated reporter must report by telephone immediately. Then, within 36 hours, the mandated reporter must file a written report.[167]

CANRA requires mandated reporters to report the following types of child abuse and neglect:

- Sexual abuse, including sexual assault[168] and sexual exploitation;[169]
- Neglect;[170]
- Physical abuse, including the willful harming or injuring of a child or the endangering of the person or health of a child, unlawful corporal punishment or injury, or non-accidental physical injury;[171]
- Emotional maltreatment;[172]

---

[165] Cal. Penal Code § 11165.9.

[166] Cal. Penal Code § 11165.7

[167] Cal. Penal Code § 11166.

[168] See Cal. Penal Code § 11165.1, defining "sexual assault" as conduct in violation of Cal. Penal Code §§ 261 (rape), 261.6(d) (statutory rape), 264.1 (rape in concern), 285 (incest), 286 (sodomy), 288 (lewd or lascivious acts upon a child), 288a (oral copulation), 289 (sexual penetration) or 647.6 (child molestation).

[169] See. Cal. Penal Code § 11165.1, defining "sexual exploitation" as conduct involving matter depicting a minor (under 18) engaged in obscene acts in violation of Ca. Penal Code § 311.2 (preparing, selling or distributing obscene matter) or 311.4(a) (employment of a minor to perform obscene acts).

[170] See Cal. Penal Code § 11165.2, defining "neglect" as acts or omissions constituting negligent treatment or maltreatment of a child by a person responsible for the child's welfare under circumstances indicating harm or threatened harm to the child's health or welfare.

[171] See Cal. Penal Code §§ 11165.3-11165.4.

[172] See Cal. Penal Code § 11166.05, defining the suffering of or risk for "serious emotional damage" as being evidenced by "severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others."

EXHIBIT 15 - 044

*Draft September 20, 2017*

- Abuse or neglect in out-of-home care.[173]

Under CANRA, the identity of a person reporting child abuse or neglect is kept confidential except that it is shared among agencies and people tasked with receiving and investigating such reports.[174]

CANRA provides for civil and criminal immunity for mandated reporters who report known or suspected child abuse or neglect.[175] CANRA also provides for penalties that apply to mandated reporters who fail to report.[176]

### 6. California Penal Code[177]

#### a) Sexual Battery – *Cal. Penal Code § 243.4*

Under the California Penal Code, a person is guilty of "misdemeanor sexual battery" if they touch the intimate part of a person against the will of the person touched and the touching is for the purpose of sexual arousal, sexual gratification or sexual abuse.[178]

Similarly, a person is guilty of "sexual battery" if they touch the intimate part of a person while unlawfully restraining them, or if they cause the restrained person to masturbate or touch an intimate part of the accused or a third person, if the touching is for the purpose of sexual arousal, sexual gratification or sexual abuse.[179]

#### b) Rape – *Cal. Penal Code § 261*

Under the Penal Code, the crime of "rape" has the following elements:[180]

- An act of sexual intercourse[181] accomplished with a person not the spouse of the perpetrator, under any of the following circumstances:

---

[173] Cal. Penal Code § 11165.5.
[174] Cal. Penal Code § 11167.
[175] Cal. Penal Code § 11172.
[176] Cal. Penal Code § 11166 (misdemeanor conviction punishable by up to six months imprisonment or a fine of $1000 or both; it is a continuing offense to intentionally conceal one's failure to report known abuse or severe neglect).
[177] Under California law, a person who commits any of the below-referenced acts, except for sexual battery, against someone who is 14 or younger and at a time when the perpetrator is more than seven years older than the victim also commits the crime of "Aggravated Sexual Assault of a Child." Cal. Penal Code § 269. Because the facts in this matter do not raise a potential violation of this law, it is not discussed here. Similarly, a person over 18 who engages in sexual intercourse, Sodomy, Oral Copulation, or sexual penetration with a child who is 10 or younger commits the crime of "Sexual Intercourse/Sodomy/Oral Copulation/Sexual Penetration with a Child." Cal. Penal Code § 288.7. Because the facts do not raise a potential violation of this law, it is not discussed here.
[178] Cal. Penal Code § 243.4(e).
[179] Cal. Penal Code § 243.4(c)-(d).
[180] Cal. Penal Code § 261.
[181] Cal. Penal Code § 263 states that "sexual intercourse" consists of "any sexual penetration, however slight;" the California Model Jury Instructions contain the same statement. Under California law, a person cannot consent to sexual intercourse if they are under the age of 18. Cal. Penal Code § 261.5.

EXHIBIT 15 - 045

*Draft September 20, 2017*

- o Where a person is incapable, because of a mental disorder or developmental or physical disability, of giving legal consent, and this is known or reasonably should be known to the person committing the act;
- o Where it is accomplished against a person's will using force, violence, duress, menace or fear of immediate and unlawful bodily injury;
- o Where a person is prevented from resisting by any intoxicating or anesthetic substance or controlled substance and this condition is known or reasonably should be known to the person committing the act;
- o Where the person is at the time unconscious of the nature of the act, and this is known to the accused;
- o Where a person submits under the belief that the person committing the act is someone known to the victim other than the accused and this belief is intentionally induced by the accused;
- o Where the act is accomplished against the victim's will by threatening to retaliate in the future against the victim or another person and there is a reasonable possibility that the perpetrator will execute the threat;
- o Where the act is accomplished against the victim's will by threatening to use authority to incarcerate, arrest or deport the victim or another person and the victim has a reasonable belief that the perpetrator is a public official.

### c)  Unlawful Sexual Intercourse – *Cal. Penal Code § 261.5*

Under the Penal Code, the crime of "unlawful sexual intercourse" is defined as "an act of sexual intercourse accomplished with a person who is not the spouse of the perpetrator, if the person is a minor [under the age of 18 years]."[182]  Under section (b), "[a]ny person who engages in an act of unlawful sexual intercourse with a minor who is not more than three years older or three years younger than the perpetrator, is guilty of a misdemeanor."[183]  Under section (c) "[a]ny person who engages in an act of unlawful sexual intercourse with a minor who is more than three years younger than the perpetrator is guilty of either a misdemeanor or a felony."[184]  Under section (d), "[a]ny person 21 years of age or older who engages in an act of unlawful sexual intercourse with a minor who is under 16 years of age is guilty of either a misdemeanor or a felony."  Mandatory minimum terms of imprisonment apply under sections (c) and (d).

### d)  Sodomy – *Cal. Penal Code § 286*

Under the Penal Code, the crime of "sodomy" is defined as "sexual conduct consisting of contact between the penis of one person and the anus of another person."[185]  Mandatory minimum terms of imprisonment for sodomy apply in various circumstances (related to relating to lack of consent, the age of the parties, or other special circumstances), all of which are listed in the Penal Code.[186]

---

[182] Cal. Penal Code § 261.5.
[183] Cal. Penal Code § 261.5 (b).
[184] Cal. Penal Code § 261.5 (c).
[185] Cal. Penal Code § 286.
[186] Cal. Penal Code § 286 (b)-(k).  See also Cal. Penal Code § 289.

EXHIBIT 15 - 046

*Draft September 20, 2017*

### e)    Lewd or Lascivious Acts – *Cal. Penal Code § 288*

Under the Penal Code, "lewd and lascivious acts" are willful acts upon or with the body upon a child who is under 14 with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child.[187]  A conviction carries a mandatory minimum term of imprisonment, which is enhanced if the act is completed by use of force, violence, duress or fear or if the person committing the act is a caretaker and the child acted upon is in their care.

### f)    Harmful Matter Sent to Minors  – *Cal. Penal Code § 288.2*

The Penal Code prohibits the sending of "harmful matter" to minors.[188]  The crime has the following elements:

- Knowingly distributing to a minor any "harmful matter;"[189]
- With the intent of arousing, appealing to or gratifying the lust, passions or sexual desires of that person or the minor; and
- With the intent to or for the purposes of engaging in sexual intercourse, sodomy or oral copulation with the other person, or with the intent that either person touches an intimate body part of the other.

### g)    Oral Copulation – *Cal. Penal Code § 288a*

Under the Penal Code, the crime of "oral copulation" is defined as "the act of copulating the mouth of one person with the sexual organ or anus of another person."[190]  Non-consent and force are not elements of the crime.

Mandatory minimum terms of imprisonment for oral copulation apply in various circumstances, all of which are listed in the Penal Code.[191]

### h)    Forcible Sexual Penetration – *Cal. Penal Code § 289*

Under the Penal Code, a person commits a crime if they commit an act of sexual penetration[192] against the victim's will under any of the following circumstances:[193]

---

[187] Cal. Penal Code § 288.
[188] Cal. Penal Code § 288.2.
[189] This term refers to the definition set forth in Cal. Penal Code § 313, which defines "harmful matter" as "matter, taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest, and is matter which, taken as a whole, depicts or describes in a patently offensive way sexual conduct and which, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors."
[190] Cal. Penal Code § 288a.
[191] *Id.*  See also Cal. Penal Code § 289.
[192] Sexual penetration is defined as "penetration, however slight, of the genital or anal opening of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object."  Cal. Penal Code § 289(k)(1).
[193] Cal. Penal Code § 289.

EXHIBIT 15 - 047

- o Where it is accomplished against a person's will using force, violence, duress, menace, or fear of immediate and unlawful bodily injury;
- o Where a person is incapable, because of a mental disorder or developmental or physical disability, of giving legal consent and this is known or reasonably should be known to the person committing the act;
- o Where a person is prevented from resisting by any intoxicating or anesthetic substance or controlled substance and this condition is known or reasonably should be known to the person committing the act;
- o Where the person is at the time unconscious of the nature of the act, and this is known to the accused;
- o Where a person submits under the belief that the person committing the act is someone known to the victim other than the accused and this belief is intentionally induced by the accused;
- o Where the act is accomplished against the victim's will by threatening to retaliate in the future against the victim or another person and there is a reasonable possibility that the perpetrator will execute the threat;
- o Where the act is accomplished against the victim's will by threatening to use authority to incarcerate, arrest, or deport the victim or another person and the victim has a reasonable belief that the perpetrator is a public official.

### 5. Welfare and Institutions Code: Inspection of Juvenile Court Records – *Cal. Welfare & Inst. Code § 827*

Under the California Welfare and Institutions Code, juvenile case files may only be inspected by:[194]

- Court personnel;
- The district attorney, city attorney or prosecutor authorized to prosecute criminal or juvenile cases;
- The minor who is the subject of the proceeding;
- The minor's parents or guardian;
- The attorneys for the parties, judges, referees or other hearing officers, probation officers and law enforcement officers who are actively participating in criminal or juvenile proceedings involving the minor;
- The county or city attorney or other attorneys representing the petitioning agency in a dependency action;
- The superintendent or designee of the school district where the minor is attending or enrolled in school;
- Members of the applicable child protective services agency;
- The State Department of Social Services;

---

[194] Cal. Welfare & Inst. Code § 827.

EXHIBIT 15 - 048

*Draft September 20, 2017*

- Authorized legal staff or special investigators who are authorized representatives of the Department of State, as necessary to perform their duties;
- Members of children's multidisciplinary teams, persons or agencies providing treatment or supervision of the minor;
- A judge, commissioner, or other hearing officer assigned to a family law case involving the minor;
- A statutorily-authorized or court-appointed investigator acting within the scope of their duties and conducting an investigation pursuant to the Family Code or who is participating in guardianship proceedings involving the minor;
- A local child support agency for the purpose of establishing paternity or enforcing child support orders;
- Juvenile justice commissioners; or
- Any other person designated by the court upon the filing of a petition.

Prior to the release of a juvenile case file, the court must afford due process, including notice and an opportunity to file an objection. All interested parties must have the opportunity to object to the release of the juvenile case file.[195]

Notwithstanding the general proscription against releasing juvenile court files, records indicating that a minor enrolled in a public school has been found to have committed any felony or any misdemeanor involving curfew, gambling, alcohol, drugs, tobacco products, carrying weapons, a specified sex offense,[196] assault or battery, larceny, vandalism or graffiti, must be released in writing from the court to the district superintendent within seven days. The superintendent must then relay the information to the school principal who will disseminate the information to teachers or administrators who directly supervise or report on the behavior of the minor in question.[197]

### D.     PAUSD Board Policies (BP) and Administrative Regulations (AR)

#### 1.     Nondiscrimination in District Programs and Activities – *BP 0410*

PAUSD Board Policy 0410 prohibits discrimination based on gender, sex, race, color, religion, ancestry, national origin, ethnic group identification, age, marital or parental status, physical or mental disability, sexual orientation, gender identity or expression, genetic information, the perception of one or more such characteristics or the association with a person or group with one or more of these actual or perceived characteristics.

Board Policy 0410 mandates the following:

---

[195] *Id.*

[196] Cal. Welfare & Inst. Code § 827 references Cal. Penal Code § 290, which lists the sex offenses requiring registration and encompasses, generally, rape, sodomy, lewd or lascivious acts, oral copulation, forcible penetration, and related acts.

[197] Cal. Welfare & Inst. Code § 827(b)(2). Additional details about the confidentiality of the information and the consequences for breaching that confidentiality are detailed at § 827(b)(2)(A) through (C).

EXHIBIT 15 - 049

*Draft September 20, 2017*

- Annually, the Superintendent[198] or their designee must review district programs and activities to ensure the removal of any barrier that may unlawfully prevent an individual or group in any protected category from accessing district programs, activities or facilities.  The Superintendent must take prompt, reasonable actions to remove any identified barrier.  The Superintendent or their designee must report their findings and recommendations to the PAUSD Board after each review;
- The Superintendent or their designee must notify students, parents/guardians, employees, employee organizations, applicants for admission and employment and sources of referral for applicants about the PAUSD nondiscrimination policies and related complaint procedures in each announcement, bulletin, catalog, handbook, application form or other distributed material;[199]
- PAUSD must publish its nondiscrimination policy and related materials in a format that parents/guardians can understand.  When 15 percent or more of the district's students speak a single primary language other than English, the materials must be translated into that other language.

### 2.    Complaints Concerning District Employees – *BP/AR 1312.1*

PAUSD Board Policy 1312.1 specifies that the PAUSD Board "accepts responsibility for providing a means by which the public can hold employees accountable for their actions."  The Board Policy specifies that the Board prohibits retaliation against complainants and states that "the Superintendent or [their] designee at may keep a complainant's identity confidential except to the extent necessary to investigate the complaint."  The Board Policy further states, "the district will not investigate anonymous complaints unless it so desires."

Administrative Regulation 1312.1 states:

- Annually, PAUSD must notify its students, employees, parents/guardians, district advisory committee, school advisory committees and other interested parties of its complaint procedures including the opportunity to appeal to the California Department of Education.  The notice summarizing the complaint procedures will be prepared by district administration and published in secondary student handbooks, staff handbooks, and the annual notice of parent/guardian rights, and will be provided to members of school site councils;
- Any written and signed statement will constitute a complaint and will be processed in accordance with the policy if it alleges a violation of federal [or] state laws or regulations or unlawful discrimination on the basis of actual or perceived sex, ethnic group identification, race, national origin, religion, mental or physical disability, sexual orientation, gender identity, gender expression, or association with a group or person with one or more of these actual or perceived characteristics;
- An investigation and written report must be completed within 60 calendar days unless the complainant agrees to extend the deadline;
- Alternative means of resolution are allowed and encouraged;

---

[198] When used in the PAUSD BP/AR context, "Superintendent" refers to the PAUSD Superintendent as opposed to the State Superintendent of Public Instruction.  The current PAUSD Superintendent is Glenn "Max" McGee, Ph.D.
[199] This requirement is consistent with 34 CFR §§ 104.8 and 106.9.

EXHIBIT 15 - 050

*Draft September 20, 2017*

- The complainant may bypass the PAUSD's process and file their complaint directly with the California Department of Education, or the complainant may appeal PAUSD's decision to the California Department of Education if they are dissatisfied with the result;
- The complaint process does not prevent complainants from attempting to address issues "informally" – i.e. by raising concerns directly with the employee(s) in question or with their immediate supervisor.  Complainants are encouraged to raise their concerns directly with the involved personnel, if they wish.  If they do so, they should meet with the employee to try to resolve the identified issue.  Complainants are also encouraged to meet with the employee's supervisor to try to resolve the identified issue;
- If informal attempts at resolution are unsuccessful, complainants may make a "formal" report by putting their concern in writing and directing it to the employee's immediate supervisor and the principal/instructional supervisor.  The immediate supervisor will review the complaint with the employee and attempt to resolve it.  If the complaint is not in writing, PAUSD will be "unable to take formal action;"
- Within 10 working days, the employee's supervisor will respond in writing to the person filing the complaint. The response will also go to the employee(s) and, at the secondary level, the principal.  The response will propose a resolution;
- If the proposed resolution is unsatisfactory, the complainant may request in writing that the matter be forwarded to the Superintendent's designee who must respond within 10 working days;
- If the designee's proposed resolution is unsatisfactory, the complainant may request in writing that the matter be forwarded to the Superintendent who must respond within 20 working days;
- Appeals of the Superintendent's decision may be made to the PAUSD Board.

### 3.     Uniform Complaint Procedures (UCP) – *BP/AR 1312.3*

PAUSD Board Policy 1312.3 recognizes that PAUSD "has the primary responsibility to ensure compliance with applicable state and federal laws and regulations governing educational programs."  The Board Policy and Administrative Regulations specify that the UCP will be used to investigate and resolve the following complaints:

1. Any complaint alleging that the PAUSD violated a state or federal law or regulation governing adult education programs, consolidated categorical aid programs, migrant education, technical education and training programs, child care and development programs, child nutrition programs and special education programs;
2. Any complaint alleging the occurrence of unlawful discrimination (including discriminatory harassment, intimidating or bullying) against any person in district programs or activities based on actual or perceived characteristics of race, ethnicity, color, ancestry, nationality, national origin, ethnic group identification, age, religion, marital or parental status, physical or mental disability, sex, sexual orientation, gender, gender identity, gender expression, genetic information or any other protected characteristic or based on association with a person or group with one or more of the perceived or actual characteristics;
3. Any complaint alleging PAUSD noncompliance with the requirements regarding lactating/breastfeeding students; fees, deposits or charges for participating in educational

51

EXHIBIT 15 - 051

*Draft September 20, 2017*

activities; school transfer credits, graduation requirements or other issues related to foster youth; transfer credits or other issues related to homeless students; course repeats; or physical education requirements;

4. Any complaint alleging retaliation against a complainant or other participant in the complaint process; and

5. Any other complaint as specified in PAUSD policy.

Board Policy 1312.3 prohibits "any form of retaliation against any individual who has filed or participated in the UCP." The Board Policy specifies that participating in the complaint process "shall not in any way affect the status, grades, or work assignments" of the complainant. The Board Policy further provides, "[i]n investigating complaints, the confidentiality of the parties involved shall be protected as required by law." The Board Policy directs the PAUSD Superintendent or their designee to keep the identity of the complainant or reporting party alleging unlawful discrimination or retaliation confidential, "as long as the integrity of the complaint process is maintained."

Board Policy 1312.3 requires the following:

- The Superintendent or designee must provide training to district staff to ensure awareness and knowledge of current law and related requirements, including the steps and timelines specified in BP/AR 1312.3;

- The Superintendent or designee must maintain records of all UCP complaints and investigations and must destroy those records "in accordance with applicable state law and district policy;"

- The following complaints should *not* be subject to the UCP and should be referred to the specified agency:
  - Any complaint alleging child abuse or neglect must be referred to the County Department of Social Services, the County Protective Services Division, and the appropriate law enforcement agency;
  - Any complaint alleging health and safety violations in a licensed child development program must be referred to the appropriate Child Development regional administrator;
  - Any complaint alleging employment discrimination must be sent to the California Department of Fair Employment and Housing and the compliance officer must notify the complainant by first class mail of the transfer;
  - Any complaint alleging fraud must be referred to the California Department of Education;
  - Any complaint related to the sufficiency of textbooks or other instructional materials, emergency or urgent facilities or conditions that threaten the health or safety of students or staff or teacher vacancies or misassignments must be reported and processed in accordance with PAUSD's Williams Uniform Complaint Procedures (AR 1312.4).

Administrative Regulation 1312.3 identifies the compliance officer who "shall receive and investigate complaints" as "Associate Superintendent – Educational Services." The Administrative Regulation states that the Superintendent or designee will ensure that the

EXHIBIT 15 - 052

*Draft September 20, 2017*

compliance officer and other designated investigators "receive training and are knowledgeable about the laws and programs for which they are responsible."  Further, the "compliance officer shall receive and investigate complaints and shall ensure district compliance."

Administrative Regulation 1312.3 requires:

- Annual "written/online" notification by the Superintendent or designee of PAUSD's UCP to students, employees, parents/guardians, the district advisory committee, school advisory committees and other interested parties;
- Posting of BP/AR 1312.3 in all district schools and offices including staff lounges and student government meeting rooms;
- If 15 percent or more of students enrolled in a particular school speak a primary language other than English, the policy and procedures and all related forms and notices concerning the UCP must be translated into that language;
- The notice must:
    - Identify the person(s), position(s) or unit(s) responsible for receiving complaints;
    - Explain any civil law remedies that may be available to a victim of discrimination under state or federal discrimination laws;
    - Describe the appeals process including, if applicable, a complainant's right to take the complaint directly to the California Department of Education[200] or to pursue remedies before civil courts or other public agencies;[201]
    - Include statements that:
        - PAUSD has primary responsibility to ensure compliance with applicable state and federal laws and regulations governing educational programs;
        - The complaint review must be completed within 60 calendar days from the date of receipt of the complaint unless the complainant agrees in writing to an extension;
        - A complaint alleging unlawful discrimination must be filed no later than six months form the date it occurred or six months from the date the complainant first obtained knowledge of the facts;
        - A complainant has a right to appeal PAUSD's decision to the California Department of Education by filing a written appeal within 15 days of receiving the district's decision;
        - The appeal to the California Department of Education must include a copy of the complaint filed with PAUSD and a copy of the district's decision; and
        - Copies of the district's UCP procedures are available free of charge.

Under Administrative Regulation 1312.3, complaints alleging unlawful discrimination, including discriminatory harassment, intimidation and/or bullying shall be investigated using the district's UCP regardless of whether the alleged harassment occurred on or off campus.  Further, the UCP states that when the conduct is reported to have occurred against an individual off campus, the District Compliance Officer (Title IX Coordinator) shall investigate and document the activity

---

[200] AR 1312.3 describes how to file an appeal to the California Department of Education.
[201] AR 1312.3 describes other civil remedies available and provides a link to and information about filing a complaint with OCR.

EXHIBIT 15 - 053

*Draft September 20, 2017*

and shall identify specific facts and circumstances that explain the impact or potential impact on school activity, school attendance, or the subject of the complainant's educational performance.

AR 1312.3 details the following procedural steps in resolving a UCP:

- Any student, parent/guardian, third party, or other person or organization who believes that they or another student or group has been subjected to unlawful discrimination on or off campus may 1) report the conduct orally to any school employee or administrator, and/or 2) file a written complaint under these procedures:
  - Oral reports:
    - A staff member who receives an oral report alleging discrimination, harassment, intimidation or bullying must notify the principal or site designee within one day of receiving the report;
    - The principal/designee who receives such a report must inform the person who made the initial oral report of the resolution options available under the UCP, including the right to file a written complaint;
    - If the reporting student wishes to file a written complaint but is unable, staff must assist them in the filing of the complaint.
  - Written complaints:
    - Within two days of receiving a written complaint, the receiving administrator must send it to the District Compliance Officer.
- After a report or complaint is made, the principal, designee or Compliance Officer must determine whether interim measures are necessary to stop, prevent or address the effects of discrimination, including intimidation, harassment or bullying;
- After a report or complaint is made, the principal, designee or Compliance Officer may engage in informal efforts to resolve the complaint;
- If the matter is *not* going to be resolved informally, the Compliance Officer will initiate an impartial investigation within five school days of receiving a formal complaint. The five-day time period may be extended if informal resolution is undertaken, but in all cases investigation must begin within ten days of receipt of the complaint unless the Compliance Officer has confirmed that the complaint has been resolved informally to the satisfaction of the Complainant[202] and their parent/guardian;
- The Compliance Officer must describe the complaint procedure to the Complainant and their parent/guardian, discuss what actions are being sought in response to the complaint, provide the Complainant with an opportunity to describe the incident, identify witnesses, and provide other evidence and information, and keep the information about the complaint confidential except as necessary to carry out the investigation or take other subsequent necessary action;

---

[202] Note that in the AR, PAUSD uses the phrase "subject of the complaint" to refer to the Complainant and uses "person accused of unlawful discrimination" to refer to the Respondent.  For brevity, this summary uses "Complainant" and "Respondent."

EXHIBIT 15 - 054

*Draft September 20, 2017*

- The Compliance Officer must interview individuals who have relevant information including the Respondent, witnesses and anyone mentioned as having relevant information;
- The Compliance Officer must review any records, notes or statements related to the complaint;
- The Compliance Officer must document their information gathering and maintain that documentation for at least two years;
- Within 60 calendar days of receiving the complaint, the Compliance Officer must conclude the investigation and prepare a written report of their findings that contains:
  - The findings of fact based on evidence gathered;
  - As to each allegation, the District's conclusion as to whether unlawful discrimination has occurred;
  - Rationale for such conclusion(s);
  - Corrective actions, if applicable;
  - Notice that the Complainant and their parent/guardian should immediately report the reoccurrence of the conduct or retaliation to the Compliance Officer, principal or designee;
  - Notice of the Complainant's right to appeal within 15 days to the CDE and the procedures for initiating an appeal; and
- The district's decision shall be in writing and sent to the complainant.

In addition to outlining the procedural steps in the UCP, Administrative Regulation 1312.3 addresses 1) remedial actions that may result from a report or complaint[203] and 2) disciplinary actions that may result from a finding that the Respondent engaged in discriminatory conduct.[204] Administrative Regulation 1312.3 also prohibits knowingly filing false complaints of discrimination and provides for possible outcomes if a person is found to have engaged in such conduct.

### 12.    Conduct – *BP 5131*

PAUSD Board Policy 5131 states that PAUSD "believes that all students have the right to be educated in a positive learning environment free from disruptions" and that "students should be expected to exhibit appropriate conduct that does not infringe upon the rights of others or interfere with the school program" while on school grounds, going to or from school, while at school activities, while using school transportation or off-campus during non-school hours if such conduct poses a threat or danger to the safety of students, staff or district property or substantially disrupts school.

---

[203] Remedial actions include interventions for the Respondent such as parental notification, counseling, training, or discipline, and interventions for the Complainant such as counseling and academic support. Remedial actions also include separating the Complainant and Respondent (as long as such separation does not penalize the Complainant), following up to ensure that the discriminatory conduct has stopped, training, and other interventions for the larger school community to ensure that all community members understand the types of behavior that constitute discrimination.

[204] Disciplinary actions include warnings, mandatory training, counseling, suspension, transfer, and expulsion. Suspension and recommendations for expulsion must follow applicable law.

EXHIBIT 15 - 055

*Draft September 20, 2017*

Board Policy 5131 requires the Superintendent or designee to ensure that each school 1) develops standards of conduct and discipline consistent with board policies and administrative regulations and 2) notifies students and parents/guardians about the district and school rules related to conduct.

Board Policy 5131 states that prohibited student conduct includes, but is not limited to:

- Conduct that endangers students, staff, or others, including but not limited to, physical violence, possession of a weapon or terroristic threats;
- Conduct that disrupts the orderly classroom or school environment;
- Discrimination, harassment and/or intimidation of students or staff, including bullying, sexual harassment, hate-motivated behavior, cyberbullying, hazing or initiation activity, extortion or any other verbal, written or physical conduct that causes or threatens to cause violence, bodily harm or substantial disruption;
- Damage to or theft of property belonging to students,[205] staff or the district;
- Possession or use of a laser pointer, unless for a valid school-related purpose;
- Obscene acts or use of profane, vulgar or abusive language;
- Plagiarism or dishonesty on schoolwork or tests;
- Inappropriate attire;
- Tardiness or unexcused absence from school;
- Failure to remain on school premises in accordance with school rules;
- Possession, use, or being under the influence of tobacco, alcohol or other prohibited drugs; and
- Use of a cell phone during instructional time.

BP 5131 requires employees to provide appropriate supervision to enforce standards of conduct and to immediately intervene or call for assistance if they observe or receive a report of a violation of the standards. BP 5131 grants school officials the right to search students and their belongings, consistent with BP/AR 5145.12, if they "suspect that [such a search] will turn up evidence of the student's violation of the law or school rules."

Under BP 5131, a student who violates school rules or regulations may be subject to discipline in the forms of suspension, expulsion, transfer to alternative programs, referral to a student success team or counseling services, denial of participation in extracurricular or co-curricular activities or other privileges or other measures as appropriate.

### 13.    Bullying Prevention – *BP/AR 5131.2*

BP/AR 5131.2 prohibits bullying, defined consistent with California law as "any severe or pervasive physical or verbal act or conduct, including communications made in writing or by means of electronic act, and including one or more acts committed by a pupil or group of pupils that constitutes sex harassment, hate violence or creates an intimidating or hostile educational

---

[205] BP 5131 states that PAUSD is not responsible for students' personal belongings brought onto campus or to a school activity and are lost, stolen or damaged.

EXHIBIT 15 - 056

environment directed at one or more pupils that has or can be reasonably predicted to have the effect of one or more of the following:[206]

1. Placing a reasonable pupil or pupils in fear of harm to that pupil's or those pupils' person or property;
2. Causing a reasonable pupil to experience a substantially detrimental effect on his or her physical or mental health;
3. Causing a reasonable pupil to experience a substantial interference with his or her academic performance; or
4. Causing a reasonable pupil to experience a substantial interference with his or her ability to participate in or benefit from the services, activities or privileges provided by a school."

BP 5132.2 specifically addresses "cyberbullying," defined as the transmission of harassing communications, direct threats or other harmful texts, sounds or images or breaking into another person's electronic account and assuming that person's identity to cause harm to that person's reputation.[207]  BP 5132.2 also prohibits "sexting" with a minor (i.e. sending a message to a minor where the message contains matter that is sexual in nature with the intent of seducing the minor).[208]

BP 5132.2 requires school staff who witness bullying to immediately intervene when it is safe to do so.  The Board Policy also states that, "when appropriate," the Superintendent or designee must notify the parents/guardians of alleged bullying "targets" and "aggressors."  The Superintendent may also involve school counselors, mental health counselors and/or law enforcement.

BP 5132.2 specifies that complaints alleging bullying based on a protected characteristic (see list in BP 0410) will be addressed under BP/AR 1312.3 (UCP) while complaints of bullying based on a non-protected status (i.e. weight) will be addressed under separate procedures at AR 5132.2.

Under BP 5132.2, students who are found to be engaged in bullying on school premises or off-campus in a manner that causes or is likely to cause a substantial disruption of a school activity or school attendance will be subject to discipline, which may include suspension or expulsion.

BP 5132.2 prohibits retaliation against a student who reports or participates in an investigation regarding bullying.  BP 5132.2 also prohibits knowingly making a false complaint or statement regarding bullying.

---

[206] Defined consistent with Cal. Ed. Code 48900(r), discussed above.

[207] BP 5131.2 also prohibits conduct in violation of Cal. Penal Code §§ 653.2, which makes it a crime for a person to distribute personal identity information electronically with the intent to cause harassment by a third party or to threaten a person's safety by posting personal information online (e.g. placing a person's picture or address online so that he receives harassing messages).

[208] BP 5131.2's prohibition against "sexting" with a minor refers to Cal. Penal Code § 288.2 which is discussed below.

EXHIBIT 15 - 057

*Draft September 20, 2017*

AR 5132.2 provides examples of conduct that may qualify as bullying.[209]  AR 5132.2 also specifies the complaint procedure that applies in cases of alleged bullying not having to do with a protected class.  AR 5132.2 details the following procedural steps in resolving such a complaint:

- At each school, the principal or designee is responsible for receiving oral or written complaints about bullying that are not based on a protected status;
- Any member of the school community who has credible information may report an act of bullying;
- A staff member who witnesses bullying or receives a complaint must report it to the principal or designee within one school day;
- The principal or designee must document all oral and written complaints of bullying and must maintain those records for two years;
- The principal or designee must provide that documentation to the Coordinator of Student Services for recordkeeping;
- After a report of bullying is made, the principal or designee must determine whether interim measures are necessary to stop, prevent or address the bullying behaviors;
- The principal or designee must investigate all allegations of bullying not based on a protected status; the investigation should begin as soon as possible upon receiving notification of a report or complaint and must be concluded within 15 school days of receiving the complaint;
- The principal or designee must provide immediate notification to the parent/guardian of both the alleged "target" and the alleged "aggressor;"
- The principal or designee may take any action necessary to protect the complainant, alleged target, other students or employees consistent with the requirements of applicable law and regulations;
- The alleged "target" and alleged "aggressor" may not be interviewed together;
- The name of the complainant may not be revealed during the investigation;
- At the conclusion of the investigation, the principal/designee must provide the complainant and the alleged aggressive with notice of the decision.  If either party disagrees, they may appeal within 15 calendar days to the Student Services Coordinator;
- A student who has been determined to be the "target" of bullying will be given priority and/or additional consideration for an inter-district transfer if that student's parent/guardian requests such a transfer.

AR 5131.2 provides factors to be used in reaching a decision about the complaint.  Those factors include:

- Statements made by the complainant, the individual accused and other people with knowledge about the allegations;
- The details and consistency of each person's account;
- Evidence of how the alleged target reacted to the alleged bullying event;
- Evidence of any past instances of bullying behaviors by the alleged aggressor and the type, frequency, and duration of those behaviors; and

---

[209] AR 5132.2 separates such behavior into 5 categories:  1) verbal, 2) nonverbal, 3) physical, 4) emotional/psychological, and 5) cyberbullying.  See AR 5132.2, p. 2.

EXHIBIT 15 - 058

*Draft September 20, 2017*

- The relationship between the alleged aggressor and the alleged target.

AR 5131.2 lists remedial and disciplinary actions that may be used, as appropriate, in response to a complaint about bullying.  Under AR 5131.2, students who are found to be engaged in bullying (which includes sexual harassment) on school premises or off-campus in a manner that causes or is likely to cause a substantial disruption of a school activity or school attendance will be subject to discipline, which may include suspension or expulsion.

### 14.     Child Abuse Prevention and Reporting – *BP/AR 5141.4*

Board Policy 5141.4 sets forth the Board's commitment to "supporting the safety and well-being of district students and desires to facilitate the prevention of and response to child abuse and neglect."  The operative definitions, procedures and obligations regarding child abuse and neglect are set forth in Administrative Regulation 5141.4.

AR 5141.4 requires mandated reporters to report child abuse or neglect.  As noted above, California law defines "mandated reporter" broadly and inclusively; in the context of a school setting, the term captures, among other individuals, teachers, instructional aides, teacher's assistants, classified employees, athletic coaches, directors and administrators.  Child abuse and neglect includes, when committed by anyone against a person under the age of 18: sexual abuse, including sexual assault or sexual exploitation; physical injury or death inflicted by other than accidental means; neglect; willful harming or injuring of a child; and unlawful corporal punishment.[210]  Sexual assault includes rape, statutory rape, rape in concert, incest, sodomy, lewd or lascivious acts upon a child, oral copulation, sexual penetration and child molestation.

A mandated reporter must report when, in their professional capacity or in the scope of their employment, they have knowledge of or observe a child who they know or reasonably suspect has been the victim of child abuse or neglect.  Reasonable suspicion is an objective reasonable person standard; the obligation does not require certainty.  A mandated reporter must immediately or as soon as practicable make an initial report to the appropriate agency or to law enforcement including any police department (except the school district's police department), the sheriff's department, the county probation department or the county welfare department.  Within 36 hours, the mandated reporter must prepare and send to the appropriate agency a written report, including a complete DOJ SS 8572 form; the information to be included in the report is specified in AR 5141.4.  Employees reporting child abuse or neglect are encouraged, but not required, to notify their principal of the report.  The principal, if notified, shall inform the district's superintendent.

Using the online training module provided by the California Department of Social Services, PAUSD employees who are mandated reporters are to be provided training within the first six weeks of each school year or initial hiring.  Proof of training completion is to be maintained by the district superintendent.

---

[210] Any mandated reporter who knows or reasonably suspects that a child is suffering serious emotional damage may make a report.

EXHIBIT 15 - 059

*Draft September 20, 2017*

BP 5141.4 specifies that, whenever the department of Social Services or other government agency is investigating suspected child abuse or neglect, the student may be interviewed by an agency representative during school hours on school premises.  The Superintendent or their designee must give the student the choice of being interviewed in private or in the presence of an adult school employee or aide selected by the student.  If school personnel accompanies the child during their interview, the principal or designee must inform that selected person of the items listed in BP 5141.4.

When a child is released to a peace officer and taken into custody as a victim of suspected child abuse or neglect, the Superintendent or designee may *not* notify the parent/guardian, but must give the peace officer the address and phone number of the child's parent/guardian.

Upon request, the Superintendent or designee must provide parents/guardians with the procedures for reporting suspected child abuse occurring at a school site.  For parents/guardians whose primary language is not English, the procedures must be in their primary language and an interpreter must be used when communicating orally.  The procedures for reporting a PAUSD employee or other person suspected of child abuse or neglect at a school site are identified in AR 5141.4.

AR 5141.4 requires the Superintendent or designee to provide all new employees who are mandated reporters with a statement that informs them of their status and their reporting obligations under Cal. Penal Code § 11166 and their confidentiality rights under Cal. Penal Code § 11167.  The new employee must sign a statement indicating that they have knowledge of the reporting obligations and stating that they will comply.  The Superintendent or designee must retain those signed statements.

The Superintendent or designee must also notify all employees about:

- Immunity from civil and criminal liability for making reports of known or suspected child abuse, except when it can be proven that the person made the report knowing it was false or with reckless disregard for the truth or falsity of the report;
- Civil and/or criminal penalties for failure to report as mandated; and
- Immunity from employment sanctions by PAUSD for making reports of known or suspected child abuse, except when it can be proven that the person made the report knowing it was false or with reckless disregard for the truth or falsity of the report.

### 15.    Discipline – *BP/AR 5144*

Board Policy 5144 states the Board's commitment to "providing a safe, supportive, and positive school environment which is conductive to student learning and to preparing students for responsible citizenship by fostering self-discipline and personal responsibility."  The operative definitions, procedures and obligations regarding discipline are found in Administrative Regulation 5144.

AR 5144 allows each school to establish "site-level" rules that are consistent with district policies and administrative regulations.  In developing site level rules under AR 5144, the

*Draft September 20, 2017*

principal or designee must solicit the participation, views and advice of one representative from each of the following groups:

- Parents/guardians;
- Teachers;
- School administrators;
- School security personnel, if any; and
- For middle or high schools, students.

AR 5144 states that "school rules shall be communicated to students clearly and in an age-appropriate manner." AR 5144 places responsibility for enforcing the school rules on "each employee of the school." AR 5144 contains a list of suggested "disciplinary strategies" for use in resolving alleged violations of school rules. The Administrative Regulation contains the following statement:

> *To the extent possible, staff shall use disciplinary strategies that keep students in school and participating in the instructional program. Except when a student's presence causes a danger to himself/herself or others or he/she commits a single act of a grave nature or an offense for which suspension or expulsion is required by law, suspension or expulsion shall be used only when other means of correction have failed to bring about proper conduct.*

AR 5144 contains specific information about restricting a student's recess time, after-school detention, community service and the prohibition against using corporal punishment.

AR 5144 requires the Superintendent or designee to notify parents/guardians, in writing, at the beginning of the school year or upon transfer into the district, of the availability of district rules about discipline.

### 16.    Suspension and Expulsion Due Process – *BP/AR 5144.1 and 5144.2*

Board Policy 5144.1 states "the grounds for suspension and expulsion and the procedures for considering, recommending and/or implementing suspension and expulsion shall be only those specified in law and the accompanying administrative regulation." Consistent with BP/AR 5144, BP 5144.1 limits the availability of suspension and expulsion to specified circumstances or instances in which other interventions have failed. BP 5144.1 contains specific information regarding removal from a class by a teacher, parental attendance and in-school suspension. BP 5144.1 requires the Superintendent or designee to maintain and monitor outcome disaggregated data related to particular subgroups of students.

The definitions, procedures and obligations regarding suspension and expulsion are found in Administrative Regulation 5144.1 (related to all students) and Administrative Regulation 5144.2 (related to students with disabilities).

61

EXHIBIT 15 - 061

*Draft September 20, 2017*

AR 5144.1 defines "suspension" as the removal of a student from ongoing instruction for adjustment purposes and defines "expulsion" as the removal of the student from the immediate supervision and control or general supervision of school personnel.

AR 5144.1 requires school principals to notify all enrolled students and their parents/guardians in writing of all school rules related to discipline including suspension and expulsion.

Under AR 5144.1, acts for which a student—including a student with disabilities—may be suspended or expelled are limited to the enumerated categories of behavior.[211]

AR 5144.1 allows a teacher to remove a student from their class for the remainder of the day only for behaviors that provide grounds for suspension and expulsion. A teacher who removes a student from class must immediately report this action to the principal or designee and send the student to the principal or designee for appropriate action. As soon as possible after a student is removed from class, the teacher must ask the student's parent/guardian to attend a parent-teacher conference regarding the removal.

AR 5144.1 allows the Superintendent, principal or designee to immediately suspend a student found at school or at a school activity to be possessing a firearm, brandishing a knife, selling a controlled substance, committing or attempting to commit a sexual assault or committing a sexual battery, or possessing an explosive. AR 5144.1 also allows the Superintendent, principal or designee to suspend a student for one of the first five grounds for suspension or expulsion or if the student's presence causes a danger to persons. For all other offenses, a student may be suspended only when the Superintendent or principal determines that other means of correction have failed to bring about proper conduct in the student. AR 5144.1 provides maximum periods of time for suspensions (5 consecutive school days unless extended pending expulsion; a maximum of 20 school days in any school year unless transferred to or enrolled in another school, in which case the maximum number of days per year is 30).

AR 5144.1 allows the Board to suspend a student for any of the acts listed in Cal. Ed. Code §§ 48900 et seq., within the limits that apply to suspensions by the Superintendent, principal or designee. Under AR 5144.1, when the Board is considering a suspension, disciplinary action or any other action except expulsion against a student, it must hold a closed session if a public hearing would lead to disclosure of information violating a student's right to privacy under Cal. Ed. Code §§ 49073-49079. Before the Board may suspend a student, it must provide the student and their parent/guardian with written notice of the closed session by registered or certified mail or personal service. Upon receiving the notice, the student or parent/guardian may request a public meeting under AR 5144.1.

AR 5144.1 contains requirements for how "supervised suspension" (i.e. in-school suspension) must be administered.

Under AR 5144.1, suspensions must be imposed in accordance with the following procedures:

---

[211] These categories are the same as those discussed above in section B.4.(c), discussing Cal. Ed. Code §§ 48900 et seq.

EXHIBIT 15 - 062

*Draft September 20, 2017*

- o An informal conference[212] conducted by the Superintendent, principal or designee with the student and, whenever practicable, the teacher, supervisor or school employee who referred the student to the principal. At the conference, the student must be provided with the reason for the disciplinary action, presented with them evidence against them, and given the opportunity to present their version and evidence in support of their defense;
- o Administrative action (i.e. suspension is imposed);
- o Notice to Parents/Guardians at the time of the suspension;
- o Parent/Guardian conference as outlined in AR 5144.1;
- o Extension of suspension, if applicable, as specified in AR 5144.1.

Only the PAUSD Board may expel a student. The Board must expel a student found to have committed any of the offenses listed under "mandatory expulsion" in Cal. Ed. Code § 48915.[213] Other than the offenses listed as "mandatory," the Board must expel a student upon the recommendation of the Superintendent, principal or designee *only* if the Board makes a finding of either or both of the following:

1. That other means of correction are not feasible or have repeatedly failed to bring about proper conduct;
2. That due to the nature of the violation, the presence of the student causes a continuing danger to the physical safety of the student or others.

Under AR 5144.1, any student recommended for expulsion is entitled to a hearing to determine whether they should be expelled. The hearing must be held within 30 school days[214] after the Superintendent, principal or designee determines that the student has committed one of the enumerated acts that may result in suspension or expulsion. A student and their parent may also waive the hearing and stipulate to the expulsion in a written and signed stipulation agreement.

AR 5144.1 states that, in expulsion hearings involving allegations of sexual assault or sexual battery, the Superintendent or designee must give the Complainant a copy of the district's suspension and expulsion policy and provide the Complainant with the right to:

1. Receive five days' notice of their scheduled testimony at the hearing;
2. Have up to two adult support persons of their choosing at the hearing during their testimony;

---

[212] This step may be omitted if the Superintendent, principal or designee determines that an emergency exists involving a clear and present danger to the lives, safety or health of students or school personnel. If the suspension occurs without this conference, the parent/guardian and student must be notified of the student's right to return to school for the conference which shall be held within 2 school days unless the student waives their right or is physically unable to attend for any reason, in which case the conference will be held as soon as possible.

[213] Cal. Ed. Code § 48915 mandates expulsion for the following acts if they occur at school or at a school activity off school grounds: 1) possessing, selling or otherwise furnishing a firearm without permission, 2) brandishing a knife at another person, 3) unlawfully selling a specified controlled substance, 4) committing or attempting to commit a sexual assault or committing a sexual batter, and 5) possessing an explosive.

[214] A student may request, in writing, one postponement of an expulsion hearing for a period of not more than 30 calendar days. Any subsequent requests for postponement may be granted at the Board's discretion. The Board may also delay the expulsion hearing if it "finds it impractical during the regular school year to comply with the time requirements." The mechanics of a Board delay to an expulsion hearing are in AR 5144.1.

EXHIBIT 15 - 063

3.  Have a closed hearing during the time they testify.

Evidence of specific instances of prior conduct of a complainant are not admissible and cannot be heard unless the person conducting the hearing determines that extraordinary circumstances require the evidence to be heard.  Before such a determination is made, the complainant must be given notice and the opportunity to oppose the introduction of such information.  Additional information about complainants in sexual assault or sexual battery cases is included in AR 5144.1 (e.g. concerning maintaining separate break rooms for complainants, seating arrangements during the hearing, and the like).

AR 5144.1 mandates that written notice of the expulsion hearing must be forwarded to the student facing expulsion and their parent at least 10 calendar days before the hearing.  AR 5144.1 enumerates what must be in such a notice.

Under AR 5144.1, the Board must conduct the expulsion hearing in a closed session unless the student requests in writing at least five days in advance that the hearing be public and holding a public hearing would not violate another student's privacy rights.  AR 5144.1 outlines other considerations regarding whether the session should be open or closed and, when closed, who should be permitted to be present.  AR 5144.1 requires the board to make a record of the hearing. The Board may issue subpoenas for the personal appearance of witnesses, if appropriate and in accordance with the California Code of Civil Procedure §§ 1985-1985.2.  At an expulsion hearing, the proceedings are not subject to the technical rules of evidence, but relevant evidence may be admitted and used as proof "only if it is the kind of evidence on which reasonable persons can rely in the conduct of serious affairs."  The decision of the Board to expel must be supported by "substantial evidence that the student committed the acts alleged" and that the acts otherwise qualify for expulsion (i.e. that they are among the acts enumerated in Cal. Ed. Code § 48900).  The Board's decision on whether to expel a student must be made within 40 school days after the student is removed from their school.

AR 5144.1 provides for an alternative expulsion hearing to be conducted by a county or state hearing officer or other impartial administrative panel of three or more certified personnel. Hearings conducted by other officials must follow the same procedures as hearings by the Board.

Whether the expulsion hearing is conducted in closed or public session by the Board, a hearing officer or an administrative panel, the final action to expel must be taken by the Board at a public meeting.  If the Board decides not to expel, the decision is final and the student must be reinstated immediately.  If the Board decides to expel, it must set a date when the student is eligible to be reviewed for readmission.  AR 5144.1 contains specific information about timeframes for readmission in "mandatory" expulsion cases.  At the time of an expulsion, the Board must recommend a plan for the student's rehabilitation.  The Superintendent or designee must sent written notice of the decision to expel to the student or parent/guardian that includes:

1.  The specific offense committed;
2.  The fact that a description of readmission procedures will be made available to the student and their parent/guardian;
3.  Notice of the right to appeal to the County Board of Education within 30 days;

EXHIBIT 15 - 064

*Draft September 20, 2017*

4. Notice of the alternative educational placement to be provided during the time of expulsion; and
5. Notice of the student's or parent/guardian's obligation to inform any new district of the expulsion.

A Board may choose to suspend the enforcement of an expulsion order as described in AR 5144.1.

AR 5144.1 provides conditions that must be fulfilled in all cases of suspension or expulsion:

- Prior notice to law enforcement of any act that may violate Cal. Penal Code § 245 (related to assault with a deadly weapon);
- Within one school day after suspension or expulsion, notice to law enforcement of any act that may violate Cal. Ed. Code §§ 48900 (c) or (d) (related to controlled substances);
- Notice to law enforcement of any act that may involve the possession or sale of narcotics or controlled substances or the possession of a firearm or ammunition within a "school zone."[215]

The Board must refer expelled students to a program of study that is: 1) appropriately prepared to accommodate students with discipline problems; 2) not provided at a comprehensive middle, junior or senior high school or at any elementary school, less the program is offered at a community day school established at such a site; and 3) not housed at the school site attended by the student at the time of suspension.

AR 5144.1 provides the procedure for readmission after expulsion. AR 5144.1 specifies that no student may be denied readmission into the district based solely upon the student's arrest, adjudication by a juvenile court, formal or informal supervision by a probation officer, detention in a juvenile facility, enrollment in a juvenile school or other such contact with the juvenile justice system.

Under AR 5144.1, the District is required to maintain records of all suspensions and expulsions and to provide those records under circumstances specified in AR 5144.1.

AR 5144.2 outlines procedures that apply for students with disabilities pursuant to the Individuals with Disabilities Education Act (IDEA). Students who have not been identified as having a disability pursuant to IDEA and who have engaged in behavior that violates the district's code of student conduct may assert the protections under IDEA *only if* the district had knowledge that the student was disabled before the behavior that precipitated the disciplinary action. AR 5144.2 outlines how to evaluate whether the district had such knowledge.

Under AR 5144.2, students with disabilities are provided with additional protections in the suspension and expulsion processes, including, *inter alia*:

---

[215] "School Zone" is defined in the "Gun Free School Zone Act" at Cal. Penal Code §§ 626.9 or 626.10.

EXHIBIT 15 - 065

*Draft September 20, 2017*

- If a disabled student is to be suspended and the suspension would result in a change of placement as defined by 34 CFR § 300.536, the student's IEP[216] team must determine the appropriate educational services;
- If a disabled student engages in dangerous behavior (i.e. carrying or possessing a weapon, using or selling illegal drugs or causing serious bodily injury upon another person) the student may be immediately removed from school and placed in an interim alternative educational setting, but the setting must be determined by the student's IEP team and the student receives notice and certain procedural safeguards codified at 34 CFR § 300.504; and
- If a disabled student is suspended for more than 10 consecutive school days, the student is entitled to notice and a "manifestation determination" which examines the relationship between the student's disability and the behavior subject to the disciplinary action.

If a disabled student's parent/guardian disagrees with any decision regarding placement or the manifestation determination, they may request an appeal hearing.

Suspension and expulsion procedures for students with disabilities are the same as for all students. Upon readmission, a disabled student's IEP team will be convened.

Under AR 5144.2, prior to the suspension or expulsion of a disabled student, the principal or their designee must also send to law enforcement copies of the pupil's special education and disciplinary record, to the extent permitted by the Family Educational Rights and Privacy Act (FERPA) at 20 U.S.C. §§ 1232g et seq.

### 17.    Questioning and Apprehension by Law Enforcement – *BP/AR 5145.11*

Board Policy 5145.11 states that "law enforcement officers may interview and question students on school premises and may remove them when appropriate." BP 5145.11 permits law enforcement officers to interview students on campus, but states that the principal or designee must request the officer's identity, their official capacity and the legal authority under which the interview is to be conducted. The principal or designee must maintain a record of all documentation relative to law enforcement interviews of students. Except in cases of alleged child abuse or neglect, the principal or designee must attempt to notify the student's parent/guardian as soon as possible if the student is interviewed by law enforcement or removed from school into the custody of law enforcement.

### 18.    Nondiscrimination / Harassment – *BP/AR 5145.3*

Board Policy 5145.3 prohibits "at any district or school activity … unlawful discrimination, including harassment, intimidation and/or bullying of any student, based on actual or perceived characteristics of race or ethnicity, color, nationality, national origin, ethnic group identification, age, religion, physical or mental disability, sex, sexual orientation, gender, gender identity, gender expression or any other [protected] characteristic or based on association with a person or group with one or more of these actual or perceived characteristics."

---

[216] "IEP" stands for Individualized Education Program. It is a written plan developed through a team effort for each public school child who needs special education.

EXHIBIT 15 - 066

*Draft September 20, 2017*

Discrimination is defined by BP 5145.3 as "harassment, intimidation or bullying, consisting of physical, verbal, nonverbal or written conduct, based on one of the categories listed above, that is so severe or pervasive that it: affects a student's ability to participate in or benefit from an educational program or activity; creates an intimidating, threatening, hostile, or offensive educational environment; has the effect of substantially or unreasonably interfering with a student's academic performance; or otherwise adversely affects a student's educational opportunities." For incidents of alleged harassment, intimidation and/or bullying that occur off campus, if the effects of the conduct result in harassment, intimidation or bullying at school that is sufficiently serious to interfere with or limit the targeted student's ability to participate in or benefit from the education program, the school must respond promptly and effectively to eliminate the harassment that occurs at school, prevent its recurrence and address its effects. Such response may include discipline of the alleged harasser in accordance with applicable law and as provided in BP/AR 5144.

AR 5145.3 requires the Superintendent or designee to implement the following measures:

- Publicize the district's nondiscrimination policy and related complaint procedures to students, parents/guardians, employees, volunteers and the public;
- Provide students with a handbook that contains age-appropriate information that clearly describes the district's nondiscrimination policy, procedures for filing a complaint and the resources available to students who feel they have been the alleged target of such behavior;
- Annually notify all students and parents/guardians of the nondiscrimination policy;
- Ensure that all students and parents/guardians, including those with limited English language proficiency, are notified of how to access the relevant information provided in the district's nondiscrimination policy, procedures, notices and forms in a language they can understand;
- Provide students, employees, volunteers and parents/guardians with age-appropriate training and information about the district's nondiscrimination policy, including what constitutes conduct in violation of the policy, how to guard against segregating or stereotyping students when providing instruction, how and when to report an incident and guidelines for addressing issues related to transgender and gender-nonconforming students;
- At the beginning of each school year, inform school employees that any employee who witnesses an act of discrimination, harassment, intimidation or bullying is required to intervene if it is safe to do so; and
- At the beginning of each school year, inform each principal or designee of the district's responsibility to provide appropriate assistance or resources to protect student's privacy rights and to ensure their safety from threatened or potentially discriminatory behavior.

Under AR 5145.3, the District's Compliance Officer (Title IX Coordinator) is designated as the employee responsible for coordinating the district's efforts to comply with federal and state civil rights laws, including Title IX. AR 5145.3 provides that any student should immediately contact the Compliance Officer, the principal or any other staff member to report unlawful discrimination, including discriminatory harassment, intimidation, retaliation or bullying.

67

EXHIBIT 15 - 067

School employees are also required to report conduct they observe to the Compliance Officer or principal, whether or not the student files a complaint.  AR 5145.3 also provides that the principal or compliance officer must inform the student or parent/guardian of the right to file a formal complaint under the UCP.  Further, "Upon receiving a complaint of unlawful discrimination, including discriminatory harassment, intimidation, retaliation or bullying of a protected class, the Compliance Officer shall immediately investigate the complaint in accordance with the district's uniform complaint procedures specified in AR 1312.3 – Uniform Complaint Procedures."  Even if the student chooses not to file a formal complaint, the principal or compliance officer shall implement immediate measures necessary to stop the discrimination and to ensure all students have access to the educational program and a safe educational environment.

### 19.    Sexual Harassment – *BP 5145.7*

Board Policy 5145.7 contains the same definition of sexual harassment that appears at Cal. Ed. Code § 212.5.  BP 5145.7 lists examples of conduct that may constitute sexual harassment, including but not limited to unwelcome leering, unwelcome sexual slurs, sexual jokes, derogatory posters, spreading sexual rumors, unwanted grabbing or fondling, displaying sexually suggestive objects, sexual assault or sexual battery, dating violence, stalking and relationship abuse.

BP 5145.7 requires the Superintendent or designee to ensure that all District students receive age-appropriate instruction and information on sexual harassment, including:

- What acts constitute sexual harassment;
- A clear message that students do not have to endure sexual harassment;
- Encouragement for bystanders to report instances of sexual harassment;
- Information about the district's procedure for investigating complaints (the UCP); and
- Information about the rights of students and parents/guardians to file a criminal complaint, as applicable.

BP 5145.7 requires the district to include copies of its sexual harassment policy in the annual notifications to parents/guardians, to post copies of the policy in the main administrative building or other prominent areas, to provide information on the policy as part of new student orientation, to publicize the policy in the student handbook and other district publications, and to be provided to employees and employee organizations.

Under BP 5145.7, all complaints and allegations of sexual harassment must be kept confidential "except as necessary to carry out the investigation or take other subsequent necessary action."

BP 5145.7 requires the Superintendent or designee to maintain records of all reported cases of sexual harassment to enable the District to monitor, address and prevent repetitive harassing behavior in its schools.

EXHIBIT 15 - 068

**EXHIBIT 21**

| | |
|---|---|
| Ticket No. | 90332 |
| Report Date | 1/28/22 11:30 am |
| Due Date | 2/2/22 9:15 am |
| Reporter | ███████████.com> |
| Tech | Kelly Gallagher <kgallagher@pausd.org> |
| Priority | Medium |
| Status | Open |
| Request Type | Title IX |
| Subject | RE: Pete Colombo |

**Request Detail**

To Whom it may concern.

I'm writing you today to inform you of a tragedy that occurred roughly 20 years ago involving a staff member within your district, Peter Colombo. My wife was raped by Pete when she was 11 years old in the girl's locker room of Jordan/Greene Middle School. I believe he was around 27 years old at the time, and continued to tease and taunt her after the rape for the rest of the school year. He used to say that she was "Saucy" and torment her while he hid under the bleachers. If he is indeed the same man who had any involvement with a middle school girl's swim team in Palo Alto at Green Middle School at any point in the early 2000's, then I've come to the right place and I have the right person:

https://linkprotect.cudasvc.com/url?a=https%3a%2f%2fthecampanile.org%2f2017%2f04%2f26%2fthemanbehindthemitt%2f&c=E,1,eJ0V8_-2rlyP3b9p71CxFRpGfRHaNIEb2TIUyXkyqNakBkOg7wj2UDEN7ajp1ukBZ_jkooLMUiEFnIHzKWVdXdzHEmbDK9wvYZFeFmvp&typo=1 Teacher/Coach[Teacher/Coach](https://linkprotect.cudasvc.com/url?a=https%3a%2f%2fthecampanile.org%2f2017%2f04%2f26%2fthemanbehindthemitt%2f&c=E,1,_Qc2dDAc-4khHO8ukThHMtLITBnKNMydP5KEx_DD7qPG0Kr_31Z3MpxNeramaBOfWLiuOG1HbLY9-ThuaKs26VAr2l3F0MNmCDMgkVh8KvSz9S2t_G0iEsXPNA_&typo=1 Teacher/Coach)Palo Alto Unified School District Aug 1998 – Present23 years 6 months Greene Middle School (Formerly Jordan Middle School) and Palo Alto High School 8th Grade Physical Education Teacher Head J.V. Basketball Coach at Palo Alto High School Asst. Varsity Baseball Coach at Palo Alto High School

Mr. Colombo's name has haunted my wife for two decades. She's an extremely resilient person, but she has struggled with this reality since childhood and will likely be in therapy dealing with it for the rest of her life. I don't know if you can truly appreciate or imagine the harm Pete has caused to her life and the lives of those around her. She's asked me repeatedly over the last five years not to ever do anything with this information out of fear of this man, and I truly wish I could simply stomach it and move on like she claims to have done, but I refuse. To my knowledge, no consequences have ever come to Peter for his actions since this event, and he continues to be a celebrated member of this school district.

I'm telling you this today not because I intend to pursue anything about this allegation with the authorities (We're likely well past the timeline for any legal recourse anyways) and have no proof other than my wife's victims story, but because I have to live with this reality every day as her husband. You may choose to ignore this email and the information contained within it because it makes you uncomfortable. You may choose to ignore it because maybe Coach Pete is too valuable an asset to the school and it would be unfortunate if he was confronted over this matter. I highly doubt he would admit to it, especially now all of these years later. Most importantly I worry that he may have other victims. Child predators are commonly serial hunters. He's in the right profession to hide himself rather well, after all. As I mentioned above, what you do with this allegation is entirely up to you, but I simply could not go on without confronting this in some small way. I'm not like my wife and will not live in fear of this man, however dangerous he may truly be. Her family and friends know his face and know what he's done to her, and none of them have had the courage over the years to take any action over this devastating event. We'll get on with our lives, continuing to live in the shadow of this event. I pray we are truly the only ones who have suffered from Pete's actions and that he has not victimized any other children since then, though I know the odds are quite high that he has. I hope this message finds you, and that you have to strength to accept the reality of this situation and perhaps confront him yourself over this. Please do not reach out or attempt to contact me or my wife in any capacity. This is a one way reality check, and a burner account. I will never contact you again.

Sent with [ProtonMail]( https://linkprotect.cudasvc.com/url?a=https%3a%2f%2fprotonmail.com%2f&c=E,1,pnia14aJHPVXzZ-_7wO99N6pE4MdjekZ3FT16To0JXdNEB5cYMKKC1jPig6LwEAafc_CHskzQg8HrqfrLVJ5Y7_A7tTIoZjJaka6OJHiC40WMA,&typo=1) Secure Email.

**Recipients**

Kelly Gallagher
Marie Jo Sievert
Komey Vishakan
Robert Andrade
Amanda Bark
█████████

**From:** Komey Vishakan on behalf of Komey Vishakan <kvishakan@pausd.org>
**Sent:** Friday, February 04, 2022 7:31 PM EST
**To:** Franco-Clausen, Yolanda <Yolanda.Franco-Clausen@CityofPaloAlto.org>
**Subject:** PAPD # 22-00330

**Komey Vishakan, General Counsel**
**Palo Alto Unified School District | 25 Churchill Avenue | Palo Alto, CA 94306 | kvishakan@pausd.org**

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.



**From:** Title IX Coord <titleixcoordinator@pausd.org>
**Date:** Friday, January 28, 2022 at 11:30 AM
**To:** Robert Andrade <randrade@pausd.org>
**Subject:** Ticket 90332 Open --> RE: Pete Colombo: To Whom it may concern.I'm wr...

| Client | |
|---|---|
| **Name** | ███████████.com> |
| **Address** | |

| Ticket Info | |
|---|---|
| **Ticket No.** | 90332 |
| **Report Date** | 1/28/22 11:30 am |
| **Due Date** | 2/2/22 9:15 am |
| **Reporter** | ██████████.com> |
| **Tech** | Kelly Gallagher <kgallagher@pausd.org> |
| **Priority** | Medium |
| **Status** | Open |
| **Request Type** | Title IX |
| **Subject** | RE: Pete Colombo |



**Request Detail**

To Whom it may concern.

I'm writing you today to inform you of a tragedy that occurred roughly 20 years ago involving a staff member within your district, Peter Colombo. My wife was raped by Pete when she was 11 years old in the girl's locker room of Jordan/Greene Middle School. I believe he was around 27 years old at the time, and continued to tease and taunt her after the rape for the rest of the school year. He used to say that she was "Saucy" and torment her while she hid under the bleachers. If he is indeed the same man who had any involvement with a middle school girl's swim team in Palo Alto at Green Middle School at any point in the early 2000's, then I've come to the right place and I have the right person:

https://linkprotect.cudasvc.com/url?
a=https%3a%2f%2fthecampanile.org%2f2017%2f04%2f26%2fthemanbehindthemitt%2f&c=E,1,eJ0V8_-
2rIyP3b9p71CxFRpGfRHaNIEb2TIUyXkyqNakBkOg7wi2UDEN7ajp1ukBZ_jkooLMUiEFnlHzKWVdXdzHEmbbDK9wvYZFeFmvp&typo=1
Teacher/Coach[Teacher/Coach](https://linkprotect.cudasvc.com/url?
a=https%3a%2f%2fthecampanile.org%2f2017%2f04%2f26%2fthemanbehindthemitt%2f&c=E,1,_Qc2dDAc-
4khHO8ukThHMtLITBnKNMydP5KEx_DD7qPG0Kr_31Z3MpxNeramaBOfWLiuOG1HbLY9-
ThuaKs26VAr2I3F0MNmCDMgkVh8KySz9S2t_G0iEsXPNA,&typo=1 Teacher/Coach)Palo Alto Unified School District Aug 1998 -
Present23 years 6 months Greene Middle School (Formerly Jordan Middle School) and Palo Alto High School 8th Grade Physical
Education Teacher Head J.V. Basketball Coach at Palo Alto High School Asst. Varsity Baseball Coach at Palo Alto High School

Mr. Colombo's name has haunted my wife for two decades. She's an extremely resilient person, but she has struggled with this reality since childhood and will likely be in therapy dealing with it for the rest of her life. I don't know if you can truly appreciate or imagine the harm Pete has caused to her and the lives of those around her. She's asked me repeatedly over the last five years not to ever do anything with this information out of fear of this man, and I truly wish I could simply stomach it and move on like she claims to have done, but I refuse. To my knowledge, no consequences have ever come to Peter for his actions since this event, and he continues to be a celebrated member of this school district.

I'm telling you today not because I intend to pursue anything about this allegation with the authorities (We're likely well past the timeline for any legal recourse anyways) and have no proof other than the victims story, but because I have to live with this reality every day as her husband. You may choose to ignore this email and the information contained within it because it makes you uncomfortable. You may choose to ignore it because maybe Coach Pete is too valuable an asset to the school and it would be unfortunate if he was confronted over this matter. I highly doubt he would admit to it, especially now all of these years later. Most importantly I worry that he may have other victims. Child predators are commonly serial hunters. He's in the right profession to hide himself rather well, after all. As I mentioned above, what you do with this allegation is entirely up to you, but I simply could not go on without confronting this in some small way. I'm not like my wife and will not live in fear of this man, however dangerous he may truly be. Her family and friends know his face and know what he's done to her, and none of them have had the courage over the years to take any action over this devastating event. We'll get on with our lives, continuing to live in the shadow of this event. I pray we are truly the only ones who have suffered from Pete's actions and that he has not victimized any other children since then, though I know the odds are quite high that he has. I hope this message finds you, and that you have to strength to accept the reality of this situation and perhaps confront him yourself over this. Please do not reach out or attempt to contact me or my wife in any capacity. This is a one way reality check, and a burner account. I will never contact you again.

Sent with [ProtonMail](https://linkprotect.cudasvc.com/url?a=https%3a%2f%2fprotonmail.com%2f&c=E,1,pnia14aJHPVXzZ-
_7wO99N6pE4MdjekZ3FT16To0JXdNEB5cYMKKC1jPig6LwEAafc_CHskzQg8HrqfrLVJ5Y7_A7tTIoZjIaka6OJHiC40WMA,&typo=1)
Secure Email.

**Notes**

Add Hidden Note    Add Note

Status: Open In Progress Resolved Closed Cancelled Idea

| Date | Name | Note Text |
|------|------|-----------|
|      |      |           |

**Recipients**

Kelly Gallagher
Marie Jo Sievert
Komey Vishakan
Robert Andrade
Amanda Bark
██████

**From:** Franco-Clausen, Yolanda <Yolanda.Franco-Clausen@CityofPaloAlto.org>
**Sent:** Friday, February 04, 2022 6:06 PM EST
**To:** Komey Vishakan <kvishakan@pausd.org>
**Subject:** Re: PAPD # 22-00330

Sorry for the confusion. Can you forward the actual email sent from the ███ mail address.

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

---

**From:** Komey Vishakan <kvishakan@pausd.org>
**Sent:** Friday, February 4, 2022 2:39:17 PM
**To:** Franco-Clausen, Yolanda <Yolanda.Franco-Clausen@CityofPaloAlto.org>
**Subject:** Re: PAPD # 22-00330

CAUTION: This email originated from outside of the organization. Be cautious of opening attachments and clicking on links.

---

Hi Yolanda,

Please see below:

████████████.com

Komey

**Komey Vishakan, General Counsel**
**Palo Alto Unified School District | 25 Churchill Avenue | Palo Alto, CA 94306 | kvishakan@pausd.org**

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**From:** Franco-Clausen, Yolanda <Yolanda.Franco-Clausen@CityofPaloAlto.org>
**Sent:** Friday, February 4, 2022 2:13 PM
**To:** Komey Vishakan <kvishakan@pausd.org>
**Subject:** PAPD # 22-00330

CAUTION: This email originated from outside of the organization. Be careful opening attachments or clicking links.

Good Afternoon Komey,

I wanted to follow up with you after our call. If you could forward the email you referenced in todays call, it would be much appreciated.

Thanks again and look forward to speaking again next week.

*Thank you,*

*Detective Yolanda Clausen*
*Phone: 650-329-2307*
*Fax: 650-329-2565*
*Investigative Services Division*
*Palo Alto Police Department*
*yolanda.clausen@cityofpaloalto.org*

**To:** Kelly Gallagher <kgallagher@pausd.org>
**Subject:** Ticket 90332 Open --> RE: Pete Colombo: To Whom it may concern.I'm wr...

| Client | |
|---|---|
| **Name** | ████████████████████ |
| **Address** | |

**Ticket Info**

| | |
|---|---|
| **Ticket No.** | 90332 |
| **Report Date** | 1/28/22 11:30 am |
| **Due Date** | 2/2/22 9:15 am |
| **Reporter** | ████████████████ |
| **Tech** | Kelly Gallagher <kgallagher@pausd.org> |
| **Priority** | Medium |
| **Status** | Open |
| **Request Type** | Title IX |
| **Subject** | RE: Pete Colombo |
| **Request Detail** | To Whom it may concern. |

I'm writing to you today to inform you of a tragedy that occurred roughly 20 years ago involving a staff member within your district, Peter Colombo. My wife was raped by Pete when she was 11 years old in the girl's locker room of Jordan/Greene Middle School. I believe he was around 27 years old at the time, and continued to tease and taunt her after the rape for the rest of the school year. He used to say that she was "Saucy" and torment her while she hid under the bleachers. If he is indeed the same man who had any involvement with a middle school girl's swim team in Palo Alto at Green Middle School at any point in the early 2000's, then I've come to the right place and I have the right person:

https://linkprotect.cudasvc.com/url?
a=https%3a%2f%2fthecampanile.org%2f2017%2f04%2f26%2fthemanbehindthemitt%2f&c=E,1,eJ0V8_-
2rjyP3b9p71CxFRpGfRHaNlEb2TfUyXkyqNakBkOg7wj2UDEN7ajp1ukBZ_jkooLMUiEFnlHzKWVdXdzHEmbDK9wvYZFeFmvp&typo=1
Teacher/Coach](https://linkprotect.cudasvc.com/url?
a=https%3a%2f%2fthecampanile.org%2f2017%2f04%2f26%2fthemanbehindthemitt%2f&c=E,1,_Qc2dDAc-
4khHO8ukThHMtLJTBnKNMydP5KEx_DD7gPG0Kr_31Z3MpxNeramaBOfWLiuOG1HbLY9-
ThuaKs26VAr2l3F0MNmCDMgkVh8KySz9S2t_G0iEsXPNA,,&typo=1 Teacher/Coach)Palo Alto Unified School District Aug 1998 - Present23 years 6 months Greene Middle School (Formerly Jordan Middle School) and Palo Alto High School 8th Grade Physical Education Teacher Head J.V. Basketball Coach at Palo Alto High School Asst. Varsity Baseball Coach at Palo Alto High School

Mr. Colombo's name has haunted my wife for two decades. She's an extremely resilient person, but she has struggled with this reality since childhood and will likely be in therapy dealing with it for the rest of her life. I don't know if you can truly appreciate or imagine the harm Pete has caused to her life and the lives of those around her. She's asked me repeatedly over the last five years not to ever do anything with this information out of fear of this man, and I truly wish I could simply stomach it and move on like she claims to have done, but I refuse. To my knowledge, no consequences have ever come to Peter for his actions since this event, and he continues to be a celebrated member of this school district.

I'm telling you this today not because I intend to pursue anything about this allegation with the authorities (We're likely well past the timeline for any legal recourse anyways) and have no proof other than the victims story, but because I have to live with this reality every day as her husband. You may choose to ignore this email and the information contained within it because it makes you uncomfortable. You may choose to ignore it because maybe Coach Pete is too valuable an asset to the school and it would be unfortunate if he was confronted over this matter. I highly doubt he would admit to it, especially now all of these years later. Most importantly I worry that he may have other victims. Child predators are commonly serial hunters. He's in the right profession to hide himself rather well, after all. As I mentioned above, what you do with this allegation is entirely up to you, but I simply could not go on without confronting this in some small way. I'm not like my wife and will not live in fear of this man, however dangerous he may truly be. Her family and friends know his face and know what he's done to her, and none of them have had the courage over the years to take any action over this devastating event. We'll get on with our lives, continuing to live in the shadow of this event. I pray we are truly the only ones who have suffered from Pete's actions and that he has not victimized any other children since then, though I know the odds are quite high that he has. I hope this message finds you, and that you have to strength to accept the reality of this situation and perhaps confront him yourself over this. Please do not reach out or attempt to contact me or my wife in any capacity. This is a one way reality check, and a burner account. I will never contact you again.

Sent with [ProtonMail](https://linkprotect.cudasvc.com/url?a=https%3a%2f%2fprotonmail.com%2f&c=E,1,pnia14aJHPVXzZ-
7wO99N6pE4MdjekZ3FT16To0JXdNEB5cYMKKC1jPig6LwEAafc_CHskzQg8HrgfrLVJ5Y7_A7tTloZjlaka6OJHiC40WMA,,&typo=1)
Secure Email.

**Notes**

Status: Open | In Progress | Resolved | Closed | Cancelled | Idea    Add Hidden Note    Add Note

| Date | Name | Note Text |
|---|---|---|

**Recipients**

Kelly Gallagher
Marie Jo Sievert
Komey Vishakan
Robert Andrade
Amanda Bark
drreyes32

EXHIBIT 21 - 007

PAUSD002731

**From:** Title IX Coord <titleixcoordinator@pausd.org> <titleixcoordinator@pausd.org>
Case 5:24-cv-0138-NC    Document 199-1    Filed 11/03/25    Page 172 of 385
**Sent:** Sunday, January 30, 2022 2:06 PM EST
**To:** Kelly Gallagher <kgallagher@pausd.org>
**Subject:** Ticket 90339 Open --> Reporting Up: On the morning of January 30th, P...

---

**Client**

| | |
|---|---|
| **Name** | Sharon Ofek <sofek@pausd.org> |
| **Location** | 25 Churchill - District Office |
| **Phone** | 650-329-3717 |
| **Address** | |

---

**Ticket Info**

| | |
|---|---|
| **Ticket No.** | 90339 |
| **Report Date** | 1/30/22 10:46 am |
| **Due Date** | 2/2/22 2:30 pm |
| **Reporter** | Sharon Ofek <sofek@pausd.org>    [10.250.128.233] |
| **Location** | 25 Churchill - District Office |
| **Tech** | Kelly Gallagher <kgallagher@pausd.org> |
| **Priority** | Medium |
| **Status** | Open |
| **Request Type** | Title IX |
| **Subject** | Reporting Up |
| **Request Detail** | On the morning of January 30th, Peter Colombo called and reported that his wife was the recipient of an anonymous LinkedIn message. According to what he reported, the message was from the husband of one of his former students alleging that he (Peter) had raped his wife in the locker room when she was a sixth grader/11 years old on the swim team at Jordan middle school twenty years ago. Apparently the message also stated that they were not going to pursue anything.

I encouraged him to report it report it to Human Resources and he said he was telling me. I called Lisa Hickey to inform her and Trent Bahadursingh to report to him. |
| **Reported to** | Lisa Hickey and Trent Bahadursingh |

---

**Notes**                                    Add Hidden Note    Add Note

Status:    Open    In Progress    Resolved    Closed    Cancelled    Idea

| Date | Name | Note Text |
|---|---|---|
| | | |

---

**Recipients**

Amanda Bark
Komey Vishakan
Robert Andrade
Marie Jo Sievert
Kelly Gallagher
Sharon Ofek

EXHIBIT 21 - 008

PAUSD002732

From: Kelly Gallagher on behalf of Kelly Gallagher <kgallagher@pausd.org>
Case 5:24-cv-06128-NC    Document 199-1    Filed 11/03/25    Page 173 of 385
Sent: Monday, February 07, 2022 4:48 PM EST
To: ███████████████████████
CC: Title IX Coordinator <titleixcoordinator@pausd.org>
Subject: Re: Report received

Hello,

Thank you for responding to my message. I understand you were also able to connect with my colleague, Komey Vishakan. I am happy to hear you are coordinating with Komey and that you and your wife may choose to share additional information through her coordination. I want to be thoughtful to not confuse or overwhelm with additional contact, so I will defer to Komey as your point of contact with the District. She and I will connect if it ever makes sense for both of us to be available or included on correspondence.

I remain available if I can assist in coordinating support for your wife.

Sincerely,
Kelly Gallagher

---

From: ████████████████████████
Date: Monday, January 31, 2022 at 5:42 PM
To: Kelly Gallagher <kgallagher@pausd.org>
Subject: Re: Report received

CAUTION: This email originated from outside of the organization. Be careful opening attachments or clicking links.

Apologies for the typos in my previous email, let me know if you need me to clarify anything that didn't make sense.

Sent with ProtonMail Secure Email.

------- Original Message -------
On Monday, January 31st, 2022 at 2:36 PM, ███████████████████████ wrote:

Hi Kelly,

Thank you for your response to this issue. At this time, my wife and I are fine with the district taking any additional action it deems necessary. Obviously I would be happy to see some form of justice occur, though I am not really sure where all of this can lead given this event happened so long ago.

If it helps to speak over Zoom about this issue, I can make myself available on Wednesday or Friday this week to chat more with you and share what I know; even if all it does is lend more slightly legitimacy to this allegation. This morning I provided all of the details I know of my wife's history with Pete Colombo via email. As for supportive measures, I don't think she needs anything from the district at this point; I will say however, that I know my wife will not likely be able to tolerate anything that would involve her having to interact with Pete Colombo again or reveal herself to him in any direct or indirect way. Even discussing this event is extremely difficult for her as she spent years defining her life by the trauma of this encounter at Jordan/Greene middle school.

Sent with ProtonMail Secure Email.

------- Original Message -------
On Monday, January 31st, 2022 at 1:58 PM, Kelly Gallagher <kgallagher@pausd.org> wrote:

Hello,

My name is Kelly Gallagher and I am the Title IX Coordinator for the Palo Alto Unified School District. I received the message sent from this email address regarding a staff member's conduct approximately 20 years ago.

I am writing because I want to be able to address any needs for supportive measures. Supportive Measures are measures designed to restore or preserve equal access to educational programs or activities, without unreasonably burdening the other party. Supportive measures may include, but are not limited to academic support or wellness support services. Supportive measures are available regardless of whether someone chooses to submit a complaint under the Uniform Complaint Procedure.

I also want to provide you with the opportunity to discuss the resolution options available under the UCP. You have the right to submit a complaint. Following the submission of a complaint, you have the right to: participate in a formal process; request an informal resolution process; or ask the District not to take additional action.

Please let me know if you wish to speak. I am happy to go over all of this with you via Zoom, if you would like. I have also attached a link to the Title IX office for your convenience: https://www.pausd.org/about-us/policies-procedures/title-ix-office.

EXHIBIT 21 - 009

Sincerely,

Kelly Gallagher
Title IX Coordinator

EXHIBIT 21 - 010

PAUSD002734

| Client | |
|---|---|
| Name | Kelly Gallagher <kgallagher@pausd.org> |
| Location | 25 Churchill - District Office |
| Address | |

| Ticket Info | |
|---|---|
| Ticket No. | 90404 |
| Report Date | 2/7/22 1:48 pm |
| Due Date | 2/10/22 11:33 am |
| Reporter | Kelly Gallagher <kgallagher@pausd.org> |
| Location | 25 Churchill - District Office |
| Tech | Kelly Gallagher <kgallagher@pausd.org> |
| Priority | Medium |
| Status | Open |
| Request Type | Title IX |
| Subject | Re: Report received |
| Request Detail | |

Hello,

Thank you for responding to my message. I understand you were also able to connect with my colleague, Komey Vishakan. I am happy to hear you are coordinating with Komey and that you and your wife may choose to share additional information through her coordination additional contact, so I will defer to Komey as your point of contact with the District. She and I will connect it if ever makes sense for both of us to be available or included on correspondence.

I remain available if I can assist in coordinating support for your wife.

Sincerely,
Kelly Gallagher

From:
Date: Monday, January 31, 2022 at 5:42 PM
To: Kelly Gallagher <kgallagher@pausd.org>
Subject: Re: Report received
CAUTION: This email originated from outside of the organization. Be careful opening attachments or clicking links.

Apologies for the typos in my previous email, let me know if you need me to clarify anything that didn't make sense.

Sent with ProtonMail https://linkprotect.cudasvc.com/url?a=https%3a%2f%2fprotonmail.com%2f&c=E,1,DYVAHb1H1BT3v1p891rgwV09wwMY-l6PUq4XwBOxCbpHdBkYABCRr4Zb0Yvz9r32h1MKH_oFw5-OD491bNsnEx294L9MGHdiZzZrXKK0yLvl0XzFs1J8T&typo=1>

------ Original Message ------
On Monday, January 31, 2022 at 2:36 p.

Hi Kelly,

Thank you for your response to this issue.  At this time, my wife and I are fine with the district taking any additional action it deems necessary.  Obviously I would be happy to see some form of justice occur, though I am not really sure where all of this can lead given this eve

If it helps to speak over Zoom about this issue, I can make myself available on Wednesday or Friday this week to chat more with you and share what I know; even if all it does is lend more slightly legitimacy to this allegation.  This morning I provided all of the details I know a supportive measures, I don't think she needs anything from the district at this point; I will say however, that I know my wife will not likely be able to tolerate anything that would involve her having to interact with Pete Colombo again or reveal herself to him in any direct or indi her as she spent years defining her life by the trauma of this encounter at Jordan/Greene middle school.

Sent with ProtonMail https://linkprotect.cudasvc.com/url?a=https%3a%2f%2fprotonmail.com%2f&c=E,1,aq8q4V9-XVd3CQxQ3Unx8kNudqAzOpxfDVGuXGhhDXPyZp-fMrGtqGrHaDACFn_mBrK3RuVENgFS7vaZJew9r9gotzMAUBb0_593EBbho.&typo=1> Secure Email.

------ Original Message ------
On Monday, January 31, 2022 at 1:58 p.m, Kelly Gallagher <kgallagher@pausd.org> wrote:

Hello.

My name is Kelly Gallagher and I am the Title IX Coordinator for the Palo Alto Unified School District. I received the message sent from this email address regarding a staff member's conduct approximately 20 years ago.

I am writing because I want to be able to address any needs for supportive measures. Supportive Measures are designed to restore or preserve equal access to educational programs or activities, without unreasonably burdening the other party. Supportive meas wellness support services. Supportive measures are available regardless of whether someone chooses to submit a complaint under the Uniform Complaint Procedure.

I also want to provide you with the opportunity to discuss the resolution options available under the UCP. You have the right to submit a complaint. Following the submission of a complaint, you have the right to: participate in a formal process; request an informal resolution p

Please let me know if you wish to speak. I am happy to go over all of this with you via Zoom, if you would like. I have also attached a link to the Title IX website, for your convenience: https://www.pausd.org/about-us/policies-procedures/title-ix-office <https://linkprotect.cudasvc a=https%3a%2f%2fwww.pausd.org%2fabout%2dus%2fpolicies%2dprocedures_title%2DIX%2Doffice%26d%3dDwMFAg%26c%3d-35OdAkTchMhZ0rngvJPOeA%26r%3d3gAptoMMijoZJ6-nJEgSELBFHvzfQYRzTPy8YBAEH+uLYlf%26m%3dkNfWfBF692jcY4nmXt64W3P8at0GFdRw27MwaH4kFOazJ6qn7NEBvXxYyTz_mc3%26s%3dy6L3Yp7owqLcmVdYmRzdXw3U6yC6fS_ie7BdLu_NJ8%26e%3d&c=E,1,MUQzxAAe5lVqfsCVHuuyvMnu80XSri7ABen647bR6h6Lnu4MzHDmgDUGm1x

Sincerely,
Kelly Gallagher
Title IX Coordinator

| Notes | | | Status: |
|---|---|---|---|
| Date | Name | Note Text | |

| Recipients |
|---|
| Amanda Bark |
| Kelly Gallagher |
| Marie Jo Sievert |
| Robert Andrade |
| Komey Vishakan |
| drreyes32 |

EXHIBIT 21 - 011

PAUSD002735

Outlook

**Ticket 90332 Open -->> RE: Pete Colombo: To Whom it may concern.I'm wr...**

**From** Title IX Coord <titleixcoordinator@pausd.org> <titleixcoordinator@pausd.org>
**Date** Fri 1/28/2022 11:30 AM
**To** Robert Andrade <randrade@pausd.org>

Client

Name

Address

TICKET 90332

**Ticket Info**

**Ticket No.** 90332

**Report Date** 1/28/22 11:30 am

**Due Date** 2/2/22 9:15 am

**Reporter**

**Tech** Kelly Gallagher <kgallagher@pausd.org>

**Priority** Medium

**Status** Open

**Request Type** Title IX

**Subject** RE: Pete Colombo

**Request Detail**

To Whom it may concern.

I'm writing to inform you of a tragedy that occurred roughly 20 years ago involving a staff member within your district, Peter Colombo. My wife was raped by Pete when she was 11 years old in the girl's locker room of Jordan/Greene Middle School. I believe he was around 27 years old at the time, and continued to tease and taunt her after the rape for the rest of the school year. He used to say that she was "Saucy" and torment her while she hid under the bleachers. If he is indeed the same man who had any involvement with a middle school girl's swim team in Palo Alto at Green Middle School at any point in the early 2000's, then I've come to the right place and I have the right person:

https://linkprotect.cudasvc.com/url?
a=https%3a%2f%2fthecampanile.org%2f2017%2f04%2f26%2fthemanbehindthemill%2l&c=E_1,eJ0x8_2pVf29i9g7t1CeFBqGftHsiNEbZTlUyXkyqNaKBkOxt2w9zUDfNT0in01u8Z_IxoiLMUjEFrih9zkWvWv0zHEmbDK0woYZFeFmxo&typo=1
Teacher/Coach/Teacher/Coachhttps://linkprotect.cudasvc.com/url?a=https%3a%2f%2fthecampanile.org%2f2017%2f04%2f26%2fthemanbehindthemill%2l&c=E_1_Qc2d0Ac-
4xtxHQbkThtMItlTBrkNMydP5KEz_DD7qF5GtK_31Z3MoxNeram6BOWLisOG1HbLY9sThut4s20VaQtF0MNmCDMxVo8KvSz6521_G9EsXPNA_&typo=1 Teacher/Coach/Palo Alto Unified School District Aug 1998 - Present23 years 6 months Greene Middle School (Formerly Jordan Middle School) and Palo Alto High School 8th Grade Physical Education Teacher Head J.V, Basketball Coach at Palo Alto High School Asst. Varsity Baseball Coach at Palo Alto High School

Mr. Colombo's name has haunted my wife for two decades. She's an extremely resilient person, but she has struggled with this really since childhood and will likely be in therapy dealing with it for the rest of her life. I don't know if you can truly appreciate or imagine the harm Pete has caused to her life and the lives of those around her. She's asked me repeatedly over the last five years not to ever do anything with this information out of fear of this man, and I truly wish I could simply stomach it and move on like she claims to have done, but I refuse. To my knowledge, no consequences have ever come to Peter for his actions since this event, and he continues to be a celebrated member of the school district.

I'm telling you this today not because I intend to pursue anything about this allegation with the authorities (We're likely well past the timeline for any legal recourse anyways) and have no proof other than the victims story, but because I have to live with this really every day as her husband. You may choose to ignore this email and the information contained within it because it makes you uncomfortable, You may choose to ignore maybe Coach Pete is too valuable an asset to the school and it would be unfortunate if he was confronted over this matter. I highly doubt he would admit to it, especially now all of these years later. Most importantly I worry that he may have other victims. Child predators are commonly serial hunters, He's in the right profession to hide himself rather well, after all. As I mentioned above, what you do with this allegation is entirely up to you, but I simply could not go on without confronting this in some small way. I'm not like my wife and will not live in fear of this man, however dangerous he may truly be. Her family and friends know his face and know what he's done to her, and none of them have had the courage over the years to take any action over this devastating event. We'll get on with our lives, continuing to live in the shadow of this event. I pray we are truly the only ones who have suffered from Pete's actions and that he has not victimized any other children since then, though I

5/20/25, 1:13 PM

Mail - Robert Andrade - Outlook

know the odds are quite high that he has. I hope this message finds you, and that you have to strength to accept the reality of this situation and perhaps confront him yourself over this. Please do not reach out or attempt to contact me or my wife in any capacity. This is a one way really check, and a burner account. I will never contact you again.

Sent with [ProtonMail](https://linkprotect.cudasvc.com/url?a=https%3a%2f%2fprotonmail.com%2f&c=E,1,pqai14aJHPVXoZ-7wO95N6oE4M9ekZ3FT16To0JXdNfB5cYtMKKCliPjq6LwFAafc_CHskzQe8HrdfL\VJ5Y7_A7TlbZ\laka6OUHiC40VMA_&typo=1) Secure Email.

Status:   Open   In Progress   Resolved   Closed   Cancelled   Idea

Add Hidden Note    Add Note

Notes

| Date | Name | Note Text |
|------|------|-----------|

Recipients

Kelly Gallagher
Marie Jo Sievert
Komey Vishakan
Robert Andrade
Amanda Bark
drreyes32

TICKET

EXHIBIT 21 - 013

PAUSD002499

5/20/25, 1:31 PM

Mail - Robert Andrade - Outlook

PAUSD002500

Outlook

**From:** Title IX Coord <titleixcoordinator@pausd.org>
**Date:** Friday, January 28, 2022 at 11:30 AM
**To:** Robert Andrade <randrade@pausd.org>
**Subject:** Ticket 90332 Open -> RE: Pete Colombo: To Whom it may concern.I'm wr...

TICKET 90332

**Client**

Name

Address

**Ticket Info**

**Ticket No.** 90332

**Report Date** 1/28/22 11:30 am

**Due Date** 2/2/22 9:15 am

**Reporter** Kelly Gallagher <kgallagher@pausd.org>

**Priority** Medium

**Status** Open

**Request Type** Title IX

**Subject** RE: Pete Colombo

**Request Detail** To Whom it may concern.

I'm writing you today to inform you of a tragedy that occurred roughly 20 years ago involving a staff member within your district, Peter Colombo. My wife was raped by Pete when she was 11 years old in the girl's locker room of Jordan/Greene Middle School. I believe he was around 27 years old at the time, and continued to tease and taunt her after the rape for the rest of the school year. He used to say that she was "Saucy" and torment her while she hid under the bleachers. If he is indeed the same man who had any involvement with a middle school girl's swim team in Palo Alto at Green Middle School at any point in the early 2000's, then I've come to the right place and I have the right person:

https://linkprotect.cudasvc.com/url?
a=https%3a%2f%2fthecampoanile.org%2f2017%2f04%2f26%2fthemanbehindthemitt%2f&c=E_1_aJ0x8_-2HyF23b9o71CFEIsGR3haNEIs2TlUvX8yqNak8sOn2w2zUDEN7ljq1uk8Z_kpoLMUEIEnIkzKWWXXdzHEmbDK9woVZZeFmw&voor1
Teacher/Coach(Teacher/Coach)https://linkprotect.cudasvc.com/url?a=https%3a%2f%2fthecampoanile.org%2f2017%2f04%2f26%2fthemanbehindthemitt%2f&c=E_1_Oz2dDAc-
4khHO9uKThHIMU1BnKWMwdP3KEx_DD7oFGoRc_3123MopNeramalBO0MUaOG1HsLV9s7hua4Sz6VAv2t3FOMNmCDdVaKVnBKv5zd5S1_G0ExXPhA_&voor1 Teacher/Coach)Palo Alto Unified School District Aug 1998 - Present23 years
6 months Greene Middle School (Formerly Jordan Middle School) and Palo Alto High School 8th Grade Physical Education Teacher Head J.V. Basketball Coach at Palo Alto High School Asst. Varsity Baseball Coach at Palo Alto High School

Mr. Colombo's name has haunted my wife for two decades. She's an extremely resilient person, but she has struggled with this reality since childhood and will likely be in therapy dealing with it for the rest of her life. I don't know if you can truly appreciate or imagine the harm Pete has caused to her life and the lives of those around her. She's asked me repeatedly over the last five years not to ever do anything with this information out of fear of this man, and I truly wish I could simply stomach it and move on like she claims to have done, but I refuse. To my knowledge, no consequences have ever come to Peter for his actions since this event, and he continues to be a celebrated member of this school district.

EXHIBIT 21 - 014

5/20/25, 1:31 PM

Mail - Robert Andrade - Outlook

I'm telling you this today not because I intend to pursue anything about this allegation with the authorities (We're likely well past the timeline for any legal recourse anyways) and have no proof other than the victims story, but because I have to live with this reality every day as her husband. You may choose to ignore this email and the information contained within it because it makes you uncomfortable. You may choose to ignore it because maybe Coach Pete is too valuable an asset to the school and it would be unfortunate if he was confronted over this matter. I highly doubt he would admit to it, especially now all of these years later. Most importantly I worry that he may have other victims. Child predators are commonly serial hunters. He's in the right profession to hide himself rather well, after all. As I mentioned above, what you do with this allegation is entirely up to you, but I simply could not go on without confronting this in some small way. I'm not like my wife and will not live in fear of this man, however dangerous he may truly be. Her family and friends know his face and know what he's done to her, and none of them have had the courage over the years to take any action over this devastating event. We'll get on with our lives, continuing to live in the shadow of this event. I pray we are truly the only ones who have suffered from Pete's actions and that he has not victimized any other children since then, though I know the odds are quite high that he has. I hope this message finds you, and that you have to strength to accept the reality of this situation and perhaps confront him yourself over this. Please do not reach out or attempt to contact me or my wife in any capacity. This is a one way really check, and a burner account. I will never contact you again.

Sent with (ProtonMail(https://linkprotect.cudasvc.com/url?a=https%3a%2f%2fprotonmail.com%2f&c=E-1,pqixt14sJsHPVXqZ-_7xO99N9q6f4M9jekZ3FT16To0JXdNEB5cYtzMKGC1Pjy6LyjEFAehc_CHskxQo9tHq4tVJ5Y7_A7I1bx7jaka6QJHiiC40nWMA_&type=1) Secure Email.

## Notes

Status: Open In Progress Resolved Closed Cancelled Idea

| Date | Name | Note Text |
|------|------|-----------|

## Recipients

Kelly Gallagher
Marie Jo Sievert
Komey Vishakan
Robert Andrade
Amanda Bark
drreyes32

TICKET

EXHIBIT 21 - 015

 Outlook

## Ticket 90339 Open --> Reporting Up: On the morning of January 30th, P...

**From** Title IX Coord <titleixcoordinator@pausd.org> <titleixcoordinator@pausd.org>

**Date** Thu 2/17/2022 11:34 AM

**To** Robert Andrade <randrade@pausd.org>

TICKET 90339

**Client**

| | |
|---|---|
| **Name** | Sharon Ofek <sofek@pausd.org> |
| **Location** | 25 Churchill - District Office |
| **Phone** | 650-329-3717 |
| **Address** | |

**Ticket Info**

| | |
|---|---|
| **Ticket No.** | 90339 |
| **Report Date** | 1/30/22 10:46 am |
| **Due Date** | 2/2/22 2:30 pm |
| **Reporter** | Sharon Ofek <sofek@pausd.org>  [10.250.128.233] |
| **Location** | 25 Churchill - District Office |
| **Tech** | Kelly Gallagher <kgallagher@pausd.org> |
| **Priority** | Medium |
| **Status** | Open |
| **Request Type** | Title IX |
| **Subject** | Reporting Up |
| **Request Detail** | On the morning of January 30th, Peter Colombo called and reported that his wife was the recipient of an anonymous LinkedIn message. According to what he reported, the message was from the husband of one of his former students alleging that he (Peter) had raped his wife in the locker room when she was a sixth grader/11 years old on the swim team at Jordan middle school twenty years ago. Apparently the message also stated that they were not going to pursue anything.<br><br>I encouraged him to report it report it to Human Resources and he said he was telling me. I called Lisa Hickey to inform her and Trent Bahadursingh to report to him. |
| **Reported to** | Lisa Hickey and Trent Bahadursingh |

**Notes**                  **Add Hidden Note**   **Add Note**

Status:   Open   In Progress   Resolved   Closed   Cancelled   Idea

EXHIBIT 21 - 016

PAUSD002502

| Date | Name | | | | Note Text |
| --- | --- | --- | --- | --- | --- |

**Recipients**

Amanda Bark
Komey Vishakan
Robert Andrade
Marie Jo Sievert
Kelly Gallagher
Sharon Ofek

TICKET

EXHIBIT 21 - 017

PAUSD002503

**EXHIBIT 23**



**PALO A.    .IFIED SCHOOL DISTRICT**

25 Churchill Avenue • Palo Alto, CA 94306
Telephone: (650) 329-3958 • FAX: (650) 323-5162

**PALO ALTO**
UNIFIED SCHOOL DISTRICT

HUMAN RESOURCES

January 31, 2022

Peter Colombo

████████████

Re: Notice of Paid Administrative Leave

Method of Delivery: in person

Dear Mr. Colombo:

You are hereby placed on paid administrative leave from your position as a teacher at Greene Middle School and all coaching assignments in the Palo Alto Unified School District, effective January 31, 2022. This leave is not intended to be disciplinary, but is intended to avoid any undue disruption at Greene Middle School and coaching assignments.

During this leave, you will continue to receive your usual salary, and health and welfare benefits, if applicable. As such, you are to remain available to return to work at my direction. You are to remain available by telephone during regular business hours and are required to keep the district notified of a telephone number where you can be reached during those times. In the event that you will be unavailable during regular business hours on a normal work day, you shall notify the District in advance and report your unavailability as either sick leave or personal necessity leave if applicable. You are not authorized to accept any other paid employment during your regular business hours while you are on leave.

You are hereby directed not to return to any District property, including Greene Middle School or coaching locations, unless authorized to do so in advance by me.

You are also being directed to turn in any district related technology equipment (including laptop/tablet) and any district keys. You are not to remove any materials, documents or items from your classroom or any District property unless authorized by me.

You will remain on paid leave until such time as you are otherwise notified by me. A copy of this notice will be placed in your personnel file. If you have any questions concerning this leave, please call me directly.

Sincerely,

Trent Bahadursingh
Deputy Superintendent
Palo Alto Unified School District

cc: Personnel File

EXHIBIT 23

**EXHIBIT 25**

**From:** Kena C. Cador <kcador@beesontayer.com>
**Sent:** Thursday, ███████████ 12:14 PM EDT
**To:** Komey Vishakan <kvishakan@pausd.org>
**CC:** Hilda Melchor <hmelchor@beesontayer.com>
**Subject:** RE: Peter Colombo

Hi Komey,

████████████████████████████████████████████. According to our records this was the last communication we received on the matter and I have not been contacted by the investigator.

Any information you could provide would be appreciated, especially as we approach the end of the regular school year and the beginning of the summer sessions.

Thanks
Kena

---

████████████████████████
**Sent:** Friday, ███████████ 11:20 AM
**To:** Kena C. Cador <kcador@beesontayer.com>
**Cc:** Hilda Melchor <hmelchor@beesontayer.com>
**Subject:** Re: Peter Colombo

Thank you, Kena. ████████████████████████.

Komey

**Komey Vishakan, General Counsel**

**Palo Alto Unified School District | 25 Churchill Avenue | Palo Alto, CA  94306 kvishakan@pausd.org**

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**From:** Kena C. Cador <kcador@beesontayer.com>
**Sent:** Friday, ███████████ 10:53 AM
**To:** Komey Vishakan <kvishakan@pausd.org>
**Cc:** Hilda Melchor <hmelchor@beesontayer.com>
**Subject:** Re: Peter Colombo

Thank you Komey,

██████████████████████████████

Regarding additional information my client has asked that I relay the following:

1- He has heard nothing from the police since his concurrent reporting of the anonymous email to the District. It has been 3.5 weeks.

2-████████████████████████████████████████████

Please do not hesitate to let me know if you have any questions.

Sincerely,
Kena

_____
Kena C. Cador
BEESON, TAYER & BODINE
Sent from my iPhone

On ████████████████████████████████████████

Dear Ms. Kena,

Thank you for your email

█████████████████████ Throughout the duration of the investigation, your client will remain on paid administrative leave.

We will ensure any communication with your client is done through you. ██████████████████████
███████████████████████████████████

Thank you,
Komey

**Komey Vishakan, General Counsel**

**Palo Alto Unified School District | 25 Churchill Avenue | Palo Alto, CA  94306 kvishakan@pausd.org**

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**From:** "Kena C. Cador" <kcador@beesontayer.com>
**Date:** Wednesday, ██████████████████ at 4:41 PM
███████████████████████████████████████████████████████
**Subject:** Peter Colombo

CAUTION: This email originated from outside of the organization. Be careful opening attachments or clicking links.

Good Evening,

█████████████████████████████████████████████
████████████████████████████████

█████████████████████████████████████████████████
██████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████

I look forward to speaking with someone soon.

Sincerely,
Kena C. Cador

<0.gif>          **Kena C. Cador**
                 Attorney

                 www.beesontayer.com

**Please note our Oakland office's new address below.**

492 Ninth Street, Suite 350    **D:**(510) 267-6325
                               **O:**(510) 625-9700
Oakland, CA  94607             **F:**(510) 625-8275

CONFIDENTIALITY NOTICE:
*The information contained in this communication from* **kcador@beesontayer.com** *sent at 2022-02-16 19:41:44 (Eastern) may contain confidential and/or privileged information. It is intended solely for use by* **lhickey@pausd.org** *and others authorized to receive it. If you are not* **lhickey@pausd.org** *you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by reply e-mail and delete this message. Thank you for your cooperation.*

NOTE:
*As a result of the COVID-19 Virus and the federal, state, and local mandates, all Beeson, Tayer & Bodine attorneys and staff are working remotely. Further, the buildings housing our offices have closed. While we are able to receive US Mail, our ability to receive other deliveries (UPS/DHL etc.) is extremely limited at this time. Thus, we are asking that you refrain from sending any correspondence or documents by overnight delivery at this time and instead use email or a file transfer for large files. Thank you for your consideration and professional courtesy. Please contact our offices with any questions.*

**From:** Kena C. Cador <kcador@beesontayer.com>
**Sent:** Thursday, May 19, 2022 12:14 PM EDT
**To:** Komey Vishakan <kvishakan@pausd.org>
**CC:** Hilda Melchor <hmelchor@beesontayer.com>
**Subject:** RE: Peter Colombo

Hi Komey,

I just wanted to follow up to see if you had an updated anticipated timeline for this matter. According to our records this was the last communication we received on the matter and I have not been contacted by the investigator.

Any information you could provide would be appreciated, especially as we approach the end of the regular school year and the beginning of the summer sessions.

Thanks
Kena

---

**From:** Komey Vishakan <kvishakan@pausd.org>
**Sent:** Friday, February 25, 2022 11:20 AM
**To:** Kena C. Cador <kcador@beesontayer.com>
**Cc:** Hilda Melchor <hmelchor@beesontayer.com>
**Subject:** Re: Peter Colombo

Thank you, Kena. I will forward this message to the investigator.

Komey


**Komey Vishakan, General Counsel**

**Palo Alto Unified School District | 25 Churchill Avenue | Palo Alto, CA  94306 | kvishakan@pausd.org**


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**From:** Kena C. Cador <kcador@beesontayer.com>
**Sent:** Friday, February 25, 2022 10:53 AM
**To:** Komey Vishakan <kvishakan@pausd.org>
**Cc:** Hilda Melchor <hmelchor@beesontayer.com>
**Subject:** Re: Peter Colombo

Thank you Komey,

I look forward to updates as soon as they're available.

Regarding additional information my client has asked that I relay the following:

1- He has heard nothing from the police since his concurrent reporting of the anonymous email to the District. It has been 3.5 weeks.

2- He is willing to help in any way he can and to assist however you need to bring this to a prompt resolution.

Please do not hesitate to let me know if you have any questions.

Sincerely,
Kena

_____
Kena C. Cador
BEESON, TAYER & BODINE
Sent from my iPhone


On Feb 17, 2022, at 15:29, Komey Vishakan <kvishakan@pausd.org> wrote:


Dear Ms. Kena,

Thank you for your email.

EXHIBIT 25 - 003

The District is currently investigating this matter. Throughout the duration of the investigation, your client will remain on paid administrative leave.

We will ensure any communication with your client is done through you. If you would like to share any information with the investigator, please feel free to communicate it to me.

Thank you,
Komey

**Komey Vishakan, General Counsel**

**Palo Alto Unified School District | 25 Churchill Avenue | Palo Alto, CA  94306 | kvishakan@pausd.org**

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**From:** "Kena C. Cador" <kcador@beesontayer.com>
**Date:** Wednesday, February 16, 2022 at 4:41 PM
**To:** Lisa Hickey <lhickey@pausd.org>, Trent Bahadursingh <tbahadursingh@pausd.org>
**Subject:** Peter Colombo

CAUTION: This email originated from outside of the organization. Be careful opening attachments or clicking links.

Good Evening,

My name is Kena Cador and I'm an attorney retained by the California Teachers Association working with Peter Colombo regarding his administrative leave and investigation by the District.

As I understand it, the District has hired an outside investigator so I would appreciate if you could share their conteact information or connect me with them at your earliest convenience.

Please don't hesitate to let me know if one of you, or District counsel if more appropriate, would be available sometime soon to discuss the matter as well as Mr. Colombo is eager to have this resolved and return to his students as soon as possible.

I look forward to speaking with someone soon.

Sincerely,
Kena C. Cador

<0.gif>      **Kena C. Cador**
             Attorney

             www.beesontayer.com

**Please note our Oakland office's new address below.**

492 Ninth Street, Suite 350      **D:**(510) 267-6325
                                 **O:**(510) 625-9700
Oakland, CA  94607               **F:**(510) 625-8275

CONFIDENTIALITY NOTICE:
The information contained in this communication from kcador@beesontayer.com sent at 2022-02-16 19:41:44 (Eastern) may contain confidential and/or privileged information. It is intended solely for use by lhickey@pausd.org and others authorized to receive it. If you are not lhickey@pausd.org you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by reply e-mail and delete this message. Thank you for your cooperation.

NOTE:
As a result of the COVID-19 Virus and the federal, state, and local mandates, all Beeson, Tayer & Bodine attorneys and staff are working remotely. Further, the buildings housing our offices have closed. While we are able to receive US Mail, our ability to receive other deliveries (UPS/DHL etc.) is extremely limited at this time. Thus, we are asking that you refrain from sending any correspondence or documents by overnight delivery at this time and instead use email or a file transfer for large files. Thank you for your consideration and professional courtesy. Please contact our offices with any questions.

EXHIBIT 25 - 004

**EXHIBIT 29**

CAUTION: This email originated from outside of the organization. Be careful opening attachments or clicking links.

Hi Komey,

*Thank you,*

*Detective Yolanda Clausen*
*Phone: 650-329-2307*
*Fax: 650-329-2565*
*Investigative Services Division*
*Palo Alto Police Department*
*yolanda.clausen@cityofpaloalto.org*

**From:** Komey Vishakan <kvishakan@pausd.org>
**Sent:** Friday, February 4, 2022 4:45 PM
**To:** Franco-Clausen, Yolanda <Yolanda.Franco-Clausen@CityofPaloAlto.org>
**Subject:** Fw: Ticket 90332 Open --> RE: Pete Colombo

CAUTION: This email originated from outside of the organization. Be cautious of opening attachments and clicking on links.

Detective Clausen:

This is the information we received through our reporting system. Please see below.

Thank you,
Komey

**Komey Vishakan, General Counsel**
**Palo Alto Unified School District | 25 Churchill Avenue | Palo Alto, CA 94306 | kvishakan@pausd.org**

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** Title IX Coord <titleixcoordinator@pausd.org>
**Date:** Friday, January 28, 2022 at 11:30 AM
**To:** Robert Andrade <randrade@pausd.org>
**Subject:** Ticket 90332 Open --> RE: Pete Colombo: To Whom it may concern.I'm wr...



| Client | |
|---|---|
| **Name** | ▮▮▮▮▮▮▮▮▮▮.com> |
| **Address** | |

| Ticket Info |
|---|
| |

**EXHIBIT 30**

EVAN C. NELSON (SBN 172957)
JONATHAN MCDOUGALL, ESQ. (SBN 212359)
LAW OFFICE OF JONATHAN MCDOUGALL
1640 Laurel Street
San Carlos, CA  94070
Telephone: (650) 594-4200
Email:  jonathan@mcdlaw.net; evancnelson.law@gmail.com

*Attorneys for Plaintiff Peter Colombo*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PETER COLOMBO,<br><br>             Plaintiff,<br><br>v.<br><br>PALO ALTO UNIFIED SCHOOL DISTRICT, DON AUSTIN, Individually and as Superintendent for PAUSD, LISA HICKEY, Individually and as Director of Certificated Human Resources for PAUSD, AMANDA BARK, Individually and as Manager, Policy and Legal Compliance for PAUSD, and TRENT BAHADURSINGH, individually and as Chief of Staff for PAUSD,<br><br>             Defendants. | Case No. 5:24-cv-00909-NC<br><br>**SUPPLEMENTAL DECLARATION OF CINDI DURCHSLAG AHERN**<br><br><br><br>**HON. NATHANAEL M. COUSINS** |

1.      My name is Cindi Durchslag Ahern. I make this declaration based on my own personal knowledge and if called to testify would testify as follows.

2.      After the 2024-2025 school year, I retired as a certificated PE teacher with approximately 29 years of teaching experience at Palo Alto Unified School District, PAUSD or the District.

-1-
SUPPLEMENTAL DECLARATION OF CINDI DURCHSLAG AHERN
*Colombo v. Palo Alto Unified School District, et al. Case No.: 5:24-cv-00909-NC*

EXHIBIT 30 - 001

5.      I have been clear regarding my willingness to provide information relevant to what I perceive to have been a misidentification of the alleged perpetrator and/or otherwise improbable, if not false, claim against Mr. Colombo. I am highly critical of the government officials who failed to contact me to obtain information, which I have always been available and willing to provide. I previously provided a declaration and I have also appeared for a deposition to allow all parties to the current lawsuit an opportunity to learn the information I have to share.

6.      During my deposition in this matter, I testified that the locker room protocols made it highly improbable, if not impossible, for the alleged assault to have occurred as claimed by the former student accuser. Based on my experience and recollection, if the former student had been sexually assaulted during 2001-2002, Mr. Giordano would have been the most likely "perp" or perpetrator; but not as a rape during school hours in the girls' locker room at the beginning of lunch.

7.      I also testified about the fact that I do not believe we held swim modules for 6th graders at Jordan and/or Terman in 2001-2002, because of the difficulties involving walking the Terman 6th graders over to the pool; and Jordan and Terman were on the same "schedules" so we would have had swim modules for Terman 6th graders if we had swim modules for Jordan 6th graders, and vice versa. I also do not recall walking 6th graders over to the pool from Terman. I do recall walking 7th graders over to the pool the following year, but we did not always have swim modules for 6th graders.

SUPPLEMENTAL DECLARATION OF CINDI DURCHSLAG AHERN
*Colombo v. Palo Alto Unified School District, et al. Case No.: 5:24-cv-00909-NC*

EXHIBIT 30 - 002

11.    As with my testimony contained in my prior declaration and deposition, I was able and willing to provide this information to the District or its administration, to law enforcement and/or to anyone else had they been interested in conducting a thorough investigation of the claim that I strongly consider having been wrongfully prosecuted against Mr. Colombo.

12.    If the District has a properly authenticated, true and correct copy of the student's 6th grade student record, I will defer to that record, but I would expect them to explain how it can be authenticated since it was concealed previously. In the absence of such a properly verified student record, my best recollection is as stated herein, in my prior declaration and in my deposition testimony.

SUPPLEMENTAL DECLARATION OF CINDI DURCHSLAG AHERN
*Colombo v. Palo Alto Unified School District, et al. Case No.: 5:24-cv-00909-NC*

EXHIBIT 30 - 003

I so declare under penalty of perjury under the laws of the United States and the State of California, executed this 19th Day of September, 2025 in San Jose, California.

_____
Cindi Durchslag Ahern

I so declare under penalty of perjury under the laws of the United States and the State of California, executed this 19th Day of September, 2025 in San Jose, California.

Cindi Durchslag Ahern

**SUPPLEMENTAL DECLARATION OF CINDI DURCHSLAG AHERN**
*Colombo v. Palo Alto Unified School District, et al. Case No.: 5:24-cv-00909-NC*

## Terman and Jordan Daily Schedule 2001

|  | Monday | Tuesday | Wednesday | Thursday | Friday |
|---|---|---|---|---|---|
| 8:10 - 9:05 | Period 1 | Period 1 | Period 6 | Period 1 | Period 1 |
| 9:10 - 10:10 | Period 2 | Period 2 | Period 7 | Period 2 | Period 2 |
| 10:10 -10:20 | Brunch | Brunch | Brunch | Brunch | Brunch |
| 10:25 - 11:20 | ██████ | Period 7 | ██████ | Period 5 | ██████ |
| ██████ | ████████████ | █████ | ██████ | Period 6 | Period 5 |
| 12:20 - 12:55 | Lunch | Lunch | Lunch | Lunch | Lunch |
| 1:00 - 1:55 | Period 5 | █████ | Advisory 1:00 - 1:40 | Period 7 | Period 6 |
| 2:00 - 2:55 | Period 6 | Period 5 |  | █████ | Period 7 |
| 2:55 - 3:05 | Team | Team |  | Team | Team |

████████████████████ 6th graders met twice a week for PE. One set of classes met on **M/W** during 3rd and 4th periods. The other set of classes met on **T/TH** for 3rd period, and **T/F** for 4th period

6th Grade PE at Jordan was during 5th and 6th periods.

EXHIBIT 30 - 006

# 2001 Terman and Jordan Daily Schedule

|  | Monday | Tuesday | Wednesday | Thursday | Friday |
|---|---|---|---|---|---|
| 8:10 - 9:05 | 1 | 1 | 6 | 1 | 1 |
| 9:10 - 10:10 | 2 | 2 | 7 | 2 | 2 |
| 10:10 - 10:20 | Brunch | Brunch | Brunch | Brunch | Brunch |
| 10:25 - 11:20 | 3 | 7 | 3 | 5 | 4 |
| 11:25 - 12:20 | 4 | 3 | 4 | 6 | 5 |
| 12:20 - 12:55 | Lunch | Lunch | Lunch | Lunch | Lunch |
| 1:00 - 1:55 | 5 | 4 | Advisory | 7 | 6 |
| 2:00 - 2:55 | 6 | 5 |  | 3 | 7 |
| 2:55 - 3:05 | Team | Team |  | Team | Team |

EXHIBIT 30 - 007

**EXHIBIT 32**

# Student Records

The Palo Alto Unified School District (PAUSD) has established a Custodian of Records at each school site and at the Distract Office, to receive requests for records, and to ensure a copy of those records is provided to authorized individuals making the request. Students currently ltt€ndint a PAUSD school should request rccords from tha school thc studcnt .ttands.



# Changing Student Name and/or Gender

Submit requests, along with any required additional documents, to the Reglstration Services office (contact Informatlon llsted above):

    o If the name / gender change has been changed legally, download Legal Change of Name / Gender form.

    ɼ If the name/gender change has not been legally changed, download Requested Change of Name / Gender form.

# Special Education Student Records

Submit a Socciallduratloo Records Request form by fax or postal mall, to the attention of the Director of Special Education:

    o Fax: (550) 833-4265

    o Mail: Special Education Depanment
       Palo Alto Unified School Distrlct
       25 Churchill Avenue
       Palo Alto, CA 94305

Call (650) 8334257 for questions regarding Special Education records.

# Enrollment Verification

Enrollment Verifications can not be provlded over the phone. Submit a Records Requesl]fqrm to Retistration Services: email RegistrationServices@pausd.org, or fax (650) 321 -4525.

# Transcripts, Report Cards, Progress Reports

ocurrcnt3tudCnt3:Send@totheschoolltself,ifschoolisinsesslon;sendto

lggistratlonServlces@oausd.org during summer school closures. There is no charge for records up to a maxlmum of five (5) copies.

    ɼ Formcr studants: two (2) documents without charte; additional copies 310 each. Cash or check only. Checks made payable to PAUSD. Contact PAUSD Registration Services if other arrangements are needed.

        o If the student is over eighteen (1 8) years old, the student must be the requestor; If not, a written release from the student must be included with this form, granting permission for the requestor to receive the records.

EXHIBIT 32 - 001

o Requcsts have a fivc (5) day turnaround.

o Include Requestors Government Issued photo ID.

# Requests related to Legal Actions

Please dlrect subpoenas for student records to:

- Mall: Palo Alto Unltled School Dlstrlct

  Att€ntlon: Legal Depanment

  25 Churchill Avenue

  Palo Alto, CA 94306

  o Phonc: (5503l13ZEii

E     English

EXHIBIT 32 - 002

# EXHIBIT 34



**Subject:** Re: [EXTERNAL] Re: People v. Columbo (B2201250) - Inquiry
**Date:** Tue, 17 Jan 2023 13:44:25 -0800
**Importance:** Normal

---

Hi Kelly,

I'm working on finalizing our article about Mr. Colombo's case and had a few follow up questions that I would appreciate your help answering:



If so, when did you/police receive it? The Palo Alto Police Department referred me over to you for more information, since the case is currently moving through the court system.
- What was the outcome of the Jan. 5 preliminary examination? It looks like the case was continued to March 21, but I wanted to confirm that with you. Was there any other notable developments at the Jan. 5 hearing?

Best,
Zoe

Zoe Morgan (she/her)
Staff Writer, Palo Alto Weekly/Mountain View Voice
450 Cambridge Ave.
Palo Alto, CA 94306
650.326.8210    650.223.6519 (direct)


On Mon, Dec 19, 2022 at 9:12 AM Zoe Morgan <zmorgan@embarcaderomediagroup.com> wrote:
> Thanks for the reply! Is there a time today or tomorrow that we could nail down for a call? Both days are very open for me, so let me know what works for you.
>
> Here are some options:
>
> - 11 a.m. on Monday, Dec. 19
> - 2 p.m. on Monday, Dec. 19
> - 9 a.m. on Tuesday, Dec. 20
> - 12:30 p.m. on Tuesday, Dec. 20
>
>
> Best,
> Zoe
> Zoe Morgan (she/her)
> Staff Writer, Palo Alto Weekly/Mountain View Voice

EXHIBIT 34 - 001

**From:** Zoe Morgan <zmorgan@embarcaderomediagroup.com>
**To:** "Meeker, Kelly" <kmeeker@dao.sccgov.org>
**Subject:** Re: [EXTERNAL] Re: People v. Columbo (B2201250) - Inquiry
**Date:** Thu, 02 Feb 2023 09:46:09 -0800
**Importance:** Normal

---

Hi Kelly,

███████████████████████████████████████████████████████

████████████████████████████████████████ It's important that I can corroborate what the district has told me for my article.

Could you confirm whether the police received a copy of the student's record?

Best,
Zoe


Zoe Morgan (she/her)
Staff Writer, Palo Alto Weekly/Mountain View Voice
450 Cambridge Ave.
Palo Alto, CA 94306
650.326.8210    650.223.6519 (direct)


On Fri, Jan 20, 2023 at 2:58 PM Meeker, Kelly <kmeeker@dao.sccgov.org  wrote:

> Hi Zoe,
>
> The case was continued to a new preliminary hearing date of March 21, 2023.
>
> I am unable to provide specific information to you about the investigation of this case or what information is contained within my confidential file.
>
> Please let me know if you have any additional questions,
>
> Kelly Meeker
>
> Deputy District Attorney

EXHIBIT 34 - 002

# EXHIBIT F

EXHIBIT 34 - 003



EXHIBIT 34 - 004

**EXHIBIT 36**

# EXHIBIT PP

EXHIBIT 36 - 001

EXHIBIT 36 - 002

EXHIBIT 36 - 003





EXHIBIT 36 - 004

# EXHIBIT PP-1

EXHIBIT 36 - 005

EXHIBIT 36 - 006

EXHIBIT 36 - 007

# EXHIBIT PP-2

EXHIBIT 36 - 008

EXHIBIT 36 - 009

**EXHIBIT 40**

# Open Forum Meeting

Recording Name:
[Open Forum 8_19_2025]

Transcript Prepared By:

(720) 287-3710
1355 S. Colorado Blvd.
Suite C515
Denver, CO 80222

DUNS Number: 037801851
CAGE Code: 6C7D5
Tax ID #: 27-2983097

EXHIBIT 40 - 001

| | | |
|---|---|---|
| 1 | Speaker: | First, and most importantly, PAUSD values inclusion |
| 2 | | and tolerance, and we strive to create a safe space |
| 3 | | for all to express their views.  Please withhold |
| 4 | | commentary both during and after everyone is speaking. |
| 5 | | I'm trying to count how many speakers we have.  Okay. |
| 6 | | Um, as we have over 15 commentors for bylaws of the |
| 7 | | board, 9.3.23, each speaker will be limited to one |
| 8 | | minute.  As per our practice and policy, we prioritize |
| 9 | | students, so I start with students, and then go |
| 10 | | between Zoom and in person.  The First Amendment |
| 11 | | protects the public's right to speak, and we honor |
| 12 | | that right.  At the same time, I encourage all |
| 13 | | speakers to remember that our students are listening. |
| 14 | | Let us model the respectful, thoughtful discourse we |
| 15 | | hope to see and do see in our students.  Thank you. |
| 16 | | Okay.  So now we will start open forum.  We have Mar |
| 17 | | Lucas (ph), followed by Clark Barrett. |
| 18 | Lucas: | Hi.  My name is Mar Lucas.  Uh, my son was a wrestler |
| 19 | | at Gunn.  He died by suicide eight years ago, which is |
| 20 | | eight (inaudible - 00:01:19) You may have met me here |
| 21 | | last June.  Last spring.  I wear his thumbprint near |
| 22 | | my heart every day.  My grief's only eclipsed by the |
| 23 | | sadness that he was in so much pain.  I'd like to |
| 24 | | share a few stats with you.  In 2024, 20 percent of |
| 25 | | high school students nationwide seriously considered |

|    |           |                                                            |
|----|-----------|------------------------------------------------------------|
| 1  |           | attempting suicide, 10 percent attempted.  So at Paly,     |
| 2  |           | that means 400 considered and 200 attempted.  Probably     |
| 3  |           | at a minimum. Imagine if 200 students at Pal had           |
| 4  |           | cancer.  How would we react?  I'm continuing my plea       |
| 5  |           | from last spring that this community treat suicide         |
| 6  |           | like the epidemic that it is.  I appreciate everyone's     |
| 7  |           | efforts with the wellness committee community              |
| 8  |           | organizations, planning, good intentions, big actions,     |
| 9  |           | but, uh, we're not moving fast enough.  You have to        |
| 10 |           | ask yourself, "What are you doing this week, next          |
| 11 |           | week, and in one month?"  I'm in- -- I'm asking this       |
| 12 |           | community to put a sense of urgency around this. Thank     |
| 13 |           | you.                                                       |
| 14 | Speaker:  | Thank you.  Okay.  We have Clark Barrett followed by       |
| 15 |           | Marek Gopalan (ph).                                         |
| 16 | Barrett:  | Well, building on that, I'd like to start by               |
| 17 |           | acknowledging the loss of a 17-year-old Gunn student       |
| 18 |           | just over a week ago.  I can't imagine what her family     |
| 19 |           | and friends are feeling.  I hugged my daughter, a          |
| 20 |           | sophomore at Gunn, a little harder and a little longer     |
| 21 |           | than usual the day I heard about it.  It's a tragic        |
| 22 |           | and stark reminder of the ongoing challenge we face to     |
| 23 |           | ensure that we are taking care of the mental health        |
| 24 |           | and wellness of our students.  The promise was crafted     |
| 25 |           | to create -- keep this issue top of mind.  How are we      |

3

1          doing?  Not well, I'm afraid.  My main message tonight

2          is about Fletcher Middle School.  It's hard to imagine

3          a more complete failure to live up to the promise and

           the situation there. 

17

18  Speaker:   Thank you.  Mr. Gopalan followed by Naveen (ph).

19  Gopalan:   To be clear, we are not here to judge Mr. Colombo's

           guilt or innocence, but

25

EXHIBIT 40 - 004

4

 9                    We understand that the legal issues

10                are complicated.  But no one stepped up and said,

11                "This is going to hurt our kids if we don't handle it

12                differently," and we will hold you accountable for

13                that.

14 Speaker:  Thank you.  We have Naveen (inaudible - 00:04:48),

15                followed by Karen Ceresnak.

16 Naveen:  Yeah, hi, there.  My name is Naveen and I'm one of the

17                parents of --

18 Speaker:  Can you, um -- if you get c- -- then we -- thank you.

19 Naveen:  Oh, yeah.  Sure.  So my name is Naveen.  I am a -- a

20                father of a seventh grader in -- in -- in the same

21                school that we're talking about, Fletcher Middle

22                School.  And, uh, I -- my main point is I am -- I

23                think we are all gonna talk about what has happened in

24                the past two months as parents, you know, went through

25                a lot during summer about the decision that we made to

EXHIBIT 40 - 005

███       hire this teacher.  ████████████ ████ ████████

2         ████████ ██████ But I am bit more worried about what

3         has happened in the past four days, uh, you know, the

4         -- since the school has opened.  Uh, I was hoping like

5         there would be a -- a dialogue, especially dealing

6         with the students in the school.  And what I've seen

7         is actually very surprising and -- uh, um, to the

8         extent where like students are not a- -- open --

9         allowed to openly speak about their, you know -- what

10        their -- what is going through their minds.  They are

11        able to share with us at home that they are under

12        stress, uh, but I see that the school is not, you

13        know, understanding that situation.  Thank you.

14  Speaker:   Thank you.  We have Karen followed by Tracy Lee.

15  Ceresnak: I'm not here to talk about Mr. Colombo, but the

16        response my child got from her trusted adults at

17        Fletcher.  Emily read what everyone else read online,

███       and was rightfully worried.  ██ ████████ ████ ████████

███   ████████ ███████████ █████ ███████ ████

███   █████████████ ██ ███████ ██████ ████████

21    ██████████████████ ████ ████ ████████ ████ ████████

22        When she went to the school mental health and wellness

23        associate, she was questioned with, "How long do you

24        plan on doing this?"  Then followed up with, "You will

25        get detention and then if you get more than one



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
1355 S. Colorado Blvd., Suite C515, Denver, CO 80222

EXHIBIT 40 - 006

```
 1              detention, you won't be allowed on your SoCal choir
 2              trip."  Does this sound like an appropriate response
 3              to you?  She has been berated by her P.E. teacher
 4              instead of being supported.  She was met with raised
 5              and aggressive voice and was pressured to explain
 6              herself in front of Mr. Colombo when she asked to see
 7              her counselor.  This is the opposite of a safe and
 8              emotionally supportive environment, anchored by
 9              trained adults.  What occurred instead created a
10              hostile environment.  Emily was intimidated,
11              threatened, and pressured to disclose sensitive
12              concerns in front of the very individual she feels
13              unsafe around.  As a result, she feel like she can no
14              longer teach this -- trust this teacher.  How we
15              choose to handle this situation shapes not only this
16              moment, but also how they approach and navigate
17              similar situations for the rest of their lives.
18  Speaker:   Thank you.
19  Ceresnak:  Staff at Fletcher and the district --
20  Speaker:   Please feel free to email your comments --
21  Ceresnak:  -- need to do better.
22  Speaker:   -- to board at PAUSD.  We have Tracy.  I also would
23              like to remind the audience to please refl- -- refrain
24              from clapping before, after, or during.  We have Tracy
25              Lee, followed by Julia.
```

```
 1   Tracy:     Good evening, d- -- board members.  I'm speaking
 2              tonight as a mother who's deeply concerned about the
 ▮              safety and wellbeing of our children.  ▬▬▬▬▬▬▬
 ▮              ▬▬▬▬▬ ▬▬▬▬ ▬▬ ▬▬ ▬▬▬ ▬▬▬▬ ▬▬▬▬ ▬▬▬ ▬▬▬▬▬▬
 5              ▬▬▬▬▬▬▬ ▬▬▬▬▬▬ ▬▬▬▬▬  Some of them are so
 6              anxious that they actually create a buddy system to
 7              walk into class.  This is not normal, and this is
 8              unacceptable.  But the truth is, for every student
 9              that stands up, there are actually 20 more who remain
10              silent.  And the reason why is because they are afraid
11              of retribution or detention.  So their silence does
12              not mean that they feel safe.  They actually feel
13              powerless.  And that's why we are here as parents to
14              advocate for them, where they cannot do it for
15              themselves.  You, the board, have made a public
16              promise to prioritize students' wellbeing as well as
17              mental health.  Right now, that promise is being
18              broken.  By moving forward with this placement, you
19              are basically sending a message to the students and
20              parents that their fears are not, uh -- basically they
21              -- it doesn't matter.  So we ask you to step up and
22              urge and follow and keep your promise with this
23              district.
24   Speaker:   Thank you.  We have Julia, followed by Casey.
25   Julia:     When I first heard about Mr. Colombo coming to my
```

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
1355 S. Colorado Blvd., Suite C515, Denver, CO 80222

EXHIBIT 40 - 008

1       sister's school, I was shocked and confused.  But I

2       was mostly worried.  Worried for my sister attending

3       Fletcher.  It loomed over my family's entire summer.

4       Our vacations were filled with anxiety and fear for my

5       sister.  My parents tried reassuring her, but they

        were never reassured themselves.



11      How she doesn't feel comfortable in

12      the environment where she's expected to focus, learn,

13      grow, and feel safe.  Imagine you had a daughter who

14      was constantly scared and having to check over her

15      shoulder in order to feel secure.  My sister and every

16      girl at Fletcher needs to feel safe and protected at

17      school.  Thank you.

18  Speaker:   Thank you. We have Casey Walker followed by Allison

19          Leek (ph).

    Walker:



24      It

25      needs to be unmade immediately.  Mr. Colombo should be

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
1355 S. Colorado Blvd., Suite C515, Denver, CO 80222

EXHIBIT 40 - 009

1          put back on TOSA.  Then if you really want to bring
2          him back, our suggestion would be to appoint an
3          independent committee of stakeholders to produce a
4          report building a case for whether he should or should
5          not be teaching middle school children.  The committee
6          should operate transparently, should include parents
7          and students, and should not include anyone who is
8          named in the lawsuit, as they clearly have a conflict
9          of interest.  We conclude by offering our own promise:
10          We will not stop raising our voices and sounding the
11          alarm until someone steps up and displays the
12          leadership required to put the wellbeing of our kids
13          first.  And if no one here has the courage to do it,
14          we will direct all of our efforts towards seeking new
15          leadership for the school district.  Thank you.
16  Speaker:  Thank you.  We have Allison, followed by Emily, and
17          then Lana.
18  Leek:    On the PAUSD website, the very first line in the
19          mental health and wellness section is, "Wellbeing is
20          a prerequisite for learning."  I agree.  How can
21          students be expected to learn in an environment where
22          they don't feel safe.  By making the decision to hire
23          Mr. -- Mr. Colombo, feelings of anxiety and fear among
24          Fletcher students have increased.  As such, I expect
25          that changes are made to accommodate any and all

1          concerns that they may have, including mental health

2          support and an opt-out right for all children assigned

3          to Mr. Colombo's class who feel uncomfortable.

           Moreover, 

8          PAUSD students, and

9          we'll hold you to that.  Thank you.

10  Speaker:   Thank you.  We have Emily, followed by it's either

11          Llana (ph) or Yana, and then Steven Davis.

12  Emily:   My name is Emily, and I'm a seventh grade student at

13          Fletcher Middle School.  All three days I have gone to

14          school in P.E., I have actually gone to the office

15          because I felt uncomfortable being with Peter Colombo.

16          While he was not my actual teacher, my concerns are

17          still real and there.  In the two t- -- in the two

18          times I went to class for a little bit, he was there.

19          Yet, every time I've gone to the office with these

20          concerns, I was either dismissed or met with

21          consequences.  One specific day, yesterday, I actually

22          went to class, only to find out that our classes were

23          combined with Mr. Colombo's.  I asked my teacher to go

24          to the counselor, but was yelled and verbally abused

25          by her, which made me wanna cry.  My concerns are

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
1355 S. Colorado Blvd., Suite C515, Denver, CO 80222

EXHIBIT 40 - 011

```
 1              important, but no one from the district or from school
 2              has told me so.  What I know of Peter Colombo makes me
 3              feel unsafe in a place where I'm supposed to feel
 4              safe.  And every time I have looked for help at
 5              school, I felt like disappearing.  No one is helping
 6              me feel safe.  Our safety is more important than some
 7              lawsuit.  He has caused us a great amount of stress
 8              and tears.  No kid my age should have to go through
 9              this.
10  Speaker:   Thank you so much.  But please email the rest of your
11              comments to board at PAUSD.org.  All right.  Yes.  But
12              any future comments, please email us.  Thank you.  We
13              have either Llana or Yana and then we actually have
14              Kayla next, as I wanted to get all the students.
    Llana:
```



```
25
```

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
1355 S. Colorado Blvd., Suite C515, Denver, CO 80222

EXHIBIT 40 - 012

| 1 | | The district even supposedly did its own investigation |
|---|---|---|
| 2 | | of Mr. -- on Mr. Colombo, but somehow the results of |
| 3 | | that has been kept a secret.  So how can we reassure |
| 4 | | the kids?  What evidence do we have that they are |
| 5 | | indeed safe?  As a student who has experienced |
| 6 | | inappropriate behavior from a teacher at a young age, |
| 7 | | I wish I had -- I only wish I had a -- an adult who I |
| 8 | | could trust and believe in.  You are responsible for |
| 9 | | the decision you've made, and you will forever have to |
| 10 | | live with the consequences.  Thank you. |
| 11 | Speaker: | Thank you.  We have Kayla, followed by Steven Davis, |
| 12 | | then Rich Lee. |
| 13 | Female: | Kayla just stepped out.  She'll be right back. |
| 14 | Speaker: | Okay.  That's totally -- yeah, that's fine.  Um, so |
| 15 | | then we'll go to Steven Davis, Rich Lee, and then |
| 16 | | Kayla. |
| 17 | Davis: | We have gone from 16 regular board meetings a year in |
| 18 | | '22 to '23 to 12 this year.  I don't think this was |
| 19 | | intentional, but should be a serious concern to |
| 20 | | everyone as transparency oversight and insight into |
| 21 | | district operations are lost when we reduce the number |
| 22 | | of meetings.  The board has substantial |
| 23 | | responsibilities to just keep the light on.  Budgets, |
| 24 | | union negotiations, state-mandated reporting, these |
| 25 | | all take a lot of time and are non-negotiable.  As we |

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
1355 S. Colorado Blvd., Suite C515, Denver, CO 80222

EXHIBIT 40 - 013

1        reduce the number of meetings, everything else gets

2        squeezed out.  This denies our district tream- -- team

3        the time to present the w- -- their work, and prevents

4        the board from having insight and oversight into what

5        is happening in our school district.  It can also

6        exacerbate political problems.  Please take action to

7        add, uh, two meetings a month as we used to.  Thank

8        you.

9  Speaker:  Thank you.  We have Rich Lee, followed by Kayla if she

10        is back.  If not, we will get back.

11  Rich:  Hello members of the school board.  My name's Rich

12        Lee, and we heard a lot about mental health and also

13        the Paly total, uh, district promise.  And I'll share

14        my experience with you guys for the past four months,

15        along with about 200, uh, parents and students.

16        Students share their anxiety with the site principal.

        Their concerns were dismissed.



25

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
1355 S. Colorado Blvd., Suite C515, Denver, CO 80222

EXHIBIT 40 - 014

|    |          |                                                      |
|----|----------|------------------------------------------------------|
| 1  |          | Tell the students that their safety and emotional    |
| 2  |          | wellbeing matters.  Stop intimidating and threatening |
| 3  |          | the students who come to you for comfort.  We elected |
| 4  |          | you to represent us, and we elected you to hear our  |
| 5  |          | voices.                                              |
| 6  | Speaker: | Thank you.  Please email the rest --                 |
| 7  | Rich:    | Keep your promise.                                   |
| 8  | Speaker: | -- of your comments to board at PAUSD.org.  We have  |
| 9  |          | Ian, followed by Kayla, and then our -- followed by  |
| 10 |          | Maxime.                                              |
| 11 | Ian:     | So I really appreciate the opportunity to come up here |
| 12 |          | and speak in front of everybody.  You know, I sat here |
| 13 |          | and listened to the board meeting.  And given what's |
| 14 |          | going on at Fletcher, everything before this just came |
| 15 |          | across as hypocrisy.  You know, I asked my son how,  |
| 16 |          | uh, things were going at Fletcher, and he's like, "Are |
| 17 |          | you talking about the diddler?  Mr. Diddy?"  And I was |
| 18 |          | like, "Yeah.  What's going on?"  And he was like,    |
| 19 |          | "Well, nobody's happy about it.  Nobody's comfortable |
| 20 |          | talking about it."  And, you know, the school board  |
| 21 |          | and the school district has got a responsibility to  |
| 22 |          | create a safe and, uh, conducive learning environment, |
| 23 |          | and this is just an unforced error.  And I think     |
| 24 |          | there's something that we can do by putting him back |
| 25 |          | on the TOSA and making sure that, uh, he's actually in |

EXHIBIT 40 - 015

1    a place where, you know, the students can learn.  We

2    can figure out what the right thing for him to do is.



6    This isn't about guilty or not guilty.  This

7    is about a safe, great environment for students to

8    learn.  We have enough mental health issues with kids

9    walking in front of trains.  We don't need to be

10   adding to the stress of the students.

11   Speaker:    Thank you.  Is Kayla -- so we have Kayla.

12   Kayla:     Um, last year when I was at Fletcher, and he wasn't

13   even hired yet, it was like a huge topic of

14   conversation.  It took away from my class time.  It

15   took away from my friends' class time.  It took away

16   from our learning experiences.  And while I myself

17   sometimes am not the biggest fan of school, I still

18   value my learning, and I would really appreciate if I

19   could learn.  Also, my brother attends Fletcher, and

20   from what I've heard, he is not happy about it.  He

21   has -- he met the teacher next semester, and I know he

22   is scared.  I know his friends are scared.  I'm scared

23   for him.  I was scared last year.  And it just -- I

24   don't think it's a good situation, and yeah.  I think

25   a lot of kids are scared, and that doesn't foster a

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
1355 S. Colorado Blvd., Suite C515, Denver, CO 80222

EXHIBIT 40 - 016

```
 1              good learning community, and that's what school is
 2              for.  For learning.
 3  Speaker:    Thank you.  We have Maxime and then we have a caring
 4              parent via Zoom.
 5  Coh:        All right.  Thank you everybody for your time.  Um, my
 6              name is Maxime Coh (ph).  I am a parent of two
 7              students at Fletcher Middle School.  Uh, one of them
 8              has, uh, Mr. Colombo as a teacher.  Um, so you know, I
                --
```

21              But our children equally
22              have a right to a safe learning environment, and my
23              son does not feel comfortable.
24  Speaker:    Thank you.  We now have a caring parent via Zoom
25              followed by Sonal Singla via Zoom.



Parent:   Good evening.  Good evening. ▮▮▮▮▮▮▮▮▮ ▮

21                      ▮▮▮▮▮▮ Thank you.

22  Speaker:  Thank you.  We have Sonal Singla via Zoom followed by

23            Nandini (ph) Singla via Zoom.

24  Sonal:    Hi.  Can you hear me?

25  Speaker:  Yes.

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
1355 S. Colorado Blvd., Suite C515, Denver, CO 80222

EXHIBIT 40 - 018

```
 1   Sonal:     Okay.  Um, I am here to express my anguish at the
 2              situation our kids are facing at Fletcher Middle
 3              School with the P.E. curriculum.  Due to appointment
 4              of Mr. Colombo, the kids are fearful to attend the
 5              P.E. class.  It's the opposite of what a school is
 6              supposed to represent a f- -- a safe place for our
 7              kids.  For kids, perception is r- -- is reality.  And
 8              regardless of what courts have ruled, the presence of
 9              Mr. Colombo in cam- -- on campus is stressful for
10              kids.  I urge the board to uphold your promise towards
11              the students and return Fletcher to a safe
12              environment, both in reality and perception.
13   Speaker:   Thank you.  And now we have Nandini via Zoom.
14   Nandini:   Can you hear me?
15   Speaker:   Yes.
16   Nandini:   My name is Nandini Singla, and I am a seventh grader
17              at Ellen Fletcher Middle School and here are my
                thoughts about this:
```



```
25                                                   Such news going
```

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
1355 S. Colorado Blvd., Suite C515, Denver, CO 80222

EXHIBIT 40 - 019

1          around the school is very disturbing, and I urge you

2          to do something about this.  And also -- actually,

3          never mind.  Thank you.

4  Speaker:  Thank you.  And our final open forum commentor is

5          Warren Tan (ph).  Oh, okay.  Okay.  Thank you.  And

6          that concludes open forum.  We now move on to discuss

7          -- discussion items staff presentation.

1                    TRANSCRIBER'S CERTIFICATE

2

3          I, Alessandra Ferriso, do hereby certify that I have

4    listened to the recording of the foregoing; further that the

5    foregoing transcript, Pages 1 through 19, was reduced to

6    typewritten form from a digital recording of the proceedings

7    held, in this matter; and that the foregoing is an accurate

8    record of the proceedings as above transcribed in this matter on

9    the date set forth.

10          DATED this 20th day of August, 2025.

11

12

13                                    _____

14                                    Alessandra Ferriso

15                                    Ditto Transcripts
                                      1355 S. Colorado Blvd.
16                                    Suite C515
                                      Denver, CO 80222
17                                    Tel: 720-287-3710
                                      Fax: 720-952-9897
18

19                                    DUNS Number: 037801851
                                      CAGE Code: 6C7D5
20                                    Tax ID #: 27-2983097

21

22

23

24

EXHIBIT 40 - 021

**EXHIBIT 43**

**From:** Amanda Bark <abark@pausd.org>
**Sent:** Tuesday, August 02, 2022 3:43 PM EDT
**To:** Thomas Kelly <tkelly@pausd.org>
**CC:** Lisa Hickey <lhickey@pausd.org>
**Subject:** RE: PRA 91578 - PC Work History

Thanks for the summary, Tom.  Are there reports or screen shots (e.g., of the Events or Position screens) that can be provided?

Amanda

---

**From:** Thomas Kelly <tkelly@pausd.org>
**Sent:** Tuesday, August 2, 2022 7:35 AM
**To:** Lisa Hickey <lhickey@pausd.org>; Amanda Bark <abark@pausd.org>
**Subject:** RE: PRA 91578 - PC Work History

Colombo's work history is pretty simple – full-time P.E. at Greene (Jordan) since 1999-2000 (our first year with a data base) except the 2001-02 year at Terman.  He got tenured 8/23/2001.

In the 2009-10 year he took unpaid leave, got paid for a total of 123 days.  I can't say for sure, but that looks to have involved using sick days.

That's it.  If you need salary, let me know.

---

**From:** Lisa Hickey <lhickey@pausd.org>
**Sent:** Monday, August 1, 2022 9:18 PM
**To:** Amanda Bark <abark@pausd.org>
**Cc:** Thomas Kelly <tkelly@pausd.org>
**Subject:** Re: PRA 91578 - PC Work History

Hi Amanda,

Tom was out of the office on Friday and Monday. Tom, can you please prioritize this tomorrow morning and copy me on the work history? I know there is a lot to catch up with when you come back after a couple days out.

Thanks.

-Lisa

---

**From:** Amanda Bark <abark@pausd.org>
**Date:** Monday, August 1, 2022 at 11:34 AM
**To:** Lisa Hickey <lhickey@pausd.org>
**Subject:** RE: PRA 91578 - PC Work History

Thanks for forwarding, Lisa. Sue and Cassidy have replied. I'll follow up with Tom.
Amanda

---

**From:** Lisa Hickey <lhickey@pausd.org>
**Sent:** Saturday, July 30, 2022 9:12 PM
**To:** Amanda Bark <abark@pausd.org>
**Cc:** Trent Bahadursingh <tbahadursingh@pausd.org>; Thomas Kelly <tkelly@pausd.org>; Sue Harris <sharris@pausd.org>; Cassidy Bolger <cbolger@pausd.org>
**Subject:** Re: PRA 91578 - PC Work History

Hi Amanda,

I am copying Tom, Sue, and Cassidy to help us with this. Analytic can provide us with 2011-on. You know better than I do regarding work history prior to this. Cassidy, can you assist with coaching history?

Please let me know what I can do to help too.

Thanks,
Lisa

EXHIBIT 43 - 001

PAUSD000077

**From:** Amanda Bark <abark@pausd.org>
**Date:** Friday, July 29, 2022 at 3:21 PM
**To:** Lisa Hickey <lhickey@pausd.org>
**Cc:** Trent Bahadursingh <tbahadursingh@pausd.org>
**Subject:** PRA 91578 - PC Work History

Hi, Lisa.

Can HR please provide a report (or multiple reports, if the info exists in different systems) that show Peter Colombo's work history with PAUSD? In particular, the Weekly wants "the dates and school location of his employment, with the periods shown when he worked as a credentialed teacher, as a coach and in any other non-credentialed position."

Can this please be prioritized? We are hoping to be able to provide it to Mr. Johnson by 8/4/2022.

Thank you,
Amanda

**From:** Bill Johnson <bjohnson@paweekly.com>
**Sent:** Monday, July 25, 2022 5:46 PM
**To:** Amanda Bark <abark@pausd.org>
**Cc:** Don Austin <daustin@pausd.org>; Komey Vishakan <kvishakan@pausd.org>
**Subject:** Re: CPRA 91578 - PC Complaints


Finally, so we report accurately on his tenure with the district, could you please provide the dates and school location of his employment, with the periods shown when he worked as a credentialed teacher, as a coach and in any other non-credentialed position. If you have not already provided this information to the police and the district is unwilling to prepare a document showing it, please consider this a new PRA request for the monthly pay records of all monies paid to Peter Colombo beginning in 1998 and through today's date.
We are working on the employment history report.

Thank you for your assistance.

Bill

William S. Johnson
Publisher, Palo Alto Weekly
President & CEO, Embarcadero Media
450 Cambridge Ave.
Palo Alto, CA  94306
650.326.8210   650.223.6505 (direct)


On Mon, Jul 25, 2022 at 3:53 PM Amanda Bark <abark@pausd.org> wrote:

Dear Bill,

Please see attached records.

Thank you,
Amanda

**From:** Amanda Bark
**Sent:** Friday, June 24, 2022 6:54 PM
**To:** Bill Johnson <bjohnson@paweekly.com>
**Cc:** Victoria Maya <vmaya@pausd.org>
**Subject:** RE: CPRA 91578 - PC Complaints

Dear Bill,

Please see the District's initial response attached.

Thank you,
Amanda

EXHIBIT 43 - 002

PAUSD000078

**EXHIBIT 44**

**Sent:** Friday, June 10, 2022 12:47 PM EDT
**To:** Lisa Hickey <lhickey@pausd.org>
**Subject:** RE: 2001/2002 school year assignment

Hi, Lisa.

In Analytic, there is an "Events" tab that includes many years that predate Analytic. I believe 2001-02 should be included. There should be a line entry (or multiple lines if split assignment) to at least show site, FTE, pay, etc.

Alternatively, Tom should have access to the system that came before Analytic (which was also developed by Richard Wilmuth). He might be able to generate an assignment notice?

Please let me know if you have any additional Qs.

Amanda

---

**From:** Lisa Hickey <lhickey@pausd.org>
**Sent:** Thursday, June 9, 2022 9:10 PM
**To:** Amanda Bark <abark@pausd.org>
**Subject:** FW: 2001/2002 school year assignment

Hi Amanda,

Since 2001-02 were before analytic, is there anywhere else I can get this info if it's not in his personnel folder?

Thanks,
Lisa

---

**From:** Peter Colombo <pcolombo@pausd.org>
**Date:** Thursday, June 9, 2022 at 3:22 PM
**To:** Lisa Hickey <lhickey@pausd.org>
**Subject:** 2001/2002 school year assignment

Hi Lisa,

I have a H.R. request.

I'm hoping you can find in school district records my official teaching assignment for 01/02 school year.

That school year is the year Terman, 6th grade only, reopened and myself and Cindy Durshlag were 6th grade teachers for P.E. that year at Terman along with my assignment next door at Jordan.

I believe I taught 2 6th grade classes at Terman that year and 3 7th at Jordan.

This HR request would be be very helpful and thanks for your help.

Pete C

Pete Colombo

EXHIBIT 44 - 001

PAUSD000091

**EXHIBIT 45**

Palo Alto Unified School District

**Assignment Notification**

**Colombo, Peter M**

Employee# 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

SSN 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

Alternate Name:

e

San Carlos                 CA 94070              (650) 573-8032

Status Permanent

Employee Type Certificated

Spouse

Emergency Contact

ire              1-1998        TB Due Date      5-18-2

Termination Date                Prof Gr Units    80.167

BirthDate  6- 6-1967

Sex  Male

Ethnicity  White (Not Hispanic

**Benefits**   STRS    Medicare:          CaliforniaCare 1              Delta        on

**MS Tchr -- P.E**                          Permanent          Start  8-23-01 End   6-14-02 Days/yr 186           FTE .7

| Dept | 51 | Jordan | | | Mos/Yr | 10 | FTE 0.70000 |
| Group | 30-CE | Middle Classrm Teacher | | Level P.E. | Track | | FTE/Yr 0.70000 |
| Range | Step | Sal Table Rate | Annual Base Rate | Budget Account | | | ProRate |
| 75 | 5 | 55822.00 | $55,822.00 | 01-51-017100-11100 | | | 0.70000 |

**ExtraPay**         Degrees

                Longevity

                Differential

                ProfGr

**Annual Salary**      **$39,075.40** Base      **$39,075.40** Total      $3,907.54 Monthly Total

**MS Tchr -- P.E.**                         Permanent                                          FTE .3

| Dept | | Middle Classrm Teacher | | | Mos/Yr | 10 | FTE 0.30000 |
| Group | 30-CE | | | Level P.E. | Track | | FTE/Yr 0.30000 |
| Range | Step | Table Rate | Annual Base | Account | | | |
| 75 | 5 | 55822.00 | $55,822.00 | 01-52-017100-11100 | | | 0.30000 |

**ExtraPay**         Degrees

                Longevity

                Differential

                ProfGr

**Annual Salary**      **$16,746.60** Base      **$16,746.60** Total      $1,674.66 Monthly Total

|  | FTE | Base Salary | Extra Pay | Total Salary |
| --- | --- | --- | --- | --- |
| **Employee Total** | 1.00000 | $55,822.00 | $0.00 | $55,822.00 |



**Employee: Please complete this section:**

I have reviewed the information on this form and:

☐ agree that it is correct.    ☐ have made corrections as noted.    ☐ need to discuss with Personnel

Please cross out the following items you DO NOT wish to have printed in the Personnel Directory:

ADDRESS      PHONE

Signature                                                Date

Printed: 9/24/2001                        EXHIBIT 45 - 001                    PAUSD002797

# EXHIBIT A-5

EXHIBIT 45 - 002

Palo Alto Unified School District

**Colombo, Peter M**

Employee# 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

Alternate Name: | SSN 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
e | Status Permanent
San Carlos          CA 94070          (650) 573-8032 | Employee Type Certificated

Spouse

Emergency Contact

ire          1-1998          TB Due Date     5-18-2
Termination Date          Prof Gr Units     80.167

BirthDate   6- 6-1967
Sex   Male
Ethnicity   White (Not Hispanic

**Benefits** STRS     Medicare:          CaliforniaCare 1          Delta

on

**MS Tchr -- P.E**          Permanent           Days/yr 186

Mos/Yr     10

| Group | 30-CE | Middle Classrm Teacher | | Level P.E. | Track | ProRate |
|---|---|---|---|---|---|---|
| Range | Step | Sal Table Rate | Annual Base Rate | Budget Account | | |
| 75 | 5 | 55822.00 | $55,822.00 | 01-51-017100-11100 | | |

**ExtraPay**          Degrees
Longevity
Differential
ProfGr

**Annual Salary**     $39,075.40 Base     **$39,075.40** Total     $3,907.54 Monthly Total

**MS Tchr -- P.E.**          Permanent          Days/yr 186

Mos/Yr     10

| Group | 30-CE | Middle Classrm Teacher | | Level P.E. | Track | |
|---|---|---|---|---|---|---|
| Range | Step | Table Rate | Annual Base | Account | | |
| 75 | 5 | 55822.00 | $55,822.00 | 01-52-017100-11100 | | |

**ExtraPay**          Degrees
Longevity
Differential
ProfGr

**Annual Salary**     $16,746.60 Base     **$16,746.60** Total     $1,674.66 Monthly Total

| | FTE | Base Salary | Extra Pay | Total Salary |
|---|---|---|---|---|
| **Employee Total** | 1.00000 | $55,822.00 | $0.00 | $55,822.00 |

**Employee: Please complete this section:**
I have reviewed the information on this form and:

☐ agree that it is correct.     ☐ have made corrections as noted.     ☐ need to discuss with Personnel

Please cross out the following items you DO NOT wish to have printed in the Personnel Directory:
ADDRESS     PHONE

Signature                                              Date

Palo Alto Unified School District

Employee# 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

**Colombo, Peter M.**

Alternate Name:

SSN 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

Status Permanent

392 Ridge Rd

San Carlos      CA 94070     (650) 365-9361     Employee Type Certificated

Spouse/Partner

Emergency Contact

BirthDate   6- 6-1967

Hire Date   9- 1-1998    TB Due Date   5-18-2003     Sex   Male

Termination Date     Prof Gr Units   80.167     Ethnicity   White (Not Hispanic

**Benefits**   STRS    Medicare:     CaliforniaCare S



**MS Tchr -- P.E.**      **Permanent**

                   Level P.E.     Track     Mos/Yr   10

Group    30-CE   Middle Classrm Teacher                             ProRate

Range   Step    Sal Table Rate    Annual Base Rate    Budget Account

75    6     63117.00     $63,117.00    01-51-017100-11100

**ExtraPay**     Degrees

     Longevity

       Differential

         ProfGr

**Annual Salary**     **$44,181.90** Base     **$44,181.90** Total     $4,418.19 Monthly Total

**MS Tchr -- P.E.**      **Permanent**      Days/yr 186

                   Level P.E.     Track     Mos/Yr   10

Group    30-CE   Middle Classrm Teacher                             ProRate

Range   Step    Sal Table Rate    Annual Base Rate    Budget Account

75    6     63117.00     $63,117.00    01-52-017100-11100

**ExtraPay**     Degrees

     Longevity

       Differential

         ProfGr

**Annual Salary**     **$18,935.10** Base     **$18,935.10** Total     $1,893.51 Monthly Total

| | FTE | Base Salary | Extra Pay | Total Salary |
|---|---|---|---|---|
| **Employee Total** | 1.00000 | **$63,117.00** | **$0.00** | **$63,117.00** |

**Employee: Please complete this section:**     **Please confirm work phone   494-8120**

I have reviewed the information on this form and:

☐ agree that it is correct.    ☐ have made corrections as noted.    ☐ need to discuss with Personnel

Please cross out the following items you DO NOT wish to have printed in the Personnel Directory:

ADDRESS    PHONE

Signature                                     Date

# EXHIBIT 48

# EXHIBIT UU

EXHIBIT 48 - 001

EXHIBIT 48 - 002

EXHIBIT 48 - 003

**EXHIBIT 49**

# EXHIBIT VV

EXHIBIT 49 - 001

EXHIBIT 49 - 002

EXHIBIT 49 - 003

**EXHIBIT 50**

# EXHIBIT WW

EXHIBIT 50 - 001

EXHIBIT 50 - 002

EXHIBIT 50 - 003

**EXHIBIT 60**

**PAUSD info for investigation**

Trent Bahadursingh <tbahadursingh@pausd.org>
Mon 6/27/2022 2 25 PM
To:yolanda.franco-clausen@cityofpaloalto.org <yolanda.franco-clausen@cityofpaloalto.org>

▮ 1 attachments (3 MB)
Student_Records_Files.pdf;

Detective Clausen,

Following up on our phone conversation...

    1. Attached is a copy of the student's records.
    2. I will be your point of contact for PAUSD while Komey Vishakan is out.  My cell number is (310) 704-3889
    3. I am following up on any complaints received and will share what I find.

Thanks.

> **TRENT BAHADURSINGH**
>
> Deputy Superintendent
>
> 25 Churchill Avenue, Palo Alto, CA 94306
> Phone: (650) 329-3958

EXHIBIT 60 - 001

**PAUSD000984**

**EXHIBIT 65**

**From:** Don Austin <daustin@pausd.org>
**Sent:** Sunday, June 19, 2022 8:20 PM EDT
**To:** Lisa Hickey <lhickey@pausd.org>
**Subject:** Re: Public Records Act request
**Attachment(s):** "PAUSD PRA request for Peter Columbo documents.pdf"

Thanks!

Sent from my iPhone

> On Jun 19, 2022, at 5:17 PM, Lisa Hickey <lhickey@pausd.org> wrote:

Hi Don and Trent,

I'll make sure you have the personnel file as well as the file that was in my office on your desk in the morning.

Happy Father Day to both of you!

- Lisa

> On Jun 19, 2022, at 4:30 PM, Don Austin <daustin@pausd.org> wrote:

I know I already forwarded this. I'd like to see everything we have tomorrow. That means absolutely everything. I have a thought about our board meeting on Tuesday.

**From:** Bill Johnson <bjohnson@embarcaderopublishing.com>
**Sent:** Friday, June 17, 2022 3:10 PM
**To:** Komey Vishakan <kvishakan@pausd.org>
**Cc:** Don Austin <daustin@pausd.org>; Jocelyn Dong <jdong@embarcaderopublishing.com>; Zoe Morgan <zmorgan@embarcaderopublishing.com>
**Subject:** Public Records Act request

CAUTION: This email originated from outside of the organization. Be careful opening attachments or clicking links.

Dear Komey,

Please find attached a Public Records Act request for complaints made to PAUSD about Peter Columbo.

Thank you for your prompt attention to this matter.

Bill

William S. Johnson
President & CEO, Embarcadero Media
450 Cambridge Ave.
Palo Alto, CA  94306
650.326.8210    650.223-6505 (direct)

EXHIBIT 65

PAUSD000086

**EXHIBIT 75**

NEWS

# Unfit to teach? Teacher accused of rape had a checkered history in schools

*Palo Alto Unified continued to employ Peter Colombo for over two decades*

by **Zoe Morgan**
February 17, 2023  Updated January 24, 2024

---

*Editor's note: This article contains descriptions of sexual violence and self harm that may be disturbing to some readers.*

In January of last year, the Palo Alto Unified School District received an anonymous email from the husband of a former student, alleging that two decades earlier physical education teacher Peter Colombo had raped the then-sixth grader.

The allegation, which led to a police investigation and his arrest last June, was only the latest charge of criminal conduct by Colombo stretching back nearly 30 years. That list doesn't include additional noncriminal complaints about his behavior that parents submitted to the school district.

District administrators knew of Colombo's criminal history more than a decade ago and yet kept him in the district's employ, according to documents obtained by the Palo Alto Weekly.

How could this have happened? That's the question the ███████████████████ filing Public Records Act requests, ████████████████████████, scrutinizing online personnel data and posing numerous questions to the state's teacher credentialing commission. We also reached out to the student and her husband, as well as Colombo and his attorney, though none

EXHIBIT 75 - 001

responded.

The picture that has emerged is one of numerous second chances given to a teacher and athletic coach who was well-known and, by some, well-regarded. Despite red flags and a checkered history, Colombo worked with Palo Alto students for nearly a quarter century. Colombo himself acknowledged in 2021 the grace administrators had extended to him a decade earlier, saying that they found him "likable" and appreciated the success he'd had with students in athletics.



"Selecting and retaining the people that work with your children is the most important job that we do in the school district," ████████████████████████████████████████████
████████████████████████████

When Palo Alto Unified received the rape allegation, district officials placed Colombo on administrative leave and reported the message to police, who conducted an investigation. Colombo was ultimately arrested in June and was charged with aggravated sexual assault of a child. He is currently out on bail awaiting a preliminary hearing scheduled for next month. If convicted, he faces 15 years to life in prison.

## Legal troubles pre-date Colombo's work in Palo Alto schools

Colombo's professional troubles began before he was hired by Palo Alto Unified in 1998. He failed to disclose three prior criminal convictions on a 1995 substitute teaching credential application, an omission that triggered the California Commission on Teacher Credentialing to issue a "public reproval" in 1997, which serves as a public warning of misconduct.

Those convictions included a 1988 misdemeanor trespassing charge after he went unannounced to the home of a woman he had met through his girlfriend and began honking the horn of his vehicle, according to the teacher credentialing commission's summary of his criminal cases. When police arrived, he was found hiding in the bushes, the summary states.

EXHIBIT 75 - 002

Later that year, he was arrested for ripping a telephone off its cord outside a bar and grill and throwing it at a parked car during an argument with the person inside the vehicle. He pleaded no contest and was convicted of misdemeanor vandalism and misdemeanor disorderly conduct under the influence of alcohol or drugs, the summary of his criminal cases states.

In 1990, he was convicted after pleading no contest to misdemeanor charges of DUI and hit and run. The charges stemmed from a traffic accident after which he failed a field sobriety test, had a blood alcohol level of 0.236% and told police officers that he had a drinking problem, the summary states. The legal limit is 0.08%.

The Palo Alto Unified School District hired Peter Colombo in 1998 as a P.E. teacher at Jordan Middle School, now called Greene, and Palo Alto High School. Source: Palo Alto Unified School District records.

The state Commission on Teacher Credentialing issued the public warning in June 1997. The following year, Palo Alto Unified hired Colombo as a P.E. teacher at Jordan Middle School, now called Greene, and Palo Alto High School, district records show.

It's unclear what the district would have known before hiring Colombo in the 1990s.

The California Commission on Teacher Credentialing in 1998 provided an "all points bulletin" to superintendents that listed adverse actions the commission took against educators, a representative from the commission told the Weekly. Although the commission now offers an online tool to look up a teacher's credential status, that wasn't launched until 2001, after Colombo was hired in Palo Alto.

For employees being hired today, not all criminal convictions are automatically disqualifying,

EXHIBIT 75 - 003

Austin said, including DUI convictions. Relevant factors in determining whether to employ someone with a DUI conviction include looking at any proactive measures the applicant has taken to address the issue, their explanation of what occurred and the district's level of confidence that the issue is in the past, Austin said.



EXHIBIT 75 - 004



Courtesy Palo Alto Police Department.

# PETER COLOMBO'S HISTORY IN PALO ALTO SCHOOLS

Peter Colombo spent nearly a quarter century teaching and coaching Palo Alto students, before being arrested last year for allegedly raping a former student. Records obtained by the Palo Alto Weekly show that Colombo had a disciplinary and criminal history dating back to before he was hired by Palo Alto Unified in 1998 and that district officials knew about that history more than a decade ago.



While it isn't known whether the district was aware of Colombo's criminal history when it hired him in 1998, it turned out that he had not put his alcohol problems in his past. In December 2003, he was pulled over for traffic violations and exhibited signs of intoxication. His blood alcohol content measured at 0.19% and 0.17%, according to the summary of his criminal cases. The following month, he pleaded guilty and was convicted of misdemeanor DUI, court records show.

Despite the conviction, Colombo continued working and coaching. **http**, he led the Palo Alto High School baseball team to the Central Coast Section Division I championship game.

EXHIBIT 75 - 005

In October 2005, the Commission on Teacher Credentialing wrote Colombo to notify him that the Committee of Credentials had found probable cause to recommend the suspension of his teaching credential for 60 days. The basis for the suspension recommendation is not publicly known; an attachment explaining the basis of the decision wasn't included among the documents that the commission released to the Weekly, and a commission representative stated that it was exempt from public disclosure.

Colombo appealed the 2005 suspension recommendation, requesting an administrative hearing, the commission confirmed.

After the administrative hearing, Colombo and the commission agreed on a **http** in February 2007, the commission representative told the Weekly. That agreement placed him on a four-year probationary period, citing his multiple convictions, including the 2004 DUI.

The conditions of probation included that Colombo couldn't drink alcohol and would be subject to random alcohol tests. He also had to attend Alcoholics Anonymous, or a similar group if he got pre-approval from the Commission, at least once a week for the first two years of probation. Colombo was also required to follow all federal, state and local laws and submit a detailed written account of any arrests and citations, except minor traffic offenses, within 72 hours. The agreement took effect on March 17, 2007.

Peter Colombo and the California Commission on Teacher Credentialing agreed on a Consent Determination and Order in February 2007. That agreement placed him on a four-year probationary period. Source: California Commission on Teacher Credentialing records.

Jordan Middle School's principal at the time and Assistant Superintendent for Human Resources

EXHIBIT 75 - 006

Scott Bowers each signed forms acknowledging that Colombo had given them a copy of the agreement.

An administrator from the Redwood City Elementary School District also signed a form acknowledging he had received the agreement. Colombo had worked as a day-to-day substitute teacher in the district during the 2006-2007 school year, a Redwood City School District spokesperson told the Weekly.

On March 9, 2010, the Commission on Teacher Credentialing sent Colombo a letter notifying him that it had received credible evidence he had used alcohol during his probation. According to the terms of the 2007 agreement, if he used alcohol during probation, the Commission would immediately suspend his credential until it reviewed and took "final action" on the issue.

As a result, Palo Alto Unified placed Colombo on leave, his Palo Alto employment record shows. Bowers wrote the Commission on Teacher Credentialing a letter on April 6, 2010, urging it to reinstate Colombo's credential.

"I would like the Commission to know that I believe that Mr. Colombo has made considerable effort and progress in dealing with his alcohol issues," the letter states. "On a continued positive note, these issues have not impacted his work as a teacher in our District."

The letter also notes that Colombo remained a tenured teacher in the district and was entitled to a full-time job when the suspension was lifted.

EXHIBIT 75 - 007

Palo Alto school district administrator Scott Bowers wrote the Commission on Teacher Credentialing a letter on April 6, 2010, urging it to reinstate Peter Colombo's credential. Source: Palo Alto Unified School District records.

The Commission and Colombo subsequently agreed to modify the 2007 Consent Determination and Order so that his credential would be suspended from March 9, 2010, through April 28, 2010, and his probation would be extended by two more years, for a total of six years. He was also required to attend Alcoholics Anonymous or a similar group at least once a week for the rest of the probation period.

On April 29, 2010, Colombo's employment record shows that he returned to his position at Jordan.

In April 2013, the Commission sent Colombo a letter notifying him that he had successfully complied with the probation requirements, and his credential was restored.



Bowers declined to answer questions for this article.

## Multiple complaints as the 2021-2022 school year starts

School district records show that Colombo found himself in trouble again in the fall of 2021. Within the first month of the 2021-2022 school year, Greene Middle School parents lodged four complaints against Colombo for rudeness and inappropriate comments and behavior.

EXHIBIT 75 - 008

A parent emailed Greene Middle School o!cials in September 2021, objecting to Peter Colombo using "pimp" to refer to male students. Source: Palo Alto Unified School District records.

One parent reported that Colombo used the term "pimp" to refer to students and said that it didn't appear to have been a one-time incident, emails released by the district show.

"I am really appalled by the standards you have for yourself with these kids," the parent wrote. "You are supposed to be a role model when you are with them and instead you are introducing them to highly offensive language and you are glorifying misogyny and human trafficking."

Colombo responded, telling the parent it wouldn't happen again.

"I understand your feelings and my only recourse is to assure you this will not happen again," Colombo wrote.

The parent then followed up with Greene Middle School Principal Sebastian Benavidez and said that Colombo had once again called the child, and others, a pimp.

"I demand that he is reprimanded and fired. He has no remorse, is not contrite, and lied to us," the parent wrote in an email to Benavidez and an assistant principal.

Colombo explained his behavior to Benavidez, writing in an email that he intended "pimp" as a compliment, that it was a way of saying that the student was "hecka cool" and that he had used the term for years. At the same time, Colombo said that he needed to change with the times and that he had no excuses.

Benavidez, who had taken over as principal two months before, replied that he appreciated

EXHIBIT 75 - 009

Colombo's reflection.

"Just so you know, I'm not about consequences, I'm about learning and development, especially my own. I'm learning and growing every day and here to support you in doing the same," said Benavidez, who had previously worked in the Fresno Unified School District from 2004 to 2021.

Peter Colombo emailed Greene Middle School Principal Sebastian Benavidez in September 2021 after parents complained about his behavior. Source: Palo Alto Unified School District records.

In a follow-up email to Benavidez, Colombo wrote that his "ego is out of control and I need to look at that." He said that he had almost lost his job in 2010 because of drug and alcohol abuse, and that this was the first time in 11 years that he'd had ego-driven behavior problems.

"In all honesty I should have been fired back in 2010 but they gave me one more chance because

EXHIBIT 75 - 010

they said I was likeable and had done lots of good things coaching too," Colombo wrote.

Benavidez replied, "You're a great person Pete. Your struggles have given you a deep understanding many others will never know. I'm proud of you for recovering from a challenging addiction and for being courageous enough to share your experience with me."

Greene Middle School Principal Sebastian Benavidez emailed Peter Colombo in September 2021, responding to a message from Colombo that described his history of addiction. Source: Palo Alto Unified School District records.

Another parent complaint alleged that a physical education teacher was rude to their son on two different occasions. In one case, the child allegedly went to the P.E. teachers' office to report that his lock was missing from his locker. Three teachers were in the middle of a conversation, so the student said that he waited for a break in the conversation.

One of the teachers turned to him and said "What do you want? Just go!," the parent's email stated. Although the report didn't name the teacher, it described him as bald and not very tall. Benavidez apparently knew this referenced Colombo because he forwarded the email to him.

EXHIBIT 75 - 011

Green Middle School received multiple complaints at the start of the 2021-2022 school year about Peter Colombo's behavior with students. Source: Palo Alto Unified School District records.

Another complaint that the district released, sent on Sept. 2, 2021, alleged that Colombo had made inappropriate comments to multiple students, including talking about his dating life before he was married and his divorce. What the writer described as the "most disturbing" incident was largely redacted but involved the phrase "dez nutts."

"For him to talk about his genitalia, to (redacted) any child in a joking manner or not, is utterly irresponsible and outrageous," the complaint states.

The email went on to say that Colombo told students "that he knows who files reports against him so don't try it."

On Sept. 3, Benavidez emailed Colombo a more formal message that began "Dear Mr. Colombo" and informed Colombo that Benavidez wanted to meet with him the following day to discuss multiple complaints that were received over the past week. Lisa Hickey, the district's director of human resources for certificated employees, which encompasses teachers, was included on the message, and Benavidez said that she would be present for the meeting.

EXHIBIT 75 - 012

Following the meeting, Benavidez sent Colombo a formal warning letter, directing him to correct his behavior moving forward, which included always using appropriate language with students, not directly emailing parents who have concerns or complaints, and avoiding physical contact with students at all times.

{pdf 1003}

While warning Colombo that his behavior must change, Benavidez also wrote that during their meeting it was clear Colombo had "taken responsibility and reflected" on the complaints.

Benavidez also said, "In speaking with you on multiple occasions, you appear to be a physical communicator." The letter referenced a fourth complaint about Colombo that Benavidez had received: A student "complained about contact you made with them that made them feel uncomfortable."

Benavidez told the Weekly that "the alleged contact happened during the daily routine of guiding students through an exercise/activity. Mr. Colombo redirected the student in (the) right direction by putting his open hand on the middle of their back."

In response to the Weekly's questions about Benavidez's initially forgiving email exchanges with Colombo, followed by the warning letter, Benavidez stressed the broader context of his messages, including that he was responding to Colombo sharing information about his struggles with addiction. He also said that disciplinary action typically isn't finalized until after a meeting with the staff member, which was when the warning letter was issued.

"Therefore, I did not switch course because my course of action had not yet been decided," Benavidez wrote in an email.

## How the rape allegation surfaced

Less than five months after issuing the warning letter to Colombo, the district received the rape allegation that **http**.

In an email to the school district, included in the police department's investigative report, the student's now-husband alleged that his wife had been raped by Colombo roughly 20 years ago,

EXHIBIT 75 - 013

during the 2001-2002 school year, when she was 11 years old. After the assault, Colombo called her "saucy" and tormented her about the rape, the email said.



The Palo Alto Unified School District forwarded police an email in January 2022 from the husband of one of Peter Colombo's former students, alleging that the teacher had raped the then-sixth grader roughly 20 years before. Source: Palo Alto Police Department investigative report.

He told the district that he was sending the email not because he wanted to pursue legal recourse but because he has to live with the reality of his wife's rape every day. He added that, most importantly, there could be other victims.

"I pray we are truly the only ones who have suffered from Pete's actions and that he has not victimized any other children since then, though I know the odds are quite high that he has," the husband wrote.

After receiving the email, the district's then-General Counsel Komey Vishakan, whose employment with the district was terminated last summer, contacted the police department, forwarding a copy of the message. The district also placed Colombo on paid administrative leave.

Before the police had identified who the former student was or interviewed Colombo, he contacted them to report what he described as "cyberbullying." Colombo said that he and his wife were sent an anonymous email, which police confirmed was similar to the one the district received.

EXHIBIT 75 - 014

Colombo told police that it could have been a case of mistaken identity because another teacher had been arrested for inappropriate behavior with a student. The police report states that Colombo brought up someone named Bill, but the last name is redacted from the report.

Bill Giordano was a fellow teacher and coach at Jordan Middle School who was **http** in 2006 for child molestation that occurred from 1991 to 1994. Giordano began teaching in the district in 1978 and was teaching at Jordan from 1991 until his arrest in 2005.

Colombo also suggested the allegation could have been made by "a disgruntled former girlfriend or some other mentally unhealthy person," according to the police report. He also said that he was dealing with alcohol addiction at the time and "may have been an alcoholic, and a womanizer," but that he wasn't a "child abuser."

Once Colombo's accuser was identified in 2022, she was at first hesitant to talk to police but ultimately agreed to be interviewed, according to the police report. She attributed her willingness to talk to "the fact that she had recently become a mother and wanted to reconcile her past trauma for both her and her family," the police report states.

She confirmed to police that although her attacker had raped her from behind, she knew it had been Colombo.

She recounted that the assault occurred after class during the swim unit in the 2001-2002 school year. Colombo asked her to stay behind to help with the pool cover and by the time she returned to the locker room to get changed, it was almost or entirely empty, she told police.

Colombo then came up behind her, pushed her down on a bench and raped her, she said. The former student explained that when she recalls the assault, she has flashbacks to a mural above her locker that she was looking at during the rape. The mural honored a Jordan student who had died and depicted a child's face among the clouds.

When the student got home that day, she told her mother that she wanted "to get Mr. Colombo fired" and that he was "too nice to me," an account that her mother confirmed to investigators, according to the police report.

EXHIBIT 75 - 015

Tables and benches outside the gymnasium at Greene Middle School (formerly Jordan Middle School). Embarcadero Media file photo by Veronica Weber.

Prior to the assault, the student told police, she got good grades and was on a competitive swim team. Afterward, she said that she experienced major depression, began drinking and doing drugs. Her sister also told police that she used to be "bubbly and happy" but then began to self-harm and developed bulimia.

The student also tried to avoid Colombo and P.E. class, including in one case purposefully kicking a basketball post so hard that she bled, she said.

"She stated that everything changed after this incident and was the cause of self-medication and drug and alcohol use at a very young age," the police report states.

Her mother told police that her daughter required psychiatric help. The family decided to move to try to improve things.

EXHIBIT 75 - 016

According to the police report, the investigating officer spoke to family members and friends in 2022 who confirmed that they had been told about the assault over the years. The older sister told police that when she was 14 years old, her younger sister told her that she had been raped by Colombo. The older sister also sent police a copy of a 2010 online chat with her now-husband, in which she wrote that Colombo had raped her sister in sixth grade.

Their father told police that his younger daughter had told him that she was raped by Colombo the year after the assault occurred. Their mother told police that she had learned about the assault from a family friend when her younger daughter was roughly 16 years old.



One of the student's friends told police that almost 16 years ago, the student told her that she'd been sexually assaulted by her P.E. teacher. When another teacher was arrested for sexual misconduct — identified in the report as Bill, with the last name redacted — the friend contacted the student, who was positive that had not been the person who had raped her, according to the police report.

The student and her older sister both told police that before the assault, Colombo behaved in ways that in retrospect were inappropriate. The older sister told police that Colombo always asked about her younger sister and made comments about her. She said that this attention was unique to her younger sister.

The younger sister also recalled that when Colombo once overheard that she had forgotten her lunch, he offered to take her to his house and make her food. When she refused, he offered to buy her pizza. She said that she was so uncomfortable that she responded "I don't like food" and quickly walked away.

She also remembered that Colombo would walk through the girls locker room and yell, "Girls, a guy is coming through, close your eyes!" She said this stuck out to her as weird behavior because he was an adult man in a girls' locker room telling students to close their eyes.

EXHIBIT 75 - 017

. A fellow physical education teacher told police that she would often be in the locker room at the time of day that the assault was described to have happened, so she believed it was unlikely to have occurred. She also said that in 21 years of working with Colombo, she had "never witnessed anything that alarmed her or seemed inappropriate," and was only concerned "about his mouth," noting that he would yell and use words like "honey" in a way that she said was innocent.

In an interview with police, Colombo reviewed a copy of the school yearbook and denied remembering either of the sisters.

After conducting interviews with nearly a dozen people connected to the case and reviewing documentation including a school yearbook, photos of the student before and after the alleged rape, and a 2004 poem the student had written, police ultimately **http**.

Peter Colombo has been charged with aggravated sexual assault of a child. If convicted, he faces 15 years to life in prison. Source: Santa Clara County Superior Court records.

After initially being held without bail, a judge granted Colombo's lawyers' request for bail in June, over prosecutors' objections. Colombo posted the $250,000 bond. His next scheduled court date is a preliminary hearing in March.

Austin told the Weekly that Colombo remains on unpaid administrative leave while the current court case proceeds.

EXHIBIT 75 - 018



"Due to the serious and sensitive nature of an allegation from long ago, we followed the request of the Palo Alto Police Department to stand down and allow them to conduct an unobstructed investigation," Austin said in an email.

A police department spokesperson declined to comment on the specifics of Colombo's case but confirmed that in general, "a criminal investigation takes precedence over an administrative (internal) investigation, so that the criminal investigator can have the first opportunity to gather evidence and perform interviews."

Typically, investigators will let other entities know when the criminal investigation has reached a point where an administrative inquiry wouldn't impact law enforcement's ability to gather evidence and perform interviews, the police spokesperson said.



As for whether the student who said that Colombo raped her was the only one to make such

EXHIBIT 75 - 019

allegations, ███████████████████████████████
███████ and encouraging those with information to contact police. No one else alleging misconduct has come forward to the district, Austin said, though he added that he wouldn't know if someone contacted law enforcement.

Santa Clara County Deputy District Attorney Kelly Meeker declined to comment on whether any other victims have been identified, beyond saying that only one victim is listed in the criminal complaint.

Colombo's attorney did not return multiple requests for comment.

*Graphics of documents by Douglas Young.*

*Graphics of documents by Douglas Young.*

*Graphics of documents by Douglas Young.*

*Graphics of documents by Douglas Young.*



Once again, PAUSD has failed to appropriately address sexual harassment. The allegations at Greene in 2021-22 should have been investigated as Title IX complaints because they involved allegations of a hostile environment. The Board needs a new policy such that any time a teacher is alleged to have said or done anything even remotely sexual in nature (calling a student a "pimp" for example) it should be reported to the Board. Apparently, instead of sending the allegations to Title IX, Benavidez decided to attribute them to this alleged predator being a "physical communicator." Don Austin should take a look at what happened during the time that he was in charge, and account for that, because Scott Bowers is evidently not the only person who screwed this up.

**v-2**

February 17, 2023 at 8:31 am

Scott Bowers!!! he gets to walk away, WOW

**hal**                    EXHIBIT 75 - 020

**hal**

February 17, 2023 at 8:43 am

"Accused" So no one else has come forward ? Court dates keep getting extended? DA has nothing is what this article reads like. Since there is no real news, dig some up. Sad to see a persons life and family get slowly destroyed by just one false accusation. No wonder there is a teacher shortage.

## retired-pausd-teacher

February 17, 2023 at 8:55 am

Remember, a vital precept to our justice system is "Innocent Until Proven Guilty". Mr. Colombo was charged on 6/14/22 and has since then sat at home awaiting his day in court. He has been clean for 11 years and is allowed to continue his role as a highly respected AA counselor. Unfortunately, Ms. Morgan goes to great lengths to document complaints against Mr. Colombo but put very little effort into finding the myriad of compliments and thank you cards he has received over the years. In addition, his personnel file is a lot cleaner than many other PAUSD staff members when it comes to complaints.

If a vigorous high five or male chest bump is tantamount to sexual abuse, then there is a long list of PAUSD administrators, teachers, staff, and coaches that are all suspect too. On any given day benevolent high fives, fist bumps, nudges, hugs, and hands on shoulders are administered by the aforementioned. Terms of endearment like "honey" and "sweetheart" are used frequently. Yes, pimp is not an appropriate term, but it is used by students as a compliment, and Mr. Colombo mistakenly fed on that and learned his lesson. As far as offers of food to students, it happens daily on campus. In 27 years, I've seen teachers, administrators, and staff offer food to hungry kids, and often students come begging for it. Heck, not long ago, before the PAUSD website was covered with construction images, there was an image of Don Austin seated on a couch with an elementary school child. Should he be investigated too?

Of course, the press is always looking for tantalizing tidbits to attract readers so digging up the Colombo case that has gone nowhere in nearly 8 months with no other accusers coming forward must have seemed a good idea. But the press is not a courtroom, nor is this forum. The accuser, her family, and Mr. Colombo all deserve justice. Let the facts speak before you jump to conclusions.

## jennifer-2

February 17, 2023 at 8:56 am

The rape of a sixth grader over two decades ago and all his other criminal activity, this man should've been sent to prison a long time ago. How he kept his job is beyond me. I hope he's sentenced to prison for the rest of his life. Hopefully there aren't other victims. Referring to a student as a "pimp" isn't a "compliment" but it's not as bad as everything else he's done. He's disgusting, and so is enabling him all these years. Enough is enough.

## a-person

EXHIBIT 75 - 021

February 17, 2023 at 10:28 am

Kudos to the PA Weekly and Zoe Morgan for this investigative journalism.

## a-person

February 17, 2023 at 10:47 am

I'm a child of PAUSD and a parent of PAUSD. Bill Giordano tried to groom me in junior high. He regularly asked me to chat after class, designed personal jokes with me, included me on special field trips to pick bands for school events. He successfully groomed many other girls, leaving them with PTSD that was only temporarily relieved by his arrest and conviction. Hawaiian shirts with white pants can bring up challenging memories for me…I can't imagine how these shirts fall for the girls who didn't get away. That said, Giordano wasn't violent, he was stealth. Colombo raping an 11-year-old girl and blaming it on Giordano is another level of sociopath.

## pausd-parent-5

February 17, 2023 at 11:28 am

We learned a few months ago that the in house attorney for the district was fired suddenly and without cause. Is this investigation the reason? Was the school district trying to avoid responsibility and an investigation?

███████████████████

██████████████████

███████████████████████████████████████████████. Furthermore, even if he doesn't drink, that has nothing to do with whether he is abusive. █████████████████████████

████████████████████████████.

## ben-z-2

February 17, 2023 at 12:27 pm

This is just another example of higher-ups protect sexual abusers until the flood gates open up.

It shouldn't matter what position a person has, whether it be a school administrator, a police officer, a district attorney, or even a judge. These people have an OBLIGATION to protect children in the community.

Sadly, I can attest that this doesn't always happen. Some administrators just prefer to throw other people's children under the bus rather than hold their colleagues and subordinates accountable.

## jerry-2

EXHIBIT 75 - 022

It's good that Colombo is now clean but that doesn't negate the fact that he allegedly raped a schoolgirl. If guilty, that might be considered at his sentencing.

Unfortunately there's no public evidence (yet) that he's guilty. But the fact that the DA brought charges against him suggest they have some strong evidence. Many comments on this story here have already convicted him or exonerated him.

The real failing here is that PAUSD did not aggressively investigate each of these complaints when they arose. Even if Colombo is innocent, he should have been fired by PAUSD long ago for inappropriate and unprofessional behavior. He himself admitted this.

I think this story is well written and detailed but the graphics are a bit on the 1970's creepy side.

## pausd-volunteer

February 17, 2023 at 12:59 pm

@Michelle Dauber
There are multiple places to attend AA meetings and because "the jerk" you refer doesn't attend your meeting doesn't mean he's not, in fact, he attends meetings daily in his home city.
You also sound like you're making a threat which is violent behavior and to someone that hasn't been convicted of molestation or rape.
So much anger, you may need to consider anger management meetings.

## lynne-henderson

February 17, 2023 at 1:09 pm

I fail to see why the lack of other reports of rape make the charge a "false accusation". The CA statute of limitations for child sexual abuse cases was lengthened to allow adult survivors who were unable to "tell" as children to come forward, but many still do not report assaults for many reasons. (Or maybe there is a "one free rape" understanding in this culture–you need multiple victims to prove he really did it?)
As for "he's just kidding around"/"everybody does it"–no, "everybody *doesn't.* Offering food to hungry students at school is one thing, inviting a single student home for pizza is quite another.

## jordanmom

February 17, 2023 at 2:48 pm

@RetiredPAUSDTeacher: Well said: "The press is not a courtroom, nor is this forum. Let the facts speak before you jump to conclusions."

## jennifer-2

EXHIBIT 75 - 023

## jennifer-2

February 17, 2023 at 3:22 pm

You're "innocent until proven guilty" in a court of law. In the court of public opinion (which this is) you're only "innocent" if you didn't do it. I've read more than enough "facts" to form an opinion. As a child and parent of PAUSD, this makes me sick. Unless you're a sworn juror, you're entitled to an opinion. That's what commenting here is all about.



## jordan-student

February 17, 2023 at 4:14 pm

I went to Jordan Middle School 2006-2009. It was an open secret that he messed with a sixth grade girl at that time, and that he has a criminal record. It confused everyone on how he managed to still have employment at Jordan, but he was liked well enough by the guys who took PE seriously. He also kept saying how he used to teach math and he had debates with students on history, such as WWII. He always rubbed me the wrong way, even after he returned from an administrative leave for a year.

The only shocking thing is that it took PAUSD this long to actually get an investigation on him and for charges to be pressed. The amount of people defending him is very disappointing.

## north-pa-mom

February 17, 2023 at 4:15 pm

My kids had Mr. G, and they had Mr. C. Not impressed by their demeanor with the kids, and after my two boys went through Jordan, and I had a daughter, it's pretty sad that I had to tell her to look out for pervy PE coaches since PAUSD was doing nothing to discipline and fire them. And like Michelle Dauber, I am astounded by the parents who defend these guys and victim shame. The bro network sticks together and defends their own. I was amazed by how little time Mr. G spent in prison. Clearly, Mr. C needed help that he was not getting, but keeping him on the payroll and allowing further interactions with children is beyond the pale.

## bystander

February 17, 2023 at 4:41 pm

EXHIBIT 75 - 024

I am not defending either of these two former teachers so please do not take this as such.

However, if a mistake has been made and somebody, anybody, gets accused of sexual assault, even if later found innocent, their life is ruined. Particularly in the age of internet, there is always an old article or an opinion somewhere that can be found by a future employer or similar. I think it is time that we remember that innocent until proven guilty is the way the law works and a court of law decides that, not as mentioned above, the court of public opinion. It is bad when someone who is later acquitted has their life destroyed in this way.

## jordanmom

February 17, 2023 at 5:01 pm

@Jennifer, in my "opinion", the article is written in a way that implies the accused is guilty.

## spectator-at-large

February 17, 2023 at 5:10 pm

It's not only PE teachers who are molesting students. I had a history/English teacher at my junior high school back in late 50's or early 60's who was doing it with a student (everyone knew about it) and he later went on to marry her after she finished high school so it validated our suspicions or outright knowledge. He had been carrying on with her for all those years and was married to boot.

It's great that girls are feeling freer to report abuses but all too frequently it doesn't result in the outcome it should.

After Mr. G's sentencing, students in Paly's student publication the Voice were still talking about how much they liked Mr. G. Some felt sorry for him for having
to do jail time.

I too am shocked at how many people are jumping in to defend this Colombo creep. The perp is just as capable of committing another rape whether he is
sober or intoxicated. One commenter even said that he thinks the fact that Colombo says he isn't drinking any longer should be considered at his trial.

Like Ms Dauber, I am supremely disappointed at how many other creeps live in
my fair city.

## jordan-student

February 17, 2023 at 5:13 pm

@bystander: Colombo ruined his life when he got his first DUI. He's been known among everyone at Jordan to be a troubling person. Just because he's good at his job absolutely does not mean he gets to keep his job. I guess the past administration decided landing Paly's baseball team into championships was more important than firing someone shady.

EXHIBIT 75 - 025

@JordanMom: the article does not imply anything. It merely states that Colombo has a rap sheet the length of a CVS receipt prior to being hired by PAUSD, and he's continued being a rambunctious individual with too many people excusing his behavior. Ask anyone who's attended Jordan in the 2000's and they'll confirm everything written in this article.

## jennifer-2

February 17, 2023 at 5:25 pm

I'm also appalled by the number of Palo Altan's defending him, probably parents. All I care about is the kids. If defendants were really "innocent until proven guilty" would they be allowed to be jailed, sometimes without bail? You're innocent until proven guilty in a court of law, where the prosecution has the burden of proof. This isn't a court of law.

## nayeli

February 17, 2023 at 6:14 pm

Yikes! If true, this is a shocking failure of the PAUSD. The district certainly didn't do its due diligence during the hiring process. If this was my child, I'd seek a maximum penalty AND THEN sue the district for as much in damages as can be levied. There is no money that can compensate that child.

Of course, if it's found to not be true, then this man will still be guilty in the eyes of others. Either way, this is a reason why fewer men (and women) have opted to pursue a career in education. It's already a difficult profession even before you weigh the dangers of being accused of a crime. Yes, this man could be guilty of what he's been accused. However, even a completely innocent person is damaged forever by such an accusation.

Personally, I'd prefer to withhold an opinion of guilt until the legal system has done its best at fair and impartial jurisprudence.

## myfeelz

February 17, 2023 at 7:09 pm

@Michele Dauber have you ever seen the documentary called "13th Step -a film by Monica Richardson"? It can be seen in full for free at youtube here > https://www.youtube.com/watch?v=-iUd6qZRSi8 < No shortage of newcomers in AA who are often referred to as babies, newbies, pigeons, etc. All diminutive descriptors for people who are newly sober and extremely vulnerable. Low hanging fruit. I'm not surprised this guy is an AA cheerleader.

PS there are no "AA Counselors". If you mean "SPONSOR", Retired PAUSD Teacher, those are exactly some of the worst offenders who commit the 13th step on the regular.

## roger-dodger

February 17, 2023 at 7:58 pm

EXHIBIT 75 - 026

One would hope that somewhere along the line in her 34 years of sobriety, Ms. Dauber would have come across the 11th Tradition of AA, which strongly encourages maintaining anonymity "at the level of press, radio, and film." One of the main ideas there was to keep egos in check. Not that they're in play here at all, really. (There's also a notion floating around AA that people are capable of change, that people can forgive and be forgiven, and that people can be redeemed from the depths of unspeakable suffering. Not that these are in play here either. Nothing to see here, move along.)

The man has been tried and found guilty by the "court of public opinion" here on the PA Town Square. Surely the gallows should be raised in front of city hall? Hardly a fair trial, but it is what it is. A sad spectacle in an allegedly progressive, thoughtful community….



It's Columbo who brought sobriety into public controversy not me. He's the one who had had "all these years of supposed recovery," and an apparently acquaintance here claimed he was an "AA Counselor" which is by the way not a thing. It's Columbo who decided to bring recovery into this in a way that brought sobriety into public controversy and a negative light;

## north-pa-mom

February 17, 2023 at 8:21 pm

If you're a woman, and a mother, having observed Mr. C's behavior, you would never want your daughter to be in a situation alone with him. His behavior was inappropriate on so many occasions, and he was always given a pass. He should've been fired.

## anonymous

February 17, 2023 at 8:25 pm

Very complicated situation and account, but:
– I think my kids both had this teacher – thought was….semi-ok……
– I had one interaction (as an adult parent) with Giardano that appeared normal
– mention of not all criminal offenses are disqualifying for employment:
This brings to mind California's charming efforts to prioritize criminal offenders over victims.
In some cities landlords cannot check/use criminal history of tenant applicants (I am horrified, I believe landlords' attempts to have safe dwellings are now at risk, unaware female tenants are at risk)
AND employers under the Fair Chance Act are required to help applicants; a quick search shows SB-731 "was signed into law by California Governor Gavin Newsom (in) 2022. The new law will automatically seal felony records for non-sex offender-related, non-violent offenses that meet (certain criteria)…(for convictions after January 1, 2005) The new

EXHIBIT 75 - 027

law will expunge these records from public view and make them difficult for most employers to access during background checks."

I believe female employees – naive to the clear risky workplace they may be in – are now especially placed at risk. These things are complicated and schools MUST be especially careful to have a safe environment for students, teachers, staff.

New law(s) for elaborate rules, hiring procedures place burdens on police, school administrators/hiring officials (our politicians trying to help ex-felons with their employment and apartment searches) that will lead to omissions and mistakes.

I could care less about the ex-offenders: I DO care about the general public who are naive to the risk a nearby co-worker may pose, for example (under CA's misguided priorities).

I hope to leave California as I oppose prioritizing criminals, felons, ex-offenders over children, women, vulnerable persons, whether at school, CA places of employment, or in rental housing. Ex-offenders may well re-offend.

## myfeelz

February 17, 2023 at 8:26 pm

Roger, I believe it was in the Retired PAUSD opinion that outed the accused as an "AA Counselor". Which, if you read your big book, you will find there are no AA Counselors. It would be interesting to know how Retired PAUSD came to use that particular term for him. Any old drunk can be an AA member. But you have to be really special if you're going to call yourself an "AA Counselor"? Unless he has a license as a drug and alcohol counselor, he's misstating his position. And if he DOES have a license, AA would be filing a cease and desist order because, among the traditions, Tradition 6 states: "An AA Group ought never endorse, finance, or lend the AA name to any related facility, or outside enterprise, lest problems of money, property and prestige divert us from our primary purpose." You can insert "An AA member" where it says "An AA group."

## jennifer-2

February 17, 2023 at 8:37 pm

Sadly, it's women (probably mom's) who are defending him. Why? I don't know anything about AA, but sober or not, what does that have to do with abusing young girls? He says himself he should've been fired in 2010. If you don't know a horse, look at its track record.

This article points out his criminal activity. If that makes him look guilty, whose fault is that?

As a woman and a mom, I DO know what Michele Dauber is saying. She's an advocate, and a darn good one.

## myfeelz

February 17, 2023 at 8:44 pm

Jennifer, many people hide behind the mantle of AA membership to smooth the rough edges of a sketchy past. But it

EXHIBIT 75 - 028

being an "anonymous" program, and they are promoting themselves toward a higher reputation than they actually have by citing AA membership, AA's traditions say essentially 'don't use us as a human shield'. The funniest thing I ever saw was a Norm MacDonald stand-up bit about alcoholics. And now when I watch it, I put the accused's face on it and it seems even funnier. >https://www.youtube.com/watch?v=TCxfIoD1MXg&lt;

## retired-pausd-teacher

February 17, 2023 at 8:55 pm

So now we are parsing sponsor over counselor. I own the wrong nomenclature. Sorry folks. That is all some weak people have: pin the "undereducated" on buzzwords because there is no substance to the "educated" argument. Great. Enjoy it and then wonder why your children can't stand to live. At the end of the day, why do this to a man unless you have all the facts. Hyperbole is great. Facts are better, but none of that counts when you are a crusader, right Michelle?

## morgan

February 17, 2023 at 10:11 pm

Why is Benavidez still the principal at Greene? How can he be so naive? His first email sounds more like he wants to be Columbo's buddy.

And, as always, Austin sits on his ass and says, "there's nothing we can do".

There have been far too many teachers at PAUSD that have given similar creepy vibes that have either been caught and/or fired or still lurk on campus. Almost always, the female students can tell you exactly who they are. Publicly called out have been Airo, Giordano, Farrell and I know I'm missing at least one. There are also those still on campus like Shelton at Paly and Rappaport who was "allowed to resign" for unwanted comments and behavior. Teachers and students all knew when Jackson Hall was raping students and within the past few years there were at least two students accused of multiple rapes that never became public.

It's a top-down problem. Austin makes everything about him, so he tries to brush aside bad news instead of accepting responsibility. Sites are essentially encouraged to bury negative incidents. If they do, they are rewarded with promotions, just look at Kathie Laurence and the former Terman principal Pier Angeli La Place.

## myfeelz

February 17, 2023 at 10:59 pm

@Retired, he can file a slander suit if any lies have been published. But he admits so much himself, and convictions are public record, so nobody is shying away from the real matter at hand. There are enough AA "stars" out there and you can pore over the sites that have Speaker tapes that can be had for free. I'm sure he's out there. That's why I love the Richie K. story in Norm MacDonald's standup bit about AA. People tell stories in AA that will curl your hair. Despite the 2nd A in the name of the group, people do talk outside of meetings about what they hear there, to others who are NOT members of the club. Meanwhile, there are 30 years of criminal records that CAN'T be obtained by the average citizen, to

EXHIBIT 75 - 029

determine if those citizens want their kids to be taught by a career criminal.

## rebecca-eisenberg

February 18, 2023 at 1:57 am

I hate rape and I love Title 9. I have been a consistent vocal critic of the school district every single time — *countless* times — that the district fails to address sexual assault and rape culture. I do not trust Don Austin to do one thing right to protect young women and girls. And as to the Paly Principal, I'm still steaming from how he blamed victims for outing their harassers and assailants on instagram. It's not the talking about assault that is the problem, Principal Kline. It is the actual assault that is the problem.

That said, I question this article's research. I do not understand why the other PE teacher, who later was convicted for multiple assaults during that exact time period, was not considered for this rape as well. Given that most rape is done by repeat offenders (I think I learned that from Michele Dauber, amongst others), Giordano is the obvious #1 suspect. Did they interview him?

This is particularly troubling because in the email I read (PAO should publish the entire emails), the victim states that she was unsure who raped her–very different from what this article reports. In that email, the victim's husband describes the rapist as her PE teacher and swim coach–both of which point to Giordano, not Colombo.

Yes, Colombo used inappropriate language. But the complaints were from parents of boys, who were not victims of sexism. Both my daughter and my son had Colombo for PE at Greene fka Jordan, and yes, the language sometimes was bad, but they always felt safe. Bad language does not correlate with rape, but a history of sexual assault, like Giordano's, does.

As to Colombo's criminal record, none of it involved violence, only drunkenness, and no crimes were committed at or near school. If we fired all recovered alcoholics, we would have far fewer teachers (and doctors, lawyers, etc). Recovered alcoholics can be exceptional at their jobs, even teaching.

Did PAO talk to Giordano? Did PAUSD? Did PAPD? He's out of jail by now, sadly.

## pausd-volunteer

February 18, 2023 at 8:16 am

Thank you @ Rebecca Eisenberg for your thoughtful comments.
I'm not suggesting that Giordano is the suspect, however the victim never saw who the rapist was, but pointed her accusations to Mr Colombo.
It appears that the law professor @ Dauber is on a witch hunt and has tried and convicted Mr Colombo, without a trial. I am all for justice, but let's wait for the real judicial system to work this out.
Yes, Mr Colombo had a past, who doesn't? Everyone commenting, is a saint?
He is not PC, (I didn't read anywhere that his language was sexual) he aligns with the kids and their language to be "cool" and to relate, not to abuse and violate, that might be his downfall. But let's be honest, do you think your kids

EXHIBIT 75 - 030

haven't used or heard this language elsewhere? As a parent this is where discussion, as to what is acceptable in your family. Sure it's ok to report, but it's important that your student is educated and understands these things happen outside their bubble and how they'll deal with words that are offensive to them.

Mr Colombo is passionate about his teaching/coaching. As the article states he redirected a male student, by putting his hand mid back. This is not sexual, Why is this a problem? Palo Alto parents get real, your kids are soft, if they aren't exposed to some of this type of banter and language they will have a difficult transition into the real world. It's definitely worth a conversation with your child, but let's face it, Palo Alto is not the real world. Your children are sheltered need some real life.

And yes, I have adult children that went through Jordan and Paly and were instructed by Mr Colombo.

## myfeelz

February 18, 2023 at 11:22 am

"What an order! I can't go through with it." Do not be discouraged. No one among us has been able to maintain anything like perfect adherence to these principles. We are not saints." Some people stop right there because that sentence gives them a pass to allow them not to change anything except remove the alcohol. A drunken multiple offender, minus alcohol, is still a multiple offender. One thing is certain. In many cases where offenders blame their bad behavior on alcohol –(BOOZE MADE ME DO IT!) — judges are lenient in sentencing and will give the offender a pass if they will go to mandatory AA meetings. If an offender is already claiming to be an AA Counselor, the judge might be inclined to see him as nothing but an opportunistic parasite. This particular person being referenced in the article has a 30 year history of "bad behavior", and if sobriety churns out people who are like that, I'm in agreement with Ms. Dauber. He sets a bad example. If AA's traditions say that their "public relations policy is based on attraction rather than promotion", any recovery advocacy on his part can be taken with a grain of salt. Unless this disclaimer is added: "Do as I say, not as I do".

## spectator-at-large

February 18, 2023 at 12:41 pm

It is unfortunate that Mr. Columbo's involvement with AA was introduced into this article. The door that was opened has afforded anopportunity for people with no real knowledge of how AA works (other than a video referenced on this forum and a comedian's disgraceful strand up routine about alcoholism). The very unfortunate result of all of this side chatter about alcoholics and criticism of AA is that suffering alcoholics out there that may have been thinking of trying to get some help will decide that AA is not for them without even trying it out. By extension, that individual may die some day from this disease and cause untold havoc in their own lives as well as in the lives of those who love them. Alcoholism is a terminal disease that can be put in permanent remission by removing the substance from one's life. Unfortunately, most people require a spiritual program and some kind of support in order to achieve long-term sobriety. Reading so many negative things about twelve step recovery programs in this forum may severely reduce the chances of recovery for many people. If there is only one person who misses a chance to get sober because of all the misinformation that has been offered in this forum it would be heartbreaking.

Please consider that this article in a not a forum on AA. It is about Mr. Columbo and his behavior. Thanks to those that

EXHIBIT 75 - 031

stick to the subject.



@PA volunteer, I for one do not have a "past" of being accused of raping a child, or of being inappropriate with children. No, not everyone has "a past" of that nature. And I wholeheartedly agree with Spectator that his drinking or lack thereof is irrelevant to the current accusations. And ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████

## jerry-2

February 18, 2023 at 3:16 pm

"One commenter even said that he thinks the fact that Colombo says he isn't drinking any longer should be considered at his trial."

@Spectator If you're referring to my comment, that's not what I said at all. I said it *might* be considered at his sentencing. That's a statement of fact, not my intent. It's standard practice during sentencing to consider the defendant's current circumstances.

I'm not defending this guy at all. I'm just trying to stick the facts presented in the article. I would hope that any potential juror would keep that mindset. As @Bystander said, if someone is wrongly convicted, it will follow them forever and destroy their life.

We all know how the Court of Public Opinion works because we're all part of it right now. But that doesn't make it a good thing or even an acceptable thing. In my opinion, it's the internet equivalent of mob lynching.



A white man in a union possibly losing his job or being held criminally accountable after receiving appropriate due process not lynching. Nor is discussion of it. That is offensive and insulting to black people who have actually been lynched to make that comparison.

## jennifer-2

February 18, 2023 at 5:26 pm

You don't see the "innocent until proven guilty" "court of public opinion" outrage when someone is facing burglary, etc.

EXHIBIT 75 - 032

charges. Why the defense of an alleged child rapist? If someone is wrongfully accused of any crime it could ruin them, and that's why certain news organizations withhold names, including this one. You'll notice names are mentioned in this article for a reason. If you're more concerned about him than the young girl, I hope and pray you don't have any daughters. It's human nature to have an opinion, and I find it "acceptable."

## david-10

February 18, 2023 at 9:59 pm

Rather than debate and rebut and defend and judge, I'll just say Colombo is many things and has flaws but HE IS MOST DEFINITELY not a rapist. It is really that simple and you will see soon that the DA messed up. Hope we don't have two victims here. To the alleged victim, you need to be 100% certain and you are admittedly NOT!

## rebecca-eisenberg

February 19, 2023 at 12:24 am

Jennifer: I don't think you were asking me, but FYI: I do become outraged when someone is unfairly accused of burglary, etc. See, e.g., https://rle.medium.com/admitting-lack-of-evidence-papd-blames-purse-theft-on-black-males-in-their-early-20s-cbc3732a8db4

## neighbor-5

February 19, 2023 at 3:45 am

"Yes, pimp is not an appropriate term, but it is used by students as a compliment, and Mr. Colombo mistakenly fed on that and learned his lesson."

Is this appropriate in school? I don't understand why people are defending inappropriate behavior. Let boys be boys is not acceptable. Coaches and teachers that boys are okay with and love that young women feel uncomfortable around MUST BE INVESTIGATED if a concrete allegation (rape, inappropriate touch, bad language) is made.

Why isn't the District following through in investigations and reporting them? Why does the principle still have his job at Jordan?

## neighbor-5

February 19, 2023 at 3:51 am

Thank you Zoe Morgan for writing this piece. Without these kinds of articles, we would have no idea what goes on in the district and be able warn our children about it. I already talk thoroughly about body safety but will make sure I have conversations about all their teachers and coaches periodically.

This is a great reminder to parents. This happens in school and in activities. Let's not forget the School of Rock guitar

EXHIBIT 75 - 033

teacher that molested a child several years ago right in midtown. I am sure there are many more examples. Be vigilant with your kids!

## silver-linings

February 19, 2023 at 8:27 pm

Much of the back and forth above has to do with people's different experiences of this person. Too many seem to assume that if their child had no issues, therefore the victim couldn't have.

This is a non sequitur.

Sexual predators, gaslighters of all stripes and even emotional abusers who don't use physical force, get away with it by insinuating themselves into a group and are prepared to come across as congenial compared to the victim. When the victim complains about what they were subjected to, the perpetrator inflicts yet more harm by blaming the victim or invalidating them; the perpetrator gets away with it because they are "liked" (as Colombo made a point of talking up in his letter).

I cannot speak to the facts of the case but I believe the victim, especially since she has no incentive to come forward, and there was so much corroboration from the time.

"Current Superintendent…said in an interview that no one who had decision-making power over Colombo's employment at the time of his criminal convictions and credential suspension is still employed by the district, and he couldn't speak for them. However, Austin said that if the same series of events happened today, he would not let the teacher keep their job."

This is such a cop out. He's basically saying, those people left the district (almost certainly to other nearby districts), so therefore I/PAUSD bears no responsibility and can't do anything. What a crock. This is why our district is condemned to keep repeating its mistakes. Instead of reacting to a wrong by figuring out how to make it right, how to take responsibility, how to do the right thing for kids who have been harmed, our district culture is to sweep under the rug, cover up, push people out, avoid even dealing with the harmed kids or families. Then believe with all their shrunken shriveled hearts that if the situation came up again, THEN they'd do the right thing. Lather, rinse, repeat.

## morgan

February 19, 2023 at 8:36 pm

Silver Linings hit the nail on the head, "This is such a cop out. He's basically saying, those people left the district (almost certainly to other nearby districts), so therefore I/PAUSD bears no responsibility and can't do anything. What a crock. This is why our district is condemned to keep repeating its mistakes. Instead of reacting to a wrong by figuring out how to make it right, how to take responsibility, how to do the right thing for kids who have been harmed, our district culture is to sweep under the rug, cover up, push people out, avoid even dealing with the harmed kids or families. Then believe with all their shrunken shriveled hearts that if the situation came up again, THEN they'd do the right thing. Lather, rinse, repeat."

EXHIBIT 75 - 034

Austin is too cowardly to take responsibility or make changes for the future that will benefit the students.

It's amazing that the board can't see through his act, or maybe they don't care about students either.

## staying-home

February 20, 2023 at 9:37 am

there is a sense of betrayal here. you want to trust teachers/coaches and believe they represent the best of us.

Teachers/coaches use inappropriate language all the time. It's usually the adult trying to connect with the student by using the same words they youths use among themselves. I can forgive foul language. Drug use is so common these days, a run in with the law can sometimes be seen as an outlier instead of a pattern of behavior. The desire to trust and believe is strong. Sexual assault, though is not in the same category as foul language and drug use. It is unacceptable in any context and requires zero tolerance. Victims need to be believed, investigations need to be made, and if found guilty, columbo needs to be punished.

## hal

February 20, 2023 at 8:51 pm

A couple interesting sources of reference:

https://www.reddit.com/r/micheledauber/

https://www.youtube.com/watch?v=JHjU6FLl0CY

## myfeelz

February 20, 2023 at 11:33 pm

Spectator at large, I guess you only noticed the Norm MacDonald video (may he rest in peace) delivering irony by the plate-ful at that show. If you scroll through the comments many sober old-timers said it was hilarious if it's taken in the right context and if you have a sense of humor. The other link I provided was https://www.youtube.com/watch?v=-iUd6qZRSi8, a documentary that recounts numerous 13th stepper horror stories, when "newbies" or "pigeons" or "babies" a.k.a. newcomers are often 13 stepped before even knowing what it is. This usually happens when a young vulnerable person goes to a group and is latched on by a "Counselor" — no such thing, but there ARE sponsors. Nothing in the AA literature says you have to have a sponsor. Also, AA is not the only solution for sobriety. Many people can't get past "How It Works" that starts off every meeting, saying "Remember that we deal with alcohol—cunning, baffling, powerful! Without help it is too much for us. But there is One who has all power—that One is God. May you find Him now" — quite preachy, and not everyone can get behind that. The only thing I know about AA is take what you need, and leave the rest as you walk out the door. I hope that Mr. Columbo finds strength in his "program". Every change, whether wanted or not, leads to a new opportunity.

**v-3**                    EXHIBIT 75 - 035

## v-3

February 21, 2023 at 10:29 am

@Jordan Student – well said!!! It's sad, but the district likes to hide issues. It's not only students getting hurt, but staff as well. I think former administrators should be prosecuted for allowing things like this to happen. It's all about who knows who and who helped who.

## rc

February 21, 2023 at 3:35 pm

This story is appalling in so many ways. I wish the people involved could be held accountable in some way, even if they are long gone from the district. While Scott Bowers was so graciously defending Pete Columbo, he was also responsible, (along with the the Terman principal at that time) of bringing down an entire staff by removing the beloved secretary there and lying about it to parents and staff. Yet, he was fine trying to get Pete Columbo reinstated…and it worked! I can only hope this comes back to haunt those involved. Stop defending this teacher and the others who enabled him and his behavior.

## myfeelz

February 21, 2023 at 4:26 pm

@RC it's ironic there are 3 headlines pointing to this article on the front page of this website, but comments like yours get censored for naming names. It's like they WANT everybody here to call out the system that brought a suspicious character into a position of authority with access to children, yet they don't want anybody to really say how this could ever happen.

## concerned-student

February 26, 2023 at 9:14 am

I believe the user Retired PAUSD Teacher is Mr. Colombo, his lawyer, or close friend. The user states direct knowledge of the gender of the student who was touched in 2021. While the article clearly states "they're back."

Retired PAUSD states on Feb 18, 2023 at 8:16 am: "As the article states he redirected a male student, by putting his hand mid back. This is not sexual, Why is this a problem?"

## concerned-student

February 26, 2023 at 10:02 am

Adults on this thread, please act and step up to protect students from sexual predators.

Palo Alto has turned a blind eye to toxic male teacher behavior for too long.

EXHIBIT 75 - 036

The analogy used earlier in this thread of Mr. Colombo having a rap sheet as long as a CVS receipt is all too true. Colombo's reputation is well known and it's unfortunate it extends beyond his sexualized comments and inappropriate touching into sexual assault.

It only takes one rape to make a rapist. I hope this is the only case and there are not other victims. We are finally starting to see justice for victim's of the early 2000s — too many cases but, justice for cases like Weinstein are increasing public attention.

## myfeelz

February 26, 2023 at 8:51 pm

Thank you Concerned Student. Weinstein is a perfect example of a person who could influence people's future and the victims had no voice because they were faced with too much to lose by telling the truth. The alleged victim in this case took 20 years to gather the strength to do it. I can't think of a single reason to allege something if it never happened, 20 years after the fact. The victim will still likely be grilled over this process even after so long. There's no purpose to it except to try to make your generation safer than the victim's generation was. It's an act of generosity and hope for future generations.

Everybody should see the movie "Bombshell", which is about how the FOX network's style of sexual harassment became a way of life, until one reporter just couldn't remain silent anymore.

## palo-alto-res

February 26, 2023 at 9:37 pm

How convenient for Superintendent Don Austin to say anyone related to hiring or keeping PE teacher Colombo is no longer at the PAUSD district. Ultimately doesn't the buck stop with Don Austin? PAUSD was getting complaints nonstop about PAUSD PE teacher Columbo in 2021-2022. Multiple emails to the principal Benavidez (that Don Austin hired) and so really you have the Principal Benavidez and Superintendent Don Austin working at PAUSD and fully aware of the complains.

Ironic Don Austin passes the buck. Is he ever responsible for anything other than "being a leader" in education (which he constantly touts and pats himself on the back with)?

Also why did the district not notify PAUSD parents and try to keep news like this under cover?

Student suicides at PAUSD? PAUSD parents not notified.
Teacher investigated? PAUSD parents not notified.
Teacher death during pandemic? PAUSD parents not notified.
Teacher arrested for grooming investigation or rape allegations? PAUSD parents not notified.

Don Austin likes to do things by omission. Everything is top secret, especially things that should come to light.

Instead of sending out an email to parents to ask if there are any other reportable instances regarding PE Teacher Pete

EXHIBIT 75 - 037

Colombo, it's all a secret. Hidden away.

## morgan

February 28, 2023 at 3:46 pm

@Palo Alto Res – You are exactly right. Most people don't see it. Those that stay up on what comes out of PAUSD are well aware. I think it was one of the reasons Shana Segal ran for school board. She doesn't trust him.

He always comes off publicly as though he cares about students and respects parents. Ask anyone who has brought an opposing opinion to him and you realize he only cares about his public perception. He will lie straight to your face. It's amazing he's lasted this long.

He will only bring up the positives, never accept blame for any of the negatives.

## myfeelz

March 4, 2023 at 11:36 am

An incidental finding on zee interweebz reveals this:

https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/09141217-b.pdf It's an agreement between the Office Of Civil Rights under HHS and PAUSD from 2017. Among the orders given to PAUSD is below:

"Tracking Reports and Complaints of Sexual Harassment
1. The District will develop an online system where students and parents can make anonymous reports of sexual harassment and sexual violence. To the extent possible based on anonymous reports, complaints will be processed consistent with Section A.2.e and A.2.f."

And this: "OCR will monitor this resolution agreement for a minimum of three years."

Sounds like any one of the affected students, faculty, parent, friend of a friend, etc can re-open the complaint by filing a new complaint referencing "OCR Case Nos. 09-13-5901 and 09-14-1217" We don't know all of the facts, as usual. This is about more than what the DA can charge the accused with. It's a violation of all people affected by PAUSD, and their civil rights under Title IX, and PAUSD's failure to keep up with their mandated responsibilities per OCR. Just because the case expired doesn't mean PAUSD could get back to "business as usual".

© 2024 Palo Alto Online.

EXHIBIT 75 - 038

**EXHIBIT 78**

□ NEWS    □ SPORTS    □ OPINION ▾    □ FEATURES    □ CULTURE ▾

□ MULTIMEDIA ▾    □ ABOUT ▾    □ PALY PUBS ▾

# DA dropping charges, but district plans to investigate Colombo

Shreyas Shashi and Joseph Kessler

The husband of former Greene Middle School student Jane Doe accused Colombo of

EXHIBIT 78 - 001

sexually assaulting his wife during the 2001-2002 school year while Colombo was a physical education teacher and Doe was a student.

Colombo was arrested in June 2022, at which time the district placed him on unpaid leave. In April 2023, Colombo pleaded not guilty to the crime.

Before he was placed on administrative leave, Colombo served as the head coach for the Palo Alto High School boys' junior varsity basketball team and an assistant coach for the Paly varsity baseball team, in addition to teaching physical education at Greene Middle School.



In addition to the allegation of sexual assault, a Palo Alto Online article mentions Colombo drew complaints in 2021 from parents who were concerned about inappropriate comments he allegedly made toward students.

allegations    Don Austin    investigation    Palo Alto Unified School District    peter colombo

superintendent    Teacher

Leave a Comment

Contact Us    Sta!    Facebook    Twitter    Policies    Corrections    Advertising

EXHIBIT 78 - 002

News Tips    Archives

© 2024 • FLEX Pro WordPress Theme by SNO • Log in

EXHIBIT 78 - 003

**EXHIBIT 88**

**PALO ALTO UNIFIED SCHOOL DISTRICT**

25 Churchill Avenue • Palo Alto, CA 94306
Telephone: (650) 329-3958 • FAX: (650) 323-5162

**HUMAN RESOURCES**

████████████

Peter Colombo
642 Bair Island Rd. #1001
Redwood Shores, CA 94063

**Re:    NOTICE OF PLACEMENT ON PAID ADMINISTRATIVE LEAVE**

Method of Delivery: Regular US Mail and email to ptrcolombo@yahoo.com

Dear Mr. Colombo:

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

During this leave, you will continue to receive your usual salary, and health and welfare benefits, if applicable. While on leave, you are to remain available to return to work at my direction. You are to remain available by telephone during regular business hours, and you are required to keep the district notified of a telephone number where you can be reached during business hours. In the event that you will be unavailable during regular business hours on a normal work day, you shall notify the District in advance and report your unavailability as either sick leave or personal necessity leave as applicable. You are not authorized to accept any other paid employment during your regular business hours while you are on leave.

You are hereby directed not to return to any District property, including Greene Middle School, unless authorized to do so in advance by me. You are further directed not to contact any staff or students via email, text, phone, or in person.

████████████████████████████████████ You may submit a written response, which will be attached and placed in your file.

Please contact me if you would like to respond to your placement on paid administrative leave, or if you have any questions regarding this correspondence.

Sincerely,


Lisa Hickey
Director of Certificated Human Resources
Palo Alto Unified School District

████████████████

EXHIBIT 88 - 001

**EXHIBIT 90**



EXHIBIT 90

PAUSD000013

**EXHIBIT 103**

# INVESTIGATING
# EMPLOYEE
# AND
# STUDENT-RELATED
# COMPLAINTS

**Schools Legal Service**
**Orange County Department of Education**               **January, 2009**

EXHIBIT 103 - 001

# INVESTIGATING EMPLOYEE
# AND
# STUDENT-RELATED COMPLAINTS

_____

Copyright © 2009 by

ALL RIGHTS RESERVED

Printed in the United States of America

Inquiries regarding permission for use of material contained in this publication should be addressed to:

200 Kalmus Drive, P.O. Box 9050
Costa Mesa, CA  92628-9050

SCHOOLS LEGAL SERVICE STAFF
Ronald D. Wenkart, General Counsel
Claire Y. Morey, Counsel
Lysa M. Saltzman, Counsel
Karen T. Meyers, Counsel
Norma Garcia, Paralegal

EXHIBIT 103 - 002

TABLE OF CONTENTS

REASONS TO INVESTIGATE……………………………………………………………1

APPLICABLE LAWS AND POLICIES………………………………………………...1

CHOOSING THE INVESTIGATOR………………………………………………...2

PRIVACY ISSUES AND CONFIDENTIALITY……….…………………………….3

DEFINING THE SCOPE AND TIMELINE OF THE INVESTIGATION…………..4

COLLECTING AND MAINTAINING EVIDENCE…………………………………4

EVIDENTIARY ISSUES………………………………………………………………...5

REQUESTS FOR REPRESENTATION………………………………………………...6

OVERLAP WITH CRIMINAL INVESTIGATIONS…………………………………7

INTERVIEWS…………………………………………………………………………7

MAKING CREDIBILITY DETERMINATIONS………………………………………10

SPECIAL ISSUES CONCERNING RETALIATION COMPLAINTS………………...11

WRITING THE INVESTIGATIVE REPORT…………………………………………12

CLOSING MATTERS………………………………………………………………...14

SAMPLE INVESTIGATIVE REPORT………………………………………....15

EXHIBIT 103 - 003

## INVESTIGATING EMPLOYEE AND STUDENT-RELATED COMPLAINTS

### REASONS TO INVESTIGATE

Federal and state laws require investigations in a number of circumstances, such as when a student or employee alleges unlawful discrimination or harassment. Moreover, as stewards of public resources, school districts and community college districts are obligated to engage in self-regulation. For practical purposes, it is best for schools and colleges to follow up on alleged wrongdoing before an outside agency is called in to investigate. Further, districts may be able to decrease their liability in some cases with a good investigation. For example, a district may avoid some damages if it can establish it took reasonable steps to prevent and correct sexual harassment.[1]

### APPLICABLE LAWS AND POLICIES

It is not possible to list here each and every law that may come into play during an investigation. The following is a list of some of the most common laws and regulations that will guide investigators. In the employment context, investigators should be aware of federal and state laws, such as:

- Title VII of the Civil Rights Act of 1964, 42 USC 2000e *et seq*. (prohibits discrimination in employment);
- Age Discrimination in Employment Act of 1967, 29 USC 6239(a) (protects employees age 40 and older);
- Americans with Disabilities Act, 42 USC 12101 *et seq*.;
- Family and Medical Leave Act of 1993, 29 USC 6901 *et seq*.;
- California Fair Employment and Housing Act, Government Code section 12900 *et seq*.; and
- California Family Rights Act, Government Code sections 12945.1 and 12945.2

In the student context, investigators should be aware of federal and state laws, such as:

- Title IV of the Civil Rights Act of 1964, 42 USC 2000c-8 (prohibits segregation);
- Title VI of the Civil Rights Act of 1964, 42 USC 2000d *et seq*. (prohibits race, color, or national origin discrimination);
- Title IX of the Education Amendments of 1972, 42 USC 2000h *et seq*. (prohibits sex discrimination);

---

[1] See State Department of Health Services v. Superior Court (McGinnis), 31 Cal.4th 1026, 6 Cal.Rptr.3d 441 (2003).

EXHIBIT 103 - 004

- Section 504 of the Vocational Rehabilitation Act of 1973, 29 USC 794 (prohibits discrimination against disabled persons);
- Individuals with Disabilities Education Act, 20 USC 1400 *et seq*.;
- Education Code section 260 (ensuring that school programs and activities are free from discrimination);
- Title 5, California Code of Regulations, Sections 4600-4687 (uniform complaint procedures); and
- Title 5, California Code of Regulations, Sections 4900-4965 (nondiscrimination in school programs and activities)

Investigators employed or retained by community college districts to investigate complaints of discrimination should be aware of Title 5 of the California Code of Regulations, Section 59300 *et seq*., which contains specific requirements regarding such investigations. Please note that this workbook does not cover the rights and obligations of peace officers who may be employed by districts. Investigators who are not familiar with the rights and obligations set forth in the Peace Officer's Bill of Rights, California Government Code sections 3300-3312, are advised to work with legal counsel in an investigation involving a peace officer.



## CHOOSING THE INVESTIGATOR

Individuals who are asked to conduct an investigation need to disclose to the responsible district administrator any potential conflicts of interest. Such conflicts may be personal, professional or financial. Conflicts may be actual, meaning the investigator has an interest in the outcome of the matter, or perceived, meaning the investigator may be viewed as having an interest in the outcome of the matter. Both types of conflicts must be considered by the appointing authority. Thus, the potential investigator should disclose his or her relationship or familiarity with the complainant, the respondent and individuals who are likely to be witnesses, as well as any interest the investigator might have in the outcome of the matter. An investigator should not be appointed to a particular matter if there are any reasonable concerns about the investigator's objectivity.

Outside investigators (those who are not employees of the district) must be licensed as attorneys or private investigators.[2]

## PRIVACY ISSUES AND CONFIDENTIALITY

Since most investigations concern allegations of personal or professional wrongdoing, the respondent has a vested interest in making sure the allegations are not repeated unnecessarily. It must be remembered that the allegations may or may not be substantiated by the investigation. The right to privacy is explicitly guaranteed by the California Constitution, Article 1, Section 1, which states:

> "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

Complainants and witnesses also have privacy rights and may need to be protected from retaliation. It is therefore, important not to disclose information regarding respondents, complainants or witnesses to individuals who do not have a "need to know."

Claims of defamation may arise from an investigation in which information is spread beyond those who have a "need to know." Best practices in protecting privacy/confidentiality rights include:

- Avoiding the use of e-mail during the investigation;
- Ensuring that the confidentiality of documents (hard copy and electronic) is maintained;[3] and
- Avoiding discussion of the allegations except as necessary to solicit information from parties and witnesses.

Despite these cautions about privacy and confidentiality, it is important for investigators not to promise anonymity to any of the involved individuals. Investigators may assure participants and witnesses that protection of their identity, and the information they provide, will be maintained to the extent possible within the legitimate needs of law and the investigation. It may be necessary to reveal the name of a party or witness in order to investigate the matter effectively.

---

[2] Business and Professions Code section 7521 *et seq*.
[3] Beware of placing investigation-related documents on a shared server. Hard copies should be kept in locked file cabinets.

3

EXHIBIT 103 - 006

**DEFINING THE SCOPE AND TIMELINE OF THE INVESTIGATION**

Complainants do not always carefully describe the scope of their complaints. Thus, it is sometimes necessary to meet with the complainant to understand the nature of the complaint, even before beginning the investigation. (The complainant does not determine the scope of the investigation; the responsible district administrator holds that power.) ███████████████████████████████████████████████████████ en ████████████████ The investigator also should be clear as to what time period is involved in the investigation. Some board policies provide that complaints must be filed within a certain period of time after the incident giving rise to the complaint. The district may determine to investigate allegations that were not filed by the complainant within the "statute of limitations," but the investigator should ask the responsible district administrator for such a determination before proceeding with the investigation.

Investigators also need to be clear that the investigation is backward-looking; complainants should not be permitted to continue adding new allegations as the investigation proceeds. If new information does come to light, the investigator should confer with the responsible district administrator to make the call as to whether to include the new allegations in the scope of the investigation.



**COLLECTING AND MAINTAINING EVIDENCE**

███████████████████████████████████████████████ s. Investigators should be cautious, however, as most districts have computer use/electronic communications policies that may limit the investigator's access to electronic information. The district may have an approval process that needs to be followed before preserving or accessing electronic information.

Investigators should be cautious in making sure any searches of an employee's office or other area in which the employee has a reasonable expectation of privacy is consistent with federal and state laws.   The first approach may be to simply ask the individual for the document or other evidence.   Investigators should seek legal advice before conducting searches.

Investigators do not have the authority to compel people to cooperate with the investigation.   If a witness is not cooperating, the investigator should contact the responsible district administrator for guidance.   The district may determine to direct the person to cooperate with the investigation (assuming the witness is a district employee), but the investigator would not be the person issuing such a directive.   It is important for investigators to remain neutral and non-threatening.

 Additional copies may have relevant notations.   In addition, i                                    .   Investigators should request copies of documents, rather than originals.

- Personnel files;
- Desk files (sometimes referred to as "drop files");
- Project files;
- Notes, diaries, e-mails, calendar entries; and
- 

It is important to keep track of the source of each document received.   Some investigators find it helpful to maintain a spreadsheet of documents that references the source of the document, date received, and a short summary of the document. Documents can then be numbered and referenced by their exhibit number in the investigative report.

## EVIDENTIARY ISSUES

Investigators should be mindful of the standard of proof applicable to the investigation.   Most investigators will be applying the "preponderance of the evidence" standard of proof as that is the standard used in most civil proceedings.   It is a lower standard of proof than that used in the criminal context (proof beyond a "reasonable doubt").   "Preponderance of the evidence" means that one body of evidence has more

convincing force than the evidence opposed to it.[4]  It is useful to think of a preponderance of the evidence as a 51% (or more) certainty that a fact has been established.  ██████████ ██ or ███████████████████████████████████████████████████ ███████████ ██ █████████████████████████████████ ███████████████████████████████████████████████ ████████████

Some investigations may involve a "probable cause" standard of proof.  This standard applies in the context of discrimination investigations in the community college context.[5]

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

## REQUESTS FOR REPRESENTATION

The complainant may ask to bring someone to the interview.  Unless the written procedures speak to this issue (most do not), this is left to the investigator's discretion.  It is probably best to make the complainant comfortable by allowing a support person to be present, provided that person is not expected to be a witness, and provided the support person agrees to maintain the confidentiality of the information.  If the complainant is represented by counsel, it is customary to allow counsel to be present; the complainant will likely refuse to participate if counsel's presence is denied.  The investigator should speak to the district's counsel before proceeding, however.  The investigator will probably want to warn the complainant's counsel that he or she should not interfere with the interview and should allow the complainant to speak for himself or herself.

The respondent also may request to bring a representative to the interview.  If the respondent is part of a bargaining unit, *Weingarten* rights apply; thus, since the interview may lead to discipline, the employee must be permitted to bring a representative.[6] Employees need not be informed of the right to union representation, nor is postponement required when a particular union representative is not available as long as another representative is available. The union representative may speak on behalf of the employee but the employee may be required to respond to job-related questions. The union representative does not have the right to cross-examine or interrogate supervisors or third parties who may be present.  If the respondent is not part of a bargaining unit, there is no right to representation.  However, as with requests from the complainant, the investigator may determine to allow a representative to be present in the interest of

---

[4]  See 1 Witkin, Evidence, Burden of Proof and Presumptions, Section 35 (4th ed. 2000).

[5]  5 Cal. Code Regs., Section 59334.  "Probable cause" involves a determination as to whether a reasonable person could entertain a strong suspicion that an allegation is true.  See Cooley v. Superior Court, 29 Cal.4th 228, 127 Cal.Rptr.2d 177 (2002).  This standard is even easier to meet than the preponderance of the evidence standard.

[6]  NLRB v. Weingarten, 420 U.S. 251, 95 S.Ct. 959 (1975); See also *Redwoods Community College District v. Public Employment Relations Board*, 159 Cal.App.3d 617, 205 Cal.Rptr. 523 (1984).

6

EXHIBIT 103 - 009

obtaining the best cooperation from the respondent. In such cases, the representative needs to agree in advance to maintain the confidentiality of the information.

Witnesses may request to bring a representative, but even if the witness is part of a bargaining unit, unless the interview may lead to discipline, the witness has no right to representation. Generally, witnesses should not need a representative present since they can be assured that they are not the subject of the investigation, and that the law protects them from retaliation. When a witness is hesitant to cooperate, investigators should inquire as to why the witness is concerned as there may be a way to address the concern. Investigators should try gentle reassurance and ask if the witness would at least be willing to answer a few general, background questions. (Often once the witness gets talking, the level of cooperation increases.)

### OVERLAP WITH CRIMINAL INVESTIGATIONS

In some instances, a criminal investigation may be pending at the same time the district is trying to conduct an internal investigation. Under such circumstances, it is possible that the respondent will refuse to cooperate with the district's investigation. In such cases, the investigator should contact the responsible district administrator who will work with the district's counsel in responding to the objection. In all cases in which a criminal investigation is pending, the investigator should make contact with the detective responsible for the criminal investigation to determine whether the detective has any objection to the district's plan for investigation. Generally, the police will not object to a school or college investigation, but occasionally the police department will ask the investigator to hold off on certain interviews until the police department has completed all or part of its investigation.

### INTERVIEWS



unless an in-person interview would be impracticable or would cause undue delay. the

In some cases, however, it is exceedingly expensive or time-consuming to conduct an in-person interview, such as when the interviewee does not live in the state.

Occasionally, a non-district witness will agree to a telephone interview only; in such cases, it is advisable to proceed as the witness demands as that is the only way to obtain any information from the witness. However, the investigator will have to determine whether he or she is able to adequately assess the credibility of the witness.

Each interview should be conducted separately in order to preserve the integrity of the investigation. Individuals may feel pressure to provide certain information in front of others, which may or may not reflect the facts. I

harassment and discrimination investigations, as well as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Interviews typically proceed in the following order: (1) complainant; (2) respondent; (3) witnesses; (4) re-interview complainant, if necessary; and (5) re-interview respondent, if necessary. Investigators may deviate from the above order when there is a good reason to do so, although the complainant should be interviewed first if at all possible. Generally, it is preferable to interview the respondent before interviewing witnesses as the respondent may provide information that makes further interviews unnecessary. The respondent may admit to the allegations, for example. In some cases, it is necessary to interview one or more witnesses before interviewing the respondent, however, because the exact nature of the allegations cannot be known without talking to witnesses.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ne Investigators who choose to tape record their interviews must have the consent of all parties to the interview. Failure to obtain such consent is a criminal offense.[7] The consent to be taped should be given orally by each individual present once the tape is running. Other investigators choose not to tape-record interviews because the presence of a tape recorder may impact the willingness of the interviewee to be candid. Tape recorders often make people hesitant to speak freely. Many investigators feel they can build rapport much easier without the presence of a tape recorder. Moreover, the transcription of tape recordings is time-consuming and expensive.

The basic rules of interviewing focus on making the interviewee comfortable and getting the interviewee to talk as much as possible. Thus, investigators typically start with "easy" questions, such as questions about the interviewee's education and work experience. Investigators use open-ended questions and are not afraid of pauses in the conversation which may encourage the interviewee to speak. Since the goal is to collect information, rather than disseminate it, investigators should be careful of sharing facts with the interviewee and should discuss the process of the investigation, rather than the substance. Investigators should use "who, what, where, why and how" questions and should keep the chronology of the events in mind at all times. It is often tempting to share one's feelings about the investigation; however, investigators should not succumb to this temptation. It is certainly acceptable to thank the individual for coming forward and/or cooperating with the investigation, but the investigator should not indicate a probable outcome before all the information has been gathered.[8]

All interviewees, including complainants and witnesses, should be told of their obligation to maintain the confidentiality of the allegations and the information provided

---

[7] Penal Code section 632.
[8] Even then, only certain parties will have a right to know the outcome of the investigation. Dissemination of results will be discussed below.

during the interview.  The investigator should inform each interviewee that a failure to maintain confidentiality may result in discipline and/or civil liability.

It is useful to explore motives with interviewees.  For example, if an interviewee denies a certain allegation to which another person attests, it would be helpful to ask the interviewee why he or she believes the other person would fabricate the allegation. Investigators should always ask the interviewee whether he or she has kept a log or notes concerning the allegations.

When interviewing the complainant, the investigator should explain his or her neutral role and provide a description of the process.  The investigator should explain that he or she has no interest in the outcome of the matter.  It is helpful to inquire whether the complainant has shared the allegations with anyone else.  Also, the investigator should ask the complainant for a list of people with relevant information.  If the list is long, the investigator should ask the complainant what specific information each person would have concerning the allegations. The investigator is not obligated to interview each person suggested by the complainant, but should make a reasoned decision as to whether each person needs to be interviewed.  Most investigators feel it is helpful to ask the complainant what he or she would like to see happen as a result of the complaint.

In interviewing the respondent, the interview should keep in mind two goals: gathering information and providing the "accused" a fair opportunity to respond to the allegations.  The investigator should not be accusatory in tone as no findings will have been made at this point.  While the complainant's story may have sounded compelling, the respondent may have information to share that will call into question the complainant's credibility.  Generally, it is helpful to explore the relationship and past history of the complainant and respondent.  The respondent should be asked to provide relevant documents and a list of witnesses.  Again, if the list is long, the respondent should provide specifics as to what each witness would be expected to say.  Although a written response typically is not required, it is a good idea to ask the respondent if he or she would like to provide a written response to the allegations.  The investigator should warn the respondent not to try to speak to the complainant or witnesses regarding the allegation.  The investigator also should caution the respondent not to engage in any behaviors that might be perceived as retaliatory.[9]

Arranging interviews with witnesses can be a delicate task in that interviewees often demand certain information prior to the interview, while the investigator would prefer to ask his/her questions face to face in order to be able to assess the interviewee's credibility.  Moreover, witnesses generally do not have a right to be informed of the nature of the allegations.  It is recommended that investigators share as little information as possible when setting up the interview.  For example, an investigator might state: "I have been assigned to investigate a complaint filed by an employee.  You are not the subject of the investigation.  I need to meet with you because I believe you may have

---

[9] Retaliation is anything that would deter a reasonable person from making a complaint.  This would include adverse employment actions and a host of less severe actions.  The law protects witnesses, as well as complainants, from retaliation.

relevant information.  I cannot discuss the specifics of the allegations with you, but will be happy to answer any questions you have regarding the process of the investigation.  Please do not discuss this matter with anyone."

The investigator will need to inform the witness that because of confidentiality obligations, he or she is not permitted to discuss the nature of the complaint.  Witnesses should be informed that while they may believe they are aware of the nature of the complaint, they should not jump to conclusions and must not share the information with anyone else.  The best method for witness questioning is to use a funnel approach in which the investigator asks broad, open-ended questions and then focuses on more detailed questions.  The investigator should be careful not to suggest the answers, but to let the witness describe the situation in his or her own words.  The investigator should ask for relevant documents and should ask the witness whether there are other people who have relevant information.  It is helpful to review the witness's answers to make sure there are no misunderstandings.

Some investigators ask the witness to sign a summary of the information provided during the interview.  While this can be helpful in avoiding misunderstandings or confusion, it also can prolong the process as witnesses often fail to review the statement in a timely fashion.  Investigators should use their discretion in deciding whether signed witness statements are critical to the investigation, or whether an oral summary provided at the end of the interview is sufficient.  The investigator should encourage witnesses to contact him or her with any additional information that comes to mind.  It is very important to reiterate the importance of confidentiality, including possible liability for defamation and invasion of privacy.

Some investigations involve unpredictable people or circumstances.  Investigators should take precautions if they feel their safety may be in jeopardy during an interview.  Investigators may choose to have a note-taker or observer present, or to have plain-clothes police officers nearby.  Investigators should be sure that the exit out of the room is not blocked.  If the situation feels unsafe, the investigator should conclude the interview and reschedule under circumstances that ensure a greater degree of protection.

## MAKING CREDIBILITY DETERMINATIONS





When an investigator is having a difficult time making a credibility determination, the best approach is usually to re-interview people with relevant knowledge. Sometimes the interviewee will make statements that are inconsistent with the information he or she provided earlier. This inconsistency would weigh against the person's credibility. Conversely, if a person is able to tell of events in a similar fashion on multiple occasions, his or her credibility is strengthened.

There may be some instances in which even a very thorough investigation will not reveal the facts by a preponderance of the evidence (or other standard or proof that may be applicable). In such cases, the investigator should state that the investigation is "inconclusive" as opposed to stating that the allegations are false. Again, this will occur only rarely as investigators generally should be able to make credibility determinations. Investigators should keep in mind that they are not being asked to determine whether an interviewee is lying; they are being asked to determine if the person is credible. It may be that the interviewee believes certain facts to be true, yet the investigator finds that the interviewee is not credible because of a lack of corroborating evidence, inconsistent statements by the witness, or other considerations.

### SPECIAL ISSUES CONCERNING RETALIATION COMPLAINTS

The California Legislature has enacted whistleblower legislation known as the "Reporting by School Employees of Improper Governmental Activities Act (the "Act"). [11] The Act protects school district and community college district employees who report improper governmental activities. Section 44112 defines an "improper governmental activity" as an activity by a public school agency or employee that (1) violates a state or federal law or regulation; or (2) is economically wasteful or involves gross misconduct, incompetency, or inefficiency. Investigators should be mindful of the breadth of this law. A complainant need not cite to this law specifically in order for it to apply to a claim of retaliation. For example, if an employee files an internal or external complaint of discrimination, and then later alleges that he or she suffered an adverse action, the provisions of the Act (including the shifting burden of proof and "clear and convincing" standard of proof, as discussed below) likely would apply.

Under Education Code section 44113, it is unlawful to use or attempt to use one's official authority or influence to intimidate, threaten, coerce, command (or attempt to intimidate, threaten, coerce, or command) any person for the purpose of interfering with the person's right to disclose a suspected improper governmental activity to a school administrator or board member.

---

[10] EEOC's Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors (1999), http://eeoc.gov/policy/docs/harassment.html.
[11] Education Code section 44111 *et seq.*

A finding of retaliation requires three elements: (1) that the complainant engaged in a protected activity; (2) that the complainant suffered an adverse action; and (3) that there is a causal link between the protected activity and the adverse action. In any civil or administrative proceeding (including an internal investigation), once it has been demonstrated by a preponderance of evidence that an activity protected under the Act was a contributing factor in the alleged retaliation against a former, current, or prospective public school employee, the burden of proof shall be on the supervisor, school administrator, or public school employer to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the public school employee had not engaged in protected disclosures or refused an illegal order.[12]

Thus, if a school employee establishes by a preponderance of the evidence that he or she suffered an adverse action because of a protected activity (disclosure of a suspected improper governmental activity or refusal to obey an illegal order), then the burden of proof shifts to the supervisor or manager. The supervisor or manager must establish by clear and convincing evidence that the action was taken for reasons independent of the protected activity. The "clear and convincing" burden of proof is a higher standard than the "preponderance of the evidence" and is met only where there is a "high probability that a fact is true."[13]

Evidence of retaliation (as with evidence of discrimination) may be circumstantial. Courts will consider whether the respondent had knowledge of the complainant's protected activity, the timing of the adverse action and differences in how the respondent was treated as opposed to other employees. Given that the law is unsettled with regard to proving the causal link between an adverse action and a protected activity, investigators are advised to contact legal counsel for advice.

### WRITING THE INVESTIGATIVE REPORT

Reports should be objective and well written and should not contain typographical errors. Investigators generally find that they are better able to proof-read the report if they have set it aside for a day or two once the draft is complete. A



---

[12] Education Code section 44114(e).
[13] See Judicial Council of California Civil Jury Instruction Number 201.



The "scope and manner of the investigation" is a brief summary of the policies and procedures governing the investigation, as well as the steps the investigator took in gathering information. The investigator may set forth a list of people interviewed and a summary of the documents reviewed. The investigator may discuss any procedural issues that arose, as well as any interviews or evidence the investigator chose not to obtain or was unable to obtain (and why).

The "summary of the allegations" is either a verbatim recitation of the complaint, or a summary of the complaint in the investigator's own words. Since most written complaints filed with districts generally do not contain each and every factual allegation, it is usually helpful for the investigator to summarize the allegations in full and attach the written complaint as an exhibit.

The "response to the allegations" is a summary of the respondent's version of the events. If the allegations are numerous, it is helpful to set forth each allegation followed by the respondent's response. Again, the tone of this section should be neutral and objective.

The most important sections of the report are those that set forth the investigator's credibility determinations and analyze the factual issues in dispute. In writing the credibility section, the investigator should carefully describe the factors that weigh in favor of – and against – the witness's credibility, and should set forth his or her determinations. As stated above, the question is not whether the person is "lying," but whether the person's statements are credible based on all of the evidence.

In the "findings" section of the report, the investigator should apply a four-step process: (1) define the issue; (2) identify the relevant policy or law; (3) set forth the evidence that weighs in favor of the complainant's allegations, as well as that which detracts from it, and; (4) make a finding by explaining why the evidence supporting or refuting the allegation is more persuasive. The "findings" section should state the standard of proof the investigator is applying.

The report should contain a "legal conclusions" section only if required by law or policy. For example, in discrimination investigations for community colleges, the investigator must draw a conclusion as to whether there is probable cause of discrimination.[14]

The most effective investigative reports are those that use short, clear sentences.

A factual dispute that does not relate closely to the essential aspects of the complaint may be left unresolved at the discretion of the investigator (although such

---

[14] 5 Cal. Code Regs., Section 59334.

"minor" disputes often relate to credibility and should, therefore, be addressed).  The report should include references to exhibit numbers.  Relevant exhibits should be attached to the report.  A sample investigative report is attached as part of this workbook.

## CLOSING MATTERS

The report should be provided only to the district administrator who assigned the matter to the investigator.  Questions concerning the report or the investigator's findings should be directed to that administrator.  The investigator should continue to safeguard the confidentiality of the investigation and all evidence received.  The investigator may inform the complainant and respondent when he or she has completed the investigation and may refer the complainant and respondent to the responsible administrator for further information.  Any outside requests for information should be referred to the District's Public Records Act coordinator.

Some investigators retain only their final report and exhibits; they destroy their notes once the investigative report is finalized.  Other investigators retain their interview notes.  There really is no right or wrong answer to the question of whether to retain interview notes.  However, the investigator should keep in mind the advantages and disadvantages of each approach.  The investigator should understand that if he or she retains interview notes, they will be disclosed to both sides should the matter end up in litigation.  Thus, the interviewer will have to explain any discrepancies that may exist between the interview notes and the investigative report.  On the other hand, some investigators find that certain peripheral information contained in interview notes does not make it into the final report and yet can be helpful if the investigator is called to testify.

An investigator should have a consistent practice as to retaining or destroying interview notes.  If the investigator decides he or she will destroy interview notes, that destruction should occur at the same point in each investigation (e.g., after the report is finalized).  No destruction may occur once the district is notified of litigation, threatened litigation, or an investigation by a criminal or civil authority, as that would be considered spoliation of evidence.  In such cases, all evidence, including documents and electronic files, must be preserved, even if the evidence would otherwise be destroyed pursuant to the district's document retention/destruction policy.

Investigations often involve complicated legal questions involving matters of process and evidence, as well as substantive questions of law.  In

**Complaint of Sexual Harassment**
**Made by Darla Darling**


**XYZ School District**



**April 10, 2008**


**Investigation conducted by Irma Investigator**

# Table of Contents

Page

I.    Scope and Manner of Investigation ................................................. 1

II.   Darla Darling's Claims  ........................................................ 1

III.  Sam Supervisor's Responses to the Allegations  ......................... 3

IV.   Summary of Witness Interviews........................................... 5

    A.    Ronda Russo ..................................................... 5

    B.    Mel Maintenance ............................................... 6

    C.    Ian Instructor.................................................... 7

    D.    Tim Teacher.................................................... 8

V.    Credibility Determinations........................................... 9

VI.   Findings.......................................................... 11

EXHIBIT 103 - 019

I. **Scope and Manner of Investigation**

On March 4, 2008, Darla Darling raised a complaint of sexual harassment against her Supervisor, Sam Supervisor.  On March 10, 2008, XYZ School District asked me to conduct an investigation into Ms. Darling's claims.

In investigating the allegations, I interviewed the following individuals on the dates noted.

| Name | Date |
|------|------|
| Darla Darling | March 11, 2008 |
| Sam Supervisor | March 12, 2008 |
| Ronda Russo | March 13, 2008 (by phone) |
| Mel Maintenance | March 13, 2008 |
| Ian Instructor | March 13, 2008 |
| Tim Teacher | March 13, 2008 |

II. **Darla Darling's Claims**

Ms. Darling has been an administrative assistant in the District since March 13, 2007. She was hired by and reports to Sam Supervisor.  Ms. Darling began serving as Mr. Supervisor's assistant beginning in August of 2007 when Ronda Russo, who had been filling that role, transferred to another location.

Ms. Darling states that Mr. Supervisor has sexually harassed her in the workplace since she began working for him.  Ms. Darling's claims are summarized below.

A. **Inappropriate Workplace Remarks**

Mr. Supervisor commented during an office lunch that he liked "dominatrix stuff."  This was said in front of co-worker Ronda Russo, who left the room when the comment was made.  Ms. Darling told me she questioned Mr. Supervisor if this was "like Pulp Fiction" and she started calling Mr. Supervisor "gimp."  She said she just kept joking about it and calling him "gimp" which made him feel uncomfortable and in a week or so he quit talking about it.

Mr. Supervisor told Ms. Darling that she "looked good." He made this type of comment on more than one occasion.

Mr. Supervisor told Ms. Darling he had "developed feelings" for her.

On one occasion, Mr. Supervisor discussed with Ms. Darling that he is "looking to get laid" in "several contexts like what kind of car he drives."  He said something like, "how am I going to get laid if I drive a mini van."  Around this same time, Mr. Supervisor kept telling Ms. Darling that he would "rock her world."

1

EXHIBIT 103 - 020

Mr. Supervisor told Ms. Darling that she was his "work wife."

Mr. Supervisor told Ms. Darling, "I love you" when she called to check in before returning to work from a vacation.

Over the course of her employment, Mr. Supervisor repeatedly told Ms. Darling that he was going to "spank" her.

On December 19 or 20, 2007, Mr. Supervisor said it would be funny to see Mel's reaction if he [Mr. Supervisor] and Ms. Darling were in the bathroom or office making sex noises.

On January 16, 2008, Mr. Supervisor talked about his new "girlfriends" on his computer screen. Ms. Darling said she responded by asking about his wife, and he told Ms. Darling that "things aren't good with his wife."

On January 20, 2008, Ms. Darling was expressing frustration to Mr. Supervisor about another employee. Mr. Supervisor told her he thought she was "sexy" when she swore. On this same day, Mr. Supervisor told Ms. Darling over the radio he was picking up parts near a strip club.

On approximately January 21, 2008, Mr. Supervisor talked to Ms. Darling after work (after giving her the "silent treatment" all day) and told her that he had done a lot for her and that she "owed" him.

### B.      Inappropriate Workplace Conduct

According to Ms. Darling, Mr. Supervisor has indicated he is "like a brother" to Ms. Darling, or that she is like his little sister; he used that as a pretext to give her hugs in the workplace. Ms. Darling said he hugged her "at least ten times" with the last time occurring approximately February 1, 2008. At that time, she told him "no" and he did not hug her after that occasion. Ms. Darling said she had, "said no once before."

In January of 2008, Ms. Darling says that she was under a truck with a new employee, showing him parts of the delivery truck. She said that Mr. Supervisor came by and "slapped [her] ass" while she was under the truck. He then kicked her foot and she kicked him to get him away from her. After work, she confronted him and told him that she did not like his behavior.[15]

### C.      Invitations to Socialize Outside the Workplace

A few months ago, Mr. Supervisor told Ms. Darling that he had thought about calling her to invite her to his house over the four-day weekend that had just passed. Later in the conversation, he told Ms. Darling his wife was at work "that day."

---

[15] Ms. Darling said he did not touch her after she told him not to touch her on this occasion.

Mr. Supervisor once invited Ms. Darling to his house and she told him no several times. He would ask her over from time to time, but that eventually stopped.

One day, Mr. Supervisor "continually mentioned" about going on some type of road trip with Ms. Darling.

Mr. Supervisor asked Ms. Darling when she would invite him to her house.

Mr. Supervisor invited Ms. Darling to go to a car show in San Diego.  He told her to call him and he would meet her.

One time, Mr. Supervisor asked Ms. Darling to "hang out with him on Saturday to do his car stuff."

### D.    Miscellaneous

Ms. Darling complains that on a few occasions, Mr. Supervisor's work number would appear on her home phone but there was no message left for her.  She said this happened about once a week for approximately one month, and then stopped.

## III.    Sam Supervisor's Responses to the Allegations

Mr. Supervisor began working as a Supervisor for the District in February of 2007.  He recommended the hire for all of his current staff members.

Mr. Supervisor said that when Ms. Darling became his assistant, he took her "under his wing."

### A.    Alleged Workplace Remarks

Mr. Supervisor states that the remarks that Ms. Darling attributes to him are either completely taken out of context or simply not true.  He also says many of the comments that she seems to imply were one-on-one were actually things said in a group setting. These conversations would take place during the lunch hour or the morning or afternoon breaks.

Mr. Supervisor vaguely recalls that the group was talking about Pulp Fiction at one point and thinks that might be where Ms. Darling gets the "dominatrix" comment. [16]

Mr. Supervisor said he never told Ms. Darling that she "looks good."  He said he has asked her if anything was wrong, when she appeared to be stressed.  He vaguely

---

[16] This comment was allegedly made before all of the third party witnesses to this investigation were hired, except Ronda Russo.  Ms. Russo does not recall ever talking about Pulp Fiction, and did not hear any comment about dominatrix preferences.

3

EXHIBIT 103 - 022

remembers commenting to her the day after one of these days that she must have gotten some rest because she "looked better" or "looked healthier" or "something to that effect."

Mr. Supervisor says his wife drives a van and he drives a Taurus. He did not ask Ms. Darling how he would get laid driving a van.

Mr. Supervisor remembers telling Ms. Darling on more than one occasion that she needed to lobby for her position (as assistant). He said this was in the context of raising performance concerns with her. He was trying to tell her that she could improve and that he still believed she "had it in her" to be successful. He also told her that her co-workers were having a hard time with her.

Mr. Supervisor said on one occasion he did "a parts run." He said the reference to the strip club is completely out of context. He called her on the radio and asked her about the location of the store. He said he thought it was next to a big pink building that is a strip club. It is clearly marked and hard to miss. His raising the strip club was for purposes of discussing the location, nothing more.

Regarding some of the comments, Mr. Supervisor said he never said what is being alleged and cannot think of where she would get the idea. He never told her he had feelings for her. He never told her, "I love you."

### B.    Alleged Workplace Conduct

Mr. Supervisor said he is a "huggy" person so he likely hugged Ms. Darling, but he believes he would have asked first, or felt she was comfortable with it. He said he has not hugged her in the context that she thinks. With Ms. Darling, he said they would occasionally knock the top of their fists together.

### C.    Invitations to Socialize Outside the Workplace

Mr. Supervisor said he has invited Ms. Darling to his house. He believes he also invited her boyfriend. He said he would have cleared the invitation with his wife, and his wife and kids would certainly have been around if Ms. Darling had come to his house. She did not. Mr. Supervisor said he has invited many co-workers to his house. He likes to entertain, barbecue, watch sports and visit.

Mr. Supervisor said he talked to Ms. Darling about going on a road trip with him. He said they were joking around about "going for the road," but it was not something they were planning. Mr. Supervisor said, "My wife would not let me!"

Mr. Supervisor said he never asked Ms. Darling to invite him to her house.

4

EXHIBIT 103 - 023

### D.    Miscellaneous

Mr. Supervisor says Ms. Darling would take photos of a hole in one of their colleague's shorts and then after people left, she would stay and show him pictures of this man's legs being open.  She would joke about how he was "hanging out" of his shorts.  Mr. Supervisor asked Human Resources to deal with it because it was embarrassing to him.  Someone in Human Resources told the employee to buy new clothes and watch his hygiene.  Ms. Darling joked about this all of the time.

Mr. Supervisor said he finds Ms. Darling to be "a bit strange."  When she first started, he arrived at work and thought the building was on fire.  Ms. Darling had a clam filled with incense that she was burning.  She was walking around the office and the garage.  He asked what she was  doing, and she told him she was trying to eliminate the "negative energy" and that she felt spirits were there.  He told her she could not do it because it was a fire hazard.

## IV.    Summary of Witness Interviews

### A.    Ronda Russo

Ronda Russo currently works as a Supervisor at another site.  She transferred from Mr. Supervisor's site in July of 2007.

Ms. Russo served as the assistant to Mr. Supervisor when she was at his location.  She said as part of her duties, she would come in around 5:30 a.m. and get things organized in the morning.  Ms. Russo said even though her paid time did not start until 6:00 a.m., she liked to be early as a courtesy and to feel more organized about her day.  She said Mr. Supervisor did not ask her to be there until a few minutes before 6:00.  She explained that Mr. Supervisor needed someone to call his second in command, and he had selected her.  Ms. Russo said she never felt that Mr. Supervisor was having her perform duties outside the scope of her work.  When she left, Mr. Supervisor asked her who would be a good person to be second in command, and she suggested another employee, not Ms. Darling.  She believes that Mr. Supervisor asked this other employee to become the assistant before he selected Ms. Darling.

Ms. Russo said Ms. Darling is not a good role model, and should not be affiliated with the District.  She does not work well with others.  Employees do not like her and have complained about her.  Ms. Russo said, "I would say over half of the employees she works with complained about her."

Ms. Darling did not spend time with the group.  "She did not spend any one-on-one time with Mr. Supervisor."  It would be an unusual circumstance to see Ms. Darling in the office with Mr. Supervisor.  The only time they would have spent one-on-one time together was when they worked on a training manual.  This would have been for a two or three-day period.  "Other than that, I am certain they didn't spend a lot of time together."

5

EXHIBIT 103 - 024

Ms. Russo said, "There was no sex talk at all, period, ever." Ms. Russo said the only way sex would "ever enter the equation would be when Ms. Darling would show up with hickeys all over her neck. That was the only time that sex was mentioned." Ms. Darling told Ms. Russo that the hickeys on her neck were from a guy she met in a bar and spent the weekend with, and Ms. Russo said, "That was more information than I wanted to know." Mr. Supervisor asked Ms. Russo to talk to Ms. Darling about the hickeys.

Ms. Russo said, "Mr. Supervisor has never, ever been out of line with me. For two weeks when I came to the District I trained with him. I was with him for two weeks non-stop. There was no sexual talk, gestures. I think any sexual talk would be out of line with anything I know of working with him."

Ms. Russo said when Mr. Supervisor visits her site, he will hug her hello and goodbye. She is totally comfortable with it and says it is not inappropriate at all.

Ms. Russo said Mr. Supervisor would talk about his wife and his kids often, but never talked about marital problems or anything personal. When the group would talk at lunch, they would talk about personal issues, such as what kids had done, but "we most assuredly did not talk about sex."

Ms. Darling did not socialize with the group (four or five people in the office, who ate lunch together every day). A few times she would have lunch with the group, but she would only stay 15 or 20 minutes. Many times she would eat in her car.

Mr. Supervisor invited people to his house with their spouses. He may have invited Ms. Darling, but that would have been to be with his wife and kids participating.

Ms. Russo said she told Mr. Supervisor that Ms. Darling would not be successful even before she reached passed probation. Mr. Supervisor told Ms. Russo that she should take Ms. Darling "under her wing" and help her because he felt that women should support other women. He would have done this for anyone because he is a nice guy.

### B.    Mel Maintenance

Mel Maintenance is a maintenance worker for the District. Mr. Supervisor hired him.

Mr. Maintenance said the entire group has lunch at the same time. They often all eat together in the office. While someone might go out to get something to eat every once in awhile, there are usually several of them together at lunch. Mr. Maintenance usually eats there. He said the group has never talked about any inappropriate sexual things. He has never heard Mr. Supervisor say anything inappropriate "like that."

Mr. Maintenance noticed that Ms. Darling and Mr. Supervisor would eat lunch together in his office, sometimes with the door open and sometimes with the door closed. This was "almost every day for awhile." He does not recall thinking this was strange or anyone else reacting to it in any way. He believes in the four months between when he

6

EXHIBIT 103 - 025

started and February of 2008, Mr. Supervisor and Ms. Darling had lunch with just the two of them "at least half of the time."

Mr. Maintenance has observed Mr. Supervisor with Ms. Darling and has never seen anything out of the ordinary or anything that would cause him concern.

Mr. Maintenance said Mr. Supervisor asked him once if, "I would do her [Ms. Darling]." He replied that he was fine with his girlfriend. In this conversation, just the two of them were present. Mr. Maintenance did not remember the context. He did not remember anything else about the conversation, how it came up, or when or where it was said.

Mr. Maintenance does not know Ms. Darling very well. He says, "Hi" to her and asks how she is doing, but they have not had any personal conversations.

Mr. Supervisor has talked to Mr. Maintenance about having him over for a barbeque and to hang out at his house with his family, but he has not followed up.

Mr. Maintenance said he was leaving work one day and bumped into another car in the parking lot. The next day he received an accident report that was filled out by Ms. Darling and given to him by Mr. Supervisor. Mr. Supervisor ended up telling him it was a joke, but Mr. Maintenance did not think it was very funny.

Mr. Maintenance said he interacts with Mr. Supervisor once or twice a day, but does not have personal conversations. The only thing they have talked about is video games. Mr. Maintenance ended the conversation saying he has never heard Mr. Supervisor say anything inappropriate to Ms. Darling.

### C.    Ian Instructor

Mr. Instructor is a driver-trainer for the District.

Mr. Instructor says that at one point he received a cell phone call at 1:17 a.m. He says it was Ms. Darling. He does not think that a number showed up on his phone, but he says he knows it was Ms. Darling. The person said, "Hi, it is Darla, what are you doing?" He does not know anyone else named Darla. He is sure it was her voice, "It sounded like her, it was her." He said she did not say anything inappropriate and never called again. It was not a big deal to him, except the fact that she denied it. "It bothered me that she lied. I wish she would have just said it was her." He did not file a complaint because he is "not a complaint kind of guy." He told Ms. Russo about it and she raised it with Mr. Supervisor. They all talked together about it, Ms. Darling denied making the call, and that was the end of the issue.

Mr. Instructor said since that day, he is careful what he says around Ms. Darling. Mr. Instructor does not feel comfortable around her. Also, he did not like that she lied about calling him. He said she is "odd." She has some strange beliefs and practices.

7

EXHIBIT 103 - 026

Mr. Instructor said it is a common practice at lunch for everyone to sit together and "chat." Sometimes all of them are in Mr. Supervisor's office. Mr. Supervisor is usually in his office. Mr. Instructor said that Mr. Supervisor "did not have any lunches alone with Darla that I know of." He said Ms. Darling would go in on occasion to talk to him during the lunch hour. He said Ms. Darling and Mr. Supervisor did spend time together sometimes. This would usually be during the lunch hour or sometimes after work. Ms. Darling rarely stayed late. There were always people around.

Mr. Instructor said he never heard Mr. Supervisor say anything inappropriate to Ms. Darling. He said the only "bawdy" conversation was started by Ms. Darling and was about the employee who was "hanging out" of his shorts. He said Ms. Darling came in while he was talking to Mr. Supervisor and told them that the man's "balls were hanging out of his shorts." He said they started joking around and laughing, and Mr. Instructor said, "What are you doing looking down there?"

Mr. Instructor also said he has never seen Mr. Supervisor be affectionate with Ms. Darling.

Mr. Supervisor has told Mr. Instructor that he wants to have him over to his house and get together to play cards.

In the past few weeks, Mr. Supervisor began asking Mr. Instructor to come into his office during the lunch break. He started talking about being unhappy with Ms. Darling's performance. He also told Mr. Instructor that he was becoming uneasy around Ms. Darling and asked Mr. Instructor to open the door if Ms. Darling came in and shut it behind her.

Mr. Instructor said everyone has received complaints from employees about Ms. Darling.

### D.    Tim Teacher

Mr. Teacher is a driver-trainer for the District.

Mr. Teacher said the employees break for lunch at 11:30 a.m. for an hour. Most of them grab lunch and sit in the office to eat. Ms. Darling has her own desk and Mr. Supervisor is usually in his office. Sometimes the whole group goes into Mr. Supervisor's office, informally. Mr. Supervisor does call Ms. Darling into his office during the lunch hour. This occurred approximately two times per week for awhile. Others would sometimes go in with her.

Mr. Teacher said he has never seen Mr. Supervisor be inappropriate or flirtatious with Ms. Darling. He said he teases her, like he teases others. They have friendly banter, like between friends. He would tease her about things, like her pet iguana. Mr. Teacher has never heard Mr. Supervisor make an inappropriate comment about Ms. Darling. Mr. Teacher said he never saw Mr. Supervisor even get close enough to Ms. Darling to touch her and he recalls him always being very professional.

8

EXHIBIT 103 - 027

Mr. Teacher has sat and talked with Mr. Supervisor "many times." Mr. Supervisor has spoken about his wife and his family very warmly. These conversations are usually after work when things are winding down. Mr. Teacher has to wait for the bus so he will clock out and sometimes hang around for a bit. These conversations were always appropriate. The talk would be social. Mr. Teacher said he believes Mr. Supervisor is a "nice, decent guy."

Mr. Teacher likes Ms. Darling but says she is "odd." For example, she talked about the fact that her iguana spits on her, and she believes that this means the pet loves her.

Mr. Teacher said he notices things in people and he did note that the relationship between Mr. Supervisor and Ms. Darling changed at some point in late January or early February and they were not as informal with each other. She was not smiling or happy as usual.

Mr. Teacher said his personal motto is to "be kind and do no harm" and he has always perceived Mr. Supervisor to have this same kind of attitude.

## V.     Credibility Determinations

The account provided by Ms. Darling diverges from the account provided by Mr. Supervisor. Thus, it is necessary to make credibility determinations. In making such determinations, certain factors are relevant to the fact-finder: (1) the inherent plausibility of each person's story; (2) corroborating evidence that would tend to support or contradict each person's story; (3) each person's motive to lie; and (4) each person's demeanor; that is, whether the person appears to be telling the truth when interviewed about the incident.[17]

### A.     Ms. Darling's Credibility

I did not find Ms. Darling to be credible in many respects.

Ms. Darling attempted to create an impression that she worked side-by-side and somewhat alone with Mr. Supervisor on a regular basis. However, the evidence shows that for most of the day Ms. Darling and the other employees are working separate from Mr. Supervisor. There is a short morning and afternoon break, and a lunch hour. During the lunch hour, the witnesses stated that the employees typically hang around the office.

While Ms. Darling may have had extra time alone with Mr. Supervisor as his assistant, I do not believe this was a significant amount of time. As the assistant, Ms. Darling stated that she arrived earlier in the mornings, around 5:30 a.m. Witnesses stated that Mr. Supervisor arrives at approximately 7:00 a.m. when others are also arriving at the office. And, while Mr. Supervisor typically stays late, Ms. Darling does not. Accordingly, Ms.

---

[17] EEOC's "Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors."

Darling and Mr. Supervisor would have relatively little time to have conversations that were not heard by others, or interactions that were not observed by others. All witnesses stated they had observed no inappropriate interactions or comments.[18]

Ms. Darling complained that beginning in February, Mr. Supervisor began giving her the "silent treatment." She raised this treatment several times in our interview. While she did not say it directly, she seems to imply that his cold treatment of her was in response to her rebuffing his advances. However, around this time [19] it is clear that Mr. Supervisor became increasingly frustrated with her performance. Ms. Darling even admitted that Mr. Supervisor "could have been mad about some things I had done or not done that he was not happy with." She says Mr. Supervisor called her into his office on several occasions in January and February and told her that she needed to improve her performance. It is more plausible that Mr. Supervisor's changed demeanor resulted from Ms. Darling's escalating poor performance.

### B.    Mr. Supervisor's Credibility

I found Mr. Supervisor to be credible.

First, Mr. Supervisor was very forthcoming and shared information with me even when it tended to discredit him. For example, he told me he had talked to Ms. Darling about going on the road. He agreed that he had probably hugged her, on occasion. His explanations about what he had actually said or done were plausible.

Witness testimony corroborated many of the statements made by Mr. Supervisor.

Lastly, the record did not support a finding that Mr. Supervisor engages in juvenile or sexual behavior in the workplace. Not a single witness corroborated these claims. And, the evidence seemed to point to the contrary; that Mr. Supervisor is professional in the workplace. As an example, written warnings during Ms. Darling's first few months of employment were provided by Mr. Supervisor, with one exception. The warning regarding Ms. Darling's hickeys was provided by Ms. Russo. One of the reasons for this was Mr. Supervisor's embarrassment regarding the subject matter. His hesitancy to discuss hickeys with Ms. Darling supports his testimony that he did not engage in offensive or inappropriate sexual banter with her.

### C.    Credibility of Other Witnesses

Mr. Maintenance said that he had never heard Mr. Supervisor say anything inappropriate, and said he had never witnessed any inappropriate behavior by Mr. Supervisor. Then,

---

[18] Except Mr. Maintenance's single assertion.

[19] Ms. Darling says the "turning point" for her was very early on in the relationship. However, she says his "silent treatment" of her did not begin until January or February, much later. The timing suggests that Mr. Supervisor's changed demeanor was attributable to Ms. Darling's performance deficiencies, not a reaction to the alleged sexual dynamics.

10

EXHIBIT 103 - 029

unexpectedly and somewhat casually, Mr. Maintenance raised a sexually aggressive statement he claims Mr. Supervisor made about "doing" Ms. Darling. The statement seemed at odds with Mr. Maintenance's description of his interactions with and discussions with Mr. Supervisor. In context with the rest of the interview, it seemed not believable. I was bothered enough about this statement to make a follow-up inquiry. I was aware that a Human Resources staff member, Mr. Manager, had interviewed Mr. Maintenance, among others, regarding Ms. Darling's claims before this investigation was assigned to me. I asked Mr. Manager if Mr. Maintenance had told him about this alleged comment during their meeting. Mr. Manager said Mr. Maintenance had not. In fact, Mr. Manager had asked him if he had ever heard any sexual statement by Mr. Supervisor about Ms. Darling. Mr. Maintenance had said that he had not heard Mr. Supervisor make any such comments about anyone. This tended to corroborate my assessment that Mr. Supervisor did not make this statement to Mr. Maintenance.

With the exception of Mr. Maintenance, I found the remainder of the witnesses to be credible.

## VI.    Findings

Based on the facts presented and my credibility assessments, I make the following findings of fact.[20]

1. The vast majority of Mr. Supervisor's interactions with Ms. Darling occurred when other employees were present.

2. Mr. Supervisor may have talked generally about Pulp Fiction. Mr. Supervisor may have commented jokingly to Ms. Darling about his "girlfriends" either having to do with a screen saver, a calendar, or a poster in the workplace. I do not find that Ms. Darling found Mr. Supervisor's conduct to be unwelcome.

3. Mr. Supervisor did not tell Ms. Darling that he had developed feelings for her. He did not tell her, "I love you." He did not tell her he would spank her.

4. Mr. Supervisor hugged Ms. Darling on one or two occasions. Mr. Supervisor hugs other employees and co-workers. Ms. Darling found this conduct to be unwelcome and asked him to stop. Mr. Supervisor did not hug Ms. Darling after she told him she did not want him to hug her.

5. Mr. Supervisor did not "slap" Ms. Darling's buttocks when she was under a truck.[21]

---

[20] In making findings of fact, I have applied a preponderance of the evidence standard.
[21] Ms. Darling says she was under the truck showing the employee parts of the truck from beneath. Accordingly, she would have been on her back. Given this, I find it more likely that Mr. Supervisor's version is correct. He walked by and kicked her leg lightly to get her attention.

11

EXHIBIT 103 - 030

6.   Mr. Supervisor and Ms. Darling spent time alone in his office during the lunch hour approximately two or three times a week for several months as part of her Assistant duties.[22]

7.   Mr. Supervisor invited Ms. Darling to his house, as he has invited other employees.  Mr. Supervisor planned that his wife and children would have been home if Ms. Darling had accepted the invitation.  I do not find that Ms. Darling found Mr. Supervisor's conduct to be unwelcome.

8.   Mr. Supervisor did not ask Ms. Darling about going to her house.

9.   Mr. Supervisor joked with Ms. Darling about going "on the road" with her and she joked back with him.  I do not find that Ms. Darling found Mr. Supervisor's conduct to be unwelcome.

If you have any questions regarding this report, or if I can provide any further information, please do not hesitate to contact me.


Irma Investigator                                    April 10, 2008

---

[22] Mr. Maintenance and Mr. Teacher said that Ms. Darling regularly had lunch alone with Mr. Supervisor, while Mr. Instructor testified that he "never" saw this happen.  Applying the preponderance of the evidence standard, I find that these private lunches did occur.  However, I find they were for legitimate business reasons.  Ms. Russo said that she never saw Ms. Darling having lunch alone with Mr. Supervisor.  This makes sense because Ms. Darling did not become Mr. Supervisor's assistant until Ms. Russo transferred.  This supports the idea that Mr. Supervisor's request for lunch alone with Ms. Darling related to the assistant position.  Ms. Darling herself told me that he would ask her to have lunch with him if "he had something to talk about or something for me to do as part of my job."

EXHIBIT 103 - 031

**EXHIBIT 104**

Nicole Miller & Associates, Inc. is a licensed California Private Investigation Firm based in South Orange County. We are bonded and insured for $1,000,000.00. Our private investigators license is 28276. Our background and license status is on file with the California Department of Consumer Affairs, Bureau of Investigative Services (916) 322-4000 bsis@dca.ca.gov.

Privacy Policy

Copyright© 2021. Nicole Miller & Associates, Inc.  All Rights Reserved.

EXHIBIT 104 - 003

Nicole Miller & Associates, Inc. is a licensed California Private Investigation Firm based in South Orange County. We are bonded and insured for $1,000,000.00. Our private investigators license is 28276. Our background and license status is on file with the California Department of Consumer Affairs, Bureau of Investigative Services (916) 322-4000 bsis@dca.ca.gov.

Privacy Policy

Copyright© 2021. Nicole Miller & Associates, Inc.  All Rights Reserved.

EXHIBIT 104 - 006

**EXHIBIT 105**

# City Council

### Monday, August 13, 2018
#### Special Meeting
#### Council Chambers
#### **5:00 PM**

*Agenda posted according to PAMC Section 2.04.070. Supporting materials are available in the Council Chambers on the Thursday 11 days preceding the meeting.*

**PUBLIC COMMENT**
Members of the public may speak to agendized items; up to three minutes per speaker, to be determined by the presiding officer. If you wish to address the Council on any issue that is on this agenda, please complete a speaker request card located on the table at the entrance to the Council Chambers, and deliver it to the City Clerk prior to discussion of the item. You are not required to give your name on the speaker card in order to speak to the Council, but it is very helpful. Public comment may be addressed to the full City Council via email at City.Council@cityofpaloalto.org.

**TIME ESTIMATES**
Time estimates are provided as part of the Council's effort to manage its time at Council meetings. Listed times are estimates only and are subject to change at any time, including while the meeting is in progress. The Council reserves the right to use more or less time on any item, to change the order of items and/or to continue items to another meeting. Particular items may be heard before or after the time estimated on the agenda. This may occur in order to best manage the time at a meeting or to adapt to the participation of the public. To ensure participation in a particular item, we suggest arriving at the beginning of the meeting and remaining until the item is called.

**HEARINGS REQUIRED BY LAW**
Applicants and/or appellants may have up to ten minutes at the outset of the public discussion to make their remarks and up to three minutes for concluding remarks after other members of the public have spoken.

## Call to Order

## Closed Session                                              5:00-7:00 PM
Public Comments: Members of the public may speak to the Closed Session item(s); three minutes per speaker.

1.    CONFERENCE WITH LABOR NEGOTIATORS
      City Designated Representatives: City Manager and his Designees Pursuant to Merit System Rules and Regulations (James Keene, Ed Shikada, Kiely Nose, Rumi Portillo, Sandra Blanch, Nicholas Raisch, Molly Stump, Terence Howzell, and Michelle Flaherty)
      Employee Organizations: 1) Service Employees International Union, (SEIU) Local 521; 2) Palo Alto Fire Chiefs' Association (FCA); 3) International Association of Fire Fighters (IAFF), Local 1319; 4) Palo Alto Police Managers' Association (PAPMA); and 5) Utilities Management and Professional Association of Palo Alto (UMPAPA)
      Authority: Government Code Section 54957.6(a) (HR)

MATERIALS RELATED TO AN ITEM ON THIS AGENDA SUBMITTED TO THE CITY COUNCIL AFTER DISTRIBUTION OF THE AGENDA PACKET ARE AVAILABLE FOR PUBLIC INSPECTION IN THE CITY CLERK'S OFFICE AT PALO ALTO CITY HALL, 250 HAMILTON AVE. DURING NORMAL BUSINESS HOURS.

EXHIBIT 105 - 001

2.    CONFERENCE WITH CITY ATTORNEY-POTENTIAL LITIGATION
      Significant Exposure to Litigation Under Section 54956.9(d)(2)
      (One Potential Case, as Defendant)–Palo Alto-Stanford Fire
      Protection Agreement
      Authority: Government Code Section 54956.9(d)(2)

<u>Agenda Changes, Additions and Deletions</u>

<u>City Manager Comments</u>                                    7:00-7:10 PM

<u>Oral Communications</u>                                      7:10-7:30 PM
 Members of the public may speak to any item NOT on the agenda. Council reserves the right to limit the duration of
 Oral Communications period to 30 minutes.

<u>Minutes Approval</u>                                        7:30-7:35 PM

3.    Approval of Action Minutes for the July 30, 2018 Council Meeting

<u>Consent Calendar</u>                                        7:35-7:40 PM
 Items will be voted on in one motion unless removed from the calendar by three Council Members.

4.    ██████████████████████████████████████████████
      ████████████████████████████ool Resource Officer Services
      and Shared Funding of the Positions in the Form of Reimbursable
      Payment (Revenue) to the City, up to $200,000 in Fiscal Year (FY)
      2019 and $250,000 in FY2020

5.    Approval of a Construction Contract With Waterproofing Associates,
      Inc. in an Amount Not-to-Exceed $250,298 and Authorization of a
      Contract Contingency in an Amount Not-to-Exceed $25,030 to Replace
      the Existing Pavilion Wing Roof at Cubberley Community Center

Q&A    6.    Adoption of a Resolution Establishing the Fiscal Year 2018-19 Secured
             and Unsecured Property Tax Levy for the City of Palo Alto's General
             Obligation Bond Indebtedness (Measure N)

Q&A    7.    Approval of a Blanket Purchase Order With Hill Brothers Chemical
             Company for a One-year Period in an Amount Not-to-Exceed $464,405
             for Bulk Magnesium Hydroxide Slurry for the Regional Water Quality
             Control Plant, With the Option to Renew for two Additional One-year
             Periods Not-to-Exceed $464,405 per Year Subject to Consumer Price
             Index (CPI) Increases

8.    Approval of the Response to the Grand Jury Report on Law
      Enforcement Mental Health Training

MATERIALS RELATED TO AN ITEM ON THIS AGENDA SUBMITTED TO THE CITY COUNCIL AFTER DISTRIBUTION OF THE AGENDA
PACKET ARE AVAILABLE FOR PUBLIC INSPECTION IN THE CITY CLERK'S OFFICE AT PALO ALTO CITY HALL, 250 HAMILTON AVE.
DURING NORMAL BUSINESS HOURS.

EXHIBIT 105 - 002

Q&A   9.   Adoption of a Resolution Authorizing the City Manager to Purchase a Portion of the City's Natural Gas Requirements From the City of Redding, CA Under Specified Terms and Conditions During Calendar Years 2018 Through 2030, Inclusive

10.   Adoption of a Resolution Authorizing the Submittal of a Financial Assistance Application to the United States Bureau of Reclamation for the WaterSMART: Title XVI Water Reclamation and Reuse Projects

11.   Approval of Amendment No. 5 to Contract No. C869 Between the City of Palo Alto and the Board of Trustees of the Leland Stanford Junior University Related to the Regional Water Quality Control Plant's Pretreatment Program as Applied to Stanford

12.   Approval of Amendment No. 1 to Contract No. C17163750 With Biggs Cardosa Associates, Inc. in an Amount Not-to-Exceed $198,514 to Provide Construction Administration Services for the Baylands Boardwalk Improvement Project (PE-14018), for a new Total Not-to-Exceed Amount of $638,506, and to Extend the Term Through June 30, 2019

13.   Approval of an Agreement With Prospect Silicon Valley, for a Not-to-Exceed Amount of $225,000, for a Term of 18 Months, to be Principal Investigator for the City's Fair Value Commuting Project in Cooperation With the Federal Transit Administration

14.   Adoption of a Resolution Authorizing the City Manager to Purchase a Portion of the City's Verified Emission Reductions Requirements From Carbonfund.org Foundation Under Specified Terms and Conditions During Calendar Years 2018 Through 2027, Inclusive

15.   Approval to Submit a National Endowment for the Arts Art Works Grant Request for $40,000 to Support Code:ART2 in Downtown Palo Alto in October 2019

<u>Action Items</u>
Include: Reports of Committees/Commissions, Ordinances and Resolutions, Public Hearings, Reports of Officials, Unfinished Business and Council Matters.

7:40-9:00 PM

**MEMO**   16.   PUBLIC HEARING:  Adoption of an Ordinance Amending Title 16 of the Palo Alto Municipal Code to Modify and Increase the Citywide Transportation Impact Fee (Chapter 16.59); Indefinitely Suspend Application of the Existing Area-specific Transportation Impact Fees for the Stanford Research Park/El Camino Real CS Zone (Chapter 16.45) and the San Antonio/West Bayshore Area (Chapter 16.46); and Amend the Municipal Fee Schedule to Update the City's Transportation Impact

3                                August 13, 2018

MATERIALS RELATED TO AN ITEM ON THIS AGENDA SUBMITTED TO THE CITY COUNCIL AFTER DISTRIBUTION OF THE AGENDA PACKET ARE AVAILABLE FOR PUBLIC INSPECTION IN THE CITY CLERK'S OFFICE IN PALO ALTO CITY HALL, 250 HAMILTON AVE. DURING NORMAL BUSINESS HOURS.

EXHIBIT 105 - 003

Fees in Accordance With These Changes, all in Furtherance of Implementation of the Comprehensive Plan. The Citywide Transportation Impact Fee is a One-time fee on new Development and Redevelopment Throughout Palo Alto to Fund Transportation Improvements to Accommodate and Mitigate the Impacts of Future Development in the City. This Ordinance is Within the Scope of the Comprehensive Plan Environmental Impact Report (EIR) Certified and Adopted on November 13, 2017 by Council Resolution No. 9720 (Continued From May 7, 2018)

9:00-10:00 PM

17.    Adoption of a Resolution to Join the Santa Clara/Santa Cruz Airport/Community Roundtable

10:00-10:15 PM

18.    Designation of Voting Delegate and Alternate for the League of California Cities Annual 2018 Conference, to be Held September 12-14, 2018 in Long Beach, CA

State/Federal Legislation Update/Action

Council Member Questions, Comments and Announcements
 Members of the public may not speak to the item(s)

Adjournment

AMERICANS WITH DISABILITY ACT (ADA)
Persons with disabilities who require auxiliary aids or services in using City facilities, services or programs or who would like information on the City's compliance with the Americans with Disabilities Act (ADA) of 1990, may contact (650) 329-2550 (Voice) 24 hours in advance.

MATERIALS RELATED TO AN ITEM ON THIS AGENDA SUBMITTED TO THE CITY COUNCIL AFTER DISTRIBUTION OF THE AGENDA PACKET ARE AVAILABLE FOR PUBLIC INSPECTION IN THE CITY CLERK'S OFFICE AT PALO ALTO CITY HALL, 250 HAMILTON AVE. DURING NORMAL BUSINESS HOURS.

EXHIBIT 105 - 004

# Additional Information

**Council and Standing Committee Meetings**

Policy & Services Committee Cancellation August 14, 2018

Sp. City Council Meeting-Closed Session   August 14, 2018

Rail Committee Meeting                        August 15, 2018


Sp. City/School Committee Meeting         August 16, 2018


Sp. City Council Meeting-Closed Session   August 16, 2018

**Schedule of Meetings**

Schedule of Meetings

**Tentative Agenda**

Tentative Agenda

**Informational Report**

Status Update on Airplane Noise Issues

Utilities Fiscal Year 2018 Quarterly Report

**Public Letters to Council**

Set 1

5                                    August 13, 2018

MATERIALS RELATED TO AN ITEM ON THIS AGENDA SUBMITTED TO THE CITY COUNCIL AFTER DISTRIBUTION OF THE AGENDA PACKET ARE AVAILABLE FOR PUBLIC INSPECTION IN THE CITY CLERK'S OFFICE AT PALO ALTO CITY HALL, 250 HAMILTON AVE. DURING NORMAL BUSINESS HOURS.

EXHIBIT 105 - 005

# CITY OF PALO ALTO OFFICE OF THE CITY CLERK

**August 13, 2018**

**The Honorable City Council**
**Attention: Finance Committee**
**Palo Alto, California**

## Approval of Action Minutes for the July 30, 2018 Council Meeting

Staff is requesting Council review and approve the attached Action Minutes.

**ATTACHMENTS:**

- Attachment A: 07-30-18 DRAFT Action Minutes  (DOCX)

Department Head:    Beth Minor, City Clerk

EXHIBIT 105 - 006

EXHIBIT 105 - 007

# CITY OF PALO ALTO CITY COUNCIL DRAFT ACTION MINUTES

Special Meeting
July 30, 2018

The City Council of the City of Palo Alto met on this date in the Council Chambers at 5:13 P.M.

Present:    DuBois, Filseth, Fine, Holman,  Kniss, Kou, Scharff, Tanaka, Wolbach

Absent:

Agenda Changes, Additions and Deletions

None.

Minutes Approval

1.    Approval of Action Minutes for the June 25, 2018 Council Meeting.

**MOTION:**  Council Member Scharff moved, seconded by Council Member Wolbach to approve the Action Minutes for the June 25, 2018 Council Meeting.

**MOTION PASSED:**  9-0

Consent Calendar

**MOTION:**   Council Member Scharff moved, seconded by Council Member Fine to approve Agenda Item Number 2.

2.    PUBLIC HEARING / QUASI-JUDICIAL. 999 Alma Street [18PLN-00060]: Request for a Hearing on the Director's Tentative Approval of a Conditional Use Permit for a Commercial Recreation (Gym) Use in an Existing Building on the Site. The Project Includes a Request to Begin Operations at 5:00 A.M. and end  at 11:00 P.M. The South of Forest Area (SOFA) Coordinated Area Plan Permits By-right Hours of Operation From 6:00 A.M. to 11:00 P.M. Environmental Assessment: Exempt From the Provisions of the California Environmental Quality Act (CEQA) per Guidelines Section 15301. Zone District: RT-35 (SOFA II). (Appellants Have Withdrawn Requests for a Public Hearing).

EXHIBIT 105 - 008

# DRAFT ACTION MINUTES

**MOTION PASSED:** 7-2 Holman, Kou no

Action Items

3.      Adopt the Initiative Measure to Reduce the Comprehensive Plan's Citywide Cumulative Cap on Office/R&D Development (Initiative Measure) as an <u>Ordinance 5446</u> Entitled, "Initiative Measure to Reduce the Comprehensive Plan's Citywide Cumulative Cap on Office/R&D Development," or Adopt a Resolution Placing the Initiative Measure on the November 6, 2018 Ballot.

**MOTION:** Mayor Kniss moved, seconded by Council Member Fine to adopt a Resolution calling an election to submit the Initiative Measure to Reduce the Comprehensive Plan's Citywide Cumulative Cap on Office/R&D Development to the voters at the next general municipal election on November 6, 2018.

**SUBSTITUTE MOTION:** Council Member Kou moved, seconded by Council Member Holman to adopt an Ordinance amending the Comprehensive Plan and Title 18 (Zoning) of the Palo Alto Municipal Code, as proposed by the Initiative Measure to Reduce the Office/R&D Development Cap, to reduce the citywide cumulative cap on new office/R&D development to 850,000 square feet.

**SUBSTITUTE MOTION PASSED:** 5-4 Fine, Kniss, Scharff, Tanaka no

4.      <u>Resolution 9783</u> Entitled, "Resolution of the Council of the City of Palo Alto Placing a Measure on the November 6, 2018 General Election Ballot to Increase the City's Transient Occupancy Tax (TOT) by one and One-half Percentage Points to Make Minor Revisions to the Ballot Language."

**MOTION:** Council Member Scharff moved, seconded by Council Member Wolbach to adopt a Resolution to:

A.      Rescind previously-adopted Resolution No. 9778 that submitted a measure to the voters at the general election on November 6, 2018 to increase the City's Transient Occupancy Tax (TOT) by one and one-half percentage points, using ballot language that would have been required under a potential statewide initiative Constitutional measure that has since been withdrawn; and

B.      Submit the same measure to the voters at the general municipal election on November 6, 2018 to increase the City's Transient Occupancy Tax (TOT) by one and one-half percentage points, using updated ballot language.

# DRAFT ACTION MINUTES

**AMENDMENT:** Council Member Tanaka moved, seconded by Council Member XX to add to the Motion, "update the Ballot Question to more transparently reflect infrastructure concerns."

**AMENDMENT FAILED DUE TO THE LACK OF A SECOND**

**MOTION PASSED:** 6-3 Holman, Kou, Tanaka no

5.    Policy and Services Committee Recommends Council Adopt an Ordinance Adding Chapter 10.62 to Title 10 (Vehicles and Traffic) of the Municipal Code to Regulate Unnecessary Idling of Vehicles (Continued From April 2, 2018 and June 12, 2018).

**MOTION:** Council Member Holman moved, seconded by Mayor Kniss to:

A.    Adopt an Ordinance amending the Municipal Code to add Chapter 10.62 to Title 10 (Vehicles and Traffic) to regulate unnecessary idling of vehicles; and

B.    Direct Staff to create cards detailing negative air quality impacts of vehicle idling and fuel savings from turning the engine off and restarting.

**INCORPORATED INTO THE MOTION WITH THE CONSENT OF THE MAKER AND SECONDER** to add to the Motion Part A, "including Municipal Code Section 10.62.040, Option 2."

**INCORPORATED INTO THE MOTION WITH THE CONSENT OF THE MAKER AND SECONDER** to add to the Motion Part A, "(with Option 3 applying to construction vehicles)."

**INCORPORATED INTO THE MOTION WITH THE CONSENT OF THE MAKER AND SECONDER** to remove from the Motion Part A, "(with Option 3 applying to construction vehicles)."

**MOTION AS AMENDED RESTATED:** Council Member Holman moved, seconded by Mayor Kniss to:

A.    Adopt an Ordinance amending the Municipal Code to add Chapter 10.62 to Title 10 (Vehicles and Traffic) to regulate unnecessary idling of vehicles, including Municipal Code Section 10.62.040, Option 2; and

B.    Direct Staff to create cards detailing negative air quality impacts of vehicle idling and fuel savings from turning the engine off and restarting.

# DRAFT ACTION MINUTES

**MOTION AS AMENDED PASSED:**  9-0

State/Federal Legislation Update/Action

None.

Adjournment:  The meeting was adjourned at 10:10 P.M.

EXHIBIT 105 - 011

# City of Palo Alto
**(ID # 9268)**
## City Council Staff Report

---

**Report Type: Consent Calendar**

**Summary Title: Agreement with PAUSD Regarding School Resource Officers**

**Title: Approval of the Agreement Between the City of Palo Alto and the Palo Alto Unified School District for School Resource Officer Services and Shared Funding of the Positions in the Form of Reimbursable Payment (Revenue) to the City, up to $200,000 in FY19 and $250,000 in FY20**

**From: City Manager**

**Lead Department: Police**

### Recommendation

Staff recommends the City Council approve an agreement between the City of Palo Alto and the Palo Alto Unified School District (PAUSD) for PAUSD to reimburse the City for the cost of half of two School Resource Officer (SRO) positions up to $200,000 in Fiscal Year (FY) 2019 and up to $250,000 in FY 2020.

### Background

School Resource Officers (SROs) are fully sworn Palo Alto Police Department (PAPD) officers and work closely with the Palo Alto Unified School District (PAUSD) administrators in an effort to create a safer environment for both students and staff. PAPD has provided a School Resource Officer to PAUSD campuses for over twenty years. Providing SRO services to schools has become the industry norm as police departments are obligated to respond to school-generated calls for service. Having a regular SRO presence improves working relationships with school staff and enhances school safety efforts.

Since FY 2014, the Police Department has dedicated a second SRO position to assist with the implementation of the District's "Safety Enhancement Project." In 2017, PAUSD requested to expand the scope of services provided by the City to include assisting the District in meeting their statutory requirements of the California Education Code, Title IX, and other applicable state laws related to health and confidentiality/privacy in sexual misconduct and related matters.

During the process of updating the attached contract, the previous agreement between the City of Palo Alto and PAUSD expired on June 30, 2017. While the new contract between the City of Palo and PAUSD was being updated, the SROs continued their regular SRO responsibilities

EXHIBIT 105 - 012

within PAUSD schools and PAUSD continued to reimburse the City of Palo Alto under the terms of the previous agreement.

The attached contract formally memorializes the agreement for increased reimbursement and reflects an updated scope of services between the City of Palo Alto and PAUSD.  Currently, both SRO positions are staffed and working in PAUSD schools.

**Discussion**
Since 2014, the SROs have assisted PAUSD with the implementation of their "Safety Enhancement Project" in addition to their regular SRO responsibilities.  Continued SRO participation with the District and the project will include, but is not limited to, Parent Project recruitment and facilitation; Emergency Preparedness training to schools within the District; responding to calls for service; teaching classes; handling truancy issues; complying with legal reporting requirements; and conducting proactive policing on campuses.

**Resource Impact**
The agreement between the  City and PAUSD will be effective  following City Council approval through June 2019, with the option to extend for up to one year through June 2020.  The FY 2019 Police Department Operating Budget includes a $200,000 revenue estimate for reimbursements from PAUSD and 2.0 FTE SRO positions. The anticipated reimbursement for FY 2020 is $250,000 if the contract is extended.  The average annual salary and benefits costs for an SRO are $262,000 in FY 2019 and are anticipated at $280,000 in FY 2020.

**Policy implications**
This agreement will result in no policy impact.

**Environmental Review**
This is not a project under the California Environmental Quality Act (CEQA).
**Attachments:**
- ████████████████████

EXHIBIT 105 - 013

## CITY OF PALO ALTO CONTRACT NO. _____

### AGREEMENT BETWEEN THE CITY OF PALO ALTO AND THE PALO ALTO UNIFIED SCHOOL DISTRICT

#### FOR PROFESSIONAL SERVICES

This Agreement is entered into on this_____day of August 2018 ("Agreement") by and between the CITY OF PALO ALTO, a California chartered municipal corporation ("CITY"), and the Palo Alto Unified School District, a unified school district, located at 25 Churchill Avenue, Palo Alto, CA 94306-1099 ("PAUSD").

### RECITALS

The following recitals are a substantive portion of this Agreement:

A.  PAUSD intends to provide increased safety at its public schools by utilizing two Palo Alto Police Department School Resource Officers for its Project ("Safety Enhancement Project") and desires to engage the City to provide two such officers in connection with the Project ("Services").

B.  CITY and PALO ALTO POLICE DEPARTMENT ("PAPD") represent that its School Resource Officers have the necessary professional expertise, qualifications, and capability, and all required licenses and/or certifications to provide the Services.

C.  PAUSD in reliance on these representations desires to engage CITY to provide the Services as more fully described in Exhibit "A", attached to and made a part of this Agreement.

NOW, THEREFORE, in consideration of the recitals, covenants, terms, and conditions, in this Agreement, the parties agree:

### AGREEMENT

**SECTION 1. SCOPE OF SERVICES.** CITY shall perform the Services described in Exhibit "A" in accordance with the terms and conditions contained in this Agreement. The performance of all Services shall be to the reasonable satisfaction of both parties.

**SECTION 2. TERM.** The term of this Agreement shall be from the date of its full execution through June 30, 2019, with the option to extend for up to 1 year until June 30, 2020, unless terminated earlier pursuant to Section 15 of this Agreement.

**SECTION 3. SCHEDULE OF PERFORMANCE.** Time is of the essence in the performance of Services under this Agreement. Any Services for which times for performance are not specified in this Agreement shall be commenced and completed by CITY in a reasonably prompt and timely manner based upon the circumstances and direction communicated to the CITY.

006247.00028
17708061.1

EXHIBIT 105 - 014

**SECTION 4. NOT TO EXCEED COMPENSATION.** The compensation to be paid to CITY for performance of the Services described in Exhibit "A", including both payment for professional services and reimbursable expenses, shall not exceed the cost of half of two officers, equivalent to one FTE as follows:

July 1, 2018 – June 30, 2019 (FY 19) – 50% of two officers / amount shall not exceed $200,000

July 1, 2019 – June 30, 2020 (FY 20) – 50% of two officers / amount shall not exceed $250,000

CITY shall not receive any compensation for Additional Services performed without the prior written authorization of PAUSD. Additional Services shall mean any work that is determined by CITY to be necessary for the proper completion of the Project, but which is not included within the Scope of Services described in Exhibit "A".

**SECTION 5. INVOICES.** In order to request payment, CITY shall submit by June 1, 2018, invoices to the PAUSD describing the services performed and the applicable charges (including an identification of personnel who performed the services, hourly rates, and reimbursable expenses). If applicable, the invoice shall also describe the percentage of completion of each task. The information in CITY'S payment requests shall be subject to verification by PAUSD. CITY shall send all invoices to the PAUSD address specified in Section 16 below. PAUSD will process and pay invoices within thirty (30) days of receipt.

**SECTION 6. QUALIFICATIONS/STANDARD OF CARE.** All of the Services shall be performed by CITY or under CITY's supervision. CITY represents that it possesses the professional and technical personnel necessary to perform the Services required by this Agreement and that the personnel have sufficient skill and experience to perform the Services assigned to them. CITY represents that it, its employees and sub consultants, if permitted, have and shall maintain during the term of this Agreement all licenses, permits, qualifications, insurance and approvals of whatever nature that are legally required to perform the Services.

All of the services to be furnished by CITY under this agreement shall meet the professional standard and quality that prevail among professionals in the same discipline and of similar knowledge and skill engaged in related work throughout California under the same or similar circumstances.

CITY shall retain control over supervision, wages, and other terms and conditions of employment of the officers providing the Services under this Agreement. The parties acknowledge that such officers are held to the requirements of the law and CITY policies and procedures. PAUSD agrees that it shall not have authority to direct the officers' law enforcement activity. PAUSD shall assist CITY with evaluation of the officers, however, the CITY shall have the responsibility to evaluate, manage, and supervise the officers. PAUSD will immediately notify CITY of any concerns regarding such activity.

**SECTION 7. COMPLIANCE WITH LAWS.** CITY shall keep itself informed of and in compliance with all federal, state and local laws, ordinances, regulations, and orders that may affect in any manner the Project or the performance of the Services or those engaged to perform Services under this Agreement. CITY shall procure all permits and licenses, pay all charges and fees, and give all notices required by law in the performance of the Services.

2

006247.00028
17708061.1

EXHIBIT 105 - 015

**SECTION 8. INDEPENDENT CONTRACTOR.** It is understood and agreed that in performing the Services under this Agreement CITY, and any person employed by or contracted with CITY to furnish labor and/or materials under this Agreement, shall act as and be an independent contractor and not an agent or employee of the PAUSD.

**SECTION 9. ASSIGNMENT.** The parties agree that the expertise and experience of CITY are material considerations for this Agreement. CITY shall not assign or transfer any interest in this Agreement nor the performance of any of CITY's obligations hereunder without the prior written consent of the city manager. Consent to one assignment will not be deemed consent to any subsequent assignment. Any assignment made without the approval of the city manager will be void.

**SECTION 10. SUBCONTRACTING.**

**No Subcontractor:** CITY shall not subcontract any portion of the work to be performed under this Agreement without the prior written authorization of the city manager or designee.

**SECTION 11. PROJECT MANAGEMENT.** CITY will assign the Police Department Investigative Services Division Commander as the Project Manager to have managerial responsibility for the performance, progress, and execution of the Services and as the project liaison to represent CITY. If circumstances cause the substitution of the project manager, project coordinator, or any other key personnel for any reason, the appointment of a substitute project director and the assignment of any key new or replacement personnel will be subject to the prior written approval of the PAUSD's project manager. CITY shall review any request made by PAUSD to remove CITY personnel who PAUSD finds do not perform the Services in an acceptable manner, are uncooperative, or present a threat to the adequate or timely completion of the Project or a threat to the safety of persons or property. The day-to-day supervision of the services will be handled by the Investigative Services Division Supervisor as assigned by the Project Manager.

The PAUSD's project manager is Yolanda Conaway, Assistant Superintendent of Strategic Initiatives and Operations, Palo Alto Unified School District, Palo Alto, CA 94306. PAUSD's project manager will be CITY's point of contact with respect to performance, progress and execution of the Services. PAUSD may designate an alternate project manager from time to time.

**SECTION 12. INDEMNITY.**

12.1.    The CITY shall protect, indemnify, defend, and hold harmless the PAUSD, its employees, agents, and Board members from and against any demands, claims, liability, or expense on account of suits, verdicts, judgments, costs or claims of any nature or kind arising out of, or in any way connected with, the CITY'S performance or nonperformance under this Agreement, including the CITY'S operations on, use, management, alteration or control of the PAUSD's property under this Agreement except for any claims or liability, or portions thereof, arising from the concurrent or sole negligence or intentional malfeasance of the PAUSD, its directors, officers, employees or agents.

12.2.    PAUSD shall protect, indemnify, defend, and hold harmless the CITY, its employees, agents, and elected officials from and against any demands, claims, liability, or expense on

account of suits, verdicts, judgments, costs or claims of any nature or kind arising out of, or in any way connected with, the PAUSD's performance or nonperformance under this Agreement, including the PAUSD's operations on, use, management, alteration or control of the PAUSD's property under this Agreement except for any claims or liability, or portions thereof, arising from the concurrent or sole negligence or intentional malfeasance of the CITY, its directors, officers, employees or agents.

**SECTION 13. WAIVERS.** The waiver by either party of any breach or violation of any covenant, term, condition or provision of this Agreement, or of the provisions of any ordinance or law, will not be deemed to be a waiver of any other term, covenant, condition, provisions, ordinance or law, or of any subsequent breach or violation of the same or of any other term, covenant, condition, provision, ordinance or law.

## SECTION 14. INSURANCE.

14.1. PAUSD, at its sole cost and expense, shall obtain and maintain, in full force and effect during the term of this Agreement, the insurance coverage described in Exhibit "B". PAUSD and its contractors, if any, shall obtain a policy endorsement naming CITY as an additional insured under any general liability policy or policies.

14.2. All insurance coverage required hereunder shall be provided through carriers with AM Best's Key Rating Guide ratings of A-:VII or higher which are licensed or authorized to transact insurance business in the State of California. All contractors of CITY retained to perform Services under this Agreement will obtain and maintain, in full force and effect during the term of this Agreement, identical insurance coverage, naming CITY as an additional insured under such policies as required above.

14.3. Certificates evidencing such insurance shall be filed with CITY concurrently with the execution of this Agreement. The certificates will be subject to the approval of CITY's Risk Manager and will contain an endorsement stating that the insurance is primary coverage and will not be canceled, or materially reduced in coverage or limits, by the insurer except after filing with the Purchasing Manager thirty (30) days' prior written notice of the cancellation or modification. If the insurer cancels or modifies the insurance and provides less than thirty (30) days' notice to PAUSD, PAUSD shall provide the Purchasing Manager written notice of the cancellation or modification within two (2) business days of the PAUSD's receipt of such notice. PAUSD shall be responsible for ensuring that current certificates evidencing the insurance are provided to CITY's Purchasing Manager during the entire term of this Agreement.

14.4. The procuring of such required policy or policies of insurance will not be construed to limit PAUSD's liability hereunder nor to fulfill the indemnification provisions of this Agreement. Notwithstanding the policy or policies of insurance, PAUSD will be obligated for the full and total amount of any damage, injury, or loss caused by or directly arising as a result of the Services performed under this Agreement, including such damage, injury, or loss arising after the Agreement is terminated or the term has expired.

14.5.    The CITY, at its sole cost and expense, shall obtain and maintain, in full force and effect during the term of this Agreement, the insurance coverage described in Exhibit "B". The CITY and its contractors, if any, shall obtain a policy endorsement naming PAUSD as an additional insured under any general liability policy or policies. The CITY may self-insure to meet the requirement specified in this Section 14.

14.6.    Certificates evidencing such insurance shall be filed with PAUSD concurrently with the execution of this Agreement. The certificates will be subject to the approval of PAUSD's Risk Manager and will contain an endorsement stating that the insurance is primary coverage and will not be canceled, or materially reduced in coverage or limits, by the insurer except after filing with the Purchasing Manager thirty (30) days' prior written notice of the cancellation or modification. If the insurer cancels or modifies the insurance and provides less than thirty (30) days' notice to CITY, CITY shall provide the Purchasing Manager written notice of the cancellation or modification within two (2) business days of the CITY's receipt of such notice. CITY shall be responsible for ensuring that current certificates evidencing the insurance are provided to PAUSD's Purchasing Manager during the entire term of this Agreement.

## SECTION 15. TERMINATION OF SUSPENSION OF AGREEMENT OR SERVICES.

15.1.    Either party may suspend the performance of the Services, in whole or in part, or terminate this Agreement, with or without cause, by giving thirty (30) days prior written notice thereof to the other party. Upon receipt of such notice, CITY will immediately discontinue its performance of the Services.

15.2    Upon such suspension or termination by either party, CITY will be paid for the Services rendered or materials delivered to PAUSD in accordance with the scope of services on or before the effective date (i.e., 30 days after giving notice) of suspension or termination. The following Sections will survive any expiration or termination of this Agreement: 12, 15.2, 16 and 21.

15.3.    No payment, partial payment, acceptance, or partial acceptance by CITY will operate as a waiver on the part of CITY of any of its rights under this Agreement.

## SECTION 16. NOTICES.

All notices hereunder will be given in writing and mailed, postage prepaid, by certified mail, addressed as follows;

To CITY:
ATTN: Office of the City Clerk City of Palo Alto
Post Office Box 10250
Palo Alto, CA 94303
With a copy to the City of Palo Alto Purchasing Manager

To PAUSD:
ATTN: Yolanda Conaway, Assistant Superintendent of Strategic Initiatives and Operations.

5

EXHIBIT 105 - 018

25 Churchill Avenue
Palo Alto, CA 94306-1099

## SECTION 17. CONFLICT OF INTEREST.

17.1.   In accepting this Agreement, PAUSD covenants that it presently has no interest, and will not acquire any interest, direct or indirect, financial or otherwise, which would conflict in any manner or degree with the performance of the Services.

17.2.   Both parties certify that they will comply with all laws applicable to governmental agencies and related conflicts of interest.

17.3.   If the Project Manager determines that PAUSD is a "Consultant" as that term is defined by the Regulations of the Fair Political Practices Commission, PAUSD shall be required and agrees to file the appropriate financial disclosure documents required by the Palo Alto Municipal Code and the Political Reform Act.

**SECTION 18. NONDISCRIMINATION.** As set forth in Palo Alto Municipal Code section 2.30.510, PAUSD certifies that in the performance of this Agreement, it shall not discriminate in the employment of any person because of the race, skin color, gender, age, religion, disability, national origin, ancestry, sexual orientation, housing status, marital status, familial status, weight or height of such person. PAUSD acknowledges that it has read and understands the provisions of Section 2.30.510 of the Palo Alto Municipal Code relating to Nondiscrimination Requirements and the penalties for violation thereof, and agrees to meet all requirements of Section 2.30.510 pertaining to nondiscrimination in employment.

**SECTION 19. ENVIRONMENTALLY PREFERRED PURCHASING AND ZERO WASTE.** PAUSD shall comply with the City's Environmentally Preferred Purchasing policies, which are available at the City's Purchasing Department, incorporated by reference and may be amended from lime to lime. PAUSD shall comply with waste reduction, reuse, recycling and disposal requirements of the City's Zero Waste Program. Zero Waste best practices include first minimizing and reducing waste; second, reusing waste and third, recycling or composting waste. In particular, PAUSD shall comply with the following zero waste requirements:

- All printed materials provided by PAUSD to City generated from a personal computer and printer including but not limited to, proposals, quotes, invoices, reports, and public education materials, shall be double-sided and printed on a minimum of 30% or greater post-consumer content paper, unless otherwise approved by the City's Project Manager. Any submitted materials printed by a professional printing company shall be a minimum of 30% or greater post-consumer material and printed with vegetable-based inks.

- Goods purchased by PAUSD on behalf of the City shall be purchased in accordance with the City's Environmental Purchasing Policy including but not limited to Extended Producer Responsibility requirements for products and packaging. A copy of this policy is on file at the Purchasing Office.

6

EXHIBIT 105 - 019

- Reusable/returnable pallets shall be taken back by the PAUSD, at no additional cost to the City, for reuse or recycling. PAUSD shall provide documentation from the facility accepting the pallets to verify that pallets are not being disposed.

**SECTION 20. NON-APPROPRIATION.** This Agreement is subject to the fiscal provisions of the Charter of the City of Palo Alto and the Palo Alto Municipal Code. It is further subject to the fiscal provisions of the PAUSD's appropriations process. This Agreement will terminate without any penalty (a) at the end of any fiscal year in the event that funds are not appropriated for the following fiscal year, or (b) at any time within a fiscal year in the event that funds are only appropriated for a portion of the fiscal year and funds for this Agreement are no longer available. This section shall take precedence in the event of a conflict with any other covenant, term, condition, or provision of this Agreement.

**SECTION 21. MISCELLANEOUS PROVISIONS.**

21.1. This Agreement will be governed by the laws of the State of California.

21.2. In the event that an action is brought, the parties agree that trial of such action will be vested exclusively in the state courts of California in the County of Santa Clara, State of California.

21.3. The prevailing party in any action brought to enforce the provisions of this Agreement may recover its reasonable costs and attorneys' fees expended in connection with that action. The prevailing party shall be entitled to recover an amount equal to the fair market value of legal services provided by attorneys employed by it as well as any attorneys' fees paid to third parties.

21.4. This document represents the entire and integrated agreement between the parties and supersedes all prior negotiations, representations, and contracts, either written or oral. This document may be amended only by a written instrument, which is signed by the parties.

21.5. The covenants, terms, conditions and provisions of this Agreement will apply to, and will bind, the heirs, successors, executors, administrators, assignees, and consultants of the parties.

21.6. If a court of competent jurisdiction finds or rules that any provision of this Agreement or any amendment thereto is void or unenforceable, the unaffected provisions of this Agreement and any amendments thereto will remain in full force and effect.

21.7. All exhibits referred to in this Agreement and any addenda, appendices, attachments, and schedules to this Agreement which, from time to time, may be referred to in any duly executed amendment hereto are by such reference incorporated in this Agreement and will be deemed to be a part of this Agreement.

21.8. If, pursuant to this contract with PAUSD, City shares with PAUSD personal information as defined in California Civil Code section 1798.81.5(d) about a California resident ("Personal Information"), PAUSD shall maintain reasonable and appropriate security procedures to protect that Personal Information, and shall inform City immediately upon

7

learning that there has been a breach in the security of the system or in the security of the Personal Information. PAUSD shall not use Personal Information for direct marketing purposes without City's express written consent. Similarly, the CITY shall maintain reasonable and appropriate security procedures to protect personal information pertaining to PAUSD students.

21.9.   The individuals executing this Agreement represent and warrant that they have the legal capacity and authority to do so on behalf of their respective legal entities.

21.10.   This Agreement may be signed in multiple counterparts, which shall, when executed by all the parties, constitute a single binding agreement.

**IN WITNESS WHEREOF,** the parties hereto have by their duly authorized representatives executed this Agreement on the date first above written.

**Signatures of the Parties**

**For PALO ALTO UNIFIED SCHOOL DISTRICT:**

Date

Date

**For CITY OF PALO ALTO:**

Purchasing Manager                                              Date

Police Department Representative                         Date

EXHIBIT 105 - 021

**Attachments:**

EXHIBIT "A":      SCOPE OF WORK

EXHIBIT "B":      INSURANCE REQUIREMENTS

006247 00028
17708061.1

EXHIBIT 105 - 022

## EXHIBIT "A"

### SCOPE OF SERVICES

The PAPD/PAUSD School Resource Officer shall perform the following services:

A.    **Parent Project.** The School Resource Officer (SRO) shall facilitate management of the Parent Project. The SRO shall recruit and register parents for the English and Spanish Parent Project classes; update / maintain Parent Project official website; Facilitate Two 12-week English classes; and Facilitate One-Two 12-week Spanish classes.

B.    **Emergency Preparedness.** The School Resource Officer (SRO) shall provide training to public and certain private schools; Meet with District Office Risk Manager and school administrators who serve as regular members of the Emergency Preparedness and Safety Team; schedule and provide Emergency Preparedness training to District staff; schedule, prepare, and evaluate Drills; and respond to school to provide Site- Security Walkthroughs and recommendations to the District Emergency and Safety Team.

C.    **Calls for Service.** On-duty patrol officers will be the primary responders for any emergency or exigent call for service generated by PAUSD. The School Resource Officer (SRO) at the direction of the Investigative Services Division Supervisor may respond to calls for service and complete reports / make arrests /citations per incident; provide criminal legal advice to school administrators in their official capacities; and speak to truant or offending students. If the School Resource Officer (SRO) is unable to respond to a call for service, PAPD will make an effort to ensure that the responder has been instructed/trained with regard to all provisions contained in this agreement and its exhibits, including but not limited to all protocols contained therein.

D.    **C.O.R.E-Type Requests.** The School Resource Officer (SRO) shall teach classes as requested; appear on multidisciplinary panels; attend career fairs; and attend Exit Interviews (held at JLS Middle School). Events occurring outside of school hours may be mutually agreed upon to be considered part of the base duties of the SRO, however, hours and schedules will be adjusted at the direction of the Investigative Services Division Supervisor. The CITY retains the right to make necessary staffing adjustments as necessary.

E.    **Truancy Issues.** The School Resource Officer (SRO) shall assist the PAUSD resolve truancy issues, including by attending Student Attendance Review Board (SARB) meetings, and Truancy Mediation Meetings with District Attorney; other duties may include providing information on criminal consequences of truancy; issue criminal citations in certain cases; meeting with parents of habitual truants; and completing home visits / welfare checks of truant students.

10

F.     **Comply With Legal Reporting Requirements.** The School Resource Officer (SRO) shall comply with legal reporting requirements, including completing the Monthly Report on the Detention of Minors form for the California Board of State and Community Corrections, and completing the Annual Survey of Law Enforcement Facilities.

G.     **School "Office Hours".** The School Resource Officer (SRO) will be available during school hours. The SRO shall be proactive in policing on school campuses; work with school Campus Security Officers; work with school administrators regarding school happenings; interact with kids of all campuses during brunch, lunch, free play, etc.; attend after-suspension, school intake hearings; and assist with First Aid.

H.     **Juvenile Training to New Officers.** The School Resource Officer (SRO) shall provide training regarding juvenile issues to new officers.

I.     **Protocols for Involuntary Psychiatric Holds.** The School Resource Officer (SRO) when feasible may transport a student for a psychiatric evaluation when the student, as a result of a mental disorder, meets the criteria of Welfare and Institutions Code section 5150 and is determined to a danger to self or others or is gravely disabled. PAPD shall provide all necessary training to its officers, including SROs, regarding assessing, determining the need, reporting, and transporting a student for an involuntary psychiatric hold, including but not limited to the specific persons and agencies to contact prior to, during, and/or upon completion of transport of the student to the applicable medical facility.

J.     **Use of Mechanical Restraints during Transport.** As required by PAPD policy, the School Resource Officer (SRO) or the responding officer shall use mechanical restraints on a student being transported to a medical facility, but the SRO or the responding officer will make an effort, when possible, to do so out of view of other students. When possible, school officials or administrators will provide a location out of view of other students where the officer may apply the mechanical restraints.

K.     **Searching Students on School Grounds.** The School Resource Officer (SRO) or the responding officer shall notify the school principal or designee before the officer conducts a search of a student's person, possession, locker, or other shared property. The only exception to this requirement is if there is a real and immediate physical threat to the officer, student, staff or public safety. When feasible, all searches and pat downs that take place at school should happen outside the view of other youth (unless emergency situations make it impossible), to maintain the student's privacy and to decrease public embarrassment, humiliation, and any other future stigmatization and discrimination against the student(s) involved. When possible, the school officials or administrators will provide a location out of view of other students where the officer may conduct the search.

L.     **Confidentiality With Regard to Reports to Child Protective Services.** Reports to Child Protective Services and the information contained therein are confidential and shall not be revealed except as provided by law (to make the report to Child Protective Services or to notify the designated school administrator.)

11

EXHIBIT 105 - 024



rties," related to sexual mi...

## 1. Background:

PAUSD is committed to a working and learning environment free from sexual harassment and sexual violence, including sexual assault, sexual battery, and sexual coercion (collectively, "sexual misconduct"). Sexual misconduct is not tolerated. It corrupts the integrity of the educational process and work environment, and it violates the core mission and values of the PAUSD.

Sexual misconduct in the educational or work setting may constitute sex discrimination prohibited by federal and state anti-discrimination laws, including Title IX of the Education Amendments of 1972 ("Title IX"), Title VII of the Civil Rights Act, California's Fair Employment and Housing Act, and the California Education Code. In addition, some forms of sexual misconduct violate the criminal laws of the State of California.

## 2. Purpose:

Because sexual misconduct may constitute a violation of state and federal law, the criminal laws of California, and PAUSD Board policies and administrative regulations, it is important for the PAUSD to clarify its working relationship with the PAPD                                            t,

The Parties will work together collaboratively and effectively when sexual misconduct is reported. The Parties recognize that they each have different obligations under state and federal law, and it is important to respect those differences.



## 4. Agreement:

i.    An investigation conducted by the PAPD is a separate investigation from PAUSD's Title IX investigation. Investigations may proceed on parallel paths, and involve different professional and legal obligations under federal

12

and state law. PAUSD will not directly or indirectly discourage (or, alternatively, require) individuals from making a criminal complaint. Similarly, the PAPD will not directly or indirectly discourage (or, alternatively, require) individuals from pursuing a Title IX investigation or seeking District disciplinary action.

ii.    To the extent practicable, investigations shall be conducted in a manner that minimizes duplicative interviews and maximizes efficiency of the Parties' resources.

iii.    The Parties will each identify a point of contact for the other with respect to this MOU:

| **PAUSD** | **PAPD** |
|---|---|
| Megan Farrell | Persons/Crimes Supervisor |
| District Compliance Officer/Title IX Coordinator | (650) 392-2140 |
| (650) 833-4248 | |

iv.    Unless otherwise agreed to, any information sharing between the Parties described in this MOU will flow between these points of contact. The Parties agree to share a contact list with their point of contact for implementation of this MOU, and to notify the Parties of any changes to their points of contact as soon as practicable.

v.    The Parties will comply with applicable law and guidance regarding anonymous and confidential reporting of sexual misconduct, including when, how, and what information can or must be disclosed to local law enforcement officials or designated District officials. The Parties agree that if an alleged victim requests confidentiality regarding a reportable incident, the Parties will take all reasonable steps to comply with the request or inform the reporting individual when the Parties cannot ensure confidentiality.

## 5.    Responsibilities of PAPD:

i.    PAPD will share information with PAUSD related to instances of sexual violence, such as sexual assault or sexual battery, that occurs within    the

13

006247.00028
17708061.1

EXHIBIT 105 - 026

PAPD's jurisdiction, in accordance with California law and as appropriate given the particular circumstances.

ii.    The PAPD will respond to calls for service by PAUSD related to the investigation of sexual misconduct.

iii.    [redacted]

iv.    During the normal course and scope of their work, the PAPD will follow the check-in procedures outlined in District Board Policy/Administrative Regulation ("BP/AR") 5145.11 when arriving on school premises to question and/or apprehend students. In situations involving exigent or unique circumstances, the PAPD will follow the check-in procedures when practical or reasonable based on the circumstances. Pursuant to applicable state law, prior to conducting a student interview, the PAPD officer will provide the principal or designee his/her identity, his/her official capacity, and the legal authority under which the interview is to be conducted. The PAPD will advise minors of their right to have a representative, which includes a District representative, appear at the interview with them. Upon the student's request for a District representative, the PAPD officer will include PAUSD representative in the interview. The student's parent/guardian shall be notified by the school site principal or designee as soon as practicable when the student is questioned, and immediately when the student is taken into the custody of law enforcement, except in cases of suspected child abuse, pursuant to BP/AR 5145.11.

v.    Upon receiving information that a criminal restraining order has been violated, the PAPD will confirm the existence and the terms of the restraining order and take any appropriate action to address the violation. The PAPD will also inform PAUSD's Point of Contact (identified above) as allowable by law of the reported violation so that PAUSD may take any appropriate action.

vi.    In an effort to increase interagency awareness of responsibilities of the respective agencies and to coordinate interagency processes, the PAPD agrees to participate with PAUSD in interagency training of District staff. Such training shall discuss each agencies legal mandates, procedures and investigatory processes as they relate to sexual misconduct.

## 6.   Responsibilities of PAUSD:

i.    In an effort to increase interagency awareness of responsibilities of the respective agencies and to coordinate interagency processes, PAUSD agrees to provide training to the PAPD/District School Resource Officer ("SRO") and other designated PAPD officers on PAUSD's Title IX

14

EXHIBIT 105 - 027

obligations, policies, strategies and best practices for responding to reports of sexual misconduct in a trauma-informed manner.

ii.     PAUSD will notify all reporting parties of the right to file a civil or criminal complaint. The decision to file a civil or criminal complaint rests solely with the complainant, unless a California mandated reporting is required based upon the victim's classification (e.g., minor, dependent adult, etc.).

iii.    PAUSD will annually provide the PAPD with copies of the following policies:

   1)   Sexual Harassment policies (which include sexual violence);

   2)   Uniform Complaint Procedures; and

   3)   BP/AR 5145.11.

iv.     Prior to contacting a respondent regarding a complaint that PAUSD has been informed is under investigation by the PAPD, PAUSD and/or PAUSD's Title IX Coordinator will first contact the PAPD

v.      PAUSD will provide training to staff regarding the appropriate procedures to follow when the PAPD enters school premises to question and/or apprehend students, as outlined in BP/AR 5145.11. In addition to obtaining the PAPD officer's identity, his/her official capacity, and the legal authority under which the interview is to be conducted pursuant to applicable state law, the site staff will also immediately inform PAUSD's Point of Contact (identified above) in writing of the PAPD's presence on site and any information gathered from the PAPD officer.

vi.     PAUSD acknowledges its duty to comply with protective orders and is committed to implementing such orders while ensuring the rights of all students to access education. PAUSD will work with the protected student and the students' parent/guardian to create a plan for implementation of the protective order and provide information about reporting violations of the protective order.

vii.    PAUSD, by and through PAUSD's Point of Contact (identified above), will ensure that information related to the protective orders is effectively communicated between school site staff and PAPD officers. PAUSD will provide its staff and the PAPD with copies of its policy or protocols on implementation of protective orders.

viii.   Upon receiving information that a protective order has been issued, PAUSD will follow the following procedures:

15

1)     Notify PAUSD**'s Point of Contact (identified above)** and provide a copy of the protective order;

2)     Notify the parties subject to the protective order;

3)     Work with the protected and restrained student and the student's parent/guardian to create a plan for implementation of the protective order, regardless of whether the restrained individual is a student at the same school;

4)     If the restrained individual is not a student at the same school, PAUSD will focus on how to restrict that individual's access to the school according to the protective order and how to support the students travels to and from school;

5)     If the restrained individual is a student at the same school, PAUSD will work to make changes to the students' schedule(s), participation, or environment in order to comply with the protective order.

6)     If the protective order raises concerns that would warrant a sufficient risk to other students and/or staff, PAUSD will notify the PAPD, administrators, and/or PAUSD community to the extent allowed by applicable state and federal law;

7)     Upon receiving information that a protective order has been violated in a way that implicates a safety risk, PAUSD will promptly notify the PAPD of the reported violation, as well as the parties subject to the protective order.

006247.00028
17708061.1

EXHIBIT 105 - 029

## EXHIBIT "B"

### INSURANCE REQUIREMENTS

Palo Alto Unified School District (PAUSD), AT THEIR SOLE EXPENSE. SHALL FOR 11 IE TERM OF THE CONTRACT OBTAIN AND MAINTAIN INSURANCE IN THE AMOUNTS FOR THE COVERAGE SPECIFIED BELOW, **AFFORDED BY COMPANIES WITH AM BEST'S KEY RATING OF A-:VII, OR HIGHER, LICENSED OR AUTHORIZED TO TRANSACT INSURANCE BUSINESS IN THE STATE OF CALIFORNIA.**

AWARD IS CONTINGENT ON COMPLIANCE WITH CITY'S INSURANCE REQUIREMENTS. AS SPECIFIED,

BELOW:

17

| Northern California ReLiEF Protected Insurance Program for Schools | **CERTIFICATE OF COVERAGE** | Issue Date 6/18/2018 |
|---|---|---|

| ADMINISTRATOR: Keenan & Associates 1740 Technology Drive, Suite 300 San Jose, CA 95110 | LICENSE # 0451271 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE COVERAGE DOCUMENTS BELOW. |
|---|---|---|

408-441-0754
www.keenan.com

ENTITIES AFFORDING COVERAGE:

ENTITY A: Northern California ReLiEF

ENTITY B: Protected Insurance Program for Schools

ENTITY C:

ENTITY D:

ENTITY E:

COVERED PARTY:
Palo Alto Unified School District
25 Churchill Avenue
Palo Alto CA 94306

THIS IS TO CERTIFY THAT THE COVERAGES LISTED BELOW HAVE BEEN ISSUED TO THE COVERED PARTY NAMED ABOVE FOR THE PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN. THE COVERAGE AFFORDED HEREIN IS SUBJECT TO ALL THE TERMS AND CONDITIONS OF SUCH COVERAGE DOCUMENTS.

| ENT LTR | TYPE OF COVERAGE | COVERAGE DOCUMENTS | EFFECTIVE/ EXPIRATION DATE | MEMBER RETAINED LIMIT / DEDUCTIBLE | LIMITS |
|---|---|---|---|---|---|
| A | **GENERAL LIABILITY** [ ✓] GENERAL LIABILITY [ ] CLAIMS MADE [✓] OCCURRENCE [ ✓] GOVERNMENT CODES [ ✓] ERRORS & OMISSIONS | NCR 01705-17 | 7/1/2018 7/1/2019 | $ 50,000 | COMBINED SINGLE LIMIT EACH OCCURRENCE $ 1,000,000 |
| A | **AUTOMOBILE LIABILITY** [ ✓] ANY AUTO [ ✓] HIRED AUTO [ ✓] NON-OWNED AUTO [ ✓] GARAGE LIABILITY [ ✓] AUTO PHYSICAL DAMAGE | NCR 01705-17 | 7/1/2018 7/1/2019 | $ 50,000 | COMBINED SINGLE LIMIT EACH OCCURRENCE $ 1,000,000 |
| A | **PROPERTY** [ ✓] ALL RISK [ ✓] EXCLUDES EARTHQUAKE & FLOOD [ ] BUILDER'S RISK | NCR 01705-17 | 7/1/2018 7/1/2019 | $ 50,000 | $ 250,250,000 EACH OCCURRENCE |
| A | **STUDENT PROFESSIONAL LIABILITY** | NCR 01705-17 | 7/1/2018 7/1/2019 | $ 50,000 | $ Included EACH OCCURRENCE |
| B | **WORKERS COMPENSATION** [ ✓] EMPLOYERS' LIABILITY | PIPS7839 | 7/1/2018 7/1/2019 | $ | [ ] WC STATUTORY LIMITS [ ✓] OTHER $ 1,000,000 E.L. EACH ACCIDENT |
| | **EXCESS WORKERS COMPENSATION** [ ] EMPLOYERS' LIABILITY | | | $ | $ 1,000,000 E.L. DISEASE - EACH EMPLOYEE $ 1,000,000 E.L. DISEASE - POLICY LIMITS |
| | **OTHER** | | | $ $ | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/RESTRICTIONS/SPECIAL PROVISIONS:
Proof of coverage only.

CERTIFICATE HOLDER:

Palo Alto Unified School District

CANCELLATION......SHOULD ANY OF THE ABOVE DESCRIBED COVERAGES BE CANCELED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING ENTITY/JPA WILL ENDEAVOR TO MAIL ___30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT. BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE ENTITY/JPA, ITS AGENTS OR REPRESENTATIVES.

John Stephens

AUTHORIZED REPRESENTATIVE

EXHIBIT 105 - 031

www.rCertsOnline.com
42605075 | PALOALTU | 18/19 Super Pool P&L | Maya Williams | 6/18/2018 4:32:49 PM (PDT) | Page 1 of 1