EVAN C. NELSON (SBN 172957)
JONATHAN MCDOUGALL, ESQ. (SBN 212359)
LAW OFFICE OF JONATHAN MCDOUGALL
1640 Laurel Street
San Carlos, CA 94070
Telephone: (650) 594-4200
Email: jonathan@mcdlaw.net; evancnelson.law@gmail.com

*Attorneys for Plaintiff Peter Colombo*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PETER COLOMBO,<br>Plaintiff,<br>v.<br>PALO ALTO UNIFIED SCHOOL DISTRICT, DON AUSTIN, Individually and as Superintendent for PAUSD, LISA HICKEY, Individually and as Director of Certificated Human Resources for PAUSD, and TRENT BAHADURSINGH, individually and as Deputy Superintendent and Chief of Staff for PAUSD,<br>Defendants. | Case No. 5:24-cv-00909-NC<br>**PLAINTIFF PETER COLOMBO'S EXPERT WITNESS LIST**<br>**HON. NATHANAEL M. COUSINS** |

Plaintiff is submitting his Expert Witness List separately, and not as a joint submission with Defendants, because Defendants failed to submit their proposed filing in a timely fashion. Plaintiff requested Defendants proposed submissions in time to allow Plaintiff a reasonable ability to compile joint submissions and file such as a Trial Readiness Binder with sufficient lead time to allow for copying and inclusion in the Joint Trial Binders for delivery to the Court by noon on December 19, 2025 per the Court's Trial Preparation Order, ECF #167.

Accordingly, Defendants submission, if any, will be separately filed, copied and provided to the Court for inclusion in the Trial Readiness binders.

Plaintiff's Expert Witness List is as follows:

| No. | Witness Name | Brief Description of Opinions/Theories |
|---|---|---|
| 1. | Saundra K. Schuster | Ms. Schuster will provide expert opinion testimony regarding Title IX "101" regarding the history, purpose and administration of Title IX and her opinions regarding any violations of Title IX. Based on her 50+ years of experience as a Title IX administrator and consultant, she intends to opine regarding the areas where, in her opinion based on the standards and practices of the relevant Title IX administrators industry, The District engaged in conduct that was retaliatory and/or not legitimately based in sound policy or practice. Her Report and CV are attached as Attachment 1A. |
| 2. | Detective Mark Alifano (ret.) | Mr. Alifano will provide expert opinion testimony regarding standards and practices for coordinated, interdisciplinary investigations relating to allegations of sexual assault that involve both law enforcement and schools. His opinions are based on his personal involvement as a Detective/Detective Sargeant in approximately 150 such interdisciplinary sexual assault investigations. He intends to provide opinions regarding Defendants' compliance/non-compliance with proper standards and procedures in this case, which included a complete lack of investigative integrity, fairness or thoroughness by Defendants and the PAPD in the coordinated investigation and how such led, in his opinion, to the wrongful prosecution of Peter Colombo through reckless failure to locate and consider exculpatory, even exonerating evidence that was requested by the PAPD detective and was known by and readily available to Defendants Hickey, Bahadursingh and Austin. His Report, Supplemental Report (submitted in response to Defendants' discovery requests), and CV are attached as Attachment 1B. |
| 3. | Ken Whittemore | Mr. Whittemore will provide expert opinion testimony regarding human resources ("HR") standards and practices relating to treatment of employees by California K-12 schools and Defendants' compliance/non-compliance with those standards. Based on his 18 years in HR administration for California schools, he will opine that Defendants had a clear obligation to not delay their investigation pursuant to board policies (whether Title IX as testified by Vishakan, Uniform Complaint Procedure ("UCP") if determined to not be Title IX, or as a claim against an Employee), which could not be dropped or indiscriminately delayed due to the stated potential risk to existing students. He will also provide opinion testimony relating to Defendants failure to treat Mr. Colombo with dignity and failure to provide him reasonable opportunity to succeed after the criminal charges were dropped – Defendants' failure to "work with the employee" to put him in position to succeed as required by Board Policy 4000 and Association of California Schools Administrators (ACSA) policies instead of "doing things to him" in retaliation as a means of attempting to force him out of his employment. His Report, Supplemental Report (submitted in response to Defendants' discovery requests), and CV are attached as Attachment 1C. |
| 4. | Barry Ben-Zion, PhD | Dr. Ben-Zion will provide expert opinion testimony regarding economic loss calculations, including conversion of future economic losses to |

| | | |
|---|---|---|
| | | present value, depending on the evidence submitted during trial. He has provided two economic loss reports for use by the jury to determine the value of Plaintiff's employment without retaliation/harassment and to determine the economic loss if the jury determines there has been a constructive termination, with one report assuming planned retirement at age 70 in accordance with Mr. Colombo's deposition testimony and declaration (ECF #66-1, at p. 14 of 767, Exhibit A, ¶11) and as reported in the "Man Behind the Mitt" article published in a District publication in 2017 (Exhibit 68) and another calculation using age 65 as planned age of retirement, representing the full retirement age for Mr. Colombo's pension. His Report including all calculations, charts, etc., Alternative Report (submitted in response to Defendants' discovery requests) including all charts, graphs, etc., and CV are attached as Attachment 1D. |
| 5. | Jessica Chaudhary, MD | Dr. Chaudhary will provide expert opinion testimony regarding her agreement with Plaintiff's treater's diagnoses of Post Traumatic Stress Disorder ("PTSD") and General Anxiety Disorder ('GAD") using the industry standard Diagnostic and Statistics Manual of Mental Disorders, 5th Edition ("DSM-V") and based on her two-hour Independent Medical Examination of Mr. Colombo. Based on her stellar education, experience and training, clinical practice and well-documented studies published in reliable medical literature regarding the impacts from stigmatization relating to sexual assault claims, she will provide her opinions that each significant contribution to the stigmatization of Plaintiff is a substantial contributing cause of his psychiatric injuries/damages. Her Report and CV are attached as Attachment 1E. |
| [6.] | [James Armontrout, MD] | [Only in the event that the Court were to grant Defendants' Daubert Motion relating to Dr. Chaudry's diagnosis or causation opinions, Plaintiff would present Dr. Armontrout's Report (Exhibit 179) and/or his testimony. A copy of Dr. Armontrout's Report and CV are attached hereto as Attachment 1F.] |

Dated: December 17, 2025

LAW OFFICES OF JONATHAN D. MCDOUGALL

By: */s/ Evan C. Nelson*
EVAN C. NELSON
Attorneys for Plaintiffs

# ATTACHMENT 1A

**<u>Peter Colombo v. Palo Alto Unified School District, et. al</u>**

**Case Number 5:24-cv-909-NC**

**U.S. District Court**

**Northern District of California**

**San Jose Division**

**Expert Report**

**By: Saundra K. Schuster, Esq.**

**Partner, TNG Consulting, LLC**

**Expert Witness For Peter Colombo**

**September 24, 2025**

## Contents

Statement of Experience and Credentials .......... 3
Basis for Opinions .......... 4
Prior Expert Witness Work .......... 5
Compensation .......... 7
Documents Reviewed .......... 7
Applicable Standards .......... 8
Brief Summary of the Facts .......... 17
Discussion and Conclusions .......... 17
Summary .......... 25

## STATEMENT OF EXPERIENCE AND CREDENTIALS

I currently serve as a Partner with TNG Consulting, LLC (The National Center for Higher Education Risk Management) (hereinafter TNG). Partners with TNG currently serve as consultants for or legal counsel to school systems, colleges, and universities throughout the United States. The organization of which I am a Partner is viewed nationally as a thought leader and policy expert in helping to ensure compliance and define best practices for Title IX compliance and risk management in the field of education.

I am a nationally recognized expert in preventive and civil rights law, notably in the fields of Title IX, and other forms of civil rights violations including harassment, discrimination, sexual misconduct, and sexual violence in the field of education. In addition to my research and writing in the field of sexual misconduct and discrimination, I have extensive experience and expertise in, and routinely advise clients on the following areas: compliance with the Americans With Disabilities Act and §504 of the Rehabilitation Act; the First Amendment and Campus Access issues; Institutional Enterprise Risk Management and Liability; Behavior Intervention and Threat Assessment; Student Discipline and Campus Conduct; the Family Education Rights and Privacy Rights Act; and Intellectual Property and Employment issues. I provide assistance nationally to both two-year and four-year public and private educational entities as well as the Pre-K-12 environment in policy development, faculty handbooks and employee manuals, and training for state and federal compliance.

I have provided extensive consultation to and training for the U.S. Department of Justice Office of Violence Against Women; the White House Task Force on Sexual Assault; and the Futures Without Violence organization. I also conduct civil rights-based investigations and training for K-12 schools, community colleges, and universities across the country.

I have written hundreds of codes of conduct and sexual misconduct and harassment policies for schools and colleges. The ATIXA “One Policy, Two Processes” (“1P2P”) Model, of which I am a co-author, is in use by colleges, universities, and schools nationwide. I have also authored a number of peer-reviewed articles and whitepapers in the areas of sex and gender-based violence, Title IX, and civil rights investigations.

Prior to joining TNG in 2009, my significant education-based legal experience included serving as General Counsel for Sinclair Community College; as Senior Assistant Attorney General for the State of Ohio, representing fifty-three public colleges and universities in the State; and as Associate General Counsel for the University of Toledo.

In addition to my legal work in higher education, I have over twenty-five years’ experience in college administration and teaching, including serving as the Associate Dean of Students at The Ohio State University; Director of the Office of Learning Assistance at Miami University; and

as Assistant Dean at Western College. I also served as a faculty member at The Ohio State University, Miami University, and Columbus State Community College.

As an education consultant, I have served as a guest speaker/educator for student groups, faculty and non-faculty employees on topics including alcohol, sexual assault, hazing and risk management, academic freedom, campus protests and employment issues, and have provided risk management consulting and/or legal services to colleges, universities, schools, fraternities, sorority chapters, governmental agencies, and military institutions. I have provided consultation to schools and colleges regarding litigation, liability, negligence, foreseeability, special relationships, duty of care, event management, student organizations risk management, risk mitigation, insurance, FERPA compliance, ADA, Section 504, Title IX, Clery Act, state law, First Amendment, Red Flags Rule, academic freedom, search and seizure, and dozens of other topics impacting education law.

My depth of knowledge is supported by my involvement in many professional organizations of which I am a founder and member. I am a co-founder of the Association of Title IX Administrators ("ATIXA") and serve as the President of this organization that hosts over 19,000 members. I am a founding member of the National Association for Behavior Intervention and Threat Assessment ("NABITA") as well as a founding member of the Association for Student Conduct Administration (ASCA) formerly the Association for Student Judicial Affairs. I have served nine years as a member of the Board of Trustees for the Columbus College of Art and Design.

I hold a Bachelor's Degree in Education, focusing on K-12, and a Master's Degree in Counseling and Higher Education from Miami University of Ohio. I completed my coursework for my Ph.D. in Organizational Development at The Ohio State University. I received my Juris Doctorate degree from the Moritz College of Law, The Ohio State University. I am admitted to practice law in the State of Ohio, U.S. District Court for the Southern District of Ohio and the U.S. Court of Appeals for the Sixth Circuit. More information about my background, credentials and publications is available in my CV, which is attached to this report.

## Basis for Opinions

My analysis and opinion in this matter are developed based on my education, including an undergraduate degree in elementary education, and training, summarized above, as well as my more than five decades of professional experience in the education environment, as a teacher, a school administrator, faculty member and legal counsel, as an attorney overseeing training and compliance for all colleges, universities and public K-12 schools for the State of Ohio, and as a Partner with TNG.

In addition, the knowledge I bring to analyzing an institution's response to awareness of sexual grooming and the risks involved by not intervening to stop the behavior, is influenced by my deep understanding of institutional standards and compliance from a Board-level perspective.

Finally, my opinions are developed based upon my review of the documents provided to me by counsel for Plaintiff regarding this case and a review of relevant guidance documents. All opinions stated are held to a reasonable degree of professional certainty. The methodology I used to provide my opinions in this case is the same as the methodology I use and that my colleagues use when providing training and consultation to schools, colleges, and universities. In summary, this methodology involves reviewing documents to gather facts concerning the school's conduct and/or policies, followed by analyzing them, followed by comparing them to industry standards.

## PRIOR EXPERT WITNESS WORK

*McGrath v. Dominican College of Blauvelt*, 672 F. Supp. 2d 477 (U.S. Dist. Ct., D.N.Y. 2009 – case settled) (expert for Plaintiff)

*Pico v. Kamehameha Schools,* (Dispute Prevention & Resolution, State of Hawaii, 2011 – case settled) (expert for Plaintiff)

*Singh v. University of Pennsylvania and Amazon, Inc*., (Ct. of Common Pleas, Philadelphia County, Pennsylvania, 2016 - case settled) (expert for Plaintiff)

*Tubbs v. Stony Brook University,* U.S. Dist. Ct., S.D. New York, 2016 – case settled)(expert for Defendant)

*Ross v. University of Tulsa,* (U.S. Ct. of Appeals, 10th Cir., 2017 – case settled) (expert for Defendant)

*Burrell v. Florida A & M University,* (U.S. Dist. Ct., N.D. Florida, 2016 – case settled) (expert for Plaintiff)

*Locklear v. William Patterson University,* (U.S. Dist. Ct., Dist. of New Jersey–case settled, 2019) (expert for Defendant)

*Larios v. Chadron State University and the Board of Trustees of the Nebraska State Colleges,* (U.S. Dist. Ct., Dist. of Nebraska—case settled 2020) (expert for Plaintiff)

*Stevens v. Brigham Young University – Idaho (*U.S. Dist. Ct., Dist. of Idaho –(case settled, 2022) (expert for Defendant)

*Doe v. Raleigh County Board of Education and Lori M. Knight (*Circuit Court of Raleigh County, West Virginia – case ongoing) (expert for Plaintiff)

*Mary Doe v. Baylor University, Case # 6:19-cv---227-RP-AWA* (U.S. Dist. Ct., W. D. Texas, Waco Div. (case settled 2022) (expert for Plaintiff)

*Shaynen Jones v. Marshall University Board of Governors,* Case # 3:20-cv-00786, U.S. Dist. Ct., S. Dist. West Virginia, (case settled 2021) (expert for Defendant)

*Mary Durstein v Cabell County Board of Education*, Case # 3:19-cv-00029, U.S. Dist. Ct., S. Dist. West Virginia, Div. 3 (case settled 2021) (expert for Defendant)

*Erika Pogorzelska v Vandercook School of Music,* Case #19 C 5683, U.S. Dist. Ct., Northern Dist. of Illinois, Eastern Division (case ongoing) (expert for Defendant)

*Jane Doe and Jane Roe v Boulder Valley School District and Donald Stensrud in his personal capacity,* case #21-CV02133, U.S. Dist. Ct., Dist. of Colorado (case ongoing) (expert for Plaintiffs)

*Doe v. University of Southern Indiana, Dameion Doss, Beth Devonshire, D. Stafford & Associates, Karen Nutter, Grand River Solutions,* Case # 3:21-cv-00144-TWP-MJD, U.S. Dist. Ct., S.D. Indiana, Evansville Div. (case ongoing) (expert for Plaintiff)

*Fatimah Totten v. Benedictine University,* Case # 1:20-cv-06107, U.S. Dist. Ct. N. Dist. Illinois, Eastern Div. (case settled 2024) (expert for Plaintiff)

*J.B. a Minor by her Father and Next Friend, Guy Blume v. Liberty Local Schools, Case #4:22-CV01752-PAB, U.S. Dist. Ct., N. Dist Ohio, E Div. (case ongoing) (expert for Plaintiff)*

*John Doe v. Rockingham County School Board, D/B/A Russel County Public Schools, Phil Judd, Sandy King, Wesley Dunlap, Timeless Toys, LLC, and John Roes 1-10, Civil Action No.: 5:21-CV-00051, U.S. dist. Ct., W Dist, Va, Harrisonburg Div (case ongoing) (expert for Defendants)*

*Tess McGlenn, et al. v. Madison Metropolitan School District, David Kruchten in his individual capacity, Heidi Tepp, Joe Fanning and Joe Balles d/b/a JB Public Safety Consulting, LLC, and auto-Owners Insurance Company and Community Insurance Corporation, Case # 3:21-CV-00683, U.S. Dist. Ct., W Dist. of Wisconsin (expert for Defendant), Case resolved on Summary Judgment*

*Marissa Michaels v Newington Board of Education and Town of Newington, Superior Court, J.D. of Hartford at Hartford (case ongoing) (expert for Plaintiff)*

## COMPENSATION

Billing for this expert report is at the rate of $792.50/hr. for case and document review, research, report preparation and telephone calls and other local consultation.

For trial or deposition or any consultation requiring out-of-state travel, a fee of $12,500 per day is charged, regardless of the location of the trial or deposition, or partial days consumed.

Travel is charged at the rate of $350.00 per hour plus actual expenses for travel time to/from the applicable destination. All travel arrangements will be made by TNG and shall be charged without mark up.

## DOCUMENTS REVIEWED

- Third Amended Complaint, dated January 6, 2025
- Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, dated March 27, 2025
- Defendants' Response to Plaintiff's Requests for Admissions 3 & 4, Interrogatory 17.1, Production of Documents, dated July 25, 2025
- Depositions
    - Komathy Vishakan, June 5, 2025
    - Lisa Hickey, June 16, 2025
    - Cindi Durchslag Ahern, June 16, 2025
    - Peter Colombo, July 14, 2025
    - Trent Bahadursingh, August 25, 2025
    - Don Austin, August 26, 2025
    - Robert Andrade, August 26, 2025
    - Nicole Miller, September 16, 2025
- Exhibits
    - Exhibits 2-15
    - Exhibit 21
    - Exhibits 25-29
    - Exhibit 34
    - Exhibit 36
    - Exhibit 38
    - Exhibit 40
    - Exhibits 43-46
    - Exhibits 48-50
    - Exhibit 58

- Exhibit 59
- Exhibit 59A_Redacted
- Exhibit 67
- Exhibit 105
- Exhibit 109
- Exhibits A-X (PAUSD003069-3840)
- Title IX Training and Certificates (PAUSD001409-2503)

## APPLICABLE STANDARDS

The field of education is not governed by one uniform, published set of standards. Instead, standards vary from state-to-state and depend as well on the type of school. With respect to public K-12 schools in California, in relation to sex-based issues involving employees and students, the standard of care is discerned via applicable federal statutes and regulations, case law, state law, District policies, and the customs and practices commonly adopted within a field or profession.

### TITLE IX: STATUTE AND REGULATIONS

Title IX of the Education Amendments of 1972, codified at 20 U.S.C. §1681 et seq., is a broad federal civil rights law that prohibits discrimination on the basis of sex in any federally funded education program or activity. Title IX governs the obligations of educational institutions with respect to covered sex discrimination, which includes sexual harassment and, as is relevant in this case, retaliation. The statute and the U.S. Department of Education's implementing regulations prohibit discrimination on the basis of sex in a school's "education program or activity," which includes all the school's operations.[1] Title IX applies to every public and private school that receives federal funds, including elementary and secondary schools.[2]

In 2020, the Department of Education released a new set of Title IX regulations.[3] The new regulations mandated changes to Title IX processes in K-12 districts, implemented new due process protections for parties, and detailed prescriptive requirements for federal funding recipients to fulfill within their Title IX grievance procedures. They also included robust retaliation protections that reshaped how the field responds to Title IX complaints. **Over the past five years, the 2020 regulations have become a primary source shaping the industry standards regarding**

[1] 20 U.S.C. §§ 1681 *et seq*. PAUSD003174.
[2] Id. at §1681(c).
[3] 34 C.F.R. §106.

**the grievance procedures for resolving Title IX Sexual Harassment allegations once a recipient has notice.**[4]

## TITLE IX: RETALIATION

Industry standard practice, stemming from regulatory requirements, features broad retaliation protections. Specifically, any attempt to address or resolve Title IX Sexual Harassment allegations using a non-Title IX process is per se Title IX retaliation if it is done for the purpose of interfering with any Title IX right or privilege.[5]

> "Intimidation, threats, coercion, or discrimination, *including charges against an individual for code of conduct violations that do not involve sex discrimination or sexual harassment,* but arise out of the same facts or circumstances as a report or complaint of sex discrimination, or…of sexual harassment, for the purpose of interfering with any right or privilege secured by Title IX…constitutes retaliation."[6]

The industry-wide reason that using a non-Title IX process when the reported conduct meets the Title IX regulatory definition is considered to be a retaliatory adverse action is because, pursuant to the 2020 Title IX Regulations, the Parties are entitled to certain due process protections and fairness safeguards when the allegations implicate Title IX. The next section outlines the numerous rights and privileges "secured by Title IX" that the prohibition on retaliation protects, illuminating why the regulations went so far as to characterize deprivation of those rights and privileges as retaliation.

Moreover, under the regulations and industry standard practice, a recipient may be considered to have engaged in Title IX retaliation if it fails to keep information about the Parties or allegations confidential. Specifically, the recipient "must keep confidential the identity of…any respondent," unless required by law or some disclosure is necessary to implement the Title IX grievance process.[7] This provision would prohibit the recipient from acknowledging, for example, to a local newspaper that a student or employee was named in a report alleging Title IX sexual harassment. This is part of the reason why it is industry standard practice for a recipient to decline to comment on open investigations.

---

[4] "Title IX Sexual Harassment" is a term referring to all misconduct falling within the purview of the 2020 Title IX regulations.

[5] The OCR Resolution Agreement contains a condition that the District will not investigate alleged sexual harassment or sexual violence under other non-Title IX policies, too. *See* PAUSD003071.

[6] 34 C.F.R. §106.71(a) (emphasis added). Explained further at 85 Fed. Reg. 30496 (May 19, 2020) and 85 Fed. Reg 30536 (May 19, 2020). Sexual assault allegations, assuming they fulfill all other Title IX jurisdictional requirements, qualify as Title IX sexual harassment under the regulatory definitions that all recipients use.

[7] 34 C.F.R. §106.71(a)

## Title IX: Grievance Process[8]

There are five phases of the Title IX grievance process drawn from regulatory requirements and industry standard practice for an incident like sexual assault: (1) the notice/formal complaint phase; (2) the initial assessment phase; (3) the formal investigation phase; (4) the decision-making phase; and (5) the appeal phase. The grievance process must also be prompt and equitable.[9]

*Notice/Formal Complaint Phase*

Many schools receive notice of Title IX allegations through online reporting forms, phone calls, emails, or conversations with students, parents, teachers, or other staff. When a school receives notice of potential Title IX allegations, it is industry standard practice for the person receiving the report to notify the Title IX Coordinator so they can provide oversight of the district's response.[10][11] The Title IX Coordinator or other trained individual will then reach out to the impacted individual (or their parent), otherwise known as the Complainant, or the person who filed the report, for more information.[12] Typically, a Title IX Coordinator will meet with a student and/or a parent to explain the process and offer supportive measures during an intake meeting.[13] The Title IX Coordinator will also discuss whether the Complainant wishes to file a formal complaint.

Notice alone does not trigger a Title IX grievance process; rather, the regulations require a formal complaint.[14] There is no set formal complaint template or required formal complaint language. Simply put, a formal complaint is any document from the Complainant alleging sexual harassment against an individual, otherwise known as the Respondent.[15]

---

[8] This section contains numerous references to the regulations, so it is important to reemphasize that when the U.S. Department of Education released the Title IX Regulations in August 2020, industry standards evolved rapidly to reflect the regulatory requirements. Throughout the grievance process, if there is a regulatory provision on point, the industry standard reflects that provision. When there is not an applicable regulatory provision, industry standards may fill those gaps.

[9] PAUSD003175.

[10] PAUSD003176. For purposes of this section, the Title IX Coordinator may designate or assign responsibility to a designee, like a Deputy Title IX Coordinator, an investigator, an intake officer, or principal. Different offices have different staffing capabilities and practices. Whoever fulfills these responsibilities must receive training first. The District had documented problems with effective oversight in the past, *see* PAUSD003164.

[11] The mandatory reporting requirement is also an element in the PAUSD Policy

[12] The District had documented problems with providing information about their process in the past, *see* PAUSD003167.

[13] 34 C.F.R. §106.44(a). The District had documented problems with providing supportive measures in the past, *see* PAUSD003167.

[14] 34 C.F.R. §§ 106.30, 106.45.

[15] 34 C.F.R. §106.30.

The Title IX Coordinator has authority to initiate a formal complaint and may sign a formal complaint on behalf of the Complainant even if a Complainant does not wish to move forward with an investigation or if the Complainant is not participating or attempting to participate ("P/ATP") in the education program or activity at the time of the formal complaint.[16] Title IX Coordinators at the K-12 level will often consider whether there are safety concerns for the Complainant, the school, or the district that necessitate moving forward against the wishes of the Complainant. As a result, K-12 Title IX Coordinators will typically sign a formal complaint when the allegations involve an employee Respondent and a student Complainant, not only to protect the Complainant, but other students as well. This is an industry standard practice in K-12.[17]

*Initial Assessment Phase*

The initial assessment phase is also known as the gatekeeping phase or the preliminary inquiry phase. During the initial assessment phase, the Title IX Coordinator assesses the formal complaint to determine whether the complaint facially alleges sufficient facts to initiate the grievance process and whether the allegations fall within Title IX jurisdiction. The first question is whether the allegations, if proven, would be Title IX Sexual Harassment under the school's Title IX policy.[18] Notably, for allegations occurring in the past, such as in the present case, the industry standard approach is to apply the policy definitions that were in effect at the time of the alleged incident and the procedures in effect at the time of the report or formal complaint. Districts must apply the policy definitions in effect at the time of the alleged incident for due process reasons. Students or employees should not be held accountable for violating policies that were not in effect at the time of the alleged incident and of which they did not have notice. There is no retroactive application of current policy to past actions. Applying current procedures, though, is a practical matter as well as a due process matter. The personnel charged with implementing the Title IX grievance process (investigators, decision-makers) are expected to have received extensive training on the 2020 regulations including the grievance procedures, not the procedures in effect twenty years prior. Moreover, the 2020 regulations provide significant due process protection to the Parties and more fundamental fairness safeguards than any similar process from twenty years past. So not only is it the process that the recipient knows how to implement, but it is also the one that provides the most due process to all Parties.

The second jurisdictional question relates to the identities/roles of the parties themselves.

- First, is the Complainant P/ATP in the school's education program or activity at the time the formal complaint was filed?[19] Note, as referenced above, in certain situations with

---

[16] 34 C.F.R. §106.30.
[17] Mr. Andrade, the District's Title IX Coordinator, echoed this industry practice in his deposition at p. 34.
[18] 34 C.F.R. §106.30.
[19] 34 C.F.R. §106.30.

safety concerns present, the Title IX Coordinator may choose to sign a formal complaint for a Complainant that is not P/ATP. The Title IX Coordinator signing a formal complaint effectively makes the Complainant P/ATP for the purposes of the jurisdictional analysis.

- Second, is the Respondent within the school's control? This question typically asks whether the Respondent is still a student or employee of the recipient.

If yes to both questions, the Title IX Coordinator will then need to explore whether the alleged incident took place within the school's education program or activity. This analysis usually involves analyzing the degree to which the school controlled the context of the harassment.[20] For example, a sexual assault occurring on school grounds or in school buildings during the school day would clearly qualify.

If the answers to the above questions are all "yes" or "arguably, yes," the matter continues in the Title IX process. If not, the Title IX Coordinator may or must dismiss the formal complaint and may refer it to a different disciplinary process.[21] If the Title IX Coordinator does not have enough information for the jurisdictional analysis, they may meet with the Complainant or ask the reporting individual for more information, conduct some background assessment, evaluate pattern concerns, assess safety risk, determine whether a complaint can be subject to informal resolution, evaluate whether an emergency removal should be put in place, and address a number of other preliminary matters.

During this phase, the Title IX Coordinator will discuss supportive measures with the Complainant, and the Respondent as appropriate, and implement supportive measures as necessary. Examples of common supportive measures are no contact directives, academic accommodations, schedule changes, or counseling services.[22]

*Formal Investigation Phase*

Upon receiving a formal complaint and establishing jurisdiction, the Title IX Coordinator determines the charges, based on school or district policy, and sends a Notice of Investigation and Allegations (NOIA).[23] The NOIA must contain:

- Information about the school's Title IX grievance process, including any informal resolution process

[20] 34 C.F.R. §106.44(a).
[21] 34 C.F.R. §106.45(b)(3). Once a recipient determines that Title IX applies, and notifies Parties that Title IX applies, if later the recipient determines Title IX does not apply, they must dismiss, notify the Parties of the dismissal, and offer an appeal of that dismissal decision. The recipient cannot just change course.
[22] 34 C.F.R. §106.44(a).
[23] 34 C.F.R. §106.45(b)(2).

- Notice of the allegations of sexual harassment, including sufficient details known at the time (identities of parties, the alleged conduct, the date, and the location of the incident, etc.)
- A statement of presumed non-responsibility and that a determination of responsibility will be made at the conclusion of the grievance process
- Information about the party's right to an Advisor
- Information about the party's right to inspect and review evidence
- Any conduct code provision related to making false statements[24]

The Title IX Coordinator is required to send the NOIA immediately, typically, within one (1) business day of receiving a formal complaint but may wait a few days if there is cause to do so, depending on the circumstances.[25] The Title IX Coordinator appoints an investigator or a team of investigators drawn from the administration staff or an external provider. Rarely are School Resource Officers used to investigate claims under Title IX except in a supportive role, because of the potential conflict of interest between investigating both a crime and a potential civil rights violation, simultaneously. Investigators interview witnesses and gather relevant, available evidence.

The investigator typically interviews the Complainant, the Respondent, witnesses to the event itself, and anyone else with potentially relevant information.[26] The Title IX regulations and industry standards reflect several requirements for investigations:

- Ensure the burden of proof and burden of gathering evidence is on the school, not the parties
- Provide an equal opportunity for the parties to present witnesses, including fact and expert witnesses, and other inculpatory and exculpatory evidence
- Refrain from restricting the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence
- Provide notice of the date, time, location, participants, and purpose of all interviews, with sufficient time to prepare
- Provide both parties with an equal opportunity to inspect and review any evidence

---

[24] 34 C.F.R. §106.45(b)(2).
[25] 34 C.F.R. §106.45(b)(2)(i).
[26] These industry standards were reinforced for the District in the Cozen O'Connor report at PAUSD003177. The District had documented problems with conducting appropriate Title IX investigations in the past, *see* PAUSD003168.

- Create an investigation report fairly summarizing relevant evidence[27]

At the conclusion of the investigation, the investigator assembles all the relevant evidence into a draft investigation report and sends it to the parties and Advisors for their review and comment.[28] Schools must permit at least 10 days for review and comment.[29] Once the investigator receives the parties' feedback, the investigator incorporates the feedback, completes any necessary additional interviews, and collects any remaining relevant evidence prior to finalizing the investigation report and sending the final report to the parties.[30]

This duty to investigate is well-understood in the field. The hallmarks of an appropriate investigation include thoroughness, reliability, promptness, impartiality, and fairness. Basic fairness and industry standards require that individuals investigating allegations of sexual misconduct have training to do so. The more serious the allegations and potential consequences, the greater the need for a more robust investigation. Failure to conduct a prompt, thorough, and impartial investigation runs a substantial risk of sexual misconduct going unaddressed and thus allowing a hostile environment to persist. Appropriate investigations do not happen by accident. An investigation consists of fact-gathering, sorting, organizing, and sifting through evidence warranting consideration by the decision-maker. A thorough investigation examines and follows every viable lead, does not cut corners, leaves no relevant stone unturned, and gathers all available evidence. Under industry standards, an investigation involves the active accumulation of relevant and directly related evidence by a trained, neutral, impartial investigator.

A reliable investigation follows policies and procedures that guide the investigation such that no matter how many times investigators perform the investigation, or no matter which investigator performs the investigation, the investigation methodology is materially consistent. Policies and procedures outlining the investigation process increase reliability.

A prompt investigation means that it is performed as soon as is reasonably practicable upon receipt of notice of an alleged violation. Promptness is necessary to ensure memories are fresh and to minimize the disruption to all involved in the process. There is no set timeline for most cases, though a good rule of thumb is to make a good faith effort to resolve matters without undue delay, if possible. At the K-12 level, the industry standard is to aim to resolve allegations within 90-120 days, depending on complexity.[31] Temporary delays are permissible for good cause, but schools must provide written notice to the complainant and the respondent of the delay. Good cause for delays may include the absence of a party or witness, an advisor,

---

[27] 34 C.F.R. §106.45(b)(5).
[28] 34 C.F.R. §106.45(b)(5)(vi).
[29] 34 C.F.R. §106.45(b)(5)(vi).
[30] 34 C.F.R. §106.45(b)(5)(vi).
[31] The District had documented problems with implementing prompt investigations in the past, *see* PAUSD3170.

concurrent law enforcement activity, or accommodation of disabilities.[32] Industry standard practice is to limit delays to a short amount of time, such as a few days or a few weeks, if requested to do so by the parties, their advisors, or law enforcement. However, indefinite or prolonged delays are not the industry standard and run afoul of the regulations and case law. Districts may not abdicate their investigatory responsibilities to law enforcement.[33]

An impartial investigation is unbiased and objective. Investigators must have no actual or perceived conflict of interest and must recognize and neutralize their own biases. An investigator has no "side" in the process, as their north star is the integrity of the process. An impartial investigator does not have a stake in the outcome, only that it is reached in a manner consistent with industry standards and the school's policies, procedures, and the overarching principles of fairness and integrity.

The principles of a fair investigation overlap with those of impartiality, thoroughness, and reliability. A procedurally fair investigation adheres to the school's procedures and guidelines and allows the parties an opportunity to fully address each element of the allegations and provide evidence in support of their position.

