Eugene B. Elliot, State Bar No. 111475
Ethan M. Lowry, State Bar No. 278831
Benjamin I. Oreper, State Bar No. 329480
BERTRAND, FOX, ELLIOT, OSMAN & WENZEL
2749 Hyde Street
San Francisco, California 94109
Telephone: (415) 353-0999
Facsimile:  (415) 353-0990
Email:       eelliot@bfesf.com
                 elowry@bfesf.com
                 boreper@bfesf.com

Attorneys for Defendants
PALO ALTO UNIFIED SCHOOL DISTRICT
and LISA HICKEY

ALISON K. BEANUM (State Bar No. 221968)
alison.beanum@clydeco.us
VEENA A. MITCHELL (State Bar No. 161153)
veena.mitchell@clydeco.us
CLYDE & CO US LLP
355 S. Grand Avenue, Suite 1400
Los Angeles, California 90071
Telephone:  (213) 358-7600
Facsimile:  (213) 358-7650

Attorneys for Defendants
DON AUSTIN and TRENT BAHADURSINGH

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER COLOMBO,<br><br>        Plaintiff,<br><br>v.<br><br>PALO ALTO UNIFIED SCHOOL DISTRICT, et al.,<br><br>        Defendants. | Case No. 5:24-cv-00909-NC<br><br>**DEFENDANTS PALO ALTO UNIFIED SCHOOL DISTRICT, LISA HICKEY, DON AUSTIN, AND TRENT BAHADURSINGH'S JOINT LIST OF EXPERT WITNESSES**<br><br><br>**Hon. Nathanael M. Cousins** |

Defendants PALO ALTO UNIFIED SCHOOL DISTRICT, DON AUSTIN, TRENT BAHADURSINGH, and LISA HICKEY (collectively, "Defendants"), pursuant to Federal Rule of Civil Procedure 26(a)(1)(B) and the Court's Order, respectfully submit the following list of Expert Witnesses they anticipate calling at trial.

| No. | Witness Name | Brief Description of Opinions/Theories |
|---|---|---|
| 1 | James Armontrout, M.D. | Dr. Armontrout is a forensic psychiatrist and Clinical Associate Professor of Psychiatry at the Stanford School of Medicine, and an expert on adult and forensic psychiatry. He will provide expert opinion testimony regarding his medical examination of Plaintiff and his reports and conclusions derived therefrom and from his review of documentation provided by and obtained from Plaintiff in this litigation. He will opine that while Plaintiff meets diagnostic criteria for Generalized Anxiety Disorder, he does not meet criteria for Post-Traumatic Stress Disorder. Furthermore, he likely met criteria for Major Depressive Disorder in the months after the rape allegation but this is presently in remission. He will further opine that Mr. Colombo's Generalized Anxiety Disorder and current emotional distress, if any, stem primarily from the rape accusation and the subsequent public notoriety; and that Mr. Colombo's prognosis is generally positive and his symptom burden likely to decrease. His Expert Report and CV are attached as Attachment 1A. |
| 2. | Nancy Hoffman, PsyD. | Dr. Hoffman is a forensic neuropsychologist and an expert on adult and forensic psychology. She will provide expert opinion testimony based on the independent medical examination conducted of Plaintiff Peter Colombo, inclusive of the administration and interpretation of the MMPI-RF to assess Plaintiff's psychological functioning. She will opine that Mr. Colombo's pattern of scores is not consistent with PTSD and he does not meet the criteria for the disorder due to a lack of Criteria A. He further does not match the profile for diagnosed PTSD in clinical samples, but likely meets the criteria for an anxiety-related disorder. Her Expert Opinions and CV are attached as Attachment 1B. |
| 3. | Liz DeChellis | Ms. DeChellis is an attorney and Partner with Van Dermyden Makus Law Corporation. She is an expert in Title IX investigations and workplace investigations, and in evaluating Title IX and sexual harassment matters. She will provide expert opinion testimony regarding the history, purpose, and administration of Title IX, and her opinions that Defendants responded appropriately to the allegations against Mr. Colombo, in line with industry standard and guidance in place at the time of the conduct and of the reports, including Defendants' provision of a prompt, thorough and impartial investigation of the allegations, and that neither the 2020 Title IX regulations nor the District's Administrative Regulation 5145.71 required the District to process the allegations against Colombo under the procedures proscribed by the 2020 Title IX regulations. Her Expert Report and CV are attached as Attachment 1C. |

DEFENDANTS' JOINT LIST OF EXPERT WITNESSES
*Colombo v. Palo Alto Unified School District, et al.,* Case No.: 5:24-cv-00909-NC

| No. | Witness Name | Brief Description of Opinions/Theories |
|-----|--------------|----------------------------------------|
| 4. | Howard A. Jordan, Chief of Police (Ret.) | Mr. Jordan is the former Chief of Police for the City of Oakland and is an expert in police practices and investigations. Mr. Jordan is being produced as a rebuttal witness, and will provide expert rebuttal testimony to the opinion testimony of Mark Alifano. Specifically, Mr. Jordan will opine that Alifano's contention that "best practices" allow for "only 10 to 14 days for law enforcement investigation priority" is not in line with contemporary police procedures for concurrent investigations and unfounded; that priority should always be given to criminal investigations when conducted concurrently with administrative investigations; that Defendants' approach to the investigation aligned with its appropriate efforts to refrain from actions which might disrupt or compromise any law enforcement investigation or proceedings; that it was reasonable for the District to await the conclusion of the criminal investigation before commencing with its administrative investigation. He will further opine that, contrary to Alifano's contentions, the responsibility for affirmative provision of witness information and documentation did not rest with the District; that it was the duty of Palo Alto Police Department investigators to supply the District with a witness list and request their assistance in locating identified witnesses and documents; and that evidence or documents should be provided only upon request by investigators. His Expert Rebuttal Report and CV are attached as Attachment 1D. |

Dated: December 18, 2025                    BERTRAND, FOX, ELLIOT, OSMAN & WENZEL


By: _____*/s/ Ethan Lowry*_____
       Eugene B. Elliot
       Ethan M. Lowry
       Benjamin I. Oreper
       Attorneys for Defendants
       PALO ALTO UNIFIED SCHOOL DISTRICT and
       LISA HICKEY

Dated: December 18, 2025                    CLYDE & CO US LLP


By: _____*/s/ Allison Beanum*_____
       Allison K. Beanum
       Veena A. Mitchell
       Attorneys for Defendants
       DON AUSTIN and TRENT BAHADURSINGH

DEFENDANTS' JOINT LIST OF EXPERT WITNESSES
*Colombo v. Palo Alto Unified School District, et al.,* Case No.: 5:24-cv-00909-NC

ATTACHMENT 1A

ATTACHMENT 1A



9/9/2025

**James Armontrout, MD**
*Forensic Psychiatrist*
*Board Certified – Psychiatry,*
*Addiction Medicine & Forensic*
*Psychiatry*
825 San Antonio Road #105
Palo Alto, CA 94303
P (650) 772-8439
F (256) 242-0953
jarmontrout@fpamed.com

University Appointment

Stanford School of Medicine
*Clinical Associate Professor*
*of Psychiatry*

fpamed Medical Directors

Mark I. Levy, MD, DLFAPA
*Medical Director*
Charles Saldanha, MD, DFAPA
*Assistant Medical Director*

Main Office

Forensic Psychiatric  Associates, LP
440 N. Barranca Ave. #1946
Covina, CA 91723 P
(415) 388-8040
F (415) 634-2400
www.fpamed.com
forensics@fpamed.com

Benjamin I. Oreper
Bertrand Fox Elliot Osman + Wenzel
The Waterfront Building
2749 Hyde Street
San Francisco, CA 94109
Cell: 415-933-0034
Office: 415-353-0999 x113

RE:        **Colombo v. PAUSD, Case No. 5:24-cv-909-NC**

Dear Mr. Oreper:

At your request I evaluated Mr. Colombo on 8/21/2025 for three hours and thirty minutes. The following report and my conclusions are based on my interview of Mr. Colombo and the information listed below.  I reserve the right to modify my findings should additional relevant material become available.

Of note, the duration of this examination including testing was limited to 3.5 hours. This led to modifications of the examination including:
• Only one psychological test was performed, rather than performing multiple instruments as per recommended and usual practice;
• Portions of Mr. Colombo's history, particularly the social history, by necessity were reviewed in a superficial manner.

These modifications would be expected to:
• Decrease the likelihood of detecting feigning or exaggerating if present, and
• Decrease the likelihood of detecting other causes of Mr. Colombo's mental health conditions, if any.

In addition to the limits on the examination, I have not reviewed any primary source medical records in this case. I reviewed a one-page statement from Mr. Colombo's therapist confirming that he has engaged in psychotherapy and that she diagnosed PTSD and Generalized Anxiety Disorder.

Remaining mindful of these limits, my examination was sufficient to reach opinions to a reasonable degree of medical certainty.

# Contents

EXAMINER QUALIFICATIONS ................................................................................................ 3

MY OPINIONS (STATED TO A REASONABLE DEGREE OF MEDICAL CERTAINTY): ........................... 3

SOURCES OF INFORMATION ............................................................................................... 10

INFORMED CONSENT ........................................................................................................ 12

PSYCHIATRIC HISTORY BEFORE THE RAPE ALLEGATION ............................................................ 12

SUBSTANCE USE HISTORY ................................................................................................. 13

TRAUMA HISTORY ............................................................................................................ 14

ACCOUNT OF THE RAPE ALLEGATION AND SUBSEQUENT EVENTS ............................................. 14

CURRENT PSYCHIATRIC SYMPTOMS .................................................................................... 18

MEDICAL HISTORY ........................................................................................................... 19

FAMILY HISTORY ............................................................................................................. 19

SOCIAL HISTORY ............................................................................................................. 20

    Daily Routine ............................................................................................................. 20

    Childhood ................................................................................................................. 20

    Relationship History ..................................................................................................... 20

    Education History ........................................................................................................ 20

    Military History ........................................................................................................... 21

    Occupational History .................................................................................................... 21

    Hobbies and Interests ................................................................................................... 21

    Religion .................................................................................................................... 21

    Legal History .............................................................................................................. 21

CURRENT MENTAL STATUS EXAMINATION ........................................................................... 22

TESTING REVIEWED ......................................................................................................... 23

REVIEW OF RELEVANT RECORDS ........................................................................................ 23

References ...................................................................................................................... 24

## EXAMINER QUALIFICATIONS

I received both my B.A. in Psychology and my M.D. from the University of Virginia. I completed residency training in Psychiatry at the Harvard Longwood Psychiatry Residency Training Program, followed by fellowship training in Forensic Psychiatry at the University of California, San Francisco. I am board certified in Psychiatry with Added Qualification in Forensic Psychiatry by the American Board of Psychiatry and Neurology. I am also board certified in Addiction Medicine by the American Board of Preventive Medicine.

I served as a Staff Psychiatrist from August 2017 to May 2022 in the VA Palo Alto's Trauma Recovery Program, a residential treatment program focused on treating PTSD and other trauma-based disorders. I also instructed and supervised Stanford medical students and residents completing rotations at the Trauma Recovery Program. I have since moved to the Stanford Department of Psychiatry and Behavioral Sciences where I serve as the Program Director for the Forensic Psychiatry Fellowship. I also serve as an attending psychiatrist in the Post-Traumatic Stress Disorder Clinic and the Dual Diagnosis (addiction) clinic.

I have performed over 200 Independent Medical Evaluations (IMEs) and have been qualified as an expert in the field of psychiatry in courts in California. I am a member of the American Academy of Psychiatry and the Law and of the American Psychiatric Association.

## MY OPINIONS (STATED TO A REASONABLE DEGREE OF MEDICAL CERTAINTY):

**1. Mr. Colombo meets diagnostic criteria for Generalized Anxiety Disorder. He does not meet criteria for Post-Traumatic Stress Disorder. He likely met criteria for Major Depressive Disorder in the months after the rape allegation but this is presently in remission. Mr. Colombo also meets criteria for Alcohol Use Disorder in long-term remission (abstinent from alcohol since 2010).**

Per the DSM-5-TR **Generalized Anxiety Disorder** is characterized by:

| Diagnostic Criteria | F41.1 |
|---|---|

A. Excessive anxiety and worry (apprehensive expectation), occurring more days than not for at least 6 months, about a number of events or activities (such as work or school performance).

B. The individual finds it difficult to control the worry.

C. The anxiety and worry are associated with three (or more) of the following six symptoms (with at least some symptoms having been present for more days than not for the past 6 months):

**Note:** Only one item is required in children.

1. Restlessness or feeling keyed up or on edge.
2. Being easily fatigued.
3. Difficulty concentrating or mind going blank.
4. Irritability.
5. Muscle tension.
6. Sleep disturbance (difficulty falling or staying asleep, or restless, unsatisfying sleep).

D. The anxiety, worry, or physical symptoms cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

In addition, criterion E specifies that the disturbance is not attributable to the physiological effects of a substance or to another medical condition. Criterion F clarifies that the diagnosis must not be better explained by another mental disorder.

Mr. Colombo described continuing to experience:

- Anxiety, for example when he returned to school and faced protests against his return or "dirty looks" from students.
- Having some difficulty with concentration and "slowing down" his mind and thoughts. He has previously been diagnosed with ADHD but noted that the "dark cloud" of anxiety impacts on his concentration as well.
- Irritability and anger, for example when thinking about what he perceives to be unjust handling of the allegation against him.
- Some muscle tension that primarily manifests as lower back pain.
- Some sleep disturbance, though with the use of over the counter melatonin (a sleep aid) his sleep is intact and restorative.
- A physical sensation of a "bowling ball" in his stomach that occurs when he feels anxious. This has been associated with decreased appetite and weight loss. This has also been associated with past instances of vomiting in response to intense anxiety.
- Frequently thinking about the rape allegation and its sequelae.
- Worry about how others will perceive any situation where he is alone with a child.
- Occasional senses of unreality, questioning how his situation is "happening" or "is real."

It is likely that Mr. Colombo met diagnostic criteria for Major Depressive Disorder in the months after the allegation, though this appears to be in remission at this time. In addition to symptoms related to his anxiety disorder he described experiencing:

- A lack of enjoyment of life.
- Low appetite with an initial 10-pound weight loss (around February to March of 2022).
- More substantial sleep disruption, sleeping around six hours per night. His insomnia intensified once incarcerated.
- Hopeless thoughts around the time of booking for the charge, believing "my shit is hitting the papers and my life is over."
- Frequent crying, such as while exercising on the treadmill.
- Developing suicidal thoughts about hanging himself while incarcerated, along with suicidal thoughts about killing himself if he was later found guilty.

Mr. Colombo stated that recently he has experienced enjoyment of time with his family and with the recovery (twelve step) community. His sleep is intact with over-the-counter melatonin. He did not describe hopelessness and noted his determination to be resilient at several points during the examination. His memory is intact, and while his concentration remains disrupted this appears related both to longstanding deficits (past ADHD diagnosis) and anxiety. He also has not experienced any suicidal thinking since shortly after his 2022 incarceration. He described frequent irritability and anxiety, but not a pervasive sense of sadness or anhedonia (absence of pleasure).

In addition, Mr. Colombo does not meet diagnostic criteria for Post-Traumatic Stress Disorder. Per the DSM-5-TR, a diagnosis of Post-Traumatic Stress Disorder requires:

A. Exposure to actual or threatened death, serious injury, or sexual violence in one (or more) of the following ways:
1. Directly experiencing the traumatic event(s).
2. Witnessing, in person, the event(s) as it occurred to others.
3. Learning that the traumatic event(s) occurred to a close family member or close friend. In cases of actual or threatened death of a family member or friend, the event(s) must have been violent or accidental.
4. Experiencing repeated or extreme exposure to aversive details of the traumatic event(s) (e.g., first responders collecting human remains; police officers repeatedly exposed to details of child abuse). **Note:** Criterion A4 does not apply to exposure through electronic media, television, movies, or pictures, unless this exposure is work related.
B. Presence of one (or more) of the following intrusion symptoms associated with the traumatic event(s), beginning after the traumatic event(s) occurred:
1. Recurrent, involuntary, and intrusive distressing memories of the traumatic event(s). **Note:** In children older than 6 years, repetitive play may occur in which themes or aspects of the traumatic event(s) are expressed.

2. Recurrent distressing dreams in which the content and/or affect of the dream are related to the traumatic event(s). **Note:** In children, there may be frightening dreams without recognizable content.

3. Dissociative reactions (e.g., flashbacks) in which the individual feels or acts as if the traumatic event(s) were recurring. (Such reactions may occur on a continuum, with the most extreme expression being a complete loss of awareness of present surroundings.) **Note:** In children, trauma-specific reenactment may occur in play.

4. Intense or prolonged psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event(s).

5. Marked physiological reactions to internal or external cues that symbolize or resemble an aspect of the traumatic event(s).

C. Persistent avoidance of stimuli associated with the traumatic event(s), beginning after the traumatic event(s) occurred, as evidenced by one or both of the following:

1. Avoidance of or efforts to avoid distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s).

2. Avoidance of or efforts to avoid external reminders (people, places, conversations, activities, objects, situations) that arouse distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s).

D. Negative alterations in cognitions and mood associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:

1. Inability to remember an important aspect of the traumatic event(s) (typically due to dissociative amnesia, and not to other factors such as head injury, alcohol, or drugs).

2. Persistent and exaggerated negative beliefs or expectations about oneself, others, or the world (e.g., "I am bad," "No one can be trusted," "The world is completely dangerous," "My whole nervous system is permanently ruined").

3. Persistent, distorted cognitions about the cause or consequences of the traumatic event(s) that lead the individual to blame himself/herself or others.

4. Persistent negative emotional state (e.g., fear, horror, anger, guilt, or shame).

5. Markedly diminished interest or participation in significant activities.

6. Feelings of detachment or estrangement from others.

7. Persistent inability to experience positive emotions (e.g., inability to experience happiness, satisfaction, or loving feelings).

E. Marked alterations in arousal and reactivity associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:

1. Irritable behavior and angry outbursts (with little or no provocation), typically expressed as verbal or physical aggression toward people or objects.

2. Reckless or self-destructive behavior.

    3.  Hypervigilance.

    4.  Exaggerated startle response.

    5.  Problems with concentration.

    6.  Sleep disturbance (e.g., difficulty falling or staying asleep or restless sleep).

F.  Duration of the disturbance (Criteria B, C, D and E) is more than 1 month.

G.  The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

H.  The disturbance is not attributable to the physiological effects of a substance (e.g., medication, alcohol) or another medical condition.

During my examination Mr. Colombo described only one recent exposure that would meet Criterion A. He stated that when he was booked into jail the officer told him that he would likely be assaulted. Mr. Colombo stated that he feared that he would be attacked and could be seriously injured. This experience meets criterion A1, exposure to threatened serious injury. He did not describe other situations where he believed he would be exposed to death, serious injury, or sexual violence. If Post-Traumatic Stress Disorder were present related to these charges, the fear of injury when jailed would be the cause.

In Mr. Colombo's case, however, he does not endorse sufficient symptoms to reach a diagnosis of PTSD. Regarding Criterion B, he experiences recurrent, involuntary, intrusive memories about the rape allegation and subsequent events on a daily basis. He does not experience nightmares, though can at times have stressful dreams related to the rape allegation and subsequent events. He does not experience flashbacks, and his physical and psychological distress in response to ongoing stress are better explained by his Generalized Anxiety Disorder.

Importantly, Mr. Colombo did not describe pathological avoidance behaviors. He has continued work with the Palo Alto school district and find coaching and teaching meaningful. He described avoiding going out in Palo Alto because of the notoriety related to publicity around his charge. This avoidance appears to be rooted in reality-based concerns rather than distorted or pathological beliefs, as evidenced by media coverage of his case and community-based protests about his return to teaching.

Regarding Criterion D, Mr. Colombo does not have any peritraumatic amnesia. He also described experiencing positive emotions and enjoyment. He has not experienced estrangement from friends and family. He noted that the close bonds he shares with friends and family have helped sustain him emotionally. He did not describe a lack of interest in hobbies or other significant activities. He does report angry thoughts about how the case was handled and these thoughts may reflect posttraumatic changes. From Mr. Colombo's perspective, however, he does not view these thoughts as being distorted or stemming primarily from a mental disorder.

Regarding Criterion E, Mr. Colombo endorsed ongoing anger but has not engaged in aggressive behavior or outbursts. He has not engaged in reckless or self-destructive behaviors. He endorsed being watchful if out in Palo Alto because of the high-profile nature of his case within the community but did not describe a general pathological hypervigilance. He did not describe any exaggerated startle response. He has some issues with concentration which, as noted above, appear attributable to anxiety and ADHD. He also has minimal current sleep disturbance. He continues to take a sleep aid (melatonin) but has intact and restorative sleep.

Mr. Colombo's MMPI responses were also consistent with a clinically significant issue with anxiety but were not suggestive of current Post-Traumatic Stress Disorder.

In brief, while some features of Mr. Colombo's presentation can be seen in Post-Traumatic Stress Disorder, Generalized Anxiety Disorder is a better fit for his current symptom profile.

Regarding his Alcohol Use Disorder Mr. Colombo appeared open about his past issues with alcohol. At present, his Alcohol Use Disorder has been in remission since 2010. He remains active in 12-step programming and finds this a significant source of emotional support.

**2. Mr. Colombo's Generalized Anxiety Disorder and current emotional distress stem primarily from the rape accusation and the subsequent public notoriety. He also experiences anger and distress related to what he believes to be mishandling of the charge by authorities.**

Mr. Colombo described periods of emotional distress treated with psychotherapy and medication before January 2022. Unfortunately, these records are not available for my review. It is possible that he may have met criteria for GAD, MDD, or another mental disorder during those periods. He recalled that one of his providers may have suspected bipolar disorder, which would explain his having been previously prescribed lamotrigine and topiramate (mood stabilizing medications that are rarely used for anxiety or depression, but often used to treat bipolar disorder; topiramate is also sometimes used to treat Alcohol Use Disorder). If GAD and MDD were present before January 2022, his most recent episodes would represent recurrence of each disorder.

Mr. Colombo described the recent onset of symptoms of Generalized Anxiety Disorder and Major Depressive Disorder in the months after the January 28, 2022 rape accusation. No medical records or other contemporaneously documented accounts detail the exact time course of his symptoms from the time of the accusation onward. By his description, Mr. Colombo began experiencing a "bowling ball" sensation and nausea from anxiety in the months after the allegation and before any official criminal charge. As mentioned above, he also experienced insomnia, irritability, loss of appetite and weight loss, and anhedonia. He recalled feeling

"worried 24 hours a day" from around March. He also described frequent and intense worry about whether he would be charged in the month leading up to his June 2022 charge.

Once he was charged, he was promptly incarcerated for a total of one week before being released on bail. Once charged and incarcerated his symptom burden intensified to include suicidal thinking.

The time course of his symptoms suggests that the stressors present in the months after the accusation were a proximate cause for the onset or recurrence of his GAD and likely MDD. These stressors included the rape allegation, the concern about the effect on his reputation and future employability, and the potential he would face criminal charges.

A factor that has contributed to sustaining Mr. Colombo's GAD has been the degree of public notoriety associated with the rape accusation, or in Mr. Colombo's words being "labeled as a child rapist." Because his charge has been published by local media, including on the internet, the accusation has become widely known. Mr. Colombo described public backlash to his being reinstated as a teacher, including protests from the school community. This has been distressing and anxiety-provoking.

Mr. Colombo also expressed anger related to the belief that the political environment influenced the handling of his case. He expressed a belief that school officials are "politicians," that the superintendent's wife was a prominent "me too" activist, and that the Palo Alto detective who handled his case was a "nightmare" who did not investigate the case in a thorough and impartial manner (for instance, calling the alleged victim and other witnesses on the phone instead of questioning them more formally in-person). This has been associated with a reported sense of anger, frustration, and betrayal compounded on the primary issue of his charge and the associated notoriety.

**3. Mr. Colombo's prognosis is generally positive. His symptom burden is likely to decrease, though may not fully resolve.**

Mr. Colombo has been in therapy with Catlin MacCalla, LMFT since October 2023. He is currently attending sessions at least twice per month. Because I have not reviewed his treatment record, it is unclear what psychotherapeutic approach has been used or what specific issues have been addressed in treatment so far. Mr. Colombo informed me that he has connected well with his therapist and finds these sessions beneficial.

Currently the ongoing lawsuit and his very-recent return to teaching PE serve as ongoing stressors, particularly given community-based protests of his return to teaching. If Mr. Colombo

reintegrates into teaching and the intensity of public scrutiny decreases, this would be expected to decrease the intensity of his anxiety symptoms.

If symptoms persist, Mr. Colombo would likely benefit from a course of Cognitive Behavioral Therapy focused on reducing anxiety if not already attempted. CBT is frequently associated with significant improvement in Generalized Anxiety Disorder symptoms. For example, a 2018 meta-analysis found that research participants with Generalized Anxiety Disorder who completed a course of CBT had a 56.3% remission rate (95% confidence interval: 50.2-62.2%) which increased to 65.2% (95% confidence interval: 53.1%-75.6%) at follow-up (Springer et al., 2018).

Mr. Colombo informed me that he does not want to take psychiatric medication. His GAD is likely to improve significantly with decreased intensity of public scrutiny over time and with appropriate treatment including CBT. Should symptoms persist, and should he reconsider openness to psychiatric medication, he could benefit from a Selective Serotonin Reuptake Inhibitor antidepressant or Serotonin-Norepinephrine Reuptake Inhibitor antidepressant. Further reduction of symptoms would be expected with these agents. Meeting with a psychiatrist around monthly at the beginning of treatment, followed by 2-4 meetings per year while treatment is ongoing, would be recommended. Once the antidepressant dose and symptom profile is stabilized, ongoing management of the prescription could be returned to Mr. Colombo's primary care physician.

Of note, because one of Mr. Colombo's past providers may have suspected bipolar disorder he should initially be monitored carefully if started on an antidepressant. I did not find evidence to support a diagnosis of bipolar disorder. If bipolar disorder is present, however, an antidepressant may increase the risk for an episode of mania or hypomania. In addition, while Mr. Colombo has not reported a positive response to past medication treatment it appears he has only taken lamotrigine and topiramate. Both agents are sometimes used in bipolar disorder, but are not generally prescribed as monotherapy for Major Depressive Disorder or Generalized Anxiety Disorder. His response to, and toleration of, first-line antidepressant therapy would likely be significantly better than his response to either of these past trials.

## SOURCES OF INFORMATION

The following information has been received from your office:

COMPLAINT
1. Doc 113 - Third Amended Complaint for Damages,  1/6/2025

DEPOSITION AND EXHIBITS

2.  Deposition of Peter Colombo with Exhibits 500-513, and Prior Exhibits 11, 21, 23, 44, 90, and 109 7/14/2025
    a.  EXHIBIT 500   - Defendant Palo Alto Santo Unified School District's Amended Deposition Notice of Plaintiff Peter Colombo, 7/9/2025
    b.  EXHIBIT 501    - PAUSD000578 - Resume of Peter Colombo, Grades 4 to 8
    c.  EXHIBIT 502 - PAUSD000073-000076 - Employee ID, Name, State; Colombo, Peter; Positions
    d.  EXHIBIT 503    - PAUSD003014-003015 - Email Thread, Colombo to Hickey
    e.  EHXIBIT 504 - Handwritten Document; "Due Process, etc."
    f.  EHXIBIT 505    - PAUSD002761 - Letter, Mistler to Hickey, 6/13/2023
    g.  EXHIBIT 506    - PAUSD000202-000203 - Email, Bark to Bentley and attachment, 7/5/2022
    h.  EXHIBIT 507    - PAUSD000118-000121 - Email, Bark to Bently and attachment, 1/18/2023
    i.  EXHIBIT 508    - COLOMBO_001045-001064 - Unfit to Teach? Teacher accused of Rape had a Checkered History in Schools; Palo Alto Online; Zoe Morgan, February 17, 2023, Updated January 24, 2024
    j.  EXHIBIT 509    - PAUSD000051-000052 - Letter, Hicky to Colombo, 6/16/2022
    k.  EXHIBIT 510    - COLOMBO_000485-000488 - Criminal Sex-Assault Charge to be Dropped Against Palo Alto Teacher Peter Colombo; Palo Alto Online; Dremann and Morgan, April 25, 2023; Updated January 24, 2024
    l.  EXHIBIT 511    - DA Dropping Charges, but District Plans to Investigate Colombo; ThePalyVoice; Shashi and Kessler, May 15, 2023
    m.  EXHIBIT 512   - Email Thread, Willis to Nelson, 1/16/2024
    n.  EXHIBIT 513    - PAUSD002753-002759 - To Inform, April 16, 2025 and Attachments
    o.  EXHIBIT 11 - PAUSD003065-003068 - PC Notes and Call
    p.  EXHIBIT 21 - PAUSD000975-002503 – Emails, 2022
    q.  EXHIBIT 23-001 - Letter to Peter Colombo from Palo Alto Unified School District, 1/31/2022
    r.  EXHIBIT 44 - PAUSD000091 – Email, 6/9/20222-6/10/222
    s.  EXHIBIT 90 - PAUSD000013 - Letter to CTC, 6/26/2023
    t.  EXHIBIT 109   -001 - Letter to Peter Colombo re Notice of Investigation Findings, 5/28/2024

COLOMBO EMPLOYMENT DOCUMENTS
3.  Colombo Application and Onboarding Documents (including Transcripts)
4.  Colombo Contracts and Assignments, 1998-2023
5.  Colombo Credentials
6.  COLOMBO_011202-011337 - Colombo Criminal History Documents

7. Colombo Evaluations, 1999-2023

MEDICAL RECORDS
8. Letter from Caitlin MacCalla, LMFT, verifying that Mr. Colombo has been in treatment since October 2023 for PTSD and GAD.

# INFORMED CONSENT

Prior to beginning the evaluation, I informed Mr. Colombo I am a psychiatrist who was retained to evaluate him in relation to his claim. I explained the nature and purpose of the evaluation, that treatment services would not be provided, and the limits of confidentiality (that the interview would not be held confidential and my report would be made available to inform legal proceedings). Mr. Colombo indicated he understood these issues. It is my opinion he was competent to decide whether to proceed with the evaluation.

# PSYCHIATRIC HISTORY BEFORE THE RAPE ALLEGATION

Mr. Colombo was diagnosed with hyperactive ADHD as a child. He is unsure who first diagnosed this condition. The diagnosis occurred in eighth grade and he was treated with Ritalin, which "made me feel like a Zombie" but "made me quiet, the nuns loved it because Colombo wasn't acting out!" He described talking in class, frequently fidgeting, and being a child who was "very likeable but I could be a pain in the ass" regarding minor disciplinary issues. He did not have any more serious disciplinary issues leading to suspension, expulsion, or other similar administrative responses. Mr. Colombo stopped Ritalin in high school.

Mr. Colombo next worked with a therapist Dr. Blackmore after he was injured playing high school basketball. His father was very judgmental about this injury and Mr. Colombo experienced persistent sadness about his father's response to the injury, including his father stopping speaking with him at times. Mr. Colombo also felt "depressed" about his inability to participate in sports, which were "everything to [him] growing up." He does not recall if he developed other symptoms aside from low mood. He engaged in individual psychotherapy focused largely on his relationship with his father.

He next saw therapist Renee Bolo in 2004 after a DUI. He engaged in 1.5 years of therapy, again focused largely on his relationship with his father. He recalled being prescribed lamotrigine and topiramate at some point during treatment, likely for around one year from 2004-2005. He does not remember why these were prescribed. He believes his provider might have mentioned the possibility of bipolar disorder at some point (lamotrigine and topiramate are mood stabilizers

that are often prescribed for bipolar disorder), but he is not sure. He did not describe any history of episodes consistent with either mania or hypomania at any point.

Mr. Colombo informed me that aside from treatment for Alcohol Use Disorder he did not have other specific mental health treatment before the 2022 allegation. He stated that either before or after the rape allegation he has never been psychiatrically hospitalized, has never attempted suicide, has never engaged in self-injurious behavior, and has never engaged in assaultive behavior toward others. He also informed me that he does not have access to a firearm.