*Decision-making Phase*

The decision-making phase begins no fewer than 10 days after the parties receive the final report.[34] In K-12, a hearing is not required by the federal Title IX regulations, and hearings are not industry standard unless suspension or expulsion are contemplated;[35] rather, the decision-maker (an individual or a panel) reviews the investigation report and provides an opportunity for the parties to submit any written, relevant questions for the other party or witnesses, with limited follow-up questions available thereafter.[36] In some states, hearings may be required by law or board policy, but that is not standard across the industry, as it is in higher education.

After reviewing and weighing all the relevant evidence, as well as credibility, the decision-maker then issues a written determination regarding responsibility, applying the standard of evidence. The industry standard is the preponderance of the evidence standard. The written determination has several required elements:

- Description of the allegations
- Description of the procedural steps taken during the grievance process

---

[32] 34 C.F.R. §106.45(b)(1)(v).
[33] See, also, the OCR Resolution Agreement at PAUSD003071.
[34] 34 C.F.R. §106.45(b)(5)(vii).
[35] *Goss v. Lopez*, 419 U.S. 565 (1975).
[36] 34 C.F.R. §106.45(b)(6).

- Findings of fact supporting the determination
- Conclusions regarding the application of the school's code of conduct to the facts
- A statement of, and rationale for, the result as to each allegation, including a responsibility determination, any sanctions, and any remedies
- The school's appeal procedures[37]

The parties receive the written determination simultaneously.[38]

*Appeal Phase*

All parties must have a right to appeal. Typically, schools permit filing appeals within 5-10 days after delivering the written determination to the parties. There are three grounds for appeal that schools must offer:

- Procedural irregularity that affected the outcome of the matter
- New evidence that was not reasonably available at the time the determination regarding responsibility or dismissal was made, that could affect the outcome of the matter
- The Title IX Coordinator, investigator(s), or decision-maker(s) had a conflict of interest or bias for or against complainants or respondents generally or the individual complainant and respondent that affected the outcome of the matter[39]

Schools may include additional grounds for appeal in their policy, too.[40] The school must notify other parties when the school receives an appeal and provides all other parties with an opportunity to respond.[41]

A single appeal decision-maker or a panel determines whether the appeal identifies appropriate grounds and, if so, renders a decision on the appeal. The scope of review is limited to the grounds identified in the appeal and the other parties are entitled to respond to the appeal. Depending on the nature of the appeal, appeal decision-makers may need to meet with or receive statements from any of the parties, the Title IX Coordinator, the investigator, or the decision-maker. The decision-maker must issue a written decision describing the result of the appeal and the rationale, providing the written decision simultaneously to all parties.[42] An appeal decision-maker may reject the appeal, take no action, and finalize the decision, at which point sanctions

---

[37] 34 C.F.R. §106.45(b)(7).
[38] 34 C.F.R. §106.45(b)(7)(iii). The District had documented problems with providing written determinations to the parties, *see* PAUSD 003170.
[39] 34 C.F.R. §106.45(b)(8)(i).
[40] 34 C.F.R. §106.45(b)(8)(ii).
[41] 34 C.F.R. §106.45(b)(8)(iii).
[42] 34 C.F.R. §106.45(b)(8)(iii).

and remedies will take effect.[43] Or, the appeal decision-maker may remand the complaint back for further consideration or action. The industry standard practice is to provide only one appeal opportunity.

As one can see, industry standard practice and the Title IX regulations accord significant rights and protections under Title IX for parties in the grievance process, which is why denying those rights to any party and steering the complaint into a different process is per se retaliatory.

## Brief Summary of the Facts

In January 2022, a former District student alleged that Plaintiff sexually assaulted her during the 2001-2002 school year. The District suspended Plaintiff from his position immediately. A criminal investigation began soon thereafter, resulting in charges and Plaintiff's imprisonment, though the charges were dropped in June 2023.

The District did not permit Plaintiff to return to his position after the charges were dropped. The District eventually hired an external investigator and opened an investigation around August 2023 that was completed in May 2024 when the District determined the allegations were not substantiated because of a lack of evidence. The District assigned Plaintiff a "Teacher on Special Assignment" (TOSA) position for the 2024-2025 school year, and Plaintiff did not return to the classroom until the 2025-2026 school year.

## Discussion and Conclusions

### A. The District failed to adhere to industry standard practices when it retaliated against Plaintiff by failing to use its Title IX process to resolve the sexual assault allegations against Plaintiff.

There is evidence in the record that the District determined that the District's Title IX policy applied. Ms. Vishakan stated that, "the policies since the OCR Resolution…were clear as to how these matters should be handled…it being a prospective Title IX and it should be handled that way."[44] Ms. Vishakan confirmed in her deposition that in February 2022, "the District was

---

[43] 34 C.F.R. §106.45(b)(7)(iii).

[44] Vishakan deposition, page 162. It is notable that Ms. Vishakan was "let go" by the District around August 2022. The District did not provide Ms. Vishakan with any reason for their decision to let her go, but Ms. Vishakan speculated that the reason was because her "work for compliance and following policies and things like that was not welcomed," and that her termination "probably had something to do with" Plaintiff's case. Vishakan deposition, page 160-1. Mr. Bahadursingh reported that Ms. Vishakan was in charge of Title IX for the district, so it is unclear why her determination that the complaint implicated Title IX was seemingly ignored. *See* Bahadursingh deposition at p. 40. Additionally. Mr. Andrade indicated in his deposition that Ms. Gallagher, as Title IX Coordinator, would be responsible for determining whether Title IX applied, but the record does not show that Ms. Gallagher was involved, either. *See* Andrade deposition at p. 31-32.

conducting a Title IX investigation at that point."[45] Dr. Austin later reported that the District had offered the individual making the allegations an opportunity to file a formal complaint.[46] And Mr. Bahadursingh told Plaintiff on January 31, 2022, that the District would be investigating, too, telling Plaintiff to "trust the process."[47]

As referenced above in the industry standard section, if a recipient determined that Title IX applied, using any non-Title IX policy and procedure to resolve allegations of Title IX Sexual Harassment would be retaliation per se if it was done to interfere with an individual's Title IX rights.[48] Plaintiff has Title IX rights, and to deny him those rights by using another process is against industry standard practice. To explore the extent to which the District denied Plaintiff his rights and retaliated against him, an in-depth explanation of Plaintiff's rights in the Title IX process is necessary.

Upon receipt of the report alleging sexual assault – and here it is undisputed in the record that the husband reported to multiple high-level administrators at the District – industry standard practice would be to apply the policy definitions in place at the time of the incident and to apply the procedures in place at the time of the report. In other words, the District should have used the policy language prohibiting sexual assault that was in place in 2001-2002 and resolved the complaint using the regulatory procedures in place in 2022. Failure to do so would be inconsistent with industry standard practice.

In my review of the record, there was little to no evidence that the District implemented its Title IX policy in any meaningful way, which is astounding considering the District's agreement with the Office for Civil Rights in 2017, in which they agreed to use their Title IX policies and procedures for allegations like those brought against Plaintiff.[49] And, furthermore, the District adopted the 2020 Title IX regulations for their District policy, so their failure to adhere to industry standard practice and their OCR agreement also meant they did not follow their own policies. The industry standard section above reads like a list of actions the District did not take

---

[45] Vishakan deposition, page 76.
[46] Exhibit 508.
[47] Colombo deposition, pages 66-67.
[48] 34 C.F.R. §106.71(a).
[49] PAUSD003070. ("if the District is on notice of a factual finding that a District employee engaged in behavior with the student…which constitutes sexual harassment, sexual violence… the District shall investigate under revised policies [5145.7 and 1312.3] and take action…") It is important to note that this Agreement was reached in 2017 and that the Office for Civil Rights monitored PAUSD for "a minimum of three years" following the agreement. At the conclusion of the monitoring period, the District is expected to maintain the practices to which it agreed, unless there is some superseding authority, like a federal regulation, that modifies the agreement. The monitoring period concluding does not mean the District can revert to noncompliant practices. Any argument to that end is not consistent with logic or industry standard practice. Moreover, the Title IX regulations went into effect in August 2020, which codified the same expectations and compliance elements described in the PAUSD 2017 OCR Agreement, further rendering moot any argument that the Agreement's principles no longer applied after the three-year monitoring period expired.

between receipt of the report in January 2022 and the conclusion of their investigation in May 2024:

- Provide notice? No.[50]
- Attempt to interview the Parties and witnesses? No.
- Give the Parties opportunity to gather and present evidence? No.
- Notify the Parties about the right to an Advisor? No.
- Keep the Parties up to date about delays? No.[51]
- Create an investigation report summarizing relevant evidence? No.
- Provide the parties with an opportunity to review and comment on the evidence the District collected? No.
- Provide for a decision-making process in which the decision-maker reviews all relevant evidence and shares a written determination with the Parties? No.
- Share appeal procedures? No.
- Conclude the grievance process in a reasonably prompt manner? No.[52]

And, as discussed previously, when a recipient determines that Title IX applies, the denial of Plaintiff's Title IX rights by failing to follow the appropriate and mandatory grievance process is retaliatory according to industry standards. The District finally opened an investigation after two years of sitting on the original report, only to conclude – after nine additional months of investigating – there was insufficient evidence to sustain a finding that Plaintiff violated District policy.[53] Such inaction is inconsistent with industry standard practice. And the failure to communicate *anything* with Plaintiff during this period of time is also clearly out of step with industry standards.[54]

---

[50] Hickey deposition, Page 17.
[51] Ms. Hickey seemed to have known the process would not be prompt from the start, since she communicated to Plaintiff that the investigations take longer than employees think and, with the District being understaffed, it "wouldn't surprise" her if Plaintiff was out the rest of the year.[51] It turned out to be more than two years before the District's investigation concluded, and more than three years until Plaintiff was returned to the classroom.
[52] PAUSD003139-40 lists the procedural requirements Plaintiff was owed and denied. It is also notable that several of these procedural requirements were included in the Resolution Agreement with the Office for Civil Rights from 2017.
[53] Mr. Bahadursingh defended how long their investigations take, asserting that investigations involve "a lot of people, a lot of questions," though I saw little evidence in the record that the District's investigation talked to anyone or asked any questions. Bahadursingh deposition at p. 131.
[54] Colombo deposition, page 154. It should be noted that the record contains information suggesting that PAUSD had a history of failing to adhere to industry standard practice. In addition to the OCR Agreement in 2017, a 2017 report authored by Cozen O'Connor (PAUSD003147 et. al) reviewed PAUSD's response to a reported Title IX

Interestingly, in her deposition, Ms. Hickey outlined a series of steps she would have taken, as Director of Certificated Human Resources, had she been asked to investigate the allegations against Plaintiff, none of which the District appeared to do at any point.[55] The investigation strategy Ms. Hickey described is largely aligned with industry standard practice, which arguably makes the District's failure to adhere to basic investigatory expectations even more head scratching since they had in-house expertise they chose not to leverage. Ms. Hickey outlined steps like contacting IT to secure data about student registration from 2001-2002, contacting the reporting party to obtain any records like report cards, walking over to the next office and reviewing Plaintiff's personnel files, speaking to their HR data analyst who handled digital recordkeeping, interviewing Plaintiff, and potentially interviewing any other teachers or students depending on their availability.[56] These are all basic elements of any investigation and a core part of industry standard practice, but the District failed to meet that standard.

**<u>Investigations without Complainant Participation</u>**

The Complainant refusing to participate in an investigation would generally not alleviate the District's obligations or the rights owed to Plaintiff. Once the District determined Title IX applied, the District may not resolve Title IX allegations through an alternative process simply because the Complainant did not want to participate. Such action would flout industry standard practice.[57] The District's Title IX obligations "exist regardless of whether the individual who was harassed makes a complaint," or asks the District to act.[58]

Title IX Investigations, especially in K-12, frequently occur without the participation of the Complainant, for a variety of reasons. This is especially the case in situations where, as referenced above, a Title IX Coordinator signs a formal complaint because the allegations involve an employee sexually harassing a student.[59] Mr. Andrade correctly shared a similar sentiment in his deposition when he stated, "the only other context in which the District would initiate an investigation is if Mr. Colombo presented an eminent [*sic*] threat of safety or harm to

---

incident and concluded, "this incident reflects systemic concerns about the application of Title IX and Board policy given our observations about the role of the Title IX Coordinator, the level of supervisor authority exercised, the coordination of information and personnel, and the failure to follow written policies in practice." PAUSD003148-9. Many of the same issues appear to have plagued the District's response to the allegations against Plaintiff, given that the Title IX Coordinator was left out of the loop by the District's legal counsel and the District failed to follow its own written policies.

[55] Hickey deposition, Page 101. Even Ms. Ahern, a PE teacher who does not have a background in investigations, was able to accurately describe some investigatory steps the district could have easily taken. See Ahern deposition at page 66.

[56] Hickey deposition, Page 101-104.

[57] The District would have needed to dismiss the complaint, provided notice, and provided an opportunity to appeal the dismissal decision.

[58] PAUSD003176.

[59] *See, generally,* Policy 5145.71 AR, p.2, par. 2. PAUSD003138.

any of the students at PAUSD."[60] Any reasonable Title IX Coordinator would immediately suspend and investigate out of an abundance of caution to protect the District's students in the event there were other unreported allegations. Industry standard practice in such situations is to move forward with notice and investigating to see what relevant evidence is available.

Mr. Andrade was incorrect when he stated that "it comes down to first what the complaining party would like to do and then coming next to what the assessment [*sic*] of whether or not the conduct that's alleged even falls within the confines of Title IX."[61] Although, yes, the Complainant's wishes are important, the Title IX Coordinator also has a broader obligation to the other students and staff in the District. Recipients cannot simply throw up their hands if a Complainant refuses to participate in the process. Recipients have an obligation to stop, prevent, and remedy for the entire District – and they also have an obligation to accord Respondents their Title IX rights. The District failed to do so and in doing so, failed to adhere to industry standard practices.

**Concurrent Law Enforcement Investigations**

Likewise, recipients may not abdicate their responsibility to investigate simply because there is a concurrent law enforcement investigation ongoing. It is not uncommon for a district to pause its administrative process at the request of police or the request of the Complainant, at least for a week or two until the police finish collecting evidence. Here, the District claimed that the police asked the District to refrain from investigating. But there was no documentation of such a request, and no one could identify to whom the alleged request was made. For example, Dr. Austin reported that Ms. Vishakan received that request, but Ms. Vishakan did not recall a conversation with the police about suspending or delaying any District investigation.[62] Request or not, it is an unquestionable deviation from industry standard practice for a district to step aside and let the police handle a sexual assault for which the district has notice. Indeed, the agreement the District entered into with OCR in 2017 reflects this obligation.[63] And the District entered into a Memorandum of Understanding (MOU) with the City of Palo Alto in 2018 to clarify their obligations, so there should have been no misunderstanding in responding to the

---

[60] Andrade deposition at p. 34. Mr. Andrade's gatekeeping threshold for Title IX complaints involving staff and students is uncharacteristically high for K-12 schools, industry-wide. He discussed the concept of consent when determining whether to investigate a complaint, which is not an industry standard consideration in these situations.

[61] Andrade deposition at p. 35-36.

[62] Austin deposition at p. 43-44; Vishakan deposition at p. 183.

[63] PAUSD003071. ("The District will revise its Memorandum of Understanding (MOU) with the Palo Alto Police Department to clarify the roles and responsibilities of police department and district staff with respect to compliance with Title IX and a safe, nondiscriminatory school environment, including the responsibility of the District's separate obligation to promptly and equitably resolve complaints of sexual harassment *even while a criminal investigation is ongoing.* (emphasis added)")

allegations against the Plaintiff in 2022, merely four years later.[64] Notably, the MOU contained the following language: "An investigation conducted by the PAPD is a separate investigation from PAUSD's Title IX investigation. Investigations may proceed on parallel paths, and involve different professional and legal obligations under federal and state law."[65] The MOU outlines points of contact for each agency, discusses information sharing practices, and states that "the PAPD's investigation will not take the place of a District Title IX investigation."[66] The 2017 report from Cozen O'Connor further underscores this point, demonstrating the District was well aware of its obligations when the allegations surfaced against Plaintiff.[67] Though Mr. Bahadursingh disputed that the Board ratified the MOU, the MOU represented industry standard practice and reflected the principles in the OCR Resolution Agreement and the Cozen O'Connor report, so the District was clearly aware of their deficiencies in this area. Whether the Board officially ratified the MOU is immaterial to whether the District followed industry standard practice or not.[68] But that said, Mr. Bahadursingh's testimony that the District never formally adopted the MOU is very problematic given that revising the MOU was an explicit term of the OCR Resolution Agreement.[69]

Beyond regulatory requirements, there are practical considerations at play, too. What if, as happened in this case, the Plaintiff's arrest did not result in any charges and the Plaintiff returned to work? It would have been imperative for the District to take all measures it could have to ensure that Plaintiff was not a danger to the District's students. And, as happened in this case, the District would surely want a robust investigation to help assuage the concerns of the public about Plaintiff. Dr. Austin's comment during his deposition that "the high stakes nature" of the allegations made a concurrent District investigation "less acceptable" is

---

[64] See PAUSD003081 et. al. The relevant portion begins on PAUSD003092, where the city and the District clarify that "they each have different obligations under state and federal law," and the purpose of the MOU is "to coordinate PAUSD and PAPD processes in response to reported sexual misconduct…to build an understanding between the agencies regarding their respective responsibilities and promote compliance with the numerous state and federal laws….including…Title IX…"

[65] PAUSD003092.

[66] PAUSD003093-4.

[67] PAUSD003152.

[68] Bahadursingh deposition at p. 119. Mr. Andrade explained in his deposition that the MOU would have needed to be updated after the 2020 regulations went into effect. *See* Andrade deposition at p. 64. It is not clear if the update did not take place or if the Board simply did not ratify the update. If the latter, it is not clear from the terms of the MOU whether the District would need to re-ratify the MOU after an update or whether the update would modify the MOU and automatically take effect. Either way, the MOU reflects the 2020 regulations and reflects industry standards for concurrent Title IX/law enforcement investigations, so really any argument that the lack of an MOU absolved the District of their responsibility to investigate is irrelevant to the District's Title IX obligations.

[69] *See* PAUSD003071. ("The District will revise its Memorandum of Understanding (MOU) with the Palo Alto Police Department to clarify the roles and responsibilities of police department and district staff with respect to compliance with Title IX…")

inexplicable, bewildering, and contrary to common sense and industry standard.[70] The chain of events leading to this lawsuit are practically a case study of why the industry practice is for a recipient to implement its grievance process right alongside any law enforcement investigation. Moreover, the standard of evidence is different in criminal cases, as are the evidentiary rules, and the rights of the Parties. There are distinct and important differences between a law enforcement investigation and a Title IX process – and why one does not override the need for the other.

Having a party imprisoned or being subject to criminal investigation can certainly impact, and, in some cases, impede the Title IX process, but the obligation to follow published policy and procedures remains. But there is little evidence in the record that the District attempted any investigation, not only while the law enforcement investigation was active, but for many months afterward.[71]

Indeed, there is significant evidence in the record that the District was more than happy to step aside and deny Plaintiff his rights:

- In the *Unfit to Teach* article, Dr. Austin said, "The new, and unrelated, allegations are a different story. We expect the current allegation from long ago to be presented, heard, and judged in the court of law. Until that happens, unpaid leave is our only option." In fact, unpaid leave was not the District's only option. According to District policy, they had an obligation to investigate the allegations and come to their own determination.
- In the same article, Dr. Austin admitted that "due to the serious and sensitive nature of an allegation from long ago, we followed the request of the Palo Alto Police Department to stand down and allow them to conduct an unobstructed investigation."[72] This was not industry standard practice, did not follow the MOU, and ignored the principles outlined in the OCR Resolution Agreement and Cozen O'Connor report. Additionally, it is not clear whether PAPD made such a request and to whom.
- Austin also disclosed that the district had offered its formal complaint process to the person accusing Plaintiff of sexual assault, but she declined, and, as a result, "there was very little the district could investigate at that time."[73] The District could have and should have investigated the allegations under its policies.

---

[70] Austin deposition at p. 79.
[71] *See* Bahadursingh deposition, p. 83.
[72] Mr. Bahadursingh reported a similar sentiment in his deposition at p. 83.
[73] Exhibit 508.

Given the above, I conclude that the District's lack of an investigation failed to adhere to industry standards and, after determining initially that Title IX applied, their use of any other policy or procedure to resolve the Title IX Sexual Harassment allegations was likely retaliatory.

**B. The District failed to adhere to industry standard practice when it retaliated against Plaintiff by discussing the allegations against him with local newspapers.**

Industry standard practice, stemming from regulatory requirements, requires recipients to maintain confidentiality regarding the identity of a Party to a Title IX process. Failure to do so is retaliation, per se, unless sharing such information falls within narrow exceptions: FERPA, requirements of other laws, or to implement a Title IX grievance process.

After their initial determination that Title IX applied, the District made several public statements that may be considered retaliatory under industry standard practice. In *Unfit to Teach*, Dr. Austin made several comments that ran afoul of industry standard practice. Whereas recipients typically respond, "no comment" regarding allegations or an investigatory process, Dr. Austin provided several quotes.[74] Taken in the context of the larger article being about Plaintiff allegedly sexually assaulting a student, these comments would likely be seen as retaliatory within the field. As would Dr. Austin's comments to Palo Alto Online in an article dated April 25, 2023. These actions are contrary to industry standard practice.

**C. The District failed to adhere to industry standard practices when it did not follow its published policies and procedures and failed to provide the Plaintiff notice or an opportunity to be heard.**

Even if we assume that Title IX was not in play, the District did not use any sort of discernable published policy or process to resolve the allegations against the Plaintiff, which is against industry standards. From my review of the record, Plaintiff was not formally noticed of the allegations under investigation until his attorney received an email from Mr. Willis on January 16, 2024 – almost two years after the allegations surfaced.[75] Providing notice of the charged policy violations and the allegations underlying the investigation is a basic due process right incorporated into any type of policy or procedure designed to resolve complaints in the K-12 field. And, looking at the District's policies, they all include some type of notice. However, Mr. Willis sought to place the allegations outside of the Board's published policies in his email, stating, "While certain board policies may dictate govern [*sic*] certain types of investigations, the District's ability to conduct investigations is not limited to the policies."[76] One wonders what

---

[74] Exhibit 508. Dr. Austin asserted that he was quoted out of context but provided no documentation in support of his claim. *See* Austin deposition at p. 72.
[75] Exhibit 512.
[76] Exhibit 512.

other investigatory authority Mr. Willis is referring to in his email. Mr. Bahadursingh admitted there was not a name for the process they followed regarding the allegations against Plaintiff.[77] And he could not identify the policy authority the District used to place Plaintiff on leave for over a year while the District failed to conduct its own investigation, either.[78] Mr. Willis' and Mr. Bahadursingh's inability to identify a policy mirrors Ms. Miller's assertion that she was not following any Board policies in her investigation and did not know which policy Plaintiff had allegedly violated.[79]

It would be far outside the industry standard for the District to use some nameless unpublished policy or procedure to investigate Plaintiff and possibly strip him of his tenure and position. Such policies are often governed by state law or, in the absence of state law, collectively bargained agreements. And, as demonstrated in the record, the District has well-developed published board policies. In fact, they have so many policies that sometimes it is fairly challenging to discern which policy applies to a set of allegations.[80] Furthermore, Mr. Willis did not even identify which published or unpublished policy was guiding their process, which inhibited my review of it. Based on my review of the record, I do not see much evidence they followed any process, published or unpublished, or provided Plaintiff with a modicum of his rights to receive notice and be heard. The District certainly did not follow its policy titled "Complaints Concerning District Employees" because notice is required within five days or "in accordance with the applicable collective bargaining agreement."[81] Needless to say, it was considerably more than five days for Plaintiff to receive notice.[82] Moreover, under that policy, the complaint should be resolved in 30 calendar days.[83] Instead, the District resolved the complaint in 849 days. The record demonstrates that the District did not follow its Title IX policy, or its employee discipline policy, or some unnamed unpublished policy. In fact, the record demonstrates that the District did not follow any policy, and in doing so failed to meet even the most basic and fundamental industry standards of fairness, due process, the right to notice, and the right to be heard.

## Summary

Based upon a review of the documents provided to me by counsel, within the context of my knowledge and experience in Title IX matters and policy and procedures within the K-12

[77] Bahadursingh deposition, p. 284.
[78] Bahadursingh deposition, p. 165.
[79] Miller deposition, p. 39 and p. 44.
[80] The District provided a helpful chart for navigating their policies, though, at PAUSD3119.
[81] PAUSD003117.
[82] See Colombo deposition, page 316.
[83] PAUSD003118.

field, I can state with a reasonable degree of professional certainty the District failed to follow industry standard practices in responding to the allegations against Plaintiff.

*This report is based on the information reviewed and my experience, training, skill, knowledge, and expertise. There may be subsequent significant and new information that may alter this report. Therefore, I reserve the right to amend, revise, or supplement this report based on the availability of new information.*

Respectfully submitted,



Saundra K. Schuster, Esq.

# CURRICLUM VITA

---

**SAUNDRA K. SCHUSTER, Esq.**
1952 Samada Avenue
Worthington, Ohio 43085
(614) 885-7318

---

## PROFESSIONAL EMPLOYMENT HISTORY

## CURRENT EMPLOYMENT

**TNG: The NCHERM Group, LLC,(NATIONAL CENTER FOR HIGHER EDUCATION RISK MANAGEMENT)**

**Partner, The NCHERM Group, LLC; Founder and Board Member of the National Behavioral Team Association (NaBITA) and the Association of Title IX Administrators (ATIXA)**

NCHERM is a consulting firm dedicated to best practices for campus health and safety. The firm emphasizes best practices for policy, training and educational programming as proactive risk management. NCHERM specializes in advancing culture change strategies and problem solving for colleges and universities. NCHERM offers expertise in: sexual misconduct, campus investigations, judicial panel training, campus behavioral intervention and threat assessment, disruptive students, hazing, sexual harassment, campus alcohol issues, student organization risk management and student suicide.

## EMPLOYMENT HISTORY: LEGAL

**SCHUSTER & CLIFFORD, LLP (2005-2016)**

**Managing Partner**

Law practice devoted to preventive education law, involves providing legal consultation to educational institutions, K-12 schools and school systems and charter schools. Legal services include policy audits, review, development and implementation assistance; delivery of training seminars on legal issues; specifically, tailored training on institutional policies and procedures, including training of internal hearing bodies

**SINCLAIR COMMUNITY COLLEGE**

**General Counsel, Assistant Attorney General State of Ohio, 2005 – 2009**

Responsible for providing legal advice to the College President, Vice Presidents and Board of Trustees and others, as appropriate, on a variety of legal matters including student and employment matters, civil rights issues, intellectual property and technology issues, constitutional law, regulatory matters, construction, real property and local governmental regulation, liability issues, contracts and public records and open meetings laws. Represent the College's legal interests to external agencies, coordinate and supervise assigned special counsel.

- Special expertise in sexual harassment and sexual misconduct issues, liability and risk management matters, public records and FERPA issues
- Expertise in employment law issues, discrimination laws, affirmative action, contracts, and Federal regulations of higher education
- Expertise in matters involving intellectual property, copyright and trademark in public institutions
- Extensive experience in conducting legal risk avoidance training
- Experience with defense of discrimination allegations with OCRC and EEOC
- Training in mediation and other Alternative Dispute Resolution techniques

**OHIO ATTORNEY GENERAL**

**Senior Assistant Attorney General, State of Ohio - Education Section, August 1997- 2005**

Oversee legal matters for state colleges and universities in Ohio. Duties include: providing informal legal opinions and general legal advice to special counsel, in-house counsel and college administrators on a wide range of legal issues including, but not limited to, contracts, affirmative action, conflicts of interest, student affairs, athletics, intellectual property, and employment issues, academic freedom, tenure issues and college/university foundation related matters; providing in-house expertise on campus police, athletics, intellectual property; providing training for and implementation of negotiation and mediation settlement procedures.

- Litigation expertise, including jury trials
- Extensive additional training in mediation and other ADR techniques
- Co-authored amicus brief on behalf of State of Ohio in *Gratz & Hammacher v. Bollinger*, and *Grutter v. Bollinger*, arguing in support of diversity as a compelling governmental interest in higher education
- Conduct presentations and workshops on a wide range of legal issues in

higher education
- Special expertise in Public Records and FERPA issues

**Interim Associate General Counsel, University of Toledo (January- August 2005)**
Provided assistance for the University of Toledo's General Counsel Office for an interim period. Conducted a comprehensive review of their Code of Student Conduct and provided extensive training for faculty, staff and students. Provided assistance with employment related cases.

**Criminal Defense Practicum: Ohio State University, 1997**
Represented clients in Municipal Court who were charged with criminal offenses

**City Attorney's Office: Night Prosecutor Program, 1995-97**
**Hearing Officer/Mediator**
Conducted mediation of criminal complaints

**Office of Legal Affairs: The Ohio State University, 1994-97**
**Legal Intern**
Conducted legal research; conducted analysis of institutional Affirmative Action Programs

**Court of Common Pleas: Domestic and Juvenile Division: Judge Kay Lias**
**Summer Extern Program, 1996**
Conducted legal research, drafted judicial opinions

**Kemp, Schaeffer, Rowe and Lardiere Co., L.P.A.**
**Law Clerk - January 1995 - September 1995**
Conducted general legal research; wrote research memorandum, briefs, pleadings and other legal documents related to litigation

## EMPLOYMENT HISTORY: HIGHER EDUCATION

**THE OHIO STATE UNIVERSITY, OFFICE OF STUDENT LIFE**
**Associate Dean of Students*:* 1989-1997**

(50% time 1994-1997 while attending law school full-time)
Responsibilities included assisting with human, fiscal and space resource management; formulating administrative policy; participating in strategic and long-range planning; coordinating the review and development of university policies, including the *Code of Student Conduct*; participating in student problem solving and crisis management; developing and implementing leadership and management training programs for university staff and students; participating in budget development and management; coordinating staff search systems; participating on various university committees and task forces; serving as liaison with Academic Affairs, the Alumni Association, University Development, college student affairs staff, Campus Ministry, and Athletics.

**Summer Extern Program, 1996**
Conducted legal research, drafted judicial opinions

**Director, Student Development: 1987-1989**
Provided leadership and supervision for Office of Student Development, which included Judicial Affairs, Drug/Alcohol Education, University Mentoring Program, and Forensics Program. Responsibilities included supervision of professional staff and selection, training, and supervision of graduate and undergraduate support staff; oversight of practica students; annual publication of Student Handbook; coordination of orientation programs; creation of peer assistant program for drug and alcohol education and prevention; and developing external grant support. Additional responsibilities include providing institutional consultation regarding student's rights, due process, and grievance procedures; overseeing non-academic judicial systems; and, administering Code of Student Conduct.

**Coordinator of Judicial Affairs: 1983-1987**
Served as the primary institutional hearing officer in non-academic misconduct cases; coordinate judicial panels; conduct training and evaluation of judicial panels; serve as judicial liaison with Residence Life, University Police, the Office of Traffic and Parking, and serve as Student Affairs representative to Academic Misconduct Panel; advise University Court; serve as a resource to Academic departments regarding the Code of Student Conduct.

**Coordinator of Alcohol and Drug Education Program: 1985-1987**

Coordinated the Alcohol Education Program, including chairing the Student Affairs Alcohol and Drug Education Advisory Committee; advising the student group, BACCHUS; providing presentations, workshops and general consultation on topics of alcohol and substance abuse; coordinating the annual National Collegiate Alcohol Awareness Week activities; supervise the Alcohol Education Resource Center; provide information on trends, issues, and concerns relating to alcohol and substance abuse.

**Ohio Board of Regents**
**Consultant: Summer, 1982**

Composed and edited the Ohio College Manual. Conducted research for presentation to the Ohio Legislature regarding funding for international graduate students.

**Miami University, Oxford, Ohio, Office of Learning Assistance**
**Director: 1979-82; Coordinator: 1976-79; Assistant Coordinator: 1974-76**

Charged with creating an office which would administer a University-wide academic assistance program, including centralized tutoring, peer counseling; basic skills evaluation and prescription center, as well as writing, math, study skills and spelling/reading procedures to support this complex program. General responsibilities included administrative leadership, budgetary planning, program development and evaluation, and the generation and presentation of training programs.

**Instructor: Department of Personnel and Guidance, Miami University 1974-82**

EDL 100 (Role of the University in American Life) 1974-82
EDG 211 (Academic Survival Skills) 1980.

**Head Start Program, Preble County, Eaton, Ohio**
**Director: 1973-74**

Responsibilities included administrative leadership of the program, supervision of staff of 15, development of a competency-based teacher training program, grant writing, budget administration, in-service training, and volunteer and staff recruitment and training.

**The Western College, Oxford, Ohio**
**Assistant to Dean of Students: 1972-73**

Responsibilities included assisting with student counseling, housing concerns, and financial aid.

**Miami University, Oxford, Ohio, Department of Residence Life**
**Resident Advisor: 1970-72**

One-year freshman advisor; one-year upper-class advisor. Management of a 370-student housing complex, responsibilities included serving as academic advisor; supervising selection, training and evaluation of student staff; advising hall government, and hall judicial committee; implementation of educational and cultural programming.

## TEACHING EXPERIENCE

**Miami University: Instructor: Department of Personnel and Guidance**

EDL 100 (Role of the University in American Life)
EDG 211 (Academic Survival Skills).