## SUBSTANCE USE HISTORY

Mr. Colombo had his first drink at the age of 14 and began drinking heavily in a binge pattern by the age of 17. During his teenage years, he would consume alcohol on weekends after basketball games. In his adult life, Mr. Colombo continued to drink on weekends, primarily consuming beer. He acknowledges that his judgment was impaired when he drank, often becoming hyperactive and loud. Despite his drinking habits, Mr. Colombo managed to function appropriately in daily life, including going to work and remaining effective in his role as a teacher.

In the year 2000, Mr. Colombo made his first attempt to stop drinking by attending an Alcoholics Anonymous (AA) meeting, encouraged by his ex-wife. He made a more serious effort to quit in 2004 following a DUI in 2003. Mr. Colombo stated that from 2004 to 2010 his drinking was infrequent, occurring one to two times per year at most.

He informed me that in 2010 while his teaching credential was still on probation he experienced another return to use. This provoked significant shame and guilt. He discussed it with his sponsor who encouraged honesty. He thus reported his use to the CTC, who ultimately chose not to terminate his credential because he self-reported but warned that another return to use would likely result in termination.

Mr. Colombo then began attending daily 7 a.m. AA meetings, and he credits these meetings and honesty with making a significant difference in his journey towards sobriety. He informed me that he has not had a drink since April 21, 2010. He remains highly active in AA, serving as a treasurer and running a fourth-step workshop. He also indicated that AA has been very helpful to him to assist with coping with the recent stress related to the rape allegation and subsequent proceedings. He has not engaged in individual psychotherapy or medication management for his Alcohol Use Disorder.

Mr. Colombo informed me that he "dipped" tobacco in high school and college. He has not used nicotine in several decades.

Mr. Colombo indicated that he tried marijuana early in life but never engaged in problematic use. He reported no recent use of cannabis.

Mr. Colombo stated that he otherwise has no history of recreational substance use.

## TRAUMA HISTORY

Mr. Colombo stated that his father was verbally abusive when he was a child. He made statements such as "you're a loser" and was "old school." He noted that despite having an abrasive manner verbally, his father loved him a great deal and expressed that love differently. Mr. Colombo stated that his father also instilled many positive characteristics in him including a strong work ethic. He informed me that his upbringing initially led him to be "hard on" the children he coached, but that he always balanced this with supportiveness and genuine positive regard for the children. He noted that his psychotherapy earlier in life generally revolved around processing his relationship with his father.

Mr. Colombo informed me that he was struck by a baseball in February 2003. He was evaluated in the emergency room but sent home. His girlfriend's father, who was a physician, advised that he return to the ER because he had signs and symptoms of internal bleeding. Mr. Colombo did so and required an emergency splenectomy. He awoke in the ICU. He recalled completing a will during his ICU stay because his medical team suspected he might die.

Mr. Colombo stated that the near-death experience around his splenectomy did not have a major enduring emotional impact. He noted that he did not develop nightmares, intrusive thoughts, persisting mood changes, or other major responses to this event and that within a month he was back to coaching despite having surgical staples still in place. He noted that he sometimes thinks about this event and his mortality but otherwise was relatively unaffected.

Mr. Colombo described the rape allegation and subsequent events as traumatic. This will be further reviewed in the relevant section below.

He otherwise denied any history of witnessing serious injury or death, of exposure to life-threatening injury, of exposure to natural disasters, of exposure to sexual trauma, or of any other exposures that he would view as significantly traumatic.

## ACCOUNT OF THE RAPE ALLEGATION AND SUBSEQUENT EVENTS

For the time shortly before the allegation Mr. Colombo reported no active issues with depression or anxiety. He stated he was "worried about winning games, and I loved teaching," that he was "living the dream" and that he did not have concerns about his mood, sleep, or anxiety levels.

Mr. Colombo stated that his wife received the allegation by email January 28, 2022. She confronted him with the email two days later on a Sunday. He stated that she was crying but that at the time "I wasn't worried. [I thought] I'll get this handled." They went to breakfast where Mr. Colombo reported feeling increasingly "pissed off" and "bullied," believing that someone was harassing him by email. He contacted the assistant superintendent to notify her about the email. He noted that he viewed this situation as requiring mandated reporting, and that he was glad to hear that she would file a mandated report.

Later in the afternoon while watching a 49ers game on television he received a call from school administrator Lisa Hickey. She arranged for them to discuss the email on Monday. On Monday he had two meetings with school administrators who informed him that with an allegation this serious they would typically do an outside investigation. He was placed on leave.

Mr. Colombo stated that at that point "I started to get a lot of anxiety because I didn't do anything. Thinking I've gotta coach my basketball team today, I've gotta teach my classes. How long am I going to be out, a week?"

He also contacted the Palo Alto Police Department. He met with Detective Clausen who he described as a "nightmare." He stated that she informed him if he did not hear from them in a week he should "go ahead and live your life." He noted that he also obtained a routing number and brought it to the detective to help her discover who had sent the email.

Mr. Colombo stated that in March 2022 the detective called him back in. She informed him they had found the person who sent the email and that she wanted to ask him more questions. He went back to the police station without an attorney. The detective concluded the meeting by informing him and his wife that "you'll hear from us if we are going to press charges."

At that point Mr. Colombo informed me that he developed a "bowling ball" sensation in his stomach which persisted "all the time." He described experiencing intense nausea but being unable to vomit. His sleep decreased to around 6 hours per night. He began to feel more irritable. His appetite decreased and he lost around 10 pounds. He found himself unable to enjoy life. He described feeling "worried 24 hours a day," often discussing with his wife whether he would be charged.

In June he went on a trip to Cabo and described feeling "worried constantly, trying to enjoy our resort." When he returned he received a text from his attorney. He and his wife met with the attorney that day and were informed that he would be charged. He recalled his wife starting to cry. He made arrangements to meet with his attorney the next afternoon to drive together to the police station and turn himself in.

Mr. Colombo stated that the night before he presented to the police department was "the worst night I ever had in my life." He described frequently vomiting. He noted that the "bowling ball" sensation was constant. He found himself unable to move and was lying in bed with his wife Heidi holding him. He described feeling fixated on the thought that "when you get charged with something like that and your mugshot hits the paper you're never teaching again."

The next day at the police department the detective came "with a smirk on her face. That b... don't get me started. She gives me the walk of shame. She handcuffs me" and then walked him down a busy street where one of his students witnessed him being taken to jail.

Mr. Colombo stated that at booking the officer informed him that he would likely be assaulted in the facility because of the nature of his charges. Mr. Colombo stated that the officer chose a facility where the assault would likely be "less severe." When asked whether Mr. Colombo feared he would be seriously injured or killed while incarcerated, he informed me that he did experience that fear because he was aware of how people accused of raping children are treated in correctional settings.

He ultimately spent one week in solitary confinement. He described it as "the worst thing that has ever happened in my life." He ruminated on the thought that "my shit is hitting the papers and my life is over." He found himself thinking "fuck, how is this happening in the United States of America." He stated that his symptoms intensified. The "bowling ball" in his abdomen became more intense. He felt that his life was over and that his reputation would be ruined. He recalled looking out of the small window in his cell and noted that even now when he looks out of the window of his home he will experience memories of that incarceration. He described being unable to sleep during his incarceration. He also stated that one night while incarcerated he began to experience suicidal thinking. He thought about how he could use a bedsheet to hang himself. He recalled "playing out the court case" in his mind. He ultimately got past the episode of suicidal thinking by reminding himself to take "one more moment. You can do this. One more moment."

After one week he was allowed to post bail. He remained on house arrest for 9 months with an ankle monitor. He was allowed only to go out in a 600-foot radius from his house to walk his dog. In August 2022 his attorney obtained permission from the court for him to leave home for one hour per day to attend his daily AA meetings. He otherwise remained at home but noted that support from family and friends who visited him often provided some encouragement and comfort.

During his house arrest he described feeling "scared." Whenever a private number called, he believed it was his attorney and would "think what is it now?" He noted that several court dates were canceled and that this caused significant anxiety and a desire to "get it over with." He

indicated that at one point he discussed with his wife that he wanted to carry a pill with him to the trial and to commit suicide if found guilty.  His wife reassured him and the suicidal thinking passed.  He described feeling "anxiety, never a day without anxiety.  Never a day without worry."  He indicated that he felt restless, irritable, and discontent.  He continued to exercise 60 to 90 minutes/day and found that this provided some relief but often found himself crying on the treadmill.  He often ruminated about being "labeled as a child rapist."

His charges were ultimately dropped around March 2023.  His teaching credential had expired and he was not able to renew the credential.  In May he also received a letter stating that he was on unpaid administrative leave pending an internal investigation.  He recalled thinking to himself "so here's the third investigation. They're trying to get me to quit."  In August he received a letter stating he was on unpaid leave.  In October he went to a CTC proceeding and his teaching credential was restored.  He noted that the district investigation still had not been completed.  He stated a belief that it was not completed because they believed he would not get his credential back.

He stated that he was placed in a TOSA (Teacher on Special Assignment) role July 2024 through June 2025.  He expressed a belief that this was a "sham job" meant to "make my life as uncomfortable as possible."  He described working in close proximity with the individuals he was suing.

He stated that from the time the charges were dropped he experienced anger, anxiety, fear, and thoughts such as "why are they doing this to me.  You could see they were trying to get me to go away.  Before the charges but especially after."  He noted that he was bothered by some events such as emailing that he would come back to Greene "first thing on Monday" to teach after the credential was restored and receiving a response indicating that he was threatening the district.

He noted that he has been working with a psychotherapist Caitlin from around August or October 2023 through the present.  He described her as "awesome, perfect for me."  He feels understood by his therapist and noted that work around issues such as forgiveness has been helpful to him.  He has not taken psychiatric medication at any point since approximately 2005 and indicated that he has no intent to take medication.  He noted that he plans to meet with a psychologist but that this meeting will be focused on evaluating for accommodations such as taking time away from work for treatment.

No medical or mental health records were available for my review, aside from a one-page statement from Caitlin MacCalla, LMFT, verifying that Mr. Colombo has been in treatment since October 2023 for Post-Traumatic Stress Disorder (PTSD) and Generalized Anxiety Disorder (GAD).

## CURRENT PSYCHIATRIC SYMPTOMS

Mr. Colombo described his recent mood as "anxiety when I show up to school." He noted that he thinks everyone is looking at him, especially the kids. He stated that he tries to remind himself that they are "just kids, and the parents are just going by what they read in the paper."

He stated that he does enjoy activities like time with his wife and pizza nights with his mother and father. He also indicated that he had enjoyed our meeting, where "somebody's listening to me." His sleep is intact with the use of around 10 mg of melatonin per night. He believes his appetite is somewhat decreased and that he may have lost weight, but he has not tracked his weight. His memory is intact. He finds it difficult at times to "slow down" and concentrate. He stated that the last time he thought about suicide was when he discussed killing himself if found guilty with his wife. He noted that he continues to feel there is a "dark cloud" around him.

He stated that his current anxiety and frustration centers around the district and the school. He returned to school this week and described walking past protestors who are opposing his return without escort or assistance. He noted that when he first returned to work some of the "girls were giving me the dirtiest look in the world. Coming to classes in groups because they're scared of me." He noted that the "bowling ball" sensation occurred again as he contemplated whether he could remain at the school under current conditions, though on the first day he decided to "give it until noon" and found that once he was teaching again the situation was more manageable. He described experiencing some muscle tension including some recent lower back pain. He experiences some dreams with themes of stress, such as dreaming that he is interacting with the superintendent, though reported that he does not experience nightmares or nighttime sweating.

He stated that he experiences anger that comes and goes. He indicated that his anger currently focuses on two district administrators and their behavior. He noted that he can become "animated, I'm a character" when angry but that he never behaves in an irritable or angry/threatening manner directly with others. He continues to think about the accusation and his situation daily. The thoughts typically occur spontaneously in the morning or when talking about school. He does not make specific efforts to avoid thinking about the situation but reflected that the situation is a "cloud" over him. He avoids going out in Palo Alto because he is concerned people will identify and react negatively to him. He remains committed to continuing to show up for work noting that he would not "let them cancel me."

Mr. Colombo reported that he has no gaps in memory for any of the events related to the accusation or subsequent proceedings. He does not blame himself for what has happened, reflecting that "[I] didn't bring this on." He continues to experience positive emotions, especially at AA or with his family. He stated that he still has a passion for coaching and is motivated to do high-quality work. He does not experience social detachment from family or friends except when

children are around.  He noted that he has become very self-conscious about his conduct around children; for instance, when he was throwing a baseball alone with a friend's son he found himself wondering if the friend would be okay with that.  In general he finds himself being very conscious of avoiding being alone with children and reflects on how others would perceive his being alone even briefly with a child.  He does not experience any exaggerated startle response.  He stated that at various points he has had thoughts such as "how is this happening?  How is this real?"  He has not experienced any overt dissociation.

He stated that he understands he needs "to learn to move on.  I have got to let go of this, these politicians, who played this game with my life."  He indicated that he believes he has to improve in therapy, that "I've got to have faith in humanity.  That everything is not about politics.  And that I just got caught up in a very bad situation."

## MEDICAL HISTORY

Mr. Colombo stated that he currently takes atorvastatin for high cholesterol and melatonin 5 to 10 mg at bedtime to promote sleep.

He informed me that he has had left knee arthroscopy.

Medical review of systems was omitted due to time constraints.

Mr. Colombo informed me that he had an emergency splenectomy as outlined above.  He indicated that the situation was life-threatening and resulted in an ICU stay.

Mr. Colombo reported having no known history of drug allergies.  He indicated that he was allergic to dust as a child and that he took shots to help resolve that.

Mr. Colombo stated that he has no history of head trauma.  He has no lifetime history of a seizure and no known history of thyroid problems.  To his knowledge he met all developmental milestones on time.

## FAMILY HISTORY

Mr. Colombo stated that his mother suffered from alcoholism and bulimia.  He reported no other known family history of mental health diagnoses.

## SOCIAL HISTORY

### Daily Routine

Mr. Colombo stated that he has recently resumed teaching at Fletcher middle school.  He wakes at 6:15 AM, takes a shower, and goes to AA each morning.  He stated that he has been going to the same morning meeting for the past 15 years.

He then goes to school to teach.  A typical workday last from 8:15 AM to 3:15 PM.  At the end of the day he waits until most people have left to avoid running into parents.  He then goes home and exercises for approximately 1 hour.  He typically chooses aerobic exercises such as Peloton workouts, running on the treadmill, or walking.  He also does limited resistance exercise including push-ups.  He noted that exercise is "my medication."

In the evening he spends time playing with his two puppies.  He has dinner with his wife Heidi and then she typically returns to completing work (she is an HR director).

He goes to bed at about 10 PM.  He takes one to two 5 mg over-the-counter melatonin sleep aids and falls asleep promptly while watching television.  He sleeps throughout the night and feels well rested when he wakes.

### Childhood

Mr. Colombo was born and raised in the Bay area.  As above, he described his father as loving him a great deal and as instilling many great values in him but as being harsh and verbally abusive as well.  He noted that with age he has come to understand his father better and that he has a very close and loving relationship with his father today.  Further review of childhood history was omitted due to time constraints.

### Relationship History

Mr. Colombo is currently married and described his wife as being very supportive.  He was previously married from 1997 through 2002.  He believes that that marriage ended because he was not "mature enough" at the time.  They have remained on good terms and still enjoy speaking when they see each other out in public.  He married his current wife at the end of 2012.

### Education History

Per his deposition testimony Mr. Colombo:
- Graduated high school in 1986.
- Attended Canada College playing baseball '87
- Attended Foothill  college playing baseball in 1988

- Attended the University of San Francisco on a baseball scholarship from 1989-1990
- Graduated USF 1991

His available transcript shows grades typically in the B to C range.

## Military History

Mr. Colombo did not report any history of military service.

## Occupational History

His CV shows:
- Assistant baseball coach at Canada College 1993
- Freshman sophomore basketball coach Menlo high school Atherton 1994
- Teacher and head JV baseball coach at Serra high school 1993-1995
- Full-time substitute at Redwood City elementary school district September 1996
- Student teacher at Redwood City elementary school district February 1997 to June 1997
- Palo Alto high school assistant varsity baseball coach starting January 1998
- Redwood City elementary school district middle school teacher starting August 1997

Mr. Colombo has served as a teacher with the Palo Alto Unified School District since approximately the late 1990s.

## Hobbies and Interests

Mr. Colombo enjoys walking his dogs, spending time with his wife, and spending time with family and friends. He is highly active in AA and enjoys daily morning meetings there.

## Religion

Not assessed due to time constraints.

## Legal History

His CTC documents show:
- DUI on Jan 28, 2004. Probation 3 years. 48 hours jail, license restricted 90 days. BAC was 0.19.
- 1990 - DUI + hit and run. Probation 3 years. BAC was .236.
- August 18, 1988 vandalism and disorderly conduct under the influence of alcohol and drugs. 3 year probation, 40 hours community service; ripped a telephone off its wire and threw it at a vehicle during an argument.

- July 10, 1988 trespass, court probation 1 year, went uninvited to residence of female he met through his girlfriend, was honking horn, at police arrival was found hiding in the bushes.

The arrest report for trespassing indicated that Mr. Colombo misidentified himself to the responding officer. He informed the officer that he had falsely called out that "Mike and Edward were there" hoping that this would get the girl to come outside. Per the report after arrest he yelled out "what's wrong with having a hard-on for a girl?"

Mr. Colombo informed me that alcohol was a significant factor in all his arrests before the rape allegation occurred. He noted that obtaining sobriety and emphasizing honesty in his recovery has been key for him.

Mr. Colombo informed me that he does not have any other history of arrest or incarceration, aside from the arrest and incarceration related to the rape allegation.

## CURRENT MENTAL STATUS EXAMINATION

**Appearance**: bald white male appearing younger than his stated age of 58. Mr. Colombo was dressed neatly, with good grooming and hygiene. He was awake and alert throughout the examination.

**Attitude**: engaged, cooperative, and friendly.

**Behavior**: Mr. Colombo appeared animated through much of the examination. He often fidgeted in his chair and at times stood when illustrating points, for instance miming watching out the window while in solitary confinement. He often spoke directly to the audio recorder, addressing comments to board members who he believed may later listen to this examination.

**Speech**: talkative, rapid and somewhat loud, normal prosody. When discussing emotionally salient topics at times become louder, near yelling.

**Mood**: "anxiety"

**Affect**: somewhat labile and wide-ranging, often euthymic and jocular but anxious with sharp pivots to intense anxiety and sadness, particularly when discussing emotionally salient topics. At times began to cry intensely.

**Thought Content**: No suicidal thinking. No evidence of psychosis elicited at any point during the evaluation. Often returned to themes of perceived injustice.

**Thought Process**: linear and logical, though often overinclusive.

**Insight**: intact, with good recognition of symptoms.

**Judgment**: intact, though with likely chronic mild impulse control issues

**Cognition**: grossly intact, not formally tested at this encounter though with no obvious deficits in memory or concentration throughout the 3.5-hour examination

## TESTING REVIEWED

I administered the MMPI-2-RF by computer-based administration. Dr. Nancy Hoffman, a qualified psychologist, interpreted the responses to this instrument.

Mr. Colombo's responses on this instrument were valid for interpretation, without any clear evidence of exaggeration or feigning when his responses were considered in the context of the psychiatric interview. His responses were consistent with an anxiety disorder, with endorsement of clinically significant features of anxiety (T=80). He also endorsed a range of items related to feeling persecuted. His pattern of scores was not consistent with PTSD. There was no evidence of clinically significant elevation of demoralization, somatic preoccupation, low positive emotions, dysfunctional negative emotions, hyperarousal, social avoidance, antisocial behavior, proneness to anger, self-doubt, helplessness, or substance abuse.

## REVIEW OF RELEVANT RECORDS

Review of Mr. Colombo's deposition provided an account of events consistent with the one provided during my examination.

Disciplinary letters from his employment file noted that he used inappropriate language with students in 2021. This included the terms "pimp" and "Deez nuts." In a third complaint a student felt uncomfortable and unsupported when he needed help with his locker. The disciplinary letter indicated "it was clear that you have been very concerned about the complaints and have taken responsibility and reflected." During my examination Mr. Colombo also discussed these incidents. He indicated that he had used this language to attempt to connect with students using their own language and humor, but that he stopped this behavior after the reprimand.

Mr. Colombo's disciplinary record also shows that he was suspended for two weeks for allowing a basketball scrimmage in violation of COVID protocols in November 18, 2020.

Mr. Colombo's employee performance evaluations were included and were positive, typically reflecting that he was supportive, established strong rapport with students, and that he interacted well with the children in his class.

Thank you for referring this matter to me for evaluation and report.

Sincerely,

James Armontrout, MD
*Forensic Psychiatrist*
*Board Certified – Psychiatry & Forensic Psychiatry*
Forensic Psychiatric Associates, LP

## References

Springer, K. S., Levy, H. C., & Tolin, D. F. (2018). Remission in CBT for adult anxiety disorders: A

meta-analysis. *Clinical Psychology Review*, *61*, 1–8.

https://doi.org/10.1016/j.cpr.2018.03.002

James Alden Armontrout, MD
825 San Antonio Road #105
Palo Alto, CA 94303
T: 650-204-1116
F: 256-242-0953

**Academic Appointments:**

2024-          Clinical Associate Professor of Psychiatry, Stanford School of Medicine

2023-          Program Director, Stanford Forensic Psychiatry Fellowship

2022-2024      Clinical Assistant Professor of Psychiatry, Stanford School of Medicine

2019-2022      Clinical Assistant Professor of Psychiatry (Affiliated), Stanford School of Medicine

**Employment:**

2024-          Clinical Associate Professor of Psychiatry, Stanford School of Medicine

2022-2024      Clinical Assistant Professor of Psychiatry, Stanford School of Medicine

2020-2022      Medical Director, Menlo Park Trauma Recovery Program, VA Palo Alto Healthcare System

2017-2020      Staff Psychiatrist, Menlo Park Trauma Recovery Program, VA Palo Alto Healthcare System

2017-          Private practice in Forensic Psychiatry

**Education and Postdoctoral Training:**

2016-2017      Forensic Psychiatry Fellow, University of California, San Francisco

2015-2016      Co-Chief Resident of Outpatient Psychiatry, Beth Israel Deaconess Medical Center

2012-2016      Clinical Fellow, Harvard Medical School

2012-2016      Resident, Harvard Longwood Psychiatry Residency Program

2008-2012      MD, University of Virginia

2003-2007      BA Psychology with High Honors, University of Virginia

**Certifications and Licensure:**

| | |
|---|---|
| 2023- | Florida Medical License #ME163826 (full medical license; previously held expert witness license MEEW8210) |
| 2023- | Virginia Medical License #0101278442 |
| 2023- | Mississippi Medical License #32002 |
| 2022- | Board Certified in Addiction Medicine, American Board of Preventive Medicine, Initial Certification Granted January 1, 2022 |
| 2017- | Board Certified in Forensic Psychiatry, American Board of Psychiatry and Neurology, Initial Certification Granted October 11, 2017 |
| 2016- | Board Certified in Psychiatry, American Board of Psychiatry and Neurology, Initial Certification Granted September 22, 2016 |
| 2016- | California Medical License #A138817 |
| 2012 – 2016 | Massachusetts Limited License #251424 |

**Additional Administrative and Leadership Experiences:**

| | |
|---|---|
| 2024- | Discuss and advise about forensic psychiatric and psychological evaluations with Stanford faculty, including faculty taking or considering cases via the department's Program in Psychiatry and the Law |
| 2023- | Lead negotiations for a Stanford / Department of State Hospitals rotation and contract, created a Department of State Hospitals selective as the Stanford Forensic Psychiatry Fellowship Director |
| 2023- | Work with the Statewide Chief Psychiatrist for the California Department of Corrections overseeing forensic psychiatry fellow rotations at San Quentin and the California Medical Facility (Stanford Forensic Psychiatry Fellowship Program Director Role) |
| 2023- | Coordinate with referral sources in San Francisco and other counties (both local and in Southern California) to develop a private case panel rotation for the forensic psychiatry fellows (Stanford Forensic Psychiatry Fellowship Program Director Role) |
| 2023- | Formed a new Sexually Violent Predators Clinic rotation based in San Francisco for the Stanford Forensic Psychiatry Fellowship |
| 2023- | Formed a new Landmark Case didactic series for the Stanford Forensic Psychiatry Fellowship |
| 2023- | Oversee the appointment of new faculty to the Stanford Forensic Psychiatry Fellowship |

2023-      Coordinate with Journal of the American Academy of Psychiatry and the Law Section Editor Jennifer Piel for submission of two legal case review articles per year for publication by the fellows (Stanford Forensic Psychiatry Fellowship Program Director Role)

2017-2022  Screened veterans applying for residential PTSD treatment from the Bay Area, Northern California, Nevada, Hawaii, and the Pacific Islands as a staff psychiatrist for the VA Palo Alto Healthcare System, Menlo Park Division


**Teaching Experience:**

2023-      Help coordinate and oversee three mock testimony experiences per year, including overseeing fellow participation in the Stanford International Association of Defense Counsel Trial Advocacy Workshop and assisting in two Stanford psychiatry-based exercises through the Stanford Forensic Psychiatry Fellowship

2023-      Direct Forensic Psychiatry Fellowship Didactic Series, Landmark Case Series, and Case Conference Series, Stanford Forensic Psychiatry Fellowship

2023-      Supervise an Addiction Medicine Fellow's outpatient dual diagnosis clinic, one day per week, Stanford Department of Psychiatry and Behavioral Sciences

2023-      Direct Stanford Psychiatry Residency "Legal Aspects of Psychiatry" didactic series, PGY 3 and 4, Stanford Department of Psychiatry and Behavioral Sciences

2022-      Supervise and teach Stanford Forensic Psychiatry Fellows through the Stanford Forensic Psychiatry Fellowship

2020-2022  Site Director for Stanford Resident Psychiatrists completing rotations at the Menlo Park Trauma Recovery Program, VA Palo Alto Healthcare System

2020-2022  Clerkship Director for the Stanford 308E Trauma Psychiatry Selective while serving as Medical Director of the Menlo Park Trauma Recovery Program, VA Palo Alto Healthcare System

2018-      Presented recurring didactic talks for the Stanford Psychiatry Residents on topics including Antisocial Personality Disorder, Post-Traumatic Stress Disorder, Violence Risk Assessment, and Assessment of Criminal Responsibility, Stanford Department of Psychiatry and Behavioral Sciences.

2017-2022  Instruct and supervise Stanford medical students and residents, as well as visiting medical students, completing rotations at the Menlo Park Trauma Recovery Program

2017-      Present an annual case conference presentation for the University of California, San Francisco Forensic Psychiatry Fellowship training program

2016-2017  Instructed University of California, San Francisco medical students completing an advanced elective rotation in forensic psychiatry with the University of California, San Francisco Forensic Psychiatry Fellowship

| | |
|---|---|
| 2015-2016 | Co-Chief Resident of Outpatient Psychiatry at Beth Israel Deaconess Medical Center, assisted in instruction of second through fourth year psychiatry residents in psychotherapy, patient assessment and management, and clinic administration |
| 2012-2016 | Instructed Harvard Medical Students completing clerkship rotations in psychiatry at Harvard Medical School training sites at Beth Israel Deaconess Medical Center, Brigham and Women's Hospital, Brigham and Women's Faulkner Hospital, and Massachusetts Mental Health Center |
| 2009 | Taught "adventures in medicine" course to high school students in the Navajo Nation to encourage interest in science and medicine.  Also completed quality improvement research within the Indian Health Services clinic in Kayenta, AZ. |
| 2007 | Kaplan MCAT [Medical College Admissions Test] Prep Course Instructor, All Subjects |
| 2005-2008 | Research Assistant, Kubovy Perceptual Psychology Lab at the University of Virginia, Trained Incoming RAs |

**Awards:**

| | |
|---|---|
| 2024 | Stanford Department of Psychiatry and Behavioral Sciences Chairman's Award – Unsung Hero Award |
| 2017 | 2017 Young Investigator Prize, American Academy of Psychiatry and the Law |
| 2007 | University of Virginia 2006-2007 Department of Psychology Undergraduate Research Excellence Award |

**Committee Memberships:**

| | |
|---|---|
| 2022- | Stanford Forensic Psychiatry Fellowship Program Evaluation Committee and Clinical Education Committee |
| 2020-2022 | VA Palo Alto Education Committee |
| 2019-2022 | Early Career Development Committee, American Academy of Psychiatry and the Law |
| 2018-2019 | Domestic Violence Committee, VA Palo Alto Healthcare System |
| 2018- | Trauma and Stress Committee, American Academy of Psychiatry and the Law |
| 2017 - | Technology Committee, American Academy of Psychiatry and the Law |

**Other relevant skills and training:**

| | |
|---|---|
| 2017 | Training in Cognitive Processing Therapy for PTSD through the department of Veteran's Affairs, VA Palo Alto Healthcare System |

| 2016-2017 | Training in the administration an interpretation of psychological testing instruments including (but not limited to) the Psychopathy Checklist-Revised; Structured Inventory of Reported Symptoms-2; the Miller Forensic Assessment of Symptoms Test; and the Test of Memory Malingering at the University of California, San Francisco Forensic Psychiatry Fellowship |
|---|---|
| 2015-2016 | Training in administration of electroconvulsive therapy, Harvard Longwood Psychiatry Residency Training Program |
| 2015 | Clozapine Risk Evaluation and Mitigation Strategy (REMS) system enrolment (as a resident at the Harvard Longwood Psychiatry Residency Training Program) |
| 2014 | Completed suboxone training to qualify for X-waiver 12/17/14, Harvard Longwood Psychiatry Residency Training Program |
| 2013-2016 | Training in psychodynamic psychotherapy, cognitive behavioral therapy, and acceptance and commitment therapy.  Have both completed cases under supervision as a psychiatry resident and offered supervision as a chief resident in each modality at the Harvard Longwood Psychiatry Residency Training Program. |
| 2012 - | Experience working in multidisciplinary teams comprised of physicians, psychologists, nurse practitioners, nursing staff, social work and support staff across multiple settings (University of Virginia School of Medicine, Harvard Longwood Psychiatry Residency Training Program, University of California San Francisco Forensic Psychiatry Fellowship, VA Palo Alto Healthcare System, and Stanford Department of Psychiatry and Behavioral Sciences) |
| 2012 | Assisted in research on stages of change and coping behaviour use at the University of Virginia's Center for Addiction Research and Education |
| 2012 | Creative writing with short fiction published in UVa's 2012 Veritas magazine, University of Virginia School of Medicine |

**Memberships:**

| 2015 – | American Academy of Psychiatry and the Law (AAPL) |
|---|---|
| 2012-2016 | Massachusetts Medical Society (MMS) |
| 2012 - | American Psychiatric Association (APA) |
| 2012 - | American Medical Association (AMA) |
| 2005 - | Psi Chi, International Honor Society of Psychology (ΨΧ) |

**Peer Reviewed Publications:**

1. Current Regulation of Mobile Mental Health Applications. **James Armontrout**, John Torous, Marsha Cohen, Dale McNiel, & Renee Binder. *The Journal of the American Academy of Psychiatry and the Law* 2018, 46:204-11

2. A Resident Perspective on the Goldwater Rule. **James Armontrout**, Sagar Vijapura. *The Journal of the American Academy of Psychiatry and the Law*. June 2017, 45(2) 249-252.