**Ohio State University: Instructor**

Freshman Survey Course
Moritz College of Law – Negotiation Course

**Columbus State Community College: Instructor**

Business Law course

**Wright State University**

Law & Higher Education class

## EDUCATION

**The Moritz College of Law, The Ohio State University -** Columbus, Ohio
**Juris Doctor,** May 1997, Member Ohio Bar, Federal Bar

Chief Justice, Moot Court Governing Board, 1996-97

Honor Council, 1995-96
President, Delta Theta Phi legal fraternity, 1995-96
Representative, NCAA Certification Committee
Taught Negotiation course with William Pitt, Professor of Law, Loyola University

**The Ohio State University -** Columbus, Ohio
**Doctoral Candidate (Ph.D.)** (course work completed)
Higher Education Administration: focus in organizational development; mediation, research techniques

**Miami University -** Oxford, Ohio.
**M.S. Student Personnel & Counseling, B.S. Education**

## EXPERT WITNESS WORK

***McGrath v. Dominican College of Blauvelt***, 672 F. Supp. 2d 477 (S.D.N.Y. 2009) (Plaintiff);

***Pico v. Kamehameha Schools***, Dispute Prevention & Resolution, State of Hawaii (2011) (Plaintiff)

***Ross v. University of Tulsa***, 180 F. Supp. 3d 951 (N.D. Okla. 2016) (Defendant)

***Singh v. University of Pennsylvania and Amazon, Inc***., Court of Common Pleas, Philadelphia County, Penn. 2016 (Plaintiff)

***Burrell v. Florida A & M University***, (U.S. Dist. Ct., N.D. Florida) (Plaintiff)

***Tubbs v. SUNY at Stony Brook***, U.S. Dist. Ct., S. Dist of N.Y. (15 CIV 0517) (Defendant)

***Larios v. Chadron State College and the Board of Trustees of the Nebraska State Colleges***, (U.S. Dist. Ct., Dist. of Nebraska – case settled) (Plaintiff)

***Locklear v. William Patterson University***, (U.S. Dist. Ct., Dist. of New Jersey – case settled) (Plaintiff)

***Lori Stevens v. Brigham Young University-Idaho*** (U.S. Dist. Ct., Dist. of Idaho – case ongoing)(Defendant)

***Doe v. Raleigh Cty Bd. of Education, and Lori M. Knight***, In the Circuit Court of Raleigh County West Virginia – case ongoing)(Plaintiff)

## RELEVANT COMMITTEE/ORGANIZATION INVOLVEMENT:

- Member, American, Ohio and Columbus Bar Associations, Committee on Alternative Dispute Resolution, Education Law Committee
- Association for Student Judicial Affairs (currently Association for Student Conduct Administration) (founding member): National President, 1996; Conference Chair, 1994; Chair, Awards Committee, 1994; Chair, Research Committee 1991, and 1992; Keynote Speaker 1997-2017
- Campus Advisory Board, Avon Foundation for Women & Futures Without Violence, 2011
- Ohio Association of Student Personnel Administrators Conference, Program Committee
- National Association for College and University Attorneys, Program Committee
- National Behavior Intervention Team Association (NABITA- founding member), National President 2011-2013, Advisory Board 2009 to present
- Association of Title IX Administrators (ATIXA-founding member), Advisory Board, 2011-present
- Committee on Campus Security and Right To Know Act, 20 USC 1001 (OSU)
- Chair, Legislative-Judicial Subcommittee of Council on Student Affairs (involving review of recent legislation and case law related to campus discipline) (OSU)
- Chair, Athletic Council Drug Testing Appeal Process (OSU)
- Adviser, Association of Ohio State Class Honoraries (AOSCH) Ohio State University
- Adviser, Chimes Junior Honorary, Ohio State University
- Search Committee, Vice President Human Resources and Relations, Ohio State University
- Vice President's Task Forces on: Drug Free Work Place, Drug Free Schools

- Student Affairs Alcohol and Drug Education Advisory Committee, Chair, Ohio State University
- Chair, Legislative-Judicial Subcommittee of Council on Student Affairs, Ohio State University
- Search Coordinator for five Student Life professional staff positions, Ohio State University
- Chair, Athletic Council Drug Testing Appeal Process, Ohio State University
- Chair, Dean of Student Life Search Committee, Ohio State University
- Chair, Judicial Task Force on Racism, Ohio State University
- Grievance Review Committee, Office of Affirmative Action, Ohio State University
- Representative, NCAA Certification Committee, Ohio State University
- Taught Negotiation course with William Pitt, Professor of Law, Loyola University at Moritz College of Law

## NATIONAL RECOGNITIONS

- Invited Member of the U.S. Dept. of Justice Violence Against Women Panel, 2015
- Consultant to the White House Task Force on Sexual Assault, 2014
- Distinguished Service Award 2007, Association for Student Conduct Administration
- D. Parker Young Award (In Recognition of Outstanding and Ongoing Scholarly and Research Contributions in the area of Higher Education and Student Conduct Administration). Association for Student Conduct Administration, 2014
- Invited panelist for the Futures Without Violence Symposium, 2012
- Consultant for the Office of Violence Against Women, providing national training for grantees

## GRANTS

- *Student Conduct Practice: The Complete Guide for Student Affairs Professionals,* Stylus Publishing, LLC, 2008, contributing author
- *The First Amendment on Campus: A Handbook for College & University Administrators,* NASPA Publishing, 2006, author/editor
- Board of Advisors, Civic Research Institute's *Campus Safety and Student Development Report*
- Grants from U.S. Department of Education for substance abuse prevention; $250,000, Ohio State; $200,000 for Ohio Consortia of State Supported Institutions.
- Federal and State Educational Opportunity Grant (to establish a learning support program for high risk students), Miami University, Oxford, Ohio
- State grant to establish a county-wide Head Start program, Eaton, Ohio

## PUBLICATIONS

- *"The First Amendment on Campus: A Handbook for College & University Administrators",* NASPA Publishing, 2006, author/editor
- *"The History & Evolution of Student Judicial Affairs",* College Associates Publication, co-author
- *"The ATIXA Playbook: Best Practices for the Post Regulatory Era",* 2017, co-author, Sokolow, B.A., Lewis, W.S., Henry, M., Swinton, D.C., Black, N., Morris, L., Oppenheim, A.
- *"The ATIXA Guide to Sanctioning Student Sexual Misconduct Violations",* 2018, co-author, Sololow, B.A., Lewis, W.S., Henry, M., Swinton, D.C., Oppenheim, A.
- *" The ATIXA Rubric for Addressing Campus Sexual Misconduct"* 2017, co-author,

Sokolow, B.A., Lewis, W.S., Henry, M., Swinton, D.C., Black, N., Morris, L., Oppenheim, A.

- *"Due Process and the Sex Police"* 2017, co-author, Sokolow, B.A., Lewis, W.S., Henry, M., Swinton, D.C., Grimmett, J.
- *"Equity is Such a Lonely Word",* 2014, co-author, Sokolow, B.A., Lewis, W.S., Swinton, D.C.
- *"The Seven Deadly Sins of Title IX Investigations",* 2016 Whitepaper, co-author, Sokolow, B.A., Lewis, W.S., Swinton, D.C., Morris, L., Van Brunt, B.
- *"The Challenge of Title IX Responses to Campus Relationship and Intimate Partner Violence",* 2015 Whitepaper, co-author, Sokolow, B.A., Lewis, W.S., Swinton, D.C., Morris, L., Van Brunt, B.
- *"The Crisis of Campus Sexual Violence: Critical Perspectives on Prevention and*
- *"Student Conduct Practice: The Complete Guide for Student Affairs Professionals",* D. Waryold & J. Lancaster, ed., Stylus Publications (2008) contributed chapter on First Amendment
- *"The State of Student Conduct: Current Forces and Future Challenges Revised",* D. W
- *"The State of Student Judicial Affairs: Current Forces and Future Challenges",* publication of the Association for Student Judicial Affairs
- *"The Top Ten Things We Need to Know About Title IX (That the DCL Didn't Tell Us)",* 2013, co-author, Sokolow, B.A., Lewis, W.S., Swinton, D.C., URMIA Journal, 2013
- *"First Amendment & Sexual Harassment: Will Your Policies Hold Up In Court",* 2013, S.K. Schuster
- *"Gamechangers: Changing Title IX Through Litigation"*, 2010, co-author, Sokolow, B.A., Lewis, W.S.
- *"Deliberately Indifferent: Crafting Equitable and Effective Remedial Processes to Address Campus Sexual Violence"*, 2011, co-author, Sokolow, B.A., Lewis, W.S.

- *"Threat, Threat, Threat, Threat, Threat",* 2011, co-author, Sokolow, B.A., Lewis, W.S.
- *"New Challenges to Colleges: Addressing Bullying on Campus",* National Association of Student Personnel Administrators, Leadership Exchange: Solutions for Student Affairs Management
- *"Sexual Harassment and the First Amendment: Will Your Policies Hold Up In Court?"* National Association of Student Personnel Administrators, Leadership Exchange: Solutions for Student Affairs Management
- *"Suicidal Students, Behavioral Intervention Teams, and the Direct Threat Standard"* 2011, University Risk Management and Insurance Association (URMIA) Journal, 2012
- *"The Book on BIT: Forming and Operating Effective Behavioral Intervention Teams on College Campuses"* NaBITA publication 2012, University Risk Management and Insurance Association Journal, 2012,
- *"The Top 10 Things We Need to Know About Title IX (That the DCL Didn't Tell Us)"*, URMIA Journal, 2013
- *"Suicidal Students, BITS, and the Direct Threat Standard*", co-author, B.A. Sokolow, W.S. Lewis, 2012 Whitepaper, published by NaBITA and NCHERM
- "The Developmental Model Code" – Wiki Version, co-authored with J. Lowery, W. Fischer, W.S. Lewis, D.C. Swinton, B. Sokolow, 2013
- Annual Case Law Update 2005-2017 (review of the top court rulings in higher education for the year)
- *"The State of Student Conduct: Current Forces and Future Challenges Revised",* D. Waryold and J. Lancaster, Ed. (2013) contributed chapter on Current Forces
- *"Student Conduct Practice: The Complete Guide for Student Affairs Professionals",* Stylus Publishing, LLC, 2008
- Contributing Author: "*The State of Student Judicial Affairs: Current Forces and Future Challenges", a monograph for the Association for Student Judicial Affairs*", February 1998

## PRESENTATIONS/CONSULTING ACTIVITIES:

*Extensive experience in delivering presentations to groups ranging in size from 25 to several thousand, and audiences as diverse as students to University Counsel and practicing attorneys.*

**I am a professional legal consultant and trainer. I have presented over a thousand programs, one day and multi-day trainings, keynote addresses and featured presentations. A full list of the presentations I have conducted during my professional career will be provided if requested. Examples of the scope of the presentations I have conducted include:**

Civil Rights Investigator Training, Levels I, II, III, IV, delivered to regional groups and nationally (audiences of 50- 500)

Title IX Coordinator Training (4-day Level I, 2-day Levels II, III, IV, V)

504/ADA multi-day training

Annual Case Law Update: The 50 Top Higher Education cases of the previous year, presented since 2005 to the Association of Student Conduct Administrators (ASCA)

Ohio Association of Student Personnel Association: Fall, 1998, 1999 Presentation on Legal Issues in Higher Education

Keynote address: 6th Judicial Circuit meeting: Ohio Supreme Court challenge to FERPA regulations, July 1998

Keynote address: 10th Annual Association of Student Judicial Affairs National Conference, February 1998

Keynote address: Ohio Association of Women in Education: Are We Hiding or Protecting?: The Dilemma Posed by Campus Records Regulations", Nov. 1997

Invited Presentation: NASPA/ACPA National Convention, March,1997; "Computerizing Campus Judicial Systems

Faculty member, National Conference on Legal Issues in Higher Education,

Burlington, Vermont, Oct. 1996

Faculty, Donald D. Gehring Summer Institute on Judicial Affairs, 1993 – 1997, 1999-2017

Faculty member, 15th Annual National Conference on Law and Higher Education, Presented by Stetson College of Law, February 14, 1994

Keynote Addresses, Alpha Lambda Delta/Phi Eta Sigma Honorary and Golden Key Honor Society induction ceremonies

Racial Harassment Presentation "Institutional Responses to Racial Harassment", Sponsored by Miami University and the U.S. Department of Education

Hate Behaviors: "Creating Appropriate Response Systems", presented at the 1991 NASPA Conference, Washington D.C.

Workshop for Ohio Chief Probation Officers

Hazing workshop for Inter-Fraternity Council Presidents and Executive Boards

Seminar for National Association of Accountants on Impact of Time and Stress Management

Keynote Address, John W. Bricker, Sorority Woman of the Year banquet

Leadership Ohio State workshops

Keynote Address, Families & Children Coalition Conference

Keynote address, National Adopt-a-School Conference

Leadership training workshop for student leaders from Ohio State regional campuses

Orientation and Goal Setting retreat for University Staff Advisory Committee

"Time Management for Professionals: Time for your Life", presented to Association of Government Accountants

"Hate Behaviors: Creating Reasonable Responses to Unreasonable Actions", 1991 Association for Student Judicial Affairs Conference, Clearwater, Florida

"Creating a State-Wide Consortia for Substance Abuse", presented at the FIPSE Conference, Washington, D.C.

"Hate Behaviors: Creating Reasonable Responses to Unreasonable Actions", 1990 Southern Association of College Student Affairs, Savannah, Georgia

"Considerations When Changing Your Code of Student Conduct", presented at 1990 Association for Student Judicial Affairs Conference

Keynote speaker, Ohio Staters, Inc. Conference for regional transfer students

Workshops on Race Relations and Discriminatory Harassment for University College (UVC 100) Classes

"Hazing" workshop for Inter-Fraternity Council Presidents and Executive Boards

"Substance Abuse: National Trends", presented to the College of Nursing

Keynote, the Tri-State BACCHUS Conference

"Diversity and Institutional Racism", presented at Greek Leadership Conference

Radio Talk Show on Student Activism (WCKK)

Orientation Programs representing Student Affairs

Panel on Mentoring for 4th Annual University College Conference on Academic Advising

Retention and Diversity Workshop - Student Financial Aid Office

"Decideaphobia--Is This You?", Leadership presentation for The Ohio State University Student Alumni Council

"How-To's of Programming", presented to Wittenberg University Greek Leadership Conference

"Developmental Discipline--Implications for Greek Leadership", presented to Greek Leadership Conference, Otterbein College

Consultant for Battelle Institute Research Office, including organizational analysis

Consultant for Borden's, including organizational analysis and program development

"Coping with Academics: Is Developmental Education the Answer?", presented to American Personnel and Guidance Association, Washington, D.C.

## <u>COMMUNITY/VOLUNTEER ACTIVITIES:</u>

- Member, Board of Trustees, Columbus College of Art & Design, Chair Student Affairs Committee, Board Secretary (2015- Present)
- Leadership Roundtable, Worthington
- Worthington Zoning Commission
- Community Crime Patrol, Board of Directors, President (2008-Present)
- Alliance for Quality Education, Trustee
- Community Coordinating Board, Worthington, President,
- TWIG 149, Children's Hospital, President,

# ATTACHMENT 1B

Mark C. Alifano
3421 Kensington Court, El Dorado Hills, CA 95762
markalifano@gmail.com 650.773.0393

Expert Case Review –

Investigative Handling of Allegations Against Peter Colombo

## Introduction

I am submitting this case review regarding the investigative handling of allegations made against Mr. Peter Colombo, a current teacher at the Palo Alto Unified School District (PAUSD), relating to an alleged sexual assault that occurred during the 2001–2002 school year.

This matter involves serious allegations against an employee that resulted in both criminal and administrative investigations. After reviewing all records, depositions, communications, and exhibits related to the case, it is my professional opinion that the investigations were deficient in multiple respects, unreasonably delayed, and failed to meet the standards required to ensure a fair process under both Title IX and law enforcement best practices.

The purpose of a Title IX investigation is to ensure fairness and protection for both the claimant and the accused. In this case, that purpose was compromised repeatedly, resulting in significant prejudice against Mr. Colombo.

## Expert Qualifications

My name is Mark Alifano. I have approximately 22 years of law enforcement experience, retiring in July 2025, as a Detective Sergeant. In that capacity I supervised investigators and personally investigated thousands of serious felony crimes, including homicides, sexual assaults, crimes against persons, and property crimes.

Of those years, approximately 12 were served as a Detective and 2.5 as a Detective Sergeant. My experience spans investigations of crimes against persons, specializing in homicides, sexual assaults, serious felonies, and assaults involving the use of violence or coercion.

I have supervised numerous complex investigations requiring:

- Evidence collection, including documentary and electronic evidence.
- Interviewing victims, witnesses, and suspects.
- Collaborating with other law enforcement agencies and administrative bodies.
- Conducting thorough reviews of investigative reports.
- Providing expert testimony and written opinions in both civil and criminal proceedings.

I have also overseen investigations involving sensitive allegations of sexual assault within institutional settings, requiring careful compliance with federal, state, and local protocols, including Title IX obligations.

I have not previously provided expert witness testimony outside my official employment in law enforcement.

Mark C. Alifano
3421 Kensington Court, El Dorado Hills, CA 95762
markalifano@gmail.com 650.773.0393

## Detailed Observations and Opinions

### 1. Timeline and Investigation Failures

- January 28, 2022 – Initial Title IX complaint surfaced.
- January 31, 2022 – May 28, 2024 – Title IX investigation assigned by PAUSD. Mr. Colombo was told he could "trust the process" (Exhibit 25).
- Shortly thereafter, the investigation was canceled without notice to Colombo (Vishakan Depo., Exhibit 1; Hickey Depo., Exhibit 2; Hickey Notes, Exhibit 11; Hickey Emails, Exhibit 125).
- No documentation exists supporting a delay request from PAPD; best practices allow only 10–14 days for law enforcement priority. Yet the district delayed nearly 2.5 years (OCR Resolution Agreement, Exhibit 2).
- April 15, 2022 – Detective Franco-Clausen submitted a report to the DA (Exhibit 27), creating an opportunity for PAUSD to conduct its internal review, which was not taken.
- June 9, 2022 – Colombo requested confirmation of his 2001–2002 teaching assignment. That request was ignored despite corroborating emails from Thomas Kelly (Exhibits 43–45).

### 2. Witness Interviews and Procedural Deviations

- All accuser interviews were conducted by phone, not in person, contrary to Santa Clara County sexual assault protocol (Exhibits 26, 27, 37).
- Detective Franco-Clausen failed to employ standard investigative methods such as pretext calls or interviewing fresh complaint witnesses/family members (Exhibit 37).
- Key PE teachers present during the alleged time — Ahern, Naylor, and Becker — were not interviewed despite being available. Their sworn declarations later confirmed the locker room was constantly supervised and the assault allegation was impossible (Exhibits 48–50).
- Cindi Ahern (Exhibit 3; Exhibit 49) testified she shared the same schedule with Colombo, directly supervised locker rooms, and called the allegation "false and fake news." She further stated: *"I find it very upsetting that a rape report was even filed and not investigated properly ... If it was a true investigation, they would be checking everybody, everything ... I was never asked."*

### 3. Documentary Evidence Failures

- The accuser's 6th grade student record was missing; PAUSD failed to produce it despite multiple requests (Ruth Jang Declaration, Exhibit 36).
- Journalist Zoe Morgan corresponded with ADA Meeker about this missing record, confirming prosecutorial concern (Exhibit 34).
- Instead, the student's 5th grade record was transmitted to law enforcement, creating further error (Exhibit 60).
- These failures violated PAUSD Board Policy 5125 BP and AR 5125 AR regarding student record retention (Exhibit 6).

Mark C. Alifano
3421 Kensington Court, El Dorado Hills, CA 95762
markalifano@gmail.com 650.773.0393

4. Administrative Oversight and Missed Witnesses

- District leaders (Hickey, Vishakan, Austin, Bahadursingh) failed to provide witness information to investigators (Exhibits 1, 2, 32, 67).
- Ahern deposition reiterated investigators never contacted her or other teachers present, despite their unique ability to confirm or deny the accuser's claims (Exhibit 3; Exhibit 49).
- Ahern also testified that a proper investigation would have checked schedules, contract PE rosters, and pool supervision logs — none of which were done.

5. Testimony Highlights and Admissions

Nicole Miller (Investigator, Exhibit 31)

- Miller acknowledged she found no corroborating evidence and that the accuser's claims lacked inherent plausibility (Miller Depo., pp. 59–60).
- She confirmed no prior misconduct existed and no physical evidence supported the allegations (Miller Depo., p. 60).
- Miller admitted her report was withheld from Colombo, produced only to district counsel, undermining transparency (Miller Depo., pp. 81–83).
- She noted it was "very unusual" that PAPD relied on phone interviews instead of in-person meetings for such a serious allegation (Miller Depo., pp. 93–94).
- She confirmed poor communication with PAUSD administrators and PAPD, including unanswered requests about the accuser's credibility and refusal to provide her information about the MOU (Miller Depo., pp. 93–97).

Don Austin (Superintendent, Exhibit 32)

- Testified: *"There are members of the community who are willing to ruin a man's life to advance their own agenda."* He characterized this as part of an *"unconscionable common plan to sponsor malicious prosecution"*(Austin Depo., Exhibit 32).
- Publicly stated Colombo was removed "for the protection of students" immediately upon allegations, contradicting Title IX's requirement of impartial fact-finding before interim measures (Miller Depo., pp. 64–65; Exhibit 31).

Komey Vishakan (Former General Counsel, Exhibit 1)

- Confirmed she assigned the Title IX investigator but canceled the investigation without notice to Colombo (Exhibit 1).
- Acknowledged PAUSD's duty under the OCR Resolution Agreement (Exhibit 2), yet delayed investigations contrary to established timelines.
- Confirmed receipt of Detective Franco-Clausen's evidence requests but failed to ensure student records and other materials were preserved (Exhibits 28–29, 36).
- Admitted oversight deficiencies in both monitoring PAPD's handling of the case and ensuring PAUSD policies were followed (Exhibit 1).

Mark C. Alifano
3421 Kensington Court, El Dorado Hills, CA 95762
markalifano@gmail.com 650.773.0393

## Criminal Proceedings Outcome

- March 2023 – At preliminary hearing, Colombo was "held to answer" (Exhibit 123).
- April/May 2023 – The District Attorney dismissed all charges due to lack of evidence (Exhibit 34).
- Dismissal confirms that the case lacked sufficient corroboration despite nearly 15 months of exposure to criminal prosecution.

## Administrative Investigation Outcome

- September 2023 – PAUSD resumed investigation, assigning Nicole Miller.
- Only Colombo was interviewed (Exhibit 107). No corroborating staff were interviewed despite availability.
- May 24, 2024 – PAUSD issued a letter of findings (Exhibit 109). Findings relied on incomplete data, disregarded declarations from locker room supervisors, and failed to resolve exculpatory contradictions.

## Conclusion

The investigations by both the Palo Alto Police Department and PAUSD were procedurally deficient, unreasonably delayed, and failed to meet the minimum standards of fairness required under Title IX and law enforcement best practices.

- Criminally, Detective Franco-Clausen failed to use established methods like pretext calls or prompt interviews of fresh complaint witnesses, undermining credibility assessment and evidence gathering.
- Administratively, PAUSD's cancellations, failure to notify Colombo, disregard for record retention obligations, and omission of key witnesses represent violations of investigative integrity.
- Leadership and Counsel admitted under oath that community bias, poor communication, and disregard of OCR obligations all contributed to a process that was neither impartial nor fair.

The cumulative effect was a wrongful prosecution, reputational harm, and professional damage to Colombo that could have been avoided with timely, thorough, and fair investigation.

My above opinions are stated and based on my experience and training, applicable standards of investigation integrity, and review of materials. The foregoing I state under penalty of perjury under the laws of the State of California and the United States of America.

Signed,

Mark Alifano
Date: 09/22/2025

Mark C. Alifano
3421 Kensington Court, El Dorado Hills, CA 95762
markalifano@gmail.com 650.773.0393

**Exhibit Appendix**

1. Exhibit 1 – Deposition of Komathy Vishakan
2. Exhibit 2 – OCR Audit Resolution Agreement between PAUSD and the Department of Education Office of Civil Rights
3. Exhibit 3 – Deposition of Cindi Durchslag Ahern
4. Exhibit 6 – PAUSD Board Policy 5125 BP and AR 5125 AR regarding student record retention
5. Exhibit 11 – Hickey Notes
6. Exhibit 25 – Emails referencing Colombo being told to "trust the process"
7. Exhibit 26 – Title IX/PAUSD procedural records regarding interviews
8. Exhibit 27 – 4/15/2025 Emails Re Case Submitted to DA on 4/14/2025
9. Exhibit 29 – PAPD/PAUSD correspondence (Detective Clausen to Vishakan)
10. Exhibit 32 – Deposition of Superintendent Don Austin
11. Exhibit 34 – Zoe Morgan email correspondence with ADA Meeker regarding missing records
12. Exhibit 36 – Declaration of Ruth Jang (Data Secretary, PAUSD records retention)
13. Exhibit 37 – Detective Franco-Clausen investigative file/protocol review
14. Exhibit 38 – PAPD Press Release regarding collaborative PAPD/PAUSD investigation
15. Exhibit 43–45 – Emails from Thomas Kelly confirming Colombo's teaching assignment in 2001–2002
16. Exhibit 46 – Palo Alto Daily article regarding Terman reopening (2001–2002 with 6th graders only)
17. Exhibit 48 – Declaration of Jill Naylor
18. Exhibit 49 – Declaration of Cindi Ahern
19. Exhibit 50 – Declaration of Aimee Becker
20. Exhibit 60 – Transmission of accuser's 5th grade file (instead of 6th grade file) to law enforcement
21. Exhibit 67 – Emails between Superintendent Don Austin and Deputy Superintendent Trent Bahadursingh regarding press release and collaboration
22. Exhibit 107 – Miller's administrative investigation file/interview notes
23. Exhibit 108/108A – Declaration of Deputy Superintendent Bahadursingh
24. Exhibit 109 – PAUSD Letter of Findings (May 24, 2024)
25. Exhibit 123 – Preliminary Hearing Transcript
26. Exhibit 123A – Excerpt of Preliminary Hearing Transcript (Giordano identification testimony)
27. Exhibit 125 – Lisa Hickey emails (reverse chronological, 2022–2023)
28. Exhibit 126 – Deposition of Komathy Vishakan (additional pages re: Title IX investigator assignment)
29. Exhibit 128/128A – Deposition of Cindi Ahern (full and excerpted portions)
30. Exhibit 139/113A – Detective Franco-Clausen police report excerpts re: missing student record
31. Deposition Transcript of Nicole Miller
32. Deposition Transcript of Don Austin

Mark C. Alifano
3421 Kensington Court, El Dorado Hills, CA 95762
markalifano@gmail.com 650.773.0393

**Addendum to Report of Mark Alifano**

The opinions and conclusions stated in my Report are based on my extensive and relevant experience, education, knowledge, and training. The purpose of this addendum is to place into proper context the documents being produced in response to Defendants' demand for me to produce documents that might support my opinions relating to certain policies and practices. Not all policies or practices are written, and the documents that are being produced support the legal requirements, practicality and even common-sense underlying policies and procedures relevant to my opinions.

**Fair process under both Title IX and law enforcement best practices.**

1. 34 Code of Federal Regulations §106.45, cited by Ms. Schuster. Under Title IX regulations, a prompt and equitable resolution is mandatory. Parties must be treated equitably. The respondent must be presumed to not be responsible (presumption of innocence). Prompt timeframes for completion of the entire grievance process is mandated. Reasonable steps are to be taken to protect privacy of all parties. Objective evaluation of all relevant evidence is necessary. A complaint investigation is supposed to be adequately thorough, reliable and impartial with specific forms of due process provided to the respondent.

2. Article 1, California Constitution, Declaration of Rights. Similar to the United States Constitution and mandates due process, or fairness.

3. Palo Alto Police Department Policy Manual (08/22/2025). Page 18, under the Organizational Structure and Responsibility section, "Enforce City and Department rules, regulations, policies and procedures consistently and fairly" and "Be fair and consistent in decision making and in dealing with all people."

4. State of California Commission on Peace Officer Standards and Training, as well as Police Policies and Procedures from other counties neighboring Santa Clara County, contain very similar protections to ensure a fair process, which was not provided in this case.

I am aware of no documents, and my research located no documents, that would support the viewpoint that an unfair process, similar to what took place in this case, would be proper. Indeed, such unfair policies and procedures, are contrary to our laws.

**Best practices for the timing of an Admin/Title IX investigation with a criminal investigation.**

Mark C. Alifano
3421 Kensington Court, El Dorado Hills, CA 95762
markalifano@gmail.com 650.773.0393

1. San Mateo County Office of Education- Student Sexual Abuse Response Guidelines for San Mateo County Schools and Law Enforcement (2023-24). Page 6, explains while Title IX requires schools to conduct their own investigations, the U.S. Department of Education's Office for Civil Rights has explicitly recognized that schools "may need to temporarily delay the fact-finding portion of a Title IX investigation while law enforcement is gathering evidence." This delay is expected to be "brief, approximately 3–10 calendar days, though OCR has recognized that the evidence gathering process may be longer," and it is "recommended that a school temporarily delay the initiation of its investigation to allow law enforcement to engage in the evidence gathering process of their criminal investigation"

2. Department of Education, Office of Civil Rights Questions and Answers (2014). Starting on page 24, reiterates the requirements to be fair, thorough, impartial and prompt. Page 28 prohibits waiting to conduct a Title IX investigation until after completion of a related criminal investigation or criminal proceeding, but may allow a brief delay at the request of police. It specifically references that the schools should have an MOU with law enforcement, which PAUSD had but appears to have ignored.

3 . Department of Education, Office of Civil Rights Questions and Answers (2021-2022). Fairness is again reiterated. Time frames for resolving a claim of sexual harassment/sexual assault as discussed on pages 20 and 21, include the same 60-day limit set forth in the OCR documents, Board policies and MOU that were in place in this case, but were apparently ignored. On page 21, this documents expressly states that a temporary delay or limited extension of the 60-day timeframe might be allowed for concurrent law enforcement activity.

As with my opinions regarding requirements of due process and a fair process being required, my research located no documents that would support the viewpoint that the delay by Defendants would be deemed appropriate by any authoritative source. Indeed, anything other than "a brief delay" such as the approximate 10-day to 14-day delay discussed in my opinions was not supported by any of the research I conducted for documents that Defendants sought.

**Law Enforcement training, best practices, and policies & procedures for investigations of sexual assault/abuse.**

1. California Commission on Peace Officer Standards and Training-Adult/Adolescent Sexual Assault Investigation – Guideline 14, page 29. "Law enforcement should be familiar with the use of pretext telephone calls as an investigative tool. A pretext telephone call is a recorded telephone call between the

Mark C. Alifano
3421 Kensington Court, El Dorado Hills, CA 95762
markalifano@gmail.com 650.773.0393

victim and the suspect. The purpose is to elicit incriminating statements from the suspect… This is a particularly valuable investigative tool in cases where the suspect and victim are acquainted." This valuable investigative tool was not utilized, nor was a pretext text message attempt made.

2. California Commission on Peace Officer Standards and Training-Adult/Adolescent Sexual Assault Investigation – Guideline 15, page 31. In summary, the guideline directs the investigator to determine interview order, each witness's source of knowledge, relationship to victim/suspect, developmental/functional level, and motivation; separate witnesses to avoid statement contamination; fully identify witnesses and gather multiple contact methods; be aware of cultural differences; set expectations about the process; and anticipate a range of emotional/behavioral responses. In this case, rather than prioritizing the witness' source or depth of knowledge of the incident and possible statement contamination, the detective advised the victim to contact possible witnesses to advise them of the criminal investigation and upcoming contact with the detective.

The other authoritative sources discussed above also support the opinions provided in my Report.

I am aware of no policies or procedures, and was unable to find any, that would support the administrative failures by the District's leadership and counsel that, in my opinion, led directly to a wrongful prosecution of Mr. Colombo.

The foregoing is stated under penalty of perjury under the Laws of California and the United States of America.

Signed,



Mark Alifano

Mark C. Alifano
3421 Kensington Court, El Dorado Hills, CA 95762
markalifano@gmail.com 650.773.0393

**Addendum Source List**

1. 2013 San Mateo County Children's Sexual Abuse Protocol
2. 2020 San Mateo County Child and Adolescent Sexual Abuse and Assault Multidisciplinary Team Protocol
3. 2018 Student Sexual Abuse Response Guidelines for San Mateo County Schools and Law Enforcement
4. 2025 San Mateo County Child and Adolescent Sexual Assault and Abuse Multidisciplinary Team Protocol
5. 2023-24 San Mateo County Office of Education/Coalition for Safe Schools & Communities Student Sexual Abuse Response Guidelines for San Mateo County Schools and Law Enforcement
6. 2023 Santa Clara County Child Abuse Protocol for Law Enforcement
7. 2019 Santa Clara County Sexual Assault Protocol
8. 2018-25 San Mateo County Adult Sexual Assault Protocol Quick Guide (Page 1)
9. 2018-25 San Mateo County Adult Sexual Assault Protocol Quick Guide (Page 2)
10. 2020 San Mateo County Child/Adolescent Sexual Abuse Quick Guide
11. 2021 California Commission on POST, "Adult/Adolescent Sexual Assault Investigation"
12. 2025 San Mateo County Child and Adolescent Sexual Assault and Abuse Multidisciplinary Team Protocol
13. 
14. 2025 The State of California Commission on Peace Officer Standards and Training-LD 00-Becoming an exemplary peace officer.
15. 2025 The State of California Commission on Peace Officer Standards and Training- LD 01-Leadership, professionalism, and ethics.

**Mark Alifano**
3421 Kensington Court | El Dorado Hills, CA 95762
Phone: 650.773.0393 | Email: markalifano@gmail.com

## Professional Summary

Accomplished law enforcement professional with over 22+ years of experience in supervision, patrol, criminal investigations, SWAT operations, and specialized task forces as an officer, detective (12+ years) and sergeant. Recognized gang and narcotics expert witness in San Mateo County Superior Courts. Proven leadership as a Sergeant, Field Training Officer, SWAT TEAM Leader/Instructor, and mentor. Committed to public safety, threat assessment, and operational excellence, with a prior management background in the high-technology sector.