3. Mobile Mental Health: Navigating New Rules and Regulations for Digital Tools. **James Armontrout**, John Torous, Matthew Fisher, Eric Drogin & Thomas Gutheil. *Current Psychiatry Reports* 2016:18:9

4. Do Consultation Psychiatrists, Forensic Psychiatrists, Psychiatry Trainees, and Health Care Lawyers Differ in Opinion on Gray Area Decision-Making Capacity Cases?  A Vignette-Based Survey. **James Armontrout**, David Gitlin, Thomas G Gutheil. *Psychosomatics*. 2016:57(5), 472-479

5. Life or Limb: Family as Decision Makers for a Psychotic Patient with Life-Threatening Gangrene. **James Armontrout**, Sejal B. Shah. *Psychosomatics* 2015:56:691-695

6. Visual determinants of a cross-modal illusion. **James Armontrout**, Michael Schutz and Michael Kubovy. *Attention, Perception, & Psychophysics*, 2009, Volume 71, Number 7, Pages 1618-1627

**Textbook Chapter**

1. Record Keeping in Private Practice.  Eric Drogin, **James Armontrout**.  <u>Handbook of Private Practice</u>, Chapter 6, p. 66-78. Edited by Steven Walfish, Jeffrey Barnett, and Jeffrey Zimmerman. Oxford University Press, published in the United States in New York, New York, April 21, 2017.

**Poster and other Presentations:**

1. Intelligent Use of Artificial Intelligence: a Practical and Ethical Approach. Andrew Nanton, Alan Newman, Michael Rogers, **James Armontrout**. 2023 Meeting of the American Academy of Psychiatry and the Law, Chicago, IL, October 21, 2023.

2. Neuroscience in the Court Room. Octavio Choi, Shafi Lodhi, Grace Cheney, **James Armontrout**. 2023 Conference of the American Psychiatric Association, San Francisco, CA, May 22, 2023

3. Telehealth Pearls, Pitfalls, and Strategies to Improve Patient Experience. **James Armontrout**. Pacific Southwest Mental Health Technology Transfer Center Online Presentation (Invited as a Virtual Talk), July 27, 2020.

4. Veteran's Week: Managing TBI and PTSD During the Pandemic. **James Armontrout.** Mission College (invited speaker), Santa Clara, CA November 6, 2020.

5. Fanatics, Incels and Trolls: The Forensic Expert's Guide. Andrew Nanton, Alan Newman, **James Armontrout**, Michael Rogers. 2019 Meeting of the American Academy of Psychiatry and the Law, Baltimore, MD, October 24, 2019.

6. Veteran's Week: TBI & PTSD Workshop. James Armontrout. Mission College (invited speaker), Santa Clara, CA November 4, 2019.

7. Complex Decisional Capacity Assessments: From Disposition, to Organ Donation, and Death. Vivek Datta, James Bourgeois, Lawrence Kaplan, Panid Sarifnia, **James Armontrout**. 2019 Conference of the American Psychiatric Association, San Francisco, CA, May 21, 2019.

8. When is a smartphone a regulated medical device? Exploring the boundaries with mental health apps. **James A Armontrout**, John Torous, Marsha Cohen, Dale McNiel, Renee Binder. 2017 Conference of the American Academy of Psychiatry and the Law, Denver, CO.

9. Do Consult Psychiatrists, Forensic Psychiatrists, Psychiatry Trainees, and Healthcare Lawyers Differ in Opinion on Grey Area Decision Making Capacity Cases?  A Vignette-Based Survey. **James A Armontrout**, David Gitlin, Thomas G Gutheil.  Mysell Research Day Poster Session, Harvard Medical School, March 23, 2016

10. Kayenta Quality Improvement Questionnaire.  **James Armontrout** and Benjamin Kaufman. The Kayenta Indian Health Services Clinic, Kayenta, AZ, July 30, 2009.

11. Is there a link between ADHD and sleep disorders?  A review of comorbidity at The Lynchburg Family Practice Residency. **James Armontrout.** Internal Presentation for the Lynchburg Family Practice Residency and affiliates, Lynchburg, VA, August 2006

**Other Professional Publications:**

1. Legal Rights and Responsibilities of Healthcare Administrators and Insurers. Maria Chuop, **James Armontrout**. Accepted for publication in *The Journal of the American Academy of Psychiatry and the Law* with planned publication in 2024.

2. Government Management of Accompanied Minors Held in the Custody of Immigration Authorities. **James Armontrout** and John R. Chamberlain. *The Journal of the American Academy of Psychiatry and the Law*. June 2017, 45(2) 269-271



10/6/2025

**James Armontrout, MD**
*Forensic Psychiatrist*
*Board Certified – Psychiatry,*
*Addiction Medicine & Forensic*
*Psychiatry*
825 San Antonio Road #105
Palo Alto, CA 94303
P (650) 772-8439
F (256) 242-0953
jarmontrout@fpamed.com

University Appointment

Stanford School of Medicine
*Clinical Associate Professor*
*of Psychiatry*

Benjamin I. Oreper
Bertrand Fox Elliot Osman + Wenzel
The Waterfront Building
2749 Hyde Street
San Francisco, CA 94109
Cell: 415-933-0034
Office: 415-353-0999 x113

RE:     **Colombo v. PAUSD, Case No. 5:24-cv-909-NC**

Dear Mr. Oreper:

I recently received the expert report by psychiatrist Dr. Jessica Chaudhary. I have prepared this report to address areas of divergence with her opinions and methodology.

fpamed Medical Directors

Mark I. Levy, MD, DLFAPA
*Medical Director*
Charles Saldanha, MD, DFAPA
*Assistant Medical Director*

Main Office

Forensic Psychiatric  Associates, LP
440 N. Barranca Ave. #1946
Covina, CA 91723 P
(415) 388-8040
F (415) 634-2400
www.fpamed.com
forensics@fpamed.com

**My opinions (stated to a reasonable degree of medical certainty):**

**1. The report does not demonstrate the use of some methods that are commonly utilized in the field of forensic psychiatry.**

I observed several issues regarding methodology in Dr. Chaudhary's report. Specifically:

- The amount of time for examination was not specified (the IME + report was listed as six hours in a billing document, but the total exam time is unclear).
- No psychological testing was administered.
- It is unclear whether any diagnosis was reached.
- Causation regarding PTSD, if deemed present, was not sufficiently addressed.

One important task when conducting a forensic examination is to carefully assess the accuracy of self-reported data about mental health symptoms. That assessment usually rests on (1) a review of medical records and other case documents, (2) an in-depth forensic psychiatric interview, and (3) psychological testing. As with my examination, Dr. Chaudhary was not provided with any primary source medical records, though did have access to some other case documents. She received and reviewed the brief letter that Caitlin McCalla, LMFT prepared but did not have access to any other medical records. That makes an in-depth interview and psychological testing particularly important.

While Dr. Chaudhary covered basic components of a psychiatric examination, it is unclear how long she examined Mr. Colombo and the level of detail she elicited about his psychiatric history, ruling in or out other causes or contributors to his symptoms, and the evolution of his symptoms. Importantly, it is usual practice to administer psychological testing measures to help assess the accuracy of self-reported data. Based on the report, it does not appear Dr. Chaudhary administered any psychological testing. As I mentioned in my report, this decreases the likelihood of identifying feigning or exaggeration if present.

Reviewing multiple collateral documents, conducting a forensic psychiatric examination (which typically takes 3-5 hours), and conducting psychological testing is generally not done in the clinical context. When treating patients, we generally accept self-reported symptoms at face value unless there is a compelling reason not to do so. This is because the goal of a clinical evaluation is treatment, the base rates of feigning or exaggeration are significantly lower than in the forensic context, and information can continue to be assessed and clarified across many follow-up visits. In a forensic context, a robust assessment of the accuracy of self-report and careful consideration about causation of symptoms is needed.

In addition, it is not clear whether Dr. Chaudhary diagnosed Mr. Colombo with a mental disorder. She noted that "Mr. Colombo describes significant anxiety as well as PTSD symptoms" but did not clearly state whether he has a diagnosable anxiety disorder or Post-Traumatic Stress Disorder. This makes it difficult to assess whether I agree with her diagnostic conclusions (I diagnosed Generalized Anxiety Disorder, Major Depressive Disorder in remission, and Alcohol Use Disorder in Long-Term remission).

If Dr. Chaudhary has diagnosed Post-Traumatic Stress Disorder, further exploration of causation is needed. She indicated that "The most significant traumatic events that have substantially contributed to cause Mr. Colombo's current adverse mental health conditions stem from perceived mistreatment by his employer, including the school district and key members of the school's administration." As mentioned in my original report, though, Criterion A of Post-Traumatic Stress Disorder requires exposure to actual or threatened death, serious injury, or sexual violence. As I explained, I believe that when Mr. Colombo was incarcerated and told that he would be assaulted this met Criterion A. It is not clear to me, though, how the school district or school administrators exposed Mr. Colombo to actual or threatened death, serious injury, or sexual violence unless the finder of fact determines that he was incarcerated because of the district's actions.

**2. My opinions about causation diverge from Dr. Chaudhary's.**

As mentioned in #1 above, it is unclear whether Dr. Chaudhary has diagnosed Mr. Colombo with a mental disorder. She does note, though, that (report p. 7):

> The most significant traumatic events that have substantially contributed to cause Mr. Colombo's current adverse mental health conditions stem from perceived mistreatment by his employer, including the school district and key members of the school's administration.

She acknowledged that the rape accusation, investigation, arrest and prosecution impacted Mr. Colombo's mental health but appears to have limited this to the time before the charge was dropped (report p. 7):

> The report against him, criminal investigation, arrest and prosecution had a substantial adverse impact on Mr. Colombo's mental health status during the time that he was going through that experience, including some suicidal ideation while he was jailed in solitary confinement. However, Mr. Colombo endured that process and was ready to move forward with his life when the criminal charges were dropped, including returning to the teaching and coaching career that he loved. However, the ongoing distrust of Mr. Colombo and the ongoing investigation, initiated by the school, further exacerbated Mr. Colombo's mental health condition.

My opinion with regard to causation, in contrast, is that (from p. 8 of my original report):

> Mr. Colombo's Generalized Anxiety Disorder and current emotional distress stem primarily from the rape accusation and the subsequent public notoriety. He also experiences anger and distress related to what he believes to be mishandling of the charge by authorities.

In brief, as Mr. Colombo explained being "labeled as a child rapist" has been highly distressing to him. This is particularly true because he was charged, incarcerated, and kept on house arrest and this charge has become widely known in the Palo Alto community. Whether Mr. Colombo was "labeled a child rapist" in public perception because of the actions of the school district, because of the original accusation, because of the actions of the police department or district attorney's office, because of the actions of the media, or because of other factors remains a question for the trier of fact.

It should be noted that if the "ongoing distrust" Dr. Chaudhary mentioned is the public notoriety I mentioned in my report, then we agree on that element of causation, though I would defer to the finder of fact about whether and to what extent the school district is responsible for that distrust.

In addition, it is unclear what mental disorder(s), if any, Dr. Chaudhary has diagnosed. If she has diagnosed an anxiety disorder and Post-Traumatic Stress Disorder, though, these symptoms had their onset in the early months after the accusation and (for some posttraumatic features) after incarceration. It thus appears that the original cause prompting initial development of these issues would be found in the events that occurred in that earlier time period. More recent events may be sustaining factors but would not have caused the initial development of symptoms in early or mid-2022.

In addition, Dr. Chaudhary concludes that (p. 5):

> This is a 58-year-old gentleman who was prosecuted for sexual assault, improperly removed from his teaching position, maligned in the press and elsewhere, and also has been retaliated against by his employer for standing up for himself against the wrongful claim.

My understanding is that determining whether removal from employment was improper and determining that retaliation has occurred are ultimate issue legal questions. As a medical examiner, it is preferable to defer to the finder of fact on legal questions such as these.

Sincerely,

*Colombo*
*Page 5 of 5*

James Armontrout, MD
*Forensic Psychiatrist*
*Board Certified – Psychiatry & Forensic Psychiatry*
Forensic Psychiatric Associates, LP

ATTACHMENT 1B

ATTACHMENT 1B

I, Nancy Hoffman PsyD, declare:

I am a resident of the State of California and over the age of 18.

I earned a doctoral degree in clinical psychology from the California Institute of Integral Studies in 2004. At the time of my graduation, CIIS was an APA accredited school. APA accreditation assures the public, licensing boards and potential employers that a student has had a sound educational and scientific foundation.

I am a neuropsychologist. A neuropsychologist is a psychologist who has specialized training in the relationship between the brain and behavior. I completed a two-year, 4000-hour postdoctoral residency in neuropsychology at Kaiser Permanente in San Francisco.  We had weekly didactics in neuropsychology. We also had monthly rounds with the Department of Neurology at Kaiser. On Friday mornings I went to the hospital with my supervisor and saw patients for bedside evaluations. I also attended weekly rounds at UCSF in the Memory and Aging Center for several years.

My clinical practice over the past 20 years has involved the evaluation of patients with stroke, dementia, traumatic brain injury, and other cognitive complaints. I have evaluated thousands of patients in a variety of settings. I have seen and evaluated patients in my offices in San Rafael and Santa Rosa, at their homes throughout the Bay Area, at Kaiser Permanente, in the emergency room of Kaiser Permanente, at Kentfield Rehabilitation and Specialty Hospital, and in skilled nursing facilities.

I submit this Declaration in the case of Colombo v PAUSD. My role in this case was limited to interpreting the MMPI- RF, a 338-item true/false self-report measure that assesses psychological functioning. The test was provided by me to Dr. Armontrout via email and completed by Mr. Colombo in his presence.  Scoring is done via computer through the publishing company.

Due to legal constraints imposed by the Court, I have not met Mr. Colombo and did not have the benefit of interpreting this test in the context of his personal presentation or the collateral information. Therefore the information provided to Dr. Armontrout was general in nature and offered a framework for his interview and subsequent opinions.

Since I did not interview or evaluate Mr. Colombo, I did not render a diagnosis. My opinion is the Plaintiff's pattern of scores is not consistent with PTSD and he doesn't meet the criteria for this disorder due to a lack of Criteria A. Plaintiff does not match the profile for diagnosed PTSD in clinical samples, but he likely meets the criteria for an anxiety-related disorder. If called upon as a witness, I could and would competently testify about this to the best of my knowledge.

Attached hereto as Exhibit A are my opinions, analysis, and interpretation of the findings of the MMPI-2-RF administered to Mr. Colombo.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 24th day of September 2025, at 1330 Lincoln Avenue, Suite 110B, San Rafael, California 94901.



Nancy Hoffman PsyD

James:

Here is the interpretation of Mr. Colombo's MMPI-2-RF. I have not met him and do not have the benefit of interpreting this test in the context of his personal presentation or the collateral information.


**Validity:**

There may be some tendency towards over reporting, but not significant enough to invalidate this test. Three of the nine validity scales were elevated. His symptoms may be plausible if he is currently experiencing significant emotional distress. If you did not uncover any significant dysfunction, he may be over reporting. Evidence of psychopathology may rule out the idea he is over reporting.


**Symptoms**

1. Does he experience GI problems? If so, were they present prior to the traumatic event? Are they the result of the stress of this event and the aftermath? He endorsed responses that suggest GI issues.

2. Was there any indication of suicidal ideation? Does he have a history of suicidal ideation or even past attempts? He may be at some risk for suicide, as per his response pattern.

3. He appears to be struggling with significant anxiety, which is to be expected after a traumatic event. He may be having nightmares or intrusive ideation related to the trauma.

4. One significant elevation was that of thought dysfunction. He may feel he is being persecuted by someone who wants to harm him. This may lead him to be suspicious of others and it may be hard for him to trust that people are not trying to harm him.

5. He does not appear to be someone who acts out his concerns in dysfunctional ways.

6. He appeared to be cooperative while taking this test.

7. There is <u>no evidence</u> of the following:
- Demoralization
- Somatic preoccupation
- Low positive emotions
- Dysfunctional negative emotions
- Peculiar/odd experiences
- Hyperarousal
- Social avoidance
- Antisocial behavior
- Emotional internalizing
- Emotional externalizing
- Proneness to anger
- Self-doubt

1

- Helplessness
- Behavior restricting fears
- Substance abuse

His primary elevations are on anxiety, but a person only has to endorse a few symptoms for this scale to be elevated.

His pattern of scores is not consistent with PTSD and he doesn't meet the criteria for this disorder due to a lack of criteria A. I read several research studies and he does not match the profile for diagnosed PTSD in clinical samples.

He likely meets the criteria for an anxiety related disorder.

Was there anything in your interview or his history to suggest a psychotic disorder? There may be some paranoid delusional thinking. This is related to his ideas of persecution.

Here are some of his test responses that might help clarify things for you:

Anxiety (T=80 and a T of 65 or over is considered significant):
- I have nightmares every few nights. (True)
- I feel anxiety about something or someone almost all the time. (True)
- Several times a week I feel as if something dreadful is about to happen. (True)

(These were all the responses he had to give to have a significant elevation on the anxiety scale.)

Ideas of Persecution (T=94)
- I believe I am being plotted against. (True)
- I feel that I have often been punished without cause. (True)
- Someone has been trying to rob me. (True)
- I am sure I am being talked about. (True)
- I have no enemies who really wish to harm me. (False)
- People say insulting and vulgar things about me. (True)
- Someone has it in for me. (True)
- People are not very kind to me. (True)
- If people had not had it in for me, I would have been much more successful. (True)

Nancy Hoffman PsyD

2

# Nancy Hoffman, PsyD

Geriatric Neuropsychologist
Psychotherapist
*Psy 20516*

Mailing Address: 1330 Lincoln Avenue, Suite 110B, San Rafael CA 94901
*Offices in San Rafael & Santa Rosa*

Tel. 415.699.0733     http://DrNancyHoffman.com     Fax:  415.324.8088

---

**Professional Credentials**
_____

State of California: October 2005
*Licensed Psychologist (#PSY 20516)*

**Education**
_____

California Institute of Integral Studies, San Francisco, California
*Doctor of Psychology, Clinical Psychology (APA accredited), February 2004*

Dominican College, San Rafael, California
*Bachelor of Arts, Liberal Arts, May 1995*

**Employment**
_____

| | |
|---|---|
| 2022-Present | Expert Witness, Forensic Psychiatric Associates Mill Valley, California |
| 2018-Present | Expert Reviewer, California Board of Psychology Sacramento, California |
| 2013-Present | Expert Witness in Private Practice San Rafael, California |
| 2013-2016 | Volunteer Mediator, Community Boards, San Francisco, California Community mediation in San Francisco |
| July 2008-2015 | Kentfield Rehabilitation Hospital, Kentfield, California Neuropsychologist |

| | |
|---|---|
| July 2008-2010 | Rehab Without Walls, San Jose, California<br>Neuropsychologist |
| 2007-2008 | Institute on Aging, San Francisco, California<br>Neuropsychologist |
| 2006-Present | Private Practice, San Rafael, California<br>Geriatric Neuropsychologist/Psychotherapist |
| 2006-2016 | Kaiser Permanente, Hayward, California<br>Staff Neuropsychologist |
| 2006-2007 | Adjunct Faculty, Alliant University, San Francisco CA<br>Taught Psychodiagnostic Assessment to graduate students |

**Clinical Training**

_____

| | |
|---|---|
| 2003-2005 | Kaiser Permanente, Department of Psychiatry<br>San Francisco, California<br>Pre- and Postdoctoral Fellow in Neuropsychology<br>(Predoctoral: 8/03-2/03; Postdoctoral: 2/03-6/05 |
| 2001-2003 | Kaiser Permanente, Department of Psychiatry<br>Vallejo, California<br>Predoctoral Internship in Clinical Psychology |
| 2000-2001 | Sunset Mental Health Services<br>San Francisco, California<br>Clinical Psychology Trainee |
| 1998-1999 | Haight Ashbury Psychological Services<br>San Francisco, California<br>Clinical Psychology Trainee |

**Mediation Training**

_____

| | |
|---|---|
| 2013 | Basic Mediation Training (40 hours), Community Boards, San Francisco, California |
| 2012 | Elder Mediation Training (16 hours), Community Boards, San Francisco, California |
| 2011 | Basic Mediation Training (40 hours), UC Berkeley Extension |

Berkeley, California

**Teaching Experience**
_____

Fall 200     Psychodiagnostic Assessment
                  Alliant University, San Francisco, CA

Fall 1999        Living and Dying
                 Sonoma State University, Department of Psychology

Spring 1999      Health Psychology
Fall 1999        Sonoma State University, Department of Psychology

**Professional Presentations**
_____

*When It's Not Alzheimer's: An Introduction to Other Forms of Dementia and Their Effect on Capacity*
(August 2021) The Alameda County Bar Association

*The Red Flags of Undue Influence*
(April 2021) The Marin County Bar Association

*The Ins and Outs of Capacity and Undue Influence*
(November 2020) The San Mateo Bar Association via Zoom

*The Psychology of Undue Influence*
(June 2019)  World Elder Abuse Awareness Day, San Rafael, California

*Neuroplasticity and the Changing Brain:  How To Keep Your Brain Healthy*
(June 2017) The Buck Institute Immersion Program, Sonoma, California

*The Psychology of Undue Influence*
(June 2017)  Professional Fiduciary Association of California Conference, Burlingame, California

*Is It Normal Aging or Something Else?*
(April 2016) Redwood Psychological Association, Santa Rosa, California

*The Psychology of Undue Influence*
(April 2016) The Napa Alliance on Aging, Napa, California

*Neuroplasticity and the Changing Brain:  How To Keep Your Brain Healthy*
(March 2016) The Buck Institute Immersion Program, Sonoma, California

*Navigating the Maze of Capacity: A Panel Discussion*
(March 2016)  Redwood Empire Estate Planning Council, Santa Rosa California

*The Psychology of Undue Influence*

(February 2016) Legal Assistance for Seniors MCLE Program

*Neuroplasticity and the Changing Brain:  How To Keep Your Brain Healthy*
(December 2015) The Buck Institute Immersion Program, Sonoma, California

*Neuroplasticity and the Changing Brain:  How To Keep Your Brain Healthy*
(September 2015) The Buck Institute Immersion Program, Sonoma, California

*When It's Not Alzheimer's:  Different Types of Dementia & Their Effect on Capacity*
(April 2015) Professional Fiduciary Association of California, San Francisco California

*Why You Should Routinely Screen Your Patients for Sleep Apnea*
(April 2015) Kaiser Permanente, Department of Medicine, Fremont, California

*How a Neuropsychological Consultation Can Help You Help Your Patients*
(March 2015)  Kaiser Permanente, Department of Medicine, Fremont, California

*How a Neuropsychological Consultation Can Help You Help Your Patients*
(March 2015)  Kaiser Permanente, Department of Medicine, Hayward, California

*Death, Paperwork, & Difficult Conversations*
(July 2014) Panel discussion at the Marin County Section on Aging, San Rafael, California

*Death, Paperwork, & Difficult Conversations*
(June 2014) Panel discussion at Whistlestop Marin, San Rafael, California

*The Dangers of Untreated Sleep Apnea: Why You Should Be Routinely Screening Your Patients*
(May 2014), Kaiser Permanente Department of Psychiatry, Hayward, California

*When It's Not Alzheimer's:  Dementia and the Effect on Capacity and Undue Influence*
(March 2014)  American Society for Aging Conference, San Diego, California

*Food & Mood: How Your Food Choices Affect the Way You Feel*
(2013) Kaiser Permanente webinar for patients and staff, Northern California

*Keeping Your Brain Healthy: Everything You Need to Know*
(July 2013)  Kaiser Permanente webinar for patients and staff, Northern California

*When It's Not Alzheimer's: Dementia & the Effects on Capacity*
(May 2012)  Legal Assistance for Seniors Annual Conference, Hastings School of the Law, San Francisco,  California

*The Evaluation of Capacity in Older Adults*
(April 2012)  Featured workshop at the California Psychological Association Annual Conference, Monterey, California

*Keeping Your Brain Healthy: Body, Mind & Spirit*

(2012) Presentation to staff, residents, and family members at Wind Chime of Marin, Kentfield, California

*Keeping Your Brain Healthy: Body, Mind & Spirit*
(2012) Presentation to staff and residents at Villa Marin, San Rafael, California

*Keep Your Brain Healthy: An Integrated Approach*
(January 2012).  Marin County Section on Aging, San Rafael, California

*Take Control of Your Stress!*
(2011) A series of presentations to various employee groups at Kaiser Permanente in Hayward and Fremont

*Everything You Wanted to Know About TBI But Were Afraid to Ask:*
(August 2010). Fiduciary Education Day, Oakland, California

*Using the MOCA as a Quick Cognitive Screen*
 (2010). Staff presentation, Kaiser Permanente, Department of Psychiatry, Union City, California

*When It's Not Alzheimer's:  An Introduction to Other Forms of Dementia:*
(2009). Staff presentation, Kaiser Permanente Department of Psychiatry, Union City and Department of Psychiatry, Fremont, California

*Food & Mood:  How the Food You Eat Affects the Way You Feel*
(2009). Multiple presentations at NUMMI on behalf of Kaiser Permanente, Fremont, California

*Using Brief Measures of Intelligence in Neuropsychological Assessment*
(January 2004). Staff presentation. Kaiser Permanente, Department of Psychiatry, San Francisco, California.

*Using Dialectical Behavior Therapy in Individual Psychotherapy*
(May 2002). Presentation to trainees. Kaiser Permanente, Department of Psychiatry, Vallejo, California.

*Using the Sandtray in Adult and Child Psychotherapy*
(April 2001). Presentation to trainees. Kaiser Permanente, Department of Psychiatry, Vallejo, California.


**Conference Organizer**
_____

*Health Care Reform Summit for Neuropsychologists: How To Survive and Thrive in the Brave New World of Health Care Reform* (June 1, 2013)
Mill Valley, California
Co-sponsored all day conference with the Northern California Neuropsychology Forum and Division VIII (Neuropsychology) of the California Neuropsychology Forum

Featured speakers:  Karen Postal, PhD, ABPP, and Antonio Puente, PhD, ABPP


*Neurodevelopmental Disorders Across the Lifespan* (June 5, 2010)
Berkeley, California
Annual Conference of the Northern California Neuropsychology Forum
Featured speaker: E. Mark Mahone, PhD, ABPP

*Practical Principles in Forensic Neuropsychology*  (September 26, 2009)
Oakland, California
Annual Conference of the Northern California Neuropsychology Forum
Featured speakers:  Ron Ruff, PhD, ABPP, Howard Friedman, PhD, ABPP, H. Michael Harwood,
Esq., and William Gavin, Esq.


**Publications**
_____

*The Assessment of Testamentary Capacity and Undue Influence in the Older Adult*
    Chapter 10 in Forensic Geropsychology: Practice Essentials (APA Books, March 2018)

*The Role of Capacity Assessments in Elder Abuse Investigations and in Guardianships:*  Clinics in
    Geriatric Medicine (November 2014)

*Mi Historia, Mi Vida: Un Diario de Autodescubrimiento* (August 2013) Bella Vida Press

*My Story, My Life:  A Journal of Self Discovery* (August 2012) Bella Vida Press

*A Series on Health Care Reform for Neuropsychologists*: The California Psychologist
    Jan/Feb 2013:  *Health Care Reform and the Neuropsychologist: What You Need to Know to Survive
    (and Thrive) in the New Health Care Economy*, Vol. 46, Number 1

    March/April 2013: *Accountable Care Organizations: A Primer for Neuropsychologists*
    Vol. 46, Number 2

    May/June 2013: *Health Care Reform and Neuropsychology: Redesigning Your Practice to Thrive in
    the New World*, Vol. 46, Number 3

    July/August 2013: *Are You a Cost Increaser or a Cost Decreaser?* Vol. 46, Number 4

*The Basics of Testamentary Capacity for Geriatric Neuropsychologists*: The California Psychologist,
    Volume 43, Number 6


2008- 2011: Guest editor for the summer newsletter of Psychologists in Long Term Care

**Professional Affiliations**

_____

Northern California Neuropsychology Forum
       2003-2005:  Student Representative to the Board
       2005-2006:  Board Member, Member-at-Large
       2006-2008:  Board Member, Secretary
       2008-2009:  Board Member, President Elect
       2009-2010:  President
       2010-2011:  Past President

California Psychological Association: Member Division 8 (Neuropsychology)
       2010-2015:  Chair of the Committee for Geriatric Neuropsychology
       2012:  Chair Elect for Division 8 (Neuropsychology) of the California
           Psychological Association
       2013:  Chair for Division 8 (Neuropsychology)
       2014:  Past Chair for Division 8 (Neuropsychology)
National Academy of Neuropsychology
Marin County Psychological Association
       2012:  Continuing Education Coordinator
Marin County Section on Aging
Redwood Psychological Association
       2019-2020: Board Secretary

**Adjunct Employment History**

_____

2012-Present       Bella Vida Press
                    Owner and Publisher
                    www.bellavidapress.com

**Awards**

_____

Richard Kalish Graduate Student Paper Award:  Association for Death Education and Counseling, February 2000.  *Closing the Circle:  Using Narrative and Existential Psychotherapy in Counseling the Terminally Ill.*

Distinguished Service Award, California Psychological Association Division of Neuropsychology

ATTACHMENT 1C

ATTACHMENT 1C



**VAN DERMYDEN MAKUS**

*Investigations Law Firm*

# EXPERT WITNESS REPORT

Pursuant to Federal Rules of Civil Procedure, Rule 26
Prepared for Bertrand, Fox, Elliot, Osman & Wenzel
Regarding *Colombo vs. Palo Alto Unified School District*
Case No. 5:24-cv-909-NC
September 24, 2025

EXPERT REPORT | *COLOMBO V. PALO ALTO UNIFIED SCHOOL DISTRICT*

## TABLE OF CONTENTS

I.      Brief Introduction ........................................................................................................... 1

II.     Summary Of Expert Opinion ......................................................................................... 1

III.    Qualifications ................................................................................................................. 1

IV.     Documents Reviewed .................................................................................................... 2

V.      Bases for Opinions ........................................................................................................ 3

        A.      Sources ............................................................................................................... 3

        B.      Standard Practices in the Field ......................................................................... 3

VI.     Relevant Timeline of Events ......................................................................................... 5

VII.    Expert Opinion .............................................................................................................. 6

VIII.   Conclusion ................................................................................................................... 10

## I.    Brief Introduction

I have been retained by Bertrand, Fox, Elliot, Osman & Wenzel, counsel for Defendant Palo Alto Unified School District (PAUSD or District), to examine file materials and offer expert opinion testimony in connection with a lawsuit filed in the United States District Court, Northern District, *Peter Colombo v. Palo Alto Unified School District, Don Austin, Lisa Hickey, Amanda Bark and Trent Bahadursingh,* Case No. 5:24-cv-909-NC.

I was asked to opine whether PAUSD acted appropriately and in line with applicable guidance and industry standards as to the manner in which they responded to a January 2022 report of an alleged sexual assault of student NT by Plaintiff Colombo that took place decades prior, during the 2001/2002 school year.

This Expert Witness Report (Report) provides a summary of the expert opinion testimony I am offering in this matter. As an expert, I do not intend to reach legal conclusions nor proffer an opinion on areas reserved for the jury or factfinder. In forming the opinions expressed in this report, I relied upon all the available facts set forth in the documents I reviewed. In reaching these opinions, I did not resolve any factual disputes. To the extent there are material disputes of fact related to my opinions, I rely on the facts most favorable to Plaintiff Colombo.


## II.    Summary Of Expert Opinion

This section contains a summary of my opinion. The remainder of the Report sets forth the basis for this opinion.

It is my expert opinion that Defendants met industry standards and complied with industry guidance related to investigating and responding to the allegations made by the husband of a former student (NT) against Colombo.  Specifically, I offer the following opinion:

> ➢ **Defendants Responded Appropriately To The Allegations Against Colombo, In Line With Industry Standards And Guidance In Place At the Time Of the Conduct and Reports.**


## III.   Qualifications

My Curriculum Vitae (CV) is attached to this Report. It provides data related to my qualifications as an expert witness. It also includes a list of publications and presentations I have authored in the last six years, and a list of seminars I have presented in the last nine years.  **Exhibit A.**

As a brief overview and as stated in my CV, I am a Partner in Van Dermyden Makus Law Corporation, an investigations law firm.  My primary work is conducting Title IX sexual assault investigations and hearings, as well as Title VII and other workplace investigations.

I received an undergraduate degree from University of California, Davis in 2004 and a Juris Doctor from University of the Pacific, McGeorge School of Law in 2012.  I am licensed to practice law by the State Bar of California.  I am certified as a Senior Professional in Human Resources (SPHR).