## Education

**Bachelor of Science – Business Management**
University of Phoenix | June 2002 – July 2005

## Professional Experience

**Redwood City Police Department — Redwood City, CA**
**Sergeant / Police Officer / Detective** | July 2006 – July 2025

**Investigations & Task Force Work**

- Investigations Sergeant (2022-2025)
- Permanent Detective, specializing in property crimes, crimes against persons, sexual assaults, crimes involving force or violence, and gang suppression.
- Investigator, County Major Crimes Task Force (including homicide investigations).
- OICI County Team Member and School/Workplace Threat Assessment Team Member.
- Recognized gang and narcotics expert, testified in San Mateo County Superior Courts.

**Patrol & Specialized Assignments**

- Patrol Sergeant (2019-2022)
- Field Training Officer (Patrol) and RIMS Trainer/Committee Member.
- Patrol Officer and Downtown Theatre District Beat Officer.
- San Mateo Gang Task Force Officer/Detective for summer deployments (2009–2012).
- Field Evidence Technician and EVOC Instructor.

### SWAT & Tactical Operations

- SWAT Team Leader (2019-2025)
- SWAT Operator / Distraction Device Instructor (since 2008).
- Competitor in *Best in the West* SWAT Team Competition (2010–2013).
- Competitor in *Urban Shield* SWAT Team Competition (2011–2017).

### Leadership & Mentoring

- Patrol and Investigations Sergeant
- Former RPCD Recruiting Team Member and Trainee Mentor.
- Physical Training volunteer at the Police Academy – College of San Mateo.

### Awards & Distinctions

- 2019 Medal of Valor Award.
- 2017 Police Office of the Year.
- 2013/14/17/21/22/23 Outstanding Duty Awards – Investigations Bureau & Patrol.
- Avoid the 23 Pin Award (2008–2010) for DUI enforcement (12+ arrests annually).

---

## Specialized Law Enforcement Training

### Investigations & Threat Assessment

- PORAC Internal Affairs Training – 24 hrs (12/2018)
- Association of Threat Assessment Professionals – Boise, 40 hrs (06/2018) & Los Angeles, 40 hrs (08/2016)
- Officer Involved Critical Incident Training – 8 hrs (05/2015)
- School/Community Threat Assessment – 24 hrs (10/2013)
- Assessing Threats/Workplace Violence Risk (WAVR-21) – 8 hrs (08/2013)

### Tactical & SWAT Operations

- CATO Tactical Conference – 40 hrs (09/2015)
- SWAT Vehicle Operators Course – 8 hrs (07/2014)
- Distraction Device Instructor – 8 hrs (07/2013)
- SSI-MACTAC Active Shooter Course – 16 hrs (06/2013)
- Basic SWAT School – 80 hrs (11/2008)
- *Best in the West* & *Urban Shield* SWAT Competitions

### Narcotics, Gangs & Surveillance

- DOJ Wiretap Certification Course – 8 hrs (02/2011)
- Narcotics Task Force Two-Week Training – 40 hrs (08/2010)

- San Mateo GIU/GTF Training – multiple courses, 2009–2015
- California Gang Investigators Association Conference – 40 hrs (08/2011)
- SJPD Basic Surveillance Course – 40 hrs (02/2012)
- Asset Forfeiture Training – 8 hrs (09/2011)

**Driving & Field Operations**

- EVOC Instructor School – 80 hrs (08/2010)
- POST EVOC Driver Awareness Instructor Course – 24 hrs (02/2012)
- Field Training Officer Course – 40 hrs (07/2014)
- Field Evidence Technician School – 80 hrs (01/2009)
- Carbine/M4 Rifle School – 24 hrs (03/2009)
- DWI/Standardized Field Sobriety Test – 24 hrs (08/2009)

**Additional Law Enforcement Certifications**

- POST ICI Core Investigators Course – 80 hrs (12/2011)
- Law Enforcement Spanish Certification (11/2011)
- Prop 69 DNA Update Training – 8 hrs (05/2008)
- POST Basic Police Academy – 880 hrs (08/2002)

---

# Core Competencies

- Criminal & Gang Investigations
- SWAT / Tactical Operations
- Threat Assessment & Risk Management
- Expert Witness Testimony
- Field Training & Instructor Development
- Evidence Collection & Forensics
- Leadership & Team Supervision
- High-Technology Sales & Client Relations

# ATTACHMENT 1C

EXPERT WITNESS TESTIMONY: INVESTIGATION OF MR. PETER COLOMBO

**Qualifications and Role**

My name is Ken Whittemore, and I have been retained to provide an expert opinion on the human resources practices and procedures followed by the Palo Alto Unified School District (PAUSD) in the investigation of Mr. Peter Colombo. My expertise is in human resources leadership, specifically within educational settings, and I have over 18 years of experience in conducting and overseeing internal investigations, ensuring compliance with state and federal regulations, and managing employee relations.

I have reviewed the documents provided (a complete list of materials reviewed is included with these materials), including depositions, policies, and correspondence related to the case. My testimony will address areas where PAUSD's actions, or lack thereof, deviated from established policies, regulations, and standard human resources practices applicable to any reasonable, competent school district administrator with supervisorial responsibilities over human resources functions, thereby potentially exposing the district and/or district administrators to liability.

**Failure to Adhere to Policies and Regulations**

PAUSD has a documented history of findings against them by the Department of Education Office of Civil Rights (OCR), which resulted in mandatory revisions to their administrative policies and regulations, particularly concerning Title IX issues. This history underscores the critical importance of strict adherence to these policies to prevent further liability.

Based on my review, there is no evidence that PAUSD immediately followed its own regulations and policies upon being notified of the allegations against Mr. Colombo. The evidence does not show that Mr. Colombo was provided the appropriate formal letters as required by district policy.

The purpose of these policies is to **protect the district from liability**. Failing to follow them places the district at risk of litigation and diverts resources from their intended use - educating students - to defending actions that could have been avoided.

A uniform complaint could have been filed against the district for its failure to follow its own regulations, which would have placed PAUSD in a difficult position to defend.

**Inadequate Investigation and Evidence Management**

The investigation conducted by PAUSD was deficient in several key areas. A thorough investigation should have included:

- **Student and Teacher Records:** State law requires that student records be maintained in perpetuity. The inability to produce key student records in this case is highly questionable and legally problematic. Additionally, there is a notable absence of teacher records, schedules, and maps of the campus that could have clarified the timeline and location of the alleged incident.

- **Teacher Interviews:** A comprehensive investigation would have involved interviewing Mr. Colombo's colleagues, such as the other PE teachers, who could have provided valuable context. The fact that at least one teacher's deposition stated the alleged incident couldn't have occurred in that location suggests a critical gap in the initial investigation. This lack of due diligence deprived the district of information that could have led to more detailed investigation findings and a just outcome.

- **Evidence Gathering:** The investigation by the district did not begin the first workday they were made aware of the allegations against Mr. Colombo. There was not an effort to immediately gather information and properly categorize it. Information that could lead to the search for the truth was not collected, preserved and made available for law enforcement and district investigations.

- **Assumption of Innocence or Non-responsibility in the Investigation:** From the evidence provided, it is my opinion Mr. Colombo was not provided with the assumption of innocence or non-responsibility, as required to stay in accordance with Board Policy. There is a public comment reported in the newspaper that the District is going to do a deeper investigation after the District Attorney dropped the criminal charges. In my experience, districts and superintendents avoid making any non-neutral comments regarding an accused employee or student involved in an ongoing investigation. The comments made by the superintendent, and behavior of the investigation, did not center around the truth, but appears to stigmatize Mr. Colombo and imply his guilt.

**Improper Reporting to the California Teaching Commission (CTC)**

In reviewing the deposition of Ms. Hickey, it is highly concerning that she reported Mr. Colombo to the California Teaching Commission (CTC) for unprofessional conduct without being in full control of the investigative file. In my professional experience, reporting an employee to the CTC is a grave action that can effectively end a person's career. The individual making the report is professionally and ethically obligated to have complete knowledge of the investigation's findings. To rely solely on a police report or information from a third party is an unacceptable deviation from standard human resources practice.

An HR leader must be the custodian of the district's investigation and the evidence supporting any claim submitted to the CTC. Ms. Hickey's statement that she "did not have the investigation" and was "not in control of the investigation" is a clear failure of this responsibility. The egregiousness of these failings is magnified because AB 2534 requires provision of the report to CTC to any potential public school employer where Mr. Colombo might apply for work as a teacher in the future, either long-term or as a substitute. Since the alleged claim involves a disqualifying offense of sexual assault, it is my opinion that no other district or school would seriously consider employing Mr. Colombo even though there is no evidence to substantiate the claim made against him.

**Mismanagement of the Investigation and Lack of Transparency**

PAUSD's decision to hand the investigation over to outside counsel did not absolve the district of its core responsibilities. As the district representative, PAUSD remained responsible for all procedural paperwork, including providing the required letters to the complainant and the respondent. The district is the ultimate custodian of the investigation documentation, not outside counsel. The lack of evidence that PAUSD fulfilled these duties demonstrates a systemic breakdown in procedural oversight.

Additionally, there was a significant lack of transparency both in providing evidence to the Palo Alto Police Department and in the process itself.

Ms. Hickey's admission that she had information that could have been beneficial to Mr. Colombo but did not pass it on is a seriously egregious, reckless lapse in judgment and a violation of the fundamental HR principle to seek the truth, not to take sides. Any information that could have positively or negatively affected the investigation should have been immediately shared with law enforcement and any district investigator.

From January 31, 2022 through April 26, 2022 (and even through May 19, 2022), Ms. Hickey, Mr. Bahadursingh and others represented to Mr. Colombo and his union attorneys that the district's investigation was taking place concurrent with the police investigation and told Mr. Colombo to provide any evidence or information to them and they would forward it to the investigators. In actuality, no such district investigation was taking place or, alternatively, the results of that investigation have been concealed. Either way, when Mr. Colombo provided potentially exculpatory information and evidence that might have exonerated him, or at least delayed or prevented his arrest, the information and evidence was suppressed and was intentionally never provided to law enforcement or to any investigator.

**Breach of Employee Privacy and Confidentiality**

There is evidence that Mr. Colombo's private, constitutionally protected information was shared with the media. The California Constitution and California confidentiality laws protect confidential information of school employees related to their medical and personal history.

Publicly disclosing private information about an employee's personal issues, such as a history with alcohol, serves no legitimate purpose other than to damage their reputation and cast public doubt on their character. This action is a severe breach of confidentiality and exposes the district to additional potential liability. Such a disclosure demonstrates an unconscionable lack of respect for Mr. Colombo's dignity as an employee and as a human being.

These opinions are based on my experience and training, minimal standards applicable to any reasonable, competent California public school administrator with supervisorial responsibilities involving the human resources function. I so testify under penalty of perjury under the laws of the United States of America and the State of California,

_____/s/____________ Dated: September 23, 2025
Kenneth Whittemore

**Materials Reviewed**

**Exhibit 2 – Audit Resolution Agreement**
**Exhibit 5 – PAUSD Board Policy 1312.3 BP**
**Exhibit 7 – PAUSD Board Policy 5145.3 BP**
**Exhibit 8 – PAUSD Board Policy 5145.7 BP**
**Exhibit 10 – PAUSD Admin Reg 1312.3 AR**
**Exhibit 11 – Notes by Lisa Hickey from January/February of 2022**
**Exhibit 12 – PAUSD Title IX Logs**
**Exhibit 13 – PAUSD Admin Reg 5145.3 AR**
**Exhibit 14 – PAUSD Admin Reg 5145.71 AR**
**Exhibit 15 – Cozen O'Conner Title IX Audit Report**
**Exhibit 21 – Early Emails Title IX Coordinator Gallagher**
**Exhibit 23 – Paid Leave Letter January 31, 2022**
**Exhibit 25 – Emails PC Union Lawyer Cador**
**Exhibit 27 – Detective Emails with Summary of Claim**
**Exhibit 29 – Detective Emails requesting District's evidence**
**Exhibit 30 – 2001-2002 Class Schedule [assume 3rd & 4th at Terman]**
**Exhibit 33 – PAUSD Website info re Student Records**
**Exhibit 34 – Reporter email about missing student records**
**Exhibit 35 – Detective revised request for District evidence**
**Exhibit 36 – Data Secretary Declaration re Student Records**
**Exhibit 38 – Police Press Release re Colombo Arrest**
**Exhibit 40 – PAUSD Board Meeting Open Forum 8/19/2025**
**Exhibit 41 – 2025 PAUSD link to Audit Resolution Agreement**
**Exhibit 43 – HR Data Specialist Kelly re Colombo assignments**
**Exhibit 44 – Email to Hickey re 2001-2002 assignments and Ahern**
**Exhibit 45 – Colombo work assignments for 2001-2002**
**Exhibit 46 – History of Terman – only 6th grade in 2001-2002**
**Exhibit 48 – Declaration of Jill Naylor**
**Exhibit 49 – Declaration of Cindi Ahern**
**Exhibit 50 – Declaration of Aimee Becker**
**Exhibit 52A – Interview of Accuser's sister**
**Exhibit 58 – Accuser's 7th grade report card (no PE, grades)**
**Exhibit 59A – Archives Swimming Times (great through 2003)**
**Exhibit 60 – Student Record for elementary school, not 6th grade**
**Exhibit 66 – Emails re Article coming out**
**Exhibit 67 – Austin emails re press release re arrest**
**Exhibit 68 – "Man Behind the Mitt" article about Colombo**
**Exhibit 75 – "Unfit to Teach" with Austin comments (CPRA docs)**
**Exhibit 78 – Article re DA dropping charges with Austin comments**
**Exhibit 83 – Unpaid Leave Letter post-arrest 06/16/2022 (bond)**
**Exhibit 88 – Paid Leave Letter after charges dropped 05/24/2023**
**Exhibit 90 – Hickey Letter to CTC re discipline 06/26/2023**
**Exhibits 92/99 – Emails re proper credential renewal backdating**
**Exhibit 93 – Letter re Unpaid Leave 08/24/2023 (unnecessary)**
**Exhibit 95 – Email starting District investigation 090/15/2023**
**Exhibit 104 – Printouts from District Investigator Website**
**Exhibit 105 – Palo Alto City Council**

**Exhibit 107 – Notes re Colombo Interview on 01/25/2024**
**Exhibit 108A – Bahadursingh Declaration**
**Exhibit 109 – Notice of Investigation Findings 05/28/2024**
**Exhibit 113A – Subpoena Response from Palo Alto Police**
**Exhibit 123A – Accuser/Detective Testimony 03/21/2023**
**Exhibit 125 – Hickey Emails re investigation 04/21/2022**
**Exhibit 126 – Deposition of former GC Vishakan**
**Exhibit 127 – Deposition of Director HR-Certificated Hickey**
**Exhibit 128 – Deposition of Cindi Durchslag Ahern**
**Exhibit 129 – Deposition of Peter Colombo**
**Exhibit 143 – Colombo Grievance re PE TOSA position**

# ADDENDUM TO EXPERT WITNESS STATEMENT BY KEN WHITTEMORE

Defendants requested that I provide documents to support certain areas of my expert witness statement provided in this case. I want to be clear that my opinions are based on my extensive experience relevant to proper discharging of human resources functions within California school districts, and my statement is based on that experience. This addendum briefly discusses some documents providing **background supporting my experience-based opinions**.

---

## Documents Reflecting Standard HR Practices

This request appears to relate to my introductory statement about my qualifications, including my knowledge of HR practices. In general, standard HR policies can be formally expressed in, or adapted to conform with, **board policies, statutes** (such as the Education Code, Government Code, Title IX, FEHA, the ADA, etc.), **regulations** (California Code of Regulations, Code of Federal Regulations, etc.), **contractual documents** (Collective Bargaining Agreements, MOUs, Resolution Agreements, etc.), and **general human resources principles** such as treating employees with dignity, respect, and value.

The overall guiding standards for HR administrators in K-12 education are represented by the Association of California School Administrators (**ACSA**) February 5, 2021 publication **"Best Practices that Lead to Success as an HR Administrator."** These best practices include:

1. Become familiar with district culture to build trust and establish positive relationships.
2. Lack of compassion and sensitivity will damage your effectiveness and reputation.
3. Regardless of the situation, make every effort to **preserve the dignity** of the individual involved.
4. Resolve serious or complex issues face to face, not with email.
5. Build a collaborative team.
6. Keep other administrators, including principals, abreast of personnel decisions and solicit their assistance in problem-solving and controlling the rumor mill.
7. Be open-minded and flexible to compromise and consensus building.
8. Be patient and **transparent with employees who are under investigation** and placed on administrative leave to alleviate fearfulness and feelings of isolation – **avoid the appearance of a disciplinary action or retaliation**.
9. School HR administrators are the guardians of the rules, policies, codes, state and federal laws, and district contracts relating to employment.
10. Remember the **"human" side of Human Resources**.

---

## Documents Reflecting Standard Transition Policies

I used somewhat of a commonsense approach to respond to this demand from Defendants. Returning a teacher from extended leave, particularly from involuntary leave following dismissal of criminal charges, intersects several different areas of HR functions or roles including employee relations, legal compliance, health and safety (of both employee and students), investigations, and discipline and more. The general standards from the ACSA guide are particularly important.

### A. Board Policies

**Palo Alto Unified School District Board Policy 4000 BP** makes clear its policy to provide safe and supportive working conditions and that the success of students hinges on proper support being provided to the teachers the district employs. **Board Policy 4030 BP and Administrative Regulation 4030 AR** make clear that **retaliation is supposed to be prohibited**.

### B. General HR Guides and Scientific Literature

General human resources guides and scientific literature demonstrate the well-understood critical importance of implementing a **proper transition policy**, also referred to as a **reintegration plan** or **return to work ("RTW") policy**, for employees who have been on extended leave to **support the returning employee**, optimize the employee's chances for success upon return, and to avoid ostracization and other forms of **retaliation**.

As discussed in my initial statement, if any transition or RTW plan was utilized by Defendants in this case, such appears to have been designed to hinder rather than facilitate a supportive and healthy return to work for Mr. Colombo.

Long term leave for teachers and other employees is typically necessitated by illness, injury, or other health concerns. In general, return to work policies are designed to optimize employee success and **support their mental health**, regardless of the reason for the long-term absence. Mr. Colombo also has **specific mental health conditions known to the district** that required specific support and care under the **ADA** and **FEHA**.

### C. FEHA Statutes and Regulations

Because a reasonable, competent school district administrator would be cognizant of their responsibility to not violate FEHA, I provide copies of **FEHA statutes and regulations** applicable to Mr. Colombo's situation. It is **unlawful under FEHA to retaliate** against an employee or to discriminate against an employee based on any suspect classification, including qualified disabilities and/or an arrest that does not result in a conviction.

In light of Mr. Colombo's situation, a proper and careful transition plan was **essential to avoid adverse employment actions that would violate FEHA** and expose the district to liabilities.

### D. Federal Equal Employment Opportunity Commission (EEOC) Statement

I also produce a general statement from the federal **Equal Employment Opportunity Commission (EEOC)**. FEHA is California state law, but the district is also subject to federal law under the Department of Education. A proper and careful transition plan was required to **avoid violation of federal laws that also prohibit discrimination and retaliation** in the workplace.

**E. PERB Decisions**

**PERB (Public Employment Relations Board) decisions** can also assist in developing a proper transition plan and avoid adverse employment actions based on improper motives.

---

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Ken Whittemore

October 9, 2025

# Kenneth Whittemore

2195 Maze Way | Dixon, CA 95620 | Cell: (510) 932-1805

## Summary

Highly accomplished and results-driven education professional with over two decades of experience in school administration and human resources. Proven expertise in leading and managing Human Resources departments, overseeing employee relations and negotiations, and developing innovative solutions for recruitment and retention. Adept at strategic planning, grant management, and implementing large-scale professional growth and evaluation systems to drive organizational excellence.

## Professional Experience

**Assistant Superintendent, Human Resources** Fairfield Suisun Unified School District, Fairfield, CA October 2019 – Present

- Responsible for the day-to-day operations of the entire Human Resources Department.
- Managed employee relations and negotiations with four bargaining units.
- Directed recruitment and hiring practices for certificated and classified personnel.
- Oversaw employee wellness and safety programs.
- Developed and implemented the LCAP plan for recruitment and retention.
- Investigated and managed uniform and employee complaints.
- Oversaw change to and back of Title IX procedures.
- Oversee the Compliance Office.
- Upgraded certificated teacher and management evaluation tools.
- Managed updates to Board Policies.
- Oversee employee complaints.
- Developed an electronic onboarding system for new hires.
- Created an efficient and timely reference check system.
- Prepared and successfully received the California Classified to Teacher Grant.
- Served as Superintendent-in-charge when the Superintendent was out of the District.

**Assistant Superintendent, Human Resources** West Contra Costa Unified School District, Richmond, CA June 2012 – October 2019

- Directed the daily operations for the Human Resources Department.
- Handled employee relations and negotiations with five bargaining units.
- Oversaw all employee complaints and grievances.
- Managed recruitment and hiring practices for certificated and classified personnel.
- Upgraded business/human resources management software system (Munis).
- Oversaw employee wellness and safety programs.
- Developed LCAP plans for recruitment and retention.
- Investigated and managed uniform and employee complaints.
- Upgraded certificated teacher and management evaluation tools.
- Managed updates to Board Policies.
- Developed an electronic onboarding system for new hires and a timely reference check system.
- Secured the California Classified to Teacher Grant.
- Served as Superintendent-in-charge when the Superintendent was out of the District.

**Teacher Incentive Fund (TIF) Grant Coordinator** Washoe County School District, Reno, NV January 2011 – June 2012

- Managed a $9 million federal grant for reform efforts in nine district schools.
- Developed and implemented a Teacher Professional Growth System and Evaluation Rubric.
- Developed and implemented a Principal/Assistant Principal Professional Growth System and Evaluation Rubric.
- Developed and implemented a Performance Pay System.
- Hired and recruited classroom support personnel.
- Communicated and updated TIF stakeholders.
- Organized and managed committee groups working on grant objectives.
- Served as District Liaison at national and regional meetings.

**Assistant Superintendent, Human Resources** Natomas Unified School District, Sacramento, CA September 2004 – December 2010

- Managed all human resource functions in the district.
- Handled all negotiation functions with both bargaining units.
- Managed and oversaw all recruitment, hiring, and retention programs.
- Oversaw wellness and loss prevention in the district.
- Directed new employee orientation and placement.

- Managed and updated all human resource records.
- Developed and updated evaluation systems and policies.
- Reviewed and made recommendations on board policies.

**Principal** Golden State Middle School, Washington Unified School District, West Sacramento, CA March 1999 – September 2004

**Assistant Principal** River City High School, Washington Unified School District, West Sacramento, CA June 1994 – March 1999

**Assistant Principal** Quincy Jr./Sr. High School, Plumas Unified School District, Quincy, CA August 1993 – June 1994

**Teacher** Northern Humboldt Union High School District, Arcata, CA July 1989 – August 1993

- Taught Social Science.
- Served as Head Football Coach.

**Teacher** Josephine County School District, Grants Pass, OR August 1986 – July 1989

- Taught Social Science.
- Served as Head Wrestling Coach and Football Coach.

## Education

**California State University, Sacramento**

- Master of Arts, Educational Administration (1998)
- Bachelor of Arts, Social Science (1986)

**Humboldt State University, Arcata**

- Administrative Service Credential (1993)

**Shasta College, Redding**

- General Education (1983)

## References

References available upon request.

# ATTACHMENT 1D

***BARRY BEN-ZION, Ph.D.***
***Consulting Economist***
*P.O. Box 9517, Santa Rosa, CA 95405 • Telephone (707) 526-2236*
*e-mail: barry@bbenzion.com*

# ECONOMIC LOSS

# PETER M. COLOMBO

September 18, 2025

**_BARRY BEN-ZION, Ph.D._**
**_Consulting Economist_**

_P.O. Box 9517, Santa Rosa, CA 95405 • Telephone (707) 526-2236_
_e-mail: barry@bbenzion.com_

September 18, 2025

Mr. Evan C. Nelson, Esq.
Attorney at Law
Law Office of Evan C. Nelson
1990 North California Blvd., 8th Floor
Walnut Creek, CA 94596

Re: Peter M. Colombo v. Palo Alto Unified School District, et al.

Dear Mr. Nelson:

I have arrived at approximately **$1,690,039** as the economic loss sustained by Peter M. Colombo following the anticipated constructive termination from his employment with Palo Alto Unified School District.

The following report provides a list of documents reviewed as well as the facts, considerations, and assumptions used to reach the above conclusion.

## DOCUMENTS REVIEWED

1. Palo Alto Unified School District Teachers' 2021-22 Salary Schedule, the 2022-23 Salary Schedule, the 2023-24 Salary Schedule, and the 2024-25 Salary Schedule.

2. Palo Alto Unified School District, Human Resource Center, 2022-23 Coaching Salary Schedule and the 2023-24 Coaching Salary Schedule (Appendix H).

3. Palo Alto Unified School District website - Certificated Special Salaries and Stipends, effective 7/01/2024.

4. Palo Alto Unified School District website for 2024 and 2025 employer health insurance rates for medical, dental, and vision insurance coverage.

5. Mr. Colombo's Annual CalSTRS Member Statement as of 6/30/2021, as of 6/30/2022, and as of 6/30/2023.

6. Mr. Colombo's May 2024 pay stub.

7. Article printed 5/09/2024 in the Daily Post about the Palo Alto Unified School District's agreement, providing the teachers with an 8perecent increase.

8. Gary R. Skoog, James E. Ciecka and Kurt V. Krueger, "The Markov Model of Years to Final Separation from the Labor Force 2012-17: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors," *Journal of Forensic Economics*, Vol. 18, No. 1-2, September 2019.

9. U.S. Department of Health and Human Services, National Center for Health Statistics, *U.S. Life Tables, 2019*.

10. U.S. Department of Labor, Bureau of Labor Statistics (BLS), *Consumer Price Index*, from 1970 through 2025.

11. Congressional Budget Office (CBO) March 2025 report, *The 2025 Long-Term Budget Outlook*.

12. U.S. Department of Labor, Bureau of Labor Statistics (BLS), *Hourly Compensation Index*, 1970 through 2025.

13. U.S. Department of the Treasury, Daily Treasury Par Yield Curve Rates.

14. Council of Economic Advisors to the President of the U.S., *Economic Indicators*, 1970 through 2024.

## FACTS, CONSIDERATIONS, AND ASSUMPTIONS

### VITAL INFORMATION

1. The following table provides Peter M. Colombo's vital information:

| | |
|---|---|
| DATE OF BIRTH: | 6/6/1967 |
| DATE OF VALUATION: | 1/26/2026 |
| ESTIMATED DATE OF TERMINATION OF EMPLOYMENT: | 1/26/2026 |
| DATE OF END OF WORKLIFE EXPECTANCY: | 6/14/2037 |
| DATE OF END OF LIFE EXPECTANCY: | 2/6/2050 |
| | |
| AGE AT VALUATION: | 58.64 |
| AGE AT ESTIMATED TERMINATION OF EMPLOYMENT: | 58.64 |
| AGE AT END OF WORKLIFE EXPECTANCY: | 70.02 |
| AGE AT END OF LIFE EXPECTANCY: | 82.67 |
| | |
| YEARS FROM VALUATION TO ESTIMATED TERMINATION: | 0.00 |
| YEARS FROM ESTIMATED TERMINATION TO END WORKLIFE EXPECTANCY: | 11.38 |
| YEARS FROM VALUATION TO END OF WORKLIFE EXPECTANCY: | 11.38 |
| YEARS FROM VALUATION TO END LIFE EXPECTANCY: | 24.03 |

Sources:

*Worklife Expectancy: Gary R. Skoog, James E. Ciecka and Kurt V. Krueger, "The Markov Model of Years to Final Separation from the Labor Force 2012-17: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors" Journal of Forensic Economics, Vol. 18, No. 1-2, September 2019.*
*Male, Bachelor's degree*

*Life Expectancy: National Center for Health Statistics, "United States Life Tables, 2019" Volume 70, Number 18*
*Male, California*

LOSS OF EARNINGS AND RETIREMENT INCOME

2. Mr. Colombo has been working as a full time teacher for the Palo Alto Unified School District for many years. Mr. Colombo has a Bachelor's degree plus 90 additional units. In addition to his teaching pay, Mr. Colombo also teaches during the Summer School session and he coaches basketball and baseball. You have asked me to assume that Mr. Colombo will be constructively termination as of 1/26/2026.

PAST LOSS OF EARNINGS

3. You have indicated that Mr. Colombo was not paid **$41,154.40** for August through October 2023.

4. No additional earnings loss is computed from 2023 to 1/25/2026.

FUTURE LOSS OF EARNINGS AND RETIREMENT INCOME

5. The future loss of earnings consists of the future loss of earnings and the net future loss of California State Teachers' Retirement System (CalSTRS) retirement income.

<u>Earnings – Present Value</u>

6. You have asked me to assume that Mr. Colombo will no longer be able to find an alternative teaching position given the constructive termination from the Palo Alto Unified School District.

7. The future loss of earning capacity is computed from the 1/26/2026 assumed date of termination to the end of Mr. Colombo's statistical worklife expectancy. Although Mr. Colombo's statistical worklife expectancy is to age 70.02, which is on 6/14/2037, it is assumed that Mr. Colombo would have likely worked through to the end the school year, or through 6/30/2037, when he would have been 70.06. The future loss of earnings is computed for 11.42 years.

8. A review of Mr. Colombo's CalSTRS retirement annual statement ending on 6/30/2022 indicates that Mr. Colombo had 24.916 years of service as of that date. With a full time schedule, Mr. Colombo would have 27.916 years of service as of 6/30/2025.

9. The 2024-2025 salary schedule for teachers in the Palo Alto Unified School District indicates that for a teacher with a Bachelor's degree plus 90 units and with over 27 years of employment, like Mr. Colombo, the salary is $168,598 per year.

10. The teachers with the Palo Alto Unified School District earned a 7.0 percent wage increase on 7/01/2022 and a 8.0 percent wage increase ion 7/01/2024. It is assumed that a 3.0 percent general wage increase will take effect (retroactively) for the 2025-26 school year. The 2025-26 school year wage rate for a teacher with a Bachelor degree plus 90 units and over 27 years of service, like Mr. Colombo, is computed at $173,660.

11. You have indicated that Mr. Colombo has worked 4 hours for 17 days during the Summer school session, or a total of 68 hours during the Summer. The 2024-25 school year schedule indicates that the hourly rate is $83 per hour for the Summer school session. It is projected that the 2025-26 school year rate for teaching Summer School will be $85 per hour.

12. You have indicated that Mr. Colombo has been coaching basketball and baseball while employed at Palo Alto Unified School District. The 2024-25 Palo Alto Unified School District coaching schedule indicates that basketball (category C) and baseball (category D) provides for a total of $8,746 in additional income for a coach. It is projected that the 2025-26 school year rate for coaching will be $9,008.

13. You have asked me to assume that Mr. Colombo would have retired from his full time teaching position at the end of the 2029-30 school year when he would have accrued 32.916 years of CalSTRS service credits and been 63.07 years of age. Mr. Colombo would have continued to work as a substitute teacher and coach from the 2030-31 school year to the end of his worklife at age 70.06.

14. You have indicated that the substitute pay is $240 to $260 per day. For the purpose of this analysis the earnings as a substitute teacher is computed at $240 pr day.

15. You have indicated that Mr. Colombo would have worked a full school year as a substitute teacher, or 180 days per school year.

16. Mr. Colombo's earning capacity, salary, Summer school pay, and coaching pay, beyond 2026 is projected to increase at 1 percent above the CBO inflation projections. This is consistent with the relationship between the increase in compensation vis-a-vis the overall rate of inflation that was experienced in the U.S. for the past 30 plus years.

17. The mandatory employee contributions to CalPERS of 10.25 percent of the projected full time teacher earnings are subtracted.

18. Teachers, like Mr. Colombo, have health insurance coverage through Palo Alto Unified School District. Given the 2024 and 2025 rates for medical, dental, and vision insurance, the 2026 coverage is computed at $1,623.36 per month.

19. Mr. Colombo's health insurance coverage beyond 2026 is projected to increase at 1 percent above the CBO inflation projections. This is consistent with the relationship between the increase in health insurance premiums vis-a-vis the overall rate of inflation that was experienced in the U.S. for the past 20 plus years.

20. The discount rate used to determine the present value of the loss of future earning capacity is 4.0 percent per year, compounded. This rate is consistent with the current interest rate on prudent investments.

21. The present value of the future loss of Mr. Colombo's earnings is $1,170,032. Subtracting the mandatory contributions to CalSTRS and adding the value of health insurance coverage, produces a future loss of earnings of **$1,169,389**.

<u>CalPERS Retirement Income – Actuarial Present Value</u>

22. Mr. Colombo participates in the 2.0% at age 60 formula with CalSTRS. CalSTRS allows participants to begin receiving a monthly retirement income as early as at age 55. CalSTRS provides a longevity bonus for retirees with over 30 years.

*Without Termination*

23. Mr. Colombo had accrued 24.916 years of CalSTRS service credit as of 6/30/2022. Had Mr. Colombo been able to work to 6/30/2030, he would have accrued 32.916 years of service. The resulting pension would have been $13,024.86 per month plus $400 per month in longevity bonus, or a total of $13,424.86, payable upon retirement at age 63.07.

24. CalSTRS has a cost-of-living increase provision of 2.0 percent of the initial retirement income.

25. The actuarial present value of CalSTRS retirement income is based on the *2019 U.S. Life Expectancy Table* mortality factors for males at 4.0 percent interest, with an allowance for the system's cost-of-living increase provision, computed at 2.0 percent per year, simple.

**_BARRY BEN-ZION, Ph.D._**
**_Consulting Economist_**



26. The actuarial present value of Mr. Colombo's CalSTRS retirement income is **$1,959,671**.

*Accrued CalSTRS Retirement Income*

27. Mr. Colombo had accrued 25.034 years of CalSTRS service credit as of 6/30/2023. It is projected that Mr. Colombo will earn 27.604 years of service as of 1/26/2026. If Mr. Colombo were to start receiving his accrued pension as of 1/26/2026, at age 58.64, the amount of the retirement would be $7,179.32 per month.