EXPERT REPORT | *COLOMBO V. PALO ALTO UNIFIED SCHOOL DISTRICT*

My practice has focused on employment law since 2012 and Title IX services since 2016. In addition to conducting my own investigations and hearings, I serve as the Title IX Program Director for our Title IX services and am an expert in conducting sexual harassment and sexual assault hearings, as well as sexual harassment and sexual assault investigations. I routinely serve as an investigator, hearing officer, and appeal officer for K-12 school districts and post-secondary institutions.

I am an active member of the Association of Workplace Investigators (AWI). As a member of the Association of Workplace Investigators, I have attended two week-long Training Institutes and I received a Certificate from the ANSI-accredited AWI Training Institute. I serve as faculty for the week-long workplace investigator AWI Training Institute, have presented at AWI Annual Conferences, contributed to their quarterly Journal, and performed trauma-informed interviewing webinars.

I also serve as faculty with T9 Mastered, a training organization that focuses solely on providing training for Title IX professionals. Some of the topics I have presented on include: Title IX: K-12 Investigations Training; Analyzing the Elements of Title IX Sexual Harassment; and Consent: Gathering the Essential Facts.

I have presented trainings at several educational-focused conferences, including the California School Boards Association's CCSA[1] Virtual Workshop and the Association of Chief Human Resource Officers (ACHRO) Annual Conference.

I am also an active member of the National Association of College and Workplace Attorneys (NACUA). NACUA provides legal assistance to educational institutions through continuing legal education programming, a listserv, and web-based resources pages.

The list of depositions in which I have testified is attached as **Exhibit A**. My statement of the compensation to be paid for the study and testimony in this case is also attached as **Exhibit A.**

## IV. Documents Reviewed

In forming my opinions in this Report, I reviewed the following documents:

| | Document |
|---|---|
| 1 | Plaintiff's Third Amended Complaint |
| 2 | Defendant's Answer to Plaintiff's Third Amended Complaint |
| 3 | Komathy Vishakan's Deposition Transcript |
| 4 | Lisa Hickey's Deposition Transcript |
| 5 | Trent Bahadursingh's Declaration and Exhibits |
| 6 | Trent Bahadursingh's Deposition Transcript |
| 7 | Peter Colombo's Deposition Transcript and Exhibits |
| 8 | District Board Policies and Administrative Regulations |
| 9 | Don Austin's Deposition Transcript |
| 10 | Cindi Durchslag Ahern's Deposition Transcript |
| 11 | Nicole Miller's Deposition Transcript (rough draft) |
| 13 | District's Document Production: PAUSD003059 |

---

[1] California Council of School Attorneys.

EXPERT REPORT | *COLOMBO V. PALO ALTO UNIFIED SCHOOL DISTRICT*

| 14 | District's Document Production: PAUSD001288 |
| 15 | Robert Andrade's Deposition Transcript |
| 16 | ATIXA[2] Training Materials |

## V. Bases for Opinions

### A. Sources

In forming the opinions in this Report, I relied upon numerous professional sources, including but not limited to: guidance and model policies promulgated by governmental agencies such as the United States Department of Education, Office for Civil Rights including the 2020 Title IX Regulations (Final Rule) and Questions and Answers Regarding the Department's Final Title IX Rule (dated September 4, 2020), as well as the "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" (dated January 2001); guidance promulgated by court decisions; materials from the National Association of College and University Attorneys (NACUA); materials from Title IX Sexual Misconduct seminars; and, the sharing of practical approaches and strategies at professional conferences and continuing education courses for educational professionals, attorneys, and investigators.

I also drew guidance from model policies promulgated by other schools in their discipline processes; court decisions; materials from investigations seminars; books and treatises; and, the sharing of practical approaches and strategies at professional conferences and continuing education courses for Title IX professionals and investigators. I also considered ATIXA training materials and guidance available online.

I relied on a notable source regarding standard practices in investigating claims of misconduct, the Association of Workplace Investigators (AWI) – a national, nonprofit association comprised of investigators. AWI was established in 2009 to promote and enhance investigative practices. AWI has promulgated the Guiding Principles for Investigators (2013). The organization has presented information at conferences, in publications, on its listserv, and on its website. Further, the Equal Employment Opportunity Commission's (EEOC) Guidance, including but not limited to the "Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors," No. 915.002, 6/18/99 (EEOC Guidance), cites seminal cases in the area of harassment and discrimination, and is widely relied upon by professionals as a practical guide for conducting adequate investigations.

The District also maintains their own policies regarding sexual harassment and student discipline. These are additional resources upon which I considered for the observations outlined in this document.

### B. Standard Practices in the Field

In the field of Title IX and sexual misconduct investigations, certain practices are recognized as "standard practices" for the handling of student complaints of sexual harassment, including maintaining and enforcing policies; responding promptly to complaints of harassment, discrimination and retaliation; and, taking prompt and appropriate remedial action.

Under both Title IX and general industry guidance, when an educational institution knows (or reasonably should have known) about sex-based discrimination or harassment, it must:

- Investigate

---

[2] Association of Title IX Administrators.

EXPERT REPORT | *COLOMBO V. PALO ALTO UNIFIED SCHOOL DISTRICT*

- End the discrimination

- Prevent the discrimination from occurring again

In 2001 – when the alleged conduct at issue took place – the United States Department of Education, Office for Civil Rights (OCR) had issued it's "Revised Sexual Harassment Guidance," effective January 2001.[3] In this document, OCR offered guidance as to how a school should address potential harassment:

> Regardless of whether the student who was harassed, or his or her parents, decides to file a formal complaint or otherwise request action on the student's behalf […] the school must promptly investigate what occurred and then take appropriate steps to resolve the situation.  The specific steps in an investigation will vary depending upon the nature of the allegations, the source of the complaint, the age of the student or students involved, the size and administrative structure of the school, and other factors.  However, in all cases the inquiry must be prompt, thorough, and impartial.

The following industry standards are drawn from all resources described above.

***Prompt.***  To meet the "prompt" element in applying standard practices, an investigation must be initiated and conducted timely in a manner reasonable in the circumstances.  Promptness will depend on a number of factors, such as the seriousness and complexity of the case; concurrent criminal investigations; the nature of the incidents; the number of issues and allegations; the number of complainants and respondents; the amount, availability, and cooperation of witnesses; the amount of information necessary to make findings and draw conclusions; and, the need for special expertise.

***Thorough***.  As with "promptness," whether an investigation is sufficiently thorough will depend greatly on the facts and circumstances.  In remedying harassment and discrimination, the end goal is to employ a process that reaches reasonable and informed findings, so that the school can take appropriate action.  Thoroughness can include the following steps: interview relevant witnesses, review relevant evidence, prepare and maintain records, and reach a well-reasoned conclusion.

It is standard practice for the investigator to identify, gather, review, and analyze the relevant evidence throughout the investigation.  This evidence includes: testimonial evidence; documentary evidence; physical evidence; and, demonstrative evidence.

After completing the necessary fact-finding, the investigator must reach a well-reasoned conclusion that is supported by the evidence.  In California, schools are expected to analyze the facts in a Title IX and sexual misconduct investigation using the preponderance of the evidence standard.  As stated by the Association of Workplace Investigators' Guiding Principles:[4]

> When evaluating the evidence, the investigator generally considers use of an evidentiary standard similar to the 'preponderance of evidence' standard used in civil courts: after weighing all evidence, (a) is it more likely than not that the alleged incident occurred or (b) is it more likely than not that the alleged incident did not occur.

***Impartial.***  To meet the "impartial" element required by standard practices, an investigation must – at its core – be fair.  Fairness, and more precisely, the appearance of fairness, both in the impartiality of the

---

[3] I note this document is not a binding regulation, but is instead guidance OCR offered as to how to address sex-based harassment.

[4] Guiding Principles for Investigators Conducting Impartial Workplace Investigations. See website.

EXPERT REPORT | *COLOMBO V. PALO ALTO UNIFIED SCHOOL DISTRICT*

investigator and in the process by which an investigation is conducted, is one of the most important requirements for investigations.  It is important for the investigator to be subjectively and objectively impartial – free from actual bias, and the appearance of bias.

## VI.  Relevant Timeline of Events

In forming the opinions expressed in this Report, I relied upon all the available facts set forth in the documents reviewed. Although not intended to be an exhaustive recitation, I next briefly outline certain key facts in the timeline below which set the stage for this action and my opinions.

The following timeline chronologizes the above events.  I obtained this information from the documents outlined in Section IV., above.  To the extent there are material disputes of fact related to my opinions, I either point that out or I rely on the facts most favorable to Plaintiff Colombo.

| Date | Action |
| --- | --- |
| **Alleged Sexual Assault** | |
| 2001 | According to the January 28, 2022 messages received by the District (see below), the husband of a former PAUSD student asserted that "in the early 2000's," PAUSD Physical Education Teacher Peter Colombo "raped" the student in the girl's locker room of Jordan/Greene Middle School. |
| **PAUSD Becomes Aware of the Incident** | |
| January 28, 2022 | Three reports were sent by the husband of the former student, identified later as NT. The husband alleged Colombo "raped" his wife when she was a student at Jordan/Greene Middle School in the early 2000's. The reports were submitted via a PAUSD online reporting system, an email to the Board, and in a private message to Colombo's wife via LinkedIn. |
| January 30, 2022 | Colombo called District Director of Certificated Human Resources Lisa Hickey, reporting the message his wife received via LinkedIn. |
| January 31, 2022 | Colombo met with Hickey in-person and brought a copy of the message sent to his wife on LinkedIn. He denied the allegations and Hickey told him the District would need to conduct an investigation. |
| **Actions Taken by PAUSD and the Palo Alto Police Department and District Attorney's Office[5]** | |
| January 28, 2022 | District Counsel Komathy Vishakan forwarded the January 28, 2022 online report to Sgt. Eric Bulatao of the Palo Alto Police Department. The case was eventually assigned to Detective Yolanda Clausen to investigate. |
| January 31, 2022 | The District placed Colombo on a paid, non-disciplinary leave. |
| June 2022 | Colombo emailed Hickey asking for official teaching assignments for the 2001/2002 school year. Hickey responded and wrote the records show Colombo taught "70% at Jordan and 30% at Terman." |
| June 15, 2022 | Colombo was criminally charged with Rape by the Palo Alto Police Department. |
| June 16, 2022 | The District placed Colombo on an unpaid "compulsory leave of absence" due to the criminal charges. |

[5] District actions are highlighted in blue and actions taken by the Palo Alto Police Department and/or District Attorney's Office are highlighted in red.

EXPERT REPORT | *COLOMBO V. PALO ALTO UNIFIED SCHOOL DISTRICT*

| April 2023 | The Palo Alto District Attorney's Office dropped all charges against Colombo. |
|---|---|
| May 24, 2023 | The District placed Colombo on paid administrative leave and notified him they would be conducting an internal investigation. |
| Late August 2023 | The District retained Investigator Nicole Miller of Nicole Miller & Associates to conduct the administrative investigation into Colombo. |
| January 16, 2024 | District Counsel, Jabari Willis, emailed Colombo's counsel and affirmed the investigation's scope as follows: Did [Colombo] engage in serious misconduct by sexual[ly] assaulting a student on District property? The allegation is that [Colombo] sexually assaulted a female student in the girls' locker room during the 2001-2002 school year. |
| Late February 2024 | Miller concluded her investigation, finding the preponderance of the evidence did not support the allegations raised against Colombo. |
| May 28, 2024 | The District transmitted a Notice of Investigation Findings to Colombo, writing "The Investigator determined that the allegation was not substantiated due to a lack of evidence, including but not limited to, the absence of a direct statement from the alleged victim to support the claim." |

## VII. Expert Opinion

In Plaintiff Colombo's complaint, as relevant to this expert opinion, he asserts the District "removed [NT's sexual assault] claims from the mandatory Title IX process that required strict compliance with express due process procedures."

After a thorough review of the documents listed above, it is my expert opinion that PAUSD met industry standards and complied with OCR guidance in all material respects related to responding to and addressing the report made by NT's husband. Specifically, I offer the following opinion:

> ➢ **Defendants Responded Appropriately To The Allegations Against Colombo, In Line With Industry Standards And Guidance In Place At the Time Of the Conduct and Reports.**

In offering this opinion, I conclude that neither the 2020 Title IX Regulations, nor PAUSD Administrative Regulation 5145.7, required PAUSD to process the allegations made by NT's husband under the 2020 Title IX Regulations. Instead, PAUSD appropriately processed the allegations as a general personnel investigation, which met the applicable guidance for this matter, as articulated by industry standards as well as OCR's January 2001 "Revised Sexual Harassment Guidance."

On August 14, 2020, new Title IX Regulations (Final Rule) went into effect, mandating a specific grievance process be followed for any matter that fell under the jurisdiction of Title IX. The Final Rule was not applicable to the report regarding Colombo for the following reasons.

First, the alleged conduct at issue in this matter took place during the 2001/2002 school year, or approximately 18 to 19 years prior to the issuance of the Final Rule. On September 4, 2020, OCR issued a document titled "Questions and Answers Regarding the Department's Final Title IX Rule."[6] In that

---

[6] See website.

EXPERT REPORT | *COLOMBO V. PALO ALTO UNIFIED SCHOOL DISTRICT*

document, OCR specifically addressed whether or not the Final Rule would be applied retroactively, and clarified that it would not. OCR wrote (typed verbatim):

> The Title IX Rule will not be enforced retroactively. In the Preamble to the Rule at page 127, the Department states unambiguously that the Department will not enforce these final regulations retroactively. […]

> Consistent with the Department's statements in the preamble to the Title IX Rule regarding non-retroactivity, the Rule does not apply to schools' responses to sexual harassment that allegedly occurred prior to August 14, 2020. The Department will only enforce the Rule as to sexual harassment that allegedly occurred on or after August 14, 2020. With respect to sexual harassment that allegedly occurred prior to August 14, 2020, OCR will judge the school's Title IX compliance against the Title IX statue and the Title IX regulations in place at the time that the alleged sexual harassment occurred. In other words, the Rule governs how schools must respond to sexual harassment that allegedly occurs on or after August 14, 2020.

Applying this language, the Final Rule was not applicable to the 2001/2002 conduct alleged by NT's husband; instead, the District was obligated to look into the allegations using the guidance in place at the time of the alleged conduct.[7] In this case, the applicable guidance was both industry standards as well as the January 2001 "Revised Sexual Harassment Guidance."

Second, even if there were no guidance as to the date applicability of the Final Rule (which there is), I note the Final Rule (specifically 34 CFR § 106.30) provides the following about requirements for a "formal complaint" (typed verbatim, emphasis added):

> At the time of filing a formal complaint, a complainant *must* be participating in or attempting to participate in the education program or activity of the recipient with which the formal complaint is filed.

In this matter, NT was last a student with PAUSD during the 2001/2002 school year. There was no information in the materials I reviewed that suggested NT was currently participating in or attempting to participate in any education program or activity with PAUSD at the time her husband reported the concerns to PAUSD in January 2022. Further, NT did not submit or sign a formal complaint at any point. Applying these factors, NT's husband's report still does not fall under the jurisdiction of the Final Rule.

I further note the "ATIXA Jurisdictional Rubric Online Tool," located on the ATIXA website, also affirms the Final Rule is not applicable to this matter.[8] Specifically, following the prompts on the Jurisdictional Rubric, I selected the "complainant" was a "Non-Affiliate", selected the respondent was an employee, entered that the conduct occurred in the United States, on-campus, and that the complaining individual was not participating in or attempting to participate in an education program or activity. According to the "ATIXA Jurisdictional Analysis" response, "Title IX does not apply."[9]

Third, PAUSD's Administrative Regulation 5145.71 was not applicable to this matter. The Regulation states, "the complaint procedures described in this administrative regulation shall be used to address any complaint governed by Title IX of the Education Amendments of 1972 […]" As explored above, the matter falls outside the jurisdiction of the Final Rule, promulgated and implemented in 2020, and the applicable

---

[7] This is also consistent with guidance provided on the ATIXA website. <u>See website.</u>

[8] <u>See website</u>.

[9] This mirrors the guidance provided in ATIXA's online training materials for K-12 Title IX Coordinators. **Exhibit B.**

EXPERT REPORT | *COLOMBO V. PALO ALTO UNIFIED SCHOOL DISTRICT*

OCR materials related to this matter are guidance and are not binding regulations. Accordingly, Administrative 5145.71 is not applicable to this matter; instead, the only applicable guidance comes from the January 2001 "Revised Sexual Harassment Guidance" document as well as industry standards, both of which call for a prompt, thorough, and impartial investigation.

Fourth, one source of relevant and applicable guidance for NT's husband's report – the January 2001 guidance – suggests schools respond as follows to reports of sexual harassment:

> Regardless of whether the student who was harassed, or his or her parents, decides to file a formal complaint or otherwise request action on the student's behalf […] the school must promptly investigate what occurred and then take appropriate steps to resolve the situation.  The specific steps in an investigation will vary depending upon the nature of the allegations, the source of the complaint, the age of the student or students involved, the size and administrative structure of the school, and other factors.  However, in all cases the inquiry must be prompt, thorough, and impartial.

The standards set forth in this guidance are congruent with the other source relevant and applicable for NT's husband's report – namely, industry standards. Both industry standards and the January 2001 guidance note investigations should be prompt, thorough, and impartial. PAUSD did precisely that.

***Prompt.*** Industry standards require schools to conduct inquiries in a reasonable and effective manner, ensuring that they take steps to address and end the sexually-harassing behavior.  PAUSD did so.

As noted above, to meet the "prompt" element in applying standard practices, an investigation must be initiated and conducted timely in a manner reasonable in the circumstances.  Promptness will depend on a number of factors, such as the seriousness and complexity of the case; concurrent criminal investigations; the nature of the incidents; the number of issues and allegations; the number of complainants and respondents; the amount, availability, and cooperation of witnesses; the amount of information necessary to make findings and draw conclusions; and, the need for special expertise.

In this matter, these factors reasonably necessitated a delay in initiating an administrative investigation into the allegations, as explored below.

On January 28, 2022, PAUSD became aware of NT's husband's report against Colombo. That same day, PAUSD's General Counsel forwarded the report to the Palo Alto Police Department for their review. The next business day following receipt of NT's report, the District met with Colombo and put him on a paid leave while they looked into the matter. This is reasonably understood to be a prompt response.

The District then responded to requests from law enforcement but did not otherwise conduct their own internal administrative investigation until 2023, after the criminal matter had concluded. It was the understanding of District employees that law enforcement had requested the District pause on commencing any administrative investigation while their criminal investigation was ongoing. While there is no specific documentation to this point (other than the Lead Detective requesting the District not release the January 28, 2022 report as part of a Public Information Act Request), such a practice is common when there is a concurrent criminal investigation ongoing. Additionally, in matters involving serious allegations such as rape, schools must proceed especially carefully to ensure they do not engage in actions that could negatively impact or derail the criminal investigation.

EXPERT REPORT | *COLOMBO V. PALO ALTO UNIFIED SCHOOL DISTRICT*

In this matter, Colombo was charged criminally in June of 2022. The District continued to pause their internal review while the criminal charges were pending.[10] This again is not an uncommon practice, given that criminal charges typically cause parties, including the Respondent, to become less likely to participate in an administrative investigation.

In April 2023, the District Attorney's office dropped the charges against Colombo. By late August 2023, the District had retained Investigator Nicole Miller to conduct an independent administrative personnel investigation.  Miller estimated she completed her investigation and report around late February 2024. The District sent Colombo a Notice of Investigation Findings on May 28, 2024.

I acknowledge and considered that there can be numerous delays in retaining an investigator and starting an investigation, including contracting procedures as well as considerations of summer break and availability of necessary personnel. Likewise, there can be numerous steps that need to be taken at the end of an investigation, including review of the report and findings and, as in this case, determining placement of the employee when they return from leave. I also acknowledge the timing in beginning and concluding this investigation is not the ideal under industry standards. Specifically, the timeline the District followed after the criminal charges were dropped was not perfect.[11] Nor must it be.  While ideally we strive to operate in a world of perfection, industry standards require a school take steps to understand what occurred, and to undertake a prompt, thorough, and impartial response. In this case, the District addressed the conduct as soon as they became aware of it, then took steps to investigate and redress the conduct, and took steps to maintain the safety of the educational environment moving forward.

Where the District knows or reasonably should know of an incident of alleged sexual harassment, the District must take steps to understand what occurred and to respond appropriately.  In this case, the responses to the allegations met industry standards.  As a result of the incidents, the District took effective actions.  Specifically, the District notified law enforcement and provided documentation as requested, hired an outside investigator who spoke to relevant witnesses, analyzed the information gathered, and made reasoned determinations.

**Thorough.** The Investigator hired by the District, Nicole Miller, was appropriately thorough in her examination. As explored in her deposition, she was assigned the matter, reached out to the most relevant witnesses (the Palo Alto Police Detective assigned to the criminal investigation, NT, and Colombo), reviewed documents, and reached a reasoned conclusion. Notably, she concluded that based on the evidence available to her, further investigation was not needed because the preponderance of the evidence did not establish Colombo engaged in the actions as alleged.

**Impartial.** The District's investigator was appropriately impartial. There was no evidence in the record that Miller was acquainted with any party in this case or that she had a predisposed desired outcome for the matter. Instead, the evidence supports she reviewed the matter without outside influence or pressure and fairly evaluated the evidence available to her, eventually concluding the allegations were not sustained.

---

[10] I note that in the documents I reviewed, there were multiple references to a Memorandum of Understanding between the Palo Alto Police Department and the City of Palo Alto. As the Memorandum of Understanding was not signed by, or adopted by, the District, I did not consider it relevant in my evaluation of the District's response to the concerns raised.

[11] Specifically, approximately four months lapsed between the dropping of the criminal charges and the launch of the administrative investigation. I ultimately did not find these imperfections material in assessing the District's response, as their actions and their end result still met industry standards. Further, I did not identify any evidence, including witness statements or document-gathering, that was negatively impacted by the administrative investigation commencing in August 2023 as opposed to May 2023.

EXPERT REPORT | *COLOMBO V. PALO ALTO UNIFIED SCHOOL DISTRICT*

Where a District knows or reasonably should know of an incident of alleged sexual misconduct, the District must take steps to understand what occurred and to respond appropriately. In this case, the responses to the allegations met industry standards and complied with industry guidance. As a result of the incidents, the District took effective actions. Specifically, the District did the following:

- Notified law enforcement;

- Placed Colombo on a paid leave to ensure the safety of the school community;

- Launched an internal administrative investigation when charges were dropped against Colombo;

- Hired an independent third-party investigator who reviewed documents, spoke to witnesses, and reached a reasoned conclusion that the preponderance of the evidence did not support the allegations against Colombo; and

- Returned Colombo to work.

In conclusion, the District took prompt, effective, and reasonable action to address the serious allegations raised and therefore responded appropriately and in line with industry standards and guidance.

## VIII. Conclusion

This concludes the Expert Witness Report. As expert discovery is still ongoing, this Report is preliminary in nature and I reserve the right to supplement this Report at the conclusion of discovery.

I hereby certify that this Report is a complete and accurate statement of all of my opinions, and the basis and reasons for them, to which I will testify under oath.

Respectfully Submitted,

*Liz DeChellis*

Liz DeChellis

# EXHIBIT A

# Liz DeChellis
# Curriculum Vitae



**VAN DERMYDEN MAKUS**
*Investigations Law Firm*

# Liz DeChellis

*Partner & Director of Title IX Services*

<u>Download VCard</u>  |  <u>Email</u>



Liz DeChellis, AWI-CH, is a Partner with Van Dermyden Makus Law Corporation. Her practice focuses on conducting workplace investigations as well as Title IX investigations and hearings. She is available as an expert in evaluating Title IX and sexual harassment matters.

Liz serves as Van Dermyden Makus' Director of Title IX Services, overseeing all Title IX investigations and hearings. She also frequently conducts Title IX trainings as a faculty member of T9 Mastered.

Trained in Trauma Informed Forensic Interviewing, Liz is also an experienced investigator in Title IX sexual misconduct claims. Liz understands best practices in the Title IX arena, and the challenges facing schools and parties when sexual violence allegations surface. She has conducted investigations for K-12 Districts, as well as higher education institutions.

Liz is an expert in conducting Title IX Hearings. She has served as a Hearing Officer for multiple schools, applying a variety of policies and practices, and is familiar with both "new regulation" cases and cases falling outside the new regulations. In this role, Liz serves as the final adjudicator, completing the complaint and investigation process. She also serves as an Appeal Officer when students challenge the process, the outcome, and/or the sanction. Liz has overseen cases involving dating violence, drug abuse, sexual assault, and incapacitation. She has experience questioning parties using trauma-informed techniques, making admissibility and relevance decisions, and issuing well-reasoned, thorough decisions.

Liz is also an experienced workplace investigator, investigating allegations of harassment, discrimination, retaliation, and other types of misconduct. She conducts trainings for staff and management on a variety of legal issues, including sexual harassment and discrimination prevention, as well as how to conduct effective investigations. Additionally, Liz is a part-time faculty member for the Association of Workplace Investigators.

Liz graduated from McGeorge School of Law in 2012 and earned an undergraduate degree from UC Davis. She is licensed to practice law in the State of California, and is certified as a Senior Professional in Human Resources (SPHR).

## PROFESSIONAL INVOLVEMENT

- Juris Doctor, McGeorge School of Law, 2012

- Bachelor of Arts, History, University of California, Davis, 2004

- State Bar of California, Labor & Employment Section, Member

- T9 Mastered, Faculty

- National Association of College and University Attorneys (NACUA), Member

- NACUA Web Page Legal Resources Library Committee, Member

- Association of Workplace Investigators, Member

- AWI Accredited Certificate, AWI Institute

- Certified Senior Professional in Human Resources (SPHR), 2015

- Trained in Trauma Informed Forensic Interviewing

- Completed APSAC Advanced Forensic Interview Institute, December 2019

- Completed FETI Methodology Course, February 2020

## NOTABLE SPEECHES & PRESENTATIONS

- "Effective Strategies for Managing External Investigations" – 2025 CCSA Fall Virtual Workshop (September 19, 2025)

- "The Investigator's Superpower: Using Trauma-Informed Techniques to Build Trust and Learn the Truth" 2025 ACHRO/EEO Annual Conference, in Costa Mesa, CA (September 23-26, 2025)

- "Crafting Relevant & Effective Questions in Title IX Hearings" – T9 Mastered (August 27, 2025)

- "Critical Factors that Make (or Break) a Workplace Investigation", Presenter – 2025 State Bar of Arizona Convention, Phoenix, AZ (June 23, 2025)

- "Analyzing the Elements of Title IX Sexual Harassment" – T9 Mastered (May 28, 2025)

- "Workplace Investigations: Mastering Credibility Assessments", Presenter – SHRM AZ Legislative Conference, Phoenix, AZ (February 28, 2025)

- "Navigating Neurodivergence in K-12 Investigations: Tips and Tools for Managing Title IX Matters Involving Neurodiversity", Presenter – Title IX Working Group Webinar (January 15, 2025)

- "Title IX: Gathering Facts on Dating Violence, Partner Violence and Stalking" – T9 Mastered (October 10, 2024)

- "Title IX: K-12 Investigations Training" – T9 Mastered (September 24, 2024)

- "Responding to Complaints: A Blueprint for Efficient, Effective, and Defensible Investigations" – CalGovHR Conference, Sonoma, CA (March 12, 2024)

- Panel 6: "K-12 and Higher Education" – Berkeley Center on Comparative Equality & Anti-Discrimination Law: New Developments in Gender Discrimination, Harassment, and Violence in Employment and Education (January 5, 2024)

- "Gathering Facts on Dating Violence, Partner Violence, and Stalking" – T9 Mastered (September 13, 2023)

- "The New Title IX Regulations: Navigating Staff, Faculty, and Student Complaints" – ACHRO Annual Conference (October 26, 2022)

- "Navigating the Workplace Sexual Assault Investigation from an Internal and External Perspective" – AWI Annual Conference (October 14, 2022)

- "Putting Facts Into Focus: Title IX Writing" – T9 Mastered (September 21, 2022)

- "Title IX Regulations: Managing the Changes" – T9 Mastered (March 31, 2022)

- "Hearing Officer Training" – T9 Mastered (January 18 to 21, 2022)

- "Consent: Gathering the Essential Facts" – T9 Mastered (November 9, 2011)

- "Using Trauma-Informed Techniques in Workplace Investigations" – AWI Journal, September 2021

- "New Title IX Regulations: What Changed?" – American Association of School Personnel Administrators (October 13, 2020)

- T9 Mastered's "Hearing Officer Training" (September 24-29, 2020)

- Webinar: "Elevating the Remote Investigation – Conducting an Effective Remote Interview" – Van Dermyden Maddux Law Corporation (July 9, 2020)

- Webinar: "Conducting Remote Hearings – Ensuring Consistency, Competence, and Compassion" – T9 Mastered (May 13, 2020)

- "Lessons Learned in The #MeToo Era" – HR West 2020 in Oakland, CA (March 10, 2020)

- "Lessons Learned in The MeToo Era" – 2019 CALPELRA Annual Training Conference in Monterey, CA (November 18-22, 2019)

- "Trauma-Informed" – What is it and why does it matter? – Association of Workplace Investigators Annual Conference in Marina Del Rey, CA (September 26-28, 2019)

- "Workplace Investigations – Mastering the Basics" – Next Concept HR Association, Sonoma Harvest in Vacaville, CA (September 18, 2019)

- T9 Mastered's "Essential 3-Day Training" – Pasadena, CA (November 13-15, 2018)

- T9 Mastered's "Essential 3-Day Training" – Seattle, WA (September 25-27, 2018)

- "Conducting Effective Sexual Harassment Investigations In The #MeToo Era." – Sacramento Employer Advisory Council Workshop at the Citrus Heights City Hall (April 18, 2018)

## NOTABLE SPEECHES & PRESENTATIONS

- "Workplace Investigations – Mastering the Basics" – Next Concept HR Association's HR Business Leader Regional Series (Solano/Yolo) (March 22, 2018)
- T9 Mastered's "Advanced 2-Day Training" – Westin Sacramento, CA (February 27-28, 2018)
- "Conducting Effective Investigations: Navigating The Difficult Witness" – CALPELRA's 42nd Annual Training Conference, in Monterey, CA (December 8, 2017)
- "Using Trauma-Informed Techniques in the Workplace" – Third National Workplace Bullying Coalition online conference (October 19, 2017)
- T9 Mastered UC Training for Campus Investigators – A three-day Title IX intensive training course in Newport Beach, CA (March 7-9, 2017)
- T9 Mastered CSU 3rd Annual Title IX/DHR Investigator Training – San Francisco State, San Francisco, CA (August 1-2, 2016)
- T9 Mastered Training for Campus Investigators – A three-day Title IX intensive training course in Orange, CA (June 14-16, 2016)
- T9 Mastered Training for Campus Investigators – A three-day Title IX intensive training course in Sacramento, CA (February 16-18, 2016)

## PUBLICATIONS

- "Using Trauma-Informed Techniques in workplace Investigations" AWI September 2021 Journal
- "New Federal Campus Sexual Harassment Rules Strive for Balance" EdSource.org, May 2020
- "New Regulations, New Policies, New Challenges and Opportunities" Van Dermyden Makus Blog Post, May 2020

# List Of Designated Expert Witness Cases
# For Liz DeChellis
## Van Dermyden Makus Law Corporation

| | Date Retained | Case Name/Venue | Attorney/ Party | Status | Opinion(s) |
|---|---|---|---|---|---|
| 1 | 8/8/2025 | *Peter Columbo v. Palo Alto Unified School District, Don Austin, Lisa Hickey, Amanda Bark, and Trent Bahadursingh*<br><br>*United States District Court, Northern District of California, San Jose Division*<br><br>*Case No. 5:24-cv-909-NC.* | Bertrand, Fox, Elliot, Osman & Wenzel/Def | Retained | Retained on behalf of the defendant to review the adequacy of the school's responses to complaints. |
| 2 | 7/8/2024 | *SO v. Rescue Union School District*<br><br>Superior Court of California, County of Sacramento<br><br>Case No.: 223CV00406DJCAC | Spinelli, Donald & Nott/Def | Designated<br>Deposition: 6/9/2025 | Retained on behalf of defendant to review the adequacy and effectiveness of defendant's responses to complaint of sexual harassment. |
| 3 | 11/1/2021 | *Doe v. Berkeley Unified School District*<br><br>United States District Court, Northern District<br><br>Case No.: 3:20-cv-08842-WHA | Spinelli, Donald & Nott/Def | Designated | Retained on behalf of defendant to review the adequacy and effectiveness of defendant's responses to complaint of sexual harassment. |
| 4 | 7/1/2021 | *Jay Brome v. California Highway Patrol*<br><br>Solano Superior Court<br><br>No. FCS047706 | Rosen, Bien, Galvan & Grunfeld/Plf | Designated | Retained on behalf of defendant to review the adequacy and effectiveness of defendant's responses to complaint of sexual harassment. |

# Liz DeChellis
## Van Dermyden Makus Law Corporation
### Expert Witness Fees

| Task | Amount |
|------|--------|
| **Preparation.** All expert witness preparation services, including but not limited to, evaluation of documents, preparation for testimony, preparation of reports, evaluation of documents, meetings, conferences, travel time and other services necessary to render an opinion . | **$565 per hour** |
| **Testimony.** Deposition and trial testimony. | **$645 per hour** |
| **Non-refundable retainer.** In order to commence work on this matter, we require an advance retainer payment. This sum will be deposited in a client trust account maintained for these purposes in accordance with State Bar rules. The payment is non-refundable after the designation is made and an expert disclosure is served on the opposing party, regardless of the amount of work performed. The advance payment will be applied against any final invoices of fees and costs. | **$2,500.00** |
| **Consultant shall be reimbursed by the Client as follows:** mileage at the federal standard mileage rate in effect for the year; expenses for photocopies at $0.10 per copy, and actual costs of reproduction of documents and photographs, transcription, preparation of exhibits, mail, courier services and other reasonable expenditures at market rates; other reasonable expenses, as agreed upon, at actual cost, including travel, dining and other necessary costs related to Consultant's work. | |



**VAN DERMYDEN MAKUS**
*Investigations Law Firm*

### Liz DeChellis

Bay Area | Los Angeles | Sacramento | San Diego | Tempe

**P:** (916) 779-2402  |  **F:** (916) 779-1451

lad@vmlawcorp.com

vmlawcorp.com

# EXHIBIT B

# ATIXA TRAINING

# K-12 COORDINATOR: FOUNDATIONS



# PART 3

# JURISDICTION UNDER TITLE IX

**Lesson 1**
**K-12 Coordinator: Determining Jurisdiction**

Before moving forward with the Title IX process, you must determine whether a complaint falls under the jurisdiction of Title IX or whether it should be dismissed and addressed under another student or employee conduct policy. In this section, you'll learn about the requirements for Title IX jurisdiction.