28. CalSTRS has a cost-of-living increase provision of 2.0 percent of the initial retirement income.

29. The actuarial present value of CalSTRS retirement income is based on the *2019 U.S. Life Expectancy Table* mortality factors for males at 4.0 percent interest, with an allowance for the system's cost-of-living increase provision, computed at 2.0 percent per year, simple.

30. The actuarial present value of Mr. Colombo's CalSTRS accrued retirement income is **$1,480,175**.

*BARRY BEN-ZION, Ph.D.*
*Consulting Economist*



TOTAL ECONOMIC LOSS

31. The total economic loss is summarized below:

SUMMARY OF LOSS OF EARNINGS AND RETIREMENT INCOME
PETER M. COLOMBO

| | | | |
|---|---|---|---|
| PAST LOSS OF EARNINGS | | | 41,154 |
| FUTURE LOSS OF EARNINGS AND RETIREMENT INCOME | | | |
| EARNINGS AND RETIREMENT INCOME WITHOUT TERMINATION | | | |
| Earnings to End of 2036-37 School Year (PV) | 1,169,389 | | |
| CalSTRS Retirement Income (APV) | 1,959,671 | | |
| TOTAL EARNINGS WITHOUT TERMINATION | | 3,129,060 | |
| LESS: ACCRUED CalSTRS RETIREMENT INCOME (APV) | | 1,480,175 | |
| NET FUTURE LOSS OF EARNINGS AND RETIREMENT INCOME | | | 1,648,885 |
| **TOTAL LOSS OF EARNINGS AND RETIREMENT INCOME** | | | **$1,690,039** |

OTHER LOSSES

32. The total economic loss shown above does not include the amount that would be required to neutralize the adverse tax consequence of a lump sum award or settlement.

FUTURE REVISIONS

This report will be amended in the future if additional relevant information becomes available (current union wage contract) or if a new trial date is assigned.

CURRICULUM VITAE AND TESTIMONY

Enclosed with this report is my current curriculum vitae, my fee schedule, as well as a list of all testimony which I have provided in both trials and depositions from 2021 to the present time.

Please do not hesitate to contact me if you have any questions concerning this report or any other aspect of this case.

Respectfully submitted,



Barry Ben-Zion, Ph.D.
BBZ/ic

Enclosures

SUMMARY OF LOSS OF EARNINGS AND RETIREMENT INCOME
PETER M. COLOMBO

| | | | |
|---|---|---|---|
| PAST LOSS OF EARNINGS | | | 41,154 |
| FUTURE LOSS OF EARNINGS AND RETIREMENT INCOME | | | |
| EARNINGS AND RETIREMENT INCOME WITHOUT TERMINATION | | | |
| Earnings to End of 2036-37 School Year (PV) | 1,169,389 | | |
| Projected CalSTRS Retirement Income (APV) | 1,959,671 | | |
| TOTAL EARNINGS WITHOUT TERMINATION | | 3,129,060 | |
| LESS: ACCRUED CalSTRS RETIREMENT INCOME (APV) | | 1,480,175 | |
| NET FUTURE LOSS OF EARNINGS AND RETIREMENT INCOME | | | 1,648,885 |
| **TOTAL LOSS OF EARNINGS AND RETIREMENT INCOME** | | | **$1,690,039** |

FUTURE EARNINGS WITHOUT TERMINATION (PV)
PETER M. COLOMBO

Working thru 2029-30 school year

| Period | Period Length | Age at beginning of period | CBO+1% Increase | Annual Wage | Period Wage | Present Value D= 4.0% | CBO+1% Increase | Daily Substitute Rate | Annual Substitute Wage 180 | Period Wage | Present Value D= 4.0% | Hourly Summer School | Annual Summer School 68 | Period Summer School | Annual Coaching | Period Coaching | Total Period Wage | Present Value D= 4.0% | Less Emee CalSTRS 10.25% | CBO+1% Increase | Monthly Emer M+D+V | Annual Emer M+D+V | Plus Period Emer M+D+V | Period Total | Present Value D= 4.0% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/26/2026 - 6/30/2026 | 0.43 | 58.64 | | 173,660 | 74,674 | 74,047 | | 240 | 43,200 | | 0 | 85 | 5,780 | 2,485 | 9,008 | 3,873 | 81,032 | 80,352 | 8,306 | | 1,623.36 | 19,480 | 8,376 | 81,102 | 80,421 |
| 7/1/2026 - 12/31/2026 | 0.50 | 59.07 | 3.44% | 179,636 | 89,818 | 87,454 | 3.44% | 248 | 44,640 | | 0 | 88 | 5,984 | 2,992 | 9,318 | 4,659 | 97,469 | 94,904 | 9,991 | | 1,623.40 | 19,481 | 9,741 | 97,219 | 94,660 |
| 1/1/2027 - 6/30/2027 | 0.50 | 59.57 | | 179,636 | 89,818 | 85,756 | | 248 | 44,640 | | 0 | 88 | 5,984 | 2,992 | 9,318 | 4,659 | 97,469 | 93,061 | 9,991 | 3.32% | 1,677.20 | 20,126 | 10,063 | 97,541 | 93,130 |
| 7/1/2027 - 12/31/2027 | 0.50 | 60.07 | 3.32% | 185,591 | 92,796 | 86,879 | 3.32% | 256 | 46,080 | | 0 | 91 | 6,188 | 3,094 | 9,627 | 4,814 | 100,704 | 94,282 | 10,322 | | 1,677.20 | 20,126 | 10,063 | 100,445 | 94,040 |
| 1/1/2028 - 6/30/2028 | 0.50 | 60.57 | | 185,591 | 92,796 | 85,192 | | 256 | 46,080 | | 0 | 91 | 6,188 | 3,094 | 9,627 | 4,814 | 100,704 | 92,452 | 10,322 | 3.26% | 1,731.80 | 20,782 | 10,391 | 100,773 | 92,515 |
| 7/1/2028 - 12/31/2028 | 0.50 | 61.07 | 3.26% | 191,636 | 95,818 | 86,258 | 3.26% | 264 | 47,520 | | 0 | 94 | 6,392 | 3,196 | 9,941 | 4,971 | 103,985 | 93,610 | 10,658 | | 1,731.80 | 20,782 | 10,391 | 103,718 | 93,369 |
| 1/1/2029 - 6/30/2029 | 0.50 | 61.57 | | 191,636 | 95,818 | 84,583 | | 264 | 47,520 | | 0 | 94 | 6,392 | 3,196 | 9,941 | 4,971 | 103,985 | 91,792 | 10,658 | 3.24% | 1,787.90 | 21,455 | 10,728 | 104,055 | 91,854 |
| 7/1/2029 - 12/31/2029 | 0.50 | 62.07 | 3.24% | 197,849 | 98,925 | 85,629 | 3.24% | 273 | 49,140 | | 0 | 97 | 6,596 | 3,298 | 10,263 | 5,132 | 107,355 | 92,927 | 11,004 | | 1,787.90 | 21,455 | 10,728 | 107,079 | 92,688 |
| 1/1/2030 - 6/30/2030 | 0.50 | 62.57 | | 197,849 | 98,925 | 83,967 | | 273 | 49,140 | | 0 | 97 | 6,596 | 3,298 | 10,263 | 5,132 | 107,355 | 91,122 | 11,004 | 3.24% | 1,845.80 | 22,150 | 11,075 | 107,426 | 91,182 |
| 7/1/2030 - 12/31/2030 | 0.50 | 63.07 | 3.24% | 204,253 | | 0 | 3.24% | 282 | 50,760 | 25,380 | 21,124 | 100 | 6,800 | | 10,595 | 5,298 | 30,678 | 25,534 | | | 1,845.80 | 22,150 | | 30,678 | 25,534 |
| 1/1/2031 - 6/30/2031 | 0.50 | 63.57 | | 204,253 | | 0 | | 282 | 50,760 | 25,380 | 20,714 | 100 | 6,800 | | 10,595 | 5,298 | 30,678 | 25,038 | | 3.24% | 1,905.50 | 22,866 | | 30,678 | 25,038 |
| 7/1/2031 - 12/31/2031 | 0.50 | 64.07 | 3.24% | 210,863 | | 0 | 3.24% | 291 | 52,380 | 26,190 | 20,960 | 103 | 7,004 | | 10,938 | 5,469 | 31,659 | 25,337 | | | 1,905.50 | 22,866 | | 31,659 | 25,337 |
| 1/1/2032 - 6/30/2032 | 0.50 | 64.57 | | 210,863 | | 0 | | 291 | 52,380 | 26,190 | 20,553 | 103 | 7,004 | | 10,938 | 5,469 | 31,659 | 24,845 | | 3.24% | 1,967.20 | 23,606 | | 31,659 | 24,845 |
| 7/1/2032 - 12/31/2032 | 0.50 | 65.07 | 3.24% | 217,693 | | 0 | 3.24% | 300 | 54,000 | 27,000 | 20,777 | 106 | 7,208 | | 11,292 | 5,646 | 32,646 | 25,122 | | | 1,967.20 | 23,606 | | 32,646 | 25,122 |
| 1/1/2033 - 6/30/2033 | 0.50 | 65.57 | | 217,693 | | 0 | | 300 | 54,000 | 27,000 | 20,373 | 106 | 7,208 | | 11,292 | 5,646 | 32,646 | 24,634 | | 3.24% | 2,031.00 | 24,372 | | 32,646 | 24,634 |
| 7/1/2033 - 12/31/2033 | 0.50 | 66.07 | 3.24% | 224,751 | | 0 | 3.24% | 310 | 55,800 | 27,900 | 20,644 | 109 | 7,412 | | 11,658 | 5,829 | 33,729 | 24,957 | | | 2,031.00 | 24,372 | | 33,729 | 24,957 |
| 1/1/2034 - 6/30/2034 | 0.50 | 66.57 | | 224,751 | | 0 | | 310 | 55,800 | 27,900 | 20,243 | 109 | 7,412 | | 11,658 | 5,829 | 33,729 | 24,472 | | 3.25% | 2,096.90 | 25,163 | | 33,729 | 24,472 |
| 7/1/2034 - 12/31/2034 | 0.50 | 67.07 | 3.25% | 232,046 | | 0 | 3.25% | 320 | 57,600 | 28,800 | 20,490 | 113 | 7,684 | | 12,036 | 6,018 | 34,818 | 24,772 | | | 2,096.90 | 25,163 | | 34,818 | 24,772 |
| 1/1/2035 - 6/30/2035 | 0.50 | 67.57 | | 232,046 | | 0 | | 320 | 57,600 | 28,800 | 20,092 | 113 | 7,684 | | 12,036 | 6,018 | 34,818 | 24,291 | | 3.25% | 2,165.00 | 25,980 | | 34,818 | 24,291 |
| 7/1/2035 - 12/31/2035 | 0.50 | 68.07 | 3.25% | 239,587 | | 0 | 3.25% | 330 | 59,400 | 29,700 | 20,318 | 117 | 7,956 | | 12,427 | 6,214 | 35,914 | 24,569 | | | 2,165.00 | 25,980 | | 35,914 | 24,569 |
| 1/1/2036 - 6/30/2036 | 0.50 | 68.57 | | 239,587 | | 0 | | 330 | 59,400 | 29,700 | 19,923 | 117 | 7,956 | | 12,427 | 6,214 | 35,914 | 24,092 | | 3.25% | 2,235.40 | 26,825 | | 35,914 | 24,092 |
| 7/1/2036 - 12/31/2036 | 0.50 | 69.07 | 3.25% | 247,381 | | 0 | 3.25% | 341 | 61,380 | 30,690 | 20,187 | 121 | 8,228 | | 12,831 | 6,416 | 37,106 | 24,408 | | | 2,235.40 | 26,825 | | 37,106 | 24,408 |
| 1/1/2037 - 6/14/2037 | 0.45 | 69.57 | | 247,381 | | 0 | | 341 | 61,380 | 27,621 | 17,833 | 121 | 8,228 | | 12,831 | 5,774 | 33,395 | 21,561 | | | 2,235.40 | 26,825 | | 33,395 | 21,561 |
| 6/15/2037 - 6/30/2037 | 0.04 | 70.02 | | 247,381 | | 0 | | 341 | 61,380 | 2,455 | 1,570 | 121 | 8,228 | | 12,831 | 513 | 2,968 | 1,898 | | 3.26% | 2,308.20 | 27,698 | | 2,968 | 1,898 |
| Total | 11.42 | 70.06 | | | 829,388 | 759,765 | | | | 390,706 | 285,801 | | | 27,645 | | 124,676 | 1,372,415 | 1,170,032 | 92,256 | | | | 91,556 | 1,371,715 | 1,169,389 |

Employer contributions to health insurance coverage

| | April 2024 | 2025 | Estimated 2026 |
|---|---|---|---|
| Delta dental | 128.55 | 133.13 | 137.90 |
| Sutter | 1,031.50 | 1,230.50 | 1,467.90 |
| Vision | 17.56 | 17.56 | 17.56 |
| Total | 1,177.61 | 1,381.19 | 1,623.36 |

FUTURE RETIREMENT INCOME (APV)
PETER M. COLOMBO
*CalSTRS Retirement Without Termination*
Working thru 2029-30 school year

| | | | | | |
|---|---|---|---|---|---|
| Years of Service: | | | | | |
| Accrued years of service | | | 7/1/2022 | 24.916 | |
| Additional years | | | | | |
| 7/1/2022 | - | 1/25/2026 | | 3.58 | |
| 1/26/2026 | - | 6/30/2030 | | 4.42 | |
| Total Years of Service | | | | | 32.916 |
| Retirement Factor: | | | | | 2.40% |

Highest Compensation:

| Period | | | Period Length | Annual Wage | Period Wage | Present Value D= 4.0% |
|---|---|---|---|---|---|---|
| 1/26/2026 | - | 6/29/2029 | 3.42 | | | |
| 6/30/2029 | - | 6/30/2029 | 0.00 | | | |
| 7/1/2029 | - | 12/31/2029 | 0.50 | 197,849 | 98,925 | 85,629 |
| 1/1/2030 | - | 6/30/2030 | 0.50 | 197,849 | 98,925 | 83,967 |
| Total | | | 1.00 | | 197,850 | 169,596 |
| | | | 4.42 | | | |

| | | | | |
|---|---|---|---|---|
| Final highest monthly compensation in future $: | | | 16,487.50 | |
| Final highest monthly compensation in present value: | | | | 14,133.00 |

| | | | | |
|---|---|---|---|---|
| Monthly retirement income in future $: | | 13,024.86 | | |
| Longevity bonus | | 400.00 | | |
| | | | 13,424.86 | |
| Monthly retirement income in present value (4.0%): | | | | 11,288.14 |
| 4.0% | 4.42 | | | |
| SSE at retirement (4.0% w/2.0% COLA, simple): | | | 63.07 | 182.90 |
| Survivial probability: | | | | 0.9492 |
| valuation | | 58.64 | 86,682.32 | |
| retirement | | 63.07 | 82,278.81 | |
| Actuarial Present Value | | | | 1,959,671 |

FUTURE RETIREMENT INCOME (APV)
PETER M. COLOMBO
*CalSTRS Retirement With Termination*

| | | | |
|---|---|---|---|
| Years of Service: | | | |
| Accrued years of service | 6/30/2023 | 25.034 | |
| Additional years | | | |
| 7/1/2023 - 1/25/2026 | | 2.57 | |
| Total Years of Service | | | 27.604 |
| age thru | 1/25/2026 | 58.64 | |
| | ===> | 58 yrs and 6 mos. | |
| Retirement Factor: | | | 1.82% |

Highest Compensation:

| Period | | Period Length | Annual Wage | Period Wage |
|---|---|---|---|---|
| 1/26/2025 | - 6/30/2025 | 0.43 | 168,598 | 72,497 |
| 7/1/2025 | - 1/26/2026 | 0.57 | 173,660 | 98,986 |
| Total | | 1.00 | | 171,483 |
| | | 1.00 | | |

Final highest monthly compensation: 14,290.25

| | | | |
|---|---|---|---|
| Monthly retirement income: | | | 7,179.32 |
| SSE at valuation (4.0% w/2.0% COLA, simple): | | 58.64 | 206.17 |
| Survivial probability: | | | 1.0000 |
| valuation | 58.64 | 86,682.32 | |
| retirement | 58.64 | 86,682.32 | |
| Actuarial Present Value | | | 1,480,175 |

VITAL INFORMATION
PETER M. COLOMBO

| | |
|---|---|
| DATE OF BIRTH: | 6/6/1967 |
| DATE OF VALUATION: | 1/26/2026 |
| ESTIMATED DATE OF TERMINATION OF EMPLOYMENT: | 1/26/2026 |
| DATE OF END OF WORKLIFE EXPECTANCY: | 6/14/2037 |
| DATE OF END OF LIFE EXPECTANCY: | 2/6/2050 |
| AGE AT VALUATION: | 58.64 |
| AGE AT ESTIMATED TERMINATION OF EMPLOYMENT: | 58.64 |
| AGE AT END OF WORKLIFE EXPECTANCY: | 70.02 |
| AGE AT END OF LIFE EXPECTANCY: | 82.67 |
| YEARS FROM VALUATION TO ESTIMATED TERMINATION: | 0.00 |
| YEARS FROM ESTIMATED TERMINATION TO END WORKLIFE EXPECTANCY: | 11.38 |
| YEARS FROM VALUATION TO END OF WORKLIFE EXPECTANCY: | 11.38 |
| YEARS FROM VALUATION TO END LIFE EXPECTANCY: | 24.03 |

Sources:

*Worklife Expectancy: Gary R. Skoog, James E. Ciecka and Kurt V. Krueger, "The Markov Model of Years to Final Separation from the Labor Force 2012-17: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors" Journal of Forensic Economics, Vol. 18, No. 1-2, September 2019.*
*Male, Bachelor's degree*

*Life Expectancy: National Center for Health Statistics, "United States Life Tables, 2019" Volume 70, Number 18*
*Male, California*

EARNINGS AND BENEFITS OF TEACHERS WITH PALO ALTO UNIFIED SCHOOL DISTRICT
PETER M. COLOMBO

Mr. Colombo has a BA degree with 90 units
April 2024 pay 13,615.64

| Summer school hours: | | |
|---|---|---|
| 4 hours for 17 days = | | 68 hours |
| Hourly teaching rate 2024-25 school year | | 83 |
| Estimated hourly teaching rate 2025-26 school year | 3.0% | 85 |

| Coaching pay: | 2022-23 and 2023-24 school year |
|---|---|
| each stipend is paid in 3 payments | |
| Fall=Sept, Oct+Nov | |
| Winter=Dec, Jan+Feb | |
| Spring=Mar,Apr+May | |
| Basketball - category C | 4,531 |
| Baseball - category D | 3,556 |
| Total | 8,087 |

| CalSTRS Contributions: | April 2024 |
|---|---|
| | Employee |
| Monthly gross wage | 13,615.64 |
| Contributions | 1,395.60 |
| Rate | 10.250% |

| Coaching pay: | | | Estimated |
|---|---|---|---|
| Starting 11th Year | | **7/1/2024** | 7/1/2025 |
| Basketball - category C | 3.0% | 4,900 | 5,047 |
| Baseball - category D | 3.0% | 3,846 | 3,961 |
| Total | | 8,746 | 9,008 |

| Period | Period Length | Yrs of Service at beginning of period | Increase | Computed Monthly Wage BA+90 units | Annual Wage BA+90 units *12* | Hourly Summer School Wage | Annual Summer School 68 | Annual Coaching Wage | Total Annual Wage | Computed Monthly Wage 12 |
|---|---|---|---|---|---|---|---|---|---|---|
| **7/1/2022** - 6/30/2023 | 1.00 | **24.916** | **7.00%** | 12,100.80 | **145,209** | **77** | 5,236 | **8,087** | 158,532 | 13,211.00 |
| | | 25.000 | | | **149,772** | **77** | 5,236 | **8,087** | 163,095 | 13,591.25 |
| 7/1/2023 - 6/30/2024 | 1.00 | 25.916 | | 12,481.00 | **149,772** | **77** | 5,236 | **8,087** | 163,095 | 13,591.25 |
| 7/1/2024 - 6/30/2025 | 1.00 | 26.916 | **8.00%** | 13,634.50 | **163,614** | **83** | 5,644 | **8,746** | 178,004 | 14,833.67 |
| *9/1/2024* | | 27.000 | | | **168,598** | **83** | 5,644 | **8,746** | 182,988 | 15,249.00 |
| 7/1/2025 - 6/30/2026 | 1.00 | 27.916 | 3.00% | | **173,660** | **85** | 5,780 | **9,008** | 188,448 | 15,704.00 |

CalSTRS Annual Reports
PETER M. COLOMBO

| | | |
|---|---|---|
| Service Credit as of | 7/1/2020 | 22.916 |
| Credit earned during | 2020-21 | 1.000 |
| Service credits as of | 6/30/2021 | 23.916 |
| | | |
| Service Credit as of | 7/1/2021 | 23.916 |
| Credit earned during | 2021-22 | 1.000 |
| Service credits as of | 6/30/2022 | 24.916 |
| | | |
| Service Credit as of | 7/1/2022 | 24.916 |
| Credit earned during | 2022-23 | 0.118 |
| Service credits as of | 6/30/2023 | 25.034 |

***BARRY BEN-ZION, Ph.D.***
***Consulting Economist***

*P.O. Box 9517, Santa Rosa, CA 95405-9991 • Telephone (707) 526-2236*
*e-mail: barry@bbenzion.com*

# CURRICULUM VITAE

## EMPLOYMENT

1973 to Present:
Barry Ben-Zion, Ph.D. – Consulting Economist
Santa Rosa, California.

1969 to 2000:
Professor of Economics, School of Business & Economics, Sonoma State University,
Rohnert Park, California.

1967 to 1969:
Instructor of Economics, Lane Community College,
Eugene, Oregon.

1965 to 1969:
Research Assistant, Department of Economics, University of Oregon,
Eugene, Oregon.

## EDUCATION & DEGREES

Ph.D. (Economics), 1973, University of Oregon.

M.A. (Economics), 1968, University of Oregon.

B.A. (Economics), 1965, Sonoma State University.

## FIELDS OF STUDY IN Ph.D. PROGRAM

Microeconomic and Macroeconomic Theory
Quantitative Economic Analysis and Statistics
Money and Banking
Economic Development and History
Industrial Organization and Antitrust Policy

**PUBLICATIONS**

*Financial Proposal for a College Union at Sonoma State College*, August 1965.

*The Nursing and Convalescent Industry of Sonoma County*, Nursing Home Association, 1970.

*The Economy of Sonoma County and Its Prospects* (with Richard Van Gieson), Savings and Loans Institutions of Sonoma County, July 1970.

*The Market for Student Housing at Sonoma State*, State of California Publications, August 1970.

*The Theory and Practice of Multi-Level Marketing: An Overview of Selected Economic and Related Legal Issues*, International Direct Marketing Association, 1973.

*Alternative Concepts of Export Diversification: An Application to Export Growth*, University of Oregon, 1973.

*Economic Impact of Land Use Alternatives for Sonoma County 1975-2000*, Sonoma County Planning Department, 1975.

*Countywide Population Projections for the Sonoma County General Land Use Plan*, Sonoma County Planning Department, 1975.

*Economic Evaluation of Sonoma County and the Proposed General Plan: A Technical Report*, (with Richard Van Gieson), University Research Center, 1976.

*Sources of Information for Research in Economics*, State of California Publications, 1977.

"Life Expectancy and Actuarial Present Values: A Note to Forensic Economists," (with Ronald G. Reddall) *Research in Law and Economics: A Research Journal*, Volume 7, 1985.

"The Real Price of a Buy-Out," (with Ronald G. Reddall), *Family Advocate* (A Practical Journal of the American Bar Association, Family Law Section), Vol. 8, No. 2, Fall 1985.

"Treatment of Future Salary Increases in Pension Buyout Valuation," (with Murray Projector and Ronald G. Reddall) *Family Law News*, Vol. 10, No. 3, Fall/Winter 1987.

*The Economic Impact of Wastewater Releases into the Russian River by the City of Santa Rosa*, City of Santa Rosa, July 1990.

"A Tale of Two Surveys: California Dissolution Retirement Experts' Fees and Valuation Opinions," *Family Law News*, Vol. 16, No. 3, Winter 1993.

**PUBLICATIONS – Continued**

*Economic Information: Where To Find It*, BZ Publications, 1994 (2d Edition 1995).

*Information on the California Economy: Where To Find It*, BZ Publications, 1995.

*Trends in Sonoma County Retailing* (with Collin Wilkerson), Sonoma State University, Department of Economics, Spring 1998.

*Marin County: Trends in Retail Sales, 1980 -1998* (with Joshua Shaeffer), Sonoma State University, Department of Economics, Fall 2000.

*Sonoma County: Trends in Retail Sales, 1980-1998* (with Joshua Shaeffer), Sonoma State University, Department of Economics, Fall 2000.

"Neutralizing the Adverse Tax Consequences of a Lump-Sum Award in Employment Cases," *Journal of Forensic Economics*, Vol. XIII, No. 3, Fall 2000.

"The Valuation of the Loss of Future Pension Income," *Journal of Legal Economics*, Vol. 11, No. 3, Winter, 2001-02.

"Assessing Economic Damages in Personal Injury and Wrongful Death Litigation: The State of California," *Journal of Forensic Economics*, Vol. XVII, No. 3, Fall 2004.

"The Forecast Plays 20 Questions with Barry Ben-Zion," *The Forecast (A Newsletter of NAFE)*, Vol. 33, Issue 1 (Winter 2019), pp. 8-9.

"Implementing California Civil Code Section 3361: Ensuring Damage Estimates Comply with State Law," (with Robert Johnson), Consumer Attorneys of California, *Forum*, Volume 51, Number 1, January/February 2021, pp 44-47.

"Update of Assessing Economic Damages in Personal Injury and Wrongful Death Litigation: The State of California," (with Michael S. Visser), *Journal of Forensic Economics*, Vol. XXIX, No. 2 (September 2021).

"Recent Decisions Affecting Tax Neutralization in California: Clemens, Economy and Barber," *Journal of Legal Economics*, Vol. 27, No. 1, July 2021.

"The Natural Rate of Interest, Trends and Application to Forensic Economics" (with Peter Formuzis), *Journal of Legal Economics*, Vol. 28, No. 1, July 2022.

**PRESENTATIONS**

Numerous presentations have been made to various academic and professional associations, law schools classes, and service clubs. A select list is as follows:

American Economic Association (AEA)
Western Economic Association, International (WEAI)
Eastern Economic Association (EEA)
Southern Economic Association (SEA)
National Association of Forensic Economics (NAFE)
American Academy of Economic and Financial Experts (AAEFE)
American Rehabilitation Economics Association (AREA)
International Association of Rehabilitation Professionals (IARP)
Redwood Empire Trial Lawyers Association
Denver Colorado Bar Association
Sonoma County Bar Association
Empire Law School
University of San Francisco Law School

**RESEARCH**

Regional economic projections for public agencies and private firms;
Studies on sources of information for research in economics;
Research on California's legal guidance in personal injury and wrongful death cases.
Research on tax issues in employment and commercial damage cases.
Research on various forensic economic issues.

**FORENSIC ASSIGNMENTS**

Tort Cases
Loss of earnings and earning capacity in personal injury cases;
Present value of future medical care costs and life care plans;
Loss of financial support in wrongful death cases;
Loss of household services in personal injury and wrongful death cases.

Employment Termination and Discrimination Cases
Loss of past and future earnings;
Loss of earnings in wage & hour cases, including class action cases;
Calculations to neutralize the adverse tax consequences of a lump sum award.

**FORENSIC ASSIGNMENTS – Continued**

Business Cases
Business losses in fraud, theft, disaster, breach of contract, and antitrust cases;
Valuations of business firms and professional practices.

Family Law Cases
Actuarial buyout valuations of pensions;
Community interest in businesses and professional practices;
Moore-Marsden calculations;
Marital standard of living analysis;
Preparation of Domestic Relations Orders (DRO's/QDRO's).

**MEMBERSHIP IN PROFESSIONAL ASSOCIATIONS**

American Economic Association (AEA)

Western Economic Association, International (WEAI)

National Association of Forensic Economics (NAFE)
(VP Western Region and Board Member, 1996-2000)

American Academy of Economic and Financial Experts (AAEFE)
(Board Member, 1995-1999 and 2007 - 2010)

American Rehabilitation Economics Association (AREA)
(Board Member, 1995-1997)

**HONORS & AWARDS**

NAFE, Past Presidents' Award for Outstanding Service to the Association, 2002.
Board of Editors of the *Journal of Forensic Economics*, Award for Peer Review Services, 2010.
Sonoma State University, Distinguished Alumni Award, 2019.
AAEFE, Lifetime Achievement Award, 2023.

**TRIAL TESTIMONY**

Testimony has been presented in hundreds of legal cases in depositions and trials adjudicated in Federal and State Courts in California, Oregon, Washington, Alaska, Idaho, Nevada, Colorado, New Mexico, and Arizona.