After completing this section, you will be able to:
- Explain jurisdiction under Title IX, and
- Describe the elements of determining jurisdiction.

**Title IX Jurisdiction**
As Title IX Coordinator, you will receive reports of sexual harassment. When a student, parent or guardian, or employee files a formal complaint requesting an investigation, you must first determine whether the allegations fall within Title IX jurisdiction. If the allegations fall within Title IX, then the school or district must follow the Title IX process. However, if the allegations fall outside Title IX, then the school or district has flexibility to address the behavior under their usual student conduct or employee conduct process.

**Elements of Jurisdiction**
Title IX requires you to analyze whether a report falls within Title IX jurisdiction. When considering jurisdiction, focus on the following elements:
- Who is the Complainant?
- Who is the Respondent?
- Did the conduct occur in the context of a school's education program or activity? and
- Does the conduct, as alleged, match one or more of the definitions of sexual harassment under Title IX?

Let's start by discussing the first element of jurisdiction, the complainant.

**Who is the Complainant?**
For Title IX to apply, the Complainant must be a person who is participating (a student or an employee) or attempting to participate in an educational program or activity. This means the Complainant must be a student or employee, but Title IX adopts a broad definition of "attempting to participate." As a result, applicants for employment, future students, or alumni trying to participate in programming may all meet this definition.

However, former students and employees may not be complainants. If you receive a report from a former student or employee, you may have an interest in speaking with them to learn more, but you're not under an obligation to respond under Title IX.

**Who is the Respondent?**
For the Respondent, you'll need to determine whether they're an individual over whom the school or district exercises some degree of control. Ask yourself, does the school or district have authority to take disciplinary or remedial action against the Respondent? Sometimes a school may lack disciplinary authority, such as when a student is sexually harassed by another student attending school in another district or if an employee resigns before a school is able to fully investigate.

If the Respondent is a third-party vendor, guest, or former student or employee, you may need to talk with your general counsel to clarify your methods to address and remedy the behavior. You may not be obligated to use your Title IX process for third parties.

**Control Over the Context**

For Title IX to apply, the school or district must have control over the context where the reported harassment occurred. Ask yourself, did the conduct occur within the context of the school or district's education program or activities? One clear-cut area of analysis to consider is where the conduct occurred. Did the harassment occur:

- At a location, event, or in a circumstance over which the school exercised substantial control?
- On property being used by a school-sponsored program or event?
  - Renting a facility to host prom is an example of a school-sponsored event.
- On property owned or controlled by an organization recognized by the school?

Keep in mind, there can be circumstances where the school or district controls the context, even when incidents do not occur on school property.

<u>What about conduct outside of the United States?</u>
Title IX jurisdiction does not apply when conduct occurred outside the United States, even if it occurred on a school-sponsored trip.

**Context: School Technology**

Control over the context is not just a question of physical location. A common circumstance in K-12 settings involves harassment that occurs using school technology. Does the school or district control the context of the harassment if school-sponsored technology was involved, such as school-issued devices or networks?

To consider whether the behavior may qualify as "in-school" or "out-of-school" ask yourself the following questions:

- Does the incident involve harassment in school during the school day, even if it is involving personal devices and commercial networks?
- Are school-sponsored devices involved?
- Are school networks and other infrastructure involved?

If the answer to any of these questions is "yes", then a school may have control over the context of the behavior and would need to move forward with a Title IX process.

**Insight from an Expert: School Technology**
**Tanyka Barber, M.H.S., J.D.,** Partner, TNG & ATIXA Advisory Board Member



When we're talking about the use of technology and whether or not you have Title IX jurisdiction, the same rules apply. So you still have to ask yourself, do I have control over the harasser? And do I have control over the context of that harassment? That first box is typically easier to check off, whether that person is typically your current student or your current employee who is using that technology, to engage in sexual harassment or sex-based discrimination.

The second question is usually where you have to probe a little further and get some more details in terms of whether you have control over the context when someone uses technology to engage in sexual harassment. That could be the use of social media to harass someone. That could be text messages over using someone's phone to text message. That could be sending some messages in the virtual learning environment, whether it's in a chat, or in zoom, or Google Meets, whatever kind of virtual learning environment you're using. But typically, these types of cases, particularly in the K-12 arena, will arise through the use of social media. So you'll have to ascertain whether or not you have control over the context of that behavior.

A couple of things you'll want to think about what device was used to engage in that behavior. We've recently seen a lot of schools and districts issue school-issued devices to students, whether that's a laptop or a tablet, while you engage in virtual learning. So, if a student were to use those school-issued devices to engage in this behavior, you have control over that context. If that behavior occurred in your virtual learning space, again, if I'm using the chat function to harass one of my classmates during a virtual learning, or if I'm engaged in texting them during the virtual learning timeframe, then you have control over that context.

You'll also want to look at the times I talk about if I'm engaging in that behavior during a virtual learning session, then that's during the school day, that's during school hours. Then you would have control over that context. If I'm using my personal device, but I'm using the school or the district's network to transmit these text messages or to transmit these social media posts, then you have control over that context. So those are a couple of things you'll want to think about. What device is being used? The time that that behavior is happening. Is it happening over your virtual learning space or during your virtual learning time and whatever kind of platform you're using? Am I using the school-issued Wi-Fi network to engage in this behavior? Those are typically the factors that will allow you to have control over that context, such that Title IX would apply.

Now, if I were to be using my device on my personal time, it's my personal device. It's not a school-issued device. Maybe I'm at home after school or I'm at home over the weekend, and I'm posting harassing messages on social media, you may have control over the harasser if I'm your current student or employee, but you would not have control over that context. That happened outside of your education program or activity. It was in my private home using my personal device over the weekend. So when you think about whether or not you have jurisdiction when it comes to technology-facilitated sexual harassment, the same rules apply. You're going to ask yourself, "Do I have control over the context?" Which is the main piece you'll want to think about? And "Do I have control over that harasser?"

**In-Program Effects**

Even if you answered "no" to all of those questions, you should still consider whether there are in-school effects of out-of-school harassment. Title IX requires schools and districts to address "in-program effects" for out-of-school harassment, even if the response is limited to supportive measures.

If the reported incident is a combination of in-program and out-of-program conduct, the school or district has jurisdiction over the in-program conduct.

**Does Conduct Constitute Sexual Harassment?**

For Title IX to apply, the alleged behavior must constitute behavior that would meet one or more of the definitions of sexual harassment. The jurisdictional assessment helps us understand whether the Title IX process will apply, or whether schools may use an alternate process to address the alleged conduct violation.

**Covered Programs**

Finally, Title IX jurisdiction applies to all programs operated by a school or district that receives federal funding, regardless of whether the individual program in question receives or uses federal funding. This means that all of the school or district's programs fall under Title IX jurisdiction.

**Review: Elements of Jurisdiction**

Review this list of all the elements of jurisdiction covered in this module. Remember, for a complaint to qualify under Title IX to apply, all of these requirements must be met.

- Who is the Complainant?
- Who is the Respondent?
- Did the conduct occur in the context of the school's education program or activity?
- Does conduct meet one of the definitions of sexual harassment under Title IX regulations?

When evaluating these definitions for jurisdictions, the question is not whether this conduct definitely occurred, but whether the allegations could be a policy violation if proven. If so, there is jurisdiction under the Title IX regulations.

**Conclusion**

You've reached the end of Determining Jurisdiction. After completing this section, you should now be able to:

- Explain jurisdiction under Title IX, and
- Describe the elements of determining jurisdiction.

Please review our catalog of courses for additional training on this and other Title IX related topics or visit us at ATIXA.org for other Title IX resources.

---

**Lesson 2**
**K-12 Coordinator: Defining Sexual Harassment**

Jurisdictional analysis has many components.  One is whether the alleged behavior meets one of the definitions of sexual harassment under Title IX. The regulations outline six different types of Sexual Harassment:

- Quid Pro Quo Harassment
- Hostile Environment Harassment
- Sexual Assault
- Dating Violence
- Domestic Violence
- Stalking

If the behavior meets one or more of these definitions, and all the other jurisdictional elements are present, you'll need to follow your Title IX process. This section will breakdown the definitions of each and discuss the school or district's responsibility to respond to retaliation.

After completing this section, you will be able to:
- Identify the elements and components of the different forms of sexual harassment and retaliation, and
- Summarize the district's responsibility to respond to a Title IX retaliation.

_____

### Quid Pro Quo & Hostile Environment

**Defining Quid Pro Quo**
Quid Pro Quo means "this for that." Quid Pro Quo sexual harassment is defined as "an employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct."

This definition applies to an employee's conduct and could include an employee harassing another employee or a student.

**Important Elements of Quid Pro Quo**
Quid Pro Quo complaints involve unwelcome sexual conduct or advances where the complainant may be offered an advantage or suffer a deprivation depending on how they respond. Advantages could be a promotion, earned grade, or letter of recommendation. Deprivation could mean losing out on opportunities to participate or avoiding any program or activity. Avoidance could look like a student quitting a school play because the teacher proposed exchanging sex for a better role in the play.

**Defining Hostile Environment**
The second type of the sexual harassment is hostile environment harassment. Hostile environment harassment is defined as:
> *"Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity."*

Hostile environment harassment can apply to student or employee conduct. Determining whether a hostile environment exists is a fact-specific analysis. You will need to consider the totality of the circumstances.

**Breaking Down the Definition**
The definition of hostile environment is complex and has many parts. We will break down each part of the definition and how they relate to one another.

**Unwelcome**
The first element in the hostile environment analysis is unwelcomeness. The "unwelcome" analysis looks at the subjective perspective of the complainant. How did the actual Complainant feel about the incident? Was it welcome or unwelcome?

You should note that a Complainant telling the Respondent to stop is not a requirement for unwelcomeness. Additionally, unwelcomeness is implied by law if the Complainant is younger than the age of consent.

**Reasonable Person**
The next phase of the analysis relies on a fictional reasonable person.  Unlike the unwelcome element, the reasonable person is objective, rather than subjective.

For this element, ask yourself whether a similarly situated person to the Complainant would find the behavior in question to be severe, pervasive, and objectively offensive enough to impact their access to their education or workplace. For example, consider a case involving a female fifth grade student being harassed by another student. The reasonable person analysis would ask you to consider whether the average female fifth grade student would find the conduct sufficiently severe, pervasive, and objectively offensive.

**Objective Consideration**
Sometimes it can be challenging to consider facts objectively instead of subjectively through our own perspective. To help you be objective, consider discussing the allegations with a Deputy Title IX Coordinator or your legal counsel to gain additional input.

**Severe**
The next consideration in a hostile environment analysis is whether the behavior is considered severe. There can be many ways that harassment is severe.

**Defining Severe**: Situations where the conduct is physical are often severe, but some forms of non-physical conduct can also be severe, especially when accompanied by threats. Some physical conduct, like sexual assault, has its own definition. If the behavior falls under another definition, not hostile environment, you will not need to do a severity analysis.

**Example 1:** A group of students following and taunting another student because of their sexual orientation, resulting in the group shoving the student into lockers, tripping them, and punching or kicking them.

**Example 2:** A student using school technology and social media to harass a student about their sexual orientation, including vicious slurs and name-calling. The harassment could include sharing lewd photos of that student on multiple occasions and name calling on social media and in person, leading to in-school gossip and harassment by other students during the day.

**Pervasive**
The next requirement is pervasive. Harassment that becomes persistent, widely known, or

impactful on the school setting or the Complainant meets this requirement. A single incident triggering a pervasive effect could meet this requirement, too. An example of pervasiveness could be verbal harassment that continues over the course of days or weeks. A slur directed at a student once may not meet this requirement, but repeated use of a slur towards a particular student may be pervasive.

### Pervasive: Single Incidents

A single instance of harassment that is public in nature, becomes widely known at the school, or impacts the Complainant's academic performance, social reputation, or relationship among peers could have a pervasive effect, as well. For example, if a student shares a nude photo of another student with their friends, and the image travels around the school. Pervasive does not necessarily require repeated harassment.

### Objectively Offensive

The last element in the hostile environment definition is whether the behavior is objectively offensive. Would a reasonable person in the Complainant's shoes be impacted or affected by this? Behavior that is frequent, severe, physically threatening, humiliating, intimidating, ridiculing, or abusive. Consider factors such as the age and relationships of the parties involved, as well as the number of persons involved.

One example of objectively offensive could be a student writing "Quincy is a prude and a virgin" on all the chalkboards in the school after Complainant refused Respondent's advances. Another example might be Respondents starting a cheer that a basketball player is "easy" during every home game.

## Hostile Environment: Other Considerations

There is no bright line rule for hostile environment sexual harassment. You'll need to evaluate each situation based on the totality of the circumstances. Here are some additional considerations:

1. The impact on the Complainant's mental or emotional state.
2. Whether the conduct was directed at more than one person.
3. Whether the conduct unreasonably interfered with the Complainant's educational or work performance.
4. Whether an individual was offended by discourtesy or rudeness.
5. Whether the speech or conduct deserves academic or First Amendment protections.

## Is it a Hostile Environment?

Review these scenarios to see if you can determine whether they meet the definition of a hostile environment.

### A Peck on the Cheek

At a school dance, two teachers serve as chaperones. One teacher reported that the other teacher allegedly engaged in an unwelcome lingering hug and an awkward "peck on the cheek" that came very close to her mouth. This encounter happened when they greeted each other in the parking lot before the event.

_____

Because this was an isolated incident, in this case, the lingering hug and brief kiss would not be seen as having a pervasive effect. This may not be severe either. Remember, if this would not qualify under Title IX, the behavior can still be addressed in other ways, such as informally through an employee conduct code.

**A Snapchat Threat**

After school one day, while waiting for practice to start, a student-athlete used Snapchat -- while on the school's wireless network -- to ask a male student to have sex with her. The male student refused. The track athlete then responded that she would rape him if he did not have sex with her. He took a screenshot and brought a complaint against her. As a result of the exchange, he is avoiding her at school and wants to drop the elective class in which they are both enrolled.

_____

The content is sex-based, and the threat could qualify as severe and objectively offensive. Additionally, although a one-time comment is not typically pervasive, the effect arguably may be pervasive, given the impact on the male student.

**Rating "Hotness"**

A group of five students stand outside the cafeteria rating the "hotness" of other students as they walk by. They each write their ratings on individual small whiteboards, then hold them up for all to see. They also make comments about whether they've had sex with any of the other students. This incident is filmed and posted on TikTok and shared amongst the students.

_____

The conduct is likely severe and pervasive and a reasonable person in the students' shoes would find this to be offensive, embarrassing, and humiliating in a typical high school setting.

_____

### Sexual Assault

**Defining Sexual Assault**

The next type of Title IX Sexual Harassment is sexual assault. The definition of sexual assault is defined as "any sexual act directed against a Complainant, without their consent, or instances in which the Complainant is incapable of giving consent." Sexual assault has six subparts: rape, sodomy, sexual assault with an object, fondling, statutory rape, and incest.

**Rape**
- Penetration, no matter how slight, of the vagina or anus with any body part
- or object,
  - or oral penetration by a sex organ of another person,
- without the consent of the Complainant,
  - including instances where they are incapable of giving consent because of age
  - or because of temporary mental
  - or physical incapacity.

**Sodomy**
- Oral
- or anal sexual intercourse with a Complainant,
- forcibly,
- and/or against their will;
  - or not forcibly
  - or against their will in instances in which the Complainant is incapable of giving consent because of age or because of temporary or permanent mental or physical incapacity.

**Sexual Assault with an Object**
- The use of an object or instrument to penetrate, however slightly,
- the genital or anal opening of the body of the Complainant
- forcibly,
  - and/or against the person's will (non-consensually);
  - or not forcibly or against the person's will in instances in which the Complainant is incapable of giving consent because of age or because of temporary or permanent mental or physical incapacity.

**Fondling**
- A touching of the private body parts of the Complainant (buttocks, groin, breasts),
- for the purpose of sexual gratification,
- forcibly, and/or
  - against their will (non-consensually);
  - or not forcibly or against their will in instances in which the Complainant is incapable of giving consent because of age or because of temporary or permanent mental or physical incapacity.

**Fondling: Purpose Requirement**

The phrase "for the purposes of sexual gratification" requires gathering evidence about a motivation for the touching. The circumstances of an incident, such as the age and maturity of the parties, would be factors in determining whether a sexualized purpose exists.

The purpose requirement is meant to separate fondling cases from inappropriate touching that may occur with younger children and inadvertent contact, such as brushing against someone's buttocks trying to move in a crowded hallway. Remember, if the conduct does not qualify as sexual assault, the conduct could still qualify as a hostile environment if it meets the criteria.

**Consent**

As discussed in the sexual assault definitions, consent can be an important concept in evaluating sexual assault allegations. Your district policy must include a definition of consent.

ATIXA's model definition defines consent as "knowing, voluntary, and clear permission by word or action, to engage in sexual activity." Note that incapacitated individuals are not able to give consent. Incapacity could be due to age, mental illness, disability, or caused by drugs or alcohol. Consent cannot be obtained through force or coercion, either.

**ACTIVITY: SCENARIO**

*While skipping class, two students are hooking up in a parked car in the school parking lot. Cara and Kevin are both 18 years old. Cara told Kevin that she intended for the "hooking up" to be kissing only. As things progressed, Kevin also began to squeeze Cara's breasts and put his hands down the back of her leggings to caress her buttocks. Cara was frozen and did not know how to respond. She managed to extract herself from the car and feigned a stomachache with the school nurse to go home for the day. Cara decided to quit the school play so she could avoid Kevin as much as possible.*

Does this investigation involve allegations of touching of private parts?

Response: This answer to this question is Yes. If Cara alleges that Kevin touched her breasts and buttocks without her consent, the allegations will likely meet the definition of fondling. Any investigation would need to explore facts around consent, in addition to facts relevant to the fondling policy.

If you're wondering how to address the fact the students skipped class, you could use your student conduct process. However, prior to disciplining students for conduct issues, you should always consider whether the situation implicates Title IX before proceeding. In this situation, you should consider resolving any Title IX claims before disciplining the students for skipping class.

**Insight from an Expert: Fondling**
**Joe Vincent, M.L.S.,** Senior Supervising Consultant, TNG & ATIXA Advisory Board Member



In this particular case study, we have Cara alleging that Kevin engaged in some behavior that might implicate portions of our Title IX policy. And when we're analyzing any allegation, one of the first steps is to take a look at what's actually described and determine which provisions within the policy appear to be implicated by the conduct that's alleged. So what Cara describes here is a case where, although she and Kevin appear to have had an agreement, or at least an understanding regarding what conduct she was consenting to, and by virtue of what she consented to possibly what conduct she was not consenting to, Cara described that Kevin pushed the boundaries of her consent by contacting her breasts and her buttocks in a way that she felt like she had not consented to.

Obviously, consent is going to be an important part of the fact pattern analysis. But even before that, we can take about a half step backwards and say, which type of misconduct is implicated by what she's described. Right, and what Cara has said is that there was contact with her body. Right, and so we're inside the sexual assault descriptions of prohibited conduct. And since we don't see any implication that there was any type of penetrative conduct, we're probably looking at the fondling provision of the Title IX policy as being the one that most appropriately fits this allegation, right? And within fondling, we have a description of prohibited conduct that includes contact with various portions of the body for the purpose of sexual gratification. And so that's sort of a starting point for you as you're looking at initiating an investigation into these allegations. It's important to make sure we have adequately and clearly identified not only the policy that's in play, right, that we'll be investigating allegations of potential violations of that policy, but also within the policy which specific provisions are implicated by the allegations. And in this case, as you probably recognized, fondling is the best fit for the alleged

misconduct.

Now, beyond that, I assume that it's clear to you that this is going to be largely dependent on the investigators ability to gather evidence related to consent. And so because we're in a car, because there's likely no other witnesses, because likely this is going to become what we call one of those word versus word cases, the investigator will really need to focus in on the consent that was exchanged between Cara and Kevin contemporaneously leading up to their interaction and during the interaction itself. Now, remember, the rubric for analyzing the existence or the absence or the withdrawal of consent works through sort of a three-part process where we ask was there force applied to obtain access, where consent would be nullified by the application of physical violence or threats of violence or intimidation or coercion. And after we move past that part of the analysis, we pose a second set of questions regarding the potential for incapacity.

And I suspect if you're like me and we're looking at what Cara's alleged, there don't appear to be allegations that involve force or lack of capacity that would have rendered Cara unable to provide effective consent. And so, we're left at the bottom part of the consent analysis, sort of what we call question number three as it relates to the mutually understandable permission that exchanged between the parties contemporaneously before and during the interaction. And Cara's already given us a couple of clues, but we don't have a lot here in this very brief description. And it's going to be really on the Investigator to explore the finer details of the interaction in the communication between Cara and Kevin, to understand what mutually understandable permission was given, what mutually understandable permission was declined.

And then even when, if there's gray area there as the interaction proceeded, what sort of clues and additional or maybe even non-verbal communication led Kevin to believe he had permission to engage in those subsequent activities? And conversely, why Cara believes she had effectively foreclosed those activities and either refused to provide or withdrew or revoked consent as the interaction played out? That's just some ideas about how we're cueing this case up in terms of what policies are implicated, what sort of issues are going to rise to the surface, and how you should strategize with the Investigator as you move it into that formal investigative phase.

**Defining Sexual Assault**

The remaining two kinds of sexual assault involve sexual activity that may be consensual but are situations where the individuals involved cannot legally consent to sexual activity with each other: incest and statutory rape. The definitions under Title IX are designed to track with how each of these offenses are defined under state law.

Check your district policy and consult with legal counsel to identify and understand your state's laws defining statutory rape and incest.

**Statutory Rape**
Non-forcible sexual intercourse with a person who is below the statutory age of consent under your state's law.

**Incest**
Non-forcible sexual intercourse, between persons, who are prohibited from engaging in sexual activity due to familial relations, under your state's law.

_____

**Interpersonal Violence & Retaliation**

**Forms of Interpersonal Violence**
Title IX regulations prohibit three additional types of sexual harassment that are typically thought of as forms of interpersonal violence: dating violence, domestic violence, and stalking.

**Dating Violence**
Dating violence is defined as violence, on the basis of sex, committed by a person who is in, or has been in, a social relationship of a romantic or intimate nature with the Complainant.

Even if the parties would not label themselves as "dating," you should consider whether the relationship still meets the definition. Facts to consider include the length of the relationship, the type of relationship or interactions between the parties, and the frequency of interactions.

**Investigating Dating Violence**
Dating violence includes, but is not limited to, sexual or physical abuse. If two students were to get into a fist fight at school and they are in a dating relationship, you would consider whether the fight qualifies as dating violence. In these situations, school and district administrators must be well-trained to contact you before disciplining the fight as a student conduct issue.

Lastly, dating violence does not include domestic violence acts, so if a behavior meets the elements of domestic violence, it cannot also be dating violence.

**Case Study: Dating Violence**
Review this case study on dating violence involving Angelique and Robert.

> *An employee reports to her supervisor that a colleague, Angelique, is being physically abused by her boyfriend, Robert, a full-time employee in Facilities Management. The employee indicates that Angelique seems noticeably withdrawn lately and that Angelique recently came to work late, had red puffy eyes, and looked as though she had been crying. The employee says Angelique was walking with a limp last week, and when asked about it, told people she twisted her knee after slipping on some ice in her driveway. Later that same day, the employee said someone overheard Angelique on the phone saying, "But I'm scared of what he would do if I tried to leave him."*
>
> *According to the employee, Angelique missed a few days of work last month and returned wearing a sling. Angelique claimed that she sprained her shoulder while working in the yard. Yesterday Angelique arrived late to work and had some swelling around her eye and her lip. When asked, Angelique said she got up to use the bathroom last night in the dark and walked into the edge of her open closet door. The employee says that yesterday afternoon, Robert and Angelique got into a loud argument in the parking lot and that Angelique was crying in the bathroom afterward.*

*What issues can you spot?*
*What are the Title IX Coordinator's next steps?*
_____

*An investigation could uncover that dating violence is happening between Robert and Angelique, who are in a social relationship of a romantic nature. The Title IX Coordinator would meet with Angelique to see if she wanted to file a formal complaint and would offer her supportive measures. The incident in the parking lot would meet the location requirements for Title IX jurisdiction, but a loud argument, by itself, would not be violence as defined under the dating violence definition.*

*Although some of this behavior may have occurred off-site, it is impacting Angelique's work. An Investigator would gather information about the argument in the parking lot, including whether it included violence or threats, as well as whether any other incidents of dating violence occurred at school.*

*Remember, if Angelique did not want to move forward with a formal investigation, or if there was no Title IX jurisdiction, you could still offer supportive measures to Angelique.*

**Insight from an Expert: Dating Violence**
**Tanyka Barber, M.H.S, J.D.,** Partner, TNG & ATIXA Advisory Board Member



Let's talk about some of the issues you're able to spot. This scenario clearly presents some problematic behavior that's happening between Angelique and Robert. It says that Robert is Angelique's boyfriend. We also know that they both are your employees, but this information is being reported by someone else. So, it's not Angelique who is coming forward. It's certainly not Robert who is coming forward to report some of this behavior. So, there is indications that Angelique has bruising, that she has red puffy eyes, instances where she was alleged to have been crying, talked about being scared on the phone, walking with the limp, having something on her arm. And so, there are indications that there is some potential violence that's happening between Angelique and Robert, such that it may constitute dating violence under the definition of sexual harassment under Title IX.

Even if we have that, you also still have to think about whether you have jurisdiction. So, the two questions, do I have control over the harasser? In this case, it's Robert. And do I have control over the context of that harassment? Meaning, did it happen in your education programs or activities? You do have control over Robert because that's your employee. But think about the issues in terms of whether or not you have control over the context.

So, the scenario talks about some behaviors that are happening in the workplace, but there are also instances where the behaviors are happening outside of the work environment and that was the majority of the instances that were being reported to you were happening outside of the work environment. But you do have some downstream effects that are now impacting the work environment, particularly with Angelique showing up to work late or missing work and even having this other

employee who was not involved come forward to report this information.

So even if the conduct is happening outside of the work environment, it is still some potential impact from this scenario within the work environment. And so we always want to be mindful of addressing those downstream effects as well. And so think about what would be your next steps as a Title IX Coordinator. Again, Angelique is not the one who reported this to you. This is a third party or an uninvolved colleague who is coming forward to report this information. So think about should you talk to Angelique and if so, how to craft that conversation and that outreach, particularly in light of a situation of dating violence.

There really are some unique considerations when you're approaching a potential victim of dating violence that you'll want to take into consideration and make sure that you have adequate resources to support that individual that may be in your school or your work environment. You also want to think about whether or not you can talk to Robert. Should you talk to Robert?

Again, thinking about the nuances with dating violence issues by talking to the alleged abuser, what impact will that have on Angelique and her safety, but also her ability to work and access your education programs and activities. So you always want to be mindful of the resources. If you choose to reach out to Angelique, make sure that you have adequate resources in school and out of school that you can kind of refer Angelique to to help support her as she's navigating in the work environment. But you'll also have to make that determination about whether or not Title IX applies. And that may require you to dig a little deeper to find out additional information.

Certainly, the incident in the parking lot, you would have control over that context. But from the scenario, you see that a lot of information or incidents happened outside of the work environment, and Title IX may not apply there. So your response may be limited to more of a supportive measure for Angelique in reaching out, talking about the process to file a formal complaint if she chose to do so. But most importantly, offering those supportive measures to Angelique so that she can be successful in navigating through her work environment.

**Domestic Violence**
Next is domestic violence. To categorize an incident as domestic violence, the cohabitation between the respondent and the complainant must be more than just two people living together as roommates. There must be a spousal or intimate relationship.

Domestic Violence is defined as violence, on the basis of sex, committed:
- by a current or former spouse or intimate partner of the Complainant, by a person with whom the Complainant shares a child in common, or
- by a person who is cohabitating with, or has cohabitated with, the Complainant as a spouse or intimate partner, or
- by a person similarly situated to a spouse of the Complainant under your state's domestic or family violence laws, or
- by any other person against an adult or youth Complainant who is protected from that person's acts under your state's domestic or family violence laws.

**Stalking**
Another form of interpersonal violence is staking. Stalking is defined as engaging in a course of conduct, on the basis of sex, directed at a specific person that would cause a reasonable person to fear for the

person's safety, the safety of others, or suffer substantial emotional distress.

**Course of Conduct:** Two or more acts in which the respondent directly, indirectly, or through third parties,

- by any action, method, device, or means,
- follows, monitors, observes, surveils, threatens, or communicates to or about a person,
- or interferes with a person's property.

**Substantial Emotional Distress**

Significant mental suffering or anguish that may, but does not necessarily require, medical or other professional treatment or counseling.

Title IX Coordinator must collaborate with other school or district staff to distinguish between true stalking behavior and a person who might have poor social skills or developmental challenges that impact human interactions.

**Case Study: Stalking**

Review this case study on stalking and course of conduct involving Darnell and Tate.