**Dr. Barry Ben-Zion's Trial Testimony in 2021**

| CASE NUMBER | NAME OF CASE | COUNTY/JURISDICTION |
|---|---|---|
| SFSC CGC-18-564337 | James Varga v. Twitch Interactive, Inc. | San Francisco County Superior Court |
| Arbitration #15597 | Francis Davin, et al. v. Kaiser Foundation Health Plan, et al. | Arbitration - JAMS |
| MSC16-01426 | Richmond Compassionate Care, Co. v. Richmond Patient Group, et al. | Contra Costa County Superior Court |
| RG21088294 | Edward M. Richards, et al. v. 3M Company, et al. | Alameda County Superior Court |
| SFSC CGC-17-560481 | Michael Ghadieh v. City and County of San Francisco, et al. | San Francisco County Superior Court |

**Dr. Barry Ben-Zion's Trial Testimony in 2022**

| CASE NUMBER | NAME OF CASE | COUNTY/JURISDICTION |
|---|---|---|
| FFL 157901 | IRMO Durden | Solano County Superior Court |
| 34-2019-00252455 | Angela Updegraff v. City of Sacramento, et al. | Sacramento County Superior Court |
| SCV-264020 | Jonathan Ramos, et al. v. William Wallahan, et al. | Sonoma County Superior Court |

**Dr. Barry Ben-Zion's Trial Testimony in 2023**

| CASE NUMBER | NAME OF CASE | COUNTY/JURISDICTION |
|---|---|---|
| 3:21-cv-04250-MMC | Harvey Smith, et al. v. The Pasha Group, et al. | U.S. District Court, Northern District of California |
| MSC17-01159 | Debra M. Weiss-Ishai, et al. v. Merry P. Cheonis, et al. | Contra Costa County Superior Court |
| SCV-265337 | Alison R. O'Keefe, et al. v. Target Corp., et al. | Sonoma County Superior Court |
| JAMS #5100000660 | Taggart, LLC v. Great Lakes Insurance SE, et al. | Arbitration - JAMS |

**Dr. Barry Ben-Zion's Trial Testimony in 2024**

| CASE NUMBER | NAME OF CASE | COUNTY/JURISDICTION |
|---|---|---|
| RG18931876 | Dreisbach Enterprises, Inc. v. Pacific Coast Containers, Inc. et al. | Alameda County Superior Court |
| 3:22-cv-01160-IM | Jaime B. Merced v. United States of America, et al. | U.S. District Court, Oregon, Portland Division |

**Dr. Barry Ben-Zion's Trial Testimony in 2025**

| CASE NUMBER | NAME OF CASE | COUNTY/JURISDICTION |
|---|---|---|
| CV2022-0119 | Theodore T. Pitts, et al. v. City of Davis, et al. | Yolo County Superior Court |
| SFSC CGC-18-564487 | Melanie Siemon v. Regents of the University of California | San Francisco County Superior Court |

**Dr. Barry Ben-Zion's Deposition Testimony for 2023**

| CASE NUMBER | NAME OF CASE | JURISDICTION |
|---|---|---|
| CIV2102245 | Rosa Pantoja and Lorenzo Pantoja v. Eva Maria Estrada, et al. | Marin County |
| SCV-262714 | Joseph Romano, et al. v. Fairway View Estates Homeowners Assoc. | Sonoma County |
| SFSC CGC-21-276977 | Ronald D. Scrivner, et al. v. Soco West, Inc. et al. | San Francisco County |
| 22CV021433 | Mollie A. Damron v. Albay Construction, et al. | Alameda County |
| RG21098758 | James Garcia, et al. v. Kaiser Foundation Health Plan, Inc., et al. | Alameda County |
| JAMS #5100000660 | Taggart, LLC v. Great Lakes Insurance SE, et al. | Sonoma County |
| CIV 1802570 | Kiera Hynes v. Buck Institute of Research of Aging, et al. | Marin County |

**Dr. Barry Ben-Zion's Deposition Testimony for 2024**

| CASE NUMBER | NAME OF CASE | JURISDICTION |
|---|---|---|
| 56-2021-00552204-CU-AS-VTA | Thelma Massey, et al. v. 3M Company, et al. | Ventura County Superior Court |
| SFSC CGC-23-277109 | Timothy F. Deasy, et al. v. Ferguson Enterprises, LLC, et al. | San Francisco County Superior Court |
| S-CV-0047551 | Harlee Netherby v. Lahontan Community Assoc., et al. | Placer County Superior Court |
| SFSC CGC-21-276979 | Juliet Smith, et al. v. General Electric Company, et al. | San Francisco County Superior Court |
| 21CV004294 | Derek Barragan, et al. v. Honeywell International, Inc. et al. | Alameda County Superior Court |
| 198624 | Rosemary Sauceda Acevedo Hernandez, et al v. Patients' Hospital of Redding, et al. | Shasta County Superior Court |

**Dr. Barry Ben-Zion's Deposition Testimony for 2025**

| CASE NUMBER | NAME OF CASE | JURISDICTION |
|---|---|---|
| CV2022-0119 | Theodore T. Pitts, et al. v. City of Davis, et al. | Yolo County Superior Court |
| 2024CUAS024817 | Sandra L. DeGraw, et al. v. 3M Company, et al. | Ventura County Superior Court |
| 2024CUAS027020 | Jimmy O. Wise, et al. v. Air & Liquid Systems Corp., et al. | Ventura County Superior Court |
| SFSC CGC-18-564487 | Melanie Siemon v. Regents of the University of California | San Francisco County Superior Court |
| 56-2023-00574619-CU-PO-VTA | Gayle Eastering, et al. v. American Insulated Wire Corp., et al. | Ventura County Superior Court |
| SFSC-CGC-23-277120 | Selena Pearson, et al. v. Metropolitan Life Insurance Company, et al. | San Francisco County Superior Court |
| SFSC-CGC-23-277128 | Beaumont Udovch, et al. v. Westburne Supply, Inc., et al. | San Francisco County Superior Court |
| SFSC-CGC-23-277165 | Clarence DeLeouis, Jr. v. General Electric Company, et al. | San Francisco County Superior Court |
| SFSC-CGC-23-277104 | John M. Burns, et al. v. J G Machee Co., et al. | San Francisco County Superior Court |
| 4:24-cv-00309-DMR | William D. Palmer, et al. v. NYK Lines, et al. | U.S. District Court, Northern District of California |
| 23CV-264020 | M. Todd Gilbert v. Aysay Stieb, et al. | Sonoma County Superior Court |
| SFSC-CGC-23-277142 | Margarita Guzman, et al. v. American Optical Corp., et al. | San Francisco County Superior Court |
| SFSC-CGC-23-277133 | Judith Lee, et al. v. Amcord, Inc., et al. | San Francisco County Superior Court |
| SFSC-CGC-22-277021 | James R. Hevener, et al. v. Bay Equipment Co., Inc. | San Francisco County Superior Court |
| 2024CUAS034989 | Charles C. Collier v. Amcord, Inc., et al. | Ventura County Superior Court |
| 3:24-cv-00209YY | Amin F. Mohamed v. Alaskan Tanker Company, LLC, et al. | U.S. District Court, Division of Oregon, Portland Division |

**Dr. Barry Ben-Zion's Deposition Testimony for 2021**

| CASE NUMBER | NAME OF CASE | JURISDICTION |
|---|---|---|
| BC722122/JCCP 4674 | Carroll W. Hylton, et al. v. 3M Company, et al. | Los Angeles County Superior Court |
| 20STCV12538 | Jeffrey Mor, et al. v. Montrose Springs Skilled Nursing & Wellness Center, et al. | Los Angeles County Superior Court |
| SFSC CGC-18-564337 | James Varga v. Twitch Interactive, Inc., a/k/a Twitch.tv, Inc. | San Francisco County Superior Court |
| MSC16-01426 | Richmond Compassionate Care, Co. v. Richmond Patient Group, et al. | Contra Costa County Superior Court |
| Arbitration #15597 | Francis Davin, et al. v. Kaiser Foundation Health Plan, et al. | Kaiser Arbitration |
| MSC16-01426 | Richmond Compassionate Care, Co. v. Richmond Patient Group, et al. | Contra Costa County Superior Court |
| SCUK-CVFL-11-57616 | Mari Rodin v. Clayton Brennan | Sonoma County Superior Court |
| RG21088294 | Edward M. Richards, et al. v. 3M Company, et al. | Alameda County Superior Court |
| SCV-258451 | Security National Guaranty, Inc. v. Evariste Group, LLC | Sonoma County Superior Court |
| 6:18-cv-01351-JWB-GEB | Stan Laber v. Lloyd J. Austin, III, Secretary of U.S. Department of Defense | U.S. District Court for the District of Kansas |
| SFL-076737 | Thomas C. Degenhardt v. Cynthia F. Nugent | Sonoma County Superior Court |
| RG18931876 | Dreisbach Enterprises, Inc. v. Pacific Coast Containers, Inc. et al. | Alameda County Superior Court |

**Dr. Barry Ben-Zion's Deposition Testimony for 2022**

| CASE NUMBER | NAME OF CASE | JURISDICTION |
|---|---|---|
| 56-2021-00555246-CU-AS-VTA | Warren Thompson,et al. v. Air & Liquid Systems Corp., et al. | Ventura County Superior Court |
| 34-2019-00252455 | Angela Updegraff v. City of Sacramento, et al. | Sacramento County Superior Court |
| SFSC CGC-20-276839 | Dolores Sugarman, et al. v. Kaiser Gypsum Co., Inc., et al. | San Francisco County Superior Court |
| RG19020984 | Oran F. Poole, et al. v. 3M Company, et al. | Alameda County Superior Court |
| 18CV325347 | Laurie Hall v. Phillip Bullock, et al. | Santa Clara County Superior Court |
| RIC1804451 | Melinda Richmond, et al. v. Polaris Industries Inc., et al. | Riverside County Superior Court |
| SCV-264020 | Jonathan Ramos, et al. v. William Wallahan, et al. | Sonoma County Superior Court |
| SFSC CGC-20-276840 | LeeAnna Timm, et al. v. General Electric Company, et al. | San Francisco County Superior Court |
| SCV-266644 | Douglas C. Fladseth, et al. v. Nzinga L. Woods | Sonoma County Superior Court |
| SCV-265337 | Alison R. O'Keefe, et al. v. Target Corp., et al. | Sonoma County Superior Court |
| 56-2022-00563261-CU-AS-VTA | Salvatore D. Papetti, et al. v. Air & Liquid Systems Corp., et al. | Ventura County Superior Court |
| SCV 263680 | Emily Vega, et al. v. St. Jospeh Health System Urgent Care, et al. | Sonoma County Superior Court |
| SFSC CGC-20-276848 | Teresa A. Starr, et al. v. Crane Co., et al. | San Francisco County Superior Court |
| MSC18-02558 | Gagandeep Bains, et al. v. Tracie Tatz, et al. | Contra Costa County Superior Court |
| 22CV01835 | William L. McDuffey III, et al. v. AGCO Corp., et al. | Alameda County Superior Court |
| MSC17-01159 | Debra M. Weiss-Ishai, et al. v. Merry P. Cheonis, et al. | Contra Costa County Superior Court |
| SFSC CGC-21-276926 | Janet Simcic, et al. v. SoCo West, Inc., et al. | San Francisco County Superior Court |
| CIV1701300 | Lauren Ross v. The Woodlands Store, Inc., et al. | Marin County Superior Court |

***BARRY BEN-ZION, Ph.D.***
***Consulting Economist***

*P.O. Box 9517, Santa Rosa, CA 95405 • Telephone (707) 526-2236*
*e-mail: barry@bbenzion.com*

# ECONOMIC VALUE OF LOST EMPLOYMENT

PETER M. COLOMBO
v.
PALO ALTO UNIFIED SCHOOL DISTRICT, et al.

June 19, 2025

**_BARRY BEN-ZION, Ph.D._**
**_Consulting Economist_**
_P.O. Box 9517, Santa Rosa, CA 95405 • Telephone (707) 526-2236_
_e-mail: barry@bbenzion.com_

June 19, 2025

Mr. Evan C. Nelson, Esq.
Attorney at Law
Law Office of Evan C. Nelson
1990 North California Blvd., 8th Floor
Walnut Creek, CA 94596

Re: Peter M. Colombo v. Palo Alto Unified School District, et al.

Dear Mr. Nelson:

I have arrived at approximately **$2,112,690** as a reasonable estimate of the economic loss that would be sustained by Peter Colombo as a result of events in 2022 and the anticipation that Mr. Colombo will no longer be employed with Palo Alto Unified School District as of 1/26/2026.

The following report provides the facts, considerations, and assumptions used to reach the above conclusion.

FACTS, CONSIDERATIONS, AND ASSUMPTIONS

VITAL INFORMATION

1. The following table provides Peter M. Colombo's vital information:

| | |
|---|---|
| DATE OF BIRTH: | 6/6/1967 |
| DATE OF VALUATION: | 1/26/2026 |
| ESTIMATED DATE OF TERMINATION OF EMPLOYMENT: | 1/26/2026 |
| DATE OF END OF WORKLIFE EXPECTANCY: | 6/14/2037 |
| DATE OF END OF LIFE EXPECTANCY: | 2/6/2050 |
| | |
| AGE AT VALUATION: | 58.64 |
| AGE AT ESTIMATED TERMINATION OF EMPLOYMENT: | 58.64 |
| AGE AT END OF WORKLIFE EXPECTANCY: | 70.02 |
| AGE AT END OF LIFE EXPECTANCY: | 82.67 |
| | |
| YEARS FROM VALUATION TO ESTIMATED TERMINATION: | 0.00 |
| YEARS FROM ESTIMATED TERMINATION TO END WORKLIFE EXPECTANCY: | 11.38 |
| YEARS FROM VALUATION TO END OF WORKLIFE EXPECTANCY: | 11.38 |
| YEARS FROM VALUATION TO END LIFE EXPECTANCY: | 24.03 |

Sources:

*Worklife Expectancy: Gary R. Skoog, James E. Ciecka and Kurt V. Krueger, "The Markov Model of Years to Final Separation from the Labor Force 2012-17: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors" Journal of Forensic Economics, Vol. 18, No. 1-2, September 2019.*
*Male, Bachelor's degree*

*Life Expectancy: National Center for Health Statistics, "United States Life Tables, 2019" Volume 70, Number 18*
*Male, California*

LOSS OF EARNINGS AND RETIREMENT INCOME

2. The economic loss consists of the past and future loss of earnings.

3. At this time, the amount needed to neutralize the adverse tax consequence of a lump sum award (or settlement) has not been determined.

4. Mr. Colombo has been working as a full time teacher for the Palo Alto Unified School District for many years. Mr. Colombo has a Bachelor's degree plus 90 additional units. In addition to his teaching pay, Mr. Colombo also teaches during the Summer School session and he coaches basketball and baseball.

5. You have asked me to assume that Mr. Colombo will be constructively terminated as of 1/26/2026.

**Past Loss of Earnings**

6. You have indicated that Mr. Colombo was not paid **$41,154.40** from August through October 2023. I have accepted this figure assuming that no other past damages have been incurred.

**Future Loss of Earnings - Present Value**

7. You have asked me to assume that Mr. Colombo will no longer be able to find an alternative teaching position given the constructive termination from the Palo Alto Unified School District.

8. The future loss of earning capacity is computed from the 1/26/2026 assumed date of termination to the end of Mr. Colombo's statistical worklife expectancy. Although Mr. Colombo's statistical worklife expectancy is to age 70.02, which is on 6/14/2037, it is assumed that Mr. Colombo would have likely worked through to the end the school year, or through 6/30/2037, when he would have been 70.06. The future loss of earnings is computed for 11.42 years.

9. You have informed me that Mr. Colombo obtained his teaching credential after earning a bachelor's degree in Psychology from University of San Francisco. His membership in the CalSTRS started on 9/01/1997, and as of 7/01/2022 Mr. Colombo had accrued 24.916 years of service with CalSTRS. With a full time schedule, Mr. Colombo would have 27.916 years of service as of 6/30/2025.

10. Given his educational attainment, Mr. Colombo's salary as a teacher with the school district was at the top step, or with 90 units credited after the receipt of a bachelor's degree.

11. The 2024-2025 salary schedule for teachers in the Palo Alto Unified School District indicates that for a teacher with a Bachelor's degree plus 90 units and with over 27 years of employment, like Mr. Colombo, the salary is $168,598 per year.

12. The teachers with the Palo Alto Unified School District earned a 7.0 percent wage increase on 7/01/2022 and an 8.0 percent wage increase on 7/01/2024. For the purpose of this analysis, it is assumed that a 3.0 percent general wage increase will take effect (retroactively) for the 2025-26 school year (a conservative assumption). The 2025-26 school year wage rate for a teacher with a Bachelor degree plus 90 units and over 27 years of service, is computed at $173,660.

13. You have indicated that Mr. Colombo has worked 4 hours per day for 17 days during the Summer school session, or a total of 68 hours during the Summer. The 2024-25 school year schedule indicates that the hourly rate is $83 per hour for the Summer school session. It is projected that the 2025-26 school year rate for teaching Summer School will be $85 per hour.

14. You have indicated that Mr. Colombo has been coaching basketball and baseball while employed at Palo Alto Unified School District. The 2024-25 Palo Alto Unified School District coaching schedule indicates that basketball (category C) and baseball (category D) provides for a total of $8,746 in additional income for a coach. It is projected that the 2025-26 school year rate for coaching will be $9,008.

15. Mr. Colombo's earning capacity, salary, Summer school pay, and coaching pay, beyond 2026 is projected to increase at 1 percent above the CBO inflation projections. This is consistent with the relationship between the increase in compensation vis-a-vis the overall rate of inflation that was experienced in the U.S. for the past 30 plus years.

16. The mandatory employee contributions to CalPERS of 10.25 percent of the projected earnings are subtracted.

17. Teachers, like Mr. Colombo, have health insurance coverage through Palo Alto Unified School District. Given the 2024 and 2025 rates for medical, dental, and vision insurance, the 2026 coverage is computed at $1,623.36 per month.

18. Mr. Colombo's health insurance coverage beyond 2026 is projected to increase at 1 percent above the CBO inflation projections. This is consistent with the relationship between the increase in health insurance premiums vis-a-vis the overall rate of inflation that was experienced in the U.S. for the past 20 plus years.

19. The discount rate used to determine the present value of the loss of future earning capacity is 4.0 percent per year, compounded. This rate is consistent with the current interest rate on prudent investments.

20. The present value of the future loss of Mr. Colombo's earnings is $2,073,613. Subtracting the mandatory contributions to CalSTRS and adding the value of health insurance coverage, produces a future loss of earnings of **$2,071,541**.

21. Mr. Colombo participates in the "2.0% at age 60" formula with CalSTRS. CalSTRS allows participants to begin receiving a monthly retirement income as early as at age 55. CalSTRS provides a longevity bonus for retirees with over 30 years of credited service.

22. At this time no consideration of the impact of the termination on Mr. Colombo's CalSTRS retirement income is computed.

TOTAL ECONOMIC LOSS

23. The total economic loss is summarized below:

SUMMARY OF LOSS OF EARNINGS
PETER M. COLOMBO

| | |
|---|---|
| PAST LOSS OF EARNINGS | 41,154 |
| FUTURE LOSS OF EARNINGS (PV) | 2,071,541 |
| **TOTAL LOSS OF EARNINGS** | **$2,112,695** |

OTHER LOSSES

24. The total economic loss shown above does not include the amount that would be required to neutralize the adverse tax consequence of a lump sum award or settlement.

Please do not hesitate to contact me if you have any questions concerning this report or any other aspect of this case.

Respectfully submitted,

Barry Ben-Zion

Barry Ben-Zion, Ph.D.
BBZ/ic

# ATTACHMENT 1E

# JESSICA CHAUDHARY, M.D.

Tel. (206) 240-5536 | Fax. (847) 258-9342 | Email. info@psychconsultancy.com | Website: www.PsychConsultancy.com


08/04/2025

## PSYCHIATRIC MEDICAL EXAMINATION AND EXPERT REPORT

RE: Peter Colombo
D/BIRTH: June 6, 1967

To Whom It May Concern:

**IDENTIFYING INFORMATION:**

This is a 58-year-old gentleman who was seen for virtual psychiatric medical examination via secured telehealth platform, Doxy.me.

**SOURCES OF INFORMATION**:

The following records were reviewed prior to this examination:

1. The complaint file in the United States District Court of the Northern District of California for the matter *Colombo v. Palo Alto Unified School District, et al.* Case Number 5:24-cv-00909.
2. A letter that is undated, written by Caitlin McCalla, LMFT.
3. The responses of Mr. Peter Colombo to district interrogatories.
4. The transcription of the deposition of Cindi Ahern.
5. The deposition of Lisa Hickey.
6. The deposition of Komathy Vishakan.
7. The deposition of Peter Colombo.
8. The declaration of the records custodian.

**HISTORY OF PRESENT ILLNESS:**

This is a 58-year-old Caucasian gentleman who had been working as a middle school PE teacher, at the same school for approximately 25 years, when in January, 2022, he




Board Certified Psychiatrist
Active medical licensure in the following U.S. states: Connecticut, Florida, Massachusetts, and Texas
Member of the American Board of Psychiatry and Neurology (ABPN)
Fellow of the American Psychiatric Association (FAPA)

Office:
Connecticut: 1698 Post Road East Suite 2A | Westport, CT | 06880

JESSICA CHAUDHARY, M.D.

Tel. (206) 240-5536 | Fax. (847) 258-9342 | Email. info@psychconsultancy.com | Website: www.PsychConsultancy.com

states that his wife received an email from an anonymous person stating that Mr. Colombo had raped this person's wife 20 years ago at the school in the locker room. He states that his wife received the email on a Friday, and on Sunday when he learned of this email, he proceeded to call the school district as well as go to the police. He states the events that transpired following the receipt of this email were extremely distressing for him.

On the Monday following this incident, he was placed on paid leave. He then met a detective who said that there would likely be an investigation; but, for the time being, he could proceed with his life unless he heard otherwise. He states several months went by, and in June, 2022, he was charged with sexual assault and was sent to jail, where he spent one week in solitary confinement prior to being released. When he was released, he was released with an ankle monitor and confined to his home until March, 2023.

He states that in April, 2023, all legal charges were dropped, and he thought that he could go back to being a coach and teacher, a job that he had enjoyed for the last 25 or so years. He states that the arrest and criminal prosecution were traumatic while he was going through that part of the ordeal, but when the charges were finally dropped, he was ready at the point to put it behind him and move forward with his teaching and coaching career. What he identifies as being the most troubling was how he was treated by the district and its key administrators who made representations and promises to him that they did not keep regarding conducting an immediate and proper investigation that he understood would clear him by mid-2022, then retaliating against him by continuing to treat him as though he were guilty even after the criminal charges were dropped and prolonging his emotional or mental distress from May of 2023 through the present. That betrayal by people he trusted combined with their publicly humiliating him and making public statements implying his guilt and that he was unfit to teach, Mr. Colombo feels has been more damaging to him than the investigation by law enforcement.

Even though the criminal charges were dropped, Mr. Colombo did not return to his teaching position. Instead, he was then notified that the state of California and the Palo Alto Unified School District would be launching their own investigations, and he was placed back on leave. He states for several months, he had unpaid leave, which was not ever reimbursed to him; and, in October, 2023, after he and his lawyer traveled to



Board Certified Psychiatrist
Active medical licensure in the following U.S. states: Connecticut, Florida, Massachusetts, and Texas
Member of the American Board of Psychiatry and Neurology (ABPN)
Fellow of the American Psychiatric Association (FAPA)

Office:
Connecticut: 1698 Post Road East Suite 2A | Westport, CT | 06880

JESSICA CHAUDHARY, M.D.

Tel. (206) 240-5536 | Fax. (847) 258-9342 | Email. info@psychconsultancy.com | Website: www.PsychConsultancy.com

Sacramento, his teaching credential was renewed, but he was still placed on leave for the following academic year instead of being returned to his teaching and coaching positions.

In July, 2024, he received a letter stating that he would be able to rejoin the school but only as a "TOSA," teacher on special assignment, in the physical education department. When asked what this meant, he describes that it was essentially a job in which he was always watched, and he could not really interact meaningfully teaching children in any capacity any longer.

He states that as of our interview on August 4, 2022, he continues to be in this role. Mr. Colombo also states he is pending returning to school in the fall; however, at a different school that is within the same district, Fletcher Middle School. This school is also in the backyard of the former school board president, who Mr. Colombo states has been the driving force behind the district's actions against him. He states that it also significantly increases his commute times daily and it moves him away from his longstanding support group and surroundings with which he is most comfortable and familiar. There are also petitions circulating to not have him return to teaching at Fletcher. This has been exceedingly difficult for him and he gets markedly shaken and tearful considering going to teach at this new school, where he states there will be protestors trying to dissuade him from entering. Mr. Colombo states that he has thought about going somewhere else, but he has, at this point, a nearly 28-year history with the school, and he wants to stand up for his rights and protect his innocence. He feels that his name has been severely sullied by stigmatizing public statements that were made in the press and elsewhere.

Mr. Colombo describes his self-esteem as low because of this incident. He feels on edge at times and constantly anxious. He has decreased enjoyment in the things that he used to enjoy. He states that he used to be able to feel "free and easy" around kids and being their teacher, and he is constantly on edge now. He describes his energy as being okay, his appetite as being up and down with a weight loss of 15 pounds over the course of this incident. His concentration is described as normal. He describes sleeping with melatonin but having nightmares at times, especially of being in jail and solitary confinement. He describes constant anxiety, especially in terms of going back to the school, but no panic. He denies obsessive compulsive thinking. He denies



Board Certified Psychiatrist
Active medical licensure in the following U.S. states: Connecticut, Florida, Massachusetts, and Texas
Member of the American Board of Psychiatry and Neurology (ABPN)
Fellow of the American Psychiatric Association (FAPA)

Office:
Connecticut: 1698 Post Road East Suite 2A | Westport, CT | 06880

JESSICA CHAUDHARY, M.D.

Tel. (206) 240-5536 | Fax. (847) 258-9342 | Email. info@psychconsultancy.com | Website: www.PsychConsultancy.com

mania. He denies psychosis. He denies suicide attempts. He states he did think about suicide while he was in solitary confinement. He denies a history of violence. He describes a mental health history significant for therapy in 2003 to 2004, after being hospitalized due to a splenectomy. He states he was previously seen by someone he describes as an addiction specialist from the ages of 38 to 40. He was placed on lamotrigine and Topamax at that time. He may have received a diagnosis of bipolar disorder in the context of alcohol use. He had two rehab stays in 2003 and 2006. He also has been in therapy with Ms. Caitlin McCalla since October, 2023, twice a month and she has treated him for PTSD and anxiety disorder

Mr. Colombo describes having negative thoughts about himself and feeling guilty for what this ordeal has put his family through, particularly his wife and his parents, who are in their 80s. He has also tried to stay away from places that are reminders of this traumatic experience.

**SUBSTANCE USE HISTORY:**

Mr. Colombo does have a history of drinking from age 17 until about age 38. He has a history of using alcohol and marijuana. He did receive two DUIs in 1991 and 2003. He states he did dabble in drug use when he was younger. However, he has been completely sober for the last 15 years and attends AA meetings religiously.

**MEDICAL/SURGICAL HISTORY:**

He denies medical history. He denies traumatic brain injury. His spleen was removed in 2003. He denies allergies.

**CURRENT MEDICATIONS:**

He is currently not taking any prescription medications.

**FAMILY HISTORY:**



Board Certified Psychiatrist
Active medical licensure in the following U.S. states: Connecticut, Florida, Massachusetts, and Texas
Member of the American Board of Psychiatry and Neurology (ABPN)
Fellow of the American Psychiatric Association (FAPA)

Office:
Connecticut: 1698 Post Road East Suite 2A | Westport, CT | 06880

JESSICA CHAUDHARY, M.D.

Tel. (206) 240-5536 | Fax. (847) 258-9342 | Email. info@psychconsultancy.com | Website: www.PsychConsultancy.com

His mother and father are both living. He has two sisters and no children. He is originally from California. He describes a good childhood but some difficulty with his father after he sustained a sports injury and his dad being verbally abusive towards him at times.

**SOCIAL HISTORY:**

He has been married for 13 years. This is his second marriage. His first marriage ended in divorce in 2001. He completed college and some master's degree. He denies military history.

**MENTAL STATUS EXAMINATION:**

This is a casually groomed gentleman who is cooperative throughout the interview. He is wearing glasses. His behavior is within normal limits, but he is noted to have a tearful affect and at times becomes extremely tearful through the interview. His mood is described as on edge. His thoughts are linear. His thought content is within normal limits. There is no current suicidal or homicidal ideation. There are no auditory or visual hallucinations.

**COGNITIVE EXAMINATION:**

He is alert and oriented x3. He is able to spell "world" correctly forwards and backwards. He is able to tell me four quarters, three dimes, two nickels, and a penny equals $1.41. He is not able to recall any of the three objects that he is presented with after five minutes.

**SUMMARY AND CONCLUSIONS:**

This is a 58-year-old gentleman who was prosecuted for sexual assault, improperly removed from his teaching position, maligned in the press and elsewhere, and also has been retaliated against by his employer for standing up for himself against the wrongful claim. The criminal charges against him have been dropped, and he has finally been



Board Certified Psychiatrist
Active medical licensure in the following U.S. states: Connecticut, Florida, Massachusetts, and Texas
Member of the American Board of Psychiatry and Neurology (ABPN)
Fellow of the American Psychiatric Association (FAPA)

Office:
Connecticut: 1698 Post Road East Suite 2A | Westport, CT | 06880

# JESSICA CHAUDHARY, M.D.

**Tel. (206) 240-5536 | Fax. (847) 258-9342 | Email. info@psychconsultancy.com | Website: www.PsychConsultancy.com**


reinstated at the school district that he used to work at for 25 years after more than a year of additional forced leave following dismissal of the criminal charges; however, the nature of his job responsibilities were initially substantially changed to a non-teaching position despite, he states, the charges being dropped and all investigations being closed. He is now being transferred to a perceived hostile environment at a different school from where he has spent almost his entire 25-plus years working at the District.

Mr. Colombo describes significant anxiety as well as PTSD symptoms, including the re-experiencing symptom of flashbacks, avoiding reminders of the event, feeling on edge, having difficulty sleeping, which arousal and reactivity symptoms, as well as cognitive and mood symptoms, including having negative thoughts about himself, loss of interest in enjoyable activities, and feeling guilty for the pain that this ordeal has caused his wife and his parents. The events in question has had a significant impact on Mr. Colombo's life, and he continues to sustain significant damage from an emotional standpoint.

He is in therapy, and he should continue to engage in therapy, and he should also consider starting psychiatric medication, such as anxiolytics, to help with both symptoms of anxiety and post-traumatic stress disorder.

Furthermore, it is not recommended that Mr. Colombo return to Fletcher Middle School, given the severity of his emotional response. It is recommended he be allowed to return to the same school where he taught for more than 25 years, Greene, and where he has a more extensive support network. The school board should also issue a formal apology to aid in clearing his name and getting his life back on track.

## OPINIONS

Based on the above medical examination and discussion along with my extensive training and experience as a Board Certified Psychiatrist, the following opinions are stated to a reasonable degree of medical certainty following standard protocols for my profession including the established clinical guideline of psychiatric interview and diagnoses based on Diagnostic and Statistical Manual of Mental Disorders or DSM V:




Board Certified Psychiatrist
Active medical licensure in the following U.S. states: Connecticut, Florida, Massachusetts, and Texas
Member of the American Board of Psychiatry and Neurology (ABPN)
Fellow of the American Psychiatric Association (FAPA)

Office:
Connecticut: 1698 Post Road East Suite 2A | Westport, CT | 06880

JESSICA CHAUDHARY, M.D.

Tel. (206) 240-5536 | Fax. (847) 258-9342 | Email. info@psychconsultancy.com | Website: www.PsychConsultancy.com

1. Each of the significant past traumatic events suffered by Mr. Colombo throughout his life have played a role contributing to his current mental health.

2. Since Mr. Colombo has been completely sober from April 2010 to current, he had effectively managed and controlled his alcohol use, and as of January 28, 2022 (the date of the report claiming he was the perpetrator of a sexual assault against an 11 year-old girl about 20 years prior), he was in a good place from a mental health perspective.

3. The report against him, criminal investigation, arrest and prosecution had a substantial adverse impact on Mr. Colombo's mental health status during the time that he was going through that experience, including some suicidal ideation while he was jailed in solitary confinement. However, Mr. Colombo endured that process and was ready to move forward with his life when the criminal charges were dropped, including returning to the teaching and coaching career that he loved. However, the ongoing distrust of Mr. Colombo and the ongoing investigation, initiated by the school, further exacerbated Mr. Colombo's mental health condition.

4. The most significant traumatic events that have substantially contributed to cause Mr. Colombo's current adverse mental health conditions stem from perceived mistreatment by his employer, including the school district and key members of the school's administration.

5. It is my opinion that Mr. Colombo should continue to engage in therapy and is likely to require therapy for the foreseeable future due to the prolonged nature of the harms to his mental health that continued after the criminal charges were dropped.

6. Furthermore, it is my opinion that Mr. Colombo's current mental health state does not support a return to Fletcher Middle School under the existing circumstances, given the severity of his emotional response. It is my opinion that his mental health would best be supported by being allowed to return to the same school



Board Certified Psychiatrist
Active medical licensure in the following U.S. states: Connecticut, Florida, Massachusetts, and Texas
Member of the American Board of Psychiatry and Neurology (ABPN)
Fellow of the American Psychiatric Association (FAPA)

Office:
Connecticut: 1698 Post Road East Suite 2A | Westport, CT | 06880

JESSICA CHAUDHARY, M.D.

Tel. (206) 240-5536 | Fax. (847) 258-9342 | Email. info@psychconsultancy.com | Website: www.PsychConsultancy.com

where he taught for more than 25 years, Greene, and where he has a more extensive support network. It is also my opinion that one of the best supports for Mr. Colombo would be for the school board to issue a corrected statement to the community to include statements made by their own investigator as discussed during Mr. Colombo's deposition and to aid Mr. Colombo in clearing his name and getting his life back on track.

Respectfully submitted,

Jessica Chaudhary, MD

Jessica Chaudhary, MD
Psychiatry

**References**

1. Brooks and Greenberg. *Psychological Impact of Being Wrongfully Accused of Criminal Offence: A Systematic Literature Review,* Medicine Science and the Law, 2021 Volume 61(1) 44-54.

2. Darunde and Bansal, *Psychological Impact of Falsely Accused and Wrongful Convictions in Sexual Assault Cases: A Systematic Literature Review,* Industry 5.0 an Paradigm Shift 2023 (page 99)

3. Simon, Robert. *The Psychological and Legal Impact of False Arrest and Imprisonment.* Bull Am Academy of Psychiatry and the Law, Vol 21 No 4, 1993



Board Certified Psychiatrist
Active medical licensure in the following U.S. states: Connecticut, Florida, Massachusetts, and Texas
Member of the American Board of Psychiatry and Neurology (ABPN)
Fellow of the American Psychiatric Association (FAPA)

Office:
Connecticut: 1698 Post Road East Suite 2A | Westport, CT | 06880

# JESSICA CHAUDHARY, MD

206-240-5536 · jessicajchaudhary@gmail.com · linkedin.com/in/dr-jessica-c-125b49178/

Results-oriented medical director leading key growth initiatives with a passion for integrated whole health. Known for delivering innovative, impactful, cost-saving solutions and strategies that streamline processes, drive business growth, and improve clinical care outcomes. Committed, analytical, and driven with strong management skills and experience that builds and empowers teams. Relentless work ethic, creative problem solving, effective communication. Successful implementation and execution of novel and cutting-edge clinical programs.

## CORE COMPETENCIES

- Program Design and Innovation
- Case Management
- Process Improvement
- Program Management and Implementation
- Data Analytics
- Policy Interpretation
- Consultation
- Quality Assurance
- Product Development
- Population Health

## PROFESSIONAL EXPERIENCE

**Elevance Health (formerly Anthem Blue Cross Blue Shield)** **2018-Present**

*Medical Director, National Accounts*

- Provide clinical leadership and direction to utilization and care management teams focusing on topics including cost of care opportunity identification and project development. Savings of **$100m over 5 years**
- Identify high-cost claimants and create targeted and innovative interventions to earn 5:1 return on investment
- Develop educational material and product content related to significant mental health issues
- Numerous presentations to large National Accounts clients such as Bank of America, Verizon, Wells-Fargo, etc.
- Participate in Digital Solutions Steering Committee responsible for creating and developing company digital strategy
- Build and foster relationships between providers and stakeholders within the Elevance network and beyond.
- Coordination of integration activities and comparative analysis of capabilities between Anthem/Beacon Health merger
- Developing curriculum related to the creating of clinical health programs
- Leading teams in ideating and implementing cost of care initiatives and leading integrated clinical rounds related to the initiatives

***Elevance Health Cost of Care Initiatives:***

***Suicide Prevention Program***

Thought leader in creating, implementing and executing a program based on predictive analytics to offer case management and prevention strategies, including peer supports, for those at high risk of suicide. Ages 10 and up, across commercial and government business. **Targeting nearly 25k members** Clinical outcomes show fifteen percent reduction in suicide attempts and events in a high risk population. Vendor based texting for member engagement. **Publication: *Journal of Community Medicine and Public Health Volume 7: 378* Oct 2023.** Submitted for NCQA award. Expanding scope.