> *Darnell and Tate dated for four months until Tate ended the relationship. In the past month since the breakup, Darnell has sent dozens of messages -- often Snapchats and texts -- to Tate, even after Tate asked Darnell to stop. Some of the messages have had a menacing tone to them. Tate has also seen Darnell driving past Tate's apartment several times and sitting outside of the school waiting for Tate to emerge at the end of the day. Tate left school late one night to find two tires slashed on their car.*
>
> *What issues can you spot?*
> *What are the Title IX Coordinator's next steps?*
> _____
> *Tate describes a course of conduct, based upon their prior dating relationship, that would likely cause a reasonable person to suffer substantial emotional distress and possibly fear for their safety. The investigation would have to gather additional information about the content and circumstances of the messages, and evidence about whether Darnell was responsible for the slashed tires.*
>
> - *To make the jurisdiction assessment, you should also look at what behaviors are occurring on school property and what behaviors are outside of school jurisdiction.*
>
> *Additionally, given the severity of this situation and the destruction of property, the police would likely be involved in this situation. As a Title IX Coordinator, you will have to balance the involvement of law enforcement with your own commitment to your own reasonably prompt process. Establishing a Memorandum of Understanding with your local police department can help clarify expectations prior to any incident.*

**Insight from an Expert: Stalking & Course of Conduct**
**W. Scott Lewis, J.D.,** Managing Partner, TNG & Co-Founder & Advisory Board Member, ATIXA & NABITA



In this case study, we're focusing on stalking as a policy violation potentially, as well as understanding how that course of behavior could happen. The case you had with Darnell and Tate, definitely Darnell with the text messages, the showing up after school, the driving by Tate's apartment, has engaged in a course of conduct. It's not a singular act. You can't be stalked with a single act, but it has to be that course of conduct that happens over time with the menacing tone of the text messages, the showing up after class, those could all be things that cause a reasonable person, some emotional distress, in this case, the threshold is substantial emotional distress and perhaps fear for their own safety. So certainly, a reasonable person like Tate having to come out of class and see Darnell coming out of their apartment and seeing Darnell having these messages with this menacing tone all in and of themselves, that course of conduct could constitute stalking if it were proven to be so.

Add the variable of the slashed tires now, Tate comes out and the tires are slashed. That definitely would up the apprehension, the emotional distress, the fear for safety. Now we have property damage involved. So, we don't know if it was Darnell that slashed the tires. There certainly would have to be an investigation into that. But add to that the possibility of police involvement. So, Tate would know that they could go to the police to report both the stalking behaviors as well as the damage to the tires, and the investigation would want to look into that. Perhaps there's cameras in the parking lot. Perhaps there's people that saw what happened. There's a variety of things that could go on during the investigation to indicate whether or not Darnell was the one who slashed the tires.

But there's no question at all that you would have this course of behaviors that would cause a reasonable person that substantial emotional distress. Oh, my gosh. Do I have to, every time I leave, is he going to be there or is she going to be there? And now my property has been damaged. What's the next steps? There could be considered an escalation. You might want to also work with your behavior intervention or your threat assessment team to check those messages to the menacing tone. What exactly were those messages? Are we coupling that with the potential of the damage to the property, does that escalate the risk of Darnell? So, in addition to working perhaps with local P.D. or with your campus police department having an MOU, you in that situation is very, very helpful.

But we're also looking at the possibility of wanting our behavior intervention or threat assessment to have both Darnell and Tate on their radar. Does Darnell have any past behaviors that we don't know about? The intervention team would be able to dig into that, find out a little bit more and would be able to give you a good assessment of potential for harm to self or potential for harm to others.

Why do I say have Tate on that radar? Well because Tate's suffering this emotional distress. So, Tate is going to want to be connected with resources by either the Title IX office and/or by the behavior intervention or care team to make sure that Tate's being tended to as well, while this investigation is going on, before the investigation happens, and perhaps even after the investigation happens with some case management.

So, what seems like a very straightforward dating relationship breaks up, lots and lots of text messages, showing up at school, and sometimes the work can play into that as well, in some of these scenarios.

Showing up outside their home, the slashed tires. Now we've got three different entities we want to talk about that may be having to work together to find out how we're going to respond to this institutionally. You got police, got Title IX, you got probably student conduct in there somewhere. And then behavior intervention. So really four. But the Title IX and student conduct are probably tied together for the investigation. I hope this has been helpful. The situations, while they seem very straightforward can merge into complex things with a lot of moving parts really quickly.

**Prohibition on Retaliation**
Title IX also prohibits retaliation against a person for exercising their rights under Title IX. This applies to individuals who make a report or complaint and to others who serve as witnesses or participants in a Title IX process.

The school or district itself may not retaliate and must ensure that individuals are not retaliated against by the other party or any other individual. A school or district must effectively respond to reports of retaliation, too.

**Conclusion**
You've reached the end of Defining Sexual Harassment. After completing this section, you should now be able to:
- Identify the elements and components of the different forms of sexual harassment and retaliation, and
- Summarize the district's responsibility to respond to Title IX retaliation.

---

**Lesson 3**
**The First Amendment & Dismissal**

Before moving forward with the Title IX process, you must determine whether a complaint falls under the jurisdiction of Title IX or whether it should be dismissed and addressed under another student or employee conduct policy. In this section, you'll learn about the requirements for jurisdiction under Title IX and about mandatory and discretionary dismissal of formal complaints. This section also covers how the First Amendment intersects with Title IX.

After completing this section, you will be able to:
- Explain the requirements for Title IX jurisdiction.
- Determine whether a formal complaint should be dismissed, and
- Identify intersections of the First Amendment and Title IX.

_____

**First Amendment & Title IX**

**First Amendment & Title IX**
Title IX work often requires you to weigh reported harassment against an individual's free speech rights. Navigating free speech concerns can be a challenging process. The Supreme Court addressed free

speech concerns in public schools in a case called Tinker versus Des Moines Independent Community School District. In this case, a small number of high school students wore black armbands to protest the Vietnam War.

The school district had received notice of the armband demonstration ahead of time and adopted a policy permitting suspension of students who refused to remove their armband. In the end, the district disciplined five students when they refused to remove their armbands.

**Insights from an Expert: First Amendment Rights & Title IX**
**Kim Pacelli, M.Ed, J.D.,** Partner, TNG & ATIXA Advisory Board Member



I'm going to take a few minutes to talk about the tension and the nexus between our First Amendment freedoms of free speech and free expression, among others of course, in our public school settings as something that Title IX Coordinators need to navigate alongside Title IX, which of course obligates us in school settings to ensure that when harassment or discrimination are happening on the basis of sex or gender, that we are stopping harassment, preventing its recurrence and remedying the effects.  So obviously these two laws, the First Amendment, on the one hand, and Title IX on the other can sometimes be in tension with each other.

Now, the Title IX regulations very clearly state that we are not supposed to abridge the First Amendment in any way in how we operationalize Title IX in our school settings. But of course, we can just naturally anticipate that one person's free speech or free expression may very well come forward to us as a report of either harassing behavior or a hostile environment for another member of our school community. So as Title IX Coordinators, we can anticipate that we're going to have to navigate this tension. It can be a really complicated and vexing area of our work. I often recommend that ATIXA members consult with us as experts or with their local legal counsel about how to proceed in some of these situations. But I want to give you just the general rules of the road, so you feel comfortable navigating these two areas of the law.

**Tinker Decision**
The Tinker case made its way to the Supreme Court, which ultimately decided that a school may not discipline a student for speech or expression unless the conduct "materially and substantially" interferes with the operation of the school or "invades the rights of others." Since the black arm bands were not disruptive, the students should not have faced discipline.

The Tinker standard requires that the disruption be actual and not merely based upon a hypothetical fear of disruption. Administrators may not discipline speech just because it makes others uncomfortable or is unpleasant.

**Navigating First Amendment Rights**
As a Title IX Coordinator, you'll be responsible for evaluating whether reported behavior falls under protected speech and expression or qualifies as harassment prohibited by policy. You should consult your general counsel in situations involving free speech concerns because Title IX practice may implicate speech often. Some unprotected speech that could directly impact your Title IX policy include:
- Incitement of disruption and breach of peace.

- Defamation.
- True threat, and
- Obscenity.

**Insights from an Expert: Permitted Regulation of Speech**
**Kim Pacelli, M.Ed, J.D.,** Partner, TNG & ATIXA Advisory Board Member



The other concept I want you to have your head wrapped around is the idea that, in our school settings, we can put some restrictions on when and how members of our school community engage in speech. And I think many administrators have had to deal in recent years with school protests and other kinds of administrative decisions about students speaking during the school day, the general rules of the road, and again, as Title IX Coordinator, you're not necessarily overseeing all of this, but it can very well be the case that maybe some issue that is in your purview is getting attention among a group of students or group of employees. And there are some sort of, kind of effort at organized kind of speech and community participation in some particular issue.

Know that schools are allowed to have reasonable time, place, and manner restrictions or restrictions on the time of speech. The place, meaning to say, in some areas of the school setting might be appropriate for speech, whereas other settings, say in a classroom where the teacher is really in control of the environment, and the manner. And, just as a Title IX Coordinator, it's good for you to know that within Title IX law there are different kinds of forums that can sort of shape our understanding of what kinds of restrictions might be appropriate. You should never feel like you have to engage in any of this analysis on your own. We just want you to have these issues in the back of your mind as something that you should be aware of. And when it comes up to consult with your building principal, with your superintendent, and possibly with your legal counsel about how to proceed.

**Other Free Speech Considerations**
In addition to the free speech exceptions, there are a few other free speech issues that may intersect with Title IX work.

The first is academic freedom. The Supreme Court held that academic freedom protects the right to decide on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study. In most instances, academic freedom is limited to scholars engaged in subject matter-related teaching, learning, and research.

When a Complainant alleges that speech or expression created a hostile environment, determining when speech or behavior moves beyond the bounds of academic freedom may be a primary consideration for Title IX Coordinators at public schools.

**Hate Speech**
There is no First Amendment prohibition against hate speech. However, it could constitute either disruption under Tinker or it could constitute harassment under certain circumstances. Like all free speech concerns, this may be a legal question that you should discuss with legal counsel.

**Regulating Hate Speech**
Schools' efforts to address hate speech must avoid raising First Amendment concerns. This is challenging to do but, speech or expression that crosses over into harassment, like sex- and gender-based harassment, can be regulated by policy. For example, while it may be difficult to punish a single use of a homophobic slur, repeated use may rise to the level of sex- and gender-based harassment and a hostile environment.

However, schools do not have to wait until expression becomes harassment to intervene. Although schools may not be able to punish a student for using a slur, schools can still use it as an educational opportunity to stop the behavior before it reaches the level of harassing conduct.

### Insights from an Expert: Regulating Expression
**Kim Pacelli, M.Ed, J.D.,** Partner, TNG & ATIXA Advisory Board Member



So, as Title IX Coordinators, I always want you to have these *Tinker* rules in the back of your brain because, as you are navigating reports that come in to you or grievance processes that you are overseeing that deal with speech issues, you're going to be wanting to consider whether or not you are in a space where this *Tinker* analysis might apply. And at bottom, the *Tinker* analysis says that the school should not be disciplining students for their speech unless that speech materially or substantially interferes with the operations of the school or infringes on the rights of other individuals. So taking that standard and applying it to the black armbands that the students wore in the actual *Tinker* case, they were just wearing black armbands. There wasn't a lot of particular disruption in the school setting. Therefore, that speech was permissible.

So as Title IX Coordinators, and I promise you, your colleagues who are building principals, superintendents, apply this *Tinker* standard probably almost every day, and in their regular practice are always thinking about expression, whether it's expression that students are coming to school in terms of the clothing that they're wearing or the messaging, I should say, that's on clothing that they're wearing or discourse that they are having with each other, either in sort of face-to-face interaction or in social media that is happening inside of the schools, that jurisdiction or messaging, electronically facilitated messaging that's happening. Is the speech having the effect of substantially interfering with the school's operation or substantially infringing on the rights of other individuals in the school setting? So just kind of keeping these broad concepts in the back of your mind as a Title IX Coordinator, you never need to be an expert in First Amendment law. But you are responsible for ensuring that the work of your area, the processes that you oversee, are not infringing on individuals of free speech and First Amendment rights. And so it's just important to have this baseline understanding

_____

**Case Studies: Jurisdiction Under Title IX**

**Case Study: Charles & Casey**
Review this case study involving Charles and Casey.

*Two high school students were discussing the upcoming state election for*
*governor after their government class explored the concepts of federalism and*

*voting rights. One student, Charles, argued that the incumbent governor, a woman, was not fit to hold office because her decisions had been weak, irrational, and emotional.*

*Charles argued that men have a natural predisposition to leadership based in evolution. Casey, the other student, told Charles he was ignorant and a chauvinist.*

*Casey made a report to your office, citing Charles's comments and saying she felt harassed and discriminated against.*

**Case Study: Is It a IX?**
Review this case study on determining jurisdiction under Title IX.

*A sexual assault occurred at a student's home over the weekend. By Monday morning, news of the assault had spread throughout the student body. By the time they arrived at school on Monday, other students had subjected the Complainant to harassing tweets and Snapchats.*

*Other students made verbal comments in the hallways, as well, like calling the Complainant a "slut" and asking if the Complainant was interested in recording a threesome for money. Recordings of the harassment appeared on social media, too, including an instance of another student grabbing the Complainant's buttocks and laughing after the Complainant ran off crying.*

**Insights from an Expert: Is It a IX?**
**Mikiba Morehead, M.A., Ed.D.,** Consultant, TNG



Case studies are a great way to take the information you've just learned and apply it to a set of facts. In this case study, we have a student who experienced sexual assault over the weekend outside of school but is now experiencing the effects of that assault during the school day. Standards established by the Supreme Court, and included in federal law, help us understand when Title IX applies. These standards tell us that Title IX applies, and jurisdiction is required when the school has cover over the respondent and control over the context of the harassment. In this case, we don't have information regarding the identity of the Respondent. Therefore, the school may not have control over the person responsible for the sexual assault. Additionally, we learn that the assault took place at the student's private home over the weekend. It did not occur on school property or during a school event. Therefore, the school doesn't have control over the context of the harassment, meaning the location or a situation in which the sexual assault took place. However, the case study continues into Monday, where the student is experiencing verbal harassment via social media, verbal harassment in the hallways of the school from other students, and physical harassment in the form of the instance where another student grabbed the student's butt in the hallways.

This situation is escalating. Think back to the required elements of Title IX jurisdiction and apply the facts of what is described as occurring on Monday. In light of Monday's facts, we see that the school now has

control over the Respondent, identified as the other students who are engaging in harassment towards the Complainant. And now the school has control over the context of the harassment. The behavior is taking place during school hours within hallways of school buildings, and, given that the harassment is also occurring over social media, the school's network is likely being used to facilitate sexual harassment online. The definition of sexual harassment covers in program effects of out of program misconduct even in situations where the misconduct itself is not covered. In this case, the Complainant is experiencing the effects of the out of program sexual assault in the form of harassment while at school, during the school day, when the Complainant is attempting to participate in an education program or activity. The Office of Civil Rights has established a fairly broad definition of what constitutes attempting to participate in an education program or activity. But the case study makes this idea much clearer. Here, the Complainant is attempting to attend school and engage in the learning environment.

However, the Complainant's ability to engage is being impacted by the harassment, as demonstrated by the Complainant running off crying after the incident of sexual harassment. In summary, a school may extend its jurisdiction under Title IX to address off-campus incidents when sufficient control is established, both over the harasser as well as the context in which the harassment is taking place, or when the off-campus conduct has an in-program effect that meets the federal definition of sexual harassment.

_____

### Dismissal of a Formal Complaint

**Mandatory Dismissal of Formal Complaints**
As part of your role, you'll need to evaluate each formal complaint and determine whether or not the alleged incident or conduct falls within Title IX jurisdiction. When it does not, the Title IX regulations require that the school or district formally dismiss the complaint.

Communicate this dismissal to all parties in writing. Although rare, parties are entitled to appeal any decision to dismiss a formal complaint using the appeal process outlined in your policy.

In situations where you dismiss a formal complaint, you'll likely address the conduct using a different school or district policy, such as a student or employee conduct policy.  Additionally, you should provide supportive measures to the parties.

**Discretionary Dismissal of Formal Complaints**
Following a jurisdictional assessment, you also have the discretion to dismiss a formal complaint, in addition to mandatory dismissal, if:
- The Complainant notifies you in writing that they'd like to withdraw the formal complaint or any allegations;
- The Respondent is no longer enrolled or employed by the school or district; or
- Specific circumstances prevent the school or district from gathering evidence sufficient to reach a determination. For example, if no parties are willing to participate in the process, you may consider dismissal.

**Notification of Dismissal**
When you dismiss a complaint, notify all parties in writing and permit them to appeal the decision.

In situations where the Respondent is not yet aware of the formal complaint, sending a letter of dismissal can cause confusion. As Title IX Coordinator, you might consider how best to communicate in those circumstances and be prepared to provide support, if needed.

**Not a IX?**
Remember, if you determine that Title IX jurisdiction is not present, you should still address the behavior through other policies and processes, such as a student or employee conduct process.

You should still consider how you can provide support and resources to the parties. There may be actions you can take outside of Title IX to address the behavior, mitigate problems, or resolve situations.

**Conclusion**
You've reached the end of Jurisdiction, Dismissal, and the First Amendment. After completing this section, you should now be able to:
- Explain the requirements for Title IX jurisdiction.
- Determine whether a formal complaint should be dismissed, and
- Identify intersections of the First Amendment and Title IX.

# Liz DeChellis
# Curriculum Vitae



VAN DERMYDEN MAKUS
Investigations Law Firm

# Liz DeChellis

*Partner & Director of Title IX Services*

Download VCard | Email

Liz DeChellis, AWI-CH, is a Partner with Van Dermyden Makus Law Corporation. Her practice focuses on conducting workplace investigations as well as Title IX investigations and hearings. She is available as an expert in evaluating Title IX and sexual harassment matters.

Liz serves as Van Dermyden Makus' Director of Title IX Services, overseeing all Title IX investigations and hearings. She also frequently conducts Title IX trainings as a faculty member of T9 Mastered.

Trained in Trauma Informed Forensic Interviewing, Liz is also an experienced investigator in Title IX sexual misconduct claims. Liz understands best practices in the Title IX arena, and the challenges facing schools and parties when sexual violence allegations surface. She has conducted investigations for K-12 Districts, as well as higher education institutions.

Liz is an expert in conducting Title IX Hearings. She has served as a Hearing Officer for multiple schools, applying a variety of policies and practices, and is familiar with both "new regulation" cases and cases falling outside the new regulations. In this role, Liz serves as the final adjudicator, completing the complaint and investigation process. She also serves as an Appeal Officer when students challenge the process, the outcome, and/or the sanction. Liz has overseen cases involving dating violence, drug abuse, sexual assault, and incapacitation. She has experience questioning parties using trauma-informed techniques, making admissibility and relevance decisions, and issuing well-reasoned, thorough decisions.

Liz is also an experienced workplace investigator, investigating allegations of harassment, discrimination, retaliation, and other types of misconduct. She conducts trainings for staff and management on a variety of legal issues, including sexual harassment and discrimination prevention, as well as how to conduct effective investigations. Additionally, Liz is a part-time faculty member for the Association of Workplace Investigators.

Liz graduated from McGeorge School of Law in 2012 and earned an undergraduate degree from UC Davis. She is licensed to practice law in the State of California, and is certified as a Senior Professional in Human Resources (SPHR).

## PROFESSIONAL INVOLVEMENT

- Juris Doctor, McGeorge School of Law, 2012
- Bachelor of Arts, History, University of California, Davis, 2004
- State Bar of California, Labor & Employment Section, Member
- T9 Mastered, Faculty
- National Association of College and University Attorneys (NACUA), Member
- NACUA Web Page Legal Resources Library Committee, Member
- Association of Workplace Investigators, Member
- AWI Accredited Certificate, AWI Institute
- Certified Senior Professional in Human Resources (SPHR), 2015
- Trained in Trauma Informed Forensic Interviewing
- Completed APSAC Advanced Forensic Interview Institute, December 2019
- Completed FETI Methodology Course, February 2020

## NOTABLE SPEECHES & PRESENTATIONS

- "Workplace Investigations: Mastering Credibility Assessments", Presenter – SHRM AZ Legislative Conference, Phoenix, AZ (February 28, 2025)

- "Navigating Neurodivergence in K-12 Investigations: Tips and Tools for Managing Title IX Matters Involving Neurodiversity", Presenter – Title IX Working Group Webinar (January 15, 2025)

- "Responding to Complaints: A Blueprint for Efficient, Effective, and Defensible Investigations" – CalGovHR Conference, Sonoma, CA (March 12, 2024)

- Panel 6: "K-12 and Higher Education" – Berkeley Center on Comparative Equality & Anti-Discrimination Law: New Developments in Gender Discrimination, Harassment, and Violence in Employment and Education (January 5, 2024)

- "Gathering Facts on Dating Violence, Partner Violence, and Stalking" – T9 Mastered (September 13, 2023)

- "The New Title IX Regulations: Navigating Staff, Faculty, and Student Complaints" – ACHRO Annual Conference (October 26, 2022)

- "Navigating the Workplace Sexual Assault Investigation from an Internal and External Perspective" – AWI Annual Conference (October 14, 2022)

- "Putting Facts Into Focus: Title IX Writing" – T9 Mastered (September 21, 2022)

- "Title IX Regulations: Managing the Changes" – T9 Mastered (March 31, 2022)

- "Hearing Officer Training" – T9 Mastered (January 18 to 21, 2022)

- "Consent: Gathering the Essential Facts" – T9 Mastered (November 9, 2011)

- "Using Trauma-Informed Techniques in Workplace Investigations" – AWI Journal, September 2021

- "New Title IX Regulations: What Changed?" – American Association of School Personnel Administrators (October 13, 2020)

- T9 Mastered's "Hearing Officer Training" (September 24-29, 2020)

- Webinar: "Elevating the Remote Investigation – Conducting an Effective Remote Interview" – Van Dermyden Maddux Law Corporation (July 9, 2020)

- Webinar: "Conducting Remote Hearings – Ensuring Consistency, Competence, and Compassion" – T9 Mastered (May 13, 2020)

- "Lessons Learned in The #MeToo Era" – HR West 2020 in Oakland, CA (March 10, 2020)

- "Lessons Learned in The MeToo Era" – 2019 CALPELRA Annual Training Conference in Monterey, CA (November 18-22, 2019)

- "Trauma-Informed" – What is it and why does it matter? – Association of Workplace Investigators Annual Conference in Marina Del Rey, CA (September 26-28, 2019)

- "Workplace Investigations – Mastering the Basics" – Next Concept HR Association, Sonoma Harvest in Vacaville, CA (September 18, 2019)

- T9 Mastered's "Essential 3-Day Training" – Pasadena, CA (November 13-15, 2018)

- T9 Mastered's "Essential 3-Day Training" – Seattle, WA (September 25-27, 2018)

- "Conducting Effective Sexual Harassment Investigations In The #MeToo Era." – Sacramento Employer Advisory Council Workshop at the Citrus Heights City Hall (April 18, 2018)

- "Workplace Investigations – Mastering the Basics" – Next Concept HR Association's HR Business Leader Regional Series (Solano/Yolo) (March 22, 2018)

- T9 Mastered's "Advanced 2-Day Training" – Westin Sacramento, CA (February 27-28, 2018)

- "Conducting Effective Investigations: Navigating The Difficult Witness" – CALPELRA's 42nd Annual Training Conference, in Monterey, CA (December 8, 2017)

- "Using Trauma-Informed Techniques in the Workplace" – Third National Workplace Bullying Coalition online conference (October 19, 2017)

- T9 Mastered UC Training for Campus Investigators – A three-day Title IX intensive training course in Newport Beach, CA (March 7-9, 2017)

- T9 Mastered CSU 3rd Annual Title IX/DHR Investigator Training – San Francisco State, San Francisco, CA (August 1-2, 2016)

## NOTABLE SPEECHES & PRESENTATIONS

- T9 Mastered Training for Campus Investigators – A three-day Title IX intensive training course in Orange, CA (June 14-16, 2016)
- T9 Mastered Training for Campus Investigators – A three-day Title IX intensive training course in Sacramento, CA (February 16-18, 2016)

## PUBLICATIONS

- "Using Trauma-Informed Techniques in workplace Investigations" AWI September 2021 Journal
- "New Federal Campus Sexual Harassment Rules Strive for Balance" EdSource.org, May 2020
- "New Regulations, New Policies, New Challenges and Opportunities" Van Dermyden Makus Blog Post, May 2020

# List Of Designated Expert Witness Cases
## For Liz DeChellis
### Van Dermyden Makus Law Corporation

| | Date Retained | Case Name/Venue | Attorney/Party | Status | Opinion(s) |
|---|---|---|---|---|---|
| 1 | 07/2024 | *SO v. Rescue Union School District*<br><br>Superior Court of California, County of Sacramento<br><br>Case No.: 223CV00406DJCAC | Spinelli, Donald & Nott/Def | Designated | Retained on behalf of defendant to review the adequacy and effectiveness of Defendant's responses to complaint of sexual harassment. |
| 2 | 11/2021 | *Doe v. Berkeley Unified School District*<br><br>United States District Court, Northern District<br><br>Case No.: 3:20-cv-08842-WHA | Spinelli, Donald & Nott/Def | Designated | Retained on behalf of defendant to review the adequacy and effectiveness of Defendant's responses to complaints of sexual harassment. |
| 3 | 07/2021 | *Jay Brome v. California Highway Patrol*<br><br>Solano Superior Court<br><br>No. FCS047706 | Rosen, Bien, Galvan & Grunfeld/Plf | Retained | Retained on behalf of defendant to review the adequacy and effectiveness of Defendant's responses to complaints of sexual harassment. |

Liz DeChellis
Van Dermyden Makus Law Corporation
Expert Witness Fees

| Task | Amount |
|------|--------|
| **Preparation.**  All expert witness preparation services, including but not limited to, evaluation of documents, preparation for testimony, preparation of reports, evaluation of documents, meetings, conferences, travel time and other services necessary to render an opinion. | $525 per hour |
| **Testimony.**  Deposition and trial testimony. | $600 per hour |
| **Non-refundable retainer.**  In order to commence work on this matter, we require an advance retainer payment.  This sum will be deposited in a client trust account maintained for these purposes in accordance with State Bar rules. The payment is non-refundable after the designation is made and an expert disclosure is served on the opposing party, regardless of the amount of work performed.  The advance payment will be applied against any final invoices of fees and costs. | $2,500 |
| Consultant shall be reimbursed by the Client as follows: mileage at the federal standard mileage rate in effect for the year; expenses for photocopies at $0.10 per copy, and actual costs of reproduction of documents and photographs, transcription, preparation of exhibits, mail, courier services and other reasonable expenditures at market rates; other reasonable expenses, as agreed upon, at actual cost, including travel, dining and other necessary costs related to Consultant's work. | |



# SUPPLEMENT TO EXPERT WITNESS REPORT

Pursuant to Federal Rules of Civil Procedure, Rule 26
Prepared for Bertrand, Fox, Elliot, Osman & Wenzel
Regarding *Colombo v. Palo Alto Unified School District*
Case No. 5:24-cv-909-NC
October 6, 2025

SUPPLEMENT TO EXPERT REPORT | *COLOMBO VS. PALO ALTO UNIFIED SCHOOL DISTRICT*

## TABLE OF CONTENTS

I.    Rebuttal Information.................................................................................................................. 1

    A.    Rebuttal to Schuster's Opinion: The 2020 Title IX regulations were required to be applied to the report made by the former student's husband. ................................................................ 1

    B.    Rebuttal to Schuster's Opinion: A Title IX Coordinator can sign a formal complaint for a Complainant who is not participating in or attempting to participate in a district program or activity and this makes the Complainant participating in or attempting to participate in the District's education program or activity for purposes of the jurisdictional analysis. ......... 1

    C.    Rebuttal to Schuster's Opinion: The District "retaliated" against Plaintiff by failing to use its Title IX process to resolve the sexual assault allegations against Plaintiff. ............................... 2

    D.    Rebuttal to Schuster's Opinion: The District failed to adhere to industry standard practices when it did not follow its published policies and procedures and failed to provide the Plaintiff notice or an opportunity to be heard. ............................................................................................... 3

    E.    Rebuttal to Whittemore's Opinion: The 2020 Title IX regulations were applicable to the report made by the former student's husband. ........................................................................... 3

    F.    Rebuttal to Alifano's Opinion: The 2020 Title IX regulations were applicable to the report made by the former student's husband. ........................................................................................ 4

II.    Conclusion ................................................................................................................................ 4

## I.    Rebuttal Information

This report supplements my Expert Witness Report (Report) dated September 24, 2025 and is provided in rebuttal to Plaintiff's Expert Witness Disclosures dated September 24, 2025.[1]

**A.    Rebuttal to Schuster's Opinion: The 2020 Title IX regulations were required to be applied to the report made by the former student's husband.**

As explored fully in my Report, I disagree that the 2020 Title IX regulations were applicable to this matter and instead assert that express guidance from the Department of Education made it clear that the regulations were not retroactive and that instead, Districts should process pre-August 14, 2020 reports using the guidance in place at the time of the alleged conduct.

**B.    Rebuttal to Schuster's Opinion: A Title IX Coordinator can sign a formal complaint for a Complainant who is not participating in or attempting to participate in a district program or activity and this makes the Complainant participating in or attempting to participate in the District's education program or activity for purposes of the jurisdictional analysis.**

In her opinion for the Plaintiff, Schuster wrote, "in certain situations with safety concerns present, the Title IX Coordinator may choose to sign a formal complaint for a Complainant that is not P/ATP[2]. The Title IX Coordinator signing a formal complaint effectively makes the Complainant P/ATP for the purposes of the jurisdictional analysis."

Schuster later argued, "The Title IX Coordinator has authority to initiate a formal complaint and may sign a formal complaint on behalf of the Complainant even if a Complainant does not wish to move forward with an investigation or if the Complainant is not participating or attempting to participate in the education program or activity at the time of the formal complaint." Schuster cited 34 C.F.R. §106.30 as guidance for this opinion.

However, 34 C.F.R. §106.30, defines "formal complaint" as follows (typed verbatim, emphasis added):

> Formal complaint means a document filed by a complainant or signed by the Title IX Coordinator alleging sexual harassment against a respondent and requesting that the recipient investigate the allegation of sexual harassment. **At the time of filing a formal complaint, a complainant must be participating in or attempting to participate in the education program or activity of the recipient with which the formal complaint is filed**. A formal complaint may be filed with the Title IX Coordinator in person, by mail, or by electronic mail, by using the contact information required to be listed for the Title IX Coordinator under § 106.8(a), and by any additional method designated by the recipient. As used in this paragraph, the phrase "document filed by a complainant" means a document or electronic submission (such as by electronic mail or through an online portal provided for this purpose by the recipient) that contains the complainant's physical or digital signature, or otherwise indicates that the complainant is the person filing the formal complaint. **Where the Title IX Coordinator signs a formal complaint, the Title IX Coordinator is not a complainant or otherwise a party under this part or under §**

---

[1] Plaintiff's filing states "October 24, 2025," but as that date has not yet occurred, I assumed the date of filing was the date of the expert disclosure deadline, which was September 24, 2025.

[2] Participating in or attempting to participate in a District education program or activity.

> **106.45, and must comply with the requirements of this part, including §**
> **106.45(b)(1)(iii).**

It is unclear where in the cited regulations, or industry standards, a complaining individual does not have to be participating in, or attempting to participate in, a District education program or activity, regardless of who signs the formal complaint. Accordingly, I affirm my original position that the 2020 Title IX regulations were not applicable to this matter.

### C. Rebuttal to Schuster's Opinion: The District "retaliated" against Plaintiff by failing to use its Title IX process to resolve the sexual assault allegations against Plaintiff.

In her opinion for the Plaintiff, Schuster argued that essentially because the former student was offered a formal complaint option and because some District employees thought the report should be handled under Title IX, the failure of the District to in fact process the report under Title IX amounts to "retaliation."

First, please see my rebuttal opinion in I.A., above, as to the applicability of the 2020 Title IX regulations.