***Cardiac Care and Chronic Disease Management Program***

Integrated behavioral health initiative targeting those with co-occurring cardiac and behavioral health concerns including those that present to the Emergency Room with chest pain that is anxiety related. Case management and health coaches offered to improve member lifestyle and progression of chronic disease as well as offering integrating approaches to disease management. **Targeting nearly 10k members**

***Sleep Apnea and Chronic Care Disease Management Program***

Integrated behavioral health case management initiative for ages 60-75 across commercial and government business. Goal to reduce the longoterm impacts of sleep apnea in those with diagnosis and other chronic medical and behavioral health conditions and subsequent reduce long term health care costs. **Targeting over 15k members**

***Health Stress Program***

Targeting those members, by predictive analytics, at high risk for food insecurity, housing insecurity, and abuse using a Health Stress Score (HSS). Case management and peer based program to offer intervention in these areas of high stress to reduce the impact to health care and cost. **Targeting nearly 22k members**

## EDUCATION

**DOCTOR OF MEDICINE (MD)** June 2007
**University of Washington** Seattle, WA

**BACHELOR OF ARTS -** *Political Science with Honors* June 2002
**Wellesley College** Wellesley, MA

## CLINICAL TRAINING

**FELLOWSHIP, PSYCHOSOMATIC MEDICINE**
**Harvard Medical School/Brigham and Women's Hospital and Dana Farber Cancer Institute**
October 2012 – January 2014
Boston, MA

**INTERNSHIP AND PSYCHIATRY RESIDENCY** June 2007 – June 2011
**Yale University** New Haven, CT

## POLICY FELLOWSHIP

**HEALTH POLICY FELLOW** January 2012 – June 2012
**American Academy for the Advancement of Science** Washington, D.C.

- *Advisor and Fellow*, State Department, International Health Bureau
- Faculty Appointment**:** George Washington University School of Medicine, Clinical Instructor

## LICENSES & CERTIFICATIONS

**Current Medical Licenses:** States of Connecticut, Florida, Massachusetts and Texas
**Board Certified in Psychiatry by the American Board of Psychiatry and Neurology**
**Diplomate of the American Board of Psychiatry and Neurology** 2012

## ACADEMIC APPOINTMENT & LEADERSHIP

**Yale University School of Medicine, Clinical Instructor**

## AWARDS

***2024: Strategic Innovator Award, Blues Consortium Health Plans***

***2019: Values in Action Award and Certificate of Recognition for Leadership at Elevance Health***

***Several IMPACT awards recognizing significant contributions to Elevance Health***

## CURRENT MEMBERSHIPS

- Academy of Psychosomatic Medicine
- American Psychiatric Association
- American Medical Association and American Medical Women's Association
- American College of Healthcare Executives
- American Association for Physician Leadership
- Clinical practice in Connecticut

**LIST OF CASES**

- *Estate of Maria Elthes* (New York County, NY)
- *Alston v. Danielle Hall, Youth and Family Alternatives Inc* (Hillsborough County, FL)
- *Krishnamani v. Suresh* (Philadelphia, PA 2023)
- *Bradford v. Gilleon et al.* (Leon County, FL)
- *Llanas Moreno v. Stratmann* (Harris County, TX)
- *Lopez v. Butler Hospital Et Al* (Boston, MA)
- *DOH v Ramos Administrative Complaint* (FL 2019)
- *Romero v. Samadzeyeu* (Erie County, NY 2017)
- *Texas Medical Board v. Tannu* (Harris County, TX)
- *Hamboze, Hawraa (a/n/f of R.A. and H.A.) v. Raamco RBBC, LLC* (Harris County, TX)
- *Ashraf v. Bell* (Dallas County, TX)
- *Sottile v. Rose Arbor Homeowner's Association* (NJ)
- *Ford v. Jaccard* (NM)
- *DOJ v. Dr. Devine* (FL)
- *State of FL v. Colby Norris (Gandolfo v. Clearwater Holdings)* (Pinellas County, FL)
- *State v. Carmine Biello* (FL)
- *Camal Barnes* (Waterbury Court, CT)
- *Gonzalez v. Robbins State of Indiana Department of Insurance* (IN)
- *Katia Borgella and Anthony Williams v. Robins & Morton Corp* (Miami Dade, FL)
- *Charles A. Boggs v. BP Exploration & Production, Inc.* (E.D. LA 2016)
- *Martinez v. Webber* (Tampa, FL)
- *Mind and Soul Therapy and Mariela Padro MD v. Delgado* (11th Cir. 2023)
- *Commonwealth of PA, DOT v. Rebecca Jean Hayden* (Bucks County, PA)
- *Pamela Balsley, Individually and Personal Representative of the Estate of Joseph Balsley v Atrium Medical Center, et al.* (Butler County Court, Hamilton, OH)
- *S. Omojola vs ARC of Ocean Co et al.* (D.N.J. 2022)
- *Matthew Timberger et al. v. Bradley Rein et al.* (Middlesex, SS. Superior Court)
- *Gail Delaney v. VPNE Parking Solutions et al.* (Middlesex, SS. Superior Court)
- *Ruffin v. BP Exploration & Production, Inc., et al.*, Case No. 2:22-CV-01006 (E.D. La.).
- *Guay v. Acadia Hospital Corporation* (D.Me. 2024)
- *Charles Hunnicutt vs Innercept LLC* (Idaho Dist. 2021)
- *Edward Mendez v. T-Mobile USA, Inc.* (S.D.Fla 2021)
- *Rivera v. City of York et al* (M.D.Pa. 2022)
- *Motes vs. USA 1:23-cv-00629-CCC* (Middle District of PA)
- *Tammy Damron vs. Appalachian Regional Health Care, Inc* Kentucky Perry Circuit Civil Action No 22-CI-432
- *Michelle Thornton vs Washington, DC Department of Building*
- *MUSHAWN KNOWLES, as Personal Representative of the Estate of ODESSA EASTERLIN. Plaintiff, vs.ABDELHAKIM CHOUBABI, an individual; and BEST FOOD INC., d/b/a THE CANDY MARKET, a corporate business domiciled and operating in the State of Washington; MOHAMMAD ALHAWAMDEH, an individual; and MAHMOUD ALHAWAMDEH, an individual; State of Washington Pierce County NO. 23-2-04871-2*
- *Zander Angelovic v. Okaloosa Island Fire District Pensacola Florida 24-009359JW*
- *Darryl W. Finkton, Jr. v. Clarence Glenn, III, M.D., case no. 22STCV18895, California Superior Court- Los Angeles County, Judge*

**LIST OF CASES**

- *Ian Conley, Plaintiff v 165 Thorndike Street Corp; Select One Construction LLC, Excel Mechanical inc and Lupoli Companies, LLC Defendants v Control Technologies Inc, Third Party Defendant Massachusetts*
- *Efrat Yair vs. IVFMD, Ineabelle Collazo, Daniella Zitzmann 2024-003025-CA-01*
- *Angela and Andrew Pack v Adam Lashner and Nai Mertz Corporation Court of Common Pleas Philadelphia County 2403-01525*
- *Marcia Mazzoni Lutter v Jefferson Health et al Court of Common Pleas Philadelphia County 2301-00032*
- *Berthiaume vs. North American Insurance for Life and Health Insurance Case No. 2:24-cv-11925 Easter District of Michigan, Southern Division*
- *Elkhalil v East Beach, LLC, Case No. 25-60391-CIV-SMITH, S.D. Fla 2025*
- *Thomas et al v Orozco-Pineda et al Case No 3:24-cv-00288-MEM US District Court, Middle District of PA*
- *Caroline Miller v. Acadia Malibu Inc, Case No 24SMCV00646 Superior Court for the State of California, County of Los Angeles, West District*
- *Teofilo Reynoso vs The City of New York et al Case No 806435/2022E*

# [ATTACHMENT 1F]

fpamed

**James Armontrout, MD**
*Forensic Psychiatrist*
*Board Certified – Psychiatry, Addiction Medicine & Forensic Psychiatry*
825 San Antonio Road #105
Palo Alto, CA 94303
P (650) 772-8439
F (256) 242-0953
jarmontrout@fpamed.com

University Appointment
Stanford School of Medicine
*Clinical Associate Professor of Psychiatry*

fpamed Medical Directors
Mark I. Levy, MD, DLFAPA
*Medical Director*
Charles Saldanha, MD, DFAPA
*Assistant Medical Director*

Main Office
Forensic Psychiatric Associates, LP
440 N. Barranca Ave. #1946
Covina, CA 91723 P
(415) 388-8040
F (415) 634-2400
www.fpamed.com
forensics@fpamed.com

9/9/2025

Benjamin I. Oreper
Bertrand Fox Elliot Osman + Wenzel
The Waterfront Building
2749 Hyde Street
San Francisco, CA 94109
Cell: 415-933-0034
Office: 415-353-0999 x113

**RE: Colombo v. PAUSD, Case No. 5:24-cv-909-NC**

Dear Mr. Oreper:

At your request I evaluated Mr. Colombo on 8/21/2025 for three hours and thirty minutes. The following report and my conclusions are based on my interview of Mr. Colombo and the information listed below. I reserve the right to modify my findings should additional relevant material become available.

Of note, the duration of this examination including testing was limited to 3.5 hours. This led to modifications of the examination including:

- Only one psychological test was performed, rather than performing multiple instruments as per recommended and usual practice;
- Portions of Mr. Colombo's history, particularly the social history, by necessity were reviewed in a superficial manner.

These modifications would be expected to:

- Decrease the likelihood of detecting feigning or exaggerating if present, and
- Decrease the likelihood of detecting other causes of Mr. Colombo's mental health conditions, if any.

In addition to the limits on the examination, I have not reviewed any primary source medical records in this case. I reviewed a one-page statement from Mr. Colombo's therapist confirming that he has engaged in psychotherapy and that she diagnosed PTSD and Generalized Anxiety Disorder.

Remaining mindful of these limits, my examination was sufficient to reach opinions to a reasonable degree of medical certainty.

## Contents

EXAMINER QUALIFICATIONS ..... 3
MY OPINIONS (STATED TO A REASONABLE DEGREE OF MEDICAL CERTAINTY): ..... 3
SOURCES OF INFORMATION ..... 10
INFORMED CONSENT ..... 12
PSYCHIATRIC HISTORY BEFORE THE RAPE ALLEGATION ..... 12
SUBSTANCE USE HISTORY ..... 13
TRAUMA HISTORY ..... 14
ACCOUNT OF THE RAPE ALLEGATION AND SUBSEQUENT EVENTS ..... 14
CURRENT PSYCHIATRIC SYMPTOMS ..... 18
MEDICAL HISTORY ..... 19
FAMILY HISTORY ..... 19
SOCIAL HISTORY ..... 20
- Daily Routine ..... 20
- Childhood ..... 20
- Relationship History ..... 20
- Education History ..... 20
- Military History ..... 21
- Occupational History ..... 21
- Hobbies and Interests ..... 21
- Religion ..... 21
- Legal History ..... 21

CURRENT MENTAL STATUS EXAMINATION ..... 22
TESTING REVIEWED ..... 23
REVIEW OF RELEVANT RECORDS ..... 23
References ..... 24

## EXAMINER QUALIFICATIONS

I received both my B.A. in Psychology and my M.D. from the University of Virginia. I completed residency training in Psychiatry at the Harvard Longwood Psychiatry Residency Training Program, followed by fellowship training in Forensic Psychiatry at the University of California, San Francisco. I am board certified in Psychiatry with Added Qualification in Forensic Psychiatry by the American Board of Psychiatry and Neurology. I am also board certified in Addiction Medicine by the American Board of Preventive Medicine.

I served as a Staff Psychiatrist from August 2017 to May 2022 in the VA Palo Alto's Trauma Recovery Program, a residential treatment program focused on treating PTSD and other trauma-based disorders. I also instructed and supervised Stanford medical students and residents completing rotations at the Trauma Recovery Program. I have since moved to the Stanford Department of Psychiatry and Behavioral Sciences where I serve as the Program Director for the Forensic Psychiatry Fellowship. I also serve as an attending psychiatrist in the Post-Traumatic Stress Disorder Clinic and the Dual Diagnosis (addiction) clinic.

I have performed over 200 Independent Medical Evaluations (IMEs) and have been qualified as an expert in the field of psychiatry in courts in California. I am a member of the American Academy of Psychiatry and the Law and of the American Psychiatric Association.

## MY OPINIONS (STATED TO A REASONABLE DEGREE OF MEDICAL CERTAINTY):

**1. Mr. Colombo meets diagnostic criteria for Generalized Anxiety Disorder. He does not meet criteria for Post-Traumatic Stress Disorder. He likely met criteria for Major Depressive Disorder in the months after the rape allegation but this is presently in remission. Mr. Colombo also meets criteria for Alcohol Use Disorder in long-term remission (abstinent from alcohol since 2010).**

Per the DSM-5-TR **Generalized Anxiety Disorder** is characterized by:

| **Diagnostic Criteria** | **F41.1** |
|---|---|

A. Excessive anxiety and worry (apprehensive expectation), occurring more days than not for at least 6 months, about a number of events or activities (such as work or school performance).

B. The individual finds it difficult to control the worry.

C. The anxiety and worry are associated with three (or more) of the following six symptoms (with at least some symptoms having been present for more days than not for the past 6 months):

**Note:** Only one item is required in children.

1. Restlessness or feeling keyed up or on edge.
2. Being easily fatigued.
3. Difficulty concentrating or mind going blank.
4. Irritability.
5. Muscle tension.
6. Sleep disturbance (difficulty falling or staying asleep, or restless, unsatisfying sleep).

D. The anxiety, worry, or physical symptoms cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

In addition, criterion E specifies that the disturbance is not attributable to the physiological effects of a substance or to another medical condition. Criterion F clarifies that the diagnosis must not be better explained by another mental disorder.

Mr. Colombo described continuing to experience:

- Anxiety, for example when he returned to school and faced protests against his return or “dirty looks” from students.
- Having some difficulty with concentration and “slowing down” his mind and thoughts. He has previously been diagnosed with ADHD but noted that the “dark cloud” of anxiety impacts on his concentration as well.
- Irritability and anger, for example when thinking about what he perceives to be unjust handling of the allegation against him.
- Some muscle tension that primarily manifests as lower back pain.
- Some sleep disturbance, though with the use of over the counter melatonin (a sleep aid) his sleep is intact and restorative.
- A physical sensation of a “bowling ball” in his stomach that occurs when he feels anxious. This has been associated with decreased appetite and weight loss. This has also been associated with past instances of vomiting in response to intense anxiety.
- Frequently thinking about the rape allegation and its sequelae.
- Worry about how others will perceive any situation where he is alone with a child.
- Occasional senses of unreality, questioning how his situation is “happening” or “is real.”

It is likely that Mr. Colombo met diagnostic criteria for Major Depressive Disorder in the months after the allegation, though this appears to be in remission at this time. In addition to symptoms related to his anxiety disorder he described experiencing:

- A lack of enjoyment of life.
- Low appetite with an initial 10-pound weight loss (around February to March of 2022).
- More substantial sleep disruption, sleeping around six hours per night. His insomnia intensified once incarcerated.
- Hopeless thoughts around the time of booking for the charge, believing "my shit is hitting the papers and my life is over."
- Frequent crying, such as while exercising on the treadmill.
- Developing suicidal thoughts about hanging himself while incarcerated, along with suicidal thoughts about killing himself if he was later found guilty.

Mr. Colombo stated that recently he has experienced enjoyment of time with his family and with the recovery (twelve step) community. His sleep is intact with over-the-counter melatonin. He did not describe hopelessness and noted his determination to be resilient at several points during the examination. His memory is intact, and while his concentration remains disrupted this appears related both to longstanding deficits (past ADHD diagnosis) and anxiety. He also has not experienced any suicidal thinking since shortly after his 2022 incarceration. He described frequent irritability and anxiety, but not a pervasive sense of sadness or anhedonia (absence of pleasure).

In addition, Mr. Colombo does not meet diagnostic criteria for Post-Traumatic Stress Disorder. Per the DSM-5-TR, a diagnosis of Post-Traumatic Stress Disorder requires:

A. Exposure to actual or threatened death, serious injury, or sexual violence in one (or more) of the following ways:
   1. Directly experiencing the traumatic event(s).
   2. Witnessing, in person, the event(s) as it occurred to others.
   3. Learning that the traumatic event(s) occurred to a close family member or close friend. In cases of actual or threatened death of a family member or friend, the event(s) must have been violent or accidental.
   4. Experiencing repeated or extreme exposure to aversive details of the traumatic event(s) (e.g., first responders collecting human remains; police officers repeatedly exposed to details of child abuse). **Note:** Criterion A4 does not apply to exposure through electronic media, television, movies, or pictures, unless this exposure is work related.

B. Presence of one (or more) of the following intrusion symptoms associated with the traumatic event(s), beginning after the traumatic event(s) occurred:
   1. Recurrent, involuntary, and intrusive distressing memories of the traumatic event(s). **Note:** In children older than 6 years, repetitive play may occur in which themes or aspects of the traumatic event(s) are expressed.

2. Recurrent distressing dreams in which the content and/or affect of the dream are related to the traumatic event(s). **Note:** In children, there may be frightening dreams without recognizable content.
3. Dissociative reactions (e.g., flashbacks) in which the individual feels or acts as if the traumatic event(s) were recurring. (Such reactions may occur on a continuum, with the most extreme expression being a complete loss of awareness of present surroundings.) **Note:** In children, trauma-specific reenactment may occur in play.
4. Intense or prolonged psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event(s).
5. Marked physiological reactions to internal or external cues that symbolize or resemble an aspect of the traumatic event(s).

C. Persistent avoidance of stimuli associated with the traumatic event(s), beginning after the traumatic event(s) occurred, as evidenced by one or both of the following:
1. Avoidance of or efforts to avoid distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s).
2. Avoidance of or efforts to avoid external reminders (people, places, conversations, activities, objects, situations) that arouse distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s).

D. Negative alterations in cognitions and mood associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:
1. Inability to remember an important aspect of the traumatic event(s) (typically due to dissociative amnesia, and not to other factors such as head injury, alcohol, or drugs).
2. Persistent and exaggerated negative beliefs or expectations about oneself, others, or the world (e.g., "I am bad," "No one can be trusted," "The world is completely dangerous," "My whole nervous system is permanently ruined").
3. Persistent, distorted cognitions about the cause or consequences of the traumatic event(s) that lead the individual to blame himself/herself or others.
4. Persistent negative emotional state (e.g., fear, horror, anger, guilt, or shame).
5. Markedly diminished interest or participation in significant activities.
6. Feelings of detachment or estrangement from others.
7. Persistent inability to experience positive emotions (e.g., inability to experience happiness, satisfaction, or loving feelings).

E. Marked alterations in arousal and reactivity associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:
1. Irritable behavior and angry outbursts (with little or no provocation), typically expressed as verbal or physical aggression toward people or objects.
2. Reckless or self-destructive behavior.

3. Hypervigilance.
4. Exaggerated startle response.
5. Problems with concentration.
6. Sleep disturbance (e.g., difficulty falling or staying asleep or restless sleep).

F. Duration of the disturbance (Criteria B, C, D and E) is more than 1 month.
G. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.
H. The disturbance is not attributable to the physiological effects of a substance (e.g., medication, alcohol) or another medical condition.

During my examination Mr. Colombo described only one recent exposure that would meet Criterion A. He stated that when he was booked into jail the officer told him that he would likely be assaulted. Mr. Colombo stated that he feared that he would be attacked and could be seriously injured. This experience meets criterion A1, exposure to threatened serious injury. He did not describe other situations where he believed he would be exposed to death, serious injury, or sexual violence. If Post-Traumatic Stress Disorder were present related to these charges, the fear of injury when jailed would be the cause.

In Mr. Colombo's case, however, he does not endorse sufficient symptoms to reach a diagnosis of PTSD. Regarding Criterion B, he experiences recurrent, involuntary, intrusive memories about the rape allegation and subsequent events on a daily basis. He does not experience nightmares, though can at times have stressful dreams related to the rape allegation and subsequent events. He does not experience flashbacks, and his physical and psychological distress in response to ongoing stress are better explained by his Generalized Anxiety Disorder.

Importantly, Mr. Colombo did not describe pathological avoidance behaviors. He has continued work with the Palo Alto school district and find coaching and teaching meaningful. He described avoiding going out in Palo Alto because of the notoriety related to publicity around his charge. This avoidance appears to be rooted in reality-based concerns rather than distorted or pathological beliefs, as evidenced by media coverage of his case and community-based protests about his return to teaching.

Regarding Criterion D, Mr. Colombo does not have any peritraumatic amnesia. He also described experiencing positive emotions and enjoyment. He has not experienced estrangement from friends and family. He noted that the close bonds he shares with friends and family have helped sustain him emotionally. He did not describe a lack of interest in hobbies or other significant activities. He does report angry thoughts about how the case was handled and these thoughts may reflect posttraumatic changes. From Mr. Colombo's perspective, however, he does not view these thoughts as being distorted or stemming primarily from a mental disorder.

Regarding Criterion E, Mr. Colombo endorsed ongoing anger but has not engaged in aggressive behavior or outbursts. He has not engaged in reckless or self-destructive behaviors. He endorsed being watchful if out in Palo Alto because of the high-profile nature of his case within the community but did not describe a general pathological hypervigilance. He did not describe any exaggerated startle response. He has some issues with concentration which, as noted above, appear attributable to anxiety and ADHD. He also has minimal current sleep disturbance. He continues to take a sleep aid (melatonin) but has intact and restorative sleep.

Mr. Colombo's MMPI responses were also consistent with a clinically significant issue with anxiety but were not suggestive of current Post-Traumatic Stress Disorder.

In brief, while some features of Mr. Colombo's presentation can be seen in Post-Traumatic Stress Disorder, Generalized Anxiety Disorder is a better fit for his current symptom profile.

Regarding his Alcohol Use Disorder Mr. Colombo appeared open about his past issues with alcohol. At present, his Alcohol Use Disorder has been in remission since 2010. He remains active in 12-step programming and finds this a significant source of emotional support.

**2. Mr. Colombo's Generalized Anxiety Disorder and current emotional distress stem primarily from the rape accusation and the subsequent public notoriety. He also experiences anger and distress related to what he believes to be mishandling of the charge by authorities.**

Mr. Colombo described periods of emotional distress treated with psychotherapy and medication before January 2022. Unfortunately, these records are not available for my review. It is possible that he may have met criteria for GAD, MDD, or another mental disorder during those periods. He recalled that one of his providers may have suspected bipolar disorder, which would explain his having been previously prescribed lamotrigine and topiramate (mood stabilizing medications that are rarely used for anxiety or depression, but often used to treat bipolar disorder; topiramate is also sometimes used to treat Alcohol Use Disorder). If GAD and MDD were present before January 2022, his most recent episodes would represent recurrence of each disorder.

Mr. Colombo described the recent onset of symptoms of Generalized Anxiety Disorder and Major Depressive Disorder in the months after the January 28, 2022 rape accusation. No medical records or other contemporaneously documented accounts detail the exact time course of his symptoms from the time of the accusation onward. By his description, Mr. Colombo began experiencing a "bowling ball" sensation and nausea from anxiety in the months after the allegation and before any official criminal charge. As mentioned above, he also experienced insomnia, irritability, loss of appetite and weight loss, and anhedonia. He recalled feeling

"worried 24 hours a day" from around March. He also described frequent and intense worry about whether he would be charged in the month leading up to his June 2022 charge.

Once he was charged, he was promptly incarcerated for a total of one week before being released on bail. Once charged and incarcerated his symptom burden intensified to include suicidal thinking.

The time course of his symptoms suggests that the stressors present in the months after the accusation were a proximate cause for the onset or recurrence of his GAD and likely MDD. These stressors included the rape allegation, the concern about the effect on his reputation and future employability, and the potential he would face criminal charges.

A factor that has contributed to sustaining Mr. Colombo's GAD has been the degree of public notoriety associated with the rape accusation, or in Mr. Colombo's words being "labeled as a child rapist." Because his charge has been published by local media, including on the internet, the accusation has become widely known. Mr. Colombo described public backlash to his being reinstated as a teacher, including protests from the school community. This has been distressing and anxiety-provoking.

Mr. Colombo also expressed anger related to the belief that the political environment influenced the handling of his case. He expressed a belief that school officials are "politicians," that the superintendent's wife was a prominent "me too" activist, and that the Palo Alto detective who handled his case was a "nightmare" who did not investigate the case in a thorough and impartial manner (for instance, calling the alleged victim and other witnesses on the phone instead of questioning them more formally in-person). This has been associated with a reported sense of anger, frustration, and betrayal compounded on the primary issue of his charge and the associated notoriety.

**3. Mr. Colombo's prognosis is generally positive. His symptom burden is likely to decrease, though may not fully resolve.**

Mr. Colombo has been in therapy with Catlin MacCalla, LMFT since October 2023. He is currently attending sessions at least twice per month. Because I have not reviewed his treatment record, it is unclear what psychotherapeutic approach has been used or what specific issues have been addressed in treatment so far. Mr. Colombo informed me that he has connected well with his therapist and finds these sessions beneficial.

Currently the ongoing lawsuit and his very-recent return to teaching PE serve as ongoing stressors, particularly given community-based protests of his return to teaching. If Mr. Colombo

reintegrates into teaching and the intensity of public scrutiny decreases, this would be expected to decrease the intensity of his anxiety symptoms.

If symptoms persist, Mr. Colombo would likely benefit from a course of Cognitive Behavioral Therapy focused on reducing anxiety if not already attempted. CBT is frequently associated with significant improvement in Generalized Anxiety Disorder symptoms. For example, a 2018 meta-analysis found that research participants with Generalized Anxiety Disorder who completed a course of CBT had a 56.3% remission rate (95% confidence interval: 50.2-62.2%) which increased to 65.2% (95% confidence interval: 53.1%-75.6%) at follow-up (Springer et al., 2018).

Mr. Colombo informed me that he does not want to take psychiatric medication. His GAD is likely to improve significantly with decreased intensity of public scrutiny over time and with appropriate treatment including CBT. Should symptoms persist, and should he reconsider openness to psychiatric medication, he could benefit from a Selective Serotonin Reuptake Inhibitor antidepressant or Serotonin-Norepinephrine Reuptake Inhibitor antidepressant. Further reduction of symptoms would be expected with these agents. Meeting with a psychiatrist around monthly at the beginning of treatment, followed by 2-4 meetings per year while treatment is ongoing, would be recommended. Once the antidepressant dose and symptom profile is stabilized, ongoing management of the prescription could be returned to Mr. Colombo's primary care physician.

Of note, because one of Mr. Colombo's past providers may have suspected bipolar disorder he should initially be monitored carefully if started on an antidepressant. I did not find evidence to support a diagnosis of bipolar disorder. If bipolar disorder is present, however, an antidepressant may increase the risk for an episode of mania or hypomania. In addition, while Mr. Colombo has not reported a positive response to past medication treatment it appears he has only taken lamotrigine and topiramate. Both agents are sometimes used in bipolar disorder, but are not generally prescribed as monotherapy for Major Depressive Disorder or Generalized Anxiety Disorder. His response to, and toleration of, first-line antidepressant therapy would likely be significantly better than his response to either of these past trials.

## SOURCES OF INFORMATION

The following information has been received from your office:

COMPLAINT

1. Doc 113 - Third Amended Complaint for Damages, 1/6/2025

DEPOSITION AND EXHIBITS

2. Deposition of Peter Colombo with Exhibits 500-513, and Prior Exhibits 11, 21, 23, 44, 90, and 109 7/14/2025
    a. EXHIBIT 500 - Defendant Palo Alto Santo Unified School District's Amended Deposition Notice of Plaintiff Peter Colombo, 7/9/2025
    b. EXHIBIT 501 - PAUSD000578 - Resume of Peter Colombo, Grades 4 to 8
    c. EXHIBIT 502 - PAUSD000073-000076 - Employee ID, Name, State; Colombo, Peter; Positions
    d. EXHIBIT 503 - PAUSD003014-003015 - Email Thread, Colombo to Hickey
    e. EHXIBIT 504 - Handwritten Document; "Due Process, etc."
    f. EHXIBIT 505 - PAUSD002761 - Letter, Mistler to Hickey, 6/13/2023
    g. EXHIBIT 506 - PAUSD000202-000203 - Email, Bark to Bentley and attachment, 7/5/2022
    h. EXHIBIT 507 - PAUSD000118-000121 - Email, Bark to Bently and attachment, 1/18/2023
    i. EXHIBIT 508 - COLOMBO_001045-001064 - Unfit to Teach? Teacher accused of Rape had a Checkered History in Schools; Palo Alto Online; Zoe Morgan, February 17, 2023, Updated January 24, 2024
    j. EXHIBIT 509 - PAUSD000051-000052 - Letter, Hicky to Colombo, 6/16/2022
    k. EXHIBIT 510 - COLOMBO_000485-000488 - Criminal Sex-Assault Charge to be Dropped Against Palo Alto Teacher Peter Colombo; Palo Alto Online; Dremann and Morgan, April 25, 2023; Updated January 24, 2024
    l. EXHIBIT 511 - DA Dropping Charges, but District Plans to Investigate Colombo; ThePalyVoice; Shashi and Kessler, May 15, 2023
    m. EXHIBIT 512 - Email Thread, Willis to Nelson, 1/16/2024
    n. EXHIBIT 513 - PAUSD002753-002759 - To Inform, April 16, 2025 and Attachments
    o. EXHIBIT 11 - PAUSD003065-003068 - PC Notes and Call
    p. EXHIBIT 21 - PAUSD000975-002503 – Emails, 2022
    q. EXHIBIT 23-001 - Letter to Peter Colombo from Palo Alto Unified School District, 1/31/2022
    r. EXHIBIT 44 - PAUSD000091 – Email, 6/9/20222-6/10/222
    s. EXHIBIT 90 - PAUSD000013 - Letter to CTC, 6/26/2023
    t. EXHIBIT 109 -001 - Letter to Peter Colombo re Notice of Investigation Findings, 5/28/2024

COLOMBO EMPLOYMENT DOCUMENTS

3. Colombo Application and Onboarding Documents (including Transcripts)
4. Colombo Contracts and Assignments, 1998-2023
5. Colombo Credentials
6. COLOMBO_011202-011337 - Colombo Criminal History Documents

7. Colombo Evaluations, 1999-2023

MEDICAL RECORDS

8. Letter from Caitlin MacCalla, LMFT, verifying that Mr. Colombo has been in treatment since October 2023 for PTSD and GAD.

## INFORMED CONSENT

Prior to beginning the evaluation, I informed Mr. Colombo I am a psychiatrist who was retained to evaluate him in relation to his claim. I explained the nature and purpose of the evaluation, that treatment services would not be provided, and the limits of confidentiality (that the interview would not be held confidential and my report would be made available to inform legal proceedings). Mr. Colombo indicated he understood these issues. It is my opinion he was competent to decide whether to proceed with the evaluation.

## PSYCHIATRIC HISTORY BEFORE THE RAPE ALLEGATION

Mr. Colombo was diagnosed with hyperactive ADHD as a child. He is unsure who first diagnosed this condition. The diagnosis occurred in eighth grade and he was treated with Ritalin, which "made me feel like a Zombie" but "made me quiet, the nuns loved it because Colombo wasn't acting out!" He described talking in class, frequently fidgeting, and being a child who was "very likeable but I could be a pain in the ass" regarding minor disciplinary issues. He did not have any more serious disciplinary issues leading to suspension, expulsion, or other similar administrative responses. Mr. Colombo stopped Ritalin in high school.

Mr. Colombo next worked with a therapist Dr. Blackmore after he was injured playing high school basketball. His father was very judgmental about this injury and Mr. Colombo experienced persistent sadness about his father's response to the injury, including his father stopping speaking with him at times. Mr. Colombo also felt "depressed" about his inability to participate in sports, which were "everything to [him] growing up." He does not recall if he developed other symptoms aside from low mood. He engaged in individual psychotherapy focused largely on his relationship with his father.

He next saw therapist Renee Bolo in 2004 after a DUI. He engaged in 1.5 years of therapy, again focused largely on his relationship with his father. He recalled being prescribed lamotrigine and topiramate at some point during treatment, likely for around one year from 2004-2005. He does not remember why these were prescribed. He believes his provider might have mentioned the possibility of bipolar disorder at some point (lamotrigine and topiramate are mood stabilizers

that are often prescribed for bipolar disorder), but he is not sure. He did not describe any history of episodes consistent with either mania or hypomania at any point.

Mr. Colombo informed me that aside from treatment for Alcohol Use Disorder he did not have other specific mental health treatment before the 2022 allegation. He stated that either before or after the rape allegation he has never been psychiatrically hospitalized, has never attempted suicide, has never engaged in self-injurious behavior, and has never engaged in assaultive behavior toward others. He also informed me that he does not have access to a firearm.

## SUBSTANCE USE HISTORY

Mr. Colombo had his first drink at the age of 14 and began drinking heavily in a binge pattern by the age of 17. During his teenage years, he would consume alcohol on weekends after basketball games. In his adult life, Mr. Colombo continued to drink on weekends, primarily consuming beer. He acknowledges that his judgment was impaired when he drank, often becoming hyperactive and loud. Despite his drinking habits, Mr. Colombo managed to function appropriately in daily life, including going to work and remaining effective in his role as a teacher.

In the year 2000, Mr. Colombo made his first attempt to stop drinking by attending an Alcoholics Anonymous (AA) meeting, encouraged by his ex-wife. He made a more serious effort to quit in 2004 following a DUI in 2003. Mr. Colombo stated that from 2004 to 2010 his drinking was infrequent, occurring one to two times per year at most.

He informed me that in 2010 while his teaching credential was still on probation he experienced another return to use. This provoked significant shame and guilt. He discussed it with his sponsor who encouraged honesty. He thus reported his use to the CTC, who ultimately chose not to terminate his credential because he self-reported but warned that another return to use would likely result in termination.

Mr. Colombo then began attending daily 7 a.m. AA meetings, and he credits these meetings and honesty with making a significant difference in his journey towards sobriety. He informed me that he has not had a drink since April 21, 2010. He remains highly active in AA, serving as a treasurer and running a fourth-step workshop. He also indicated that AA has been very helpful to him to assist with coping with the recent stress related to the rape allegation and subsequent proceedings. He has not engaged in individual psychotherapy or medication management for his Alcohol Use Disorder.

Mr. Colombo informed me that he "dipped" tobacco in high school and college. He has not used nicotine in several decades.

Mr. Colombo indicated that he tried marijuana early in life but never engaged in problematic use. He reported no recent use of cannabis.

Mr. Colombo stated that he otherwise has no history of recreational substance use.