Second, whether District administrators, at any point in the processing of a report, considered the possible application of Title IX to said report, does not dictate whether the 2020 Title IX regulation's grievance process is definitively applicable to any matter. Individuals may consider and review a variety of complaint options when they receive a report; none of this requires a matter to be processed under a certain grievance procedure unless certain requirements are met. As explored in my Report and above, the Title IX grievance procedures threshold was not met in this matter.

Further, as ATIXA notes in one of their blogs, the Title IX Coordinator should be repeatedly assessing jurisdiction to ensure a matter is being properly processed under the correct regulations or guidance. In a June 6, 2022 blog post by Dan Fotoples, he writes (typed verbatim):

> the Title IX Coordinator, as the process yields more information, may need to continually assess jurisdiction. If new information indicates that the school does not have jurisdiction, the Title IX Coordinator is required to dismiss the complaint at that time, subject to appeal rights required by the regulations.[3]

This supports that the jurisdictional analysis is ongoing, and just because one individual might initially believe a report belongs under one grievance process, no District is precluded from processing a report under a different grievance process.

Notably, as explored more fully in my Report, using 2020 procedures is not in line with Department of Education guidance on the non-retroactive application of the 2020 regulations. The non-retroactive guidance applies to the process/procedures as well as the definitions (it applies to the entire Rule).

All of the arguments made by Plaintiff relate to failure to follow the specific procedures outlined in the 2020 regulations or adopted via the District's 2017 OCR agreement (which closed on November 10, 2020) or contained within the unadopted 2018 MOU are predicated on the case falling under the jurisdiction of Title IX regulations, which in my expert opinion are not applicable to this matter.

---

[3] See website.

**D.** **Rebuttal to Schuster's Opinion: The District failed to adhere to industry standard practices when it did not follow its published policies and procedures and failed to provide the Plaintiff notice or an opportunity to be heard.**

In her opinion for the Plaintiff, Schuster argued, "even if we assume that Title IX was not in play, the District did not use any sort of discernable published policy or process to resolve the allegations against the Plaintiff, which is against industry standards." Schuster cited the Plaintiff receiving no "formal notice" of the allegations until January 16, 2024.

However, this fails to account for the fact that on January 31, 2022, Plaintiff met with Hickey in-person and brought a copy of the message sent to his wife on LinkedIn. He denied the allegations and Hickey told him the District would need to conduct an investigation.

This affirms Plaintiff was provided with the information regarding the nature of the allegations, the alleged time of the conduct, the location of the alleged incident, and discussed this information with Hickey on January 31, 2022. Plaintiff had the same information regarding the allegations as the District and was then placed on paid leave.

When Plaintiff was criminally charged on June 15, 2022, he was placed on unpaid leave. This again supports Plaintiff had notice of the nature and facts of the allegations that resulted in the actions taken by the District.

Plaintiff then received written notice on May 24, 2023 of the administrative investigation, after the criminal investigation concluded and charges dropped. As noted in my Report, although the timing of this notice was not ideal or perfect, he was still provided notice.

Further, the scope of the investigation was confirmed in January 2024, and it aligned with the original allegations presented to Plaintiff in January 2022.

Finally, the District hired a third-party investigator who contacted witnesses, conducted interviews, reviewed documents, and wrote an investigation report with findings. This was a discernable process in line with industry standards.

Accordingly, I do not identify how the District's process interfered with or encumbered Plaintiff's awareness of the allegations nor his ability to respond to said allegations. I further note the administrative investigator did not sustain the allegations, which furthers the argument that Plaintiff was afforded the opportunity to review and respond to the allegations to an unbiased investigator who evaluated the evidence fairly and appropriately using the preponderance of the evidence standard.

**E.** **Rebuttal to Whittemore's Opinion: The 2020 Title IX regulations were applicable to the report made by the former student's husband.**

In his expert opinion, Whittemore asserts, "PAUSD's history with the Department of Education Office of Civil Rights (OCR) necessitates strict adherence to their administrative policies, particularly those concerning Title IX. My review indicates that PAUSD failed to immediately follow its own regulations upon receiving allegations against Mr. Colombo."

As explored fully in my Report, I disagree that the 2020 Title IX regulations and associated District Administrative Regulations were applicable to this matter and instead assert that express guidance from the Department of Education made it clear that the regulations were not retroactive and that instead,

Districts should process pre-August 14, 2020 reports using the guidance in place at the time of the alleged conduct.

    **F.** **Rebuttal to Alifano's Opinion: The 2020 Title IX regulations were applicable to the report made by the former student's husband.**

In his expert opinion, Alifano writes, "it is my professional opinion that the investigations were deficient in multiple respects, unreasonably delayed, and failed to meet the standards required to ensure a fair process under both Title IX and law enforcement best practices."

As explored fully in my Report, I disagree that the 2020 Title IX regulations were applicable to this matter and instead assert that express guidance from the Department of Education made it clear that the regulations were not retroactive and that instead, Districts should process pre-August 14, 2020 reports using the guidance in place at the time of the alleged conduct.

## II.  Conclusion

This concludes the Supplement to the Report.

<div align="center">♦♦♦  ♦♦♦  ♦♦♦  ♦♦♦</div>

Respectfully Submitted,


*Liz DeChellis*


Liz DeChellis

ATTACHMENT 1D

ATTACHMENT 1D



## REPORT OF DEFENDANTS' POLICE PRACTICE EXPERT
## Federal Rule 26(a)(2)(B)

Howard A. Jordan, Chief of Police (Ret)
MPA, FBINA, SMIP[1]
POLICE PRACTICE EXPERT

Case No. 5:24-cv-00909-NC

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

PETER COLOMBO,

Plaintiffs,

v.

PALO ALTO UNIFIED SCHOOL DISTRICT,
et al.,

Defendants

---

[1] *See* Exhibit A, CV of Howard A. Jordan.



## TABLE OF CONTENTS

I.      BACKGROUND ....................................................................................................1

II.     QUALIFICATIONS – POLICE PRACTICE AND PROCEDURES EXPERT ................1

III.    MY ARRANGEMENT WITH DEFENDANTS...................................................2

IV.     DOCUMENTS REVIEWED (THUS FAR).......................................................3

V.      BRIEF RELEVANT  OVERVIEW OF THE INCIDENT .................................3

VI.     REBUTTAL OPINIONS .................................................................................4

EXHIBIT A................................................................................................................7

EXHIBIT B...............................................................................................................11

EXHIBIT C...............................................................................................................13



## I.    BACKGROUND

My name is Howard A. Jordan, and I have been engaged to submit this report at the request of the Palo Alto Unified School District ("Defendant") Case No. 5:24-cv-00909-NC pending in the United States District Court for the Northern District of California, who is being sued for damages by the Plaintiff listed on the cover page of this report.

## II.    QUALIFICATIONS – POLICE PRACTICE AND PROCEDURES EXPERT

a)  My areas of expertise, based on relevant education, training and experience, include, but are not limited to, police administration, patrol procedures, critical incident management, use of force, criminal investigations, internal affairs investigations, risk management, care custody and control of inmates, training and police practices and procedures. I served in a wide range of assignments as an officer, sergeant, lieutenant, captain, deputy chief, assistant chief and chief, including, but not limited to, Patrol, Criminal Investigations, Special Operations Division, SWAT, Training, Bureau of Services, Internal Affairs Division and Office of Chief of Police.

b)  As one of many collateral assignments between 1995-1999, I served as a Booking Officer for the City's jail.  While serving as the Administrative Captain for the Bureau of Services, I was responsible for overseeing the day-to-day operations of the Jail Division.

c)  The City of Oakland encompasses over 78 square miles with a population of over 413,000.

d)  The Oakland Police Department had over 700 sworn police officers and over 350 civilian employees during my employment with the department (1988-2013). I have extensive experience conducting internal administrative investigations on a wide range of issues, including use of force, officer misconduct, and criminal investigations. I have experience as an expert on matters involving police investigative procedures, misconduct, corruption, promotions, search and seizure, and use of force incidents.

e)  In my capacity as a Supervisor, Command Officer, and Chief of Police of the Oakland Police Department, I have made disciplinary determinations in approximately over 150 disciplinary cases, including those cases that have resulted in suspensions, demotions, and terminations.

f)  In my capacity as a Command Officer, I have served as the Incident Commander during critical incidents.

g)  As a Chief of Police for the Oakland Police Department, I reviewed and approved numerous administrative investigations related to whether officers performed their duties pursuant to proper policies and department procedures.

h)  While serving as a Chief of Police and later a Consultant, I have been retained in approximately 30 civil and police arbitration cases as an expert witness for both plaintiff and defense, involving allegations of improper uses of force by police officers in California, New York, North Carolina, and Florida.

i)  I have experience conducting both criminal investigations and administrative investigations.

j)  I have extensive experience in collaborating with both criminal investigators and administrative investigators.

k)  I served as the Officer in Charge (OIC) of the Oakland Police School Unit from 2001-2004.

l)  In 2016, I was hired by the City of Sunnyvale, California to review the City's Police Department's Internal Affairs procedures.

m)  In 2016/17, I was part of a team of Police Practice and Procedures Experts that assessed the Madison, Wisconsin Police Department. I was tasked with reviewing the Department's Internal Affairs procedures.

n)  In January 2020, I was part of a team of experts that was retained by the Santa Clara County Board of Supervisors to oversee reforms, including Use of Force, in the Santa Clara County Sheriff's Office.

o)  I am a current Adjunct Faculty member in the Administration of Justice Department at Diablo Valley College in Pleasant Hill, California, where I have taught Introduction to Administration of Justice for over ten years.

p)  I am a graduate of the Police Executive Research Form Senior Management in Policing (SMIP) training course (2007).

## III.    MY ARRANGEMENT WITH DEFENDANTS

a)  The Defendant engaged my services, through counsel, to review the report prepared by Plaintiff's Expert Witness, Mr. Mark C. Alifano, and to provide an expert opinion concerning certain aspects of his conclusions.

b)  My compensation is not dependent on the outcome of this litigation. I am being compensated at a rate of $375.00 per hour for expert witness work. I am being

compensated at a rate of $450.00 per hour for court proceedings and for deposition testimony.

c) I have been found qualified as an expert in use of force/police practices and procedures in federal and state courts and arbitration proceedings. I have been deposed as an expert in use of force and other police related matters.

d) I have never been rejected as an expert in any court proceedings or arbitrations.

e) This report is based on materials provided to me by Defense's counsel. Should any subsequent information cause me to expand upon or revise any of my opinions, I will supplement this report.

f) My opinions were made within a reasonable degree of certainty, based on the materials that were available to me at the time, and based on my experience and expertise in police practices and procedures.

## IV.    DOCUMENTS REVIEWED (THUS FAR)

1. Report of Plaintiff's expert- Mark C. Alifano

2. Declaration of Trent Bahadursingh-

3. Exhibits A-O

## V.    BRIEF RELEVANT OVERVIEW OF THE INCIDENT[2]

_Involved persons include:_

• Defendant- Palo Alto Unified School District("District")

• Plaintiff- Peter Colombo("Colombo")

• On January 28, 2022, the District received an email from the husband of a former female District student alleging that Colombo, who was a coach and teacher within the District, had raped the student in the locker room of Greene Middle School during the 2001-2002 school year. Colombo was subsequently placed on paid administrative leave on January 31, 2022, pending the outcome of the investigation.

• The District immediately notified the Palo Alto Police Department ("PD") regarding this incident.

---

[2] Taken from Trent Bahadursingh declaration

- On June 15, 2022, after an independent investigation conducted by the Palo Alto Police Department and the Santa Clara County District Attorney's Office, Colombo was taken into custody, formally charged with felony aggravated sexual assault of a child, and booked at the Santa Clara County Main Jail.

- On or about April of 2023, the Santa Clara District Attorney notified Colombo that the charges against him were being dismissed.

- The 2022-2023 academic school year ended on June 1, 2023.

- The 2023-2024 academic year commenced on August 9, 2024. Following the conclusion of its summer recess, the District initiated an independent personnel investigation regarding the allegations of rape against Colombo.

- On May 26, 2024, the District notified Colombo that the administrative investigation had been completed, and the allegations were unsubstantiated due to insufficient evidence. (***Exhibit M***)

## VI.    REBUTTAL OPINIONS

*Plaintiff's expert, Mr. Mark Alifano ("Alifano") wrote in his report the following:*

No documentation exists supporting a delay request from PAPD; best practices allowed for only 10 to 14 days for law enforcement priority. Yet the district delayed nearly 2.5 years.(OCR Resolution Agreement, Exhibit 2). ***Alifano report, pg. 2, Timeline and Investigation Failure.***

In my view, Alifano's claim is unfounded and does not align with contemporary police procedures for concurrent investigations. My opinion is informed by over thirty years of experience in both criminal and administrative cases, as well as my current involvement in three ongoing concurrent investigations.

When criminal and administrative investigations are conducted concurrently, priority should be given to criminal investigation for the following reasons:

- Criminal investigators retain the initial opportunity to interview witnesses and examine evidence.

- Administrative investigators risk undermining an ongoing criminal investigation if they interview witnesses, speak with complainants, or collect evidence while the criminal investigation is still in progress.

4



- Information obtained through the criminal investigation may be disclosed to administrative investigators; however, administrative investigators shall not share any information acquired from their independent administrative inquiry with criminal investigators.

The investigation commenced only after the completion of criminal proceedings involving Colombo, ensuring that it did not interfere with any simultaneous, independent law enforcement investigations or with Colombo's legal process. This approach aligned with the District's consistent conduct throughout the duration of the criminal proceedings, during which the District made continuous efforts to refrain from actions that might disrupt or compromise any law enforcement proceedings or investigations. This statement is corroborated by Mr. Bahadursingh declaration ***(pg.4, 9-18)***.

*A review of Exhibit L revealed the following:*

On July 5, 2022, Mr. Bahadursingh sent an email to Detective Clausen at the Palo Alto PD informing her that the District had received a public records request to provide documents to Colombo and seeking her advice on how to proceed.

On July 6, Detective Clausen reported that she had consulted with the District Attorney's Office, which recommended that the District not release the documents requested by the media. The District adhered to this guidance. This case illustrates the collaborative efforts between the District and PAPD throughout the duration of the investigation.

It is my further opinion that it was reasonable for the district to await the conclusion of the criminal investigation before commencing with their administrative investigation.

*Plaintiff's expert, Mr. Mark Alifano ("Alifano") wrote in his report the following:*

District leaders (Hickey, Vishakan, Bahadursingh) failed to provide witness information to investigators.

Based on my extensive law enforcement experience, I believe that the responsibility for providing witness information to investigators did not rest with the District. Rather, it was the duty of PAPD investigators to supply the District with a witness list and request their assistance in locating the identified witnesses.

An examination of ***Exhibit E*** indicated that the District collaborated with PAPD by providing witness information upon their request.

Based on my experience as the Officer in Charge for the Oakland Police School Unit and as an Investigator, I strongly preferred that the District refrain from submitting evidence or documents unsolicited during concurrent investigations. Rather, evidence or documents should be provided only upon request by investigators.

Finally, Alifano did not specifically reference any information or evidence that the District failed to provide to the PAPD. As indicated in Mr. Bahadursingh's declaration, the District responded to the PAPD's inquiry regarding the alleged victim. (pg. *2, 14-19*). Further, although Alifano references portions of the accuser's "grade report," as indicated in Mr. Bahadursingh's declaration, the District was unable to locate that documentation.

I am prepared to testify at trial if called upon to do so. I also reserved the right to amend and supplement my opinions based on any other subsequent expert reports disclosed.

October 6, 2025

Howard Jordan
Police Practice and Procedure Expert
Jordan Consulting and Investigations



**EXHIBIT A**

**Curriculum Vitae**
**Howard A. Jordan**
**Use of Force/ Police Practice Expert**
**2025**

**Business**
P.O. Box 23646
Pleasant Hill, Ca
Cell: (925) 765-4256
Fax: (925) 210-1196
Email: howard@jordanci.com
LinkedIn Profile:www.linkedin.com/in/howardjordan1

**Objective:**
- Police Chief - City of Oakland (Retired)
- Police Practice Expert
- California License Private Investigator
- Adjunct Professor - Administration of Justice

**Education:**
- M.A, Public Administration - Cal State - Hayward
  *Concentration: Public Policy Development*
- B.A, Liberal Studies - Columbia College - Missouri
  *Concentration: General Studies*

**Relevant Academic Courses in the Administration of Justice field:**
- Public Policy Implementation          PUAD-6802      2006
- Public Policy Topics                  PUAD-6808      2005
- Public Administration Society         PUAD-4800      2003
- Police                                CJAD-311       2002
- Laws of Evidence                      CJAD-405       2002
- Criminal Justice Elective             CJAD-144       2002
- Oakland Police Academy                               1988
- Intro to Administration of Justice    CJAD-101       1986
- Criminal Law                          CJAD-301       1986
- Criminal Investigation                CJAD-201       1984
- Legal Aspects of Law Enforcement      CJAD-144       1984

**Experience:**

- Investigator/Consultant - Sloan Sakai, LLP - Emeryville, CA - 2013-Present
- Senior Policy and Procedures Advisor- Pacific Gas and Electric- 2022-Present
- Internal Affairs/Use of Force Investigator - Alameda County Probation Department - 2016-2024
- Police Practice and Procedure Consultant - City of San Bruno - Safe and Equitable police project - 2022
- Officer-Involved Shooting - Daly City, CA - Lead Investigator and Use of Force Expert - 2021.
- Management Consultant - City of Vallejo - 2019-2020
- Police Practice and Procedure Consultant - Santa Clara Stadium Authority Police Deployment audit - 2018
- Auditor for the City of Rohnert Park Department of Public Safety - 2018/19
- Internal Affairs Investigator - Rohnert Park Department of Public Safety Marijuana Interdiction Team - 2018/19
- Police Practice and Procedure Consultant - Madison WI Police Department - 2017
- Lead Investigator - In-Custody Death, Santa Clara County Sheriff's Office - 2016
- City of Sacramento - Crisis Management consultant - 2016
- Law Enforcement Analyst for CBS Local (KPIX) - 2016-present
- Internal Affairs Auditor- the City of Sunnyvale - Department of Public Safety - 2016
- Police Chief 2011-2013 City of Oakland, CA
- Labor-Management Liaison - Oakland Police Department - 2005-2008
- California License Private Investigator - Internal Affairs Investigations - 2013-present
- Various supervisory and management ranks - Oakland, CA - 1988-2011
- California POST Certified Baton Instructor - Oakland Police Academy - 1992-2000

**Presentations:**

- Howard Jordan (May 2023) - California Lawyers Association - Law Enforcement Practices and Liabilities Conference - Race and Policing, Mental Health, Altered States, and Policing - San Diego, CA.
- Howard Jordan (October 2022) - Basic Internal Affairs Investigations - Oak Park, IL Police Department
- Howard Jordan (November 2021) - The Battle Over Qualified Immunity - California Public Employees Labor Relations Association (CALPELRA), Monterey, CA
- Howard Jordan (2019) - All You Need to Know About SB1421 - California Police Transparency Law - CALPELRA, Monterey, CA
- Howard Jordan (2019) – All You Need to Know About SB1421 - California Police Transparency Law - League of California Cities Annual Conference, Long Beach California (City Attorney's Track).

- Howard Jordan (2018) - Responding to active shooter incidents - Richmond, CA.
- Howard Jordan (2017) - Understanding SB54 - California Sanctuary City Laws.
- Howard Jordan (2017) - Police and Fire hiring process - Background Investigations - City of Oakland Fire Department, Oakland, California.
- Howard Jordan (2017) - Policing in the 21st Century - Sons in Retirement, Concord, California.
- Howard Jordan (2016) - Responding to Workplace Violence/active shooters-CAL PERS Sacramento, CA.
- Howard Jordan (2016) – Responding to a School Active Shooter incident-Oakland/Richmond, CA Charter schools.
- Howard Jordan (2016) - Effective Crisis Management for elected/appointed officials-League of California Cities Annual Conference, Long Beach California.
- Howard Jordan (2016) - Managing a Police Department during crisis- Presented at the University of California - Berkeley, Goldman School of Public Policy- Public Policy Development, Berkeley, CA.
- Howard Jordan (2015) - Know Your Rights- Police and Community Engagement workshop hosted by the Bay Area Black Prosecutors- Richmond, CA.
- Howard Jordan (2014) - Managing a Police Department during crisis- Presented at the University of California, Berkeley- Goldman School for Public Policy- Public Policy Development, Berkeley, CA.
- Howard Jordan (2012) - Crowd Management and Occupy Oakland- Presented at the Police Executive Research Forum, Symposium on Crowd Management- Washington DC.
- Howard Jordan (2010) - Lessons learned from the death of four Oakland Police Officers on Mar 21, 2009. Presented at the California Police Chief's Association. Annual Conference- San Jose, Ca. Texas Law Enforcement Agencies annual training, FBI National Academy Annual Conference, Alexandria, VA Police Department, Roll Call training - 2010.

**Certificates:**
- Peace Officers Standards and Training- Background Investigations - 2022
- Peace Officers Standards and Training- Executive Development Certificate - 2012
- Peace Officers Standards and Training- Management Certificate - 2008
- Police Executive Research Forum-Senior Management in Policing Training Certificate - 2007
- Peace Officers Standards and Training- Supervisory Certificate - 2000
- FBI National Academy Certificate - Class 219 - 2004

**Professional Organizations**
- California Police Chiefs Association - Retired member
- Association of Workplace Investigators

- California Association of Law Enforcement Background Investigators

**Skills and Qualifications**
- California License Private Investigator - PI28475-2013 to Present
- Microsoft Office - Word, Excel, PowerPoint



## EXHIBIT B

### Expert Witness

My Law Enforcement career spans over 25 years of experience with the Oakland, California Police Department. I served as the Police Chief for the City of Oakland during the final 2 years of active service (2011-2013).

Over the past four years, I have provided expert testimony on Police Practice and Procedures in a number of court cases, as detailed below:

1) Gilliland v. City of Pleasanton, CA- Superior Court of California, County of Alameda, Case No. RG18924833

2) People v. Thorson (Criminal Defense Expert) Santa Clara Superior Court Case No. B1902661-

3) Audrey v. City of Lafayette, CA- United States District Court-Northern District of California, - Civil Action No: 3:21-cv-03545- WHO

4) Wilson v. Bay Area Rapid Transit District (BART) Superior Court of California, County of Alameda, Case No. RG19014736

5) Banks/Washington v. City of Raleigh-(Plaintiff's Expert) United States District Court - Eastern District of North Carolina-.

6) O'Neil v City of Springfield, MA (Plaintiff's Expert) United States District Court-District of Massachusetts- Civil Action No. 3:20-cv-30035-MGM

7) Adamako v. City of Fremont, CA- United States District Court- Northern District of California- Case No. 17-cv-06386-DMR

8) Sandoval v. City and County of San Francisco, CA-United States District Court- Northern District of California No. 3:21-cv-05920- RS

9) Dyer v City and County of San Francisco, CA- United States District Court -Northern District of California- Case No. 3:21-cv- 05920- RS

10) Mondragon v. City of Fremont, CA- United States District Court- Northern District of California- Case No. 5:18-cv- 01605 NC

11) Molina v. City of Napa, CA- United States District Court -Northern District of California- Case No. 3:19-cv-06898 VC

12) Craven v Town of Mooresville, NC (Plaintiff's Expert)- United States District Court-Western District of North Carolina- Civil Action No. 5:21-cv-174 WDNC

11

13) Green v BART- United States District Court- Northern District of California- Civil Action No. 4:21-cv- 00113-DMR

14) Guidel v City of San Leandro. CA- United States District Court- Northern District of California- Civil Action. 4:21-CV- 00379- KAW

15) NYPD- Citizens Complaint Review Board v. Police Officers Thompson  and Davis (CCRB's expert)

16) Galindo v City and County of San Francisco- United States District Court Northern District of California -Civil Action No. 3:21-cv- 08133-JSC

17) Expert witness in Police Use of Force – City of Oakland, CA – 2014-2015

18) Alameda County Sheriff's Office v. Deputy Ramsey Jackson- Administrative   Hearing (ACSO Use of Force Expert)

19) Alameda County Sheriff's Office v Deputy Paul Wieber- Administrative Hearing (ACSO Use of Force Expert)

20) Nakia v. Porter, et al, v County of Solano, et al, CA- Unted States District- Eastern District of California- Case No. 2:21-cv-01473-KJM-JDP

21) Moody v City of San Leandro- United States District Court Northern District of California- Civil Action. 3.23-cv-01621-TSH

22) Schqueilla Lefort v. San Leandro, et al. United States District Court- Northern District of California- Case 4:24-cv-00661- KAW

23) R.P. v CCSF- United States District Court- Northern District of California- Case No. 3:24-cv-00522-LJC

**EXHIBIT C**

**Fee Schedule**

Document review and report preparation **- $375.00 per hour**

**Court Testimony**

HALF DAY (morning or afternoon session): minimum of 4 hrs. X $450 = $1,800.00

FULL DAY (morning session and any portion of the afternoon session): $3,600.00

**Deposition/Arbitration Testimony**

HALF DAY (morning or afternoon session): 4 hrs. X $350 = $1,800.00

FULL DAY (morning session and any portion of the afternoon session): $3,600.00

13

# FORENSIC PSYCHIATRIC ASSOCIATES, LP

## fpamed

---

## EXPERT RETENTION AGREEMENT

*Updated 5/28/2025*

This Agreement, effective as of the latest date signed below, is between **FORENSIC PSYCHIATRIC ASSOCIATES, LP**, doing business as **FPAMED**, and its psychiatrists, psychologists and legal professionals (hereinafter referred to as "fpamed," "fpamed Expert" or "Expert") and the undersigned attorney, law firm, governmental agency or private corporation (hereinafter referred to as "Client"), which is **_not_** the Examinee, Plaintiff/Petitioner, Defendant/Respondent, or insurance company in the underlying legal matter, evaluation, or claim.

Client retains fpamed Expert(s) for assistance in the legal matter, evaluation, or claim as described in **Addendum A**, attached hereto, to provide expert forensic psychiatric and psychological consultative services. Mark I. Levy, MD, DLFAPA serves as the Medical Director of fpamed and Charles Saldanha, MD, DFAPA is the Assistant Medical Director of fpamed. All others are independent contractors to fpamed, and they provide expert consultative services to the clients of fpamed.

1   **RETENTION**. Expert(s) will commence work for Client upon fpamed being fully retained. Full retention is accomplished upon fpamed's receipt of (a) an initial retainer fee(s) and (b) a fully executed Expert Retention Agreement signed by Client and fpamed.

    1.1   The initial retainer funds shall be in an amount according to the Rate Sheet, attached hereto as **Addendum B**. When retaining more than one Expert, initial retainer funds must be received for each Experts.

    1.2   Until fully retained, fpamed has no duties to Client. Further, any fpamed Expert(s) shall not be disclosed as an expert in any litigation matter until fpamed is fully retained.

    1.3   Fpamed and Client agree that retention of any fpamed Expert and his or her services is not construed as the practice of medicine, and therefore, no treatment will be provided and no doctor-patient relationship is created between any Examinee and an fpamed Expert.

2   **EXPERT SERVICES**. Expert services include but are not limited to:

    2.1   <u>Document Review</u>. Expert shall review all files, documents, pleadings, medical records, raw data, depositions, and other materials submitted for review, whether written or audio/video recordings.

    2.2   <u>Forensic Psychiatric and/or Psychological Evaluation, or Fitness-for-Duty Evaluation. Independent Medical Exam ("IME") or Fitness-for-Duty Exam ("FFDE")</u>. At the request of Client, Expert shall conduct a Forensic Psychiatric and/ or Psychological Evaluation, or a Fitness for Duty Evaluation ("Evaluation") at a mutually agreeable location or via videoconference.

2.2.1 <u>Psychological Testing</u>. As part of an Evaluation, it is the general practice of fpamed to have Examinees assessed by a forensic psychologist or neuropsychologist utilizing psychological test instruments accepted by the courts and compliant with the law. fpamed will utilize only a qualified clinical psychologist or neuropsychologist to administer and interpret psychological tests, and the psychologists retained will be forensic psychologists who are independent contractors to fpamed. In the unlikely event that no forensic psychologist or neuropsychologist is available within fpamed, outside forensic psychological consultation will be sought by fpamed.

2.3 <u>Expert Opinions & Conclusions</u>. Expert shall render opinions based upon all evidence presented to Expert for review, Expert's training and experience, as well as current medical science. Therefore, Client understands that it is possible that the opinions and conclusions offered may not be supportive of one or more claims or theories espoused by Client.

2.4 <u>Report Preparation</u>. Expert shall render opinions and conclusions via report, either verbally or written, depending on the needs and requests of the Client.

2.5 <u>Licensing Arrangements for Services Outside California</u>. If Client requests evaluations or testimony outside of California, Expert(s) shall obtain permission from the local state medical licensing authorities and/or psychology licensing board. At times, Client will need to facilitate these arrangements with Expert. In a timely fashion, Expert shall communicate licensing needs, if any, for assistance to Client to ensure that any Evaluation proceeds without unnecessary delay.

2.6 <u>Schedule Availability</u>. Expert shall be reasonably available for phone conferences with Client, as well as to meet and prepare prior to any anticipated or scheduled deposition or trial testimony. Expert further agrees to schedule and be present for depositions and courtroom testimony, as well as any scheduled Evaluation.

3 **CLIENT DUTIES**. Client duties include but are not limited to:

3.1 <u>Consent and Authorization – Fitness For Duty Evaluation ("FFDE")</u>. If an FFDE is requested, Client shall obtain for Expert a properly signed and executed Consent & Authorization to Release Personnel and Medical Information for Fitness-for-Duty Examination & Assessment (attached hereto as **Addendum D**), which gives Expert written permission by Examinee to receive records from Client and treating physicians, as well as gives voluntary consent to the FFDE.

3.2 <u>Consent for Audio and/or Video Recording</u>. If any examination is requested, Client shall obtain a properly signed and executed Consent for Audio and/or Video Recording of Exam (attached hereto as **Addendum C**), which allows the forensic psychiatric Evaluation to be audio and/or video recorded. Unless specifically required or prohibited, fpamed Forensic Psychiatric Experts will determine whether audio and/or video recording is appropriate. This does not apply to any psychological or neuropsychological testing, which may not be video recorded and may only be audio recorded under court order or with a stipulated protective order in place.

3.3  <u>Transmission of Materials for Review</u>. Client shall make available for review and transmit all relevant materials, as well as any materials requested by Expert, including but not limited to: (a) Complaint, Amended Complaint, Indictment, Employment or Disciplinary Record and/or Administrative Claim; (b) prior and current medical, psychiatric, psychological treatment, and counseling records; (c) deposition transcripts of relevant parties (in e-transcript or .txt format, as well as any video, if recorded), (d) other medical, psychiatric or psychological expert reports; (e) employment records; (f) educational records; (g) military records; (h) police files and records, whether local, state, or federal; (i) photographs and drawings; (j) Examinee's journals and writings; (k) photographs, videos, or audio recordings; and (l) materials from other relevant litigation.

3.3.1  <u>Raw Data</u>. In accordance with the ethical guidelines of the American Psychological Association, the Psychologists and Neuropsychologists in fpamed are not able to release raw data testing to attorneys in the discovery process. Client shall arrange for any "raw data" of psychological testing from any and all treating mental health professionals and/or opposing experts to be transmitted to the Expert psychologist or neuropsychologist assigned to the matter. <u>Such data will only be exchanged directly between the treating and/or opposing expert psychologists and fpamed's forensic psychologist.</u>

3.4  <u>Notice of Motions</u>. Client shall promptly notify Expert of any *Daubert* motions, motions in limine, or other pretrial motions made by anyone to restrict, exclude or in any way limit Expert's testimony or participation in any litigation, claim or evaluation matter, for which Expert is retained.

3.5  <u>Notice of Deadlines and Dates</u>. Client shall promptly notify Expert(s) of any deadlines and dates, including but not limited report deadlines, IME or FFDE dates, deposition dates, trial dates, and other relevant deadlines and dates. If and when such deadlines and dates are modified, it is the Client's responsibility to promptly notify Expert(s).