## TRAUMA HISTORY

Mr. Colombo stated that his father was verbally abusive when he was a child. He made statements such as “you’re a loser” and was “old school.” He noted that despite having an abrasive manner verbally, his father loved him a great deal and expressed that love differently. Mr. Colombo stated that his father also instilled many positive characteristics in him including a strong work ethic. He informed me that his upbringing initially led him to be “hard on” the children he coached, but that he always balanced this with supportiveness and genuine positive regard for the children. He noted that his psychotherapy earlier in life generally revolved around processing his relationship with his father.

Mr. Colombo informed me that he was struck by a baseball in February 2003. He was evaluated in the emergency room but sent home. His girlfriend’s father, who was a physician, advised that he return to the ER because he had signs and symptoms of internal bleeding. Mr. Colombo did so and required an emergency splenectomy. He awoke in the ICU. He recalled completing a will during his ICU stay because his medical team suspected he might die.

Mr. Colombo stated that the near-death experience around his splenectomy did not have a major enduring emotional impact. He noted that he did not develop nightmares, intrusive thoughts, persisting mood changes, or other major responses to this event and that within a month he was back to coaching despite having surgical staples still in place. He noted that he sometimes thinks about this event and his mortality but otherwise was relatively unaffected.

Mr. Colombo described the rape allegation and subsequent events as traumatic. This will be further reviewed in the relevant section below.

He otherwise denied any history of witnessing serious injury or death, of exposure to life-threatening injury, of exposure to natural disasters, of exposure to sexual trauma, or of any other exposures that he would view as significantly traumatic.

## ACCOUNT OF THE RAPE ALLEGATION AND SUBSEQUENT EVENTS

For the time shortly before the allegation Mr. Colombo reported no active issues with depression or anxiety. He stated he was “worried about winning games, and I loved teaching,” that he was “living the dream” and that he did not have concerns about his mood, sleep, or anxiety levels.

Mr. Colombo stated that his wife received the allegation by email January 28, 2022. She confronted him with the email two days later on a Sunday. He stated that she was crying but that at the time "I wasn't worried. [I thought] I'll get this handled." They went to breakfast where Mr. Colombo reported feeling increasingly "pissed off" and "bullied," believing that someone was harassing him by email. He contacted the assistant superintendent to notify her about the email. He noted that he viewed this situation as requiring mandated reporting, and that he was glad to hear that she would file a mandated report.

Later in the afternoon while watching a 49ers game on television he received a call from school administrator Lisa Hickey. She arranged for them to discuss the email on Monday. On Monday he had two meetings with school administrators who informed him that with an allegation this serious they would typically do an outside investigation. He was placed on leave.

Mr. Colombo stated that at that point "I started to get a lot of anxiety because I didn't do anything. Thinking I've gotta coach my basketball team today, I've gotta teach my classes. How long am I going to be out, a week?"

He also contacted the Palo Alto Police Department. He met with Detective Clausen who he described as a "nightmare." He stated that she informed him if he did not hear from them in a week he should "go ahead and live your life." He noted that he also obtained a routing number and brought it to the detective to help her discover who had sent the email.

Mr. Colombo stated that in March 2022 the detective called him back in. She informed him they had found the person who sent the email and that she wanted to ask him more questions. He went back to the police station without an attorney. The detective concluded the meeting by informing him and his wife that "you'll hear from us if we are going to press charges."

At that point Mr. Colombo informed me that he developed a "bowling ball" sensation in his stomach which persisted "all the time." He described experiencing intense nausea but being unable to vomit. His sleep decreased to around 6 hours per night. He began to feel more irritable. His appetite decreased and he lost around 10 pounds. He found himself unable to enjoy life. He described feeling "worried 24 hours a day," often discussing with his wife whether he would be charged.

In June he went on a trip to Cabo and described feeling "worried constantly, trying to enjoy our resort." When he returned he received a text from his attorney. He and his wife met with the attorney that day and were informed that he would be charged. He recalled his wife starting to cry. He made arrangements to meet with his attorney the next afternoon to drive together to the police station and turn himself in.

Mr. Colombo stated that the night before he presented to the police department was "the worst night I ever had in my life." He described frequently vomiting. He noted that the "bowling ball" sensation was constant. He found himself unable to move and was lying in bed with his wife Heidi holding him. He described feeling fixated on the thought that "when you get charged with something like that and your mugshot hits the paper you're never teaching again."

The next day at the police department the detective came "with a smirk on her face. That b… don't get me started. She gives me the walk of shame. She handcuffs me" and then walked him down a busy street where one of his students witnessed him being taken to jail.

Mr. Colombo stated that at booking the officer informed him that he would likely be assaulted in the facility because of the nature of his charges. Mr. Colombo stated that the officer chose a facility where the assault would likely be "less severe." When asked whether Mr. Colombo feared he would be seriously injured or killed while incarcerated, he informed me that he did experience that fear because he was aware of how people accused of raping children are treated in correctional settings.

He ultimately spent one week in solitary confinement. He described it as "the worst thing that has ever happened in my life." He ruminated on the thought that "my shit is hitting the papers and my life is over." He found himself thinking "fuck, how is this happening in the United States of America." He stated that his symptoms intensified. The "bowling ball" in his abdomen became more intense. He felt that his life was over and that his reputation would be ruined. He recalled looking out of the small window in his cell and noted that even now when he looks out of the window of his home he will experience memories of that incarceration. He described being unable to sleep during his incarceration. He also stated that one night while incarcerated he began to experience suicidal thinking. He thought about how he could use a bedsheet to hang himself. He recalled "playing out the court case" in his mind. He ultimately got past the episode of suicidal thinking by reminding himself to take "one more moment. You can do this. One more moment."

After one week he was allowed to post bail. He remained on house arrest for 9 months with an ankle monitor. He was allowed only to go out in a 600-foot radius from his house to walk his dog. In August 2022 his attorney obtained permission from the court for him to leave home for one hour per day to attend his daily AA meetings. He otherwise remained at home but noted that support from family and friends who visited him often provided some encouragement and comfort.

During his house arrest he described feeling "scared." Whenever a private number called, he believed it was his attorney and would "think what is it now?" He noted that several court dates were canceled and that this caused significant anxiety and a desire to "get it over with." He

indicated that at one point he discussed with his wife that he wanted to carry a pill with him to the trial and to commit suicide if found guilty. His wife reassured him and the suicidal thinking passed. He described feeling "anxiety, never a day without anxiety. Never a day without worry." He indicated that he felt restless, irritable, and discontent. He continued to exercise 60 to 90 minutes/day and found that this provided some relief but often found himself crying on the treadmill. He often ruminated about being "labeled as a child rapist."

His charges were ultimately dropped around March 2023. His teaching credential had expired and he was not able to renew the credential. In May he also received a letter stating that he was on unpaid administrative leave pending an internal investigation. He recalled thinking to himself "so here's the third investigation. They're trying to get me to quit." In August he received a letter stating he was on unpaid leave. In October he went to a CTC proceeding and his teaching credential was restored. He noted that the district investigation still had not been completed. He stated a belief that it was not completed because they believed he would not get his credential back.

He stated that he was placed in a TOSA (Teacher on Special Assignment) role July 2024 through June 2025. He expressed a belief that this was a "sham job" meant to "make my life as uncomfortable as possible." He described working in close proximity with the individuals he was suing.

He stated that from the time the charges were dropped he experienced anger, anxiety, fear, and thoughts such as "why are they doing this to me. You could see they were trying to get me to go away. Before the charges but especially after." He noted that he was bothered by some events such as emailing that he would come back to Greene "first thing on Monday" to teach after the credential was restored and receiving a response indicating that he was threatening the district.

He noted that he has been working with a psychotherapist Caitlin from around August or October 2023 through the present. He described her as "awesome, perfect for me." He feels understood by his therapist and noted that work around issues such as forgiveness has been helpful to him. He has not taken psychiatric medication at any point since approximately 2005 and indicated that he has no intent to take medication. He noted that he plans to meet with a psychologist but that this meeting will be focused on evaluating for accommodations such as taking time away from work for treatment.

No medical or mental health records were available for my review, aside from a one-page statement from Caitlin MacCalla, LMFT, verifying that Mr. Colombo has been in treatment since October 2023 for Post-Traumatic Stress Disorder (PTSD) and Generalized Anxiety Disorder (GAD).

## CURRENT PSYCHIATRIC SYMPTOMS

Mr. Colombo described his recent mood as "anxiety when I show up to school." He noted that he thinks everyone is looking at him, especially the kids. He stated that he tries to remind himself that they are "just kids, and the parents are just going by what they read in the paper."

He stated that he does enjoy activities like time with his wife and pizza nights with his mother and father. He also indicated that he had enjoyed our meeting, where "somebody's listening to me." His sleep is intact with the use of around 10 mg of melatonin per night. He believes his appetite is somewhat decreased and that he may have lost weight, but he has not tracked his weight. His memory is intact. He finds it difficult at times to "slow down" and concentrate. He stated that the last time he thought about suicide was when he discussed killing himself if found guilty with his wife. He noted that he continues to feel there is a "dark cloud" around him.

He stated that his current anxiety and frustration centers around the district and the school. He returned to school this week and described walking past protestors who are opposing his return without escort or assistance. He noted that when he first returned to work some of the "girls were giving me the dirtiest look in the world. Coming to classes in groups because they're scared of me." He noted that the "bowling ball" sensation occurred again as he contemplated whether he could remain at the school under current conditions, though on the first day he decided to "give it until noon" and found that once he was teaching again the situation was more manageable. He described experiencing some muscle tension including some recent lower back pain. He experiences some dreams with themes of stress, such as dreaming that he is interacting with the superintendent, though reported that he does not experience nightmares or nighttime sweating.

He stated that he experiences anger that comes and goes. He indicated that his anger currently focuses on two district administrators and their behavior. He noted that he can become "animated, I'm a character" when angry but that he never behaves in an irritable or angry/threatening manner directly with others. He continues to think about the accusation and his situation daily. The thoughts typically occur spontaneously in the morning or when talking about school. He does not make specific efforts to avoid thinking about the situation but reflected that the situation is a "cloud" over him. He avoids going out in Palo Alto because he is concerned people will identify and react negatively to him. He remains committed to continuing to show up for work noting that he would not "let them cancel me."

Mr. Colombo reported that he has no gaps in memory for any of the events related to the accusation or subsequent proceedings. He does not blame himself for what has happened, reflecting that "[I] didn't bring this on." He continues to experience positive emotions, especially at AA or with his family. He stated that he still has a passion for coaching and is motivated to do high-quality work. He does not experience social detachment from family or friends except when

children are around. He noted that he has become very self-conscious about his conduct around children; for instance, when he was throwing a baseball alone with a friend's son he found himself wondering if the friend would be okay with that. In general he finds himself being very conscious of avoiding being alone with children and reflects on how others would perceive his being alone even briefly with a child. He does not experience any exaggerated startle response. He stated that at various points he has had thoughts such as "how is this happening? How is this real?" He has not experienced any overt dissociation.

He stated that he understands he needs "to learn to move on. I have got to let go of this, these politicians, who played this game with my life." He indicated that he believes he has to improve in therapy, that "I've got to have faith in humanity. That everything is not about politics. And that I just got caught up in a very bad situation."

## MEDICAL HISTORY

Mr. Colombo stated that he currently takes atorvastatin for high cholesterol and melatonin 5 to 10 mg at bedtime to promote sleep.

He informed me that he has had left knee arthroscopy.

Medical review of systems was omitted due to time constraints.

Mr. Colombo informed me that he had an emergency splenectomy as outlined above. He indicated that the situation was life-threatening and resulted in an ICU stay.

Mr. Colombo reported having no known history of drug allergies. He indicated that he was allergic to dust as a child and that he took shots to help resolve that.

Mr. Colombo stated that he has no history of head trauma. He has no lifetime history of a seizure and no known history of thyroid problems. To his knowledge he met all developmental milestones on time.

## FAMILY HISTORY

Mr. Colombo stated that his mother suffered from alcoholism and bulimia. He reported no other known family history of mental health diagnoses.

## SOCIAL HISTORY

### *Daily Routine*

Mr. Colombo stated that he has recently resumed teaching at Fletcher middle school. He wakes at 6:15 AM, takes a shower, and goes to AA each morning. He stated that he has been going to the same morning meeting for the past 15 years.

He then goes to school to teach. A typical workday last from 8:15 AM to 3:15 PM. At the end of the day he waits until most people have left to avoid running into parents. He then goes home and exercises for approximately 1 hour. He typically chooses aerobic exercises such as Peloton workouts, running on the treadmill, or walking. He also does limited resistance exercise including push-ups. He noted that exercise is "my medication."

In the evening he spends time playing with his two puppies. He has dinner with his wife Heidi and then she typically returns to completing work (she is an HR director).

He goes to bed at about 10 PM. He takes one to two 5 mg over-the-counter melatonin sleep aids and falls asleep promptly while watching television. He sleeps throughout the night and feels well rested when he wakes.

### *Childhood*

Mr. Colombo was born and raised in the Bay area. As above, he described his father as loving him a great deal and as instilling many great values in him but as being harsh and verbally abusive as well. He noted that with age he has come to understand his father better and that he has a very close and loving relationship with his father today. Further review of childhood history was omitted due to time constraints.

### *Relationship History*

Mr. Colombo is currently married and described his wife as being very supportive. He was previously married from 1997 through 2002. He believes that that marriage ended because he was not "mature enough" at the time. They have remained on good terms and still enjoy speaking when they see each other out in public. He married his current wife at the end of 2012.

### *Education History*

Per his deposition testimony Mr. Colombo:

- Graduated high school in 1986.
- Attended Canada College playing baseball ‘87
- Attended Foothill college playing baseball in 1988

- Attended the University of San Francisco on a baseball scholarship from 1989-1990
- Graduated USF 1991

His available transcript shows grades typically in the B to C range.

## *Military History*

Mr. Colombo did not report any history of military service.

## *Occupational History*

His CV shows:

- Assistant baseball coach at Canada College 1993
- Freshman sophomore basketball coach Menlo high school Atherton 1994
- Teacher and head JV baseball coach at Serra high school 1993-1995
- Full-time substitute at Redwood City elementary school district September 1996
- Student teacher at Redwood City elementary school district February 1997 to June 1997
- Palo Alto high school assistant varsity baseball coach starting January 1998
- Redwood City elementary school district middle school teacher starting August 1997

Mr. Colombo has served as a teacher with the Palo Alto Unified School District since approximately the late 1990s.

## *Hobbies and Interests*

Mr. Colombo enjoys walking his dogs, spending time with his wife, and spending time with family and friends. He is highly active in AA and enjoys daily morning meetings there.

## *Religion*

Not assessed due to time constraints.

## *Legal History*

His CTC documents show:

- DUI on Jan 28, 2004. Probation 3 years. 48 hours jail, license restricted 90 days. BAC was 0.19.
- 1990 - DUI + hit and run. Probation 3 years. BAC was .236.
- August 18, 1988 vandalism and disorderly conduct under the influence of alcohol and drugs. 3 year probation, 40 hours community service; ripped a telephone off its wire and threw it at a vehicle during an argument.

- July 10, 1988 trespass, court probation 1 year, went uninvited to residence of female he met through his girlfriend, was honking horn, at police arrival was found hiding in the bushes.

The arrest report for trespassing indicated that Mr. Colombo misidentified himself to the responding officer. He informed the officer that he had falsely called out that "Mike and Edward were there" hoping that this would get the girl to come outside. Per the report after arrest he yelled out "what's wrong with having a hard-on for a girl?"

Mr. Colombo informed me that alcohol was a significant factor in all his arrests before the rape allegation occurred. He noted that obtaining sobriety and emphasizing honesty in his recovery has been key for him.

Mr. Colombo informed me that he does not have any other history of arrest or incarceration, aside from the arrest and incarceration related to the rape allegation.

## CURRENT MENTAL STATUS EXAMINATION

**Appearance**: bald white male appearing younger than his stated age of 58. Mr. Colombo was dressed neatly, with good grooming and hygiene. He was awake and alert throughout the examination.
**Attitude**: engaged, cooperative, and friendly.
**Behavior**: Mr. Colombo appeared animated through much of the examination. He often fidgeted in his chair and at times stood when illustrating points, for instance miming watching out the window while in solitary confinement. He often spoke directly to the audio recorder, addressing comments to board members who he believed may later listen to this examination.
**Speech**: talkative, rapid and somewhat loud, normal prosody. When discussing emotionally salient topics at times become louder, near yelling.
**Mood**: "anxiety"
**Affect**: somewhat labile and wide-ranging, often euthymic and jocular but anxious with sharp pivots to intense anxiety and sadness, particularly when discussing emotionally salient topics. At times began to cry intensely.
**Thought Content**: No suicidal thinking. No evidence of psychosis elicited at any point during the evaluation. Often returned to themes of perceived injustice.
**Thought Process**: linear and logical, though often overinclusive.
**Insight**: intact, with good recognition of symptoms.
**Judgment**: intact, though with likely chronic mild impulse control issues
**Cognition**: grossly intact, not formally tested at this encounter though with no obvious deficits in memory or concentration throughout the 3.5-hour examination

## TESTING REVIEWED

I administered the MMPI-2-RF by computer-based administration. Dr. Nancy Hoffman, a qualified psychologist, interpreted the responses to this instrument.

Mr. Colombo's responses on this instrument were valid for interpretation, without any clear evidence of exaggeration or feigning when his responses were considered in the context of the psychiatric interview. His responses were consistent with an anxiety disorder, with endorsement of clinically significant features of anxiety (T=80). He also endorsed a range of items related to feeling persecuted. His pattern of scores was not consistent with PTSD. There was no evidence of clinically significant elevation of demoralization, somatic preoccupation, low positive emotions, dysfunctional negative emotions, hyperarousal, social avoidance, antisocial behavior, proneness to anger, self-doubt, helplessness, or substance abuse.

## REVIEW OF RELEVANT RECORDS

Review of Mr. Colombo's deposition provided an account of events consistent with the one provided during my examination.

Disciplinary letters from his employment file noted that he used inappropriate language with students in 2021. This included the terms "pimp" and "Deez nuts." In a third complaint a student felt uncomfortable and unsupported when he needed help with his locker. The disciplinary letter indicated "it was clear that you have been very concerned about the complaints and have taken responsibility and reflected." During my examination Mr. Colombo also discussed these incidents. He indicated that he had used this language to attempt to connect with students using their own language and humor, but that he stopped this behavior after the reprimand.

Mr. Colombo's disciplinary record also shows that he was suspended for two weeks for allowing a basketball scrimmage in violation of COVID protocols in November 18, 2020.

Mr. Colombo's employee performance evaluations were included and were positive, typically reflecting that he was supportive, established strong rapport with students, and that he interacted well with the children in his class.

Thank you for referring this matter to me for evaluation and report.

Sincerely,

James Armontrout, MD
*Forensic Psychiatrist*
*Board Certified – Psychiatry & Forensic Psychiatry*
Forensic Psychiatric Associates, LP

## References

Springer, K. S., Levy, H. C., & Tolin, D. F. (2018). Remission in CBT for adult anxiety disorders: A meta-analysis. *Clinical Psychology Review*, *61*, 1–8. https://doi.org/10.1016/j.cpr.2018.03.002

James Alden Armontrout, MD
825 San Antonio Road #105
Palo Alto, CA 94303
T: 650-204-1116
F: 256-242-0953

**Academic Appointments:**

| | |
|---|---|
| 2024- | Clinical Associate Professor of Psychiatry, Stanford School of Medicine |
| 2023- | Program Director, Stanford Forensic Psychiatry Fellowship |
| 2022-2024 | Clinical Assistant Professor of Psychiatry, Stanford School of Medicine |
| 2019-2022 | Clinical Assistant Professor of Psychiatry (Affiliated), Stanford School of Medicine |

**Employment:**

| | |
|---|---|
| 2024- | Clinical Associate Professor of Psychiatry, Stanford School of Medicine |
| 2022-2024 | Clinical Assistant Professor of Psychiatry, Stanford School of Medicine |
| 2020-2022 | Medical Director, Menlo Park Trauma Recovery Program, VA Palo Alto Healthcare System |
| 2017-2020 | Staff Psychiatrist, Menlo Park Trauma Recovery Program, VA Palo Alto Healthcare System |
| 2017- | Private practice in Forensic Psychiatry |

**Education and Postdoctoral Training:**

| | |
|---|---|
| 2016-2017 | Forensic Psychiatry Fellow, University of California, San Francisco |
| 2015-2016 | Co-Chief Resident of Outpatient Psychiatry, Beth Israel Deaconess Medical Center |
| 2012-2016 | Clinical Fellow, Harvard Medical School |
| 2012-2016 | Resident, Harvard Longwood Psychiatry Residency Program |
| 2008-2012 | MD, University of Virginia |
| 2003-2007 | BA Psychology with High Honors, University of Virginia |

**Certifications and Licensure:**

| | |
|---|---|
| 2023- | Florida Medical License #ME163826 (full medical license; previously held expert witness license MEEW8210) |
| 2023- | Virginia Medical License #0101278442 |
| 2023- | Mississippi Medical License #32002 |
| 2022- | Board Certified in Addiction Medicine, American Board of Preventive Medicine, Initial Certification Granted January 1, 2022 |
| 2017- | Board Certified in Forensic Psychiatry, American Board of Psychiatry and Neurology, Initial Certification Granted October 11, 2017 |
| 2016- | Board Certified in Psychiatry, American Board of Psychiatry and Neurology, Initial Certification Granted September 22, 2016 |
| 2016- | California Medical License #A138817 |
| 2012 – 2016 | Massachusetts Limited License #251424 |

**Additional Administrative and Leadership Experiences:**

| | |
|---|---|
| 2024- | Discuss and advise about forensic psychiatric and psychological evaluations with Stanford faculty, including faculty taking or considering cases via the department's Program in Psychiatry and the Law |
| 2023- | Lead negotiations for a Stanford / Department of State Hospitals rotation and contract, created a Department of State Hospitals selective as the Stanford Forensic Psychiatry Fellowship Director |
| 2023- | Work with the Statewide Chief Psychiatrist for the California Department of Corrections overseeing forensic psychiatry fellow rotations at San Quentin and the California Medical Facility (Stanford Forensic Psychiatry Fellowship Program Director Role) |
| 2023- | Coordinate with referral sources in San Francisco and other counties (both local and in Southern California) to develop a private case panel rotation for the forensic psychiatry fellows (Stanford Forensic Psychiatry Fellowship Program Director Role) |
| 2023- | Formed a new Sexually Violent Predators Clinic rotation based in San Francisco for the Stanford Forensic Psychiatry Fellowship |
| 2023- | Formed a new Landmark Case didactic series for the Stanford Forensic Psychiatry Fellowship |
| 2023- | Oversee the appointment of new faculty to the Stanford Forensic Psychiatry Fellowship |

2023- Coordinate with Journal of the American Academy of Psychiatry and the Law Section Editor Jennifer Piel for submission of two legal case review articles per year for publication by the fellows (Stanford Forensic Psychiatry Fellowship Program Director Role)

2017-2022 Screened veterans applying for residential PTSD treatment from the Bay Area, Northern California, Nevada, Hawaii, and the Pacific Islands as a staff psychiatrist for the VA Palo Alto Healthcare System, Menlo Park Division

**Teaching Experience:**

2023- Help coordinate and oversee three mock testimony experiences per year, including overseeing fellow participation in the Stanford International Association of Defense Counsel Trial Advocacy Workshop and assisting in two Stanford psychiatry-based exercises through the Stanford Forensic Psychiatry Fellowship

2023- Direct Forensic Psychiatry Fellowship Didactic Series, Landmark Case Series, and Case Conference Series, Stanford Forensic Psychiatry Fellowship

2023- Supervise an Addiction Medicine Fellow's outpatient dual diagnosis clinic, one day per week, Stanford Department of Psychiatry and Behavioral Sciences

2023- Direct Stanford Psychiatry Residency "Legal Aspects of Psychiatry" didactic series, PGY 3 and 4, Stanford Department of Psychiatry and Behavioral Sciences

2022- Supervise and teach Stanford Forensic Psychiatry Fellows through the Stanford Forensic Psychiatry Fellowship

2020-2022 Site Director for Stanford Resident Psychiatrists completing rotations at the Menlo Park Trauma Recovery Program, VA Palo Alto Healthcare System

2020-2022 Clerkship Director for the Stanford 308E Trauma Psychiatry Selective while serving as Medical Director of the Menlo Park Trauma Recovery Program, VA Palo Alto Healthcare System

2018- Presented recurring didactic talks for the Stanford Psychiatry Residents on topics including Antisocial Personality Disorder, Post-Traumatic Stress Disorder, Violence Risk Assessment, and Assessment of Criminal Responsibility, Stanford Department of Psychiatry and Behavioral Sciences.

2017-2022 Instruct and supervise Stanford medical students and residents, as well as visiting medical students, completing rotations at the Menlo Park Trauma Recovery Program

2017- Present an annual case conference presentation for the University of California, San Francisco Forensic Psychiatry Fellowship training program

2016-2017 Instructed University of California, San Francisco medical students completing an advanced elective rotation in forensic psychiatry with the University of California, San Francisco Forensic Psychiatry Fellowship

| | |
|---|---|
| 2015-2016 | Co-Chief Resident of Outpatient Psychiatry at Beth Israel Deaconess Medical Center, assisted in instruction of second through fourth year psychiatry residents in psychotherapy, patient assessment and management, and clinic administration |
| 2012-2016 | Instructed Harvard Medical Students completing clerkship rotations in psychiatry at Harvard Medical School training sites at Beth Israel Deaconess Medical Center, Brigham and Women's Hospital, Brigham and Women's Faulkner Hospital, and Massachusetts Mental Health Center |
| 2009 | Taught "adventures in medicine" course to high school students in the Navajo Nation to encourage interest in science and medicine. Also completed quality improvement research within the Indian Health Services clinic in Kayenta, AZ. |
| 2007 | Kaplan MCAT [Medical College Admissions Test] Prep Course Instructor, All Subjects |
| 2005-2008 | Research Assistant, Kubovy Perceptual Psychology Lab at the University of Virginia, Trained Incoming RAs |

**Awards:**

| | |
|---|---|
| 2024 | Stanford Department of Psychiatry and Behavioral Sciences Chairman's Award – Unsung Hero Award |
| 2017 | 2017 Young Investigator Prize, American Academy of Psychiatry and the Law |
| 2007 | University of Virginia 2006-2007 Department of Psychology Undergraduate Research Excellence Award |

**Committee Memberships:**

| | |
|---|---|
| 2022- | Stanford Forensic Psychiatry Fellowship Program Evaluation Committee and Clinical Education Committee |
| 2020-2022 | VA Palo Alto Education Committee |
| 2019-2022 | Early Career Development Committee, American Academy of Psychiatry and the Law |
| 2018-2019 | Domestic Violence Committee, VA Palo Alto Healthcare System |
| 2018- | Trauma and Stress Committee, American Academy of Psychiatry and the Law |
| 2017 - | Technology Committee, American Academy of Psychiatry and the Law |

**Other relevant skills and training:**

| | |
|---|---|
| 2017 | Training in Cognitive Processing Therapy for PTSD through the department of Veteran's Affairs, VA Palo Alto Healthcare System |

| | |
|---|---|
| 2016-2017 | Training in the administration an interpretation of psychological testing instruments including (but not limited to) the Psychopathy Checklist-Revised; Structured Inventory of Reported Symptoms-2; the Miller Forensic Assessment of Symptoms Test; and the Test of Memory Malingering at the University of California, San Francisco Forensic Psychiatry Fellowship |
| 2015-2016 | Training in administration of electroconvulsive therapy, Harvard Longwood Psychiatry Residency Training Program |
| 2015 | Clozapine Risk Evaluation and Mitigation Strategy (REMS) system enrolment (as a resident at the Harvard Longwood Psychiatry Residency Training Program) |
| 2014 | Completed suboxone training to qualify for X-waiver 12/17/14, Harvard Longwood Psychiatry Residency Training Program |
| 2013-2016 | Training in psychodynamic psychotherapy, cognitive behavioral therapy, and acceptance and commitment therapy. Have both completed cases under supervision as a psychiatry resident and offered supervision as a chief resident in each modality at the Harvard Longwood Psychiatry Residency Training Program. |
| 2012 - | Experience working in multidisciplinary teams comprised of physicians, psychologists, nurse practitioners, nursing staff, social work and support staff across multiple settings (University of Virginia School of Medicine, Harvard Longwood Psychiatry Residency Training Program, University of California San Francisco Forensic Psychiatry Fellowship, VA Palo Alto Healthcare System, and Stanford Department of Psychiatry and Behavioral Sciences) |
| 2012 | Assisted in research on stages of change and coping behaviour use at the University of Virginia's Center for Addiction Research and Education |
| 2012 | Creative writing with short fiction published in UVa's 2012 Veritas magazine, University of Virginia School of Medicine |

**Memberships:**

| | |
|---|---|
| 2015 – | American Academy of Psychiatry and the Law (AAPL) |
| 2012-2016 | Massachusetts Medical Society (MMS) |
| 2012 - | American Psychiatric Association (APA) |
| 2012 - | American Medical Association (AMA) |
| 2005 - | Psi Chi, International Honor Society of Psychology (ΨΧ) |

**Peer Reviewed Publications:**

1. Current Regulation of Mobile Mental Health Applications. **James Armontrout**, John Torous, Marsha Cohen, Dale McNiel, & Renee Binder. *The Journal of the American Academy of Psychiatry and the Law* 2018, 46:204-11

2. A Resident Perspective on the Goldwater Rule. **James Armontrout**, Sagar Vijapura. *The Journal of the American Academy of Psychiatry and the Law*. June 2017, 45(2) 249-252.

3. Mobile Mental Health: Navigating New Rules and Regulations for Digital Tools. **James Armontrout**, John Torous, Matthew Fisher, Eric Drogin & Thomas Gutheil. *Current Psychiatry Reports* 2016:18:9

4. Do Consultation Psychiatrists, Forensic Psychiatrists, Psychiatry Trainees, and Health Care Lawyers Differ in Opinion on Gray Area Decision-Making Capacity Cases? A Vignette-Based Survey. **James Armontrout**, David Gitlin, Thomas G Gutheil. *Psychosomatics*. 2016:57(5), 472-479

5. Life or Limb: Family as Decision Makers for a Psychotic Patient with Life-Threatening Gangrene. **James Armontrout**, Sejal B. Shah. *Psychosomatics* 2015:56:691-695

6. Visual determinants of a cross-modal illusion. **James Armontrout**, Michael Schutz and Michael Kubovy. *Attention, Perception, & Psychophysics*, 2009, Volume 71, Number 7, Pages 1618-1627

**Textbook Chapter**

1. Record Keeping in Private Practice. Eric Drogin, **James Armontrout**. Handbook of Private Practice, Chapter 6, p. 66-78. Edited by Steven Walfish, Jeffrey Barnett, and Jeffrey Zimmerman. Oxford University Press, published in the United States in New York, New York, April 21, 2017.

**Poster and other Presentations:**

1. Intelligent Use of Artificial Intelligence: a Practical and Ethical Approach. Andrew Nanton, Alan Newman, Michael Rogers, **James Armontrout**. 2023 Meeting of the American Academy of Psychiatry and the Law, Chicago, IL, October 21, 2023.

2. Neuroscience in the Court Room. Octavio Choi, Shafi Lodhi, Grace Cheney, **James Armontrout**. 2023 Conference of the American Psychiatric Association, San Francisco, CA, May 22, 2023

3. Telehealth Pearls, Pitfalls, and Strategies to Improve Patient Experience. **James Armontrout**. Pacific Southwest Mental Health Technology Transfer Center Online Presentation (Invited as a Virtual Talk), July 27, 2020.

4. Veteran's Week: Managing TBI and PTSD During the Pandemic. **James Armontrout.** Mission College (invited speaker), Santa Clara, CA November 6, 2020.

5. Fanatics, Incels and Trolls: The Forensic Expert's Guide. Andrew Nanton, Alan Newman, **James Armontrout**, Michael Rogers. 2019 Meeting of the American Academy of Psychiatry and the Law, Baltimore, MD, October 24, 2019.

6. Veteran's Week: TBI & PTSD Workshop. James Armontrout. Mission College (invited speaker), Santa Clara, CA November 4, 2019.

7. Complex Decisional Capacity Assessments: From Disposition, to Organ Donation, and Death. Vivek Datta, James Bourgeois, Lawrence Kaplan, Panid Sarifnia, **James Armontrout**. 2019 Conference of the American Psychiatric Association, San Francisco, CA, May 21, 2019.

8. When is a smartphone a regulated medical device? Exploring the boundaries with mental health apps. **James A Armontrout**, John Torous, Marsha Cohen, Dale McNiel, Renee Binder. 2017 Conference of the American Academy of Psychiatry and the Law, Denver, CO.

9. Do Consult Psychiatrists, Forensic Psychiatrists, Psychiatry Trainees, and Healthcare Lawyers Differ in Opinion on Grey Area Decision Making Capacity Cases? A Vignette-Based Survey. **James A Armontrout**, David Gitlin, Thomas G Gutheil. Mysell Research Day Poster Session, Harvard Medical School, March 23, 2016

10. Kayenta Quality Improvement Questionnaire. **James Armontrout** and Benjamin Kaufman. The Kayenta Indian Health Services Clinic, Kayenta, AZ, July 30, 2009.

11. Is there a link between ADHD and sleep disorders? A review of comorbidity at The Lynchburg Family Practice Residency. **James Armontrout.** Internal Presentation for the Lynchburg Family Practice Residency and affiliates, Lynchburg, VA, August 2006

**Other Professional Publications:**

1. Legal Rights and Responsibilities of Healthcare Administrators and Insurers. Maria Chuop, **James Armontrout**. Accepted for publication in *The Journal of the American Academy of Psychiatry and the Law* with planned publication in 2024.

2. Government Management of Accompanied Minors Held in the Custody of Immigration Authorities. **James Armontrout** and John R. Chamberlain. *The Journal of the American Academy of Psychiatry and the Law*. June 2017, 45(2) 269-271