3.6  <u>Licensing Arrangements for Services Outside California</u>. If Client requests evaluations or testimony outside of California, Client shall assist Expert(s) in obtaining permission from the local state medical licensing authorities and/or psychology licensing board. Client agrees to promptly assist if requested by Expert(s) to ensure that any IME or FFDE proceeds without unnecessary delay.

3.7  <u>Schedule Availability</u>. Client shall be reasonably available for phone conferences with Expert, as well as to meet and prepare prior to any anticipated or scheduled deposition or trial testimony.

3.8  <u>Notice of Settlement or Request to Stop Work</u>. Client shall immediately notify Expert of any matter settlement or requests to stop work due to cost, mediation, or other reason. Notification may be in writing via email or verbally via phone call. Client understands that Client is still liable for payment of all work and services performed up to the date and time of notification.

4    **FEES AND PAYMENT OF SERVICES**. Client agrees to pay fpamed for hourly services, expenses, and cancellation fees, at the rates as outlined in **Addendum B**, attached hereto. The rates for fees and expenses may be increased twelve (12) months after retention.

4.1    Invoicing and Payments. Fpamed will invoice Client monthly, or as reasonably necessary, for services rendered, as well as expenses. Per **Addendum B,** paralegal, project management and other staff services will be utilized as necessary. Upon Client request, fpamed will provide more frequent invoicing.

Fpamed will promptly communicate the need for supplemental retainer funds to the Client when the current retainer funds are low, and the expert requires additional funds for their work. Payment is due immediately on these invoices/requests. To ensure uninterrupted work, the retainer funds must always maintain a positive balance. If payment is not made immediately, fpamed reserves the right to have all work paused until payment is received. The Client, not the party the Client represents (i.e. Plaintiff/Petitioner, Defendant/Respondent, or insurance company), is responsible for timely remittance of payment on invoices/requests.

Invoicing on closed matters and/or matters that have settled, should retainer fees be exhausted on invoices, payment on invoices is due within fifteen (15) days of invoice receipt, irrespective of case outcome.

4.1.1    Past Due Invoices. Past due invoices will accrue interest at 1.5% per month, prorated and compounding. Any failure to pay a balance owed will be considered a breach of this contract and may terminate this Agreement.

4.1.1.1    Collections and Attorney Fees & Costs. Any unpaid invoices more than thirty (30) days past due may be referred to collections. Fpamed reserves the right to charge Client any necessary attorney fees and costs to collect any unpaid invoices.

4.1.2    Bookkeeper. fpamed utilizes a Financial Administrator, Lorelei Duckworth. She can be reached via phone at (707) 326 7367 or via email at lduckworth@fpamed.com should Client have questions regarding invoicing or payments.

4.1.3    Payment Options. Payments may be made electronically, by check or e-check, or by credit card. For any question or issue, please contact Lorelei Duckworth at lduckworth@fpamed.com or 707-326-7367 (Pacific Time).

4.1.3.1    Electronic ACH Payment via checking or savings account: Please use the following banking details.

**Bank Name:**    U.S. Bank
**Account Name:**    Forensic Psychiatric Associates L.P.
**TIN:**    85-1168071
**Routing Number:**  122235821
**Account Number:** 158234587745

**Bank address:**     800 Nicollet Mall Minneapolis MN 55402
**Branch Phone:**    800-548-6466

4.1.3.2 <u>Payment by Check</u>: Payments may be made by check, sent to: Forensic Psychiatric Associates, LP, 440 N. Barranca Ave. #1946, Covina, CA 91723.

4.1.3.3 <u>Payment by E-check or Credit Card:</u> Payments may be expedited through Clio at https://app.clio.com/link/v2/2/2/59fcbe1ce54ec7710fc9d35e3062c026?hmac=9b6bfafb5552a1e154c7213a79fd1287036c0f7c56ab029eea7d0d045b939827
A convenience fee of 3% of the paid balance will be added to the total to offset the merchant servicing fee.

4.2  <u>Initial Non-Refundable Retainer Fee; Estimates</u>. Unless Client is a governmental entity specifically precluded from paying retainer fees, prior to any consultative work, Client agrees to remit a non-refundable retainer fee for each expert retained pursuant to **Addendum B**, attached hereto. This initial non-refundable retainer must be received by fpamed in order to be fully retained and begin services. Upon request, fpamed will provide an estimate of fees and costs. Any estimate is only an approximation and is not a firm bid or any cap on fees or costs.

4.3  <u>Retainer Replenishment</u>. With the exception of governmental entities that are specifically precluded from paying retainer fees, fpamed's standard billing practice is to invoice against retainer fee deposits. Upon written request by fpamed to Client, these balances shall be replenished and must maintain a positive balance to prevent any workflow interruptions. Should the retainer balance become completely exhausted, all work will cease. Any balance owed for work done beyond the retainer deposit shall become immediately due and payable. No work on the matter shall resume until the outstanding balance is paid in full and a replenishment of the retainer is received.

4.4  <u>Cessation of Services by Notice of Client</u>. Should Client wish to cease services being rendered by fpamed or its experts Client will immediately notify fpamed in writing. Client will be promptly invoiced for services and expenses incurred through the notification date and time, and any unused refundable retainer funds returned via check mailed to Client.

5  **CONFLICT OF INTEREST**. Fpamed will ensure that there is no conflict of interest with any services contracted between fpamed and Client. Fpamed agrees to not accept any other consultative work from other parties, which would create a conflict of interest with the services being provided under the terms of this Agreement. Should a conflict of interest arise, fpamed is obligated to notify Client immediately. Such notification should be verbal with a written notification to follow.

6  **CONFIDENTIALITY**. Expert(s) agree(s) to keep all case and Examinee information confidential, unless otherwise requested with an appropriate consent to release information, discoverable in the context of the litigation, or mandated by statute or court order.

7  **TERMINATION; UNUSED RETAINER FUNDS**. This Agreement may be terminated for any reason by either party with written notice to the other party, which may be delivered via e-mail, regular mail or in person. The termination is effective upon delivery of written notice. In the event of termination by

either party, a final invoice shall be due to Client within thirty days (30) of delivery of written notice, and payment of final invoice shall be due upon receipt. Should there be unused refundable retainer funds, that amount shall be refunded via check mailed to Client.

8    **BREACH OF CONTRACT/DISPUTES**.

8.1    <u>Mediation & Arbitration.</u> Any disputes, claims or controversies ("Claims") relating to this Agreement, where the amount of the Claim is over $25,000 (exclusive of costs and attorneys' fees) shall be submitted to JAMS, or its successor, for mediation, and if the matter is not resolved through mediation, then it shall be submitted to JAMS, or its successor, for final and binding arbitration as set forth below.

8.2    <u>Request for Mediation.</u> A party may commence mediation by providing to JAMS and the other parties a written request for mediation, setting forth the subject of the dispute and the relief requested.

8.3    <u>Selecting Mediator; Costs.</u> The parties will cooperate with JAMS and with one another in selecting a mediator from the JAMS panel of neutrals and in scheduling the mediation proceedings. The parties will participate in the mediation in good faith and will share equally in its costs.

8.4    <u>Confidentiality.</u> All offers, promises, conduct and statements, whether oral or written, made in the course of the mediation by any of the parties, their agents, employees, experts and attorneys, and by the mediator or any JAMS employees, are confidential, privileged and inadmissible for any purpose, including impeachment, in any arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation.

8.5    <u>Arbitration.</u> A party may initiate arbitration with respect to the matters submitted to mediation by filing a written demand for arbitration at any time following the initial mediation session or at any time following 45 days from the date of filing the written request for mediation, whichever occurs first ("Earliest Initiation Date"). The mediation may continue after the commencement of arbitration if the parties so desire.

8.6    <u>No other proceedings.</u> No party may initiate an arbitration or litigation related to this Agreement prior to the Earliest Initiation Date, except to pursue a provisional remedy that is authorized by law or by JAMS Rules or by agreement of the parties. However, this limitation is inapplicable to a party if the other party refuses to comply with the requirements of **Paragraph 8.3** above.

8.7    <u>Tolling.</u> All applicable statutes of limitation and defenses based upon the passage of time shall be tolled until 15 days after the Earliest Initiation Date. The parties will take such action, if any, required to effectuate such tolling.

8.8    <u>Attorneys' Fees.</u> In the event that a party is required to retain the services of an attorney to enforce the provisions of this Agreement, the prevailing party is entitled to receive
Reasonable attorney's and other experts' fees and costs, including collections costs.

8.9    <u>Limitation of Liability.</u> In no event will a party be liable to the other party or to any third party for any consequential, indirect, incidental or special damages, including lost profits, even if that party

has been advised at any time of the possibility of such damages. fpamed's total liability under any or all provisions of this Agreement shall not exceed the aggregate of the payments actually made to fpamed in the preceding 12 months under this Agreement for the services resulting in the Claim. The foregoing limitation of liability shall not apply to amounts owed under Section 4 or to the extent prohibited by law.

9    **GOVERNING LAW**. The laws of the State of California, County of Marin, shall govern the provisions of this Agreement.

10   **SEVERABILITY**. If any provision in this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions shall continue in full force and effect. The headings to the sections of this Agreement are for reference only and shall not affect its construction or interpretation.

11   **AMENDMENTS**. This Agreement shall be amended only by written agreement signed by both parties.

12   **ENTIRE AGREEMENT**. **This Agreement contains all representations by each party and expresses the entire understanding between the parties with respect to the matters contained herein. The parties agree that there are no terms of conditions other than those set forth herein. No statement or promise of a party shall be binding unless reduced to writing and signed by both parties. Signature below indicates full agreement with the terms and conditions of this Agreement.**

DATED:_____          DATED:_____

**FORENSIC PSYCHIATRIC ASSOCIATES, LP**          **CLIENT**

_____          _____
Mark Levy, MD, DLFAPA                                       (signature)

Managing Partner & Medical Director
Forensic Psychiatric Associates, LP dba fpamed          _____
440 N. Barranca Ave #1946                                    (printed name)
Covina, CA 91723
(415) 388-8040                                                   _____
                                                                      firm/company)

                                                                      _____
                                                                      (address)

                                                                      _____
                                                                      (city, state, zip)

                                                                      _____
                                                                      (phone)

# FORENSIC PSYCHIATRIC ASSOCIATES, LP
## fpamed

### ADDENDUM A – DESCRIPTION OF MATTER
*Updated 5/28/2025*

Client retains the following fpamed Expert(s) for assistance in the legal matter, evaluation, or claim as described below:

1   Expert(s) Retained: Upon mutual agreement between Client and fpamed, and if needed due to availability or the needs of the legal matter, different expert(s) might be added or substituted.

Check all that apply:

**Forensic Psychiatrists**

- ☐  Forensic Psychiatrist **Mark I. Levy**, MD, DLFAPA
- ☐  Forensic Psychiatrist **Charles Saldanha**, MD, DFAPA
- ☐  Forensic Psychiatrist **James Armontrout**, MD (Addiction Medicine)
- ☐  Forensic Psychiatrist **Ayesha Ashai**, MD
- ☐  Forensic Child and Adolescent Psychiatrist **Elissa P. Benedek**, MD, FACP
- ☐  Forensic Psychiatrist **Steven H. Berger**, MD
- ☐  Forensic Psychiatrist **Austin Blum**, MD, JD
- ☐  Forensic Psychiatrist **Nicole Brooks**, MD
- ☐  Forensic Child and Adolescent Psychiatrist **Jorien Campbell**, MD
- ☐  Forensic Child and Adolescent Psychiatrist **Grace Cheney**, MD
- ☐  Forensic Neuropsychiatrist **Octavio Choi**, MD, PhD
- ☐  Forensic Child and Adolescent Psychiatrist **Loretta A. Dumontet**, MD
- ☐  Forensic Psychiatrist **Tyler Durns**, MD
- ☐  Forensic Psychiatrist **Matthew Edwards**, MD
- ☐  Forensic Child and Adolescent Psychiatrist **Paul Elizondo**, DO
- ☐  Forensic Psychiatrist **Ambarin Faizi**, DO
- ☐  Forensic Psychiatrist **Brian Holoyda**, MD, MPH, MBA (Malpractice, Correctional Litigation & Paraphilic Disorders)
- ☐  Forensic Psychiatrist **David Y. Kan**, MD, DFASAM (Addiction Medicine)
- ☐  Forensic Psychiatrist **Cortney A. Kohberger**, MD, PLLC
- ☐  Forensic Neuropsychiatrist **Shafi Lodhi**, MD
- ☐  Forensic Child and Adolescent Psychiatrist **Amanie Mustafa Salem**, DO, MPH
- ☐  Forensic Child and Adolescent Psychiatrist **Sumedha Purkayastha**, MD
- ☐  Forensic Psychiatrist **Joy Stankowski**, MD
- ☐  Forensic Psychiatrist **Takeo Toyoshima**, MD (Addiction Medicine)
- ☐  Forensic Psychiatrist **Ashley VanDercar**, MD, JD

INITIALS: CLIENT_____FPAMED_____

**Forensic Psychologists**

- ❐ Forensic Neuropsychologist **William B. Barr**, PhD, ABPP
- ❐ Forensic Neuropsychologist **Jeremy Blank**, PsyD, QME
- ❐ Forensic Psychologist and Neuropsychologist **John Fabian**, PsyD, JD, ABPP
- ❐ Forensic Neuropsychologist **Howard J. Friedman**, PhD, ABPP
- ❐ Forensic Pediatric Neuropsychologist **Sarah A. Hall**, PhD
- ❐ Forensic Geriatric Neuropsychologist **Nancy Hoffman**, PsyD
- ❐ Forensic Neuropsychologist **Catherine L. Marreiro**, PhD, ABPP-CN, QME
- ❐ Forensic Clinical Psychologist **William McMullen**, PhD, ABPP-CN
- ❐ Forensic Child and Adolescent Psychologist **Amanda Mossman Steiner**, PhD, BCBA-D (Autism)
- ❐ Forensic Neuropsychologist **Christine Naber**, PhD
- ❐ Forensic Clinical Psychologist **Alexis Smith**, PsyD
- ❐ Forensic Child and Adolescent Psychologist **Mary F. Spence**, PhD
- ❐ Forensic Autism Expert **Bryna Siegel**, PhD

2   Client represents the following individual(s) or entity(ies): _____

3   a. If applicable, is a Forensic Psychiatric evaluation requested? _____
    b. Has the Examinee and/or counsel agreed to the Evaluation? _____

4   a. If applicable, Fitness for Duty Evaluation (FFD) requested? _____
    b. Has the Examinee and/or counsel agreed to FFD as of yet? _____

5   a. If applicable, psychological testing requested? _____
    b. Has the Examinee and/or counsel agreed to testing as of yet? _____

6   Lead attorney *or* individual handling matter (name/firm/email/phone):
    Name:
    Firm:
    Email:
    Phone:

7   Other individuals who are contact points on this matter – please specify role:
    Name:                          Name:
    Role:                           Role:
    Email:                        Email:
    Phone:                        Phone:

    Additional Person(s): _____

8   Billing contact and claim number, if any.
    Name:
    Email:
    Phone:

INITIALS: CLIENT_____FPAMED_____

# FORENSIC PSYCHIATRIC ASSOCIATES, LP

## fpamed

### ADDENDUM B – FPAMED RATE SHEET

| Effective January 1, 2025<br>*(Updated 5/28/25) | |
|---|---|
| **Forensic Psychiatrists** | **Hourly Rate** |
| **Mark I. Levy**, MD, DLFAPA | $1,100 |
| **Charles Saldanha**, MD, DFAPA | $1,000 |
| **James Armontrout**, MD (Addiction Medicine) | $900 |
| **Ayesha Ashai,** MD | $800 |
| **Elissa P. Benedek**, MD, FACP (Child & Adolescent) | $850 |
| **Steven H. Berger**, MD | $800 |
| **Austin Blum**, MD, JD | $700 |
| **Nicole Brooks**, MD | $675 |
| **Jorien Campbell**, MD (Child & Adolescent) | $900 |
| **Grace Cheney**, MD (Child & Adolescent) | $750 |
| **Octavio Choi**, MD, PhD (Neuro) | $1,200 |
| **Loretta A. Dumontet**, MD (Child & Adolescent) | $900 |
| **Tyler Durns**, MD | $700 |
| **Matthew Edwards**, MD | $700 |
| **Paul Elizondo**, DO (Child & Adolescent) | $900 |
| **Ambarin Faizi**, DO | $750 |
| **Brian Holoyda**, MD, MPH, MBA (Malpractice, Correctional Litigation & Paraphilic Disorders) | $900 |
| **David Y. Kan**, MD, DFASAM (Addiction Medicine) | $1,000 |
| **Cortney A. Kohberger**, MD, PLLC | $675 |
| **Shafi Lodhi**, MD (Neuro) | $800 |
| **Amanie Mustafa Salem**, DO, MPH (Child & Adolescent) | $675 |
| **Sumedha Purkayastha**, MD (Child & Adolescent) | $700 |
| **Joy Stankowski**, MD | $750 |
| **Takeo Toyoshima**, MD (Addiction Medicine) | $750 |
| **Ashley VanDercar**, MD, JD | $675 |
| **Forensic Psychologists** | **Hourly Rate** |
| **William B. Barr**, PhD, ABPP (Neuro) | $750 |
| **Jeremy Blank**, PsyD, QME (Neuro) | $700 |
| **John Fabian**, PsyD, JD, ABPP (Neuro) | $700 |
| **Howard J. Friedman**, PhD, ABPP (Neuro) | $800 |
| **Sarah A. Hall**, PhD (Pediatric Neuro) | $725 |
| **Nancy Hoffman**, PsyD (Geriatric Neuro) | $675 |
| **Catherine L. Marreiro**, PhD, ABPP-CN, QME (Neuro) | $675 |
| **William McMullen**, PhD, ABPP-CN (Clinical) | $700 |
| **Amanda Mossman Steiner**, PhD, BCBA-D (Child & Adolescent) & (Autism) | $675 |
| **Christine Naber**, PhD (Neuro) | $750 |
| **Alexis Smith**, PsyD (Clinical) | $750 |
| **Mary F. Spence**, PhD (Child & Adolescent) | $650 |
| **Other** | **Hourly Rate** |

INITIALS: CLIENT_____FPAMED_____

| **Bryna Siegel**, PhD (Autism Expert) | $700 |
|---|---|
| **Retainer, Deposition and Testimony** | |
| Initial Retainer Funds | Hourly rate x10 (unless otherwise estimated by fpamed) |
| Local deposition & trial testimony | Hourly rate for door-to-door time away from expert's office |
| Out-of-town deposition & trial testimony | Hourly rate for door-to-door time away from expert's office |
| **Expenses** | |
| Travel Time Rate - portal to portal, per hour | Hourly Rate for door-to-door time away from expert's office |
| Travel Expenses – lodging, mileage, airfare, meals, etc. | Actual Expenses Incurred |
| **Cancellation and other fees** | |
| Trial testimony - Late cancellation fee will be charged if canceled on the 5th business day prior, and up to the scheduled testimony date | Hourly Rate x10 |
| Deposition, Examinee Testing and/or Evaluation - Late cancellation fee will be charged if canceled on the 5th business day prior, and up to the scheduled deposition, testing or evaluation date including "no shows" | Hourly Rate x5 |
| Paralegal and Other Staff Assistance – Hourly Fee | Up to $250 hourly |
| Project Management – Hourly Fee | $400 hourly |
| Rushed Deadlines | *Rushed deadlines may incur an agreed expert rate surcharge of $300 per hour in addition to the expert's hourly rate detailed above. A larger retainer may be required upon mutual agreement, any unused portion of which will be refunded.* |

**Expenses**. Mileage will be billed at the current IRS rate per mile. All other expenses will be billed at actual cost. Expenses include but are not limited to: Postage and delivery fees, copy costs, facsimile costs, parking fees and tolls, business class airfare, ground transportation and car rentals, hotel accommodations, and meals.

▪ <u>Airfare</u>. Expert will purchase Business Class airfare, or First-Class airfare if Business Class is not available. All airfare purchased will be refundable fares unless Expert is instructed otherwise by

INITIALS: CLIENT_____FPAMED_____

Client prior to purchase.

**Rushed Deadlines.** Defined by the volume of work that is presented and expected of an expert where there is a sense of urgency and causes the expert to have to adjust their schedules to meet the deadline. While this can vary by expert, the expert will notify client if what is being requested of them falls into the "rushed deadlines" category.

**Deposition Testimony Fees.** <u>No later than five (5) business days *prior* to any scheduled deposition, the amount of time, in hours, that the opposing counsel wants the expert(s) to set aside for the deposition must be communicated to Expert and fpamed.</u> Fpamed will issue an invoice for this time and send it to Client, to forward to opposing counsel.

- ▪ Payment for the time set aside, at the Expert's hourly rate, must be received by fpamed at least five (5) business days prior to the start of the deposition, in order for the deposition to proceed as scheduled. If payment is not received five (5) business days prior to the scheduled deposition, fpamed will charge against existing retainer funds in order to allow deposition to proceed. In the absence of sufficient retainer funds, fpamed reserves the right to cancel the scheduled deposition. Fpamed will promptly credit Client for any payment received by opposing counsel.
- ▪ Following the deposition, any additional deposition time will be charged to Client at the expert's hourly rate, and payable to fpamed. A second invoice can be issued upon request, and fpamed will promptly credit Client for any payment received by opposing counsel.
- ▪ Client is responsible for arranging the prompt payment of all deposition time to fpamed.
- ▪ Client is responsible for communicating all details of the deposition arrangements to Expert.
- ▪ Client is also responsible for all other costs related to the deposition, including door-to-door time away from the Expert's office, all other travel expenses and will be financially responsible in the event that opposing counsel does NOT pay for Expert's travel time.

**Cancellations & Cancellation Fees.** Proper notice shall be given of any cancellation of trial or deposition testimony. The Day Rates above will be charged for cancellations within the stated time frames.

- ▪ <u>Trial Testimony Cancellation</u>. To avoid charges for canceling trial testimony, notice of cancellation **must** be received by fpamed and Expert(s) at least five (5) business days *prior* to the scheduled testimony. <u>If</u> notice of cancellation is received fewer than 5 business days prior to any scheduled testimony, the Client agrees to pay the Expert(s)' hourly fee x10.

- ▪ <u>Deposition Cancellation</u>. To avoid charges for canceling deposition testimony, notice of cancellation **must** be provided at least five (5) business days *prior* to the scheduled deposition date. <u>If</u> notice of cancellation is received fewer than 5 business days prior to any scheduled deposition date, the Client agrees to pay the Expert(s)' hourly fee x5.

- ▪ <u>Examinee Testing, Evaluation Cancellation & No Shows</u>. To avoid charges for canceling an Examinee Testing or Evaluation, notice of cancellation **must** be provided at least (five) 5 business days *prior* to the testing or evaluation date. <u>If</u> notice of cancellation is received fewer than 5 business days prior to scheduled appointment, including any "no show," the Client agrees to pay the Expert(s)' hourly fee x5.

INITIALS: CLIENT_____FPAMED_____

# FORENSIC PSYCHIATRIC ASSOCIATES, LP

## fpamed

### ADDENDUM C

## CONSENT FOR AUDIO AND/OR VIDEO RECORDING OF EVALUATION

1   In connection with an examination being conducted by Forensic Psychiatric Associates Medical Corporation ("fpamed") and its professional examiners, I, _____ ("Examinee"), hereby give my consent and authorization to have said examination audio and/or video recorded by fpamed and its examiners.

2   This recording shall be treated confidentially, as any other medical record; and shall only be disclosed or re-disclosed pursuant to applicable law or release.

3   This authorization will expire twelve (12) months from the date of its execution by me.

4   A photocopy or facsimile copy of this authorization may be accepted and shall be fully binding as though it were the original.

**DATED** this_____day of_____,_____.


_____
Examinee Signature


_____
Examinee Printed Name


## IF EXAMINEE IS A MINOR OR INCAPACITATED:

I authorize the audio and/or video recording of_____in connection with an examination conducted by Forensic Psychiatric Associates Medical Corporation and its professional examiners pursuant to the provisions above.

**DATED** this_____day of_____, _____.


_____
Parent/Guardian Signature


_____
Parent/Guardian Printed Name

# FORENSIC PSYCHIATRIC ASSOCIATES, LP

## fpamed

**ADDENDUM D**

## CONSENT & AUTHORIZATION

### TO RELEASE PERSONNEL AND MEDICAL INFORMATION
### FOR FITNESS-FOR-DUTY EXAMINATION & ASSESSMENT
### (FFD)

1   In connection with a fitness-for-duty examination and assessment ("FFD"), I hereby authorize my Employer, _____ ("Employer"), as well as my healthcare providers ("Providers"), including but not limited to my non-physician treaters (e.g. social workers, psychologists, chiropractors, dentists, etc.), to release to the professional staff of Forensic Psychiatric Associates, LP ("fpamed") and its examiners, any relevant personnel and medical information for review in order to examine and assess my fitness for duty:

    1.1   Relevant personnel records supporting the request for a FFD examination and assessment;

    1.2   A description of my essential job functions; and

    1.3   Relevant medical and psychiatric information, specific to this FFD and the medical and/or psychological condition at issue, which may include the following: consultation records; physical and occupational therapy records; discharge summaries; radiological images and reports; photographs, reports and studies; letters; charts; psychiatric and psychological records and testing information; counseling records; alcohol and substance abuse records; emergency reports; laboratory reports; outpatient records; pathology records; providers' notes; physical condition records; history or treatment records; progress notes; optometry records; and dental records.

2   I understand that this consent and authorization includes the release of any psychiatric and alcohol and drug abuse records, which are protected by virtue of the provisions of federal regulations, 42 CFR – Part 2. I consent and authorize the release of these records and state that the following notice shall accompany all disclosures of any alcohol and drug abuse records made pursuant to this authorization:

    This information has been disclosed to you from records whose confidentiality is protected by federal law. Federal regulations (42 CFR – Part 2) prohibits you from making any further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose.

3   I understand that other than the individual specified in Section 4.1, all information is confidential, except under the following conditions: (a) any information regarding suspected child or elderly abuse, or (b) imminent risk or dangerousness to self and/or others. No medical documentation or records received by fpamed or its examiners from my Providers will be re-disclosed to my Employer.

4   I understand that findings will include conclusions as to fitness for duty and why. I understand that my Employer may act upon these findings with a range of administrative actions; however, I do understand that any fpamed examiner does not make personnel decisions and is merely an advisor to my Employer. Results are confidential and will not be revealed by any fpamed examiner to any other person or entity, except the individual specified below.

4.1 Please release the results of this examination to the following individual, who is a representative of my employer:

    4.1.1  Name:_____Title:_____

    4.1.2  Company Name:_____

    4.1.3  Address:_____

    4.1.4  Phone:_____Email:_____

5    I understand that I may refuse to participate, or to answer specific questions relating to my fitness for duty. That fact will, however, be reported to the individual specified in 4.1. Furthermore, I understand that honesty is a requirement of this examination and assessment, and any evidence of dishonesty, omissions or misrepresentations in any test, survey, or interview will be noted and reported.

6    I understand that it is a violation of my rights under the Genetic Information Nondiscrimination Act (GINA) to answer any questions regarding my family medical history during any employment–related medical exam, such as a FFD; and therefore, I can refuse to answer any such questions without reprisal.

7    I further agree to hold fpamed and its examiners harmless from any liability or action that may be taken by my Employer as a result of this evaluation. In agreeing to this, I acknowledge that fpamed and its examiners do not make personnel decisions, and that is the responsibility of my Employer. I understand that signing this document does not affect my right to pursue any available administrative remedy against my Employer, as permitted by law.

8    I agree that the records and results from this examination and assessment belong to fpamed and my Employer. I am not entitled to records from this evaluation or an explanation of the results pursuant to the American Psychological Association Ethics Code, Section 9.10, as well as principles of copyright, trade secrets and test security. However, I acknowledge that I have the right to request these records, or issue a subpoena for them, as part of any hearing, disciplinary proceeding or appeal of same resulting from this examination and assessment. In any such instance, I understand that I must provide a HIPAA compliant release and protective order to fpamed and its examiners to reproduce same.

9    No additions, deletions or changes may be made to this document without the written agreement of fpamed, its examiners, and my Employer.

10    I understand that I have the right to have this document reviewed by an attorney prior to signing. I acknowledge that no threat, reward, promise, coercion or any other undue influence has been used by my Employer or fpamed or its examiners to obtain my cooperation in this examination and assessment or for the execution of this document.

11    I understand that this consent and authorization is voluntary, and I may revoke this authorization at any time by requesting such in writing, unless action has already been taken in reliance upon it, or during a contestability period under applicable law. Additionally, I understand that by signing this document, I will not be denied health care or health plan coverage.

12    This authorization will expire six (6) months from the date of its execution by me.

13    A photocopy or facsimile copy of this authorization may be accepted and shall be fully binding as though it were the original.

14  I certify that I understand the purpose and use of this examination and assessment, and I agree to participate. My signature acknowledges that I have received a copy of this document for my records.

   **DATED** this_____day of_____, 20_____.


        _____
        Examinee Signature


        _____
        Print Name

Form **W-9**
(Rev. March 2024)
Department of the Treasury
Internal Revenue Service

## Request for Taxpayer
## Identification Number and Certification

Go to *www.irs.gov/FormW9* for instructions and the latest information.

Give form to the
requester. Do not
send to the IRS.

**Before you begin.** For guidance related to the purpose of Form W-9, see *Purpose of Form*, below.

1 Name of entity/individual. An entry is required. (For a sole proprietor or disregarded entity, enter the owner's name on line 1, and enter the business/disregarded entity's name on line 2.)

Forensic Psychiatric Associates LP

2 Business name/disregarded entity name, if different from above.

3a Check the appropriate box for federal tax classification of the entity/individual whose name is entered on line 1. Check only **one** of the following seven boxes.

☐ Individual/sole proprietor    ☐ C corporation    ☒ S corporation    ☐ Partnership    ☐ Trust/estate

☐ LLC. Enter the tax classification (C = C corporation, S = S corporation, P = Partnership) _____

**Note:** Check the "LLC" box above and, in the entry space, enter the appropriate code (C, S, or P) for the tax classification of the LLC, unless it is a disregarded entity. A disregarded entity should instead check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) _____

3b If on line 3a you checked "Partnership" or "Trust/estate," or checked "LLC" and entered "P" as its tax classification, and you are providing this form to a partnership, trust, or estate in which you have an ownership interest, check this box if you have any foreign partners, owners, or beneficiaries. See instructions . . . . . . . . . . ☐

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from Foreign Account Tax Compliance Act (FATCA) reporting code (if any) _____

*(Applies to accounts maintained outside the United States.)*

5 Address (number, street, and apt. or suite no.). See instructions.

440 N. Barranca Avenue # 1946

6 City, state, and ZIP code

Covina, CA 91723

7 List account number(s) here (optional)

Requester's name and address (optional)

See *Specific Instructions* on page 3.    Print or type.

## Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note:** If the account is in more than one name, see the instructions for line 1. See also *What Name and Number To Give the Requester* for guidelines on whose number to enter.

Social security number

| | | | – | | | – | | | | |

**or**

Employer identification number

| 8 | 5 | – | 1 | 1 | 6 | 8 | 0 | 7 | 1 |

## Part II    Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and, generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

Sign
Here

Signature of
U.S. person    *Lorelei Duckworth*

Date    01.01.2025

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## What's New

Line 3a has been modified to clarify how a disregarded entity completes this line. An LLC that is a disregarded entity should check the appropriate box for the tax classification of its owner. Otherwise, it should check the "LLC" box and enter its appropriate tax classification.

New line 3b has been added to this form. A flow-through entity is required to complete this line to indicate that it has direct or indirect foreign partners, owners, or beneficiaries when it provides the Form W-9 to another flow-through entity in which it has an ownership interest. This change is intended to provide a flow-through entity with information regarding the status of its indirect foreign partners, owners, or beneficiaries, so that it can satisfy any applicable reporting requirements. For example, a partnership that has any indirect foreign partners may be required to complete Schedules K-2 and K-3. See the Partnership Instructions for Schedules K-2 and K-3 (Form 1065).

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS is giving you this form because they

Form **W-9** (Rev. 3-2024)